# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                             Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

## NORTHWESTERN MUTUAL'S BRIEF IN OPPOSITION TO

## PLAINTIFFS' MOTION FOR AN ORDER REDEFINING THE CLASS AND FOR

## RELATED RELIEF

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iv

INTRODUCTION .............................................................................................................1

FACTUAL BACKGROUND...............................................................................................3

I.      Plaintiffs Structured This Case as a Statewide Declaratory Class to Avoid *Noonan* ..................3

II.     The Seventh Circuit Held That Multiple States' Law Applies............................................6

III.    Plaintiffs' Now-Proposed Class Includes Members with Different Types of Policies and Who Are Differently-Situated for Purposes of Class Certification .................................6

        A.      Putative Class Members..............................................................................6

        B.      Types of Annuities at Issue .........................................................................8

        C.      Plaintiffs' Proposed Class Representatives ...................................................9

ARGUMENT....................................................................................................................9

I.      Legal Standards......................................................................................................9

II.     Plaintiffs Have Not Satisfied Rule 23(a) .................................................................10

        A.      Plaintiffs Have Not Shown Commonality of Questions of Law or Fact....................10

                1.      Multiple states' law would apply .......................................................10

                        a.      The Seventh Circuit found multiple states' law would apply.............10

                        b.      The Seventh Circuit was correct that many states require application of their law to insurance policies of their citizens ..............................12

                        c.      The Wisconsin Legislature made clear it has no interest in applying its law to policies issued to residents of other states ................................13

                        d.      Wisconsin's choice-of-law framework requires application of non-Wisconsin law to many proposed class member claims ....................14

                                i.      Wisconsin applies the law of the state where the insured was domiciled when the insured applied for the policy................14

                                ii.     The *Heath* factors favor application of non-Wisconsin law for claims of non-Wisconsin residents............................................14

                2.      Class members do not share a common injury ..................................16

i

B.    Plaintiffs Have Not Carried Their Burden to Show Typicality and Adequacy ..........18

    1.    The proposed class representatives' claims are subject to individual defenses ....................................................................................................18

        a.    LaPlant ..............................................................................................19

        b.    Williams ............................................................................................21

    2.    There is a conflict of interest between putative class members ......................23

III.    Plaintiffs Have Not Satisfied Rule 23(b)(3)'s Requirements for a Damages Class.................24

A.    A Substantial Percentage of Putative Class Members Suffered No Financial Harm, and in Many Cases Benefited from the 1985 Change ........................................24

B.    Individualized Damages Issues Would Predominate ........................................................25

    1.    Hoyer does not even attempt to calculate damages on a classwide basis for many of plaintiffs' claims or theories of liability .........................25

    2.    Even as to the claim and damages theory Hoyer focuses on, Hoyer's model is flawed and requires individualized determinations ...........................29

        a.    Hoyer's proposed model ..................................................................29

        b.    Mr. Hoyer's model fails to account for certain aspects of damages ..30

        c.    Mr. Hoyer's model fails to account for the individualized investment decisions that the policyholders would have made .............................31

        d.    Mr. Hoyer's analysis misstates damages by failing to consider when policy-related transactions actually occurred ........................................32

        e.    Mr. Hoyer's model does not account for pre-MN policyholders who agreed to Update '83 after 1985 ............................................................32

C.    Punitive Damages Cannot Be Calculated on a Classwide Basis ....................................33

    1.    Diverse punitive damages state standards defeat predominance....................33

    2.    The need for individual factual determinations defeats predominance ..........35

D.    Individualized Issues Regarding Affirmative Defenses Would Predominate.............36

E.    Class Treatment Is Not a Superior Method of Resolution ............................................39

    1.    Individualized issues would render the class unmanageable ...........................39

<table>
<tr><td></td><td>2.</td><td>Notice difficulties would render proposed class-wide trials unmanageable</td><td>40</td></tr>
</table>

        2.      Notice difficulties would render proposed class-wide trials unmanageable ........................................................................................... 40

        3.      Plaintiffs cannot carry their burden of showing superiority because their claims can be pursued individually ............................................... 41

IV.    Plaintiffs Have Not Satisfied Rule 23(b)(2)'s Requirements for an Injunctive or Declaratory Judgment Class ................................................................................................. 42

    A.    Putative Class Members Are Not Cohesive...................................................... 43

    B.    Injunctive Relief Is Improper Because It Is Not Final ................................... 43

    C.    Remedies Sought Are Individualized and Do Not Flow to the Class as a Group ..... 44

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998)................................................................................................45

*Am. Driver Service, Inc. v. Truck Ins. Exch.*,
  631 N.W.2d 140 (Neb. Ct. App. 2001) .............................................................................12

*Am. Express Co. v. Italian Colors Rest.*,
  No. 12-133, 2013 WL 3064410 (U.S. June 20, 2013) ................................................. 9, 41

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................... 18, 24

*Andrews v. Chevy Chase Bank*,
  545 F.3d 570 (7th Cir. 2008)...................................................................................... 25, 42

*Beck v. Farmers Ins. Exch.*,
  701 P.2d 795 (Utah 1985) ..................................................................................................13

*Bell v. City of Milwaukee*,
  514 F. Supp. 1363 (E.D. Wis. 1981) .................................................................................39

*Bernhard v. Farmers Ins. Exch.*,
  915 P.2d 1285 (Colo. 1996) ...............................................................................................13

*Bieneman v. City of Chicago*,
  864 F.2d 463 (7th Cir. 1988)..............................................................................................16

*BMW of N. Am. v. Gore*,
  517 U.S. 559 (1996) .................................................................................................... 35, 36

*Boelk v. AT&T Teleholdings, Inc.*,
  No. 12-CV-40-BBC, 2013 WL 261265  (W.D. Wis. Jan. 10, 2013) ..................................44

*Bowers v. Jefferson Pilot Fin. Ins. Co.*,
  219 F.R.D. 578 (E.D. Mich. 2004).....................................................................................11

*Brae Asset Fund, L.P. v. Adam*,
  661 A.2d 1137 (Me. 1995)..................................................................................................13

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)..............................................................................................................1

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ................................................................................................40

iv

*CE Design Ltd. v. King Architectural Metals, Inc.*,
    637 F.3d 721 (7th Cir. 2011) ........................................................................................19

*Chilton Water Auth. v. Shell Oil Co.*,
    No. CIV.A. 98-T-1452-N, 1999 WL 1628000 (M.D. Ala. May 21, 1999) ........................35

*Cole v. General Motors Corp.*,
    484 F.3d 717 (5th Cir 2007) .........................................................................................11

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013)..........................................................................................1, 24, 25, 26

*Corrado Bros., Inc. v. Twin City Fire Ins. Co.*,
    562 A.2d 1188 (Del. 1989) ...........................................................................................12

*Craggett v. Adell Ins. Agency*,
    635 N.E.2d 1326 (Ohio Ct. App. 1993).........................................................................12

*Crosse v. BCBSD, Inc.*,
    836 A.2d 492 (Del. 2003) .............................................................................................12

*Crossley v. Allstate Ins. Co.*,
    400 N.W.2d 625 (Mich. 1986) .....................................................................................12

*Cunningham Charter Corp. v. Learjet, Inc.*,
    258 F.R.D. 320 (S.D. Ill. 2009).....................................................................................10

*Dailey v. N. Coast Life Ins. Co.*,
    919 P.2d 589 (Wash. 1996) ..........................................................................................34

*Distinctive Printing & Packaging Co. v. Cox*,
    443 N.W.2d 566 (Neb. 1989) .......................................................................................34

*Doll v. Chicago Title Ins. Co.*,
    246 F.R.D. 683 (D. Kan. 2007) ....................................................................................35

*Drinkwater v. Am. Family Mut. Ins. Co.*,
    714 N.W.2d 642 (Wis. 2006) .......................................................................... 11, 14, 15, 16

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974).....................................................................................................41

*Espenscheid v. DirectSat USA, LLC*,
    705 F.3d 770 (7th Cir. 2013) ........................................................................................25

*Feinstein v. Firestone Tire & Rubber Co.*,
    535 F. Supp. 595 (S.D.N.Y. 1982) ...............................................................................41

*Fidelity & Cas. Co. of N.Y. v. Metro. Life Ins. Co.*,
248 N.Y.S.2d 559 (N.Y. Sup. Ct. 1963) ...........................................................................12

*Foster v. St. Jude Med., Inc.*,
229 F.R.D. 599 (D. Minn. 2005) .........................................................................................41

*Garvey v. Nat'l Grange Mut. Ins. Co.*,
No. CIV.A.95-0019, 1995 WL 115416 (E.D. Pa. Mar. 16, 1995) ..................................13

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ................................................................................................................1

*Gorman v. Se. Fidelity Ins. Co.*,
621 F. Supp. 33 (S.D. Miss. 1985).....................................................................................12

*Greenberg v. Life Ins. Co. of Va.*,
177 F.3d 507 (6th Cir. 1999) ...............................................................................................12

*Haley v. Medtronic, Inc.*,
169 F.R.D. 643 (C.D. Cal. 1996) ........................................................................................35

*Hardin v. Harshbarger*,
814 F. Supp. 703 (N.D. Ill. 1993)........................................................................................21

*Hardy v. City Optical Inc.*,
39 F.3d 765 (7th Cir. 1994) .................................................................................................40

*Harlach v. Metro. Prop. & Liab. Ins. Co.*,
602 A.2d 1007 (Conn. 1992) ...............................................................................................12

*Heath v. Zellmer*,
151 N.W.2d 664 (Wis. 1967) .........................................................................................14, 15

*Hejsak v. Great-West Life & Annuity Ins. Co.*,
331 F. Supp. 2d 756 (W.D. Wis. 2004) .............................................................................14

*Hennig v. Ahearn*,
601 N.W.2d 14 (Wis. Ct. App. 1999) ...............................................................................34

*Heretick v. Northwestern Mut. Life Ins. Co.*,
No. 02-1061-CI-11, 2003 WL 25694174 (Fla. Cir. Ct. June 23, 2003) .........................12

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) .........................................................................................18, 40

*In re Baycol Prods. Litig.*,
218 F.R.D. 197 (D. Minn. 2003); .................................................................................35, 36

vi

*In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*,
Nos. C-05-04726 RMW, C-06-00537 RMW, 2007 WL 486367 (N.D. Cal Feb. 12, 2007) ..............13

*In re Copley Pharm., Inc.*,
161 F.R.D. 456 (D. Wyo. 1995), *aff'd.*, 232 F.3d 900, (10th Cir. 2000) ...............................................36

*In re Ford Motor Co.*,
182 F.R.D. 214 (E.D. La. 1998) ................................................................................................... 40, 41

*In re Matter of Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ...........................................................................................................10

*In re Metro. Life Derivative Litig.*,
935 F. Supp. 286 (S.D.N.Y. 1996) ....................................................................................................12

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
975 F. Supp. 584 (D.N.J. 1996) .........................................................................................................12

*In re Telectronics Pacing Sys., Inc.*,
172 F.R.D. 271 (S.D. Ohio 1997) ............................................................................................... 35, 36

*In re Tri-State Crematory Litig.*,
215 F.R.D. 660 (N.D. Ga. 2003) .......................................................................................................35

*Jamie S. v. Milwaukee Public Sch.*,
668 F.3d 481 (7th Cir. 2012) .............................................................................................................44

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
702 F.3d 364 (7th Cir. 2012) ...................................................................................................... 38, 45

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
634 F.3d 883 (7th Cir. 2011) ....................................................................................................passim

*Kaser v. Swann*,
141 F.R.D. 337 (M.D. Fla. 1991) ......................................................................................................12

*Kindschuh v. City of Fond du Lac*,
No. 09-C-213, 2010 WL 1507883 (E.D. Wis. Apr. 14, 2010)...........................................................39

*Knight & Bostwick v. Moore*,
234 N.W. 902 (Wis. 1931) .................................................................................................................21

*Kohen v. Pac. Inv. Mgmt Co.*,
571 F.3d 672 (7th Cir. 2009) .............................................................................................................24

*Koos v. First Nat'l Bank of Peoria*,
496 F.2d 1162 (7th Cir. 1974)...........................................................................................................19

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 8 of 59   Document 38

*LaFavor v. Am. Nat'l Ins. Co.,*
    155 N.W.2d 286 (Minn. 1967)........................................................................................13

*Langston v. Bigelow,*
    820 So.2d 752 (Miss. Ct. App. 2002)............................................................................12

*LaPlant v. Northwestern Mut. Life Ins. Co.,*
    701 F.3d 1137 (7th Cir. 2012)................................................................................passim

*Lauzon v. State Farm Mut. Auto. Ins. Co.,*
    674 A.2d 1246 (Vt. 1995)..............................................................................................13

*Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO,*
    216 F.3d 577 (7th Cir. 2000).........................................................................................43

*Mack v. Gen. Motors Acceptance Corp.,*
    169 F.R.D. 671 (M.D. Ala. 1996)..................................................................................35

*Maine Farms Venison, Inc. v. Peerless Ins. Co.,*
    No. CV-01-005, 2002 WL 33946004 (Me. Sup. Ct. Apr. 18, 2002)..............................13

*Martin v. State Farm Mut. Auto. Ins. Co.,*
    808 N.E.2d 47 (Ill. App. Ct. 2004) ...............................................................................12

*McCauley v. Suls,*
    716 A.2d 1129 (Md. Ct. Spec. App. 1998)....................................................................13

*McLachlan v. N. Y. Life Ins. Co.,*
    488 F.3d 624 (5th Cir. 2007).........................................................................................12

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012).........................................................................................24

*Nagel v. ADM Investor Servs., Inc.,*
    217 F.3d 436 (7th Cir. 2000).........................................................................................42

*Nash v. Ohio Nat'l Life Ins. Co.,*
    597 S.E.2d 512 (Ga. 2004) ............................................................................................12

*Noonan v. Northwestern Mut. Ins. Co.,*
    726 N.W.2d 356 (Wis. Ct. App. 2006) (*Noonan II*)................................................passim

*Pavlova v. Mint Mgmt. Corp.,*
    868 A.2d 322 (N.J. Super. Ct. App. Div. 2005) ............................................................33

*Pool v. Farm Bureau Town & Country Ins. Co.,*
    311 S.W.3d 895 (Mo. Ct. App. 2010) ...........................................................................13

*RBS Citizens, N.A. v. Ross,*
133 S. Ct. 1722 (2013)..........................................................................26

*Ross v. RBS Citizens, N.A.,*
667 F.3d 900 (7th Cir. 2012).................................................................26

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,*
601 F.3d 1159 (11th Cir. 2010)........................................................11, 36

*Safeco Ins. Co. of Am. v. Butler,*
823 P.2d 499 (Wash. 1992)...................................................................12

*Santana v. Registrars of Voters of Worcester,*
502 N.E.2d 132 (Mass. 1986)................................................................34

*Sears, Roebuck & Co. v. Am. Mut. Liab. Ins. Co.,*
372 F.2d 435 (7th Cir. 1967).................................................................43

*Sec'y of Labor v. Fitzsimmons,*
805 F.2d 682 (7th Cir. 1986).................................................................23

*Shin v. Sunriver Preparatory Sch., Inc.,*
111 P.3d 762 (Or. Ct. App. 2005)..........................................................13

*Siegel v. Shell Oil Co.,*
256 F.R.D. 580 (N.D. Ill. 2008)............................................................10

*Simer v. Rios,*
661 F.2d 655 (7th Cir. 1981).................................................................40

*Solberg v. Metro. Life Ins. Co.,*
185 N.W.2d 319 (Wis. 1971).................................................................14

*Spencer v. Aetna Life & Cas. Ins. Co.,*
611 P.2d 149 (Kan. 1980).....................................................................13

*St. Clare Hosp. of Monroe, Wis. v. Schmidt, Garden, Erickson, Inc.,*
437 N.W.2d 228 (Wis. Ct. App. 1989)...................................................20

*St. Paul Fire & Marine Ins. Co. v. A.P.I., Inc.,*
738 N.W.2d 401 (Minn. App. 2007).......................................................13

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
538 U.S. 408 (2003).............................................................................36

*State Farm Mut. Auto. Ins. Co. v. Floyd,*
366 S.E.2d 93 (Va. 1988).....................................................................12

*State of Ala. v. Blue Bird Body Co., Inc.,*
  573 F.2d 309 (5th Cir. 1978) ...................................................................................41

*Szabo v. Bridgeport Machs., Inc.,*
  249 F.3d 672 (7th Cir. 2001) ...............................................................16, 24, 42

*Szymanski v. Boston Mut. Life Ins. Co.,*
  778 N.E.2d 16 (Mass. App. Ct. 2002) ..................................................................13

*Thao v. Midland Nat'l Life Ins. Co.,*
  No. 09-C-1158, 2012 WL 1900114 (E.D. Wis. May 24, 2012) ...........................1, 16, 17, 24

*Thompson v. Jiffy Lube Int'l, Inc.,*
  250 F.R.D. 607 (D. Kan. 2008) ............................................................................34

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011) ...............................................................................passim

*Wayne Duddlesten, Inc. v. Highland Ins. Co.,*
  110 S.W.3d 85 (Tex. Ct. App. 2003) ....................................................................12

*Wilson v. State Farm Mut. Auto. Ins. Co.,*
  795 F.Supp. 1077 (D. Wyo. 1992) .......................................................................13

*Woodard v. Fid. Nat'l Title Ins. Co.,*
  No. CIV 06-1170 RB/WDS, 2008 WL 5737364 (D. N.M. Dec. 8, 2008) .........................34

**STATUTES**

28 U.S.C. § 2202 ....................................................................................................33

Ala. Code § 6-11-21 ................................................................................................34

Colo. Rev. Stat. Ann. § 13-21-102 ......................................................................33, 34

Colo. Rev. Stat. Ann. § 13-25-127 ...........................................................................34

Conn. Gen. Stat. Ann. § 52-240b .............................................................................34

Fla. Stat. Ann. § 768.72 ..........................................................................................33

Fla. Stat. Ann. § 768.73 ..........................................................................................34

Idaho Code Ann. § 6-1604 .......................................................................................34

Iowa Code Ann. § 668A.1 ........................................................................................34

Kan. Stat. Ann. § 60-3701 .......................................................................................34

Minn. Stat. Ann. § 549.20 .......................................................................................34

Miss. Code. Ann. § 11-1-65 ............................................................................................33, 34, 35

N.C. Gen. Stat. Ann. § 1D-15 ................................................................................................33

N.C. Gen. Stat. Ann. § 1D-35 ................................................................................................36

N.C. Gen. Stat. Ann. § 1D-5 ..................................................................................................33

N.D. Cent. Code Ann. § 32-03.2-11 ......................................................................................35

N.H. Rev. Stat. Ann. § 507:16 ...............................................................................................34

Nev. Stat. § 42.005 .................................................................................................................34

Or. Rev. Stat. § 31.730(3) ......................................................................................................33

Tex. Civ. Prac. & Rem. Code Ann. § 41.003 ........................................................................33

Wis. Stat. § 632.62 ...................................................................................................................3

Wis. Stat. Ann. § 631.01 ..........................................................................................13, 14, 15

Wis. Stat. Ann. § 893.57 ........................................................................................................21

Wis. Stat. Ann. § 895.043 .................................................................................................33, 34

**RULES**

Fed. R. Civ. P. 23 .............................................................................................................passim

**OTHER**

5 James Wm. Moore et al., Moore's Federal Practice - Civil § 23.46 .....................................41

ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues (2d ed.
    2010).................................................................................................................................25

Wis. JI-Civil 1707.1 ...............................................................................................................35

# INTRODUCTION

Plaintiffs, who brought this case as a putative *injunction-only* statewide class after having their requests for damages classes twice rejected by Wisconsin courts, ask this Court to certify a nationwide damages class on behalf of just over half of the people who bought annuities from Northwestern Mutual ("NM") sales agents twenty-eight or more years ago. As a fallback, even though the original named plaintiff no longer owns the annuity at issue and even though they concede what they really want is money, plaintiffs seek an injunction class.

A class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). A class may be certified only "if the trial court is satisfied, after a rigorous analysis," that the requirements of Rule 23 have been met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Plaintiffs cannot show there are common issues of law or fact, much less that common issues would predominate as required for a damages class. In its decision affirming removal was appropriate, the Seventh Circuit held that multiple states' law would apply, and did not limit that holding to policies with an explicit choice-of-law clause, observing that "[m]any states require insurance policies to be governed by the law of the state in which the insured lives . . . ." *LaPlant v. Northwestern Mut. Life Ins. Co.*, 701 F.3d 1137, 1140 (7th Cir. 2012). And many putative class members either were not injured or actually benefited from the alleged misconduct. As this Court has previously held, where a substantial percentage of putative class members do not share a common injury, certification is inappropriate. *Thao v. Midland Nat'l Life Ins. Co.*, No. 09-C-1158, 2012 WL 1900114, at *10 (E.D. Wis. May 24, 2012) (R-App. 670).[1]

Individualized questions of compensatory damages, affirmative defenses and punitive

---

[1] The materials cited herein, including unpublished cases, are included in the accompanying appendix and cited as "R-App.".

1

damages, not to mention application of different states' law, would also overwhelm whatever common issues do exist and render any class trial unmanageable. For example, plaintiffs' expert Robert Hoyer purports to provide a methodology for determining compensatory damages on a classwide basis, but makes no effort to account for how different putative class members would have acted in a but-for world where NM disclosed and sought consent for the 1985 Change as plaintiffs' contend NM should have done. (R-App. 15, Hoyer 5/17/13 Dep. 59:3-25.) Hoyer also makes no effort to account for punitive damages, which plaintiffs are seeking, or statutes of limitations despite acknowledging that different putative class members likely would have noticed the 1985 Change at different times. As NM's experts explain, different investors behave differently, and each policyholder must be queried to determine what he or she knew or would have done.

Because any class trial would not dispose of the litigation, the proposed class also fails the superiority requirement for a damages class. In fact, in their effort to certify a class—any class— plaintiffs' attorneys concede they are abandoning owners of 45% of Pre-MN annuity policies. Plaintiffs are instead using the class action vehicle simply to leverage a settlement. That weighs against—not for—class certification, especially given the substantial amount of litigation that would remain even were it possible (and it is not) to try this case on a classwide basis using common proof.

Plaintiffs' back-up request of an injunction class is no more appropriate. Under 23(b)(2), such a class must be cohesive and "is permissible only when class plaintiffs seek 'final injunctive relief' that is 'appropriate respecting the class as a whole.'" *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 887 (7th Cir. 2011). Plaintiffs all but concede that any injunction here would not be a final remedy. For example, Ms. LaPlant would not benefit from an injunction because she surrendered her policy. Damages would need to be tried, as well as affirmative defenses and potentially punitive damages. These, and many other difficulties with plaintiffs' requests for class certification, demonstrate why certification of plaintiffs' proposed class must be denied.

2

# FACTUAL BACKGROUND

## I. Plaintiffs Structured This Case as a Statewide Declaratory Class to Avoid *Noonan*

This case began as a single-state class action seeking only declaratory relief. It involved the claims of approximately 3,300 Wisconsin residents who owned a certain class of annuity ("Pre-MN annuity") as of March 31, 1985. Plaintiffs sought declarations that, beginning in 1985, NM breached (1) the terms of the annuity contract, (2) the implied duty of good faith and fair dealing, and (3) its fiduciary duties, by changing the methodology used to calculate annuitants' yearly dividends ("the 1985 Change"), failing to give notice of the change and failing to obtain consent for the change. Plaintiffs also sought declarations that Wisconsin's punitive damages predicates were satisfied.

Specifically, plaintiffs asserted that NM had committed the following breaches:

- NM breached the express terms of the contract and violated Wis. Stat. § 632.62 by making the 1985 Change and failing to pay dividends equal to the life insurance rate of return thereafter. (R-App. 59-74, Plfs Proposed FFCL ¶¶ 1-18.)

- NM breached the duty of good faith and fair dealing by implementing the 1985 Change without giving policyholders notice and for failing to obtain consent. (*Id.* at ¶¶ 19-26, R-App. 74-77.)

- NM breached its fiduciary duties to Pre-MN policyholders by making the 1985 Change, failing to disclose the change and then acting to conceal the change. (*Id.* at ¶¶ 27-43. R-App. 77-83.)

Plaintiffs intentionally structured their case as a *statewide* class action for *declaratory relief* in order to avoid the prior decisions in *Noonan* denying certification of nationwide and statewide damages classes. (*See* R-App. 87-100, 9/30/09 Plfs. Brief.) In *Noonan*, the trial court rejected plaintiffs' counsel's request for certification of a nationwide class of over 35,000 policyholders who had executed annuity applications in all 50 states and Washington D.C. (R-App. 104-106, *Noonan* 6/15/05 Order.) First, the court held that multiple states' law would apply to individual members' claims depending on their residence at the time of purchase. (*Id.*) Second, the court concluded that individualized evidence would be required to prove each cause of action, to analyze affirmative

defenses, to establish individual damages, and to show punitive damages. (*Id.*) The *Noonan* court specifically rejected plaintiffs' assertion that damages could be determined by a classwide formula. (*Id.*, R-App. 104 ("The Court believes that a proper verdict will inquire as to damages and not as to a formula. Individual damages awards will have to be fleshed out for the jury.").)

The Court of Appeals affirmed, concluding the trial court had "reasonably found that the varied factual scenarios for each putative class member rendered the determination and application of choice of law for all putative class members unmanageable." *Noonan v. Northwestern Mut. Ins. Co.*, 726 N.W.2d 356 at ¶ 18 (Wis. Ct. App. 2006) (*Noonan II*) (R-App. 678). It rejected plaintiffs' arguments that Wisconsin law must apply to each aspect of the proposed class action, holding instead that "this case is not clearly governed solely by Wisconsin law" and that the "circumstances under which each putative class member purchased annuities and where each 'final significant event' occurred is relevant under Wisconsin law for determining which state's law to apply to a breach of contract claim." (*Id.* at ¶¶ 18, 19 n.14, 21, 24 n.18.)

On remand, Noonan brought a second motion for certification, proposing a nationwide class on more limited issues and an alternative Wisconsin-only class. (R-App. 109-112, 113-115, 4/30/07 Mot.) The *Noonan* court denied certification, holding the same two problems would exist for both proposed classes. (R-App. 121-126, 1/29/08 Order ("There will be a considerable lack of commonality on the breach and damage questions.").) Plaintiff's counsel then withdrew and brought this action on behalf of a different class represented by Ms. LaPlant.

To avoid the choice-of-law problems identified in *Noonan*, plaintiffs narrowed the proposed class to individuals who were Wisconsin residents when they purchased their Pre-MN annuities. (R-App. 130-132, 133-134, 6/1/09 Hrg. Tr. 11:11-13:9, 20:17-21:8.) Plaintiffs sought only declaratory relief to avoid having to try individualized issues, such as interactions with NM sales agents, NM's affirmative defenses, and damages. (R-App. 133-134, 6/1/09 Hrg. Tr. 20:24-21:4

4

("And the reason this is significant is in the class certification context, the difficulties in manageability that Judge Schmidt [Noonan judge] has articulated we think are solved by Wisconsin only declaratory judgment class, and that's why this case has been—is crafted the way it is, is to avoid those difficulties.")); *see also* R-App. 157-158, 10/12/09 Hrg. Tr. 13:23-14:3 (telling court that "individualized defense theories are simply not relevant to the declaratory judgment. . . . They go to defending against individualized damages claims, and that's not the case here.")

The state trial court granted statewide class certification, relying on the limits imposed by plaintiffs.[2] The state court acknowledged that if "the law of another state would be applied," this fact "would, standing alone, be enough to produce the result of unmanageability." (R-App. 151-152, 10/26/09 Order.) Because plaintiffs had intentionally limited the class to Wisconsin residents at the time of purchase, however, the court reasoned that "[c]hoice of law issues are, based upon the record presented, not a proper basis for finding that class certification should be denied under the concept of unmanageability." (*Id.*) The court had acknowledged in an earlier decision that "an action seeking damages would be more complicated and issue-intense than a cause of action that does not include damages." (R-App. 166, 6/15/09 Order.) But in certifying the narrowed class, the court reasoned that "the case before us does not seek damages under declaratory judgment." And in rejecting the argument that affirmative defenses created individual issues, the court stated "those asserted defenses relate to damages and that it is not a matter before us in this case." (R-App. 140, 148-149, 10/26/09 Order.)

After the state court issued its trial decision ruling for plaintiffs, however, they moved to redefine the class to include all Pre-MN annuitants nationwide, to apply the trial court's findings to

---

[2] The state trial court certified the statewide class under Wisconsin's standards for class certification, which are different from federal law. As plaintiffs concede, federal law controls whether certification is appropriate here. (*See* Plfs Opening Br. at 12 ("the case is now governed by federal class action law").) NM has filed a separate motion asking for the statewide class to be de-certified because plaintiffs cannot meet their burden of proof under Fed. R. Civ. P. 23 even as to the statewide class certified by the state trial court.

that class, to strike NM's affirmative defenses (even though they were not tried), and indicated their

intent to seek damages in post-trial proceedings.[3] NM timely removed under CAFA.

## II. The Seventh Circuit Held That Multiple States' Law Applies

Following removal, plaintiffs moved to remand the case to state court citing the "internal

affairs" exception to CAFA. This Court granted plaintiffs' motion. (R-App. 180.)

The Seventh Circuit reversed. It held plaintiffs' claims did not solely involve NM's internal

affairs and that multiple states' laws would apply in any event. *LaPlant*, 701 F.3d 1137. In concluding

that "multiple states' law applies to these contracts," the Seventh Circuit did not limit its holding

only to those policies with an express choice-of-law provision. Rather, it relied on the fact that

"[m]any states require insurance policies to be governed by the law of the state in which the insured

lives (or the policy is issued) . . . ." *Id.* at 1140, 1141-42.

## III. Plaintiffs' Now-Proposed Class Includes Members with Different Types of Policies and Who Are Differently-Situated for Purposes of Class Certification

### A. Putative Class Members

Plaintiffs now seek certification of the following nationwide damages class:

> All persons who (a) purchased a Northwestern Mutual Life Insurance Company
> Flexible Premium Annuity or Retirement Annuity (or other deferred, fixed annuity)
> in force and in its deferral period as of March 31, 1985, and (b) did not sign the 1983
> Amendment Agreement while residing in a state other than Wisconsin, and their
> successors in interest. Excluded from the Class are any Northwestern Mutual Life
> Insurance Company's officers, trustees and their family members or affiliates.

(Plfs Mot. to Certify Class at 1.) This class includes an estimated 18,553 putative members (and

19,735 policies), while excluding the 15,467 policies owned by annuitants who signed Update '83

outside of Wisconsin. (R-App. 193, Moore Rep. ¶ 7 & R-App. 251, Moore Rep. Ex. 1). Thus, even if

---

[3] NM strongly disputes the state trial court's factual findings or legal conclusions and, per the Seventh Circuit's opinion, will challenge them once class certification briefing and decisions are complete. *See LaPlant*, 701 F.3d at 1142 ("The district judge must determine whether to certify a nationwide class for damages and, having resolved that and any other procedural issue, must decide the case on the merits."); *id.* ("The doctrine of law of the case therefore does not prevent the district judge from evaluating both sides' contentions.").

6

the proposed class were certified, it would not include the claims of roughly 43% of policyholders (~45% of policies) allegedly affected by the 1985 Change.

Putative class members' policies were issued in all 50 states and the District of Columbia. (R-App. 297, Sales Aff. ¶ 4.) Over 14,000 of the putative class members were non-Wisconsin residents when their policies issued and, as best NM can tell, the vast majority of those individuals do not reside in Wisconsin today. (*Id.* at ¶ 7, R-App. 298.) The last known address for approximately 8,400 putative class members is over 10 years old. (*Id.* at ¶ 15, R-App. 299.) Approximately 2,200 of the putative class members are deceased, (*Id.* at ¶ 13, R-App. 298), and it is not clear who (if anyone) has the right to sue on their behalf.

Only 2,664 putative class members have in-force policies today, meaning that over 15,500 putative class members have surrendered or otherwise terminated their policies. (R-App. 252, Moore Rep. Ex. 2.) Of those, 8,391 surrendered or otherwise terminated their policies between 1985 and year-end 1993. (R-App. 253, Moore Rep. Ex. 3.) That is significant because, as the highlighting in the table at right shows, the Pre-MN annuity policy dividend interest rate ("DIR") in the actual world (*i.e.*, the world in which NM made the 1985 Change) before 1993 was in most years either the same as or *higher* than the DIR

| Year | Annuity (Actual) | Life (Actual) | Annuity (But-For) |
|------|------------------|---------------|-------------------|
| 1985 | 11.15% | 11.15% | 11.15% |
| 1986 | 11.00% | 11.25% | 11.25% |
| 1987 | 10.75% | 11.00% | 11.00% |
| 1988 | 10.75% | 10.25% | 10.25% |
| 1989 | 10.75% | 10.00% | 10.00% |
| 1990 | 10.00% | 10.00% | 10.00% |
| 1991 | 10.00% | 10.00% | 10.00% |
| 1992 | 9.50% | 9.25% | 9.25% |
| 1993 | 8.50% | 9.25% | 9.25% |
| 1994 | 7.50% | 8.50% | 8.50% |
| 1995 | 7.00% | 8.50% | 8.50% |

plaintiffs contend would have applied to Pre-MN annuities in the but-for world. (R-App. 733, Hoyer 3/4/13 Rep. 6.) As a result, many of the 8,391 putative class members who terminated their policies before year-end 1993 not only suffered no financial injury but made money as a result of the 1985 Change. (R-App. 256-258, Moore Rep. Exs. 6-8.)

7

Many putative class members also owned NM life insurance policies during the class period. This is significant for two reasons. First, there were over 5,000 putative class members who concurrently owned Pre-MN annuities and life insurance policies in 1993 and thereafter. (R-App. 253, Moore Rep. Ex. 3; R-App. 298, Sales Aff. ¶ 12.) Those class members would have received information annually from which they could have determined the Pre-MN annuity DIR was lower than the life insurance DIR and hence would have been on notice of the 1985 Change (or at least had reason to inquire further). Second, approximately 4,600 putative class members currently own NM life insurance policies. (R-App. 299, Sales Aff. ¶ 16.) These individuals have different interests than other class members inasmuch as future life insurance dividends would be negatively impacted by a significant judgment in this case. (R-App. 296, Klawonn Aff. ¶ 15.)

## B.    Types of Annuities at Issue

There are three different types of Pre-MN annuities at issue in this case, each having different terms and conditions: Flexible Premium Annuities (FPA), Retirement Annuities (RA), and Single Premium Retirement Annuities (SPRA). (R-App. 313-314, Dhar Rep. ¶ 36.) The SPRA requires a single payment to be made when the annuity is purchased, whereas the FPA and RA allow for flexible payments during the annuity's deferral period. (*Id.*) Unlike SPRAs, FPAs have limits on the maximum premium payments that can be made. (*Id.*)

Within each of the three product categories, certain terms and conditions vary depending on when the putative class member purchased the policy—*e.g.*, front-end load, loan rate, policy fee, expense charge and guaranteed fixed rate of return. (R-App. 205, Moore Rep. ¶ 38; R-App. 255, Moore Rep. Ex. 5; R-App. 395, LaPlant policy; R-App. 313-314, Dhar Rep. ¶ 36.) Policies of the 2,229 putative class members who signed Update '83 in Wisconsin are subject to "direct recognition," which affects the DIR. (R-App. 251, Moore Rep. Ex. 1.)

8

### C. Plaintiffs' Proposed Class Representatives

Plaintiffs propose two class representatives. The first, Marleen LaPlant, purchased her Flexible Premium Annuity policy on May 1, 1975 and surrendered it on July 3, 2008, meaning she is no longer being affected by the 1985 Change. (R-App. 193, Moore Rep. ¶ 6.) The second, Bruce Williams, has two currently in-force Pre-MN annuities. He purchased his Fixed Premium Annuity on July 27, 1984 and his Single Premium Retirement Annuity on May 3, 1984. (*Id.*) Both were Wisconsin residents when the policies issued. (*Id.*)

## ARGUMENT

### I. Legal Standards

Under Rule 23(a), the party seeking certification must first show that: "(1) the class is so numerous that joinder of all members is impracticable [numerosity], (2) there are questions of law or fact common to the class [commonality], (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality], and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy]." Fed. R. Civ. P. 23(a).

The party seeking certification must then show the proposed class satisfies one of Rule 23(b)'s three requirements. Plaintiffs here rely on Rules (b) (2) and (b)(3). "[C]ertification of a class under Rule 23(b)(2) is permissible only when class plaintiffs seek 'final injunctive relief' that is 'appropriate respecting the class as a whole.'" *Kartman*, 634 F.3d at 886. Where, as here, "the ultimate relief sought is money damages" plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*; Fed. R. Civ. P. 23(b)(3). Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, No. 12-133, 2013 WL 3064410 (U.S. June 20, 2013) (R-App. 686).

9

## II.     Plaintiffs Have Not Satisfied Rule 23(a)

Plaintiffs devote less than two pages of their brief to whether they meet the requirements of Rule 23(a), even though they bear the burden of satisfying the "rigorous analysis" test set forth in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). Plaintiffs must show, for instance, that the putative class members "have suffered the same injury," not merely that they "have all suffered a violation of the same provision of law." *Id.* at 2550-51. They must show that common issues of law or fact exist. And they must show that the class representatives have standing, that their claims are typical of the class, and that their interests are not at odds with the interests of other class members. Plaintiffs cannot meet any of these burdens here.

### A.     Plaintiffs Have Not Shown Commonality of Questions of Law or Fact

#### 1.     Multiple states' law would apply

"No class action is proper unless all litigants are governed by the same legal rules." *In re Matter of Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002). "[O]therwise the class representative cannot meet his burden of satisfying the commonality, superiority, and predominance requirements . . . ." *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 583 (N.D. Ill. 2008) (citing *In re Bridgestone/Firestone*, 288 F.3d at 1015). Plaintiffs bear the burden of proving multiple states' laws would not apply. *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 332 (S.D. Ill. 2009).

##### a.     The Seventh Circuit found that multiple states' law would apply

In reversing this Court's remand decision, the Seventh Circuit expressly held that "multiple states' law applies to these contracts." *LaPlant*, 701 F.3d at 1141-42. It further observed, "[e]very state enforces promises, but states differ in how they calculate damages and when (if ever) punitive damages are available for breach of contract (which the plaintiffs want to recast as a tort claim for breach of fiduciary duty)." *Id.* at 1142. It concluded, "[a]nd if multiples states' law applies, this litigation cannot be resolved 'solely' under Wisconsin's corporate law even if it were within the

scope of the internal affairs doctrine (which, to repeat, it isn't)." *Id.* at 1140-41.

The panel did not, as plaintiffs argue, limit its holding to policies with choice-of-law clauses. Rather it expressly recognized that "many states *require* insurance policies to be governed by the law of the state in which the insured lives (or the policy is issued) rather than the law of the state in which the insurer is incorporated." *Id.* at 1140 (emphasis added). The panel rejected plaintiffs' argument that the Wisconsin Supreme Court's decision in *Drinkwater v. Am. Family Mut. Ins. Co.*, 714 N.W.2d 642, 661-662 (Wis. 2006), required application of Wisconsin law to such contracts, pointing out that *Drinkwater* itself had applied the law of the insured's domicile (Wisconsin) to claims against an out-of-state insurer. *LaPlant*, 701 F.3d. at 1141.

Plaintiffs make no effort to analyze any other state's law, much less compare it to Wisconsin's. *See, e.g.*, *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010) (plaintiffs must "provide an *extensive analysis* of state law variations to reveal whether these pose insuperable obstacles" (emphasis in original) (quoting *Cole v. General Motors Corp.*, 484 F.3d 717, 724 (5th Cir 2007)); *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 581 (E.D. Mich. 2004) (plaintiff must "establish the absence of variations in states' laws").

Plaintiffs instead present only "an abbreviated discussion of choice of law," summarily reiterating arguments from their remand briefing, which itself did not include any analysis of other states' laws. (Plfs Opening Br. at 18-21.) And despite the Seventh Circuit's observation that plaintiffs "do[] not contend that any other state's domestic law would be repugnant to Wisconsin," *LaPlant*, 701 F.3d at 1141, they have provided no additional evidence here that Wisconsin would disapprove application of other states' laws to the class claims. Nor could they given the *Noonan* court's holding that other states' law could apply. Given plaintiffs' failure to address the Seventh Circuit's choice-of-law determination, certification should be denied without further analysis.

11

**The Seventh Circuit was correct that many states require application of their law to insurance policies of their citizens**

Many states require application of their law to claims involving their citizen's insurance policies. At least 13 states prohibit choice-of-law provisions specifying application of other states' law to policies issued or delivered to their citizens in that state.[4] At least 7 other states have statutory provisions that specify that insurance policies are deemed to have been made within the state and subject to the laws of the state and hence subject to that state's law.[5] At least 12 other states have provisions requiring that insurance companies comply with the laws of their state.[6]

That different states' law would apply would affect resolution of plaintiffs' claims. For example, many states do not recognize claims for breach of fiduciary duties against a mutual insurer on the facts alleged here. Numerous states do not recognize fiduciary duty claims by insureds against insurers,[7] and many others only recognize such claims in special circumstances not present here,

---

[4] Those 13 states are: Arizona, Louisiana, Maryland, Massachusetts, Nebraska, Oklahoma, Oregon, South Dakota, Utah, Virginia, and West Virginia. The relevant statutory provisions are set forth in R-App. 359, Table 1.

[5] Those seven states are: Alabama, Colorado, Minnesota, North Carolina, South Carolina, Tennessee, and Texas. The relevant statutory provisions are set forth in R-App. 360, Table 2.

[6] Those 12 states are: Alaska, Arkansas, Florida, Georgia, Hawaii, Michigan, Montana, Nevada, New Mexico, Pennsylvania, Rhode Island, and Wyoming. The relevant statutory provisions are set forth in R-App. 361, Table 3.

[7] Those states include at least the following: Connecticut, Delaware, Florida, Georgia, Illinois, Michigan, Minnesota, Mississippi, Nebraska, New York, Ohio, Tennessee, Texas, Washington, and Virginia. *See, e.g., Harlach v. Metro. Prop. & Liab. Ins. Co.*, 602 A.2d 1007, 1009 (Conn. 1992); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 616-18 (D.N.J. 1996) (applying Connecticut law); *Corrado Bros., Inc. v. Twin City Fire Ins. Co.*, 562 A.2d 1188, 1192 (Del. 1989); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 493-496 (Del. 2003); *Heretick v. Northwestern Mut. Life Ins. Co.*, No. 02-1061-CI-11, 2003 WL 25694174 (Fla. Cir. Ct. June 23, 2003) (R-App. 704); *Kaser v. Swann*, 141 F.R.D. 337, 341 (M.D. Fla. 1991); *Nash v. Ohio Nat'l Life Ins. Co.*, 597 S.E.2d 512 (Ga. 2004); *Martin v. State Farm Mut. Auto. Ins. Co.*, 808 N.E.2d 47, 51-52 (Ill. App. Ct. 2004); *Crossley v. Allstate Ins. Co.*, 400 N.W.2d 625, 627 (Mich. 1986); *Langston v. Bigelow*, 820 So.2d 752, 756 (Miss. Ct. App. 2002) (purchase of insurance is deemed to be arms' length transaction and does not create any special trust or fiduciary relationship; however, covenant of good faith and fair dealing is implicit in every contract of insurance); *Gorman v. Se. Fidelity Ins. Co.*, 621 F. Supp. 33, 38 (S.D. Miss. 1985); *Am. Driver Service, Inc. v. Truck Ins. Exch.*, 631 N.W.2d 140, 148-49 (Neb. Ct. App. 2001); *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 292-93 (S.D.N.Y. 1996); *Fidelity & Cas. Co. of N.Y. v. Metro. Life Ins. Co.*, 248 N.Y.S.2d 559, 565 (N.Y. Sup. Ct. 1963); *Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1331-32 (Ohio Ct. App. 1993); *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 521-22 (6th Cir. 1999) (applying Ohio law); *Wayne Duddlesten, Inc. v. Highland Ins. Co.*, 110 S.W.3d 85, 96 (Tex. Ct. App. 2003); *State Farm Mut. Auto. Ins. Co. v. Floyd*, 366 S.E.2d 93, 97 (Va. 1988); *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 503 (Wash. 1992); *see also McLachlan v. N. Y. Life Ins. Co.*, 488 F.3d 624, 628 (5th Cir. 2007) (applying Louisiana law).

such as where the insurer is in control of defending the insured against third-party claims.[8]

### c. The Wisconsin Legislature made clear it has no interest in applying its law to policies issued to residents of other states

Wisconsin has made clear it has no interest in applying its law to claims regarding insurance policies issued to or delivered in other states, even by Wisconsin companies. First, Wisconsin's insurance statute by its express terms applies to insurance policies "delivered or issued for delivery in [Wisconsin], on property ordinarily located in [Wisconsin], on persons residing in [Wisconsin] when the policy . . . is issued, or on business operations in [Wisconsin]." Wis. Stat. Ann. § 631.01. Here the vast majority of putative class members' policies were not issued or delivered in Wisconsin and do not cover property, persons residing, or business operations in Wisconsin.

Second, the Wisconsin Legislature in comments to § 631.01 stated, "[s]ub. (1) applies to

---

[8] Those states include at least the following: California, Colorado, , Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, Missouri, Oregon, Pennsylvania, Utah, Vermont, and Wyoming. *See, e.g., In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, Nos. C-05-04726 RMW, C-06-00537 RMW, 2007 WL 486367 at *6-7 (N.D. Cal Feb. 12, 2007) (R-App. 712) ("[A]s a matter of California law, no true fiduciary duty arises from the insurer-insured relationship and an insured therefore cannot maintain a claim for breach of fiduciary duty based solely on the insurer-insured relationship."); *Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289-90 (Colo. 1996) (en banc) (holding that relationship is contractual, not fiduciary, but becomes quasi-fiduciary where insurer controls defense of insured's lawsuit); *Spencer v. Aetna Life & Cas. Ins. Co.*, 611 P.2d 149, 155 (Kan. 1980) (fiduciary duty in third-party claim but not in first-party claim); *Maine Farms Venison, Inc. v. Peerless Ins. Co.*, No. CV-01-005, 2002 WL 33946004, *4 (Me. Sup. Ct. Apr. 18, 2002) (R-App. 721) (insurer does not owe fiduciary duty to insured, absent special circumstances); *Brae Asset Fund, L.P. v. Adam*, 661 A.2d 1137, 1140 (Me. 1995) (fiduciary duty arises only where special trust and confidence or disparity in position or influence); *McCauley v. Suls*, 716 A.2d 1129, 1134 (Md. Ct. Spec. App. 1998) ("[A]n insurance company owes no fiduciary duty in a first-party claim because the insured controls the litigation and a fiduciary duty need not be imposed."); *Szymanski v. Boston Mut. Life Ins. Co.*, 778 N.E.2d 16, 27 (Mass. App. Ct. 2002) ("The relationship of insurer and policy holder does not entail a fiduciary duty absent 'special circumstances of assertion, representation and reliance.'"); *LaFavor v. Am. Nat'l Ins. Co.*, 155 N.W.2d 286, 290 (Minn. 1967) ("[T]he concept of legal relations between an applicant for insurance and the insurance company is essentially and fundamentally the same as that between parties negotiating other contracts and, as such, is purely contractual."); *St. Paul Fire & Marine Ins. Co. v. A.P.I., Inc.*, 738 N.W.2d 401, 406-407 (Minn. App. 2007) ("Minnesota has carved out an exception when an insurer is obligated to assume and assumes the defense of the insured."); *Pool v. Farm Bureau Town & Country Ins. Co.*, 311 S.W.3d 895, 907 (Mo. Ct. App. 2010) (fiduciary duty exists where insurance company is defending insured, not where the insured is suing the insurance company); *Shin v. Sunriver Preparatory Sch., Inc.*, 111 P.3d 762, 771 (Or. Ct. App. 2005) ("[W]here the insurer does not undertake the defense of the insured, the carrier does not assume the fiduciary duty that would result from having done so, and its responsibilities are confined to the contract terms."); *Garvey v. Nat'l Grange Mut. Ins. Co.*, No. CIV.A.95-0019, 1995 WL 115416, *4 (E.D. Pa. Mar. 16, 1995) (R-App. 733) ("[T]he contract and the duties it imposes can give rise to a fiduciary relationship between the parties….[An insurer's] failure to exercise its contractual duty of good faith and fair dealing does not given rise to an actionable claim for a breach of fiduciary duty."); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 799-800 (Utah 1985) ("In the first-party situation ... the reasons for finding a fiduciary relationship and imposing a corresponding duty are absent."); *Lauzon v. State Farm Mut. Auto. Ins. Co.*, 674 A.2d 1246, 1248 (Vt. 1995) ("An insurer owes no fiduciary duty to its insured in a claim arising under an uninsured motorist provision"); *Wilson v. State Farm Mut. Auto. Ins. Co.*, 795 F. Supp. 1077, 1082 (D. Wyo. 1992) ("[A]n insurance company 'cannot be said to be fiduciaries for their insureds in the strict meaning of the term.'").

contracts *used* in this state." Wis. Stat. Ann. § 631.01, comments to L.1975, C. 375 § 41 (emphasis added). The Legislature further explained that it had repealed a statutory provision requiring application of Wisconsin law to certain out-of-state contracts issued by Wisconsin insurers because the provision "does not serve any significant Wisconsin public policy purpose and is abandoned." *Id.*

### d. Wisconsin's choice-of-law framework requires application of non-Wisconsin law to many proposed class member claims

#### i. Wisconsin applies the law of the state where the insured was domiciled when the insured applied for the policy

Plaintiffs ignore that the Wisconsin Supreme Court applies "the traditional rule of conflicts which states that rights created under an insurance policy are determined by the law of the state *where the insured was domiciled* when he applied for the policy." *Solberg v. Metro. Life Ins. Co.*, 185 N.W.2d 319, 321 (Wis. 1971) (emphasis added). Under Wisconsin law, the law of the state where the insurance policy was issued or delivered to the insured will apply. *See, e.g., Hejsak v. Great-West Life & Annuity Ins. Co.*, 331 F. Supp. 2d 756, 762 (W.D. Wis. 2004) (Wisconsin law governed in action against Colorado insurer because the policy "was issued in Wisconsin").

#### ii. The *Heath* factors favor application of non-Wisconsin law for claims of non-Wisconsin residents

Where there is not a clear choice-of-law rule for a particular type of claim, Wisconsin favors application of the law of the forum "unless it becomes clear that non-forum contacts are of the greater significance." (R-App. 184, 8/20/12 Order (citation omitted).) Where it is not clear which forum has more significant contacts, Wisconsin courts apply the five *Heath* factors to determine the applicable law. As explained in NM's remand briefing, non-forum contacts are more significant for claims of out-of-state residents. (R-App. 365-367, NM Opp. Br. at 26-28.) In any event, the Seventh Circuit's opinion reversing this Court's remand decision, in conjunction with *Drinkwater*, makes clear the *Heath* factors favor application of non-Wisconsin law to those claims.

14

The first *Heath* factor—predictability of results—favors application of non-Wisconsin law for out-of-state residents. In *Drinkwater* plaintiffs were Wisconsin resident policyholders and defendant was an Iowa insurance plan. The Wisconsin Supreme Court held that the first *Heath* factor "points at least somewhat to application of Wisconsin law" because "although the application of Iowa law might modestly increase predictability for the Plan, the application of Wisconsin law would facilitate predictability for Wisconsin citizens such as Drinkwater." *Drinkwater*, 714 N.W.2d at 661-662 ); *see also id.* at 661 ("Wisconsin citizens are entitled to some assurance that when they suffer injuries in their own state, they can generally predict and expect that Wisconsin law will dictate their rights to recovery.") Here NM is a Wisconsin company and many of the putative class members are out-of-state residents—under *Drinkwater* the first factor tips in favor of application of out-of-state law to the latters' claims. The basis for this Court's prior opinion to the contrary—that NM "is incorporated and located in Wisconsin and plaintiff's suit involves [NM's] internal affairs," (R-App. 185, 8/20/12 Order), has been reversed by the Seventh Circuit.

The second and fourth factors—maintenance of interstate and international order and advancement of the forum's governmental interests—also point to other states' law. According to the Wisconsin Supreme Court:

> [Maintenance of interstate and international order] means that no state should impose its law in a situation when its parochial rules would unduly and without substantial reason so impinge upon another state as to interfere with the free flow of commerce or the exercise of another state's legitimate policies in such a manner that would invite retaliation from another jurisdiction. Deference to the substantial interests of another state are [sic] necessary and for a state that is only minimally concerned with a transaction or tort to thrust its law upon the parties would be disruptive of the comity between states. A state whose interest is negligible should not attempt to displace the law of a state whose interest is substantial, and the choice of law should not be a mere forum preference in disregard of the competing rationales behind diverse foreign and forum laws.

*Heath v. Zellmer*, 151 N.W.2d 664, 672 (Wis. 1967). As discussed, the Wisconsin Legislature in the text of and comments to § 631.01 has indicated it does not have an interest in applying its law to

claims regarding out-of-state policies issued by Wisconsin insurers. Meanwhile, other states have expressed a strong preference favoring application of their laws to policies owned by their residents.

The third factor—simplification of the judicial task—is at best neutral. Plaintiffs have offered no evidence, either here or in their remand briefing, that application of Wisconsin law would simplify the judicial task other than the conclusory assertion that it is easier for Wisconsin courts to apply Wisconsin law. As shown above, application of non-Wisconsin law would simplify the judicial task in many cases because other states do not recognize a claim for breach of fiduciary duty in these circumstances. *See supra* Section II.A.1.b.

The final factor—application of the better rule of law—favors non-Wisconsin law. This Court previously held this factor favored application of Wisconsin law because "Wisconsin law ensures that all policyholders will have the same rights and that defendant will not be saddled with different obligations in different states." (R-App. 186, 8/20/12 Order.) That finding is directly contrary to *Drinkwater* which applied Wisconsin law to resident insured policyholders despite the fact that the defendant insurance plan was from Iowa. *See Drinkwater*, 714 N.W.2d at 580.

### 2. Class members do not share a common injury

Plaintiffs must prove—not allege—that each class member has suffered the same injury. *Wal-Mart*, 131 S. Ct. at 2551 (plaintiff must prove all Rule 23 requirements, including that the class members have suffered the same injury, even if doing so requires resolving issues relevant to the merits of the underlying claims); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001) (same); *see also Bieneman v. City of Chicago*, 864 F.2d 463, 465-66 (7th Cir. 1988) (class certification inappropriate where some class members benefitted).

This Court's opinion in *Thao* is on point. Plaintiffs there argued class certification was appropriate because the insurance company defendant had improperly used the same five factors to set the cost of insurance for the whole class. Recognizing that plaintiff must prove not just a

common issue but a common injury, this Court rejected plaintiffs' argument:

> The key premise in Thao's argument for class certification is that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. If this premise is false—if, for example, a set of rates based exclusively on the five factors would result in *higher* rates for certain policyholders—then the members of the proposed class would not have a common claim against Midland. Only those members who would pay lower rates would have a claim, because only those members would have been injured by Midland's conduct.

*Thao,* 2012 WL 1900114 at *4 (citing *Wal-Mart* and other authorities). Because putative class members did not suffer the same injury, they did not share a "common grievance" and certification was inappropriate. *Id.* at *10. The same analysis applies here.

Plaintiffs assert that NM injured them by segregating Pre-MN annuity accounts. But they gloss over the fact that not all class members were financially worse off because of the 1985 Change, and in many cases were financially better off. As explained by NM's expert Professor Moore:

> In the actual world, cumulative returns to the pre-MN annuities from 1985 until 1993 were higher, on average, than cumulative returns to NM life insurance policies. Pre-MN annuitants whose policies matured or were terminated prior to 1994 thus might have earned a higher rate of return in the actual world than they would have absent the 1985 change. They are therefore better off in the actual world than in the but-for world, and so were not injured by NM's alleged misconduct. (R-App. 216-217, Moore Report ¶ 73.)

Plaintiffs' own expert conceded that there are putative class members who were not injured by the 1985 Change:

> Q.    And I just want to be clear: In the group of putative class members, were there some who surrendered their policies at a particular time such that those individuals were not financially harmed by the 1985 change?
>
> A.    That is correct.

(R-App. 47, Hoyer 5/17/13 Dep. 158:12-17.) He even conceded that some putative class members were as much as two-percent better off financially than they otherwise would have been. (*Id.* at R-App. 48, 161:1-11.)

17

Hoyer nevertheless claims that the number of policyholders who benefited from the 1985 change was "a very small amount", (*id.* at R-App. 47, 158:18-20), and the extent to which those class members benefited was "immaterial" (though left uncalculated), (*id.* at R-App. 44-45, 147:14-148:10; R-App. 46, 157:9-16). His assertion is contradicted by the numbers. Over 45% of putative class members (9,038) surrendered or otherwise terminated their policies before year-end 1993. The DIR enjoyed by Pre-MN annuitants in the actual world was the same as or higher than Hoyer's but-for DIR in all but three years between 1985 and 1993. (R-App. 339, Hoyer 3/4/13 Rep. ¶ 26.) And roughly 3,500 putative class members (or ~18% of the putative class) surrendered or otherwise terminated their policies between the beginning of 1989 and year-end 1993 when the cumulative returns in almost all cases would have been higher in the actual world than in the but-for world. (R-App. 253, 258, Moore Rep. Exs. 3, 8.) These class members do not share a common grievance with Ms. LaPlant and Mr. Williams.

## B. Plaintiffs Have Not Carried Their Burden to Show Typicality and Adequacy

Plaintiffs LaPlant and Williams must demonstrate their claims are typical of the class and they will serve as adequate representatives. The adequacy requirement is essential to due process and mandates that a class representative must "possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-595 (1997). It ensures that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The related requirement of typicality "determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (citation omitted). Named plaintiffs here are neither typical nor adequate.

### 1. The proposed class representatives' claims are subject to individual defenses

"Where it is predictable that a major focus of the litigation will be on an arguable defense

18

unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative." *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir. 1974); *see also CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011) (plaintiff "cannot be an adequate representative of the class . . . if it is subject to a defense that couldn't be sustained against other class members"). Plaintiffs LaPlant and Williams are each subject to individual defenses that render them inappropriate class representatives.

### a. LaPlant

Ms. LaPlant purchased a flexible premium annuity from NM in 1975. (R-App. 373, LaPlant 9/9/09 Dep. 19:5-7; R-App. 193, Moore Rep. ¶ 6.) She purchased her policy from one of NM's independent contractor agents. (R-App. 373, LaPlant 9/9/09 Dep. 19:8-15.) During that process, she and her husband discussed the policy with her agent and no one else. (*Id.* at 21:3-11, R-App. 375.) After she purchased the policy, Ms. LaPlant and her husband met with her agent a few times. (*Id.* at 22:6-17, R-App. 376.) She does not remember the substance of those discussions. (*Id.* at 22:15-23:19 R-App. 376-377.) While Ms. LaPlant owned her policy her only expectation was to receive some unstated amount of dividends. (*Id.* at 49:8-50:6, R-App. 386-387, 20:17-21, R-App. 374-375, 72:21-74:21, R-App. 389-391.) However, Ms. LaPlant knew dividends increased the cash value of her policy beyond her contribution. (*Id.* at 71:18-72:3, R-App. 388-389.)

In 2002, Ms. LaPlant learned about the *Noonan* action. (*Id.* at 37:14-38:5, R-App. 378-379.) She and her husband contacted counsel for the Noonans (who are her counsel here) to discuss the class action. Ms. LaPlant consulted with them on multiple occasions. (*Id.* at 39:8-40:18, R-App. 380-381.) Mr. LaPlant kept almost weekly tabs on the *Noonan* litigation and kept Ms. LaPlant apprised of what occurred. (*Id.* at 44:24-47:12, R-App. 382-385.) She was aware that class certification was denied. (*Id.* at 46:14-25, R-App. 384.)

19

Ms. LaPlant voluntarily surrendered and cashed in her policy in July 2008. (R-App. 193, Moore Rep. ¶ 6.) Her annuity was worth about $93,000 at the time of surrender. Ms. LaPlant had contributed about $20,000 of that total in premiums, and the remainder was accrued dividends and interest. (R-App. 349-351, Hoyer Rep. ¶¶ 49-52.) She filed this suit on August 26, 2008, after surrendering her policy. Given this history, Ms. LaPlant is subject to defenses that are unique to her.

First, NM has a plaintiff-specific waiver defense against Ms. LaPlant because she surrendered her policy. Section 5.2 of her annuity contract provided:

> 5.2 CASH SURRENDER
>
> The Owner may surrender this policy for its cash value less any indebtedness. The policy shall terminate upon receipt at the Home Office of this policy and a *written surrender of all claims*. Receipt of the policy may be waived by the Company.

(R-App. 395, LaPlant policy)(emphasis added.) When she surrendered her policy, Ms. LaPlant signed an agreement expressly "surrendering all or a portion of said contract and all claims thereunder to Northwestern Mutual." (R-App. 408.) Ms. LaPlant has since acknowledged that she read and understood the provision before signing it. (R-App. 392-393, LaPlant 9/9/09 Dep. 86:16-87:13.)[9]

When a policyholder surrenders an insurance policy, it by definition results in "the voluntary cancellation of the legal liability of an insurance company by the insured and beneficiary for a consideration." (R-App. 412, WEBSTER'S COLLEGIATE DICTIONARY 1186-87(10th ed. 1996); *see also* R-App. 416, BLACK'S LAW DICTIONARY 1458 (7th ed. 1999) (second definition of "surrender" is "[t]he giving up of a right or claim; RELEASE").) NM is entitled to prove that Ms. LaPlant's surrender constitutes a valid and enforceable waiver of any and all legal claims she may have had against NM, as there was adequate consideration, a knowing execution, and no fraud or duress. *See, e.g., St. Clare Hosp. of Monroe, Wis. v. Schmidt, Garden, Erickson, Inc.*, 437 N.W.2d 228, 230 (Wis. Ct.

---

[9] The state court held that this provision was unenforceable. This Court is free to reconsider that erroneous ruling per the Seventh Circuit's decision. *LaPlant*. 701 F.3d at 1142.

20

App. 1989) ("A release is a contract and is construed as such"); *Knight & Bostwick v. Moore*, 234 N.W. 902, 903 (Wis. 1931) (with regard to contract, "he who will not reasonably guard his own interests when he has reasonable opportunity to do so … must take the consequences. Courts do not exist for the purpose of protecting persons who fail in that regard") (citations omitted)). Having surrendered her claims—a different determination than other putative class members made—Ms. LaPlant can hardly be said to be "typical."

Second, Ms. LaPlant is also subject to unique statute of limitations defenses. It is undisputed that Ms. LaPlant knew of the 1985 change by 2002 at the latest. From 2002 through 2008, even though she knew about the 1985 change, and even though class certification was rejected in *Noonan* on June 6, 2005, she did not file suit for over three years. NM is entitled to argue that the applicable statute of limitations has run as to some or all of her claims, in particular her breach of fiduciary duty claim which has a three-year statute of limitations under Wisconsin law. Wis. Stat. Ann. § 893.57 (3-year period for intentional torts). NM is also entitled, based on, among other things, specific interactions with her agent, to show it did not actively conceal the 1985 Change from her and hence the limitations period was not tolled prior to the filing of the *Noonan* case.

Finally, because Ms. LaPlant no longer owns an in-force policy, she does not have standing to seek certification of an injunction class if a damages class is denied. "[T]he Seventh Circuit has held that a class cannot be certified by a representative who lacks standing to bring a claim for injunctive relief, regardless of the existence of compensatory claims." *Hardin v. Harshbarger*, 814 F. Supp. 703, 708 (N.D. Ill. 1993) (citations omitted).[10]

### b. Williams

Mr. Williams purchased a single premium retirement annuity on May 3, 1984 and a flexible premium annuity on July 27, 1984. (R-App. 419, Tr. Ex. 157; R-App. 433, Tr. Ex. 155.) Mr. Williams

---

[10] The state court rejected this standing argument. It did so under state law and, in any event, this Court is free to reconsider the state court's rulings per the Seventh Circuit's decision. *LaPlant*, 701 F.3d at 1142.

also has other policies with NM, including life insurance policies. (R-App. 453-454, Williams Dep. 15:18-16:15.) Mr. Williams purchased his annuities through Rick Stamm, an independent agent, who allegedly told Mr. Williams that dividends paid under the annuities would be "based on the profits of the company." (R-App. 467, 11/8/10 pm Trial Tr. 18:12-21.) He admitted he was never provided any document stating that his dividends would be determined in the same way as other policyholders or that the factors going into the dividend determination would remain the same. (*Id.* at 20:3-11, R-App. 469.) To the contrary, he testified that he understands dividends are not guaranteed and that Mr. Stamm told him this prior to his purchase. (R-App. 457, Williams 5/18/10 Dep. 46:6-11.) In 2010, Mr. Williams received written notice of the LaPlant class action. He testified this was the first time he heard of any lawsuit against NM. (*Id.* at 33:16-22, R-App. 455.) Prior to receiving notice, he never complained about the amount of dividends he was receiving, and he testified he did not have any complaints about dividends prior to receiving notice of the lawsuit. (*Id.* at 46:21-47:8, R-App. 457-458.) Even after learning of the 1985 Change he has no plans to sell his annuities. (*Id.* at 34:14-16, R-App. 456.)

Like Ms. LaPlant, Mr. Williams is subject to unique defenses. Mr. Williams owned both life policies and annuity policies issued by NM. After the 1985 Change became effective, Mr. Williams would have received information on his life insurance and annuity dividends and hence put him on notice of the discrepancy—or at the very least given him reason to inquire further. Performing such a comparison is precisely how the *Noonan* plaintiffs learned of the change. (R-App. 473-475, 11/8/10 am Trial Tr. 66:7-68:15.) Mr. Williams' failure to similarly inquire implicates defenses of waiver, limitations, laches, and failure to mitigate. And given that Mr. Williams has received information about his annuity and life insurance policies yearly since the 1985 Change, NM is entitled to show it did not conceal the change and hence the limitations period was not tolled.

22

### 2.     There is a conflict of interest between putative class members

Class certification is inappropriate if there are conflicts among class members. "[T]he law is clear that a single class cannot be fairly and adequately represented by the entirely different and separate named plaintiffs if the members of that class have antagonistic or conflicting interests." *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (citation omitted).

Putative class members who still own NM life insurance or disability policies and who would have less money available for dividends and other benefits in the future if NM were to pay a judgment here would have different interests than class members who did not. In particular, the over 8,300 putative class members who terminated their annuities before year-end 1993, and hence do not stand to benefit from any money judgment here, and who currently own NM life insurance policies would not want this class action to proceed. Plaintiffs' expert Hoyer tries to duck the issue by asserting that a judgment against NM would not affect future dividends available to NM life insurance policyholders, going so far as to state that even a "billion dollar judgment" would not alter future payments. (R-App. 49-50, Hoyer 5/17/13 Dep. 168:15-169:22.) In his view, a judgment would only impact divisible surplus if the solvency or going concern status of the company changed. (*Id.*) This is demonstrably wrong. Should NM lose a significant judgment in this matter, to the tune of what plaintiffs are seeking, the over 4,600 putative class members who own NM life insurance policies would enjoy less in future life insurance dividends. (*See* R-App. 296, Klawonn Aff. ¶ 15 (judgment of $ 200 million would affect future life dividends).) This clear conflict between at least Ms. LaPlant and certain class members further demonstrates why she is an inadequate representative. And even though Mr. Williams owns life insurance policies, other class members who long ago surrendered their annuities likely will think differently.

23

## III. Plaintiffs Have Not Satisfied Rule 23(b)(3)'s Requirements for a Damages Class

Plaintiffs also must show that the proposed class meets the even more rigorous requirements of one of the subsections of Rule 23(b). As to damages classes under Rule 23(b)(3), plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Szabo*, 249 F.3d at 677 (certification inappropriate if there are "[n]agging issues of choice of law, commonality, and manageability"). "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432. Plaintiffs cannot satisfy Rule 23(b)(3)'s requirements.

### A. A Substantial Percentage of Putative Class Members Suffered No Financial Harm, and in Many Cases Benefited From the 1985 Change

To certify a damages class, plaintiffs must "demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 131 S.Ct. at 2551 (citations omitted); *Thao*, 2012 WL 1900114 at *4 (citing *Wal-Mart's* "holding that to show commonality plaintiff must show that the class members have suffered the same injury"); *cf. Comcast*, 133 S.Ct. at 1433-34 (model impermissibly included damages for rejected theories of liability).[11]

As explained *infra*, Section III.A.2, the proposed class includes a substantial number of putative class members who either were not harmed or who benefited from the 1985 Change. Indeed, roughly 18% of the putative class (~3,500 putative class members) surrendered or otherwise terminated their policies between 1989 and 1993 when the cumulative returns in almost all cases would have been higher in the actual than in the but-for world. (R-App. 253, Moore Rep. Ex. 3.)

---

[11] Prior to *Wal-Mart* and *Comcast*, the Seventh Circuit held in *Kohen v. Pacific Investment Management Co.*, 571 F.3d 672 (7th Cir. 2009), that while a class can include some people who were not in fact harmed, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury." *Id.* at 677; *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 822-26 (7th Cir. 2012). *Wal-Mart's* commonality holding that all class members must share an injury applies *a fortiori* to (b)(3)'s "more stringent" requirement that common issues predominate. *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 609. The Court need not examine whether *Kohen* is consistent with *Wal-Mart and Comcast*, as here the proposed class includes a large number of individuals who, for various reasons, could not have been injured.

### B. Individualized Damages Issues Would Predominate

To satisfy Rule 23(b)(3), plaintiffs must prove not only that damages are "measurable on a class wide basis through a 'common methodology'", but also "that the existence of individual injury" resulting from the alleged violation would be "capable of proof at trial through evidence that [was] common to the class rather than individual to its members." *Comcast*, 133 S.Ct. at 1428, 1430. A plaintiff's class-wide damages model must be "consistent with its liability case, particularly with respect to the alleged … effect of the violation." *Id.* at 1432-33.[12] The Supreme Court in *Comcast* recently rejected certification because plaintiffs' damages model relied on an unsound methodology, leading to an "arbitrary" measurement of damages that "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast,* 133 S.Ct. at 1434.

To satisfy *Comcast*, plaintiffs' expert Hoyer created his own "classwide damages model", something he has testified in favor of more than 25 times, but never testified against in his expert career. (R-App. 20-21, Hoyer 5/7/13 Dep. 76:2-18, 77:15-19.) Like the rejected *Comcast* damages model, Mr. Hoyer's damages analysis is an arbitrary simplification of a complex problem that in reality requires individualized analysis of each individual class member's damages.

#### 1. Hoyer does not even attempt to calculate damages on a classwide basis for many of plaintiffs' claims or theories of liability

As the Supreme Court in *Comcast* recently made clear, "a 'plaintiff's damages case must be consistent with its liability case.'" *Comcast*, 133 S. Ct. at 1433 (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010) and *Wal-Mart*, 131

---

[12] Even prior to *Comcast*, many courts in this Circuit held that predominance is defeated where individualized damages (alone or with other issues) would overwhelm any common issues. *See, e.g., Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013) (rejecting certification because "to determine damages would . . . require 2341 separate evidentiary hearings, which might swamp the Western District of Wisconsin with its two district judges"); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 891 (7th Cir. 2011) (lower court properly denied certification because each plaintiff-insured's claim "require[d] proof that a compensable loss occurred and was underpaid or not paid at all—a claim-specific inquiry"); *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) ("If the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims.").

S.Ct. at 2551 (2011)).[13] Here plaintiffs' proposed damages model does not account for all of plaintiffs' claims or theories of liability.

Plaintiffs in the state court advanced a number of different claims and theories of liability. They asserted that NM breached the Pre-MN annuitants' contracts by making the 1985 Change and calculating annuity dividends thereafter based on a segmented account rather than the general portfolio. (*See, e.g.*, R-App. 61-67, Plfs Proposed FFCL ¶ 8.) Plaintiffs' expert Hoyer's damages model addresses damages for that purported theory of liability and damages.

However, plaintiffs have also alleged that NM breached the annuity contracts, including the duty of good faith and fair dealing, and its fiduciary duties by failing to give notice of the 1985 Change or seek consent for the 1985 Change. For instance, plaintiffs allege that NM violated its "fiduciary duties of disclosure" by, among other things, "[f]ailing to provide Annuitants directly with a full and fair disclosure of the 1985 Change and its potential effects upon their Annuity dividends" and "[t]aking steps to make it unlikely that Annuitants would become aware of the 1985 Change and its potential effects on their Annuities and dividends." (*Id.* at ¶ 33, R-App. 80.)[14]

The notice and consent theories of liability are central to plaintiffs' case. Hoyer previously admitted that NM could have avoided liability by providing notice and obtaining consent from Pre-MN annuitants. (R-App. 509-510, Hoyer 6/30/2010 Rep. ¶¶ 88, 90 (opining that it would have been a "viable alternative" for NM to obtain agreement from Pre-MN annuitants).) And the failure

---

[13] *Comcast*'s holding applies to all class actions, not just antitrust suits. *See, e.g., RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013) (vacating and remanding a wage and hour case, *Ross v. RBS Citizens, N.A.*, 667 F.3d 900 (7th Cir. 2012), for further consideration in light of *Comcast*).

[14] Plaintiffs asserted similar notice and consent theories in support of their breach of contract and duties of good faith and fair dealing claims. (*See, e.g.*, R-App. 65, Plfs' Proposed FFCL ¶ 8(j)(i) (proposing finding that NM breached its contract by, among other things, making the 1985 Change "without notice to Annuitants"); *id.* at ¶ 25, R-App. 76-77 (proposing finding that "Northwestern breached its duties of good faith and fair dealing . . . in failing to notify the Annuitants of the Change, in taking steps to conceal the Change from the Annuitants . . ."). The state trial court found a breach of the duty of good faith and fair dealing and fiduciary duties based on failure to give notice and seek consent. (R-App. 614-615, 3/7/11 Order ¶ 26 (breach of fiduciary duties); *id.* at ¶ 25, R-App. 613-614 (breach of duty of good faith and fair dealing).)

26

to give notice and alleged concealment are key elements of plaintiffs' breach of fiduciary duty and punitive damages claims. Any classwide damages methodology must take into account those theories of liability. Yet Hoyer admits his model does not even attempt to calculate damages in a but-for world where NM gave notice or sought consent. (R-App. 11-12, Hoyer 5/17/13 Dep. 51:18-52:2.) According to Hoyer, any attempt to do so would be "speculative," is "not within the scope of actuarial work," and that he "never analyzed that." (*Id.* at 59:3-25, R-App. 15.)

As NM's experts explain and the evidence demonstrates, it is likely that a substantial number of Pre-MN annuitants would not have objected to the 1985 Change if given notice and would have consented if asked. (R-App. 306-307, Dhar Rep. ¶¶ 16-21.) Each putative class member would need to be questioned to determine what they would have done in that but-for world.

First, basic consumer behavioral science, including academic literature and market research, makes clear that different putative class members would have reacted differently to both notice and request for consent. (R-App. 306-321, Dhar Rep. ¶¶ 16-58.) Different investors have different reasons for choosing a particular investment, including different risk tolerances, and hence will react differently to proposed changes in the nature of the investment. (*Id.* ¶¶ 33-58, R-App. 312-321.) Motivations include a desire to invest in the NM brand, tax motivations, third-party ratings, as well as desire to maximize investment return. (R-App. 205-206, Moore Rep. ¶¶ 39-44, 58; R-App. 312-314; 316-317, Dhar Rep. ¶¶ 34-36; 44-46.) Some consumers are only concerned with the return on their overall portfolio of investments rather than individual products, or lack the time or desire to track individual product returns. (R-App. 206-207, 221, Moore Rep. ¶¶ 44, 84.) Other consumers rely on agents for information regarding their annuities, and so the 1985 Change would have influenced individual pre-MN annuitants differently depending on the extent to which agents had different points of view. (R-App. 210-211, Moore Rep. ¶ 52; R-App. 315, Dhar Rep. ¶ 40.) Policyholders would have differed in their expectations of future dividends, with some preferring

27

the 1985 Change, as evidenced by the number of annuitants who surrendered their policies and moved to competing products based on short-term interest rates in the early 1980s. (R-App. 220-221, Moore Rep. ¶¶ 81-83; R-App. 316-317, Dhar Rep. ¶¶ 44-46.) Since consumers have different investment time horizons, policyholders more concerned with short-term benefits would have preferred dividends based on the segmented portfolio in 1985 because it offered higher immediate dividends. (R-App. 213-214, Moore Rep. ¶ 58; R-App. 318-319, Dhar Rep. ¶¶ 50-53.)

Academic literature and market research shows that different investors also react differently to notices and recommendations. (R-App. 309-311, Dhar Rep. ¶¶ 25-32.) Some annuitants receiving notice would have held onto their pre-MN policies despite the 1985 Change, while others would have effectively mitigated damages by changing their investment strategies. (R-App. 206-214, Moore Rep. ¶¶ 44, 51-59; R-App. 309-311, Dhar Rep. ¶¶ 25-32.) As Hoyer himself admitted, "[d]ifferent policyholders do different things in any situation, it has nothing to do with the 1985 change, and I have no opinion as to what an individual policyholder would do in any situation." (R-App. 13-14, Hoyer 5/17/13 Dep. 57:24-58:6.)

Second, over 1,600 putative class members purchased NM's Current Rate Annuity ("CRA") product during the class period—many after terminating their Pre-MN annuity. (R-App. 254, Moore Rep. Ex. 4.) The CRA was advertised as being funded with short-term investments. (R-App. 194, Moore Rep. ¶ 9.) That roughly 9% of putative class members purchased CRAs rather than investing in the Pre-MN annuity demonstrates that a substantial percentage of the class likely would have been amenable to the 1985 Change. Individual inquiries must be made of Pre-MN annuitants who also purchased the CRA in order to determine which ones would have accepted the 1985 change.

Third, in the past when NM has provided notice and sought consent for a change, a substantial number of Pre-MN annuitants have agreed. For example, roughly 43% of the putative class members consented to Update '83, which altered the way NM calculated the DIR for

28

policyholders who borrowed on their policies. (R-App. 251, 262, Moore Rep. Exs. 1, 12.)

Finally, of the 2,746 members of the statewide class who received notice following certification by the state trial court, 115 (~4%) opted out of the class. (R-App. 620, Report on Class n.1.) The large percentage of opt outs suggests many of the putative class members, even today, do not object to NM's implementation of the 1985 Change.

### 2. Even as to the claim and damages theory Hoyer focuses on, Hoyer's model is flawed and requires individualized determinations

Hoyer asserts he can calculate on a classwide basis the "Difference" between how much putative class member earned in the actual world and how much they would have earned in a but-for world where NM did not implement the 1985 Change. But, as explained below, his model depends on a number of flawed assumptions and, in any event, requires individualized calculations to determine each putative class member's actual damages.

#### a. Hoyer's proposed model

Hoyer begins by dividing the putative class into two groups—those with and without direct recognition. For policies with direct recognition, the DIR depends on how much each policyholder borrowed against his policy and the policy loan rate—meaning that each policyholder with direct recognition could have a unique DIR each year. (R-App. 336-337, Hoyer Rep. ¶ 14.) For policies without direct recognition, the DIR does not depend on indebtedness. (*Id.* ¶ 15, R-App. 337.)

Next Hoyer determines what the but-for DIRs would have been. According to Hoyer, the DIRs for each Pre-MN annuitant vary based on: (1) whether or not the annuity policy is subject to direct recognition, and (2) the policy loan rate (5%, 6% or 8%) specified in the policy. (*Id.* ¶ 21, R-App. 338.) For policies with direct recognition and no loan balance, Hoyer *assumes* the but-for DIR is equal to the corresponding DIR for life insurance policies. (*Id.* ¶ 24, R-App. 338.) Where a policy with direct recognition has a loan balance, Hoyer *assumes* the but-for DIR on borrowed funds is the same as the DIR in the actual world because it is based on the policy loan rate. (*Id.* ¶ 27, R-App.

339.) For policies without direct recognition, Hoyer *assumes* the but-for DIR is the weighted average of the but-for direct recognition DIRs on borrowed and non-borrowed funds for each different policy loan rate. (*Id.* ¶ 28, R-App. 340.)

Hoyer then uses his various but-for DIRs to determine the accumulated "Difference" for each putative class member, which he says depends on "[t]he cash value of a Pre-MN annuitant's account at any point in time is based on the history of cash deposits, expense charges, policy loans, withdrawals, and the history of DIRs used to determine policyholder dividends credited to the account." (*Id.* ¶ 20, R-App. 338.) First, Hoyer *assumes* that each putative class member would have deposited the same amounts, borrowed the same amounts, and terminated their policies in the same years in the but-for world as in the actual world. (R-App. 338, Hoyer Rep. ¶ 22; R-App. 16, Hoyer 5/17/13 Dep. 65:1-8.) Second, Hoyer *assumes* that all deposits, withdrawals (including borrowings), and surrenders occurred at the end of each year, (R-App. 346, Hoyer Rep. ¶ 43.), despite acknowledging the timing of deposits, withdrawals, and surrenders in a given year affects the "Difference." (*Id.* ¶ 37, R-App. 345.) Third, Hoyer does not attempt to calculate the "Difference" for policies surrendered or otherwise terminated before 1993. (*Id.* ¶ 36, R-App. 344.) Finally, Hoyer performs an individual calculation for each putative class member based on whether direct recognition applies, policy loan rate, and timing and amount of deposits, withdrawals, borrowings, and surrenders. (*Id.* ¶¶ 49-52, R-App. 349-351.)

> b.    **Mr. Hoyer's model fails to account for certain aspects of damages**

Hoyer admits that his model does not calculate "damages" but rather something he calls the "Difference." (R-App. 5-6, Hoyer 5/17/13 Dep. 37:21-38:4 (admitting that "Difference" was "part of damages").) His model does not account for potential statute of limitations issues. (*Id.* at 17:9-22, R-App. 4.) His model does not account for different individualized investment decisions that putative class members would have made in the but-for world. (*Id.* at 57:24-58:6, R-App. 13-14.)

30

Each such issue would need to be litigated on an individual basis even if Hoyer's methodology could otherwise be applied to determine the "Difference" for each putative class member.

### c. Mr. Hoyer's model fails to account for the individualized investment decisions that the policyholders would have made

Hoyer's model assumes that each investor would have made exactly the same policy investment, borrowing, withdrawal and surrender decisions had NM not made the 1985 change. (R-App. 338, Hoyer Rep. ¶ 22.) This is a faulty assumption, as Mr. Hoyer largely concedes:

> Q. If, however, Northwestern Mutual had never implemented the 1985 change, would you have any reason to believe that the cash deposits would have been of the same amount and at the same time as they were in the actual world?

> A. They would certainly not have been.

(R-App. 16, Hoyer 5/17/13 Dep. 65:9-14; for comparable concessions, *see also id.* at 71:14-18, R-App. 17; 71:22-72:8, R-App. 17-18; 73:4-9, R-App. 19; 91:17-92:9, R-App. 27-28; 95:16-96:1, R-App. 31-32.)

The academic literature and third-party research confirms that absent the 1985 change, investors would have made different loan and deposit decisions. As noted, the non-segmented portfolio provided lower dividends for many years between 1985 and 1993. (R-App. 30, Moore Rep. ¶¶ 74-75, R-App. 256-258, Moore Rep. Exs. 6-8.) Basic economics dictates that some investors who retained their Pre-MN annuities would have divested themselves, or invested less, if they had received the lower returns corresponding to the life insurance DIR in the actual world before 1993. (*Id.* ¶ 78, R-App. 218-219.) Policyholders likely would have responded differently in the years after 1993 in the but-for world where returns would have been higher on a yearly basis. (*Id.* ¶ 78 & n. 66, R-App. 218-219.) Some investors, for example, would have invested less money and terminated earlier because funds in the annuity reached a particular investment goal more quickly, or they may have borrowed more because more money was available. (*Id.* ¶¶ 81-83, R-App. 220-221.) Absent individualized inquiry, there is simply no way to know.

31

### d. Mr. Hoyer's analysis misstates damages by failing to consider when policy-related transactions actually occurred

For the sake of "simplicity" and "understandability," (R-App. 9, Hoyer 5/17/13 Dep. 42:20-21), Hoyer assumed that all transactions, including the payment of premiums, withdrawals, and policy loans, occurred at the end of the year. (*Id.* at 42:19-43:8, R-App. 9-10.) Hoyer acknowledges that this assumption results in under- or over-estimations of actual damages for each class member. (*Id.* at 83:9-86:14, 88:4-18, R-App. 22-26.) For instance, Hoyer concedes that his assumption underestimates damages for putative class members who did not borrow or make withdrawals, since the accumulated difference in their accounts would be greater if the actual premium payment date prior to the end of the year were used. (*Id.* at 83:9-24, R-App. 22.) Hoyer also admits that his assumption that policyholders who surrendered their policies did so at the end of the year tends to overstate damages. (*Id.* at 92:20-93:1, R-App. 28-29.) Yet Hoyer claims, without having conducted any actual calculations, that such errors are immaterial. (*Id.* at 83:9-86:14, 88:4-18; 93:9-18, 94:18-95:3, R-App. 22-26, 29-31.)

### e. Mr. Hoyer's model does not account for pre-MN policyholders who agreed to Update '83 after 1985

Hoyer assumes that every putative class member either did or did not have direct recognition for the entire class period. However, over 100 of the putative class members did not sign Update '83 until 1985 or later. (R-App. 262, Moore Rep. Ex. 12.) Hoyer's model could not calculate the "Difference" for these policyholders—individual calculations, charts and tables would need to be created for each individual based on when their policies changed from direct to non-direct recognition. (R-App. 229, Moore Rep. ¶ 108.) Rather than address the problem created by these putative class members, Hoyer simply assumed the issue was immaterial to his model and so ignored it. (R-App. 38-39, 42-43, Hoyer 5/17/13 Dep. 136:6-137:17, 142:11-143:11.) When pressed, Hoyer could say only that he conducted an "analysis" and "numerical assessment" rather than

32

"calculations" to verify his assumption, none of which were written down or included in the report. (*Id.* at 140:10-141:25, R-App 40-41.)

### C.  Punitive Damages Cannot Be Calculated on a Classwide Basis

Plaintiffs make no mention of punitive damages in their brief, but it is clear they intend to demand them. (*See* R-App. 290, Complaint and Jury Demand at p. 21 (requesting declaration that NM "acted in an intentional disregard of the rights of the Class"); Plfs Opening Br. at 13 ("Plaintiff anticipates the need to seek further relief under 28 U.S.C. § 2202, including injunctive relief and damages.").) And it is equally apparent that each plaintiff's right to punitive damages must be evaluated under the particular state standards that apply to his or her claim, and each plaintiff's punitive damages award (if any) must be calculated on an individual basis.

#### 1.  Diverse punitive damages state standards defeat predominance

The law of the state where each putative class member lived when the policy issued provides the law of decision. *See supra* Section II.A.1. Here, the putative class members resided in all 50 states and the District of Columbia. (R-App. 297, Sales Aff. ¶ 4.) The inconsistencies among the states in assessing punitive damages abound:

- <u>Different standards apply</u>: *See, e.g.*, Wis. Stat. Ann. § 895.043(3) ("acted maliciously toward the plaintiff or in an intentional disregard of rights of the plaintiff"); Fla. Stat. Ann. § 768.72(2) (intentional misconduct or gross negligence); N.C. Gen. Stat. Ann. §§ 1D-5(5), (7), 1D-15(a) (fraud, malice, willful conduct, or wanton conduct); *Pavlova v. Mint Mgmt. Corp.*, 868 A.2d 322, 326 (N.J. Super. Ct. App. Div. 2005) (defendant must know or have reason to know of "circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct"); Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (fraud, malice, or gross negligence).

- <u>Different types of mitigating evidence the defendant may (or may not) introduce</u>: *See, e.g.*, Colo. Rev. Stat. Ann. § 13-21-102(2) (court may reduce punitive damages to extent deterrent effect of damages accomplished, wrongful conduct has ceased, or purpose of damages otherwise served); Miss. Code Ann. § 11-1-65(1)(f)(2)(ii)(4) (court may consider "[i]n mitigation, the imposition of criminal sanctions on the defendant for its conduct and the existence of other civil awards against the defendant for the same conduct"); Or. Rev. Stat. § 31.730(3) (court may reduce damages if defendant establishes it has taken reasonable remedial measures to prevent reoccurrence of conduct that gave rise to

33

punitive damages claim; in reducing punitive damages court may consider amount of previous punitive damages judgment for same conduct).

- Different burdens of proof: *See, e.g., Hennig v. Ahearn*, 601 N.W.2d 14, 29-30 (Wis. Ct. App. 1999) (clear and convincing evidence); Minn. Stat. Ann. § 549.20(1)(a) (same); Idaho Code Ann. § 6-1604(1) (clear and convincing); Iowa Code Ann. § 668A.1(1)(a) (preponderance of clear, convincing, and satisfactory evidence); Colo. Rev. Stat. Ann. § 13-25-127(2) (beyond reasonable doubt).

- Different decisionmaker (court vs. jury): *See, e.g.*, Wis. Stat. Ann. § 895.043(4) (if case tried to jury, jury determines punitive damages; if case tried to court, court determines punitive damages); Conn. Gen. Stat. Ann. § 52-240b (court determines amount of punitive damages to be awarded).

- Some states bifurcate punitive damages claims, and in different ways: *See, e.g.*, Minn. Stat. Ann. § 549.20(4) (if phasing requested by any party, trier of fact first determines whether and in what amount compensatory damages are awarded and, in a separate proceeding determines whether and in what amount punitive damages should be awarded); Nev. Stat. § 42.005(3) (trier of fact first decides if punitive damages are to be awarded, then in subsequent proceeding determines amount).

- Some states impose caps on punitive damages or disallow them: *See, e.g.*, Wis. Stat. Ann. § 895.043(6) (may not exceed twice the amount of any compensatory damages recovered by the plaintiff or $200,000, whichever is greater); Ala. Code § 6-11-21 (various caps depending on the claim and the size of the defendant, to be adjusted according to the Consumer Price Index); Colo. Rev. Stat. Ann. § 13-21-102(1)(a), (3) (cannot exceed actual damages; court may increase to up to three times actual damages if certain factors exist); Fla. Stat. Ann. § 768.73(1) (shall not exceed three times compensatory damages or $500,000, whichever is greater, unless conduct motivated by financial gain and defendant knew of unreasonable danger and high likelihood of injury); Kan. Stat. Ann. § 60-3701(e), (f) (shall not exceed annual gross income of defendant or $5 million, whichever is lesser, unless court finds profitability of defendant's misconduct exceeds gross income or $5 million); Miss. Code Ann. § 11-1-65(3)(a) (sliding scale of caps depending on defendant's net worth); *see also Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989) (punitive damages not allowed under Nebraska constitution); N.H. Rev. Stat. Ann. § 507:16 (punitive damages cannot be awarded unless statute expressly allows it); *Santana v. Registrars of Voters of Worcester*, 502 N.E.2d 132, 135 (Mass. 1986) (punitive damages cannot be awarded in Massachusetts without express statutory authorization); *Dailey v. N. Coast Life Ins. Co.*, 919 P.2d 589, 590 (Wash. 1996) (same – Washington).

Courts have routinely declined to certify classes requiring the application of multiple states' punitive damages regimes. *See, e.g., Woodard v. Fid. Nat'l Title Ins. Co.*, No. CIV 06-1170 RB/WDS, 2008 WL 5737364 at **3-4 (D. N.M. Dec. 8, 2008) (R-App. 737); *Thompson v. Jiffy Lube Int'l, Inc.*, 250

34

F.R.D. 607, 627 (D. Kan. 2008); *Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683, 691-94 (D. Kan. 2007); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 215 (D. Minn. 2003); *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 679 (N.D. Ga. 2003); *Chilton Water Auth. v. Shell Oil Co.*, No. CIV.A. 98-T-1452-N, 1999 WL 1628000, at *8 (M.D. Ala. May 21, 1999) (R-App. 745); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 294 (S.D. Ohio 1997); *Mack v. Gen. Motors Acceptance Corp.*, 169 F.R.D. 671, 678-79 (M.D. Ala. 1996); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 653-54 (C.D. Cal. 1996).

Moreover, certification of a nationwide punitive damages class runs a heightened risk of violating the Constitutional limits on states' imposition of punitive damages for defendants' lawful out-of-state conduct. *See BMW of N. Am. v. Gore*, 517 U.S. 559 (1996). Here, a classwide award of punitive damages could penalize NM for acts that did not rise to the level of punishable conduct in a particular class member's state of residence. But any attempt to avoid this result by parsing out the multiple and conflicting state standards would lead to impossible manageability problems.

### 2. The need for individual factual determinations defeats predominance

Wisconsin law obligates the factfinder to consider factors specific to the *individual* plaintiff before imposing punitive damages. *See, e.g.*, Wis. JI-Civil 1707.1 (instructing jury to consider four factors including "the potential damage which might have been done by such acts as well as the actual damage"). As a result, even assuming Wisconsin law would apply to plaintiffs' claims, individual factors will inevitably predominate over common questions in determining whether punitive damages are appropriate, and if so, in what amount. Since multiple states' law would in fact apply here, the individual factors to be addressed would be exponentially higher as several other states also require consideration of certain plaintiff-specific factors. *See, e.g.*, Miss. Code Ann. § 11-1-65 (factfinder must consider impact of defendant's conduct on plaintiff); N.D. Cent. Code Ann. § 32-03.2-11(4) (factfinder must consider harm that actually occurred to plaintiff); N.C. Gen. Stat.

Ann. § 1D-35(2) (actual damages may be considered in determining amount of punitive damages).[15]

As a result, several courts have refused to certify classes seeking punitive damages because such individual factors would inevitably predominate over common questions. *See In re Baycol*, 218 F.R.D. 197, 215-16 (D. Minn. 2003) (refusing to certify a class seeking punitive damages because due process requires that each class member demonstrate that such damages are appropriate with regards to him or her); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. at 294 (same); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 467-68 (D. Wyo. 1995), *aff'd*, 232 F.3d 900, (10th Cir. 2000) ("[P]unitive damages and punitive conduct should be determined on an individual basis.").

### D. Individualized Issues Regarding Affirmative Defenses Would Predominate

Plaintiffs do not dispute that class certification would be improper if NM is allowed to assert individual affirmative defenses against putative class members, such as laches, waiver, estoppel and statutes of limitations.[16] *Sacred Heart*, 601 F.3d at 1176-77 (holding that risk of "voluminous and individualized extrinsic proof runs particularly high where a defendant raises substantial affirmative defenses to breach"). Plaintiffs contend instead that NM is barred from asserting any affirmative defenses against any class member because the state trial court found that NM had "concealed" the 1985 Change and hence that equitable defenses are not available and that statutes of limitations were tolled across the board. (Plfs Opening Br. 23, 25.) Plaintiffs are incorrect.

First, as explained above, plaintiffs affirmatively disclaimed that NM's affirmative defenses were at issue before the state trial court. *See supra* pp. 3-5. Plaintiffs cannot now rely on the state

---

[15] Even without a specific state law directive, the U.S. Constitution requires any punitive damages award to be tailored to the particular plaintiff. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("The precise [punitive damages] award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff"); *BMW of N. Am.*, 517 U.S. at 580-83 (must be "reasonable relationship" between harm likely to result from defendant's conduct and actual harm to plaintiff).

[16] The Court does not need to resolve the statute of limitations choice-of-law issue here. Regardless of the applicable limitations law, class certification is inappropriate because individualized inquiry into when each class member learned of the 1985 change will be necessary to resolve the merits of NM's statute of limitations defense. And because the Court does not need to resolve the applicability of the business judgment rule to resolve this motion, NM does not address plaintiffs' arguments concerning its applicability here. NM reserves its rights to do so at the appropriate time.

36

court's trial decision to deprive NM of all of its defenses.

Second, the state court's findings that NM actively concealed the 1985 Change is contrary to the evidence, and, as the Seventh Circuit explained, this court is free to reconsider the state court's findings. *LaPlant*, 701 F.3d at 1142.

NM typically does not deal directly with individual annuitants, but instead relies on its network of independent agents to market and sell its products and communicate with individual purchasers. (R-App. 299, Sales Aff. ¶ 17.) The record is undisputed that NM communicated the 1985 Change to its independent agents when it was implemented and that these agents were responsible for communicating with policyholders. (R-App. 627, Tr. Ex. 66 p. -511; R-App. 646, Tr. Ex. 67 p. 16; R-App. 662, Tr. Ex. 73.) The Wisconsin Court of Appeals acknowledged this precise reality in rejecting plaintiffs' counsel's request for nationwide certification in the *Noonan* case:

> The record reflects that NML's independent agents had been informed of the change, and that it was the agents' job to communicate information to annuity owners. Thus, it was logical for the circuit court to infer that some agents had communicated the 1985 change in dividend distribution to their clients. If those putative class members knew of the change and accepted it, this would raise the issue of whether they waived their right to enforce the previous provisions…

*Noonan II*, 726 N.W.2d 356, at ¶ 28. The Wisconsin Court of Appeals concluded the "varied factual scenarios under which the plaintiffs entered into their contracts and then learned of NML's breach provide support for the [circuit] court's conclusion" that certification was inappropriate. *Id.* ¶ 17.

The record also reflects that NM told putative class members that their annuity and life insurance dividends were based on different investment portfolios. For example, one NM communication from 1990 responds to a policyholder's letter "inquiring about the differences between dividends on annuities and life insurance policies," explaining that "[a]nnuities and life insurance policies are treated differently with respect to dividends. This is due to the fact that assets for each of the portfolios are invested differently." (R-App. 663, 6/7/1990 Letter.) Another email from 1998 explains that NM is "paying your annuity a lower dividend rate" than the life rate

37

disclosed in the Annual Report because the rates "have been different since 1986. Prior to this, the two product lines shared the same dividend interest rate. A change was made to reflect differences in how NML invests the assets underlying these two products." (R-App. 664, 4/7/1998 Email.) According to the 1998 email, the annuities' lower rates were due to "the underlying investments associated with annuities that are different than those used for life insurance." (*Id.*) Another letter from 1999 explains the differences in DIRs for life insurance and annuities: "Our fixed annuities are invested in short term investments, such as bonds and mortgages with maturity periods of less than five years," while the 8.80% rate set out in the Annual Reports is for life insurance products, "which invest in larger term bonds, stock, and real estate investments." (R-App. 665, 9/14/1999 Letter).

As these documents reflect, NM put individual policyholders on notice that annuity and life insurance dividends were based on different investment portfolios, which was freely-given information containing precisely the facts that Ms. LaPlant contends were hidden as part of NM's vast, decades-long "scheme." Such individualized evidence is directly relevant to affirmative defenses that putative class members waived any right to sue, are estopped from complaining about the 1985 Change, and/or are time-barred from asserting such claims. This case is thus distinguishable from *Meriter* where the defendant had "failed to identify any communications to individual plan participants." *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 370 (7th Cir. 2012).

In addition to these direct communications, moreover, NM each year informed its policyholders of the dividends paid on their respective policies through direct communications and published the life insurance rates in the company's annual reports. (R-App. 299, Sales Aff. ¶ 18.) At the very least, such information gave putative class members reason to inquire as to why the dividends were different. Performing such a comparison is how the *Noonan* plaintiffs learned of the change in dividend methodology. (R-App. 473-475, 11/8/10 am Trial Tr. 66:7-68:16.) And after contacting NM regarding the discrepancy, NM in 2000 provided the Noonans with a full

38

explanation of the 1985 Change and its impact on annuity and life insurance dividends. (R-App. 667, Tr. Ex. 316.) There is no evidence that NM actively or fraudulently concealed the 1985 Change such that tolling on a classwide basis is warranted. *See, e.g., Kindschuh v. City of Fond du Lac*, No. 09-C-213, 2010 WL 1507883, at *6 (E.D. Wis. Apr. 14, 2010) (R-App. 753) ("To toll the statute of limitations with the doctrine of estoppel by fraudulent concealment the court must find that the 'defendant's conduct and representations were so unfair and misleading as to outbalance [the] public's interest in setting limitation on [the] action.'" (quoting *Bell v. City of Milwaukee*, 514 F. Supp. 1363, 1371 (E.D. Wis. 1981)).

Plaintiffs' own expert Hoyer testified that he assumed policyholders with both annuity and life insurance policies would have "began to become aware [of the change] when the rates for life and annuities started to diverge somewhat," stating the annuity rate was "substantively lower" as of 1993. (R-App. 51-53, Hoyer 5/17/13 Dep. 205:21-206:8, 208:2-9.) Hoyer opined that even putative class members who owned only annuity policies likely would have noticed the change at some point:

> You're putting forth that the only way to see a change is if you had both policies. You know, there appears to be a downward trend on annuities, so if I didn't have a life insurance policy, certainly at some point here, if I were an annuity policyholder, I would—I would be aware that my dividends were decreasing materially.

(*Id.* at 208:16-209:9, R-App. 53-54.) Individual inquiry is required to determine which putative class members had notice of the 1985 Change and hence the applicability of NM's affirmative defenses.

### E. Class Treatment Is Not a Superior Method of Resolution

A class action must also be superior to individual trials. The most significant requirement in the superiority analysis is manageability, which encompasses a wide range of practical problems. Plaintiffs fail in their cursory attempt to show that their proposed classes are manageable and that the class action mechanism is the superior means of addressing class members' claims against NM.

#### 1. Individualized issues would render the class unmanageable

"A critical need [in deciding class certification] is to determine how the case will be tried."

39

Fed. R. Civ. P. 23, Advisory Comm. Notes to 2003 Amendments; *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (reversible error not to consider "how a trial on the merits would be conducted").

Plaintiffs' failure to address how a nationwide damages class action would be tried alone requires denial of certification. And in fact, it is clear that a class trial here would be unmanageable. As discussed, individual issues infect plaintiffs' claims, from proof of liability to affirmative defenses, from existence of injury to the calculation of class members' alleged compensatory damages, from punitive damages to the application of multiple states' law. It is impossible to conceive of jury instructions that could dispose of even one such issue in a class-wide damages trial. Substantial individual trials for each class member would be inevitable. *Castano*, 84 F.3d at 745 n.19 ("The greater the number of individual issues, the less likely superiority can be established."); *In re Am. Med. Sys., Inc.*, 75 F.3d at 1085 (any "economies of scale achieved by class treatment are more than offset by the individualization of numerous issues relevant to only a particular plaintiff").

Aside from the need for class members to prove so many elements of their cases on an individual basis, NM has a due process right to challenge, on an individual basis for every class member, any evidence presented on each of these issues. *In re Ford Motor Co.*, 182 F.R.D. 214, 221 (E.D. La. 1998). Moreover, the Seventh Amendment prohibits plaintiffs from relying on multiple proceedings with different juries that require adjudication of the same or overlapping facts, making it even more difficult to see what sort of class-wide trial structure could possibly be workable in these cases. *Id.* at 224; *see also Castano*, 84 F.3d at 750-51.

### 2. Notice difficulties would render proposed class-wide trials unmanageable

Rule 23(c)(2) requires notice to class members. Difficulties satisfying this notice requirement also make plaintiffs' proposed classes unmanageable. *Simer v. Rios*, 661 F.2d 655, 677-78 (7th Cir. 1981); *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994); 5 James Wm. Moore et al., Moore's

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 52 of 59   Document 38

Federal Practice - Civil § 23.46[2][e][i] ("If the members of the class are not identifiable, managing the action may pose insurmountable problems.") The notice requirement is grounded in due process, to protect the rights of absent class members who would be bound by a judgment and may wish to opt out. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974). The Supreme Court recently rejected the assertion that "(the class-notice requirement) must be dispensed with because the 'prohibitively high cost' of compliance would 'frustrate [plaintiff 's] attempt to vindicate' the rights at issue." *Am. Express Co.*, 2013 WL 3064410, *1 (citing *Eisen*, 417 U. S. at 166-68).

Notice is particularly difficult where membership in the proposed class is not ascertainable. *Foster v. St. Jude Med., Inc.*, 229 F.R.D. 599, 607 (D. Minn. 2005). In this matter, we know over 2,200 (over 10%) of the putative class members are deceased. (R-App. 298-299, Sales Affidavit ¶¶ 13-14.) We know that NM has no way of identifying to whom to send notice and that plaintiffs have not met their burden of explaining how they would provide notice. (*Id.*) This was made clear in the state trial court when plaintiffs attempted to notify members of the statewide class. Of 3,358 potential notices, 579 were returned as undeliverable by the Post Office and 33 were not sent because there was no address of record. (R-App. 620, Class Report at 1 n.1.) Roughly 18% of the statewide class members, or their representatives, thus did not receive notice.

### 3. Plaintiffs cannot carry their burden of showing superiority because their claims can be pursued individually

Plaintiffs' primary argument for the supposed superiority of the class action device in this litigation is that litigation of individual cases is not feasible. (Plfs Opening Br. at 26-28.) But the need to try a significant number of issues on an individual basis regardless of class certification defeats "the purported economies of class treatment." *In re Ford Motor Co.*, 182 F.R.D. at 224. If class treatment will "in actuality require a multitude of mini-trials . . . then the justification for class certification is absent." *State of Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 328 (5th Cir. 1978); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 608 (S.D.N.Y. 1982) ("To certify any of

41

these actions as class actions would be to unleash a Frankenstein monster of unmanageability, weighted down with individual questions of fact and law which clearly predominate, to the potential disadvantage of the litigants, and to the certain prejudice of the orderly disposition of such enforceable legal claims as may arise.").[17]

Moreover, a class action would not resolve the claims of all Pre-MN annuity policyholders, itself rendering the vehicle ineffective. Plaintiffs' counsel has abandoned roughly 43% of Pre-MN annuitants (~45% of polices at issue) who might want to pursue claims. That, along with what we know empirically from the 100+ individuals who opted out of this litigation when counsel was seeking a Wisconsin-only class, means that a significant portion of grievances would go unresolved even if this class were certified and the court were to undertake thousands of individual trials on the individual issues that are not amenable to class treatment. As a result, class treatment would be an especially *inferior* method of litigation.

## IV. Plaintiffs Have Not Satisfied Rule 23(b)(2)'s Requirements for an Injunctive or Declaratory Judgment Class

Almost as an afterthought, plaintiffs spend the last few pages of their brief arguing that, in the alternative, this Court should certify the proposed class under Rule 23(b)(2). (*See* Plfs Opening Br. at 28-29.) Plaintiffs' request should be denied because, contrary to the demands of Rule 23(b)(2), the putative class members are not cohesive; an injunction would not end the case; and the remedies sought are individualized and cannot be calculated for the class as a whole.

---

[17] Plaintiffs' self-serving assertion that they would not pursue these claims absent class certification is insufficient to carry their burden. LaPlant claims to be owed $34,000 before interest and punitive damages, and other class members no doubt will seek more. (R-App. 351, Hoyer Rep. ¶ 51.) *See, e.g., Andrews,* 545 F.3d at 577 (no superiority where plaintiffs can expect to receive over $50,000 plus attorney's fees and costs); *Szabo,* 249 F.3d at 677-78 ("[I]t is unnecessary to certify a nationwide class. Each buyer has a substantial claim, of the sort that could be, and often is, pursued independently."); *Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 443 (7th Cir. 2000) ("each class member had a sufficiently large stake to be able to afford to litigate on his own-a consideration that weighs against allowing a suit to proceed as a class action, in view of the well-known drawbacks of class litigation" (citations omitted)).

## A. Putative Class Members Are Not Cohesive

Rule 23(b)(2) presumes that "the interests of the class members are cohesive and homogeneous", and therefore "the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000). The *Lemon* court explained:

> A suit for money damages, even if the plaintiffs seek uniform, class-wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual plaintiff's claim.

*Id.*; *see also Kartman*, 634 F.3d at 893 n.8 ("Where a class is not cohesive such that a uniform remedy will not address the injuries of *all* plaintiffs, class certification is typically not appropriate."). Here, the putative class seeks compensatory and punitive damages that can only be awarded after each class member's individualized claim is adjudicated according to applicable state laws. The cohesion of the putative class thus disintegrates.

## B. Injunctive Relief Is Improper Because It Is Not Final

Plaintiffs cite to an older, inapposite case in claiming that their request for injunctive relief is appropriately "final" because it "'will settle the particular controversy and clarify the legal relations in issue.'" (Plfs Br. at 28 (quoting *Sears, Roebuck & Co. v. Am. Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967)).) In that unremarkable case, the plaintiff was permitted to seek a declaration that its insurer was required to defend and indemnify it in another lawsuit brought against the plaintiff. *Sears,* 372 F.2d at 438-40. The court concluded that the issue of insurance coverage was sufficiently independent from the liability lawsuit that granting insured plaintiff a declaration of policy coverage would resolve the controversy between the parties. *Id.* at 440.

The case plaintiffs should have cited is *Kartman*, in which the Seventh Circuit unambiguously held that in the context of class certifications, "[a]n injunction is not a final remedy if it would

43

merely lay an evidentiary foundation for subsequent determinations of liability." *Kartman*, 634 F.3d at 893. As a result, Rule 23(b)(2) "is not appropriately invoked for adjudicating common issues in an action for *damages*." *Id.* at 895 (emphasis in original); *see also Jamie S. v. Milwaukee Public Sch.*, 668 F.3d 481, 498-499 (7th Cir. 2012) (demand for injunctive or declaratory relief must be "final to the class as a whole"); *Boelk v. AT&T Teleholdings, Inc.*, No. 12-CV-40-BBC, 2013 WL 261265 at *12 (W.D. Wis. Jan. 10, 2013) (R-App. 762) (courts should not certify (b)(2) classes "solely to lay the groundwork for subsequent individualized monetary damage awards").[18]

### C. Remedies Sought Are Individualized and Do Not Flow to the Class as a Group

A Rule 23(b)(2) class is proper only where a "single injunction or declaratory judgment would provide relief to each member of the class," and not where each class member is entitled to a "*different* injunction or declaratory judgment against the defendant." *Jamie S.,* 668 F.3d at 499 (quoting *Wal-Mart*, 131 S.Ct. at 2557). Where the relief sought "would merely initiate a process through which highly individualized determinations of liability and remedy are made, this kind of relief would be class-wide in name only, and it would certainly not be final." *Id.*

As with a damages determination, individualized issues would infect any injunctive relief. For example, the terms of any injunction would be dependent on whatever state law applies to each particular class member. Other class members would not benefit from injunctive or declaratory relief at all, including those who surrendered their policies or whose policies are now in the payout phase.

Not only must a Rule 23(b)(2) class seek uniform prospective relief, any monetary relief that it pursues must be uniform. The Supreme Court described appropriate (b)(2) damages as "incidental", *Wal-Mart*, 131 S.Ct. at 2557, meaning "damages that flow directly from liability to the

---

[18] It is true that *Kartman* allowed certification of an injunctive class where the class seeks past damages for one harm and prospective relief for another. *Kartman*, 634 F.3d at 894. But even if plaintiffs' request here for an injunction requiring NM to alter future Pre-MN annuity dividend payments could be considered "prospective," it would affect only the 2,719 putative class members who have in-force policies today. Such prospective relief would be meaningless to the 17,666 putative class members whose policies have terminated.

class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *Id.* (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998)). Such damages "'should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new substantial legal or factual issues, nor entail complex individualized determinations.'" *Id.* (quoting *Allison*, 151 F.3d at 415). As already discussed, many of the factors weighing against a (b)(2) class are present here—damages are individualized rather than flowing to the class as a whole; additional hearings would be required on the merits of each individual's case (including applicable affirmative defenses); and complex individualized determinations are necessary.

Plaintiffs can find no comfort in the recent Seventh Circuit's *Meriter* case. There, the court held that a Rule 23(b)(2) class was appropriate because the subclasses initially sought only equitable reformation of the pension plan, and any later claim for money damages would require a simple mechanical computation that would be "incidental" to the declaratory and injunctive relief. 702 F.3d at 371-72. Here, not only are plaintiffs seeking primarily to certify a (b)(3) class, but again, each putative class member's alleged damages requires individualized calculation.[19]

## CONCLUSION

For the foregoing reasons, Northwestern Mutual respectfully requests that the Court deny Plaintiffs' Motion for an Order Redefining the Class and for Related Relief.

---

[19] Nor can plaintiffs reasonably propose divided certification, meaning a (b)(2) proceeding, and if declaratory relief is granted, a (b)(3) proceeding for damages. Bifurcation is not "optimal if the issues underlying the declaratory and damages claims overlap[]." *Meriter,* 702 F.3d at 371. Under the Seventh Amendment, the defendant in a divided-certification case is entitled to have the damages claims tried first, to a jury. *Id.*

45

Dated this 1st day of July, 2013.

By:   /s/ Adam Hoeflich
Adam Hoeflich (*pro hac vice*)

Attorneys for Defendant
The Northwestern Mutual Life Insurance Company

Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile:  (312) 494-4440
Email:  adam.hoeflich@bbhps.com

Sean C. Grimsley (*pro hac vice*)
John M. Hughes (*pro hac vice*)
Bartlit Beck Herman Palenchar & Scott LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile:  (303) 592-3140
Email:  sean.grimsley@bbhps.com
         john.hughes@bbhps.com

Eric J. Van Vugt (Wis. Bar No. 1017336)
Joshua D. Maggard (Wis. Bar No. 1061378)
Quarles & Brady LLP
411 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 277-5625
Facsimile:  (414) 978-8625
Email:  eric.vanvugt@quarles.com
         joshua.maggard@quarles.com

46

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served via the ECF system which will send a notice of electronic filing to the following: George Kersten, Jeffrey A. Bartos, Mark B. Pollack.

/s/ *Adam Hoeflich*