# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                                    Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

**APPENDIX TO NORTHWESTERN MUTUAL'S OPPOSITION TO**

**PLAINTIFFS' MOTION TO CERTIFY A NATIONWIDE CLASS**

**VOLUME I**

**Items 1-15**

**Pages 1-299**

# Index to Northwestern Mutual's Appendix

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 1 | Robert Hoyer Deposition Transcript Excerpts | May 17, 2013 | 1 | I |
| 2 | Plaintiffs Proposed Findings of Fact, Conclusions of Law and Order for Judgment | Dec. 20, 2010 | 56 | I |
| 3 | Plaintiff's Reply Brief in Support of Class Certification | Sept. 30, 2009 | 85 | I |
| 4 | *Noonan* – Decision on Motion to Certify for Class Action | June 15, 2005 | 102 | I |
| 5 | *Noonan* – Plaintiffs' Brief in Support of Motions: (1) to Certify Class Trial of Count One (Declaratory Relief) and Class-Wide Issues of Count Two (Breach of Contract), and (2) for Partial Summary Judgment | Apr. 30, 2007 | 108 | I |
| 6 | *Noonan* – Decision on Motions to Certify for Class Action and Summary Judgment | Jan. 29, 2008 | 118 | I |
| 7 | Motion Hearing Transcript Excerpts | June 1, 2009 | 129 | I |
| 8 | Decision and Order on Motion of Plaintiff for Class Certification | Oct. 26, 2009 | 137 | I |
| 9 | Hearing Transcript Excerpts | Oct. 12, 2009 | 156 | I |
| 10 | Decision on Motion of Defendant to Dismiss | June 15, 2009 | 161 | I |
| 11 | Decision and Order | Aug. 20, 2012 | 180 | I |
| 12 | Expert Report of Michael J. Moore, Ph.D. | June 28, 2013 | 188 | I |
| 13 | Summons and Complaint | Aug. 26, 2008 | 267 | I |
| 14 | Affidavit of Jason T. Klawonn | June 27, 2013 | 293 | I |
| 15 | Affidavit of Nicholas J. Sales | June 27, 2013 | 297 | I |
| 16 | Expert Report of Ravi Dhar | July 1, 2013 | 300 | II |
| 17 | Expert Wtiness Report: Robert L. Hoyer, FSA, MAAA | Mar. 4, 2013 | 333 | II |
| 18 | Table 1, States prohibiting choice of law provisions specifying application of other states' law to resident policyholders | | 359 | II |
| 19 | Table 2, States Deeming Resident Policis as Made in the State and Subject to that state's law | | 360 | II |
| 20 | Table 3, States requiring insurance companies to comply with law of state of insured's residence | | 361 | II |
| 21 | Northwestern Mutual's Opposition to Plaintiff's Motion to Remand | Nov. 18, 2011 | 362 | II |
| 22 | Marleen LaPlant Deposition Transcript Excerpts | Sept. 9, 2009 | 371 | II |
| 23 | LaPlant Annuity policy | May 1, 1975 | 395 | II |
| 24 | LaPlant surrender | July 3, 2008 | 408 | II |
| 25 | Webster's Collegiate Dictionary: definition of surrender | 1996 | 412 | II |
| 26 | Black's Law Dictionary: definition of surrender | 1999 | 416 | II |
| 27 | Trial Ex. 157, NML Single Premium Retirement Annuity Policy for Bruce Williams | May 3, 1986 | 419 | II |
| 28 | Trial Ex. 155, NML Flexible Premium Annuity Policy for Bruce Williams | July 27, 1984 | 433 | II |

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 29 | Bruce Williams Deposition Transcript Excerpts | May 8, 2010 | 450 | II |
| 30 | November 8, 2010 pm Trial Transcript Excerpts | Nov. 8, 2010 | 460 | II |
| 31 | November 8, 2010 am Trial Transcript Excerpts | Nov. 8, 2010 | 471 | II |
| 32 | Expert Witness Report: Robert L. Hoyer, FSA, MAAA | June 30, 2010 | 477 | II |
| 33 | Decision in Matter Tried to the Court | Mar. 7, 2011 | 522 | III |
| 34 | Report to the Court Regarding Class Notice | Mar. 31, 2010 | 619 | III |
| 35 | Trial Ex. 528, Dividend Interest Rates vs. Current Rate Annuity Credit Rates | | 622 | III |
| 36 | Trial Ex. 66, NM Feb 1985 Information Release to all Agents | Feb. 1985 | 623 | III |
| 37 | Trial Ex. 67, Introducing NM New FPA-SPRA | Feb. 26, 1985 | 629 | III |
| 38 | Trial Ex. 73, Column – Change to current rate method on annuities expected to meet w/ consumer satisfaction | June 12, 1985 | 662 | III |
| 39 | June 7, 1990 Letter | June 7, 1990 | 663 | III |
| 40 | April 7, 1998 Email | Apr. 7, 1998 | 664 | III |
| 41 | September 14, 1999 Letter | Sept. 14, 1999 | 665 | III |
| 42 | Trial Ex. 316, NML Letter  to Noonan's re Contract #7182718 | May 9, 2000 | 667 | III |
| 43 | *Thao v. Midland Nat'l Life Ins. Co.*, No. 09-C-1158, 2012 WL 1900114 (E.D. Wis. May 24, 2012) | May 24, 2012 | 670 | III |
| 44 | *Noonan v. Northwestern Mut. Ins. Co.*, 726 N.W.2d 356 (Wis. Ct. App. 2006) (*Noonan II*) | Nov. 16, 2006 | 678 | III |
| 45 | *Am. Express Co. v. Italian Colors Rest.*, No. 12-133, 2013 WL 3064410 (U.S. June 20, 2013) | June 20, 2013 | 686 | III |
| 46 | *Heretick v. Northwestern Mut. Life Ins. Co.*, No. 02-1061-CI-11, 2003 WL 25694174 (Fla. Cir. Ct. June 23, 2003) | June 23, 2003 | 704 | III |
| 47 | *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, Nos. C-05-04726 RMW, C-06-00537 RMW, 2007 WL 486367 (N.D.Cal Feb. 12, 2007) | Feb. 12, 2007 | 712 | III |
| 48 | *Maine Farms Venison, Inc. v. Peerless Ins. Co.*, No. CV-01-005, 2002 WL 33946004 (Me. Sup. Ct. Apr. 18, 2002) | Apr. 18, 2002 | 721 | III |
| 49 | *Garvey v. Nat'l Grange Mut. Ins. Co.*, No. CIV.A.95-0019, 1995 WL 115416 (E.D. Pa. Mar. 16, 1995) | Mar. 16, 1995 | 733 | III |
| 50 | *Woodard v. Fid. Nat'l Title Ins. Co.*, No. CIV 06-1170 RB/WDS, 2008 WL 5737364 (D. N.M. Dec. 8, 2008) | Dec. 8, 2008 | 737 | III |
| 51 | *Chilton Water Auth. v. Shell Oil Co.*, No. CIV.A. 98-T-1452-N, 1999 WL 1628000 (M.D. Ala. May 21, 1999) | May 21, 1999 | 745 | III |
| 52 | *Kindschuh v. City of Fond du Lac*, No. 09-C-213, 2010 WL 1507883 (E.D. Wis. Apr. 14, 2010) | Apr. 14, 2010 | 753 | III |
| 53 | *Boelk v. AT&T Teleholdings, Inc.*, No. 12-CV-40-BBC, 2013 WL 261265  (W.D. Wis. Jan. 10, 2013) | Jan. 10, 2013 | 762 | III |

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF WISCONSIN

 3    ----------------------------------------------------------

 4   MARLEEN M. LAPLANT, on her own behalf
     and on behalf of a class similarly situated,
 5
                       Plaintiffs,
 6
            vs.                          Case No. 2:11-CV-00910
 7
     THE NORTHWESTERN MUTUAL
 8   LIFE INSURANCE COMPANY, a
     Wisconsin Mutual Insurance Corporation,
 9
                       Defendant.
10
     ----------------------------------------------------------
11

12

13          VIDEOTAPED DEPOSITION OF ROBERT L. HOYER

14                 Friday, May 17th, 2013

15                      9:00 a.m.

16                         at

17                 QUARLES & BRADY, LLP
                  411 East Wisconsin Avenue
18                  Milwaukee, Wisconsin

19
            Reported by Carla J. Miller, RPR, CRR
20

21

22

23

24

25
```

www.GramannReporting.com · 414.272.7878

GRAMANN
REPORTING
Innovation · Expertise · Integrity

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 4 of 302   Document 38

R-App 001

1          Videotaped Deposition of ROBERT L. HOYER, a

2      witness in the above-entitled action, taken at the

3      instance of the Defendants, pursuant to the rules of

4      Federal Civil Procedure, pursuant to Notice of

5      Deposition, before Carla J. Miller, Registered

6      Professional Reporter and Certified Realtime

7      Reporter, in and for the State of Wisconsin, at

8      QUARLES & BRADY, LLP, 411 East Wisconsin Avenue,

9      Milwaukee, Wisconsin, on the 17th day of May, 2013,

10      commencing at 9:00 a.m. and concluding at 3:58 p.m.

11

12  A P P E A R A N C E S:

13          KERSTEN & McKINNON, S.C., by
              MR. GEORGE P. KERSTEN and
14          E. CAMPION KERSTEN
              11518 North Port Washington Road, Suite 104
15          Mequon, Wisconsin, 53092
              Appeared on behalf of the Plaintiffs
16
              BARTLIT BECK HERMAN PALENCHAR & SCOTT, by
17          MR. SEAN C. GRIMSLEY and MR. ADAM HOEFLICH
              1899 Wynkoop Street
18          Denver, Colorado, 80202
              Appeared on behalf of the Defendants
19
              NORTHWESTERN MUTUAL, by
20          MR. RODD SCHNEIDER
              720 East Wisconsin Avenue
21          Milwaukee, Wisconsin, 53202

22  ALSO PRESENT:   Mr. Mark Lyle, Ryker & Lyle Legal
23                  Video Service

24

25

1                         I N D E X

2    EXAMINATION                                        PAGE

3    BY MR. GRIMSLEY                                       5
        MR. KERSTEN                                      212
4       MR. GRIMSLEY                                     212

5

6                      E X H I B I T S

7                         (NONE)

8
     EXHIBIT NO.                            PAGE IDENTIFIED
9
     No. 1 - Hoyer Actuarial Litigation invoice           8
10
     No. 2 - Nathan Associates invoice                   10
11
     No. 3 - Hoyer Actuarial Litigation report
12             dated 3/4/13                              14

13   No. 4 - Plaintiffs' Motion for an Order
               Redefining the Class and for              48
14             Related Relief

15   No. 5 - Dividend Interest Rates chart               99

16   No. 6 - Hoyer Actuarial Litigation report
               dated 6/30/10                            122
17
     No. 7 - Trial Exhibit 127 chart                    158
18
     No. 8 - Affidavit of Robert Hoyer                  172
19
     No. 9 - Affidavit of Christ Trost                  193
20

21
                  (Exhibits filed with original
22                 transcript, copies to counsel.)

23

24

25

 1      to whether you mean pre-judgment or post-judgment

 2      interest.

 3   BY MR. GRIMSLEY:

 4   Q   Sir, did you do anything with regard to calculating

 5      interest as to any judgment, whether it's

 6      pre-judgment or post-judgment in this case?

 7   A   That was not included in Paragraph 6 and I did not do

 8      any such analysis.

 9   Q   In your analysis, did you take into consideration the

10      potential impact of any statutes of limitations in

11      this case?

12   A   For purposes of this report I did not.

13   Q   Were you asked to do so by any of the lawyers?

14   A   Again, I'm not an attorney.  If they asked me to

15      review statutes of limitations, I would say that's

16      beyond my scope and capability, but I did not in this

17      instance.

18   Q   Did the lawyers provide you any assumptions that you

19      should make with regard to statutes of limitations?

20              MR. KERSTEN:  Objection as irrelevant.

21              THE WITNESS:  No, that -- that never

22      surfaced in our discussions.

23   BY MR. GRIMSLEY:

24   Q   Did the lawyers for Plaintiffs ask you to assume

25      anything about the impact that various state laws

```
 1        this report, so I can't cite other specifics off the
 2        top of my head, no.
 3   Q    Now, we talked about prospective relief for in-force
 4        policyholders.  For those policyholders that are
 5        putative class members but have surrendered or
 6        otherwise terminated their policies as of today's
 7        date, what would you call the relief you're
 8        calculating for them?
 9   A    That relates to the third question or third bullet of
10        Paragraph 6 that counsel asked if that same
11        methodology could quantify a difference for those
12        policyholders which were in the initial class but are
13        no longer in force, and my answer to that third
14        request of Plaintiffs' counsel was positive, that the
15        same methodology would apply, it will calculate a
16        difference at the time of termination between the
17        amounts accrued for each individual or group of
18        policyholders compared to what I believe would be
19        fair and equitable treatment but for, and that's the
20        term that we have defined, but for the 1985 change.
21   Q    In your mind with regard to those putative class
22        members that have terminated or surrendered their
23        policies, would the relief be damages?
24   A    The difference is the term I'm using.  And, again,
25        we're talking this distinction between a legal and a
```

```
 1        dictionary definition.
 2   Q    That's why I asked in your mind.
 3   A    Certainly in my mind, using the dictionary definition
 4        of damages, that would be a part of damages.
 5   Q    What other part of damages would there be for the
 6        individuals who have surrendered or terminated their
 7        policy?
 8   A    Well, I could use as an example, if an individual
 9        policyholder terminated in 2005, what I have
10        quantified and what this methodology quantifies is
11        how much additional funds they should have received
12        in 2005, but in fact they did not receive any
13        additional funds, so clearly this difference is
14        applicable to 2005.  The Court may decide, someone
15        else may decide, that since it was not paid in 2005,
16        if it is paid in 2013, there is an interest
17        differential, that's beyond the scope of my report.
18   Q    You did nothing to determine on a class-wide basis
19        what the interest differential would be for
20        individuals in the putative class who have
21        surrendered or terminated their policies?
22                   MR. KERSTEN:  Objection, ambiguous as to
23        form.
24                   THE WITNESS:  I believe that's correct,
25        sir.
```

WWW.GRAMANNREPORTING.COM • 414.272.7878

**GRAMANN**
REPORTING
*Innovation · Expertise · Integrity*

```
 1   BY MR. GRIMSLEY:
 2   Q    Are there any other parts of damages that you can
 3        think of besides the accumulated difference indicated
 4        in the third bullet point in Paragraph 6 for
 5        individuals who have terminated or otherwise
 6        surrendered their policies?
 7   A    Again, you're throwing out that term, and I keep
 8        saying I'm not sure how you're using it, in my
 9        definition of the dictionary term "damages" or a
10        legalese perspective, and I'm not --
11   Q    And that's fair enough.
12   A    I'm trying to answer as best I can, but you keep
13        asking the same thing and I keep saying there is two
14        levels.
15   Q    That's fair enough.  In your definition.  And earlier
16        in response to one of my questions on this issue,
17        using your definition, you said the accumulated
18        difference would be part of damages.  So given your
19        understanding of damages, not the legal definition,
20        you then testified that interest might be another
21        component?
22   A    Might be, that's correct, sir.
23   Q    Is there some other component of damages that you can
24        think of given your definition of damages that would
25        not be included in the accumulated difference for
```

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 10 of 302   Document 40

R. App 007

1      individuals who terminated or surrendered their

2      policies?

3   A   I'm not an attorney, but I have been involved in

4      litigation situations certainly, and there may or may

5      not be punitive damages or costs.  There is -- you

6      know, it gets to be a determination made by the

7      courts, not by my analysis.

8   Q   So you just mentioned also there are punitive damages

9      and potentially costs.  Is there any other part of

10      damages given your definition of damages that you can

11      think of that would not be included in the

12      accumulated difference?

13   A   Offhand, from my definition, I'm not aware.  I

14      realize that this I believe is a basis -- a

15      difference which is certainly part of damage.

16   Q   But other than the accumulated difference, you did

17      not actually in your report take into account any of

18      those other parts of damage?

19   A   That is correct, sir.

20   Q   Look at Paragraph 8, please.

21   A   (Witness complies.)

22   Q   And the fourth line at the end says, "The data needed

23      to perform the formulaic calculations is readily

24      available to NML and requires no additional data from

25      Pre-MN annuity policyholders."  What is the data

```
 1        also to apply the formula, cash values and cash
 2        transactions would need to be known.
 3                    So cash values certainly should be
 4        readily available, cash transactions certainly should
 5        be readily available, and they would include
 6        deposits, withdrawals, policy loans, repayment of
 7        policy loans.  Whatever cash transacts between the
 8        company and these Pre-MN annuitants.
 9   Q    One of the pieces of data that you would want is when
10        certain premiums were actually paid; correct?
11   A    Yes, that's part of the cash transactions.  So if a
12        policyholder deposited an amount of money, how much
13        and when would be a necessary value to apply the
14        formula properly.
15   Q    And you would not only want to know what year the
16        premium was paid, you would want to know when in that
17        year the premium was paid in order to apply the
18        formula properly?
19   A    No, that's not correct.  As shown in the report, for
20        purposes of simplicity and for purposes of
21        understandability, we took all transactions as of the
22        end of the policy year and applied the formula, and
23        the formula works perfectly well under that basis,
24        which is cash transactions defined by year.  It also
25        states within the report that if more refined
```

```
 1        information were available, such as cash transactions
 2        at specific dates, the same formula would apply
 3        equally well to that additional information and
 4        provide a reasonable and reliable value for
 5        difference under that scenario as well.  So the
 6        formula is the same, the value is equally reliable
 7        under each and could be applied under either
 8        scenario.
 9   Q    Is it true, however, that the accumulated difference
10        in an account would be greater if you assume the
11        premium was deposited at the beginning of the year
12        rather than at the end of the year as your model
13        assumes?
14   A    Yes, sir, that is accurate.
15   Q    So your model, if anything, comes up with a damages
16        number that is lower than in your mind the real
17        damages number would be?
18   A    It comes up with a reasonable, reliable value for
19        difference, not damage, for difference which in my
20        opinion is conservatively stated, yes, sir.
21   Q    In your -- Does that mean that your model is really
22        an estimate of the accumulated difference rather than
23        the actual accumulated difference in the "but-for"
24        world?
25   A    Yeah, there is -- it certainly is a reliable
```

WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING

*Innovation · Expertise · Integrity*

```
 1        Go ahead and answer.
 2              THE WITNESS:  That has nothing to do with
 3        my current report, but I do -- I do remember that
 4        that was a topic of issue.
 5   BY MR. GRIMSLEY:
 6   Q    You say it had nothing to do with your current
 7        report.  Did you do anything at all with regard to
 8        your current report to determine what actions
 9        policyholders would have taken in the "but-for" world
10        had Northwestern Mutual provided notice of the 1985
11        change?
12   A    Policyholders did not exist in the "but-for" world.
13        The "but-for" world is a theoretical concept used to
14        define a current difference.  So it's -- I have no
15        idea, and it's irrelevant to my conclusions, any
16        actions they might have taken in such world.  They
17        did not live in that world.
18   Q    But you have not done any analysis for purposes of
19        this report of what policyholders would have done in
20        a world in which they had received notice of the 1985
21        change?
22   A    I have done no analysis in that regard.
23   Q    You have also done no analysis in your report of what
24        policyholders would have done if Northwestern Mutual
25        had provided notice and sought their consent to the
```

```
 1       1985 change?

 2   A   I have not done such analysis.

 3   Q   Were you asked by counsel to do such an analysis of

 4       whether -- of what the "but-for" world would look

 5       like if Northwestern Mutual had given notice of the

 6       1985 change?

 7               MR. KERSTEN:  Do you mean other than this

 8       financial difference that he's analyzed?

 9               THE WITNESS:  You know, I developed the

10       "but-for" world as the basis for my methodology, so

11       counsel did not ask me to do anything in that world.

12       It's simply a world used to develop a difference.

13   BY MR. GRIMSLEY:

14   Q   Did counsel ask you to develop a model for a

15       "but-for" world in which Northwestern Mutual had

16       given notice to policyholders and asked for consent

17       to the 1985 change?

18   A   Again, the "but-for" world is my definition, so

19       counsel did not ask me anything about such an

20       environment.

21   Q   Counsel did not ask you to perform any analysis of

22       what policyholders would have done had they been

23       notified of the 1985 change?

24   A   Not for purpose of this report.

25   Q   And counsel for purposes of this report did not ask
```

1       of the 1985 change before implementing that change?

2                   MR. KERSTEN:  Same objection as before.

3                   THE WITNESS:  I have the same answer as

4       before, which is no one can opine as to what every

5       policyholder would do in any situation, let alone

6       notification of the '85 change, so I certainly did

7       not do that regarding every individual.

8    BY MR. GRIMSLEY:

9    Q    But did you attempt to do it on a class-wide basis?

10                  MR. KERSTEN:  Objection as to the ambiguity

11      of the word "it" and absorbing the earlier question,

12      which is equally ambiguous and also irrelevant; but

13      go ahead, Bob, do the best you can.

14                  THE WITNESS:  What I did do, again, two

15      years ago, was opine as to the proprietary of making

16      such an announcement to class members.  That I did

17      do.

18   BY MR. GRIMSLEY:

19   Q    But you have not opined as to what class members

20      would, in fact, have done if Northwestern Mutual had

21      given notification prior to implementing the 1985

22      change?

23   A    I was not asked to do that and I did not do that.

24   Q    Do you think given your experience that different

25      policyholders would have done different things if

| | | |
|---|---|---|
| 1 | | they had been given notice of the 1985 change prior |
| 2 | | to its implementation? |
| 3 | A | Different policyholders do different things in any |
| 4 | | situation, it has nothing to do with the 1985 change, |
| 5 | | and I have no opinion as to what an individual |
| 6 | | policyholder would do in any situation. |
| 7 | Q | Now I want to ask you about your opinion from the |
| 8 | | earlier case that not only should Northwestern Mutual |
| 9 | | have notified policyholders before the change, but it |
| 10 | | should have sought consent.  Do you recall giving |
| 11 | | that opinion? |
| 12 | A | I provided opinions which were specified exactly, |
| 13 | | precisely, and reflected my analysis two years ago in |
| 14 | | my report, and I testified on that basis.  I remember |
| 15 | | those topics being discussed, but I do not recall |
| 16 | | precisely and exactly what my opinion was, how I |
| 17 | | specified it in my report, and how I described it in |
| 18 | | court.  However, I can tell you that the way I |
| 19 | | expressed it in my report and the way I expressed it |
| 20 | | in court is exactly the result of my analysis, so I |
| 21 | | have no new perspective to provide. |
| 22 | Q | Have you at any point done anything to determine what |
| 23 | | class members would have done had Northwestern Mutual |
| 24 | | notified them of the 1985 change and sought their |
| 25 | | consent prior to implementing that change? |

```
 1   A     I was never asked that question and I provided no
 2         opinions thereon.
 3   Q     Sitting here today, can you say with any confidence
 4         what each class member would have done had
 5         Northwestern Mutual notified them of the 1985 change
 6         and sought consent before implementing that change?
 7               MR. KERSTEN:  Objection as double in form
 8         and irrelevant.  Beyond the scope -- proper scope of
 9         this deposition.
10               THE WITNESS:  I would not opine as to what
11         any particular class member would do in any
12         situation, whether it be the 1985 change or any other
13         situation.
14   BY MR. GRIMSLEY:
15   Q     And why would you not opine as to that?
16   A     Because it would be speculative and I could not opine
17         as to what an individual would do, that's not within
18         the scope of actuarial work.
19   Q     Do you know or have an opinion on what types of
20         different things various individuals would have done
21         had Northwestern Mutual notified them of the 1985
22         change and sought consent before implementing that
23         change?
24   A     I have never analyzed that.  I have no opinion
25         thereon.
```

1   Q   You assume in your model that in the "but-for" world

2       the cash deposits made by the various class members

3       would have been made at the same time and for the

4       same amounts as they were made in the actual world;

5       correct?

6   A   I'm assuming that because it's a fact.  So cash

7       transactions were factual, so the facts of the matter

8       are the facts of the matter and that's what I used.

9   Q   If, however, Northwestern Mutual had never

10      implemented the 1985 change, would you have any

11      reason to believe that the cash deposits would have

12      been of the same amount and at the same time as they

13      were in the actual world?

14  A   They would certainly not have been.

15  Q   The second item you mention is expense charges.  What

16      do you mean there by expense charges?

17  A   I mean charges for expenses.

18  Q   That's an actuarial term?

19  A   That's a definition out of the dictionary.

20  Q   What is your definition of it?

21  A   Charges made by the company for expenses, to cover

22      expenses.

23  Q   And those charges can change over time?

24  A   It's possible, but many of them are defined within

25      the policy.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 19 of 302   Document 33   R-App 016

```
 1        been other changes like that in a world in which
 2        Northwestern Mutual had not implemented the 1985
 3        change?
 4   A    I have no opinion in that regard.
 5   Q    The next item you identify in Paragraph 20 is policy
 6        loans?
 7   A    Yes, sir.
 8   Q    Did you assume that in your "but-for" world the dates
 9        and amounts of policy loans would have been the same
10        for each class member as they were in the actual
11        world?
12   A    Yes, I did, because those are the facts of the
13        transactions.
14   Q    Did you do anything to determine what the dates and
15        amounts of policy loans would have been in a world in
16        which Northwestern Mutual had not made the 1985
17        change?
18   A    No, I did not.
19   Q    Do you have any reason to believe that the dates and
20        amounts of policy loans in a world where Northwestern
21        Mutual made the 1985 change -- Strike that.
22                  Do you have any reason to believe that
23        the dates and amounts of policy loans in a world in
24        which Northwestern Mutual had not made the 1985
25        change would have been the same as in the actual
```

```
 1        world where it did?
 2   A    I did not analyze that and I have no such opinion.  I
 3        have no opinion one way or the other.
 4   Q    Do you think it's likely that at least some of the
 5        policy loan dates and amounts would be different in a
 6        world in which Northwestern Mutual had not made the
 7        1985 change?
 8   A    Absolutely.
 9   Q    The next item that you identify -- And did you take
10        into account in your model the fact that policy loan
11        dates and amounts would have been different in a
12        world in which Northwestern Mutual did not make the
13        1985 change in coming up with your opinions in this
14        report?
15   A    I did not because that did not exist.
16   Q    The next item is withdrawals.  Did you assume for
17        purposes of your model that the withdrawals in the
18        "but-for" world would have been for the same amount
19        and at the same date as withdrawals in the actual
20        world?
21   A    I did because those are the facts of those
22        transactions.
23   Q    Do you have any reason to believe that the
24        withdrawals would have been on the same date and for
25        the same amount in a world in which Northwestern
```

```
 1        Mutual had not implemented the 1983 change as in
 2        the -- 1985 change as in the actual -- Let me start
 3        that over.
 4                   Do you have any reason to believe that
 5        withdrawals would have been for the same amount and
 6        on the same date in a world in which Northwestern
 7        Mutual had not made the 1985 change as the actual
 8        world in which it did implement that change?
 9    A   I can assure you they would be different.
10    Q   Did you take into account the fact that they would be
11        different in coming up with your model that is set
12        forth in your report?
13    A   Yes, I did, in saying that the "but-for" world is a
14        nonexistent world.  Transactions are facts, and the
15        methodology appropriately reflects those facts.
16    Q   But you do acknowledge that if --
17                   MR. KERSTEN:  Objection as argumentative in
18        form by the use of the word "but."
19    BY MR. GRIMSLEY:
20    Q   Are you an economist, sir?
21    A   No, I'm not.
22    Q   Have you ever been asked to calculate damages in a
23        particular case?
24    A   Yes, sir.
25    Q   In what circumstance?
```

```
 1          quantified, so I don't recall those other situations.
 2  Q    Have you ever in the context of a motion for class
 3          certification provided a damages model for
 4          calculating damages on a class-wide basis?
 5  A    Yes, sir.
 6  Q    And what was that situation?
 7  A    Many such situations.
 8  Q    Can you give me one?
 9  A    I could give you one that was -- you know, cases are
10          I guess public information after they go to court,
11          but I certainly quantified damages using one such
12          example regarding Prudential and the vanishing
13          premium type policies.
14  Q    Was that in the context of a motion for class
15          certification?
16  A    Yes.
17  Q    Any other examples besides that one?
18  A    More than 25.
19  Q    And have those all been on the side of the plaintiff?
20  A    No.
21  Q    So have you ever in any circumstance testified that a
22          party could not, in fact, calculate damages on a
23          class-wide basis?
24  A    I'm sorry, read the question.
25                    (Question read aloud by the reporter.)
```

```
 1                    THE WITNESS:  I have not so testified.  I
 2        have come to that conclusion and discussed those
 3        situations with counsel.  Such as this instance they
 4        asked me a question, I analyzed it, responded to
 5        counsel that in this instance I could do that.  In
 6        some instances I would be asked by counsel can you do
 7        a certain thing.  I would review that certain thing
 8        and conclude that no mechanical process could be used
 9        and that would be the end of my involvement, so it's
10        not a testifying situation.
11   BY MR. GRIMSLEY:
12   Q    But you said you had testified for defendants in the
13        context of class certification motions?
14   A    Yes.
15   Q    In the context of class certification motions, have
16        you ever provided an opinion on the defense side that
17        damages could not be quantified on a class-wide
18        basis?
19   A    I do not recall testifying to that extent.
20   Q    Have you ever prepared a report in which you
21        expressed such an opinion?
22   A    Very possibly.  I don't recall offhand.
23   Q    Back to Paragraph 20, if you would, sir.  The last
24        item that you identify as relevant to determining the
25        cash value of an annuitant's account at any point in
```

```
 1                    (Off the record.)
 2                    THE VIDEOGRAPHER:  We're back on the
 3         record.  This is the beginning of Disk No. 2 of the
 4         deposition of Robert Hoyer.  Today's date, May 17th,
 5         2013.  The time, 11:24 a.m.
 6   BY MR. GRIMSLEY:
 7   Q     Turn to Paragraph 48 on Page 16 of your report, sir.
 8   A     (Witness complies.)
 9   Q     It reads, "This report illustrates how Differences
10         can be calculated in a mechanical way for each
11         individual annuitant with basic annual information
12         and a limited number of variables.  Assumptions of
13         end of year deposits tend to underestimate
14         differences."  Do you see that?
15   A     Yes, sir.
16   Q     What did you mean by "tend to underestimate"?
17   A     Well, clearly the difference is conservatively
18         stated, and hence the word "tend" is used, that it
19         need not be every exact situation but certainly in
20         most.
21   Q     Are there situations in which the assumption of
22         end-of-year deposits could overestimate the
23         difference?
24   A     It is possible, but de minimis.
25   Q     In what circumstances would it be possible to
```

1          overestimate the difference using the assumption of

2          end-of-year deposits?

3     A    I would say that it's never a scenario where you

4          would overestimate the difference in any way other

5          than in a de minimis way, but a de minimis

6          differential theoretically could exist if I were to

7          adjust the timing of deposits and withdrawals and

8          mathematically play with those numbers to get a de

9          minimis negative difference.

10    Q    With regard to the extent to which the assumption

11         underestimates the difference, that would not

12         necessarily be de minimis, would it?

13    A    I would use a different term.  Rather than de

14         minimis, I would say immaterial.

15    Q    If a class member had, in fact, made all of their

16         deposits at the first of the year rather than at the

17         end of the year, the assumption the deposits were

18         made at the end of the year would materially

19         underestimate differences?

20    A    No, sir, it would not.

21    Q    Why do you say that?

22    A    Because those amounts are in fact offset because the

23         same assumption is used for any withdrawals, partial

24         withdrawals or policy loans, they are also assumed to

25         be at the end of the year.  So any such transactions

 1         would tend to mitigate and it would not be a material

 2         difference in any regard.  There would be an

 3         immaterial but conservative difference.

 4    Q    Imagine a putative class member who did not withdraw

 5         anything at any point in time and did not borrow

 6         against his or her account.  Imagine also that that

 7         individual always deposited their premiums at the

 8         beginning of the year rather than at the end.  Your

 9         assumption of end-of-year deposits would materially

10         impact that particular class member?

11    A    No, I would not agree with that.

12    Q    What would the impact be to the calculation if you

13         assumed beginning-of-year deposits as opposed to

14         end-of-year deposits?

15    A    Again, the formula would be readily applicable.  It

16         would apply to all as a group or individual

17         annuitants; and it would tend to be a reasonable and

18         reliable estimate, but it would tend to overstate the

19         difference if I made such an assumption.

20    Q    Have you made any effort to determine the extent to

21         which the assumption of year-end deposits

22         underestimates differences on a class-wide basis?

23    A    Yes, I have, and that's exactly why I'm telling you

24         that such difference is immaterial to the

25         quantification of difference.  It is a conservative

**G**
WWW.GRAMANNREPORTING.COM · 414.272.7878
*Innovation · Expertise · Integrity*
**GRAMANN**
REPORTING

R. App 024

```
 1        estimate that I have made, but it is immaterial to

 2        the aggregate differential.

 3   Q    Where in your report is it set forth a calculation of

 4        what the amount of underestimated difference is as a

 5        result of your assumption of year-end deposits?

 6                  MR. KERSTEN:  Could you just re-read that?

 7                  (Question read aloud by the reporter.)

 8                  THE WITNESS:  That's not in my report

 9        because I did not do a quantification, I did an

10        analysis and concluded that such differential would

11        be immaterial to the aggregate quantification of

12        difference, and the aggregate quantification would be

13        aggregate for the entire policy group or aggregate

14        for an individual.

15   BY MR. GRIMSLEY:

16   Q    Have you attempted any quantification of how much

17        your assumption of end-of-year deposits

18        underestimates the difference for any particular

19        putative class member?

20   A    Only to the extent as to the propriety of this

21        mechanical process I did do such analysis and made

22        the conclusion that this methodology is an accurate

23        and reasonable representation of the difference.

24   Q    I am asking only whether you actually calculated how

25        much the assumption of end-of-year deposits would
```

```
 1        how that may either overstate or understate the
 2        calculation in this regard, and I concluded that it
 3        was immaterial.
 4   Q    You don't know sitting here today how much your
 5        assumption understates accumulated difference for any
 6        particular class member, do you?
 7   A    I know that such differential is immaterial.
 8   Q    You have done it for every single class member on an
 9        individualized basis?
10   A    I have looked at the formula and determined that the
11        formula is applicable and is a realistic and
12        reasonable representation of the difference and that
13        that assumption, while tending -- tending to be
14        conservative is immaterial.
15   Q    Have you, in fact, tested your formula against any
16        individual class members other than Ms. LaPlant?
17   A    Have I quantified using that formula on any
18        individual annuitant, and that answer is no.
19   Q    Have you attempted to quantify the amount of
20        underestimation that results from your assumption of
21        end-of-year deposits for any particular--meaning the
22        person has a name--annuity policyholder?
23             MR. KERSTEN:  Objection as repetitious.
24             THE WITNESS:  I just said I have not done
25        that in this instance.  I would like to add to that.
```

```
 1   A    Oh, I'm sure that in the 35,000 class members in this
 2        instance or thereabouts, that I'm sure someone has
 3        kept that information, but I -- I don't see why that
 4        has any bearing on my formula or whatever.
 5   Q    Is it possible in your mind that some people --
 6        policyholders would have deposited less money after
 7        1985 than they did in the actual world, in a world in
 8        which Northwestern Mutual never made the 1985 change?
 9   A    Absolutely.
10   Q    Is it possible that policyholders would have borrowed
11        more against their policies in a world in which
12        Northwestern Mutual never made the 1985 change?
13   A    It's possible that policyholders would do anything;
14        and in a different scenario, policyholders might do
15        different things.  Certainly that is a consideration,
16        but I haven't spent much time analyzing it.
17   Q    And is it possible that policyholders would have
18        withdrawn more money in a world in which Northwestern
19        Mutual had not made the 1985 change than they did in
20        the actual world?
21   A    Well, that is one where I can say that a prudent
22        individual and a reasonable estimate of what somebody
23        theoretically may have done would say that fewer
24        people would have withdrawn their policies if the
25        "but-for" world or if the 1985 change, you know, did
```

1       not exist.

2   Q   But is it possible that there are some people who

3       would have withdrawn more in a world in which the

4       1985 change had never been made?

5   A   Again, I have no opinion as to what an individual may

6       or may not do in a scenario that didn't exist, so I

7       can only talk about what a reasonable and prudent

8       group would tend to do over time, not what any given

9       individual would do.

10          MR. KERSTEN:  You know, I object to this

11      whole line of questioning on which we have now spent

12      the better part of at least two hours as wholly

13      immaterial and a waste of time.

14  BY MR. GRIMSLEY:

15  Q   You also assumed for purposes of your report in the

16      "but-for" world that individuals who surrendered

17      their policies did so at the end of the year; is that

18      correct?

19  A   That is correct.

20  Q   If, however, people surrendered their policies before

21      the end of the year, would your assumption of

22      end-of-year surrenders tend to overstate the

23      accumulated difference?

24  A   It would tend to overstate.  It is a mitigating

25      assumption relative to the contra-assumption that

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 31 of 302   Document 49

R. App 028

```
 1        deposits are made at the end of the year.
 2   Q    Have you done anything to quantify the amount that
 3        the assumption of end-of-year surrenders overstates
 4        the accumulated difference?
 5   A    In an attempt to quantify the extent of surrenders in
 6        a vacuum, no.  To identify the implications or the
 7        magnitude of the aggregate assumption, which was used
 8        for both deposits and terminations, yes.
 9   Q    Where in your report is the calculation of the
10        aggregate assumptions that shows that your
11        assumptions on the whole tend to understate the
12        accumulated difference?
13   A    I did not do a quantification of that, I did an
14        analysis of that.  And where is it stated?  I don't
15        know offhand, but if we walk through page by page it
16        would say that by assuming the end of the year, it is
17        a conservative estimate, but an immaterial
18        differential.
19   Q    But you did not do anything to quantify the
20        offsetting assumptions of surrenders at the end of
21        the year versus deposits at the end of the year?
22   A    I did analysis of that, not quantification, but
23        analysis of that to enable me to opine that such
24        differential is immaterial.
25   Q    What analysis did you do specifically, sir?
```

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 32 of 302   Document 40

R-App 029

```
 1   A    I looked at values and looked at the methodology and
 2        mathematically analyzed the extent to which I would
 3        either be high or low given a given cash transaction;
 4        concluded that since I'm making the same assumption
 5        on both deposits and withdrawals, that there is
 6        certainly a mitigation one to the other.  However,
 7        for most policies, deposits are greater than
 8        withdrawals, for especially in-force policies, and
 9        hence the tendency would be a conservative
10        estimation, but not a material one.
11   Q    But you have done no effort to actually quantify
12        what --
13                  MR. KERSTEN:  Objection as repetitious.
14                  MR. GRIMSLEY:  Hey, buddy, let me finish my
15        question and then you can object.
16                  MR. KERSTEN:  Okay, finish.
17   BY MR. GRIMSLEY:
18   Q    You have made no effort to actually quantify what the
19        amount of overestimation based on the assumption of
20        end-of-year surrenders would be versus the
21        underestimation for the assumption of end of year
22        deposits?
23   A    That's not correct.  I have done analysis to enable
24        me to conclude that such differential is immaterial,
25        so I did enough analysis to reach that opinion.  A
```

WWW.GRAMANNREPORTING.COM · 414.272.7878

**GRAMANN**
REPORTING
*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 33 of 302   Document 40

R. App 030

```
 1        quantification, which is a numerical determination,
 2        is not what I did.  I did an analysis to enable the
 3        conclusion.
 4   Q    Can you describe your analysis that you performed to
 5        come to that conclusion in sufficient detail for a
 6        court to understand it?  Because that's ultimately
 7        the person who is going to be looking at this.
 8                  MR. KERSTEN:  Objection, that's already
 9        been done repeatedly over the last two hours.
10                  THE WITNESS:  Yes.
11   BY MR. GRIMSLEY:
12   Q    The description you have provided is the full
13        description you believe would be necessary to explain
14        to a court what the analysis was that you performed?
15   A    Yes, sir.
16   Q    In a world in which Northwestern Mutual had not made
17        the 1985 change, is it possible that some
18        policyholders would have surrendered their policies
19        sooner than they did in the actual world?
20   A    I have answered this question fifteen times, which
21        is, I have no opinion as to the actions of some
22        policyholders or individual policyholders.  I -- My
23        professional background, my experience says that
24        rendering opinion on what individuals may or may not
25        do is beyond the scope of my capability, so I have no
```

```
 1        opinion.
 2  Q     Would the best people to ask that be the individual
 3        policyholders themselves as to what they would have
 4        done?
 5                 MR. KERSTEN:  Objection on the assumption
 6        that would be legally competent evidence.
 7                 THE WITNESS:  No, I think that would be
 8        kind of a ridiculous request or statement.
 9  BY MR. GRIMSLEY:
10  Q     You think it would be ridiculous to ask individual
11        policyholders what they would have done in the
12        "but-for" world?
13                 MR. KERSTEN:  Same objection as before.
14                 THE WITNESS:  That's correct, they don't
15        know what a "but-for" world is, it's something I
16        invented.  So if you go to individual policyholders
17        and say what would you have done in 2002 if you lived
18        in Bob Hoyer's "but-for" world, I would dare say you
19        would not get an answer which would be reasonable and
20        appropriate.
21  BY MR. GRIMSLEY:
22  Q     So there is nobody to ask really about what somebody
23        might do in Bob Hoyer's "but-for" world?
24  A     It never existed, it doesn't exist now, so I think
25        individuals would have a hard time concluding what
```

```
 1   A    I'm not sure.
 2   Q    Are there any individuals in the -- who had in-force
 3        policies as of 1985 who had non-tax-qualified annuity
 4        policies?
 5   A    No.
 6             MR. KERSTEN:  Counsel, I object as a
 7        continuing objection so I don't have to keep making
 8        it.  It's all ambiguous as to time.
 9             THE WITNESS:  Yeah, I'm not sure.
10   BY MR. GRIMSLEY:
11   Q    You don't know whether any of the in-force policies
12        as of 1985 were tax qualified or not?
13   A    I don't recall, I reviewed that at some time years
14        ago.
15   Q    You do know that there are different DIR rates
16        applicable to tax qualified versus non-tax qualified?
17   A    There are different DIR rates applied to different
18        categorizations, yes.
19   Q    You have not, in fact, taken into account the
20        different DIR rates that apply to tax qualified
21        versus non-tax qualified annuity policies in your
22        model, in your March 4th, 2013 report, have you?
23             MR. KERSTEN:  Same objection, ambiguous in
24        form as to time.
25             THE WITNESS:  Yeah, I believe I have
```

WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING
*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 36 of 302   Document 49

R. App 033

```
 1          incorporated that fairly and equitably.
 2   BY MR. GRIMSLEY:
 3   Q    Is there anyplace in your report that you can point
 4        me to where you talk about the distinction in DIRs
 5        with regard to tax qualified versus non-tax qualified
 6        policies that were in-force as of 1985?
 7   A    It's not stated in the report.
 8   Q    And your model does not specifically differentiate
 9        between the DIRs applicable to tax-qualified versus
10        non-tax-qualified policies?
11   A    I think it incorporates the two to the extent they
12        exist and does so properly and equitably.
13   Q    But does it actually delineate what the DIRs would be
14        for each of those types of policies in the "but-for"
15        world?
16   A    No, I do not believe in the "but-for" world that
17        that's appropriate.
18   Q    How does your model account for the fact that in the
19        "but-for" world some policies would have been tax
20        qualified and some would have been non-tax qualified?
21          MR. KERSTEN:  Objection as ambiguous in
22        form because of the timing.
23          THE WITNESS:  Yeah, it looks to be the
24        aggregate -- aggregate compilation of both of those
25        and I believe it accurately reflects the existence of
```

WWW.GRAMANNREPORTING.com · 414.272.7878

GRAMANN
REPORTING
Innovation · Expertise · Integrity

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 37 of 302   Document 49

R. App 034

```
 1          that to the extent that they were there.
 2     BY MR. GRIMSLEY:
 3     Q    Have you done any -- made any effort to quantify what
 4          the differential in DIRs would be in the "but-for"
 5          world for Pre-MN annuitants with tax qualified versus
 6          non-tax qualified policies at any time during the
 7          class period?
 8     A    Only to the extent whether that would materially
 9          misstate the differences that we quantified and
10          concluded they would not.
11     Q    What did you do to actually determine there would be
12          no material misstatement as a result of tax qualified
13          versus non-tax qualified?
14     A    Again, the "but-for" world is theoretical and it's
15          representative and there is nothing that came to
16          our -- my awareness that there would be a necessity
17          to subset the methodology such as we did for various
18          interest rates -- policy loan rates, rather.  That
19          differential was immaterial.
20     Q    But you made no quantification of that differential?
21     A    Again, only to the extent that our formula was a
22          reasonable representation of what would be
23          applicable.
24     Q    Where is the quantification in the report of the
25          differential between tax qualified and non-tax
```

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 38 of 302   Document 40

R-App 035

 1       qualified DIRs in the "but-for" world?

 2                 MR. KERSTEN:  Objection as repetitious.

 3                 THE WITNESS:  I just said that was done as

 4       an analysis, not as a quantification.

 5   BY MR. GRIMSLEY:

 6   Q    Where is the analysis?

 7   A    The analysis was done prior to me stating this

 8       formulation and this numerical approach and formulaic

 9       approach as being representative for all Pre-MN

10       annuitant class members.

11   Q    What specific analysis did you do to take into

12       account the difference in tax qualified versus

13       non-tax qualified DIRs?

14   A    I just looked at those policies, looked at the

15       historical disparity, and concluded that this was a

16       reasonable representation for those policies.

17   Q    Did you do any mathematical analysis to back that up?

18   A    The analysis results in a mathematical result, which

19       is that to the extent there would be materiality such

20       as was found for various policy loan rates, that

21       would require the formula to reflect that difference.

22       My analysis in regard to what you are now stating is

23       that they -- the "but-for" world is a reasonable

24       representation of that differential and accurately

25       reflects the difference for those policies.

WWW.GRAMANNREPORTING.COM · 414.272.7878

**G**
GRAMANN
REPORTING
*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 39 of 302   Document 4850
**R-App 036**

```
 1   Q    And what was your conclusion?
 2   A    That there is an immaterial difference between the
 3        two as stated in my report; and that the life rate,
 4        which is a benchmark rate, which is a readily
 5        available rate, which is well defined and understood,
 6        was not only reasonable, but the -- the most accurate
 7        representation of what the annuity rate should be.
 8   Q    Are there any calculations anywhere in your report to
 9        reflect the analysis that you have just described?
10   A    No, there are not.
11   Q    Where could I find those calculations?
12   A    I don't think they exist.
13   Q    So you did not do any calculations to determine the
14        reasonableness of your assumption that the life and
15        Pre-MN DIRs would be identical to one another in the
16        "but-for" world even though they were not in the
17        actual world prior to the 1985 change?
18   A    I did not do such calculations because I conclude
19        that such calculations are irrelevant and
20        unnecessary.  I do analysis and I make conclusions.
21        Sometimes I adjunct my analysis with quantification,
22        but that's hardly a basis for an opinion in all
23        instances.
24             MR. KERSTEN:  I didn't have a chance, but I
25        object on the great amount of repetition on what is
```

```
 1        How many are in the group, how many opted for Update
 2        '83, when they did so, and that would be I think
 3        sufficient basis for a reasonable person with
 4        knowledge in this area to make an informed opinion as
 5        I did.
 6   Q    But just to be clear, you don't know today how many
 7        people actually agreed to Update '83 after the '85
 8        change was made?
 9   A    I don't have a number, no.
10   Q    Do you know how much in terms of the amount invested
11        in annuities was accounted for by individuals who
12        accepted the 1983 change after -- or the 1983 update
13        after the 1985 change had been put in place?
14   A    I saw that in the totality of evidential matter that
15        I reviewed over the years of this case, and I know it
16        in sufficient detail to conclude that my opinion in
17        this regard is reasonable and accurate, and I'm
18        satisfied that any outlier would be immaterial to
19        such quantification.
20   Q    Is there anywhere in your report where you discuss
21        the question of the potential impact on your analysis
22        of the fact that some number of putative class
23        members accepted the 1983 update after implementation
24        of the 1985 change?
25   A    Yes.
```

WWW.GRAMANNReporting.com · 414.272.7878
*Innovation · Expertise · Integrity*
GRAMANN
REPORTING

Case 2:11-cv-00910-LA    Filed 07/01/13    Page 41 of 302    Document 40
R. App 038

1    Q     Where?

2    A     Where I conclude that this formula and its

3          application represents a fair and reasonable and

4          accurate representation of that difference.  I could

5          not reach that conclusion without having considered

6          the implications of various outliers, subtleties,

7          nuances, trends, and differences that existed which

8          are a part of reaching that conclusion.

9    Q     I understand that you have the conclusion in here, so

10         I don't want to be confusing, but did you include in

11         the report itself the underlying analysis that led

12         you to conclude that it was immaterial to your model

13         that certain individuals had accepted Update '83

14         after the 1985 change?

15                   MR. KERSTEN:  Objection as repetitious.

16                   THE WITNESS:  No, it's not spelled out in

17         detail in this report.

18   BY MR. GRIMSLEY:

19   Q     Let's assume your model that's in your report and a

20         hypothetical class member who accepted the 1983

21         change after -- or I'm sorry.

22                   Let's assume your model that is set

23         forth in your report and assume also that there is a

24         class member who agreed to Update '83 after the 1985

25         change.  Say, for instance, sometime in 1986.  Okay?

```
 1        terminated in that duration, and obviously they
 2        couldn't have opted for direct recognition in 1990
 3        and terminated in 1988, but that's the only case
 4        where that information would be pertinent.  And since
 5        it applies only to those who terminated during the
 6        period in which you are asking your question, that
 7        no, I do not care, and the reason I do not care is
 8        because it does not impact the answer.  There is an
 9        immaterial difference.
10   Q    Let's take out of the hypothetical you were just
11        talking about somebody surrendering before they
12        accepted direct recognition.  Let's assume they
13        surrendered in 2000.  Would there be a difference --
14        an accumulated difference for that person if they had
15        adopted direct recognition in 1986 versus adopting it
16        in 1990?
17   A    The answer is no to any material extent.
18   Q    Have you done any actual calculation to make that
19        determination?
20   A    Yes.  Any analysis, yes.  "Calculation," you keep
21        referring to that.  Calculation is done to augment
22        analysis as appropriate.  Analysis incorporates
23        numerical assessment.  I did numerical assessment,
24        not calculation.
25   Q    What numerical assessment did you perform to conclude
```

```
 1        that the difference in taking direct recognition in
 2        1986 and 1990 would have been immaterial for somebody
 3        who surrendered their policy later?
 4    A   By looking at the values that we have developed and
 5        by saying what if a different treatment had been
 6        utilized and in applying that in a numerical sense, I
 7        conclude that there is no material difference.
 8    Q   How would an actuarial expert recreate that analysis
 9        that you just described?
10    A   By doing just what I just described.  By looking at
11        the values that are shown in this report and
12        hypothetically applying them to those two scenarios.
13        And when you do so, you will get no material
14        distinction.
15    Q   Did you in any way memorialize in writing the process
16        of the analysis that you performed that you just
17        described?
18    A   No, because it's irrelevant to the conclusions that I
19        reached.  Irrelevant in the sense that I have
20        considered alternatives and I am -- and I concluded
21        that in my opinion that this formula meets the
22        objectives and it attains the goals that I have said
23        in the report and that there is no outliers or
24        fluctuations or considerations or anything else of a
25        material nature that I have not considered.
```

```
 1   Q    So let's assume, again, somebody who opted for direct
 2        recognition in 1990.
 3                  MR. KERSTEN:  Is there such a person,
 4        counsel?
 5                  THE WITNESS:  Yeah, I said it's de minimis.
 6   BY MR. GRIMSLEY:
 7   Q    Let's just assume hypothetically.
 8                  MR. KERSTEN:  Wait a minute now.  Is there
 9        any foundation for that assumption, counsel?
10   BY MR. GRIMSLEY:
11   Q    Let's assume hypothetically that there is somebody
12        who in 1992 adopted direct recognition.
13                  MR. KERSTEN:  Same objection.  There is no
14        foundation at all for these that I'm aware of.  If
15        counsel is aware of any conceivable foundation, I ask
16        that he so state.
17   BY MR. GRIMSLEY:
18   Q    I'm assuming a hypothetical.
19   A    And the question is?
20   Q    Assume that somebody adopted direct recognition in
21        1990.
22   A    Right.
23   Q    Which grid would you apply to that individual in your
24        model, the direct recognition grid or the non-direct
25        recognition grid?
```

WWW.GRAMANNREPORTING.COM · 414.272.7878

**G**

**GRAMANN**
REPORTING
*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 45 of 302   Document 46

R-App 042

```
 1   A    For that hypothetical, the model would assume the
 2        direct recognition grid.
 3   Q    Why?
 4   A    Because that accurately reflects the difference,
 5        which is what we're trying to quantify.  And the
 6        difference is either a current difference, and the
 7        direct recognition grid will do precisely that; or
 8        they terminated it sometime prior to the current, and
 9        the direct recognition grid will calculate a fair and
10        accurate number for that individual.  And that, I
11        said, is a de minimis group in any case.
12   Q    How many people would constitute a de minimis group?
13   A    It would depend on the nature of the question being
14        asked and the situation.
15   Q    Assuming a putative class of 19,000 people, what
16        would be a de minimis number in your mind of people
17        that accepted Update '83 after the 1985 change?
18   A    Since the numerical calculation is immaterial in any
19        case, that -- how much would be de minimis?  Perhaps
20        a lot, because the numerical calculation does not
21        give a numerical answer which is of any material
22        difference.
23   Q    Now, you said for presentational purposes the report
24        presents accumulated differences beginning in the
25        year 1993?
```

```
 1       the quantification of the damages to that person?
 2   A   Quantification of damages is a decision for the court
 3       to decide upon.  The financial implications are
 4       relatively small -- relatively small for the group as
 5       a whole, and that's why my presentation is as shown.
 6       But the court would decide how to quantify their
 7       damages.  I have just spelled out a difference.
 8   Q   There are people, though, who surrendered their
 9       policies prior to 1993 in the actual world who did
10       better from a financial perspective than they would
11       have in your "but-for" world?
12   A   To a de minimis extent, to an immaterial extent, yes,
13       I would agree.  Strictly from a financial standpoint.
14   Q   Have you gone through and calculated what the actual
15       difference would be between the accumulated
16       difference in your "but-for" world and the actual
17       difference in the actual world for people who
18       actually were financially better off because they
19       surrendered before 1993?
20   A   Certainly I have considered that, and it's
21       immaterial.
22   Q   What's the amount?
23   A   I don't know offhand, but I am well aware of its
24       relative magnitude and in my opinion it's immaterial.
25   Q   Do you have a rough sense as to order of magnitude of
```

WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING
Innovation · Expertise · Integrity

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 47 of 302   Document 40

R. App 044

```
 1        the amount?
 2   A    Yes.
 3   Q    What is the order of magnitude of the amount?
 4   A    Immaterial.
 5   Q    Is it thousands, tens of thousands of dollars,
 6        hundreds of thousands?
 7   A    It certainly approaches the first of those three.  It
 8        is immaterial.
 9   Q    But you don't know sitting here today what it is?
10   A    I do not have a numerical value for that.
11   Q    If a person were intending to terminate their policy,
12        say in 1992, how would they have been harmed by the
13        implementation of the 1985 change?
14   A    I just answered that.  You want me to say the same
15        answer?
16   Q    How would they have been financially harmed by the
17        implementation of the 1985 change?
18   A    That's a different question.  I will answer that one
19        now.  Certain of those policies, you just indicated
20        that it's conceivable that someone may have by the
21        subsidies paid by Northwestern received any material,
22        but greater dollar amount.  There is at least that
23        many people who also received not significant in
24        total, but to them it's their only value, and they
25        received less, so those people were harmed
```

1          accumulated amount in the account up to that point in

2          time?

3    A    Yes, it would.

4    Q    And that would include all of the money that the

5          policyholder had invested up to that date and any

6          dividends it had received as well?

7    A    That's correct, for purposes of this exhibit which

8          has no policy loans within it.

9    Q    So for purposes of the amount -- Put aside policy

10         loans.  For purposes of the amount that the annuity

11         was worth as of the time of the 1985 change, looking

12         just at that amount, people who surrendered in 1991

13         and 1992 would have been financially better off in

14         the actual world than in the "but-for" world?

15   A    If they made no further deposits, that is correct, to

16         an immaterial amount.

17   Q    Have you -- in your view, is 2 percent an immaterial

18         amount?

19   A    2 percent is not immaterial to an individual.  2

20         percent is 2 percent.  Each individual can make their

21         own determination.  For purposes of this analysis,

22         this methodology gives you a reasonable and accurate

23         and fair and reasonable presentation of any

24         difference.

25   Q    But in your opinion, for purposes of your

WWW.GRAMANNREPORTING.COM · 414.272.7878

**GRAMANN**
REPORTING
*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 49 of 302   Document 119

R-App 046

```
 1         methodology, is that 2 percent difference immaterial?
 2   A     Yes, that 2 percent, and we have just quantified
 3         exactly which one it is.
 4   Q     Yes.
 5   A     And the reason it's immaterial is because that one
 6         individual, given that situation, we have quantified
 7         no financial difference for those individuals, so the
 8         "but-for" world and this analysis would say that in
 9         that particular deposit for that one individual,
10         there is no financial implication, vis-á-vis,
11         difference.
12   Q     And I just want to be clear:  In the group of
13         putative class members, were there some who
14         surrendered their policies at a particular time such
15         that those individuals were not financially harmed by
16         the 1985 change?
17   A     That is correct.
18   Q     How many people were there that would fit into that
19         category?
20   A     A very small amount.
21                 (Deposition Exhibit No. 7 was marked for
22         identification.)
23   BY MR. GRIMSLEY:
24   Q     I'm showing you what is being marked as Deposition
25         Exhibit 7, and this was a trial exhibit from the
```

```
 1   Q   We can also -- And people who surrendered in 1992, if
 2       they hadn't put in any additional premiums after
 3       1985, would have been 2 percent better off in the
 4       actual world than in the "but-for" world; correct?
 5   A   That's quite a mouthful.  To the extent that they
 6       never made another deposit and to the extent that
 7       they terminated at that point, the financial
 8       implication would be 2 percent.  I have talked about
 9       harm to those individuals which exists irrespective
10       of the 2 percent, but 2 percent in my opinion does
11       not nearly make up for the harm done to them.
12   Q   But from -- Well, have you quantified the harm that
13       was done to them that was other than financial, sir?
14   A   No, that's not a quantifiable value for an actuary to
15       do.
16   Q   Was that something that you were asked to perform as
17       part of your analysis in coming to your opinions in
18       the March 4th, 2013 report?
19   A   I was neither asked to do that nor did I do it.
20   Q   And that would not be something that you would feel
21       you had expertise to quantify; correct?
22   A   I would not attempt to quantify that number, no.
23   Q   But let's go back to this chart then.  Assuming that
24       the people who surrendered in 1992, which were 1,255
25       of them, had not made any premium payments after
```

G

WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING
*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 51 of 302   Document 49

R. App 048

```
 1   A    Absolutely not.
 2   Q    Where would it come from?
 3   A    It would come from the surplus of the company.
 4   Q    And how is that different than the divisible surplus
 5        of the company?
 6   A    Divisible surplus is determined each year as that
 7        amount which will be used for dividends, so it's not
 8        going to be a dividend.  This is a different thing
 9        than a dividend.
10   Q    Would the amount of divisible surplus that was
11        determined at the end of the year depend on what
12        money was paid out of the surplus already during that
13        year?
14   A    No, it would not to this extent.
15   Q    If there were a -- let's just speak hypothetically.
16        If a mutual insurance company had a billion dollar
17        judgment rendered against it in a particular year,
18        that money would be taken out of the surplus of the
19        company?
20   A    That's correct.
21   Q    And once that money was taken out of the surplus of
22        the company, the divisible surplus at the end of the
23        year would be impacted by that payout?
24   A    Absolutely not.
25   Q    How can that be?  You can understand why I might
```

WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING
*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 52 of 302   Document 39

R-App 049

```
1           think that's hard to believe.  If the surplus is less
2           than it otherwise would have been, why wouldn't that
3           affect divisible surplus?
4      A    Because there is retained surplus to become a viable
5           ongoing entity; and as long as that's held at certain
6           reasonable levels, extra amounts in that surplus
7           would be utilized to provide unusual or untoward
8           payments or disbursements, such as a legal decision.
9           It would only impact divisible surplus if the
10          materiality of such payment were such that the
11          materiality or going concern status of the company
12          were to have changed.
13                      As an example, in this particular
14          situation, the surplus of the company is so large
15          that this judgment would hardly be noticed.  And if
16          divisible surplus were to change, then the
17          competitive position of a company relative to the
18          other companies that it compares itself to every week
19          of its life would change.  The company does not want
20          that to happen, it would not happen in this instance
21          most assuredly, and so divisible surplus would not be
22          changed by a dollar.
23     Q    Have you interviewed anybody at Northwestern Mutual
24          to determine whether in fact they would alter the
25          divisible surplus at the end of a year based on
```

WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING

*Innovation · Expertise · Integrity*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 53 of 302   Document 49

R. App 050

```
 1   A    That's absolutely correct.
 2   Q    And if Northwestern Mutual had decided to do that
 3        back when they developed the policies, they could
 4        have then after that point in time applied different
 5        investment income experience factor values to the two
 6        types of policies?
 7   A    That is accurate, and I'll elaborate just to make
 8        sure you're clear.  The development of that policy
 9        includes the pricing, the sales, the communication.
10        Such as your example of CRA annuities, that's the way
11        they were sold, that's the agreement that
12        policyholders agreed to, and certainly you could use
13        a different -- you could do anything that the two
14        parties agreed to.  That was not the case for the
15        Pre-MN annuities.  They could have structured a
16        policy differently and sold it differently and
17        communicated it differently.  They did not.  So the
18        second part of your questions before were could they
19        then selling it one way have decided they would --
20        No, they can't do that.
21   Q    Do -- Do you have any opinion or have you provided
22        any opinion in conjunction with this report as to
23        when particular members of the putative class became
24        aware of the fact that the annuity policy rate was
25        less than the life rate?
```

```
 1                    MR. KERSTEN:  Do you mean the Wisconsin
 2          people or other people?
 3   BY MR. GRIMSLEY:
 4   Q     Any people.
 5   A     Yeah, I do not know individually.  And certainly as a
 6          class, I would just make the assumption that they
 7          began to become aware when the rates for life and
 8          annuities started to diverge somewhat.
 9   Q     That would have been in roughly 1993?
10   A     I'm not even sure exactly when that would be.
11   Q     Just look at Exhibit 5, again, I think it is, which
12          has the rates themselves, or you can look in your
13          report, Page 6, actually, which we were looking at
14          which has the rates.  Do you see that?
15   A     Yes.
16   Q     And there is a chart there, Table 1, that has the
17          rates.  When would you say that the actual annuity
18          rate and the actual life rate began to diverge
19          significantly?
20   A     Just looking at numbers, I really -- I don't know
21          what significance translates to in this instance.  So
22          I can see differences and I can see differences
23          getting larger, but I'm not sure how to answer your
24          question because that wasn't part of my analysis and
25          it's just a visual representation here.
```

```
 1        observation.
 2  Q     So if you go back to the chart on Page 6, in -- and
 3        keep in mind the sentence from Page 5, you are saying
 4        that as of 1993 the difference between the two is
 5        substantive?
 6  A     Well, I'm saying it certainly is getting larger in an
 7        increasing manner here.  So, yes, it's substantive
 8        there.  That's not an actuarial opinion, it's just an
 9        observation.
10  Q     And how many people at the point in time, 1993, owned
11        both a Pre-MN annuity and a Northwestern Mutual life
12        insurance policy?
13  A     I have no idea.
14  Q     You haven't looked at that at all?
15  A     Not at all.
16  Q     So you don't have an opinion as to how many people
17        have noticed there was a difference?
18              MR. KERSTEN:  Objection as to whether they
19        can tell the difference, counsel, conceivably under
20        these circumstances with what they're provided in the
21        policy.
22              MR. GRIMSLEY:  You have done so well.
23        Objection as to form, sir.
24              MR. KERSTEN:  That's the objection.
25              MR. GRIMSLEY:  That's not a form objection.
```

```
 1       Objection to form is objection to form.  It's not a
 2       minute talking about what the objection is.
 3                 THE WITNESS:  You're putting forth that the
 4       only way to see a change is if you had both policies.
 5       You know, there appears to be a downward trend on
 6       annuities, so if I didn't have a life insurance
 7       policy, certainly at some point here, if I were an
 8       annuity policyholder, I would -- I would be aware
 9       that my dividends were decreasing materially.
10  BY MR. GRIMSLEY:
11  Q    At what point in time would you have been aware of
12       that, Mr. Hoyer?
13  A    It would be a function -- You're saying me
14       personally?
15  Q    Yes.
16  A    If I had annuity?
17  Q    Yes.
18  A    Well, I would be aware of what the annuity dividend
19       interest rates were at ten other companies, so the
20       moment you started to decrease mine at all, I would
21       know.  But that's different than the majority of this
22       class who would have one policy if that were the
23       case.  They might have a different recognition point,
24       so it's -- I'm not sure.
25  Q    You haven't actually asked any policyholders when, if
```

```
1
        STATE OF WISCONSIN )
2                          ) SS:
        MILWAUKEE COUNTY   )
3

4

5              I, Carla J Miller, Registered

6      Professional Reporter and Notary Public in and for

7      the state of Wisconsin, do hereby certify that I have

8      carefully compared the foregoing pages with my

9      stenographic notes, and that the same is a true and

10     correct transcript.

11             I further certify that I am not a

12     relative or employee or attorney or counsel of any of

13     the parties, or a relative or employee of such

14     attorney or counsel, or financially interested

15     directly or indirectly in said action.

16             Dated at Milwaukee, Wisconsin, on this

17     _____ day of _____, 2013.

18

19             _____
               Carla J. Miller
20             Registered Professional Reporter
               Notary Public
21

22

       My commission expires May 15, 2016
23

24

25
```

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

                Plaintiffs,

         vs.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

                Defendant.

Case No.    08-CV-11988

Code:        30701
Declaratory Judgment

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

The plaintiff and class propose that the Court make and enter the

attached findings of fact, conclusions of law and declaratory judgment.

Dated this 20th day of December 2010.

              By:
                 George P. Kersten, WI Bar #1008099
                 E. Campion Kersten (1007641)
                 Kenan J. Kersten (1008505)
                 Jeffrey A. Bartos
                 Mark B. Pollack (1010557)
                 Timothy D. Battin
                 Christopher Le
                 Mark J. Schirmer
                 Soye Kim
                 Attorneys for the Plaintiff

**Plaintiff's Counsel**:

STRAUS & BOIES, LLP
David Boies III
Timothy D. Battin
Ian Otto
Christopher Le
4041 University Drive, Fifth Floor
Fairfax, VA   22030
Telephone: (703) 764-8700
Fax: (703) 764-8704

GUERRIERI, CLAYMAN, BARTOS &
    PARCELLI, PC
Jeffrey A. Bartos
Soye Kim
1625 Massachusetts Avenue, NW
Washington, DC 20036
Telephone: (202) 624-7400

KERSTEN & MCKINNON, S.C.
George P. Kersten (1008099)
E. Campion Kersten (1007641)
Kenan J. Kersten (1008505)
11518 N. Port Washington Rd.
Suite 104
Mequon, WI   53092
Telephone: (262) 241-0054
Fax:  (262) 241-5935

GALANIS, POLLACK, JACOBS &
    JOHNSON, S.C.
Mark B. Pollack, WI Bar # 1010557
839 N. Jefferson Street, Suite 200
Milwaukee, WI  53202
Telephone: (414) 271-5400

2

# TABLE OF CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.   General Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  Historical Sequence of Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  Financial Markets in the Late 1970's and Early 1980's . . . . . . . . 12

    B.  Development of the Current Rate Annuity . . . . . . . . . . . . . . . . . . 16

    C.  The Side-by-Side Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    D. The 1985 Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III. Additional Findings as to the 1985 Change . . . . . . . . . . . . . . . . . . 36

CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I.   Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    A.  Breach of the Express Terms of the Contract and
       Applicable Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    B.  Breach of Contractual Duties of Good Faith and
       Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    C.  Material Impact of the 1985 Change . . . . . . . . . . . . . . . . . . . . . . 71

II.  Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

III. Additional Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

ORDER FOR JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 61 of 302   Document 29   R-App 058

# CONCLUSIONS OF LAW

Based on the entire trial record and the above Findings of Fact, the Court concludes as follows:

## I. BREACH OF CONTRACT.

### A. <u>Breach of the Express Terms of the Contract and Applicable Statute.</u>

1. Each year since adopting the 1985 Change, Northwestern has breached the Pre-MN Annuity contracts that were in force and in their deferral period in the respects and for the reasons set forth in the following paragraphs.

2. The Pre-MN Annuity contracts must be interpreted in accordance with what a reasonable person in the position of the Annuitant would have understood the words to mean, giving the common and ordinary meaning it would have in the mind of a lay person. *Kremers-Urban Co. v. Am. Employers Ins. Co.*, 119 Wis.2d 722, 735-36, 351 N.W.2d 156, 163 (1984); *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis.2d 16, 32, 673 N.W.2d 65, 73 (2004).

3. Northwestern breached the Pre-MN Annuity contracts in making the 1985 Change and in its annual dividend determinations thereafter pursuant to the Change by failing to perform its duties under the contracts, by performing them defectively and by violating the dividend-related rights of

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 62 of 302   Document 29

the Annuitants under the contracts. [Adapted from Wis JI-Civil 3053 Breach of Contract.]

4.    Northwestern was obligated to comply with the following Annuity contract language:

> This policy shall share in the divisible surplus, if any, of the Company. This policy's share shall be determined annually and credited as a dividend.

5.    The substantial equivalent of this language (except for the last clause dealing with the effect of loans on policy dividends) was contained in the Update '83 amendment to which some Annuitants agreed:

> This policy will share in the divisible surplus of the Company. This surplus is determined each year. The policy's share will be credited as a dividend on the policy anniversary. This dividend will reflect the mortality, expense and investment experience of the Company and will be affected by any policy indebtedness during the policy year.

[*E.g.*, Exhibits 262 and 263.]

6.    Northwestern was obligated to comply with the following statutes which the law treats as part of the Pre-MN Annuity contracts:

> (2) PARTICIPATION. Every participating policy shall by its terms give its holder full right to participate annually in the part of the surplus accumulations from the participating business of the insurer that are to be distributed.

and

54

(4) DIVIDEND PAYMENTS. . . . (b) Payment. Every insurer doing a participating business shall annually ascertain the surplus over required servers and other liabilities. After setting aside such contingency reserves as may be considered necessary and be lawful, such reasonable non-distributable surplus as is needed to permit orderly growth, making provision for the payment of reasonable dividends upon capital stock and such sums as are required by prior contracts to be held on account of deferred dividend policies, the remaining surplus shall be equitably apportioned and returned as a dividend to the participating policyholders or certificate holders entitled to share therein. A dividend may be conditioned on the payment of the succeeding year's premium only on the first and second anniversaries of the policy.

Wisconsin Stat. §632.62(2) and (4); *Noonan v. Northwestern Mut. Life Ins. Co.,* 2004 WI App 154, ¶¶12-17, 276 Wis.2d 33, 41-43, 687 N.W.2d 254 ("*Noonan I*").

7.   By virtue of the foregoing contract language and statutory provisions, the Pre-MN Annuity contracts unambiguously required that Northwestern make an annual determination of the Company's "divisible surplus," and provide to the Pre-MN Annuitants their "full right" to participate in that divisible surplus through annual dividends pursuant to an "equitable apportion[ment]" of that divisible surplus.

8.   Northwestern breached the Pre-MN Annuity contracts by failing to satisfy these requirements for each of the following reasons:

55

(a)   The contract requires that the Pre-MN Annuities "shall share in the divisible surplus . . . of the Company."  When it drafted the Annuities Northwestern did not qualify this language, as it did for the CRAs (and with respect to the impact of loans, in the Update '83 program).  Being unqualified, the Pre-MN language would ordinarily be understood by an owner of the Company to mean a genuine share of the Company's overall divisible surplus, which reflects the Company's overall profitability, rather than merely a share of an atypical, limited  fund or account that  performs independently of the financial performance of the Company as a whole.

(b)   As confirmed by Northwestern's highest officers, participation means policyholders prosper as the Company prospers, and (as the Annuitants were told in their annual reports) dividends are a way in which the participating policyholders share in the results of the Company's operations.

(c)   The word "dividend" commonly and ordinarily means (in the absence of relevant qualification) a share in the overall financial performance of the dividend-issuing company, as distinguished from a share of interest yielded by an atypical, limited account held by the company.  In a broader context, the term "dividend" commonly and ordinarily means "'[a] portion of a company's earnings or profits distributed pro rata to its shareholders, us[ually] in the form of cash or additional shares.'"  *Yates v. Holt-Smith,* 2009

56

WI App 79 ¶16, 319 Wis.2d 756, 767, 768 N.W.2d 213, quoting Black's Law Dictionary 512 (8th ed. 2004).

(d)   Accepted practices in the insurance industry include the contribution principle.  This principle contemplates departure from a purely pro rata allocation of a company's divisible surplus among participating policyholders by permitting adjustments among different classes of policyholders to reflect their relative contributions to a company's profitability.

(e)   However, in applying the contribution principle here, Northwestern had established the Annuities and life policies in the *same* investment experience factor class, so that under accepted actuarial standards, practices and principles Northwestern was not free to segment the Pre-MN Annuities into a *separate* investment experience factor class without policyholder agreement.  (FOF 140)

(f)   Further, as confirmed by the principal Northwestern actuary involved in the 1985 Change, dividends credited by a mutual company are supposed to be portfolio-based unless special arrangements are made (which did not exist here), and the word "dividend" connotes a general account portfolio-based yield, as contrasted with the word "interest" which would properly be used when referring to the yield on a debt investment account.

(g)   Northwestern had consistently applied the contribution principle for many years before the 1985 Change, crediting the Pre-MN Annuities with portfolio-based dividends.  It was told by its own actuarial consultant it could *not* retroactively segment the Pre-MN Annuities, and no insurance company other than Northwestern is known to have done so, all of which confirms the conclusion that Northwestern could not properly do so.  (Durland Dep. at 30-34; FOF 133-140.)

(h)   Accordingly, the term "dividend" without any qualification, together with the phrase "share in the divisible surplus . . . of the Company," again without qualification, would not be understood by a reasonable person in the position of the Annuitant to permit an adjustment that entirely abandons the Company's overall earnings or divisible surplus as the basis for dividends, and instead allows a switch into a limited account that yields interest bearing no relationship to the Company's overall financial performance.  Rather, the unqualified contract language, particularly when taken with the statutory requirement for a "full right to participate," would lead a reasonable person in the position of the Annuitant to understand that the dividends would be substantially based on the overall financial performance and profitability of the Company.

(i)   Further supporting the conclusion that the contribution principle did not permit the 1985 Change is that, apart from all of the considerations

58

stated above, Northwestern's contribution-principle theory rests on the false premise that the 1985 Change was required to cure a supposed "cross subsidy," which in fact did not exist. *(See* FOF 39-40, 118-120.)

(j)    In any event, Northwestern's 1985 Change and dividend determinations made pursuant to it failed to satisfy the requirement that the Company's divisible surplus "shall be equitably apportioned" in several respects:

(i)    Northwestern made the Change from its long-standing, established dividend practices unilaterally, without notice to Annuitants and inequitably in many other respects as set forth in Findings of Fact 106, 116-133, 138-153.

(ii)    Annuities are essentially investments. *Reichel v. Jung,* 2000 WI App 151, ¶18, 237 Wis.2d 853, 863, 616 N.W.2d 118.  By the 1985 Change Northwestern, without notice to or agreement of the Pre-MN Annuitants, changed the fundamental investment characteristics of their Annuities, materially and substantially impairing the Annuitants' dividend rights.

(iii)    The 1985 Change unilaterally and without notice switched the annuitants to a substantially different investment philosophy in disregard of their reasonable dividend expectations.

59

(iv)   The 1985 Change was contrary to accepted insurance industry practices and procedures, as set forth in Findings of Fact 133 through 138 above and confirmed by Northwestern's inability to identify any other insurance company which retroactively segmented as to in-force annuities.

(v)   The 1985 Change violated accepted actuarial principles, as set forth in Findings of Fact 140.  Having designed, priced, marketed, sold and administered the Pre-MN Annuities on the basis of their being in the same investment experience factor class as the life policies (all deriving their dividend interest rate from the yield on the Company's general account portfolio), Northwestern was not free, absent Annuitant agreement, to change the Annuities' investment experience factor class.  This also is confirmed by Northwestern's inability to identify any other insurance company that ever retroactively segmented as to in-force annuities, since the relevant actuarial principles would apply to the actuarial practices of other companies as well as to Northwestern and the financial and competitive circumstances leading to the 1985 Change were essentially common to all.

(vi)   The inequity of Northwestern's 1985 Change is demonstrated, among other things, by an example to which

Northwestern's own consultant (Durland of TPF&C) testified:

Annuitant funds paid as premiums prior to 1985 were used for capital investments (such as the acquisition of the Baird securities firm and MGIC), which typically forego current income but achieve profit through long-term capital gains. Switching the Pre-MN Annuities into the segmented account limited to debt investments deprived the Annuitants of the benefit of those investments to which they had contributed. The Baird investment produced a capital gain in Northwestern's general account portfolio of $30 million. The MGIC investment produced capital gains of approximately $850 million, of which $350 million was realized by 1998. None of this benefitted the Pre-MN Annuities which in the meantime had been switched to the segmented account. (FOF 129)

(vii) The 1985 Change was made in bad faith and unfairly, in each and all of the respects set forth in the Findings of Fact 152 and 153.

9. A separate and independent reason Northwestern violated the Annuity contracts in adopting the 1985 Change and in the annual determination of the Pre-MN Annuity dividends thereafter is that the Pre-

MN Annuity language and statutory requirements quoted above unambiguously require that every year Northwestern must (1) ascertain the surplus over required reserves and liabilities and (2) subtract necessary contingency reserves, funds for orderly growth, dividends for capital stock and sums required by prior contracts to arrive at its dividend surplus. After the divisible surplus is determined, then and only then must Northwestern decide how to equitably apportion it. *Noonan I,* 276 Wis. 2d at 43-44, ¶17.

10. Contrary to these contractual and statutory requirements, Northwestern made the allocation to the Annuities before it determined the surplus, in that:

(a) The financial performance of the segmented account established by Northwestern pursuant to the 1985 Change is determined by the assets that are already held in that account and expenses related thereto; and

(b) The financial performance of that segmented account determines the annual dividends for the Annuities; and

(c) As a result, the dividends for the Pre-MN Annuities are predetermined by the financial performance of the segmented account, are established without reference to the Company's surplus and

divisible surplus determinations contemplated in the statute and vary independently of those determinations.

11.    Even if the Pre-MN Annuity contracts were to be regarded as ambiguous[4], a reasonable construction of the contracts as a whole, together with the statutory provisions quoted above, requires the conclusion that Northwestern breached the contract in making the 1985 Change and in the annual dividend determinations made each year thereafter for the Pre-MN Annuities, and the Court does so conclude.

12.    If the words or provisions of the Annuities are capable of more than one reasonable construction, they are ambiguous, and ambiguous provisions must be construed in favor of the Annuitants. *Froedtert Mem'l Lutheran Hosp. v. Nat'l States Ins. Co.,* 2009 WI 33, ¶41, 317 Wis. 2d 54, ¶41; *Danbeck v. Am. Family Mut. Ins. Co.,* 2000 WI App 26, ¶16, 232 Wis. 2d 417, ¶6 (1999), *aff'd* 245 Wis. 2d 186 (2001); *Kozak v. U.S. Fid. & Guar. Co.,* 120 Wis. 2d 462, 467 (Wis. Ct. App. 1984) ("We construe all provisions tending to limit liability most strongly against the insurer."); *Wis. Label v. Northbrook*

---

[4] Plaintiffs submit that their interpretation of the contracts, discussed above, is the only reasonable interpretation as a matter of law and should be adopted and applied by the Court. At a minimum, the plaintiffs' construction of the annuity contracts is a reasonable one, supported by both the plain language of the contracts and the applicable statutory provisions. Assuming arguendo that Northwestern Mutual has also advanced a reasonable construction of the contracts, the term would be ambiguous as a matter of law, *see Solowicz v. Forward Geneva Nat., LLC,* 2010 WI 20, ¶36, 323 Wis. 2d 556, ¶36, 780 N.W.2d 111, ¶36, and the proposed conclusions of law in this section should apply.

R-App 069

*Prop. & Cas. Ins. Co.,* 2000 WI 26, ¶24, 233 Wis. 2d 314, ¶24; *Gen. Cas. Co. of Wis. v. Hills,* 209 Wis. 2d 167, 175, 561 N.W.2d 718, 722 (1997) (ambiguous insurance contract interpreted against drafter, especially when it is a standard form supplied by the drafting party).

13.    Construing the contracts in favor of the Annuitants and against Northwestern leads to the conclusion the Annuitants were entitled under the contracts to the portfolio-based dividends they received prior to 1985 and that in making the 1985 Change and determining the Annuitants' dividends each year thereafter pursuant to that Change Northwestern breached the Annuity contracts.

14.    Another canon of construction leads to the same result: that the Court "ordinarily will place that interpretation upon the terms of the contract which the parties in the course of their dealings have adopted." *George J. Meyer Mfg. Co. v. Howard Brass & Copper Co.*, 246 Wis. 558, 574, 18 N.W. 2d 468 (1945). The acts of the parties, showing the construction that they themselves have put upon a contract are strong evidence of what the arrangement was between the parties. *See* Wis JI-CIVIL 3050 Contracts: Subsequent Construction by Parties.

15.    Northwestern's uniform and consistent conduct in marketing, selling and administering the Annuities prior to the 1985 Change is a strong

64

demonstration of its own understanding of its contractual obligations. It authorized and supported the regular use by its agents of illustrations portraying future dividends as portfolio-based in selling the Annuities. It supplied the same portfolio-based illustrations portraying future dividends to all Annuitants in connection with its Update 83 program. Beginning in 1983 it included portfolio-based illustrations portraying future dividends in the contracts themselves. Throughout that time dividends were a major feature of Northwestern's marketing efforts, and their value was consistently and prominently portrayed by Northwestern as being largely due to the efficacy of its balanced, long-term oriented general account portfolio.

16.  Prior to the 1985 Change, Northwestern's administration of the Annuities - crediting them with portfolio-based dividends - was consistent with these marketing and selling efforts. It was consistent also with its agents' portrayal of the Annuities as an investment in the Company with dividends being based on Northwestern's profitability, and with the dividends being characterized in the annual reports as the way in which the Annuitants share in the improved results of the Company's operations. This long-established and consistent course of conduct demonstrates Northwestern's own construction the Annuity contracts, which further confirms the Annuitants' entitlement to portfolio-based dividends.

17.   If, contrary to the above, Northwestern were correct in contending that the policy language is unambiguously broad, and that the equitable apportionment of its divisible surplus is a matter of business judgment, it would not be protected by the business judgment rule.[5]  The business judgment rule provides that courts will not generally review internal corporate business decisions made in informed good faith and based on the honest belief that the actions are taken in the corporation's best interest. Protection from challenge to corporate decisions under this rule is subject to limits that have clear application here:

(a)   The rule applies only when the business judgment is exercised in good faith.  In this case Northwestern failed to exercise the required good faith in numerous ways as detailed in the above Findings of Fact and in the further Conclusions set forth in paragraphs 19 through 25 below.  *Yates v. Holt-Smith,* 2009 WI App 79 ¶¶ 22-25, 319 Wis.2d 756, 770·72, 768 N.W.2d 213; *Reget v. Paige,* 2001 WI App 73, ¶¶ 17, 18, 242 Wis. 2d 278, 293-294, 626 N.W. 2d 302; *Sprecher v. Weston's Bar, Inc.,*78 Wis. 2d 26, 40-41, 253 N.W. 2d 493 (1977).

---

[5] The plaintiffs do not believe that the "business judgment rule" is applicable in this case.  See *Noonan I*, 276 Wis.2d at 43, ¶16.  However, should the Court consider the "business judgment rule" defense, plaintiffs conditionally propose the following conclusion of law.

66

(b)     The business judgment rule does not excuse a breach of contract, including a breach of the implied covenant of good faith and fair dealing.  *Id., E.g., Emily Towers Owners Corporation v. Carleton Emily Towers, LT* 649 NYS 2d 996 (1996).  ("Breach of contract is not a choice that is within the Board's business judgment to make, and the Board may only exercise this judgment where it is authorized to act in the first instance.")

(c)     Under the cases cited in subparagraph (a) of this Conclusion, the business judgment rule does not excuse Northwestern's breach of its fiduciary duties as set forth in the above Findings of Fact and in the further Conclusions set forth in paragraphs 27 through 43 below.

(d)     The business judgment rule does not excuse, and is irrelevant to, Northwestern's improper departure from and violation of the process mandated by Wisconsin Stat. § 632.62 (4)(b) for the determination of dividends.  *Noonan I*, 276 Wis.2d at 43-44, ¶¶ 16-18.

18.     The court concludes that the 1985 Change and the dividend determinations for the Pre-MN Annuities based on it were not made in good faith, were not equitable and breached Northwestern's fiduciary duties as concluded below.  Therefore the business judgment rule does not apply and Northwestern breached its contractual obligation to equitably apportion its

67

divisible surplus and provide to the Pre-MN Annuitants a dividend based thereon.

## B.   <u>Breach of Contractual Duties of Good Faith and Fair Dealing</u>

19.     Northwestern was required to act in good faith towards the Pre-MN Annuitants, and deal fairly with them in performing its obligations under the Annuity contracts. This requirement is a part of the Annuity contract just as though the contract stated it. (Adapted from WI JI-Civil–good faith and fair dealing.)[6]

20.     The duties of good faith and fair dealing required Northwestern to refrain from conduct that would impair Annuitants' rights to receive the benefits of the Annuity contracts. The duties may be breached even if there is no violation of an express term of the contract. *Id*.

21.     Whether Northwestern met its duties of good faith and fair dealing is determined by examining the purpose of the contract and the benefits the parties expected at the time the agreement was made. In these

---

[6] The authority supporting the legal principles set forth in paragraphs 19 through 25 (relating to the implied contractual duties of good faith and fair dealing) are contained in the Wisconsin standard instruction and extensive discussion of case authorities included with that standard instruction. These and other supporting authorities are also cited in the accompanying brief at pp. 15 through 19.

68

respects Northwestern breached its duties of good faith and fair dealing in at least two material ways.

22.     First, the fundamental purpose of the Annuity is to serve as a vehicle for retirement investment. The 1985 Change unquestionably constituted a material change in the investment characteristics of the Pre-MN Annuities. Northwestern knew at the time it made the 1985 Change there was a genuine risk that the result would be a reduction in the dividends to be credited to the Annuities based on that Change. That result in fact did occur. Moreover, as the evidence showed and the court has found, Northwestern knew at the time it made the Change that a reduction in future dividends was likely. The court concludes that, even apart from the question of whether Annuitant agreement was required for the 1985 Change, it was bad faith and unfair dealing for Northwestern to make the Change and then to make dividend determinations annually thereafter based on that Change without having given full and fair notice and disclosure of the Change to the Annuitants. It was manifestly bad faith and unfair dealing for Northwestern to make the conscious decision against giving direct notice, adopt a smooth landing process to reduce the potential (and make it unlikely) for Annuitants to become aware of the Change and misrepresent the Change to its agents at the time it was made.

23.     Second, Northwestern's understanding of its obligations as demonstrated in how it marketed, sold and administered the Annuities as portfolio-based investments is itself a demonstration of the parties' reasonable expectations embodied in the contract at the time the agreement was made, and the court so concludes. The 1985 Change and dividend determinations made annually pursuant to the Change are in breach of the duties of good faith and fair dealing for this reason as well.

24.     In determining whether Northwestern and its officers, trustees and employees acted in good faith, the court considers the motives and intent of those involved in making the 1985 Change. *Id.* As the court has found based on contemporaneous documents, Northwestern made the 1985 Change out of self-interest to facilitate its introduction of the CRA and at the expense of the Pre-MN Annuitants. In doing so it violated accepted practices of the insurance industry and accepted principles of actuarial practice, and compounded the inequity of its conduct by the decisions to withhold direct notice to the Annuitants of the Change and to take the additional steps to make it unlikely the Annuitants would ever know the Change had been made.

25.     Accordingly, the court concludes that Northwestern breached its duties of good faith and fair dealing in making the 1985 Change, in failing to

70

notify the Annuitants of the Change, in taking steps to conceal the Change from the Annuitants and in basing its dividend determinations each year after 1985 on the Change.

## C. **Material Impact of the 1985 Change**.

26.    The impact of Northwestern's breach of the Pre-MN Annuity contracts is properly, fairly and reasonably measured by the differential shown in the chart set forth in Finding of Fact 102, since the chart fairly and reasonably measures the difference between what the Pre-MN Annuitants would have received as dividends absent the 1985 Change compared with what they did receive because of the Change. *Thorp Sales Corp. v. Gyuro Grading Co.,* 111 Wis. 2d 431, 438,  331 N.W. 2d 342 (1983).

## II.    **BREACH OF FIDUCIARY DUTY.**[7]

27.    Northwestern was and is a fiduciary to the Pre-MN Annuitants in respect to the dividend issues that are the subject of this case.   *Noonan I*, 276 Wis.2d at 47, ¶ 24 .

_____

[7] The controlling law defining fiduciary duties relevant to this case includes *Zastrow v. Journal Comm., Inc.,* 2006 WI 72, ¶¶ 28-9, 291 Wis.2d 426, 703 N.W.2d 673; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis. 2d 127, 136 (1985); *Jorgenson v. Water Works, Inc.*, 218 Wis.2d 761, 783 (1995); *Groshek v. Trewin*, 2010 WI 51, ¶¶ 15-6, 325 Wis. 2d 250, 261-3; *Van Der Puy v. Van Der Puy*, 2009 WI App 27 ¶ 8; 316 Wis. 2d 412; 763 N.W.2d 559 (Ct. App. 2009)(unpublished); *Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶ 56, 284 Wis.2d 307, 337-8, 700 N.W.2d 180, 195.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 80 of 302   Document 29   R-App 077

28.    This fiduciary relationship arose from Northwestern's agreement in the Annuities to act for the benefit of the Annuitants and the special circumstances regarding the relative positions of Northwestern and the Annuitants, as to which there was an inequality between them, a dependence of the Annuitants on Northwestern's good faith, fair and equitable performance of its duties relating to dividends, Northwestern's superior knowledge of facts involved, the trust and confidence Annuitants placed in Northwestern in entrusting their investments and savings on a continuing basis to Northwestern's power and control, and Northwestern's possession and exercise of that power and control over the Annuitants' investments and savings during that continuing period . *Noonan I,* 276 Wis. 2d at 47, ¶24; *Miranovitz v. Gee,* 163 Wis. 2d 246, 252-53, 157 N.W. 790 (1916); *Winslow v. Winslow,* 257 Wis. 393, 396-97, 43 N.W.2d 496 (1950) and *Estate of Lecic*, 104 Wis. 2d 592, 608, 614-15, 312 N.W.2d 773 (1981).  *See* FOF 111-115.

29.    The Northwestern officers and trustees who made and acted pursuant to the 1985 Change were also fiduciaries to the Annuitants in respect to the dividend issues that are the subject of this case (with respect to the 1985 Change and actions taken pursuant to it).  *Noonan I,* 276 Wis. 2d at 47, 48, ¶¶ 25, 27; *Grognet v. Fox Valley Trucking Services,* 45 Wis. 2d 235, 241-42, 172 N.W.2d 812 (1969).

72

30.   All actions at issue were performed by Northwestern's officers, employees and trustees acting within the scope and in the course of their respective offices and trusteeships with the full knowledge, participation, authority and approval of Northwestern's highest management and Board of Trustees.  Accordingly, Northwestern is vicariously liable for all of their actions, which actions were a cause of the 1985 Change and the adverse dividend determinations made pursuant to that Change.

31.   As fiduciaries, Northwestern and its officers and trustees each had and continue to have the duty to act with utmost loyalty, diligence, good faith, fairness and honesty toward the Annuitants with respect to the dividend issues that are the subject of this case.  They were and are prohibited from acting in a way that would deprive Annuitants of the right to enjoy the fruits and profits of their Annuity investments, and from acting in a way that would otherwise injure or prejudice that right.

32.   As fiduciaries, Northwestern, and each of its officers and trustees involved in making and acting pursuant to the 1985 Change were and are also bound to make a fair, timely and full disclosure to Annuitants of the 1985 Change, since it materially and substantially affected their interests, rights, investment and savings and was reasonably likely to affect their judgments and actions in respect to their annuities and dividends.

73

33.    Northwestern, and each of its officers and trustees involved in the 1985 Change, intentionally violated their fiduciary duties of disclosure to the Annuitants in the following ways:

(a)    Failing to provide Annuitants directly with a full and fair disclosure of the 1985 Change and its potential effects upon their Annuity dividends.

(b)    Taking steps to make it unlikely that Annuitants would become aware of the 1985 Change and its potential effects on their Annuities and dividends.

(c)    Misrepresenting the 1985 Change to its agents, rather than providing to them a full and fair disclosure of the 1985 Change and its potential effects on the Annuity dividends.

(d)    Failing to instruct the agents to inform Annuitants of the 1985 Change and of its potential effects upon their Annuities and dividends.

(e)    Making dishonest and misleading representations in and after 1985 with respect to Northwestern's continuing strategy of long-term investments, when in fact it had switched the basis for Pre-MN Annuity dividends to a short-term oriented portfolio of debt instruments.

34.     As a fiduciary Northwestern was also prohibited from acting in its own interest at the expense of the Annuitants, and was required to prefer the interests of those Annuitants over its own interests.

35.     Northwestern, and its officers and trustees involved in the 1985 Change, intentionally violated their fiduciary duties of loyalty, and instead acted in Northwestern's interests and contrary to and at the expense of the interests of the Pre-MN Annuities, by making the 1985 Change in order to facilitate the marketing and sale of the CRA Northwestern brought to the market in 1985.

36.     Northwestern, and its officers and trustees involved in the 1985 Change, intentionally breached their fiduciary duty of good faith to Annuitants in failing to equitably apportion the Company's divisible surplus in the following respects:

    (a)     In engaging in an inequitable and unfair course of conduct rendering the apportionment process inequitable, as found by the court in the Findings of Fact; and

    (b)     In determining the Pre-MN Annuitants' dividends each year since 1985 on the inequitable and unfair basis established in the 1985 Change.

R-App 081

37.   Northwestern intentionally violated its fiduciary duties to Annuitants by adopting the 1985 Change and acting annually thereafter pursuant to that Change, thereby depriving the Pre-MN Annuitants of their rights to enjoy the fruits and profits of their annuity investments, and in injuring and prejudicing those rights.

38.   Northwestern's breaches of fiduciary duty were directed against and committed as to the "closed block" of Pre-MN Annuities as a whole, thereby proximately causing financial injuries to the Pre-MN Annuitants in that block.

39.   The breaches of fiduciary duties by its officers and trustees for which Northwestern is vicariously liable, and each of them, were directed and committed as to the "closed block of Pre-MN Annuities as a whole, thereby causing financial injuries to the Pre-MN Annuitants in that block.

40.   The financial injury to the Pre-MN Annuitants from these breaches and each of them is fairly and reasonably measured by the differential between the "life" (portfolio-based) and Pre-MN Dividend Interest Rates shown in the chart appearing in Finding of Fact 102 for the reasons stated above.

76

R-App 082

41.     Each of Northwestern's breaches of fiduciary duties was done in an intentional disregard of the rights of the Pre-MN Annuitants within the meaning of Wisconsin Statutes §895.85 (3).

42.     The Northwestern officers and trustees involved in the 1985 Change and in the dividend determinations made pursuant to the 1985 Change intentionally violated their fiduciary duties to Annuitants in participating in, consenting to and authorizing each of the acts and misconduct described in these Findings and Conclusions, for which breaches of fiduciary duties Northwestern is vicariously liable.

43.     Each of the breaches of fiduciary duty of the Northwestern officers and employees referred to in paragraph 42 above was and is done in an intentional disregard for the rights of Annuitants within the meaning of Wisconsin Statutes §895.85 (3).

## III.   ADDITIONAL CONCLUSIONS.

44.     Neither the Wisconsin Department of Insurance nor the New York Insurance Department adjudicated, concluded or ruled that the 1985 Change was consistent with Northwestern's contractual or fiduciary obligations toward the Plaintiffs.  The existence *vel non* of the regulatory approval claimed by Northwestern does not bear on the claims involved in this case.  *Noonan I*, 276 Wis. 2d at 48-49, ¶¶29, 30.

45.    The Wisconsin Department of Insurance never granted approval to the 1985 Change.

46.    The New York Insurance Department's approval of Northwestern's plan of segmentation did not constitute approval of the 1985 Change with respect to Plaintiffs, because such approval was specifically based on Northwestern's giving of notice to the plaintiffs, and such notice was never provided.  (FOF 72.)

47.    The interest of justice are best served by this court's retaining jurisdiction of this case following entry of the Declaratory Judgment set forth below.

## ORDER FOR JUDGMENT

Therefore, IT IS ORDERED that a Declaratory Judgment shall be entered in accordance with and based upon the above Findings and Conclusions.

Signed this        day of                  , 2011.

BY THE COURT:


The Honorable Dennis J. Flynn
Reserve Circuit Judge

R-App 084

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY

MARLEEN M. LAPLANT, on her own
behalf and on behalf of a class similarly
situated,

                              Plaintiff,         Case No.    08-CV-11988

              vs.

                                                 Code:       30701
THE NORTHWESTERN MUTUAL LIFE                     Declaratory Judgment
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

                              Defendant.

## PLAINTIFF'S REPLY BRIEF IN SUPPORT
## OF CLASS CERTIFICATION

George P. Kersten (1008099)            David Boies III
E. Campion Kersten (1007641)           Timothy D. Battin
Kenan J. Kersten (1008505)             Mark J. Schirmer
KERSTEN & MCKINNON, S.C.               STRAUS & BOIES, LLP
11518 N. Port Washington Rd.           4041 University Drive
Suite 104                              Fifth Floor
Mequon, WI  53092                      Fairfax, VA   22030
Telephone:    (262) 241-0054           Telephone: (703) 764-8700
Fax:  (262) 241-5935                   Fax: (703) 764-8704


Mark B. Pollack  (1010557)             Jeffrey A. Bartos
Maria S. Lazar (1017150)               GUERRIERI, EDMOND, CLAYMAN &
GALANIS, POLLACK, JACOBS &                  BARTOS, PC
     JOHNSON, S.C.                      1625 Massachusetts Avenue, NW
839 N. Jefferson Street, Suite 200      Washington, DC 20036
Milwaukee, WI  53202                    Telephone: 202-624-7400
Telephone:  414-271-5400                Fax: 202-624-7420
Fax:  414-271-5571

# Table of Contents[1]

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Commonality and Numerosity Are Not Disputed. . . . . . . . . . . . . . . 3

III.  Mrs. LaPlant Is an Adequate Class Representative. . . . . . . . . . . . . 3

      A.    Mrs. LaPlant Has a Valid Claim. . . . . . . . . . . . . . . . . . . . . . 3

      B.    Northwestern's Other Challenges to Mrs. LaPlant as Class
            Representative Are Without Merit. . . . . . . . . . . . . . . . . . . 9

IV.   This Declaratory Judgment Action Is Manageable as a Class Action.  10

      A.    The Alleged Individualized Defenses Are Irrelevant to the
            Declaratory Judgment Sought. . . . . . . . . . . . . . . . . . . . . 11

      B.    The Alleged Individual Issues Are Self-contradictory, Speculative
            and Without Foundation in the Record. . . . . . . . . . . . . . 12

      C.    Choice of Law Issues Do Not Make the Class Unmanageable.
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      D.    Damages Do Not Affect Manageability. . . . . . . . . . . . . . . . . . 22

V.    Issue Preclusion Does Not Apply Here. . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

---

1    Citations to Plaintiff's exhibits are given by page numbers to Plaintiff's appendix (App. __) and
supplemental appendix filed herewith (S.App. ___) , and to Defendant's exhibits as "N. Exhibit __."
Parallel citations to the Northwestern Reports are deleted because the cases are being provided with
this brief.

this action involves a declaratory judgment, not the award of damages. In any event, the theory is contrary to the record.

As set forth in the affidavit of Actuary Robert Hoyer (App. 254-254), there is a huge disparity between the dividends Northwestern pays to life policies ($5 billion last year) (S.App. 389) and the differential owing to the Wisconsin Pre-MN annuitants had the contract and statute been complied with ($1 million for last year).[8] Even if damages were at issue now, the actual impact on life policy dividends for relief to the Wisconsin Pre-MN annuitants is 0.02% annually, effectively zero.[9] Thus, Northwestern's alleged conflict has no basis and cannot be a ground to deny class certification. *See Littlewolf v. Hodel*, 681 F. Supp. 929, 936-937 (D.D.C. 1988) ("incantations of the *potential* for antagonism" between class members insufficient to defeat class certification.); *In re South Central States Bakery Products Antitrust Litigation*, 86 F.R.D. 407, 418 (M.D. La. 1980) ("A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the heart of the subject matter of the suit.").

## IV. THIS DECLARATORY JUDGMENT ACTION IS MANAGEABLE AS A CLASS ACTION.

---

[8] Hoyer estimates the current annual short-fall for Pre-MN annuities nationally at $10 million dollars and declining. App. 257, ¶ 13. The parties agree the Wisconsin Class is approximately 10 % of the putative national class. *See, e.g.*, App. 269 and 256 (¶ 12) and 257 (¶¶ 13-15).

[9] Even for a national class there is no conflict. Northwestern's assertion that Annuitants who surrendered their Annuities during the phase-in years might have come out (minimally) ahead means only that they may not have a right to damages.

10

The declaratory relief sought is subject to common proof. LaPBr. at 7-12. The dominant issues depend exclusively on whether Northwestern's internal conduct with respect to the "block" of pre-MN annuities complied with the contract and controlling statute. In response, Northwestern speculates that manageability problems might arise from hypothetical individualized defenses, supposed conflicts of law difficulties, and the false premise that this action is a claim for something other than declaratory relief. As held in *Schlosser II*, benefits derived from class treatment must be outweighed by a genuine risk posed by individualized issues in order to deny certification. *Id.*, 86 Wis. 2d at 233-34, citing *Nolte v. Michels Pipeline Construction, Inc.,* 83 Wis. 2d 171,177 (1978); s*ee Blihovde,* 219 F.R.D. 607, 622 (W.D. Wis. 2003) ("[I]t would be improper to let manageability concerns overwhelm the predominance decision.") Northwestern cannot demonstrate a reasonable risk of unmanageability by relying on defenses it does not know exists and, as we show, could not be available to it.

### A.    The Alleged Individualized Defenses Are Irrelevant to the Declaratory Judgment Sought.

Northwestern's so-called affirmative defenses are irrelevant to the declaratory judgment issues. In a back-door effort to find relevance, Northwestern argues that if the Class obtains a declaratory judgment, and if supplemental relief is ultimately sought by some class members, jury confusion might occur. But that is not the issue now before the Court. If and when it becomes an issue, Northwestern can then explain why a jury would be confused in deciding the simple question of whether any

11

annuitants were notified of and agreed to the 1985 change (the speculative assertion which underlies all the supposed "defenses").

Northwestern relies on two cases that are patently inapt. The first is *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, an action by residential well owners against twenty oil companies claiming well water contamination and alleging numerous causes of action including negligence and failure to warn. 209 F.R.D. 323, 328 (S.D.N.Y. 2002). The plaintiff sought certification of a class on liability. Understandably, the court held there could not be a class determination on liability followed by individual damage actions brought by the well owners since the basis for the class liability finding might not relate to a given individual's damage claims, and would be intertwined with contributory negligence, warning and similar issues. *Id.* at 351-5.

The second case is *Pryor v. NCAA*, 2004 WL 1207642 (E.D. Pa. 2004), in which a class finding of race discrimination would not establish liability in favor of individual plaintiffs who were required to prove the defendant engaged in intentional discrimination specifically against each plaintiff. *Id* at 2-3.

These decisions do not apply since Northwestern's hypothetical affirmative defenses are based on notice, a simple issue completely discrete from and not intertwined with whether Northwestern's conduct complied with the contract and its fiduciary duties. Significantly, the proposed class here is limited to Annuitants who

12

"did not expressly consent, in writing, to limit or surrender their right to participate in Northwestern's divisible surplus." Compl. ¶ 11.

### B. The Alleged Individual Issues Are Self-Contradictory, Speculative and Without Foundation in the Record.

In an apparent attempt to draw attention from the obvious advantages of class certification – and the Wisconsin policy preference for joining all persons whose rights could be affected by a declaratory judgment – Northwestern speculates about the existence of potential affirmative defenses, citing its Exhibits P and Q. Northwestern contends that it told its agents of the 1985 change when it occurred and that "agents *may have* discussed this change with any number of putative class members...." NBr. at 15 (emphasis supplied). If such a discussion took place, Northwestern reasons, it might have an equitable defense despite its failure to procure the Annuitants' written consent to the 1985 change (and apparently despite its not even "reaching out" to the Annuitants to determine whether they learned of the 1985 Change and agreed to it). Conjecture built on conjecture, however, is not evidence of individualized issues.

"[T]he hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issue is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action." *Miner v. The Gillette Co.*, 428 N.E.2d 478, 485 (Ill. 1981); *see also In re Farmers Ins. Co., Inc. FCRA Litigation*, 2006 WL 1042450,*8 (W.D.Okla. 2006) (In granting class

13

certification, "the court is reluctant to permit the entire course of this action to turn, at this stage of the proceedings, on potentially ephemeral issues as to the factual and legal effect of a telephone call from an agent to a class member who has received a formal written notice on the same subject as that of the hypothetical phone call.")

Nor would actual evidence that any agents had notified any class members make the class action unmanageable. Northwestern would still have to demonstrate those conversations were more than isolated incidents giving rise to a reasonable showing the defenses would overcome the benefits of resolving the common issues in this declaratory judgment proceeding. *Schlosser II*, 86 Wis. 2d at 233-34, citing *Nolte v. Michels Pipeline Construction, Ind.*, 83 Wis. 2d 171, 177 (1978) and *Schlosser I*, 65 Wis. 2d at 172. It has not done so, nor could it.

The likelihood of any such evidence even existing is undermined by Northwestern's behavior. In the information release it contends the agents received Northwestern did not direct or request the agents to communicate this information to customers. N.Exhibits P & Q. In fact, the agents were instructed not to disseminate the information to the public, App. 125., and its Annual Report to Policyholders at the time told the Annuitants Northwestern "continued to emphasize a long-term approach to investments and dividends that optimizes returns for its policyowners and avoids short-term swings." App. 74.

Northwestern has had ample opportunity to present some evidence supporting its assertions of notice of the change to annuitants. It has repeatedly

14

been asked to produce such evidence in discovery, but it has not done so. *See,* Northwestern's circumlocutions at S.App. 391-93. Its failure to produce anything beyond speculative assertions leads to the reasonable inference that Northwestern has no real evidence that agents disclosed and explained the 1985 change to their customers.

> "It is a well-established rule that where relevant evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and he fails to do so, *without satisfactory explanation,* the jury may draw an inference that such evidence would be unfavorable to him. This rule is uniformly applied by the courts and is an integral part of our jurisprudence." (Emphasis supplied.)

*Coney v. Milwaukee & S.T.Corp..* 8 Wis. 2d 520, 526 (1959), quoting with approval 20 Am. Jur., Evidence, p. 188, §183 [equivalent to 29 Am.Jur.2d, *Evidence* § 245].

This inference is confirmed by other evidence. First, the only evidence on whether an agent would have communicated the 1985 change to an Annuitant contradicts Northwestern's conjecture. In the *Noonan* action, Northwestern Agent Michael J. Holden stated in an affidavit:

> If there were any change, including the one just referred to, it would not be and could not be the agents' job to communicate that to the annuitants. The structure of NML's agency system and the varying degree of contact, if any, agents have with policyholders throughout the country would prohibit that form being either the understanding or expectation of either NML or the agents in that regard. To the contrary, I and any other agent would understand that disclosures and descriptions of any such changes, if permitted by law, would be made directly by NML's home office to annuitants and other policyholders.

15

App. 344. Second, Holden is corroborated by Northwestern's submission to the New York Insurance Department regarding the 1985 change. Northwestern promised that Department it would notify the pre-MN annuitants, not through its agents, but directly in its annual report, press releases, and an explanatory "stuffer" in the annuitants' account statements. N.Exhibit J, pp.2-3. Northwestern never took these steps. *See,* App. 36-90 (Annual Reports, containing no such disclosure) and S.App.281-82 (Mrs. LaPlant, who would have received a stuffer had it been sent, testifying she did not receive one.) Northwestern's unfulfilled promise acknowledges such disclosures are expected by all involved to come from the Company, not through its agents. Further, the expectation of company notice of important changes is clearly shown by the manner in which the 1983 change was presented to the Annuitants. LaPBr. at 6.

Northwestern's attack on manageability is fundamentally untenable. If speculation about individualized issues were allowed to defeat class certification, no class would ever be certified. *See Wilborn v. Dun & Bradstreet Corp.*, 180 F.R.D. 347, 356-57 (N.D. Ill. 1998).

Even if Northwestern had any evidence to support its asserted defense, it would fail as a matter of law. It sounds in equity and requires reliance. In contract disputes involving claims or defenses in equity, courts consider it probative whether action or inaction by one party (here, the class members) created *reasonable reliance* by the other party (Northwestern) resulting in a detriment. *See e.g., DOR v.*

16

*Moebius Printing Co.*, 89 Wis. 2d 610, 634 (1979). The lack of reliance precludes the application of equitable doctrines. *See In re Mihelcic's Estate*, 63 Wis. 2d 33, 44-5 (1974).[10]

Northwestern admits it has never made an attempt to ascertain whether any agents told any Annuitants of the 1985 change at any time. *See* NBr. at 15. Moreover, its theories are self-contradictory: if it cannot even identify any Annuitants who (supposedly) learned of the change, what could it claim it relied on? Nor does it claim to have evidence that any Annuitant consented to the change. It is impossible for Northwestern to have relied on any action or inaction by any Annuitant. Thus it cannot assert its purported equitable defenses. Moreover, its admitted ignorance of the existence of notice and waiver is indefensible in light of its fiduciary duty to the Annuitants.

### C. Choice of Law Issues Do Not Make the Class Unmanageable.

This case addresses the rights of Annuitants who entered into Annuity agreements while residing in Wisconsin, and Northwestern, a Wisconsin chartered

---

[10]    Although developing Wisconsin law may be unclear as to whether reliance is an essential element of waiver, courts do consider reliance to be relevant when determining the existence of a waiver. *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 290 Wis. 2d 264, 275 Fn. 8 (2006). Furthermore, some have actually required that reliance be shown. *See Am. Suzuki Motor Corp. v. Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir.1995) (attempt at "modification by words or conduct . . . operates as a waiver only if the party seeking to enforce the attempted modification, reasonably relied on the attempted modification"). Moreover, a fiduciary cannot rest on mere silence or failure to object. *Robinson v. McWayne*, 35 Haw. 689, 1940 WL 7586 (1940) ("Mere silence as to a claim cannot be construed to constitute a release thereof."), *Stowers v. Norwest Bank Indiana, N.A.* 624 N.E.2d 485, 488 (Ind. App. 1993) (Beneficiary has no duty to approve or disapprove a proposed act of trustee), cited in Annotation, *Beneficiary's Consent to, Acquiescence in, or Ratification of, Trustees' Improper Allocation or Distribution of Assets*, 29 A.L.R.2d 1034 (1953). In any event, the party raising the defense of waiver must demonstrate it through clear evidence. *See* 28 Am. Jur. 2d Estoppel and Waiver 225.

17

and headquartered company. Northwestern hopes to defeat certification of this Wisconsin Class by arguing "choice of law" issues render the case unmanageable. It asserts that because some Annuitants may have moved out of Wisconsin after purchasing their Annuities the Court will be forced to address choice-of-law issues relating to whether Northwestern owes them a fiduciary duty. Northwestern then extends this argument to assert that since some of those class members may have executed the 1983 dividend amendment after moving out of Wisconsin (the amendment provides that "the Amendment" is governed by the law of the state of the owner's residence at time of execution) the Court should not certify this class. Setting aside the requirement that Northwestern must first actually show that class members have moved to other states and signed the amendment (and that they couldn't simply be made a subclass if in fact disparate fiduciary law applied to them), neither Northwestern argument has merit because the relevant class-wide facts and Wisconsin choice of law doctrine establish that Wisconsin law applies to the entire Class on all relevant issues.

Wisconsin law applies to issues between Wisconsin based companies and their owners. *Beloit Liquidating Trust v. Grade*, 2004 WI 39, ¶¶ 24-31, 270 Wis. 2d 356, 374-77 (2004) (Wisconsin corporate law applies to intra-corporate issues for companies based in Wisconsin);[11] *Finch v. Southside Lincoln-Mercury, Inc.*, 2004 WI

---

[11]     Northwestern cites *Beloit* for the proposition that some other state's law might apply to the corporate relationships for this Wisconsin based corporation – which is exactly the *opposite* of *Beloit's* holding. Northwestern also cites the unpublished *Noonan II* decision for the proposition that choice of law issues may make the class unmanageable. *Noonan II*, however, addressed only whether the trial court abused its discretion in being "concerned" that there might be choice of law issues

App 110, ¶¶ 29-32, 274 Wis.2d 719, 743-45 (Ct. App. 2004) (Wisconsin corporate law relating to the fiduciary duties arising from the corporate form applies to Wisconsin based corporation).[12] Likewise, courts throughout the U.S. would apply Wisconsin law to these issues. *See State Farm Mutual Auto Ins. Co. v. Superior Court*, 8 Cal. Rptr.3d 56, 63-70 (Cal. App. 2003) (discussing the law throughout the U.S. governing choice of law with regard to corporate relationships). Domiciliary law *must* apply to dividend determinations. *Equitable Life Assurance Soc. v. Brown*, 213 U.S. 25, 43-44 (1909); 18 Am Jur 2d, Corporations, § 15, at 659-60 (2004). Applying the law of any other state would be "irrational." *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 483 (R.I. 2004).

Further, the residency of a class member at the time of a suit does not alter the choice of law analysis. "Wisconsin courts have held that a plaintiff's residency is an insufficient contact to support the application of the law of the plaintiff's home

---

regarding a potential nationwide class claiming fiduciary duties, but did not decide the question of whether the Wisconsin or the foreign law would apply.

[12] Northwestern's citation of *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507 (6th Cir. 1999) is misleading and wrong. Greenberg involved a fraud claim against the insurance company for allegedly misrepresenting the terms of its insurance – no issues regarding rights to corporate surplus were involved. Further, the court noted that the plaintiffs "do not allege that the fiduciary relationship stems from their agreements with Life of Virginia, but rather from the operation of a special relationship between the parties." *Id.* at 521. *Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174 (3d Cir. 1985), involved a dispute on payment of a life insurance claim not participation or ownership rights. *Fidelity & Cas. Co. of New York v. Metropolitan Life Ins. Co.*, 248 N.Y.S.2d 559, 565-664 (N.Y. Sup. Ct. 1963), a trial level decision, addressed how New York's (now changed) insurance law applied to the dispute between two New York based and incorporated companies. *Equitable Life Assurance Society of the United States v. Brown*, 213 U.S. 25 (1909), also addressed the application of certain provisions of New York law (now superseded) to a New York chartered mutual insurance company. Neither New York case addressed the issue as to whether New York law applies to deprive New York residents of their rights as corporate owners of a non-New York corporation or choice of law issues.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 99 of 302   Document 29   RL-App 096

state." *Brooks v. General Casualty Company of Wisconsin*, 2007 WL 4305577 at *3 (E.D. Wis. 2007) citing *Burns v. Geres*, 140 Wis. 2d 197( Ct. App. 1987), *Johnson v. Travelers Ins. Co.*, 1992 WL 142249 (Wis. App. 1992), and *Beloit Liquidating Trust, supra.*

In arguing that choice of law issues would impede class treatment, Northwestern does not identify why any other state would have an interest in the application of its laws to the issues in this case.[13] In fact, no other state has a substantial interest in applying its law to the issues in this case. First, any interest in protecting the rights of citizens is met by applying Wisconsin law, not by reducing their Annuitant-citizens' rights if its own law so required. Second, no other state has an interest in governing Northwestern's internal corporate structure and decisions, because Northwestern is organized under Wisconsin law and headquartered here. Application of any other state's law to these issues would constitute "officious intermeddling." *See Beloit Liquidating Trust v. Grade, supra,* ¶24; *Finch, supra,* ¶¶ 28-31.

Northwestern does not and cannot claim that multiple state laws *actually* govern its decisions and duties to its participating policyholders. It hides behind the speculative pretense an issue *may* exist. Its actions establish no such issue does exist. It admits all its actions relevant to the issues were made on a unitary basis at

---

[13]     The five factors to examine in making choice of law determinations are: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Drinkwater*, 290 Wis.2d at 658-66, ¶¶ 40-64; *Coady v. Cross Country Bank*, 2007 WI App 26, ¶ 14, 299 Wis. 2d 420, 434.

20

the corporate level. And Northwestern fails to adddress this crucial point: every state identified as not providing a fiduciary duty would find that Wisconsin law governs under the circumstances here. *See e.g. Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980) (New York, the home of the insurance companies in *Fidelity* and *Equitable Life Assurance*, applies the internal affairs doctrine to corporate issues: the law of the state of incorporation controls issues regarding the relationship between a corporation and its owners); 15 Pa. C.S.A. § 4145 (same under Pennsylvania law [law applicable in *Benefit Trust*]); *Bryan v. DiBella*, 2009 WL 638472 (Ohio App. 2009) (same under Ohio law); *Stockbridge v. Gemini Air Cargo, Inc.*, 611 S.E. 2d 600 (Va. 2005) (same under Virginia law).

Also unavailing is Northwestern's argument that because some class members may have moved before signing the 1983 amendment to their Annuities, stating that "this Amendment" should be governed by the law of the annuitant's residence at the time of amendment, creates a choice of law problem. The amendment did not alter the language creating the rights at issue here and did not purport to change those rights and the Company's obligations as to them. Northwestern argues the choice of law clause should apply to unchanged language, rights and obligations. This strained interpretation is contrary to the plain language of the Amendment and defies conventional rules of contract construction by broadly construing the document in favor of Northwestern rather than strictly against it. Additionally, such an interpretation is inconsistent with Wisconsin choice of law principles.

21

*Drinkwater v. American Family Insurance*, 2006 WI 56, ¶¶ 40, 41, 290 Wis. 2d 642,

658 (courts are to apply Wisconsin law unless a substantial reason exists to apply

another state's law).

When, as here, the principal contract was created in Wisconsin between a

Wisconsin company and Wisconsin residents, Wisconsin law governs the

interpretation of the contract. *State Farm Mutual Auto Ins. v. Gillette*, 2002 WI 31, ¶

27, 251 Wis. 2d 561, 577. Applying Wisconsin law to the unchanged terms of the

agreement protects Wisconsin's interest in ensuring predictable and consistent

interpretation of rights and simplifying this Court's task. *Drinkwater, supra,* 660, ¶

46; 662, ¶ 53. Also, it conforms with Wisconsin's policy of construing ambiguous

policy provisions against the drafter. *See State Farm Mutual Auto Ins. Co. v.*

*Gillette*, 251 Wis. 2d at 578, ¶ 28; *Brown County v. OHIC Ins. Co.*, 2007 WI App 46, ¶

11, 300 Wis. 2d 547, 552-53. And it protects the foreign state's interest in

maximizing the rights of their citizens, not reducing them in favor of a foreign

insurance company.

### D. Damages Do Not Affect Manageability.

The Court has already rejected the argument repeated here by Northwestern,

that this is only a disguised damage action and that "hundreds of 'mini-trials'" will

therefore be required to determine damages and rule on its defenses. NBr. at 20.

The Complaint seeks only declaratory relief, which is clearly useful. *See,*

Decision on Motion, p. 37. Mrs. LaPlant is not seeking damages in this action,

22

although that is her goal and she so testified. Her comments during her deposition regarding her ultimate goal of being made whole by Northwestern for its illegal acts are consistent with the relief sought here, which is step one in that process.

Northwestern also undercuts its prior argument that the calculation of class-wide damages is unmanageable in contending (N.Br. at 3) that some proposed class members who cashed out their annuities between 1985 and 1992 benefitted from the 1985 change. Apparently, when it suits its purpose, Northwestern finds it easy to make calculations regarding class-wide impact in order to separate those who allegedly benefitted from the 1985 change from those who did not. The analysis of the class-wide impact would be a straight-forward application of the chart provided by Northwestern's actuary, Mr. Fisher. *See,* App. 35, 253 and 257-258.

## V.        Issue Preclusion Does Not Apply Here.

Finally, Northwestern seeks to reargue its motion to dismiss, claiming again that Mrs. LaPlant is precluded from seeking class certification in light of *Noonan.* NBr. at 23-25. Northwestern argues that a different outcome is now warranted because Mrs. LaPlant was aware of the *Noonan* litigation and "considered herself to be a member of the putative class." NBr. at 23. But the Court's earlier decision did not turn on Mrs. LaPlant's knowledge or state of mind. To the contrary, the Court held that there was no preclusion because "there is not yet any final judgment or order in the *Noonan* case that would constitute precedent on the matter regarding a class of solely Wisconsin residents that could be used in support of issue preclusion

23

in this case." Decision, June 15, 2009, at 29.[14] Those facts have not changed.

Accordingly, Northwestern's reargument is without merit.

## CONCLUSION

For the foregoing reasons, Plaintiff, Marleen LaPlant, respectfully requests that certification be granted.

Dated: September 30, 2009.

George P. Kersten (1008099)
E. Campion Kersten (1007641)
Kenan J. Kersten (2008505)
KERSTEN & McKINNON, S.C.

David Boies, III
Timothy D. Battin
Mark J. Schirmer
Ian Otto
Christopher Le
STRAUS & BOIES, LLP

Mark B. Pollack (1010557)
Maria S. Lazar (1017150)
GALANIS, POLLACK, JACOB &
  JOHNSON, S.C.

Jeffrey A. Bartos
Soye Kim
GUERRIERI, EDMOND,
CLAYMAN & BARTOS, PC

---

[14] The specific relevant facts regarding Mrs. LaPlant all involved her objective status as a matter of law, not her subjective state of mind or level of awareness. *See id.* at 29-30 ("LaPlant was not a named Plaintiff in *Noonan;*" "LaPlant did not have any right to independently appeal" in *Noonan;* "LaPlant did not have separate counsel").

24

CATHERINE D. NOONAN and DANIEL
A. NOONAN,
        Plaintiffs,

                                Decision on Motion to Certify for Class
                                          Action

        vs.
THE NORTHWEST MUTUAL LIFE                  Case No. 01-CV-012349
INSURANCE COMPANY, DOE A; DOE
B; DOE C; INSURER X; INSURER Y and
INSURER D,
        Defendants,

## APPEARANCES

Kersten & McKinnon, S.C., by E. Campion Kersten and George Kersten, for Plaintiffs
Quarles & Brady, LLP, by Eric J. Van Vugt, for Defendants

## DECISION

The plaintiffs, Noonans, bring this motion to certify for a class action. The Court has received the parties' briefs and heard argument on March 15, 2005. Because the jury trial to determine the issues of breach of contract, breach of fiduciary duty, punitiveness and concomitant damages will not be manageable as a class action, the Court denies the motion.

## LAW

Wisconsin does not have many cases dealing with the class action statute, §803. Wis. Stats. The lead case, *Schlosser v. Allis Chalmers Corp.*, 86 Wis.2d 226, 271 N.W. 2d 879 (1978), states that the proposed class must have commonality, numerosity and adequate representation.

FILED
26 | JUN 1 5 2005 | 26
JOHN BARRETT
Clerk of Circuit Court

In addition, a fourth factor, manageability, is cited in *Cruz v. All Saints Healthcare Systems, Inc.*, 2001 WI App 67, 242 Wis.2d 432, 625 N.W. 2d 344 (Ct. App. 2001).

## FACTS

The defendant, NML, is a mutual financial institution that offers financial instruments, e.g. annuities, life insurance policies, etc. These instruments are pedaled and sold by independent agents throughout the United States. There are thousands of them. The agents do not exclusively sell NML policies. Noonans purchased NML annuity contracts in 1976 through an agent, Daniel Madigan. The terms of the annuity permitted Noonans to share in the financial performance of the company. Most of NML's instruments were in long-term securities, real estate and business endeavors. In the early 1980's, when interest rates cycled up, perhaps even spiked, some NML annuity holders cashed in their long-term annuities because bank certificates of deposits and other short-term bonds were more remunerative. An officer of NML indicated NML's annuity portfolio was uncompetitive causing clients to surrender contracts and created marketing problems for agents, (deposition of Richard E. Fisher, Plaintiff's exhibit 8, pages 28-30).

In response NML in 1985 or 1986 changed, allegedly unilaterally according to the complaint, the basis for payment of the annual dividends for the annuities by creating a "segmented account" that paid dividends on short-term high interest bonds. That resulted in a higher return for the annuities for several years, but when interest rates cycled down, the longer-term equities paid more. Noonans allege they first noticed in 2000 that their annuities were worth materially less than they would be had the change not been made.

Noonans contacted their agent, Madigan, who on March 8, 2000 requested of NML an explanation, (Defendant's exhibit M). Prior to receiving a response from NML, Daniel A. Noonan

prepared a handwritten log in which he expressed a concern about being "screwed" on this and that Madigan agreed with him stating NML had a right to do it, (Plaintiff's exhibit N).

Consequently, Noonans brought this lawsuit for breach of contract, breach of fiduciary duty and punitive damages. The motion before the Court is to permit them to act on behalf of others, similarly situated, i.e. certification for a class action.[1]

## REASONING

There is no dispute in this case with regard to the competence of Noonans to represent all members of the proposed class. There is no dispute with the numerosity criterion except if the testimony and evidence possessed by many or all of the proposed class is material and probative, and not redundant, then the judicial efficiency purpose of the one class action is defeated. There is a dispute over commonality and manageability.

Noonans appear to argue that the whole question of class action certification begins and ends with NML's alleged unilateral change of the pre 1984-85 annuity contracts. They argue that any distinctions as to individual damages, if any, can be determined by a formula after the trial is over. The Court believes that a proper verdict will inquire as to damages and not as to a formula. Individual damage awards will have to be fleshed out for the jury.

The Court is especially concerned with the punitive damages question and award. The use of the word "screw" is well understood in mechanics as one of the simple machines where an inclined plane moves in a circle. However, when applied to interpersonal human conduct, it becomes the "s" word connoting intentional wrongdoing. This is the domain of punitive damges.[2] The Court granting

---

[1] Other background information can be garnered from the complaint, the briefs and the appellate court decision *Noonan v. Northwestern Mutual Life Insurance Co.,* 276 Wis.2d (Ct. App. 2004).

[2] Recent Wisconsin Supreme Court decision may very well require greater evidentiary efforts by parties to defend punitive damage claims. *Strenke v. Hogner, et al,* 2005 WI 25 (pending publication), *Wischer v. Mitsubishi Heavy Industry Am. Inc.,* 2005 WI 26 (pending publication).

the question and the jury making the award would want to hear plumbed under oath the factual content of Daniel A. Noonan's conversation with Madigan. And at that point, the Court does not know of any evidentiary rule precluding NML from putting as many independent agent-client conversations before the Court and jury to dispel, if it can, the notion that NML engages in using the circular inclined plane maneuver on those who end up owning its financial instruments. The trier of fact should not be left to speculate how NML is still in business if that is the word on the street and in the mouths of the agents. Noonans argued at the March 15, 2005 hearing that damage concerns at this point are a "red herring." At the jury trial, that will not be a sustainable objection.

The Noonans also made shortshrift of other concerns NML has over commonality regarding equitable remedies the law has developed to take the harshness out of unambiguous contracts, e.g. waiver, estoppel, etc. These remedies may be applicable to any number of the proposed class depending on their individual facts.

NML has concerns about the applicability of the other state laws. Noonans argue that the laws of the forty-nine other states where the contracts were actually sold are not relevant. Statutes of limitation, for example, may very well be relevant.

The Court is not aware what the adversarial strategies of the parties will be, but it is more likely than not that many fact situations between clients and independent agents will be material and probative. The purchasing of an annuity is not like receiving insurance ancillary to employment as in *Schlosser* or the cost of medical records ancillary to medical treatment as in *Cruz.* The majority of other cases cited by plaintiffs in which a class action certification was granted are similar such fact situations. On the other hand, the purchase of an annuity involves big plan, big money and big monitor ever after. And if the testimony can be discovered from twenty years ago and brought to the trial over

the inconvenient out state miles, the Court envisions interminable objections and offers of proof, interminable jury in and jury out. The Court thinks as a class action little time will be saved.

Further, a one class action suit here will be difficult, if not unworkable, for the jury with a multiple-page verdict on the damage question. In addition to waiver and estoppel concerns, if notice of the 1985-86 change can be shown with regard to certain members of the proposed class, it may raise the issue of mitigation of damages for those individuals. (Defendant's exhibit 6)

Given these concerns, the Court looks for guidance from case law. Noonans have cited 43 cases and NML 45 cases. The parties have argued over their applicability given their respective interests in this case. The Court finds no Wisconsin case on point with regard to the fact situation here present. None of the Wisconsin cases, including *Schlosser*, have the independent agent whose skills are almost totally determinative of the sale of financial instruments. The cases that have that factor are federal cases and one Pennsylvania state case. Noonans argue that these cases are not on point because they deal with misrepresentation causes of action. In the Court's view, the underlying cause of action is not the relevant point, but the independent agent factor that gets the financial instruments out there and keeps them there is. And it is the give and take between the client and agent that will generate material and probative testimony in this case, particularly as to whether there was notice of the 1985-86 change. In all the cases cited that had the agent factor, none were certified for class action. And each of these cases expressed one or more of the concerns the Court mentioned above, *Adams v. Kansas City Life Insurance Co.,* 192 F.R.D. 274 (W.D. Mo 2000), *Cunningham v. PFL Life Insurance Co.,* 1999 WL 3656879 (N.D. Iowa), *Jackson National Life Insurance Co. Premium Litigation,* 183 F.R.D. 217 (W.D. Mich. 1998), *Keyes v. Guardian Life Insurance Co.,* 194 F.R.D. 253 (S.D. Miss. 2000), *Parkhill v. Minnesota Life,* 188 F.R.D. 332 (D. Minn. 1999), *Zarella v. Minnesota Life Ins. Co.,* 1999 WL 22623 (R.I. Super. Apr. 4, 1999) *Janick v. Prudential Ins. Co. of*

*America,* 305 Pa. Super., 120, 451 A.2d 451 (1982), Note: In *Janick* class action was denied, but granted for residents of Pennsylvania.

For the reasons stated and the cases cited, Noonans motion to certify a class action is denied. Counsel for NML may prepare an order and forward it to Joan Smith, Deputy Clerk to Chief Judge, Milwaukee County Courthouse, 901 North 9th Street, Room 609, Milwaukee, Wisconsin 53233, for my signature pursuant to Milwaukee County's "five-day rule."

Dated at Birnamwood, Wisconsin, this 10 day of June, 2005.

Earl W. Schmidt
Reserve Judge

STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY

CATHERINE D. NOONAN and
DANIEL A. NOONAN,

              Plaintiffs,        Declaratory Relief
    vs.                         Case Code:   30301

THE NORTHWESTERN MUTUAL LIFE     Case No. 01 CV 12349
INSURANCE COMPANY, et al.

              Defendant.

---

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTIONS:   (1) TO CERTIFY CLASS
TRIAL OF COUNT ONE (DECLARATORY RELIEF) AND CLASS-WIDE
ISSUES OF COUNT TWO (BREACH OF CONTRACT), AND
(2) FOR PARTIAL SUMMARY JUDGMENT**

---

### INTRODUCTION

This brief is filed to support the following motions:

First, motions to certify Count One (declaratory relief) and certain class-wide

issues in Count Two (breach of contract) of the Amended Complaint for class trial. The

limited nature of the issues to be certified and applicable law satisfy the concerns

expressed in this Court's earlier decision.

Second, for partial summary judgment finding that the annuity contracts have

been breached, because discovery has confirmed beyond dispute that NML committed

the acts which the Court of Appeals has held breach the dividend requirements of the

contracts.

*Noonan I*, ¶ 17, holding that, "Here, [NML] made the allocation to annuity policyholders before it determined the surplus. This is contrary to the terms of the annuity contracts and the statute."

## ARGUMENT

## PART ONE:  CLASS CERTIFICATION

## INTRODUCTION

Unlike the original motion, these motions ask the Court only to certify issues common to the following Class under Counts One (Declaratory Relief) and Two (Breach of Contract) of the Amended Complaint:

> All persons and successors in interest to persons who, as of January 1, 1996, directly or indirectly owned NML participating individual deferred annuities which were issued prior to March 1, 1985 and were in the deferred (accumulation) phase as of January 1, 1996.

This Court earlier found that certifying all issues under all claims as a class action rendered the case "unmanageable." App. 21. The Court was "especially concerned with the punitive damages question and award." App. 23. The Court of Appeals affirmed in an unpublished decision ("*Noonan II*," App. 28-47), finding it within the trial court's discretion even though the appellate court might have reached a different result. *Noonan II*, ¶¶ 5, 7, 26, 29 and fn 12, 21.

The concerns earlier expressed by this Court are eliminated by our revised request limiting class certification to certain class-wide issues for three main reasons.

5

1.  The present motions do not seek certification of the fiduciary duties claim, the only one involving punitive damages, which triggered the Court's principal concerns. It is black letter law that "A trial court can certify a class with respect to some counts of a complaint and not as to others." 59 AM. JUR. 2D PARTIES § 110, p. 520; *Goebel v. First Fed. Savings & Loan Assoc.*, 83 Wis. 2d 668, 681-85, 266 N.W.2d 352 (1978).

2.  Our first new motion expressly limits the declaratory relief claim to issues which the Court determines are class-wide and identifies the issues which are unquestionably class-wide.

3.  As to the breach of contract claim, our new motions also limit class certification to the class-wide issues. This accords with the methodology approved by the Wisconsin Supreme Court in *Goebel* and in *Schlosser I*:

> [T]he court must determine whether the advantages of disposing of the entire controversy in one proceeding are outweighed by the difficulties of combining divergent issues and persons. It is a question of the balance of convenience whether the court will settle all the issues in one suit; or will *settle only the common question in one suit and then allow the independent questions to proceed in separate equity suits*; or not settle the controversy at all in a single unit. (Emphasis added).

*Schlosser v. Allis-Chalmers Corp.*, 65 Wis. 2d 153, 172, 222 N.W.2d 156 (1974) ("*Schlosser I*") and *Goebel*, 83 Wis. 2d at 681-2. In *Goebel*, the Supreme Court approved the trial court's use of the "second of these alternatives, that of settling the common question [whether the defendant's conduct breached the identical contracts of First Federal's customers] in a single suit" and later "allowing independent determination of the individualized questions." *Goebel* 83 Wis. 2d at 682-3.

6

Thus, the Court need not be concerned here with any individual issues asserted by NML – for example, estoppel, which *Goebel* specifically identifies as an individual issue to be litigated separately, allowing the class litigation to proceed on the common issues. *Id.*, 83 Wis. 2d at 682.

To the extent individual issues really exist and require adjudication, it will be up to the individual annuitants to litigate them "in separate equity suits" after the common issues have been tried here (pursuant to *Schlosser I* and *Goebel*), unless the Court should then choose one of the many alternative options available to it. A variety of such options is discussed in the leading authority on class actions, NEWBERG ON CLASS ACTIONS, an authority relied on in *Cruz v. All Saints Health Care Systems, Inc.*, 242 Wis. 2d at 446, ¶ 20. Vol. 3 NEWBERG (4th Ed.), § 10.2, in discussing these options, cites a summary of them in *In re Visa Check / MasterMoney Antitrust Litigation*, 280 F.3d 124, 141, (2d Cir. 2001), *cert. den.*, 122 S. Ct. 2382 (U.S. 2002):

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class. (footnote omitted).

The Court of Appeals found it was not unreasonable for this Court to conclude that, despite the availability of case management techniques in determining damages, the

7

"complicated factual scenarios" under which those damages arose contributed to unmanageability. *Noonan II* at ¶ 26, App. 44.

That reason for denying certification no longer exists. Certification of the breach of fiduciary duty and punitive damage claims is not sought here so that the Court need not be concerned about the complexities of assessing punitive damages or compensatory damages peculiar to breach of fiduciary duties. The contract damages, in contrast, are measured by NML's conduct against the Class as a "block" and determined in one verdict question as discussed below.

Accordingly, our limited request for class certification relates only to issues on which there are no reasonable "unmanageability" arguments. Through this process important rights are protected, the interests of public policy and sound judicial administration are preserved and a forfeiture of the rights of Class members, most close to or in their retirement years, is avoided.

To protect against the possibility some new NML argument might persuade the Court that class treatment for even the streamlined nationwide Class on the limited issues now proposed would be unmanageable, we have moved in the alternative for certification of a Wisconsin Class for either Count One or Count Two if not certified on a nationwide basis as to the issues identified herein.

# I. THE COURT SHOULD CERTIFY COUNT ONE OF THE AMENDED COMPLAINT (FOR DECLARATORY RELIEF) AS A CLASS CLAIM.

## A. Overview of the Declaratory Relief Claim.

8

N.W.2d 446 (1963); *Dells Paper & Pulp Co. v. Willow River Lumber Co.*, 170 Wis. 19, 37, 173 N.W. 317 (1919). *See also*, 5A CORBIN ON CONTRACTS, sec. 1143, p. 126 (1964); 11 WILLISTON ON CONTRACTS, sec. 1430, p. 877 (3d ed. JAEGER, 1968). *See also, Pennsylvania Oil Co. of Wisconsin v. Andrew*, 233 Wis. 226, 248-49, 288 N.W. 246 (1940). This is a "well-settled principle" of the common law. *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F.2d 383, 397-98 (S.D.N.Y. 1999).

In summary, NML's affirmative defense theories are legally and factually without merit, and would not bear on the trial of the issues common to the Class in any event.

**E.** **If NML Should Provide an Argument Persuading the Court That a Nationwide Class is Not Feasible on Breach of Contract Issues, the Court Should Certify a Wisconsin Class in Any Event.**

The plaintiffs' certification motions (¶ 4) ask that, in the event the Court finds that certifying either Count One or Count Two of the Amended Complaint for litigation on behalf of a nationwide class would render the case "unmanageable," then in the alternative that the count(s) not so certified should be certified at least on behalf of a Wisconsin Class.

For the reasons discussed, we believe the issues described above should be certified on behalf of a nationwide Class. However, if on completion of the briefing the Court should feel, for example, that it would be unmanageable to try the common issues under Count Two (breach of contract) for a nationwide class, the Court should in any

37

event allow that claim to be tried on behalf of a class limited to Wisconsin residents, since even under NML's arguments such a trial would manifestly be manageable.

Class treatment for Wisconsin annuitants would involve no choice-of-law issues or concerns because there would be no reason to apply the laws of a state other than Wisconsin to any issues. There could be no concerns about other states' statutes of limitations because Wisconsin's statute would apply to all members of a Wisconsin Class. Parol evidence would not be an issue because such evidence would be inadmissible as a matter of Wisconsin law. As *Noonan I* held (App. 11, ¶ 17) and as *Noonan II* noted, p. 13, fn 13, under Wisconsin law, the annuity contracts are unambiguous.

For the reasons expressed above, individual issues such as waiver, estoppel or mitigation would not be resolved until after the class trial, in separate lawsuits (under *Goebel*) unless this Court should later prefer to adopt one of the alternative post-verdict procedures available to it discussed above. The difference in a Wisconsin class is that there would be far fewer Class members who could have possibly known of the 1985 change.

Although **parts** of the above arguments were made earlier to this Court and to the Court of Appeals in *Noonan II*, this Court is required to weigh the benefits of a class trial on the limited issues **as now requested** against the inherent difficulties in such a trial. All of the above arguments, including those previously made, demonstrate that in the context

38

of these new limited motions the court's earlier manageability concerns are eliminated and any reasonable "weighing" favors the certification now sought.

**PART TWO: PARTIAL SUMMARY JUDGMENT.**

## I. THE COURT SHOULD SUMMARILY ADJUDGE THAT NML HAS BREACHED THE ANNUITY CONTRACTS.

On behalf of themselves and the Class to be certified pursuant to the foregoing motions, the Noonans move that the Court grant partial summary judgment, finding as a matter of law that NML breached the dividend requirements of the annuity contracts.

### A. <u>Applicable Legal Standard</u>.

Summary judgment is appropriate when the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. § 802.08(2), WIS. STATS. The purpose of summary judgment is to determine whether genuine disputes of material fact exist and to avoid delays and trials where there is nothing to try. *Yahnke v. Carson*, 236 Wis. 2d 257, 264, 613 N.W.2d 102, 106 (2000).

A motion for partial summary judgment is permitted by § 802.06, WIS. STATS., as demonstrated by the Wisconsin Supreme Court in *National Operating v. Mutual Life Ins. Co.*, 2001 WI 87, 244 Wis. 2d 839, 630 N.W.2d 116, (reversing a trial court's denial of partial summary judgment and remanding "with instructions to grant [plaintiff's] motion for partial summary judgment." *Id.* at ¶ 102.) Partial summary judgments were also affirmed in *Lake County Racket and Athletic Club v. Morgan*, 206 WI App. 25, ¶¶ 1, 35, 289 Wis. 2d 498, 710 N.W.2d 701 (rejecting challenge to constitutionality of statute

39

In view of the documents NML has produced, we believe it will be impossible for NML to create any genuine issue of material fact, so that the partial summary judgment requested here must be granted.

Milwaukee, Wisconsin, April 30, 2007

Respectfully submitted,

By: _____
George P. Kersten, Esq.
State Bar No. 1008099
E. Campion Kersten, Esq.
State Bar No. 1007641
Kenan J. Kersten, Esq.
State Bar No. 1008505
K. Scott Wagner, Esq.
State Bar No. 1004668
Maria S. Lazar, Esq.
State Bar No. 1017150
Mark B. Pollack, Esq.
State Bar No. 1010557
Attorneys for the Plaintiffs

46

CERTIFICATE OF SERVICE

I certify that on April 30, 2007, a copy of the foregoing Plaintiffs' Brief in

Support of Motions: (1) to Certify Class Litigation of Count One (Declaratory Relief)

and Class-wide Issues of Count Two (Breach of Contract), and (2) for Partial Summary

Judgment, together with the motions and appendix were personally served by hand

delivery upon Eric J. Van Vugt and Christina Hernandez-Malaby, counsel for the

defendants, at their address of record.

George P. Kersten, Esq.
State Bar No. 1008099

OF COUNSEL:

KERSTEN & McKINNON, S.C.
735 North Water Street, Suite 630
Milwaukee, WI 53202
Tel. No.( 414) 271-0054
Fax No. (414) 271-7131

GALANIS, POLLACK, JACOBS &
JOHNSON, S.C.
330 E. Kilbourn Avenue, Suite 560
Milwaukee, WI 53202
Tel. No. (414) 271-5400
Fax No. (414) 271-5571

HALE & WAGNER, S.C.
205 E. Wisconsin Avenue, Suite 300
Milwaukee, WI 53202
Tel. No. (414) 278-7000
Fax No. (414) 278-7590

47

# STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY

CATHERINE D. NOONAN and
DANIEL A. NOONAN,
              Plaintiffs,

versus                            **CASE NUMBER: 01-CV-12349**

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, DOE A;
DOE B; DOE C; INSURER X;
INSURER Y and INSURER D,
              Defendants,



---

## DECISION ON MOTIONS TO CERTIFY FOR CLASS ACTION AND SUMMARY JUDGMENT

---

### APPEARANCES

Kersten & McKinnon, S.C., by E. Campion Kersten and George Kersten, for Plaintiffs.

Quarles & Brady, LLP., by Eric J. Van Vugt, Christina Hernandez-Malaby, Ray Manista and Rodd Schneider.

### DECISION

The plaintiffs, Noonans, bring motions for class-wide certification and partial summary judgment. The class-wide certification motion has 2 counts:

Count 1 is for class-wide certification based on declaratory relief;

Count 2 is for class-wide certification based on breach of contract with a fall-back position to certify only Wisconsin cases.

The second motion is for summary judgment on the breach of contract claim for the putative class.

The Court has received the parties' briefs and heard arguments on June 25, 2007. The Court will first consider Count 2 of the first motion, including the fall back position for Wisconsin cases only, and then Count 1 of the first

1

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 121 of 302   Document 39

motion. The second motion for partial summary judgment will be considered last.

The Court starts then with Count 2 of the first motion. The Court denies Count 2, including the fall-back position for Wisconsin claimants only, because the jury trial to determine the issues of breach of contract and concomitant damages will not be manageable as a class action. This determination is augmented by lack of commonality for breach and damages.

With regard to Count 1 of the first motion, it requests the Court to declare that NML violated §806.04 Wis Stats., sometime around 1985-1986. Because declaratory relief should not be certified when the relief sought is monetary damages, and there will be manageability problems when the individual monetary damages are resolved, the Court denies Count 1 of the first motion.

With regard to the second motion for partial summary judgment for the putative class, because the Court has denied the motions for class certification, it cannot consider summary judgment for a class that does not exist. Therefore, the Court denies the second motion for procedural reason.

## LAW

Regarding Count 2 of the first motion, Wisconsin does not have many cases dealing with the class action statute, §803 Wis. Stats. The lead case, *Schlosser v. Allis Chalmers Corp.*, 86 Wis.2d 226, 271, N.W. 2d 879 (1978), states that the proposed class must have commonality, numerosity and adequate representation. In addition, a fourth factor, manageability, is cited in *Cruz v. All Saints Healthcare Systems, Inc.*, 2001 WI App 67, 242 Wis 2d 432, 625 N.W. 2d 344 (Ct, App. 2001).

There is also an unpublished decision **Noonan v. Northwestern Mutual Life Insurance Company,** No. 2005 AP1683, 2006 WL 3314622 (CT App 2006) **(Noonan II)** which affirmed this Court's first denial of Noonans' request for class action certification and deals with class action law as it applies to the facts of this case.

Regarding Count 1 of the first motion, there is the Wisconsin declaratory judgment statute, §806.04 (2) Wis. Stats. Also there is §632.62 Wis. Stats. which imposes duties on mutual companies like NML. The Court Notes *Thompson v. Robertson*, 58 Wis 2d 730.207 N.W. 2d 675, 676 (1973) which held that declaratory judgment should not be used where ordinary remedies exist such as an action in tort for money damages. And **Aslanukov v. Amer. Express Travel Related Serv. Co., Inc.,** 426 F. Supp 2d 888, 891 (W.D. Wis 2006) stands for the proposition that declaratory judgment should be to stop a

2

wrong before it occurs.  And there is **Jefferson v. Ingersoll Intl., Inc,** 195 F. 3d 894, 898 (7td Cir. 1999) which held that declaratory judgments should not be used for class determination when the relief sought relates primarily to money damages.

Regarding the second motion requesting summary judgment for a putative class that now does not exist, the Court cites **Peritz v. Liberty Loan Corp.,** 523 F2d 349, 353-54 (7th Cir. 1975).

## FACTS and BACKGROUND

The defendant, NML, is a mutual financial institution that offers financial instruments, e.g. annuities, life insurance policies, etc.  These instruments are pedaled and sold by independent agents throughout the United States.  There are thousand of policies.  The agents do not exclusively sell NML policies. Noonans purchased NML annuity contracts in1976 through an agent, Daniel Madigan.  The terms of the annuity permitted Noonans to share in the divisible surplus of NML, called dividends.  At that time most of NML's instruments were in long-term securities, real estate and business endeavors.  In the early 1980s when interest rates cycled up, perhaps even spiked, some NML annuity holders cashed in their long-term annuities because bank certificates of deposits and other short-term bonds were more lucrative.  An officer of NML indicated NML's annuity portfolio was uncompetitive causing clients to surrender contracts and created marketing problems for agents.[1]

In response, NML in 1985 or 1986 changed, allegedly unilaterally according to the complaint, the basis for payment of the annual dividends for the annuities by creating a "segmented account" that paid dividends on short-term high interest bonds.  That resulted in a higher return for the annuities for several years, but when interest rates cycled down, the longer-term equities paid more.  Noonans allege they first noticed in 2000 that their annuities were worth materially less than they would be had the change not been made.  They sued NML for breach of contract and breach of fiduciary duty, seeking actual and punitive damages.

After the Appellate Court reversed a Circuit Court's judgment and order granting NML's motion to dismiss and denied NML's motion for reconsideration, **Noonan v Northwestern, Mut. Life Ins. Co.,** 2004 WI App 154, 276 Wis 2d 33.687 N.W. 2d 254, **(Noonan I)**, Noonans moved for class certification.  This Court denied the motion for class certification and was affirmed by the Appellate Court, **Noonan II**, with petition for review denied by the Supreme Court.

---

[1] The Court notes that the NML Board must have also noticed money trickling out of the money/assets reservoir that NML has to maintain the value of its outstanding policies.

3

Noonans then bring these motions as previously outlined. However, Noonans have changed the putative class to those policy holders who are owners of the annuities in question as of January 1, 1996 as opposed to 1985 in the **Noonan II** motions.

Noonans have also withdrawn their fiduciary duty claim from these motions. The fiduciary duty claim still seeking actual and punitive damages would attach solely to the Noonans at trial. [2]

## REASONING
### Count 2 of First Motion

The Court's concerns about a class action, as indicated in its previous decision, have not been assuaged by Noonans' withdrawal of the fiduciary duty claim from this class action request but have been buttressed by the rationale and lucidity of **Noonan II.**

There is no dispute in this case with regard to the competence of Noonans to represent all members of the putative class. There is no dispute with the numerosity criterion except if the testimony and evidence possessed by many or all of the putative class members are material and probative, and not redundant, then the judicial efficiency purpose of the one class action is defeated. There is a dispute over commonality and manageability.[3] There is a presumption in favor of class actions, **Nat. Bank, Jackson, Miss v. Roper,** 445 v.s. 326, 339 (1980).

Noonans appear to argue that the whole question of class action certification begins and ends with NML's alleged unilateral change of the pre-1984-85 annuity contracts. They argue that any distinctions as to individual damages, if any, can be determined by a formula administered by a special master after the trial is over for breach of contract and a lump sum damage award is made. The Court believes that a proper verdict will inquire as to individual damages and not as to a formula. Individual damage awards will have to be fleshed out for the jury.

There will be a considerable lack of commonality on the breach and damage questions. The Court notes that the purchasing of an annuity is not like receiving insurance ancillary to employment as in **Schlosser** or the cost of medical records ancillary to medical treatment as in **Cruz.** The majority of

---

[2] For a more detailed factual background, see Noonan I.
[3] Because Count 2 is an identical motion, except for different policy holders, as the motion which was the subject of Noonan II, most of the reasoning for Count 2 will be repetitive of what the Court wrote in that case. The Court does not quote extensively from **Noonan II,** but it will expand its reasoning where **Noonan II** appears to call for it.

4

other cases cited by plaintiffs in which a class action certification was granted are similar such fact situations. On the other hand, the purchase of an annuity involves big plan, big money and big monitor ever after. The monitoring would probably involve talking with the independent agents who sold the policies. The Court notes that Noonans began by talking to their agent when they had a question about the 1985-86 change. Then they addressed NML corporate officials. These conversations are not going to follow a pattern, but they will be material and probative as to breach and damages. Upon discovery, these conversations could give rise to NML's request for jury instructions peculiar to a certain claimant that could bear on the breach and damages questions. Noonans could request other countering instructions for that certain claimant.

If the claimant is a Wisconsin resident, subject to Wisconsin law, those instructions could relate to duty to mitigate.[4] The Court has to be concerned about who is going to assess the credibility of claimants under oath.[5] Noonans assert that a special master could administer an oath and ask some questions once the lump sum award is made as envisioned by Noonans.[6] The Court has no problem with a master administering an oath. It is a ministerial function. But assessing credibility, the Court believes credibility is very much a jury function.[7] The Court believes the same jury function attaches to the other standard jury instructions referred to in this decision. The Court would be concerned about NML's civil process rights, as it understands the facts in this case, were it to decide otherwise.[8] All of these commonality concerns will make a class action suit difficult, if not unworkable for the jury with a verdict of very many pages.

And the Court has to respond to NML's concerns about the choice of law issue. Noonans argue that the laws of the forty-nine states where the contracts were actually sold are not relevant. The Court believes statutes of limitation, for example, may very well be relevant. There will also be differences in the parol evidence rules. **Noonan II** is so clear on this choice of law issue that the Court does not think there is much more it can say.[9] This Court agrees with the **Noonan II** rationale.

---

[4] See Instructions Wis II-Civil: 3074 Damages: Duty to Mitigate.
[5] Noonans guesstimate the average individual claim will be ten thousand dollars. Although this average may fit a class action claim, ten thousand dollars is still double the small claims jurisdiction in Wisconsin today. The Court has no figures as to what the high end dollar amount of the range of claims is, see page twenty "Plaintiffs' Brief in Support of Motions."
[6] See page 12, "Plaintiffs' Brief in Support of Motions."
[7] See instruction Wis II-Civil: 300 Credibility of Witnesses.
[8] The Court has expanded its concerns about commonality problems in this decision. It is in response to the **Noonan II** Court's footnote 4, on page 5.
[9] Footnote 9, page 13, **Noonan II** even indicates the states have developed differing tests for determining whether a contract is ambiguous.

5

However the Court notes that the conversations that any claimant had with the independent agent who sold him/her a policy will be material and probative as to breach of contract also.[10]  These conversations would demonstrate lack of commonality on the breach question.  Again the Court anticipates that discovery will result in the parties requesting jury instructions peculiar to one claimant bearing on breach.  If the claimant is a Wisconsin resident, subject to Wisconsin law, these could relate to estoppel, waiver, waiver of strict performance and modification by conduct.[11]  The Court at this time can only imagine what other states' jury instructions are.

Given these concerns, the Court looks for guidance from case law.  Both parties have cited numerous cases.  The parties have argued over their applicability given their respective interest in this case.  The Court finds no Wisconsin case on point with regard to the fact situation here present.  None of the Wisconsin cases, including **Schlosser,** have the independent agent whose skills are almost totally determinative of the sale of financial instruments.  The cases that have that factor are federal cases and one Pennsylvania state case.  Noonans argue that these cases are not on point because they deal with misrepresentation causes of action.  In the Court's view, the underlying cause of action is not the relevant point, but the independent agent factor that gets the financial instruments out there and keeps them there is.  And it is the give and take between the client and agent that will generate material and probative testimony in this case, particularly as to whether there was notice of the 1985-86 change.  In all the cases cited that had the agent factor, none were certified for class action.  And each of these cases expressed one or more of the concerns the Court mentioned above, **Adams v. Kansas City Life Co.,** 192 F.R.D. 274 (W.D. Mo 2000), **Cunningham v. PFL Life Insurance Com.,** 1999 WL 365879 (N.D. Iowa), **Jackson National Life Insurance Co. Premium Litigation,** 183 F.R.D. 217 (W.D. Mich. 1998), **Keyes v. Guardian Life Insurance Co.,** 194 F.D.R. 253 (S.D. Miss 2000), **Parkhill v. Minnesota Life,** 188 F.R.D. 332 (D. Minn 1999), **Zarella v. Minnesota Life Ins. Co.,** 1999 WL 22623 (R.I. Super, Apr. 4, 1999) **Janick v. Prudential Ins. Co. of America,** 305 Pa Super., 120, 451 A.2d 451 (1982).

The Court notes that throughout their arguments, Noonans have suggested that bifurcation especially of the damage questions is the way to go, i.e., the jury awards a lump sum and a special master divides it up.  The Court believes only a jury can make the proper assessment of individual damages in this case.  And if the testimony can be discovered from twenty plus years ago and brought to the trial over the inconvenient out state miles, the Court

[10] The Court desires to make clear that client/agent conversations may lead to material and probative facts for both the breach and damages issues of the trial.  Footnote twelve, page 12 and 13, **Noonan II** indicated ambiguity on the Court's part in its previous decision where it appeared to relate the client/agent conversations to the choice of law issue only.

[11] See Instructions Wis Il-Civil: 3074 Estoppel, 3057 Waiver, 3058 Waiver of Strict Performance, and 3032 Modification by Conduct.

6

envisions interminable objections and offers of proof, interminable jury in and jury out. The Court thinks as a class action little time will be saved.

And how can the Court meaningfully give NML a proper forum on the individual fiduciary duty breach claim with its lurking punitive damage claim? The Court believes the fiduciary duty claim will also be tried at the same time. How will the jury be able to handle the punitive damage question of that claim if it does not hear the whole story of what NML is alleged to have done? The degree of egregiousness of the defendant's actions bear directly on punitiveness. The jury needs to hear the whole story from breach to individual damages.

The Court does not believe Noonans are seeking a second full-blown trial for the fiduciary duty claim. And if the one trial has both the class action breach claim and the individual fiduciary claim the Court has to be concerned about jury confusion because the class action may make the individual fiduciary claim for punitive damages appear more egregious than if heard solely, see **In re Methyl Tertiary Butyl Ether Prods. Liab. Litif.**, 209 F.R.D. 323 (S.D. N.Y. (2002).

The Court has to be careful about the punitive damage question because recent Wisconsin Supreme Court decisions may very well require a greater evidentiary effort by NML to defend the punitive claim, **Strenke v. Hogner**, et al, 286 WI2d 660 (2006), and **Wischer v. Mitsubishi Hearing Industry Am,** 279 WI 2d 4, (2006). And again the jury needs to hear all of it. Bifurcation is not a fair option here.

Further as to a special master, the Court does not believe that option permits the master to make the equivalent of jury decisions as to credibility, waiver, estoppel and mitigation of damages.

For all these reasons, and especially the rationale of **Noonan II,** the Court denies Count 2 of the first motion for class action certification.

## COUNT 2 OF FIRST MOTION
## (Fall-Back Position for Wisconsin Claimants Only)

This is a tougher call for the Court to make principally because a certification for only Wisconsin claimants resolves the choice of law issue. There may be a claim here and there showing claimants have changed state residency where a choice of law issue could still arise. But the elimination of that issue augurs much in Noonans' favor.

Originally when the Court wrote its first decision in June 2005, it considered this position because it saw the utilization of same in **Janick**. The fall-back position for only Wisconsin claimants was not advanced by Noonans at that time. The Court believes during the final arguments on March 15, 2005, NML suggested the Court should consider such a fall-back position if the Court determined a class action was justified under these facts. The Court does not believe NML agreed to the fall-back position.

The Court's brief foray into this issue at that time led it to conclude that so many facts would get into the record that would be peculiar to individual claimants only, both with regard to breach and damages, that the trial would not be manageable even when only Wisconsin law applied. The Court did not think jurors should be asked to keep individual scorecards on however many Wisconsin claimants showed up. And the Court thought there would be many once the word got out that claims could be substantial.

Today the Court has made a more thorough analysis, and its conclusion is the same. The Court does not think it serves any purpose to reiterate everything it has just written regarding its reasoning on the Count 2 all-state class wide motion. All the reader has to do is overlook any reference to the choice of law issue and you will have the Court's reasoning regarding the Wisconsin only fall-back position. The Court does emphasize that the breach and damage questions are decidedly more complicated here than in **Janick**. Therefore certification would likewise be unmanageable here even though likely having fewer claimants.

## COUNT 1 OF FIRST MOTION

This parallel class action claim is an attempt to obtain a class action by circumventing the denial of same in **Noonan II**. Noonans apparently think that if you arrive at their class action objective by another route all the problems with manageability affirmed in **Noonan II** will disappear.

But before the Court returns to manageability and the resurrection of the choice of law issue, the Court addresses the legal appropriateness of bringing a declaratory judgment motion when a money judgment is sought. Noonans are seeking a money judgment.[12] The Court believes case law does not favor declaratory judgment under the facts of this case. See **Jefferson v. Ingersoll,** In 41. Inc., 195 F. 3d 894, 898 1ta Cir. (1999). Twenty plus years ago NML made a decision for which Noonans now seek a money judgment. Noonans have a proper legal avenue to address this alleged wrong with a breach of contract case, **Thompson v. Robertson,** 58 Wis. 2d 730, 207 N.W. 2d 675 676 (1973). And there is Aslanukov v **Amer. Express Travel Related Serv. Co.,**

---

[12] See proposed jury instruction page 12, Plaintiff's Brief in Support of Motions.

8

**Inc.** 426 F. Supp 2d 888,891 (W.D. Wis 2006) which stands for the proposition that declaratory judgment should be used to stop a wrong before it occurs.

Noonans argue that these cases were later clarified and limited in **Lister v. Board of Regents**, 72 Wis 2d 282,307-08, 240 N.W. 2d 610 (1976) where that Court indicated declaratory relief is appropriate wherever it serves a useful purpose. The instant Court notes, though, that the **Lister** Court went on to say the **Lister** facts did not give rise to an action for damages by declaratory relief.

On balance then, the Court believes the motion for declaratory relief should be denied for that reason alone.

However, this motion for class-wide declaratory relief again resurrects the choice of law issue. Noonans argue the annuity contract is unambiguous, **Noonan I.** But **Noonan II** points out that states have developed differing tests for determining whether a contract is ambiguous.[13] Therefore, there is a question as to what state law the Court should use to answer the following questions advanced by Noonans for declaratory relief:

1) Whether the annuity contracts in question provide the right for dividends from NML's divisible surplus?;
2) Whether NML violated its duties under the contracts?;
3) What are the damages?.[14]

With regard to damages, again, the jury will be asked to make individual damage awards. The manageability problems relevant thereto, the Court has discussed at length, it believes, in Count 2 of the first motion. That reasoning is, again, applicable here.

Thus for reasons of legal inappropriateness and manageability problems the Court denies the motion for declaratory judgment.[15]

---

[13] See footnote 10, above.

[14] For a more precise rendition of the 3 questions, see pages 9 and 10, "Plaintiffs' Brief in Support of Motions".

[15] The Court notes that eliminating the breach question from the jury through declaratory relief would not eliminate the need for the jury to hear all the facts of the breach in order to determine claimed punitive damages under the trailing fiduciary breach claim.

9

## SUMMARY JUDGMENT
## THE SECOND MOTION

Now the Court addresses the motion for summary judgment Noonans make purportedly on behalf of a putative class in the first motion.

The Court notes that NML argues summary judgment cannot be granted on behalf of a class that does not exist, **Peritz v. Liberty Loan Corp.,** 523 F. 2d 349, 353-354 (7th Cir. 1975). The Court agrees.

Noonans do not request summary judgment solely for their individual clams for breach of contract and breach of fiduciary duty. All of Noonans' referrals to the annuities at issue in this lawsuit in their arguments for summary judgment are for a putative class. Noonans' arguments as here made are as if a certification for class action is in hand. It is not.

The Court notes further that NML goes on to argue in its brief in opposition to Noonans' motion for summary judgment that the Court should deny summary judgment for the Noonans individually. The Court is not inclined to permit NML to convert Noonans' motion into a vehicle to pursue its own theory of this case. Noonans in their reply brief do not acquiesce in NML's effort to limit summary judgment to Noonans only. Accordingly the Court declines NML's invitation to decide summary judgment on its merits.

Therefore, the Court denies the motion for procedural reason without addressing its merit.

Given that the Court finds that the problems with manageability and commonality outweigh the benefits of a class action and for the reasons stated and the cases cited, all of Noonans' motions are denied. Counsel for NML may prepare an order and forward it to Lisa Tietz, Deputy Clerk to Chief Judge Milwaukee County Courthouse, 901 North 9th Street, Room 609, Milwaukee, Wisconsin 53233, for my signature pursuant to Milwaukee County's "five-day rule".

Dated at Birnamwood, Wisconsin this the 25th day of January 2008.


**BY THE COURT:**


**Earl W. Schmidt**
**Reserve Judge**

1      STATE OF WISCONSIN       CIRCUIT COURT      MILWAUKEE COUNTY
                                CIVIL DIVISION
2

3   MARLEEN M. LAPLANT,

4              Plaintiff,
                                     Case No. 08-CV-011988
5   v.

6   NORTHWESTERN MUTUAL LIFE
    INSURANCE COMPANY,
7                                            COPY
              Defendant.
8

9                        TRANSCRIPT
                       MOTION HEARING
10

11  June 1, 2009                 Proceedings held before the
                                    HON. DENNIS FLYNN
12                              Reserve Judge Presiding

13

14
        AP PEARANCES
15
        GEORGE P. KERSTEN and CAMPION KERSTEN,
16      Kersten & McKinnon, S.C.
        JEFFERY BARTOS and TIMOTHY BATTIN, pro hac vice
17      Attorneys at Law
        Appeared with and on behalf of the Plaintiff
18

19      ERIC VAN VUGT and CRISTINA HERNANDEZ-MALABY,
        Quarles & Brady, S.C.
20      Attorneys at Law
        Appeared on behalf of the defendant
21

22

23  Denise J. Pahman, RMR
    Official Court Reporter, Br. 45
24

25                              TRANSCRIPT

1  putative class, the class that she purports to certify

2  here was all part of the putative class, it has twice

3  been rejected by the trial court, and they can't do it

4  again for a fourth time or a fifth time.

5          THE COURT:     Counsel, thank you for your

6  statements.    Who will be speaking for plaintiff?

7          MR. KERSTEN:    Mr. Bartos, Your Honor.
           MR. BARTOS:     Yes, Your Honor.   Your Honor,
8

9  thank you.    And I appreciate your granting of the - -

10         THE COURT:     Yes.   You may proceed.

11         MR. BARTOS:     Your Honor, the underlying issue

12  in this lawsuit involves retirement annuities that were

13  sold by Northwestern Mutual to Ms. LaPlant and thousands

14  of other people.    And the question that ultimately will

15  be before the Court is whether or not Northwestern

16  Mutual violated those agreements and acted contrary to

17  its fiduciary duty by the manner in which it has and

18  continues to determine the way dividends are calculated.

19         And Northwestern is absolutely correct that

20  there's been this other litigation, the Noonan

21  litigation.    And if you look at the decisions in that

22  case, you will see that it was an attempt to address

23  this particular question and - - on both the classwide

24  and individual basis, and that decisions by the circuit

25  court and the Court of Appeals give guidance into how

1   this could be addressed procedurally on a classwide

2   basis.   The Noonans themselves are currently pursuing

3   individual claims.

4           This case is an effort by another person,

5   another annuitant, to address the same underlying

6   substantive issue in terms of the annuity contract and

7   Wisconsin law, in a method which is responsive to what

8   the Noonan courts have said in terms of procedures.

9   This is not forum shopping.    It is not an end run, as

10  the defendant has characterized it, but simply a way to

11  address this dispute in a manner that is consistent with

12  what Wisconsin courts have said.

13          And I don't think it is a criticism to say

14  that we shaped - - that we are trying to pursue an

15  action that is compliant with what the Court has said

16  where the issue is involving class certification.       To

17  the contrary, I think that is the approach that

18  attorneys and the Court should take.

19          Now, while the underlying substantive issue is

20  similar, this case is different.     The claim is

21  different.    Here, we are seeking a declaratory judgment

22  or actually a series of declaratory judgments outlined

23  in the Complaint.    There is no claim in this action for

24  breach of contract or other legal theories.     In the

25  Noonan case, there were individual damage claims, there
                                   -

1   were nationwide class claims, under both contract and

2   declaratory judgment.

3         In addition, here the class is different, the

4   proposed class.   Here we are seeking a Wisconsin only

5   class.   And the class definition is more refined to

6   address some of the issues that were articulated in the

7   Noonan case, and those issues we believe ultimately will

8   be addressed or should be addressed in the context of a

9   motion for class certification.

10        We are here today on a motion to dismiss, and

11   I think it is important to keep that in mind.    The

12   question before Your Honor is is there any condition

13   under which Ms. LaPlant could succeed on her claim.    We

14   are not here to adjudicate whether or not she is an

15   adequate class representative.   We are not here to

16   adjudicate what is the proper scope of a class.

17        I think Northwestern's key argument - - and I

18   think that's clear both from the papers and from
    argument of counsel today       is the notion of issue

19

20   preclusion, that - - that the Noonan decision or the

21   decisions in Noonan preclude Ms. LaPlant from proceeding

22   on a Complaint seeking to represent a Wisconsin only

23   declaratory judgment class.

24       And I want to step back a second and talk

25   about what is that - - what is that argument about.
                       -

1    2008.

2

3           THE COURT:    2008.    That decision, whether it

4    is 25 January or 29 January, you are saying Judge

5    Schmidt did not address - - I think his language was as

6    a backdrop - - as a secondary position he did not

7    address a Wisconsin only class.

             MR. BARTOS:    He addressed a Wisconsin only - -

8

9    He addressed three different scenarios.

10          THE COURT:    Counsel, focus.

11          MR. BARTOS:    Sure.

12          THE COURT:    On the head of a pin now, look for

13   a "yes" or "no."   I understand your argument to be that

14   Judge Schmidt did not address a Wisconsin only class.

15          MR. BARTOS:    He did not.

16          THE COURT:    Is that what you are saying?

17          MR. BARTOS:   He did not address a Wisconsin

18   only declaratory judgment class.       He addressed a

19   nationwide declaratory judgment class, he addressed a

20   nationwide breach of contract class, and a Wisconsin

21   only breach of contract class, but he did not address

22   the issue which is presented here, of a Wisconsin only

23   declaratory judgment class.

24          And the reason this is significant is in the

25   class certification context, the difficulties in

                              -

1   manageability that Judge Schmidt has articulated we

2   think are solved by Wisconsin only declaratory judgment

3   class, and that's why this case has been - - is crafted

4   the way it is, is to avoid those difficulties.     So it is

5   our position, Your Honor, that Northwestern Mutual's

6   argument fails because they never get beyond the

7   threshold of a final - - a final judgment addressing the

8   issue.

9          But even if one could read Judge Schmidt's

10   decision as satisfying that threshold test, the other

11   fundamental fairness factors apply.     Issue preclusion,

12   just to get back to where we started for issue

13   preclusion, is discretionary and even with those

14   threshold questions only gets you - - only gets

15   Northwestern Mutual to the fundamental fairness.     And
several - -

16          And I think a majority of the factors to

17   be considered all counsel denial of Northwestern's

18   argument.

19          First, Ms. LaPlant could not have obtained

20   judicial review of Judge Schmidt's decision.     She was

21   not a party.    There was not a certified class.    And even

22   the Noonans, who attempted to appeal, could not appeal

23   at the time because their motion for interlocutory

24   appeal was denied.

25          Another difference, there is substantive
-

1    action.

2         The courts before have ruled that breach of

3    contract, breach of fiduciary duty, all the other tort

4    claims and contract claims that were asserted against us

5    can't proceed on a class action basis because of

6    manageability issues, because they are too fact

7    specific, because each of these transactions occurred

8    involving other third party agents.

9         And so they have abandon all of those claims

10   and now use the declaratory judgment on what they claim

11   is a very narrow issue as their sole basis for going

12   forward, and in that context it does not serve a useful

13   purpose.  It is a club, to be sure, to swing over the

14   defendant's head.  It is a device they are hoping to use

15   to get around the rulings that said the underlying

16   merits can't proceed, so we have this procedural

17   construct that we are going to let them go forward on.

18         But what it is is not useful.  What is or is

19   not judicial economy has to be looked at in the whole

20   context, which is is this the first step, and it doesn't

21   eliminate the reasons for thousands of mini-trials on

22   breach and damage issues, on all the affirmative

23   defenses, all of those things.  And in that context it

24   is misleading to take the Putnam or the Lister cases out

25   of their very limited context and say because there are

1   MILWAUKEE COUNTY    )

3

4           I, DENISE J. PAHMAN, a reporter in and for the

5   Circuit Court of Milwaukee County, do hereby certify that the

6   foregoing is a true and correct transcript of the proceedings

7   had and testimony taken in the above-entitled matter as the

8   same are contained on my original machine shorthand notes on

9

10  the said trial or proceeding.

11

12

13

14                                          11~

15      Dated at Milwaukee, Wisconsin, this        day of June, 2009.

16

17

18

19

20                              Official Court Reporter, Br. 45

21

22

23

24

25                              -4&-



State of Wisconsin          Circuit Court          Milwaukee County

Marleen M. LaPlant, on her own behalf*
and on behalf of a class similarly
situated,
                    Plaintiff,          *

Versus
                                        *

The Northwestern Mutual Life
Insurance Company, a Wisconsin          *
mutual insurance corporation,
                    Defendant.
                                        *

**DECISION and ORDER on**

**MOTION of PLAINTIFF for**

**CLASS CERTIFICATION**

Case No. 08-CV-11988

Code:   30701
             Declaratory Judgment

FILED

OCT 2 6 2009

JOHN BARRETT
Clerk of Circuit Court

### <u>Introduction</u>

The underlying action in this matter was filed on 26 August 2008. An

Answer and Affirmative Defenses were filed on 10 July 2009. The case was

assigned to this judge on 16 March 2009, as the fourth judge to preside over

the matter. An earlier Motion to Dismiss was resolved with a written decision

on 15 June 2009. A Hearing was held in Court on 10 July 2009, and dates

were set at that Hearing for the parties to file and respond to a Motion for

Class Certification since that was in dispute. A Hearing on this motion took

place in Court on 12 October 2009. The actual Motion for Class Certification

was filed by Plaintiff on 18 August 2009. It was thereafter amended on 19

August 2009.  Plaintiff's brief (with exhibits) was filed with her motion.

Defendant (hereafter Northwestern) filed its responding brief (with exhibits)

on 15 September 2009.   Plaintiff's reply brief (with exhibits) was filed on 1

October 2009.  A Scheduling Conference has also been set by the Clerk for 3

November 2009 at 10:00 A.M. at the Milwaukee County Courthouse.

## Facts

For this court and the reviewing appellate court it is important to have

an understanding of the facts asserted and arguments made by the parties on

this motion.

Plaintiff LaPlant seeks to be designated as "class representative" of a

class she defines as follows:

> *"All persons who (a) purchased a Northwestern Mutual Life*
> *Insurance Company Pre-MN Annuity prior to March 1985, (b)*
> *were residents of the State of Wisconsin at the time of purchase,*
> *and ( c)  did not expressly consent, in writing, to limit or*
> *surrender their right to fully participate in Northwestern's*
> *divisible surplus during the time that they owned the Annuities.*
> *Excluded from the Class are any of Northwestern's officers,*
> *trustees, employees, family members, or affiliates. "*

Plaintiff further asks that five attorneys and their firms be designated as co-

lead counsel.  They include David Boies III, George P. Kersten, E. Campion

Kersten, Kenan J. Kersten and Jeffery A. Bartos.  Finally, Plaintiff asks that

Attorneys Mark B. Pollack and Maria S. Lazar be denominated as "of

2

**Kohler v. Wixen**, 204 Wis. 2d 327, 339 (Ct. App. 1996), the court said:

> "In Wisconsin "unconscionability has been defined as "the absence of a meaningful choice on the part of one party, together with contract terms that are unreasonably favorable to the other party.""

Other courts have noted that it is defined as a contract that no man in his senses and not under delusion would make, on the one hand, and as one which no fair and honest man would accept, on the other. See **Discount Fabric House v. Wisconsin Telephone**, 113 Wis. 2d 258, 261 (Ct. App. 1983). Unconscionability is also impacted by looking to how the language in the contract is or isn't highlighted so as to alert all and draw it to the attention of those who would sign the release document. **Yauger, supra. at paragraphs 18 and 19.**

## Discussion

In this matter the court must exercise discretion in reviewing the factors that impact upon the class certification motion. Each factor will be dealt with separately. In addition, certain matters are referred to in the legal briefs which do not fall strictly under the legal elements to be addressed. These will also be discussed.

## I.    Commonality

In order for the class to be certified the class members must have a

right or interest in common with the Plaintiff. Here it is possible to reasonably conclude that Plaintiff and all members of the proposed class seek the same outcome--a determination of the rights and duties of the pre-MN annuitants and Northwestern under the original annuity contract language. Defendant argues that if the divisible surplus were to be divided as Plaintiff proposes that the position of some class members would be antagonistic. The record discloses that Northwestern paid approximately $5,000,000,000 in dividends just to its life policy holders in 2008. The approximate amount of the differential owing to all of the Wisconsin pre-MN annuitants for 2008 would have been about $1,000,000 according to the affidavit of Mr. Hoyer. It is possible to conclude that the impact on the life policy dividends under the theory postulated by Defendant with regard to the pre-MN annuitants would be almost nonexistent (0.02% annually). Any reduction in the overall Northwestern surplus due to reallocation of it among differing policyholder groups would not even minimally impact policyholders. It would not, under the facts presented, result in any meaningful diminution of the available divisible surplus. This claimed conflict does not rise to the level of creating a legal antagonism in the proposed class. In any event, the case before us does not seek damages under declaratory judgment. In argument on 12 October 2009, Defendant acknowledged that common issues do exist for members of

33

the proposed class. The real dispute, from Defendant's point of view, has to do with its belief that any decision in the class action would have to be relitigated in subsequent damage actions (which are not before us). Defense counsel went so far as to say that only 10% of the issues in dispute would be resolved, in its judgment, in a class action.

Plaintiff's interest in clarifying rights and duties under the pre-MN annuity contracts is consistent with all of the other policy holders. The threshold standard for commonality noted in **Cruz, supra.** ("…general understanding of the nature of the class claim alleged …") is not particularly high. Plaintiff here has met her burden of establishing commonality for class certification. Class antagonism has not been established as to Plaintiff or in juxtaposition to the class as a whole. The claims of class members are factually similar (same annuity language, no consent to 1985 change in how the divisible surplus would be determined and actions of Northwestern appear to be taken with respect to the pre-MN annuitants as a block). The controlling law in the declaratory judgment matter would be essentially the same for all class members. All class member share a common goal of obtaining a declaration of the rights and duties of the pre-MN annuitants and Northwestern as to the legality of the 1985 change in determining the divisible surplus and thereafter allocating policy dividends.

34

## II.  **Numerosity**

The record presented discloses that there are approximately 3,618 pre-MN annuities purchased by Wisconsin residents.  Of that number only 659 continue to hold those pre-MN annuities.  The diminishment of the original number is due to death, maturity of annuity such that distribution is occurring and/or surrender.  The chart contained in Plaintiff's App. 35 demonstrates how the pre-MN annuitants were impacted by the 1985 change regarding divisible surplus.  This exhibit was prepared by Northwestern's Senior Actuary.  It is argued by Northwestern that many of those who are no longer owners of pre-MN annuities are ineligible to make any claim against Northwestern due to the passing of time periods under Wisconsin's statutes of limitation for breach of contract and breach of fiduciary duty.  While not resolving those claims, it is clear that under Defendant's approach there are, at a minimum, perhaps a thousand or more persons who viably make up the proposed class.  Under Plaintiff's reasoning there are over 3,600 in the proposed class.  Under either approach, the number of proposed claimants is significant in its impact.  It would be impracticable to bring all (whether 1,000 or 3,600) of the interested persons before the court.

Plaintiff has met her burden in establishing numerosity with respect to class certification.

35

## III. Adequacy

A number of issues are contested under this criteria. Defendant contends that this motion has been addressed three times previously over an eight year period. In a generic sense that rings true. However, LaPlant was not a party to any of those prior motions. In addition, the second Court of Appeals Decision in **Noonan** focused not on a Wisconsin-only class, but rather on a nation-wide class. It is not a decision which constitutes controlling precedent. The decisions of other circuit courts (including this court) on a Wisconsin-only class are/will also not be controlling precedent. There will be precedence at such time as our appellate court(s) render there wise and thorough ruling regarding the certification of a Wisconsin-only class in this dispute.. Defendant's contention that it has already obtained binding prior rulings on the class certification motion now before us is not accurate.

Next, it is claimed that Plaintiff cannot represent fairly the interests of the proposed class because she:

1. Surrendered her annuity in 2008

2. Signed a contract "releasing any claim" against Defendant

3. Has no possibility of future loss regarding divisible surplus payments.

The facts above do support the claim that Plaintiff did surrender her

36

annuity on 3 July 2008.  The issue, however, is what effect did that surrender have on Plaintiff's standing under the "adequacy" criteria for class certification.  The contract document (Exhibit G to Defendant's legal brief) she signed in accomplishing that surrender was prepared by Northwestern alone.  The document was titled ANNUITY DISTRIBUTION REQUEST.  Plaintiff's Affidavit of 29 September 2009, and her rollover language in the surrender request document indicates that LaPlant wanted, as a part of her retirement planning, to have her annuity funds transferred to her Vanguard account.  On page 4 of the ANNUITY DISTRIBUTION REQUEST, under the heading of AUTHORIZATION AND CERTIFICATION, it is stated at item 1 as follows:

> *"I am surrendering all or a portion of said contract and all claims thereunder to Northwestern Mutual." (Emphasis)*

In the actual annuity contract from 1975, Plaintiff had the right to surrender her annuity policy for its cash value ( See Exhibit D to Defendants legal brief).  Under the facts presented the court is able to determine that no additional consideration was paid for the Plaintiff's release of future claims against Northwestern when she surrendered her annuity policy.  The law (**Bartley v Thompson**, 198 Wis. 2d 323, 333 (Ct. App. 1995) is an exemplar) requires additional consideration for the new contractual release of

*37*

future claims against Northwestern.  In addition, Northwestern served as a fiduciary (conclusion reached in first Court of Appeals decision in **Noonan** and **Thorn Wire Hedge Co. v. Washburn & Moen Mfg. Co.**, **159 U.S. 423, 433 (1895)**.  Nothing in the ANNUITY DISTRIBUTION REQUEST, given that fiduciary position, highlights (by underlining or the use of bolding or shading) the release that is said to occur in item 1 on page 4 of the distribution contract.  Fundamental fairness did not occur.  The new release of future claims language was simply put into the ANNUITY DISTRIBUTION REQUEST without reasonably alerting LaPlant as to its presence or its content and impact.

In addition to the foregoing, the ANNUITY DISTRIBUTION REQUEST contract as prepared by Defendant alone constitutes an unconscionable contract under Wisconsin law ( **Younger, supra.**).  This is so for the following reasons which are arrived at from the record presented:

1.  Plaintiff is not given any meaningful choice with respect to the "release" since it is not emphasized or highlighted for purposes of notice.  Further, there is no space provided for the annuitant to strike the provision or modify it if she wished.  There is no reason for the annuitant to believe that the language of the contract does anything other than rollover her annuity funds into her Vanguard account.  The document appears to be intentionally misleading.

2.  The release terms favor only Northwestern.  This is unreasonable on its face and even more so in the absence

*38*

of any consideration and Northwestern's fiduciary status
to the pre-MN annuitants.

3. No fair and honest person possessed of his or her senses
and not under delusion would accept such a one-sided
release contract.

The extent of Plaintiff's individual claimed harm is limited by virtue of
her annuity policy surrender in 2008. That fact does not mean that her
position as the class representative is undermined. She shares in common
with all members of the proposed class a desire to have the rights and duties
if the pre-MN annuitants and Northwestern determined under the annuity
contract at issue. Defendant has noted that it is possible that other class
members may be deceased or may have also surrendered their policies or may
now be receiving annuity payments. It would be arbitrary, a mistake of law, a
denial of equal protection and an abuse of discretion for the court to allow
only a person within the group of the existing 659 annuity policyholders to act
as a class representative. No basis has been given in the record created
which would allow the court to show favoritism and standing only to that
subgroup of the pre-MN annuitants for purposes of adequacy.

Plaintiff's status as an adequate representative of the proposed class is
not affected by the surrender of her annuity in 2008, by the signing of a
release document prepared solely by Northwestern in the rollover of her

39

annuity into her Vanguard account or by her potential "past injury only" status regarding the divisible surplus being limited to the period before her annuity was surrendered.

Plaintiff has established that she is an adequate class representative. Her interests are not antagonistic to those of the absent/proposed class members. Just the opposite is the case under the record create here. Plaintiff has presented data regarding the qualifications, experience and overall competence of the proposed class counsel. That has not been challenged in any meaningful way by Defendant. The court has also had an opportunity to observe proposed class counsel on the "field of battle" in this matter. It is possible to say that counsel for <u>both</u> parties possess the abilities needed to effectively and competently represent their respective client(s). The court has reviewed Plaintiff's Exhibit 44 (pages 355 to 380) regarding the resumes/vitaes of proposed class counsel. A finding is made based upon the record presented that proposed class counsel are qualified, experienced and generally able to conduct the subject litigation for the proposed class.

## IV.    <u>Manageability</u>

Under this heading the court must determine whether the issues common to LaPlant and the other class members are outweighed by the issues particular to the individual class members. Defendant raises five separate

40

matters under this heading.

A.    Individual defenses will necessarily need to be addressed.

The matters raised as affirmative defenses relate to laches, estoppel,

waiver, statute of limitations and accord and satisfaction.  It has not been

established in the record that these are actual issues in the case.  Defendant

has used in its brief, regarding these matters, the following language:

1.    "... agents <u>may</u> have discussed..."  Defendant's brief at p.
      15.

2.    "... <u>may</u> be barred from bringing a claim on statute of
      limitation grounds ..."  Defendant's brief at p. 16.

3.    "... <u>may</u> be deemed to have knowingly accepted the
      change and/or waived any claim."  Defendant's brief at p.
      16.

4.    "Northwestern Mutual has not affirmatively reached out
      to the thousands of policyholders and their agents to
      determine whether they knew of the change precisely
      because of the onerous nature of the task."  Defendant's
      brief at pages 16 and 17.

The matters raised as affirmative defenses are assumed to be accurate or

potentially accurate by Defendant.  Whether that proves to be the case is

unknown.  Actual evidence as to these claimed defensive matters is largely

missing in the record.  There is an affidavit referred to in the Facts that rebuts

the idea that agents ever gave notice to the involved annuitants or were even

required to do so.  However, those asserted defenses relate to damages and

that is not a matter before us in this case. What is at issue is an annuity

contract and a request that the rights and duties if the parties be determined

under that contract.

There is not a legal requirement that an entire dispute be fully resolved

in order to address either declaratory judgment or certification of a class

action. See prior decision on Motion to Dismiss and **Serafin, supra.**.

However, the court must look to a number of factors in making its decision

and exercising discretion. These include:

1.  Are the issues separable? Here a determination of the
    rights and duties of the parties to an annuity contract are
    clearly distinguishable from the affirmative defense issues
    raised (if in fact those matters come to be real and not just
    imaginary).

2.  What is the importance of the issues? The use of a class
    action to address for all class members and Northwestern
    their rights and duties is significant. The issues raised by
    Defendant may or may not ever be supported by credible
    evidence. Even if the affirmative defense matters are
    supported by credible evidence, there would still be a real
    and important benefit to be derived from concluding a
    determination of rights and duties under the annuity
    contract.

3.  Are the issues autonomous? It is clear that the defensive
    matters are separable from the contract determination
    issues. The words used have meanings. Very specific
    rules of law apply to contract interpretation in Wisconsin.

4.  Can the autonomous part of the controversy be finalized?
    In this case it is possible to resolve the matter of the rights

42

and duties of the parties under the written pre-MN annuity contract. The determination of what the annuity contract said and meant and whether the Northwestern Board had a right, under management discretion, to modify the contract terms would be determined. Other issues could thereafter be addressed if the parties sought that end. However, the contract interpretation matter would have been finalized for the benefit of all the parties.

It is not accurate under manageability to claim that affirmative defense issues must be considered in a class action under a declaratory judgment when dealing with the issue of interpreting the annuity contract under the heading of manageability. They (affirmative defense issues) are separate matters and irrelevant under the issues raised in the pleadings in this case and they can be dealt with after declaratory rulings as to the pre-MN annuity contract are made. Further, hypothetical issues are not enough to prevent certification of a class. **Miner v. The Gillette Co., 428 N.E. 2d 478, 485 (Ill. 1981) and In re Farmers Ins. Co., FCRA Litigation, 2006 WL 1042450, *8 (W.D. Okla. 2006).**

B.    A choice of law analysis must occur

Defendant claims that "Wisconsin law concerning fiduciary duty <u>may not apply</u> to putative class members that lived outside of Wisconsin after purchasing their policy" (underlining added). The fiduciary duty matter for these annuities was addressed by the Court of Appeals in its first **Noonan**

43

decision in 2004 due to a special circumstance. Defendant asserts it is "likely" that a number of policyholders who bought their policy in Wisconsin have thereafter moved out of state. No evidence was presented in support of that assertion, but the argument was made that this will result in the law of other states being applied to any breach of fiduciary duty claim. This fact (that the law of another state would be applied) would, standing alone, be enough to produce the result of unmanageability. The clear law of this state is that Wisconsin law alone would apply to situations where the contract was entered into in this state and the company issuing the annuity is Wisconsin based and the owners were residents of Wisconsin at the time the contract came into existance. **Beloit Liquidating Trust v. Grade, 2004 WI 39, paragraph 24-31**. This dispute would be an intra-corporate matter between Northwestern and certain of its policyholders. In **Brooks v. General Casualty Company of Wisconsin, 2007 WL 4305577 at *3 (E.D. Wis. 2007,** the court dealt with residency alone as the lynchpin for choice of law determinations. The court found that miniscule contacts (just residency) with another state was not enough to invoke its laws for resolution of the dispute. This would, under federalism, constitute officious intermeddling by the other state. See quote in Law section at pages 25 and 26.

Choice of law issues are, based upon the record presented, not a proper

44

basis for finding that class certification should be denied under the concept of

unmanageability. The contacts hypothecated are imaginary and/or

insufficient to invoke the law of another state without being officious

intermeddling.

C.    <u>Many of the putative class have had their annuities amended so<br>so as to be covered under the laws of another state.</u>

In 1983 a number (total unknown) of annuitants who would be in the

proposed class signed an amendment that had language saying that the

amendment should be governed by the laws of the state where the annuitant

then resided.. Those amendments were before the action of the Northwestern

Board in 1985 that is at issue in this case. Nothing in the language of the

amendment changed the contract language that is here being addressed in this

case as to the allocation of the divisible surplus of Defendant. The language

of the 1983 amendment did not affect the rights and duties at issue here. That

language is unchanged. There is no compelling reason to apply the law of

another state where the sole contact there was residency by the annuitant at

the time of an amendment that did not impact the annuity contract language

that is at issue in this case. Such an interpretation would undermine

commerce in Wisconsin and the other states, create confusion regarding

contract interpretation in all states and make it substantially more difficult for

45

a court to discharge its function of articulating and maximizing the rights of citizens in their respective states. Similarly, foreign state's would also be protected by maximizing the contract rights of their citizens.

Defendant has not established unmanageability of the class action as a result of choice of law issues resulting from the 1983 annuity amendment. Wisconsin law would govern annuity disputes and this is not changed as a result of the 1983 amendment.

D.    Plaintiff's real goal is to secure damages.

Defendant contends that Plaintiff's real goal is damages from Defendant.    In the deposition of Plaintiff, she acknowledged her objective of obtaining dividends she claims are due her. That there may be legal actions after a declaratory ruling and/or after a class certification does not act to make a case unmanageable.   See **Serafin, supra.** and prior decision on Motion to Dismiss. While Defendant asserts that there is a strong likelihood of jury confusion, that need not be the case. Appropriate instructions can be crafted and utilized if necessary to eliminate any possibility of that result impacting jury fairness. If a finding of general liability comes about there is no reason to believe that it would somehow overshadow strong defenses that might exist. This is partisan conjecture built upon unfounded fears and possibilities with a goal of creating an end result of denying class

46

R. App 153

Plaintiff also has established the competency and experience of the counsel she seeks to represent the proposed class. Conversely, Defendant has not credibly established any of its claimed objections to certification of the class or, as to Plaintiff's standing, hasn't demonstrated any legal impediment to her ability to adequately represent that class. There are also in the record serious and multiple doubts with respect to the claimed approval of the new business model made by two regulatory bodies. When all of the predicate criteria are met, as is the case here, it is in the public interest in Wisconsin to allow certification of the proposed class.

## **ORDER**

For the reasons stated herein, it is ORDERED that Plaintiff's Motion for Class Certification is granted. In addition, Plaintiff's request for approval of counsel and "of counsel" to represent the class is granted.

Dated this ____26____ day of October 2009

Dennis J. Flynn, Reserve Circuit Judge

62

Distribution

Original to:  Court File to Milwaukee County Clerk of Courts
Attn: Ms. Carol Boettger in Chief Judge's Office
1-414-278-4998

Copies to:  Attorney George P. Kersten  (for Plaintiff)
Kersten & McKinnon, S.C.
11518 North Port Washington Road
Suite 104
Mequon, WI   53092

Attorney Eric J. Van Vugt (for Defendant)
Quarles & Brady, LLP
411 East Wisconsin Avenue
Milwaukee, WI   53202-4497

63

1    STATE OF WISCONSIN: CIRCUIT COURT: MILWAUKEE COUNTY

2                        CIVIL DIVISION

3

4

     MARLEEN M. LAPLANT,
5
                            Plaintiff,
6
          vs.                    CASE NO. 2008CV011988
7
     NORTHWESTERN MUTUAL
8    LIFE INSURANCE COMPANY,

9                        Defendant.

10
     OCTOBER 12, 2009                    MOTION HEARING
11

12               PROCEEDINGS HELD BEFORE

13          THE HONORABLE DENNIS FLYNN

14                    PRESIDING JUDGE

15
     APPEARANCES:
16
     GUERRIERI, EDMOND, CLAYMAN & BARTOS, P.C., 1625
17   Massachusetts Avenue, N.W., Suite 700, Washington,
     D.C. 20036-2243, by MR. JEFFREY A. BARTOS, Attorney
18   at Law, appeared on behalf of the Plaintiff.

19   KERSTEN & McKINNON, S.C., 11518 North Port
     Washington Road, Suite 104, Mequon, Wisconsin 53092,
20   by MESSRS. GEORGE P. KERSTEN, CAMPION KERSTEN, and
     KENAN KERSTEN, Attorneys at Law, appeared on behalf
21   of the Plaintiff.

22   STRAUS & BOIES, LLP, 4041 University Drive, Fifth
     Floor, Fairfax, Virginia 22030, by MR. TIMOTHY
23   BATTIN, Attorney at Law, appeared on behalf of the
     Plaintiff.
24
     GALANIS, POLLACK, JACOBS & JOHNSON, S.C., 839 North
25   Jefferson Street, Suite 200, Milwaukee, Wisconsin
     53202, by MR. JOHN GALANIS, MR. MARK B. POLLACK and

1    proposition.    That that would satisfy any
     Wisconsin law for what the courts talk about as
2
     exculpatory waivers, and before you engage in
3
     this act, you waive and release any claims
4
     against the other party.    This is no -- it's not
5
     even a close call.
6
              So I think Mrs. LaPlant is clearly an
7
     adequate representative, and this notion of
8
     release that is presented as the primary argument
9
     just doesn't stand.
10
              The second major issue that Northwestern
11
     Mutual raises are the manageability concerns, and
12
13   the -- the one I think that is most effort is
     expended on are the -- what are described as the
14
     individualized defenses; and Northwestern Mutual
15
     says, well, this case is really about damages and
16
     to litigate damages issues, we will have the
17
     right to probe for every class member issues of
18
     estoppel in its various guises and related
19
     equitable defenses.
20
              And I think we briefed that pretty fully
21
     in the reply.    There's just two things I want to
22
     say about that.    First and foremost is those
23
     individualized defense theories are simply not
24
     relevant to the declaratory judgment.    They're
25

1    really not at issue.    They go to defending
     against individualized damages claims, and that's

2    not the case here.

3              I think a lot of Northwestern Mutual's

4    briefing is an attempt to characterize our case

5    as one for damages.    And it's not.    Characterized

6    correctly, those defenses really are not present

7    right now.

8              Secondly, I would say, and again, we

9    address it in the brief at some length, the

10   burden of showing manageability as a -- as a

11   concern that would overwhelm the benefits of

12   class treatment, the burden of that is on

13   Northwestern Mutual, and the Supreme Court in

14   Schlosser pointed out the need for a defendant

15   who raises this sort of argument to present

16   evidence to show some basis for that conclusion.

17   And as we, I think, describe at some length,

18   Northwestern Mutual has not made that evidentiary

19   showing in any respect, has not met its burden.

20             That all being said, and just to cut to

21   the chase, that's our position, Your Honor, that

22   the predominant issues in this case are class

23   wide.    There's no evidence to find that a class

24   treatment is not appropriate or would be

25

1    occur to the parties.

3
              Is there anything else now that should

4    be done?    First plaintiff?

5             MR. BARTOS:        Nothing, Your Honor.

6             THE COURT:        Defense?

7             MR. VAN VUGT:        No, Your Honor.    Thank

8    you.

9             THE COURT:        Thank you all for your

10
11   appearances today.        I appreciate it.

12            MR. BARTOS:        Thank you, Your Honor.

13
14                   *        *        *
15

16
17
18
19

20

21

22   STATE OF WISCONSIN
                              SS:
23     MILWAUKEE COUNTY

24                   I, THOMAS A. MALKIEWICZ, RPR, RMR,
     CRR, an Official Court Reporter in and for the
25   Circuit Court of Milwaukee County, do hereby certify
     that the foregoing is a true and correct transcript
26   of all the proceedings had and testimony taken in
 2

2    the above-entitled matter as the same are contained

     in my original machine shorthand notes on the said
3    trial or proceeding.

4    Dated this 14th day of October, 2009.

5    Milwaukee, Wisconsin.

6

7

8                                                    " '
                         d~A-~
9

10                        Thomas A. Malkiew1cz, RP , RMR, CRR
                          Official Reporter
11

12   another [13] 9/5 17/3 17/17 26/19 32/8

13                                        able [1] 36/24

14   $

15   36/1 37/7 42/17 42/18 42/20 42/21 48/7

16                                        about [22] 6/2 6/5 6/21 7/1
     8/3 9/4 9/6
17   48/14

18                                        11/4 13/2 13/16 13/23 15/18
     18/8 20/9
19    $200 [1] 42/7

20   answer [9] 18/20 27/10 27/15 31/14

21   l$200 000 r1l 42/8                21/2 23/21 25/23 25/24 30/18
                                       31/20
22

23   38/9 38/13 42/15 45/6 45/9

State of Wisconsin     Circuit Court     Milwaukee County

| | |
|---|---|
| Marleen M. Plant, on her own behalf * | **DECISION on MOTION** |
| and on behalf of a class similarly | |
| situated, | **OF DEFENDANT TO** |
|         Plaintiff, * | |
| | **DISMISS** |
| Versus | |
| * | |
| | Case No. 08-CV-11988 |
| The Northwestern Mutual Life | |
| Insurance Company, a Wisconsin * | Code:    30701 |
| mutual insurance corporation, |              Declaratory Judgment |
|       Defendant. | |
| * | |

## **Introduction**

The Summons and Complaint in this case were filed on 26 August 2008. Defendant filed a Motion to Dismiss on 20 October 2008. In addition Defendant filed a Motion to Stay Discovery on that same date. The court has been advised that, by mutual agreement, the parties have not proceeded with discovery pending the resolution of the Motion to Dismiss. Both sides have filed written briefs.

Initially the case was assigned to Judge Thomas R. Cooper. He recused himself. Then the case was assigned to Judge Charles F. Kahn, Jr. and a Request for Substitution was filed. Thereafter, the case was assigned to

Judge Dennis P. Moroney and he recused himself on 11 March 2009. Finally, the dispute was assigned to this Reserve Judge on 16 March 2009. A telephonic conference was held on 14 April 2009, to bring the court up to date on the status of the matter. As a result of that informal conference call and at the request of both sides, the matter was set on for oral arguments on 1 June 2009, on the Defendant's Motion to Dismiss. This occurred and was on the record (Court Reporter Denise Dahmen). Plaintiff appeared by Attorneys George P. Kersten, E. Campion Kersten and Jeff Bartos. Defendant appeared by Attorneys Eric J. Van Vugt and Christine Hernandez-Malaby. The court has had the benefit of written and oral arguments by counsel for both sides on this motion dispute.

## Facts

The operative facts are as articulated in the Complaint. An attempt is made here to restate the general averments, but the actual wording in the Complaint controls over any attempted restatement. To the Complaint the Plaintiff attached an annuity contract and the parties in arguments also refer to record documents in Milwaukee County Case No. 01-CV-012349 (hereafter referred to as the Noonan Case). In the Noonan Case certain record documents are presented as exhibits and referred to. These, in part, are:

point sufficiently firm or prior final "Wisconsin claimants class" judgment. Further, there has not been a prior appellate adjudication regarding only the rights and duties under the annuity contract such that it can be viewed as sufficiently firm so as to be accorded conclusive effect.

For the reasons stated, the court concludes that nothing in the law of Wisconsin or the facts presented would establish that it is quite clear that Plaintiff could not, under any circumstances, prevail in her class claims under the declaratory relief action because of the law relating to preclusion.

## II. **As to Other Actions being More Appropriate, Lack of Standing, Mootness, Same Jury Deciding All Juriable Issues and No Useful Purpose being served by proceeding with Declaratory Judgment**

All of these matters are joined because this is how they were presented in the moving pleading.

A party to a contract has a right to seek, before or after an alleged breach, declaratory relief in Wisconsin as to contract construction. Wisconsin Statutes, sections 806.04(2) and (3). The UDJA is to be liberally construed as an ordinary remedy. Wisconsin Statutes, section 806.04(12). Other remedies may also exist beside declaratory judgment, but that fact alone does not act to prevent a party from having access to UDJA. Inquiry must be made as to whether the other possible remedy(s) are equal to or more

Wisconsin only class regarding breach of contract with a claim for money damages as opposed to a Wisconsin only class regarding the rights and duties of the parties under the annuity contract. The issues and legal burdens that were addressed in Noonan are not the same as those under consideration in the instant matter.

Decisions of Circuit Courts are instructive, but not binding precedent on other Circuit Courts as are the decisions of the Wisconsin Court of Appeals, the Wisconsin Supreme Court and the United States Supreme Court. **State v. Mechtel, 176 Wis. 2d 87, 93 and 94 (1993)**. The same rule applies generally to the instructiveness of federal decisions on state issues from the federal Court of Appeals and/or the federal District Courts. **West Bend Mutual Ins. Co. v. Berger, 192 Wis. 2d 743, 755 (Ct. App. 1995)**.

The denial of class certification to Wisconsin only claimants regarding breach of contract and damages in Noonan Trial Decision #3 (in addition to being concerned with a different issue) does not act to affect unnamed class parties as no final judgment or sufficiently firm ruling has occurred in that matter. The Wisconsin "adequate representation" examination regarding unnamed parties cannot occur as contemplated in **Jensen**, supra because there is no on point prior sufficiently firm or final "Wisconsin claimants class" judgment. In addition, the court is not able to apply the federal "fully litigated outcome" standard from **Bridgestone**, supra because there is no on

appropriate. It could be premature to seek damages for an alleged breach of contract or breach of fiduciary duty if those contentions proved to be without merit. It would be a more efficient and fair use of court resources to, if possible, secure a statement from the court regarding the construction of the contract before commencing an action for damages or other relief. The principle of bifurcation of trial issues is often used in the courts of this state. If it is determined in a declaratory judgment action regarding the annuity contract(s) that no breach of contract or breach of fiduciary duty ever occurred, then no further action for damages or other relief would occur. Conversely, if a breach of contract or breach of fiduciary duty did occur under determinations made as to the annuity contract, such a finding may lead to the resolution of further controversy between the parties. It is not possible to state that the other remedies suggested by Defendants for use by Plaintiff would be either equal to or more appropriate than proceeding with this case. It would be an abuse of discretion for the court to conclude that Plaintiff's claim(s) for declaratory judgment is/are "contrived" or are simply a substitute for typical breach of contract or breach of fiduciary duty claims. The declaratory judgment action would serve a useful purpose in removing uncertainty and determining the rights and duties of the annuitant(s) and Northwestern regarding, among other issues, what is or isn't allowed under

the disputed dividend/divisible surplus language. The "a useful purpose" standard is mandated in Wisconsin as a predicate to utilizing UDJA whether the entire dispute is resolved or not. In a motion to dismiss the applicable standard addresses the ability of the plaintiff to prevail under any conditions. The Court is not able to conclude that after the rights and duties of the parties to the annuity contract are determined that these parties would not then be able to resolve the totality of their disagreement. Determining the rights and duties of the parties under the annuity contract would serve a manifestly useful purpose in resolving the conflict. Good faith, as opposed to obdurate posturing, by all parties to a contract is presumed in Wisconsin. **Wisconsin Natural Gas v. Gabe's Construction, 220 Wis. 2d 14, 21 (Ct. App. 1998)**.

This is particularly the case where the underlying UDJA law is itself an ordinary remedy and construction, access and administration of that law is to be broadly enabled. Certainly, an action seeking damages would be more complicated and issue-intense than a cause of action that does not include damages. The declaration of the rights and duties of the parties under the contract(s) at issue could impact intertwined legal rights before future injuries occur while at the same time addressing past and/or present wrongs, if any. This is consistent with the purpose and intent of UDJA. It could also determine under the contract(s) at issue that no past, present or future wrongs

did, are or will occur. It would be incorrect to say that Plaintiff is not seeking

prospective declaratory relief for herself and the class she seeks to have

certified. However, any declaration of rights and duties may also impact past

actions taken under the contract. This "inherent potential" to also impact past

actions of the parties, may not act to deny Plaintiff access to UDJA in

Wisconsin under the "prospective relief only" interpretation given by

Defendant.

Plaintiff does have a stake in the controversy as a declaration is sought

with respect to an annuity contract between her and Northwestern going back

to 1975. Even after an alleged breach of a contract occurs, UDJA allows a

party to seek a declaration of rights. Wisconsin Statutes, section 806.04(3).

A clear reading of the unambiguous UDJA law establishes that Plaintiff could

have legal standing-even for declarations as to past acts that may constitute,

under the contract, a breach. Where the language of a statute is unambiguous

(not capable of being understood by reasonably well-informed persons in two

or more different senses per **In the Matter of Trust Estate of Rice, 187**

**Wis. 2d 658, 663 (Ct. App. 1994))**, it is the duty of the court to apply the

language of the law directly and not give it some different meaning. A court

and/or a party may not rewrite a statute to accomplish some parochial end as

a "super legislative" entity, where the language of that statute is clear and

direct.  In **City of Brookfield v. Public Service Commission**, 186 Wis. 2d

**129, 138 (Ct. App. 1994)**, the court said:

> *"Where the language of a statute is unambiguous, our inquiry*
> *ends and we must simply apply that language to the facts of the*
> *case."*

Plaintiff's claim(s), for herself and the putative class, under UDJA could be

seen as more than a "trifle" and the legal requirement is met for her to have

standing and access to the courts in this State.

Further, the claim(s) made by Plaintiff can be viewed as not moot.

Plaintiff's request for a declaration of the rights and duties of the parties

which exist under the annuity contract(s) would have a direct and practical

effect on the controversy whether she alone is the Plaintiff or she is a member

of a class of persons who pursue the interpretation claim.

Defendant asserts that Plaintiff is ultimately seeking damages from

Defendant whether the matter proceeds with one Plaintiff or as a class action.

From this contention Defendant maintains that it would have its "same jury"

right under Article I, section 5 of the Wisconsin Constitution violated by

having a subsequent jury (after a first jury resolves the declaratory judgment

matter) address a possible remedy for any past injury to Plaintiff(s).  This

presumes that a finding would be made in the declaratory relief matter that

one or more contractual breaches occurred.  The court has no idea what may

occur in the future regarding any findings that would be made in a declaratory

judgment ruling or even if such a ruling will ever be made. Defendant argues,

as illustrative of the impropriety of the relief Plaintiff seeks, that the

declaratory judgment action should be dismissed because of the possible

violation in the future of its "same jury" right.

Plaintiff counters by expressing a hope that the outcome of the

declaratory judgment will resolve the dispute in its entirety. Further, Plaintiff

claims that Defendant's position is speculative, misdirected to an unknown

time in the future and bespeaks an unreasonable and fixed position to litigate

no matter what the facts are and what the law is. Finally, Plaintiff asserts the

legal position that, at that time in the future if there ever is a second jury, the

issues would be distinct and separable such that they could be tried separately

"without injustice" in terms of Defendant's "same jury" constitutional rights.

The court does not know what will occur in the future regarding

postulations by Plaintiff or Defendant.

What is clear as to this issue (violation of Defendant's "same jury"

right) is that it is not, based on the record presented, a fact determined issue.

Its articulation is speculative and premature. Even if there is a second jury

trial, this court is not able to conclude now that the same jury could not hear

that case or that a different jury would be unable to do so. This constitutional

argument is presumably raised under Wisconsin Statute, section 806.04(6),
which relates to the discretion vested in the trial court to refuse to entertain a
declaratory judgment matter if the judgment would not terminate the
controversy. The UDJA law states that a declaratory judgment shall have the
force and effect of a final judgment or decree on the matter raised in the
declaratory relief action. Wisconsin Statute, section 806.04(1). This is stated
even though UDJA contemplates the possibility of supplemental relief.
Wisconsin Statute, section 806.04(8).

Discretion is exercised in this case to conclude that allowing the
declaratory relief action to continue, and not be dismissed, would serve a
useful purpose even if further action(s) or supplemental relief were to occur in
the future. The determination of the rights and duties of the annuitant(s) and
Northwestern regarding (among other matters) the dividend/divisible surplus
issue may well lead to the resolution of what Defendant suggests are other
potentially disputed matters. Even if free-will, choice determinations of the
parties prevent that result, issues relating to the contract (its terms and their
meanings and the duties and rights of the parties) would be settled through
declaratory judgment. It is also an efficient means to accomplish the
determination of the rights and duties of the annuitant(s) and Northwestern in
terms of the utilization of court resources whether there is one or more than

one plaintiff. The assertion that another action may take place in the future is a factor to be considered, but it is not controlling. Its weight is affected by the speculative nature of future events and conduct after a determination occurs regarding the rights and duties of the parties under the annuity contract. The more certitude the parties have regarding the facts and the law relating to their dispute, the more likely it is that reasonable disputants will themselves resolve their matter. There is not a requirement that his will occur, but often this is the case in the court's experience. Finally, the court concludes that the utilization of UDJA is the preferred means, under the facts of this case and the law in Wisconsin, for determining the rights and duties of the annuitant(s) and Northwestern under the disputed contract.

As noted earlier, the critical determination is whether the declaratory judgment action would serve <u>a</u> useful purpose. **<u>Lister v. Board of Regents of the University of Wisconsin Systems</u>**, supra. This is not the same as a requirement that the entire case be resolved, even if that result would be a hoped-for consequence. It is not possible for the court to conclude that the declaratory judgment action would not, under any conditions, resolve the conflict between the parties regarding the subject annuity contract. In argument, Plaintiff asserted that the major issue that would prevent, as a cost consideration, individual annuitant parties from presenting a claim against

Northwestern would be resolved through a class action once the meaning of the contract terms was resolved. This represents a comment on the unknown and is not a basis for the decision here made.

For the reasons stated, the court concludes that nothing in the law of Wisconsin or the facts presented would establish that it is quite clear that Plaintiff could not, under any circumstances, prevail in her Declaratory Relief action because of the law relating to standing to sue, mootness, other adequate remedies, no useful purpose and the same jury resolving all juriable issues.

III.   **As to Statute of Limitations Matters**

While a declaratory judgment action does not have any statute of limitations applicable to it, the same cannot be said of causes of action for either breach of contract (6 years per Wisconsin Statutes, section 893.43) or breach of fiduciary duty (2 years per Wisconsin Statutes, section 893.57). Whether viewed as a single Plaintiff matter or as a class action, Defendant asserts that Plaintiff's claims are time barred.

The statute of limitation contention needs to first be addressed as to the breach of contract claim. Defendant urges that the court look, in terms of beginning the period for the running of the statute of limitation, to either the 1985 date of the alleged initial change in the calculation of the divisible

surplus <u>or</u> to 31 December 2001, the date of the filing in the **Noonan** case.

Plaintiff argues that the concept of a continuing breach should be applied to the breach of contract matter. This is the approach taken by the Appellate Court in the Noonan Appellate Decision #1. Since Northwestern is alleged factually in the Complaint, from 1985 through 2008, to have annually substituted interest earned on a short term bond account for the divisible surplus that is noted in the annuity contract, it would be correct to say that if that initial 1985 action was improper under the annuity contract, then such redundant annual action by Northwestern would constitute a continuing or successive breach of the annuity contract. Under this reasoning Plaintiff(s) would have acted well within the six year statute of limitations or repose when the instant action was filed on or about 26 August 2008. The court adopts this "continuing breach of contract" methodology for the breach of contract claim and rejects Defendant's assertion that the breach, if one occurred, was fixed as of the time in 1985 when Northwestern, allegedly covertly, changed how it would calculate dividends under the annuity contract(s) at issue or that the limitation period began to run when the **Noonan** case was filed on or about 31 December 2001.

Yet, it is important to note that Defendant alternately would commence the running of the statute of limitations on the date of the <u>filing</u> of the class

action case and not on the date of any judgment under the concept of a "fully litigated outcome". The law requires more than just the filing of a case even under the language of **Bridgestone** (sufficiently firm adjudication concept).

The breach of fiduciary duty claim has a 2 year statute of limitations and it may be tolled under the Wisconsin discovery rule if Plaintiff didn't know of the breach or shouldn't have known of it in the exercise of reasonable diligence. In her complaint Plaintiff asserts that she did not have knowledge of Defendant's alleged breach of fiduciary duty. Consideration is given, however, to Defendant's argument regarding imputing knowledge to Plaintiff once she became an unnamed member of a putative class regarding Defendant's alleged breach of fiduciary duty. This would be done in order to determine a start date for the running of the two year time period allowed in the statute of limitations under the "should have known" and "adequately represented" standards. Defendant's contention is that Plaintiff's complaint should be dismissed because of her failure to timely file her case as to any possible breach of fiduciary duty.

The facts of the Noonan case undercut the contentions made by Defendant in terms of Plaintiff being an unnamed member of a class. The Noonan complaint that was filed on 31 December 2001, did not seek certification of any class. Noonan <u>Trial</u> Decisions #1 and #2 do not relate to

any "Wisconsin claimants only" class and they would not constitute a final

judgment or sufficiently firm adjudication in any event or be binding

precedent on other Circuit Courts. Noonan <u>Appellate</u> Decisions #1 and #2 do

not relate to any "Wisconsin only claimants" class. The first time that

Plaintiff LaPlant could have had notice constructively as to being an unnamed

member of a Wisconsin only class would have been when a motion was filed

in the **Noonan** case for certification of a Wisconsin only class. That exact

date can be gotten by going to the **Noonan** case file. It appears however, that

the filing would have been after 16 November 2006, when Noonan Appellate

Decision #2 issued. If that is the date (even though there was only the filing

of a request for Wisconsin only class certification and no final judgment or

fully litigated outcome had occurred) for the commencement of the running of

the two year statute of limitation for breach of fiduciary duty, then Plaintiff's

filing of the instant action on 26 August 2008, is timely as within the statutory

two year period from when she, as an unnamed putative class member, should

have known that a "Wisconsin only class" was proposed regarding alleged

wrongs done to annuitants by Northwestern regarding the payment and

computation of dividends/divisible surplus.

     Thus, under Defendant's theory and facts, Plaintiff did not act to

piggyback one class action onto another with the result that the statute of

limitations would or could be tolled <u>indefinitely</u>.   **Hohe v. Casey, 128 F.R.D.**

**68, 71 (M.D. Pa. 1989)**.  Plaintiff did act to timely make her claim under

Defendant's theory regarding the imputed "should have known" standard.

She could not have imputed notice regarding being an unnamed member of a

class (Wisconsin only claimants) until such time as the litigants in another

case sought certification of her "Wisconsin only claimants" class.  It is also

possible under Defendant's theory that the time for commencing the running

of the statute of limitations in the breach of fiduciary action matter did not

begin until an actual final decision on Wisconsin only class certification was

made (although the law specifically requires a sufficiently firm adjudication or

final judgment, as opposed to a decision by the Trial Judge, in the matter

affecting unnamed class members).  The Noonan <u>Trial</u> Decision #3 was dated

25 January 2008 and it related to a class affecting breach of contract wherein

damages were sought.  However, if this is viewed as a final judgment or

sufficiently firm adjudication regarding a Wisconsin only class and thus the

controlling date for imputing constructive notice to Plaintiff, then Plaintiff, as

an unnamed class member, acted timely in filing her case just 7 months after

the making of the trial court decision to deny class certification to a

Wisconsin only class in **Noonan**.

　　　In addition, and as a third possibility, if one were to consider the

Noonan <u>Appellate</u> Decision #2 as relating to a class action (albeit nationwide) that included Plaintiff as an unnamed member and thus gave her constructive notice under the "should have known" and "adequately represented" and "fully litigated outcome" standards, then the two year statute of limitation period would begin to run on the issuing of Noonan <u>Appellate</u> Decision #2 on 16 November 2006. Even under this scenario Plaintiff complied with the 2 year statute of limitations regarding the breach of fiduciary duty by filing her case in Milwaukee County on 26 August 2008.

None of these situations in the court's view reflect a proper application of the law regarding imputing constructive knowledge for statute of limitation purposes in a breach of fiduciary duty claim, but even under these Defendant-urged approaches, the facts don't support dismissal. Plaintiff's isn't estopped under the statute of limitation criteria postulated by Defendant from seeking declaratory relief regarding an alleged breach of fiduciary duty because she did act timely.

However, the court makes its decision based upon the record presented and what it views as the controlling law of this State. Plaintiff, it is asserted in the Complaint, had no actual knowledge of any alleged breach of fiduciary duty by Northwestern. Plaintiff, in the exercise of due diligence, had no constructive notice regarding an alleged breach of fiduciary duty by

Northwestern as a result of being an unnamed member of a putative class in any case where a fully litigated outcome occurred or a final judgment had been entered or a sufficiently firm adjudication had been obtained. As a result of Plaintiff having neither actual nor constructive notice of any alleged breach of fiduciary duty by Northwestern and given the allegations of intentional misconduct by Northwestern in concealing that alleged misconduct, it is not possible, under Wisconsin's discovery rule and the concept of imputing knowledge so as to start the time running on a Wisconsin Statute, section 893.57 cause of action, to conclude that Plaintiff's pleadings are filed in violation of the statute of limitations

Plaintiff's case was filed timely under Wisconsin law.

For the reasons stated, the court concludes that nothing in the law of Wisconsin or the facts presented would establish that it is quite clear that Plaintiff could not, under any circumstances, prevail in her declaratory judgment action because of the law relating to the statute of limitations.

### Decision

The Motion by Defendant to Dismiss is denied for the reasons stated herein.

Dated this ___/5___ day of June 2009

Dennis J. Flynn,   Reserve Circuit Judge

Distribution

Original to:  Court File
Attn: Ms. Paula Black in Clerk's of Courts Office
1-414-278-4123

Copies to:  Attorney George P. Kersten  (for Plaintiff)
Kersten & McKinnon, S.C.
11518 North Port Washington Road
Suite 104
Mequon, WI   53092

Attorney Eric J. Van Vugt (for Defendant)
Quarles & Brady, LLP
411 East Wisconsin Avenue
Milwaukee, WI   53202-4497

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,**
                    **Plaintiffs,**

              **v.**                                    **Case No. 11-CV-00910**

**THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,**
                    **Defendant.**

---

## DECISION AND ORDER

Plaintiff, Marleen M. LaPlant, the holder of an annuity insurance policy issued by defendant, Northwestern Mutual Life Insurance Company, brought an action in state court on behalf of a class of Wisconsin policyholders and, after a two week court trial, prevailed. Subsequently, plaintiff moved to expand the class to include policyholders from other states at which point defendant removed the case under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Plaintiff now moves to remand.

The facts that gave rise to the suit are as follows: defendant is a mutual insurance company incorporated in Wisconsin. As a mutual company, it is owned cooperatively by its policyholders. Under Wis. Stat. § 632.62, defendant issued "participating" policies to members of the putative class. Section 632.62(2) requires that such policies give the policyholders the right to participate in the mutual company's profits. For a time, defendant paid dividends to the policyholders by apportioning its profits. In 1985, however, defendant moved the money invested by the policyholders into a separate short-term bond fund and began paying dividends based on the interest the fund generated. This change resulted

in the policyholders receiving smaller dividends and precipitated the present action alleging breach of contract and breach of fiduciary duty.

Under CAFA, federal courts have jurisdiction over class actions in which at least one class member is a citizen of a state different from a defendant, the class exceeds 100 members and members' claims add up to more than $5,000,000. *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 617 (7th Cir. 2012) (*citing* 28 U.S.C. § 1332(d)(2), (d)(5)). Congress enacted CAFA to allow federal courts "to decide most interstate class actions because these cases usually involve large amounts of money and many plaintiffs, and have significant implications for interstate commerce and national policy." S. Rep. No. 109-14, at 27 (2005). However, CAFA contains exceptions designed to ensure that state courts can adjudicate class actions "that have a truly local focus." *Id.* at 28. One exception, the "corporate governance exception," withdraws federal jurisdiction over a class action that "solely involves a claim that relates to the internal affairs or governance of a corporation . . . and that arises under or by virtue of the laws of the State in which such corporation . . . is incorporated . . . ." 28 U.S.C. §§ 1332(d)(9)(B), 1453(d)(2). The question presented is whether the corporate governance exception requires remand.

Plaintiff has the burden of proof on this issue. *See Appert*, 673 F.3d at 619. I address first whether the claims of members of the putative class relate solely to defendant's internal affairs. This inquiry focuses "on the source of the right that the plaintiff's claim seeks to enforce." *Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010). "Internal affairs" are "matters peculiar to the relationships among or between the corporation and its current officers,

2

directors and shareholders." S. Rep. No. 109-14, at 45 (*quoting Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)). In the present case, members of the putative class sue defendant in their capacity as defendant's owners claiming that defendant improperly calculated their dividends and thereby breached its contractual and fiduciary duties to them. The declaration and payment of dividends generally involve the internal affairs of a corporation. *See, e.g.*, *Pittway Corp. v. U.S.A.*, 88 F.3d 501, 503 (7th Cir. 1996); *In re Harnischfeger Indus., Inc.*, 293 B.R. 650, 662 (Bankr. D. Del. 2003) (*citing* Restatement (Second) of Conflict of Laws § 302 cmt. e (1971)). Further, claims for breaches of fiduciary duty against a corporation by its shareholders are regularly treated as matters involving internal affairs. *See, e.g.*, *Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 574 (7th Cir. 1996). Thus, the claims of members of the putative class relate to defendant's internal affairs.

Defendant argues that because the state trial court addressed matters other than dividends, including defendant's misleading marketing of policies, failure to give notice of the change in dividend calculation, willful cover-up of the change, deception of New York regulators and punitive damages, the case does not solely involve claims related to its internal affairs. However, the substance of plaintiff's claims does not change merely because the case raises collateral issues or because the state court discussed other wrongdoing by defendant. The phrase "solely involves" should not be read to limit the exceptions under § 1332(d)(9) to class actions that raise no collateral issues. *Greenwich*, 603 F.3d at 31. Other language in the statute such as the phrase "relates to" is fairly broad. *Id.* "If Congress had intended these provisions to apply only to class actions that involve

no legal issues extraneous to the primary claim, they [sic] would have used language that was more clearly limiting." *Id.*

I turn next to whether the claims of members of the putative class "arise[] under or by virtue of" Wisconsin law. The state court held that the Wisconsin policyholders' claims are governed by Wisconsin law. Thus, the question presented is whether Wisconsin law also governs the claims of policyholders who purchased policies elsewhere. Because this is a diversity case, I apply Wisconsin choice-of-law rules to determine the law under which putative class members' claims arise. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

Defendant contends that the Wisconsin Court of Appeals held that Wisconsin law does not govern such claims in *Noonan v. Northwestern Mutual Life Insurance Company*, No. 2005AP1683, 2006 WL 3314622 (Wis. Ct. App. Nov. 16, 2006). In *Noonan*, policyholders Daniel and Catherine Noonan brought an action on behalf of all policyholders, but the trial court denied class certification on the ground that a nationwide class action would be unmanageable in part because other states' laws might apply. The problem with defendant's argument is that, although the court of appeals affirmed, it expressly declined to decide which state's law applied and held only that the trial court did not abuse its discretion. *Id.* at *3 n.6. Thus, *Noonan* is not helpful on this issue.

Since Wisconsin has not adopted the internal affairs doctrine, under which the law of the state of incorporation ipso facto governs a corporation's internal affairs, I apply the state's general choice-of-law principles. *Beloit Liquidating Trust v. Grade*, 270 Wis. 2d 356, 373–74 (2004). *Cf. Becher v. Northwestern Mut. Life Ins. Co.*, No. 10-6264, 2010 WL

4

5138910 (C.D. Cal. 2010) (remanding a parallel lawsuit after concluding that Wisconsin law governed based on California's internal affairs doctrine). I apply the choice-of-law framework used in *Drinkwater v. American Family Mutual Insurance Company*, 290 Wis. 2d 642 (2006), which like the present case involved tightly bound contract and tort claims.

I ask first whether the case has more significant contacts with Wisconsin or the state where the class members purchased their policies. *Id.* at 658. I presume that Wisconsin law applies to lawsuits brought in Wisconsin, "unless it becomes clear that non-forum contacts are of greater significance." *Id.* If it is unclear which state's contacts are of greater significance, Wisconsin courts apply five choice-influencing factors: "(1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." *Id.* "The importance of each factor will vary depending upon the specific facts presented in each case." *Beloit*, 270 Wis. 2d at 375 (*quoting Zelinger v. State Sand & Gravel Co.*, 38 Wis. 2d 98, 106 (1968)).

In the present case, it is unclear which state's contacts are of greater significance. Defendant is located in Wisconsin, and it calculates and pays dividends out of its Wisconsin headquarters. However, the putative class members purchased their policies elsewhere and receive dividends in other states. The alleged breaches occurred in Wisconsin, but the injury occurred elsewhere. Thus, I will consider the choice-influencing factors.

The first factor, "predictability of results," requires me to decide which state's law is more likely to provide the parties with predictable and expected results. *Drinkwater*, 290

Wis. 2d at 660. Since defendant is incorporated and located in Wisconsin and plaintiff's suit involves defendant's internal affairs, I conclude that Wisconsin law provides the parties with the more predictable result. Policyholders knew they were investing in a Wisconsin corporation with headquarters in Wisconsin. Applying Wisconsin law ensures that all policyholders will be treated the same regardless of where they purchased their policy, and that defendant will not be subjected to different obligations in different states.

The second factor, "maintenance of interstate and international order," is designed to ensure that "a jurisdiction which is minimally concerned [will] defer to a jurisdiction that is substantially concerned." *Id.* at 661. Here, all the states involved are more than minimally concerned. Wisconsin has an interest in regulating Wisconsin corporations doing business in Wisconsin and the states where policies were purchased have an interest in protecting their citizens. Thus, this factor is neutral.

The third factor is "simplification of the judicial task." Application of Wisconsin law, will almost always simplify the task of a Wisconsin court. *Id.* at 662. Thus, this factor supports applying Wisconsin law unless Wisconsin's law is "complex or uncertain" as compared to that of another jurisdiction. *Id.* Wisconsin contract law is well-developed, and the Wisconsin Court of Appeals has already held that defendant owes policyholders a fiduciary duty. *Noonan v. Northwestern Mut. Life Ins. Co.*, 276 Wis. 2d 33 (Ct. App. 2004) (denying defendant's motion to dismiss the Noonans' individual claims). Thus, applying Wisconsin law would simplify the judicial task.

The fourth factor is "advancement of the forum's governmental interest." As the *Beloit* court noted, "Wisconsin has an interest in having its laws applied to corporations,

6

and their officers and directors, transacting business within the state." *Beloit*, 270 Wis. 2d at 377. In *Beloit*, the court held that Wisconsin law governed the internal affairs of a Delaware corporation because it was headquartered in Wisconsin and its officers had allegedly breached their fiduciary duty while working in the state. *Id.* The same reasoning applies here. Defendant is incorporated and headquartered in Wisconsin, and, as evidenced by Wis. Stat. § 632.62, Wisconsin has a strong interest in regulating defendant's payment of dividends.

The fifth factor, "application of the better rule of law," requires selection of "the law that most adequately does justice to the parties and has the greatest likelihood of being applicable with justness in the future." *Beloit*, 270 Wis. 2d at 377 (*quoting Heath v. Zellmer*, 35 Wis. 2d 578, 598 (1967)). Wisconsin law best satisfies this requirement. As discussed, applying Wisconsin law ensures that all policyholders will have the same rights and that defendant will not be saddled with different obligations in different states.

For the foregoing reasons, I conclude that Wisconsin choice-of-law principles favor the application of Wisconsin law to the claims of the putative class members. Defendant's final argument is that, regardless of the choice-of-law analysis, some claims are governed by other states' law because in 1983 some policyholders signed an amendment to their contracts, which included language stating that the amendment was "governed by the law of the state in which the owner resides at the time that the Amendment is accepted by the Owner." (Decl. of Joshua D. Maggard Ex. O, ECF No. 14-15.)

Assuming the amendment governs some putative class members' claims, I conclude that the choice-of-law provision contained therein is unenforceable. Parties to a

Case 2:11-cv-00910-LA Filed 07/08/2012 Page 7 of 802 Document 192 RApp 186

contract can agree to a choice-of-law provision but not "at the expense of important public policies of a state whose law would be applicable if the parties' choice of law provision were disregarded." *Bush v. Nat'l School Studios, Inc.*, 139 Wis. 2d 635, 642 (1987). As discussed, absent the amendment's choice-of-law provision, Wisconsin law would govern the claims in question. Further, applying the laws of other states would undermine important Wisconsin public policies. Specifically, it would prevent Wisconsin from effectively regulating defendant's payment of dividends to participating policyholders. As the *Beloit* court held, Wisconsin has an important governmental interest in regulating the internal affairs of companies headquartered in Wisconsin, and Wis. Stat. § 632.62 makes it clear that this regulatory interest extends to the payment of dividends by defendant as a mutual company. Thus, the choice-of-law provision in the amendment cannot be applied to the claims in the present case.

For the foregoing reasons I find that the proposed expanded class action is within CAFA's corporate governance exception. The action solely involves claims that relate to defendant's internal affairs and the claims arise under Wisconsin law. As a result, this court lacks jurisdiction.

**THEREFORE, IT IS ORDERED** that plaintiffs' motion to remand [Docket #10] is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 20th day of August 2012.


s/ Lynn Adelman
LYNN ADELMAN
District Judge

8

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **MARLEEN M. LAPLANT, on her own** | ) | Case No. 2:11-CV-00910 |
| **behalf and on behalf of a class similarly** | ) | |
| **situated,** | ) | |
|   **Plaintiff,** | ) | |
| | ) | |
|   **v.** | ) | |
| | ) | |
| **THE NORTHWESTERN MUTUAL LIFE** | ) | |
| **INSURANCE COMPANY, a Wisconsin** | ) | |
| **mutual insurance corporation,** | ) | |
|   **Defendant.** | ) | |
| _____ | ) | |

<br><br><br>

## EXPERT REPORT OF MICHAEL J. MOORE, PH.D.

### June 28, 2013

## TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................................4

A.   Qualifications and Professional Experience.................................................................4

B.   Allegations and Assignment ............................................................................................5

    *1.   Description of putative class* ....................................................................................5

    *2.   Description of defendant* ........................................................................................7

    *3.   Allegations* ...............................................................................................................8

    *4.   Assignment*...............................................................................................................9

    *5.   Materials relied upon* .............................................................................................9

C.   Analytical Approach .......................................................................................................10

    *1.   Common impact and common proof of impact* ......................................................11

    *2.   Common damages methodology* ...........................................................................12

    *3.   Characterization of the but-for world* .................................................................14

D.   Summary of Opinions .....................................................................................................16

II.  BACKGROUND RELEVANT TO ANALYSIS ................................................................17

A.   Economics of Annuities and Investing...........................................................................17

    *1.   At-issue annuities*..................................................................................................17

    *2.   Economics of investing* .........................................................................................18

B.   NM's 1985 Change ...........................................................................................................20

III. ANALYSIS ASSUMING NM IMPLEMENTS AND PROVIDES NOTICE OF THE 1985 CHANGE.....22

A.   Establishing Impact Requires Individualized Inquiry ................................................23

    *1.   Some class members might not have behaved differently because they knew about the 1985 change in the actual world*....................................................................23

    *2.   Some class members might not have behaved differently because they would have chosen not to review disclosures* ..........................................................................24

    *3.   Some class members might not have behaved differently having reviewed a disclosure of the 1985 change* ...............................................................................26

B.   **For Those Who Would Have Behaved Differently in the But-For World, Estimating Damages Requires Individualized Inquiry**.....27

2

**IV. ANALYSIS ASSUMING NM SEEKS APPROVAL FOR THE 1985 CHANGE**............................**27**

**A.  Establishing Impact Requires Individualized Inquiry** ...............................................................**28**

    *1.  Some class members might have approved the change without reviewing it*..........................28

    *2.  Some class members might have approved the change because they agreed with it*..............28

**B.  For Those Who Would Not Have Approved the 1985 Change, Estimating Damages Requires Individualized Inquiry** .........................................................................................................................**29**

**V.  ANALYSIS ASSUMING NM DOES NOT IMPLEMENT THE 1985 CHANGE**.............................**29**

**A.  Many Members of the Putative Class Were Not Injured in this Scenario** ...............................**29**

**B.  Establishing Impact Requires Individualized Inquiry** ..............................................................**31**

    *1.  Investors respond to differentials in the rate of return* .......................................................32

    *2.  Some annuitants' responses to differential rates of return might have led them to be uninjured*............33

    *3.  Discerning which annuitants would have behaved differently in the but-for world requires individualized inquiry* ....................................................................................................34

**C.  For Those Potentially Injured, Estimating Damages Requires Individualized Inquiry** ..........**35**

**VI. ANALYSIS OF HOYER REPORT** ..................................................................................................**36**

**A.  Mr. Hoyer's Assignment Does Not Address Common Impact or Damages**...............................**36**

**B.  The Hoyer Report Does Not Establish Common Economic Impact Among Putative Class Members** ..**38**

**C.  A Common Methodology for Estimating Class-wide Damages Cannot Be Derived from the Hoyer Report**............................................................................................................................................**39**

    *1.  The Hoyer Report does not account for differences in annuitant behavior between the actual and but-for worlds* ...............................................................................................................39

    *2.  The Hoyer Report does not take into account all relevant characteristics of the at-issue policies* .........40

3

# I.  INTRODUCTION

## A.  Qualifications and Professional Experience

1.  My name is Michael J. Moore.  I am a Senior Lecturer at Yale University, with appointments in the Jackson Institute for Global Affairs, the School of Management, and the School of Public Health.  I currently teach courses in Competitive Strategy, Regulation and Antitrust, and Microeconomics.  Most recently, before joining the faculty at Yale in 2012, I was a Professor of Public Policy at the Batten School of Leadership and Public Policy at the University of Virginia, where I taught courses in Econometrics, Statistics, and Cost-Benefit Analysis.  I received my Ph.D. in Economics in 1984 from the University of Michigan.  My professional career has been devoted to research, teaching, and consulting in applied microeconomics, including the fields of industrial organization, law and economics, risk and insurance, regulatory and antitrust policy, health economics, econometrics, and statistics.  I have also served on the faculties of the University of Virginia (Darden, Law School, Economics, and Medical School), Duke University (Fuqua School of Business, Sanford Institute of Public Policy, and the Center for Aging, Duke Medical Center), the University of Chicago (Graduate School of Business), INSEAD, UC-Santa Barbara (Donald Bren School of the Environment), and the University of Georgia (Terry College of Business).  In 1998-99, I was the John M. Olin Fellow in Law and Economics at the George Stigler Center at the University of Chicago.

2.  I have published approximately 50 articles in scholarly journals, monographs, and proceedings, and have acted as referee for hundreds of articles submitted to the leading scholarly journals in economics.  My research has been funded by the National Science Foundation, the National Institutes for Health, and the U.S. Veteran's Administration.  My published research consists almost entirely of economic analyses of real world problems. I have won three awards for this research: the Kenneth Arrow Award for Best Paper in Health Economics (1993), the Kulp-Wright Award for Best Book in Risk and Insurance (1992), and the Best Article Award (1988) from the economics journal Economic Inquiry.

3.  My expertise in this matter lies in my general knowledge of economics, particularly law and economics, competition policy, the economics of risk, uncertainty, insurance, and asset pricing, and of the econometric and statistical methods often used to compute economic

4

damages. I have acted as an economic expert in a testifying or consulting capacity in a number of cases. I am being compensated for my work at the rate of $750 per hour. I have directed employees of Analysis Group, Inc., an economics research and consulting firm, to assist me in this assignment. I also receive compensation based on the professional fees of Analysis Group. My curriculum vitae and record of recent testimony are presented in Appendices A and B.

4.  I reserve the right to augment or alter any of the opinions expressed herein upon receipt of further evidence or information.

### B.    Allegations and Assignment

#### 1.    Description of putative class

5.  Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief ("Plaintiff's Brief") was filed on March 4, 2013 on behalf of Marleen M. LaPlant and a putative class of purchasers of Northwestern Mutual annuity products.[1] The putative class is defined in Plaintiff's Brief to be:

> All persons who (a) purchased a Northwestern Mutual Life Insurance Company Flexible Premium Annuity or Retirement Annuity (or other deferred, fixed annuity) in force and in its deferral period as of March 31, 1985, and (b) did not sign the 1983 Amendment Agreement while residing in a state other than Wisconsin, and their successors in interest. Excluded from the Class are any of Northwestern's officers, trustees and their family members or affiliates.[2, 3]

---

[1]  Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, March 4, 2013 ("Plaintiff's Brief").

[2]  Plaintiff's Brief, p. 13.

[3]  As used by Northwestern Mutual, "Flexible Premium Annuity" ("FPA") refers to an annuity for which the annuitant may make a range of different premium payments, "Retirement Annuity" ("RA") refers to an annuity with a fixed premium due at regular time intervals, and "Single Premium Retirement Annuity" ("SPRA") refers to an annuity with a single up-front premium payment. The data I have received to date from Northwestern Mutual include only RAs prior to 1971. The data include new RAs, FPAs and SRAs for 1971. After 1971, all new Northwestern Mutual annuities in the data were either FPAs or SPRAs.

5

6.      Marleen LaPlant entered into an annuity contract with Northwestern Mutual on May 1, 1975. Mrs. LaPlant surrendered her annuity on July 3, 2008 and retired on July 31, 2008.[4]  She was a resident of Wisconsin when she entered into her annuity contract, as well as when she surrendered it.[5]  Plaintiffs seek to add Bruce Williams as an additional representative of the class.  Mr. Williams holds two Northwestern Mutual annuities still in the accumulation phase: his Flexible Premium Annuity was purchased on July 27, 1984 and his Single Premium Retirement Annuity was purchased on May 3, 1984.[6]  Mr. Williams was a resident of Wisconsin when he purchased the two annuities and remains so today.[7]

7.      Using data provided by Northwestern Mutual as part of this litigation, I estimate that 19,735 policies are potentially at issue in this litigation.  These policies were purchased by 18,553 individual annuitants (some annuitants purchased more than one policy).  Exhibit 1 describes my determination of the putative class, starting with potential class annuities identified by Northwestern Mutual and accounting for exclusions as identified in the definition of the class in Plaintiff's Brief.[8]  Annuitants who signed Update '83 outside of Wisconsin are not

---

[4]   Deposition of Marleen LaPlant, September 9, 2009, p. 77:2-6 ("Q …When did you actually retire? A. July 31st of '08"); Exhibit 1 to deposition of Marleen LaPlant, September 9, 2009, pp. 121-124.

[5]   Complaint and Jury Demand, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, August 26, 2008 ("Complaint and Jury Demand, *LaPlant v. NM*"), ¶8 ("The plaintiff Marleen M. LaPlant resides at W7868 Riedel Lane, in the City of Fort Atkinson, Jefferson County, Wisconsin 53538. She entered into the annuity contract with Northwestern attached hereto as Exhibit A on May 1,1975) and  ¶13 ("she and all Class members were residents of the State of Wisconsin at the time that they purchased the Annuity contracts."); also see Exhibit 1 to deposition of Marleen LaPlant, September 9, 2009, pp. 121-126.

[6]   Plaintiff's Brief, pp. 16-17 ("In addition, plaintiff seeks to add trial witness Bruce Williams as an additional representative for the expanded Class."); Trial Exhibit 155, NM Policy of Bruce L. Williams, July 27, 1984 and Trial Exhibit 157, NM Policy of Bruce L. Williams, May 3, 1984.

[7]   Deposition of Bruce Williams, May 18, 2010,  p. 4:10-15 ("Q. Could you please give your address for the record as well? A. 10230 West Grange Avenue, Hales Corners, Wisconsin, 53130. Q. And how long have you lived at that address? A. Since '85, about 35 years I guess."). Also see Trial Exhibit 155, NM Policy of Bruce L. Williams, July 27, 1984.

[8]   Plaintiff's Brief, p. 13.

included in the class.[9]  Exhibit 2 shows the state of residence of class members with pre-MN annuities in-force as of end-of-year 2012.

8. Using data provided by Northwestern Mutual as part of this litigation, I estimate that of the 18,553 putative class members, 4,860 owned a Northwestern Mutual life insurance policy as of 2012.  Of these, 1,374 either terminated or surrendered their annuity policies before the beginning of 1994.  I also estimate that 9,931 concurrently owned a Pre-MN annuity and Northwestern Mutual life insurance policy for some time during the class period.[10]

9. Using data provided by Northwestern Mutual as part of this litigation, I estimate that of the 18,553 putative class members, 1,665 of them purchased a Current Rate Annuity ("CRA") from Northwestern Mutual at some point during the class period.[11]

## 2. Description of defendant

10. Northwestern Mutual Life Insurance Company ("NM") was founded in 1857.  According to its website, NM is the largest direct provider of individual life insurance in the United States. NM sells its policies through independent contractor agents and has more than 350 offices in the United States.[12]

11. As of 2013, annuities accounted for 9% of NM's $202 billion in assets under management. The company currently manages $18.3 billion in annuity assets, covering 325,500 client

---

[9]  Plaintiff's Brief, p. 1 ("After removal, the Seventh Circuit held that annuitants who signed an amendment with a choice of law clause outside of Wisconsin may not have Wisconsin-law claims. Accordingly, we seek in the present motion to certify a class combining all Annuitants who have Wisconsin law claims: those who did *not* sign the amendment and those who amended in Wisconsin.").  Update '83 was a policy amendment, also referred to as the 1983 Amendment Agreement, offered by Northwestern Mutual in 1983. The purpose of the amendment was to directly link a policy's annual dividends to the loans taken against that policy.

[10]  See Exhibit 3.

[11]  See Exhibit 4.  Northwestern Mutual introduced the Current Rate Annuities or "CRA" policies in 1985 as a replacement for its existing FPA and SPRA products. The CRAs were designed to track "new money" rates by paying an interest rate on deposits that was declared monthly by the company (see Minutes of Insurance Product & Marketing Committee, September 26, 1984, ML2_NM_4832 to ML2_NM_4836, for additional description; also see Planning Committee Minutes, July 19, 1984, ML2_NM_4877 to ML2_NM_4882).

[12]  Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013.

7

R. App 194

contracts.[13]   In addition to annuities, NM provides life, disability, and long-term care insurance policies as well as other investment products and services.[14]   In 1985, the company managed a total of $18 billion in assets (approximately $39.3 billion in 2013 dollars).[15, 16]

### 3.    Allegations

12.   Plaintiffs allege that NM has violated the terms of at-issue (pre-MN) annuity contracts starting in 1985 by unilaterally changing the basis on which it credits Annuitants' accounts (the "1985 change").[17]   Before the change, plaintiffs allege these credits were based on a dividend interest rate derived from NM's divisible surplus.[18]   After the change, plaintiffs allege credits were based on the interest earned on a segmented account of short to medium term investments.[19]   Plaintiffs further allege that NM did not notify Annuitants of the 1985 change, nor did it seek their approval of such a change.[20]   Plaintiffs' brief in support of class certification contains a section titled, "*Damages Can be Calculated on a Class-Wide Basis,*" in which plaintiffs purport to advance a common, formulaic method to calculate class-wide

---

[13]   Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013.

[14]   Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013.

[15]   Northwestern Mutual Life, Trial Exhibit 285, "1985 Annual Report".

[16]   In January 2013, the Consumer Price Index (CPI) was approximately 2.18 times greater than the CPI in January 1985. See U.S. Department of Labor Bureau of Labor Statistics, "Consumer Price Index," last updated June 18, 2013, available at <ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt>, accessed on June 24, 2013.

[17]   Complaint and Jury Demand, *LaPlant v. NM,* ¶2 ("To initiate this scheme, Northwestern unilaterally and deceptively altered the basis on which it credited the accounts of Annuitants.").

[18]   See "Retirement Annuities," ML_NML3_0446.

[19]   Complaint and Jury Demand, *LaPlant v. NM,* ¶2 ("Ignoring the Annuity contract's plain requirement to credit the Annuitants' accounts with a genuine share of the Company's divisible surplus as dividends, Northwestern instead has credited Annuitants with what it continues to call 'dividends' but in fact is merely the interest earned on an account limited to some short-term bonds exclusively and secretly chosen by Northwestern.").

[20]   Complaint and Jury Demand, *LaPlant v. NM,* ¶33 ("Northwestern never solicited or obtained the Annuitants' agreement to this 1985 change, nor did it even disclose the change to them in its Annual Reports to policyholders of otherwise."); Complaint and Jury Demand, *LaPlant v. NM,* ¶35 ("Because Northwestern did not follow its own policy and practice of informing the Annuitants of the change and seeking their written consent to alter the terms of the Annuities, the Annuitants were left unaware and without a reasonable means for learning that Northwestern was no longer crediting genuine dividends to their accounts.").

damages.[21]  Plaintiffs seek to certify a nationwide class of Pre-MN annuity holders, asserting 1) that all such Annuitants suffered a common injury as the result of NM's alleged acts, and 2) that damages can be computed on a common, formulaic basis for the entire class.[22]

### 4.  Assignment

13.  I have been asked by Counsel for Defendant NM to assess whether the economic facts and evidence support a finding that all putative members of the class suffered "impact" (i.e., whether impact is "common"), whether proof of impact is common, and whether damages can be computed for all putative members of the class using a common methodology.  I have further been asked to evaluate whether Mr. Robert Hoyer's Expert Report, submitted on behalf of Plaintiffs on March 4, 2013, offers a method of proof of impact that is common to all class members, whether he proves that impact is common, and whether he provides a viable common, formulaic methodology for computing damages to individual class members.[23]

### 5.  Materials relied upon

14.  In preparing my report, I was assisted by a staff of economists at Analysis Group, Inc.  All opinions are my own, and all decisions concerning analyses to be conducted and included are also my own.

15.  I reviewed documents and materials produced by Plaintiffs and Defendants in this matter.  See Appendix C for a list of documents reviewed.  In some cases where there was a

---

[21]  Plaintiff's Brief, pp. 25-26 ("Plaintiff is prepared to prove injunctive and damages relief on a class-wide basis…Here the effect of the 1985 Change on policyholders can be calculated mechanically using common evidence, without resort to individualized trials. …The difference between the 'dividend' rate used pursuant to the 1985 Change and the portfolio-based rate that should have been used can readily be determined from Northwestern's records.").

[22]  Complaint and Jury Demand, *LaPlant v. NM*, ¶41 ("Northwestern's actions have injured and will continue to injure Annuitants by under-crediting their accounts by millions of dollars per year."); Plaintiff's Brief, p. 2 ("Plaintiff demonstrates in the accompanying expert report of Robert Hoyer (App. 727-52) how damages can be calculated on a formulaic basis for each class member.").

[23]  See Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013 ("Hoyer Report").

9

voluminous record, I identified areas in which I was interested, and instructed my research team to examine documents for relevant evidence. In all of those cases, I conducted my own independent reviews of the evidence to confirm that my instructions had been carried out effectively. My inquiry into this matter is ongoing, and I reserve the right to consider any new evidence of which I might become aware and, if necessary based on this new evidence, to alter my opinions.

### C. Analytical Approach

16. I understand as an economist that there are three thresholds under consideration in my assignment - whether impact is common, whether determination of impact is amenable to common proof, and whether there is available a viable common damages methodology. In particular, is the injury resulting from the alleged harm provable using evidence common to the class, and is there a methodology that allows the measurement of damages on a class-wide basis using a common method or formula?[24]

17. The foundation of my analysis is the determination of impact and the measurement of damages at the individual level. If it can be shown that all, or almost all, individuals have suffered injury using "common" evidence, then impact is "common," and the evidence used constitutes "common proof." If all, or almost all, individual damage calculations can be made using the same evidence and method, then a common damages method is available.

18. To determine individual impact and damages I compare a plaintiff's economic position in the actual world, where the alleged misconduct occurred, with his or her economic position in the relevant counterfactual or "but-for" world, i.e., the world as it would have been had the alleged misconduct not occurred. As summarized by Allen, Hall and Lazear (2011), "The first step in a damages study is the translation of the legal theory of the harmful event into an

---

[24] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426,1430 (2013) ("The District Court held, and it is uncontested here, that to meet the predominance requirement respondents had to show (1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of proof at trial through evidence that [was] common to the class rather than individual to its members'; and (2) that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.'").

10

analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position….Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved."[25]

### 1. Common impact and common proof of impact

19. I consider *individual* impact (injury) to be a binary outcome: either a plaintiff is injured or not. An *injured* plaintiff is one who is worse off in the actual world than in the applicable but-for world, absent the alleged misconduct. In my understanding as an economist, if all or almost all plaintiffs suffer the same type of impact as a result of Defendant's actions at issue, then the *common impact* threshold for class certification is satisfied. I interpret *amenability to common proof* to mean that proof that one plaintiff was injured constitutes proof that all, or almost all, plaintiffs were injured.

20. In my opinion as an economist, common proof of class-wide impact requires demonstrating that 1) a given plaintiff, such as Mrs. LaPlant, would have had a better economic outcome in the applicable but-for world than in the actual world, and that 2) the same type of evidence used to show Mrs. LaPlant's injury also shows that all, or almost all, of the other class members would also have had a better outcome in the applicable but-for world than in the actual world.

---

[25] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Losses in Damages Awards," in *Reference Manual on Scientific Evidence*, The National Academies Press, 2011 ("Allen, Hall, and Lazear"), p. 432.

See also ABA Section of Antitrust Law, *Proving Antitrust Damages, Legal and Economic Issues*, 2nd Edition, American Bar Association, 2010, p. 53 ("The essential starting point for any damages quantification is the but-for premise that the defendant's violation did not occur. That premise is the foundation for constructing a hypothetical 'but-for world,' which, when compared to the plaintiff's actual experience, should isolate the effect of the violation on the plaintiff from the effects of all other events. A quantification of the difference between the plaintiff's experience in the but-for and actual worlds determines the amount of damages.").

11

R. App 198

### 2.    Common damages methodology

21.    While I consider impact to be binary, I consider damages to be a "continuous" outcome, like temperature or weight.  Calculating individual damages requires quantifying the difference in economic outcomes between the actual and the but-for worlds.  In my opinion, the difference between rates of return in the actual and but-for worlds constitute the most meaningful measure of an individual's changed economic position due to the alleged misconduct in this case.  This difference, if found to be important, would then be used to compute damages based on facts such as the cash value of the policy, borrowed amounts, and date of termination.  Using this measure, putative class members will have been injured if the return on their annuity investment in the actual world was less than the return on whatever investment program they might have implemented in the but-for world.  Damages is the measure of the extent of that injury.

22.    Calculating damages for any individual in this case requires two things: First, identification of the appropriate but-for world, reflecting the actions NM would have taken absent the alleged misconduct, and second, determination of the counterfactual returns to individual class members, based on their most likely course of action in this but-for world.  For example, some NM annuitants in the but-for world might have contributed less to their NM annuities than they did in the actual world, or perhaps borrowed more from their policies in order to take advantage of higher returns elsewhere. For each individual annuitant, such alternative investment strategies would have to be identified and the returns on the alternatives quantified and compared to actual returns for each member of the class.

23.    More generally, any damages calculation will require a combination of factual and behavioral evidence from both the actual and but-for worlds.  Evidence about the actual world can often be gathered from existing records that include many important "actual world facts."  However, evidence about the but-for world is not so readily available. While some facts will be the same in both worlds, such as age and gender, others, particularly those related to individual investment decisions and the associated returns, will not.  Evidence of much of the relevant behavior in the but-for world, particularly evidence regarding individual

12

investment decisions, is necessarily based on inferences made using economic theory and empirical evidence, and not amenable to determination via formula.[26]

24.  For damages to be determined for all class members on a class-wide basis, they must be quantifiable through a common, formulaic approach.  For the formulaic approach to be common, it must "work" for every, or almost every, class member.  For it to work for almost every class member, it must rely on the same factual and behavioral evidence from both the actual and the but-for worlds for each class member, and the gathering of this evidence must not require individualized inquiry.

25.  To take a concrete example, consider named plaintiff Mrs. LaPlant.  In order to compute how much more she would have earned in the but-for world than she did in the actual world, I would have to make predictions about her behavior in the but-for world.  For example, I might, based on evidence from the record or from additional interviews, predict that Mrs. LaPlant would have terminated her policy sooner in the but-for world than she did in the actual world.  This might be the case, for example, because she might have earned a lower return in the but-for world and terminated her policy earlier in order to earn a higher return elsewhere.  To calculate her but-for returns, I would need to predict when she would have terminated her policy and where she would have invested her money in the but-for world.  Using these predictions, I would calculate her but-for returns.  I would then subtract her actual returns from her but-for returns in each year to arrive at an estimate of her annual lost returns.

26.  If my predictions about the behavior of each annuitant in the but-for world are identical to my predictions about Mrs. LaPlant's behavior, then proof that Mrs. LaPlant was injured would constitute proof that all class members were injured.  If the predictions are not identical for other class members because, for example, some class members might have terminated, borrowed from, or reduced their contributions to their annuities in order to invest elsewhere in the but-for world in a manner different from Mrs. LaPlant, then the nature of the

---

[26]  Statistical models that might be used to predict counterfactual behavior are, in the absence of a controlled experiment, fraught with econometric problems.  See Angrist, Joshua D., and Alan B. Krueger, "Empirical strategies in labor economics," in *Handbook of Labor Economics*, Vol. 3, 1999, pp. 1277-1366.

13

inquiry and the formula utilized do not work either as a common method of proof of impact or as a common method to compute damages.

27. A common damages formula can allow for differences in certain individual facts, observable in the actual world and invariant in moving to the but-for world, that act as inputs into the formula (e.g. individual class members have policies with different cash values). The dollar amount of damages can therefore differ by class member. However, the damages formula cannot depend on idiosyncratic, hypothetical evidence. If individualized inquiry is required to establish these hypothetical conditions (e.g., "what would you have done with your annuity policy?"), a common, formulaic approach to damages does not exist.

### 3. Characterization of the but-for world

28. A clear statement about the but-for world is an important step in a damages analysis. As described by Allen, Hall, and Lazear (2011), this includes "a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario."[27]

29. In the present case, one central question for determining individual impact concerns which "proper actions" NM would have taken as alternatives to the action at issue that it did take in the actual world. This is a "common question," applicable to all plaintiffs. It needs to be answered in order to set the context for evaluating how individual plaintiffs would have responded. There are at least three possible scenarios regarding the characterization of NM's behavior in the but-for world:

- Notice Scenario: This but-for world is one in which the defendant, NM, directly informed the individual plaintiffs of its decision to invest in, and pay, policy dividends based on the segmented account. This but-for world is consistent with a finding that NM was entitled to change the policy but should have disclosed the change in a specific manner.

- Consent Scenario: This but-for world is one in which NM requested approval from policyholders for the 1985 change. Using the '83 change as a benchmark example,

---

[27] Allen, Hall, and Lazear, p. 432.

14

NM could have implemented the 1985 change only for those policyholders who approved it, which could in turn affect the dividends of all policyholders. This but-for world is consistent with a finding that NM needed approval from policyholders to modify how their annuity dividends were calculated.

- No Change Scenario: This but-for world is one in which NM made no change in how it determined dividends for the pre-MN annuity policies.[28]

30.    The central question for determining individual impact concerns what action(s) each annuitant would have taken in response to NM's behavior in the but-for world. Possible annuitant responses include at least the following, each of which requires a different approach to computing the difference in returns and therefore impact:

- Retain the pre-MN NM annuity with no change to contribution or borrowing levels over time relative to what they did in the actual world.[29]

- Retain the pre-MN NM annuity while changing either the level of contributions or the borrowing level relative to what they did in the actual world. In order to examine impact and calculate damages in this circumstance, I would need to know the timing and the magnitude of the change for each annuitant, as well as the alternative use to which the annuitant would have put the extra cash at his or her disposal. For example, annuitants could increase their borrowing (in varying amounts across annuitants) in order to invest in an alternative vehicle with a higher return.

- Terminate the pre-MN annuity and transfer its cash value to a different investment vehicle. In order to examine impact and calculate damages in this circumstance, I would need to know the termination date and the returns on the new, alternative investment for each annuitant who took this action.

31.    I conduct my analysis below for each of the three baseline scenarios regarding NM's behavior in the but-for world outlined above. I then consider what actions annuitants might have taken in response to each scenario, using available deposition testimony and documentary evidence concerning annuitant behavior in the actual world.

---

[28]    This is the but-for world regarding NM's behavior advanced by Plaintiffs' expert. See Hoyer Report, ¶54 ("This report quantifies the DIRs which would have been credited to Pre-MN annuity policyholders But-For the 1985 Change.").

[29]    This appears to be the sole plaintiff response considered by Mr. Hoyer. See Section VI.C.1. below and Hoyer Report, ¶7 ("Prospective relief involves NML crediting to Pre-MN annuity policyholders' accounts the additional amount that would have accumulated 'But-For' the 1985 Change….").

15

### D.     Summary of Opinions

32.   I have three principal conclusions.   First, regardless of the appropriate baseline scenario regarding NM's behavior in the but-for world, I find that the economic facts and evidence are inconsistent with a finding that all putative class members suffered injury, much less a common injury.   For example:

- Had NM disclosed the 1985 change, the evidence indicates that some putative class members would have behaved the same way they did in the actual world.   These individuals would have the same outcome in the but-for world as they had in the actual world and therefore are uninjured.

- Had NM sought approval for the 1985 change, the evidence suggests that some putative class members would have approved the change and behaved the same way they did in the actual world.   These individuals would have the same outcome in the but-for world as they had in the actual world and therefore are uninjured.

- Had NM not made the 1985 change, the evidence suggests that, absent any difference in behavior, approximately 30 percent of the class were not financially injured by the 1985 change.

33.   Second, I find that damages cannot be computed for all putative class members using a common methodology.   In each of the three baseline scenarios, the evidence suggests that some policyholders' behavior would have been different in the but-for world because of disclosure or because they would have faced but-for dividend interest rates that would have been different than the actual world dividend interest rates.   Those policyholders whose behavior would have been different might have suffered damages, but the extent of their financial harm depends on their behavior in the but-for world.   For example, some might have terminated their policies earlier, while others might have altered their premium payments.   Without individualized inquiry, it is not possible to determine the financial injury suffered by each policyholder.   Furthermore, the determination that one policyholder would have been injured in this scenario tells us nothing about whether any others would also have been injured.

34.   Finally, I note that Mr. Hoyer's Expert Report does not address the issue of class-wide proof of common impact, and I conclude that it does not provide a common method for calculating damages.    In fact, Mr. Hoyer's calculations and his deposition testimony *confirm* my affirmative opinion that impact was not common.   His results indicate that up to 30 percent of pre-MN policyholders might have suffered no financial injury as a result of the 1985

16

change. Mr. Hoyer's analysis is incomplete because he considers only one of several possible but-for worlds regarding NM's behavior. He does not take into account that policyholder behavior might have been different in the but-for world than in the actual world. In addition, Mr. Hoyer makes several errors in his calculation of differences in returns.

## II.    BACKGROUND RELEVANT TO ANALYSIS

### A.    Economics of Annuities and Investing

#### 1.    At-issue annuities

35.    An annuity is a contract with a life insurance company that guarantees payments at regular intervals for a particular period of time. It provides the annuitant with a minimum income guarantee, with the minimum level depending on the level of contributions to the annuity.[30]

36.    The annuities at issue in this case are "deferred" annuities. The annuitant contributes to the policy during an accumulation period and receives payments from the policy during the distribution period. The annuities at issue have several characteristics that make them potentially attractive investment vehicles: annuities offer a guaranteed minimum investment return; annuitants can terminate their policy and withdraw the cash value of accumulated funds; contributions to some annuities are tax-deferred; and annuitants can borrow a portion of the cash value of the policy at a contractually determined interest rate.[31]

37.    The annuities at issue were also customizable; policyholders had a wide variety of choices in purchasing and managing their policies. Exhibit 5 presents selected characteristics of the at-issue annuities that can vary across policies. For example, annuitants could choose whether to purchase an FPA or an SPRA. Annuitants could choose a dividend payout option and a maturity option.

---

[30]    For general background information on annuities, see U.S. Securities and Exchange Commission, "Annuities," April 6, 2011, available at <http://www.sec.gov/answers/annuity.htm>, accessed on June 17, 2013. Also, see Sullivan, Paul, "Annuities: What You Need to Know," *The New York Times*, January 27, 2009, available at <http://www.nytimes.com/2009/01/28/your-money/annuities/primerannuities.html?ref=annuities>, accessed on June 17, 2013.

[31]    See Trial Exhibit 121, LaPlant Contract; Trial Exhibit 189, Dividend Interest Rate Tables.

38.     In addition to the loan rate, NM annuity policies specified fees related to administrative and transaction costs that the company charged to its policyholders. For example, named Plaintiff Marleen LaPlant's annuity contract specified a front-end load fee of 10% per premium payment, a $0.50 "collection charge" per premium payment, and a $10 per year "policy fee."[32]

## 2.     Economics of investing

39.     Financial economists define investment to be the purchase of an asset with the goal of accruing pecuniary returns from this asset in the future.[33]  Two principal characteristics of any financial asset are risk and return.[34]  Return is the growth rate (percent change) in the value of the asset per unit of time.  Risk measures are based on variability in the return.

40.     Investor preferences are classified as either risk-averse, risk-neutral, or risk-loving. Risk aversion is defined as a preference for less variability at any given level of return.[35]  The typical assumption in the finance literature is that investors are risk-averse.  Risk aversion is empirically consistent with observed behavior in most contexts.[36]  Risk preferences, including the degree of risk-aversion, vary widely across investors.[37]

---

[32]   See Trial Exhibit 121, LaPlant Contract.

[33]   See, for example, Downes, John and Jordan E. Goodman, *Dictionary of Finance and Investment Terms*, Barron's Educational Series, 2010, pp. 366-367.

[34]   Depending on the context, returns can either be expected returns (i.e., those that will likely accrue in the future) or "historical" returns (i.e., those actually earned in the past).  I will use "return" for each, unless the use of the modifying adjective is called for.

[35]   See, for example, Holt, Charles A. and Susan K. Laury, "Risk Aversion and Incentive Effects," *The American Economic Review*, Vol. 92, No. 5, Dec., 2002 ("Holt and Laury"), pp. 1644-1655.

[36]   See, for example, Holt and Laury, pp. 1649-1654.

[37]   Vitt, Lois A., "Risk Tolerance," in *Encyclopedia of Retirement and Finance*, Vol. 1, Greenwood Publishing Group, Inc. 2003, p. 688 ("Subjective risk tolerance varies by age, gender, education, and other factors. However, financial advisors should not assume that any unique individual shares the average characteristics of his or her group. Within each group—for instance, among older Americans—there is a wide variation of subjective and objective risk tolerance.").

41.	Portfolio theory shows how it is possible to construct a set of asset portfolios that maximize expected return at every given level of risk.[38]  Higher expected return portfolios will entail higher risks.  The particular portfolio chosen from this set by an individual investor will depend on that individual's attitudes towards risk and expected return, with more risk-averse investors tending to choose safer, less risky portfolios.[39]

42.	Another characteristic that determines demand for a particular asset is its liquidity, or how easy it is to get cash out of the investment. Because more liquidity is preferred to less, less liquid assets will pay a premium over more liquid assets in equilibrium.  Important determinants of the demand for liquidity include the investor's time horizon and expectations about the future rate of inflation, which vary across individuals. Therefore, the demand for liquidity will vary across individual investors.[40]

43.	In sum, investors will construct portfolios consistent with their preferences for expected return, risk, and liquidity, given that assets with higher expected returns are associated with higher risks and may be associated with lower liquidity.  One investor might put all his or her money into low risk-low expected return Treasury bonds, and another might put all his or her money into high risk-high expected return stocks.  Yet another might construct a portfolio that combines the two.

44.	Many investors include annuities as part of a larger investment portfolio, which would be constructed in its entirety to generate expected returns with a risk/return profile consistent with the preferences of the investor.  The academic literature in finance provides evidence that individual investors will seek to rebalance their investment portfolios in response to changes in relative rates of return or risks on different assets within and outside their

---

[38]	For a detailed explanation of risk, return and diversification, see Brealey, Richard A. and Stewart C. Myers, Principles of Corporate Finance, McGraw-Hill, Inc., 1991, 4th Edition ("Brealey and Myers"), Chapter 7.

[39]	For additional background on investment, risk and return, see Brealey and Myers.

[40]	Marquard, Steven, *The Distortion Theory of Macro-Economic Forecasting: A Guide for Economists and Investors*, Greenwood Publishing Group, Inc. 1994, p. 41 ("[T]he liquidity preference ratio, the ratio between an individual's cash balance and the market value of his physical good.... varies from individual to individual just as any other valuation of different options does. Variations reflect different shapes of individuals' revenue lines and different personal time preferences. Each of these trace to personal natures and circumstances.").

19

portfolio.[41]  Economic analysis also shows, in particular, that investors will decrease their contributions to pensions when the expected rate of return on other forms of savings increases relative to the expected rate of return on pension deposits.[42]

### B.    NM's 1985 Change

45.    NM's decision to change the basis for calculation of returns to pre-MN annuities in March of 1985 was implemented in response to a change in the economic environment.  In the early 1980s, shorter term investments were earning more than longer term investments.[43]  NM's investment portfolio was concentrated in longer term investments, and the Dividend Interest Rate ("DIR"), which formed the basis of its calculation of returns to both insurance and annuities up to that point, reflected the lower long term returns.[44]

46.    According to NM, some NM annuitants responded to changing relative interest rates by reducing premium payments and increasing policy surrenders.[45]   In other words, they apparently took their funds out of NM accounts in order to earn a higher return elsewhere.[46]

---

[41]    See, for example, Rosen, Kenneth T. and Larry Katz, "Money Market Mutual Funds: An Experiment in Ad Hoc Deregulation: A Note," *The Journal of Finance*, Vol. 38, No. 3, Jun., 1983, pp. 1011-1017; Gibson, William E. and James L. Pierce, "Deposit Demand, 'Hot Money,' and the Viability of Thrift Institutions," *Brookings Papers on Economic Activity*, Vol. 1974, No. 3, 1974, pp. 593-636.

[42]    Bernheim, B. Douglas and John B. Shoven, Pension Funding and Saving, in *Pensions in the U.S. Economy*, Zvi Bodie, John B. Shoven and David A. Wise (Eds.)*,* University of Chicago Press, 1988, pp. 85-114.

[43]    See, for example, Downes, John and Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms*, Barron's Educational Series, 2010, p. 366. ("Normally, lenders receive a higher yield when committing their money for a longer period of time; this situation is called a POSITIVE YIELD CURVE.  An inverted YIELD CURVE occurs when a surge in demand for short-term credit drives up short-term rates on instruments like Treasury bills and money-market funds, while long-term rates move up more slowly, since borrowers are not willing to commit themselves to paying high interest rates for many years.  This situation happened in the early 1980s, when short-term interest rates were around 20%, while long-term rates went up to only 16% or 17%. The existence of an inverted yield curve can be a sign of an unhealthy economy, marked by high inflation and low levels of confidence.").

[44]    Plaintiff's Brief, Appendix Exhibit 39, "Explanation of 1986 Dividend Scale for MM and Prior Series Deferred Annuities," p. 2 ("The company experienced very heavy surrenders on annuities during 1981 and 1982 when the long-term portfolio interest rate got so far out of line with prevailing interest rates in the marketplace.").

[45]    Employee Plans Product Development Committee, "July 29th Meeting Minutes," ML2_NM_4552 to ML2_NM_4569 at ML2_NM_4553.

[46]    "MN Series Annuities – Product Information Release," ML_NML2_0513 to ML_NML2_0519 at ML_NML2_517 ("We believe that, over the long term, an annuity owner may be more satisfied with an

This led to concerns on the part of NM regarding withdrawals in excess of reserves. Insurance companies, in structuring their investment portfolios, will invest a portion of policyholder premiums, leaving the remainder available for withdrawals, policy loans, and terminations.[47] With terminations accelerating, NM (and other insurance companies) faced an increased risk that it would have to liquidate long term investments in order to meet short term demands for funds.[48] Early liquidation of long term investments can often lead to losses, which would reduce the surplus available to all policyholders. In order to address this "disintermediation" problem, NM created a segmented fund of short to medium term assets that would provide the basis for the returns to Pre-MN annuities.[49] The fact of disintermediation, in addition to regulatory requirements,[50] thus elicited the 1985 change.

---

investment that more closely tracks the interest rates with which he is most familiar – 'new money' CDs, U.S. Treasury bills, etc. – than an investment based on a longer term portfolio which can vary substantially from those 'familiar' rates….Increasingly over the past 20 years, Northwestern Mutual's annuity products have failed to meet annuity policyowners' expectations for an interest rate that moves up with 'current rates.' For 13 out of the last 19 years, NML's annuity dividend interest rate has been below the 'current rate' as measured by the one year U.S. Treasury bill yield….As the difference between the portfolio rate and the policyowner's expectations for 'current rates' got larger and larger, and as policyowners became increasingly aware of 'current rate' alternatives, surrenders increased and new sales decreased to the point that surrenders exceeded premium for new annuity sales by a margin of 19 to 1 in 1981.").

[47]  Bardrinath, SG, Jayant R. Kale and Harley E. Ryan, Jr., "Characteristics of Common Stock Holdings of Insurance Companies," *The Journal of Risk and Insurance*, Vol. 63, No. 1, Mar., 1996, p. 49 ("At the most fundamental level, an insurance company buys risk from an individual or an institution for which it is paid a premium. These premiums are received from a large number of clients, and claims are paid to a significantly smaller number. In other words, the insurer receives a steady stream of relatively small periodic premiums, and its relatively larger liabilities occur randomly. These contingent liabilities to be paid will come partly from its equity base but primarily from the accumulated premiums. For the company to be in a sound financial position, therefore, these premiums must be invested in a manner such that it is easily able to honor these claims.").

[48]  Bardrinath, SG, Jayant R. Kale and Harley E. Ryan, Jr., "Characteristics of Common Stock Holdings of Insurance Companies," *The Journal of Risk and Insurance*, Vol. 63, No. 1, Mar., 1996, p. 68 footnote 21 ("On several different occasions in the last 20 years, inflation and high interest rates have forced life insurance companies to accommodate extraordinary cash outflows. As interest rates reached record levels in the 1980s, policyholders took advantage of the option to borrow some or all of the cash value in their policies at below-market loan rates as permissible in the policy contract. This, coupled with the surrender of policies for cash value, may have heightened the preoccupation of insurance company portfolio managers with steady cash flow sources, even though they are, in theory, long-term investors.").

[49]  See Trial Exhibit 356, a letter from Mr. William E. Ebel, a Northwestern Mutual Life General Agent, to an annuity holder ("The experience of the recent past led us to establish a separate segmented portfolio for annuities and move to a current rate basis for new issues. We have been concerned for some time about the severe disintermediation, or investment anti-selection, that we were experiencing on the part of our annuity

21

47.     Relevant but-for worlds can keep the 1985 change intact but alter the manner in which information about the change was conveyed.   Alternative but-for worlds, such as one in which NM made no change and let the disintermediation continue, can also be evaluated.   In each instance, the analysis must ask 1) whether all annuitants were injured, and 2) whether damages can be computed using a common formula or methodology, given the assumed counterfactual. For purposes of my report, I am assuming *arguendo* that plaintiffs' allegations about NM's conduct in the actual world are correct.

## III.     ANALYSIS ASSUMING NM IMPLEMENTS AND PROVIDES NOTICE OF THE 1985 CHANGE

48.     One possible but-for world is one in which NM makes the change in annuity dividend calculations and informs its policyholders of the change directly.[51]

49.     In this but-for world, determining impact for any given policyholder would depend on whether being notified of the 1985 change affects the behavior of that policyholder.   A plaintiff who would have done the same thing if directly notified of the 1985 change (the but-for world) as he did in the actual world cannot have been injured, since the but-for and actual returns for this investor would be identical.   Furthermore, a plaintiff who would have changed his behavior if notified would only have been injured if his alternative strategy in the but-for world would have made him better off than in the actual world.   Since but-for

---

policyholders and annuity purchasers. During times when new-money rates were particularly high, compared to our portfolio rate, we saw significant increases in the surrender of annuity values. Similarly, at times when new-money rates were lower than our portfolio basis, we saw a significant increase in new premium. These kinds of actions coupled with a portfolio-based approach which reflects the longer-term, less volatile investment pattern for life insurance produces negative results for the annuity policyowners, and also for our life policyowners. The net impact is to reduce the overall portfolio rate as a result of having fewer funds available to invest at high interest rates and more funds to invest when rates are lower….As noted, we have been concerned and seeking a solution for this problem for some time. We decided that the best way to deal with it was to develop a current-rate-based annuity for new sales. But this only satisfies half the problem. We also needed to move our portfolio-based inforce annuities to a similar interest basis in order to avoid the other half of the investment anti-selection.").

[50]     Plaintiff's Brief, Appendix 39, "Explanation of 1986 Dividend Scale for MM and Prior Series Deferred Annuities," p. 2. ("The New York Insurance Department passed a law this last summer requiring penalty reserves for companies that are mismatched by more than three years.  Segmented accounts are necessary to comply with these requirements.").

[51]     As described below, there is evidence that some annuitants were, in fact, informed of the change.

returns can only be determined through the analysis of individual responses to notification of the change, proof of impact here is individualized rather than common.

### A. Establishing Impact Requires Individualized Inquiry

50. NM communicates with its policyholders both directly through mailed statements and disclosures and indirectly through independent contractor agents.[52] The evidence presented below suggests that even had NM notified all plaintiffs via direct communication of its decision to invest in and pay policy dividends out of the segmented account, some class members would not have altered their behavior and therefore are not injured.

#### 1. Some class members might not have behaved differently because they knew about the 1985 change in the actual world

51. Some putative class members knew about the change in the actual world even without a formal disclosure and did not change their behavior. Thus their behavior in the actual and but-for worlds would be the same. These individuals suffered no financial impact.

52. Some annuitants were informed about the 1985 change by their NM insurance agent, or through direct communication with the company. For example, agent Michael Holden testified that he received information in 1985 regarding the 1985 change, and that he was certain that he discussed the new MN series annuities with his clients.[53] While some annuitants might have learned of the 1985 change from their agents, others received direct

---

[52] For instance, policyholders were informed of "Update '83" via a letter and an accompanying informational brochure (see Trial Exhibit 312, Documentation associated with Update '83, September 28, 1983).Policyholders also received annual reports from Northwestern Mutual and had periodic contact with their agents (see Deposition of William J. Timmers, July 23, 2010, p. 14:19-23, "Q. Do you know whether you receive an annual report from Northwestern Mutual that's not your account statement but a general report on the company? A. You know, I used to, but lately I don't know if I have or not, but I used to…" Deposition of Janet Reichart, June 16, 2010, p. 14:12-14 "Q. Did you receive annual reports from Northwestern Mutual? A. An annual report, yes." Deposition of John Komives, May 18, 2010, p. 18:4-11 "Q. How often do you meet with Mr. Gardner? A. Once a year. Q. And that's an in-person meeting? A. No, in the last seven or eight years it's -- he sends me an update on my policies and asks if there's any reason for us to get together. He's open to -- he's invited me to chat with him, but I haven't felt the need.").

[53] Deposition of Michael J. Holden, May 25, 2010, p. 31:15-22 ("Q …Do you remember receiving information in 1985 regarding the new MN series annuity? A. I'm sure -- I'm sure I did, yes. Q. Okay. Do you remember having any discussions with any of your clients regarding the new MN series annuities? A. I'm sure I did, but I have -- I can't remember who or what was said.").

communication regarding the change from NM in the form of letters or email.[54] If annuitants did not change their behavior after learning of the change in the actual world, this suggests that they might not have changed their behavior when notified (possibly at an earlier point in time) in the but-for world either and therefore are uninjured.

53.    Some annuitants noticed the 1985 change because they owned other NM policies that were yielding returns different from those on their pre-MN policies.  For example, Daniel Noonan noted the difference between the annuity dividend rate and the dividend rate on his NM insurance policy "sometime in early 2000."[55]  Exhibit 3 shows the number of class members with life and annuity policies in-force in the same year during the class period, as well as the total number of class members who own a life insurance policy as of 2012.  Approximately 53.5 percent of the putative class simultaneously owned a pre-MN annuity and a life insurance policy at some point during the class period.  Whether and when each of these investors noticed the change in dividend rates through a comparison of dividend rates across policies, and whether each would have behaved differently if notified by NM at some time prior to the fact of noticing the difference, is an individualized question.

### 2.    Some class members might not have behaved differently because they would have chosen not to review disclosures

54.    Empirical evidence indicates that some consumers do not conduct a thorough review of contracts that they sign and disclosures and financial statements that they receive.  For

---

[54]  See, for example, a June 7, 1990 letter from NM to annuitant, an April 7, 1998 email from NM to annuitant and a September 14, 1999 letter from NM to annuitant as cited in Northwestern Mutual's Memorandum in Opposition to Plaintiff's Motion for Class Certification, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-cv-00128-SPM, April 15, 2011, pp. 116-119. At least one of these annuitants continued to hold the annuity through at least 2012 without withdrawals or any change in borrowing.

[55]  Testimony of Daniel Noonan, November 8, 2010, p. 66:24-25 and p. 67:4-15 ("Well, as I communicated with Dan - Madigan, that is - I had noticed a disparity between the rate of return or the amount of dividends which I hadn't picked up on earlier, but I had noticed that there was a disparity because the premise upon which we had been proceeding for many years is that these annuities would always pay. The beauty of these he would say and the company would say well, the beauty of these annuities, they pay the same portfolio rate, same dividend interest rate as the cash surrender value rate that's paid on whole life policies. That was the beauty. That's how they were sold. So I noticed a difference. I said well, Dan, what's – what's the problem here?").

example, a survey in the UK showed that only 23 percent of consumers "had a good read" of contracts before entering them. The remainder picked out key points, gave it a quick "skim" read, did not read it at all or didn't remember.[56]   In other words, some NM policyholders were likely to read carefully through all communications from NM while others were not. Even among those who would have read a disclosure, the changes in their behavior would have varied. Those who would not have read a disclosure would behave similarly in both the actual and but-for worlds, and therefore could not have been injured. Without individualized inquiry, it is impossible to determine whether an individual class member would have read or acted upon a notification of the 1985 change in the but-for world.

55.   Depositions of members of the putative class confirm that some read statements and reports from NM, while others did not. Janet Reichart testified that she read her annuity policy and looked at both her annual annuity statements and annual reports received from NM.[57] Caroline Meckes testified that she did not remember reading her policy.[58] William Timmers testified that he did not read his annuity policy or annual reports received from NM.[59]

---

[56]   Office of Fair Trading, "Consumer Contracts," Crown Publishing, February 2011, p. 27.

[57]   Deposition of Janet Reichart, June 16, 2010, p. 13:9-14 ("Q. … did you receive on an annual basis a statement from Northwestern Mutual setting forth your annual dividend for your annuities? A. Yes, I'm sure I did. Q. Do you know whether you reviewed those or not? A. I looked at them, yes."); p. 14:12-16 ("Q. Did you receive annual reports from Northwestern Mutual? A. An annual report, yes. Q. Did you ever review the annual report? A. I looked at it, yes."); p. 20:9-12 ("Q. Okay. Did you ever read the policy that you received from Northwestern Mutual when you purchased your annuities? A. I'm sure I did.").

[58]   Deposition of Caroline Meckes, June 10, 2010, p. 8:8-19 ("Q. Do you remember reading that provision at the time you purchased the policy? A. I don't remember reading the policy at all, you know. Perhaps I did, but we're talking quite a few years ago. Q. So your understanding that you're conveying now regarding the dividends is your current understanding of dividends? A. I guess I never expected that there would be a problem with Northwestern. I trusted them and thought the dividends would be there. I trusted Dean Lawrence and I trusted the company.").

[59]   Deposition of William J. Timmers, July 23, 2010, p. 9:14-18 ("Q. Do you remember whether you read the policy for your annuity when you received it? A. No, I didn't. Q. No, you did not review it? A. No, I did not review it, no. I trusted the agent."; p. 14:19-25 ("Q. Do you know whether you receive an annual report from Northwestern Mutual that's not your account statement but a general report on the company? A. You know, I used to, but lately I don't know if I have or not, but I used to. Q. When you received those, did you read them? A. No.").

Jacqueline Baumgart testified that she did not read her annuity policy.[60]  John Komives testified that he didn't feel "compelled" to read his policies.[61]

56.     Class-wide evidence cannot identify which individual plaintiffs would have read a disclosure statement from NM.  A determination that one plaintiff would have read the disclosure does not determine whether another plaintiff would have done likewise.

### 3.     Some class members might not have behaved differently having reviewed a disclosure of the 1985 change

57.     Some class members would have read a disclosure of the 1985 change, had NM sent one directly to each annuitant.  Of these, some might have decided to retain their annuity policies with the restructured investment pools, and thus their behavior in the actual and but-for worlds is the same.  These individuals suffered no injury.

58.     Informed annuity holders might have retained their policies for several reasons, including 1) an understanding of, and agreement with, NM's analysis; 2) a deference to NM's approach; and 3) a concern for returns on other investments. Consider an individual who is contemplating terminating his or her policy in order to invest in higher-yielding short term securities.  Upon hearing that NM is going to do just that with his or her asset portfolio, the investor decides to do nothing, leaving the policy intact.  Alternatively, the individual might delegate the investment allocation decisions to NM based on NM's reputation and experience.  In another example, consider an investor who held both a whole life policy and an annuity who might have been concerned about the risks that disintermediation presented

---

[60]   Deposition of Jacqueline Baumgart, June 16, 2010, pp. 10:25-11:9 ("Q. Back in 1983 when this annuity was purchased did you read the policy when it was finally purchased? A. No. Q. To your recollection have you ever read the policy, your annuity policy? A. No. Q. Did you ever speak with anyone at Northwestern Mutual after the annuity was purchased, so after 1983, regarding that annuity policy? A. No.").

[61]   Deposition of John Komives, May 18, 2010, pp. 36:13-37:2 ("Q. …Do you recall reading any of your policies at the time you received them, the original policies from Mr. Moser or anyone else from Northwestern Mutual? A. I don't recall, but I'm sure that I glanced through it. I always felt so comfortable with NML that I never felt the need to behave in an adversarial -- I accepted the way it was presented.  Q. I'm sorry, I didn't understand the last part of your answer, sir.  A. I always felt so comfortable with NML I never felt compelled to read something in an adversarial fashion, what the hell is this kind of routine. I accepted when he handed me the piece of paper, I was comfortable with it.").

26

R. App 213

for the divisible surplus as it applied to both policies and thus agreed with NM's solution to the problem.

59.    Common evidence cannot reveal which plaintiffs would have reacted to a notification about the 1985 change by changing their investment behavior, and which would have retained their policies either because of or despite the 1985 change. Neither can common evidence tell us where those plaintiffs who would have changed their behavior would have invested their funds. Determination that plaintiff A would have cashed out of the altered annuity in the but-for world says nothing about whether plaintiff B would have done likewise.

### B.    For Those Who Would Have Behaved Differently in the But-For World, Estimating Damages Requires Individualized Inquiry

60.    Annuitants who were not aware of the 1985 change and would have changed their behavior had they received notice of the change are potentially injured. Estimating damages for such annuitants requires knowing how their behavior would have changed individually had they received such notice. Determining what an individual annuitant would have done is complicated by the fact that different responses are possible and economically plausible. Some annuitants might have terminated their policies and reinvested the withdrawn funds in another investment product. But others might have kept their NM policies and responded by, for example, reducing their premium payments or increasing borrowing against the cash value of their policy. For all types of responses, estimating damages requires assessing what alternative investments would have been selected so that the but-for return could be calculated.

### IV.    ANALYSIS ASSUMING NM SEEKS APPROVAL FOR THE 1985 CHANGE

61.    Another possible but-for world is one in which NM seeks approval for the 1985 change in annuity dividend calculations. Using Update '83 as a reference, NM could have implemented the change only for those policyholders who approved it. Any policyholder who would have approved the change was not injured.

62.    Some class members might have agreed to the at-issue change and made the same choices had NM sought approval. These class members would not be injured by the change. Individualized inquiry is needed to determine which policyholders these are.

27

63.     For those policyholders who would not have agreed to the change and may have been injured, damages depend on how their behavior would have been different given the alternatives NM provided for them. Since policyholders would have behaved in myriad ways that cannot be identified using class-wide evidence, estimating damages requires individualized inquiry.

## A.      Establishing Impact Requires Individualized Inquiry

64.     Even if NM sought approval from policyholders for the change in the pre-MN annuity policy, some plaintiffs might have approved the change and therefore not been injured.

### 1.      Some class members might have approved the change without reviewing it

65.     As described above, not all annuitants carefully review the documents and disclosures sent to them by NM. Some prefer not to take the time. Such annuitants tend to go along with suggested changes in policy.

66.     Class-wide evidence cannot reveal which annuitants would approve the 1985 change, nor which would review the change and reject it.

### 2.      Some class members might have approved the change because they agreed with it

67.     Those policyholders who were aware that short term interest rates were higher than long term interest rates during the time period before the 1985 change might have approved the change given the opportunity. It is this same group of annuitants that NM was worried would switch to the newly created CRA policies. Exhibit 4 shows the number of class members who purchased CRAs once they became available.

68.     The fact that some policyholders learned of the change during the class period but did not liquidate their policies in order to earn a higher rate of return elsewhere, indicates that the 1985 change might have been accepted by a number of putative class members.

28

69. Class-wide evidence cannot reveal which policyholders would have agreed to the 1985 change because investment preferences are idiosyncratic and variable. Determination of impact is thus individualized.

## B. For Those Who Would Not Have Approved the 1985 Change, Estimating Damages Requires Individualized Inquiry

70. Estimating damages for putative class members who might have been injured requires determining how they would have changed their premium payments, borrowing and timing of termination and identifying what alternative investments are likely to have been undertaken. For the same reasons articulated in Section III.B, above, without knowledge of the risk tolerance and investment goals of the putative class members, it is not possible to identify how potentially injured class members would have behaved with regard to contributions, borrowing or termination of annuity contracts in the but-for world.

## V. ANALYSIS ASSUMING NM DOES NOT IMPLEMENT THE 1985 CHANGE

71. The third but-for world is one in which pre-MN annuities continue to earn dividends based on the returns of the non-segmented, general account of the company. In other words, NM makes no policy change to address the disintermediation that was occurring in its existing portfolio of annuities.

## A. Many Members of the Putative Class Were Not Injured in this Scenario

72. Even assuming that in the but-for world NM would have continued paying annuitants based on a non-segmented general account, many annuitants were not injured and some were economically better off in the actual world than they would have been in the but-for world.

73. Plaintiff's expert, Mr. Hoyer, claims that but-for the 1985 change pre-MN annuity holders would have received the same DIR as life insurance policyholders.[62] However, in the actual world, cumulative returns to the pre-MN annuities from 1985 until 1993 were higher, on

---

[62] Hoyer Report, ¶24 ("The But-For DIR, in my opinion, for Pre-MN annuitants who have Direct Recognition and have no loan balance is equal to the corresponding DIR for life insurance policyholders.").

average, than cumulative returns to NM life insurance policies. Many pre-MN annuitants whose policies matured or were terminated prior to the beginning of 1994 thus might have earned a higher rate of return in the actual world than they would have absent the 1985 change. They are therefore better off in the actual world than in the but-for world, and so were not injured by NM's alleged misconduct.

74.    Exhibit 6 compares pre-MN annuity and life DIRs, for policies with direct recognition and no policy borrowing, in the time period from 1985 to 1993. Exhibit 7 shows the percentage point spread in DIRs. For most of this time period, the annuity DIR is the same as or higher than the life DIR. Even using Mr. Hoyer's benchmark for the but-for DIR, there are a number of years during which annuitants would earn more in the actual world than they would have in the but-for world. This is apparent from the tables created by Mr. Hoyer to display his "differences" calculations. Exhibit 8 shows one of these tables for the years 1985 to 1994, a portion of the table that Mr. Hoyer does not include in his Expert Report. (The complete tables for the four scenarios presented by Mr. Hoyer are shown in Appendix Exhibit 1.)

75.    Exhibit 8 demonstrates that, using Mr. Hoyer's benchmark, annuitants who terminated their policies in 1985 or any year from 1988 to year-end 1993 are likely to have earned a higher or equal return on their annuity policies in the actual than in the but-for world without the 1985 change. As shown in Exhibit 9, nearly 30 percent of the at-issue annuities were terminated in these years.

76.    This analysis might understate the number of putative class members who were uninjured because it is possible that the returns to pre-MN annuity policies would have been lower than the returns to life insurance policies had the 1985 change not occurred. First, as a simple factual matter, the pre-MN annuity DIR was lower than the life insurance policy DIR in five of the nine years for which data are available prior to the 1985 change, as shown in Exhibit 10. Second, the DIR for any particular type of policy is a function of the expenses that NM

30

allocates that policy type.[63]  I understand that had the 1985 change not taken place, NM contends it would have increased the expenses allocated to pre-MN annuities, further lowering returns to the pre-MN annuities relative to life insurance policies.[64]

### B.    Establishing Impact Requires Individualized Inquiry

77.    Investors generally seek to maximize returns for a given level of risk, and will therefore compare the current rate of return on their asset holdings with those available on similar alternative assets.[65]  The greater the return differential, the higher the likelihood that a given investor will sell the existing asset, and reallocate funds to the alternative.  This decision depends on idiosyncratic factors.

78.    If higher rates of return are available on comparable alternative investments, NM annuitants might choose to cash in their policies and invest their money elsewhere.  NM observed this behavior during the time period leading up to 1985, motivating the 1985 change.  Between 1985 and 1993, as can be seen in Exhibits 6 and 7, even using Mr. Hoyer's benchmark there were several years during which putative class members' returns on the NM annuity would have been lower in the but for than in the actual world.  In these time periods, it is therefore also the case that the differential between annuity returns in the but-for world and returns on alternative investments would have been greater.  As a result, some annuitants during this time period would have been more likely to terminate their policies, decrease their premium

---

[63]    See, for example, Plaintiff's Brief, Appendix Exhibit 39, "Explanation of 1986 Dividend Scale for MM and Prior Series Deferred Annuities," p. 1 ("First of all, the life insurance dividend interest rate is based on a gross interest rate of 11.75% less 0.50% for federal income taxes. The gross interest rate for annuities is 11.70%, only five basis points less, less a deduction of 0.20% for federal income taxes and 0.50% for home office expenses. This home office expense factor is a consequence of the competitive marketplace for annuities which limits loads deducted from premium payments so that insurance companies must recover some expenses out of interest margins. This is not the case for life insurance.").

[64]    Affidavit of Chris G. Trost, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011, ¶4 ("...if Northwestern Mutual had decided not to use segmentation, or if Northwestern Mutual were prohibited by the court from using segmentation, the Company would have assessed expense, disintermediation and dilution charges on the annuity dividend interest rates, which would have led to different final rates than the rates paid on life insurance products.").

[65]    For additional background on investment, risk and return, see Brealey and Myers.

31

R. App 218

payments, or borrow more from their policies in the but-for world in order to invest elsewhere. It is thus incorrect as a matter of economics to assume that all class members would have continued as before, earning the returns observed on NM's portfolios in the but-for world. Some would have terminated their NM annuity policies and earned more elsewhere.[66]

### 1. Investors respond to differentials in the rate of return

79. NM documents produced in this matter are consistent with a relationship between annuitant behavior and the level of returns on alternative investments relative to the returns on pre-MN annuities.[67] The minutes of an NM Employee Plans Product Development Committee meeting, dated July 1982, state as follows: "This is an interest rate driven market…In the last four years, our sales have declined sharply as the average 90-day Treasury Bill rate has become 3 to 6 percentage points higher than our FPA dividend rate." The minutes further document "increasing surrenders and declining in-force FPA and RA business as the difference between our dividend interest rate and the 90-day U.S. Treasury Bill rate rose."[68]

80. The academic literature summarized above in Section II.A provides supporting evidence that individual investors allocate their financial assets according to relative rates of return.[69] Rational investors will move money from low-return to high-return assets, holding risk and other asset characteristics constant. Economic analysis also shows that investors decrease

---

[66] For the years in which the but-for rate of return was higher than the actual rate of return, individuals might also have behaved differently in the but-for world than in the actual world. For example, some individuals might have surrendered their policies in the actual world but not in the but-for world.

[67] Simple correlations, such as those produced in this litigation, do not prove there is a relationship. Such a causal interpretation is difficult to establish here with the available data. An enormous empirical literature in finance has, however, established the causal connection.

[68] Employee Plans Product Development Committee, "July 29th Meeting Minutes," ML2_NM_4552 to ML2_NM_4569 at ML2_NM_4553.

[69] See, for example, Rosen, Kenneth T. and Larry Katz, "Money Market Mutual Funds: An Experiment in Ad Hoc Deregulation: A Note," *The Journal of Finance*, Vol. 38, No. 3, Jun., 1983, pp. 1011-1017; Gibson, William E. and James L. Pierce, "Deposit Demand, 'Hot Money,' and the Viability of Thrift Institutions," *Brookings Papers on Economic Activity*, Vol. 1974, No. 3, 1974, pp. 593-636.

32

their contributions to pensions when the interest rate on other forms of savings increases relative to the rate of return on pension deposits.[70]

### 2. Some annuitants' responses to differential rates of return might have led them to be uninjured

81. During the class period, the relationships between both but-for and actual returns on NM investment products, and between NM returns and those on alternative short term investments such as T-bills, were changing. Given the evidence presented above that investors respond to changes in interest rate differentials by reallocating investment towards the relatively higher returns, it is likely that at least some NM policyholders would have behaved differently in the but-for world than in the actual world. Relevant alternative investments include short to medium term Treasury bills, mutual funds, and other low risk, liquid instruments. Those annuitants who would have cashed out of their pre-MN annuities in the but-for world and earned higher short term returns on alternative investments that mimic those produced under the 1985 change would not have been injured by the 1985 change.

82. Exhibit 9 shows annual terminations of pre-MN annuities included in the putative class. There is a significant difference in the year to year termination rate. For example, in 1998, 9.9% of existing policies were terminated, whereas, in 2003, only 5.4% of existing policies were terminated. Exhibit 11 shows the relationship between the percentage of all pre-MN policies (including those not in the class) surrendered between 1976 and the first five months of 1982, and the spread between the annuity DIR and the 90-day Treasury bill rate. In years where the spread is greater, surrenders increase.

83. As an alternative to surrendering their policies, annuitants might have responded to return differentials by decreasing premium payments or increasing borrowing on their policies to take advantage of higher returns elsewhere. Any such change in annuitant behavior in the

---

[70] Bernheim, B. Douglas and John B. Shoven, Pension Funding and Saving, in *Pensions in the U.S. Economy*, Zvi Bodie, John B. Shoven and David A. Wise (Eds.), University of Chicago Press, 1988, pp. 85-114.

but-for world would affect the returns they earned and therefore affect the extent to which they were injured, if at all.

### 3. Discerning which annuitants would have behaved differently in the but-for world requires individualized inquiry

84. The degree of interest rate sensitivity of particular investors is determined in substantial part by individual characteristics. Some investors are more proactive and informed and therefore more likely to be aware of interest rate differentials than otherwise identical but uninformed investors. Some investors have professional financial advisors that are proactive in managing their portfolios, of which annuities form a part, while others may invest in an annuity as a retirement vehicle and not pay any attention to short-term variation in annuity returns relative to other investment opportunities. Additional idiosyncratic factors that affect responsiveness to return differentials include age, income, and wealth.

85. Risk-aversion varies across individuals as well. An individual more averse to risk might gladly hold a portfolio of short term assets, given the option, even at the cost of lower long-run returns. This is the essence of the risk-return tradeoff that forms the basis of much of the modern theory of finance. Risk-aversion can also be situational for a given plaintiff. An individual might be more willing to take risks, investing in longer-term assets, when he has a longer time horizon, greater wealth or health, or perhaps holds investments elsewhere in less-risky securities.

86. Deposition testimony indicates that putative class members have different risk preferences and different investment strategies. For example, policyholder Gerald Kreitzman held a portfolio of stocks, but did not know what "kind of investments" they were or what companies they were in because his brother managed his account.[71] Policyholder Marleen

---

[71] Deposition of Gerald Kreitzman, June 10, 2010, pp. 34:20-35:13 ("Q. Is the annuity the only -- whether an investment or a policy that you have that has a dividend payment attached to it? A. Well, my brother and I own some stocks, okay, but that's through Fidelity. And it's not like it's my stock, it's our stock together. We are, what, tenants in common or something like that, okay. And if I die, he gets all the stock. And if he dies, I get all the stock. And that's the only other kind of connection I have to the stock market. …Q. Do you know what kind of investments they are? A. No. Q. Do you know what companies they're in? A. No. I know they haven't done too well.").

LaPlant had never, during her married life, purchased stocks outside of an IRA and showed a preference for safer fixed income investments recalling that she bought "CD's and that sort of thing."[72] Policyholder John Komives had a preference for riskier investments. Mr. Komives conveyed that not only did he invest in equities, but he also had been an angel investor—and lost money—in startup companies.[73] Policyholder Janet Reichart expressed a preference for "safer investments, nothing volatile," after she retired and sold her stocks.[74] Each of these individuals is likely to have an idiosyncratic response to changes in returns to particular investments in their portfolios.

87.   Because determining how any given individual would react to a change in interest rate differentials is essential to determining whether that individual has been injured, impact cannot be determined on a class-wide basis for holders of pre-MN annuities. In other words, proof that one individual would not have changed his behavior in this but-for world and was injured says nothing about what another plaintiff would have done and therefore cannot prove that this other plaintiff was injured.

### C.   For Those Potentially Injured, Estimating Damages Requires Individualized Inquiry

88.   Annuitants who would have responded to higher interest rate differentials in the but-for world might have been injured depending on their alternative investment strategy. Without

---

[72]   Deposition of Marleen LaPlant, September 9, 2009, p. 8:6-14 ("Q. …. At any time during your married life have you or he purchased shares of stock, other than in an investment, in an IRA? A. No. Q. Have you made any investments of any kind, other than the retirement IRA's that you talked about before, and we'll talk about the Northwestern Mutual contract. A. We've bought like CD's and that sort of thing.").

[73]   Deposition of John Komives, May 18, 2010, p. 22:11-23 ("Q…Other than the investments that were from your wife, do you have any other investments that were in your name primarily? A. Well, I own some stock in a couple of these little private companies which, if they ever get sold, I might make a few dollars on them. Q. Have you been active as an angel investor with any startup company? A. Yes. Q. And have you lost money sometimes on those angel investments? A. Yes.").

[74]   Deposition of Janet Reichart, June 16, 2010, p. 11:12-24 ("Q. You mention that you have some stock investments, …[d]o you know in 1995 what kinds of stocks you got into when you went to your new financial advisor? A. I don't remember, because I'm not in stocks anymore. Q. Do you know when you got out of stocks? A. Around the time I retired we started moving more towards safer investments for my retirement. Q. Was there any kind of investment return that you were targeting for your retirement investments? A. Not specifically. Just safer investments, nothing volatile.").

knowledge of the risk tolerance and investment goals of the putative class members, it is not possible to identify which potentially injured class members would have behaved differently with regard to contributions, borrowing or termination of annuity contracts in the but-for world, or how their behavior might have been different. Individualized inquiry is required to determine annuitant behavior and but-for returns.

89.     Some annuitants might have behaved differently in the but-for than in the actual world because the timing of their retirement or their willingness to borrow from their annuity policy depends on their level of accumulated savings. To the extent that the accumulated savings differ between the actual and but-for worlds, behavior might also differ. Investment goals might differ across individuals. Some might be targeting a particular level of savings that will allow them to retire, while others might retire at a given age regardless of accumulated savings.

90.     Estimating damages for those putative class members whose behavior would have been different in the but-for than in the actual world requires determining how they would have changed their premium payments, borrowing and timing of termination and identifying what alternative investments were likely to have been undertaken. These individuals would have received different investment returns than they did in the actual world.

## VI.     ANALYSIS OF HOYER REPORT

### A.     Mr. Hoyer's Assignment Does Not Address Common Impact or Damages

91.     Plaintiffs' expert Robert Hoyer was asked by attorneys for the Plaintiffs:

> To describe a reasonable methodology that would provide the basis for prospective relief for current Pre-MN annuity policyholders; To indicate whether the methodology could be applied to all Pre-MN annuity policyholders on a common basis using a mechanical calculation; and To determine if the same methodology can be applied to determine the 'Difference' as defined (see below) to annuitants with policies no longer in-force resulting from the 1985 Change.[75]

92.     Mr. Hoyer defines "prospective relief" as including two steps. The first step "involves [NM] crediting to Pre-MN annuity policyholders' accounts the additional amount that would have

---

[75]     Hoyer Report, ¶ 6.

36

accumulated 'But-For' the 1985 Change (the 'Difference')."[76]  The second step requires NM to "credit dividends thereafter on the revised cash values using a dividend interest rate ('DIR') that reflects the company's aggregate investment income dividend factor rather than the investment income factor associated with the segmented account of current rate investments."[77]

93.    Given this assignment, the Hoyer Report does not directly address the issue of class-wide common impact.  In fact, as I explain below, Mr. Hoyer's deposition testimony *supports* my opinion that not all members of the putative class were injured, i.e., that impact is not common.  Nor does the Hoyer Report provide a methodology for proving impact or calculating damages on a class-wide basis.  Instead, Mr. Hoyer produces a set of tables showing the difference in the rate of accumulation of net deposits by year of deposit and withdrawal, assuming that but for the 1985 change NM would have set the DIR on pre-MN annuities equal to the DIR on life policies and that all putative members either did or did not have direct recognition during the entire class period.  As I explain below, the calculation of this "difference" falls far short of a complete damages methodology. It also ignores relevant annuity characteristics, rendering Mr. Hoyer's analysis inadequate as a basis for computing damages.

94.    Mr. Hoyer proposes to calculate the "DIR but-for the 1985 change."[78]  In doing so, he does not consider that there were many different ways in which NM could have behaved absent the 1985 change.  In addition, Mr. Hoyer does not attempt to calculate the but-for return to annuitants, taking into account economically plausible differences in annuitant behavior that would have affected that return in the but-for world.  Instead, he implicitly asserts that each individual annuitant would have done the same thing (i.e., nothing) had they been made aware of the change.

---

[76]   Hoyer Report, ¶7.

[77]   Hoyer Report, ¶7.

[78]   Hoyer Report, p. 5.

37

### B. The Hoyer Report Does Not Establish Common Economic Impact Among Putative Class Members

95.     In his deposition in this matter, Mr. Hoyer at one point stated his belief that "every member in this class was harmed the moment the change in '85 was made."[79]  He does not offer any, much less a plausible, definition of what he means by "harm" here. He *asserts* that plaintiffs were injured, rather than provide evidence of economic injury and argument as to the commonality of such evidence across the entire class.[80]

96.     At another point in his deposition, however, Mr. Hoyer confirmed that some class members were not *financially* harmed by the 1985 change:

> Q   And I just want to be clear: In the group of [putative] class members, were there some who surrendered their policies at a particular time such that those individuals were not financially harmed by the 1985 change?
> A   That is correct.[81]

97.     Mr. Hoyer's own "difference" calculation indicates that almost a third of the putative class might not have been financially injured.  As shown in Exhibit 9, and described in Section V. A above, nearly 30 percent of the at-issue annuities were terminated in 1985 or any year from 1988 to 1993 and are likely to have earned a higher or equal return on their annuity policies in the actual world than in Mr. Hoyer's but-for world.

98.     Moreover, Mr. Hoyer's assumption that absent the 1985 change the pre-MN annuities would have earned a rate of return equal to typical NM life insurance policies might not be correct. If, as was the case in some years prior to the 1985 change, annuities had a lower DIR than life insurance policies, then the number of uninjured putative class members would be even

---

[79]   Deposition of Robert L. Hoyer, May 17, 2013, p. 146: 8-10.

[80]   Mr. Hoyer admits in deposition that he did not attempt to quantify nonfinancial harm to plaintiffs nor was he qualified to do so.  See Deposition of Robert L. Hoyer, May 17, 2013, p. 161:12-22 ("Q. …Well, have you quantified the harm that was done to them that was other than financial, sir? A. No, that's not a quantifiable value for an actuary to do. Q. Was that something that you were asked to perform as part of your analysis in coming to your opinions in the March 4th, 2013 report? A. I was neither asked to do that nor did I do it. Q. And that would not be something that you would feel you had expertise to quantify; correct? A. I would not attempt to quantify that number, no.").

[81]   Deposition of Robert L. Hoyer, May 17, 2013, p. 158:12-20.

larger. In addition, had the 1985 change not taken place, NM might have increased the expenses allocated to pre-MN annuities, further lowering the pre-MN DIR relative to life insurance DIRs.[82]

### C. A Common Methodology for Estimating Class-wide Damages Cannot Be Derived from the Hoyer Report

99.     Regardless of what return pre-MN annuities would have earned in the absence of the 1985 change, the calculations presented in the Hoyer Report do not provide the basis for a common methodology for estimating class-wide damages.

#### 1. The Hoyer Report does not account for differences in annuitant behavior between the actual and but-for worlds

100.    As I describe above, some annuitants will respond to changing economic and personal circumstances by modifying their borrowing behavior, their deposit behavior, and/or their withdrawal (or termination of contract) behavior. They will do so in ways that vary depending on personal preferences and circumstances. Mr. Hoyer acknowledged these facts in his deposition, stating that "if the change had not been made, policyholders would have behaved in a different manner"[83] and, had NM never made the 1985 change "[i]t's possible that policyholders would do anything; and in a different scenario policyholders might do different things. Certainly that is a consideration, but I haven't spent much time analyzing it."[84]

101.    The "difference" calculation presented in the Hoyer Report assumes that annuitant behavior would have been the same in all relevant respects but for implementation of the 1985 change.

---

[82]    Affidavit of Chris G. Trost, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011, ¶4 ("...if Northwestern Mutual had decided not to use segmentation, or if Northwestern Mutual were prohibited by the court from using segmentation, the Company would have assessed expense, disintermediation and dilution charges on the annuity dividend interest rates, which would have led to different final rates than the rates paid on life insurance products.").

[83]    Deposition of Robert L. Hoyer, May 17, 2013, p. 64:5-7.

[84]    Deposition of Robert L. Hoyer, May 17, 2013, p. 91:13-16.

This "difference" calculation therefore cannot form the basis for a damages quantification because it does not "isolate the effect of the violation on the plaintiff from the effect of all other events."[85]  Hoyer rejects the need to construct a but-for world that takes into account that annuitants might have behaved differently in the actual than in the but-for world.  He states his rationale in his deposition:

> Policyholders did not exist in the 'but-for' world.  The 'but-for' world is a theoretical concept used to define a current difference.  So it's – I have no idea, and it's irrelevant to my conclusions, any action they might have taken in such world.  They did not live in that world.[86]

102.   Careful construction of a but-for world is an essential part of damages calculations.  It requires making economically plausible assumptions about a state of the world that did not occur.  Calculation of damages in the present matter must consider differences in the behavior of putative class members with regard to their policies absent the 1985 change.

### 2.   The Hoyer Report does not take into account all relevant characteristics of the at-issue policies

103.   Even assuming damages should be calculated holding annuitant behavior constant, the analysis in the Hoyer Report does not provide a viable method for estimating damages because it fails to take into account all relevant characteristics of the at-issue policies.

104.   In his deposition, Mr. Hoyer testified that his calculation of the "difference to date" is "a part of what [he] would consider damages."[87]  He further confirmed that the analysis in his report

---

[85]   ABA Section of Antitrust Law, *Proving Antitrust Damages, Legal and Economic Issues*, 2nd Edition, American Bar Association, 2010, p. 53.

[86]   Deposition of Robert Hoyer, May 17, 2013, p. 51:12-17.

[87]   Deposition of Robert L. Hoyer, May 17, 2013, p. 19:13-18 ("Prospective relief as I have analyzed it and as I discussed with counsel, in my opinion, takes two forms: A difference to date for those individuals that are remaining in force and fair and equitable treatment of those individuals prospectively from point of that adjustment.") and pp. 20:18-21:3 (Q. It would be based on things that happened in the past and there would be money provided by Northwestern Mutual to an account based on things that happened in the past? A. It would be current adjustment based on historical activity, yes, sir. Q. Is that damages? A. In my dictionary term, it's certainly a part of what I would consider damages. You have brought up that term as a legal term. I have no opinion as to how that fits your legal definition.").

did not take into account any of those other parts of damages.[88]  For individuals that terminated their at-issue annuities prior to the present, Mr. Hoyer appeared to suggest in his deposition that economic damages could be calculated by applying interest to the "difference" calculated using the method laid out in his report.[89]  He stated that the methodology in his report quantifies how much in additional funds an annuitant should have received in the year the policy was terminated and an "interest differential" could be applied to account for the damages being paid in the present.[90]

105.  This suggested approach fails to correctly calculate damages because the methodology outlined in the Hoyer Report does not quantify how much in additional funds an annuitant would have received but for the 1985 change (for a given series of annual but-for pre-MN annuity DIRs).  There are several reasons why this is so.

106.  First, the cash value of the account at termination depends on how the annuitant elected to receive his dividend payments.  For example, if an annuitant received dividend payments as cash, then the cash value of the annuity is unaffected by the DIR.  Estimating damages for such an annuitant requires a determination of how to compensate him for annual differences in his cash dividend payments, taking into account that in some years his dividend payments might have been higher in the but-for than the actual world and in some years they might have been lower.  Mr. Hoyer's methodology, using only the cash value of the annuity at termination, would not calculate damages correctly for this annuitant.  More generally, Mr.

---

[88]  Deposition of Robert L. Hoyer, May 17, 2013, p. 40:16-19 ("Q. But other than the accumulated difference, you did not actually in your report take into account any of those other parts of damage? A. That is correct, sir.").

[89]  Mr. Hoyer indicates that damages might also include punitive damages. See Deposition of Robert L. Hoyer, May 17, 2013, p. 40:3-7 ("A. I'm not an attorney, but I have been involved in litigation situations certainly, and there may or may not be punitive damages or costs. There is – you know, it gets to be a determination made by the courts, not by my analysis.").

[90]  Deposition of Robert L. Hoyer, May 17, 2013, p. 38:5-17 ("Q. What other part of damages would there be for the individuals who have surrendered or terminated their policy? A. Well, I could use as an example, if an individual policyholder terminated in 2005, what I have quantified and what this methodology quantifies is how much additional funds they should have received in 2005, but in fact they did not receive any additional funds, so clearly this difference is applicable to 2005. The Court may decide, someone else may decide, that since it was not paid in 2005, if it is paid in 2013, there is an interest differential, that's beyond the scope of my report.").

41

Hoyer's methodology works only for those policies whose dividends were applied entirely to increase cash value.

107.    Second, not all annuitants choose to receive a single cash payment when their policy is terminated. If the policy is terminated because of maturity, the annuitant has many payout options. For example, as shown in Exhibit 5, the annuitant may select a single life income plan. Under such a plan, payments are made until the death of the annuitant. The size of the periodic payments made to an annuitant that selects a single life income plan depends on the cash value of his policy at maturity. But the total payments he receives from his policy depend on how long he lives. The damage, if any, incurred by such an annuitant is therefore not simply the difference in the cash value of his policy at maturity. Rather, a damages calculation must take into account how many payments the annuitant received and whether he is still receiving payments.

108.    Third, Mr. Hoyer assumes that all putative class members who accepted Update '83 did so before the class period.[91] This assumption is incorrect, yet Mr. Hoyer implies that because the effect on overall damages is small the effect of this assumption is "immaterial."[92] Mr. Hoyer does not offer a calculation of the impact of this assumption. Instead, his method assumes the result. In addition, his approach could result in the improper calculation of the damages of those class members who accepted Update '83 during the class period. Specifically, because an annuitant's status regarding Update '83 factors into the determination of his DIR, policies that accepted Update '83 during the class period cannot be categorized into one of the four tables Mr. Hoyer uses to display his "differences"

---

[91] In deposition, Mr. Hoyer contradicts himself in his description of how he accounts for Update '83. He states that he does not have a separate formula for individuals who accepted Update '83 during the class period, implying that all putative class members who accepted the amendment were considered to have had Direct Recognition throughout the class period (see Deposition of Robert L. Hoyer, May 17, 2013, pp. 133:15 - 134:15).

[92] Deposition of Robert L. Hoyer, May 17, 2013, p. 134:6-15 ("The opinion of treatment of those who have accepted Update '83 or direct recognition and those who did not, I think within this formula, without trying to nitpick the formula for a few individuals for a couple of years, it's immaterial and hence the opinions that I made or the assumptions, however you want to categorize them, I think accurately and fairly reflect all individuals, not -- you know, including a couple who may have changed it during a certain period of time.").

42

R-App 229

calculations.  Using Mr. Hoyer's approach, these policies would each have unique tables for calculating the "difference" based on when Update '83 was accepted.  As shown in Exhibit 12, there are over a hundred at-issue annuities for which Update '83 was accepted during or after 1985.

R-App 230

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 28, 2013, in Charlottesville, Virginia.

Michael J. Moore

44

**APPENDIX A**

**CURRICULUM VITAE**

**MICHAEL J. MOORE**

| <u>Work</u> | <u>Home</u> |
|---|---|
| <u>Regular postal services</u> | 51 Lincoln Street |
| Jackson Institute for Global Affairs | New Haven CT 06511 |
| Yale University | |
| P.O. Box 208206 | |
| New Haven, CT 06520 | |

<u>Express delivery</u>
Jackson Institute for Global Affairs
Yale University
34 Hillhouse Avenue
New Haven, CT 06511

Telephone: (312) 925-3315 (M)

Email: michael.j.moore@yale.edu

**EMPLOYMENT & AFFILIATIONS**

**ACADEMIC**

Yale University:

    Jackson Institute of Global Affairs: Senior Lecturer
    School of Public Health: Senior Lecturer
    School of Management: Senior Lecturer

University of Virginia:

    Batten School of Leadership and Public Policy: Professor of Public Policy, 2011-2012; Visiting Professor, 2008-2011

    Department of Economics, 2006-2008

    Darden Graduate School of Business: Visiting Professor, 2011-present; Batten Fellow, 2009-present; Bank of America Research Professor, 2003-2005; Professor, 2001-2002; Visiting Associate Professor, 2000-2001

    Medical Center: Professor of Health Evaluation Sciences, 2001-2003

1

Law School 2005

National Bureau of Economic Research:

   Health Economics Program, Health Policy Program: Research Associate, 1996-2008

University of Chicago:

   Graduate School of Business: Adjunct Professor of Economics, 2007
   Stigler Center for the Study of Economy and the State: Olin Fellow, 1999-2000

University of Georgia:

   Terry College of Business: Visiting Professor, 2007-present

UC-Santa Barbara:

   Bren School of the Environment: Visiting Professor, 1999-2006

Duke University:

   Fuqua School of Business: Associate Professor (with tenure), 1992-2001; Associate Professor
   (without tenure), 1990-1992; Assistant Professor, 1986-1989; Visiting Assistant Professor,
   1984-1985

   Terry Sanford Institute of Public Policy, various years; Center for Aging, 1994-2001

INSEAD:

   Visiting Professor, 1995-1996

University of Michigan:

   Graduate School of Business: Instructor of Economics, 1981-1984

**NON-ACADEMIC**

Chicago Partners (Navigant Consulting): Academic Affiliate, 2011-2012; Principal, 2006-2011

Huron Consulting Group: Managing Director, 2003-2006


**EDUCATION**

Ph.D.          University of Michigan, Department of Economics, 1984, M.A., 1982

M.B.A.         Babson College, 1978

B.S.           Boston College, 1975

2

**AWARDS AND HONORS**

Kenneth Arrow Award for best paper in Health Economics, Medical Care Section, American Public Health Association, for "Drinking and Schooling," 1993

Kulp-Wright Prize for Outstanding Book in Risk and Insurance, American Society of Risk and Insurance, *Compensation Mechanisms for Job Risks*, 1990

Best Published Article published in *Economic Inquiry*, "The Quantity Adjusted Value of Life," 1988

**RESEARCH GRANTS AND OTHER CONTRACTS**

Center for the Study of Aging and Human Development, Duke University Medical Center, Senior Fellow 1994-2001
University Research Council, Duke University, 1986, 1987
National Science Foundation: Program in Decision, Risk, and Management Science, co-principal investigator, Product Liability Project 1989-1991
National Science Foundation: Program in Decision Risk and Management Science, co-principal investigator, Consumer Product Safety Project, 1990-1991
National Institute on Alcohol Abuse and Alcoholism: Youthful Drinking Project, 1992-1994
National Institute for Child Health and Development: Shannon Award, 1994-1995
National Institute for Child Health and Development: Pregnancy Outcomes Project, 1996-1998
U.S. Veteran's Administration: "Informal Caregivers of Veterans with Dementia: Costs, Quality of Life, and Service Use." 1997-2003
National Institute for Child Health and Development: Long Term Consequences of Abortion Funding Cutoffs, 1999-2001

**PROFESSIONAL ACTIVITIES**

Editorial Advisory Board, Journal of Risk and Uncertainty

American Economic Association, Econometric Society, Industrial Relations Research Association

Duke University: Faculty Compensation Committee, 1994-1996; Alcohol Policy Task Force, 1995; Sport Agents Committee, 1991-2001. Fuqua School of Business: Economics Area Coordinator, 1994-1998; Curriculum Committee, Admissions Director Search Committee, Health Care Management Committee; LEAD Program in Business, Curriculum Director 1993-1996

Ad Hoc Reviewer, *Journal of Political Economy*, *American Economic Review*, *Quarterly Journal of Economics*, *RAND Journal of Economics*, *Review of Economic Studies*, *Journal of Law and Economics*, *Review of Economics and Statistics*, *Journal of Risk and Uncertainty*, *Journal of Health Economics*, *Journal of Environmental Economics and Management*, *Journal of Human Resources*, *Journal of Public Economics*, *Economic Journal*, *Journal of Labor Economics*, *Industrial and Labor Relations Review*, *Economic Inquiry*

3

Dissertation Committees: Lindsey Boiney (Fuqua School of Business), Jens Ludwig (Duke Economics), David Anderson (Duke Economics), Rosalie Pacula (Duke Economics), Natalie Webb (Duke Economics), Geoff Gee (Duke Economics), Ruskin Morgan (Fuqua School of Business), Robert Scharff (Duke Economics), Wei Zhu (Duke Economics)

**RESEARCH PUBLICATIONS/JOURNAL ARTICLES**

"Workers' Compensation: Wage Effects, Benefit Inadequacies, and the Value of Health Losses," with W. Kip Viscusi, *The Review of Economics and Statistics*, Vol. 69, No. 2 (1987), pp. 249-261.

"The Quantity Adjusted Value of Life," with W. Kip Viscusi, *Economics Inquiry*, Vol. 26, No. 3 (1988), pp. 369-388. Awarded best paper prize for 1988 volume of *Economic Inquiry*.

"Doubling the Estimated Value of Life: Results Using New Occupational Fatality Data," with W. Kip Viscusi, *Journal of Policy Analysis and Management*, Vol. 7, No. 3 (1988), pp. 476-490.

"Adaptive Learning. Adaptive Utility, and Rational Behavior in a Repeated Prisoner's Dilemma," with Marian C. Moore (1989), *The Journal of Risk and Uncertainty*, Vol. 2, No. 4 (1989), pp. 499-515.

"Rates of Time Preference and Valuations of the Duration of Life," with W. Kip Viscusi, *Journal of Public Economics,* no. 38 (1989), pp. 297-317.

"Promoting Safety Through Workers' Compensation: The Efficacy and Net Wages Costs of Injury Insurance," with W. Kip Viscusi, *The RAND Journal of Economics*, Vol. 20, No. 4 (1989), pp. 499-515.

"Discounting Environmental Health Risks: New Evidence and Policy Implications," with W. Kip Viscusi, *Journal of Environmental Economics and Management*, No. 18 (1989), pp. S51-S62.

"Models for Estimating Discount Rates for Long-term Health Risks Using Labor Market Data," with W. Kip Viscusi, *Journal of Risk and Uncertainty*, Vol. 3 (1990), pp. 381-401.

"Pioneering and Market Share: Is Entry Time Endogenous and Does It Matter?" with William Boulding and Ronald Goodstein, *Journal of Marketing Research*, Vol. 28 (1991), pp. 97-104.

"Worker Learning and Compensating Differentials," with W. Kip Viscusi, *Industrial and Labor Relations Review*, Vol. 45, no. 1 (1991), pp. 80-96.

"Product Liability, Research and Development, and Innovation," with W. Kip Viscusi, *Journal of Political Economy*, Vol. 101, no. 1 (1993), pp. 161-184.

"Drinking and Schooling," with Philip Cook, *Journal of Health Economics*, Vol. 12 (1994), pp. 411-429. Awarded Kenneth Arrow Award, best paper in health economics (1994).

"This Tax is for You: The Case for a Higher Beer Tax," with Philip Cook, *National Tax Journal*, 47 (3), (1994), pp. 559-573.

4

R-App 235

"A Statistical Profile of Product Liability in the Pharmaceutical Industry," with W. Kip Viscusi and James Albright, *Seton Hall Law Review*, 24 (3), (1994), pp. 1418-1436.

"Habit Formation, Interdependent Preferences, and Individual Consumption: Evidence from Panel Data," with Narayan Naik, *Review of Economics and Statistics*, vol. 88 (1996), pp. 321-328.

"Unions, Employment Risks, and Market Provision of Employment Risk Differentials," *Journal of Risk and Uncertainty*, 10 (1), 1995, pp. 57-70.

"The Learning Curve for Laparoscopic Cholycystectomy," with W. Meyers and C. Bennett, *American Journal of Surgery*, 1995.

"Consumer Product Safety Regulation in the U.S. and U.K.: The Case of Bicycles," with Wes Magat, *RAND Journal of Economics*, Spring, 1996, pp. 148-164.

"The content and properties of the Caregiver Activities Time Survey (CATS): An outcome measure for use in clinical trial research on Alzheimer's disease," with Elizabeth C. Clipp and Linda K. George, *American Journal of Alzheimer's Disease and Other Dementias*, vol. 1 no. 6, 1996, pp. 3-9.

"The Impact of Velnacrine Maleate on Time Use among Caregivers of Patients with Alzheimer's Disease," with Elizabeth Clipp, *Clinical Pharmacology*, 1996.

"Death and Tobacco Taxes," *RAND Journal of Economics*, Summer 1996, pp. 415-428.

"An Outcome Measure for Use in Clinical Trials Research on Alzheimer's Disease," with Elizabeth Clipp and Linda George, *American Journal of Alzheimer's Disease*, 1996.

"Labeling and Performance Standards for Product Safety: The Case of CPSC's Lawn Mover Standards," with Wes Magat, *Managerial and Decision Economics*, 1997.

"The Injury Risk Consequences of the All-Terrain Vehicles Consent Decrees," with Wes Magat, *International Review of Law and Economics*, 1997, pp. 241-257.

"The Anatomy of Jumps and Falls in Wages," with W. Kip Viscusi and Richard J. Zeckhauser, *Research in Labor Economics*, Vol. 17, 1998.

"Changes in Abortion Funding and Pregnancy Outcomes," with Alan Parnell, Phil Cook, and Deanna Pagnini, *Journal of Health Economics*, 18 (1999), pp. 241-257.

"Only the Illusion of Possible Collusion? Cheap Talk and Similar Goals: Some Experimental Evidence," with Marian C. Moore and Ruskin Morgan, *Journal of Public Policy and Marketing*, *Competition Policy and Antitrust Law*, (2001) 20(1), pp. 27-37.

"Passive Smoking: Health Perceptions Myth vs. Health Care Reality," with Carolyn Zhu, *Journal of Risk and Uncertainty* 2000, 21 (2), pp. 283-310.

"Informal Costs of Dementia Care: Estimates from the National Longitudinal Caregiver Study," with Elizabeth Clipp and Carolyn Zhu, *Journal of Gerontology: Social Sciences*, 56B, S219-S228, 2001.

5

"Dementia Problem Behaviors and the Production of Informal Caregiving Services," with Elizabeth Clipp and Carolyn Zhu, *Review of Economics of the Household*, vol. 1, no. 1.

**BOOKS**

*Compensation Mechanisms for Job Risks: Wages, Worker' Compensation, and Product Liability*, with W. Kip Viscusi, (Princeton University Press, 1990). Awarded Kulp-Wright Prize for Outstanding Book in Risk and Insurance, 1990.

*Safety Rules: 25 Years of Consumer Product Safety Regulation in the U.S. and the U.K.*, with W. Magat (Kluwer Academic Publishers, unpublished manuscript).

*The Profit Impact of Marketing Strategy Project: Retrospect and Prospects*, Farris, Paul W., and Michael J. Moore, eds. Cambridge, Cambridge University Press, 2004.

**BOOK CHAPTERS, CONFERENCES PROCEEDINGS, AND BOOK REVIEWS**

"Michigan State Expenditures and the Provision of Public Services," John Cross with Cathy Jensen, Michael Moore and Janet Wolfe, in Brazer, Harvey E., (ed.), *Michigan's Fiscal and Economic Structure*, University of Michigan Press, Ann Arbor, Michigan, (1981).

"Social Insurance in Markets Contexts: Implications of the Structure of Workers' Compensation for Job Safety and Wages," with W. Kip Viscusi, in *Contributions to Insurance Economics,* G. Dionne, ed (Norwell, MA: Kluwer Academic Publishers, 1989), pp. 399-424.

"Have Increases in Workers' Compensation Benefits Paid for Themselves?" with W. Kip Viscusi, in *Benefits, Costs, and Cycles in Workers' Compensation Insurance*, P. Borba and D. Appel, eds., (Norwell, Ma: Kluwer Academic Publishers, 1990), pp. 1-22.

"Cooperation, Hierarchy, and Structure," with Marian Chapman Moore, in *Research on Negotiation in Organizations*, Vol. 2, Roy J. Lewicki, et al., ed., (JAI Press, 1990), pp. 207-217.

"Rationalizing the Relationship between Product Liability and Innovation," with W. Kip Viscusi, *Tort Law and the Public Interest*, P. Schuck, ed., (W.W. Norton Publishers, 1991), pp. 105-127.

"An Industrial Profile of the Links between Product Liability and Innovation," with W. Kip Viscusi, in Litan, R. and P. Huber, *The Liability Maze*, (Washington, D.C.: Brookings Institution, 1991), pp. 81-119.

"Accident Records as a Screening Device: An Appraisal," in *The Human Resources Professional*, Vol. 3, no. 3 (1991), pp. 13-15.

"Violence Reduction Through Restrictions on Alcohol Availability," with Phil Cook, in *Alcohol, Health, and Research World*, Vol. 17, no. 2 (1993), pp. 151-156.

"Taxation of Alcoholic Beverages," with Phil Cook, in Hilton, Michael, and Greg Bloss, E*conomics and the Prevention of Alcohol-Related Problems*, U.S. Department of Health and Human Services, (1993), pp. 33-58.

"Economic Perspectives on Alcohol Related Violence," with Phil Cook, in S. Martin, ed., *Alcohol and Interpersonal Violence*, Research Monograph No. 24, National Institute of Alcohol Abuse and Alcoholism, (1994), pp. 193-212.

"Nonprice Competition, Cost Shocks, and Profits in the Airline Industry," with Messod D. Beneish in B. Starr McMullen, ed., *Research in Transportation Economics*, Vol. 3 (1994), pp. 67-94.

Review of *A Measure of Malpractice: Medical Injury, Malpractice Litigation, and Patient Compensation*, Weiler, Paul C., et. al., Journal of Economic Literature.

Review of *Simulating Workplace Safety*, Kneisner, T. And J. Leeth, Kluwer Academic Press, forthcoming in *Journal of Economic Literature.*

"Insurance for Workplace Injuries," in *New Palgrave Dictionary of Law and Economics*, P. Newman, ed.

"Discontinuous Wage Changes and Job Events," with Kip Viscusi and Richard Zeckhauser, in *Research in Labor Markets*, S. Polachek, ed., vol. 17, (1998).

"Alcohol," with Philip Cook in Newhouse, J., and A. Cuyler, eds., *Handbook of Health Economics*, Amsterdam: North-Holland, 2000.

"Environment and Persistence in the Youthful Demand for Alcohol," with Philip Cook, in Gruber, J., ed., *Risky Behavior Among Youths*, University of Chicago Press/NBER, 2001.

"The Health Care Consequences of Smoking and its Regulation," with James Hughes, in Garber, A., ed., *Frontiers of Health Policy*, vol. 4. NBER.

"The Economics of Alcohol Abuse and Alcohol Control Policies," with Philip Cook, *Health Affairs*, (2002).

"Informal Costs of Dementia," with E. C. Clipp and Carolyn Zhu, In *Research and Practice in Alzheimer's Disease and Other Dementias (special Issue on Caregiving)*, B. Vellas, Editor-in-Chief, European Alzheimer's Disease Consortium (EADC), 2002.

"Product Liability Entering the 21st Century," with W. Kip Viscusi (AEI-Brookings Joint Center for Regulatory Studies, 2001).

"Cargo Cult Econometrics: Specification Testing in Simultaneous Equation Marketing Models," with Russ Morgan and Judith Roberts, in Farris, Paul, and Michael Moore, eds., *The Profit Impact of Marketing Strategy Project: Retrospect and Prospects*, Cambridge, Cambridge University Press, 2004.

**OTHER PUBLICATIONS**

"Effect of Mentane (velnacrine maleate) on Alzheimer Caregiver Time Allocation: A

7

Multicenter, Double-blind Comparison with Placebo," with Elizabeth C. Clipp. On file Hoechst-Roussel Pharmaceuticals Neurosciences Strategic Marketing, (1993).

"Consumer Product Safety Regulation: Lessons from International Data," with Wesley Magat. Final Report to National Science Foundation, Decision, Risk and Management Science program, Project No. 8922249, (1994).

"Alzheimer's Disease and Caregiver Time," with Elizabeth C. Clipp. Letter to the Editor, *The Lancet,* (1994).

"Impact of Therapy on Caregiving Time and Costs in Alzheimer's Disease," with Elizabeth C. Clipp. *Progress in Alzheimer's Disease*, 1994, in press.

"Block the threats to Workers' Compensation," op-ed article, *Wall Street Journal.*

## WORKING PAPERS

"Applied Econometrics: a STATA Companion," with Greg Talbert and Jim Albright, Working Paper.

"Addiction and Schooling," draft.

"Drinking by Young Adults, Part I: Demographics," with Philip Cook and Rosalie Pacula. Center for the Study of Business, Regulation, and Economic Policy Working Paper, No. 93-15.

"The Efficacy of Voluntary Safety Standards: Lessons from the Chain Saw Industry," with Wesley Magat.

"Habit and Heterogeneity in the Youthful Demand for Alcohol," with Philip Cook. Center for the Study of Business, Regulation, and Economic Policy Working Paper, No. 94-3.

"The Political Economy of Workplace Smoking," Working Paper.

"Napsterizing Pharmaceuticals: Access, Innovation, and Welfare," with Edward Snyder and James Hughes. (Previous version: NBER Working Paper No. 7769).

"The Sealy Litigation and Its Aftermath," with Edward Snyder. Draft.

## WORK IN PROGRESS

U.S. v. Sealy and its Aftermath (with Edward Snyder)

Pharmaceutical Regulation and Antitrust

Antitrust Law and Econometrics

8

R-App 239

**APPENDIX B**

**LAST 5 YEARS OF EXPERT TESTIMONY FOR MICHAEL J. MOORE**

**TESTIFYING EXPERT**

1. **In re TFT-LCD (Flat Panel) Price Fixing Litigation. United States District Court, Northern District of California, San Francisco Division. Master File No. 07-m-1827 SI.**

   Target Corp., et al., v. AU Optronics Corp., et al. Case No. 10-cv-4945 SI

   Motorola Mobility, Inc., v. AU Optronics Corp., et al. Case No. 09-cv-5840 SI

   AT&T Mobility, LLC, v. AU Optronics Corp., et al. Case No. 09-cv-4997 SI

   Electrograph Systems Inc.; Electrograph Technologies Corp., v. Epson Imaging Devices Corp., et al. Case No. 10-cv-00117 SI

   Antitrust Price Fixing, Liability. Declaration and deposition
   Contact: Nick Verwolf, Davis Wright & Tremaine, Seattle WA

2. **Ehret v. USA. United States District Court, Northern District of Indiana.**

   Takings Damages. Declaration and Trial Testimony
   Contact: Mark Christensen, Christensen & Ehret, Chicago IL

3. **William Roberts v. The Scott Fetzer Company. Civil action No. 4:07-CV-00080-CDL. United States District Court, Middle District of Georgia, Columbus Division.**

   Consumer Fraud, Class Certification. Declaration and deposition
   Contact: Lee Garrett, Jones Day, Atlanta GA

4. **Emerson Electric Co., et al., v. Le Carbone Lorraine, S.A., et al., United States District Court for the District of New Jersey, No. 05-cv-06042.**

   Antitrust Price Fixing Damages (settled)
   Contact: Jonathan Feld, Katten Muchen, Chicago, IL

1

5. **Chivers, et al., v. State Farm, et al.**

        Insurance Fraud, Class Certification, Declaration
        Contact: Tom Rodgers, Stacy Allen. Jackson Walker, Austin TX

6. **Burgess v. Farmers Insurance Company, Inc., and Farmers Insurance Exchange. U.S. District Court of Comanche County, State of Oklahoma, CJ-2001-292.**

        Insurance Fraud, Damages, Deposition
        Contact: Tom Rodgers, Willliam Cobb. Jackson Walker, Austin TX

7. **Grays Harbor Adventist Christian School, Greg G. Bogdanoavich, and Mary LaForest v. Carrier Corporation, U.S. District Court, Western District of Washington No. CV05-5437-RBL.**

        Class Action Damages – Consumer Fraud
        Affidavit and deposition
        Contact: Brian Swanson - Bartlit-Beck, Chicago IL

8. **Jeff Dougherty, Frank Zinn, and Harvey Opaleski v. Carrier Corporation, U.S. District Court, Eastern District of Michigan, No. 2:06-cv-15659.**

        Consumer Fraud, Class Certification
        Declaration and deposition
        Contact: Brian Swanson – Bartlit-Beck, Chicago IL

9. **Mark Neuser, Arlan and Marcia Hinkelman, vs. Carrier Corporation, U.S. District Court, Western District of Wisconsin, No. 06-C-645-S.**

        Class Certification – Consumer Fraud
        Declaration and deposition
        Contact: Brian Swanson - Bartlit-Beck, Chicago IL

10. **Costco v. Hoen, et al. U.S. District Court, Western District of Washington at Seattle, No. CV04-0360.**

        Challenges to state restrictions on alcohol distribution (21st Amendment)
        Affidavit, deposition, and trial testimony
        Contact: Michael Sandler - Sandler Ahern & McConaughy, Seattle WA
        David Burman - Perkins Coie, Seattle WA

R. App 241

11. **In Re Ocean Tankers Price Fixing Litigation.**

        Antitrust price fixing damages
        Class action Opt-outs
        Retained, case settled
        Contact: Andrew Klevorn - Eimer, Stahl, Klevorn, and Solberg,
        Chicago, IL

**CONSULTING EXPERT**

12. **In re eBay Sellers Antitrust Litigation. U.S. District Court, N.D. Cal., San Jose Division, Case No. C 07-01882 JF (RS).**

        Monopolization, Class Certification
        Contact: Tom Brown, O'Melveny and Myers, San Francisco CA

13. **Sun Microsystems, In., et al., v. Hynix Semiconductor, Inc., et al., U.S. District Court, N.D. Cal., No. C-06-01665 PJH (Consolidated).**

        Antitrust Price Fixing
        Injury and Damages
        Contact: Ian Simmons, Tom Brown – O'Melveny and Myers,
        Washington DC

14. **Anderson Contracting, Inc., v. Bayer AG, et al., (EPDM Antitrust Litigation), Iowa District Court, Polk County IA, Case No. CL 95959.**

        Antitrust Price Fixing
        Indirect purchaser class certification
        Contact: Ian Simmons - O'Melveny & Myers, Washington DC

15. **Brock v. Honeywell International, U.S. District Court, N.D. Cal., No. C-04-5328 WHA.**

        Attempt to monopolize
        Indirect purchaser class certification
        Contact: Ian Simmons - O'Melveny & Myers, Washington DC

16. **MacKinnon v. Honeywell International, Maine.**

        Attempt to monopolize
        Indirect purchaser class certification
        Supporting testifying expert
        Contact: Ian Simmons - O'Melveny & Myers, Washington DC

3

R. App 242

17. **Wright, et al., v. Honeywell, State of Vermont, Orange County Superior Court, Docket No. 301-11-04.**

        Attempt to monopolize
        Indirect purchaser class certification
        Supporting testifying expert
        Contact: Ian Simmons - O'Melveny & Myers, Washington DC

18. **In Re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation, No. 3:03-MD1542 (PCD).**

        Antitrust Price Fixing
        Direct Purchaser Class Certification
        Contact: Ian Simmons - O'Melveny and Myers, Washington DC

4

R. App 243

**APPENDIX C**

**DOCUMENTS CONSIDERED**

**Legal Filings**

*Marleen M. LaPlant v. The Northwestern Mutual Life Insurance Company*

Complaint and Jury Demand, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, August 26, 2008

Decision and Order on Motion of Plaintiff for Class Certification, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, October 26, 2009

Notice of Class Action, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, December 14, 2009

Decision in Matter Tried to the Court, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, March 7, 2011

Plaintiff's Amended Notice and Motion to Redefine the Class to Include All Pre-MN Annuitants and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, September 12, 2011

Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, March 4, 2013

Appendix Exhibit 39 to Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, March 4, 2013

1

Expert Report of Theodore E. Affleck, Submitted for *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, June 30, 2010

Expert Report of S. Travis Pritchett, Submitted for *M. LaPlant v. Northwestern Mutual Life Company*, July 2, 2010

Expert Report of Bruce W. Foudree, Submitted for *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation,* State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988*,* August 6, 2010

Expert Report of Stephen N. Steinig, Submitted for M. *LaPlant v. Northwestern Mutual Life Company*, August 6, 2010

Affidavit of Nicholas J. Sales, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, November 17, 2011

Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for *M. LaPlant v. Northwestern Mutual Life Company*, Hoyer Actuarial Litigation, LLC, March 4, 2013

### *Beverly E. Krueger v. The Northwestern Mutual Life Insurance Company*

Northwestern Mutual's Memorandum in Opposition to Plaintiff's Motion for Class Certification, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011

Affidavit of Chris G. Trost, *Beverly E. Krueger and Richard A. Race, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, June 30, 2010

Affidavit of Nicholas J. Sales, *Beverly E. Krueger, on behalf of herself and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, August 13, 2010

Affidavit of Chris G. Trost, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011

2

***Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company et al.***

Decision on Motion to Certify for Class Action, *Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company et al.*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 01-CV-12349, July 6, 2005

Decision on Motions to Certify for Class Action and Summary Judgment, *Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company et al.*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 01-CV-12349, January 25, 2008

Affidavit of Robert L. Hoyer, *Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company, et al.,* State of Wisconsin Circuit Court, Milwaukee County, Case No. 01-CV-012349, March 8, 2005

***Other***

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)

## Articles and Book Chapters

ABA Section of Antitrust Law, *Proving Antitrust Damages, Legal and Economic Issues,* 2nd ed., American Bar Association, (2010)

Allen, Mark A., et al., "Reference Guide on Estimation of Economic Losses in Damages Awards," in *Reference Manual on Scientific Evidence*, The National Academies Press, (2011): 425-502

Angrist, Joshua D., and Alan B. Krueger, "Chapter 23 Empirical strategies in labor economics," in *Handbook of Labor Economics*, Vol. 3, (1999): 1277-1366

Bardrinath, SG, Jayant R. Kale and Harley E. Ryan, Jr., "Characteristics of Common Stock Holdings of Insurance Companies," *The Journal of Risk and Insurance*, Vol. 63, No. 1 (Mar., 1996): 49-76

Bernheim, B. Douglas, and John B. Shoven, "Pension Funding and Saving," in *Pensions in the US Economy*, University of Chicago Press, (1988): 85-114

Brealey, Richard A. and Stewart C. Myers, *Principles of Corporate Finance*, McGraw-Hill, Inc., 4th ed., (1991)

Downes, John and Jordan E. Goodman, *Dictionary of Finance and Investment Terms*, Barron's Educational Series, (2010)

Gibson, William E. and James L. Pierce, "Deposit Demand, 'Hot Money,' and the Viability of Thrift Institutions," *Brookings Papers on Economic Activity*, 1974, No. 3 (1974): 593-636

3

R. App 246

Holt, Charles A. and Susan K. Laury, "Risk Aversion and Incentive Effects," *The American Economic Review*, Vol. 92, No. 5, (Dec., 2002): 1644-1655

Marquard, Steven, *The Distortion Theory of Macroeconomic Forecasting: A Guide for Economists and Investors*, Greenwood Publishing Group, Inc. (1994)

Office of Fair Trading, *Consumer Contracts*, Crown Publishing, (2011): 1-116

Rosen, Kenneth T. and Larry Katz, "Money Market Mutual Funds: An Experiment in Ad Hoc Deregulation: A Note," *The Journal of Finance*, Vol. 38, No. 3, (1983): 1011-1017

Vitt, Lois A., "Risk Tolerance," in *Encyclopedia of Retirement and Finance*, Volume 1, Greenwood Publishing Group, Inc., (2003)

**Depositions and Trial Testimony**

Deposition of Jacqueline Baumgart, June 16, 2010

Deposition of Thomas Colbert, July 23, 2010

Deposition of Thomas Dyer, May 13, 2010

Deposition of Michael J. Holden, May 25, 2010

Deposition of Robert L. Hoyer, May 17, 2013

Deposition of Russell R. Jensen, June 15, 2010

Deposition of John Komives, May 18, 2010

Deposition of Gerald Kreitzman, June 10, 2010

Deposition of Marleen LaPlant, September 9, 2009

Deposition of Caroline Meckes, June 10, 2010

Deposition of Janet Reichart, June 16, 2010

Deposition of William J. Timmers, July 23, 2010

Deposition of Bruce Williams, May 18, 2010

Testimony of Daniel Noonan, November 8, 2010

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 250 of 302   Document 89

**Non-Bates Numbered Deposition Exhibits**

Exhibits 1 - 9 to deposition of Robert L. Hoyer, May 17, 2013

Exhibit 167 to deposition of Gerald Kreitzman, June 10, 2010

Exhibit 1 to deposition of Marleen LaPlant, September 9, 2009

***Marleen M. LaPlant v. Northwestern Mutual*** **Trial Exhibits**

Trial Exhibit 15

Trial Exhibit 16

Trial Exhibit 67

Trial Exhibit 73

Trial Exhibit 74

Trial Exhibit 102

Trial Exhibit 121

Trial Exhibit 154

Trial Exhibit 155

Trial Exhibit 157

Trial Exhibit 180

Trial Exhibit 189

Trial Exhibit 261

Trial Exhibits 269 - 286

Trial Exhibit 312

Trial Exhibit 314

Trial Exhibit 316

Trial Exhibits 319 to 335

Trial Exhibit 340

Trial Exhibit 342

Trial Exhibit 356

Trial Exhibit 385

Trial Exhibit 424

Trial Exhibit 528

**Other Bates Numbered Documents**

| | |
|---|---|
| ML_NML0446 to ML_NML0459 | ML2_NM_4818 to ML2_NM_4819 |
| ML_NML2_0503 | ML2_NM_4820 to ML2_NM_4829 |
| ML_NML2_0504 | ML2_NM_4830 to ML2_NM_4831 |
| ML_NML2_0505 | ML2_NM_4832 to ML2_NM_4836 |
| ML_NML2_0506 | ML2_NM_4837 to ML2_NM_4838 |
| ML_NML2_0513 to ML_NML2_0519 | ML2_NM_4877 to ML2_NM_4882 |
| ML_NML2_0528 | ML2_NM_5553 to ML2_NM_5555 |
| ML_NML2_0533 | ML2_NM_5556 to ML2_NM_5563 |
| ML_NML2_0537 to ML_NML2_0538 | ML2_NM_5564 to ML2_NM_5572 |
| ML_NML2_0575 to ML_NML2_0576 | ML2_NM_5573 to ML2_NM_5575 |
| ML_NML3_0209 to ML_NML3_0217 | ML2_NM_5576 to ML2_NM_5579 |
| ML_NML3_0218 to ML_NML3_0234 | ML2_NM_5580 to ML2_NM_5587 |
| ML_NML3_0235 to ML_NML3_0249 | ML2_NM_5588 to ML2_NM_5595 |
| ML_NML3_0380 to ML_NML3_0503 | ML2_NM_5596 to ML2_NM_5600 |
| ML_NML3_0446 | ML2_NM_5601 to ML2_NM_5609 |
| ML_NML3_3604 to ML_NML3_3605 | ML2_NM_6738 to ML2_NM_6739 |
| ML_NML3_3606 to ML_NML3_3608 | ML2_NM_6740 to ML2_NM_6747 |
| ML_NML3_3609 to ML_NML3_3626 | ML2_NM_6748 |
| ML_NML3_3627 to ML_NML3_3629 | ML2_NM_6749 to ML2_NM_6754 |
| ML_NML3_3630 to ML_NML3_3631 | ML2_NM_6755 to ML2_NM_6758 |
| ML_NML3_3632 to ML_NML3_3637 | ML2_NM_6759 to ML2_NM_6780 |
| ML_NML3_3638 to ML_NML3_3640 | ML2_NM_6781 |
| ML_NML3_3641 to ML_NML3_3661 | ML2_NM_6782 to ML2_NM_6815 |
| ML2_NM_4518 to ML2_NM_4529 | ML2_NM_6816 |
| ML2_NM_4552 to ML2_NM_4569 | ML2_NM_6817 to ML2_NM_6818 |
| ML2_NM_4805 to ML2_NM_4806 | ML2_NM_6819 to ML2_NM_6822 |
| ML2_NM_4807 to ML2_NM_4817 | ML2_NM_6827 |

6

R. App 249

**Other Publicly Available Documents**

Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013

Sullivan, Paul, "Annuities: What You Need to Know," *The New York Times*, January 27, 2009, available at <http://www.nytimes.com/2009/01/28/your-money/annuities/primerannuities.html?ref=annuities>, accessed on June 17, 2013

U.S. Department of Labor Bureau of Labor Statistics, "Consumer Price Index," last updated June 18, 2013, available at <ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt>, accessed on June 24, 2013

U.S. Securities and Exchange Commission, "Annuities," April 6, 2001, available at <http://www.sec.gov/answers/annuity.htm>, accessed on June 17, 2013

**Data Files**

1983_12 PreMNAnn Plans_R2.txt

1985_12 Assoc CRA Plans_R2.txt

Annuity Termination Data.xlsx

Data+Field+Definitions+May3+File.xlsx

LaPlant Life policies 1983_2012 File1.txt

LaPlant Life policies 1983_2012 File2.txt

List of 36,935 Annuities Updated.xlsx

7

R-App 250

# Exhibit 1
## Determination of Putative Class

|                                                                  | Annuities |
| ---------------------------------------------------------------- | --------- |
| **Potential Class Annuities Identified by Northwestern Mutual**  | 36,935    |
| **Policies Excluded from Potential Class**                       |           |
|     Policies Terminated Prior to March 31, 1985 | 28 |
|     Policies Dated After March 31, 1985      | 66        |
|     HE Series Policies                       | 1,549     |
|     KL Series Policies                       | 89        |
|     Non-Participating Policy                 | 1         |
|     Subtotal                                 | 1,733     |
| **Potential Class Annuities: Total Less Exclusions**             | 35,202    |
| **Update '83 Status of Potential Class Annuities**              |           |
|     Not Eligible                             | 11,306    |
|     Not Signed                               | 6,131     |
|     Signed in Wisconsin                      | 2,229     |
|     Signed Outside Wisconsin                 | 15,467    |
|     Unknown                                  | 69        |
| **Putative Class:**                                              |           |
| **Annuities** (Potential Class Annuities Less Signed Outside Wisconsin) | **19,735** |
| **Annuitants**                                                   | **18,553** |

**Notes:**

[1] The 1,549 "HE Series Policies" are employee plans which are not included in the class according to Trial Ex. 404.

[2] The 89 "KL Series Policies" are employee plans which are not included in the class according to Trial Ex. 404.

[3] The one "Non-Participating Policy" is a non-participating policy with no annual change in cash value.

[4] The 11,306 "Not Eligible" annuities are those that were issued after the implementation of Update '83.

[5] The 6,131 "Not Signed" annuities are those that were eligible for Update '83 but never amended.

[6] The 69 "Unknown" annuities are those with values of "Unknown" or "???" for the "Update '83 Details" field in the data.

**Sources:**

[1] List of 36,935 Annuities Updated xlsx.

[2] Annuity Termination Data xlsx.

[3] 1983_12 PreMNAnn Plans_R2.txt.

**Exhibit 2**

**Current Residence of Putative Class Members with In-Force Annuities**

| State/Country | Number of Putative Class Members | State/Country | Number of Putative Class Members |
|---|---|---|---|
| AK | 5 | NC | 45 |
| AL | 21 | ND | 29 |
| AR | 10 | NE | 24 |
| AZ | 29 | NH | 16 |
| CA | 116 | NJ | 40 |
| CO | 41 | NM | 20 |
| CT | 44 | NV | 14 |
| DC | 4 | NY | 136 |
| DE | 2 | OH | 124 |
| FL | 121 | OK | 31 |
| GA | 35 | OR | 24 |
| HI | 20 | PA | 145 |
| IA | 97 | RI | 26 |
| ID | 14 | SC | 18 |
| IL | 206 | SD | 31 |
| IN | 97 | TN | 15 |
| KS | 32 | TX | 74 |
| KY | 29 | UT | 24 |
| LA | 11 | VA | 53 |
| MA | 48 | VT | 9 |
| MD | 42 | WA | 35 |
| ME | 14 | WI | 391 |
| MI | 114 | WV | 26 |
| MN | 74 | WY | 2 |
| MO | 53 | | |
| MS | 11 | Canada | 1 |
| MT | 14 | Other Country | 7 |
| | | Total | 2,664 |

**Note:**

[1] The total of 2,664 corresponds to the number of putative class members with at least one Pre-MN annuity in-force as of year end 2012.

**Sources:**

[1] List of 36,935 Annuities Updated.xlsx.

[2] Annuity Termination Data.xlsx.

[3] 1983_12 PreMNAnn Plans_R2.txt.

[4] Data+Field+Definitions+May3+File.xlsx.

**Exhibit 3**
**Putative Class Members with Simultaneous Life and Annuity Policies In-Force**
**1985 - 2012**

| Year | Total Class Annuities | Total Class Policyholders | Policyholders with Simultaneous Policies | Percent of Class with Simultaneous Policies |
|---|---|---|---|---|
| 1985 | 19,735 | 18,553 | 9,043 | 48.7% |
| 1986 | 18,579 | 17,482 | 8,613 | 49.3% |
| 1987 | 16,970 | 16,000 | 7,968 | 49.8% |
| 1988 | 15,438 | 14,591 | 7,236 | 49.6% |
| 1989 | 14,490 | 13,703 | 6,831 | 49.9% |
| 1990 | 13,531 | 12,815 | 6,386 | 49.8% |
| 1991 | 12,695 | 12,046 | 6,020 | 50.0% |
| 1992 | 11,972 | 11,370 | 5,717 | 50.3% |
| 1993 | 11,304 | 10,738 | 5,402 | 50.3% |
| 1994 | 10,692 | 10,162 | 5,125 | 50.4% |
| 1995 | 10,011 | 9,526 | 4,792 | 50.3% |
| 1996 | 9,347 | 8,900 | 4,474 | 50.3% |
| 1997 | 8,556 | 8,149 | 4,077 | 50.0% |
| 1998 | 7,744 | 7,386 | 3,681 | 49.8% |
| 1999 | 6,978 | 6,676 | 3,301 | 49.4% |
| 2000 | 6,409 | 6,144 | 3,029 | 49.3% |
| 2001 | 5,831 | 5,596 | 2,732 | 48.8% |
| 2002 | 5,450 | 5,235 | 2,552 | 48.7% |
| 2003 | 5,132 | 4,935 | 2,412 | 48.9% |
| 2004 | 4,856 | 4,681 | 2,298 | 49.1% |
| 2005 | 4,570 | 4,408 | 2,172 | 49.3% |
| 2006 | 4,316 | 4,161 | 2,058 | 49.5% |
| 2007 | 4,041 | 3,895 | 1,929 | 49.5% |
| 2008 | 3,724 | 3,596 | 1,803 | 50.1% |
| 2009 | 3,467 | 3,350 | 1,699 | 50.7% |
| 2010 | 3,268 | 3,160 | 1,611 | 51.0% |
| 2011 | 3,093 | 2,990 | 1,532 | 51.2% |
| 2012 | 2,905 | 2,807 | 1,438 | 51.2% |
| 1985 - 2012 | 19,735 | 18,553 | 9,931 | 53.5% |

**Notes:**

[1] "Total Class Annuities" corresponds to the annual total number of putative class annuities that are in-force or that have been terminated in each respective year.

[2] "Total Class Policyholders" corresponds to the annual total number of putative class policyholders with annuity policies in-force or policies that have been terminated in each respective year.

[3] As of 2012, 4,860 putative class members had life policies in-force. Of these, 1,374 either terminated or surrendered their annuity policies before 1994.

**Sources:**

[1] List of 36,935 Annuities Updated.xlsx.
[2] Annuity Termination Data.xlsx.
[3] 1983_12 PreMNAnn Plans_R2.txt.
[4] LaPlant Life policies 1983_2012 File1.txt.
[5] LaPlant Life policies 1983_2012 File2.txt.

**Exhibit 4**
**Putative Class Members' CRA Purchases**
**1985 - 2012**

| Year | Total Class Annuities | Total Class Policyholders | Class Members who Purchased CRAs |
|------|-----------------------|---------------------------|----------------------------------|
| 1985 | 19,735 | 18,553 | 606 |
| 1986 | 18,579 | 17,482 | 157 |
| 1987 | 16,970 | 16,000 | 169 |
| 1988 | 15,438 | 14,591 | 178 |
| 1989 | 14,490 | 13,703 | 229 |
| 1990 | 13,531 | 12,815 | 169 |
| 1991 | 12,695 | 12,046 | 155 |
| 1992 | 11,972 | 11,370 | 79 |
| 1993 | 11,304 | 10,738 | 30 |
| 1994 | 10,692 | 10,162 | 55 |
| 1995 | 10,011 | 9,526 | 60 |
| 1996 | 9,347 | 8,900 | 26 |
| 1997 | 8,556 | 8,149 | 15 |
| 1998 | 7,744 | 7,386 | 7 |
| 1999 | 6,978 | 6,676 | 4 |
| 2000 | 6,409 | 6,144 | 5 |
| 2001 | 5,831 | 5,596 | 15 |
| 2002 | 5,450 | 5,235 | 14 |
| 2003 | 5,132 | 4,935 | 13 |
| 2004 | 4,856 | 4,681 | 5 |
| 2005 | 4,570 | 4,408 | 5 |
| 2006 | 4,316 | 4,161 | 5 |
| 2007 | 4,041 | 3,895 | 4 |
| 2008 | 3,724 | 3,596 | 10 |
| 2009 | 3,467 | 3,350 | 25 |
| 2010 | 3,268 | 3,160 | 8 |
| 2011 | 3,093 | 2,990 | 9 |
| 2012 | 2,905 | 2,807 | 0 |
| 1985 - 2012 | 19,735 | 18,553 | 1,665 |

**Notes:**

[1] "Total Class Annuities" corresponds to the annual total number of putative class annuities that are in-force or that have been terminated in each respective year.

[2] "Total Class Policyholders" corresponds to the annual total number of putative class policyholders with annuity policies in-force or policies that have been terminated in each respective year.

[3] The count of annual putative class members who purchased CRAs does not sum to the 1,665 total shown for 1985 - 2012 because some putative class members purchased more than one CRA during the period shown.

**Sources:**

[1] List of 36,935 Annuities Updated xlsx.

[2] Annuity Termination Data xlsx.

[3] 1983_12 PreMNAnn Plans_R2.txt.

[4] 1985_12 Assoc CRA Plans_R2.txt.

R. App 254

**Exhibit 5**
**Selected Characteristics of At-Issue Annuities**

| Premium Modes | Policy Loan Rates |
|---|---|
| Flexible premiums ("FPA") | 5% compounded annually |
| Fixed premiums ("RA") | 6% compounded annually |
| Single premium ("SPRA") | 8% compounded annually |

| Maturity Options | Dividend Payout Options |
|---|---|
| Cash payout | Cash payout |
| Interest Income Plan | Premium payment |
| Installment Income Plans | Purchase policy additions |
|     Specified Period | |
|     Specified Amount | |
| Life Income Plans | |
|     Single Life Income | |
|     Joint and Survivor Life Income | |

**Note:**
[1] "Dividend Payout Options" and "Maturity Options" are based on Marleen M. LaPlant's Fixed Premium Annuity contract.

**Sources:**
[1] Trial Exhibit 121, LaPlant Contract.
[2] Trial Exhibits 319 to 335, Sample Contracts.



**Exhibit 6**
**Pre-MN Annuity and Life Policy DIRs**
**For Policies with Direct Recognition and No Policy Borrowing**
**1985 - 1993**

**Notes:**
[1] DIR values are as reported for tax qualified policies.
[2] "Life" and "Annuity" values are for "Employee Life Insurance" and "Retirement Annuity" policies, respectively.

**Source:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.



**Exhibit 7**

**Percentage Point Spread between Pre-MN Annuity and Life Policy DIRs
For Policies with Direct Recognition and No Policy Borrowing
1985 - 1993**

**Notes:**
[1] DIR values are as reported for tax qualified policies.
[2] "Life" and "Annuity" values are for "Employee Life Insurance" and "Retirement Annuity" policies, respectively.
[3] Spread calculated as the difference between Annuity and Life policy DIRs for non-borrowed policies with direct recognition.

**Source:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.

Exhibit 8

**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants with Direct Recognition and No Policy Borrowing**
Deposited in Column Year and Withdrawn in Row Year
Based on Hoyer Report Table 9
All Zero and Negative Values Highlighted
1985 - 1994

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 0.00 | - | X | X | X | X | X | X | X | X | X |
| 1986 | 0.28 | 0.25 | - | X | X | X | X | X | X | X | X |
| 1987 | 0.62 | 0.56 | 0.25 | - | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | -0.28 | -0.50 | - | X | X | X | X | X | X |
| 1989 | -1.14 | -1.02 | -1.23 | -1.38 | -0.75 | - | X | X | X | X | X |
| 1990 | -1.25 | -1.13 | -1.35 | -1.52 | -0.82 | 0.00 | - | X | X | X | X |
| 1991 | -1.38 | -1.24 | -1.48 | -1.67 | -0.91 | 0.00 | 0.00 | - | X | X | X |
| 1992 | -2.01 | -1.81 | -2.03 | -2.20 | -1.33 | -0.30 | -0.28 | -0.25 | - | X | X |
| 1993 | -0.53 | -0.48 | -0.87 | -1.18 | -0.35 | 0.66 | 0.60 | 0.55 | 0.75 | - | X |
| 1994 | 1.83 | 1.65 | 1.01 | 0.48 | 1.21 | 2.16 | 1.96 | 1.78 | 1.90 | 1.00 | - |

**Note:**
[1] Values expressed as percentages.

**Sources:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.
[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

**Exhibit 9**
**Timing of Terminations for Annuities Included in the Putative Class**
**1985 - 2012**

| Year | Number Terminated | | | | | Percent of Remaining Policies Terminated | Percent of Putative Class Policies Terminated |
|---|---|---|---|---|---|---|---|
| | Death | Maturity | Surrender | Other | Total | | |
| 1985 | 44 | 120 | 990 | 2 | 1,156 | 5 9% | 5 9% |
| 1986 | 67 | 190 | 1,349 | 3 | 1,609 | 8 7% | 8 2% |
| 1987 | 76 | 197 | 1,258 | 1 | 1,532 | 9 0% | 7 8% |
| 1988 | 53 | 189 | 704 | 2 | 948 | 6 1% | 4 8% |
| 1989 | 67 | 219 | 673 | 0 | 959 | 6 6% | 4 9% |
| 1990 | 67 | 194 | 575 | 0 | 836 | 6 2% | 4 2% |
| 1991 | 50 | 175 | 498 | 0 | 723 | 5 7% | 3 7% |
| 1992 | 55 | 124 | 489 | 0 | 668 | 5 6% | 3 4% |
| 1993 | 51 | 143 | 418 | 0 | 612 | 5 4% | 3 1% |
| 1994 | 42 | 167 | 472 | 0 | 681 | 6 4% | 3 5% |
| 1995 | 63 | 164 | 437 | 0 | 664 | 6 6% | 3 4% |
| 1996 | 51 | 139 | 601 | 0 | 791 | 8 5% | 4 0% |
| 1997 | 34 | 152 | 626 | 0 | 812 | 9 5% | 4 1% |
| 1998 | 37 | 135 | 594 | 0 | 766 | 9 9% | 3 9% |
| 1999 | 36 | 113 | 420 | 0 | 569 | 8 2% | 2 9% |
| 2000 | 38 | 85 | 455 | 0 | 578 | 9 0% | 2 9% |
| 2001 | 20 | 69 | 292 | 0 | 381 | 6 5% | 1 9% |
| 2002 | 30 | 77 | 211 | 0 | 318 | 5 8% | 1 6% |
| 2003 | 42 | 69 | 165 | 0 | 276 | 5 4% | 1 4% |
| 2004 | 40 | 83 | 163 | 0 | 286 | 5 9% | 1 4% |
| 2005 | 28 | 57 | 169 | 0 | 254 | 5 6% | 1 3% |
| 2006 | 30 | 55 | 190 | 0 | 275 | 6 4% | 1 4% |
| 2007 | 24 | 47 | 246 | 0 | 317 | 7 8% | 1 6% |
| 2008 | 26 | 57 | 174 | 0 | 257 | 6 9% | 1 3% |
| 2009 | 37 | 59 | 103 | 0 | 199 | 5 7% | 1 0% |
| 2010 | 37 | 36 | 102 | 0 | 175 | 5 4% | 0 9% |
| 2011 | 40 | 42 | 106 | 0 | 188 | 6 1% | 1 0% |
| 2012 | 32 | 47 | 79 | 0 | 158 | 5 4% | 0 8% |
| Total Terminated | 1,217 | 3,204 | 12,559 | 8 | 16,988 | | 86 1% |
| 1985, 1988-1993 | 387 | 1,164 | 4,347 | 4 | 5,902 | | 29 9% |

**Notes:**
[1] "Percent of Remaining Policies Terminated" corresponds to the number of policies terminated annually expressed as a percentage of the number of policies in-force as of the beginning of each respective year
[2] "Percent of Putative Class Policies Terminated" is expressed as a percentage of the 19,735 annuities that are part of the class as specified in Exhibit 1
[3] As of year end 2012, 2,747 putative class policies remain in force

**Sources:**
[1] List of 36,935 Annuities Updated xlsx
[2] Annuity Termination Data xlsx
[3] 1983_12 PreMNAnn Plans_R2 txt

## Exhibit 10
## DIRs for Life and Annuity Policies
## 1976 - 1984

| Year | Annuity | Life | Difference |
|---|---|---|---|
| | [A] | [B] | [A] - [B] |
| 1976 | 6.15% | 6.15% | 0.00% |
| 1977 | 6.50% | 6.50% | 0.00% |
| 1978 | 7.25% | 7.25% | 0.00% |
| 1979 | 7.50% | 7.50% | 0.00% |
| 1980 | 8.50% | 8.65% | (0.15%) |
| 1981 | 9.00% | 9.15%/8.65% | (0.15%)/0.35% |
| 1982 | 9.75% | 10.15% | (0.40%) |
| 1983 | 10.85% | 11.00% | (0.15%) |
| 1984 | 11.00% | 11.15% | (0.15%) |

**Notes:**

[1] From 1976 to 1981, the DIRs are for tax qualified policies without direct recognition. From 1982 to 1984, the dividend interest rates are for tax qualified policies with direct recognition and no borrowing.

[2] In 1981, the DIRs for life insurance policies with a loan rate of 8% was 9.15%. For life policies with a loan rate of 6% or 5%, the DIR was 8.65%.

[3] "Life" and "Annuity" values are for "Employee Life Insurance" and "Retirement Annuity" policies, respectively.

**Source:**

[1] Trial Exhibit 189, Dividend Interest Rate Tables.

## Exhibit 11
## Pre-MN Annuity Surrenders
## 1976 - 1982

| Year | Tax-Qualified DIR [A] | Average 90-Day Treasury Bill [B] | FPA and RA Surrenders [C] | FPAs and RAs In-Force [D] | Spread between DIR and 90-Day Treasury Bill [A] - [B] | Percent Surrendered [C] / [D] |
|---|---|---|---|---|---|---|
| 1976 | 6.2% | 5.1% | 3,155 | 37,502 | 1.1% | 8.4% |
| 1977 | 6.5% | 5.4% | 2,828 | 37,706 | 1.1% | 7.5% |
| 1978 | 7.3% | 7.6% | 2,858 | 38,819 | -0.4% | 7.4% |
| 1979 | 7.5% | 10.7% | 3,117 | 39,343 | -3.2% | 7.9% |
| 1980 | 8.5% | 12.5% | 3,822 | 38,559 | -4.0% | 9.9% |
| 1981 | 9.0% | 15.4% | 5,196 | 35,419 | -6.4% | 14.7% |
| First 5 months of 1982 | 9.8% | 13.1% | 3,188 | 33,366 | -3.4% | |

**Notes:**

[1] "Percent Surrendered" was not calculated for 1982 because values reported are for the first five months of the year only.

[2] Source document includes FPAs and RAs but does not mention SPRAs. As a result, SPRAs are not included here.

**Source:**

[1] Employee Plans Product Development Committee, titled "July 29th Meeting Minutes" (ML2_NM_4552 to ML2_NM_4569).

**Exhibit 12**
**Timing of Update '83 for Annuities Included in Putative Class**
**1982 - 2012**

| Year | Number Updated | Percent of Eligible Policies Updated |
|------|----------------|--------------------------------------|
| 1982 | 291 | 3.5% |
| 1983 | 1,767 | 21.0% |
| 1984 | 57 | 0.7% |
| 1985 | 32 | 0.4% |
| 1986 | 23 | 0.3% |
| 1987 | 23 | 0.3% |
| 1988 | 6 | 0.1% |
| 1989 | 8 | 0.1% |
| 1990 | 9 | 0.1% |
| 1991 | 6 | 0.1% |
| 1992 | 5 | 0.1% |
| 1993 | 1 | 0.0% |
| 1994 - 2012 | 0 | 0.0% |
| **1985 - 1993** | **113** | **1.3%** |

**Notes:**

[1] "Percent of Eligible Policies Updated" corresponds to the annual number of policy amendments expressed as a percentage of the 8,429 annuities included in the class that were eligible for the Update '83 policy amendment. This total was calculated by counting all of the annuities in this dataset with values of "never did," "Unknown," "WI," or "???" for the "Update '83 Details" field.

[2] There are 7 policies that accepted the amendement that were missing data to determine the timing of acceptance. These policies are excluded from the exhibit.

**Sources:**

[1] List of 36,935 Annuities Updated xlsx.

[2] Annuity Termination Data xlsx.

[3] 1983_12 PreMNAnn Plans_R2.txt.

**Appendix Exhibit I-A**

**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants with Direct Recognition and No Policy Borrowing**

Deposited in Column Year and Withdrawn in Row Year

Based on Hoyer Report Table 9

All Zero and Negative Values Highlighted

**1985 - 2010**

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1986 | 0.28 | 0.25 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1987 | 0.62 | 0.56 | 0.25 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1988 | 0.00 | 0.00 | -0.28 | -0.50 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1989 | -1.14 | -1.02 | -1.23 | -1.38 | -0.75 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1990 | -1.25 | -1.13 | -1.35 | -1.52 | -0.82 | 0.00 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1991 | -1.38 | -1.24 | -1.48 | -1.67 | -0.91 | 0.00 | 0.00 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1992 | -2.01 | -1.81 | -2.03 | -2.20 | -1.33 | -0.30 | -0.28 | -0.25 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1993 | -0.53 | -0.48 | -0.87 | -1.18 | -0.35 | 0.66 | 0.60 | 0.55 | 0.75 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1994 | 1.83 | 1.65 | 1.01 | 0.48 | 1.21 | 2.16 | 1.96 | 1.78 | 1.90 | 1.00 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1995 | 5.87 | 5.28 | 4.24 | 3.37 | 3.88 | 4.66 | 4.24 | 3.85 | 3.81 | 2.70 | 1.50 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1996 | 10.53 | 9.47 | 7.97 | 6.70 | 6.96 | 7.53 | 6.85 | 6.23 | 6.01 | 4.65 | 3.23 | 1.50 | - | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1997 | 17.35 | 15.61 | 13.46 | 11.60 | 11.47 | 11.71 | 10.65 | 9.68 | 9.19 | 7.51 | 5.80 | 3.77 | 2.00 | - | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 1998 | 26.14 | 23.52 | 20.53 | 17.94 | 17.28 | 17.08 | 15.53 | 14.11 | 13.27 | 11.18 | 9.11 | 6.72 | 4.63 | 2.30 | - | x | x | x | x | x | x | x | x | x | x | x | x |
| 1999 | 36.18 | 32.55 | 28.61 | 25.18 | 23.91 | 23.20 | 21.09 | 19.17 | 17.92 | 15.38 | 12.90 | 10.10 | 7.64 | 4.95 | 2.30 | - | x | x | x | x | x | x | x | x | x | x | x |
| 2000 | 47.60 | 42.83 | 37.80 | 33.43 | 31.46 | 30.15 | 27.41 | 24.92 | 23.20 | 20.15 | 17.22 | 13.96 | 11.09 | 8.00 | 4.95 | 2.30 | - | x | x | x | x | x | x | x | x | x | x |
| 2001 | 60.57 | 54.49 | 48.24 | 42.79 | 40.03 | 38.04 | 34.58 | 31.44 | 29.20 | 25.57 | 22.12 | 18.36 | 15.03 | 11.48 | 8.04 | 4.95 | 2.30 | - | x | x | x | x | x | x | x | x | x |
| 2002 | 75.32 | 67.77 | 60.13 | 53.46 | 49.78 | 47.01 | 42.74 | 38.85 | 36.01 | 31.73 | 27.71 | 23.38 | 19.54 | 15.49 | 11.52 | 8.18 | 5.00 | 2.35 | - | x | x | x | x | x | x | x | x |
| 2003 | 92.07 | 82.84 | 73.63 | 65.58 | 60.85 | 57.18 | 51.98 | 47.25 | 43.72 | 38.72 | 34.06 | 29.12 | 24.71 | 20.11 | 15.61 | 11.66 | 8.18 | 5.15 | 2.45 | - | x | x | x | x | x | x | x |
| 2004 | 111.49 | 100.31 | 89.29 | 79.65 | 73.68 | 68.93 | 62.67 | 56.97 | 52.64 | 46.82 | 41.44 | 35.81 | 30.77 | 25.56 | 20.48 | 15.99 | 12.04 | 8.58 | 5.49 | 2.70 | - | x | x | x | x | x | x |
| 2005 | 133.51 | 120.12 | 107.06 | 95.62 | 88.23 | 82.25 | 74.78 | 67.98 | 62.74 | 56.00 | 49.83 | 43.42 | 37.68 | 31.80 | 26.08 | 21.01 | 16.53 | 12.58 | 9.07 | 5.90 | 2.85 | - | x | x | x | x | x |
| 2006 | 159.33 | 143.34 | 127.89 | 114.36 | 105.29 | 97.85 | 88.96 | 80.87 | 74.56 | 66.76 | 59.66 | 52.38 | 45.84 | 39.19 | 32.73 | 26.99 | 21.91 | 17.41 | 13.41 | 9.80 | 6.36 | 3.15 | - | x | x | x | x |
| 2007 | 187.76 | 168.93 | 150.85 | 135.00 | 124.09 | 115.03 | 104.57 | 95.06 | 87.58 | 78.61 | 70.50 | 62.26 | 54.83 | 47.35 | 40.09 | 33.62 | 27.87 | 22.78 | 18.24 | 14.15 | 10.28 | 6.67 | 3.15 | - | x | x | x |
| 2008 | 219.05 | 197.08 | 176.11 | 157.72 | 144.76 | 133.92 | 121.75 | 110.68 | 101.89 | 91.64 | 82.44 | 73.13 | 64.75 | 56.35 | 48.21 | 40.95 | 34.48 | 28.72 | 23.59 | 18.98 | 14.64 | 10.60 | 6.67 | 3.15 | - | x | x |
| 2009 | 245.54 | 220.91 | 197.49 | 176.94 | 162.27 | 149.94 | 136.31 | 123.91 | 114.04 | 102.69 | 92.53 | 82.31 | 73.09 | 63.89 | 54.99 | 47.03 | 39.93 | 33.60 | 27.96 | 22.89 | 18.15 | 13.74 | 9.45 | 5.60 | 2.15 | - | x |
| 2010 | 270.75 | 243.59 | 217.83 | 195.22 | 178.93 | 165.19 | 150.17 | 136.52 | 125.60 | 113.20 | 102.12 | 91.02 | 80.99 | 71.02 | 61.37 | 52.74 | 45.03 | 38.16 | 32.02 | 26.52 | 21.37 | 16.60 | 11.96 | 7.79 | 4.06 | 1.70 | - |

**Note:**

[1] Values expressed as percentages.

**Sources:**

[1] Trial Exhibit 189, Dividend Interest Rate Tables.

[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

**Appendix Exhibit 1-B**

**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants without Direct Recognition and a 8% Policy Loan Rate**

Deposited in Column Year and Withdrawn in Row Year

Based on Hoyer Report Table 9

All Zero and Negative Values Highlighted

**1985 - 2010**

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1986 | 0.24 | 0.22 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1987 | 0.54 | 0.49 | 0.22 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | -0.24 | -0.44 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1989 | -0.98 | -0.88 | -1.06 | -1.20 | -0.66 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1990 | -1.07 | -0.97 | -1.17 | -1.32 | -0.72 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1991 | -1.17 | -1.06 | -1.28 | -1.45 | -0.79 | 0.00 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1992 | -1.71 | -1.55 | -1.75 | -1.90 | -1.15 | -0.26 | -0.24 | -0.22 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1993 | -0.45 | -0.41 | -0.75 | -1.02 | -0.30 | 0.58 | 0.53 | 0.48 | 0.66 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 1.85 | 1.67 | 1.10 | 0.63 | 1.24 | 2.05 | 1.87 | 1.70 | 1.80 | 1.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 5.13 | 4.64 | 3.75 | 3.00 | 3.45 | 4.13 | 3.77 | 3.43 | 3.40 | 2.43 | 1.25 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 8.92 | 8.07 | 6.81 | 5.74 | 6.00 | 6.52 | 5.94 | 5.42 | 5.24 | 4.07 | 2.69 | 1.25 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 15.06 | 13.62 | 11.80 | 10.22 | 10.13 | 10.35 | 9.44 | 8.61 | 8.19 | 6.72 | 5.07 | 3.36 | 1.87 | - | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 22.97 | 20.78 | 18.23 | 16.01 | 15.45 | 15.28 | 13.94 | 12.71 | 11.96 | 10.13 | 8.14 | 6.11 | 4.34 | 2.16 | - | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 32.01 | 28.95 | 25.57 | 22.63 | 21.53 | 20.90 | 19.06 | 17.38 | 16.27 | 14.03 | 11.66 | 9.27 | 7.16 | 4.64 | 2.16 | - | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 42.29 | 38.25 | 33.93 | 30.16 | 28.44 | 27.29 | 24.89 | 22.70 | 21.17 | 18.47 | 15.66 | 12.87 | 10.39 | 7.49 | 4.64 | 2.16 | - | X | X | X | X | X | X | X | X | X | X |
| 2001 | 53.96 | 48.81 | 43.42 | 38.71 | 36.29 | 34.54 | 31.50 | 28.73 | 26.73 | 23.50 | 20.21 | 16.96 | 14.08 | 10.75 | 7.49 | 4.64 | 2.16 | - | X | X | X | X | X | X | X | X | X |
| 2002 | 67.40 | 60.97 | 54.35 | 48.56 | 45.33 | 42.87 | 39.10 | 35.66 | 33.11 | 29.29 | 25.46 | 21.70 | 18.35 | 14.56 | 10.84 | 7.58 | 4.73 | 2.24 | - | X | X | X | X | X | X | X | X |
| 2003 | 82.50 | 74.63 | 66.65 | 59.65 | 55.49 | 52.23 | 47.63 | 43.44 | 40.27 | 35.80 | 31.36 | 27.05 | 23.19 | 18.88 | 14.67 | 10.96 | 7.71 | 4.86 | 2.29 | - | X | X | X | X | X | X | X |
| 2004 | 100.31 | 90.74 | 81.15 | 72.74 | 67.46 | 63.73 | 57.67 | 52.59 | 48.69 | 43.46 | 38.34 | 33.40 | 28.08 | 24.08 | 19.31 | 15.10 | 11.39 | 8.14 | 5.20 | 2.58 | - | X | X | X | X | X | X |
| 2005 | 120.37 | 108.88 | 97.50 | 87.50 | 80.96 | 75.62 | 68.97 | 62.90 | 58.17 | 52.10 | 46.22 | 40.57 | 35.50 | 29.98 | 24.61 | 19.84 | 15.63 | 11.92 | 8.58 | 5.60 | 2.69 | - | X | X | X | X | X |
| 2006 | 144.04 | 130.30 | 116.79 | 104.93 | 96.88 | 90.22 | 82.28 | 75.04 | 69.33 | 62.28 | 55.53 | 49.07 | 43.26 | 37.01 | 30.94 | 25.54 | 20.76 | 16.53 | 12.72 | 9.32 | 6.03 | 3.00 | - | X | X | X | X |
| 2007 | 170.15 | 153.91 | 138.08 | 124.15 | 114.44 | 106.32 | 96.96 | 88.43 | 81.64 | 73.51 | 65.79 | 58.45 | 51.83 | 44.78 | 37.95 | 31.86 | 26.45 | 21.65 | 17.32 | 13.47 | 9.76 | 6.35 | 3.00 | - | X | X | X |
| 2008 | 198.90 | 179.92 | 161.52 | 145.32 | 133.77 | 124.04 | 113.13 | 103.17 | 95.19 | 85.88 | 77.10 | 68.79 | 61.28 | 53.37 | 45.70 | 38.85 | 32.75 | 27.32 | 22.43 | 18.08 | 13.92 | 10.10 | 6.35 | 3.00 | - | X | X |
| 2009 | 223.33 | 202.02 | 181.42 | 163.30 | 150.20 | 139.12 | 126.88 | 115.71 | 106.72 | 96.39 | 86.70 | 77.55 | 69.26 | 60.58 | 52.19 | 44.68 | 37.98 | 32.00 | 26.62 | 21.83 | 17.28 | 13.09 | 9.00 | 5.33 | 2.04 | - | X |
| 2010 | 246.75 | 223.20 | 200.50 | 180.52 | 165.95 | 153.58 | 140.06 | 127.74 | 117.78 | 106.47 | 95.89 | 85.92 | 76.89 | 67.47 | 58.36 | 50.20 | 42.92 | 36.41 | 30.55 | 25.34 | 20.40 | 15.86 | 11.43 | 7.45 | 3.89 | 1.64 | - |

**Note:**

[1] Values expressed as percentages.

**Sources:**

[1] Trial Exhibit 189, Dividend Interest Rate Tables.

[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

Appendix Exhibit 1-C

**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants without Direct Recognition and a 6% Policy Loan Rate**

Deposited in Column Year and Withdrawn in Row Year

Based on Hoyer Report Table 9

All Zero and Negative Values Highlighted

1985 - 2010

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1986 | 0.22 | 0.20 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1987 | 0.49 | 0.44 | 0.20 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | -0.22 | -0.40 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1989 | -0.88 | -0.80 | -0.97 | -1.10 | -0.60 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1990 | -0.96 | -0.87 | -1.05 | -1.20 | -0.66 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1991 | -1.05 | -0.95 | -1.15 | -1.31 | -0.72 | 0.00 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1992 | -1.52 | -1.37 | -1.56 | -1.70 | -1.04 | -0.24 | -0.22 | -0.20 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1993 | -0.41 | -0.37 | -0.67 | -0.92 | -0.28 | 0.51 | 0.47 | 0.43 | 0.60 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 1.37 | 1.25 | 0.77 | 0.38 | 0.95 | 1.69 | 1.55 | 1.42 | 1.53 | 0.82 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 4.32 | 3.92 | 3.18 | 2.54 | 2.97 | 3.60 | 3.30 | 3.03 | 3.02 | 2.16 | 1.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 7.68 | 6.97 | 5.92 | 5.02 | 5.28 | 5.78 | 5.30 | 4.86 | 4.73 | 3.69 | 2.55 | 1.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 12.81 | 11.62 | 10.12 | 8.82 | 8.80 | 9.06 | 8.32 | 7.63 | 7.29 | 6.01 | 4.65 | 3.06 | 1.67 | - | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 19.38 | 17.57 | 15.51 | 13.70 | 13.31 | 13.26 | 12.17 | 11.16 | 10.57 | 8.99 | 7.35 | 5.49 | 3.84 | 1.92 | - | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 26.83 | 24.34 | 21.62 | 19.24 | 18.43 | 18.03 | 16.54 | 15.17 | 14.28 | 12.36 | 10.42 | 8.25 | 6.32 | 4.11 | 1.92 | - | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 35.27 | 31.99 | 28.55 | 25.51 | 24.23 | 23.41 | 21.48 | 19.71 | 18.48 | 16.19 | 13.90 | 11.38 | 9.14 | 6.62 | 4.11 | 1.92 | - | X | X | X | X | X | X | X | X | X | X |
| 2001 | 44.80 | 40.63 | 36.37 | 32.60 | 30.77 | 29.49 | 27.05 | 24.82 | 23.22 | 20.50 | 17.82 | 14.93 | 12.34 | 9.46 | 6.62 | 4.11 | 1.92 | - | X | X | X | X | X | X | X | X | X |
| 2002 | 55.69 | 50.51 | 45.31 | 40.71 | 38.25 | 36.42 | 33.42 | 30.66 | 28.62 | 25.42 | 22.32 | 19.00 | 16.03 | 12.75 | 9.53 | 6.68 | 4.18 | 1.98 | - | X | X | X | X | X | X | X | X |
| 2003 | 68.57 | 62.19 | 55.89 | 50.31 | 47.09 | 44.61 | 40.93 | 37.55 | 35.00 | 31.25 | 27.64 | 23.84 | 20.42 | 16.71 | 13.05 | 9.82 | 6.96 | 4.45 | 2.18 | - | X | X | X | X | X | X | X |
| 2004 | 82.85 | 75.14 | 67.63 | 60.97 | 56.90 | 53.68 | 49.25 | 45.18 | 42.05 | 37.70 | 33.56 | 29.23 | 25.34 | 21.15 | 17.04 | 13.38 | 10.15 | 7.29 | 4.72 | 2.25 | - | X | X | X | X | X | X |
| 2005 | 99.22 | 90.00 | 81.09 | 73.20 | 68.15 | 64.06 | 58.77 | 53.92 | 50.13 | 45.10 | 40.34 | 35.44 | 31.01 | 26.29 | 21.67 | 17.55 | 13.90 | 10.66 | 7.73 | 4.94 | 2.41 | - | X | X | X | X | X |
| 2006 | 118.61 | 107.58 | 97.04 | 87.69 | 81.46 | 76.34 | 70.04 | 64.26 | 59.68 | 53.85 | 48.39 | 42.81 | 37.77 | 32.44 | 27.23 | 22.58 | 18.44 | 14.76 | 11.43 | 8.27 | 5.41 | 2.70 | - | X | X | X | X |
| 2007 | 139.95 | 126.94 | 114.60 | 103.64 | 96.12 | 89.86 | 82.44 | 75.63 | 70.18 | 63.49 | 57.25 | 50.94 | 45.21 | 39.22 | 33.37 | 28.14 | 23.47 | 19.30 | 15.53 | 11.97 | 8.76 | 5.72 | 2.70 | - | X | X | X |
| 2008 | 163.40 | 148.20 | 133.89 | 121.17 | 112.22 | 104.70 | 96.06 | 88.12 | 81.73 | 74.08 | 66.99 | 59.87 | 53.41 | 46.69 | 40.15 | 34.28 | 29.03 | 24.33 | 20.08 | 16.08 | 12.48 | 9.08 | 5.72 | 2.70 | - | X | X |
| 2009 | 183.30 | 166.26 | 150.26 | 136.04 | 125.89 | 117.32 | 107.63 | 98.74 | 91.54 | 83.07 | 75.25 | 67.42 | 60.32 | 52.96 | 45.81 | 39.39 | 33.63 | 28.47 | 23.80 | 19.41 | 15.47 | 11.75 | 8.09 | 4.80 | 1.84 | - | X |
| 2010 | 202.72 | 183.87 | 166.23 | 150.54 | 139.23 | 129.63 | 118.93 | 109.11 | 101.12 | 91.84 | 83.30 | 74.78 | 67.04 | 59.06 | 51.30 | 44.33 | 38.06 | 32.45 | 27.37 | 22.60 | 18.32 | 14.29 | 10.33 | 6.76 | 3.55 | 1.53 | - |

**Note:**

[1] Values expressed as percentages.

**Sources:**

[1] Trial Exhibit 189, Dividend Interest Rate Tables.

[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants without Direct Recognition and a 5% Policy Loan Rate**
Deposited in Column Year and Withdrawn in Row Year
Based on Hoyer Report Table 9
All Zero and Negative Values Highlighted
1985 - 2010

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1986 | 0.21 | 0.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1987 | 0.45 | 0.41 | 0.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | 0.00 | -0.37 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1989 | -0.81 | -0.73 | -0.89 | -1.02 | -0.56 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1990 | -0.88 | -0.80 | -0.97 | -1.11 | -0.61 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1991 | -0.95 | -0.86 | -1.05 | -1.20 | -0.66 | 0.00 | -0.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1992 | -1.37 | -1.24 | -1.42 | -1.56 | -0.96 | -0.22 | -0.20 | 0.56 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1993 | -0.36 | -0.33 | -0.60 | -0.83 | -0.25 | 0.48 | 0.44 | 0.41 | 0.56 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 1.22 | 1.11 | 0.68 | 0.33 | 0.85 | 1.54 | 1.42 | 1.31 | 1.41 | 0.75 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 3.91 | 3.55 | 2.90 | 2.33 | 2.73 | 3.32 | 3.06 | 2.82 | 2.82 | 2.02 | 1.14 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 6.97 | 6.33 | 5.41 | 4.61 | 4.87 | 5.34 | 4.92 | 4.53 | 4.42 | 3.47 | 2.44 | 1.14 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 11.61 | 10.54 | 9.24 | 8.10 | 8.11 | 8.38 | 7.72 | 7.11 | 6.82 | 5.65 | 4.42 | 2.92 | 1.59 | - | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 17.53 | 15.92 | 14.13 | 12.55 | 12.24 | 12.24 | 11.28 | 10.39 | 9.88 | 8.44 | 6.96 | 5.21 | 3.66 | 1.83 | - | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 24.23 | 22.01 | 19.66 | 17.59 | 16.92 | 16.61 | 15.30 | 14.09 | 13.32 | 11.58 | 9.84 | 7.81 | 6.00 | 3.91 | 1.83 | - | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 31.77 | 28.86 | 25.89 | 23.26 | 22.18 | 21.52 | 19.83 | 18.26 | 17.20 | 15.13 | 13.08 | 10.75 | 8.66 | 6.28 | 3.91 | 1.83 | - | X | X | X | X | X | X | X | X | X | X |
| 2001 | 40.25 | 36.56 | 32.90 | 29.65 | 28.10 | 27.04 | 24.91 | 22.95 | 21.56 | 19.12 | 16.73 | 14.05 | 11.65 | 8.96 | 6.28 | 3.91 | 1.83 | - | X | X | X | X | X | X | X | X | X |
| 2002 | 49.83 | 45.26 | 40.81 | 36.86 | 34.79 | 33.27 | 30.65 | 28.23 | 26.47 | 23.61 | 20.86 | 17.80 | 15.06 | 12.01 | 8.99 | 6.32 | 3.95 | 1.87 | - | X | X | X | X | X | X | X | X |
| 2003 | 60.64 | 55.07 | 49.75 | 45.02 | 42.34 | 40.29 | 37.11 | 34.19 | 32.01 | 28.69 | 25.52 | 22.05 | 18.93 | 15.50 | 12.11 | 9.10 | 6.43 | 4.06 | 2.12 | - | X | X | X | X | X | X | X |
| 2004 | 73.07 | 66.36 | 60.03 | 54.40 | 51.01 | 47.71 | 44.54 | 41.03 | 38.36 | 34.52 | 30.89 | 26.97 | 23.43 | 19.58 | 15.78 | 12.39 | 9.38 | 6.71 | 4.32 | 2.12 | - | X | X | X | X | X | X |
| 2005 | 86.13 | 78.23 | 70.85 | 64.27 | 60.13 | 56.81 | 52.33 | 48.21 | 45.03 | 40.65 | 36.54 | 32.14 | 28.17 | 23.88 | 19.66 | 15.89 | 12.53 | 9.54 | 6.85 | 4.40 | 2.04 | - | X | X | X | X | X |
| 2006 | 105.94 | 96.22 | 87.25 | 79.26 | 73.96 | 69.61 | 64.13 | 59.08 | 55.11 | 49.94 | 45.13 | 40.05 | 35.45 | 30.54 | 25.73 | 21.42 | 17.56 | 14.11 | 11.01 | 8.18 | 5.48 | 3.15 | - | X | X | X | X |
| 2007 | 127.82 | 116.09 | 105.37 | 95.82 | 89.24 | 83.75 | 77.15 | 71.08 | 66.23 | 60.20 | 54.61 | 48.79 | 43.50 | 37.92 | 32.46 | 27.55 | 23.14 | 19.19 | 15.63 | 12.39 | 9.33 | 6.67 | 3.15 | - | X | X | X |
| 2008 | 151.94 | 138.00 | 125.36 | 114.08 | 106.08 | 99.33 | 91.51 | 84.30 | 78.50 | 71.51 | 65.08 | 58.44 | 52.39 | 46.08 | 39.90 | 34.33 | 29.32 | 24.82 | 20.77 | 17.08 | 13.62 | 10.60 | 6.67 | 3.15 | - | X | X |
| 2009 | 172.17 | 156.38 | 142.11 | 129.38 | 120.20 | 112.42 | 103.56 | 95.40 | 88.80 | 80.99 | 73.84 | 66.50 | 59.81 | 52.85 | 46.06 | 39.93 | 34.40 | 29.43 | 24.94 | 20.87 | 17.05 | 13.74 | 9.45 | 5.60 | 2.15 | - | X |
| 2010 | 191.30 | 173.76 | 157.95 | 143.84 | 133.56 | 124.80 | 114.97 | 105.91 | 98.56 | 89.97 | 82.12 | 74.11 | 66.80 | 59.22 | 51.83 | 45.15 | 39.13 | 33.70 | 28.81 | 24.37 | 20.21 | 16.60 | 11.96 | 7.79 | 4.06 | 1.70 | - |

**Note:**
[1] Values expressed as percentages.

**Sources:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.
[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

STATE OF WISCONSIN      CIRCUIT COURT      MILWAUKEE COUNTY

03CV011988

MARLEEN M. LAPLANT
W7868 Riedel Lane
Fort Atkinson, Wisconsin 53538, on her own
behalf and on behalf of a class similarly
situated,

HON. THOMAS R. COOPER, BR. 28
CIVIL N

                    Plaintiffs,      Case No.

             vs.             Code:   30701
                                  Declaratory Judgment

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,
720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

                    Defendant.

                    SUMMONS



FILED AND
AUTHENTICATED
0 AUG 2 8 2003 0
JOHN BARRETT
Clerk of Circuit Court

THE STATE OF WISCONSIN

To each person named above as a defendant:

    You are hereby notified that the plaintiffs named above have filed a
lawsuit or other legal action against you. The complaint, which is attached,
states the nature and basis of the legal action.

    Within forty-five (45) days of receiving this summons, you must respond
with a written answer, as that term is used in Chapter 802 of the Wisconsin

Statutes, to the complaint. The court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the court, whose address is Circuit Court of Milwaukee County, Milwaukee County Courthouse, 901 North 9th Street, Milwaukee, Wisconsin 53233, and to plaintiffs' attorneys, Kersten & McKinnon, S.C., at 11518 North Port Washington Road, Suite 104, Mequon, Wisconsin 53092. You may have an attorney help or represent you.

If you do not provide a proper answer within forty-five (45) days, the court may grant judgment against you for the award of money or other legal action requested in the complaint, and you may lose your right to object to anything that is or may be incorrect in the complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Signed at Mequon, Wisconsin, this _26th_ day of August, 2008.

KERSTEN & McKINNON, S.C.,

by: _____

George P. Kersten
State Bar No.   1008099
One of the Attorneys for the Plaintiffs
KERSTEN & McKINNON, S.C.
11518 North Port Washington Rd.
Suite 104
Mequon, WI  53092
Phone:  262-241-0054
Fax:  262-241-5935

**Plaintiffs' Counsel:**

STRAUS & BOIES, LLP
David Boies III
Timothy D. Battin
4041 University Drive, Fifth Floor
Fairfax, VA   22030
Telephone: (703) 764-8700
Fax: (703) 764-8704

STRAUS & BOIES, LLP
Mark J. Schirmer
1661 International Place Drive
Suite 400
Memphis, TN   38120

GUERRIERI, EDMOND, CLAYMAN &
BARTOS, PC
Jeffrey A. Bartos
1625 Massachusetts Avenue, NW
Washington, DC 20036
(202) 624-7400

KERSTEN & MCKINNON, S.C.
George P. Kersten (1008099)
E. Campion Kersten (1007641)
Kenan J. Kersten (1008505)
11518 N. Port Washington Rd.
Suite 104
Mequon, WI   53092
Telephone:(262) 241-0054Fax:  (262)
241-5935

GALANIS, POLLACK, JACOBS &
JOHNSON, S.C.
Mark B. Pollack, WI Bar # 1010557
Maria S. Lazar, WI Bar # 1017150
330 East Kilbourn Avenue
Two Plaza East, Suite 560
Milwaukee, WI   53202

3

**STATE OF WISCONSIN**    **CIRCUIT COURT    MILWAUKEE COUNTY**

---

MARLEEN M. LaPLANT
W7868 Riedel Lane
Fort Atkinson, Wisconsin 53538, on her
own behalf and on behalf of a class
similarly situated,

                Case No.

          Plaintiffs,

                Code:    30701

        vs.              Declaratory Judgment

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,
720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

          Defendant.

---

**COMPLAINT AND JURY DEMAND**



FILED AND
AUTHENTICATED

AUG 2 8 2008

JOHN BARRETT
Clerk of Circuit Court

---

    The plaintiff Marleen M. LaPlant by Straus & Boies, LLP, Guerrieri,

Edmond, Clayman & Bartos, PC, Kersten & McKinnon, S.C. and Galanis,

Pollack, Jacobs & Johnson, S.C., her attorneys, complains on her own behalf

and on behalf of the Class identified below against the defendant,

Northwestern Mutual Life Insurance Company ("Northwestern" or the

"Company"), as follows:

## I.  INTRODUCTION

1.     This case arises from a long-running, sophisticated, and ongoing scheme by Northwestern to quietly, deliberately and repeatedly cheat owners of certain Northwestern annuities out of millions of dollars in dividends to which they were and are clearly entitled under the explicit, unambiguous provisions of both the annuity contract language and controlling Wisconsin state law.  These annuities are participating annuity contracts (the "Annuity" or "Annuities"), each requiring Northwestern to pay owners of the Annuities (the "Annuitants") dividends based on their share of Northwestern's annual profits or "divisible surplus" (the "Dividends").  Despite the clarity of its obligations under the Annuity contracts and state statutes, Northwestern has, to this day, wrongfully refused to credit the Dividends to Annuitants, thereby substantially shortchanging Annuitants and significantly decreasing both the value of the Annuities and the amounts ultimately payable to Annuitants thereunder.

2.     To initiate this scheme, Northwestern unilaterally and deceptively altered the basis on which it credited the accounts of Annuitants. Ignoring the Annuity contract's plain requirement to credit the Annuitants' accounts with a genuine share of the Company's divisible surplus as dividends, Northwestern instead has credited Annuitants with what it

2

continues to call "dividends" but in fact is merely the interest earned on an account limited to some short-term bonds exclusively and secretly chosen by Northwestern. Thus, instead of receiving the contracted-for investment in the growth and profitability of Northwestern, Annuitants have been unilaterally relegated to a much less valuable and more limited investment in some short-term bonds, all without the Annuitants' consent or even notice. In fact, as was fully anticipated by Northwestern, the return on the short-term bond account has lagged far behind the overall growth and profitability of Northwestern, which is largely determined by the return on its long-term oriented general account portfolio of investments in a broad variety of securities, real estate, business enterprises, and other financial vehicles, and reflects both current yield and capital gains on those investments.

3.     A key component of Northwestern's scheme was its undisclosed conversion of the Annuities into "no-dividend" annuities, substantially destroying the Annuitants' rights to share in Northwestern's financial performance and divisible surplus as owners of the Company, a relationship expressly acknowledged by Northwestern in its Annual Reports to policyholders. Annuitants never consented to this forfeiture of their rights as Company owners / policyholders and were never provided notice that Northwestern had ceased to treat them as owners of the Company entitled to

3

their shares of its divisible surplus as dividends. Indeed, Northwestern actively and purposefully concealed this extinguishing of Annuitants' rights by, for example, disguising the change by phasing it in over several years, continuing to characterize as "dividends" what really is only interest on the short-term bond account, and obfuscating the source of payments and credits on account statements.

4. Compounding this illegal conduct, Northwestern wilfully violated its own internal policies and procedures by not notifying Annuitants or obtaining their written consent regarding a material change in the Annuity contract with potentially enormous financial consequences. Indeed, two years prior to making the unilateral change alleged in this case, Northwestern did notify these very Annuitants and solicited their written consent regarding a different, less important change in the Annuity contract that had a smaller financial impact on Annuitants.

5. Northwestern's manipulation of its dividend determination and payment procedures constitutes an intentional disregard of the rights of the Annuitants under the contract and state law to share in the divisible surplus of the Company. This manipulation is all the more outrageous because it eviscerates the earnings on a savings vehicle specifically designed for retirement and long-term investors.

4

6.      Northwestern has always known it owes a fiduciary duty to Annuitants, whose savings and retirement expectations are entrusted to its management and control.  Northwestern knows as well that it is responsible for the actions of its officers and directors (expressly called "trustees" in Northwestern's corporate documents) who have participated in the misconduct alleged herein and are fiduciaries to the Annuitants in respect to dividend rights.  Northwestern also knows that it was, and is, acting in its own interests, not in the interests of Annuitants when making the undisclosed, illegal and unfair dividend determinations alleged herein.

7.      Pursuant to the Wisconsin Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, plaintiff seeks a ruling from this Court determining the parties' rights and status with respect to the Annuity contracts at issue in this case.

## II.   THE PARTIES

8.      The plaintiff Marleen M. LaPlant resides at W7868 Riedel Lane, in the City of Fort Atkinson, Jefferson County, Wisconsin 53538.  She entered into the annuity contract with Northwestern attached hereto as Exhibit A on May 1, 1975.

9.      The defendant, Northwestern Mutual Life Insurance Company ("Northwestern" or the "Company"), is a  mutual insurance company

5

organized under the laws of Wisconsin. Northwestern's principal offices are located at 720 East Wisconsin Avenue, in the City and County of Milwaukee, Wisconsin 53202. Its registered agent for service at that address is Raymond J. Manista.

10.    Northwestern's officers, employees, and trustees (who function as company directors) who caused or participated in causing Northwestern to credit the Class Members' accounts improperly were at all relevant times acting within the scope and in the course of their respective offices, employment and trusteeships and were acting with the full knowledge, authority and approval of Northwestern's highest management and board of trustees.

## III.  CLASS ACTION ALLEGATIONS

11.    Marleen LaPlant brings this action on her own behalf and, under Wis. Stats. § 803.08, on behalf of all persons who are members of the Class, defined as follows:

> All persons who (a) purchased an Annuity prior to March 1985, (b) were residents of the State of Wisconsin at the time of purchase, and (c) did not expressly consent, in writing, to limit or surrender their right to fully participate in Northwestern's divisible surplus during the time that they owned the Annuities. Excluded from the Class are any of Northwestern's officers, trustees, employees, family members, or affiliates.

6

12.    Upon information and belief, the number of Class members exceeds one thousand. The exact number of Class members is known only by Northwestern.

13.    The claims of Marleen LaPlant are typical of the claims of all Class members because, among other reasons, (a) she and all Class members entered into Annuity contracts with Northwestern that are the same in all relevant respects; (b) she and all Class members were residents of the State of Wisconsin at the time that they purchased the Annuity contracts; (c) she and all Class members did not consent to limit or surrender their right to fully participate in Northwestern's divisible surplus during the time that they owned the Annuities, and (d) Northwestern's conduct in connection with the matters set forth herein was directed against and applicable to all Class members as a whole (i.e., the "block" of Annuities described herein).

14.    Marleen LaPlant will fairly and adequately represent the interests of all Class members because her claims are similar and not antagonistic to the claims of all Class members and she has retained competent counsel experienced in the prosecution of complex and class action litigation.

15.    There are numerous questions of law and fact that are common to the claims of all Class members including: (a) whether Class members

7

became policy holders and owners of Northwestern by entering into the Annuity contracts; (b) whether Northwestern failed to follow its own internal policies and procedures by failing to seek written consent for the change in the basis for determining dividends; (c) whether Northwestern had the unilateral right to convert the Annuities into no-dividend annuities; (d) how and why Northwestern made this unilateral change; (e) what steps were taken to make the change; (f) why Northwestern failed to disclose the change to owners of the Annuities; (g) why Northwestern failed to seek the Annuity Owners' agreement to the change; (h) on what authority Northwestern claims to have the right to make the change unilaterally; (i) whether the account statements and other class wide notices provided to Annuitants adequately disclosed the change in the basis for determining dividends; (j) whether declaratory relief requested herein is appropriate; (k) whether the terms of the annuity contract are unambiguous; (l) whether Northwestern and its officers and trustees owed Class members a fiduciary duty as a result of entering into the Annuity contracts or by virtue of the duties imposed upon Northwestern by Wisconsin state law; (m) whether the Wisconsin State Statutes that govern the conduct at issue in this case are unambiguous; and (n) whether Northwestern is vicariously liable for the conduct of its officers and trustees in the performance of their duties to the Class as alleged herein.

16.     The common questions among Class members predominate over issues of law or fact, if any, that affect only individual Class members. Indeed, all issues in this case are common Class issues because Marleen LaPlant has confined her requested relief to only a Class-wide claim arising from the identical contract language and applicable statute, the identical acts of Northwestern under that contract language and statute which were directed against the Class as a whole, and the identical effect of these identical acts upon the Class. A class action is the superior, if not the only practicable, method to resolve the claims asserted herein.

## IV.   GENERAL ALLEGATIONS

17.     Northwestern is in the business of selling and managing insurance products and annuities, including the Annuities that are the subject of this litigation.

18.     Northwestern is a "mutual" insurance company. As a mutual company, it is owned by and managed for the benefit of its participating policyowners. Its Annual Report published to policyowners in January 1985 stated that Northwestern "is owned by more than 1.7 million policyowners," which includes (among others) all members of the Class.

19.     Northwestern manages its business for the purpose of ensuring the ability to pay the claims of its policyowners and to reduce the obligations

9

of its participating policyowners and increase the cash value of their policies by crediting their policy accounts with their respective shares of the Company's profits (its "divisible surplus") in the form of dividends.

20.     For many years prior to 1985, Northwestern marketed and sold the Annuities. These are deferred annuities expressly denominated as "participating". The Annuities provide for participation in the Company's profits and growth through the payment or crediting of annual dividends. When an Annuity matures, Northwestern makes retirement payments to the Annuitant based on the enhanced value to which the Annuity has grown through the dividends. The contract also gives the Annuitant options to borrow against the Annuity or cash it in prior to or at maturity. *See* Exhibit A.

21.     The terms of the Annuities require Northwestern to credit the accounts of Annuitants with annual dividends equal to their respective shares of Northwestern's divisible surplus. Thus, the language of Exhibit A (§ 4.1, emphasis added), as well as equivalent language in the Annuities of all Class members, states:

> *This policy shall share in the divisible surplus, if any, of the*
> *Company. This policy's share shall be determined annually*
> *and credited as a dividend.* Payment of the first dividend is
> contingent upon payment of the premium or premiums for
> the second policy year and shall be credited proportionately

as each premium is paid.  Thereafter, each dividend shall
be payable on the policy anniversary.

22.   The foregoing and other provisions of the Annuities provide that

the annual growth in the value of the Annuities is based on a combination of

the premiums paid by Annuitants and the Dividends paid by Northwestern

reflecting the Annuitants' share of the divisible surplus.  Thus, the terms of

the Annuities entitle Annuitants to an equity share in Northwestern and to

share in its growth.  As Donald J. Schuenke, then president and CEO of

Northwestern, wrote in a January 31, 1984 letter to policyowners, "Dividends

are a way in which you [the policyowner]  share the improved results of your

company's operations."

23.   The obligations of Northwestern arising from the contract

provisions alleged above are provided also by Wisconsin's insurance laws,

which control Northwestern as a mutual insurance company organized under

Wisconsin law and domiciled here.  Wis. Stats. § 632.62(2) provides:

> **632.62(2)  Participation.**  Every participating policy
> shall by its terms give its holder full right to participate
> annually in the part of the surplus accumulations from the
> participating business of the insurer that are to be
> distributed.

The surplus accumulation to be distributed by Wisconsin mutuals is

determined according to Wis. Stats. § 632.62(4)(b), which provides:

11

632.62(4)(b)  *Payment.*  Every insurer doing a participating business shall annually ascertain the surplus over required reserves and other liabilities.  After setting aside such contingency reserves as may be considered necessary and be lawful, such reasonable nondistributable surplus as is needed to permit orderly growth, making provision for the payment of reasonable dividends upon capital stock and such sums as are required by prior contracts to be held on account of deferred dividend policies, the remaining surplus shall be equitably apportioned and returned as a dividend to the participating policyholders or certificate holders entitled to share therein.  A dividend may be conditioned on the payment of the succeeding year's premium only on the first and second anniversaries of the policy.

24.   Until 1985, Northwestern credited dividends to the Annuity accounts in accordance with the contract language and statutory provisions quoted above.  Those dividends were a genuine participation in the financial performance of the Company as a whole, which, as noted above, is largely determined by the return on Northwestern's general account portfolio of investments in a broad variety of securities, real estate, business enterprises and other financial vehicles, and reflects both current yield and capital gains on those investments. Thus, holders of the Annuities had an important economic interest in Northwestern and could expect significant returns in their Annuity accounts based upon Northwestern's profitability and growth through the years.

12

25.    The Annuity contracts contained no provision relieving Northwestern of its duties or allowing unilateral changes in its obligations thereunder. For example, the Annuity contracts (drafted solely by Northwestern) state: "This policy and the application, a copy of which is attached when the policy is issued, constitute the entire contract." Further, the application forms for the Annuities (likewise drafted by Northwestern) state: "No agent is authorized to make or alter contracts or to waive any of the Company's rights or requirements." And Northwestern's contracts with the agents through which it sold the Annuities (likewise drafted by Northwestern) provide: "Agent shall have no power, personally or on behalf of the Company or First Party, to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract."

26.    The terms of the Annuity contracts thus clearly establish the rights and obligations of Northwestern and the Annuitants and any alterations in those rights and obligations can properly be effectuated only in the usual way that binding written contracts are modified -- by notifying Annuitants of the proposed change and obtaining their consent.

27.    By 1985, however, Northwestern had become dissatisfied with the Annuity contracts. By the early 1980's economic problems experienced by the country had produced an inverted yield curve on investments, in which short-

term rates exceeded long-term rates. Accordingly, spiking short-term rates available through bank CDs and other investments exceeded what Northwestern was willing to pay as dividends on the Annuities. As a result, Northwestern's Annuity sales declined sharply and many Annuitants borrowed on their Annuities or cashed them in to invest elsewhere. In Northwestern's view (as voiced by its chief actuary), Annuitants "simply had too much control over their money." Northwestern's response to this "problem" was twofold.

28. First, to compete with alternative investments reflecting the temporary spike in short-term interest rates, Northwestern crafted a new form of annuity expressly designed to *not participate* in the Company's financial performance through dividends. Under its contract language it would instead be credited annually with the interest earned on a short-term bond account established by Northwestern. Northwestern denominated this "no-dividend" form of annuity as its "MN series." These were ready to be marketed by 1985.

29. Second, Northwestern simultaneously decided to unilaterally change the nature of the annuities already in force (which it internally called the "Pre-MN" annuities) by secretly treating them like the no-dividend annuities. In an internal memo, a senior Northwestern officer explained the

14

reason for this: "The real problem is with the [old, in-force or 'Pre-MN' annuities]." According to him, "We can't have the old [Pre-MN annuity] and the new [MN series] running side-by-side, *so the old [Pre-MN annuity] has to be made to look like the new [MN series] even though the contract language might be different.*" The "Pre-MN" annuities thus referred to are the Annuities owned by the Class. Northwestern's unilateral conversion of these Annuities into the functional equivalent of the MN no-dividend annuities is the underlying basis for this lawsuit.

30. To convert the Class's "Pre-MN" Annuities into no-dividend annuities, Northwestern internally set up an account consisting of short-term bonds, the interest on which (less expenses and taxes) became what Northwestern continued to call "dividends" for the Annuities. In a memorandum to top management at Northwestern, the actuary overseeing this 1985 change in the Class's dividend rights describes the predetermined "separate portfolio of assets for the in-force annuities" and the "gross interest rate" it earns, and gives the formula for determining the Class members' "dividend interest rate," *i.e.,* their dividends: "It is determined by taking the 'gross interest rate' (net of investment expenses) and deducting a tax charge and sometimes an expense charge."

31. Northwestern implemented this change gradually, so that the Class members were unlikely to realize what was happening. It did this by combining the short-term interest income with a partial participation, gradually diminishing over several years, in the divisible surplus generated by Northwestern's general account portfolio.

32. No Pre-MN annuities were sold after March 1985, and thus they became a "closed block." As planned, over the ensuing several years Northwestern quietly transformed the Class' block of Annuities into the equivalent of the new no-dividend annuities. All of this misconduct was done by Northwestern against the Class as a whole -- i.e., to that "block" of annuities -- long after the Annuities had been sold to the Class.

33. Northwestern never solicited or obtained the Annuitants' agreement to this 1985 change, nor did it even disclose the change to them in its Annual Reports to policyowners or otherwise. Instead, at the very time the change was being made, Northwestern's Annual Report sent to the Annuitants in early 1985 told them that Northwestern had "continued to emphasize a long-term approach to investments and dividends that optimizes returns for its policyowners and avoids short-term swings."

34. Each year since the phase-in of the 1985 change was complete, Northwestern ascertains the net interest earned by the predetermined short-

16

term bond account, and that establishes the so-called "dividends" for the Class' Annuities (the "closed block" of "Pre-MN" annuities). After Northwestern takes that annual, illegal action against the block, its computers ratably credit the Annuitants' individual accounts with amounts equal to their respective shares of the interest earned on the short-term bond account.

35. Because Northwestern did not follow its own policy and practice of informing the Annuitants of the change and seeking their written consent to alter the terms of the Annuities, the Annuitants were left unaware and without a reasonable means for learning that Northwestern was no longer crediting genuine dividends to their accounts.

## V. DECLARATORY JUDGMENT ALLEGATIONS

36. Marleen LaPlant repeats and realleges, as if fully set forth herein, each of the allegations contained in the preceding paragraphs of this Complaint.

37. The relative rights and status of the parties under the terms of the Annuity contracts and Wis. Stats. § 632.62 are a matter of actual and material dispute among the parties.

38.    A determination by this Court of the rights and status of the parties will materially advance the resolution of the dispute between the parties.

39.    The terms of the Annuities and Wisconsin law require that each year Northwestern determine the Annuitants' share of, and issue dividends from, the divisible surplus to credit the accounts of Marleen LaPlant and other Annuitants accordingly.

40.    Each year since 1985, Northwestern has failed to credit Class members' accounts with their share of Northwestern's divisible surplus. Northwestern's use of a short-term bond account to determine the "dividends" to be credited to Annuitants instead of a genuine "share" of "the divisible surplus of the Company" is contrary to the express terms of the Annuity contracts and Wisconsin law.

41.    Northwestern's actions have injured and will continue to injure Annuitants by under-crediting their accounts by millions of dollars per year.

42.    The declaratory relief requested herein should lead to a timely and final resolution of the dispute between Northwestern and the Class without unduly burdening the courts.  Faced with a clear judicial determination of the rights and status of the parties, Northwestern should be expected to do the right thing by rectifying its wrongful treatment of

18

Annuitants through a reasonable and equitable resolution. In all events, the declaratory relief requested here will substantially narrow the issues separating the parties and materially advance any further litigation should that be necessary.

43.    Under Wisconsin's version of the Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, Plaintiff and the members of the Class are entitled to a declaration of their rights and status under the Annuities and applicable state law as requested herein.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests an order from this Court certifying the Class as proposed herein and an order under Wis. Stats. § 806.04 declaring that:

A.    Wisconsin law governs the interpretation and enforcement of Class members' Annuity contracts with Northwestern;

B.    Wis. Stats. § 632.62 is unambiguous with respect to Northwestern's obligation to determine, allocate, and pay the annual divisible surplus to Northwestern policy holders;

C.    The Annuitants became policy holders and owners of Northwestern by entering into the Annuity contracts with Northwestern;

19

D.  The Annuity contracts between Northwestern and Class members are unambiguous with respect to Northwestern's obligation to determine and credit Class members with a genuine share of the Company's annual divisible surplus;

E.  The Annuity contracts between Class members and Northwestern, by their unambiguous terms, entitle Class members to receive dividends genuinely based on the Company's annual divisible surplus during the period in which they own or owned the Annuities;

F.  Northwestern owes members of the Class a fiduciary duty pursuant to the terms of the Annuity contracts and under Wisconsin law;

G.  Northwestern's conduct as alleged herein demonstrates an intent to act in its own self interest, not in the interests of Annuitants;

H.  Northwestern is liable for the conduct of its officers and trustees as alleged herein;

I.  By basing the Class' so-called "dividends" on the interest earned on a short-term bond account, Northwestern failed to determine, allocate, and credit to Class members their

20

proper and equitable share of the Company's divisible

surplus in accordance with the unambiguous provisions of

the Annuity contracts and Wisconsin state law;

J.   Northwestern's conduct as alleged in the complaint was

intended to deceive Class members concerning the true

method by which Defendants determined dividends and to

conceal the adverse economic effects to Class members

resulting from Northwestern's failure to pay Class

members their share of the divisible surplus.

K.   By its conduct alleged herein, Northwestern acted in an

intentional disregard of the rights of the Class.

Respectfully submitted this _26th_ day of August, 2008.


KERSTEN & MCKINNON, S.C.                STRAUS & BOIES, LLP,
Attorneys for the Plaintiffs,          Attorneys for the Plaintiffs,

by: _____            by: _____
    George P. Kersten (1008099)            David Boies III
    E. Campion Kersten (1007641)           Timothy D. Battin
    Kenan J. Kersten (1008505)             Mark J. Schirmer
    KERSTEN & MCKINNON, S.C.               STRAUS & BOIES, LLP
    11518 N. Port Washington Rd.           4041 University Drive
    Suite 104                              Fifth Floor
    Mequon, WI  53092                      Fairfax, VA  22030
    Telephone: (262) 241-0054              Telephone: (703) 764-8700
    Fax:  (262) 241-5935                   Fax: (703) 764-8704

21

Of Counsel:

GALANIS, POLLACK, JACOBS &
    JOHNSON, S.C.
Mark B. Pollack, WI Bar # 1010557
Maria S. Lazar, WI Bar # 1017150
330 East Kilbourn Avenue
Two Plaza East, Suite 560
Milwaukee, WI 53202

GUERRIERI, EDMOND, CLAYMAN &
    BARTOS, PC
Jeffrey A. Bartos
1625 Massachusetts Avenue, NW
Washington, DC 20036
(202) 624-7400

## DEMAND FOR A JURY

Mrs. LaPlant and the Plaintiff Class hereby demand trial by a jury of twelve persons of all issues of fact herein.

_____

George P. Kersten, one of the
attorneys for the Plaintiffs

---

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

Plaintiffs,

v.                                              Case No. 2:11-CV-00910

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, a
Wisconsin mutual insurance corporation,

Defendant.

---

## AFFIDAVIT OF JASON T. KLAWONN

---

STATE OF WISCONSIN )
                    )  ss
MILWAUKEE COUNTY )

I, Jason T. Klawonn, being first duly sworn under oath, depose and state:

1.     I am an adult resident of Kenosha, Wisconsin, and I am employed by defendant,

Northwestern Mutual.

2.     I was appointed vice president of Northwestern Mutual on June 1, 2012. In my

position as vice president – actuary, I have responsibility for actuarial life

insurance functions, reinsurance programs, and dividend scale process oversight.

Prior to my current role, I had responsibility for the methods, tools and

assumptions used to price life insurance products, life and annuity experience

studies, dividend scale process coordination and illustration testing. I started with

Northwestern Mutual in 1996 and have held various positions during my career

with Northwestern Mutual. Before joining Northwestern Mutual, I worked at the Principal Financial Group from 1990 to 1996. I graduated from Drake University with a bachelor's degree in Business Administration and a major in actuarial science. I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries.

3.    I am familiar with the manner in which Northwestern Mutual (the Company) calculates dividends for its policyholders.

4.    Northwestern Mutual has only one divisible surplus, which is determined each year. All dividends paid to the Company's policyholders, including those paid to all holders of Northwestern Mutual's pre-MN series annuities, have been paid from the divisible surplus of the Company.

5.    Broadly speaking, "surplus" represents that portion of the Company's assets that are in excess of its liabilities. "Divisible surplus" refers to that portion of the Company's surplus that the Company determines should be distributed to policyholders, rather than being retained by the Company to maintain its financial strength and stability.

6.    Determining the appropriate amount of surplus to be retained by the Company is a time-consuming, detailed and complicated process that requires the expertise and judgment of the Actuarial Department, management and the Board of Trustees.

7.    Northwestern Mutual determines the amount that it will retain as surplus annually by first determining the appropriate level of reserves. Reserves are for liabilities of the Company and represent the present value of the contractual benefit obligations of the Company, less the present value of future premiums.

8.    Next, the Company determines its additional liabilities. Once total liabilities are assessed, the Company balances those liabilities against its assets.

9.     The Company then engages in analysis to determine the appropriate level of surplus needed to protect against various contingencies and to provide for the future growth of the Company. Based upon the ongoing work of the Actuarial Department, the Controller's department, various investment departments, and the recommendations of the Management Committee, the Board of Trustees annually determines what amount of surplus should be retained by the Company, what amount is available to be distributed to policyholders, and how those distributions should be allocated among the Company's participating policyholders as dividends.

10.    One component of dividends issued to policyholders is the dividend interest rate (DIR). The DIR can vary based on, among other things, the type of policy. For example, the DIR for pre-MN annuities and whole life insurance policies have differed, even prior to the change in the method for calculating dividends for pre-MN annuities at issue in this litigation (the 1985 Change).

11.    Prior to the 1985 Change, in years where the DIR for pre-MN annuities differed from the DIR for life insurance policies the DIR for pre-MN annuities was typically lower than the life insurance DIR.

12.    The reason the DIR differed for pre-MN annuities and life insurance policies prior to the 1985 change was because the Company applied different charges to annuity and life policies prior to the 1985 Change, a practice that, to my understanding, plaintiffs do not contend was improper.

13.    Altering the Company's dividend determinations, either retrospectively or prospectively, upsets decisions of the Board of Trustees that are fundamental to how the Company operates. For example, if a policyholder claims that his policy and the policy group to which it belongs should have received greater dividends, there are only two sources from which additional dividends can come: (1) from retained surplus, in which case the

Company pays out more than was set as prudent by the Board; or (2) from already existing divisible surplus, in which case it must be reallocated away from some other group by an allocation different from the Board's determination.

14.     The process of allocating divisible surplus is a zero sum game. If pre-MN annuity policyholders are to receive a greater share of divisible surplus, then other series and types of policies will either receive less, or the Company will retain less surplus than the Board determined was prudent. The economic interests of different groups conflict over these types of changes.

15.     A judgment in this case requiring the Company to pay damages based upon a higher past and future dividend rate for pre-MN annuitants as well as possibly punitive damages could be contrary to the economic interests of the Company's other policyholders such as life insurance policyholders. For example, a judgment of $200,000,000 or more would impact the amount of available divisible surplus and would lower future life insurance policy dividends, including lowering the dividends for most if not all the approximately 4,600 putative class members who currently own Northwestern Mutual life insurance policies.

Dated at Milwaukee, Wisconsin this 27 day of June, 2013.

Jason T. Klawonn

Subscribed and sworn to before me
this 27 day of June, 2013.

Notary Public, State of Wisconsin
My commission: Is Permanent

4847-4794-2420, v. 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

        Plaintiffs,

    v.                                 Case No. 2:11-CV-00910

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, a
Wisconsin mutual insurance corporation,

        Defendant.

## AFFIDAVIT OF NICHOLAS J. SALES

STATE OF WISCONSIN )
                ) ss
MILWAUKEE COUNTY )

I, Nicholas J. Sales, being first duly sworn under oath, depose and state:

1.     I am an adult resident of Grafton, Wisconsin, and I am employed by defendant, Northwestern Mutual.

2.     I am a Senior Actuary for Northwestern Mutual, a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries.

3.     The information presented in this affidavit is based upon records maintained by Northwestern Mutual in the ordinary course of its business.

4.     I have reviewed the plaintiffs' proposed class. Members of the putative class resided as of March 31, 1985, in all 50 states and the District of Columbia.

5.     Putative class members' policies were issued in all 50 states and the District of Columbia.

6.     There are over 18,000 putative class members.

7.     Over 14,000 putative class members were non-Wisconsin residents when their policies were issued, and the majority of those class members do not reside in Wisconsin today based on the current or last known address of these putative class members in the company's records.

8.     Over 16,000 current or former pre-MN annuity policies, held by over 14,000 annuitants, are not included in the putative class because they signed the 1983 Amendment outside the state of Wisconsin.

9.     As of December 31, 2012 approximately 2,700 of the putative class members' policies remained in force.

10.     Approximately 16,000 putative class members have surrendered or otherwise terminated their policies.

11.     Over 8,500 putative class members surrendered or otherwise terminated their policies between 1985 and 1993.

12.     Over 5,000 putative class members concurrently owned Pre-MN annuities and Northwestern Mutual life insurance policies in 1993 and thereafter.

13.     According to company records, approximately 2,200 of the putative class members are known to be deceased. Additional putative class members may have died after their policies lapsed or surrendered.

14.     While Northwestern Mutual likely had information regarding the beneficiaries of the deceased putative class members at the time of their deaths, those beneficiaries themselves may now be deceased; may have changed addresses in the years since the

company's last contact with them; and in any event are not necessarily the representative(s) of the deceased putative class members' estates.

15. According to company records, approximately 8,400 of the putative class members last owned an annuity or life policy ten or more years ago. Thus, the last known address in our records for these 8,400 individuals is ten or more years old.

16. Approximately 4,600 putative class members owned Northwestern Mutual life insurance policies as of 12/31/2012.

17. Northwestern Mutual typically does not deal directly with individual annuitants, but instead relies on its network of independent contractor agents to market and sell its products and communicate with individual purchasers.

18. Northwestern Mutual provides its annuity and life insurance policyholders annual information concerning their policy values, including the dividends paid on their respective policies.

Dated at Milwaukee, Wisconsin this _27_ day of June, 2013.

_____
Nicholas J. Sales

Subscribed and sworn to before me
this _27_ day of June, 2013.

_____
Notary Public, State of Wisconsin
My commission: _١) Permanent_