# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                          Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

## APPENDIX TO NORTHWESTERN MUTUAL'S OPPOSITION TO

## PLAINTIFFS' MOTION TO CERTIFY A NATIONWIDE CLASS

### VOLUME II

**Items 16-32**

**Pages 300-521**

# Index to Northwestern Mutual's Appendix

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 1 | Robert Hoyer Deposition Transcript Excerpts | May 17, 2013 | 1 | I |
| 2 | Plaintiffs Proposed Findings of Fact, Conclusions of Law and Order for Judgment | Dec. 20, 2010 | 56 | I |
| 3 | Plaintiff's Reply Brief in Support of Class Certification | Sept. 30, 2009 | 85 | I |
| 4 | *Noonan* – Decision on Motion to Certify for Class Action | June 15, 2005 | 102 | I |
| 5 | *Noonan* – Plaintiffs' Brief in Support of Motions: (1) to Certify Class Trial of Count One (Declaratory Relief) and Class-Wide Issues of Count Two (Breach of Contract), and (2) for Partial Summary Judgment | Apr. 30, 2007 | 108 | I |
| 6 | *Noonan* – Decision on Motions to Certify for Class Action and Summary Judgment | Jan. 29, 2008 | 118 | I |
| 7 | Motion Hearing Transcript Excerpts | June 1, 2009 | 129 | I |
| 8 | Decision and Order on Motion of Plaintiff for Class Certification | Oct. 26, 2009 | 137 | I |
| 9 | Hearing Transcript Excerpts | Oct. 12, 2009 | 156 | I |
| 10 | Decision on Motion of Defendant to Dismiss | June 15, 2009 | 161 | I |
| 11 | Decision and Order | Aug. 20, 2012 | 180 | I |
| 12 | Expert Report of Michael J. Moore, Ph.D. | June 28, 2013 | 188 | I |
| 13 | Summons and Complaint | Aug. 26, 2008 | 267 | I |
| 14 | Affidavit of Jason T. Klawonn | June 27, 2013 | 293 | I |
| 15 | Affidavit of Nicholas J. Sales | June 27, 2013 | 297 | I |
| 16 | Expert Report of Ravi Dhar | July 1, 2013 | 300 | II |
| 17 | Expert Wtiness Report: Robert L. Hoyer, FSA, MAAA | Mar. 4, 2013 | 333 | II |
| 18 | Table 1, States prohibiting choice of law provisions specifying application of other states' law to resident policyholders | | 359 | II |
| 19 | Table 2, States Deeming Resident Policis as Made in the State and Subject to that state's law | | 360 | II |
| 20 | Table 3, States requiring insurance companies to comply with law of state of insured's residence | | 361 | II |
| 21 | Northwestern Mutual's Opposition to Plaintiff's Motion to Remand | Nov. 18, 2011 | 362 | II |
| 22 | Marleen LaPlant Deposition Transcript Excerpts | Sept. 9, 2009 | 371 | II |
| 23 | LaPlant Annuity policy | May 1, 1975 | 395 | II |
| 24 | LaPlant surrender | July 3, 2008 | 408 | II |
| 25 | Webster's Collegiate Dictionary: definition of surrender | 1996 | 412 | II |
| 26 | Black's Law Dictionary: definition of surrender | 1999 | 416 | II |
| 27 | Trial Ex. 157, NML Single Premium Retirement Annuity Policy for Bruce Williams | May 3, 1986 | 419 | II |
| 28 | Trial Ex. 155, NML Flexible Premium Annuity Policy for Bruce Williams | July 27, 1984 | 433 | II |

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 29 | Bruce Williams Deposition Transcript Excerpts | May 8, 2010 | 450 | II |
| 30 | November 8, 2010 pm Trial Transcript Excerpts | Nov. 8, 2010 | 460 | II |
| 31 | November 8, 2010 am Trial Transcript Excerpts | Nov. 8, 2010 | 471 | II |
| 32 | Expert Witness Report: Robert L. Hoyer, FSA, MAAA | June 30, 2010 | 477 | II |
| 33 | Decision in Matter Tried to the Court | Mar. 7, 2011 | 522 | III |
| 34 | Report to the Court Regarding Class Notice | Mar. 31, 2010 | 619 | III |
| 35 | Trial Ex. 528, Dividend Interest Rates vs. Current Rate Annuity Credit Rates | | 622 | III |
| 36 | Trial Ex. 66, NM Feb 1985 Information Release to all Agents | Feb. 1985 | 623 | III |
| 37 | Trial Ex. 67, Introducing NM New FPA-SPRA | Feb. 26, 1985 | 629 | III |
| 38 | Trial Ex. 73, Column – Change to current rate method on annuities expected to meet w/ consumer satisfaction | June 12, 1985 | 662 | III |
| 39 | June 7, 1990 Letter | June 7, 1990 | 663 | III |
| 40 | April 7, 1998 Email | Apr. 7, 1998 | 664 | III |
| 41 | September 14, 1999 Letter | Sept. 14, 1999 | 665 | III |
| 42 | Trial Ex. 316, NML Letter to Noonan's re Contract #7182718 | May 9, 2000 | 667 | III |
| 43 | *Thao v. Midland Nat'l Life Ins. Co.*, No. 09-C-1158, 2012 WL 1900114 (E.D. Wis. May 24, 2012) | May 24, 2012 | 670 | III |
| 44 | *Noonan v. Northwestern Mut. Ins. Co.*, 726 N.W.2d 356 (Wis. Ct. App. 2006) (*Noonan II*) | Nov. 16, 2006 | 678 | III |
| 45 | *Am. Express Co. v. Italian Colors Rest.*, No. 12-133, 2013 WL 3064410 (U.S. June 20, 2013) | June 20, 2013 | 686 | III |
| 46 | *Heretick v. Northwestern Mut. Life Ins. Co.*, No. 02-1061-CI-11, 2003 WL 25694174 (Fla. Cir. Ct. June 23, 2003) | June 23, 2003 | 704 | III |
| 47 | *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, Nos. C-05-04726 RMW, C-06-00537 RMW, 2007 WL 486367 (N.D.Cal Feb. 12, 2007) | Feb. 12, 2007 | 712 | III |
| 48 | *Maine Farms Venison, Inc. v. Peerless Ins. Co.*, No. CV-01-005, 2002 WL 33946004 (Me. Sup. Ct. Apr. 18, 2002) | Apr. 18, 2002 | 721 | III |
| 49 | *Garvey v. Nat'l Grange Mut. Ins. Co.*, No. CIV.A.95-0019, 1995 WL 115416 (E.D. Pa. Mar. 16, 1995) | Mar. 16, 1995 | 733 | III |
| 50 | *Woodard v. Fid. Nat'l Title Ins. Co.*, No. CIV 06-1170 RB/WDS, 2008 WL 5737364 (D. N.M. Dec. 8, 2008) | Dec. 8, 2008 | 737 | III |
| 51 | *Chilton Water Auth. v. Shell Oil Co.*, No. CIV.A. 98-T-1452-N, 1999 WL 1628000 (M.D. Ala. May 21, 1999) | May 21, 1999 | 745 | III |
| 52 | *Kindschuh v. City of Fond du Lac*, No. 09-C-213, 2010 WL 1507883 (E.D. Wis. Apr. 14, 2010) | Apr. 14, 2010 | 753 | III |
| 53 | *Boelk v. AT&T Teleholdings, Inc.*, No. 12-CV-40-BBC, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013) | Jan. 10, 2013 | 762 | III |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARLEEN M. LAPLANT, on her own
behalf and on behalf of a class similarly
situated,

               Plaintiffs,

   v.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

               Defendant.

Case No. 2:11-CV-00910

**EXPERT REPORT OF RAVI DHAR**

**July 1, 2013**

R-App 300

**Table of Contents**

I.      Qualifications ........................................................................................................ 1

II.     Background ........................................................................................................... 3

III.    Purpose of the Report ......................................................................................... 4

IV.     Summary of Opinions .......................................................................................... 5

V.      Consumer Information Processing and Decision-Making .................................. 7

VI.     Individualized Analysis is Required to Determine Which Putative Class Members
        Would Have Paid Attention to NM's Communications Regarding the 1985 Change ....... 8

VII.    Individualized Analysis is Required to Determine How Different Putative Class
        Members Would Have Understood the 1985 Change ........................................ 9

VIII.   Individualized Analysis is Required to Determine What Role, if Any, the 1985 Change
        Would Have Played in Putative Class Members' Evaluation and Their Decision to
        Hold Their Annuities ......................................................................................... 11

        A.      Consumers Differ in the Factors They Consider When Making Decisions
                Related to Buying and Holding Their Annuities ................................. 11

        B.      A Change in the Method of Calculating Future Dividends Would Not Have
                Been a Factor for Many Putative Class Members in Their Decision to Hold
                Their Annuities ................................................................................... 13

IX.     Individualized Analysis is Required to Determine Which Putative Class Members
        Would Have Preferred Dividends Based on the General Portfolio over Dividends
        Based on the Segmented Account ..................................................................... 15

        A.      Putative Class Members Would Have Differed in Their Expectations of Future
                Dividends ............................................................................................. 16

        B.      Putative Class Members Differed in the Maturity Dates of Their Annuities ....... 17

        C.      Putative Class Members Would Have Differed in Their Discounting of the
                Future ................................................................................................... 18

        D.      Putative Class Members Would Have Differed in Their Risk Perceptions and
                Risk Preferences .................................................................................. 19

X.      Conclusions ....................................................................................................... 20

Appendices

A – Curriculum Vitae

B – List of Prior Testimony

C – Materials Relied Upon

D – Data and Methodology

## I.  Qualifications

1.  My name is Ravi Dhar.  I am the George Rogers Clark Professor of Management and Marketing at the Yale School of Management and the Director of the Yale Center for Customer Insights at the School of Management at Yale University in New Haven, Connecticut.  I also have an affiliated appointment as a Professor of Psychology at the Department of Psychology, Yale University and serve on the editorial board of leading consumer research journals such as *Journal of Consumer Psychology*, *Journal of Consumer Research*, *Journal of Marketing*, and *Marketing Letters*.  I am the current Associate Editor of *Journal of Marketing Research*, the past Area Editor of *Marketing Science*, and the past Associate Editor of *Journal of Consumer Research*.

2.  I hold a Ph.D. and M.S. in Business Administration from the University of California at Berkeley.  My doctoral dissertation ("Consumer Preference for a No-Choice Option") was in the area of consumer decision making.  I have published more than fifty papers in journals, proceedings, and as book chapters, including in the leading marketing, psychology, and management journals, such as the *Harvard Business Review, Journal of Behavioral Decision Making, Journal of Business, Journal of Consumer Psychology, Journal of Consumer Research, Journal of Marketing Research, Journal of Personality and Social Psychology, Management Science, Marketing Science, Organizational Behavior and Human Decision Processes, Sloan Management Review,* and other journals.

3.  Several of my publications were also considered for research awards such as the Paul E. Green Award ("The Effect of Forced Choice on Choice," Finalist in 2004) and the William O'Dell Award ("Consumer Choice Between Hedonic and Utilitarian Goods," Winner in 2005; "Making Complementary Choices in Consumption Episodes: Highlighting Versus Balancing," Finalist in 2004; "The Effect of Forced Choice on Choice," Finalist in 2008; "Preference Fluency in Choice," Finalist in 2012).  The William O'Dell Award is presented to the best *Journal of Marketing Research* article that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice.  The Paul E. Green Award is presented to the *Journal of*

R-App 302

*Marketing Research* article that shows or demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing. I have been awarded the 2012 Distinguished Scientific Accomplishment Award from the Society of Consumer Psychologists, which is given annually to honor a scholar who has made significant and lasting contributions in the field of consumer psychology. A detailed listing of my educational background and publications is set forth in my curriculum vitae, which is attached to the end of this report as Appendix A.

4.    My fields of expertise are consumer and customer behavior, consumer psychology, branding, marketing management, and marketing strategy. In my work as a marketing professor and as a consultant to major corporations, I have conducted, supervised, and/or evaluated more than a hundred surveys as well as analyzed questions relating to different aspects of consumer behavior. Most of my research focuses on consumers' decision making—the manner in which consumers acquire and process information when forming product perception and preferences, the effect of product attributes and information presentation on consumer purchase and consumption decisions, and the effect of different marketing mix activities (such as promotions and advertising) on consumer buying decisions.

5.    My teaching responsibilities at Yale University's School of Management include two doctoral courses that examine advanced research topics in the area of consumer behavior, judgment, and decision making. I also teach or have taught several different courses for graduate students who are enrolled in the MBA program or the Executive MBA program at Yale: Consumer Behavior, E-Business and Marketing, Marketing Strategy, Marketing Management, Marketing of Financial Services, and Strategic Marketing Leadership. I have also taught and given seminars to mid-level and senior-level executives in more than a dozen countries in North and South America, Asia, and Europe. I have also worked as a consultant or adviser to companies on marketing related issues in different types of industries (e.g., consumer products, high technology, health, and financial services).

6.      I have served as an expert witness on marketing research issues in a variety of
        litigation matters.  A list of cases in which I have testified as an expert, at trial or by
        deposition in the preceding four years or more is attached as Appendix B.

## II.    Background

7.      This class action relates to a change in the method of calculating annual dividend
        payments (the "1985 Change") made by Northwestern Mutual ("NM") on certain
        annuities.  The annuities at issue (the "pre-MN annuities") are deferred fixed annuities
        sold on or prior to March 31, 1985, wherein consumers are guaranteed a fixed rate of
        return in the future for premium payments made until a pre-specified maturity date.  In
        addition to the fixed guaranteed rate of return, these annuities also provide for the
        possibility of annual dividends to their owners.  The exact amount of these dividends
        depends on the performance of an underlying pool of assets and is therefore, variable
        and not guaranteed.

8.      The 1985 Change refers to a change in the investment basis on which the dividends on
        pre-MN annuities were calculated.[1]  Before the 1985 Change, the dividends were
        based on an investment account that was oriented towards long-term investments (the
        "general portfolio").[2]  After the 1985 Change, plaintiffs allege that dividends were
        calculated based on a different account that consisted of short-term investments (the
        "segmented account").[3]

9.      Plaintiffs seek to certify a class (the "putative Class") consisting of "[a]ll persons who
        (a) purchased a Northwestern Mutual Life Insurance Company Flexible Premium
        Annuity or Retirement Annuity (or other deferred, fixed annuity) in force and in its
        deferral period as of March 31, 1985, and (b) did not sign the 1983 Amendment
        Agreement while residing in a state other than Wisconsin, and their successors in

---

[1] Complaint and Jury Demand, filed August 26, 2008, ¶2.
[2] Complaint and Jury Demand, filed August 26, 2008, ¶2.
[3] Complaint and Jury Demand, filed August 26, 2008, ¶2.

interest.  Excluded from the Class are any of NM's officers, trustees and their family members or affiliates."[4]

10.  Plaintiffs allege that: (a) NM failed "to disclose the change to owners of the Annuities" through a notice; (b) NM failed "to seek written consent for the change in the basis for determining dividends;" and (c) NM did not have the "right to make the change unilaterally."[5]

## III.  Purpose of the Report

11.  It follows from plaintiffs' class action claims and allegations, that if NM had sent a notice to or asked for consent from putative Class members for the 1985 Change, all putative Class members would have had a preference to receive dividends on their pre-MN annuities based on the general portfolio over dividends based on the segmented account, and that this preference would have driven their decision to hold their annuities.

12.  I have been asked by NM's counsel to analyze, from a consumer behavior perspective, if this is indeed the case, *i.e.,* whether the putative Class members would have responded in a common manner if NM had sent a notice or asked for consent prior to implementing the 1985 Change (hereafter referred to as "the communication from NM").  I have not been asked to determine what exact form a notice from NM would have taken or how NM would have asked for consent from the putative Class members.

13.  In forming my opinions, I have reviewed various legal filings and documents in this matter, internal NM documents produced in this litigation, deposition and trial testimony, NM data on annuity and life insurance products, and general industry and academic literature.  A complete list of the materials I have relied upon is presented in Appendix C.

---

[4] Plaintiff's Brief In Support of Motion for An Order Redefining the Class and For Related Relief ("plaintiff's brief"), filed March 4, 2013, p. 13.
[5] *See* Complaint and Jury Demand, filed August 26, 2008, ¶15.

14.     I am being compensated by NM for this task at $700 per hour. I also receive periodic compensation from Cornerstone Research, the firm that provided research assistance to me on this matter and with which I have a longstanding relationship. It is my understanding that those payments are based generally on my services for and work with that firm, including the level of fees generated on matters in which they provide support to me. I understand that those payments are in no way based on the content of my opinions or the outcome of any matter.

15.     I reserve the right to supplement my testimony and this report in response to any further information provided by the parties, and/or in light of additional documents or testimony brought forth through the ongoing discovery in this case, at trial, or otherwise, which may be brought to my attention after the date of my signature below.

## IV.     Summary of Opinions

16.     Based upon my review of the data and documents (including deposition and trial transcripts) produced in this case, and my education, background, and professional experience, it is my opinion that the putative Class members would not have responded in a common manner if NM had sent them a notice or asked for their consent regarding the 1985 Change.

17.     First, consumers differ in the levels of attention they pay to communications from financial services companies. Some putative Class members would not have paid attention to a notice from NM regarding the 1985 Change and, consequently, would have continued to hold their pre-MN annuities and received dividends based on the segmented account. Without individualized analysis, it is impossible to determine which putative Class members would have paid attention to a notice from NM regarding the 1985 Change.

18.     Second, even if some putative Class members had paid attention to the communication from NM regarding the 1985 Change, they would have differed in their ability to understand and assess what it meant. As a consequence, some putative Class members would have continued to hold their pre-MN policies and received dividends based on

the segmented account.  Identifying who among the putative Class members would have fully understood the 1985 Change requires individualized analysis.

19. Third, even if some putative Class members had paid attention to and fully understood the 1985 Change, the 1985 Change would not necessarily have been a factor in their decision to hold their annuities.  Consumers buy and hold annuities for a wide variety of reasons, and the method of calculating dividends may not be a factor in their decision making.  Further, the 1985 Change would have required putative Class members to evaluate two methods of calculating future dividends in order to form a judgment as to which of the methods was superior.  Because future dividends are variable and not guaranteed, a change in the method of calculating dividends would not have been a factor in many putative Class members' decisions to hold their annuities.  Identifying these putative Class members requires individualized analysis.

20. Finally, even if the 1985 Change had been a factor in some putative Class members' evaluation, it is incorrect to assume that all such putative Class members would have had a uniform preference for future dividends based on the general portfolio over dividends based on the segmented account. The future is by definition uncertain, and the putative Class members would have varied in their expectations of future dividends as well as in their risk preferences and time horizons of decision making. Individualized analysis is required to determine which putative Class members would have preferred future dividends based on the general portfolio over dividends based on the segmented account.

21. Thus, putative Class members would have varied in their levels of attention paid to the communication from NM and their understanding of the 1985 Change.  They would have also varied in the factors relevant in their decision to hold the pre-MN annuities and their preferences for dividends based on the segmented account.  For all these reasons, putative Class members would not have responded in a common manner to the communication from NM regarding the 1985 Change.

## V.        Consumer Information Processing and Decision-Making

22.      In order to understand how putative Class members would have responded to the
communication from NM regarding the 1985 Change, it is instructive to first
understand how consumers process information and how they make decisions based
on that information.  According to consumer behavior research, to understand how
information might impact consumer behavior, one must consider a sequence of
processes. Specifically, for any information to have impact, consumers need to first
pay attention to the information, understand that information, decide based on that
understanding how it might impact their evaluation, and finally, make a decision given
their preferences among various alternative actions.[6]

23.      To illustrate with an example, consider a putative Class member who did not pay
attention to NM's notice regarding the 1985 Change.  The actions of this putative
Class member would not have been affected by the content of the notice.
Alternatively, consider a putative Class member who, after receiving and having the
ability to understand the notice, evaluates it and decides that he prefers dividends
based on the segmented account. This putative Class member would ultimately have
received dividends based on the segmented account even if the 1985 Change had been
communicated by NM.

24.      In the following sections, I discuss variations in how putative Class members might go
through the sequence of processing information in NM's communication regarding the
1985 Change and also the variation in their evaluative response to this communication.

---

[6] For a general discussion of how consumers process information and make decisions, *see*, for example, Assael,
H. (2004), "Consumer Behavior:  A Strategic Approach," Houghton Mifflin, Chapter 17; Kotler, P. and K. Keller
(2012), "Marketing Management: 14E," Prentice Hall, Chapters 6, 17; Pride, W. and O. Ferrell (2012),
"Marketing," Cengage Learning, Chapter 7.

## VI. Individualized Analysis is Required to Determine Which Putative Class Members Would Have Paid Attention to NM's Communications Regarding the 1985 Change

25. Plaintiffs contend that NM should have communicated the 1985 Change to putative Class members prior to implementing it.[7] It is my opinion that even if the 1985 Change had been communicated, putative Class members would have varied in the amount of attention paid to the communication from NM.

26. Surveys of consumers conducted by industry researchers show that many consumers do not read or pay attention to communications from financial services companies. For example, a 2001 survey by the American Bankers Association showed that 41% of the consumers interviewed did not recall receiving or had not received their bank privacy disclosure, and 22% said they had received but had not read their notices.[8] Similarly, in a 2011 survey conducted by Insured Retirement Institute (IRI), 70% of respondents reported that they never or rarely read the prospectuses of their variable annuities.[9] An earlier study released in 1979 by the Federal Trade Commission regarding the effectiveness of life insurance cost disclosures also found that "the majority of people did not look at the disclosure materials that were provided."[10]

27. It is also clear from the deposition testimony that putative Class members differ in the levels of attention they paid to various materials they received from NM. For example, Caroline Meckes, when asked if she reviewed her annual statements said, "I'm sure I read them but I did not pay much attention to them."[11] Bruce Williams said that he "probably" received annual statements, but he did not recall "looking at

---

[7] *See* Complaint and Jury Demand, filed August 26, 2008, ¶¶4, 33, 35.
[8] "ABA Survey Shows Nearly One out of Three Consumers Read Their Banks' Privacy Notices," American Bankers Association, June 2001.
[9] "Variable Annuity Summary Prospectus High in Demand by Consumers," Insured Retirement Institute, June 2011, p. 5.
[10] "Life Insurance Cost Disclosure: Staff Report to the Federal Trade Commission," Bureau of Consumer Protection and Bureau of Economics, July 1979, p. 160.
[11] Deposition of Caroline Meckes, June 10, 2010, pp. 31:8–31:14.

them."[12]  By contrast, Marleen LaPlant, recalled receiving the annual reports and "skimming" through them for "five to ten minutes."[13]

28.    In summary, it is my opinion that putative Class members would have differed in the levels of attention they would have paid to a notice from NM regarding the 1985 Change.  As a result, some putative Class members would have continued to hold their pre-MN annuities and received dividends based on the segmented account, even if NM sent them a notice regarding the 1985 Change.  Determining which of the putative Class members would have paid attention to the notice with regard to the 1985 Change requires individualized analysis.

## VII.    Individualized Analysis is Required to Determine How Different Putative Class Members Would Have Understood the 1985 Change

29.    Even if some putative Class members had paid attention to the communication from NM regarding the 1985 Change, the extent to which they would have been able to understand this information and assess its meaning would have varied.  Therefore, they would have responded differently to the 1985 Change.

30.    Annuities are complex financial products.[14]  Many consumers do not fully understand how they work.  One of the factors contributing to consumers' lack of understanding of annuities is low financial literacy, and surveys conducted by a variety of organizations at different points in time show that by and large, consumers have varying levels of financial literacy.[15]  For example, a study conducted by FINRA in 2009 that surveyed a nationally representative sample of Americans showed that people got, on average, less than 3 out of 5 questions correct regarding basic financial matters.  Performance varied by several characteristics, including income, educational

---

[12] Deposition of Bruce Williams, May 18, 2010, pp. 28:7–28:14.
[13] Deposition of Marleen LaPlant, September 9, 2009, pp. 27:3–28:25.
[14] Brown, J., A. Kapteyn, E. Luttmer, and O. Mitchell (2013), "Complexity as a Barrier to Annuitization: Do Consumers Know How To Value Annuities?" Pension Research Council Working Paper, The Wharton School, University of Pennsylvania.
[15] "Financial Literacy Among Retail Investors in the United States," Federal Research Division, Library of Congress, December 2011, p. 1.

level, age, gender, and ethnic background.[16]  To the extent that some putative Class members had low levels of financial literacy and found annuities to be complex, their ability to understand and assess the meaning of the 1985 Change would have varied significantly.

31.     It is clear from the deposition and trial testimony that putative Class members differed in their understanding of the annuities and how the dividends on their policies were calculated.  For example, while Bruce Williams generally understood that the dividends would be "based on the profits of the company," he did not know how the dividends were calculated, and was not sure of the "difference from [*sic*] a dividend and an interest rate."[17]  While Caroline Meckes testified that she knew the dividends would be based on NM's "earnings," she was not aware that her contract had a guaranteed interest rate, or that the dividends themselves were not guaranteed.  Gerald Kreitzman, when asked if he read the policy he received from NM said, "I'm not sure I understood it all, okay.  I'm not even sure I understand it all now, okay."[18]

32.     In summary, even if putative Class members had paid attention to the communication from NM regarding the 1985 Change, they would have differed in the extent to which they understood the 1985 Change.  Because of these differences, some putative Class members would have continued to hold their pre-MN annuities and received dividends based on the segmented account.  Individualized analysis is needed to determine how each putative Class member would have responded to the communication from NM regarding the 1985 Change.

---

[16] "Financial Literacy Among Retail Investors in the United States," Federal Research Division, Library of Congress, December 2011, pp. 7–21.
[17] Trial Transcript of Bruce Williams, November 8, 2010, pp. 18:22–18:25; pp. 21:22–22:5.
[18] Deposition of Caroline Meckes, June 10, 2010, pp. 7:13–8:3; Deposition of Gerald Kreitzman, June 10, 2010, pp. 30:15–30:18.

**VIII. Individualized Analysis is Required to Determine What Role, if Any, the 1985 Change Would Have Played in Putative Class Members' Evaluation and Their Decision to Hold Their Annuities**

33. Even if putative Class members had paid attention to the communication from NM and had a common understanding of the 1985 Change, they would have been commonly affected by it only if the method of calculating dividends had been a factor in their decision to hold their annuities. As discussed next, consumers consider several different factors in their decision to buy or hold annuities and many consumers may not base their decisions on the method of calculating dividends. Individualized analysis is required to identify putative Class members for whom the method of calculating dividends would have been a factor in their decision to hold their annuities and therefore, would potentially be affected by the communication from NM regarding the 1985 Change.

**A. Consumers Differ in the Factors They Consider When Making Decisions Related to Buying and Holding Their Annuities**

34. Consumers consider a variety of factors when purchasing annuity products and they differ in the factors that they consider important. For example, according to a LIMRA survey in 2012, the financial strength of the insurer, tax-deferred benefits, rate of return, and the ability to receive guaranteed lifetime income were reported to be among the various factors that many consumers consider when buying a variable annuity (*see* Exhibit 1).[19] However, while 54% of the consumers reported tax-deferred benefits to be "very important," 8% reported tax-deferred benefits to be "not very important" in their annuity buying decision. Similarly, a Gallup survey conducted in 1992 showed that while 77% of non-qualified annuity owners reported that tax-deferred nature of earnings was a "very important" factor in their annuity

---

[19] NM also considered a wide variety of factors in annuity design. These included the "savings account" nature of annuities, tax advantages, disability and other benefits, low administrative costs as well as flexibility of investment vehicles. *See* ML2_NM_4518–529.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 16 of 225   Document 39-1

purchase, 46% reported that they valued the easy ability to save through an annuity as a "very important" factor in their purchase (*see* Exhibit 2).

35.     Since financial products are complex and difficult to understand, a factor that affects consumers' decisions to buy or hold a financial product is the firm's reputation.[20]  For example, in the case of pre-MN annuities, plaintiff Janet Reichart thought that NM was a "very solid" company, and that was one of the reasons she purchased her policy.[21]  Similarly, plaintiff Caroline Meckes felt that NM "was a good company to go with" and that she "trusted the company."[22]  Plaintiff Daniel Noonan also thought that NM was a "good company."[23]  Plaintiff John Komives said he was "so comfortable with [NM] that I never felt the need to behave in an adversarial [*sic*] – I accepted the way it was presented."[24]  These plaintiffs' perceptions are consistent with NM's industry rankings.  NM was ranked as "the most admired company" in life and health insurance industry every year from 1983 to 2006 in *Fortune* Corporate Reputations Survey, and it was the only company that ranked first in its industry every year during that period (*see* Exhibit 3).[25]  NM also ranked among the top three life insurance companies according to another influential source, A. M. Best, as seen in the annual publication *Best's Review* (*see* Exhibit 4).[26]

36.     Because consumers differ in the factors they consider important when buying and holding annuity products, firms offer annuity products with different features.  For example, the pre-MN annuities held by putative Class members are comprised of three different product types—Single Premium Retirement Annuity (SPRA), Flexible Premium Annuity (FPA), and Retirement Annuity (RA).[27]  *See* Exhibit 5.  An SPRA

---

[20] Nagy, R. and R. Obenberger (1994), "Factors Influencing Individual Investors' Behavior," *Financial Analysts Journal*, Vol. 50, No. 4, pp. 63–68.
[21] Deposition of Janet Reichart, June 16, 2010, pp. 7:8–7:16.
[22] Deposition of Caroline Meckes, June 10, 2010, pp. 7:1–7:8.
[23] Trial transcript of Daniel Noonan, November 8, 2010, pp. 58:23–59:17.
[24] Deposition of John Komives, May 18, 2010, pp. 36:9–36:20.
[25] ML_NML2_0039.
[26] A. M. Best is cited as an unbiased independent organization that publishes financial ratings in several consumer guides for annuity purchase. *See*, for example, "A Consumer's Guide to Annuities," North Carolina Department of Insurance, p. 8 and "Understanding Annuities," Office of the Commissioner of Insurance: State of Wisconsin, June 2012, p. 14.
[27] *See* Appendix D for details.

could be used to roll over savings from an existing retirement account or to invest an inheritance, while contribution limits on the FPA and RA products would make them less suitable for such purposes.[28]  Similarly, the pre-MN annuities differ in their tax status.  In 1985, at least 80% of annuities held by putative Class members were tax qualified, *i.e.*, funded by pre-tax dollars (*see* Exhibit 6).[29]  Tax qualified annuities face early withdrawal penalties by the IRS unlike non-tax qualified annuities, which face no withdrawal fees on the principal invested in the annuity.

37.   In summary, consumers differ in the factors that drive their decision to buy and hold annuity products.  Therefore, putative Class members also likely differed in the factors they considered in their decision to buy and hold their pre-MN annuities.

**B.     A Change in the Method of Calculating Future Dividends Would Not Have Been a Factor for Many Putative Class Members in Their Decision to Hold Their Annuities**

38.   Even if putative Class members had paid attention to the communication from NM, had a common understanding of the 1985 Change, and generally considered the DIR in their decision to hold their annuities, a change in the method of calculating dividends likely would not have been a factor for many of them in their decision to hold their annuities.

39.   Plaintiffs assert, looking retrospectively, that the "return on the short-term bond account has lagged far behind the…return on its long-term oriented general account portfolio of investments."[30]  However, it is important to note that, looking into the future, the DIR based on the segmented account was not guaranteed to be lower than the DIR based on the general portfolio.  Future dividends based on either the

---

[28] *See*, for example, Trial Exhibit 155 and Trial Exhibit 310, which show the limits on the Flexible Premium Annuity for plaintiffs Bruce Williams and Daniel Noonan, respectively. Trial Exhibit 157, an SPRA contract for Bruce Williams, shows no such limits.  This could allow consumers to use SPRAs for rolling over income from an existing retirement fund, investing accumulated funds from other investments, or investing an inheritance, all of which would either be unlikely or impossible to do in an FPA or RA.  *See* http://www.statefarm.com/insurance/life_annuity/annuity/deferredplus.asp, accessed on 4/29/13.

[29] Self-employed trusts can be either tax qualified or non-tax qualified, and are therefore excluded from this calculation.

[30] Complaint and Jury Demand, filed August 26, 2008, ¶2.

segmented account or the general portfolio depend on the performance of the underlying investments and were, by definition, variable and not guaranteed. Thus, the impact of the 1985 Change would have been uncertain for putative Class members, and for this reason, a change in the method of calculating dividends would not have been a factor in their decision to hold their annuities.

40. Some putative Class members (who may not have been able to assess the impact of the 1985 Change on their own) may have discussed it with their agents. NM had informed all agents of the 1985 Change.[31] Some putative Class members regularly met their agents and even sought their advice on matters relating to their annuities. When Janet Reichart, a putative Class member, was asked how she would have responded to the 1985 Change, she said, "I would have had to have called [my agent] and talked it over with him to find out exactly what that change meant."[32] John Komives generally met with his agent once a year, at times, more often.[33] Because the impact of any change in the method of calculating future dividends is uncertain, different agents may have evaluated the impact of the 1985 Change differently. Depending on what putative Class members would have discussed with their agents, a change in the method of calculating dividends may not have uniformly affected their decisions.

41. The notion that a change in the method of calculating dividends would not have been a factor in the putative Class members' decisions to hold their annuities is supported by the testimony of the plaintiffs. Some plaintiffs testified that they continued to hold their pre-MN annuities even after learning about the 1985 Change. For example, plaintiffs Bruce Williams and Caroline Meckes both testified that they continued to hold on to their annuities even until the day of their depositions.[34] Further, plaintiff Bruce Williams had "no specific plans" to sell his annuity as of 2010.[35] Named

---

[31] NML2 0539–541; ML_NML2_0489.
[32] Deposition of Janet Reichart, June 16, 2010, pp. 29:1–29:6.
[33] Deposition of John L. Komives, May 18, 2010, pp. 18:2–18:11; 24:22–25:4.
[34] Deposition of Bruce Williams, May 18, 2010, pp. 34:10–34:16; Deposition of Caroline Meckes, June 10, 2010, pp. 29:21–29:24.
[35] Deposition of Bruce Williams, May 18, 2010, pp. 34:10–34:16.

plaintiff Marleen LaPlant surrendered her annuity six years after learning about the 1985 Change.[36]

42.     Similarly, many putative Class members also held a life insurance policy with NM and, therefore, had access to information about the DIR based on the general portfolio. As of 1985, over 9,000 putative Class members also held an active life insurance policy with NM, and approximately 3,000 of those people continued to hold at least one active pre-MN and one active life insurance policy even as late as the year 2000 (*see* Exhibit 7).  Some of these putative Class members may have compared the DIR on their life insurance policies with the DIR on their pre-MN annuities and realized that the two DIRs were based on different methods.  Yet, they continued to hold their annuities based on the segmented account, suggesting that a change in the method of calculating dividends was not a factor in their decision to hold their annuities.

43.     In summary, even if putative Class members had paid attention to the communication from NM and had a common understanding of the 1985 Change, many of them would not have been able to make a judgment that one method of calculating dividends was superior to another because future dividends were variable and not guaranteed. Therefore, a change in the method of calculating dividends would not have been a factor in their decision to hold their annuities.  Individualized analysis is required to determine which putative Class members' decisions would have been affected by the 1985 Change.


IX.     **Individualized Analysis is Required to Determine Which Putative Class Members Would Have Preferred Dividends Based on the General Portfolio over Dividends Based on the Segmented Account**

44.     Even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, it is my opinion that they would not have

---

[36] Deposition of Marleen LaPlant, September 9, 2009, pp. 35:3–35:5; 76:11–76:23; 84:2–84:20.

uniformly preferred dividends based on the general portfolio to dividends based on the segmented account.

45.    The early 1980s was a period of high short-term interest rates, and the market for annuities was highly competitive at that time, with several annuity products based on short-term portfolios available to consumers.[37] Pre-MN annuities were also experiencing high surrender rates because of competition from short-term products.[38] Putative Class members demonstrated an interest in these products as well. In fact, 606 individuals in the putative Class purchased NM's current rate annuity ("CRA") product in 1985.[39] In subsequent years, an additional 1,059 individuals purchased this product.[40] This implies that if NM had communicated the 1985 Change, many putative Class members likely would have preferred to receive dividends based on the segmented account.

46.    As I discuss next, putative Class members likely differed in their expectations of future dividends, their risk preferences, and the time horizon over which they made decisions, all of which would have affected their preference for the general portfolio relative to the segmented account as a basis for receiving dividends.

### A.    Putative Class Members Would Have Differed in Their Expectations of Future Dividends

47.    Consumers vary in their expectations of future dividends, which are ultimately uncertain. According to a survey conducted in 1985, when asked about interest rate expectations over the next year, roughly one-third of a representative sample of U.S. consumers expected interest rates to increase, one-third expected them to stay constant, and roughly one-third expected them to decrease (*see* Exhibit 8).[41] Because

---

[37] ML2_NM_4475–4500.
[38] ML2_NM_4545.
[39] ML_NML2_0542–574. This product was based off of a significantly shorter-term investment portfolio and was explicitly marketed as such by NM.
[40] This is the number of unique class members who purchased their first CRA product in 1986 or later.
[41] This is consistent with academic research, which documents several reasons why this could occur, including anchoring biases, momentum beliefs, and contrarian beliefs. *See* Yagan, D. (2012), "Why Do Individual Investors Chase Stock Market Returns?" Working Paper, p. 11; Amromin, G. and S. Sharpe (2008), "Expectations of Risk

of different expectations of interest rates, consumers would likely differ in their preference for short-term versus long-term investments.

48.    Many putative Class members knew that the DIRs were variable and not guaranteed. For example, when asked during his deposition if the dividend rate would be the same over time, plaintiff John Komives replied "No."[42]  Plaintiffs Janet Reichart and Bruce Williams also knew that future dividends were not guaranteed.[43]

49.    Thus, even if a change in the method of calculating dividends had been a factor in the decision of some putative Class members, they would have had different expectations of future dividends.  Some of these putative Class members would have preferred to receive dividends based on the segmented account, even if they received the communication from NM regarding the 1985 Change.  Individualized analysis is required to determine which of the putative Class members would not have preferred to receive dividends based on the segmented account.

B.    Putative Class Members Differed in the Maturity Dates of Their Annuities

50.    In addition to having different expectations about future dividends, putative Class members would have also differed in the weight they assigned to the more immediate dividends they expected to get.  Different pre-MN annuities were purchased in different years and had different maturity dates.  As of 1985, the scheduled maturity dates for the annuities held by putative Class members ranged from a few months to up to 69 years in the future (*see* Exhibit 9).

51.    Different maturity dates would have resulted in different responses to the 1985 Change.  Putative Class members whose policies were maturing shortly after the 1985

---

and Return Among Household Investors: Are Their Sharpe Ratios Countercyclical?" Finance and Economics Discussion Series, Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, p. 28; Greenwood, R. and A. Shleifer (2013), "Expectations of Returns and Expected Returns," NBER Working Paper No. 18686; Vissing-Jorgensen, A. (2004), "Perspectives on Behavioral Finance: Does 'Irrationality' Disappear with Wealth? Evidence from Expectations and Actions," NBER Macroeconomics Annual 2003, Vol. 18, pp. 139–208.
[42] Deposition of John Komives, May 18, 2010, pp. 34:14–34:17.
[43] Deposition of Bruce Williams, May 18, 2010, pp. 46:6–46:11; Deposition of Janet Reichart, June 16, 2010, pp. 8:9–8:13.

Change had a different horizon of decision making as compared to those whose policies were maturing many years into the future. Some of them may have expected dividends based on the segmented account to be higher than those based on the general portfolio (especially given that short-term rates were high in the early 1980s). Therefore, they would have preferred to receive dividends based on the segmented account. Individualized analysis is required to identify such putative Class members.

C.    **Putative Class Members Would Have Differed in Their Discounting of the Future**

52.    In addition to different expectations of future dividends and horizons of investments due to varying maturity dates, putative Class members also likely would have differed in how they made trade-offs between current and future dividends. This is especially relevant given the high interest rate environment for short-term rates in the early 1980s. Some consumers are present-focused. They act in a manner that suggests they are more concerned about immediate gains and discount the future heavily.[44] Putative Class members may have preferred dividends based on the segmented account in 1985 because they expected dividends from the segmented account to offer higher short-term gains, even if they thought that the general account would provide higher dividends over a longer time horizon.

53.    Thus, even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, they could have discounted the future differently, and therefore, would not have responded uniformly to the communication regarding the 1985 Change. Many of them with present-focused preferences would have preferred to receive dividends based on the segmented account, and therefore, would have agreed to the 1985 Change. Individualized analysis is required to identify such putative Class members.

---

[44] Frederick, S., G. Loewenstein, and T. O' Donahue (2002), "Time Discounting and Time Preference: A Critical Review," *Journal of Economic Literature,* Vol. 40, No. 2, pp. 351–401, at p. 393.

### D. Putative Class Members Would Have Differed in Their Risk Perceptions and Risk Preferences

54.     In addition to different expectations of interest rates and horizons of investments, consumers also vary in their risk perceptions and risk preferences. Different consumers may perceive the same financial product to be more or less risky, implying different risk perceptions. Similarly, different consumers may be willing to take different levels of risk in situations of uncertainty, implying different risk preferences.[45] For example, surveys conducted by the Federal Reserve in 1983, between 4–10% of consumers said they would be willing to take "substantial" financial risks and between 30–65% said that they would not be willing to take "any" financial risks.[46] Studies have also shown that younger and less experienced investors hold riskier portfolios.[47]

55.     Dividends on the annuities held by putative Class members were not guaranteed, and inherently carried some risk. Deposition testimony suggests that putative Class members differed in their risk preferences, and that these preferences varied over time. For example, John Komives had a preference for riskier investments because he invested in equities and also had been an angel investor in startup companies.[48] By contrast, Janet Reichart invested in stocks before her retirement but "started moving more towards safer investments for [her] retirement."[49] The varied distribution of age across putative Class members, as of 1985, also suggests that they had different risk preferences (*see* Exhibit 10).

---

[45] Weber, E. and R. Milliman (1997), "Perceived Risk Attitudes: Relating Risk Perception to Risky Choice," *Management Science*, Vol. 43, No. 2, pp. 123-144; Barsky, R., T. Juster, M. Kimball, and M. Shapiro (1997), "Preference Parameters and Behavioral Heterogeneity: An Experimental Approach in the Health and Retirement Study," *Quarterly Journal of Economics,* Vol. 112, No. 2, pp. 537–579; Kimball, M., C. Sahm, and M. Shapiro (2009), "Risk Preferences in the PSID: Individual Imputations and Family Covariation," *American Economic Review*, Vol. 99, No. 2, pp. 363–368; Hallahan, T., R. Faff, and M. McKenzie (2004), "An Empirical Investigation of Personal Financial Risk Tolerance," *Financial Services Review,* Vol. 13, pp. 57–78.
[46] 1983 Survey of Consumer Finance as cited in Stango, V. and J. Zinman (2009), "Exponential Growth Bias and Household Finance," *The Journal of Finance,* Vol. 64, No. 6, pp. 2807–2849 at p. 2828.
[47] Korniotis, G. and A. Kumar (2011), "Do Older Investors Make Better Decisions?" *The Review of Economics and Statistics,* Vol. 93, No. 1, pp. 244–265 at p. 264; Agnew, J., P. Balduzzi and A. Sunden (2003), "Portfolio Choice and Trading in a Large 401(k) Plan," *The American Economic Review*, Vol. 93, No. 1, pp.193–215.
[48] Deposition of John Komives, May 18, 2010, pp. 21:13–22:23, pp. 26:24–27:19.
[49] Deposition of Janet Reichart, June 16, 2010, pp. 11:12–11:24.

56.     In summary, even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, they would have responded differently to the communication from NM regarding the 1985 Change because of different risk perceptions and risk preferences.  Some would have preferred to receive dividends based on the segmented account.  Individualized analysis is required to identify such putative Class members.

## X.      Conclusions

57.     Plaintiffs' class action claims and allegations imply that if NM had sent a notice to or asked for consent from putative Class members regarding the 1985 Change, they would have all responded in a common manner.  Plaintiffs' claims and allegations regarding common impact are invalid from a consumer behavior perspective.

58.     Thus, putative Class members would have varied in their levels of attention paid to the communication from NM and their understanding of the 1985 Change.  They would have also varied in the factors relevant in their decision to hold the pre-MN annuities and their preferences for dividends based on the segmented account.  For all these reasons, putative Class members would not have responded in a common manner to the communication from NM regarding the 1985 Change.  Some putative Class members would have received dividends based on the segmented account *even if* the 1985 Change had been communicated by NM.  Individualized analysis is required to identify these putative Class members.

I declare under penalty of perjury that the foregoing is true and correct.

_____                    <u>July 1, 2013</u>

        Ravi Dhar                                      Date

**EXHIBIT 1**

# Factors Valued in Purchasing Variable Annuities
## 2012

| Factors | Very Important | Somewhat Important | Not Very Important | Not at All Important |
|---|---|---|---|---|
| Financial Strength of Company | 71% | 27% | 1% | 1% |
| Interest Rate or Projected Return | 56% | 36% | 6% | 2% |
| Tax-Deferred Benefits | 54% | 33% | 8% | 5% |
| Recommendation of Financial Professional | 47% | 38% | 11% | 4% |
| Ability to Receive Guaranteed Lifetime Income | 47% | 36% | 13% | 4% |

Source: "Why People Buy Annuities: Exclusive LIMRA Research Examines the Motivations That Make the Sale," *Insurancenewsnet,* July 2012

R-App 323

**EXHIBIT 2**

# Factors Valued in Purchasing Non-Qualified Annuities
## 1992

| Factors | Very Important | Somewhat Important |
|---|---|---|
| Earnings would not be taxed until the funds were used | 77% | 18% |
| Was a safe purchase | 68% | 27% |
| Have a good rate of return | 60% | 31% |
| Wanted a long term savings plan | 59% | 26% |
| Could get an income guaranteed for as long as you live | 46% | 25% |
| Easy way to save | 46% | 32% |
| Wanted a source of funds that could be used to pay for emergencies, such as catastrophic illness during retirement | 46% | 25% |
| Have a choice of methods of getting the money | 39% | 30% |

Source: "Committee of Annuity Insurers: Survey of Owners of Non-Qualified Annuity Contracts," *The Gallup Organization,* January 1993

R-App 324

**EXHIBIT 3**

# Northwestern Mutual Rankings
## *Fortune* Corporate Reputations Survey
## 1983 to 2011

| Year | Life and Health Insurance Industry Ranking [2] |
|------|:---:|
| 1983 | 1 |
| 1984 | 1 |
| 1985 | 1 |
| 1986 | 1 |
| 1987 | 1 |
| 1988 | 1 |
| 1989 | 1 |
| 1990 | 1 |
| 1991 | 1 |
| 1992 | 1 |
| 1993 | 1 |
| 1994 | 1 |
| 1995 | 1 |
| 1996 | 1 |
| 1997 | 1 |
| 1998 | 1 |
| 1999 | 1 |
| 2000 | 1 |
| 2001 | 1 |
| 2002 | 1 |
| 2003 | 1 |
| 2004 | 1 |
| 2005 | 1 |
| 2006 | 1 |
| 2007 | 2 [3] |
| 2008 | 2 [4] |
| 2009 | [5] |
| 2010 | 1 |
| 2011 | 4 |

Source: *Fortune Magazine*

Note:

[1] The Corporate Reputations Survey includes companies that appear in the previous year's annual Fortune 500 and Fortune Service 500 directories. A broad sample of senior executives, outside directors, and financial analysts are asked to rate the ten largest companies (occasionally fewer) in their own industry on eight attributes of reputation, using a scale of zero (poor) to ten (excellent). The eight attributes are: quality of management; quality of product and services; innovativeness; long-term investment value; financial soundness; ability to attract, develop, and keep talented people; community and environmental responsibility; use of corporate assets.

[2] Industry categories are based on definitions by the U.S. Office of Management and Budget.

[3] Prudential Financial was ranked industry No. 1 in 2007.

[4] Aflac was ranked industry No. 1 in 2008.

[5] Data for 2009 is not available.

**EXHIBIT 4**

# Northwestern Mutual Rankings
## A.M. Best 20-Year Dividend Comparison for Whole Life Policies
## 1983 to 1993

| Year | Rank [1] | | | |
|---|---|---|---|---|
| | Average Yearly Payment [2] [3] | Interest-Adjusted Payment Index [4] [5] | Average Yearly Difference [2] [6] | Interest-Adjusted Surrender Cost Index [4] [7] |
| 1983 | 2 | 2 | 1 | 1 |
| 1984 | 1 | 2 | 1 | 1 |
| 1985 | 1 | 2 | 1 | 1 |
| 1986 | 1 | 1 | 1 | 1 |
| 1987 | 1 | 1 | 1 | 1 |
| 1988 | - | 1 | - | 1 |
| 1989 | - | 2 | - | 2 |
| 1990 | - | 2 | - | 1 |
| 1991 | - | 3 | - | 2 |
| 1992 | - | 3 | - | 2 |
| 1993 | - | 3 | - | 3 |

Source: Trial Exhibit 211

Note:

[1] Rankings in each year evaluate ordinary whole life policies originated 20 years prior. At least 50 life insurance companies were examined in each year for this study.

[2] A.M. Best's rankings after 1987 did not include Average Yearly Payment or Average Yearly Difference rankings.

[3] Average Yearly Payment is the average cost over the period if dividends are taken out in cash but the policy is continued.

[4] In 1991, 1992, and 1993, the indices are called Actual Payment Index and Actual Surrender Cost Index but are calculated using a 5% interest adjustment.

[5] Interest-Adjusted Payment Index is the Average Yearly Payment adjusted for the time value of money, assuming a 5% interest rate.

[6] Average Yearly Difference is the average cost over the period if the policy was surrendered for its cash value on the 20th policy anniversary.

[7] Interest-Adjusted Surrender Cost Index is the Average Yearly Difference adjusted for the time value of money, assuming a 5% interest rate.

**R-App 326**

**EXHIBIT 5**



**In-Force Annuities Held by Putative Class Members**
Annuity Type from 1944 to 2013

Number of Annuities

- Flexible Premium Annuities
- Single Premium Retirement Annuities
- Retirement Annuities

Source: Internal Data
Note: Annuities are defined as in-force in a given year if they are active at any point in that year.

**R-App 327**

**EXHIBIT 6**



Number of Annuities

## Pre-MN Annuities Held by Putative Class Members
### Tax Status as of 1985

| Category | Number |
|---|---|
| IRA | 9,430 |
| TDA | 4,153 |
| Personal | 2,611 |
| Corporate Trusts/Plans | 2,354 |
| Self-Employed Trusts | 1,180 |
| IRC-B457 | 6 |
| IRC-401, Qualified Policy Exchange | 1 |

Source: Internal Data

Note: Tax status represents the latest available tax status as of 1985. IRAs or Individual Retirement Accounts are tax qualified retirement accounts available to individuals. TDAs or Tax Deferred Annuities are tax qualified annuities available to employees of public schools or 501(c)(3) tax-exempt organizations. Annuities sold through Corporate Plans are tax qualified annuities purchased for employees by a plan sponsor or plan trustee. Corporate Trusts hold the assets of the Corporate Plan. Annuities sold through Self-Employed Trusts are annuities available to self-employed individuals or their trusts. Some are tax qualified. IRC-B457 and IRC-401 are tax qualified annuities available to employees or individuals associated with certain government organizations.

**EXHIBIT 7**

## Putative Class Members with Pre-MN Annuities and Life Insurance Policies
### In-Force from 1985 to 2013



Source: Internal Data
Note: Annuities and policies are defined as in-force in a given year if they are active at any point in that year. Data indicates the number of unique annuitants with at least one in-force pre-MN annuity and in-force Northwestern Mutual life insurance policy in a given year.

**EXHIBIT 8**

# Consumer Expectations of Future Interest Rates [1]
## 1985

| Month | Go Up | Stay the Same | Go Down | Don't Know |
|-------|-------|---------------|---------|------------|
| Jan 85 | 36% | 33% | 28% | 3% |
| Feb 85 | 35% | 37% | 26% | 2% |
| Mar 85 | 45% | 32% | 19% | 4% |
| Apr 85 | 47% | 31% | 19% | 3% |
| May 85 | 44% | 34% | 19% | 3% |
| Jun 85 | 36% | 36% | 26% | 2% |
| Jul 85 | 35% | 38% | 25% | 2% |
| Aug 85 | 41% | 35% | 22% | 2% |
| Sep 85 | 43% | 34% | 20% | 3% |
| Oct 85 | 44% | 33% | 21% | 2% |
| Nov 85 | 36% | 37% | 23% | 4% |
| Dec 85 | 36% | 37% | 25% | 2% |

Source: Thomson Reuters/University of Michigan Survey of Consumers
Note:
[1] Consumers were asked, "No one can say for sure, but what do you think will happen to interest rates for borrowing money during the next 12 months — will they go up, stay the same, or go down?"

R-App 330

**EXHIBIT 9**



Number of
Annuities

## Pre-MN Annuities Held by Putative Class Members
### Year of Maturity as of 1985

Source: Internal Data
Note: Year of maturity represents the latest available maturity date as of 1985. This excludes nine annuities whose maturity date was missing as of 1985 or whose listed maturity date was on or before March 31, 1985.

**R-App 331**

**EXHIBIT 10**



**Pre-MN Annuities Held by Putative Class Members**
Age of Policyholder as of 1985

Source: Internal Data
Note: Age is calculated using birthdate. When missing, latest available policy date and age at issue as of 1985 are used.

R-App 332



EXPERT WITNESS REPORT:
ROBERT L. HOYER, FSA, MAAA
M. LaPLANT

VS.

NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY

MARCH 4, 2013



# I.    Introduction

1.  I am a Fellow of the Society of Actuaries (FSA) and a Member of the American Academy of Actuaries (MAAA) and have over thirty five years of life insurance industry experience. After graduation from Syracuse University and teaching at the high school and college levels, I began my insurance career in 1971 with Aetna Life & Casualty (Aetna). At Aetna I served in various capacities, becoming an officer of the company in 1977.

2.  My consulting career began in 1980 with Price Waterhouse, where I served as Managing Partner and National Director of the firm's Actuarial Consulting Services Group. In 1989, I joined Arthur Andersen to become the Managing Partner of that firm's Actuarial Services practice. In 2002, I began a new venture, Hoyer Actuarial Litigation, LLC, as company principal. In each of these capacities, I have been retained by numerous state insurance departments, including those of New York, New Jersey, Connecticut, Texas, Maine, California, Florida, Colorado, Indiana, and New Hampshire, on consulting projects.

3.  Over this extensive period, both as an officer and employee at Aetna, and a partner or principal at consulting firms, I have acquired an extensive, in-depth knowledge and understanding of the customs and practices of the life insurance industry. I have provided litigation support and expert reports, affidavits, and/or declarations in well over one hundred disputes, and have provided expert witness testimony in over twenty five cases. These cases include expert witness services for both plaintiffs and defendants. My present consulting practice focuses primarily on legal disputes within the life insurance industry.

4.  Further, my knowledge and experience applies directly to the subject matter of the present dispute. For example, I have been engaged by numerous mutual life insurance companies regarding matters which involved policyholder dividends. A copy of my resume is enclosed as Appendix A.

5.  On June 30, 2010, I submitted an Expert Report regarding my opinions on the actions of Northwestern Mutual Life Insurance Company ("NML") in 1985 of changing the basis for determining dividends for in-force annuitants (in this case, deferred annuity policyholders referred to as "Pre-MN annuity policyholders" or "Pre-MN annuitants") by segmenting a portion of its investment portfolio, and earmarking the resulting investment income to determine those dividends (the "1985 Change"). I was deposed on July 20, 2010 and provided trial testimony on November 16, 2010 and November 17, 2010. In addition to the large volume of NML records and deposition transcripts I reviewed in connection with this litigation for my 2010 report, deposition, and trial testimony, I have

1

reviewed the additional materials listed in Appendix B. I am being compensated at a billing rate of $350 per hour. This is the only dispute in which I have testified in the last four years.

6. The attorneys for the plaintiffs in this case have asked me the following:

   - To describe a reasonable methodology that would provide the basis for prospective relief for current Pre-MN annuity policyholders;

   - To indicate whether the methodology could be applied to all Pre-MN annuity policyholders on a common basis using a mechanical calculation; and

   - To determine if the same methodology can be applied to determine the "Difference" as defined (see below) to annuitants with policies no longer in-force resulting from the 1985 Change.

7. Prospective relief involves NML crediting to Pre-MN annuity policyholders' accounts the additional amount that would have accumulated "But-For" the 1985 Change (the "Difference"). NML would then be required to credit dividends thereafter on the revised cash values using a dividend interest rate ("DIR") that reflects the company's aggregate investment income dividend factor rather than the investment income factor associated with the segmented account of current rate investments.

8. As described in detail in this report, I have concluded that the Difference can reliably be determined. In this report, I demonstrate a methodology that allows a mechanical calculation of this amount, common to all Pre-MN annuity policyholders that can be applied to individual Pre-MN annuitants or specified groups. The data needed to perform the formulaic calculations is readily available to NML and requires no additional data from Pre-MN annuity policyholders. This same methodology can be used to calculate the Difference to former Pre-MN policyholders (whose policies are no longer active).

## II. Background on Pre-MN Annuities

9. NML is a mutual life insurance company. As such, it has no stockholders but instead is owned by its participating policyholders. NML, like many insurance companies, has written a wide variety of annuity policies. "Immediate" annuities are policies that pay policyholders immediate periodic payments (frequently monthly) in exchange for a sum paid. Payments can be for the life of the annuitant, for a specified period, or for combinations thereof, and can also continue to a designated beneficiary.

10. The type of annuity at issue here is a "deferred" annuity. This form of annuity is an investment vehicle, in that the annuitant has made a contribution to the insurance

2

company (either a single deposit, or premium, or annual level deposits, or annual flexible deposits) and such contributions accumulate, but no periodic payments are made by the insurer to the annuitant. The annuitant can exercise any of the options specifically written in their policy, which frequently include the right to terminate the policy and withdraw the accumulated funds, to borrow a portion of the fund at a specified borrowing interest rate, or to convert the policy to an immediate annuity.[1]

11. NML charged the Pre-MN annuitants an expense (in the form of a "front-end load") on premium payments, including the initial payment. The contract issued to Ms. Maureen LaPlant ("LaPlant"), specified that the front-end load would be 10% of premiums plus $10 per year and $0.50 per deposit fee. By 1982, when NML introduced a revised deferred annuity policy type, the expense fee was 6%. It appears that this reduction in fees also applied to earlier annuity policy types.[2]

12. One of the features of a Pre-MN annuity is the right to take out loans secured by the cash value of the account. The unpaid loan balance accrues interest at a policy loan rate (5%, 6%, or 8%), as specified in the contract. At the time of termination, the cash value of the account is reduced by the level of indebtedness.

13. Pre-MN annuities are designated "participating," which means that they are entitled to share in NML's divisible surplus, in the form of dividends. NML uses formulas to determine dividends for all participating products, including life insurance policies and Pre-MN annuities. The Dividend Interest Rate ("DIR") is the rate of interest that policyholders receive on their cash value, and is used in NML's formula for calculating dividends.

## III. "Update '83" and "Direct Recognition"

14. Prior to 1983, the DIR that a life insurance or annuity policyholder received did not depend on that policyholder's level of indebtedness. In late 1982, NML solicited policyholder agreement to a change in the manner in which dividends would be calculated beginning in 1983. NML called this solicitation and change "Update '83." Policyholders who accepted Update '83 were considered to have agreed to "Direct Recognition."[3] For policyholders with Direct Recognition, NML calculates dividends reflecting the extent to which policyholders borrowed cash value from their policies.[4] The DIR on the borrowed funds is based on the policy loan rate and does not depend on

---

[1] See, e.g., LaPlant Contract
[2] The relationship between the premiums paid and the cash value shown in the LaPlant annual statements are consistent with a 6% expense fee.
[3] Direct Recognition became a standard provision for new policies thereafter.
[4] Trial Exhibit 312

3

the performance of NML's investments, while the DIR on non-borrowed funds reflects the investment income from NML's investments.[5]

15. Without Direct Recognition, policyholders (both life insurance and annuity) receive a DIR that is a weighted average of the borrowed and non-borrowed DIRs under Direct Recognition.[6] The weights are the average amount borrowed and the average amount not borrowed in the year. With Direct Recognition there is a different DIR for borrowed funds for each of the three policy loan rates. Thus, there is a different DIR for each policy loan rate for those without Direct Recognition.[7]

## IV.  The 1985 Change

16. At the completion of each policy year, NML calculates a policyholder dividend payable to or otherwise for the use of each policyholder. The primary component of the dividend is the return on the company's general account invested assets, and for many years prior to 1985 each policyholder shared in the overall yield, or "portfolio rate," generated by such assets.[8]

17. NML, consistent with generally accepted practices and procedures within the life insurance industry and the actuarial profession, uses the contribution principle to distribute divisible surplus to its participating policyholders. The contribution principle quantifies margins from return on invested assets (return, net of investment expenses and taxes), as well as margins on expenses (amounts charged to policyholders less actual costs) and mortality (charges assessed less actual amounts credited to policyholders)  and distributes such divisible surplus to policyholders in relation to their proportionate contribution to the aggregate value. Prior to the 1985 Change, Pre-MN annuity policyholders were deemed to have contributed to surplus from returns on invested assets in the same way as life insurance policyholders.

18. In 1985, NML decided that it would no longer write new business on the Pre-MN form of annuity.  At the same time, NML established a segregated asset portfolio of short-term income investments to support the Pre-MN annuity block, and began to use the segregated portfolio as a basis for subsequent policyholder dividends for those policies.

19. For several years after NML made the 1985 Change, it graded in the effect of the change such that the DIRs applied to Pre-MN annuitants' account values did not directly reflect the earnings on the current rate investments. Since the short-term investment yield was lower than the corresponding portfolio rate of return, the grading in adjustment resulted

---

[5] Trial Exhibit 312
[6] See, for example, Trial Exhibit 498.
[7] See Trial Exhibit 189
[8] Trial Exhibit 312

4

in subsidies paid to the Pre-MN annuitants. The subsidies paid to Pre-MN annuitants gradually decreased over time.[9] From 1993 through the current time frame, the Pre-MN annuitants received substantively lower dividends as a result of the 1985 Change.[10]

## V. Determining the DIR But-For the 1985 Change

20. The cash value of a Pre-MN annuitant's account at any point in time is based on the history of cash deposits, expense charges, policy loans, withdrawals, and the history of DIRs used to determine policyholder dividends credited to the account.

21. The annual DIRs for Pre-MN annuitants vary based largely on two factors:

    - Whether or not the annuity policy is subject to Direct Recognition; and
    - The policy loan rate (5%, 6% or 8%) specified in the product.

22. The cash value of the account at any point in time But-For the 1985 Change can be determined using the same information that determined the actual cash value. Thus, just as the actual account cash values were calculated by NML as a function of cash deposits, expense charges, policy loans, withdrawals, and DIRs, the But-For account cash values can also be calculated in a comparable manner.

### A. Direct Recognition

23. In NML documents, the DIR that is most often referred to is the rate applicable to life insurance policyholders with Direct Recognition and no loan balance.[11] The DIRs for policyholders without Direct Recognition are derived from this benchmark rate.

24. The But-For DIR, in my opinion, for Pre-MN annuitants who have Direct Recognition and have no loan balance is equal to the corresponding DIR for life insurance policyholders.

25. This conclusion is based on the following:

    - It comports with a reasonable Pre-MN policyholder's dividend expectations;
    - The historical comparability between DIRs for life insurance and annuity policyholders prior to the 1985 Change;
    - The investment income dividend factor is the most significant element in determining DIRs;
    - Prior to the 1985 Change, the investment income dividend factor was identical for life insurance and Pre-MN annuity policyholders; and

---

[9] Trial Exhibit 409
[10] Trial Exhibit 408
[11] For example, Trial exhibits 372-403

5

- The expense dividend factor for life and annuity policyholders has historically been comparable. Any disintermediation and/or dilution charges as suggested by Mr. Trost would be unwarranted, improper, and inequitable, so I make no adjustment for them.[12]

26. The resulting DIRs are shown in the table below:

**Table 1. DIRs for Non-Borrowed funds of Pre-MN Policyholders With Direct Recognition**

| Year | Annuity (Actual) | Life (Actual) | Annuity (But-For) |
|------|------------------|---------------|-------------------|
| 1985 | 11.15% | 11.15% | 11.15% |
| 1986 | 11.00% | 11.25% | 11.25% |
| 1987 | 10.75% | 11.00% | 11.00% |
| 1988 | 10.75% | 10.25% | 10.25% |
| 1989 | 10.75% | 10.00% | 10.00% |
| 1990 | 10.00% | 10.00% | 10.00% |
| 1991 | 10.00% | 10.00% | 10.00% |
| 1992 | 9.50% | 9.25% | 9.25% |
| 1993 | 8.50% | 9.25% | 9.25% |
| 1994 | 7.50% | 8.50% | 8.50% |
| 1995 | 7.00% | 8.50% | 8.50% |
| 1996 | 7.00% | 8.50% | 8.50% |
| 1997 | 6.50% | 8.50% | 8.50% |
| 1998 | 6.50% | 8.80% | 8.80% |
| 1999 | 6.50% | 8.80% | 8.80% |
| 2000 | 6.50% | 8.80% | 8.80% |
| 2001 | 6.50% | 8.80% | 8.80% |
| 2002 | 6.25% | 8.60% | 8.60% |
| 2003 | 5.75% | 8.20% | 8.20% |
| 2004 | 5.00% | 7.70% | 7.70% |
| 2005 | 4.65% | 7.50% | 7.50% |
| 2006 | 4.35% | 7.50% | 7.50% |
| 2007 | 4.35% | 7.50% | 7.50% |
| 2008 | 4.35% | 7.50% | 7.50% |
| 2009 | 4.35% | 6.50% | 6.50% |
| 2010 | 4.45% | 6.15% | 6.15% |

Source: Exhibit 189.

27. For Pre-MN annuity policyholders that have Direct Recognition and have a loan balance, the But-For DIR applicable to their loan balance is the same as the actual DIR they received on their loan balance because this rate is based on the borrowing provision in their contracts which was not affected by the 1985 Change.

---

[12] Affidavit of Chris Trost, April 15, 2011, ¶4.

6

## B. Without Direct Recognition

28. For the Pre-MN annuitants without Direct Recognition, the But-For DIRs are a function of But-For DIRs with Direct Recognition because, as described in Paragraph 15, the actual DIRs are a weighted average of the Direct Recognition DIRs. Therefore, for each year, there will be different But-For DIRs for each policy loan rate. The DIRs for Pre-MN annuitants that do not have Direct Recognition is given by the following formula:

> DIR (Borrowed with Direct Recognition) x (% Borrowed)
> + DIR (Non-borrowed with Direct Recognition) x (1-%Borrowed)
> = DIR (without Direct Recognition)

29. In 1985, the amount borrowed by Pre-MN annuity policyholders was treated as being 15% for all policy loan rates.[13] Thus, in 1985, for each policy loan rate, the without Direct Recognition actual DIR is 85% times the non-borrowed with Direct Recognition DIR plus 15% times the DIR on borrowed funds with Direct Recognition.

### Table 2. Calculation of 1985 Annuity Without Direct Recognition DIRs

| Policy Loan Rate | Borrowed Funds Rate | Non-Borrowed Funds Rate | 15% of Borrowed Funds Rate | 85% Non-Borrowed Funds Rate | Without Direct Recognition (Weighted Average) DIR |
|---|---|---|---|---|---|
| | (a) | (b) | (c)=0.15*(a) | (d)=0.85*(b) | (e)=(c)+(d) |
| 8% | 7.15% | 11.15% | 1.07% | 9.48% | 10.55% |
| 6% | 5.15% | 11.15% | 0.77% | 9.48% | 10.25% |
| 5% | 4.15% | 11.15% | 0.62% | 9.48% | 10.10% |

30. In other years, NML has not provided comparable weights, but because the actual DIRs with and without Direct Recognition have been provided, the underlying weights that NML used in each year can be derived as demonstrated for the 8% policy loan rate in 1985 using the formula above. The borrowed funds DIR was 7.15%; the non-borrowed funds DIR was 11.15%; and the without Direct Recognition rate was 10.55%. This verifies that the weight used for borrowed funds was 15.00%:

$$[7.15 \times \%B] + [11.15 \times (1 - \%B)] = 10.55$$
$$11.15 - 4.00\ \%B = 10.55$$
$$-4.00\ \%B = -0.60$$
$$\%B = 0.15$$
$$\%B = 15.00\%$$

---

[13] ML_NML3_0446

7

31. As shown in the table below, I performed equivalent calculations for all the other years using the data from Exhibit 189:

**Table 3. Actual DIRs for Pre-MN Annuitants and Borrowing Percentages Used in Non-Direct Recognition DIR Calculation**

| Year | Actual Non-Direct Recognition DIRs | | | Actual Direct Recognition DIRs | | | | Non-Direct Recognition: Borrowing Percentages Used | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | Non-Borrowed (Annuity) | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate |
| 1985 | 10.55% | 10.25% | 10.10% | 7.15% | 5.15% | 4.15% | 11.15% | 15.00% | 15.00% | 15.00% |
| 1986 | 10.55% | 9.85% | 9.30% | 7.15% | 5.15% | 4.15% | 11.00% | 11.69% | 19.66% | 24.82% |
| 1987 | 10.30% | 9.65% | 9.10% | 7.15% | 5.15% | 4.15% | 10.75% | 12.50% | 19.64% | 25.00% |
| 1988 | 10.30% | 9.65% | 9.10% | 7.15% | 5.15% | 4.15% | 10.75% | 12.50% | 19.64% | 25.00% |
| 1989 | 10.30% | 9.65% | 9.10% | 7.15% | 5.15% | 4.15% | 10.75% | 12.50% | 19.64% | 25.00% |
| 1990 | 9.65% | 9.00% | 8.55% | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% |
| 1991 | 9.65% | 9.00% | 8.55% | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% |
| 1992 | 9.20% | 8.65% | 8.15% | 7.15% | 5.15% | 4.15% | 9.50% | 12.77% | 19.54% | 25.23% |
| 1993 | 8.35% | 7.85% | 7.45% | 7.30% | 5.30% | 4.30% | 8.50% | 12.50% | 20.31% | 25.00% |
| 1994 | 7.50% | 7.10% | 6.70% | 7.30% | 5.30% | 4.30% | 7.50% | 0.00% | 18.18% | 25.00% |
| 1995 | 7.05% | 6.65% | 6.35% | 7.30% | 5.30% | 4.30% | 7.00% | 16.67% | 20.59% | 24.07% |
| 1996 | 7.05% | 6.65% | 6.35% | 7.30% | 5.30% | 4.30% | 7.00% | 16.67% | 20.59% | 24.07% |
| 1997 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 1998 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 1999 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 2000 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 2001 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 2002 | 6.30% | 6.10% | 5.85% | 7.30% | 5.30% | 4.30% | 6.25% | 4.76% | 15.79% | 20.51% |
| 2003 | 5.85% | 5.70% | 5.45% | 7.30% | 5.30% | 4.30% | 5.75% | 6.45% | 11.11% | 20.69% |
| 2004 | 5.10% | 5.05% | 4.85% | 7.30% | 5.30% | 4.30% | 5.00% | 4.35% | 16.67% | 21.43% |
| 2005 | 4.80% | 4.75% | 4.55% | 7.30% | 5.30% | 4.30% | 4.65% | 5.66% | 15.38% | 28.57% |
| 2006 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2007 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2008 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2009 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2010 | 4.55% | 4.55% | 4.45% | 7.45% | 5.45% | 4.45% | 4.45% | 3.33% | 10.00% | 0.00% |

Source: Exhibit 189.

Note: Shaded values taken from Exhibit 189. Other values are calculated.

8

32. The level of borrowing that NML used in the derivation of the non-Direct Recognition DIRs appears inconsistent with the actual level of borrowing that occurred for Wisconsin Pre-MN annuitants. As shown in the following table, the level of borrowing appears not to exceed 4.5% in any year starting in 1985:

### Table 4. Wisconsin Pre-MN Annuities Cash Values and Indebtedness

| Year | Gross Cash Value | Indebtedness | Net Cash Value | Indebtedness as Percent of Gross Cash Value |
|------|-----------------|--------------|----------------|---------------------------------------------|
| 1985 | $43,576,250 | $ 1,971,773 | $ 41,604,477 | 4.5% |
| 1986 | 46,515,398 | 1,977,667 | 44,537,731 | 4.3% |
| 1987 | 49,240,458 | 1,702,754 | 47,537,704 | 3.5% |
| 1988 | 52,308,717 | 1,428,074 | 50,880,643 | 2.7% |
| 1989 | 52,550,391 | 1,314,991 | 51,235,400 | 2.5% |
| 1990 | 55,103,202 | 1,266,997 | 53,836,205 | 2.3% |
| 1991 | 58,527,349 | 1,269,404 | 57,257,945 | 2.2% |
| 1992 | 60,410,270 | 1,293,373 | 59,116,897 | 2.1% |
| 1993 | 62,771,819 | 1,277,299 | 61,494,520 | 2.0% |
| 1994 | 63,081,508 | 1,184,863 | 61,896,645 | 1.9% |
| 1995 | 61,187,101 | 996,143 | 60,190,958 | 1.6% |
| 1996 | 58,615,326 | 986,737 | 57,628,589 | 1.7% |
| 1997 | 53,743,167 | 597,396 | 53,145,771 | 1.1% |
| 1998 | 50,502,411 | 558,056 | 49,944,355 | 1.1% |
| 1999 | 47,405,832 | 618,878 | 46,786,954 | 1.3% |
| 2000 | 44,674,628 | 651,528 | 44,023,100 | 1.5% |
| 2001 | 43,648,853 | 698,182 | 42,950,671 | 1.6% |
| 2002 | 42,408,632 | 661,378 | 41,747,254 | 1.6% |
| 2003 | 42,156,461 | 692,979 | 41,463,482 | 1.6% |
| 2004 | 38,625,409 | 624,205 | 38,001,204 | 1.6% |
| 2005 | 37,093,847 | 661,089 | 36,432,758 | 1.8% |
| 2006 | 34,552,405 | 568,120 | 33,984,285 | 1.6% |
| 2007 | 31,687,472 | 569,524 | 31,117,948 | 1.8% |
| 2008 | 29,888,383 | 466,566 | 29,421,817 | 1.6% |
| 2009 | 29,580,122 | 501,612 | 29,078,510 | 1.7% |

Source: Trial Exhibit No 407.

33. But-For the 1985 Change, NML would still have calculated the non-Direct Recognition DIRs as a weighted average between the borrowed and non-borrowed Direct Recognition

9

DIRs.  Therefore, to calculate the But-For non-Direct Recognition DIRs, it is also necessary to take a weighted average of the But-For Direct Recognition DIRs.  As described above, the But-For Direct Recognition DIRs for borrowed funds is the same as the corresponding actual annuity DIR while the But-For Direct Recognition DIR for non-borrowed funds equals the corresponding life insurance DIR.

34. In Table 5, I calculate the But-For non-Direct Recognition DIRs for each year and each policy loan rate:

### Table 5. Calculation of But-For Non-Direct Recognition DIRs

| Year | But-For Direct Recognition DIRs | | | | Non-Direct Recognition: Average Percent Borrowed | | | But-For Non-Direct Recognition DIRs | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | Non Borrowed | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate |
| 1985 | 7.15% | 5.15% | 4.15% | 11.15% | 15.00% | 15.00% | 15.00% | 10.55% | 10.25% | 10.10% |
| 1986 | 7.15% | 5.15% | 4.15% | 11.25% | 11.69% | 19.66% | 24.82% | 10.77% | 10.05% | 9.49% |
| 1987 | 7.15% | 5.15% | 4.15% | 11.00% | 12.50% | 19.64% | 25.00% | 10.52% | 9.85% | 9.29% |
| 1988 | 7.15% | 5.15% | 4.15% | 10.25% | 12.50% | 19.64% | 25.00% | 9.86% | 9.25% | 8.73% |
| 1989 | 7.15% | 5.15% | 4.15% | 10.00% | 12.50% | 19.64% | 25.00% | 9.64% | 9.05% | 8.54% |
| 1990 | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% | 9.65% | 9.00% | 8.55% |
| 1991 | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% | 9.65% | 9.00% | 8.55% |
| 1992 | 7.15% | 5.15% | 4.15% | 9.25% | 12.77% | 19.54% | 25.23% | 8.98% | 8.45% | 7.96% |
| 1993 | 7.30% | 5.30% | 4.30% | 9.25% | 12.50% | 20.31% | 25.00% | 9.01% | 8.45% | 8.01% |
| 1994 | 7.30% | 5.30% | 4.30% | 8.50% | 0.00% | 18.18% | 25.00% | 8.50% | 7.92% | 7.45% |
| 1995 | 7.30% | 5.30% | 4.30% | 8.50% | 16.67% | 20.59% | 24.07% | 8.30% | 7.84% | 7.49% |
| 1996 | 7.30% | 5.30% | 4.30% | 8.50% | 16.67% | 20.59% | 24.07% | 8.30% | 7.84% | 7.49% |
| 1997 | 7.30% | 5.30% | 4.30% | 8.50% | 6.25% | 16.67% | 20.45% | 8.43% | 7.97% | 7.64% |
| 1998 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 1999 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 2000 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 2001 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 2002 | 7.30% | 5.30% | 4.30% | 8.60% | 4.76% | 15.79% | 20.51% | 8.54% | 8.08% | 7.72% |
| 2003 | 7.30% | 5.30% | 4.30% | 8.20% | 6.45% | 11.11% | 20.69% | 8.14% | 7.88% | 7.39% |
| 2004 | 7.30% | 5.30% | 4.30% | 7.70% | 4.35% | 16.67% | 21.43% | 7.68% | 7.30% | 6.97% |
| 2005 | 7.30% | 5.30% | 4.30% | 7.50% | 5.66% | 15.38% | 28.57% | 7.49% | 7.16% | 6.59% |
| 2006 | 7.40% | 5.40% | 4.40% | 7.50% | 4.92% | 14.29% | 0.00% | 7.50% | 7.20% | 7.50% |
| 2007 | 7.40% | 5.40% | 4.40% | 7.50% | 4.92% | 14.29% | 0.00% | 7.50% | 7.20% | 7.50% |
| 2008 | 7.40% | 5.40% | 4.40% | 7.50% | 4.92% | 14.29% | 0.00% | 7.50% | 7.20% | 7.50% |
| 2009 | 7.40% | 5.40% | 4.40% | 6.50% | 4.92% | 14.29% | 0.00% | 6.54% | 6.34% | 6.50% |
| 2010 | 7.45% | 5.45% | 4.45% | 6.15% | 3.33% | 10.00% | 0.00% | 6.19% | 6.08% | 6.15% |

Sources: Tables 1 and 3.

35. In Table 6 below, I compare the But-For DIRs with the corresponding actual DIRs:

Table 6. Actual and But-For DIRs for Pre-MN Annuitants without Direct Recognition

| Year | Actual | | | But-For | | | Difference | | |
|---|---|---|---|---|---|---|---|---|---|
| | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate |
| 1985 | 10.55% | 10.25% | 10.10% | 10.55% | 10.25% | 10.10% | 0.00% | 0.00% | 0.00% |
| 1986 | 10.55% | 9.85% | 9.30% | 10.77% | 10.05% | 9.49% | 0.22% | 0.20% | 0.19% |
| 1987 | 10.30% | 9.65% | 9.10% | 10.52% | 9.85% | 9.29% | 0.22% | 0.20% | 0.19% |
| 1988 | 10.30% | 9.65% | 9.10% | 9.86% | 9.25% | 8.73% | -0.44% | -0.40% | -0.38% |
| 1989 | 10.30% | 9.65% | 9.10% | 9.64% | 9.05% | 8.54% | -0.66% | -0.60% | -0.56% |
| 1990 | 9.65% | 9.00% | 8.55% | 9.65% | 9.00% | 8.55% | 0.00% | 0.00% | 0.00% |
| 1991 | 9.65% | 9.00% | 8.55% | 9.65% | 9.00% | 8.55% | 0.00% | 0.00% | 0.00% |
| 1992 | 9.20% | 8.65% | 8.15% | 8.98% | 8.45% | 7.96% | -0.22% | -0.20% | -0.19% |
| 1993 | 8.35% | 7.85% | 7.45% | 9.01% | 8.45% | 8.01% | 0.66% | 0.60% | 0.56% |
| 1994 | 7.50% | 7.10% | 6.70% | 8.50% | 7.92% | 7.45% | 1.00% | 0.82% | 0.75% |
| 1995 | 7.05% | 6.65% | 6.35% | 8.30% | 7.84% | 7.49% | 1.25% | 1.19% | 1.14% |
| 1996 | 7.05% | 6.65% | 6.35% | 8.30% | 7.84% | 7.49% | 1.25% | 1.19% | 1.14% |
| 1997 | 6.55% | 6.30% | 6.05% | 8.43% | 7.97% | 7.64% | 1.88% | 1.67% | 1.59% |
| 1998 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 1999 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 2000 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 2001 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 2002 | 6.30% | 6.10% | 5.85% | 8.54% | 8.08% | 7.72% | 2.24% | 1.98% | 1.87% |
| 2003 | 5.85% | 5.70% | 5.45% | 8.14% | 7.88% | 7.39% | 2.29% | 2.18% | 1.94% |
| 2004 | 5.10% | 5.05% | 4.85% | 7.68% | 7.30% | 6.97% | 2.58% | 2.25% | 2.12% |
| 2005 | 4.80% | 4.75% | 4.55% | 7.49% | 7.16% | 6.59% | 2.69% | 2.41% | 2.04% |
| 2006 | 4.50% | 4.50% | 4.35% | 7.50% | 7.20% | 7.50% | 3.00% | 2.70% | 3.15% |
| 2007 | 4.50% | 4.50% | 4.35% | 7.50% | 7.20% | 7.50% | 3.00% | 2.70% | 3.15% |
| 2008 | 4.50% | 4.50% | 4.35% | 7.50% | 7.20% | 7.50% | 3.00% | 2.70% | 3.15% |
| 2009 | 4.50% | 4.50% | 4.35% | 6.54% | 6.34% | 6.50% | 2.04% | 1.84% | 2.15% |
| 2010 | 4.55% | 4.55% | 4.45% | 6.19% | 6.08% | 6.15% | 1.64% | 1.53% | 1.70% |

Source: Tables 3 and 5.

# VI. Calculating the Difference in Cash Values Due to the 1985 Change

## A. Starting Period

36. While the impact to Pre-MN annuity policyholders began at the inception of the 1985 Change, for purposes of this analysis, numerical values will be determined beginning in 1993.[14]

---

[14] NML graded in the 1985 Change to temper the numerical effects until 1993.

## B. Deposit Payments

37. As Pre-MN annuity policyholders make deposits, expenses are charged as either 10% or 6% of the gross deposits.[15] At the end of a year in which a deposit is made, the net deposit is increased by the DIR adjusted for the number of days between the net deposit date and the policy anniversary. Therefore, the timing of deposits within a year has an effect on the accumulated fund balance after the DIR is applied.

## C. Withdrawals and Borrowing

38. Withdrawals of partial accumulated fund values are treated as negative deposits in the year of withdrawal.

39. For those policies without Direct Recognition, borrowing and level of indebtedness play no role in the calculation of the Difference because the DIR applies to the cash value of the account irrespective of the level of the indebtedness.

40. For those policies with Direct Recognition, the level of indebtedness does matter because there is a different DIR paid on borrowed and non-borrowed funds. Taking out a loan is comparable to a withdrawal, or a negative net deposit, while repayments of loans are comparable to positive net deposits. The difference between loans and withdrawals is that loans accrue interest at the policy loan rate which is only partially offset by the DIR on borrowed funds. If there were no difference between the policy loan rate and the DIR on borrowed funds, taking a loan would be identical to a withdrawal for purposes of calculating the Difference.

41. The basic information necessary to adjust the But-For cash values for borrowing activity is the level of indebtedness on an annual basis. Because the policy loan rate is known (and thus, the amount of interest which accrues on the loan), the change in indebtedness provides information on new funds borrowed net of loan repayments.

## D. The Role of the DIR in Difference Calculations

42. As described above, the DIR used in the calculation of account values depends on whether Direct Recognition applies and for those without Direct Recognition, the policy loan rate.

---

[15] In addition, the LaPlant contract specifies a $10 expense taken out of the first deposit made in each year as well as a $0.50 charge per payment.

12

43. The following table shows the accumulation rates of a net deposit based on the year in which it was made (columns) and the year in which it was surrendered (rows) for non-borrowed funds of Pre-MN annuities with Direct Recognition. I assumed deposits and surrenders occurred at the end of the year. For example, as highlighted, a net deposit of $1.00 at the end of 1997 accumulated to $1.37 if surrendered at the end of 2002:

Table 7. Actual Accumulation Rates of Net Deposits Made by Pre-MN Annuitants with Direct Recognition Deposited in Column Year and Withdrawn in Row Year

| With Direct Recognition Actual Rate | Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1115 | 1985 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1100 | 1986 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1075 | 1987 | 1.37 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1075 | 1988 | 1.51 | 1.36 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1075 | 1989 | 1.68 | 1.51 | 1.36 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1990 | 1.84 | 1.66 | 1.49 | 1.35 | 1.22 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1991 | 2.01 | 1.82 | 1.64 | 1.48 | 1.34 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0950 | 1992 | 2.22 | 2.00 | 1.80 | 1.63 | 1.47 | 1.32 | 1.20 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 1993 | 2.41 | 2.17 | 1.95 | 1.76 | 1.59 | 1.44 | 1.31 | 1.19 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0750 | 1994 | 2.59 | 2.33 | 2.10 | 1.90 | 1.71 | 1.55 | 1.40 | 1.28 | 1.17 | 1.08 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0700 | 1995 | 2.77 | 2.49 | 2.25 | 2.03 | 1.83 | 1.65 | 1.50 | 1.37 | 1.25 | 1.15 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0700 | 1996 | 2.97 | 2.67 | 2.40 | 2.17 | 1.96 | 1.77 | 1.61 | 1.46 | 1.34 | 1.23 | 1.14 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0690 | 1997 | 3.16 | 2.84 | 2.56 | 2.31 | 2.09 | 1.89 | 1.71 | 1.56 | 1.42 | 1.31 | 1.22 | 1.14 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0650 | 1998 | 3.36 | 3.03 | 2.73 | 2.46 | 2.22 | 2.01 | 1.82 | 1.66 | 1.51 | 1.40 | 1.30 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0650 | 1999 | 3.58 | 3.22 | 2.90 | 2.62 | 2.37 | 2.14 | 1.94 | 1.77 | 1.61 | 1.49 | 1.38 | 1.29 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0650 | 2000 | 3.81 | 3.43 | 3.09 | 2.79 | 2.52 | 2.22 | 2.07 | 1.88 | 1.72 | 1.58 | 1.47 | 1.38 | 1.29 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X |
| 1.0650 | 2001 | 4.06 | 3.66 | 3.29 | 2.97 | 2.68 | 2.42 | 2.20 | 2.00 | 1.83 | 1.69 | 1.57 | 1.47 | 1.37 | 1.29 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X |
| 1.0625 | 2002 | 4.32 | 3.88 | 3.50 | 3.16 | 2.85 | 2.58 | 2.34 | 2.13 | 1.94 | 1.79 | 1.67 | 1.56 | 1.46 | **1.37** | 1.28 | 1.21 | 1.13 | 1.06 | 1.00 | X | X | X | X | X | X | X | X | X |
| 1.0575 | 2003 | 4.56 | 4.11 | 3.70 | 3.34 | 3.02 | 2.72 | 2.48 | 2.25 | 2.05 | 1.88 | 1.76 | 1.65 | 1.54 | 1.45 | 1.36 | 1.27 | 1.20 | 1.12 | 1.06 | 1.00 | X | X | X | X | X | X | X | X |
| 1.0500 | 2004 | 4.79 | 4.31 | 3.88 | 3.51 | 3.17 | 2.85 | 2.60 | 2.36 | 2.16 | 1.99 | 1.85 | 1.73 | 1.62 | 1.52 | 1.43 | 1.34 | 1.26 | 1.18 | 1.11 | 1.05 | 1.00 | X | X | X | X | X | X | X |
| 1.0445 | 2005 | 5.02 | 4.51 | 4.07 | 3.67 | 3.31 | 2.99 | 2.72 | 2.47 | 2.26 | 2.08 | 1.94 | 1.81 | 1.69 | 1.59 | 1.49 | 1.40 | 1.31 | 1.23 | 1.16 | 1.10 | 1.05 | 1.00 | X | X | X | X | X | X |
| 1.0475 | 2006 | 5.23 | 4.71 | 4.24 | 3.83 | 3.46 | 3.12 | 2.84 | 2.58 | 2.36 | 2.17 | 2.02 | 1.89 | 1.77 | 1.66 | 1.56 | 1.46 | 1.37 | 1.28 | 1.21 | 1.15 | 1.09 | 1.04 | 1.00 | X | X | X | X | X |
| 1.0435 | 2007 | 5.46 | 4.91 | 4.43 | 4.00 | 3.61 | 3.26 | 2.96 | 2.69 | 2.46 | 2.27 | 2.11 | 1.97 | 1.84 | 1.73 | 1.62 | 1.52 | 1.43 | 1.34 | 1.27 | 1.20 | 1.14 | 1.09 | 1.04 | 1.00 | X | X | X | X |
| 1.0435 | 2008 | 5.70 | 5.13 | 4.62 | 4.17 | 3.77 | 3.40 | 3.09 | 2.81 | 2.57 | 2.37 | 2.20 | 2.05 | 1.92 | 1.80 | 1.69 | 1.59 | 1.49 | 1.40 | 1.32 | 1.25 | 1.19 | 1.14 | 1.09 | 1.04 | 1.00 | X | X | X |
| 1.0435 | 2009 | 5.95 | 5.35 | 4.82 | 4.35 | 3.93 | 3.55 | 3.23 | 2.93 | 2.68 | 2.47 | 2.30 | 2.15 | 2.01 | 1.88 | 1.77 | 1.66 | 1.56 | 1.46 | 1.38 | 1.30 | 1.24 | 1.19 | 1.14 | 1.09 | 1.04 | 1.00 | X | X |
| 1.0445 | 2010 | 6.21 | 5.59 | 5.04 | 4.55 | 4.10 | 3.71 | 3.37 | 3.05 | 2.80 | 2.58 | 2.40 | 2.24 | 2.09 | 1.97 | 1.85 | 1.73 | 1.63 | 1.53 | 1.44 | 1.36 | 1.30 | 1.24 | 1.19 | 1.14 | 1.09 | 1.04 | 1.00 | X |
| 1.0300 | 2011 | 6.40 | 5.76 | 5.19 | 4.68 | 4.23 | 3.82 | 3.47 | 3.16 | 2.88 | 2.66 | 2.47 | 2.31 | 2.16 | 2.03 | 1.90 | 1.79 | 1.68 | 1.57 | 1.48 | 1.40 | 1.33 | 1.28 | 1.22 | 1.17 | 1.12 | 1.08 | 1.03 | 1.00 |
| 1.0300 | 2012 | 6.59 | 5.93 | 5.34 | 4.82 | 4.35 | 3.93 | 3.57 | 3.25 | 2.97 | 2.74 | 2.54 | 2.38 | 2.22 | 2.09 | 1.96 | 1.84 | 1.72 | 1.62 | 1.53 | 1.44 | 1.37 | 1.31 | 1.26 | 1.21 | 1.16 | 1.11 | 1.06 | 1.03 |

Calculated as the product of Actual Rates from year of contribution through year of withdrawal. Assumes end of year deposits and withdrawals and no borrowing. Highlighted value of 1.37 represents the accumulation of one net dollar deposited at the end of 1997 and withdrawn in the end of 2002. The 2011 and 2012 rates are based on the guaranteed minimum interest rate in the LaPlant contract because Exhibit 185 ends in 2010. These rates could be updated with additional data.

13

44. The following table shows how the same $1.00 would have accumulated But-For the 1985 Change by replacing the actual DIRs with the But-For DIRs. This table indicates that a $1.00 net deposit invested at the end of 1997 would have accumulated to a cash value of $1.52 by 2002:

Table 8. But-For Accumulation Rates of Net Deposits Made by Pre-MN Annuitants with Direct Recognition Deposited in Column Year and Withdrawn in Row Year

| With Direct Recognition But-For Rate | Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1115 | 1985 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1125 | 1986 | 1.24 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1100 | 1987 | 1.37 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1025 | 1988 | 1.51 | 1.36 | 1.22 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1989 | 1.66 | 1.50 | 1.35 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1990 | 1.83 | 1.65 | 1.48 | 1.33 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1991 | 2.01 | 1.81 | 1.63 | 1.47 | 1.33 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0625 | 1992 | 2.20 | 1.98 | 1.78 | 1.60 | 1.45 | 1.32 | 1.20 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0925 | 1993 | 2.40 | 2.16 | 1.94 | 1.75 | 1.59 | 1.44 | 1.31 | 1.19 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0950 | 1994 | 2.61 | 2.35 | 2.11 | 1.90 | 1.72 | 1.57 | 1.42 | 1.30 | 1.19 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0950 | 1995 | 2.83 | 2.55 | 2.29 | 2.06 | 1.87 | 1.70 | 1.55 | 1.41 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 1996 | 3.07 | 2.76 | 2.48 | 2.24 | 2.02 | 1.84 | 1.68 | 1.52 | 1.40 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0950 | 1997 | 3.33 | 3.00 | 2.69 | 2.43 | 2.20 | 2.00 | 1.82 | 1.65 | 1.51 | 1.39 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0630 | 1998 | 3.62 | 3.26 | 2.93 | 2.64 | 2.40 | 2.18 | 1.98 | 1.80 | 1.65 | 1.51 | 1.39 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0880 | 1999 | 3.94 | 3.55 | 3.19 | 2.87 | 2.61 | 2.37 | 2.15 | 1.96 | 1.79 | 1.64 | 1.51 | 1.39 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0890 | 2000 | 4.29 | 3.86 | 3.47 | 3.13 | 2.84 | 2.58 | 2.34 | 2.13 | 1.95 | 1.78 | 1.65 | 1.52 | 1.40 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X |
| 1.0980 | 2001 | 4.67 | 4.20 | 3.78 | 3.40 | 3.09 | 2.80 | 2.55 | 2.32 | 2.12 | 1.94 | 1.79 | 1.65 | 1.52 | 1.40 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X |
| 1.0920 | 2002 | 5.07 | 4.56 | 4.10 | 3.69 | 3.35 | 3.05 | 2.77 | 2.52 | 2.30 | 2.11 | 1.94 | 1.79 | 1.65 | 1.52 | 1.40 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X |
| 1.0640 | 2003 | 5.49 | 4.94 | 4.44 | 4.00 | 3.63 | 3.30 | 3.00 | 2.72 | 2.49 | 2.28 | 2.10 | 1.94 | 1.79 | 1.65 | 1.51 | 1.39 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X |
| 1.0770 | 2004 | 5.91 | 5.32 | 4.78 | 4.30 | 3.90 | 3.53 | 3.23 | 2.93 | 2.68 | 2.46 | 2.27 | 2.09 | 1.92 | 1.77 | 1.63 | 1.50 | 1.38 | 1.27 | 1.17 | 1.08 | 1.00 | X | X | X | X | X | X | X |
| 1.0750 | 2005 | 6.35 | 5.71 | 5.14 | 4.63 | 4.20 | 3.82 | 3.47 | 3.15 | 2.89 | 2.64 | 2.43 | 2.24 | 2.07 | 1.91 | 1.75 | 1.61 | 1.48 | 1.36 | 1.25 | 1.16 | 1.08 | 1.00 | X | X | X | X | X | X |
| 1.0750 | 2006 | 6.83 | 6.14 | 5.52 | 4.97 | 4.51 | 4.10 | 3.73 | 3.39 | 3.10 | 2.84 | 2.62 | 2.41 | 2.22 | 2.05 | 1.88 | 1.73 | 1.59 | 1.46 | 1.35 | 1.24 | 1.16 | 1.08 | 1.00 | X | X | X | X | X |
| 1.0750 | 2007 | 7.34 | 6.60 | 5.94 | 5.35 | 4.85 | 4.41 | 4.01 | 3.64 | 3.34 | 3.05 | 2.81 | 2.59 | 2.39 | 2.20 | 2.02 | 1.86 | 1.71 | 1.57 | 1.45 | 1.34 | 1.24 | 1.16 | 1.08 | 1.00 | X | X | X | X |
| 1.0750 | 2008 | 7.89 | 7.10 | 6.38 | 5.75 | 5.21 | 4.74 | 4.31 | 3.92 | 3.57 | 3.28 | 3.02 | 2.79 | 2.57 | 2.37 | 2.18 | 2.00 | 1.84 | 1.69 | 1.56 | 1.44 | 1.34 | 1.24 | 1.16 | 1.08 | 1.00 | X | X | X |
| 1.0650 | 2009 | 8.40 | 7.56 | 6.80 | 6.12 | 5.55 | 5.04 | 4.59 | 4.17 | 3.82 | 3.50 | 3.22 | 2.97 | 2.74 | 2.52 | 2.32 | 2.13 | 1.96 | 1.80 | 1.66 | 1.53 | 1.42 | 1.32 | 1.23 | 1.14 | 1.07 | 1.00 | X | X |
| 1.1615 | 2010 | 8.92 | 8.02 | 7.21 | 6.50 | 5.89 | 5.36 | 4.87 | 4.43 | 4.05 | 3.71 | 3.42 | 3.15 | 2.90 | 2.68 | 2.46 | 2.26 | 2.08 | 1.91 | 1.76 | 1.63 | 1.51 | 1.40 | 1.31 | 1.22 | 1.13 | 1.06 | 1.00 | X |
| 1.0300 | 2011 | 9.19 | 8.27 | 7.43 | 6.69 | 6.07 | 5.52 | 5.02 | 4.56 | 4.18 | 3.82 | 3.52 | 3.25 | 2.99 | 2.76 | 2.53 | 2.33 | 2.14 | 1.97 | 1.81 | 1.67 | 1.56 | 1.45 | 1.35 | 1.25 | 1.16 | 1.09 | 1.03 | 1.00 |
| 1.0300 | 2012 | 9.46 | 8.51 | 7.65 | 6.89 | 6.25 | 5.68 | 5.17 | 4.70 | 4.30 | 3.94 | 3.63 | 3.34 | 3.08 | 2.84 | 2.61 | 2.40 | 2.21 | 2.03 | 1.87 | 1.73 | 1.60 | 1.49 | 1.39 | 1.29 | 1.20 | 1.13 | 1.06 | 1.03 |

Calculated as the product of But-for Rates from year of contribution through year of withdrawal. Assumes end of year deposits and withdrawals and no borrowing. Highlighted value of 1.52 represents what the accumulation of one net dollar deposited in the end of 1997 and withdrawn in the end of 2002 would have been had annuities accumulated at the But-for rates. The 2011 and 2012 rates are based on the guaranteed minimum interest rate in the LaPlant contract because Exhibit 189 ends in 2010. These rates could be updated with additional data.

14

45. The following table shows the Difference in Rates in accumulations of net deposits due to the 1985 Change. The values in the table are found by subtracting the actual accumulation rates from the But-For accumulation rates. For example, the table indicates that a $1.00 net deposit invested in 1997 and surrendered in 2002 would have accumulated an additional $0.15 But-For the 1985 Change:

Table 9. Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants with Direct Recognition Deposited in Column Year and Withdrawn in Row Year

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1993 | -0.01 | 0.00 | -0.01 | 0.00 | 0.01 | 0.01 | 0.01 | 0.01 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 0.02 | 0.02 | 0.01 | 0.00 | 0.01 | 0.02 | 0.02 | 0.02 | 0.01 | 0.00 | Y | X | X | X | X | X | X | X | X | X | X | X | X | X | X | Y | X | X |
| 1995 | 0.06 | 0.05 | 0.04 | 0.03 | 0.04 | 0.05 | 0.04 | 0.04 | 0.04 | 0.03 | 0.01 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 0.11 | 0.09 | 0.08 | 0.07 | 0.07 | 0.08 | 0.07 | 0.06 | 0.06 | 0.05 | 0.03 | 0.01 | 0.00 | X | Y | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 0.17 | 0.14 | 0.13 | 0.12 | 0.11 | 0.12 | 0.11 | 0.10 | 0.09 | 0.08 | 0.06 | 0.04 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 0.26 | 0.24 | 0.21 | 0.18 | 0.17 | 0.17 | 0.16 | 0.14 | 0.13 | 0.11 | 0.09 | 0.07 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 0.36 | 0.33 | 0.29 | 0.25 | 0.24 | 0.23 | 0.21 | 0.19 | 0.18 | 0.15 | 0.13 | 0.10 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 0.46 | 0.43 | 0.38 | 0.33 | 0.31 | 0.30 | 0.27 | 0.25 | 0.23 | 0.20 | 0.17 | 0.14 | 0.11 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X |
| 2001 | 0.61 | 0.54 | 0.49 | 0.43 | 0.40 | 0.38 | 0.35 | 0.31 | 0.29 | 0.26 | 0.22 | 0.18 | 0.15 | 0.11 | 0.08 | 0.05 | 0.02 | 0.00 | Y | Y | X | X | X | Y | X | X | X | X |
| 2002 | 0.75 | 0.68 | 0.60 | 0.53 | 0.50 | 0.47 | 0.43 | 0.39 | 0.36 | 0.32 | 0.28 | 0.23 | 0.20 | 0.16 | 0.12 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | Y | X | X | X |
| 2003 | 0.92 | 0.83 | 0.74 | 0.66 | 0.61 | 0.57 | 0.52 | 0.47 | 0.44 | 0.39 | 0.34 | 0.29 | 0.25 | 0.20 | 0.16 | 0.12 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X |
| 2004 | 1.11 | 1.00 | 0.89 | 0.80 | 0.74 | 0.69 | 0.63 | 0.57 | 0.53 | 0.47 | 0.41 | 0.36 | 0.31 | 0.26 | 0.20 | 0.16 | 0.12 | 0.09 | 0.05 | 0.03 | 0.00 | Y | X | X | Y | X | X | X |
| 2005 | 1.34 | 1.20 | 1.07 | 0.96 | 0.98 | 0.82 | 0.75 | 0.68 | 0.63 | 0.56 | 0.50 | 0.43 | 0.38 | 0.32 | 0.26 | 0.21 | 0.17 | 0.13 | 0.09 | 0.06 | 0.03 | 0.00 | X | X | X | X | X | X |
| 2006 | 1.59 | 1.42 | 1.28 | 1.14 | 1.05 | 0.98 | 0.89 | 0.81 | 0.75 | 0.67 | 0.60 | 0.52 | 0.46 | 0.39 | 0.33 | 0.27 | 0.22 | 0.17 | 0.12 | 0.10 | 0.06 | 0.03 | 0.00 | X | X | X | X | X |
| 2007 | 1.88 | 1.69 | 1.51 | 1.35 | 1.24 | 1.15 | 1.05 | 0.95 | 0.88 | 0.79 | 0.71 | 0.62 | 0.55 | 0.47 | 0.40 | 0.34 | 0.27 | 0.23 | 0.18 | 0.14 | 0.10 | 0.07 | 0.03 | 0.00 | X | X | X | X |
| 2008 | 2.19 | 1.97 | 1.76 | 1.58 | 1.45 | 1.34 | 1.22 | 1.11 | 1.02 | 0.92 | 0.82 | 0.73 | 0.65 | 0.56 | 0.48 | 0.41 | 0.34 | 0.29 | 0.24 | 0.19 | 0.15 | 0.11 | 0.07 | 0.03 | 0.00 | Y | X | X |
| 2009 | 2.46 | 2.21 | 1.97 | 1.77 | 1.62 | 1.50 | 1.36 | 1.24 | 1.14 | 1.03 | 0.93 | 0.82 | 0.73 | 0.64 | 0.55 | 0.47 | 0.40 | 0.34 | 0.28 | 0.23 | 0.18 | 0.14 | 0.09 | 0.06 | 0.02 | 0.00 | X | X |
| 2010 | 2.71 | 2.44 | 2.19 | 1.95 | 1.79 | 1.75 | 1.50 | 1.37 | 1.26 | 1.13 | 1.02 | 0.91 | 0.81 | 0.71 | 0.61 | 0.53 | 0.45 | 0.38 | 0.32 | 0.27 | 0.21 | 0.17 | 0.12 | 0.08 | 0.04 | 0.02 | 0.00 | Y |
| 2011 | 2.79 | 2.51 | 2.24 | 2.01 | 1.84 | 1.70 | 1.55 | 1.41 | 1.29 | 1.17 | 1.05 | 0.94 | 0.83 | 0.73 | 0.63 | 0.54 | 0.46 | 0.39 | 0.33 | 0.27 | 0.22 | 0.17 | 0.12 | 0.08 | 0.04 | 0.02 | 0.00 | 0.00 |
| 2012 | 2.87 | 2.58 | 2.31 | 2.07 | 1.90 | 1.75 | 1.59 | 1.45 | 1.33 | 1.20 | 1.08 | 0.97 | 0.86 | 0.75 | 0.65 | 0.56 | 0.48 | 0.40 | 0.34 | 0.28 | 0.23 | 0.18 | 0.13 | 0.08 | 0.04 | 0.02 | 0.00 | 0.00 |

Calculated as the difference of a cell from Table 7 and the equivalent cell from Table 8. Assumes end of year deposits and withdrawals and no borrowing. Highlighted value of 0.15 represents the additional accumulation of one net dollar deposited at the end of 1997 and withdrawn at the end of 2002 But-For the 1985 Change.

46. Comparable sets of tables can be made for each policy loan rate for annuitants without Direct Recognition. Thus, there will be a total of four Difference in Rates tables.

## E. Steps in Determining the Difference But-For the 1985 Change

47. The Difference in the account values for each Pre-MN annuity policyholder can be calculated using the following steps:

**Step 1**: Determine which Difference in Rates table to use based on whether the annuitant had Direct Recognition and the policy loan rate.

**Step 2**: Based on the annuitant's termination year (2012 if the annuity remains in-force), look at the appropriate row of the Difference in Rates table.

**Step 3**: Determine the net deposit amount by year (withdrawals and policy loans being treated as negative net deposits, and policy loan repayments treated as positive net deposits).[16]

---

[16] Policy loans and policy loan repayments are only treated as negative net deposits for policyholders with Direct Recognition. The interest accrued on the policy loan, less the amount of dividend interest earned on the borrowed funds, is also treated as a negative net deposit for policyholders with Direct Recognition.

15

**Step 4**: Multiply the Step 2 Difference in Rates by the corresponding net deposits in Step 3.

**Step 5**: Add the values calculated in Step 4.

**48.**    This report illustrates how Differences can be calculated in a mechanical way for each individual annuitant with basic annual information and a limited number of variables. Assumptions of end of year deposits tend to underestimate Differences. The ultimate calculations can take into account exactly when in the year deposits were contributed, withdrawals were taken, funds were borrowed, loans were repaid and dividends were credited (that is, policy anniversary date). Factoring in these dates will not make the calculations any less formulaic.

**F.      LaPlant Example**

49. I reviewed a limited set of account statements from Ms. LaPlant. This included her "Policy Anniversary Report," issued each year on her policy anniversary date of May 1, from 1986 to 2000. These reports include her total cash value and her total "paid-in to date" (her total deposits throughout the life of the annuity). Looking at the 1986 statement, her account value as of May 1, 1986 can be determined. Looking at the change in the "paid-in to date," her total contributions each year can be determined. Other documents indicate that she did not make deposits after 2000. This information, summarized in the table below, provides sufficient information to calculate Differences in her cash value:

16

### Table 10. LaPlant Beginning Balance and Deposits

| Policy Year[a] | Gross Deposit | Net Deposit [b] |
|---|---|---|
| 1986 | $ 11,624 [c] | $ 11,624 [c] |
| 1987 | 2,000 | 1,870 |
| 1988 | 2,000 | 1,870 |
| 1989 | - | - |
| 1990 | 4,000 | 3,750 |
| 1991 | - | - |
| 1992 | 2,000 | 1,870 |
| 1993 | - | - |
| 1994 | - | - |
| 1995 | - | - |
| 1996 | - | - |
| 1997 | - | - |
| 1998 | 3,890 | 3,646 |

Sources: Policy Anniversary Reports of Marleen
LaPlant and ML2_NM_0001-0111

[a] Policy year is the year from May 2 of the previous
year until May 1 of the year stated.

[b] Calculated as Gross Contributions minus 6% load,
and $10 per year and $0.50 per payment charge.
LaPlant made two payments in 1990 and 1998.

[c] Represents Total Cash Value on May 1, 1986.

50. In order to determine the appropriate adjustments to LaPlant's cash values, I follow the five step process outlined above:

> **Step 1**: As LaPlant had Direct Recognition, use the Difference in Rates table applicable to Pre-MN annuitants with Direct Recognition.

> **Step 2**: Because LaPlant's account matured in 2008, use the row labeled 2008 for the Difference in Rates.

> **Step 3**: The net deposit amounts by year were identified in the previous table.

> **Step 4:** Multiply the net deposits by year by the corresponding Difference in Rates.

> **Step 5**: Add the values calculated in Step 4.

17

51. This process is demonstrated in the table below:

### Table 11. Difference in LaPlant's Cash Value due to 1985 Change

| Year | Net Contributions | Difference in Rates | Difference |
|------|------------------|---------------------|------------|
| 1986 | $ 11,624 | 1.76 | $ 20,458 |
| 1987 | 1,870 | 1.58 | 2,965 |
| 1988 | 1,870 | 1.45 | 2,712 |
| 1990 | 3,750 | 1.22 | 4,575 |
| 1992 | 1,870 | 1.02 | 1,907 |
| 1998 | 3,646 | 0.48 | 1,750 |
| Total | | | $ 34,357 |

52. The Difference to Ms. LaPlant's cash value, shown above, is conservatively stated because net deposits were assumed to be invested as of the end of each policy year. If NML provided actual dates for each net deposit, the calculations would be based on a proration of the Difference in Rates table values for the two surrounding calendar years and a larger adjustment would result.

## VII.  Conclusions

53. NML credits dividends on a formulaic basis to all of its policyholders. The methodology presented in this report to calculate the But-For DIRs and related Differences to cash values is consistent with that process and also uses a formulaic approach. The information necessary to perform this analysis for Pre-MN annuitants should be readily available from NML and should require no additional information from policyholders.

54. If the 1985 Change had not been effected, Pre-MN annuity policyholders would have received a higher DIR beginning at least as early as 1993 and continuing each year through the present. This report quantifies the DIRs which would have been credited to Pre-MN annuity policyholders But-For the 1985 Change. The DIRs for Pre-MN annuity policyholders with Direct Recognition and no loan balance would have been the same as the DIRs for corresponding life insurance policies. This But-For DIR is used to mechanically calculate the But-For DIR for those without Direct Recognition.

55. My methodology can be applied to remaining in-force Pre-MN annuitants to adjust their accounts to reflect the appropriate cash values upon which future dividends (reflecting the portfolio rate) should be applied. The same methodology can be used to calculate the additional accumulations that would have occurred for Pre-MN annuity policyholders that are no longer in-force.

Respectfully submitted,

Robert L. Hoyer, FSA, MAAA
Hoyer Actuarial Litigation, LLC
7708 Classics Drive
Naples, Florida 34113
(239) 776-7622
March 4, 2013

# Appendix A
# Resume of Robert L. Hoyer
# FSA, MAAA

Position :

Principal – Hoyer Actuarial Litigation, LLC

Contact Information :

Hoyer Actuarial Litigation, LLC

7708 Classics Drive

Naples, Florida 34113

Telephone : (239) 776-7622

Cell : (860) 716-6757

Email : hoyer.rl@gmail.com

Education :

FSA – Fellow of the Society of Actuaries (1977)

MAAA – Member of the American Academy of Actuaries (1980)

B.S. – Mathematics, Syracuse University (1969)

Range of Experience :

Provides litigation support and expert witness testimony regarding insurance and health care related disputes. Has testified on a wide variety of issues before municipal and district courts, bankruptcy court, regulatory hearings, legislative sessions, tax hearings, and SEC reviews. Topics involved in such projects include management effectiveness, reinsurance, health care pricing, rehabilitation structuring, acquisition appraisal, profit, risk, surplus analyses, life insurance sales practices, and pension disputes. Also provides general actuarial consulting in non-litigation scenarios.

20

Representative Clients – Insurance Companies :

- American Bankers Insurance Group
- CIGNA Corporation
- Equitable Life
- John Alden Life
- Legal and General Insurance
- Lutheran Brotherhood
- Massachusetts Mutual Life
- Mortgage Guaranty Insurance
- National Life of Vermont
- New York Life
- Northwestern Mutual Life
- Penn Mutual Life
- Phoenix Home Life
- Provident Mutual Life
- Prudential
- Sun America
- The Hartford
- Transamerica
- Travelers Corporation
- Union Central Life

Representative Clients – Health Care Entities :

- Aetna
- Alta Bates Medical Group
- Anchor -- Access HMO
- Blue Cross / Blue Shield of Missouri
- Blue Cross / Blue Shield of South Carolina
- Catholic Healthcare West
- ConnectiCare HMO
- Group Health Northwest
- Health Care Service Corporation
- Health Insurance Association of America
- Health New England HMO
- Health Source HMO
- Hitchcock Health Clinic
- Hudson IPA
- Kaiser Permanente
- Kentucky Health Purchasing Alliance
- Life Care Services
- Mac Neal Health Care

21

- Magellan Health Care
- National Vision Association
- Oxford Health Plan
- Rockford Health Plan
- Stamford Health Services
- Sutter Health Plan
- United Health Care
- University of Texas Medical Plan
- Western Health Advantage

Representative Clients – Non-Insurance Entities :

- Amoco
- Avis
- Bankers Trust
- Bank of America
- Barnett Bank
- Bausch & Lomb
- Bethlehem Steel
- Borden
- Bristol – Meyers
- Brown & Williamson
- Chase Manhattan Bank
- Chemical Bank
- Chevron
- Commonwealth Edison
- Compaq
- Continental Grain
- Crown, Cork & Seal
- Dana
- Dart
- Dole Foods
- Dresser
- Dupont
- Electric Boat
- Exxon
- FIAT
- Fleet Bank
- Flowers
- Goodyear
- Goldman Sachs
- Great Western
- GTE

22

- Guinness
- Hertz
- Hillenbrand
- Honeywell Bull
- Huntsman Corporation
- IBM
- Ingersoll Rand
- K – Mart
- Kaiser Aluminum
- Kansas City Southern
- Kaufman & Broad
- Kelloggs
- Kodak
- Kraft
- Liz Claiborne
- London Fog
- Levi Strauss
- Marriott
- Merrill Lynch
- Morgan Guaranty
- Munsingwear
- Owens – Corning
- Phillip Morris
- Pitney Bowes
- Quaker Oats
- Ralston Purina
- R.J. Reynolds
- Santa Fe
- Stanadyne
- Texaco
- Toyota
- United Technologies
- Walt Disney
- Westinghouse
- Weyerhauser

Professional and Business History :

Hoyer Actuarial Litigation, LLC (2002-    ) – Principal.

Arthur Andersen LLP – Managing Partner of Actuarial & Insurance Services (1989-2002).

Price Waterhouse – Managing Partner of Actuarial Consulting (1984-1989); Senior Manager (1882-1984); Manager (1980-1982).

Aetna Life & Casualty (1971-1980); Officer (1977-1980).

Middletown Township High School – Teacher of Physics and Calculus (1969-1971).

Syracuse University – Instructor of Psychometrics (1968-1969).

Fellow of the Society of Actuaries (1977).

Member of the American Academy of Actuaries (1980).

Authored articles regarding insurance company federal income tax legislation and implications in the Actuarial Digest and the National Underwriter.

Speaker at numerous industry, client, and firm-sponsored seminars on a variety of insurance and health care topics.


Other Professional Activities :

Syracuse University – School of Management Accounting Advisory Board, Society of Fellows, and Ambassador Leadership Programs.

24

# Appendix B
## Additional Documents Reviewed

In additional to documents reviewed for my June 30, 2010 report, July 20, 2010 deposition and November 16 and 17, 2010 trial I reviewed the following:

Expert Reports
- Theodore E. Affleck, CLU (6/30/2010)
- Bruce W. Foudree (8/6/2010)
- S. Travis Pritchett (7/2/2010)
- Stephen N. Steinig (8/6/2010)

Affidavits
- Nicholas Sales (11/17/2011)
- Chris Trost (6/30/2010)

Trial Exhibits
- 121
- 189
- 266
- 312
- 318-335
- 356
- 372-414
- 498

Policy Anniversary Reports of Marleen LaPlant

Appendix to Brief of Plaintiffs-Appellees, Volume II, United State Court of Appeals for the Seventh Circuit, Case No.12-3264

Other Bates Stamped Documents
- ML2_NM_0001-0111
- ML2_NM_5552
- ML2_NM_4552-4573

Affidavits Submitted in Beverly E. Krueger v The Northwestern Mutual Life Insurance Company, United States District Court for the Northern District of Florida, Case No. 1:10-cv-00128-SPM
- Chris G. Trost (4/15/2011)
- Nicholas Sales (8/13/2010)

25

**TABLE 1**

**STATES PROHIBITING CHOICE OF LAW PROVISIONS SPECIFYING APPLICATION OF OTHER STATES' LAW TO RESIDENT POLICYHOLDERS**

| State | Relevant Statute |
|-------|------------------|
| Arizona | Ariz. Rev. Stat. Ann. § 20-1115 |
| Louisiana | La. Rev. Stat. Ann. § 22:868 |
| Maryland | Md. Code Ann., Ins. § 12-209 |
| Massachusetts | Mass. Gen. Laws Ann. ch. 175, § 22 |
| Nebraska | Neb. Rev. Stat. Ann. § 44-357 |
| Oklahoma | Okla. Stat. tit. 36, § 3617 |
| Oregon | Or. Rev. Stat. Ann. § 742.018 |
| South Dakota | S.D. Codified Laws § 58-15-48 |
| Utah | Utah Code Ann. § 31A-21-314 |
| Virginia | Va. Code Ann § 38.2-312 |
| West Virginia | W. Va. Code § 33-6-14 |

**TABLE 2**

**STATES DEEMING RESIDENT POLICIES AS MADE IN
THE STATE AND SUBJECT TO THAT STATE'S LAW**

| State | Relevant Statute |
|---|---|
| Alabama | Ala. Code § 27-14-22 |
| Colorado | Colo. Rev. Stat. § 10-3-122 |
| Minnesota | Minn. Stat. Ann. § 60A.08 |
| North Carolina | N.C. Gen. Stat. Ann. § 58-3-1 |
| South Carolina | S.C. Code Ann. Ann. § 38-61-10 |
| Tennessee | Tenn. Code Ann. § 56-7-102 |
| Texas | Tex. Ins. Code Ann. Art. 21.42 |

**TABLE 3**

**STATES REQUIRING INSURANCE COMPANIES**
**TO COMPLY WITH LAW OF STATE OF INSURED'S RESIDENCE**

| State | Relevant Statute |
|---|---|
| Alaska | Alaska Stat. Ann. § 21.03.010 |
| Arkansas | Ark. Code Ann. § 23-60-110 |
| Florida | Fla. Stat. Ann. § 624.11 |
| Georgia | Ga. Code Ann. § 33-1-6 |
| Hawaii | Haw. Rev. Stat. Ann § 431:1-101 |
| Michigan | Mich. Comp. Laws Ann. § 500.120 |
| Montana | Mont. Code Ann. § 33-1-102(1) |
| Nevada | Nev. Rev. Stat. Ann. § 679A.150 |
| New Mexico | N.M. Stat. Ann. § 59A-1-14 |
| Pennsylvania | 40 Pa. Cons. Stat. Ann § 26 |
| Rhode Island | R.I. Gen. Laws Ann. §§ 27-2-1, 27-2-2 |
| Wyoming | Wyo. Stat. Ann. § 26-1-103 |

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

        Plaintiffs,

        v.                                 Case No. 2:11-CV-00910

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, a
Wisconsin mutual insurance corporation,

        Defendant.

## NORTHWESTERN MUTUAL'S OPPOSITION TO
## PLAINTIFF'S MOTION TO REMAND

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

    I.    The *Noonan* Case ..................................................................................... 3

    II.   Cases in Other States ............................................................................... 5

    III.  The Current Case ..................................................................................... 6

ARGUMENT ................................................................................................................ 8

    I.    Legal Standards........................................................................................ 8

    II.   Plaintiff Bears the Burden of Proving the Internal Affairs Exception Applies ............... 9

    III.  The Case Does Not Solely Involve Claims Related to the Internal Affairs of Northwestern Mutual ................................................................. 13

    IV.  Plaintiff's Proposed Class Action Does Not Solely Involve Claims That Arise Under or By Virtue of Wisconsin Law ........................... 19

        A.   Wisconsin Law Does Not Apply To The Claims Of Class Members Who Accepted The 1983 Amendment Outside Of Wisconsin ........................... 19

        B.   Wisconsin Law Does Not Apply To The Claims Of The Proposed Class Members Who Purchased Their Annuity Policies Outside of Wisconsin .......... 21

        C.   Wisconsin's Choice-Of-Law Framework Requires The Application Of Non-Wisconsin Law To The Proposed Class Members Claims ........................ 25

            1.   Under Wisconsin Law, In the Context of Insurance Contracts, the Law of the State of the Purchaser's Domicile Controls ........................... 25

            2.   The Grouping of Contacts Factors Favor Application of Non-Wisconsin Law .................................................................... 26

        D.   Even If Wisconsin Law Applies To Dividend Determinations, Plaintiff's Remand Motion Must Be Denied ........................... 28

    V.   Northwestern Mutual's Statements in Prior Cases Are Irrelevant Here ........................ 29

CONCLUSION .......................................................................................................... 30

i

differently than the Court of Appeals in *Noonan,* this Court must defer to *Noonan.* *Allstate Ins. Co.,* 285 F.3d at 637.

### C. Wisconsin's Choice-Of-Law Framework Requires The Application Of Non-Wisconsin Law To The Proposed Class Members Claims

Even without the benefit of *Noonan*, Wisconsin's choice-of-law jurisprudence establishes that non-Wisconsin law applies to the claims of proposed class members who purchased their Pre-MN annuity policies outside of Wisconsin. [20]

#### 1. Under Wisconsin Law, In the Context of Insurance Contracts, the Law of the State of the Purchaser's Domicile Controls

The Wisconsin Supreme Court applies "the traditional rule of conflicts which states that rights created under an insurance policy are determined by the law of the state *where the insured was domiciled* when he applied for the policy." *Solberg v. Metro. Life Ins. Co.*, 50 Wis. 2d 746, 750-751, 185 N.W.2d 319, 321 (1971) (emphasis added). Under Wisconsin law, the law of the state where the insurance policy was issued or delivered to the insured will apply. *See, e.g., Hejsak v. Great-West Life & Annuity Ins. Co.*, 331 F.Supp.2d 756, 762 (W.D. Wis. 2004) (Wisconsin law governed in action against Colorado insurer because the policy "was issued in Wisconsin").

Wisconsin law is also consistent with the clear majority rule that rights under an insurance policy are governed "by the local law of the state where the insured was domiciled" at the time of issuance, absent contrary choice of law provisions or "strong countervailing considerations." Restatement (Second) of Conflict of Laws § 192 & cmt. b (1971) (cited favorably in *Schlosser II*); *see also* 44 C.J.S. Insurance § 25 (the law of the jurisdiction "where the contract was executed governs the rights and liabilities of the parties…"); *Dennis v. Aetna Life Ins. & Annuity Co.*, 873 F. Supp. 1000,

---

[20] Significantly, for the reasons discussed in this section, even accepting, *arguendo,* Plaintiff's assertion and Judge Flynn's erroneous conclusion that the 1983 Amendment and its choice-of-law provision were inapplicable, the claims of those policyowners who accepted the Amendment and had originally purchased their policy outside of Wisconsin would be governed by the law of the State in which they purchased their policy.

1003 (E.D. Va. 1995) (insurance contracts "are determined by the law of the state where the insured was domiciled at the time she applied for the policy"); *Cooper v. Berkshire Life Ins. Co.*, 810 A.2d 1045, 1049, 1052-53 (Md. Ct. App. 2002 (applying Maryland law to claims brought by Maryland resident against out-of-state insurer); *Cole v. Equitable Life Assurance Soc'y*, 271 A.D.2d 271, 271-72 (N.Y. App. Div. 2000) (applying Florida law to claims brought by Florida policyholder against New York insurer).

## 2. The Grouping of Contacts Factors Favor Application of Non-Wisconsin Law

The majority of the putative class members entered into their contracts outside of Wisconsin and thus the "place of the contracting" factor weighs in favor of the application of non-Wisconsin law for those putative class members. Plaintiff maintains that because the annuity policy was "executed" in Wisconsin that the "place of contracting" for all policies was Wisconsin. Plaintiff is incorrect. *See Solberg*, 185 N.W.2d at 320. The "place of contracting" is where "the principal event necessary to make a contract occurs." Restatement (First) of Conflict of Laws § 311 cmt. d (1934). The principal event necessary to form the Pre-MN annuity contracts occurred when the Northwestern Mutual delivered the putative class members' their policies. The contract itself provides "if a policy is delivered and the premium paid . . . the coverage shall be in effect." (Ex. P, Compl., Ex. A at 13); *see also Nationwide Mut. Fire Ins. Co. v. Cate Dev., Inc.*, No. CV 110-118, 2011 U.S. Dist. LEXIS 101632, at *10 (S.D. Ga. Sept. 8, 2011) (unpublished) ("For insurance contracts, the act of delivery is the last act essential for completion of the insurance contract, and thus the place of delivery is where the insurance contract is made"). For the majority of the putative class members, this occurred outside of Wisconsin.

Likewise, for the majority of the annuitants the place of negotiation was outside of Wisconsin during meetings with Northwestern Mutual's agents. *Noonan II*, 726 N.W.2d at ¶ 15 ("contracts at issue here were negotiated and purchased in various states"). Plaintiff claims this

factor is irrelevant because the terms of the annuity policies were not subject to negotiation. But whether each putative class member would purchase the annuity in the first instance was the subject of negotiation, and for the majority of putative class members this occurred outside of Wisconsin. By contrast, for these class members no negotiation took place in Wisconsin.

Because the non-Wisconsin proposed class members' contracts were formed and negotiated outside of Wisconsin, non-Wisconsin law should apply to their claims. *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 674 F. Supp. 354, 356 (D.D.C. 1987) ("in weighing the five factors which a court must consider in resolving choice of law problems, the place of contracting and the place of negotiation of the contract emerge as far more significant than the place of performance, location of the subject matter of the contract, or place of business of the parties").

The place of performance factor also favors the application of non-Wisconsin law for putative class members who do not reside in Wisconsin. Plaintiff claims that this factor favors application of Wisconsin law for all proposed class members because Northwestern Mutual makes its dividend determination in Wisconsin. But the place of performance is the place where Northwestern Mutual provides payment to its policy holders. For most of the proposed class members, these payments occur outside of Wisconsin.

The location of the subject matter and the domicile of the parties factors are divided between Wisconsin and the states where the putative class members reside. As to the subject matter factor, Northwestern Mutual manages premiums paid under the policies and determines dividends in Wisconsin. However, payment to the policyholders is also the subject matter of the contract and this occurs wherever the policyholders reside. The domicile factor is divided because while Northwestern Mutual is a Wisconsin company, its policyholders and their agents are distributed throughout the fifty states.

For putative class members residing outside of Wisconsin, the grouping of contacts factors favor the application of non-Wisconsin law.[21]

### D. Even If Wisconsin Law Applies To Dividend Determinations, Plaintiff's Remand Motion Must Be Denied

Plaintiff contends that her claims arise under and by virtue of Wisconsin law because of the applicability of Wis. Stat. § 632.62, which requires the equitable apportionment of dividends to certain life insurance and annuity policyholders. Plaintiff's argument has already been implicitly rejected by the Wisconsin Court of Appeals in *Noonan*, which affirmed the trial court's determination that non-Wisconsin law would apply to the non-Wisconsin class-members claims notwithstanding the existence of Wis. Stat. § 632.62. And, of course, the fact that Northwestern Mutual must abide by Wis. Stat. § 632.62 does not alter the fact that the claims of the non-Wisconsin class members who signed the 1983 Amendment arise under non-Wisconsin law.

But even if Plaintiff were correct that Wisconsin law must govern all claims relating to dividend determinations, the claims they have asserted that are *unrelated* to dividend determinations render § 1332(d)(9)(B) inapplicable. *See, e.g., Rabouin v. Metro. Life Ins. Co.*, 25 A.D.3d 349, 350 (N.Y., App. Div. 2006) (denying class certification after determining "although the issuance of dividends may well be governed by New York law, questions concerning the initial policies as to reliance, parol evidence regarding the parties' intentions, and the potential need for the examination of other documents for contract interpretation or amplification, would warrant the application of the law of other jurisdictions."). For example, Plaintiff's claims that Northwestern Mutual breached its

---

[21] Because the grouping of contacts analysis confirms that non-Wisconsin contacts are more significant than Wisconsin contacts for policyholders who purchased their policies outside of Wisconsin, application of the *Heath* factors is unnecessary. *Drinkwater v. Am. Family Mut. Ins. Co.*, 290 Wis. 2d. 642, 658, 714 N.W.2d 568, 576 (2006) ("if it is not clear that the nonforum contacts are of greater significance, then the court applies five choice-influencing factors"). In any event, the Wisconsin Court of Appeals in *Noonan* has already resolved the application of those factors here in Northwestern Mutual's favor. Lastly, the cases establishing that Wisconsin courts apply the law of the state where the policyholder was domiciled when he applied for the policy establish a bright-line rule, thus rendering application of the *Heath* factors unnecessary.

fiduciary duty by failing to obtain their agreement to or notify them of the 1985 change does not relate to the determination of dividends. Nor do Plaintiff's claims for punitive damages.

## V. Northwestern Mutual's Statements in Prior Cases Are Irrelevant Here

Plaintiff spends much of her brief pointing to statements Northwestern Mutual has made in other cases. (Pls. Br. at 14-18) But Plaintiff cites no case holding that Northwestern Mutual is somehow bound by statements from other cases that involved different claims, often in different states with different underlying choice-of-law rules.[22]

Plaintiff also fails to mention that in all but one of the three cases cited by Plaintiff *the court rejected Northwestern Mutual's arguments*. In *Papadakis*, Northwestern Mutual argued that a California court should stay proceedings in favor of a Wisconsin action because the underlying claims related solely to Northwestern Mutual's internal affairs. (Pls. Ex. 47-H) The California court denied Northwestern Mutual's motion. (Ex. R, *Papadakis v. Northwestern Mut. Life Ins. Co.*, Mar. 21, 2006 Order, Case No. BC322788 (Cal. Sup. Ct.))

In *Heretick* Northwestern Mutual asked a Florida court to dismiss claims for lack of subject matter jurisdiction pursuant to a statute prohibiting Florida courts from "regulat[ing] the internal affairs of a foreign corporation authorized to transact business in [Florida]." (Pls. Ex. 47-J at 5, 13) The Florida court did not dismiss on subject matter jurisdiction grounds, did not find that the claims implicated Northwestern Mutual's internal affairs, but instead *applied Florida substantive law* to

---

[22] For instance, the doctrine of judicial estoppel would not apply here. That doctrine precludes a party from *gaining an advantage in litigation* by asserting one position and then taking the opposite position later in the case —such as when a party seeks to certify a nationwide class after prevailing on motions and at trial based on promises it was seeking only a statewide class. *See Van Deurzen v. Yamaha Motor Corp. USA*, 276 Wis. 2d 815, 821, 698 N.W.2d 777, 780 (Ct. App. 2004) (setting forth three elements for judicial estoppel); *State v. Gove*, 148 Wis. 2d 936, 944, 437 N.W.2d 218, 221 (1989) (judicial estoppel doctrine precludes a party from asserting one position during the course of litigation, only to later argue the opposite). Plaintiff can point to no inconsistent statement made by Northwestern Mutual in this case, much less an inconsistent statement that gave Northwestern Mutual an advantage.

29

conclude that plaintiffs had failed to state a claim. (Ex. S, *Heretick v. Northwestern Mut. Life Ins. Co.*, June 23, 2003 Order, Case No. 02-1061-CI-11, (Cir. Ct. Fla.))

Finally, in *Smith* the district court agreed with Northwestern Mutual that plaintiffs' claims in that case *did not* implicate Northwestern Mutual's internal affairs and hence that *Missouri law* applied. *Smith*, 2011 U.S. Dist. LEXIS 104394, at **18-19. Plaintiffs there alleged that Northwestern Mutual had breached its fiduciary duty by over-charging interest pursuant to their whole life insurance policy's loan provision. Relying on the internal affairs doctrine, plaintiffs argued that Wisconsin law applied and, like Plaintiff does here, cited *State Farm Mutual Automobile Insurance Co. v. Superior Court*, 114 Cal. App. 4th 434 (Cal. Ct. App. 2003). Northwestern Mutual argued that *State Farm* was inapposite because, unlike in *State Farm*, the claims at issue did not relate to dividend determinations.[23] Northwestern Mutual did not say that the internal affairs doctrine always applies to claims involving dividend determinations, much less that it would apply to claims like those here. Rather, Northwestern Mutual was quoting from and distinguishing *State Farm*.

## **CONCLUSION**

For the foregoing reasons, Northwestern Mutual respectfully requests that the Court deny Plaintiffs' Motion to Remand.

---

[23] Plaintiff's ellipses and chopped-up quotations aside, here is what Northwestern Mutual actually said:
> As the *State Farm* court explained, the internal affairs choice of law doctrine applies only to claims challenging "corporate governance" decisions, such as the adoption of by-laws, the issuance of shares, the holding of directors or trustee meetings, mergers, consolidations, reorganizations, and the "declaration and payment of dividends or other distributions." Because it would be "impractical to have issues such as these governed by conflicting local rules of two or more states," the state law of the company's domicile will be applied to such claims. The *State Farm* court specifically held that individual policyholder claims arising out of the specific terms and provisions of a particular contract, however, are governed by the plaintiff's local state law. This is particularly true where, as here, the Loan Interest Rate Amendments include a clause calling for the application of Missouri law.

(Pls. Ex. 47-I, p. 11) (citations omitted).

Dated this 18th day of November, 2011

s/ Joshua D. Maggard
Eric J. Van Vugt (Wis. Bar No. 1017336)
Joshua D. Maggard (Wis. Bar No. 1061378)
Attorneys for Defendant
The Northwestern Mutual Life
Insurance Company
Quarles & Brady LLP
411 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
Telephone: (414) 277-5625
Fax: (414) 978-8625
Email:  eric.vanvugt@quarles.com
            joshua.maggard@quarles.com

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing was served via the ECF system which will send a

notice of electronic filing to the following: George Kersten, Jeffrey A. Bartos, Mark B. Pollack.

s/ Joshua D. Maggard

1    STATE OF WISCONSIN   CIRCUIT COURT   MILWAUKEE COUNTY
     ------------------------------------------------------
2
     MARLEEN M. LAPLANT,              CASE NO. 08CV011988
3    W7868 Riedel Lane                CODE:  30701
     Fort Atkinson, WI  53538,
4    on her own behalf and on
     behalf of a class similarly
5    situated,
                                      DEPOSITION OF
6            Plaintiffs,              MARLEEN M. LAPLANT

7
         -vs-
8
                                      9th of September, 2009
9    THE NORTHWESTERN MUTUAL
     LIFE INSURANCE COMPANY,
10   a Wisconsin mutual insurance
     corporation,
11   720 East Wisconsin Avenue
     Milwaukee, WI  53202,
12
             Defendant.
13   ------------------------------------------------------
            DEPOSITION OF MARLEEN M. LAPLANT, before JANET
14   LARSEN, a Registered Professional Reporter and Notary
     Public, in and for the State of Wisconsin, under and
15   pursuant to Section 804 of the Wisconsin Statutes and
     the acts amended, at the offices of Quarles & Brady
16   LLP, 411 East Wisconsin Avenue, Suite 2040, Milwaukee,
     Wisconsin, on the 9th day of September, 2009,
17   commencing at 9:29 a.m. and concluding at 12:03 p.m.

18                   A P P E A R A N C E S

19           KERSTEN & MCKINNON, S.C., by
             GEORGE P. KERSTEN, ATTORNEY AT LAW
20           E. CAMPION KERSTEN, ATTORNEY AT LAW
             11518 North Port Washington Road,
21           Suite 104
             Mequon, Wisconsin  53092
22           appeared on behalf of the Plaintiff.

23           GALANIS, POLLACK, JACOBS &
             JOHNSON, S.C., by
24           MARK B. POLLACK, ATTORNEY AT LAW
             839 North Jefferson Street, Suite 200
25           Milwaukee, Wisconsin  53202
             appeared on behalf of the Plaintiff.

```
 1              STRAUS & BOIES, LLP, by
                MARK J. SCHIRMER, ATTORNEY AT LAW
 2              4041 University Drive, Fifth Floor
                Fairfax, Virginia  22030
 3              appeared by telephone on behalf of the
                Plaintiff.
 4
                QUARLES & BRADY LLP, by
 5              ERIC J. VAN VUGT, ATTORNEY AT LAW
                ELIZABETH CHAMBERLIN, ATTORNEY AT LAW
 6              411 East Wisconsin Avenue, Suite 2040
                Milwaukee, Wisconsin  53202
 7              appeared on behalf of the Defendant.

 8              NORTHWESTERN MUTUAL, by
                DAVID W. PEREZ, ASSISTANT GENERAL COUNSEL
 9              720 East Wisconsin Avenue
                Milwaukee, Wisconsin  53202
10              appeared on behalf of the Defendant.

11                   I N D E X

12    EXAMINATION BY:                          PAGE

13    Mr. Van Vugt                               3

14    EXHIBITS:                               MARKED

15    1 - Cover letter and documents produced in    35
          response to request, LaP1 through LaP 130
16        (Withdrawn)
      2 - 12-5-86 document from meeting with Mark     67
17        Mittag with handwriting, LaP 39

18    MATERIAL REQUESTED:                      PAGE

19    None

20    QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:

21    Page 40, line 6
      Page 41, line 5
22    (Original transcript supplied to Attorney Van Vugt)
      (Exhibit 1 page 1 has been copied and attached to the
23    original transcript and to each attorney's transcript
      with the original of Exhibit 1 returned to Mr. Van
24    Vugt.  Exhibit 2 was retained by Attorney George
      Kersten with a photocopy attached to the original
25    transcript and copies attached to each attorney's
      transcript.)
```

1   A.   M-hm.

2   Q.   -- just let me know.  Otherwise we'll forge ahead.

3        Okay?

4   A.   Okay.

5   Q.   The policy in question now was purchased in May of

6        1975.  Do you recall that?

7   A.   Yes.

8   Q.   What were the circumstances that led you to do

9        that at that time?

10  A.   Mark Mittag was a good friend of ours, still is,

11       and he had talked to us about it, and there was

12       not a retirement policy where I worked, and we

13       wanted, I wanted to get something started, and so

14       he talked to us about it, and I felt it was a good

15       place to invest my money.

16  Q.   All right.  You say Mark Mittag was and still is a

17       friend of the family's?

18  A.   Yes.

19  Q.   Under what circumstances have you known him?

20  A.   Went to high school with him.

21  Q.   Any other involvement?

22  A.   He became a good friend of my husband's when my

23       husband moved to the area, stood up in our

24       wedding.  So we've known each other for a long

25       time.

1  Q.  How often on an annual basis or some other period
2      do you see him?
3  A.  Oh, we haven't seen him for a few years now,
4      probably seven, eight.
5  Q.  All right.  And has your husband worked with him
6      professionally, gotten any advice from him?
7  A.  No.
8  Q.  Or purchased any products from him?
9  A.  No.
10 Q.  And had he been, you know, trying to sell you
11     products over a period of time, or was this your
12     first contact with him professionally?
13 A.  That was our first contact with him
14     professionally.
15 Q.  And did you seek him out, or did he seek you out?
16 A.  We kind of seeked each other out.
17 Q.  All right.  And what was -- What was it that you
18     thought you were buying at the time?
19 A.  A policy that I could invest in and have it grow
20     for retirement and was a long term, and that I
21     would be paid dividends each year.
22 Q.  Did you look at other kinds of investment
23     products?
24 A.  I don't recall.
25 Q.  To your recollection, did he present other

1    alternatives that you could put money in?

2  A.  I don't recollect that at all.

3  Q.  How many -- I mean, again, setting aside social

4      interaction with him, did you have an actual

5      meeting with him for the purpose of getting this

6      policy?

7  A.  Oh, yes.

8  Q.  Where did it happen; do you know?

9  A.  I think in his office.

10 Q.  And who else was there, if anyone?

11 A.  My husband.

12 Q.  How long did it last?

13 A.  It was a long time ago.

14 Q.  Right.

15 A.  I don't know how long it lasted.

16 Q.  All right.  Do you recall the discussions you had

17     with him?

18 A.  I remember him, you know, explaining what the, the

19     policy was.

20 Q.  And do you have a pretty clear recollection of

21     what he told you at the time?

22 A.  No.

23 Q.  What do you recall him telling you?

24 A.  That it was, that NML was a good company, and it,

25     its rate of, more or less rate of return was very

1      good on the policy.

2  Q.  Did he put a number on that or anything else?

3  A.  No.

4  Q.  What else can you recall him telling you?

5  A.  I, I don't recall anything else.

6  Q.  At any time after you purchased the policy, did

7      you have other discussions or meetings with

8      Mr. Mittag?

9  A.  Yes.

10 Q.  Which ones do you recall?

11 A.  He would call us, and we would go down to his

12     office, and he would show a computer printout and

13     just tell me what the dividends were and what it

14     was going to be the next year.

15 Q.  And how often did you have those kinds of meetings

16     with him?

17 A.  I only remember about two or three of them.

18 Q.  And was this early in the period or more recently?

19 A.  It was earlier.

20 Q.  In the '70s or the '80s or '90s?

21 A.  '70s, maybe early '80s.

22 Q.  And you recall two such meetings?

23 A.  Two or three.

24 Q.  Was your husband always with you at the time?

25 A.  Yes.

```
 1    Q.   Can you be any -- Do you have any better
 2         recollection or anything more to tell us about
 3         those meetings?
 4    A.   No.
 5    Q.   Okay.  Now, have you ever discussed this policy
 6         with anyone else, other than Mr. Mittag?
 7    A.   No.
 8    Q.   Do you know of anybody else in your circle of
 9         friends or neighbors who bought a policy like
10         this?
11    A.   No.
12    Q.   Did Mr. Mittag ever try to sell you other
13         insurance products?
14    A.   No.
15    Q.   And you've told us all you can recall about
16         discussions with him about your policy?
17    A.   M-hm.
18    Q.   Is that right?
19    A.   Yes.
20    Q.   Okay.  Did you have an understanding of what kinds
21         of benefits would be available to you under this
22         policy?
23    A.   Benefits as far as --
24    Q.   Well, for example, if -- What is it you would
25         expect to get from this policy?
```

```
 1          yesterday.

 2                  My question again, to your knowledge, are

 3          there any other documents that you have relating

 4          to this policy that are for one reason or another

 5          not in these documents here today?

 6   A.     No.

 7   Q.     To your knowledge, other than the annual reports,

 8          are there any documents that you received in the

 9          course of, any documents you ever received that

10          were not for one reason or another kept in this

11          file?

12   A.     No.

13   Q.     But you understand that there -- Strike that.

14                  When did you first learn about this

15          lawsuit or the prior lawsuit by the Noonans?

16   A.     Read it in the Milwaukee paper about the

17          Noonans.

18   Q.     And in the original of this file that you've

19          produced, there is -- on the top there is a

20          newspaper article, and that newspaper article

21          appears as, I think page -- well --

22                  MR. GEORGE KERSTEN:  Toward the end,

23          Eric.

24   Q.     It's LaP 89 and 90.

25                  When did you first see this article in
```

1          the paper; do you recall?

2     A.   My husband saw it and then showed it to me.

3     Q.   And was this at or about the time it was first

4          published?

5     A.   Yes.

6     Q.   Was he a regular reader of the Milwaukee Journal

7          Sentinel?

8     A.   He'd read it periodically.  Maybe at the library,

9          we'd go through it.

10    Q.   And do you recall anything more about this

11         newspaper article, other than what's in it?

12    A.   No.

13    Q.   There's some handwriting on the original of this,

14         it's also on the copy.  Whose handwriting is that?

15    A.   My husband's.

16    Q.   And it also refers to the case number of the

17         Noonan case, and it has the Kersten & McKinnon

18         name and phone number on there?

19    A.   Yes.

20    Q.   Do you know where he got that information?

21    A.   He got the Kersten name from the article.  I'm not

22         sure where he got the other from.  Phone number

23         would be easy to get.

24    Q.   Sure.

25              Did you and your husband discuss this?

1   A.   Yeah.  We talked about it.

2   Q.   What did you --

3   A.   And he had said that it was just like the policy

4        that I had.

5   Q.   And how did he know that?

6   A.   From the description in the article, that it was a

7        retirement annuity.

8   Q.   Do you recall discussing anything else with your

9        husband about this article?

10  A.   No.  Other than we wanted to check into it

11       further, and then he called George.

12  Q.   When was that?

13  A.   Shortly after this article came out.

14  Q.   Did you --

15  A.   After --

16  Q.   Go ahead.

17  A.   After it came out in the paper, I was going to

18       say.

19  Q.   Did you or your husband talk about this article or

20       this lawsuit, the Noonan lawsuit, with anybody

21       else other than Mr. Kersten?

22  A.   No.

23  Q.   And how many times did you talk with Mr. Kersten?

24            MR. GEORGE KERSTEN:  Objection as

25       invading the attorney-client privilege.

1   Q.  Did there come a point where you and your husband

2        hired Mr. Kersten?

3   A.  Yes.

4   Q.  When was that?

5   A.  About a year ago.

6   Q.  All right.  Prior to that, as far as you were

7        concerned, he was not your lawyer?

8            MR. GEORGE KERSTEN:  Objection as

9        invading the attorney-client privilege, calling

10       for a legal conclusion.

11           MR. VAN VUGT:  Are you instructing her

12       not to answer?

13           MR. GEORGE KERSTEN:  Yes.

14  Q.  Up until the point where you hired Mr. Kersten,

15       how many conversations did you have with him?

16  A.  Oh, three or four.

17  Q.  And when did those occur?

18  A.  Within the last two years.

19  Q.  After this initial contact with her --

20           MR. GEORGE KERSTEN:  Excuse me.  I'm

21       sorry.  I'm sorry.  Eric, I was interrupted.

22       Could you just start the last question over again?

23  Q.  Other than this initial -- this initial

24       conversation that you had with him shortly after

25       the article was published, how long did that

```
 1        class, that that kind of communication deserves
 2        the confidentiality that is accorded to a person
 3        after that person becomes a formal client.
 4              Now, she was not, she had not retained us
 5        yet at that point.  But I believe that in terms of
 6        confidentiality, if someone calls into the class
 7        attorney --
 8              MR. VAN VUGT:  George, I think we've got
 9        it.
10              MR. GEORGE KERSTEN:  Yeah, okay.
11   Q.   Have you discussed this lawsuit or the Noonan
12        lawsuit with anyone other than Mr. Kersten?
13   A.   No.
14   Q.   Has your husband, to your knowledge, discussed
15        this lawsuit --
16   A.   No.
17   Q.   -- or the Noonan lawsuit with anyone other than
18        Mr. Kersten?
19   A.   No.
20   Q.   Have you read anything about the Noonan lawsuit,
21        other than the newspaper article that's part of
22        your file?
23   A.   No.  It was just the newspaper article.
24   Q.   Did you monitor or keep track of developments in
25        the Noonan lawsuit?
```

1    A.   My husband did, yes.

2    Q.   And how did he do that?

3    A.   Internet.

4    Q.   Do you know what website or what site --

5    A.   No.

6    Q.   -- he was using to track that?

7    A.   No.

8    Q.   One of the notes on the newspaper article is a

9         02-C-0128.  Do you know that that's a case number?

10   A.   I don't know it as the case number, but he

11        probably does, if it is.

12   Q.   Was it your understanding that he was monitoring

13        developments in the Noonan case on some website?

14   A.   Yes, he was watching it.

15   Q.   And how often, to your recollection, did he watch

16        it?

17   A.   Oh, maybe once a week, once every two weeks.

18   Q.   For what period of time was this?

19   A.   Oh, after the article came out, he would look

20        every once in awhile to see if there had been any

21        changes or what was happening.

22   Q.   Did he tell you what he saw on the Internet?

23   A.   Some.

24   Q.   What do you recall him telling you?

25   A.   I don't recall exactly what he said, other than

1       maybe, you know, something was postponed or a

2       different date was set up, and before maybe a

3       decision was made or whatever.

4   Q.  Did you ever look on the, look at whatever --

5   A.  No.

6   Q.  -- he was looking at?

7   A.  No.

8   Q.  Did you come to learn at some point that the case

9       was dismissed and then up on appeal and then back

10      again, that sort of thing?

11  A.  Yes.

12  Q.  Did you understand that at some point -- Strike

13      that.

14          Again, I'm only interested in what you've

15      learned from your husband and from his review of

16      the website, but did you, did you know what a

17      class action was?

18  A.  Yes.

19  Q.  And what was your understanding of that?

20  A.  That it entailed, would be all the shareholders or

21      policyholders of that similar type of policy,

22      would be members of the class.

23  Q.  Did you understand at some point that an attempt

24      to have a class recognized was denied?

25  A.  Yes.

1    Q.    And was that something that your husband noted on

2          the Internet?

3    A.    I believe so.

4    Q.    What did that mean to you?

5    A.    That it wouldn't go any further, that it was being

6          not disallowed but was turned down.

7    Q.    And what was your reaction to that?

8    A.    I'm not sure.  I don't know.

9    Q.    Did you have any other discussions with your

10         husband about this lawsuit or his monitoring of

11         the Noonan lawsuit?

12   A.    No.

13   Q.    And just to be clear, you've never discussed the

14         lawsuit or the subject of this lawsuit with any

15         other person other than --

16   A.    No.

17   Q.    -- your husband and your attorney?  Is that true?

18   A.    True.

19   Q.    What about Mr. Mittag, did you ever call him up

20         or --

21   A.    No.

22   Q.    -- raise the subject with him?

23   A.    No.

24   Q.    Has your husband ever talked to him about this?

25   A.    To Mark Mittag?

1    A.   Because we had gotten a copy of this and -- after,

2         when we pulled the copies out.

3    Q.   Okay.  Why were you looking at it?

4    A.   I didn't read it word-for-word.

5    Q.   Why did you read it at all?

6    A.   I just skimmed at it, looking at it when we were

7         going to take copies of it.

8    Q.   But did you develop any understanding or become

9         aware of something from that review that you

10        didn't know from having reviewed it back in 1975?

11   A.   Probably of the dividends.

12   Q.   What did you notice when you skimmed it recently?

13   A.   That we would be, I'd be paid dividends for each

14        year annually.

15   Q.   All right.  And then you have been paid dividends

16        each year annually; haven't you?

17   A.   Yes.

18   Q.   Did you notice anything in the contract that said

19        how much the dividend was going to be?

20   A.   That it was, it would be from the profits of the

21        company.

22   Q.   And where in the contract did you see that?

23   A.   LaP 4.

24   Q.   Okay.

25   A.   Section 4, Dividends.

1   Q.   Where does it refer to profits of the company?

2   A.   The policy shall share in the divisible surplus,

3        if any, of the company.

4   Q.   Okay.

5   A.   And the policy's share shall be determined

6        annually and credited as a dividend.

7   Q.   Does it say how the policy's share will be

8        determined?

9   A.   Shall be determined from the profits of the

10       company.

11  Q.   Right.  But does it, you know, this policy, which

12       is the phrase that's there, means the annuity

13       contract that you had purchased; correct?

14  A.   Correct.

15  Q.   Does it say how this policy's share of the

16       dividend, share -- Strike that.

17            Does it say how this policy's share of

18       the divisible surplus will be determined?

19            MR. GEORGE KERSTEN:  Objection as asked

20       and answered; therefore, repetitious.

21            You can answer again.

22  A.   Oh, that it was divisible of the surplus, which

23       are the profits of the company.

24  Q.   Well, how do you know the surplus is the profits

25       of the company?

1   A.   We would have gotten together with him.

2   Q.   This is 1990, though.  Do you recall that?

3   A.   No.  It's too long ago.

4   Q.   Well, you recall meeting with him in the '80s.

5       You recall meeting with him in the '70s.

6   A.   Well, as far as talking with him, whenever any of

7       these, we got right from Mr. Mittag.

8   Q.   So would it always be in person?

9   A.   Yes.

10   Q.   So if we see one of these documents like LaP 46,

11       it would be fair to conclude that you met with him

12       at or about the date of the document?

13   A.   Yes.

14   Q.   But you don't have any specific recollection of

15       what you talked about or didn't talk about with

16       him on this date?

17   A.   Correct.

18   Q.   All right.  You know, here we have, for example, a

19       policy cash value $14,000; correct?

20   A.   Yes.

21   Q.   And additions of $8,448; correct?

22   A.   Correct.

23   Q.   Do you recall any reaction to getting that

24       information?  Would you have understood what it

25       meant?

1   A.   I don't know if I understood what the additions

2        were, other than accumulation of dividends over

3        the years.

4   Q.   All right.  And the policy cash value of $14,094,

5        would you have understood what that meant?

6   A.   I think -- I'm not sure.

7   Q.   All right.  You wouldn't even know, for example,

8        whether that represented the total of your premium

9        payments or some other number; true?

10   A.   Correct.

11   Q.   And do you recall -- Just to be thorough, if not

12       repetitious, do you recall any discussion at all,

13       any subject matter that Mr. Mittag talked to you

14       about in this or any other meeting that we haven't

15       talked about?

16   A.   No.

17   Q.   You referred earlier to LaP 57, and this is a form

18       that, at least the information is as of May 1,

19       2001.  Do you see that?

20   A.   M-hm.  Yes.

21   Q.   All right.  And this one actually shows your 2001

22       dividend; do you recall?

23   A.   Yes.

24   Q.   Do you recall getting statements in this form?

25   A.   Yes.  I got a few of them.

1   Q.   What did you do?  I mean what did you do with

2       these forms, other than put them in the folder?

3   A.   I looked at them and then put them in the

4       folder.

5   Q.   Any reaction that you recall to the numbers that

6       are on this page?

7   A.   No.

8   Q.   This one indicates for the first -- at least of

9       the documents we've identified specifically,

10      indicates total paid to date, $20,790.  Do you see

11      that?

12   A.   Yes.

13   Q.   Would you have kept track of those payments

14      yourself in some other form?

15   A.   None other than check stubs.

16   Q.   This indicates at this point that the policy has a

17      paid up -- or, excuse me, a total cash value of

18      $66,000, correct, three times as much?

19   A.   Yes.

20   Q.   Do you recall any reaction to that?

21   A.   No.

22   Q.   Do you recall even noticing that comparison

23      between what you paid in and what it was now

24      worth?

25   A.   I probably noticed it, but --

1   Q.   Did you --

2   A.   -- you know, when I looked at it at that time.

3   Q.   Did you know at this point what your options were

4      in terms of cashing this thing in or doing

5      something else with your money?

6   A.   No, because at that time I wasn't interested in

7      cashing it in.

8   Q.   Were you interested in getting, as most people

9      are, getting the best return on your investments

10      that you can?

11   A.   Yes.

12   Q.   And did you consider whether you could make this

13      much or more money in some other vehicle?

14   A.   No.  I trusted Northwestern was doing a good

15      job.

16   Q.   All right.  But, for example, you see also here

17      the 2001 dividend; don't you?

18   A.   Yes.

19   Q.   Did you have any idea as to how that number was

20      calculated when you got this statement?

21   A.   No.

22   Q.   The next page is a similar statement for the next

23      year, and if you look, it shows the, you know, the

24      total cash value is now $70,000, correct, $70,282?

25   A.   Yes.

1    A.    No.

2    Q.    -- discuss this with you?

3              Did you feel you understood the contract,

4          what you were signing?

5    A.    Yes.

6    Q.    And this was necessary to do in order to get the

7          distribution of the value of the contract?

8    A.    Correct.

9    Q.    Is there a reason why it happened on this

10         particular date or the month of July?

11   A.    No.  I wanted to have it done before I retired.

12   Q.    Okay.  But you had now set up an account at

13         Vanguard into which these funds could be rolled;

14         correct?

15   A.    Yes.

16   Q.    The option that you selected was Option A, which

17         was surrender entire contract, do you see that,

18         the first page, LaP 121?

19   A.    Yes.

20   Q.    And it says, this will cancel the contract.  True?

21   A.    Correct.

22   Q.    And you understood that's what you were doing?

23   A.    Yes.

24   Q.    All right.  And above the signature line, the

25         owner of the contract makes the following

1  authorization, election and certification.  Number

2  one, I am surrendering all or a portion of said

3  contract and all claims thereunder to Northwestern

4  Mutual.

5  Do you see that?

6  A.  What page are you on?

7  Q.  Page LaP 124.

8  A.  Yes.

9  Q.  And do you recall reading that before you signed

10  it?

11  A.  Yes.

12  Q.  Did you feel you understood it?

13  A.  Yes.

14  Q.  What did you think you were doing when you signed

15  this form surrendering all or a portion of said

16  contract and all claims thereunder?

17  A.  That it was going to be rolled over to Vanguard in

18  an IRA.

19  Q.  At that point did you feel you had any claims

20  against or claims under the contract?

21  MR. GEORGE KERSTEN:  Oh, I object on

22  that, on the vagueness and ambiguity of that,

23  calling for a legal conclusion.

24  MR. VAN VUGT:  Just say objection to

25  form.

1   STATE OF WISCONSIN)

2   MILWAUKEE COUNTY  )

3                    I, JANET LARSEN, a Notary Public in and

4   for the State of Wisconsin, do hereby certify that the

5   deposition of MARLEEN LAPLANT was taken before me,

6   under and pursuant to Section 804 of the Wisconsin

7   Statutes and the acts amended, on the 9th day of

8   September, 2009.

9                    That before said witness testified,

10  she was first duly sworn by me to testify the truth.

11                   That I am not a relative or employee or

12  attorney or counsel of any of the parties, or a

13  relative or employee of such attorney or counsel, or

14  financially interested directly or indirectly in this

15  action, and I have not entered into a contract for

16  court reporting services unless the contract is limited

17  to a particular action or incident as stated in

18  Wisconsin Act 227.

19                   That the foregoing pages is a true and

20  correct transcription of my original shorthand notes

21  taken at said time and place.

22                   Dated this 15th day of September, 2009
                     at Milwaukee, Wisconsin.
23
                     _____
24                   JANET DONALDSON LARSEN
                     REGISTERED PROFESSIONAL REPORTER
25                   NOTARY PUBLIC, STATE OF WISCONSIN
                     MY COMMISSION EXPIRES 3-28-10



The Northwestern Mutual Life Insurance Company agrees
to pay the benefits provided in this policy, subject to its terms and
conditions. Executed at Milwaukee, Wisconsin
on the Date of Issue.

Secretary

President

**Flexible Premium Annuity**

**Participating**

Retirement Income payable at maturity.
Death Benefit payable before maturity.
Flexible Premium — Section 3.1(b).

**Right To Examine Policy**—Please examine this policy carefully. The
Owner may return the policy for any reason within ten days after
receiving it. If returned, the policy will be considered void from the
beginning and any premium paid will be refunded.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY·MILWAUKEE NML

EXHIBIT
A

Case 2:11-cv-09910-LA   Filed 07/01/11   Page 99 of 225   Document 34-1

# AMENDMENT OF CONTRACT TO QUALIFY AS INDIVIDUAL RETIREMENT ANNUITY

**As of the Date of Issue, the OWNERSHIP provisions of the contract are amended to add, or amend, Section 2.4 TRANSFERABILITY RESTRICTIONS to read:**

## 2.4 TRANSFERABILITY RESTRICTIONS

Notwithstanding any other provisions of this contract, the Owner may not transfer ownership of the contract except to a former spouse of the Owner under a divorce decree or under a written instrument incident to such divorce.

**In addition, as of the Date of Issue, specific provisions in this contract to the contrary notwithstanding, the contract is amended to limit and restrict the exercise of the rights of the Owner, Annuitant or Insured and any beneficiary and the amount of premiums as follows:**

1. Except for a single premium qualifying as a rollover contribution under applicable provisions of the Internal Revenue Code of 1954, as amended, the annual premiums shall not exceed $1,500. As a further limitation, (a) no additional payments may be made on a contract purchased with a single premium qualifying as such rollover contribution and (b) no premium may be paid unless the contract is an individual retirement annuity which meets the requirements of Section 408 of the Code for the taxable year of the Owner during which the payment is made and the payment (except for a single premium described in (a) above) meets the requirements for deduction under Section 219 of the Code.

2. Any dividend shall not be paid in cash but shall be applied to the payment of a premium, or to purchase paid-up additions, in accordance with the provisions of the contract.

3. Any portion of the surrender or maturity benefits paid to the Owner in one sum shall be paid no later than the close of the taxable year of the Owner in which the Owner attains age 70½.

4. Any portion of the surrender or maturity benefits not paid in one sum shall be paid, beginning no later than the close of the taxable year of the Owner in which the Owner attains age 70½, over (a) the life of the Owner or the lives of the Owner and the Owner's spouse, or (b) a period not extending beyond the life expectancy of such Owner or the life expectancy of such Owner and the Owner's spouse.

5. If the Owner dies before the contract benefits have been paid to him, or if payment to his surviving spouse has commenced under a payment plan and such surviving spouse dies with installments remaining payable under such plan, the entire contract benefits (or the withdrawal value under the payment plan if such plan is in effect) shall, within five years after his death (or the death of his surviving spouse), be paid to the beneficiary or beneficiaries designated by such Owner (or by his surviving spouse) or applied to the purchase of an immediate annuity for such beneficiary or beneficiaries which will be payable for the life of such beneficiary or beneficiaries (or for a term certain not extending beyond the life expectancy of such beneficiary or beneficiaries) which annuity shall be immediately distributed to such beneficiary or beneficiaries. The preceding sentence shall have no application if benefit payments under a term certain payment plan commenced before the death of the Owner and the term certain of such plan is for a period permitted under paragraph 4 above.

# SECTION 1. THE CONTRACT

## 1.1 BENEFITS

(a) **Retirement.** The Northwestern Mutual Life Insurance Company agrees, subject to the terms and conditions of this policy, to pay a Monthly Retirement Life Income to the Annuitant if living on the Maturity Date. The Monthly Retirement Life Income is payable for life commencing on the Maturity Date with installments certain for ten years under the Life Income Plan (Option C) described in Section 9.3(b). In lieu of the Monthly Retirement Life Income, the cash value at maturity will be paid to the Owner on the Maturity Date if requested prior to such date. The Monthly Retirement Life Income and Maturity Value shown on page 3 assume that the specified premium is paid on each due date.

(b) **Death.** The Northwestern Mutual Life Insurance Company agrees, subject to the terms and conditions of this policy, to pay a death benefit to the beneficiary upon receipt at its Home Office of proof of death of the Annuitant before the Maturity Date. The death benefit shall be the amount of the Flexible Premium Annuity premiums paid plus the reserve on any paid-up . additions, or the cash value if greater.

## 1.2 INCONTESTABILITY

This policy shall be incontestable after it has been in force during the lifetime of the Annuitant for two years from the Date of Issue.

## 1.3 DATES

The contestable period commences with the Date of Issue. Policy months, years and anniversaries are computed from the Policy Date. Both dates are shown on page 3 of this policy.

## 1.4 MISSTATEMENT OF AGE OR SEX

If the age or sex of the Annuitant has been misstated, the amount payable shall be limited to the amount which the premiums paid would have purchased at the correct age or sex.

## 1.5 GENERAL

This policy and the application, a copy of which is attached when the policy is issued, constitute the entire contract. All statements in the application are representations and not warranties. No statement shall void this policy or be used in defense of a claim under it unless contained in the application.

Only an officer of the Company is authorized to alter this policy or to waive any of the Company's rights or requirements.

All payments by the Company under this policy are payable at its Home Office.

## 1.6 OPTIONAL MATURITY DATE

The Owner may elect to continue the policy in force, without any of the additional benefits, to an Optional Maturity Date by filing a written request with the Company at least 31 days before the Maturity Date. The Optional Maturity Date shall be the policy anniversary nearest the Annuitant's 75th birthday, or five years after the Maturity Date, whichever is later. All policy rights of the Owner shall continue in effect to the Optional Maturity Date. The cash value of the policy shall be increased at the rate of 3% compounded annually. Premium payments may be continued to the Optional Maturity Date.

# SECTION 2. OWNERSHIP

## 2.1 THE OWNER

The Owner is as shown on page 3, or his successor or transferee. All policy rights and privileges may be exercised by the Owner without the consent of any beneficiary. Such rights and privileges may be exercised only during the lifetime of the Annuitant and thereafter to the extent permitted by Sections 8 and 9.

## 2.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this policy, subject to the transferability restrictions in Section 2.4. Written evidence of transfer satisfactory to the Company must be filed at the Home Office and, unless waived by the Company, the policy must be submitted for endorsement to show the transfer.

## 2.3 COLLATERAL ASSIGNMENT

The Owner may assign this policy as collateral security, subject to the transferability restrictions in Section 2.4. The Company assumes no responsibility for the validity or effect of any collateral assignment of this policy. The Company shall not be charged with notice of any assignment unless the assignment is in

writing and filed at its Home Office before payment is made.

The interest of any beneficiary shall be subordinate to any collateral assignment made either before or after the beneficiary designation.

A collateral assignee is not an Owner and a collateral assignment is not a transfer of ownership, which can be accomplished only by complying with Section 2.2.

## 2.4 TRANSFERABILITY RESTRICTIONS

Notwithstanding any other provisions of this policy, the Owner may not change the ownership of this policy nor may this policy be sold, assigned or pledged as collateral for a loan or as security for the performance of an obligation or for any other purpose to any person other than the Company, unless the Owner is the trustee of an employee trust qualified under the Internal Revenue Code or the custodian of a custodial account treated as such. However, the foregoing restrictions shall not preclude the employer under a nontrusteed plan from transferring ownership of this policy to the Annuitant or to the custodian or trustee under a plan or trust when required by the plan.

397

### 3.1 PREMIUMS

**(a) Payment.** All premiums after the first are payable at the Home Office or to an authorized agent. A receipt signed by an officer of the Company will be provided upon request.

**(b) Flexible Premium.** The amount of the first premium is shown on page 3. Subsequent premiums may vary in amount at the option of the Owner only, but no premium payment may be less than $25. Without the consent of the Company, premiums paid in any policy year may not exceed the greater of i) 200% of the amount of premiums due in the first policy year or ii) the amount of premiums due in the first year, plus $2,500.

**(c) Frequency.** Premiums may be paid annually, semiannually, or quarterly at the published rates for this policy. A change to any such frequency shall be effective upon acceptance by the Company of the premium for the changed frequency. Premiums may be paid on any other frequency approved by the Company.

If premiums are being paid by a public school employer or by an employer described in Section 501(c) (3) of the Internal Revenue code of 1954, the availability of premium frequencies other than those enumerated above will be limited to the period during which premiums are being paid by such employer.

**(d) Default.** If a premium is not paid on or before its due date, this policy shall terminate on the due date except as provided in Sections 3.1(e) and 5.3.

**(e) Grace Period.** A grace period of 31 days shall be allowed for payment of a premium not paid on its due date. The policy shall continue in full force during this period.

**(f) Date of Crediting.** If premiums are being paid annually, semiannually, or quarterly, a premium received no later than 31 days after the due date shall be credited as of the due date; a premium received later than 31 days after the due date shall be credited on the date received.

If premiums are being paid on a monthly or more frequent basis, the premium will be credited on the date received.

### 3.2 REINSTATEMENT

If the policy has not been surrendered for its cash value, it may be reinstated during the lifetime of the Annuitant and before the Maturity Date by the resumption of premium payments.

If this policy contains the Waiver of Premium Benefit and if this benefit has terminated pursuant to (c) in paragraph 6 of the Waiver of Premium Benefit, evidence of insurability satisfactory to the Company will be required for reinstatement of this benefit with the policy.

# SECTION 4. DIVIDENDS

### 4.1 ANNUAL DIVIDENDS

This policy shall share in the divisible surplus, if any, of the Company. This policy's share shall be determined annually and credited as a dividend. Payment of the first dividend is contingent upon payment of the premium or premiums for the second policy year and shall be credited proportionately as each premium is paid. Thereafter, each dividend shall be payable on the policy anniversary.

### 4.2 USE OF DIVIDENDS

As directed by the Owner, dividends may be paid in cash or applied under one of the following:

**(a) Paid-Up Additions.** Dividends may be applied to purchase paid-up retirement annuity additions. Paid-up additions will also share in the divisible surplus.

**(b) Premium Payment.** Dividends may be applied toward payment of any premium due within one year,

if the balance of the premium is paid. If the balance is not paid, or if this policy is in force as a paid-up annuity, the dividend will be applied to purchase paid-up additions.

If no direction is given by the Owner, dividends will be applied to purchase paid-up additions.

### 4.3 USE OF ADDITIONS

Paid-up additions increase the policy's cash value and loan value and are payable as part of the policy's proceeds. Additions may be surrendered unless required under the Loan or Paid-up Annuity provisions.

### 4.4 DIVIDEND AT DEATH

A dividend for the period from the beginning of the policy year to the end of the policy month in which the Annuitant dies shall be paid as part of the policy proceeds.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 102 of 225   Document 39-1   R-App 398

# SECTION 5. CASH VALUE AND PAID-UP RETIREMENT ANNUITY

## 5.1 CASH VALUE

The cash value for each premium received shall be the net premium as defined below accumulated at a rate of 3% compounded annually from the date the premium is credited at the Home Office. The cash value of this policy shall be the aggregate of the cash values for all premiums received plus the reserve on any paid-up additions. The net premium is the basic premium multiplied by a net premium factor of .90. The basic premium is the total premium paid, exclusive of the premium for any additional benefits, less a collection charge of $.50 per payment, and less a policy fee. The policy fee is $10 per year and is charged in its entirety against the first premium paid in each contract year.

The table below shows cash values per $1,000 of basic premium for whole years elapsed from the date the premium is credited at the Home Office. Values for years not shown are calculated on the same basis as this table and will be furnished on request. Allowance shall be made for any fractional part of a year elapsed. The values shown are exclusive of any paid-up additions or indebtedness. All values are equal to or greater than those required by the State in which this policy is delivered.

## 5.2 CASH SURRENDER

The Owner may surrender this policy for its cash value less any indebtedness. The policy shall terminate upon receipt at the Home Office of this policy and a written surrender of all claims. Receipt of the policy may be waived by the Company.

The Company may defer paying the cash value for a period not exceeding six months from the date of surrender. If payment is deferred 30 days or more, interest shall be paid on the cash value less any indebtedness at the rate of 3% compounded annually from the date of surrender to the date of payment.

## 5.3 PAID-UP ANNUITY

If any premium remains unpaid at the end of the grace period, this policy shall continue in force as a participating paid-up retirement annuity with the death benefit as provided in Section 1.1(b). The Maturity Value will be for the amount the cash value will purchase as a net single premium at the attained age of the Annuitant. Any indebtedness shall remain outstanding.

## 5.4 RESERVES AND NET PREMIUMS

The Maturity Value for this policy is established using the 1955 American Annuity Mortality Table with interest at 3%. Reserves and net premiums used to fund the Maturity Value are determined with interest at 3%. The reserve is exclusive of any additional benefits.

### TABLE OF CASH VALUES

| Whole Years From Date Premium is Credited | Cash Value Per $1,000 of Basic Premium | Whole Years From Date Premium is Credited | Cash Value Per $1,000 of Basic Premium |
|---|---|---|---|
| 1 | $ 927 | 16 | $1,444 |
| 2 | 954 | 17 | 1,487 |
| 3 | 983 | 18 | 1,532 |
| 4 | 1,012 | 19 | 1,578 |
| 5 | 1,043 | 20 | 1,625 |
| 6 | 1,074 | 21 | 1,674 |
| 7 | 1,106 | 22 | 1,724 |
| 8 | 1,140 | 23 | 1,776 |
| 9 | 1,174 | 24 | 1,829 |
| 10 | 1,209 | 25 | 1,884 |
| 11 | 1,245 | 26 | 1,940 |
| 12 | 1,283 | 27 | 1,999 |
| 13 | 1,321 | 28 | 2,059 |
| 14 | 1,361 | 29 | 2,120 |
| 15 | 1,402 | 30 | 2,184 |

### 6.1 POLICY LOAN

The Owner may obtain a policy loan by assignment of this policy to the Company. The amount of the loan, plus any existing indebtedness, shall not exceed the loan value. The Company may defer making a loan for six months unless the loan is to be used to pay premiums on policies issued by the Company.

### 6.2 LOAN VALUE

The loan value is the largest amount which, with accrued interest, does not exceed the cash value either on the next premium due date or at the end of one year from the date of the loan.

### 6.3 LOAN INTEREST

Interest is payable at the rate of 6% compounded annually, or at any lower rate established by the Company for any period during which the loan is outstanding. Interest on policy loans accrues on a daily basis from the date of the loan. Unpaid interest is added to and becomes part of the loan principal and bears interest on the same terms.

### 6.4 INDEBTEDNESS

Indebtedness is unpaid policy loans including accrued interest. Indebtedness may be repaid at any time. Any unpaid indebtedness will be deducted from the policy proceeds.

If indebtedness equals or exceeds the cash value, this policy shall terminate. Termination shall occur 31 days after a notice has been mailed to the address of record of the Owner and of any assignee recorded at the Home Office.

# SECTION 7. CHANGE OF POLICY

### 7.1 CHANGE OF PLAN

The Owner may change this policy to any permanent life or endowment plan offered by the Company on the Date of Issue of this policy. The change may be made upon payment of any cost and subject to the conditions determined by the Company. For a change made after the first year to a plan having a higher reserve, the cost shall not exceed the difference in cash values or the difference in reserves, whichever is greater, plus 3½% of such difference.

The Owner may increase the retirement benefit at the Maturity Date to an amount not greater than three times the Monthly Retirement Life Income available on the Maturity Date upon payment of 103½% of the additional cash value required.

KK 12

8

## 8.1 DESIGNATION AND CHANGE OF BENEFICIARIES

**(a) By Owner.** The Owner may designate and change direct and contingent beneficiaries and further payees of death proceeds:

(1) during the lifetime of the Annuitant.

(2) during the 60 days following the date of death of the Annuitant, if the Annuitant immediately before his death was not the Owner. Any such designation of direct beneficiary may not be changed. If the Owner is the direct beneficiary and elects a payment plan, any such designation of contingent beneficiaries and further payees may be changed.

**(b) By Direct Beneficiary.** The direct beneficiary may designate and change contingent beneficiaries and further payees if:

(1) the direct beneficiary is the Owner.

(2) at any time after the death of the Annuitant, no contingent beneficiary or further payee is living, and no designation is made by the Owner under Section 8.1(a) (2).

(3) the direct beneficiary elects a payment plan after the death of the Annuitant, in which case the interest in the share of such direct beneficiary or any other payee designated by the Owner shall terminate.

**(c) By Spouse (Marital Deduction Provision).** Notwithstanding any provision of Section 8 or 9 of this policy to the contrary, if the Annuitant immediately before his death was the Owner and if the direct beneficiary is the spouse of the Annuitant and survives the Annuitant, such direct beneficiary shall have the power to appoint all amounts payable under the policy either to the executors or administrators of the direct beneficiary's estate or to such other contingent beneficiaries and further payees as he may designate. The exercise of such power shall revoke any then existing designation of contingent beneficiaries and further payees and any election of a payment plan applying to them.

**(d) Effective Date.** Any designation or change of beneficiary shall be made by the filing and recording at the Home Office of a written request satisfactory to the Company. Unless waived by the Company, the request must be endorsed on the policy. Upon the recording, the request will take effect as of the date it was signed. The Company will not be held responsible for any payment or other action taken by it before the recording of the request.

## 8.2 SUCCESSION IN INTEREST OF BENEFICIARIES

**(a) Direct Beneficiaries.** The proceeds of this policy shall be payable in equal shares to the direct beneficiaries who survive to receive payment. The unpaid share of any direct beneficiary who dies while receiving payment shall be payable in equal shares to the direct beneficiaries who survive to receive payment.

**(b) Contingent Beneficiaries.** At the death of the last surviving direct beneficiary, payments due or to become due shall be payable in equal shares to the contingent beneficiaries who survive to receive payment. The unpaid share of any contingent beneficiary who dies while receiving payment shall be payable in equal shares to the contingent beneficiaries who survive to receive payment.

**(c) Further Payees.** At the death of the last to survive of the direct and contingent beneficiaries, the proceeds, or the withdrawal value of any payments due or to become due if a payment plan is in effect, shall be paid in one sum:

(1) in equal shares to the further payees who survive to receive payment; or

(2) if no further payees survive to receive payment, to the executors or administrators of the last to survive of the direct and contingent beneficiaries.

**(d) Estate of Owner.** If no direct or contingent beneficiaries or further payees survive the Annuitant, the proceeds shall be paid to the Owner or the executors or administrators of the Owner.

## 8.3 GENERAL

**(a) Transfer of Ownership.** A transfer of ownership, will not change the interest of any beneficiary.

**(b) Claims of Creditors.** So far as permitted by law, no amount payable under this policy shall be subject to the claims of creditors of the payee.

**(c) Succession under Payment Plans.** A direct or contingent beneficiary succeeding to an interest in a payment plan shall continue under such plan subject to its terms, with the rights of transfer between plans and of withdrawal under plans as provided in this policy.

KK 12

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 105 of 225   Document 39-1   R-App 401

# SECTION 9. PAYMENT OF POLICY BENEFITS

## 9.1 PAYMENT

Payment of policy benefits upon surrender or maturity will be made in cash or under one or more of the payment plans described in Section 9.2, if elected.

If policy benefits become payable by reason of the Annuitant's death, payment will be made under any payment plan then in effect. If no election of a payment plan is in effect, the proceeds will be held under the Interest Income Plan (Option A) with interest accumulating from the date of death until an election or cash withdrawal is made.

## 9.2 PAYMENT PLANS

**(a) Interest Income Plan (Option A).** The proceeds will earn interest which may be received in monthly payments or accumulated. The first interest payment is due one month after the plan becomes effective. Withdrawal of accumulated interest as well as full or partial proceeds may be made at any time.

**(b) Installment Income Plans.** Monthly installment income payments will be made as provided by the plan elected. The first payment is due on the date the plan becomes effective.

**(1) Specified Period (Option B).** Monthly installment income payments will be made providing for payment of the proceeds with interest over a specified period of one to 30 years. Withdrawal of the present value of any unpaid installments may be made at any time.

**(2) Specified Amount (Option D).** Monthly installment income payments will be made for a specified amount of not less than $5 per $1,000 of proceeds. Payments will continue until the entire proceeds with interest are paid, with the final payment not exceeding the unpaid balance. Withdrawal of the unpaid balance may be made at any time.

**(c) Life Income Plans.** Monthly life income payments will be made as provided by the plan elected. The first payment is due on the date the plan becomes effective. Proof of date of birth satisfactory to the Company must be furnished for any individual upon whose life income payments depend.

**(1) Single Life Income (Option C).** Monthly payments will be made for the selected certain period, if any, and thereafter during the remaining lifetime of the individual upon whose life income payments depend. The selections available are:

(i) no certain period,

(ii) a certain period of 10 or 20 years, or

(iii) a refund certain period such that the sum of the income payments during the certain period will be equal to the proceeds applied under the plan, with the final payment not exceeding the unpaid balance.

**(2) Joint and Survivor Life Income (Option E).** Monthly payments will be made for a 10 year certain period and thereafter during the joint lifetime of the two individuals upon whose lives income payments depend and continuing during the remaining lifetime of the survivor.

**(3) Withdrawal.** Withdrawal of the present value of any unpaid income payments which were to be made during a certain period may be made at any time after the death of all individuals upon whose lives income payments depend.

**(d) Payment Frequency.** In lieu of monthly payments, a quarterly, semiannual or annual frequency may be selected.

## 9.3 PAYMENT PLAN RATES

**(a) Interest Income and Installment Income Plans.** Proceeds under the Interest Income and Installment Income plans will earn interest at rates declared annually by the Company, but not less than a rate of 3% compounded annually. Interest in excess of 3% will increase payments, except that for the Installment Income Specified Amount plan (Option D), excess interest will be applied to lengthen the period during which payments are made.

The present value for withdrawal purposes will be based on the rate of 3% compounded annually.

The Company may from time to time also make available higher guaranteed interest rates under the Interest Income and Installment Income plans, with certain conditions on withdrawal as then published by the Company for those plans.

**(b) Life Income Plans.** Life Income Plan payments will be based on rates declared by the Company. These rates will provide at least 104% of the income provided by the Company's Immediate Annuities being offered on the date the plan becomes effective. The rates are based on the sex and age nearest birthday of any individual upon whose life income payments depend, and adjusted for any certain period and the immediate payment of the first income payment. In no event will payments under these rates be less than the minimums described in Section 9.3(c).

**(c) Minimum Income Payments.** Minimum monthly income payments for the Installment Income Plans (Options B and D) and the Life Income Plans (Options C and E) are shown in the Minimum Income Table. The minimum Life Income payments are determined as of the date the payment plan becomes effective and depend on the age nearest birthday adjusted for policy duration.

The adjusted age is equal to the age nearest birthday decreased by one year if more than 25 years have elapsed since the Policy Date, two years if more than 35 years have elapsed, three years if more than 40 years have elapsed, four years if more than 45 years have elapsed or five years if more than 50 years have elapsed.

## 9.4 ELECTION OF PAYMENT PLANS

**(a) Effective Date.** Election of payment plans for death proceeds made by the Owner and filed at the Home Office during the Annuitant's lifetime will be effective on the date of death of the Annuitant. All other elections of payment plans will be effective when filed at the Home Office, or later if specified.

**(b) Death Proceeds.** Payment plans for death proceeds may be elected:

(1) by the Owner during the lifetime of the Annuitant.

(2) by the Owner during the 60 days following the date of death of the Annuitant, if the Annuitant immediately before his death was not the Owner. Any such election may not be changed by the Owner.

(3) by a direct or contingent beneficiary to whom such proceeds become payable, if no election is then in effect and no election is made by the Owner under Section 9.4(b) (2).

**(c) Surrender or Maturity Proceeds.** Payment plans for surrender or maturity proceeds may be elected by the Owner for himself as direct beneficiary.

**(d) Transfers Between Payment Plans.** A direct or contingent beneficiary receiving payment under a payment plan with the right to withdraw may elect to transfer the withdrawal value to any other payment plan then available.

**(e) Life Income Plan Limitations.** An individual beneficiary may receive payments under a Life Income Plan only if the payments depend upon his life. A corporation may receive payments under a Life Income Plan only if the payments depend upon the life of the Annuitant, or a surviving spouse or dependent of the Annuitant.

**(f) Minimum Amounts.** Proceeds of less than $5,000 may not be applied without the Company's approval under any payment plan except the Interest Income Plan (Option A) with interest accumulated. The Company retains the right to change the payment frequency or pay the withdrawal value if payments under a payment plan are or become less than $25.

## 9.5 INCREASE OF MONTHLY INCOME

Upon the death of the Annuitant, the direct beneficiary who is to receive the death proceeds of this policy under a payment plan may increase the total monthly income by payment of an annuity premium to the Company. The premium, after deduction of charges not exceeding 2% and any applicable premium tax, shall be applied under the payment plan at the same rates as the policy proceeds. The net amount so applied may not exceed twice the proceeds payable under this policy.

## MINIMUM INCOME TABLE
### Minimum Monthly Income Payments Per $1,000 Proceeds

**INSTALLMENT INCOME PLANS (Options B and D)**

| PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT |
|---|---|---|---|---|---|
| 1 | $84.50 | 11 | $8.86 | 21 | $5.32 |
| 2 | 42.87 | 12 | 8.24 | 22 | 5.15 |
| 3 | 29.00 | 13 | 7.71 | 23 | 4.99 |
| 4 | 22.07 | 14 | 7.26 | 24 | 4.84 |
| 5 | 17.91 | 15 | 6.87 | 25 | 4.71 |
| 6 | 15.14 | 16 | 6.53 | 26 | 4.59 |
| 7 | 13.17 | 17 | 6.23 | 27 | 4.48 |
| 8 | 11.69 | 18 | 5.96 | 28 | 4.37 |
| 9 | 10.54 | 19 | 5.73 | 29 | 4.27 |
| 10 | 9.62 | 20 | 5.51 | 30 | 4.18 |

KK 12

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 107 of 225   Document 30-1   R-App 403

# MINIMUM INCOME TABLE
## Minimum Monthly Income Payments Per $1,000 Proceeds

### LIFE INCOME PLANS

| SINGLE LIFE MONTHLY PAYMENTS (Option C) | | | | | |
|---|---|---|---|---|---|
| ADJUSTED AGE | | CERTAIN PERIOD | | | |
| MALE | FEMALE | NONE | 10 YEARS | 20 YEARS | REFUND |
| 50 | 55 | $4.62 | $4.56 | $4.34 | $4.36 |
| 51 | 56 | 4.72 | 4.65 | 4.40 | 4.44 |
| 52 | 57 | 4.83 | 4.75 | 4.46 | 4.52 |
| 53 | 58 | 4.94 | 4.85 | 4.53 | 4.61 |
| 54 | 59 | 5.07 | 4.96 | 4.59 | 4.69 |
| 55 | 60 | 5.20 | 5.07 | 4.66 | 4.79 |
| 56 | 61 | 5.33 | 5.19 | 4.72 | 4.88 |
| 57 | 62 | 5.48 | 5.31 | 4.78 | 4.99 |
| 58 | 63 | 5.64 | 5.43 | 4.84 | 5.09 |
| 59 | 64 | 5.80 | 5.57 | 4.90 | 5.20 |
| 60 | 65 | 5.98 | 5.70 | 4.96 | 5.32 |
| 61 | 66 | 6.16 | 5.85 | 5.02 | 5.44 |
| 62 | 67 | 6.36 | 5.99 | 5.07 | 5.57 |
| 63 | 68 | 6.57 | 6.14 | 5.13 | 5.71 |
| 64 | 69 | 6.79 | 6.30 | 5.17 | 5.85 |
| 65 | 70 | 7.03 | 6.45 | 5.22 | 6.00 |
| 66 | 71 | 7.28 | 6.62 | 5.26 | 6.15 |
| 67 | 72 | 7.54 | 6.78 | 5.30 | 6.31 |
| 68 | 73 | 7.83 | 6.95 | 5.33 | 6.48 |
| 69 | 74 | 8.13 | 7.11 | 5.36 | 6.66 |
| 70 | 75 | 8.45 | 7.28 | 5.39 | 6.85 |
| 71 | 76 | 8.79 | 7.45 | 5.41 | 7.05 |
| 72 | 77 | 9.16 | 7.62 | 5.43 | 7.26 |
| 73 | 78 | 9.55 | 7.79 | 5.45 | 7.48 |
| 74 | 79 | 9.96 | 7.95 | 5.46 | 7.71 |
| 75 | 80 | 10.41 | 8.11 | 5.48 | 7.95 |

### JOINT AND SURVIVOR MONTHLY PAYMENTS (Option E)

| ADJUSTED AGE | | JOINT PAYEE ADJUSTED AGE | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MALE | | 45 | 50 | 55 | 60 | 65 | 70 | 75 |
| | FEMALE | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 45 | 50 | $3.68 | $3.80 | $3.90 | $3.97 | $4.02 | $4.06 | $4.10 |
| 50 | 55 | 3.80 | 3.97 | 4.13 | 4.25 | 4.34 | 4.41 | 4.46 |
| 55 | 60 | 3.90 | 4.13 | 4.35 | 4.56 | 4.72 | 4.84 | 4.92 |
| 60 | 65 | 3.97 | 4.25 | 4.56 | 4.86 | 5.13 | 5.33 | 5.48 |
| 65 | 70 | 4.02 | 4.34 | 4.72 | 5.13 | 5.51 | 5.85 | 6.10 |
| 70 | 75 | 4.06 | 4.41 | 4.84 | 5.33 | 5.85 | 6.33 | 6.73 |
| 75 | 80 | 4.10 | 4.46 | 4.92 | 5.48 | 6.10 | 6.73 | 7.28 |

EMPLOYEE PLANS. 90-1533

C 451666

# THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY
## MILWAUKEE, WISCONSIN

APPLICATION TO

Trust No. ____
Payer No. ____
o-TDA or IRA
TDA or IRA Only

| 1A. INSURED (Please Print) OR ANNUITANT | First | Middle Initial | Last | Sex: ☐ Male ☐ Female |
|---|---|---|---|---|

1B. Owner (Identify in full.) ____

1C. Category of Policy:
☐ TDA ☐ IRC Sec. 151 (e) (4) – Public elementary or secondary school, college or university
☐ TDA ☐ IRC Sec. 501 (c) (3) – Give activity in which organization is engaged:
☐ IRA ☐ IRC Sec. 408 (a) or (b) – Individual Retirement Account/Annuity
☐ IRA ☐ IRC Sec. 408 (d) – IRA Rollover

2. RESIDENCE OF INSURED: Print:
Street & No. or R.F.D. ____
City ____ County ____
State ____ Zip Code ____

3. POLICY HEREBY APPLIED FOR: ("X" and complete next)
☐ A. Employee Life ☐ RI at age ____
  ☐ (i) $ ____ Amount.
  ☐ (ii) Such amount as a ____ Premium of $ ____ will provide. mode
☐ B. Flexible Premium Annuity at age ____ providing a monthly Retirement Life Income of $ ____
☐ C. Flexible Premium Annuity at age ____ providing a monthly Retirement Life Income of such amount as a ____ mode Premium of $ ____ will provide.
☐ D. Retirement Annuity at age ____ providing a monthly Retirement Life Income of such amount as a single premium of $ ____ will provide.
☐ E. Other (EOL, Whole Life, 65 Life, etc.): $ ____ other, specify

4. PREMIUMS: ☐ Anl ☐ Semi-Anl ☐ Qtly ☐ Mo. ☐ Bi-Wkly
☐ Single TDA ____ Months to be Omitted

5. DATE POLICY: ____

6. ADDITIONAL BENEFITS:
☐ Waiver of Premium
☐ Other, ____ specify
If any Additional Benefits cannot be approved, should the policy be issued without them? ☐ Yes ☐ No

7. Shall the Premium Loan provision, if available, become operative according to its terms? ☐ Yes ☐ No

8. ANNUAL DIVIDENDS, until otherwise directed, shall be:
☐ A. Applied toward reduction of current premium.
☐ B. Applied to purchase paid-up additions.
☐ C. Left to accumulate at interest. (Not available if Annuity is requested.) Owner's Taxpayer Ident. No. ____
☐ D. Cash.

9A. DIRECT BENEFICIARY of Retirement Life Income or Maturity Value. (Applicable only to RI and FPA)
☐ INSURED ☐ OWNER, but only in one sum.

B. DIRECT BENEFICIARY of Death Benefit:
☐ OWNER, but only in one sum.
☐ OTHER, Print Full Name ____
Relationship to Insured ____

C. CONTINGENT BENEFICIARY of Death Benefit:
Full Name (Print) ____
Relationship to Insured ____
(One of the following may be selected by marking with "X").
☐ (1) and any (other) children of the Insured.
☐ (2) and any (other) children of the Insured, except that any amount (or the withdrawal value thereof if a payment plan is in effect) a deceased child of the insured would have received, if living, shall be payable when due in one sum in equal shares to his or her then living children.
Under (1) and (2) "children" includes child and any legally adopted child, and decisions made by the Company upon evidence satisfactory to it shall be conclusive and fully protect it.

10. Has the premium for the policy applied for been paid to the agent in exchange for the policy and for the Conditional Life Insurance Agreement with the same number as the application and, if so, do you accept and agree to the terms and conditions thereof? ☐ Yes ☐ No

11. Has application or informal inquiry ever been made to the Northwestern Mutual for annuity, life, or disability insurance on the life of the Insured?
☐ Yes ☐ No If yes, last Policy No. or Application Date is ____

QUESTIONS 12 THRU 15 APPLY TO AND MUST BE ANSWERED BY THE INSURED.

12A. DATE OF BIRTH: Mo. ____ Day ____ Yr. ____
B. Place of Birth: ____ City ____ State or Country

13. Are you a citizen of the United States? (If "No" give details and present status in "REMARKS.") ☐ Yes ☐ No.

14A. PRESENT OCCUPATION:
If more than one, state all.
Job title and duties ____
Industry ____
B. Number of years with present employer ____

15. Will the insurance or annuity applied for replace insurance or annuities on Insured's (or Annuitant's) life in this Company or elsewhere?
☐ Yes ☐ No If "Yes," explain and submit required papers.

ANSWERS TO QUESTION 16 NOT REQUIRED IF FLEXIBLE PREMIUM ANNUITY IS APPLIED FOR WITHOUT WAIVER PREMIUM BENEFIT OR IF SIMPLIFIED ISSUE IS AVAILABLE.

16A. Are you a member of or do you contemplate joining, any branch of the Armed Forces, the R.O.T.C., the National Guard or any other component of the Armed Forces Reserve either on an active or inactive status? (If "Yes" complete Military Section 90-5) ☐ Yes ☐ No

B. Have you flown within the past 5 years or do you contemplate flying except as a passenger on a regularly scheduled airline? (If "Yes" complete Aviation Section, 90-5) ☐ Yes ☐ No

C. Have you within the past two years participated in or do you contemplate participating in racing (automobile, motorcycle, boat, go-kart, or snowmobile), scuba, or skin diving, sky diving, mountain climbing or rodeos? (If "Yes" complete Avocation Section, 90-6) ☐ Yes ☐ No

D. In the past two years have you been in a motor vehicle accident, charged with a moving violation of any motor vehicle law or had your license restricted or revoked? (If "Yes" complete Driving Section, 90-6) ☐ Yes ☐ No

E. Do you contemplate leaving the United States of America for travel or residence? (If "Yes" explain in "REMARKS") ☐ Yes ☐ No

F. Have you ever had life, disability or hospital insurance declined, rated, modified, cancelled or not renewed? (If "Yes" explain in "REMARKS") ☐ Yes ☐ No

ANSWER QUESTION 17 ONLY IF SIMPLIFIED ISSUE IS AVAILABLE.

17A. Are you a full-time employee? (If "No," explain in "REMARKS.") ☐ Yes ☐ No

B. Are you now actively at work? (If "No" explain in "REMARKS.") (Actively at work means that the Insured was actively at work on a full-time basis on the date of this application or on one of the 3 days before such date and that he has been working for the 5 weeks preceding the date of application without absence of more than 3 days because of sickness or injury.) ☐ Yes ☐ No

REMARKS: ____

8. If the premium for the policy applied for has been paid and the proposed Insured was actively at work and was on an acceptable risk but at a premium higher than the premium paid for the plan or for any Additional Benefit applied for, the policy shall be issued at such higher premium unless one of the following is selected:
☐ A. A Flexible Premium Annuity policy maturing at age ____ with a monthly Retirement Life Income of $ ____ or, if no amount is here inserted, a monthly Retirement Life Income the same as the policy applied for would have provided.
☐ B. A policy on the plan applied for but for such reduced amount as the Company's rules and standards permit.
☐ C. No policy.

The Insured or Annuitant consents to this application, acknowledges receipt of the Federal Fair Credit Reporting Act and Medical Information Bureau notices and declares that the foregoing answers and statements are correctly recorded, complete and true to the best of his knowledge and belief.

It is agreed that: (1) If 3B, 3C or 3D is selected, the word "Annuitant" shall be substituted for the word "Insured" wherever it appears.

2) If the premium is not paid when the application is signed, no policy shall be in effect. If, however, a policy is delivered and the premium paid during the Insured's lifetime, the coverage shall be in effect if at the time of such delivery and payment the answers and statements in the application are then true and the Insured is then actively at work.

3) Acceptance of a policy in an extra premium classification shall amend the policy so that if any premium is unpaid at the end of the grace period the policy shall be automatically continued in force under the paid-up insurance provision. If the policy contains the extended term insurance provision, it may be continued as term insurance only with consent of the

Company or if the loan value is insufficient to grant a Premium Loan.

(4) If the premium is paid when the application is taken, no insurance other than is provided in Paragraph 1. of the Receipt given for the premium is applicable.

(5) The owner of any policy issued on this application named in 1B may elect a payment plan payable to the Insured as direct beneficiary at the maturity of the policy or upon its surrender for cash.

(6) If the Owner is a Trustee or successor in trust, Custodian of qualified custodial account or the employer under a qualified non-trusteed plan, the Company shall be fully discharged of liability for all amounts paid to such Owner and shall have no obligation as to the application of such amounts. In all dealings with such Owner, including but not limited to any consent, release or waiver of interest, the Company shall be fully protected against the claims or demands of every other person.

(7) No agent is authorized to make or alter contracts or to waive any of the Company's rights or requirements.

Signed at ____ City ____ County ____ State ____ on ____ Month ____ Day ____ 19 ____ Year

_____
Signature of INSURED

_____
Signature of APPLICANT

0-1533-0175)

_____
Signature of LICENSED AGENT

## AUTHORIZATION TO OBTAIN MEDICAL INFORMATION

I authorize any physician, hospital, or other medically related facility, insurance company, the Medical Information Bureau, or other organization, institution or person, that has any records or knowledge of me or my health, to give to the Northwestern Mutual Life Insurance Company, or its reinsurers, any such information.

Dated ____ 19 ____

_____
Witness

_____
Signature of Insured

2:11-cv-00910-LA Filed 07/01/13 Page 109 of 225 Document R-App 405

# SPECIFICATIONS

PLAN AND ADDITIONAL BENEFITS

| | AMOUNT | PREMIUM | YEARS PAYABLE |
|---|---|---|---|
| FLEXIBLE PREMIUM ANNUITY AT AGE 65 | | | |
| MONTHLY RETIREMENT LIFE INCOME $ | 332.09* $ | 100.00 | 33 |
| MATURITY VALUE | 59,621* | | |

MATURITY DATE   MAY  1, 2008

A PREMIUM IS PAYABLE ON THE POLICY DATE AND EVERY POLICY MONTH THEREAFTER.
THE FIRST PREMIUM IS        $100.00.

    *THE MONTHLY RETIREMENT LIFE INCOME AND MATURITY VALUE SHOWN ABOVE
    ASSUME THAT THE SPECIFIED PREMIUM IS PAID ON EACH DUE DATE.

DIRECT BENEFICIARY   JOHN R  LA PLANT, HUSBAND OF THE ANNUITANT

OWNER             MARLEEN M  LA PLANT, THE ANNUITANT

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 110 of 225   Document 39-1   p. 406

ANNUITANT        MARLEEN M  LA PLANT        AGE AND SEX  32 FEMALE

POLICY DATE      MAY  1, 1975

## THE NORTHWESTERN MUTUAL LIFE
## INSURANCE COMPANY·MILWAUKEE



**It is recommended that you...**

CLAIRE A. THOMAS
GENERAL AGENT
MADISON, WISCONSIN

MARK E. MITTAG, Agent
81 North Main St.
Fort Atkinson, WI 53538
Office: 563-8168
Res: 563-2824

NORTHWESTERN MUTUAL LIFE · MILWAUKEE

read your policy.

notify your NML agent or the Company at 720 E. Wisconsin Avenue, Milwaukee, Wis. 53202, of any address change.

call upon your NML agent for any information — particularly upon any suggestion to terminate or exchange this policy for any other policy or plan.

### Election of Trustees

The members of The Northwestern Mutual Life Insurance Company are its policyholders of insurance policies and deferred annuity contracts. The members exercise control through a Board of Trustees. Elections to the Board are held each year at the annual meeting of members. Members are entitled to vote in person or by proxy.

### Flexible Premium Annuity

### Participating

Retirement Income payable at maturity.
Death Benefit payable before maturity.
Flexible Premium — Section 3.1(b).

KK 12



**Northwestern Mutual**

Investment Client Services Dept.
P.O. Box 2099
Milwaukee, WI 53201-2099
1 888 455 2232 ph
1 414 665 2632 fax

## ANNUITY DISTRIBUTION REQUEST
Traditional, SEP, SIMPLE, Roth IRA

### 1. CONTRACT INFORMATION (Please Print)

| CONTRACT NUMBER | ANNUITANT NAME | E-MAIL ADDRESS |
|---|---|---|
| 6986523 | Marleen M La Plant | |

| OWNER TAXPAYER ID | OWNER NAME (IF DIFFERENT THAN ANNUITANT) | OWNER DAYTIME PHONE |
|---|---|---|
| ▉ | | (920) 563-3920 |

**For SIMPLE IRA Contract Owners only:** Have you been a participant in a SIMPLE IRA plan over 2 years? ☐ Yes ☐ No

### 2. DISTRIBUTION TYPE & AMOUNT

Select A, B or C:

**☒ A. Surrender Entire Contract**

*This will cancel the contract.*
*Go to Section 3, "Federal & State Income Tax Withholding"*

**☐ B. Partial Withdrawal**

*Select One option below:*
**Amount:**

☐ Gross: $ _____ Amount withdrawn **before** applicable withdrawal charges, market value adjustment, Federal/State Income Tax Withholding and/or Express Mail Delivery Fee.

☐ Net: $ _____ Amount received **after** applicable withdrawal charges, market value adjustment, Federal/State Income Tax Withholding and/or Express Mail Delivery Fee.

☐ Available Corridor  Withdraw all available withdrawal charge free corridor.*
☐ Maximum Withdrawal Charge Free Amount  Withdraw all below, if applicable:
- Available withdrawal charge free corridor*
- 0% withdrawal charge category
- Class A units *(Only available on RR Series Variable Annuity Contracts issued after 3/00)*

*Withdrawal charge free amount not available from amounts withdrawn from GIF 8 during first four years of the guaranteed period.

**☐ C. Systematic Withdrawal**  *Withdraw money automatically in equal amounts as indicated below ($100 minimum):*

☐ Set Up  **Amount:**
☐ Change
☐ Terminate Existing Election Immediately

☐ Gross: $ _____ Amount withdrawn **before** applicable withdrawal charges, market value adjustment, and/or Federal/State Income Tax Withholding

☐ Net: $ _____ Amount received **after** applicable withdrawal charges, market value adjustment, and/or Federal/State Income Tax Withholding.

☐ Available Corridor  Withdraw all available withdrawal charge free corridor.
**(Only available on RS SPRA contracts)**

*Available for:*
- *Flexible Premium Annuities issued after 3/85*
- *Variable Annuities*
- *Single Premium Retirement Annuities*

**Frequency:**
Withdrawals will be MONTHLY unless a different frequency is selected. Withdrawals will process on the same day of each month. Requests received on days 29, 30 or 31 will begin on the first of the next month.
☐ Quarterly     ☐ Semi-Annually     ☐ Annually
**Duration:**
The withdrawals will end...
- Automatically when the amount in any of the selected funds is depleted via transfer or withdrawal -OR-
- Automatically when the final amount is distributed and there is no value left in the contract. Please note, the contract will then terminate -OR-
- After the specified period of time:  YEARS _____  MONTHS _____

*LaP 0121*

31-0952 (0408)   The Northwestern Mutual Life Insurance Company * 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202 * 414 271-1444 · www.northwesternmutual.com   (Page 1 of 4) FE

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 112 of 225   Document 29-1   R-App 408

# ANNUITY DISTRIBUTION REQUEST
## Traditional, SEP, SIMPLE, Roth IRA

Northwestern Mutual™
Investment Client Services Dept.
P.O. Box 2099
Milwaukee, WI 53201-2099
1 414 665 2552 fax

## 3 FEDERAL & STATE INCOME TAX WITHHOLDING SELECTION (Not applicable on Roth IRAs)

I DO NOT want Federal or State Income Tax withheld unless specified below:

[ ] Withhold _____ % -OR- $ _____ Federal Income Tax; withhold State Income Tax if applicable.

## 4 INVESTMENT OPTION SELECTION (Variable Annuities Only)

Distributions will be **DEDUCTED PROPORTIONATELY**¹ from each invested fund (excluding GIF 8) **unless** the Dollar or Percent to withdraw is specified below:

- If entire fund, indicate "ALL"   • Indicate either a dollar amount or percentage   • Enter whole number only

| Investment Option | Dollar (Not available for Systematic Withdrawals) | OR | Percent |
|---|---|---|---|
| Large Company Value (MSA/American Century) .... A04 | $ | | % |
| Domestic Equity (MSA/Capital Guardian) .... A23 | $ | | % |
| Equity Income (MSA/T Rowe Price) .... A22 | $ | | % |
| Large Cap Blend (MSA/Capital Guardian) .... A29 | $ | | % |
| Index 500 Stock (MSA) .... A38 | $ | | % |
| Large Cap Core Stock (MSA) .... A25 | $ | | % |
| Neuberger Berman Socially Responsive .... A21 | $ | | % |
| Russell Multi-Style Equity .... A08 | $ | | % |
| Fidelity VIP Contrafund .... A13 | $ | | % |
| Focused Appreciation (MSA/Janus)* .... A05 | $ | | % |
| Growth Stock (MSA) .... A09 | $ | | % |
| Mid Cap Value (MSA/Alliance Bernstein) .... A15 | $ | | % |
| Fidelity VIP Mid Cap .... A30 | $ | | % |
| Index 400 Stock (MSA) .... A37 | $ | | % |
| Mid Cap Growth Stock (MSA) .... A18 | $ | | % |
| Small Cap Value (MSA/T Rowe Price) .... A31 | $ | | % |
| Index 600 Stock (MSA) .... A20 | $ | | % |
| Russell Aggressive Equity .... A32 | $ | | % |
| Small Cap Growth Stock (MSA) .... A17 | $ | | % |
| Research International Core (MSA/MFS) .... A03 | $ | | % |
| International Equity (MSA/Franklin Templeton) .... A26 | $ | | % |

| Investment Option | Dollar (Not available for Systematic Withdrawals) | OR | Percent |
|---|---|---|---|
| International Growth Stock (MSA) .... A06 | $ | | % |
| Emerging Markets Equity (MSA/MFS) .... A28 | $ | | % |
| Russell Non-US .... A36 | $ | | % |
| Short Term Bond (MSA) .... A02 | $ | | % |
| Select Bond (MSA) .... A39 | $ | | % |
| Russell Core Bond .... A24 | $ | | % |
| Inflation Protection (MSA/American Century) .... A14 | $ | | % |
| Long Term U.S. Government Bond (MSA/PIMCO) .... A12 | $ | | % |
| Multi Sector Bond (MSA/PIMCO) .... A35 | $ | | % |
| High Yield Bond (MSA) .... A33 | $ | | % |
| Asset Allocation (MSA) .... A16 | $ | | % |
| Balanced (MSA) .... A34 | $ | | % |
| Russell Real Estate Securities .... A07 | $ | | % |
| Russell LifePoints Variable Moderate .... A11 | $ | | % |
| Russell LifePoints Variable Balanced .... A01 | $ | | % |
| Russell LifePoints Variable Growth .... A19 | $ | | % |
| Russell LifePoints Variable Equity Growth .... A27 | $ | | % |
| Money Market (MSA) .... A10 | $ | | % |
| Guaranteed Interest Fund † .... A44 | $ | | % |
| Guaranteed Interest Fund 8** .... A53 | $ | | % |
| **TOTAL** | $ | | **100 %** |

\* Effective April 30, 2008, the investment option name of Janus Capital Appreciation was changed to Focused Appreciation. This reflects a change in name only.

\*\* Guaranteed Interest Fund 8: Market Value Adjustment (MVA) will apply only prior to the end of the guaranteed period.

† Proportionate deduction will not include GIF 8 except to the extent that amounts in the other funds are insufficient to cover the requested withdrawal.

**Note:** Fund code numbers in italics are for Home Office use only.
The parenthetical next to certain divisions listed above reflects the adviser (Mason Street Advisors, LLC) and the sub-adviser, if any, for the underlying investment option that corresponds to the division. Assets of a division are invested exclusively in the shares of the corresponding underlying investment options.

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202 • 414 271-1444 www.northwesternmutual.com

31-0957 (04/09)
LaP 0122


**Northwestern Mutual™**

Investment Client Services Dept.
P.O. Box 2099
Milwaukee, WI 53201-2099
1 888 455 2232 ph
1 414 665 2632 fax

**ANNUITY DISTRIBUTION REQUEST**
Traditional, SEP, SIMPLE, Roth IRA

## 5 PAYEE INSTRUCTIONS

*Select A, B or C:*

☐ **A. Mail Check Payable to Owner**

☐ **Express Mail Service -**
$15.00 fee deducted from distribution proceeds. Please allow 3-5 business days for processing of distribution and an additional 1-2 days for express delivery.
  ☐ Signature required – additional $2 fee
  ☐ Signature not required

*Check will be mailed to address on record unless specified below:*
*(Street address required for Express Mail Service)*

ADDRESS
_____

ADDRESS
_____

CITY _____ STATE _____ ZIP _____

☐ **This is a new address.** Update address on record to this new address.

☒ **B. Mail Check Payable to Financial Institution as a Direct Transfer/Rollover**

☐ **Express Mail Service -**
$15.00 fee deducted from distribution proceeds. Please allow 3-5 business days for processing of distribution and an additional 1-2 days for express delivery.
  ☐ Signature required – additional $2 fee
  ☐ Signature not required

FINANCIAL INSTITUTION NAME
*Vanguard*

FOR THE BENEFIT OF
*Marleen M. LaPlant*         ACCOUNT NUMBER ▮▮▮▮▮▮

ADDRESS
~~W7868 Riedel Lane~~  *P.O. Box 1110*

ADDRESS
_____

CITY ~~East~~ *Valley Forge*   STATE *PA*   ZIP *19482-1110*

### DIRECT TRANSFER or DIRECT ROLLOVER  *Select one*

☒ **From a Traditional/SEP IRA to:**
  ☒ Traditional/SEP IRA          ☐ 403(b) Tax Deferred Annuity
  ☐ Pension/401(k) Plan          ☐ 457(b) Governmental Plan
  ☐ Former Pension Annuity

☐ **From a SIMPLE IRA to a SIMPLE IRA**

☐ **From a SIMPLE IRA to:** (only available if owner has been in a SIMPLE plan for over 2 years)
  ☐ Traditional /SEP IRA         ☐ 403(b) Tax Deferred Annuity
  ☐ Pension/401(k) Plan          ☐ 457(b) Governmental Plan
  ☐ Former Pension Annuity

☐ **From a Roth IRA to a Roth IRA**

*LaP 0123*   *OWNER*

### CONVERSION / RECHARACTERIZATION  *Select one*

| From: | To: |
|---|---|
| ☐ Traditional/SEP IRA | Roth IRA |
| ☐ Roth IRA | Traditional/SEP IRA |
| ☐ SIMPLE IRA | Roth IRA |

*(ONLY AVAILABLE IF OWNER HAS BEEN IN A SIMPLE PLAN FOR OVER 2 YEARS.)*

**OPTION C: Payee Instructions continued on page 4.**

Case 2:11-cv-00910-LA    Filed 07/01/13    Page 114 of 225    Document 39-1    R-App 410


**Northwestern Mutual™**
Investment Client Services Dept.
P.O. Box 2099
Milwaukee, WI 53201-2099
1 888 455 2232 ph
1 414 665 2632 fax

**ANNUITY DISTRIBUTION REQUEST**
Traditional, SEP, SIMPLE, Roth IRA

## 5. OPTION C: PAYEE INSTRUCTIONS *(continued from page 3)*

☐ **C. Direct Deposit to Owner's Bank Account**

*Available for:*

- *Flexible Premium Annuities issued prior to 3/85 with surrenderable additions or full surrender*
- *Flexible Premium Annuities issued after 3/85*
- *Variable Annuities*
- *Single Premium Retirement Annuities*

*Complete bank information below:*

**Deposit Timing – Please allow 3-5 business days for distribution processing and an additional 3-5 banking days for the deposit to reach your bank account.**

You authorize Northwestern Mutual to electronically transfer the withdrawal/surrender amount from your deferred annuity contract directly to your bank and deposit the proceeds into your account.

BANK NAME

BANK TRANSIT NUMBER     ACCOUNT NUMBER

<u>ACCOUNT TYPE</u>

☐ Checking-
attach voided check

☐ Savings

## 6. EFFECTIVE DATE

This request *(completed, signed and in good order)* will be effective on:

- The date your request is received in the Northwestern Mutual Home Office, if received prior to the close of trading of the New York Stock Exchange, -OR-
- If your request is received after the close of trading of the New York Stock Exchange, the next available New York Stock Exchange date, -OR-
- The date of your current systematic withdrawal, -OR-
- For cash settlements at maturity the effective date will be the contract maturity date, -OR-
- A future effective date as indicated:     FUTURE EFFECTIVE DATE (MM/DD/YYYY)

## AUTHORIZATION AND CERTIFICATION

**The owner of the contract referenced in Section 1, "Contract Information" makes the following authorization, election and certification:**

1. I am surrendering all or a portion of said contract and all claims thereunder to Northwestern Mutual.
2. I elect to have NO Federal or, if applicable, State income tax withheld from the payment requested above UNLESS indicated in Section 3 of this form.
3. I certify that the owner's tax identification number in Section 1 of this form is correct.
4. I certify that the plan to which I have directed my distribution in an eligible rollover will accept the distribution under the plan's terms and, to the extent applicable, will separately account for any after-tax contributions.

X *Marleen M. LaPlant*
SIGNATURE OF OWNER

*07-03-08*
DATE SIGNED (MM/DD/YYYY)

LaP 0124



# Merriam-Webster's Collegiate® Dictionary

## TENTH EDITION

Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1996 by Merriam-Webster, Incorporated

Philippines Copyright 1996 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.
    p.    cm.
    Includes index.
    ISBN 0-87779-708-0 (unindexed : alk. paper). — ISBN 0-87779-709-9 (indexed : alk. paper). — ISBN 0-87779-710-2 (deluxe : alk. paper). — ISBN 0-87779-707-2 (laminated cover).
    1. English language—Dictionaries.  I. Merriam-Webster, Inc.
PE1628.M36    1996
423—dc20                                    95-36076
                                              CIP

Merriam-Webster's Collegiate® Dictionary, Tenth Edition principal copyright 1993

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

1516RMcN96

**¹surface** *adj* (1664) **1 a :** of, located on, or designed for use at the surface of something **b :** situated, transported, or employed on the surface of the earth (⟨~ mail⟩ ⟨~ vehicles⟩) **2 :** appearing to be such on the surface only : SUPERFICIAL ⟨~ friendships⟩

**²surface** *vb* **surfaced; surfac·ing** *vt* (1775) **1 :** to give a surface to: as **a :** to plane or make smooth **b :** to apply the surface layer to ⟨~ a highway⟩ **2 :** to bring to the surface ~ *vi* **1 :** to work on or at the surface **2 :** to come to the surface **3 :** to come into public view : SHOW UP — **sur·fac·er** *n*

**surface-active** *adj* (1920) : altering the properties and esp. lowering the tension at the surface of contact between phases (soaps and wetting agents are typical ~ substances)

**surface of revolution** (1840) : a surface formed by the revolution of a plane curve about a line in its plane

**sur·face–rip·ened** \'sər-fəs-ˌrī-pənd, -ˌrī-p°md\ *adj* (1945) of cheese : ripened by the action of microorganisms (as molds) on the surface

**surface structure** *n* (1964) **1 :** formal representation of the phonetic form of a sentence; *also :* the structure which such a representation describes

**surface tension** *n* (1876) : the attractive force exerted upon the surface molecules of a liquid by the molecules beneath that tends to draw the surface molecules into the bulk of the liquid and makes the liquid assume the shape having the least surface area

**surface-to-air** *adj* (1949) : launched from the ground against a target in the air

**surfacing** *n* (1882) : material forming or used to form a surface

**sur·fac·tant** \(ˌ)sər-'fak-tənt, 'sər-,\ *n* [surface-active + -ant] (1950) : a surface-active substance (as a detergent) — **surfactant** *adj*

**surf and turf** *n* (1973) : seafood and steak served as a single course

**surf·bird** \'sərf-ˌbərd\ *n* (1839) : a shorebird (*Aphriza virgata*) of the Pacific coasts of America that has a black-tipped white tail

**surf·board** \-ˌbȯrd, -ˌbȯrd\ *n* (ca. 1826) : a long narrow buoyant board (as of lightweight wood or fiberglass-covered foam) used in the sport of surfing — **surfboard** *vi* — **surf·board·er** *n*

**surf·boat** \-ˌbōt\ *n* (1847) : a boat for use in heavy surf

**surf casting** *n* (1928) : a method of fishing in which artificial or natural bait is cast into the open ocean or in a bay where waves break on a beach — **surf caster** *n*

**surf clam** *n* (1884) : any of various typically rather large hard-shelled edible clams (family Mactridae); *esp :* a common clam (*Spisula solidissima*) of the Atlantic coast chiefly from Nova Scotia to So. Carolina

**sur·feit** \'sər-fət\ *n* [ME *surfait*, fr. MF, fr. *surfaire* to overdo, fr. *sur-* + *faire* to do, fr. L *facere* — more at DO] (14c) **1 :** an overabundant supply : EXCESS **2 :** an intemperate or immoderate indulgence in something (as food or drink) **3 :** disgust caused by excess

**²surfeit** *vt* (14c) : to feed, supply, or give to surfeit ~ *vi, archaic :* to indulge to satiety in a gratification (as indulgence of the appetite or senses) *syn* see SATIATE — **sur·feit·er** *n*

**surf fish** *n* (1882) : SURFPERCH

**sur·fi·cial** \ˌsər-'fi-shəl\ *adj* [surface + -icial (as in superficial)] (1892) : of or relating to a surface ⟨~ geologic processes⟩

**surf·ing** \'sər-fiŋ\ *n* (1926) : the sport of riding the surf esp. on a surfboard

**surf·perch** \'sərf-ˌpərch\ *n* (1885) : any of a family (Embiotocidae) of small or medium-sized viviparous bony fishes chiefly of shallow water along the Pacific coast of No. America that resemble the perches

**¹surge** \'sərj\ *vi* [MF *sourge-*, stem of *sourdre* to rise, surge, fr. L *surgere* to go straight up, rise, fr. *sub-* up + *regere* to lead straight — more at SUB-, RIGHT] *vi* (1511) **1 :** to rise and fall actively : TOSS (a ship *surging* in heavy seas) **2 :** to rise and move in waves or billows : SWELL **3 :** to slip around a windlass, capstan, or bitts — used esp. of a rope **4 :** to rise suddenly to an excessive or abnormal value (the stock market ~*ed* to a record high) **5 :** to move with a surge or in surges (felt the blood *surging* into his face —Harry Hervey) ~ *vt* **1 :** to let go or slacken gradually (as a rope)

**²surge** *n* (1520) **1 :** a swelling, rolling, or sweeping forward like that of a wave or series of waves (a ~ of interest) **2 a :** a large wave or billow : SWELL **b** (1) **:** a series of such swells or billows (2) **:** the resulting elevation of water level **3 :** the tapered part of a windlass barrel or a capstan **4 a :** a movement (as a slipping or slackening) of a rope or cable **b :** a sudden jerk or strain caused by such a movement **5 a :** a transient sudden rise of current or voltage in an electrical circuit

**sur·geon** \'sər-jən\ *n* [ME *surgien*, fr. AF, fr. OF *cirurgien*, fr. *cirurgie* surgery] (14c) : a medical specialist who practices surgery

**sur·geon·fish** \-ˌfish\ *n* (1871) : any of a family (Acanthuridae) of tropical bony fishes that have toxic flesh and typically a movable spine on each side of the body near the base of the tail capable of inflicting a painful wound

**surgeon general** *n, pl* **surgeons general** (1706) : the chief medical officer of a branch of the armed services or of a public health service

**surgeon's knot** *n* (1733) : any of several knots used in tying ligatures or surgical stitches; *esp :* a reef knot in which the first knot has two turns — see KNOT illustration

**sur·gery** \'sər-jə-rē, 'sər-jə-\ *n, pl* **-ger·ies** [ME *surgerie*, fr. MF *cirurgie, ML chirurgia*, fr. Gk *cheirourgia*, fr. *cheirourgos* surgeon, fr. *cheirourgos* doing by hand, fr. *cheir* hand + *ergon* work — more at CHIR-, WORK] (14c) **1 :** a branch of medicine concerned with diseases and conditions requiring or amenable to operative or manual procedures **2 :** alterations made as if by surgery (literary ~) **3 a** *Brit :* a physician's or dentist's office **b :** a room or area where surgery is performed **4 a :** the work done by a surgeon **b :** OPERATION

**sur·gi·cal** \'sər-ji-kəl\ *adj* [surgeon + -ical] (1770) **1 a :** of or relating to surgeons or surgery ⟨~ skills⟩ **b :** used in or in connection with surgery **c :** characteristic of or resembling surgery or a surgeon esp. in control or incisiveness (~ precision) **2 :** following or resulting from surgery (~ fevers) — **sur·gi·cal·ly** \-k(ə-)lē\ *adv*

**su·ri·mi** \su̇-'rē-mē\ *n* [Jp, chopped meat or fish] (1976) : a fish product made from inexpensive whitefish and often processed to resemble more expensive seafood (as crabmeat)

**sur·jec·tion** \(ˌ)sər-'jek-shən\ *n* [prob. fr. *sur-* + *-jection* (as in *projection*)] (1964) : a mathematical function that is an onto mapping — compare BIJECTION, INJECTION 3

**sur·jec·tive** \-'jek-tiv\ *adj* (1964) : ONTO ⟨a set of ~ functions⟩

**¹sur·ly** \'sər-lē\ *adj* **sur·li·er; -est** [alter. of ME *sirly* lordly, imperious, fr. *sir*] (ca. 1572) **1** *obs :* ARROGANT, IMPERIOUS **2 :** irritably sullen and churlish in mood or manner : CRABBED **3 :** menacing or threatening in appearance (~ weather) *syn* see SULLEN — **sur·li·ly** \-lə-lē\ *adv* — **sur·li·ness** \-lē-nəs\ *n* — **surly** *adv*

**¹sur·mise** \sər-'mīz, 'sər-,\ *n* (1569) : a thought or idea based on scanty evidence : CONJECTURE

**²sur·mise** \sər-'mīz\ *vt* **sur·mised; sur·mis·ing** [ME, to accuse, fr. MF *surmis*, pp. of *surmettre*, fr. L *supermittere* to throw on, fr. *super-* + *mittere* to send] (1700) : to imagine or infer on slight grounds

**sur·mount** \sər-'maunt\ *vt* [ME, fr. MF *surmonter*, fr. *sur-* + *monter* to mount] (14c) **1** *obs :* to surpass in quality or attainment : EXCEL **2 :** to prevail over : OVERCOME ⟨~ an obstacle⟩ **3 :** to get to the top of : CLIMB **4 :** to stand or lie at the top of — **sur·mount·able** \-'maun-tə-bəl\ *adj*

**¹sur·name** \'sər-ˌnām\ *n* (14c) **1 :** an added name derived from occupation or other circumstance : NICKNAME **1 2 :** the name borne in common by members of a family

**²surname** *vt* (15c) : to give a surname to

**sur·pass** \sər-'pas\ *vt* [MF *surpasser*, fr. *sur-* + *passer* to pass] (1555) **1 :** to become better, greater, or stronger than : EXCEED **2 :** to go beyond : OVERSTEP **3 :** to transcend the reach, capacity, or powers of *syn* see EXCEED — **sur·pass·able** \-'pa-sə-bəl\ *adj*

**sur·pass·ing** *adj* (ca. 1580) : greatly exceeding others : of a very high degree — **sur·pass·ing·ly** \-'pa-siŋ-lē\ *adv*

**¹sur·plice** \'sər-pləs\ *n* [ME *surplis*, fr. OF *surpliz*, fr. ML *superpellicium*, fr. *super-* + *pellicium* coat of skins, fr. L *neut.* of *pellicius* made of skins, fr. *pellis* skin — more at FELL] (13c) : a loose white outer ecclesiastical vestment usu. of knee length with large open sleeves

**²surplice** *adj* (1845) : having a diagonally overlapping neckline or closing ⟨a ~ bodice⟩

**sur·plus** \'sər-(ˌ)pləs\ *n* [ME, fr. AF, fr. ML *superplus*, fr. L *super-* + *plus* more — more at PLUS] (14c) **1 a :** the amount that remains when use or need is satisfied **b :** an excess of receipts over disbursements **2 :** the excess of a corporation's net worth over the par or stated value of its capital stock — **surplus** *adj*

**sur·plus·age** \-,(ˌ)plə-sij\ *n* (15c) **1 :** SURPLUS **1a 2 a :** excessive or nonessential matter **b :** matter introduced in legal pleading which is not necessary or relevant to the case

**surplus value** *n* (1887) : the difference between the value of work done or of commodities produced by labor and the usu. subsistence wages paid by the employer

**sur·print** \'sər-ˌprint\ *vt or n* (1917) : OVERPRINT

**sur·pris·al** \sə(r)-'prī-zəl\ *n* (1591) : the action of surprising : the state of being surprised

**¹sur·prise** *also* **sur·prize** \sə(r)-'prīz\ *n* [ME, fr. MF, fr. fem. of *surpris*, pp. of *surprendre* to take over, surprise, fr. *sur-* + *prendre* to take — more at PRIZE] (15c) **1 a :** an attack made without warning **b :** a taking unawares **2 :** something that surprises **3 :** the state of being surprised : ASTONISHMENT

**²surprise** *also* **surprize** *vb* **sur·prised; sur·pris·ing** *vt* (15c) **1 :** to attack unexpectedly; *also :* to capture by an unexpected attack **2 a :** to take unawares **b :** to detect or elicit by a taking unawares **3 :** to strike with wonder or amazement esp. because unexpected ~ *vi :* to cause astonishment or surprise (her success didn't ~) — **sur·pris·er** *n* *syn* SURPRISE, ASTONISH, ASTOUND, AMAZE, FLABBERGAST mean to impress forcibly through unexpectedness. SURPRISE stresses causing an effect through being unexpected at a particular time or place rather than by being essentially unusual or novel (*surprised* to find them at home). ASTONISH implies surprising so greatly as to seem incredible (a discovery that *astonished* the world). ASTOUND stresses the shock of astonishment (too *astounded* to respond). AMAZE suggests an effect of bewilderment (*amazed* by the immense size of the place). FLABBERGAST may suggest thorough astonishment and bewilderment or dismay (*flabbergasted* by his angry refusal).

**sur·pris·ing** *adj* (1645) : of a nature that excites surprise

**sur·pris·ing·ly** \sə(r)-'prī-ziŋ-lē\ *adv* (1661) **1 :** in a surprising manner : to a surprising degree (a ~ fast runner) **2 :** it is surprising that ⟨~, voter turnout was high⟩

**sur·ra** \'sur-ə\ *n* [Marathi *sūra* wheezing sound] (1883) : a severe Old World febrile and hemorrhagic disease of domestic animals that is caused by a flagellate protozoan (*Trypanosoma evansi*) and is transmitted by biting insects

**sur·re·al** \sə-'rē(-ə)l, -'ri-əl *also* -'rā-əl\ *adj* [back-formation fr. *surrealism*] (1937) **1 :** having the intense irrational reality of a dream **2 :** SURREALISTIC — **sur·re·al·ly** *adv*

**sur·re·al·ism** \sə-'rē-ə-ˌli-zəm, -'ri- *also* -'rā-\ *n* [F *surréalisme*, fr. *sur- + réalisme* realism] (1925) : the principles, ideals, or practice of producing fantastic or incongruous imagery or effects in art, literature, film, or theater by means of unnatural juxtapositions and combinations — **sur·re·al·ist** *adj or n*

**sur·re·al·is·tic** \sə-ˌrē-ə-'lis-tik, -ˌri- *also* -ˌrā-\ *adj* (1925) **1 :** of or relating to surrealism **2 :** having a strange dreamlike atmosphere or quality like that of a surrealist painting — **sur·re·al·is·ti·cal·ly** \-ti-k(ə-)lē\ *adv*

**sur·re·but·ter** \ˌsər-(r)i-'bə-tər\ *n* (ca. 1607) : the reply in common law pleading of a plaintiff to a defendant's rebutter

**sur·re·join·der** \-(r)i-'jȯin-dər\ *n* (ca. 1543) : the reply in common law pleading of a plaintiff to a defendant's rejoinder

**sur·ren·der** \sə-'ren-dər\ *vb* **-dered; -der·ing** \-d(ə-)riŋ\ [ME, fr. MF *surrendre*, fr. *sur-* + *rendre* to give back, yield — more at RENDER] *vt* (15c) **1 a :** to yield to the power, control, or possession of another upon compulsion or demand ⟨~ed the fort⟩ **b :** to give up completely or agree to forgo esp. in favor of another **2 a :** to give (oneself) up into the power of another esp. as a prisoner **b :** to give (oneself) over to something (as an influence) ~ *vi :* to give oneself up into the power of another : YIELD *syn* see RELINQUISH

**²surrender** *n* (15c) **1 a :** the action of yielding one's person or giving up the possession of something esp. into the power of another **b :** the relinquishment by a patentee of rights or claims under a patent **c :** the

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 118 of 225   Document 39-1   **R. App 414**

delivery of a principal into lawful custody by bail — called also *surrender by bail* **2** : the voluntary cancellation of the legal liability of an insurance company by the insured and beneficiary for a consideration **c** : the delivery of a fugitive from justice by one government to another **2** : an instance of surrendering

**sur·rep·ti·tious** \ˌsər-əp-ˈti-shəs, ˌsä-rəp-, ˌsə-rep-\ *adj* [ME, fr. L *surrepticius*, fr. *surreptus*, pp. of *surripere* to snatch secretly, fr. *sub-* + *rapere* to seize — more at RAPID] (15c) **1** : done, made, or acquired by stealth : CLANDESTINE  **2** : acting or doing something clandestinely : STEALTHY  *syn* see SECRET — **sur·rep·ti·tious·ly** *adv*

**surrey** \ˈsər-ē, ˈsə-rē\ *n, pl* **surreys** [*Surrey*, England] (ca. 1891) : a four-wheel two-seated horse-drawn pleasure carriage



surrey

**sur·ro·ga·cy** \ˈsər-ə-gə-sē\ *n* (1984) : the practice of serving as a surrogate mother

**¹sur·ro·gate** \ˈsər-ə-ˌgāt, ˈsä-rə-\ *vt* **-gat·ed; -gat·ing** [L *surrogatus*, pp. of *surrogare* to choose in place of another, substitute, fr. *sub-* + *rogare* to ask — more at RIGHT] (1533) **1** : to put in the place of another : **a** : to appoint as successor, deputy, or substitute for oneself  **b** : SUBSTITUTE

**²sur·ro·gate** \-gət, -ˌgāt\ *n, often attrib* (1603)  **1 a** : one appointed to act in place of another : DEPUTY  **b** : a local judicial officer in some states (as New York) who has jurisdiction over the probate of wills, the settlement of estates, and the appointment and supervision of guardians  **2** : one that serves as a substitute  **3** : SURROGATE MOTHER

**surrogate mother** *n* (1978) : a woman who becomes pregnant usu. by artificial insemination or surgical implantation of a fertilized egg for the purpose of carrying the fetus to term for another woman — **surrogate motherhood** *n*

**¹sur·round** \sə-ˈraund\ *vt* [ME, to overflow, fr. MF *suronder*, fr. LL *superundare*, fr. L *super-* + *unda* wave; influenced in meaning by *²round* — more at WATER] (ca. 1616)  **1 a** (1) : to enclose on all sides : ENVELOP (the crowd ~*ed* her)  (2) : to enclose so as to cut off communication or retreat : INVEST  **b** : to form or be a member of the entourage of (flatterers who ~ the king)  **c** : to constitute part of the environment of (~*ed* by poverty)  **2** : to extend around the margin or edge of : ENCIRCLE (a wall ~s the old city)  **3** : to cause to be surrounded by something (~*ed* himself with friends)

**²surround** *n* (1825) : something (as a border or ambient environment) that surrounds (from urban centre to rural — Emrys Jones)

**sur·round·ings** \sə-ˈraun-diŋz\ *n pl* (1861) : the circumstances, conditions, or objects by which one is surrounded : ENVIRONMENT

**sur·roy·al** \sər-ˈroi(-ə)l, n [ME *surryal*, fr. *sur-* + *ryall* royal antler] (15c) : one of the terminal tines above the royal antler of a large deer (as a stag) usu. grown by four years of age

**sur·sum cor·da** \ˌsùr-səm-ˈkȯr-də, -ˌdä\ *n* [LL, (lift up) your hearts; fr. the opening words] (1537)  **1** *often cap* S&C : a versicle that in traditional eucharistic liturgies exhorts the faithful to enthusiastic worship  **2** : something inspiriting

**sur·tax** \ˈsər-ˌtaks\ *n* (1881)  **1** : an extra tax or charge  **2** : a graduated income tax in addition to the normal income tax imposed on the amount by which net income exceeds a specified sum

**sur·tout** \(ˌ)sər-ˈtü, ˈsər-ˌ\ *n* [F, fr. *sur* over (fr. L *super*) + *tout* all, fr. L *totus* whole — more at OVER] (1686) : a man's long close-fitting overcoat

**sur·veil** \sər-ˈvā(ə)l\ *vt* **sur·veilled; sur·veil·ling** [back-formation fr. *surveillance*] (1949) : to subject to surveillance

**sur·veil·lance** \sər-ˈvā-lən(t)s *also* -ˈvāl-yən(t)s *or* -ˈvā-ən(t)s\ *n* [F, fr. *surveiller* to watch over, fr. *sur-* + *veiller* to watch, fr. L *vigilare*, fr. *vigil* watchful — more at VIGIL] (1802) : close watch kept over someone or something (as by a detective); *also* : SUPERVISION

**sur·veil·lant** \-ˈvā-lənt *also* -ˈvāl-yənt *or* -ˈvā-ənt\ *n* (1819) : one that exercises surveillance

**¹sur·vey** \sər-ˈvā, ˈsər-ˌvā\ *vb* **sur·veyed; sur·vey·ing** [ME, fr. MF *surveeir* to look over, fr. *sur-* + *veeir* to see — more at VIEW] *vt* (15c)  **1 a** : to examine as to condition, situation, or value : APPRAISE  **b** : to query (someone) in order to collect data for the analysis of some aspect of a group or area  **2** : to determine and delineate the form, extent, and position of (as a tract of land) by taking linear and angular measurements and by applying the principles of geometry and trigonometry  **3** : to view or consider comprehensively  **4** : INSPECT, SCRUTINIZE (he ~*ed* us in a lordly way — Alan Harrington) *vi* : to make a survey

**²sur·vey** \ˈsər-ˌvā, sər-ˈvā, *n, pl* **surveys** (1548)  **1** : the act or an instance of surveying as: **a** : a broad treatment of a subject  **b** : POLL **5a**  **2** : something that is surveyed

**survey course** \ˈsər-ˌvā-\ *n* (1916) : a course treating briefly the chief topics of a broad field of knowledge

**sur·vey·ing** \sər-ˈvā-iŋ\ *n* (1682) : a branch of applied mathematics that teaches the art of determining the area of any portion of the earth's surface, the lengths and directions of the bounding lines, and the contour of the surface and of accurately delineating the whole on paper

**sur·vey·or** \sər-ˈvā-ər\ *n* (15c) : one that surveys; *esp* : one whose occupation is surveying land

**sur·viv·able** \sər-ˈvī-və-bəl\ *adj* (1955) : resulting in or permitting survival — **sur·viv·abil·i·ty** \-ˌvī-və-ˈbi-lə-tē\ *n*

**sur·viv·al** \sər-ˈvī-vəl\ *n, often attrib* (1598)  **1 a** : a living or continuing longer than another person or thing  **b** : the continuation of life or existence (problems of ~ in arctic conditions)  **2** : one that survives

**sur·viv·al·ist** \-və-list\ *n* (1970) : one who views survival as a primary objective; *esp* : one who has prepared to survive in the anarchy of an anticipated breakdown of society — **survivalist** *adj*

**survival of the fittest** (1864) : NATURAL SELECTION

**sur·vi·vance** \sər-ˈvī-vən(t)s\ *n* (ca. 1623) : SURVIVAL

**sur·vive** \sər-ˈvīv\ *vb* **sur·vived; sur·viv·ing** [ME, fr. MF *survivre* to outlive, fr. L *supervivere*, fr. *super-* + *vivere* to live — more at QUICK] *vi* (15c)  **1** : to remain alive or in existence : live on  **2** : to continue to function or prosper  *vt* **1** : to remain alive after the death of (*survived* by his wife)  **2** : to continue to exist or live after (*survived* the

earthquake)  **3** : to continue to function or prosper despite : WITHSTAND — **sur·vi·vor** \-ˈvī-vər\ *n*

**sur·vi·ver** \-ˈvī-vər\ *n* (1602) *archaic* : one that survives : SURVIVOR

**sur·vi·vor·ship** \-vər-ˌship\ *n* (ca. 1575)  **1** : the legal right of the survivor of persons having joint interests in property to take the interest of the person who has died  **2** : the probability of surviving to a particular age; *also* : the number or proportion of survivors (as of an age group)

**Su·san B. An·tho·ny Day** \ˌsü-z'n-ˌbe-ˈan(t)-thə-nē-\ *n* (ca. 1951) : February 15 observed to commemorate the birth of Susan B. Anthony

**sus·cep·ti·bil·i·ty** \sə-ˌsep-tə-ˈbi-lə-tē\ *n, pl* **-ties** (1644)  **1** : the quality or state of being susceptible; *esp* : lack of ability to resist some extraneous agent (as a pathogen or drug) : SENSITIVITY  **2 a** : susceptible temperament or constitution  **b** *pl* : FEELINGS, SENSIBILITIES  **3 a** : the ratio of the magnetization in a substance to the corresponding magnetizing force  **b** : the ratio of the electric polarization to the electric intensity in a polarized dielectric

**sus·cep·ti·ble** \sə-ˈsep-tə-bəl\ *adj* [LL *susceptibilis*, fr. L *susceptus*, pp. of *suscipere* to take up, admit, fr. *sub-, sus-* up + *capere* to take — more at SUB-, HEAVE] (1605)  **1** : capable of submitting to an action, process, or operation (a theory ~ to proof)  **2** : open, subject, or unresistant to some stimulus, influence, or agency  **3** : IMPRESSIONABLE, RESPONSIVE  *syn* see LIABLE — **sus·cep·ti·bly** \-blē\ *adv*

**sus·cep·tive** \sə-ˈsep-tiv\ *adj* (15c)  **1** : RECEPTIVE  **2** : SUSCEPTIBLE — **sus·cep·tive·ness** *n* — **sus·cep·tiv·i·ty** \sə-ˌsep-ˈti-və-tē\ *n*

**su·shi** \ˈsü-shē *also* ˈsù-\ *n* [Jp] (1893) : cold rice dressed with vinegar, formed into any of various shapes, and garnished esp. with bits of raw fish or shellfish

**su·slik** \ˈsü-slik\ *n* [Russ] (1774)  **1** : any of several rather large short-tailed ground squirrels (genus *Citellus*) of eastern Europe or northern Asia  **2** : the mottled grayish black fur of a suslik

**¹sus·pect** \ˈsəs-ˌpekt, sə-ˈspekt\ *adj* [ME, fr. MF, fr. L *suspectus*, fr. pp. of *suspicere*] (14c)  **1** : regarded or deserving to be regarded with suspicion : SUSPECTED (investigates ~ employees)  **2** : DOUBTFUL, QUESTIONABLE (whose skills are ~ —Peter Vecsey)

**²sus·pect** \ˈsəs-ˌpekt\ *n* (1591) : one who is suspected; *esp* : one suspected of a crime

**³sus·pect** \sə-ˈspekt\ *vb* [ME, fr. L *suspectare*, freq. of *suspicere* to look up at, regard with awe, suspect, fr. *sub-, sus-* up, secretly + *specere* to look at — more at SUB, SPY] *vt* (15c)  **1** : to imagine (one) to be guilty or culpable on slight evidence or without proof (~ him of giving false information)  **2** : to have doubts of : DISTRUST  **3** : to imagine to exist or be true, likely, or probable — *vi* : to imagine something to be true or likely

**sus·pend** \sə-ˈspend\ *vb* [ME, fr. OF *suspendre* to hang up, interrupt, fr. L *suspendere*, fr. *sub-, sus-* up + *pendere* to cause to hang, weigh] *vt* (14c)  **1** : to debar temporarily from a privilege, office, or function (~ a student from school)  **2 a** : to cause to stop temporarily (~ bus service)  **b** : to set aside or make temporarily inoperative (~ the rules)  **3** : to defer to a later time on specified conditions (~ sentence)  **4** : to hold in an undetermined or undecided state awaiting further information (~ judgment) (~ disbelief)  **5 a** : HANG; *esp* : to hang so as to be free on all sides except at the point of support (~ a ball by a thread)  **b** : to keep from falling or sinking by some invisible support (as buoyancy) (dust ~*ed* in the air)  **6 a** : to keep fixed or lost (as in wonder or contemplation)  **b** : to keep waiting in suspense or indecision  **7** : to hold (a musical note) into the following chord — *vi* **1** : to cease operation temporarily  **2** : to stop payment or fail to meet obligations  **3** : HANG  *syn* see DEFER

**suspended animation** *n* (1795) : temporary suspension of the vital functions (as in persons nearly drowned)

**sus·pend·er** \sə-ˈspen-dər\ *n* (1524)  **1** : one that suspends  **2** : a device by which something may be suspended: as : one of two supporting bands worn across the shoulders to support trousers, skirt, or belt — usu. used in pl. and often with *pair*  **b** *Brit* : a fastener attached to a garment or garter to hold up a stocking or sock; *also* : a device consisting of garter and fastener — **sus·pend·ered** \-dərd\ *adj*

**sus·pense** \sə-ˈspen(t)s\ *n* [ME, fr. MF, fr. *suspendre*] (15c)  **1** : the state of being suspended : SUSPENSION  **2 a** : mental uncertainty : ANXIETY  **b** : pleasant excitement as to a decision or outcome (a novel of ~)  **3** : the state or character of being undecided or doubtful : INDECISIVENESS — **sus·pense·ful** \-fəl\ *adj* — **sus·pense·ful·ly** \-fə-lē\ *adv* — **sus·pense·ful·ness** \-fəl-nəs\ *n* — **sus·pense·less** \-ləs\ *adj*

**suspense account** *n* (1869) : an account for the temporary entry of charges or credits or esp. of doubtful accounts receivable pending determination of their ultimate disposition

**sus·pens·er** \sə-ˈspen(t)-sər\ *n* (ca. 1960) : a suspenseful film

**sus·pen·sion** \sə-ˈspen(t)-shən\ *n* [ME *suspensyoun*, fr. MF *suspension*, fr. LL *suspensionis, suspensio*, fr. L *suspendere*] (15c)  **1** : the act of suspending : the state or period of being suspended: as **a** : temporary removal from office or privileges  **b** : temporary withholding (as of belief or decision)  **c** : temporary abrogation of a law or rule  **d** (1) : the holding over of one or more musical tones of a chord into the following chord producing a momentary discord and suspending the concord which the ear expects; *specif* : such a dissonance which resolves downward — compare ANTICIPATION, RETARDATION  (2) : the tone thus held over  **e** : stoppage of payment of business obligations : FAILURE — used esp. of a business or a bank  **f** : a rhetorical device whereby the principal idea is deferred to the end of a sentence or longer unit  **2 a** : the act of hanging : the state of being hung  **b** (1) : the state of a substance when its particles are mixed with but undissolved in a fluid or solid  (2) : a substance in this state  (3) : a system consisting of a solid dispersed in a solid, liquid, or gas usu. in particles of larger than colloidal size — compare EMULSION  **3** : something suspended  **4 a** : a device by which something (as a magnetic needle) is suspended  **b** : the system of devices (as springs) supporting the upper

---

\ə\ abut  \ᵊ\ kitten, F table  \ər\ further  \a\ ash  \ā\ ace  \ä\ mop, mar  \aù\ out  \ch\ chin  \e\ bet  \ē\ easy  \g\ go  \i\ hit  \ī\ ice  \j\ job

# Black's Law Dictionary®

### Seventh Edition

**Bryan A. Garner**
Editor in Chief



**WEST**
**GROUP**

ST. PAUL, MINN., 1999

"BLACK'S LAW DICTIONARY" is a registered trademark of West Group.  Registered in U.S. Patent and Trademark Office.

COPYRIGHT © 1891, 1910, 1933, 1951, 1957, 1968, 1979, 1990 WEST PUBLISHING CO.

COPYRIGHT © 1999 By WEST GROUP
610 Opperman Drive
P.O. Box 64526
St. Paul, MN 55164–0526
1–800–328–9352,

All rights reserved
Printed in the United States of America

**ISBN** 0–314–22864–0
**ISBN** 0–314–24130–2—deluxe

 *TEXT IS PRINTED ON 10% POST CONSUMER RECYCLED PAPER* 

**surrejoinder**

**surrejoinder** (sər-ri-**join**-dər). *Common-law pleading.* The plaintiff's answer to the defendant's rejoinder. See REPLICATION.

"Where the common-law system of pleading is in force, the pleadings do not terminate with the plaintiff's replication. The defendant may interpose a rejoinder to the replication, and the plaintiff a surrejoinder to the defendant's rejoinder. Then follows the rebutter, which in turn may be met by a surrebutter." 61A Am. Jur. 2d *Pleading* § 193, at 192 (1981).

**surrender,** *n.* **1.** The act of yielding to another's power or control. **2.** The giving up of a right or claim; RELEASE (1). **3.** The return of an estate to the person who has a reversion or remainder, so as to merge the estate into a larger estate. **4.** *Commercial law.* The delivery of an instrument so that the delivery releases the deliverer from all liability. **5.** A tenant's relinquishment of possession before the lease has expired, allowing the landlord to take possession and treat the lease as terminated. — **surrender,** *vb.*

**surrender by bail.** A surety's delivery of a prisoner, who had been released on bail, into custody.

**surrender by operation of law.** An act that is an equivalent to an agreement by a tenant to abandon property and the landlord to resume possession, as when the parties perform an act so inconsistent with the landlord-tenant relationship that surrender is presumed, or when a tenant performs some act that would not be valid if the estate continued to exist.

**surrenderee.** One to whom a surrender is made. See SURRENDER.

**surrenderer.** See SURRENDEROR.

**surrender of a criminal.** An officer's delivery of a prisoner to the authorities in the appropriate jurisdiction. See EXTRADITION; RENDITION.

**surrender of a preference.** *Bankruptcy.* The yielding of a voidable conveyance, transfer, assignment, or encumbrance by a creditor to the trustee as a condition of allowing the creditor's claim.

**surrender of charter.** *Corporations.* The dissolution of a corporation by a formal yielding of its charter to the state under which it was created and the subsequent acceptance of that charter by the state.

"The surrender of a charter can be made only by some formal, solemn act of the corporation, and will be of no avail until accepted by the government. There must be

the same agreement of the parties to dissolve that there was to form the compact. It is the acceptance which gives efficacy to the surrender. Consent of the state is sometimes given by general statute." 19 Am. Jur. 2d *Corporations* § 2738, at 546 (1986).

**surrender of copyhold.** *Hist.* The transfer by a tenant of a copyhold estate by yielding it to the lord in trust for the transferee according to the terms in the surrender. ● In normal practice, the tenant went to the steward of the manor and delivered a rod, a glove, or other customary symbol, thereby conveying to the lord (through the steward) all interest and title to the estate, in trust, to be then granted by the lord to the transferee. See COPYHOLD.

**surrenderor.** One who surrenders; esp., one who yields up a copyhold estate for conveyance. — Also spelled *surrenderer.* See COPYHOLD.

**surrender to uses of will.** *Hist.* A required yielding of a copyhold interest passed by will to the will's uses. ● The requirement was abolished by St. 55 Geo. 3, ch. 192.

**surrender value.** See *cash surrender value* under VALUE.

**surreptitious** (sər-əp-**tish**-əs), *adj.* (Of conduct) unauthorized and clandestine; stealthily and usu. fraudulently done <surreptitious interception of electronic communications is prohibited under wiretapping laws>.

**surreptitious-entry warrant.** See WARRANT (1).

**surrogate** (**sər**-ə-git), *n.* **1.** A substitute; esp., a person appointed to act in the place of another <in his absence, Sam's wife acted as a surrogate>. **2.** PROBATE JUDGE <the surrogate held that the will was valid>. — **surrogacy** (**sər**-ə-gə-see), **surrogateship,** *n.*

**surrogate court.** See *probate court* under COURT.

**surrogate mother. 1.** A woman who carries a child to term on behalf of another woman and then assigns her parental rights to that woman and the father. **2.** A person who carries out the role of a mother.

**surrogate parent.** A person who carries out the role of a parent by court appointment or the voluntary assumption of parental responsibilities.

1458

 NML

The Northwestern Mutual Life Insurance Company agrees to pay the benefits provided in this policy, subject to its terms and conditions. Signed at Milwaukee, Wisconsin on the Date of Issue.

CHAIRMAN AND C E O          SECRETARY


Trial Exhibit
No. 157

Williams
EXHIBIT 157
5/18/10 JRO
GRAMANN REPORTING, LTD.

**Single Premium Retirement Annuity Policy**

**Eligible for Annual Dividends**
Retirement Benefit payable at maturity.
Payment at death before maturity.

**Right To Return Policy** - Please read this policy carefully. The policy may be returned by the Owner for any reason within ten days after it was received. The policy may be returned to your agent or to the Home Office of the Company at 720 East Wisconsin Avenue, Milwaukee, WI 53202 If returned, the policy will be considered void from the beginning Any premium paid will then be refunded.

# THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY·MILWAUKEE NML

MM 13

| | | | |
|---|---|---|---|
| ANNUITANT | BRUCE L WILLIAMS | AGE AND SEX | 28 MALE |
| POLICY DATE | MAY 3, 1984 | POLICY NUMBER | 9 263 386 |
| PLAN | SINGLE PREMIUM RETIREMENT ANNUITY AT AGE 65 | MATURITY VALUE | $ 5,796 |

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 123 of 225   Document 39-1
R-App 419   BW 3

# Guide To Policy Provisions

|  |  | Page |
|---|---|---|
| **BENEFITS AND PREMIUMS** |  | 3 |
| **SECTION 1.** | **THE CONTRACT** | 5 |
|  | Monthly Retirement Life Income payable beginning on Maturity Date. Payment at death of Annuitant before Maturity Date Incontestability. Definition of dates. Misstatement of age or sex. Optional Maturity Date. |  |
| **SECTION 2.** | **OWNERSHIP** | 5 |
|  | Rights of the Owner. Transferability Restrictions |  |
| **SECTION 3.** | **DIVIDENDS** | 6 |
|  | Annual dividends. Paid-up additions and other uses of dividends. Dividend at death |  |
| **SECTION 4.** | **CASH VALUES** | 7 |
|  | Cash surrender value. Basis of values. |  |
| **SECTION 5.** | **LOANS** | 7 |
|  | Policy loans. Effect of policy debt. Interest on loans. |  |
| **SECTION 6.** | **BENEFICIARIES** | 9 |
|  | Naming and change of beneficiaries. Marital deduction provision for spouse of Annuitant. Succession in interest of beneficiaries |  |
| **SECTION 7.** | **PAYMENT OF POLICY BENEFITS** | 10 |
|  | Payment of maturity, death or surrender proceeds. Payment plans for policy proceeds. Right to increase income under payment plan Guaranteed payment tables. |  |
| **APPLICATION** |  | Attached to the Policy |

## ENDORSEMENTS
To be made only by the Company at the Home Office

MM 13

BENEFITS AND PREMIUMS

DATE OF ISSUE - MAY 3, 1984

| PLAN | | AMOUNT | SINGLE PREMIUM |
|---|---|---|---|
| SINGLE PREMIUM RETIREMENT ANNUITY AT AGE 65 MONTHLY RETIREMENT LIFE INCOME | | $ 35.99 | $1,177.47 |
| MATURITY VALUE | | 5,796 | |
| MATURITY DATE | MAY 3, 2021 | | |

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 124 of 225   Document 39-1   R-App 420

BENEFITS AND PREMIUMS

DATE OF ISSUE - MAY  3, 1984

| PLAN | | AMOUNT | SINGLE PREMIUM |
|---|---|---|---|
| SINGLE PREMIUM RETIREMENT ANNUITY AT AGE 65 | | | $1,177.47 |
| MONTHLY RETIREMENT LIFE INCOME | $ | 35.99 | |
| MATURITY VALUE | | 5,796 | |

MATURITY DATE                MAY  3, 2021

TABLE OF GUARANTEED VALUES

| END OF POLICY YEAR | MAY  3, | CASH VALUE |
|---|---|---|
| 1 | 1985 | $  1,167 |
| 2 | 1986 | 1,231 |
| 3 | 1987 | 1,299 |
| 4 | 1988 | 1,371 |
| 5 | 1989 | 1,446 |
| 6 | 1990 | 1,526 |
| 7 | 1991 | 1,610 |
| 8 | 1992 | 1,698 |
| 9 | 1993 | 1,792 |
| 10 | 1994 | 1,890 |
| 11 | 1995 | 1,994 |
| 12 | 1996 | 2,104 |
| 13 | 1997 | 2,220 |
| 14 | 1998 | 2,342 |
| 15 | 1999 | 2,471 |
| 16 | 2000 | 2,606 |
| 17 | 2001 | 2,750 |
| 18 | 2002 | 2,901 |
| 19 | 2003 | 3,061 |
| 20 | 2004 | 3,229 |
| AGE 60 | 2016 | 4,880 |
| AGE 65 | 2021 | 5,796 |

VALUES ARE INCREASED BY PAID-UP ADDITIONS AND DECREASED BY POLICY DEBT.

DIRECT BENEFICIARY     KAREN J  WILLIAMS, WIFE OF THE ANNUITANT
OF DEATH PROCEEDS

OWNER                  BRUCE L  WILLIAMS, THE ANNUITANT

| ANNUITANT | BRUCE L  WILLIAMS | AGE AND SEX | 28    MALE |
|---|---|---|---|
| POLICY DATE | MAY  3, 1984 | POLICY NUMBER | 9 263 386 |
| PLAN | SINGLE PREMIUM RETIREMENT ANNUITY AT AGE 65 | MATURITY VALUE | $    5,796 |

M 13

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 125 of 225   Document R3App 421

# SECTION 1. THE CONTRACT

## 1.1 BENEFITS

**Retirement.** The Northwestern Mutual Life Insurance Company will pay a monthly income starting on the Maturity Date, shown on page 3, if the Annuitant is living on that date. Subject to the terms and conditions of the policy:

- the monthly income will be the Monthly Retirement Life Income shown on page 3;
- payment of the Monthly Retirement Life Income will be made to the Annuitant as the direct beneficiary; and
- the payments will be under the terms of the Single Life Income Plan (Option C), described in Section 7.2, with a chosen period of 10 years and based on the life of the Annuitant.

**Payment at Death.** The Northwestern Mutual Life Insurance Company will make a payment on the death of the Annuitant before the Maturity Date. Subject to the terms and conditions of the policy:

- payment of the amount of the Single Premium plus the cash value of any paid-up additions, or, if greater, payment of the cash value for this policy will be made after proof of the death of the Annuitant is received at the Home Office; and
- payment will be made to the beneficiary or other payee under Sections 6 and 7.

## 1.2 ENTIRE CONTRACT; CHANGES

This policy with the attached application is the entire contract. Statements in the application are representations and not warranties. A change in the policy is valid only if it is approved by an officer of the Company. The Company may require that the policy be sent to it for endorsement to show a change. No agent has the authority to change the policy or to waive any of its terms.

## 1.3 INCONTESTABILITY

The Company will not contest this policy after it has been in force during the lifetime of the Annuitant for two years from the Date of Issue.

## 1.4 DATES

The contestable period begins with the Date of Issue. Policy months, years and anniversaries are computed from the Policy Date. Both dates are shown on page 3.

## 1.5 MISSTATEMENT OF AGE OR SEX

If the age or sex of the Annuitant has been misstated, the amount payable will be the amount which the premium paid would have purchased at the correct age and sex.

## 1.6 PAYMENTS BY THE COMPANY

All payments by the Company under this policy are payable at its Home Office.

## 1.7 OPTIONAL MATURITY DATE

The Owner may elect to continue this policy in force to an Optional Maturity Date. A written election for this purpose must be received by the Company at least 31 days before the Maturity Date.

The Optional Maturity Date will be the later of:

- the policy anniversary nearest the Annuitant's 75th birthday; or
- the date five years after the Maturity Date.

All policy rights of the Owner will continue in effect to the Optional Maturity Date. The cash value of the policy will be increased at an annual effective interest rate of 3 1/2%.

# SECTION 2. OWNERSHIP

## 2.1 THE OWNER

The Owner is named on page 3. All policy rights may be exercised by the Owner, his successor or his transferee:

- without the consent of any beneficiary.
- while the Annuitant is living and, after his death, only as provided in Sections 6 and 7.

## 2.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this policy, subject to the Transferability Restrictions. Written proof of transfer satisfactory to the Company must be received at its Home Office. The transfer will then take effect as of the date it was signed. The Company may require that the policy be sent to it for endorsement to show the transfer.

## 2.3 COLLATERAL ASSIGNMENT

The Owner may assign this policy as collateral security, subject to the Transferability Restrictions. The Company is not responsible for the validity or effect of a collateral assignment. The Company will not be responsible to an assignee for any payment or other action taken by the Company before receipt of the assignment in writing at its Home Office.

The interest of any beneficiary will be subject to any collateral assignment made either before or after the beneficiary is named.

A collateral assignee is not an Owner. A collateral assignment is not a transfer of ownership. Ownership can be transferred only by complying with Section 2.2.

MM 13
5

## 2.4 TRANSFERABILITY RESTRICTIONS

Notwithstanding any other provisions of this policy, the Owner may not:

- change the ownership of the policy; or
- sell the policy, or assign or pledge the policy as collateral for a loan or as security for the performance of an obligation or for any other purpose, to any person other than the Company.

These restrictions will not apply if the Owner is:

- the trustee of an employee trust that is qualified under the Internal Revenue Code; or
- the custodian of a custodial account treated as an employee trust that is qualified under the Internal Revenue Code.

The restrictions do not preclude the employer under a non-trusteed plan from transferring ownership of this policy to the Annuitant or to the employer or trustee under another plan or trust when required by the plan.

# SECTION 3. DIVIDENDS

## 3.1 ANNUAL DIVIDENDS

This policy will share in the divisible surplus of the Company. This surplus is determined each year. The policy's share will be credited as a dividend on the policy anniversary.

## 3.2 USE OF DIVIDENDS

Dividends may be paid in cash or used to purchase paid-up retirement annuity additions. Paid-up additions share in the divisible surplus.

If no direction for the use of dividends is given, they will purchase paid-up additions.

Other uses of dividends may be made available by the Company.

## 3.3 ADDITIONS

Paid-up additions increase the policy's cash value. They are payable as part of the policy proceeds. Additions may be surrendered unless they are used for a loan.

## 3.4 DIVIDEND AT DEATH

A dividend for the period from the beginning of the policy year to the date of the Annuitant's death will be payable as part of the policy proceeds.

Case 2:11-cv-00910-LA Filed 04/16 Page 127 of 225   Document 39-1  R-App 423  BW17

# SECTION 4. CASH VALUES

## 4.1 CASH VALUE

The cash value for this policy will be the sum of:

- the cash value from the Table of Guaranteed Values; and
- the cash value of any paid-up additions.

The cash value of any paid-up additions will be the net single premium at the attained age of the Annuitant.

## 4.2 CASH SURRENDER

The Owner may surrender this policy for its cash surrender value. The cash surrender value is the cash value less any policy debt. A written surrender of all claims, satisfactory to the Company, will be required. The date of surrender will be the date of receipt at the Home Office of the written surrender. The policy will terminate and the cash surrender value will be determined as of the date of surrender. The Company may require that the policy be sent to it.

The Company may defer paying the cash surrender value for up to six months from the date of surrender. If payment is deferred for 30 days or more, interest will be paid on the cash surrender value at an annual effective rate of 3 1/2% from the date of surrender to the date of payment.

## 4.3 TABLE OF GUARANTEED VALUES

Cash values are shown on page 3 for the end of the policy years indicated. Each of these values is equal to the net single premium at the attained age of the Annuitant. These values do not reflect any paid-up additions or policy debt. Values during a policy year will reflect the time elapsed in that year.

A list of cash values for policy years not shown on page 3 will be furnished on request. All values are at least as great as those required by the state in which this policy is delivered.

## 4.4 BASIS OF VALUES

The Maturity Value is based on the 1971 Individual Annuity Mortality Table with an annual effective interest rate of 3 1/2%. Cash values and net single premiums used to fund the Maturity Value are determined at an annual effective interest rate of:

- 5 1/2% for the first 20 years after the Policy Date, or to the Maturity Date shown on page 3, if earlier; and
- 3 1/2% after that.

When an Optional Maturity Date is elected under Section 1.7, cash values and net single premiums are determined at an annual effective interest rate of 3 1/2% after the Maturity Date shown on page 3.

# SECTION 5. LOANS

## 5.1 POLICY LOANS

The Owner may obtain a loan from the Company in an amount that is not more than the loan value. The loan may be obtained on written request. The Company may defer making the loan for up to six months unless the loan is to be used to pay premiums due the Company.

## 5.2 LOAN VALUE

The loan value is:

- the cash value one year after the date of the loan; less
- interest to one year from the date of the loan; less
- any policy debt.

## 5.3 POLICY DEBT

Policy debt consists of all outstanding loans and accrued interest. It may be paid to the Company at any time. Any policy debt will be deducted from the policy proceeds.

If the policy debt equals or exceeds the cash value, this policy will terminate. Termination occurs 31 days after a notice has been mailed to the Owner and to any assignee on record at the Home Office.

## 5.4 LOAN INTEREST

Interest is payable at an annual effective rate of 8%. The Company may establish a lower rate for any period during which a loan is outstanding.

Interest accrues and is payable on a daily basis from the date of the loan. Unpaid interest is added to the loan.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 128 of 225   Document 3A-1   R3-App 424   BW 8

## 6.1 DEFINITION OF BENEFICIARIES

The term "beneficiaries" as used in this policy includes direct beneficiaries, contingent beneficiaries and further payees.

## 6.2 NAMING AND CHANGE OF BENEFICIARIES

**For Maturity Proceeds by Owner.** The Owner may name and change the beneficiaries of maturity proceeds before the Maturity Date. If no direct beneficiary is named by the Owner, the Annuitant will be the direct beneficiary.

**For Death Proceeds by Owner.** The Owner may name and change the beneficiaries:

- while the Annuitant is living.
- during the first 60 days after the date of death of the Annuitant, if the Annuitant just before his death was not the Owner. No one may change this naming of a direct beneficiary during this 60 days.

**For Surrender Proceeds by the Owner.** The Owner may name the beneficiaries at the time this policy is surrendered.

**For Death Proceeds by Direct Beneficiary.** A direct beneficiary may name and change the contingent beneficiaries and further payees of his share of the proceeds:

- if the direct beneficiary is the Owner;
- if, at any time after the death of the Annuitant, no contingent beneficiary or further payee of that share is living; or
- if, after the death of the Annuitant, the direct beneficiary elects a payment plan. The interest of any other beneficiary in the share of that direct beneficiary will end.

These direct beneficiary rights are subject to the Owner's rights during the 60 days after the date of death of the Annuitant.

**For Maturity or Surrender Proceeds by Direct Beneficiary.** After the maturity or surrender of the policy, the direct beneficiary may name and change the contingent beneficiaries and further payees of his share of the proceeds that is under a payment plan.

**By Spouse (Marital Deduction Provision).**

- **Power to Appoint.** The spouse of the Annuitant will have the power alone and in all events to appoint all amounts payable to the spouse under the policy if:
  - a. the Annuitant just before his death was the Owner; and
  - b. the spouse is a direct beneficiary; and
  - c. the spouse survives the Annuitant.
- **To Whom Spouse Can Appoint.** Under this power, the spouse can appoint:
  - a. to the estate of the spouse; or
  - b. to any other persons as contingent beneficiaries and further payees.

- **Effect of Exercise.** As to the amounts appointed, the exercise of this power will:
  - a. revoke any other designation of beneficiaries;
  - b. revoke any election of payment plan as it applies to them; and
  - c. cause any provision to the contrary in Section 6 or 7 of this policy to be of no effect.

**Effective Date.** A naming or change of a beneficiary will be made on receipt at the Home Office of a written request that is acceptable to the Company. The request will then take effect as of the date that it was signed. The Company is not responsible for any payment or other action that is taken by it before the receipt of the request. The Company may require that the policy be sent to it to be endorsed to show the naming or change.

## 6.3 SUCCESSION IN INTEREST OF BENEFICIARIES

**Direct Beneficiaries.** The proceeds of this policy will be payable in equal shares to the direct beneficiaries who survive and receive payment. If a direct beneficiary dies before he receives all or part of his full share, the unpaid part of his share will be payable in equal shares to the other direct beneficiaries who survive and receive payment.

**Contingent Beneficiaries.** At the death of all of the direct beneficiaries, the proceeds, or the present value of any unpaid payment under a payment plan, will be payable in equal shares to the contingent beneficiaries who survive and receive payment. If a contingent beneficiary dies before he receives all or part of his full share, the unpaid part of his share will be payable in equal shares to the other contingent beneficiaries who survive and receive payment.

**Further Payees.** At the death of all of the direct and contingent beneficiaries, the proceeds, or the present value of any unpaid payments under a payment plan, will be paid in one sum:

- in equal shares to the further payees who survive and receive payment; or
- if no further payees survive and receive payment, to the estate of the last to die of all of the direct and contingent beneficiaries.

**Owner or His Estate.** If no beneficiaries are alive when the Annuitant dies, the proceeds will be paid to the Owner or to his estate.

## 6.4 GENERAL

**Transfer of Ownership.** A transfer of ownership of itself will not change the interest of a beneficiary.

**Claims of Creditors.** So far as allowed by law, no amount payable under this policy will be subject to the claims of creditors of a beneficiary.

**Succession under Payment Plans.** A direct or contingent beneficiary who succeeds to an interest in a payment plan will continue under the terms of the plan.

RL-App 425  BW 9

# SECTION 7. PAYMENT OF POLICY BENEFITS

## 7.1 PAYMENT OF PROCEEDS

Proceeds from the maturity of this policy will be paid as the Monthly Retirement Life Income described in Section 1.1. In lieu of the Monthly Retirement Life Income, the proceeds will be:

- paid in cash to the Owner on the Maturity Date if requested before that date; or
- paid under a payment plan that is elected before the Maturity Date.

Proceeds that are payable due to the death of the Annuitant will be paid under the payment plan that takes effect on the date of death. The Interest Income Plan (Option A) will be in effect if no payment plan has been elected. Interest will accumulate from the date of death until a payment plan is elected or the proceeds are withdrawn in cash.

Proceeds from the surrender of this policy will be paid in cash to the Owner or under a payment plan that is elected.

## 7.2 PAYMENT PLANS

**Interest Income Plan (Option A).** The proceeds will earn interest which may be received each month or accumulated. The first payment is due one month after the date on which the plan takes effect. Interest that has accumulated may be withdrawn at any time. Part or all of the proceeds may be withdrawn at any time.

**Installment Income Plans.** Payments will be made each month on the terms of the plan that is elected. The first payment is due on the date that the plan takes effect.

- **Specified Period (Option B).** The proceeds with interest will be paid over a period of from one to 30 years. The present value of any unpaid installments may be withdrawn at any time.
- **Specified Amount (Option D).** Payments of not less than $10.00 per $1,000 of proceeds will be made until all of the proceeds with interest have been paid. The balance may be withdrawn at any time.

**Life Income Plans.** Payments will be made each month on the terms of the plan that is elected. The first payment is due on the date that the plan takes effect. Proof of the date of birth, acceptable to the Company, must be furnished for each person on whose life the payments are based.

- **Single Life Income (Option C).** Payments will be made for a chosen period and, after that, for the life of the person on whose life the payments are based. The choices for the period are:

  a. zero years;

  b. 10 years;

  c. 20 years; or

  d. a refund period which continues until the sum of the payments that have been made under the plan is equal to the proceeds that were placed under the plan.

- **Joint and Survivor Life Income (Option E).** Payments are based on the lives of two persons. Level payments will be made for a period of 10 years and, after that, for as long as one or both of the persons are living.

- **Other Selections.** The Company may offer other selections under the Life Income Plans.

- **Withdrawal.** The present value of any unpaid payments that are to be made for the chosen period (Option C) or the 10 year period (Option E) may be withdrawn only after the death of all of the persons on whose lives the payments are based.

- **Limitations.** A direct or contingent beneficiary who is a natural person may be paid under a Life Income Plan only if the payments depend on his life. A corporation may be paid under a Life Income Plan only if the payments depend on the life of the Annuitant or, after the death of the Annuitant, on the life of his spouse or his dependent.

**Payment Frequency.** On request, payments will be made once every 3, 6 or 12 months instead of each month.

**Transfer between Payment Plans.** A beneficiary who is receiving payment under a plan which includes the right to withdraw may transfer the amount withdrawable to any other plan that is available.

**Minimum Payment.** The Company may limit the election of a payment plan to one that results in payments of at least $20.

If payments under a payment plan are or become less than $20, the Company may change the frequency of payments. If the payments are being made once every 12 months and are less than $20, the Company may pay the present value or the balance of the payment plan.

## 7.3 PAYMENT PLAN RATES

**Interest Income and Installment Income Plans.** Proceeds will earn interest at rates declared each year by the Company. None of these rates will be less than an annual effective rate of 3 1/2%. Interest of more than 3 1/2% will increase the amount of the payments or, for the Specified Amount Plan (Option D), increase the number of payments. The present value of any unpaid installments will be based on the 3 1/2% rate of interest.

The Company may offer guaranteed rates of interest higher than 3 1/2% with conditions on withdrawal.

**Life Income Plans.** Payments will be based on rates declared by the Company. These rates will provide at least as much income as would the Company's rates, on the date that the payment plan takes effect, for a single premium immediate annuity contract, with no charge for issue expenses. Payments under these rates will not be less than the amounts that are described in Minimum Payment Rates.

**Minimum Payment Rates.** The minimum payment **7.5 PAYMENT PLAN ELECTIONS**

of the payments that have been made is equal to the proceeds that were placed under the plan.

**Minimum Payment Rates.** The minimum payment rates for the Installment Income Plans (Options B and D) and the Life Income Plans (Options C and E) are shown in the Minimum Payment Rate Table.

The Life Income Plan payment rates in that table depend on the sex and on the adjusted age of each person on whose life the payments are based. The adjusted age is:

- the age on the birthday that is nearest to the date on which the payment plan takes effect; plus

- the age adjustment shown below for the number of policy years that have elapsed from the Policy Date to the date that the payment plan takes effect. A part of a policy year is counted as a full year.

| POLICY YEARS ELAPSED | AGE ADJUSTMENT | POLICY YEARS ELAPSED | AGE ADJUSTMENT |
|---|---|---|---|
| 1 to 10 | +8 | 31 to 35 | -1 |
| 11 to 15 | +6 | 36 to 40 | -2 |
| 16 to 20 | +4 | 41 to 45 | -3 |
| 21 to 25 | +2 | 46 to 50 | -4 |
| 26 to 30 | 0 | 51 or more | -5 |

**7.4 EFFECTIVE DATE FOR PAYMENT PLAN**

A payment plan that is elected under Section 7.1 for maturity proceeds will take effect on the Maturity Date.

A payment plan that is elected for death proceeds will take effect on the date of death of the Annuitant if:

- the plan is elected by the Owner; and

- the election is received at the Home Office while the Annuitant is living.

In all other cases, a payment plan that is elected will take effect:

- on the date the election is received at the Home Office; or

- on a later date, if requested.

expenses. Payments under these rates will not be less than the amounts that are described in Minimum Payment Rates.

**7.5 PAYMENT PLAN ELECTIONS**

**For Death Proceeds By Owner.** The Owner may elect payment plans for death proceeds.

- while the Annuitant is living.

- during the first 60 days after the date of death of the Annuitant, if the Annuitant just before his death was not the Owner. No one may change this election made during those 60 days.

**For Death Proceeds by Direct or Contingent Beneficiary.** A direct or contingent beneficiary may elect payment plans for death proceeds payable to him if no payment plan that has been elected is in effect. This right is subject to the Owner's rights during the above 60 days.

**For Maturity or Surrender Proceeds.** The Owner may elect payment plans for maturity or surrender proceeds.

**7.6 INCREASE OF MONTHLY INCOME**

The Annuitant, or other direct beneficiary, who is to receive proceeds under a payment plan may increase the amount of monthly payments. This is done by the payment of an annuity premium to the Company at the time the payment plan described in Section 1.1 or elected under Section 7.5 takes effect. The amount that will be applied under the payment plan will be the net premium. The net premium is the annuity premium less a charge of not more than 2% and less any premium tax. The net premium will be applied under the same payment plan and at the same rates as the proceeds. The Company may limit this net premium, when used with death proceeds, to an amount that is equal to the direct beneficiary's share of the death proceeds payable under this policy. The net premium, when used with maturity or surrender proceeds, may not exceed an amount which would result in a total monthly income under the Single Life Income Plan of three times the monthly income available at the time from this policy. This right may not be used if the policy matures or is surrendered less than two years after the Policy Date.

## MINIMUM PAYMENT RATE TABLES
### Minimum Monthly Income Payment Per $1,000 Proceeds

**INSTALLMENT INCOME PLAN (Options B and D)**

| PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT |
|---|---|---|---|---|---|
| 1 | $84.65 | 11 | $ 9.09 | 21 | $ 5.56 |
| 2 | 43.05 | 12 | 8.46 | 22 | 5.39 |
| 3 | 29.19 | 13 | 7.94 | 23 | 5.24 |
| 4 | 22.27 | 14 | 7.49 | 24 | 5.09 |
| 5 | 18.12 | 15 | 7.10 | 25 | 4.96 |
| 6 | 15.35 | 16 | 6.76 | 26 | 4.84 |
| 7 | 13.38 | 17 | 6.47 | 27 | 4.73 |
| 8 | 11.90 | 18 | 6.20 | 28 | 4.63 |
| 9 | 10.75 | 19 | 5.97 | 29 | 4.53 |
| 10 | 9.83 | 20 | 5.75 | 30 | 4.45 |

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 131 of 225   Document 33-1   R3 App 427

# MINIMUM PAYMENT RATE TABLE

### Minimum Monthly Income Payments Per $1,000 Proceeds

## LIFE INCOME PLANS (Options C and E)

| SINGLE LIFE MONTHLY PAYMENTS (Option C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MALE ADJUSTED AGE* | CHOSEN PERIOD (YEARS) | | | | FEMALE ADJUSTED AGE* | CHOSEN PERIOD (YEARS) | | |
| | ZERO | 10 | 20 | REFUND | | ZERO | 10 | 20 | REFUND |
| 55 | $ 5.39 | $ 5.24 | $ 4.85 | $ 5.00 | 55 | $ 4.75 | $ 4.70 | $ 4.53 | $ 4.57 |
| 56 | 5.51 | 5.34 | 4.91 | 5.09 | 56 | 4.85 | 4.78 | 4.59 | 4.64 |
| 57 | 5.63 | 5.45 | 4.97 | 5.19 | 57 | 4.94 | 4.87 | 4.66 | 4.72 |
| 58 | 5.77 | 5.56 | 5.03 | 5.29 | 58 | 5.05 | 4.97 | 4.73 | 4.81 |
| 59 | 5.91 | 5.68 | 5.10 | 5.39 | 59 | 5.16 | 5.07 | 4.80 | 4.90 |
| 60 | 6.06 | 5.80 | 5.16 | 5.50 | 60 | 5.27 | 5.17 | 4.87 | 4.99 |
| 61 | 6.22 | 5.93 | 5.21 | 5.62 | 61 | 5.40 | 5.28 | 4.94 | 5.09 |
| 62 | 6.39 | 6.07 | 5.27 | 5.74 | 62 | 5.53 | 5.40 | 5.01 | 5.20 |
| 63 | 6.58 | 6.21 | 5.33 | 5.87 | 63 | 5.67 | 5.52 | 5.08 | 5.31 |
| 64 | 6.77 | 6.35 | 5.38 | 6.01 | 64 | 5.82 | 5.66 | 5.15 | 5.43 |
| 65 | 6.99 | 6.50 | 5.43 | 6.16 | 65 | 5.97 | 5.80 | 5.22 | 5.55 |
| 66 | 7.21 | 6.66 | 5.48 | 6.31 | 66 | 6.14 | 5.95 | 5.28 | 5.69 |
| 67 | 7.46 | 6.83 | 5.52 | 6.47 | 67 | 6.31 | 6.10 | 5.35 | 5.83 |
| 68 | 7.72 | 7.00 | 5.56 | 6.65 | 68 | 6.50 | 6.27 | 5.40 | 5.99 |
| 69 | 7.97 | 7.17 | 5.60 | 6.83 | 69 | 6.70 | 6.45 | 5.46 | 6.15 |
| 70 | 8.23 | 7.35 | 5.63 | 7.03 | 70 | 6.90 | 6.63 | 5.51 | 6.32 |
| 71 | 8.49 | 7.53 | 5.66 | 7.23 | 71 | 7.11 | 6.82 | 5.55 | 6.51 |
| 72 | 8.76 | 7.71 | 5.68 | 7.45 | 72 | 7.33 | 7.02 | 5.59 | 6.71 |
| 73 | 9.03 | 7.89 | 5.70 | 7.69 | 73 | 7.55 | 7.22 | 5.62 | 6.92 |
| 74 | 9.30 | 8.07 | 5.72 | 7.94 | 74 | 7.79 | 7.43 | 5.65 | 7.15 |
| 75 | 9.57 | 8.25 | 5.73 | 8.21 | 75 | 8.02 | 7.64 | 5.68 | 7.39 |
| 76 | 9.85 | 8.43 | 5.74 | 8.49 | 76 | 8.26 | 7.85 | 5.69 | 7.65 |
| 77 | 10.11 | 8.60 | 5.74 | 8.80 | 77 | 8.48 | 8.05 | 5.71 | 7.92 |
| 78 | 10.38 | 8.77 | 5.75 | 9.13 | 78 | 8.72 | 8.26 | 5.72 | 8.21 |
| 79 | 10.64 | 8.93 | 5.75 | 9.48 | 79 | 8.94 | 8.45 | 5.73 | 8.52 |
| 80 | 10.90 | 9.08 | 5.75 | 9.85 | 80 | 9.16 | 8.64 | 5.74 | 8.85 |
| 81 | 11.13 | 9.21 | 5.75 | 10.26 | 81 | 9.36 | 8.81 | 5.74 | 9.21 |
| 82 | 11.36 | 9.34 | 5.75 | 10.70 | 82 | 9.53 | 8.96 | 5.75 | 9.57 |
| 83 | 11.55 | 9.44 | 5.75 | 11.17 | 83 | 9.70 | 9.10 | 5.75 | 9.97 |
| 84 | 11.75 | 9.54 | 5.75 | 11.70 | 84 | 9.85 | 9.22 | 5.75 | 10.39 |
| 85 and over | 11.92 | 9.61 | 5.75 | 12.26 | 85 and over | 9.98 | 9.33 | 5.75 | 10.81 |

| JOINT AND SURVIVOR MONTHLY PAYMENTS (Option E) | | | | | | | |
|---|---|---|---|---|---|---|---|
| MALE ADJUSTED AGE* | FEMALE ADJUSTED AGE* | | | | | | |
| | 55 | 60 | 65 | 70 | 75 | 80 | 85 and over |
| 55 | $4.33 | $4.55 | $4.76 | $4.94 | $5.08 | $5.17 | $5.22 |
| 60 | 4.45 | 4.73 | 5.03 | 5.30 | 5.53 | 5.68 | 5.76 |
| 65 | 4.54 | 4.89 | 5.28 | 5.68 | 6.04 | 6.29 | 6.43 |
| 70 | 4.61 | 5.01 | 5.49 | 6.04 | 6.57 | 6.97 | 7.20 |
| 75 | 4.66 | 5.09 | 5.65 | 6.32 | 7.04 | 7.65 | 8.02 |
| 80 | 4.68 | 5.14 | 5.74 | 6.51 | 7.39 | 8.20 | 8.72 |
| 85 and over | 4.69 | 5.16 | 5.78 | 6.60 | 7.57 | 8.52 | 9.15 |

*See Section 7.3.

AMENDMENT OF CONTRACT TO QUALIFY AS

## INDIVIDUAL RETIREMENT ANNUITY

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 132 of 225   Document 30-1 R-App 428

# AMENDMENT OF CONTRACT TO QUALIFY AS
# INDIVIDUAL RETIREMENT ANNUITY

### As of the Date of Issue, Section 2.4 TRANSFERABILITY RESTRICTIONS
### is amended to read:

**2.4 TRANSFERABILITY RESTRICTIONS**

Notwithstanding any other provisions of this contract, the Owner may not transfer ownership of the contract except to a former spouse of the Owner under a divorce decree or under a written instrument incident to that divorce.

**In addition, as of the Date of Issue and notwithstanding any other specific provisions to the contrary, this contract is amended to restrict the exercise of the rights of the Owner or the Annuitant and any beneficiary, and to limit the payment of premiums as follows:**

1. The contract is established for the exclusive benefit of the Owner or his beneficiaries.

2. The interest of the Owner in the contract is nonforfeitable.

3. Except in the case of a rollover contribution described in Internal Revenue Code Section 402(a)(5), 402(a)(7), 403(a)(4), 403(b)(8), 405(d)(3), 408(d)(3), or 409(b)(3)(c), the annual premium may not exceed $2,000 or 100% of compensation for the owner's taxable year, whichever is less.

4. If employer contributions are made to this contract under a Simplified Employee Pension Plan, these annual contributions may not exceed $15,000 or 15% of compensation for the Owner's taxable year, whichever is less.

5. Dividends will not be paid in cash but will be used for paid-up additions or applied toward payment of premiums.

6. The entire interest of the Owner will be distributed to the Owner:
   - not later than the close of the Owner's taxable year in which the Owner attains age 70 1/2; or
   - in equal or substantially equal payments commencing before the close of the Owner's taxable year in which the Owner attains age 70 1/2 and made:
     a. over the life of the Owner (Option C) or the lives of the Owner and his spouse (Option E); or
     b. over a period certain (Option B) not extending beyond:
        (i) the life expectancy of the Owner; or
        (ii) the life expectancy of the Owner and his spouse.

   This will not limit any contractual rights of withdrawal given to the Owner or his beneficiary.

7. If the Owner dies before all contract benefits have been paid to him, or if payment to the Owner's surviving spouse has commenced under a payment plan and the spouse dies with installments remaining payable under the plan, then all contract benefits (or the withdrawal value of a payment plan then in effect) will, within five years after the Owner's death or the death of his surviving spouse:
   - be paid to the beneficiary or beneficiaries designated by the Owner or the spouse; or
   - be applied to purchase an immediate annuity from an insurance company for the beneficiary or beneficiaries payable for their life or lives (or for a period certain not extending beyond the life expectancy of the beneficiary or beneficiaries) which annuity will be immediately distributed to the payee.

   This paragraph will be of no effect if payments under the Option B payment plan began before the Owner's death and the period certain is permitted under paragraph 6 above.

*Peter W. Bruce*

Secretary
THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY

MM 301 (0483)

G 84835     MILWAUKEE, WISCONSIN     CHECKED BY   HR-10 or Corporate

(USE ONLY FOR IRA, TDA, HR-10 AND CORPORATE PLANS)    Payer No._____

    TDA or IRA Only

**INSURED** or Annuitant (Please Print)   *BRUCE*   *L*   *WILLIAMS*

First      Middle Initial      Last

Sex: ☒ Male ☐ Female

**OWNER** (Print Full Name)   *BRUCE L. WILLIAMS*

**A. Complete for IRA or TDA:**

- ☐ IRC 170(b)(1)(a)—Public Elementary or Secondary School, College or University (TDA)
- ☐ IRC 501(c)(3)—Non profit Organization (TDA)
- ☒ IRC 408(b) IRA—New accounts and rollovers from prior annual deduction IRA
- ☐ IRC 408(d) IRA—Rollover from corporate or HR-10 only
- ☐ IRC 408(k) IRA—Simplified Employee Pension Plan

**3B. Complete for HR-10 or CORPORATE:**

Is this policy being applied for according to the terms of a qualified plan? ☐ Yes ☐ No

If "Yes" and the plan uses or has used Northwestern Mutual policies:

The NML trust No. is_____.

**2A. RESIDENCE of Insured: Print**   *4465 S. BURRELL ST.*

Street & No. or R.F.D.

*MILWAUKEE*     *WI.*

City        State

*MILWAUKEE*     *53207*

County      Zip Code

This address will be used for all of Insured's policies.

**4B. PREMIUM PAYER:** Premium notices will be sent as specified by plan or to:

☒ Insured   ☐ Owner

☐ Other_____

                  Name

at: ☒ Insured's address (See 4A) or:

**2A. Insured's Date of Birth:**   *4*   *10*   *56*

Mo.    Day    Year

_____

Street & No. or R.F.D.

**2B. Place of Birth:** (If other than U.S.A. indicate country.)

*VIRGINIA*

_____

City           State

**2C. Insured's Taxpayer Identifying No.** *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*

_____

County        Zip Code

Unless directed otherwise, any notices will be sent to the Owner at the Insured's address.

**6. Has application or informal inquiry ever been made to the Northwestern Mutual Life for annuity, life or disability insurance on the life of the Insured?** ☒ Yes ☐ No If "Yes," Last Policy Number is_____ *7 697 807*

**7A. PLAN and AMOUNT:**

☐ **Life**

_____ Plan          Age at Retirement

Complete One:
- ☐ _____ premium of $ _____
  - Mode
- ☐ $ _____
  - Amount

☐ **Retirement Income at** _____

Age at Maturity

Complete One:
- ☐ _____ premium of $ _____
  - Mode
- ☐ $ _____
  - Amount

☒ **Annuity**   *F.P.A*       *65*

Plan           Age at Maturity

Complete One:
- ☒ *SINGLE* premium of $ *1177.47*
  - Mode
- ☐ Monthly income of $ _____

**7B. ADDITIONAL BENEFITS:**

- ☐ WAIVER OF PREMIUM
- ☐ $ _____ OF ACCIDENTAL DEATH
- ☐ ADDITIONAL PURCHASE $ _____ PER OPTION
- ☐ INDEXED PROTECTION
- ☐ OTHER, SPECIFY_____

If any additional benefits cannot be approved, should the policy be issued without the benefit? ☒ Yes ☐ No

**8. Policy to be dated**   *5*   *3*   *84*

Mo.   Day   Yr.

**9. Shall the PREMIUM LOAN provision, if available, become operative according to its terms?** ☒ Yes ☐ No

**COMPLETE QUESTION 10 IF EXERCISING ADDITIONAL PURCHASE BENEFIT OPTION**

**10A. Number of policy under which this privilege is being exercised?**

**10B. Is application?** ☐ Regular Purchase ☐ Advance Purchase (See 10C)

**10C. If an advance purchase, event is the following:**

- ☐ (1) Marriage
- ☐ (2) Birth of Child
- ☐ (3) Adoption of Child

Name of ☐ Spouse ☐ Child _____

First      Middle Initial      Last

Place and Date of Marriage, Birth or Final Decree of Legal Adoption:

_____

City     County     State     Mo. Day Yr.

☐ A. Be used to reduce current premium.
☑ B. Purchase paid-up additions.
☐ C. Accumulate at interest. Owner's Taxpayer
    Identifying Number _____
☐ D. Be cash.

## 12. PREMIUM PAYABLE:

☐ Annually  ☐ Semiannually  ☐ Quarterly
☑ Single Premium of $ *1177.47*
☐ Monthly (12 months)

TDA only:
☐ Monthly (9 or 10 months) _____
                 State months to be omitted
☐ Frequency 26

13. Has the premium for the policy applied for been paid
to the agent in exchange for the **Conditional Insurance
Agreement** with the same number as the application?
      ☑ Yes    ☐ No

14. Will the insurance (or annuity) applied for replace insur-
ance (or annuities) on the Insured's (or Annuitant's)
life in Northwestern Mutual Life or elsewhere?
      ☐ Yes    ☑ No

If "Yes," agent should explain and submit required
papers.

---

15A. **Direct Beneficiary or Retirement Life Income or**
Maturity Value: (RI or Annuity Only)
☑ Insured  ☐ Owner, but only in one sum

15B. **Direct Beneficiary** of amount payable at death:
☐ Owner, but only in one sum
☑ Other, *KAREN J. WILLIAMS*
Relationship to Insured *WIFE*

15C. **Contingent Beneficiary** of amount payable at death:

Relationship to Insured _____

NOTE: Item 1 or 2 may be selected to supplement the con-
tingent beneficiary designation or may be used to designate
children or brothers and sisters as contingent beneficiaries
without specifically naming them. Item 3 may be used to sup-
plement Item 1, 2 or any other contingent beneficiary
designation. The word "children" includes child and any legally adopted
child.
☑ (1) and any (other) children of the Insured.
☐ (2) and any (other) brothers and sisters of the In-
sured born of the marriage of or legally adopted by
_____ and _____ prior to the
Insured's death.
☐ (3) any amount a deceased contingent beneficiary
would have received, if living, will be payable when
due in one sum in equal shares to his or her then
living children.

15D. **Further Payees** (Print Name)

Relationship to Insured _____
☐ See attached Supplement Form.

---

**QUESTION 16 MUST BE COMPLETED BY THE INSURED ONLY IF GUARANTEED ISSUE IS AVAILABLE**

16. **Are you now actively at work?**  ☐ Yes  ☐ No  (If "No," explain in REMARKS)
Actively at work means that the Insured is actively at work on a full-time basis on the date of this application or on
one of the 3 days before the date of this application and that he has been so working for the 3 weeks before the date
of this application without an absence of more than 3 days for sickness or injury.

REMARKS: *#14 Pension Plan was Terminated by Employee, J.P. PATTER*
*INC. — Amount REPRESENTS Total of Distribution*

---

The Insured or Annuitant consents to this application and declares that the foregoing answers and statements (contained
on both sides of this page) are correctly recorded, complete and true to the best of his knowledge and belief.

**It is agreed that:**
If an annuity is applied for, "Annuitant" will be substituted
for "Insured" wherever it appears.
(1) If the premium is not paid when the application is signed,
no insurance will be in effect. If, however, a policy is deliv-
ered and the premium is paid during the Insured's lifetime,
the insurance will be in effect if, at the time of the delivery
**and payment, the answers and statements in the application,
which are material to the risk, are then true to the best of
the Insured's knowledge and belief and the Insured is then
actively at work.**
(2) If the premium is paid when the application is taken, no
life insurance will have been in effect if Section I. of the
Conditional Insurance Agreement applies.
(3) Acceptance of a Life Insurance policy in an extra premium
classification will amend the policy so that if any premium
is unpaid at the end of the grace period, the policy will be
in force as paid-up insurance. If the policy has the extended
term insurance provision, it may be continued as term in-

surance only with the consent of Northwestern Mutual Life
or if the loan value is not large enough for a premium loan.
(4) The Owner, named in 2, of any policy issued on this ap-
plication may elect a payment plan payable to the Insured
as direct beneficiary at the maturity of the policy or on its
surrender for cash.
(5) If the Owner is a Trustee or successor Trustee under a
qualified plan or the employer under a qualified non-trusteed
plan, Northwestern Mutual Life will be fully discharged of
liability for any action taken by the Owner in the exercise
of any policy right and for all amounts paid to, or at the di-
rection of, the Owner and will have no obligation as to the
use of the amounts. In all dealings with the Owner, North-
western Mutual Life will be fully protected against the claims
of every other person.
(6) No agent is authorized to make or alter contracts or to
waive any of the rights or requirements of Northwestern
Mutual Life.

                                *Bruce Willi...*

Signature of INSURED or Annuitant (if other than Applicant)       Signature of APPLICANT

Signed at _____

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 135 of 225   Document 91
R-App 437

# THE NORTHWESTERN MUTUAL LIFE
# INSURANCE COMPANY · MILWAUKEE

**NML**

### It is recommended that you . . .

read your policy.

notify your NML agent or the Company at 720 E. Wisconsin Avenue, Milwaukee, Wis. 53202, of an address change.

call your NML agent for information —
particularly on a suggestion
to terminate or exchange this policy
for another policy or plan.

**Election of Trustees**

The members of The Northwestern Mutual Life Insurance Company are its policyholders of insurance policies and deferred annuity contracts. The members exercise control through a Board of Trustees. Elections to the Board are held each year at the annual meeting of members. Members are entitled to vote in person or by proxy.

**Single Premium Retirement Annuity Policy**
**Eligible for Annual Dividends**
Retirement Benefit payable at maturity.
Payment at death before maturity.

MM 13





The Northwestern Mutual Life Insurance Company agrees to pay the benefits provided in this policy, subject to its terms and conditions. Signed at Milwaukee, Wisconsin on the Date of Issue.

*Donald J Schuenke*
PRESIDENT AND CEO

*Peter W. Bruce*
SECRETARY

**Flexible Premium Annuity Policy**

**Eligible for Annual Dividends**

Retirement Benefit payable at maturity.
Refund at death before maturity — Section 1.1.

Flexible Premium — Section 3.1.

**Right To Return Policy** - Please read this policy carefully. The policy may be returned by the Owner for any reason within ten days after it was received. The policy may be returned to your agent or to the Home Office of the Company at 720 East Wisconsin Avenue, Milwaukee, WI 53202. If returned, the policy will be considered void from the beginning. Any premium paid will then be refunded.

MM 12

## THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY·MILWAUKEE

NML

Trial Exhibit No. 155



Williams
EXHIBIT 155
5/18/10 pm
GRAMANN REPORTING, LTD.

| | | | | |
|---|---|---|---|---|
| ANNUITANT | BRUCE L WILLIAMS | AGE AND | | 28 MALE |
| POLICY DATE | JULY 27, 1984 | POLICY NUMBER | | 9 334 863 |
| | FLEXIBLE PREMIUM ANNUITY AT AGE 65 | MONTHLY INCOME | $ | 882.65 |

**SECTION 1.**   **THE CONTRACT**   5
Monthly Retirement Life Income payable beginning on
Maturity Date. Refund at death of Annuitant before Maturity Date
Incontestability  Definition of dates.
Misstatement of age or sex. Optional Maturity Date.

**SECTION 2.**   **OWNERSHIP**   5
Rights of the Owner. Transferability Restrictions.

**SECTION 3.**   **PREMIUMS AND REINSTATEMENT**   6
Payment of flexible premiums. Crediting of premiums.
How to reinstate the policy.

**SECTION 4.**   **DIVIDENDS**   6
Annual dividends. Paid-up additions and other uses of dividends.
Dividend at death.

**SECTION 5.**   **CASH VALUES AND PAID-UP ANNUITY**   7
Cash surrender value. What happens if premium is not paid.
Basis of values.

**SECTION 6.**   **LOANS**   8
Policy loans. Effect of policy debt. Interest on loans

**SECTION 7.**   **CHANGE OF POLICY**   8

**SECTION 8.**   **BENEFICIARIES**   9
Naming and change of beneficiaries.
Marital deduction provision for spouse of Annuitant.
Succession in interest of beneficiaries.

**SECTION 9.**   **PAYMENT OF POLICY BENEFITS**   10
Payment of maturity, death or surrender proceeds
Payment plans for policy proceeds  Right to increase income
under payment plan. Guaranteed payment tables.

**ADDITIONAL BENEFITS** (if any)   Following Page 12

**APPLICATION**   Attached to the Policy

ENDORSEMENTS
To be made only by the Company at the Home Office

MM 12

BENEFITS AND PREMIUMS

DATE OF ISSUE - JULY 27, 1984

| PLAN AND ADDITIONAL BENEFITS | AMOUNT | ANNUAL PREMIUM | PAYABLE FOR |
|---|---|---|---|
| FLEXIBLE PREMIUM ANNUITY AT AGE 65 | | $ 2,000.00 | 37 YEARS |
| MONTHLY RETIREMENT LIFE INCOME | $ 882.65* | | |
| MATURITY VALUE | 142,134* | | |

*Premiums paid*
*14,177°°*

MATURITY DATE      JULY 27, 2021

A PREMIUM IS PAYABLE ON THE POLICY DATE AND EVERY 12 POLICY MONTHS THEREAFTER.

THE FIRST PREMIUM IS      $2,000.00.


    * THE MONTHLY RETIREMENT LIFE INCOME AND MATURITY VALUE SHOWN
      ABOVE ASSUME THAT A FLEXIBLE PREMIUM ANNUITY ANNUAL PREMIUM OF
      $2,000.00 IS PAID ON EACH DUE DATE.


DIRECT BENEFICIARY      KAREN J  WILLIAMS, WIFE OF THE ANNUITANT
OF DEATH PROCEEDS

OWNER                   BRUCE L  WILLIAMS, THE ANNUITANT


| | | | |
|---|---|---|---|
| ANNUITANT | BRUCE L  WILLIAMS | AGE AND SEX | 28  MALE |
| POLICY DATE | JULY 27, 1984 | POLICY NUMBER | 9 334 863 |
| PLAN | FLEXIBLE PREMIUM ANNUITY AT AGE 65 | MONTHLY INCOME | $  882.65 |

MM 12

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 139 of 225   Document 39-1

R-App 435
PBW022
094

TABLE OF GUARANTEED VALUES

ASSUMING FLEXIBLE PREMIUM ANNUITY ANNUAL PREMIUM OF $2,000.00
IS PAID ON EACH DUE DATE.

| END OF POLICY YEAR | JULY 27, | CASH VALUE | VALUE AT AGE 65 | PAID-UP ANNUITY MONTHLY RETIREMENT LIFE INCOME AT AGE 65 |
|---|---|---|---|---|
| 1 | 1985 | $ 1,934 | $ 6,619 | $ 41.11 |
| 2 | 1986 | 3,938 | 13,063 | 81.12 |
| 3 | 1987 | 6,011 | 19,330 | 120.04 |
| 4 | 1988 | 8,157 | 25,332 | 157.31 |
| 5 | 1989 | 10,379 | 31,157 | 193.49 |
| 6 | 1990 | 12,677 | 36,806 | 228.57 |
| 7 | 1991 | 15,057 | 42,190 | 262.00 |
| 8 | 1992 | 17,519 | 47,486 | 294.89 |
| 9 | 1993 | 20,068 | 52,517 | 326.13 |
| 10 | 1994 | 22,706 | 57,460 | 356.83 |
| 11 | 1995 | 25,437 | 62,138 | 385.88 |
| 12 | 1996 | 28,262 | 66,728 | 414.38 |
| 13 | 1997 | 31,187 | 71,141 | 441.79 |
| 14 | 1998 | 34,215 | 75,466 | 468.65 |
| 15 | 1999 | 37,347 | 79,526 | 493.86 |
| 16 | 2000 | 40,590 | 83,586 | 519.07 |
| 17 | 2001 | 43,947 | 87,382 | 542.64 |
| 18 | 2002 | 47,420 | 91,089 | 565.67 |
| 19 | 2003 | 51,015 | 94,708 | 588.14 |
| 20 | 2004 | 54,736 | 98,150 | 609.52 |
| AGE 60 | 2016 | 110,974 | 131,779 | 818.35 |
| AGE 65 | 2021 | 142,134 | 142,134 | 882.65 |

VALUES ARE INCREASED BY PAID UP ADDITIONS AND DIVIDEND ACCUMULATIONS
AND DECREASED BY POLICY DEBT. VALUES SHOWN AT END OF POLICY YEAR
DO NOT REFLECT ANY PREMIUM DUE ON THAT POLICY ANNIVERSARY.

| | | | |
|---|---|---|---|
| INSURED | BRUCE L WILLIAMS | AGE AND SEX | 28 MALE |
| POLICY DATE | JULY 27, 1984 | POLICY NUMBER | 9 334 863 |
| PLAN | FLEXIBLE PREMIUM ANNUITY AT AGE 65 | MONTHLY INCOME | $ 882.65 |

MM 12

# SECTION 1. THE CONTRACT

## 1.1 BENEFITS

**Retirement.** The Northwestern Mutual Life Insurance Company will pay a monthly income starting on the Maturity Date, shown on page 3, if the Annuitant is living on that date. Subject to the terms and conditions of the policy:

- the monthly income will be the Monthly Retirement Life Income shown on page 3, assuming the specified premium is paid on each due date;
- payment of the Monthly Retirement Life Income will be made to the Annuitant as the direct beneficiary; and
- the payments will be under the terms of the Single Life Income Plan (Option C), described in Section 9.2, with a chosen period of 10 years and based on the life of the Annuitant.

**Payment at Death.** The Northwestern Mutual Life Insurance Company will make a payment on the death of the Annuitant before the Maturity Date. Subject to the terms and conditions of the policy:

- payment of the amount of the Flexible Premium Annuity premiums paid plus the cash value of any paid-up additions, or, if greater, payment of the cash value for this policy will be made after proof of the death of the Annuitant is received at the Home Office; and
- payment will be made to the beneficiary or other payee under Sections 8 and 9.

## 1.2 ENTIRE CONTRACT; CHANGES

This policy with the attached application is the entire contract. Statements in the application are representations and not warranties. A change in the policy is valid only if it is approved by an officer of the Company. The Company may require that the policy be sent to it for endorsement to show a change. No agent has the authority to change the policy or to waive any of its terms.

## 1.3 INCONTESTABILITY

The Company will not contest this policy after it has been in force during the lifetime of the Annuitant for two years from the Date of Issue.

## 1.4 DATES

The contestable period begins with the Date of Issue. Policy months, years and anniversaries are computed from the Policy Date. Both dates are shown on page 3.

## 1.5 MISSTATEMENT OF AGE OR SEX

If the age or sex of the Annuitant has been misstated, the amount payable will be the amount which the premiums paid would have purchased at the correct age and sex.

## 1.6 PAYMENTS BY THE COMPANY

All payments by the Company under this policy are payable at its Home Office.

## 1.7 OPTIONAL MATURITY DATE

The Owner may elect to continue this policy in force, without any Waiver of Premium Benefit, to an Optional Maturity Date. A written election for this purpose must be received by the Company at least 31 days before the Maturity Date.

The Optional Maturity Date will be the later of:

- the policy anniversary nearest the Annuitant's 75th birthday; or
- the date five years after the Maturity Date.

All policy rights of the Owner will continue in effect to the Optional Maturity Date. The cash value of the policy will be increased at an annual effective interest rate of 3 1/2%. Premium payments may be continued to the Optional Maturity Date.

# SECTION 2. OWNERSHIP

## 2.1 THE OWNER

The Owner is named on page 3. All policy rights may be exercised by the Owner, his successor or his transferee:

- without the consent of any beneficiary.
- while the Annuitant is living and, after his death, only as provided in Sections 8 and 9.

## 2.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this policy, subject to the Transferability Restrictions. Written proof of transfer satisfactory to the Company must be received at its Home Office. The transfer will then take effect as of the date it was signed. The Company may require that the policy be sent to it for endorsement to show the transfer.

## 2.3 COLLATERAL ASSIGNMENT

The Owner may assign this policy as collateral security, subject to the Transferability Restrictions. The Company is not responsible for the validity or effect of a collateral assignment. The Company will not be responsible to an assignee for any payment or other action taken by the Company before receipt of the assignment in writing at its Home Office.

The interest of any beneficiary will be subject to any collateral assignment made either before or after the beneficiary is named.

A collateral assignee is not an Owner. A collateral assignment is not a transfer of ownership. Ownership can be transferred only by complying with Section 2.2.

MM 12
5

## 2.4 TRANSFERABILITY RESTRICTIONS

Notwithstanding any other provisions of this policy, the Owner may not:

- change the ownership of the policy; or
- sell the policy, or assign or pledge the policy as collateral for a loan or as security for the performance of an obligation or for any other purpose, to any person other than the Company.

These restrictions will not apply if the Owner is:

- the trustee of an employee trust that is qualified under the Internal Revenue Code; or

- the custodian of a custodial account treated as an employee trust that is qualified under the Internal Revenue Code.

The restrictions do not preclude the employer under a non-trusteed plan from transferring ownership of this policy to the Annuitant or to the employer or trustee under another plan or trust when required by the plan.

## 2.5 REPORTS TO OWNER

At least once each policy year the Company will send a statement of the cash value to the Owner or the Annuitant.

# SECTION 3. PREMIUMS AND REINSTATEMENT

## 3.1 PREMIUMS

**Payment.** All premiums after the first are payable at the Home Office or to an authorized agent. A premium must be paid on or before its due date. A receipt signed by an officer of the Company will be furnished on request.

**Flexible Premium.** The amount of the first premium is shown on page 3. After the first premium the Owner may vary the amount, but no premium may be less than $25. The Company has the right to limit premiums paid in any policy year to the greater of:

- 200% of the amount of the premium shown on page 3 for the first policy year; or
- the amount of the premium shown on page 3 for the first policy year, plus $2,500.

**Frequency.** Premiums may be paid every 3, 6 or 12 months at the published rates of the Company. A change in premium frequency will take effect when the Company accepts a premium on a new frequency. Premiums may be paid on any other frequency approved by the Company.

If premiums are being paid by a public school employer or by an employer described in Section 501(c)(3) of the Internal Revenue Code, the availability of premium frequencies other than those stated above will be limited to the period during which premiums are being paid by the employer.

**Grace Period.** A grace period of 31 days will be allowed to pay a premium that is not paid on its due date. The policy will be in full force during this period.

If the premium is not paid within the grace period, the policy will terminate as of the due date unless it continues as a paid-up annuity under Section 5.2.

**Date of Crediting.** If premiums are being paid every 3, 6 or 12 months:

- a premium received no later than 31 days after the due date will be credited as of the due date.
- a premium received later than 31 days after the due date will be credited on the date that it is received.

If premiums are being paid more frequently than every 3 months, premiums will be credited on the date received.

## 3.2 REINSTATEMENT

This policy may be reinstated before the Maturity Date by resuming premium payments. This may not be done:

- if the Annuitant is not living.
- if the policy has been surrendered for its cash surrender value.

Evidence of insurability satisfactory to the Company will be required for reinstatement of any Waiver of Premium Benefit terminated under the terms of that Benefit.

SECTION 4. DIVIDENDS

# SECTION 4. DIVIDENDS

## 4.1 ANNUAL DIVIDENDS

This policy will share in the divisible surplus of the Company. This surplus is determined each year. The policy's share will be credited as a dividend on the policy anniversary.

## 4.2 USE OF DIVIDENDS

Dividends may be paid in cash or used for one of the following:

- **Paid-up Additions.** Dividends will purchase paid-up retirement annuity additions. Paid-up additions share in the divisible surplus.
- **Premium Payment.** Dividends will be used to reduce premiums. If the balance of a premium is not paid, or if this policy is in force as a paid-up annuity, the dividend will purchase paid-up additions.

If no direction for the use of dividends is given, they will purchase paid-up additions.

Other uses of dividends may be made available by the Company.

## 4.3 ADDITIONS

Paid-up additions increase the policy's cash value. They are payable as part of the policy proceeds. Additions may be surrendered unless they are used for a loan or for a paid-up annuity.

## 4.4 DIVIDEND AT DEATH

A dividend for the period from the beginning of the policy year to the date of the Annuitant's death will be payable as part of the policy proceeds.

# SECTION 5. CASH VALUES AND PAID-UP ANNUITY

## 5.1 CASH VALUE

The cash value for each premium received will be the net premium accumulated at an annual effective interest rate of 3 1/2% from the date the premium is credited at the Home Office. The cash value for this policy will be the sum of:

- the cash values for all premiums received; and
- the cash value of any paid-up additions.

The net premium is the basic premium multiplied by a net premium factor of .94. The basic premium is the total premium paid, not including the premium for any additional benefits, less a collection charge of $.50 per payment, and less a policy fee of $10 per year. The policy fee is charged against the first premium paid in each policy year.

## 5.2 PAID-UP ANNUITY

If any premium is unpaid at the end of the grace period, this policy will be in force as a paid-up retirement annuity with the payment at death as described in Section 1.1. The Maturity Value will be determined by using the cash value as a net single premium at the attained age of the Annuitant. Any policy debt will continue. The paid-up annuity will share in divisible surplus.

## 5.3 CASH SURRENDER

The Owner may surrender this policy for its cash surrender value. The cash surrender value is the cash value less any policy debt. A written surrender of all claims, satisfactory to the Company, will be required.

The date of surrender will be the date of receipt at the Home Office of the written surrender. The policy will terminate and the cash surrender value will be determined as of the date of surrender. The Company may require that the policy be sent to it.

The Company may defer paying the cash surrender value for up to six months from the date of surrender. If payment is deferred for 30 days or more, interest will be paid on the cash surrender value at an annual effective rate of 3 1/2% from the date of surrender to the date of payment.

## 5.4 TABLE OF GUARANTEED VALUES

Cash values are shown on page 4 for the end of the policy years indicated. These values assume that the premium shown on page 3 is paid for the number of years stated. They do not reflect paid-up additions or policy debt. Values during a policy year will reflect any premium paid and the time elapsed in that year.

Values for policy years not shown are calculated on the same basis as those on page 4. A list of these values will be furnished on request. All values are at least as great as those required by the state in which this policy is delivered.

## 5.5 BASIS OF VALUES

The Maturity Value is based on the 1971 Individual Annuity Mortality Table with an annual effective interest rate of 3 1/2%. Cash values and net premiums used to fund the Maturity Value are determined at an annual effective interest rate of 3 1/2%. The cash value does not include any additional benefits.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 143 of 225   Document 29-1   RL-App 439

# SECTION 6. LOANS

## 6.1 POLICY LOANS

The Owner may obtain a loan from the Company in an amount that is not more than the loan value. The loan may be obtained on written request. The Company may defer making the loan for up to six months unless the loan is to be used to pay premiums due the Company.

## 6.2 LOAN VALUE

The loan value is:

- the cash value one year after the date of the loan; less
- interest to one year from the date of the loan; less
- any policy debt.

## 6.3 POLICY DEBT

Policy debt consists of all outstanding loans and accrued interest. It may be paid to the Company at any time. Any policy debt will be deducted from the policy proceeds.

If the policy debt equals or exceeds the cash value, this policy will terminate. Termination occurs 31 days after a notice has been mailed to the Owner and to any assignee on record at the Home Office.

## 6.4 LOAN INTEREST

Interest is payable at an annual effective rate of 8%. The Company may establish a lower rate for any period during which a loan is outstanding.

Interest accrues and is payable on a daily basis from the date of the loan. Unpaid interest is added to the loan.

# SECTION 7. CHANGE OF POLICY

The Owner may change this policy to any permanent life insurance plan agreed to by the Owner and the Company by:

- paying the required costs; and
- meeting any other conditions set by the Company.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 144 of 225   Document 39-1

R3App 440

BW27

## SECTION 8. BENEFICIARIES

### 8.1 DEFINITION OF BENEFICIARIES

The term "beneficiaries" as used in this policy includes direct beneficiaries, contingent beneficiaries and further payees.

### 8.2 NAMING AND CHANGE OF BENEFICIARIES

**For Maturity Proceeds by Owner.** The Owner may name and change the beneficiaries of maturity proceeds before the Maturity Date. If no direct beneficiary is named by the Owner, the Annuitant will be the direct beneficiary.

**For Death Proceeds by Owner.** The Owner may name and change the beneficiaries:

- while the Annuitant is living.

- during the first 60 days after the date of death of the Annuitant, if the Annuitant just before his death was not the Owner. No one may change this naming of a direct beneficiary during this 60 days.

**For Surrender Proceeds by the Owner.** The Owner may name the beneficiaries at the time this policy is surrendered.

**For Death Proceeds by Direct Beneficiary.** A direct beneficiary may name and change the contingent beneficiaries and further payees of his share of the proceeds:

- if the direct beneficiary is the Owner;

- if, at any time after the death of the Annuitant, no contingent beneficiary or further payee of that share is living; or

- if, after the death of the Annuitant, the direct beneficiary elects a payment plan. The interest of any other beneficiary in the share of that direct beneficiary will end.

These direct beneficiary rights are subject to the Owner's rights during the 60 days after the date of death of the Annuitant.

**For Maturity or Surrender Proceeds by Direct Beneficiary.** After the maturity or surrender of the policy, the direct beneficiary may name and change the contingent beneficiaries and further payees of his share of the proceeds that is under a payment plan.

**By Spouse (Marital Deduction Provision).**

- **Power to Appoint.** The spouse of the Annuitant will have the power alone and in all events to appoint all amounts payable to the spouse under the policy if:

  a. the Annuitant just before his death was the Owner; and

  b. the spouse is a direct beneficiary; and

  c. the spouse survives the Annuitant.

- **To Whom Spouse Can Appoint.** Under this power, the spouse can appoint:

  a. to the estate of the spouse; or

  b. to any other persons as contingent beneficiaries and further payees.

- **Effect of Exercise.** As to the amounts appointed, the exercise of this power will:

  a. revoke any other designation of beneficiaries;

  b. revoke any election of payment plan as it applies to them; and

  c. cause any provision to the contrary in Section 8 or 9 of this policy to be of no effect.

**Effective Date.** A naming or change of a beneficiary will be made on receipt at the Home Office of a written request that is acceptable to the Company. The request will then take effect as of the date that it was signed. The Company is not responsible for any payment or other action that is taken by it before the receipt of the request. The Company may require that the policy be sent to it to be endorsed to show the naming or change.

### 8.3 SUCCESSION IN INTEREST OF BENEFICIARIES

**Direct Beneficiaries.** The proceeds of this policy will be payable in equal shares to the direct beneficiaries who survive and receive payment. If a direct beneficiary dies before he receives all or part of his full share, the unpaid part of his share will be payable in equal shares to the other direct beneficiaries who survive and receive payment.

**Contingent Beneficiaries.** At the death of all of the direct beneficiaries, the proceeds, or the present value of any unpaid payment under a payment plan, will be payable in equal shares to the contingent beneficiaries who survive and receive payment. If a contingent beneficiary dies before he receives all or part of his full share, the unpaid part of his share will be payable in equal shares to the other contingent beneficiaries who survive and receive payment.

**Further Payees.** At the death of all of the direct and contingent beneficiaries, the proceeds, or the present value of any unpaid payments under a payment plan, will be paid in one sum:

- in equal shares to the further payees who survive and receive payment; or

- if no further payees survive and receive payment, to the estate of the last to die of all of the direct and contingent beneficiaries.

**Owner or His Estate.** If no beneficiaries are alive when the Annuitant dies, the proceeds will be paid to the Owner or to his estate.

### 8.4 GENERAL

**Transfer of Ownership.** A transfer of ownership of itself will not change the interest of a beneficiary.

**Claims of Creditors.** So far as allowed by law, no amount payable under this policy will be subject to the claims of creditors of a beneficiary.

**Succession under Payment Plans.** A direct or contingent beneficiary who succeeds to an interest in a payment plan will continue under the terms of the plan.

# SECTION 9. PAYMENT OF POLICY BENEFITS

## 9.1 PAYMENT OF PROCEEDS

Proceeds from the maturity of this policy will be paid as the Monthly Retirement Life Income described in Section 1.1. In lieu of the Monthly Retirement Life Income, the proceeds will be:

- paid in cash to the Owner on the Maturity Date if requested before that date; or

- paid under a payment plan that is elected before the Maturity Date.

Proceeds that are payable due to the death of the Annuitant will be paid under the payment plan that takes effect on the date of death. The Interest Income Plan (Option A) will be in effect if no payment plan has been elected. Interest will accumulate from the date of death until a payment plan is elected or the proceeds are withdrawn in cash.

Proceeds from the surrender of this policy will be paid in cash to the Owner or under a payment plan that is elected.

## 9.2 PAYMENT PLANS

**Interest Income Plan (Option A).** The proceeds will earn interest which may be received each month or accumulated. The first payment is due one month after the date on which the plan takes effect. Interest that has accumulated may be withdrawn at any time. Part or all of the proceeds may be withdrawn at any time.

**Installment Income Plans.** Payments will be made each month on the terms of the plan that is elected. The first payment is due on the date that the plan takes effect.

- **Specified Period (Option B).** The proceeds with interest will be paid over a period of from one to 30 years. The present value of any unpaid installments may be withdrawn at any time.

- **Specified Amount (Option D).** Payments of not less than $10.00 per $1,000 of proceeds will be made until all of the proceeds with interest have been paid. The balance may be withdrawn at any time.

**Life Income Plans.** Payments will be made each month on the terms of the plan that is elected. The first payment is due on the date that the plan takes effect. Proof of the date of birth, acceptable to the Company, must be furnished for each person on whose life the payments are based.

- **Single Life Income (Option C).** Payments will be made for a chosen period and, after that, for the life of the person on whose life the payments are based. The choices for the period are:

  a. zero years;

  b. 10 years;

  c. 20 years; or

  d. a refund period which continues until the sum of the payments that have been made is equal to the proceeds that were placed under the plan.

- **Joint and Survivor Life Income (Option E).** Payments are based on the lives of two persons. Level payments will be made for a period of 10 years and, after that, for as long as one or both of the persons are living.

- **Other Selections.** The Company may offer other selections under the Life Income Plans.

- **Withdrawal.** The present value of any unpaid payments that are to be made for the chosen period (Option C) or the 10 year period (Option E) may be withdrawn only after the death of all of the persons on whose lives the payments are based.

- **Limitations.** A direct or contingent beneficiary who is a natural person may be paid under a Life Income Plan only if the payments depend on his life. A corporation may be paid under a Life Income Plan only if the payments depend on the life of the Annuitant or, after the death of the Annuitant, on the life of his spouse or his dependent.

**Payment Frequency.** On request, payments will be made once every 3, 6 or 12 months instead of each month.

**Transfer between Payment Plans.** A beneficiary who is receiving payment under a plan which includes the right to withdraw may transfer the amount withdrawable to any other plan that is available.

**Minimum Payment.** The Company may limit the election of a payment plan to one that results in payments of at least $20.

If payments under a payment plan are or become less than $20, the Company may change the frequency of payments. If the payments are being made once every 12 months and are less than $20, the Company may pay the present value or the balance of the payment plan.

## 9.3 PAYMENT PLAN RATES

**Interest Income and Installment Income Plans.** Proceeds will earn interest at rates declared each year by the Company. None of these rates will be less than an annual effective rate of 3 1/2%. Interest of more than 3 1/2% will increase the amount of the payments or, for the Specified Amount Plan (Option D), increase the number of payments. The present value of any unpaid installments will be based on the 3 1/2% rate of interest.

The Company may offer guaranteed rates of interest higher than 3 1/2% with conditions on withdrawal.

**Life Income Plans.** Payments will be based on rates declared by the Company. These rates will provide at least as much income as would the Company's rates, on the date that the payment plan takes effect, for a single premium immediate annuity contract, with no charge for issue expenses. Payments under these rates will not be less than the amounts that are described in Minimum Payment Rates.

**Minimum Payment Rates.** The minimum payment

## 9.5 PAYMENT PLAN ELECTIONS

of the payments that have been made is equal to the proceeds that were placed under the plan.

**Minimum Payment Rates.** The minimum payment rates for the Installment Income Plans (Options B and D) and the Life Income Plans (Options C and E) are shown in the Minimum Payment Rate Table.

The Life Income Plan payment rates in that table depend on the sex and on the adjusted age of each person on whose life the payments are based. The adjusted age is:

- the age on the birthday that is nearest to the date on which the payment plan takes effect; plus

- the age adjustment shown below for the number of policy years that have elapsed from the Policy Date to the date that the payment plan takes effect. A part of a policy year is counted as a full year.

| POLICY YEARS ELAPSED | AGE ADJUSTMENT | POLICY YEARS ELAPSED | AGE ADJUSTMENT |
|---|---|---|---|
| 1 to 10 | + 8 | 31 to 35 | -1 |
| 11 to 15 | + 6 | 36 to 40 | -2 |
| 16 to 20 | + 4 | 41 to 45 | -3 |
| 21 to 25 | + 2 | 46 to 50 | -4 |
| 26 to 30 | 0 | 51 or more | -5 |

### 9.4 EFFECTIVE DATE FOR PAYMENT PLAN

A payment plan that is elected under Section 9.1 for maturity proceeds will take effect on the Maturity Date.

A payment plan that is elected for death proceeds will take effect on the date of death of the Annuitant if:

- the plan is elected by the Owner; and
- the election is received at the Home Office while the Annuitant is living.

In all other cases, a payment plan that is elected will take effect:

- on the date the election is received at the Home Office; or
- on a later date, if requested.

penses. Payments under these rates will not be less than the amounts that are described in Minimum Payment Rates.

### 9.5 PAYMENT PLAN ELECTIONS

**For Death Proceeds By Owner.** The Owner may elect payment plans for death proceeds:

- while the Annuitant is living.

- during the first 60 days after the date of death of the Annuitant, if the Annuitant just before his death was not the Owner. No one may change this election made during those 60 days.

**For Death Proceeds by Direct or Contingent Beneficiary.** A direct or contingent beneficiary may elect payment plans for death proceeds payable to him if no payment plan that has been elected is in effect. This right is subject to the Owner's rights during the above 60 days.

**For Maturity or Surrender Proceeds.** The Owner may elect payment plans for maturity or surrender proceeds.

### 9.6 INCREASE OF MONTHLY INCOME

The Annuitant, or other direct beneficiary, who is to receive proceeds under a payment plan may increase the amount of monthly payments. This is done by the payment of an annuity premium to the Company at the time the payment plan described in Section 1.1 or elected under Section 9.5 takes effect. The amount that will be applied under the payment plan will be the net premium. The net premium is the annuity premium less a charge of not more than 2% and less any premium tax. The net premium will be applied under the same payment plan and at the same rates as the proceeds. The Company may limit this net premium, when used with death proceeds, to an amount that is equal to the direct beneficiary's share of the death proceeds payable under this policy. The net premium, when used with maturity or surrender proceeds, may not exceed an amount which would result in a total monthly income under the Single Life Income Plan of three times the monthly income available at the time from this policy. This right may not be used if the policy matures or is surrendered less than two years after the Policy Date.

## MINIMUM PAYMENT RATE TABLES
### Minimum Monthly Income Payment Per $1,000 Proceeds

**INSTALLMENT INCOME PLAN (Options B and D)**

| PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT |
|---|---|---|---|---|---|
| 1 | $84.65 | 11 | $ 9.09 | 21 | $ 5.56 |
| 2 | 43 05 | 12 | 8.46 | 22 | 5.39 |
| 3 | 29.19 | 13 | 7.94 | 23 | 5.24 |
| 4 | 22.27 | 14 | 7.49 | 24 | 5.09 |
| 5 | 18.12 | 15 | 7.10 | 25 | 4.96 |
| 6 | 15.35 | 16 | 6.76 | 26 | 4.84 |
| 7 | 13.38 | 17 | 6.47 | 27 | 4.73 |
| 8 | 11.90 | 18 | 6.20 | 28 | 4.63 |
| 9 | 10.75 | 19 | 5.97 | 29 | 4.53 |
| 10 | 9.83 | 20 | 5.75 | 30 | 4.45 |

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 147 of 225   Document 29-1   RL-App 443   Bw 30

# MINIMUM PAYMENT RATE TABLE

### Minimum Monthly Income Payments Per $1,000 Proceeds

## LIFE INCOME PLANS (Options C and E)

| | \multicolumn{4}{c|}{SINGLE LIFE MONTHLY PAYMENTS (Option C)} | | | | |
|---|---|---|---|---|---|---|---|---|
| MALE ADJUSTED AGE* | CHOSEN PERIOD (YEARS) | | | | FEMALE ADJUSTED AGE* | CHOSEN PERIOD (YEARS) | | |
| | ZERO | 10 | 20 | REFUND | | ZERO | 10 | 20 | REFUND |
| 55 | $ 5.39 | $ 5.24 | $ 4.85 | $ 5.00 | 55 | $ 4.75 | $ 4.70 | $ 4.53 | $ 4.57 |
| 56 | 5.51 | 5.34 | 4.91 | 5.09 | 56 | 4.85 | 4.78 | 4.59 | 4.64 |
| 57 | 5.63 | 5.45 | 4.97 | 5.19 | 57 | 4.94 | 4.87 | 4.66 | 4.72 |
| 58 | 5.77 | 5.56 | 5.03 | 5.29 | 58 | 5.05 | 4.97 | 4.73 | 4.81 |
| 59 | 5.91 | 5.68 | 5.10 | 5.39 | 59 | 5.16 | 5.07 | 4.80 | 4.90 |
| 60 | 6.06 | 5.80 | 5.16 | 5.50 | 60 | 5.27 | 5.17 | 4.87 | 4.99 |
| 61 | 6.22 | 5.93 | 5.21 | 5.62 | 61 | 5.40 | 5.28 | 4.94 | 5.09 |
| 62 | 6.39 | 6.07 | 5.27 | 5.74 | 62 | 5.53 | 5.40 | 5.01 | 5.20 |
| 63 | 6.58 | 6.21 | 5.33 | 5.87 | 63 | 5.67 | 5.52 | 5.08 | 5.31 |
| 64 | 6.77 | 6.35 | 5.38 | 6.01 | 64 | 5.82 | 5.66 | 5.15 | 5.43 |
| 65 | 6.99 | 6.50 | 5.43 | 6.16 | 65 | 5.97 | 5.80 | 5.22 | 5.55 |
| 66 | 7.21 | 6.66 | 5.48 | 6.31 | 66 | 6.14 | 5.95 | 5.28 | 5.69 |
| 67 | 7.46 | 6.83 | 5.52 | 6.47 | 67 | 6.31 | 6.10 | 5.35 | 5.83 |
| 68 | 7.72 | 7.00 | 5.56 | 6.65 | 68 | 6.50 | 6.27 | 5.40 | 5.99 |
| 69 | 7.97 | 7.17 | 5.60 | 6.83 | 69 | 6.70 | 6.45 | 5.46 | 6.15 |
| 70 | 8.23 | 7.35 | 5.63 | 7.03 | 70 | 6.90 | 6.63 | 5.51 | 6.32 |
| 71 | 8.49 | 7.53 | 5.66 | 7.23 | 71 | 7.11 | 6.82 | 5.55 | 6.51 |
| 72 | 8.76 | 7.71 | 5.68 | 7.45 | 72 | 7.33 | 7.02 | 5.59 | 6.71 |
| 73 | 9.03 | 7.89 | 5.70 | 7.69 | 73 | 7.55 | 7.22 | 5.62 | 6.92 |
| 74 | 9.30 | 8.07 | 5.72 | 7.94 | 74 | 7.79 | 7.43 | 5.65 | 7.15 |
| 75 | 9.57 | 8.25 | 5.73 | 8.21 | 75 | 8.02 | 7.64 | 5.68 | 7.39 |
| 76 | 9.85 | 8.43 | 5.74 | 8.49 | 76 | 8.26 | 7.85 | 5.69 | 7.65 |
| 77 | 10.11 | 8.60 | 5.74 | 8.80 | 77 | 8.48 | 8.05 | 5.71 | 7.92 |
| 78 | 10.38 | 8.77 | 5.75 | 9.13 | 78 | 8.72 | 8.26 | 5.72 | 8.21 |
| 79 | 10.64 | 8.93 | 5.75 | 9.48 | 79 | 8.94 | 8.45 | 5.73 | 8.52 |
| 80 | 10.90 | 9.08 | 5.75 | 9.85 | 80 | 9.16 | 8.64 | 5.74 | 8.85 |
| 81 | 11.13 | 9.21 | 5.75 | 10.26 | 81 | 9.36 | 8.81 | 5.74 | 9.21 |
| 82 | 11.36 | 9.34 | 5.75 | 10.70 | 82 | 9.53 | 8.96 | 5.75 | 9.57 |
| 83 | 11.55 | 9.44 | 5.75 | 11.17 | 83 | 9.70 | 9.10 | 5.75 | 9.97 |
| 84 | 11.75 | 9.54 | 5.75 | 11.70 | 84 | 9.85 | 9.22 | 5.75 | 10.39 |
| 85 and over | 11.92 | 9.61 | 5.75 | 12.26 | 85 and over | 9.98 | 9.33 | 5.75 | 10.81 |

| | \multicolumn{7}{c|}{JOINT AND SURVIVOR MONTHLY PAYMENTS (Option E)} |
|---|---|---|---|---|---|---|---|
| MALE ADJUSTED AGE* | FEMALE ADJUSTED AGE* | | | | | | |
| | 55 | 60 | 65 | 70 | 75 | 80 | 85 and over |
| 55 | $4.33 | $4.55 | $4.76 | $4.94 | $5.08 | $5.17 | $5.22 |
| 60 | 4.45 | 4.73 | 5.03 | 5.30 | 5.53 | 5.68 | 5.76 |
| 65 | 4.54 | 4.89 | 5.28 | 5.68 | 6.04 | 6.29 | 6.43 |
| 70 | 4.61 | 5.01 | 5.49 | 6.04 | 6.57 | 6.97 | 7.20 |
| 75 | 4.66 | 5.09 | 5.65 | 6.32 | 7.04 | 7.65 | 8.02 |
| 80 | 4.68 | 5.14 | 5.74 | 6.51 | 7.39 | 8.20 | 8.72 |
| 85 and over | 4.69 | 5.16 | 5.78 | 6.60 | 7.57 | 8.52 | 9.15 |

*See Section 9.3.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 148 of 225   Document 39-1

AMENDMENT OF CONTRACT TO QUALIFY AS

R App 414

31

# AMENDMENT OF CONTRACT TO QUALIFY AS
# INDIVIDUAL RETIREMENT ANNUITY

**As of the Date of Issue, Section 2.4 TRANSFERABILITY RESTRICTIONS
is amended to read:**

## 2.4 TRANSFERABILITY   RESTRICTIONS

Notwithstanding any other provisions of this contract, the Owner may not transfer ownership of the contract except to a former spouse of the Owner under a divorce decree or under a written instrument incident to that divorce.

**In addition, as of the Date of Issue and notwithstanding any other specific provisions to the contrary, this contract is amended to restrict the exercise of the rights of the Owner or the Annuitant and any beneficiary, and to limit the payment of premiums as follows:**

1. The contract is established for the exclusive benefit of the Owner or his beneficiaries.

2. The interest of the Owner in the contract is nonforfeitable.

3. Except in the case of a rollover contribution described in Internal Revenue Code Section 402(a)(5), 402(a)(7), 403(a)(4), 403(b)(8), 405(d)(3), 408(d)(3), or 409(b)(3)(c), the annual premium may not exceed $2,000 or 100% of compensation for the owner's taxable year, whichever is less.

4. If employer contributions are made to this contract under a Simplified Employee Pension Plan, these annual contributions may not exceed $15,000 or 15% of compensation for the Owner's taxable year, whichever is less.

5. Dividends will not be paid in cash but will be used for paid-up additions or applied toward payment of premiums.

6. The entire interest of the Owner will be distributed to the Owner:

   - not later than the close of the Owner's taxable year in which the Owner attains age 70 1/2; or

   - in equal or substantially equal payments commencing before the close of the Owner's taxable year in which the Owner attains age 70 1/2 and made:

     a. over the life of the Owner (Option C) or the lives of the Owner and his spouse (Option E); or

     b. over a period certain (Option B) not extending beyond:

        (i)  the life expectancy of the Owner; or

        (ii) the life expectancy of the Owner and his spouse.

   This will not limit any contractual rights of withdrawal given to the Owner or his beneficiary.

7. If the Owner dies before all contract benefits have been paid to him, or if payment to the Owner's surviving spouse has commenced under a payment plan and the spouse dies with installments remaining payable under the plan, then all contract benefits (or the withdrawal value of a payment plan then in effect) will, within five years after the Owner's death or the death of his surviving spouse:

   - be paid to the beneficiary or beneficiaries designated by the Owner or the spouse; or

   - be applied to purchase an immediate annuity from an insurance company for the beneficiary or beneficiaries payable for their life or lives (or for a period certain not extending beyond the life expectancy of the beneficiary or beneficiaries) which annuity will be immediately distributed to the payee.

   This paragraph will be of no effect if payments under the Option B payment plan began before the Owner's death and the period certain is permitted under paragraph 6 above.

Peter W. Bruce

Secretary
THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY

MM 301 (0483)

3 84836  IRA CHECKED BY JK  MILWAUKEE, WISCONSIN

**(USE ONLY FOR IRA, TDA, HR-10 AND CORPORATE PLANS)**

Payer No. _____

---

**INSURED**
**or Annuitant** BRUCE L. WILLIAMS
**(Please Print)**    First    Middle Initial    Last

Sex:
☒ **Male**
☐ **Female**

**OWNER**
**(Print Full Name)** BRUCE L. WILLIAMS

---

1. **Complete for IRA or TDA:**
   ☐ IRC 170(b)(1)(a)—Public Elementary or Secondary
      School, College or University (TDA)
   ☐ IRC 501(c)(3)—Non profit Organization (TDA)
   ☒ IRC 408(b) IRA—New accounts and rollovers from
      prior annual deduction IRA
   ☐ IRC 408(d) IRA—Rollover from corporate or HR-10
      only
   ☐ IRC 408(k) IRA—Simplified Employee Pension Plan

3B. **Complete for HR-10 or CORPORATE:**
   Is this policy being applied for according to the terms
   of a qualified plan?   ☐ Yes   ☐ No

   If "Yes" and the plan uses or has used Northwestern
   Mutual policies:

   The NML trust No. is_____.

2. **RESIDENCE** of Insured; Print 10230 W. GRANGE
   HALES CORNERS, WI.
   Street & No. or R.F.D.
   MILWAUKEE   WI. 53130
   City   State   Zip Code
   County
   This address will be used for all of Insured's policies.

4B. **PREMIUM PAYER:** Premium notices will be sent as
   specified by plan or to:
   ☒ Insured   ☐ Owner
   ☐ Other _____
   Name
   at: ☐ Insured's address (See 4A) or:

   _____
   Street & No. or R.F.D.

   _____
   City   State

   _____
   County   Zip Code

   Unless directed otherwise, any notices will be sent to
   the Owner at the Insured's address.

3. **Insured's Date of Birth:** 4 / 10 / 56
   Mo.   Day   Year

4. **Place of Birth:** (If other than U.S.A. indicate country.)
   VIRGINIA

5. **Insured's Taxpayer Identifying No.** 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

Has application or informal inquiry ever been made to the Northwestern Mutual Life for annuity, life or disability in-
surance on the life of the Insured?   ☒ Yes   ☐ No   If "Yes," Last Policy Number is _____

6. **PLAN and AMOUNT:**
   ☐ Life _____
   Plan   Age at Retirement

   Complete
   One:   ☐ _____ premium of $ _____
   Mode
   ☐ $ _____
   Amount

   ☐ Retirement Income at _____
   Age at Maturity

   Complete
   One:   ☐ _____ premium of $ _____
   Mode
   ☐ $ _____
   Amount

   ☒ Annuity F.P.A. 65
   Plan   Age at Maturity

   Complete   ☒ ANNUAL premium of $ 2,000.00
   One:   ☐ Monthly income of $ _____

7B. **ADDITIONAL BENEFITS:**
   ☐ WAIVER OF PREMIUM
   ☐ $ _____ OF ACCIDENTAL DEATH
   ☐ ADDITIONAL PURCHASE $ _____ PER OPTION
   ☐ INDEXED PROTECTION
   ☐ OTHER, SPECIFY _____

   If any additional benefits cannot be approved, should
   the policy be issued without the benefit?   ☒ Yes   ☐ No

8. Policy to be dated 7 27 84
   Mo   Day   Yr.

9. Shall the **PREMIUM LOAN** provision, if available, be-
   come operative according to its terms?   ☒ Yes   ☐ No

---

**COMPLETE QUESTION 10 IF EXERCISING ADDITIONAL PURCHASE BENEFIT OPTION**

A. Number of policy under which this privilege is being
   exercised?

10B. Is application?   ☐ **Regular Purchase**
   ☐ **Advance Purchase** (See 10C)

C. If an advance purchase, event is the following:
   ☐ (1) Marriage
   ☐ (2) Birth of Child
   ☐ (3) Adoption of Child

   Name of ☐ Spouse ☐ Child _____
   First   Middle Initial   Last

   Place and Date of Marriage, Birth or Final Decree of Legal Adoption:
   _____
   City   County   State   Mo   Day   Yr

1533 (0183)

BW'33

ANNUAL DIVIDENDS until otherwise directed will:
- [ ] A. Be used to reduce current premium.
- [X] B. Purchase paid-up additions.
- [ ] C. Accumulate at interest. Owner's Taxpayer
  Identifying Number _____
- [ ] D. Be cash.

**12. PREMIUM PAYABLE:**

[X] Annually   [ ] Semiannually   [ ] Quarterly

[ ] Single Premium of $ _____

[ ] Monthly (12 months)

TDA only:

[ ] Monthly (9 or 10 months) _____
<span style="font-size:smaller">State months to be omitted</span>

[ ] Frequency 26

13 Has the premium for the policy applied for been paid to the agent in exchange for the **Conditional Insurance Agreement** with the same number as the application?
[X] Yes   [ ] No

14. Will the insurance (or annuity) applied for replace insurance (or annuities) on the Insured's (or Annuitant's) life in Northwestern Mutual Life or elsewhere?
[ ] Yes   [X] No

If "Yes," agent should explain and submit required papers.

**15A. Direct Beneficiary** of Retirement Life Income or Maturity Value: (RI or Annuity Only)
[X] Insured   [ ] Owner, but only in one sum

**15B. Direct Beneficiary** of amount payable at death:
[ ] Owner, but only in one sum
[X] Other: _KAREN J. WILLIAMS_
Relationship to Insured _WIFE_

**15C. Contingent Beneficiary** of amount payable at death:

_____
Relationship to Insured _____

NOTE: Item 1 or 2 may be selected to supplement the contingent beneficiary designation or may be used to designate children or brothers and sisters as contingent beneficiaries without specifically naming them. Item 3 may be used to supplement Item 1, 2 or any contingent beneficiary designation. The word "children" includes child and any legally adopted child.

[X] (1) and any (other) children of the Insured.
[ ] (2) and any (other) brothers and sisters of the Insured born of the marriage of or legally adopted by _____ and _____ prior to the Insured's death.
[ ] (3) any amount a deceased contingent beneficiary would have received, if living, will be payable when due in one sum in equal shares to his or her then living children.

**15D. Further Payees** (Print Name)

_____
Relationship to Insured _____
[ ] See attached Supplement Form.

## QUESTION 16 MUST BE COMPLETED BY THE INSURED ONLY IF GUARANTEED ISSUE IS AVAILABLE

16. **Are you now actively at work?**   [ ] Yes   [ ] No   (If "No," explain in REMARKS)
Actively at work means that the Insured is actively at work on a full-time basis on the date of this application or on one of the 3 days before the date of this application and that he has been so working for the 3 weeks before the date of this application without an absence of more than 3 days for sickness or injury.

REMARKS:

The Insured or Annuitant consents to this application and declares that the foregoing answers and statements (contained on both sides of this page) are correctly recorded, complete and true to the best of his knowledge and belief.

**It is agreed that:**

If an annuity is applied for, "Annuitant" will be substituted for "Insured" wherever it appears.

(1) If the premium is not paid when the application is signed, no insurance will be in effect. If, however, a policy is delivered and the premium is paid during the Insured's lifetime, the insurance will be in effect if, at the time of the delivery and payment, the answers and statements in the application, which are material to the risk, are then true to the best of the Insured's knowledge and belief and the Insured is then actively at work.

(2) If the premium is paid when the application is taken, no life insurance will have been in effect if Section I. of the Conditional Insurance Agreement applies.

(3) Acceptance of a Life Insurance policy in an extra premium classification will amend the policy so that if any premium is unpaid at the end of the grace period, the policy will be in force as paid-up insurance. If the policy has the extended term insurance provision, it may be continued as term insurance only with the consent of Northwestern Mutual Life or if the loan value is not large enough for a premium loan.

(4) The Owner, named in 2, of any policy issued on this application may elect a payment plan payable to the Insured as direct beneficiary at the maturity of the policy or on its surrender for cash.

(5) If the Owner is a Trustee or successor Trustee under a qualified plan or the employer under a qualified non-trusteed plan, Northwestern Mutual Life will be fully discharged of liability for any action taken by the Owner in the exercise of any policy right and for all amounts paid to or at the direction of the Owner and will have no obligation as to the use of the amounts. In all dealings with the Owner, Northwestern Mutual Life will be fully protected against the claims of every other person.

(6) No agent is authorized to make or alter contracts or to waive any of the rights or requirements of Northwestern Mutual Life.

_Bruce L. Williams_          BW36

R-App 447

Signature of INSURED or Annuitant (if other than Applicant)

Signed at _Hales Corners, Milw. Wi._   Date _7_ _21_ _84_
<span style="font-size:smaller">City, County & State</span>   Month   Day   Year

Signature of APPLICANT

_Richard M. _____
Signature of LICENSED AGENT

1011 North Mayfair Road
Wauwatosa, Wisconsin 53226
Telephone: 414 774-1400



**RICHARD M. STAMM, District Agent**

Thomas E. Goris, CLU, General Agent

Mr. & Mrs. Bruce L. Williams
10230 W. Grange
Hales Corners, Wi. 53130

Dear Bruce and Karen:

I want to again sincerely thank you for your business. I am
certainly aware of the confidence you have placed in me, and at
this time, I want to assure you that it is my desire and
intention to give you the type of service you deserve and have
every right to expect. Please don't hesitate to call on me
whenever you have questions.

Sincerely,

Rick

Richard M. Stamm

RMS/cg



Life Insurance Programming • Business Insurance • Estate Planning
Pensions • Profit Sharing • Disability Income
THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY • Milwaukee



# THE NORTHWESTERN MUTUAL LIFE
# INSURANCE COMPANY·MILWAUKEE 

It is recommended that you . . .

read your policy.

notify your NML agent or the Company at 720 E. Wisconsin Avenue, Milwaukee, Wis. 53202, of an address change.

call your NML agent for information —
particularly on a suggestion
to terminate or exchange this policy
for another policy or plan.

### Election of Trustees

The members of The Northwestern Mutual Life Insurance Company are its policyholders of insurance policies and deferred annuity contracts. The members exercise control through a Board of Trustees Elections to the Board are held each year at the annual meeting of members. Members are entitled to vote in person or by proxy

### Flexible Premium Annuity Policy

### Eligible for Annual Dividends

Retirement Benefit payable at maturity
Refund at death before maturity — Section 1 1.

Flexible Premium — Section 3.1.

MM 12



1   00001
2              IN THE CIRCUIT COURT OF MILWAUKEE COUNTY
                        STATE OF WISCONSIN
3        ----------------------------------------------------------
4   MARLEEN M. LAPLANT,
        on her own behalf and
5   on behalf of a class similarly situated,
6                       Plaintiff,
7                 vs.                    Case No. 08-CV-11988
8   THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,
        a Wisconsin mutual insurance corporation,
9
                        Defendant.
10
        ----------------------------------------------------------
11
12                   *** CONFIDENTIAL ***
13
                Deposition of BRUCE WILLIAMS
14
                Tuesday, May 18th, 2010
15
16                        9:28 a.m.
17                          at
18               Quarles & Brady LLP
               411 East Wisconsin Avenue
19               Milwaukee, Wisconsin
20          Reported by Tammy R. O'Neal, RPR
21
22
23
24
25
26

```
 1                    Deposition of BRUCE WILLIAMS, a witness in

 2           the above-entitled action, taken at the instance of

 3           the Defendant, pursuant to Chapter 804 of the

 4           Wisconsin Statutes, pursuant to notice, before Tammy

 5           R. O'Neal, RPR and Notary Public, State of Wisconsin,

 6           at Quarles & Brady LLP, 411 East Wisconsin Avenue,

 7           Milwaukee, Wisconsin, on the 18th day of May, 2010,

 8           commencing at 9:28 a.m. and concluding at 10:51 a.m.

 9      A P P E A R A N C E S:

10              KERSTEN & McKINNON, S.C., by
                  Mr. George P. Kersten and
11                Mr. Kenan J. Kersten
                  11518 North Port Washington Road, Suite 104
12                Mequon, Wisconsin 53092
                  Appeared on behalf of Plaintiffs.
13
                GALANIS, POLLACK, JACOBS & JOHNSON, S.C., by
14                Mr. Mark B. Pollack
                  839 North Jefferson Street, Suite 200
15                Milwaukee, Wisconsin 53202
                  Appeared on behalf of Plaintiffs.
16
                QUARLES & BRADY LLP, by
17                Ms. Cristina D. Hernandez
                  411 East Wisconsin Avenue, Suite 2040
18                Milwaukee, Wisconsin 53202
                  Appeared on behalf of Defendant.
19
                NORTHWESTERN MUTUAL INSURANCE COMPANY, by
20                Mr. David W. Perez
                  720 East Wisconsin Avenue
21                Milwaukee, Wisconsin 53202-4797
                  Appeared on behalf of Northwestern Mutual.
22
           Also Present:  Chris Scaperlanda, Quarles & Brady
23

24

25
```

1                    E X A M I N A T I O N

2

        BY MS. HERNANDEZ:                         4
3       BY MR. GEORGE KERSTEN:                    47
        BY MS. HERNANDEZ:                         48

4

5                      E X H I B I T S

6       EXHIBIT NO.                      PAGE IDENTIFIED

7       No. 154  BW17 through BW19               20
        No. 155  BW20 through BW36               20
8       No. 156  BW1 and BW2                     36
        No. 157  BW3 through BW16                36
9       No. 158  Court documents related to the class   42
                 action suit for Northwestern Mutual

10
            (Original exhibits attached to original transcript;
11      copies attached to transcript copies.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    A    I know when we did those things it was for positive
2         reasons, we saw an increase in investment
3         opportunity.
4    Q    Do you recall anything else about that decision?
5    A    Again, I know one of the annuities -- and this is a
6         vague recollection -- but we had -- whether it was
7         the J.P. retirement or what, but we rolled that into
8         the annuity, the NML annuity.  One of those is a lump
9         sum.  And the question again?
10   Q    Sure.  What else do you remember about the decision
11        to roll over the IRA from First Wisconsin?  You
12        mentioned increased investment opportunity.  What
13        else do you recall?
14   A    Again, not -- I can't give specific recollection of
15        that for that specific account.
16   Q    Do you remember the timing of that decision, sir?
17   A    Not exactly.  I believe it was in the 1984 range.
18   Q    I want to turn now to your various policies and
19        investments with Northwestern Mutual.  Other than the
20        annuity policies that you brought with you today, do
21        you have any other life insurance, disability
22        insurance, other kinds of policies with Northwestern
23        Mutual?
24   A    Yes.
25   Q    Can you please describe those?
```

1   A   I have what is called whole life policies either

2       in -- for me or my wife Karen as insureds and we

3       share the beneficiaries on those policies.  And

4       this -- repeat the question again.

5   Q   Sure.  What other -- other than any annuities we've

6       already looked at today, what other policies or other

7       investments do you have with Northwestern Mutual?

8   A   There's another kind of policy besides the whole

9       life.  There's a policy, I don't remember the name of

10      it, but it starts at term and it buys or converts to

11      a whole life portion.  I want to say we have, I'm not

12      sure, three to five policies of either of those

13      sorts.  And also the business, I believe, has a

14      policy, owns a policy, through NML of the

15      term-to-conversion type.

16  Q   Does your business manage any investments on behalf

17      of its employees?

18  A   No.

19  Q   Does it have any pension or other benefits of a

20      long-term investment type set up for its employees?

21  A   Yes.

22  Q   What is that, sir?

23  A   We have a simple plan that's managed by Edward Jones.

24  Q   Are you a beneficiary of that plan, sir?

25  A   Yes.

```
 1   Q    Did you meet with counsel to prepare for the
 2        deposition today?
 3              MR. GEORGE KERSTEN:  Same objection, same
 4        instruction.
 5   BY MS. HERNANDEZ:
 6   Q    Did you review any documents in preparation for your
 7        deposition today?
 8              MR. GEORGE KERSTEN:  You can answer that.
 9              THE WITNESS:  Yes, I got the annuities out
10        and looked at those.  I read through the notice of
11        the class action.  You're asking about documents; is
12        that correct?
13   BY MS. HERNANDEZ:
14   Q    Yes, that's correct.
15   A    Yeah, that's it.
16   Q    Prior to your first contact by counsel, had you heard
17        anything about any kind of lawsuit against
18        Northwestern Mutual concerning annuity policies?
19   A    Are you including in that receipt of the class
20        notice?
21   Q    Prior to receipt of the class notice.
22   A    No, I did not.
23   Q    Are you aware of an action brought by Daniel Noonan
24        against Northwestern Mutual?
25   A    Say that again.
```

1  Q    Are you aware of an action that was brought by Daniel

2       Noonan against Northwestern Mutual?

3  A    I'm aware of it.

4  Q    When did you become aware of it?

5            MR. GEORGE KERSTEN:  Objection if it was

6       within the attorney-client privilege.

7            I believe it was, Counsel, that's why I'm

8       instructing the witness.

9  BY MS. HERNANDEZ:

10 Q    Prior to receipt of the notice of this class action,

11      had you heard of an action that was brought by Daniel

12      Noonan against Northwestern Mutual?

13 A    No.

14 Q    Do you currently have any plans to sell your

15      annuities?

16 A    I have no specific plans.

17 Q    Any general plans?

18           MR. GEORGE KERSTEN:  Instruct the witness

19      not to answer if it has anything to do with

20      attorney-client communications.

21           MS. HERNANDEZ:  I'm asking about his own

22      personal plans which is not at all seeking to elicit

23      any conversation he had with you --

24           MR. GEORGE KERSTEN:  He's already

25      answered --

1   Q    Since you learned about the existence of this lawsuit

2         through the class notice, have you destroyed any

3         documents concerning any of your Northwestern Mutual

4         policies including your annuities?

5   A    No.

6   Q    You understand, sir, that the dividends on your

7         annuity policies are not guaranteed?

8   A    Yes.

9   Q    And did Mr. Stamm tell you that at the time of

10        purchase?

11   A    Yes.

12   Q    Have you spoken with any other members of the class

13        in this action LaPlant versus the Northwestern Mutual

14        Life Insurance Company?

15   A    No.

16   Q    Did you ever make any inquiries of Mr. Stamm or any

17        other Northwestern Mutual agent or employee regarding

18        the dividends you received on any policy that you had

19        with Northwestern Mutual?

20   A    No.

21   Q    Prior to your receiving notice regarding the

22        existence of this class action, had you ever

23        complained to anyone about the amount of dividends

24        that you were receiving on any of your Northwestern

25        Mutual policies or annuities?

```
1    A    No.

2    Q    Did you have any complaints regarding the amount of

3         your dividends prior to receiving notice of the

4         existence of this class action?

5    A    Do I have any complaints?

6    Q    Did you have any prior to receiving notice of this

7         class action?

8    A    No.

9    Q    And sir, you understand that at any time you could

10        have taken the money out of your annuities with

11        Northwestern Mutual and put them into another

12        investment?

13   A    I was under that understanding, yes.

14              MS. HERNANDEZ:  I have no further

15        questions.

16                        EXAMINATION

17   BY MR. GEORGE KERSTEN:

18   Q    Just one or two questions on the one area.  You've

19        indicated in your testimony, Mr. Williams, that you

20        received a class notice earlier this calendar year?

21   A    Yes.

22   Q    And do you recall in that class notice a description

23        of the nature of the lawsuit with particular

24        reference to a change in the way that Northwestern

25        determined the so-called dividends on these
```

```
1    STATE OF _____ )
                              ) SS.
2    _____ COUNTY  )

3

4           I, BRUCE WILLIAMS, do hereby certify that I

5    have read the foregoing transcript of proceedings, taken

6    on the 18TH day of May, 2010, at 411 East Wisconsin

7    Avenue, Milwaukee, Wisconsin, and the same is true and

8    correct except for the list of corrections, if any, noted

9    on the annexed errata sheet.

10

11           Dated at _____, _____,

12   this _____ day of _____, 2010.

13

14
     _____
15       BRUCE WILLIAMS

16

17

18

19

20

21

22

23

24

25
```

1    STATE OF WISCONSIN  CIRCUIT COURT   MILWAUKEE COUNTY
                          BRANCH 36
2    ------------------------------------------------------

3    MARLEEN M. LaPLANT,

4            Plaintiff,

5       vs.                CASE NO. 08-CV-011988

6

7    NORTHWESTERN MUTUAL
     LIFE INSURANCE COMPANY,

8            Defendant.

9    ------------------------------------------------------

10                    COURT TRIAL
                        (P.M.)
11   ------------------------------------------------------

12          BEFORE THE HONORABLE DENNIS FLYNN,
          CIRCUIT COURT RESERVE JUDGE PRESIDING
13                  NOVEMBER 8, 2010

14

15          A P P E A R A N C E S:

16   GEORGE KERSTEN, CAMPION KERSTEN, KENAN KERSTEN, JEFFREY
     BARTOS, TIMOTHY BATIN, CHRISTOPHER LEE, MARK POLLACK,
17   MARIA LAZAR, Attorneys at Law, appeared on behalf of
     the Plaintiffs, Marleen M. LaPlant.
18
     MARLEEN M. LaPLANT and JOHN LaPLANT, Plaintiffs,
19   appeared in person.

20   ERIC J. VAN VUGT, CRISTINA HERNANDEZ-MALABY and JOSHUA
     MAGGARD, Attorneys at Law, appeared on behalf of the
21   Defendants.

22

23                  BONNIE H. DOMASK
                 Official Court Reporter
24

25

1

2               W I T N E S S   I N D E X

3

4                                              Page

5   DANIEL NOONAN

6   Con't. Redirect Examination by Mr. George Kersten  5

7   Recross-Examination by Mr. Van Vugt              8

8

9   BRUCE WILLIAMS

10  Direct Examination by Mr. Kenan Kersten          11

11  Cross-Examination by Mr. Van Vugt                20

12

13  JANET REICHART

14  Direct Examination by Mr. Kenan Kersten          24

15  Cross-Examination by Mr. Van Vugt                31

16

17  MARLEEN M. LaPLANT

18  Direct Examination by Mr. George Kersten         44

19  Cross-Examination by Mr. Van Vugt                54

20

21  RICHARD F. FISHER

22  Direct Examination by Mr. George Kersten      61, 119

23

24

25

E X H I B I T S   I N D E X

Exhibit Received Into Evidence:

Nos.                            Page

310 - 317                        10
180                              43
261, 262, 263, 264, 266, 267     59
441                              59
191 - 194                        76

1    A   No.

2                MR. GEORGE KERSTEN:  No further questions.

3                THE COURT:  Recross.

4    RECROSS-EXAMINATION BY MR. VAN VUGT:

5    Q   What it does tell you is that the dividends apply

6        differently depending on what kind of policy you have.

7                MR. GEORGE KERSTEN:  Objection, it's vague.

8                THE WITNESS:  I'll try to --

9                THE COURT:  Excuse me.  Please stop.  The

10       objection is vague.  Response.

11               MR. VAN VUGT:  I'll withdraw and rephrase.

12               THE COURT:  Next question.

13   BY MR. VAN VUGT:

14   Q   This document does reflect that the dividend impact on

15       the policy value is different from one policy to the

16       next, doesn't it?

17   A   I don't think it says that at all.  I'm trying to

18       answer as honestly as I can.  I cannot tell where these

19       came from.  My short answer is from my own experience

20       with these policies based upon my calculations was that

21       they had always done that.  That's why we are here in

22       court, but these do not necessarily differ from my own

23       experience.  I know they are different as you read

24       them, but I don't know where these percentages came

25       from or how they were generated.  That's what I

```
1      believe.  I'm trying to answer this as -- I don't think
2      these say what you want me to say.  I don't think it
3      says that.
4    Q  Don't worry about what I want you to say.
5    A  Well --
6    Q  I want you to confirm regardless of how they were
7      calculated, they result in different values, same
8      amendment brings different values by policy.  Isn't
9      that what this says?
10   A  No.  I don't think it says that.
11   Q  The results are different from policy to policy.
12   A  These percentages, I have no idea or clue of how they
13      were generated.
14   Q  I think this is a yes or no question.  The results are
15      different regardless of how they are calculated, the
16      results of this amendment will impact these policies
17      differently, yes or no?
18   A  I don't think I can answer yes or no.
19   Q  All right.
20              MR. VAN VUGT:  No further questions.
21              MR. GEORGE KERSTEN:  I have no further
22      questions, Your Honor.
23              THE COURT:  Thank you for your testimony.
24              THE WITNESS:  Thank you very much.  I
25      appreciate it.
```

1    Q  At least they were issued approximately two months of

2       each other?

3    A  Correct, yes.

4    Q  From whom or to whom did you purchase these policies?

5    A  Our agent is Rick Stam (phonetic).

6    Q  Mr. Stam is a Northwestern agent?

7    A  Yes, he's a Northwestern agent.

8    Q  And did you purchase both policies from him?

9    A  Yes.

10   Q  Did you meet with Mr. Stam and discuss these policies

11      prior to agreeing to buying them?

12   A  Yes.

13   Q  And when you met with him to discuss these policies,

14      can you state whether or not he reviewed with you any

15      documents that he brought with him?

16   A  Yes, he did.

17   Q  And what was the nature of the documents that he

18      reviewed with you as he was proposing these annuity

19      policies for your purchase?

20              MR. VAN VUGT:  Again, Your Honor, we interpose

21      the same objection as we did with Mr. Noonan, scope.

22              THE COURT:  Response.

23              MR. KENAN KERSTEN:  I intend to be eliciting

24      the projections that were used by the agent with

25      Mr. Williams.  I believe they are relevant for the

```
 1     reasons that have been discussed already.  I will
 2     understand should the Court permit it, there can be a
 3     standing objection to that line of questioning.
 4             THE COURT:  All right.  There will be a
 5     standing objection that's recognized as these matters
 6     go.  Comments made earlier this morning, they go not to
 7     much understanding this witness but understanding state
 8     of mind and the motives of Northwestern, the defendant,
 9     at the time of sale.  Your question if you recall it,
10     you can answer it or otherwise you can restate it.
11     BY MR. KENAN KERSTEN:
12  Q  Do you recall the question?
13  A  Yes.  He went over documents and you better read the
14     question.
15  Q  What was the nature of the documents that Mr. Stam
16     reviewed with you prior to your decision to purchase
17     the policies?
18  A  They were similar projections based on numbers that I
19     don't remember, but they would have shown how the
20     policy would perform and also worksheets to look at our
21     -- what we wanted to do with our investments over the
22     long term.
23  Q  Now, just take a look if you will, Mr. Williams, at
24     Exhibits 154 and 156.
25  A  Yes.
```

1   Q  Now, when Exhibits 154 and 156 were submitted to you by

2      Mr. Stam, you had already purchased the policy so the

3      growth being projected in those exhibits was the growth

4      based on the premiums you were paying for the policies?

5   A  Yes.

6   Q  Nonetheless, how would you compare these projection

7      type documentations, 156 and 154, with the documents

8      that Mr. Stam reviewed with you prior to your purchase

9      of the policies?

10  A  They were a very similar form with the same kind of

11     information that was presented.

12  Q  What is your best recollection, Mr. Williams, as to

13     what Mr. Stam told you prior to your purchase of these

14     policies about the nature of the investment you would

15     be making and purchasing in the annuity policies?

16  A  I remember that this was a long-term investment.  We

17     would see the value of these policies grow based on the

18     dividends that they paid.  That they were based on the

19     profits of the company.  It was a mutual company that

20     shared in their profits through these kinds of

21     policies.

22  Q  Did he explain what the dividends would be based on?

23  A  Yes.  They were based on the profits of the company, as

24     I look at these policies now, the shared earnings of

25     the company.

1    Q  When you stated whether or not in discussing these

2       annuity policies with him before you bought them, did

3       he have anything to say about the ratings of the

4       investments of the company that you would be sharing

5       in?

6    A  That there very broad based.  I don't remember the

7       specifics but that was everything the company invested

8       in.

9    Q  Now, you did read the notice of this class action that

10      you received sometime earlier this year that you

11      testified?

12   A  Yes.

13   Q  In reading the description of the lawsuit that was

14      contained in that notice, will you state whether or not

15      you recall reference to the lawsuit involving a claim

16      of a change in the way Northwestern Mutual would be

17      determining these dividends for annuity policies?

18   A  Yes, I recall that.

19   Q  When did you first become aware that there was at least

20      an alleged change?  When did you get your first notice

21      of any kind of change that dividends would be

22      determined on your policy?

23   A  When I reviewed that notice of this lawsuit.

24           MR. KENAN KERSTEN:  No further questions.

25           MR. VAN VUGT:  May I proceed, Your Honor?

```
 1              THE COURT:  Yes.
 2       CROSS-EXAMINATION BY MR. VAN VUGT:
 3    Q  Mr. Williams, have you seen anything in any document
 4       from Northwestern Mutual that said to you that your
 5       dividends would be determined in the exact same way
 6       that everybody else's dividends would be determined?
 7    A  No, I don't recall that.
 8    Q  Did you ever see any document from Northwestern Mutual
 9       that said to you that your dividends would be
10       calculated the same from one year to the next?
11    A  No.
12    Q  Did you ever see anything in writing from Northwestern
13       Mutual or anyplace else that said to you that your
14       dividend would be calculated on the basis of all the
15       investments of the company?
16    A  I would say yes in the policy saying that it was shared
17       in the -- I can't remember the wording in this
18       document.
19    Q  But the company has lots of investments, correct?
20    A  Yes.
21    Q  And has any document said to you that you were going to
22       get a dividend based on all of the investments of the
23       company as opposed to just some investments of the
24       company?
25    A  With that specific wording, no.
```

```
1     STATE OF WISCONSIN   )

2                          )   ss.

3     MILWAUKEE COUNTY    )

4

5

6                         I, BONNIE H. DOMASK, Official

7     Court Reporter in and for the Circuit Court of

8     Milwaukee County, do hereby certify that the foregoing

9     is a true and correct transcript of all the proceedings

10    had in the above-entitled matter as the same are

11    contained in my original machine shorthand notes on the

12    said trial or proceedings.

13

14    Dated at Milwaukee, Wisconsin on November 29, 2010.

15

16

17

18    _____
      BONNIE H. DOMASK
19    OFFICIAL COURT REPORTER

20

21

22

23

24

25
```

```
 1   STATE OF WISCONSIN       CIRCUIT COURT       MILWAUKEE COUNTY
 2                            Branch 36
 3   _____
 4   MARLEEN M. LA PLANT,
 5                      Plaintiff,
 6        -vs-                          Case No. 08CV011988
 7
 8   NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,
 9                      Defendant.
10   _____
11                         COURT TRIAL
12   _____
13   November 8, 2010 (a.m.)          Dennis J. Flynn
14                                    Reserve Judge Presiding
15
16   APPEARANCES:
17        Kersten & McKinnon by George P. Kersten, E. Campion
18     Kersten and Kenan J. Kersten, Attorneys at law, appeared on
19     behalf of the Plaintiff.
20        Quarles & Brady by Eric M. VanVugt and Cristina D.
21     Hernandez, Attorneys at law, appeared on behalf of the
22     Defendant.
23
24
25   Leposava Munns, Official Court Reporter
```

COPY

```
 1
 2                    WITNESS CALLED BY PLAINTIFF:
 3          Daniel A. Noonan              Direct      55
 4                                        Cross       83
 5
 6
 7
 8
 9
10
11
12
13          P R O C E E D I N G S:
14          THE CLERK:  Case 08CV011988, Marleen LaPlant
15     versus Northwestern Mutual Life Insurance Company.
16     Appearances, please.
17          MR. KERSTEN:  Your Honor, for the plaintiff and
18     Class, Attorneys George Kersten, Campion Kersten, Kenan
19     Kersten and Attorney Jeffrey Bartos, Attorney Christopher
20     Lee, Attorney Mark Pollack, Attorney Maria Lazar, Attorney
21     Timothy Battin; and Your Honor, Mrs. LaPlant and her
22     husband, John, are in the courtroom as well.
23          MR. VAN VUGT:  For the defendant Eric VanVugt,
24     Cristina Hernandez, Joshua Maggard from Quarles & Brady.
25     In-house attorneys at Northwestern Mutual Ray Manista, Rod
```

2

1   Q   Now, would you identify what is Exhibit 313?  That should be
2       the next one in the stack.
3   A   It's entitled amendment to dividend provision.
4   Q   Is this the amendment to which you agreed in the so-called
5       update '83?
6   A   I believe it is.
7   Q   Did there come a time --did there come a time when you
8       became concerned about the level of dividends being credited
9       to your annuity, Exhibit 310 and your wife's annuity,
10      Exhibit 311?
11  A   Yes.
12  Q   Can you give us a time frame as to when that you developed
13      that concern?
14  A   Well, it arose out of sort of an annual review type of
15      process that I would engage in sometimes with Dan, sometimes
16      without Dan Madigan I'm speaking of, and it --I would just
17      kind of do a net worth type of statement so he would give me
18      what is known as like a policy data review which would be a
19      summary of all of my policies and my wife's policies.
20              They were quite numerous so, you know, we just add
21      up the cash values and you kind of take a look at what your
22      net worth looks like, see where you stand type of thing.  I
23      would do that annually and I'm sure I did one concerning
24      this matter that gave rise to all of this.  It looks like it
25      occurred some time in early 2000.

66

| | | |
|---|---|---|
| 1 | Q | And what was the concern that you had just in general terms? |
| 2 | | What --what disturbed you?  What concern did you have at |
| 3 | | that point? |
| 4 | A | Well, as I communicated with Dan --Madigan, that is --I had |
| 5 | | noticed a disparity between the rate of return or the amount |
| 6 | | of dividends which I hadn't picked up on earlier, but I had |
| 7 | | noticed that there was a disparity because the premise upon |
| 8 | | which we had been proceeding for many years is that these |
| 9 | | annuities would always pay.  The beauty of these he would |
| 10 | | say and the company would say well, the beauty of these |
| 11 | | annuities, they pay the same portfolio rate, same dividend |
| 12 | | interest rate as the cash surrender value rate that's paid |
| 13 | | on whole life policies.  That was the beauty.  That's how |
| 14 | | they were sold.  So I noticed a difference.  I said well, |
| 15 | | Dan, what's --what's the problem here? |
| 16 | Q | What did he say? |
| 17 | A | He didn't know. |
| 18 | Q | What did you do with it? |
| 19 | A | I think I had run some calculations and I said look, I'll go |
| 20 | | back into the, you know, take a sample into the '90s, take a |
| 21 | | look at whether there was something going on here that I had |
| 22 | | earlier missed. |
| 23 | | Apparently there was but it became a little more |
| 24 | | dramatic as the disparity or the spread increased meaning |
| 25 | | the annuity was producing a lower rate of return --I had |

67

| | |
|---|---|
| 1 | calculated like 6.8 percent --and then the announced rate |
| 2 | that Northwestern Mutual always annually announces its rate |
| 3 | tells, you know, the customers, the policy owners and |
| 4 | everybody what their annual rates are, it was 8.8 percent at |
| 5 | that point.  I was a little off.  It turns out subsequently |
| 6 | it was really 6.5, not 6.8, so I was off in my calculation. |
| 7 Q | Having that concern in mind, having in mind that Dan Madigan |
| 8 | said he didn't know why this difference existed, what did |
| 9 | you then do? |
| 10 A | I asked him if he'd be good enough to look into it and he |
| 11 | did. |
| 12 Q | And what was the product of that request of him?  What |
| 13 | occurred next? |
| 14 A | I think he corresponded with the company and whoever was |
| 15 | responsible for answering questions like that.  He did that |
| 16 | on my wife Kathy's behalf and my behalf. |
| 17 Q | And what is Exhibit 314? |
| 18 A | The two 314 that I have, Counsel, are different than the |
| 19 | ones --actually, no, this is correct.  314, is that what |
| 20 | you're asking? |
| 21 Q | 314. |
| 22 A | Okay, I'm sorry. |
| 23 Q | Which I believe is the two-page letter. |
| 24 A | I've got that now.  Thank you. |
| 25 Q | Okay.  Just identify first of all who authored that letter, |

68

```
 1   STATE OF WISCONSIN )
 2                     )SS:
 3   MILWAUKEE COUNTY   )
 4              I, Leposava Munns, an official court reporter in
 5        and for the Circuit Court of Milwaukee County, do hereby
 6        certify that the foregoing is a true and correct transcript
 7        of all the proceedings had and testimony taken in the above-
 8        entitled matter as the same are contained in my original
 9        machine shorthand notes on the said trial or proceeding.
10              Dated at Milwaukee, Wisconsin, this 7th
11        day of January, 2011.
12
13        Leposava Munns
14              Leposava Munns, RPR
15              Official Reporter
16
17
18
```



**EXPERT WITNESS REPORT :**

**ROBERT L. HOYER , FSA, MAAA**

**M. LaPLANT**
**VS.**
**NORTHWESTERN MUTUAL**
**LIFE INSURANCE COMPANY**

**JUNE 30, 2010**

<u>EXPERT WITNESS REPORT :</u>

<u>ROBERT L. HOYER , FSA , MAAA</u>

1.   The attorneys for the plaintiffs in the matter of M. LaPlant vs. Northwestern Mutual Life Insurance Company (NML) (the Class Action), requested that Hoyer Actuarial Litigation, LLC, and its principal, Robert L. Hoyer, FSA, MAAA, perform an actuarial review of the issues in that case subject to the standards of practice of the actuarial profession. The general purpose of the review was to read and analyze pertinent documents and provide conclusions and opinions with respect to customs and practices within the life insurance industry and the actuarial profession specific to aspects of the Class Action.

2.   I have prepared this report to summarize my analyses and opinions.  All of my opinions expressed in this report are to a reasonable degree of probability in the fields of actuarial and insurance industry practice.

3.   This Class Action is the result of NML, in 1985, changing the basis for determining subsequent policyholder dividends for the in-force annuitants by segmenting a portion of its investment portfolio, and earmarking the resultant investment income to determine those dividends. The change in practice was done by NML without the agreement or knowledge of the annuity policyholders. It is frequently referred to in this Class Action as the "1985 Change."

1

4.    In the course of my review, I will include opinions with respect to the following specific questions, as well as related issues:

- Were the actions undertaken by NML in making the 1985 Change proper, appropriate, fair, equitable, and consistent with generally accepted practices and procedures of the life insurance industry and generally accepted practices and procedures of the actuarial profession?

  To this question my answer is "No."

- What, if any, standards did NML violate by its actions?

  To this question my answer is that NML's actions violated generally accepted practices and procedures within the life insurance industry, violated generally accepted practices and procedures of the actuarial profession, and directly violated Actuarial Standard of Practice No. 15 – Dividend Determination and Illustration for Participating Individual Life Insurance Policies and Annuity Contracts;

- Were the actions undertaken by NML after the 1985 Change proper, appropriate, fair, equitable, and consistent with generally accepted practices and procedures within the life insurance industry?

  To this question my answer is "No."

- Were the 1985 Change and actions undertaken by NML after the 1985 Change of material and substantial importance to the rights of the owners of the annuities that are the subject of this Class Action?

  To this question my answer is "Yes."

- Are the justifications offered by NML for its actions valid?

  To this question, my answer is "No."

- What should NML have done in 1985 and thereafter with regard to the in-force annuity business?

  My answer to this question will be provided later in this report.

5. Based on my analysis as discussed in this report, it is further my opinion that:

- The annual dividends credited to the annuities that are the subject of this Class Action following and pursuant to the 1985 Change were not an equitable share of NML's divisible surplus, and were not the dividends to which those annuitants were contractually entitled; and

- NML failed to exercise good faith toward the owners of those annuities in making the 1985 Change, in not fully and

fairly disclosing the 1985 Change to them, and in the annual determination of their dividends pursuant to the 1985 Change.

# *I. Professional Backround*

6. I am a Fellow of the Society of Actuaries (FSA) and a Member of the American Academy of Actuaries (MAAA) and have over thirty five years of life insurance industry experience. After graduation from Syracuse University and teaching at the high school and college levels, I began my insurance career in 1971 with Aetna Life & Casualty (Aetna). At Aetna I served in various capacities, becoming an officer of the company in 1977.

7. My consulting career began in 1980 with Price Waterhouse, where I served as Managing Partner and National Director of the firm's Actuarial Consulting Services Group. In 1989, I joined Arthur Andersen to become the Managing Partner of that firm's Actuarial Services practice. In 2002, I began a new venture, Hoyer Actuarial Litigation, LLC, as company principal. In each of these capacities, I have been retained by numerous state insurance departments, including those of New York, New Jersey, Connecticut, Texas, Maine, California, Florida, Colorado, Indiana, and New Hampshire, on consulting projects.

8. Over this extensive period, both as an officer and employee at Aetna, and a partner or principal at consulting firms, I have acquired an extensive, in-depth knowledge and understanding of

the customs and practices of the life insurance industry. This knowledge extends specifically to litigation and expert witness situations. I have provided litigation support and expert reports, affidavits, and/or declarations in well over fifty disputes, and have provided expert witness testimony in over twenty five cases. These cases include expert witness services for both plaintiffs and defendants. My present consulting practice focuses primarily on legal disputes within the life insurance industry.

9.    Further, my knowledge and experience applies directly to the subject matter of the present dispute. For example, I have been engaged by numerous mutual life insurance companies regarding matters which involved policyholder dividends. This experience is directly applicable to the present Class Action.

10.   A copy of my resume is enclosed as Exhibit A.


## II.  Data and Related Information Considered


11.   A listing of the data and related information specific to the Class Action that I reviewed is enclosed as Exhibit B.

## III.  Background

12.  NML is a large (in terms of revenue, assets under management, company surplus, and net gain from operations), successful life insurance company specializing in life insurance products. NML also sells annuity products, but during the relevant periods of this Class Action, annuities constituted only a small percentage of the total in-force business of the company.

13.  NML, like many insurance companies, writes a wide variety of annuity policies. "Immediate" annuities reflect policies on which the policyholder has made a contribution to the company and in turn the company is in process of making periodic (frequently monthly) payments to the policyholder.  Payments can be for the life of the annuitant, for a specified period, or for combinations thereof, and can also continue to a designated beneficiary. All of these options are as written in the contract.

14.  Another common form of annuity written by insurance companies is the "deferred" annuity. This form of annuity is an investment vehicle, in that the annuitant has made a contribution to the insurance company (either a single payment, or premium, or annual level premiums, or annual flexible premiums) and such contributions are accumulating at interest, but no periodic payments are being made by the insurer to the annuitant. At any time, the annuitant can exercise any of the options specifically written in their policy, which frequently include the right to terminate such a policy and withdraw the accumulated funds, to borrow a portion of the fund at a specified borrowing interest rate, or to convert the policy to an immediate annuity. The policies

involved in this Class Action represent flexible premium deferred annuities written by NML prior to the 1985 Change and still in-force as of the change.

15. NML is a mutual life insurance company. As such, it has no stockholders but instead is owned by its participating policyholders. At the completion of each policy year, NML calculates a policyholder dividend payable to or otherwise for the use of each policyholder. The primary component of the dividend is the return on the company's general account invested assets, and for many years prior to 1985 each policyholder shared in the overall yield, or "portfolio rate," generated by such assets.

16. NML, consistent with generally accepted practices and procedures within the life insurance industry, uses the contribution principle to determine divisible surplus, and then to distribute this amount to its participating policyholders. The contribution principle quantifies margins from return on invested assets (return net of investment expenses and taxes, as appropriate), as well as margins on expenses and mortality (amounts charged to policyholders less actual costs) and distributes such divisible surplus to policyholders in relation to their proportionate contribution to the aggregate value. As part of this calculation, for many years up to 1985, each policyholder would share equally in the investment return generated by the portfolio rate.

17. The level of policyholder dividends is a substantive competitive measure among mutual life insurance companies, and NML regards itself as an industry leader in this respect. Changes in dividend rates are considered of major importance among the

large mutual entities. Consistent with this objective, in 1983 NML solicited policyholder agreement to a change in the manner in which dividends would be calculated. NML called this solicitation and change "Update '83." For a policyholder who agreed to this change, NML was allowed to calculate dividends reflecting the extent to which policyholders had exercised their contractual rights to borrow cash value from their policies. This change had the effect of increasing the dividend rate for many life insurance and annuity policyholders. Update '83 has many parallels to the 1985 Change and demonstrates a pattern and practice of significance in this case.

18. Throughout the 1970's and early 1980's, some of NML's competitors began the process of segmenting their investment portfolios, for varied products or business divisions, by use of either separate portfolios and/or by the process of maintaining separate funds for each year of investment.

19. During this period, the investment marketplace was experiencing investment yield rates on relatively shorter-term invested assets which exceeded comparable portfolio returns on prior invested assets and exceeded yields on longer-term investments as well. Competition both from products offered by other insurance companies and from short-term investments available in the market resulted in a decline in NML's sales of deferred annuity products and an increase in surrenders of NML's in-force deferred annuities.

20. To improve its competitive posture in the annuity marketplace, NML undertook a study designed to develop a new, more interest-oriented annuity product. To assist them in this

endeavor, NML engaged the consulting firm of Towers, Perrin, Forster & Crosby (TPF&C). TPF&C is well regarded as a highly qualified firm in the provision of life insurance and actuarial consulting to life insurance companies.

21.  This study resulted in the development of a new annuity product, commonly called the "CRA" annuity. The CRA product was designed and sold to be supported by a segregated, relatively short-term investment portfolio. CRA annuitants would not share in the divisible surplus of the company and would not receive an annual policyholder dividend. Rather, the CRA annuitants would receive an annual interest credit based on the investment return of the segregated portfolio. The contract language of the CRA policy expressly provided for these terms.

22.  As NML was developing the CRA product (designated the "MN" series of NML policies), it decided that it would no longer write new business on the old pre-CRA ("Pre-MN") deferred annuity basis. It also initially decided it would do nothing to change the existing block (the Pre-MN annuities) (Exhibit 12 and Exhibit 14). Through this point, all of NML's actions appear reasonable and consistent with generally accepted practices and procedures within the life insurance industry.

23.  However, by 1985, NML instead had decided to establish a segregated asset portfolio to support the Pre-MN annuity block, and began to use the segregated portfolio as a basis for subsequent policyholder dividends for those policies. NML did not seek annuitant approval for this action, and did not inform them that a change was being made.

24. In the mid and later 1980's, short-term yields stabilized and reverted to the normal relationship in which longer-term yields typically tend to be greater than shorter-term yields. As a result, the calculation of policyholder dividends for the Pre-MN annuitants, based on the segregated shorter-term assets, began to decrease well below life insurance dividend rates based on the portfolio rate. NML used a "pegging" process in which the company arbitrarily chose to increase the dividend rates paid to Pre-MN annuitants to obscure the new distinction between the treatment of life insurance and annuity policyholders. The subsidy paid to Pre-MN annuitants was gradually decreased over time, so that there was no sudden decrease in dividends that might alert the policyholders that the change had been made. From the early 1990's through the current time frame, the Pre-MN annuitants have received substantively less policyholder dividends as a result of the change made by NML in 1985.

## IV. Update '83

25. As stated above, there exist several parallels between Update '83, applicable to both life insurance and annuity policies, and the 1985 Change, which applied only to deferred annuity policies. For one, both adjustments reflect changes to the calculation of policyholder dividends. Further, in each instance, NML utilized the contribution principle to determine dividends. Also, in each instance, the application of the contribution principle had been clearly established and consistently applied for a number of years leading up to the change. Finally, in each instance the change altered the interest factor.

26.   The processes undertaken by NML in implementing these changes, however, were distinctly different. NML utilized an extensive publicity campaign for Update '83, contacting each policyholder to explain the implications of the program, and soliciting their written approval to agree to the change. The explanatory materials provided to each policyholder included a covering letter from NML's Chief Executive Officer, individualized illustrations comparing future dividends with and without the change, a booklet with questions and answers on the change and charts depicting the effect of the change on future dividends, as well as the agreement form (Exhibit 124). If policyholders did not agree, or simply failed to respond, they were subsequently treated for dividend purposes as if Update '83 did not exist. The total costs to NML of Update '83 included dividend additions of roughly $100 million (Exhibit 54) and administrative expenses ranging from $18 million to $29 million (Exhibit 55). In contrast, the 1985 Change was implemented without a publicity campaign and without contacting the affected policyholders. NML acted in a unilateral manner without agreement from or even awareness of its annuity policyholders, although the 1985 Change would affect Pre-MN annuitants to a greater extent than would Update '83.

27.  There is also a notable difference in the insurance industry and actuarial standards relating to dividend determination that exists between the changes NML made in Update '83 and the 1985 Change. Actuarial Standard of Practice No. 15 – Dividend Determination and Illustration For Participating Individual Life Insurance Policies and Annuity Contracts (ASOP 15) establishes the basis under which all mutual insurers must determine

policyholder dividends. ASOP 15 stated that "the investment income experience factor may vary by policy loan rate." Update '83 involved this principle. However, even though the standard of practice specifically allowed the distinction between borrowing and not borrowing in determining dividends, NML realized that since the dividend process had been established and consistently applied for several years without direct recognition, it needed to obtain explicit written policyholder agreement before implementing the change. They undertook a costly process of obtaining approval from policyholders and the change was only made applicable to those who chose to be so recognized. To the question "you felt you were required to get their (policyholders) written agreement to the change in order to adopt direct recognition (Update '83)," Mr. Murphy of NML stated in deposition testimony "Yes." Mr. Murphy and NML were correct in realizing the requirement for written policyholder agreement.

28.   The 1985 Change was also an adjustment to investment income within the dividend process and also revised a methodology that had been established and consistently applied for many years. However, ASOP 15 does not specifically allow the segregation of assets contemplated in the 1985 Change. Hence, if there is any difference, NML has less basis to implement the 1985 Change than they had for Update '83. Despite this difference, NML chose to implement the 1985 Change in a unilateral manner without approval by or even awareness of the change by Pre-MN annuitants.

## V. Questions 1 and 2: Were the Actions Undertaken by NML Proper, Appropriate, Fair, Equitable, and Consistent with Generally Accepted Practices and Procedures of the Life Insurance Industry and Generally Accepted Practices and Procedures of the Actuarial Profession? And What, if any, Standards did NML Violate by its Actions?

29.  Both the life insurance and annuity contracts issued by NML prior to 1985 provided that the policyholder will "share in the divisible surplus of the Company" through an annual "dividend." NML had established a methodology for determination of those dividends which had been consistently applied prior to 1985. An important part of this consistently applied methodology was to utilize the portfolio rate of return to determine dividends for both life insurance and annuity policies.

30.  Any methodology for determining dividends must comply with the parameters set forth in ASOP 15. This standard defines an experience factor class as "a group of policies for which dividends are determined by using a common numerical value of a particular experience factor. Examples of experience factors are claims, expense, investment income, termination, tax, and other factor classes." Experience factor is defined as "those elements which reflect actual experience. ... Examples of experience factors are: investment income rates, ..." At the time NML sold policies, it established experience factor classes. Such established classes differed by experience factor, which was consistent with the standard and acceptable within the life insurance industry and the actuarial profession. For example, with regard to the expense experience factor, NML used separate experience factor classes for

life insurance and annuity products and for subsets of these product types. With regard to the investment income experience factor, prior to 1985, however, NML chose to group all life insurance and annuity products together as one experience factor class, using the portfolio rate of return as the basis for determining dividends for all policies. Having established the factor class to include both life and annuity policies, NML was not free to discriminate against annuity policyholders with respect to investment income by unilaterally changing the established experience factor class.

31. ASOP 15 (Section 5.4.4) states that "When there is more than one factor class with respect to a particular experience factor, differences in values should be based on differences in actual experience between the classes." That is, ASOP 15 dictates that if a company has established different experience factor classes for a given experience factor, then it must base dividends on the actual experience of each separate experience factor class.

32. But, for investment income, through 1985, NML had not established more than one experience factor class. Therefore, ASOP 15 does not allow NML to reflect differences in values between segments of policies that were in the same investment experience factor class. Since NML chose to aggregate both life and annuity policies into one experience factor class for investment income purposes, then the experience factor for both of them must be and must remain equal in the determination of dividends.

33. Therefore, based on my analysis and on my extensive life insurance industry experience, in my opinion, NML's actions in

1985 were not proper, appropriate, fair, or equitable, were not consistent with generally accepted practices and procedures of the life insurance industry, were not consistent with generally accepted practices and procedures of the actuarial profession, and were in violation of the standards set forth in ASOP 15.

## VI. Question 3: Were the Actions Undertaken by NML after the 1985 Change Proper, Appropriate, Fair, Equitable, and Consistent with Generally Accepted Practices and Procedures within the Life Insurance Industry?

34. In communications with the New York Department of Insurance (NY-DOI) prior to the 1985 Change, Mr. Fisher of NML wrote that the company's intention was to notify policyholders of the change using a three step process:

- Press releases to the public media;
- Mention of the change in the company's 1984 Annual Report; and
- A "stuffer" included in the 1985 dividend notice.

35. There is no evidence that NML did any of these. To the contrary, NML appears to admit that there was no press release to the public media, that there is no mention of the change in the 1984 Annual Report (published in early 1985), and that they have no evidence a stuffer was included in the 1985 dividend notice to policyholders. Annuitants who would have received such a stuffer if one had been sent say that they received none. NML also admits that it did not seek the annuitants' consent to the 1985 Change.

36. Prior to the 1985 Change, the net dividend rate for annuitants tended to be higher than the comparable rate for life insurance policyholders (Exhibit 143). This difference reflected the experience factor disparity in expenses and other portions of the dividend methodology (other than investment income) for which NML had utilized varied experience factor classes.

37. The 1985 Change established a segregated portfolio comprised of relatively short-term investments for the annuity group. Over time, and as expected, yields on the segmented investments were less than yields produced by the remaining portfolio comprised of relatively longer-term investments. Dividends based on the declining yields of shorter-term instruments would necessarily be lower than those based on yields of NML's longer-term general account portfolio.

38. However, for several years after the 1985 Change, NML made a series of adjustments to the calculated dividend rate prior to reporting to the annuitants. NML uses the terms "soft landing" and "managing the scale" (Exhibits 116, 118, and 120) and "pegging" to describe a process in which the company did not utilize the calculated dividend rate, but rather chose a different dividend rate to either smooth or otherwise adjust dividends for a specified group. In the case of Pre-MN annuitants in the later 1980's and early 1990's NML employed this process to increase the calculated dividend (determined using the segregated asset portfolio) to a rate equal to or at least close to the rate applicable to life insurance policyholders.

39. In a February, 1985 memorandum, Mr. Fisher of NML wrote that NML would increase Pre-MN annuity dividends so as not to "pull the rug out from under the in-force annuities." In their internal document discussing the 1986 dividend scale (Exhibit 32), NML states that, with respect to the Pre-MN policies, "we are very sensitive to the concerns of in-force annuity policyholders and that is why we are making the change on a gradual basis."

40. The soft landing or grading in process employed by NML in connection with the 1985 Change had the effect of making it difficult, if not impossible, for Pre-MN annuity policyholders to realize that a substantive change had been made unilaterally by the company in 1985. Since the grading in process ended, dividends for Pre-MN annuitants have been lower than comparable dividends for life insurance policyholders.

41. Over the twenty five year period since the 1985 Change, NML has continued to profess its philosophy and general approach to business. For example, in his recent deposition, Mr. Fisher of NML states that "I believe that mutual companies are supposed to credit the portfolio rate to all products unless there are some special arrangements." There were no special arrangements made with Pre-MN annuity policyholders, they were not even informed.

42. Another example of NML's position is evidenced in a 1991 memorandum entitled "1991 Dividend Scale" from Mr. Koenig to the company's management committee (Exhibit 95). Under the header "Company Philosophy," Mr. Koenig states that "in determining dividends, the company uses the portfolio method to allocate the investment portion of each dividend. That is, the earnings on the entire investment portfolio, excluding policy loans,

are used to determine an overall portfolio rate of return. This rate is then applied to all policies." This statement is not true, as a segregated portfolio was used to determine dividends for the Pre-MN annuitants.

43. As recently as 2009, in a document entitled "Our Mutual Advantage" (Exhibit 115), NML states that "by focusing on the long-term, Northwestern Mutual enjoys flexibility in selecting investments and asset classes while minimizing short-term risk and volatility. This strategy emphasizes long-term investments, which typically outperform short-term investments." For twenty five years, NML has maintained this position, while the Pre-MN annuitants have been relegated (unilaterally and without their approval or even their knowledge) to an under-performing short-term investment portfolio.

44. Therefore, based on my analysis and extensive life insurance industry experience, NML's actions after the 1985 Change were not proper, appropriate, fair, or equitable, and were not consistent with generally accepted practices and procedures of the life insurance industry.

## VII. Question 4: Were the 1985 Change and the Actions Undertaken by NML After the 1985 Change of Material and Substantial Importance to the Rights of the Owners of the Annuities that are the Subject of this Class Action?

45. The 1985 Change altered the fundamental nature of the Pre-MN annuitants' investment, from an investment in the financial performance and growth of NML to an investment in a limited fund of shorter-term instruments. This in itself is a material and substantial change.

46. Further, in a May 2000 letter, Mr. Fisher sets forth a chart comparing the life insurance (portfolio-based) dividend interest rates with the Pre-MN (segmented account based) dividend interest rates for the years 1986 through 2000. Subsequently, NML provided an interrogatory response extending the rate comparison to the year 2008 (attached as Exhibit C). For the first several years after 1985, these charts reflect NML's soft landing process.

47. In my opinion, the spread between the rates shown on these charts fairly measures the minimum difference between what the Pre-MN annuitants would have received absent the 1985 Change (the rate identified as the "Life" rate) and what the Pre-MN annuitants in fact received as a result of the 1985 Change (the rate identified as the "Pre-MN FPA" rate).

48. In addition to these charts, Mr. Murphy, in deposition testimony, indicated that prior to 1985 the annuity dividend rates were generally equal to or greater than comparable life insurance dividend rates. NML has also provided an expanded chart showing

dividend interest rates reflecting both non-tax qualified and qualified policies, with and without direct recognition of policy loans. In this chart, the comparison between the dividend interest rates applicable to life insurance and annuity policies in and after 1985 is best seen on the right most columns of page one. The testimony of Mr. Murphy and these charts confirm that while dividend interest rates for annuities may have been higher than comparable life insurance dividend rates, the effect of the 1985 Change was to reduce the dividend interest rates applicable to Pre-MM annuitants, and in some years to a material extent.

49. Therefore, based on my analysis and extensive life insurance industry experience, in my opinion, the 1985 Change and the actions undertaken by NML after the 1985 Change were of material and substantial importance to the rights of the owners of the Pre-MN annuities.

## VIII. Question 5: Are the Justifications Offered by NML for its Actions Valid?

50. Within the information provided to me for this review, NML representatives in this case have offered rationalizations for NML's actions. This section of my analysis discusses the extent of merit in their justifications:

### A. That NML Undertook the 1985 Change to Serve the Annuitant's Best Interests or to achieve Fairness or Equity.

51.  In its Memorandum in Opposition to Plaintiffs Motion for Class Certification, NML states that:

- The company "developed this segmentation because it wanted to do something to benefit the annuity policyholders;"
- "NML was acting in the annuitants best interests;" and
- NML "in fact thought this decision was a good thing for its annuitants."

52.  First, and independent of the question of intent, the 1985 Change was in fact not in the Pre-MN annuitant's best-interests and resulted in substantially reduced dividends for the policyholder group.

53.  Second, the views expressed in paragraph 51 are reflected in the testimony of some NML executives in this case. For example, in his deposition Mr. Schnorr said that the Pre-MN annuity policyholders "would be better off" under the changed scenario. However, the annuitants already had the option to participate in the current interest rate market, since they could reduce or stop premium payments, borrow, withdraw funds, or surrender their annuities without penalty to reinvest in competing investments in the market or in NML's new CRA annuity. Under the 1985 Change, the annuitants effectively lost the option to achieve the traditional and widely-acknowledged purpose of a deferred annuity (a long-term investment designed to provide for retirement)

through participation in NML's long-term oriented general account portfolio.

54.   Comparable to Mr. Schnorr's testimony is that of Mr. Murphy, who states that the 1985 Change "was specifically designed to improve the equity for the people in that block (the Pre MN annuitants)." Mr. Fisher testified that the 1985 Change was an effort to "bend over backwards to be fair to the in-force block (the Pre-MN annuities)" and that fairness to policyholders is "extremely important" to NML. Finally, Mr. Zore testified that allowing the Pre-MN annuity group to remain as they were for dividend purposes would be "unfair to everybody involved."

55.   Mr. Murphy also discusses the segregated portfolio for the Pre-MN annuitants as "an element of fairness" and "it's an element of equity" and states that "this is an effort to properly and equitably distribute surplus and provide a means to do that that was fair to everybody."

56.   Despite frequent referrals to fairness and equity, Mr. Murphy seems to diverge from these concepts when questioned about NML not informing their annuity policyholders about the change (which would appear to be an element of fairness).  To the question "Did you think it was appropriate that they (the Pre-MN annuitants) be informed … of the 1985 Change?" he responds "I don't recall having any sense of what was appropriate."

57.   The claims in the depositions of NML officers, made in hindsight, are, in my opinion, not valid.

58.   The claims by NML officers conflict with the historical context in which the 1985 Change was made, and ignore entirely the explicit documentation of the reason NML made the change. The sequence of events leading to the 1985 Change arose out of NML's experience with reduced annuity sales and increased annuity surrenders as demonstrated in Exhibits 8 and 9 and confirmed in Mr. Fisher's deposition testimony that "our sales were dropping through the floor, our surrenders were crashing through the roof and we started to think was there anything we could do about the situation." To meet these problems, NML developed the new CRA annuity product, and, as stated earlier, NML by late 1982 determined that it would do nothing to change the existing Pre-MN annuities (Exhibit 14).

59.   However, by late 1984, NML made the decision that maintaining the Pre-MN annuities on a portfolio dividend basis was somehow incompatible with marketing and maintaining the CRA product on a short-term, current interest rate basis. Mr. Zore of NML, in a July 1984 memorandum to senior management (Exhibit 27), stated that "The real problem is with the current FPA (the Pre–MN annuities)…We can't have the old FPA and the new CRA running side by side." Mr. Fisher, in his deposition, concurs, saying that NML did "not want to have both a portfolio version (the Pre-MN annuities) and a current rate version (the new CRA annuities) co-existing." Referring to the Pre-MN annuitants exercising their contractual right of taking policy loans to purchase CRA annuities, Mr. Fisher said that "you can't just let people flip-flop back and forth."

60.   Mr. Murphy's deposition states that "we've been concerned for some time about the severe disintermediation or investment

anti-selection on the part of our annuity policyholders." The terms he is using reflect the impact to NML of the annuity policyholders electing to exercise the terms of their contracts as specifically written by NML. Mr. Murphy describes the segregated portfolio for annuity policyholders as being designed "so that the people in that group will be less impacted by their own actions." In a 1985 internal NML memorandum, Mr. Murphy opines that "the policyholders of these contracts (the Pre-MN annuitants) simply had too much control over their money."

61. According to Mr. Murphy, these problems would be exacerbated if NML were to be, in effect, in competition with itself by having the old (Pre-MN) annuities and the new CRA, in Mr. Zore's words, "running side by side."

62. NML's internal documents and related deposition testimony establish that the actual reason NML made the 1985 Change was to eliminate the perceived "side by side" problem. That is, in order to remove the perceived incompatibility between marketing and maintaining the CRA annuities on a current rate basis and maintaining the Pre-MN annuities on a portfolio basis, NML decided to make the latter perform financially like the CRA. This specifically documented reason belies NML's efforts now to justify the 1985 Change as a matter of fairness or equity or of serving the annuitant's best interests.

63. NML uses the terms proper, appropriate, fair and equitable to justify their actions in this Class Action. Within the life insurance industry, these are meaningful and substantive terms which are generally understood and used on a daily basis. Unfortunately, they are terms being misused by NML in this context.

64. The basis for insurance company operations is the contractual relationship between the company and the policyholder. Insurance companies must first act in a proper, appropriate, fair, and equitable manner relative to its obligations and contractual promises to its policyholders. The Pre-MN policies were sold using policy illustrations showing projected future values based the portfolio rate underlying dividends, then subsequent dividends year after year were determined using the portfolio rate, and NML continued to disseminate information which frequently described the values of the security of the company and its long-term philosophies.

65. Administrative functions are established and consistently applied by the insurer for the benefit of its policyholders. One such administrative practice is the annual determination of policyholder dividends. NML's actions in unilaterally segmenting an investment portfolio for the Pre-MN group, using this portfolio as a basis for determining policyholder dividends, and not even informing the annuitants of this change violates every concept of proper, appropriate, fair and equitable treatment of the annuity policyholders.

66. Another example of how NML's actions were not fair or equitable to the Pre-MN annuitants relates to the loss of benefits from capital gains on equity investments. For example, prior to 1985, NML made an investment in the purchase of the Mortgage Guarantee Insurance Company (MGIC). The money used to make this investment included finances from the Pre-MN annuitants. After 1985, in a series of sales, NML sold their ownership in MGIC and generated substantial capital gains, with profits of over

$400 million (Exhibit 133). But since the Pre-MN annuitants had been relegated to the segregated portfolio, the annuitants did not share in these windfall gains, despite the fact that it was, in part, their money that was used to make the investment.

67.     Another example of the type of opportunity lost by the annuitant group was the pre-1985 investment in Baird Holding Company, which led to a post-1985 capital gain of $30 million (Exhibit 132). Again, NML used annuitant finances to make the investment, but the Pre-MN annuitants did not share in  the subsequent gain.

68. NML's own consultant, from TPF&C, testified in deposition to the inequity of switching the Pre-MN annuitants out of the long-term oriented general account portfolio into a relatively short-term fixed-income segregated account.

69.  Based on my analysis and my extensive life insurance industry experience, in my opinion, NML's actions were designed to achieve their purposes, as documented, and were not designed in the best interests of the annuity policyholders. Further, in my opinion, NML's actions were not fair or equitable, and citing these as rationale for NML's actions has no merit. Therefore, in my opinion, this does not constitute a valid justification of NML's actions.

## B. That NML's Actions were Approved by Regulators.

70.     Responding to policyholder concerns as to decreasing dividends, NML indicated that "our segmentation plan was filed and approved by both the Wisconsin Office of the Commissioner of Insurance (WOCI) and the New York Insurance Department (NY-DOI as defined earlier in this report) (Exhibit 8 – May 9, 2000 letter)."

71.   In the course of my review, I have seen no document from the WOCI indicating approval of the 1985 Change.

72.   NML's correspondence with NY-DOI was varied, and not consistent. Mr. Fisher of NML wrote to NY-DOI describing the company's intentions as "the proposal was for NML to make a prospective segmentation" and that "there would be no retroactive change" (Exhibit 51). As stated earlier in this report, Mr. Fisher, in another letter, indicated that the company would inform annuitants of any change using a three step process (Exhibit 49).

73.   After other changes to the plan, NY-DOI wrote a letter to NML which stated that "we (NY-DOI) are approving your (NML's) submission with respect to your identification of assets, for segmentation purposes only, as appropriate for (MN and Pre-MN annuities)."

74.   The discussions between NML and the NY-DOI leading to this letter related to the concept of asset-liability matching, which had become an important topic in the mid 1980's. The primary

concern of the NY-DOI is company solvency, and proper asset-liability matching provides added security regarding solvency.

75. It is unclear whether NY-DOI approved the segmentation as appropriate to analyze and assure proper asset-liability matching for the company, or if their approval related to other functions within the company. For instance, the NY-DOI letter does not specify approval of the segmentation for Pre-MN dividend determination purposes.

76. Insurance department "approval," in any case, is not a justification for the company's actions. As stated above, insurance departments have, as a primary concern, the solvency of the insurance company. Actions which may be acceptable from the regulatory perspective may not be consistent with a company's contractual obligations.

77. Based on my analysis and extensive life insurance industry experience, the regulatory approval in this instance is somewhat vague relative to the topic of policyholder dividends, and, in any case, does not assure that all related aspects of the company's actions are proper. Therefore, in my opinion, this does not constitute a valid justification of NML's actions.

### C. That NML's Actions were Proper.

78. In their Memorandum in Opposition to Plaintiffs Motion for Class Certification, NML states that their actions "were justified, done in good faith, were consistent with industry best practices and

regulatory requirements, and consistent with all applicable statutes and plaintiffs policy language concerning dividends." This document goes on to say that, regarding the decision to segregate an asset portfolio for the Pre-MN annuity group, "the decision was not hidden from policyholders" and later that "nor was there any attempt to hide this decision from the annuitants."

79. In Mr. Murphy's deposition, he opines that "I have the right to establish the dividends in the manner I think produces equity, what we think produces the appropriate equity" and that "there's nothing that says I have to use the company's year-term portfolio rate." To the question "and who determines whether it's inequitable or not?" Mr. Murphy replied "we do." These statements, in my opinion, are not consistent with generally accepted practices and procedures of the actuarial profession and, if acted upon, would result in untoward risks for the company he is working for and the policyholders he should be serving.

80. Some of the above items have been discussed earlier in this report (for example, violation of ASOP 15 and regulatory approval). As stated earlier in this report, NML's intentions to notify the annuity group were not acted upon and after the change was made, NML did implement a multi-year "soft landing" program which had the effect of making it extremely difficult if not impossible for the Pre-MN annuitants to become aware that a substantive change had been unilaterally made by NML.

81. In a 1984 memorandum, Mr. Zore of NML states that "the real problem is with the current FPA (Pre-MN annuities). We can't have the old FPA and new CRA running side by side so the old FPA has to be made to look like the new CRA even though the

contract language might be different." (Exhibit 27) This idea and certainly any actions undertaken to implement the idea are not consistent with industry best practices nor is it consistent with generally accepted practices and procedures within the life insurance industry.

82.    While a plan was forming to implement Mr. Zore's concept, NML was aware of the pitfalls. Mr. Fisher states that "we were very concerned about the implied promise made during sales of the MN and prior series annuities (Pre-MN annuities)." (Exhibit 52) The implied promise he refers to includes  policy illustrations based on the portfolio rate and NML's long-standing tradition and philosophy of the benefits of long-term investments.

83.    Mr. Jensen of NML, in a 1984 memorandum, indicated that "there is a question of whether it is legal to convert the present FPA's (the Pre-MN annuities) over to a sort of CRA type of dividend interest rate, or the terms on which it would be legal to do so. To the nice question of 'legal' we might add 'wise'." He continues by saying that if short-term interest rates decline (which they did) and annuity dividends decline (which they did), then "policyholders would have a course of (legal) action." (Exhibit 28)

84.    In another 1984 memorandum, Mr. Jensen states that "the big question is in the handling of in-force FPA's (the Pre-MN annuities): How is the dividend determined; how is this explained; how will it be effective in stopping roll-overs in a crunch; is this legal." (Exhibit 30) NML chose to answer Mr. Jensen's question of how the change would be explained to policyholders by not communicating with them at all.

85. Based on my analysis and extensive life insurance industry experience, in my opinion NML did not act in a proper manner or consistent with either best practices or generally accepted practices and procedures of the life insurance industry. Therefore, in my opinion, this does not constitute a valid justification of NML's actions.

## IX. Question 5: What Should NML have done in 1985 and Thereafter with Regard to the In-Force Annuity Business?

86. In the early 1980's, NML engaged the consulting firm TPF&C to provide industry perspective and support regarding annuity products. TPF&C gave specific recommendations to NML with respect to developing a new annuity product, and, as acknowledged by NML, "the consultant's report has given us the direction we need" to develop the new product. The subsequent CRA or MN product was structured in a manner consistent with several of the recommendations set forth by TPF&C.

87. NML has not produced TPF&C's final report, but contemporaneous documents show that TPF&C also provided specific recommendations regarding the Pre-MN annuities. With respect to segmenting assets, as stated in a 1983 letter by Mr. Fisher, "(TPF&C) says that segmentation should be started prospectively with the assets generated from the new product being one segment, and all other assets being the other segment." (Exhibit 34 and Exhibit 16). "Prospectively" in that context

necessarily means for the new CRA annuities only. Therefore, TPF&C recommended that no adjustment be made for the Pre-MN annuities. NML initially embraced this recommendation, as evidenced by a 1984 letter from Mr. Fisher to the NY-DOI, which stated that "the proposal was for NML to make a prospective segregation... there would be no retroactive change." (Exhibit 51) Ultimately, however NML did make a retroactive change by establishing a segregated portfolio for the Pre-MN annuitants.

88.   TPF&C also recommended that "a conversion, or exchange program be embarked on to exchange the old annuities (the Pre-MN annuities)... into one of the new products (the CRA annuities) that would be developed." (Deposition of Mr. Fisher) Within the life insurance industry, a conversion or exchange program means that a company obtain agreement from a group of existing policyholders to terminate or surrender their policies and purchase a newer, but comparable product offered by the company. Companies typically provide a measure of financial incentive to policyholders to obtain their approval to make such a change. NML did not implement the exchange program recommended by TPF&C.

89.   The decisions made by NML not to act according to the two recommendations provided by TPF&C with respect to the Pre-MN annuity group reflect their perspective as noted earlier in this report:

- "We (NML) can't have the old FPA (the Pre-MN annuities) and the new CRA running side by side" as stated by Mr. Zore (Exhibit 27);

- "You (NML) can't just let people (the Pre-MN annuitants) flip-flop back and forth (elect to exercise the options of their policies)" as stated by Mr. Fisher in deposition testimony, and
- "If you (NML) have the old product (the Pre-MN annuities) and you (NML) have the new product (the CRA annuities), you (NML) have to reconcile them" as stated by Mr. Zore in deposition testimony.


90. Based on my analysis and extensive life insurance industry experience, in my opinion, the two recommendations set forth by TPF&C regarding the Pre-MN annuities were consistent with generally accepted practices and procedures of the life insurance industry and consistent with generally accepted practices and procedures of the actuarial profession, and would have represented a viable course of action for NML. Further, in my opinion, each of the three statements by NML listed above are false and not consistent with generally accepted practices and procedures within the life insurance industry. NML could have and should have had the two products running side by side, NML could have and should have allowed Pre-MN policyholders to elect the options available to them under their contracts, and NML could have and should have allowed the two products to co-exist without reconciliation.

## X. Additional Opinions

91.  The analyses and opinions provided in this report reflect the work on this dispute that I have performed to-date. It is possible that I may be asked to review additional information or provide additional analyses at a later date, and if so, I may have additional conclusions and opinions at that time.

Respectfully submitted,

Robert L. Hoyer, FSA, MAAA
Hoyer Actuarial Litigation, LLC
81 Claire Pass
Saratoga Springs, New York 12866
(860) 716-6757

June 30, 2010

## Position :

Principal – Hoyer Actuarial Litigation, LLC

## Contact Information :

Hoyer Actuarial Litigation, LLC
154 Needletree Lane
Glastonbury, Connecticut  06033

Telephone : (860) 716-6757
Fax : (860) 657-4284
Email : rlhoyer@cox.net

## Education :

FSA – Fellow of the Society of Actuaries (1977)
MAAA – Member of the American Academy of Actuaries (1980)
B.S. – Mathematics, Syracuse University (1969)

## Range of Experience :

Provides litigation support and expert witness testimony regarding
insurance and health care related disputes. Has testified on a wide variety
of issues before municipal and district courts, bankruptcy court,
regulatory hearings, legislative sessions, tax hearings, and SEC reviews.
Topics involved in such projects include management effectiveness,
reinsurance, health care pricing, rehabilitation structuring, acquisition
appraisal, profit, risk, and surplus analyses, life insurance sales practices,

1

and pension disputes. Also provides general actuarial consulting in non-litigation scenarios.

## Representative Clients – Insurance Companies :

- American Bankers Insurance Group
- CIGNA Corporation
- Equitable Life
- John Alden Life
- Legal and General Insurance
- Lutheran Brotherhood
- Massachusetts Mutual Life
- Mortgage Guaranty Insurance
- National Life of Vermont
- New York Life
- Northwestern Mutual Life
- Penn Mutual Life
- Phoenix Home Life
- Provident Mutual Life
- Prudential
- Sun America
- The Hartford
- Transamerica
- Travelers Corporation
- Union Central Life

## Representative Clients – Health Care Entities :

- Aetna
- Alta Bates Medical Group
- Anchor – Access HMO

2

- Blue Cross / Blue Shield of Missouri
- Blue Cross / Blue Shield of South Carolina
- Catholic Healthcare West
- ConnectiCare HMO
- Group Health Northwest
- Health Care Service Corporation
- Health Insurance Association of America
- Health New England HMO
- Health Source HMO
- Hitchcock Health Clinic
- Hudson IPA
- Kaiser Permanente
- Kentucky Health Purchasing Alliance
- Life Care Services
- Mac Neal Health Care
- Magellan Health Care
- National Vision Association
- Oxford Health Plan
- Rockford Health Plan
- Stamford Health Services
- Sutter Health Plan
- United Health Care
- University of Texas Medical Plan
- Western Health Advantage

## Representative Clients – Non-Insurance Entities :

- Amoco
- Avis
- Bankers Trust
- Bank of America
- Barnett Bank
- Bausch & Lomb

3

- **Bethlehem Steel**
- **Borden**
- **Bristol – Meyers**
- **Brown & Williamson**
- **Chase Manhattan Bank**
- **Chemical Bank**
- **Chevron**
- **Commonwealth Edison**
- **Compaq**
- **Continental Grain**
- **Crown, Cork & Seal**
- **Dana**
- **Dart**
- **Dole Foods**
- **Dresser**
- **Dupont**
- **Electric Boat**
- **Exxon**
- **FIAT**
- **Fleet Bank**
- **Flowers**
- **Goodyear**
- **Goldman Sachs**
- **Great Western**
- **GTE**
- **Guinness**
- **Hertz**
- **Hillenbrand**
- **Honeywell Bull**
- **Huntsman Corporation**
- **IBM**
- **Ingersoll Rand**
- **K – Mart**

4

- **Kaiser Aluminum**
- **Kansas City Southern**
- **Kaufman & Broad**
- **Kelloggs**
- **Kodak**
- **Kraft**
- **Liz Claiborne**
- **London Fog**
- **Levi Strauss**
- **Marriott**
- **Merrill Lynch**
- **Morgan Guaranty**
- **Munsingwear**
- **Owens – Corning**
- **Phillip Morris**
- **Pitney Bowes**
- **Quaker Oats**
- **Ralston Purina**
- **R.J. Reynolds**
- **Santa Fe**
- **Stanadyne**
- **Texaco**
- **Toyota**
- **United Technologies**
- **Walt Disney**
- **Westinghouse**
- **Weyerhauser**

## Professional and Business History :

**Hoyer Actuarial Litigation, LLC (2002-    ) – Principal.**

**Arthur Andersen LLP – Managing Partner of Actuarial & Insurance Services (1989-2002).**

**Price Waterhouse – Managing Partner of Actuarial Consulting (1984-1989); Senior Manager (1882-1984); Manager (1980-1982).**

**Aetna Life & Casualty (1971-1980); Officer (1977-1980).**

**Middletown Township High School – Teacher of Physics and Calculus (1969-1971).**

**Syracuse University – Instructor of Psychometrics (1968-1969).**

**Fellow of the Society of Actuaries (1977).**

**Member of the American Academy of Actuaries (1980).**

**Authored articles regarding insurance company federal income tax legislation and implications in the <u>Actuarial Digest</u> and the <u>National Underwriter.</u>**

**Speaker at numerous industry, client, and firm-sponsored seminars on a variety of insurance and health care topics.**

## Other Professional Activities :

**Syracuse University – School of Management Accounting Advisory Board, Society of Fellows, and Ambassador Leadership Programs.**

## Data and Related    Exhibit B
## Information Considered

**Depositions.**
- **Richard Fisher (1/6/05, 1/27/05, and 1/8/10)**
- **James Murphy (1/21/10 and 4/23/10)**
- **Steven Webber (2/19/10)**
- **William Koenig (2/23/10)**
- **Mark Doll (2/26/10)**
- **Lawrence Durland (3/23/10)**
- **Edward Zore (3/9/10)**
- **John Schnorr (2/25/10)**
- **John Komives (5/18/10)**
- **Bruce Williams (5/18/10)**
- **Michael Holden (5/25/10)**
- **Gerald Kreitsman (6/10/10)**
- **Russell Jensen (6/15/10)**
- **Caroline Meckes (6/10/10)**
- **Thomas Dyer (5/23/10)**
- **Chris Trost (6/16/10)**
- **Stephen Frankel (6/15/10)**
- **Annuitants' depositions.**

**Deposition Exhibits 1-180.**

**Affidavits.**
- **William Koenig (5/29/07)**
- **Annuitants' affidavits.**

# Actuarial Standard of Practice No. 15

**Miscellaneous.**
- Amended Complaint
- Defendant's Response
- Protective Order
- Plaintiff's Brief
- Court of Appeals – Wisconsin
- Interrogatory Requests
- Interrogatory Responses.

**Disk Files with Background Information (6)**
- Annual Statements (1963-2005)
- Reports to Shareholders
- Board of Directors – Meeting Notes

R-App 519

EXHIBIT C

(a)     State the "Dividend Interest Rates" for "Life" and for "Pre-MN FPA" for the years 2001 through 2008, or attach to your answers to these interrogatories a chart comparable to Exhibit A to which the Dividend Interest Rates are added for the years 2001 through 2008;

(b)     Describe the formula and each of the factors used in computing the dividend interest rates for "Pre-MN FPA" annuities for the years 1975-2008 and identify all Documents that pertain to the determination of those dividend interest rates;

(c)     Describe the formula and each of the factors used in the computing of the dividend interest rates for "Life" policies for the years 1975-2008 and identify all Documents that pertain to the determination of those dividend interest rates;

(d)     Identify all Documents setting forth any computations, factors or formulae resulting in any of the dividend interest rates listed in the chart, provided in response to subsection (c) above or added to the chart attached hereto as Exhibit A.

**Supplemental Answer to Interrogatory No. 25:**     Northwestern Mutual asserts the General Objections set forth above, particularly General Objections 1, 2, 3, 4, 6, and 7, as if fully set forth herein.  Subject to and without waiving such objections, Northwestern Mutual responds as follows:

*(a)*

| Dividend Interest Rates | | |
|---|---|---|
| Year | Life | Pre-MN |
| 1986 | 11.25% | 11.00% |
| 1987 | 11.00 | 10.75 |
| 1988 | 10.25 | 10.75 |
| 1989 | 10.00 | 10.75 |
| 1990 | 10.00 | 10.00 |
| 1991 | 10.00 | 10.00 |
| 1992 | 9.25 | 9.50 |
| 1993 | 9.25 | 8.50 |
| 1994 | 8.50 | 7.50 |
| 1995 | 8.50 | 7.00 |
| 1996 | 8.50 | 7.00 |
| 1997 | 8.50 | 6.50 |
| 1998 | 8.80 | 6.50 |
| 1999 | 8.80 | 6.50 |
| 2000 | 8.80 | 6.50 |
| 2001 | 8.80 | 6.50 |
| 2002 | 8.60 | 6.25 |
| 2003 | 8.20 | 5.75 |
| 2004 | 7.70 | 5.00 |
| 2005 | 7.50 | 4.65 |
| 2006 | 7.50 | 4.35 |
| 2007 | 7.50 | 4.35 |
| 2008 | 7.50 | 4.35 |

By "Life" the above chart is referring to traditional, non-variable, cash value life insurance policies. In addition, the dividend interest rates shown are dividend interest rates paid on unborrowed cash values for policies with direct recognition.

(b)     Pursuant to Wis. Stat. § 804.08(3), Northwestern Mutual incorporates the Supplemental Document Production. Northwestern Mutual further states as follows: