# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,

                    Plaintiffs,

                    v.                                       Case No. 2:11-CV-00910

THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,

                    Defendant.

---

## APPENDIX TO NORTHWESTERN MUTUAL'S OPPOSITION TO

## PLAINTIFFS' MOTION TO CERTIFY A NATIONWIDE CLASS

## VOLUME III

### Items 33-53

### Pages 522-772

# Index to Northwestern Mutual's Appendix

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 1 | Robert Hoyer Deposition Transcript Excerpts | May 17, 2013 | 1 | I |
| 2 | Plaintiffs Proposed Findings of Fact, Conclusions of Law and Order for Judgment | Dec. 20, 2010 | 56 | I |
| 3 | Plaintiff's Reply Brief in Support of Class Certification | Sept. 30, 2009 | 85 | I |
| 4 | *Noonan* – Decision on Motion to Certify for Class Action | June 15, 2005 | 102 | I |
| 5 | *Noonan* – Plaintiffs' Brief in Support of Motions: (1) to Certify Class Trial of Count One (Declaratory Relief) and Class-Wide Issues of Count Two (Breach of Contract), and (2) for Partial Summary Judgment | Apr. 30, 2007 | 108 | I |
| 6 | *Noonan* – Decision on Motions to Certify for Class Action and Summary Judgment | Jan. 29, 2008 | 118 | I |
| 7 | Motion Hearing Transcript Excerpts | June 1, 2009 | 129 | I |
| 8 | Decision and Order on Motion of Plaintiff for Class Certification | Oct. 26, 2009 | 137 | I |
| 9 | Hearing Transcript Excerpts | Oct. 12, 2009 | 156 | I |
| 10 | Decision on Motion of Defendant to Dismiss | June 15, 2009 | 161 | I |
| 11 | Decision and Order | Aug. 20, 2012 | 180 | I |
| 12 | Expert Report of Michael J. Moore, Ph.D. | June 28, 2013 | 188 | I |
| 13 | Summons and Complaint | Aug. 26, 2008 | 267 | I |
| 14 | Affidavit of Jason T. Klawonn | June 27, 2013 | 293 | I |
| 15 | Affidavit of Nicholas J. Sales | June 27, 2013 | 297 | I |
| 16 | Expert Report of Ravi Dhar | July 1, 2013 | 300 | II |
| 17 | Expert Wtiness Report: Robert L. Hoyer, FSA, MAAA | Mar. 4, 2013 | 333 | II |
| 18 | Table 1, States prohibiting choice of law provisions specifying application of other states' law to resident policyholders | | 359 | II |
| 19 | Table 2, States Deeming Resident Policis as Made in the State and Subject to that state's law | | 360 | II |
| 20 | Table 3, States requiring insurance companies to comply with law of state of insured's residence | | 361 | II |
| 21 | Northwestern Mutual's Opposition to Plaintiff's Motion to Remand | Nov. 18, 2011 | 362 | II |
| 22 | Marleen LaPlant Deposition Transcript Excerpts | Sept. 9, 2009 | 371 | II |
| 23 | LaPlant Annuity policy | May 1, 1975 | 395 | II |
| 24 | LaPlant surrender | July 3, 2008 | 408 | II |
| 25 | Webster's Collegiate Dictionary: definition of surrender | 1996 | 412 | II |
| 26 | Black's Law Dictionary: definition of surrender | 1999 | 416 | II |
| 27 | Trial Ex. 157, NML Single Premium Retirement Annuity Policy for Bruce Williams | May 3, 1986 | 419 | II |
| 28 | Trial Ex. 155, NML Flexible Premium Annuity Policy for Bruce Williams | July 27, 1984 | 433 | II |

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 29 | Bruce Williams Deposition Transcript Excerpts | May 8, 2010 | 450 | II |
| 30 | November 8, 2010 pm Trial Transcript Excerpts | Nov. 8, 2010 | 460 | II |
| 31 | November 8, 2010 am Trial Transcript Excerpts | Nov. 8, 2010 | 471 | II |
| 32 | Expert Witness Report: Robert L. Hoyer, FSA, MAAA | June 30, 2010 | 477 | II |
| 33 | Decision in Matter Tried to the Court | Mar. 7, 2011 | 522 | III |
| 34 | Report to the Court Regarding Class Notice | Mar. 31, 2010 | 619 | III |
| 35 | Trial Ex. 528, Dividend Interest Rates vs. Current Rate Annuity Credit Rates | | 622 | III |
| 36 | Trial Ex. 66, NM Feb 1985 Information Release to all Agents | Feb. 1985 | 623 | III |
| 37 | Trial Ex. 67, Introducing NM New FPA-SPRA | Feb. 26, 1985 | 629 | III |
| 38 | Trial Ex. 73, Column – Change to current rate method on annuities expected to meet w/ consumer satisfaction | June 12, 1985 | 662 | III |
| 39 | June 7, 1990 Letter | June 7, 1990 | 663 | III |
| 40 | April 7, 1998 Email | Apr. 7, 1998 | 664 | III |
| 41 | September 14, 1999 Letter | Sept. 14, 1999 | 665 | III |
| 42 | Trial Ex. 316, NML Letter to Noonan's re Contract #7182718 | May 9, 2000 | 667 | III |
| 43 | *Thao v. Midland Nat'l Life Ins. Co.*, No. 09-C-1158, 2012 WL 1900114 (E.D. Wis. May 24, 2012) | May 24, 2012 | 670 | III |
| 44 | *Noonan v. Northwestern Mut. Ins. Co.*, 726 N.W.2d 356 (Wis. Ct. App. 2006) (*Noonan II*) | Nov. 16, 2006 | 678 | III |
| 45 | *Am. Express Co. v. Italian Colors Rest.*, No. 12-133, 2013 WL 3064410 (U.S. June 20, 2013) | June 20, 2013 | 686 | III |
| 46 | *Heretick v. Northwestern Mut. Life Ins. Co.*, No. 02-1061-CI-11, 2003 WL 25694174 (Fla. Cir. Ct. June 23, 2003) | June 23, 2003 | 704 | III |
| 47 | *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, Nos. C-05-04726 RMW, C-06-00537 RMW, 2007 WL 486367 (N.D.Cal Feb. 12, 2007) | Feb. 12, 2007 | 712 | III |
| 48 | *Maine Farms Venison, Inc. v. Peerless Ins. Co.*, No. CV-01-005, 2002 WL 33946004 (Me. Sup. Ct. Apr. 18, 2002) | Apr. 18, 2002 | 721 | III |
| 49 | *Garvey v. Nat'l Grange Mut. Ins. Co.*, No. CIV.A.95-0019, 1995 WL 115416 (E.D. Pa. Mar. 16, 1995) | Mar. 16, 1995 | 733 | III |
| 50 | *Woodard v. Fid. Nat'l Title Ins. Co.*, No. CIV 06-1170 RB/WDS, 2008 WL 5737364 (D. N.M. Dec. 8, 2008) | Dec. 8, 2008 | 737 | III |
| 51 | *Chilton Water Auth. v. Shell Oil Co.*, No. CIV.A. 98-T-1452-N, 1999 WL 1628000 (M.D. Ala. May 21, 1999) | May 21, 1999 | 745 | III |
| 52 | *Kindschuh v. City of Fond du Lac*, No. 09-C-213, 2010 WL 1507883 (E.D. Wis. Apr. 14, 2010) | Apr. 14, 2010 | 753 | III |
| 53 | *Boelk v. AT&T Teleholdings, Inc.*, No. 12-CV-40-BBC, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013) | Jan. 10, 2013 | 762 | III |

State of Wisconsin          Circuit Court          Milwaukee County

Marleen M. Plant, on her own behalf *     **DECISION IN MATTER**
and on behalf of a class similarly
situated,                                 **TRIED TO THE COURT**
        Plaintiff,

Versus



The Northwestern Mutual Life          Case No. **08-CV-11988**
Insurance Company, a Wisconsin   *    Code:   30701
Mutual Insurance Corporation,         Declaratory Judgment
        Defendant.        *

FILED

MAR — 7 2011

JOHN BARRETT
Clerk of Circuit Court

## INTRODUCTION

The Summons and Complaint in this matter were filed on
26 August 2008.  Defendant filed a Motion to Dismiss on
various grounds on 20 October 2008.  It was briefed by both
sides.  That matter was resolved by a written Decision dated
15 June 2009.  The Answer and Affirmative Defenses were
filed on 10 July 2009.

Plaintiff filed a Motion for Class Certification on 18
August 2009.  Both sides filed briefs on this motion.  A
written Decision on the Motion for Class Certification was
entered on 26 October 2009.  Next, a Scheduling Order was
signed on 3 November 2009.

On 16 November 2009, Plaintiff filed a Motion to

1

Approve Class Action Notice (This also included an Order for Dissemination of Class Notice and an Opt-Out form.). Objection was made and Legal Briefs were submitted by both sides. A written Decision was filed on that matter by the Court on 12 December 2009.

The case was scheduled to be tried to a Jury beginning on 8 November 2010. Before trial both sides joined in waiving their right to a Jury Trial and asked that the matter be tried to the Court. That Joint Motion was granted and the court trial began on 8 November 2010. Multiple written Motions in Limine were filed by the parties and ruled on by the Court. The trial itself lasted two full weeks at the Milwaukee County Courthouse. The parties requested that they be allowed to file post-trial legal briefs. That request was granted. The last brief was filed on 28 January 2011.

This class action case was brought as a declaratory judgment under Wisconsin Statutes, section 806.04. It relates to the rights and duties of the parties regarding certain pre-MN annuity contracts sold by Northwestern Mutual Life Insurance Company (hereafter NWM) and the meaning of Wisconsin Statutes, section 632.62.

## FACTS

Each side in this matter presented evidence through

witnesses, exhibits and confrontation via cross-examination. There were 21 witnesses and over 500 exhibits. Further, Counsel for both sides made Opening Statements and Closing Arguments. The Court benefited from the scope and focus of those presentations and the legal briefs that were filed.

The Court will review, as to both sides, certain testimony given by the witnesses and some of the critical exhibit evidence presented. The determination of the facts and the reasonable inferences that flow from those facts is critical in this case given the disputed positions maintained by Plaintiff Class and Defendant Insurance Company. Also, the facts will determine whether certain legal rules in Wisconsin should or should not be applied in this matter. Comments will be made as to credibility issues relating to the witnesses.

Not all matters in this declaratory judgement case are in dispute. Agreement exists as to the critical insurance statute and as to certain Pre-MN annuity contract terms. The parties each agree that the statutory wording of Wisconsin Statutes, section 632.62 is unambiguous, but, paradoxically, they disagree as to what that unambiguous language means. Finally, the actual words contained in the Pre-MN annuity contracts as to policy dividends are not in dispute. What those words mean and/or allow is in dispute.

Witnesses were presented in the trial as follows:

3

A. **Daniel A. Noonan**
This witness purchased Pre-MN annuities from Northwestern Mutual beginning in 1976. Exhibit 310 is the December 1976 Annuity policy he purchased. It contains the following unqualified language at paragraph 4.1 which was written by NWM and is titled DIVIDENDS:

> "*This policy shall share in the divisible surplus, if any, of the company. This policy's share shall be determined annually and credited as a dividend.*" (*Underlining* added.)

Similar language is found in <u>each</u> NWM Pre-MN annuity policy of class members, including those who agreed to the amendment in 'UPDATE 83'. The policy language notes that they are participating contracts which means that the Pre-Mn annuitants are owners of NWM.

This witness is now (since 1996) a Circuit Judge in Milwaukee County. Judge Noonan said his NWM agent was Dan Matigan. He said NWM had a marketing strategy in their sale of the Pre-MN annuity product. Mr. Matigan intentionally told him, in his sales initiative, that the beauty of this annuity is that you get the same rate as the whole life policies get. Judge Noonan said NWM agent Matigan sold the annuity products to him as long term retirement investments. Mr. Matigan said Judge Noonan was annually to be paid a portfolio rate under the annuity contract which would be a share of the divisible surplus of the earnings of NWM's general fund. Mr. Matigan never told Judge Noonan that the Pre-MN annuity dividend was to be interest from a short term bond fund. As a policy owner Judge Noonan learned in 2000 (See Exhibit 316) that NWM made a change to his (and his wife's) annuity policy in 1985. He never was notified of that change by NWM. He asked his NWM agent for an explanation of the lower rate of return he was getting on his annuities as compared to his NWM life policies. His agent sent a letter to NWM (Exhibit 315) and Mr. Richard Fisher responded for NWM. See Exhibit 316. An earlier NWM response from Mr. George Akpan of Customer Services (Exhibit 192) to Ms. Katherine D. Noonan was inaccurate according to Mr. Fisher.

4

The Mr. Fisher response raised many concerns in Judge Noonan, including the fact that he and his wife never received notice regarding this annuity contract modification. Thereafter, he checked with the Wisconsin Insurance Department and it was his opinion (policy owner/expert under 907.02 Stats.), based upon his interaction with that Office, that the Wisconsin Insurance Department/Commissioner's Office never gave NWM approval for the '1985 change' to his (or his wife's) annuity contract or permission to modify his or the other Pre-MN annuity policies at issue in this case. He was notified by NWM of "UPDATE 83" and he agreed in writing (Exhibit 313) to the modification or policy amendment sought by NWM. It was his position that the PRE-MN annuities could only be amended by mutual agreement after notice was provided to the policyholders by NWM. He expressed the position that the UPDATE 83 amendment was a clear example, as precedent, for the understanding as to how NWM knew any change to his (and the Class) annuity could be made. Judge Noonan is the Plaintiff in a separate lawsuit against NWM relating to his Pre-MN annuity policy. That still-pending case has had a decision issued by the Wisconsin Court of Appeals in **276 Wis. 2d 33 (Ct. App. 2004)**. Counsel for NWM announced (not as a threat, but as a fact) in this trial that the noted Court of Appeals decision would be appealed with respect to the conclusion that NWM had a fiduciary duty to the Pre-MN annuitants. Judge Noonan's involvement in that case is a factor to consider in deciding what weight to give to his testimony in this matter and any bias he may have.

B. **Bruce Williams**
This person purchased Pre-MN annuities from NWM agent Rick Stamm in July 1984 (Exhibit 155). He stated Agent Stamm, acting on behalf of NWM, marketed his annuity product as a long term investment for retirement. Mr. Stamm said the value of the Pre-MN annuities would grow through dividends which would be determined by the profits of the NWM Company. This NWM agent also gave Mr. William's long term projections regarding policy growth. Mr. Williams first learned of the '1985 change' when he got the Class Notice in this case.

5

The sales pitch utilized by the NWM agent was composed of telling Mr. Williams that the Pre-MN annuity growth in this retirement investment would come from sharing in the profits of the company's overall investment portfolio.

C. **Janet Reichart**
This woman purchased 2 Pre-MN annuities from NWM in 1983. She said NWM Agent Michael Hargarten marketed the Pre-MN annuity product as a long term retirement investment. He also told her that her yearly dividends would be based upon the profits of the company. The annuity contract said that as well. She never received any notice of the '1985 change' until she got the Class Notice in January 2010. She would not have agreed to the '1985 change'. On the advice of her financial adviser, she surrendered her NWM Pre-MN annuities in 1995.

D. **Marlene LaPlant**
She is the named individual Plaintiff for the Class. She purchased her NWM Pre-MN annuity(s) (Exhibit 261) in 1975 when she was about age 32. She said NWM agent Mark Nutag marketed the Pre-MN annuity product as a long term retirement investment for her. She understood that her annuity would grow from dividends reflective of the general account portfolio of the NWM Company. She surrendered her Pre-MN annuity(s) at retirement and rolled it over into her Vanguard account. She first learned of the '1985 change' upon reading a newspaper article (Exhibit 264) on a lawsuit brought by Daniel Noonan (see A above). She received written notice from NWM regarding 'Update 83' and agreed in writing to that policy amendment. By inference, this meant that NWM knew that notice and mutual consent were minimum predicates to amending the Pre-MN annuity policies. She never would have agreed to the '1985 change' as it changed her portfolio dividend calculation from NWM's general account divisible surplus to a separate and segmented short term bond fund within the general account portfolio of NWM.

D. **Richard Fisher**
This witness was the internal NWM employee/actuary responsible (team captain) for managing the development of the new Current Rate Annuity

6

(hereafter CRA) product for NWM during the period 1982 through 1 March 1985. He referred to this position, for him, as being "unfortunate". He presented himself as not really knowing what was going on regarding the Tower consultation matter. He noted that he would put matters in his memo's regarding the '1985 change' that he knew nothing about just because someone mentioned the data to him or he overheard it. Mostly, he underplayed his and NWM's involvement in creating a current rate annuity product and thereafter modifying the Pre-MN annuity product. He worked for NWM for 33 years and retired in about 2006. He said that Mr. Akpan did not correctly relate why NWM made the '1985 change'. He wrote the Noonan's a correct explanation in Exhibit 194.

NWM was confronted in the late 1970's and early 1980's with a very difficult interest environment. He said he was not an expert on interest rates or an inverted yield curve, but that the relatively high short term market interest rates were causing problems with the sales of NWM's annuity products and were inducing in-force life policies to incur loans and in-force annuity policies to incur either loans or cancellations. He called this phenomenon "disintermediation". Also NWM's competitors were selling CRA annuity products which were based on higher current market rate dividend returns to policyholders than did NWM's annuity policies. This allowed those competing companies to create illustrations which were based upon those current (short term) high market rates. Since NWM's investment approach was long term and conservative, this meant that sales projections or illustrations for NWM's annuity dividends were lower than the projections made by competing insurance companies. Short term interest rates in this period (late 1970's and early 1980's) tended to be higher than NWM's portfolio rate. This was the inverted yield situation which led to disintermediation. However, he noted that NWM was able to easily absorb cash problems associated with annuity surrenders. It was his view that the impact on NWM from disintermediation was quite small.

To address some disintermediation problems (but not significantly cash issues regarding annuity

7

surrenders), NWM hired a consultant (Towers, Perrin, Forster and Crosby hereafter referred to as Tower) to develop a "current-rate annuity product" (CRA). NWM's sales agents were also asking that such a product be developed. Larry Durland was the actuary from Towers who was assigned to do the consulting on this matter. Mr. Fisher attempted to undercut the importance of this consultation hiring by stating that NWM often hired consultants but didn't follow 80% Of the reports that were filed. Mr. Fisher noted that his letter to Mr. Durland of 23 February 1982 discussed disintermediation, but that he believed that was only a "minor concern" to NWM. There was much interaction between Mr. Fisher (and senior NWM management) and Mr. Durland on the consultation project. He noted that the Pre-MN annuity products were long term investment products that looked toward a policy holder's retirement.

The report from the consultant did recommend the creation of a CRA product. It also recommended that NWM "segment" the assets underlying the annuity products by means of a separate portfolio within the general NWM portfolio. This was a concept that was gaining traction in the insurance industry, but was <u>new</u> to NWM in terms of its actual use. In Exhibit 16 Mr. Fisher refers to segmentation as follows:

> "A <u>recent development</u> in the insurance industry has been a technique called 'segmentation'." (Underlining added)

Mr. Durland recommended treating the Pre-MN annuities separately as opposed to folding them into the new CRA annuity product or else creating a subsidiary for the new annuity product. He viewed an exchange program as opposed to unilateral segmentation by NWM. This part of the Consultant's recommendation was overridden by NWM even though Mr. Fisher and Mr. Durland were not aware of any other mutual insurance company folding its existing annuity product(s) into a new CRA product or its investment segment. See Exhibits 9 and 11. It was the recommendation of Mr. Fisher and the NWM Committee on developing a new CRA product that the new CRA and the Pre-MN

8

annuities should both receive dividends based upon the returns from a separate/segmented portfolio that was referred to in Exhibit 9 at page two as:

> "*The ideal portfolio would be a short to intermediate term debt portfolio without equity or conversion features… The general account of NML would be segmented into two parts—an annuity portfolio and an insurance portfolio. Separate assets would be identified for the two segments. Segmented portfolios is the KEY REQUIREMENT to providing returns on annuity contracts different from returns on insurance contracts.*"

Within NWM there was spirited discussion/vetting regarding the CRA product and what to do with the Pre-MN policies. No information was presented regarding input from NWM's legal counsel although that was requested by the Product Planning Committee. See Zore Exhibit 27 and Jensen Memo of 18 July 1984 – Exhibit 28. Mr. Fisher said it was the opinion of Chief Actuary Gustafson that the CRA product would not survive an interest rate downturn. Ultimately, NWM decided to utilize segmentation and have a separate portfolio that would support the annuity products, both Pre-MN annuities and the new CRA's. The Pre-MN annuities were to be made to look like the new CRA product, even though the products were quite dissimilar. In the deposition of Mr. Fisher he noted that mutual insurance companies " … *are supposed to credit the portfolio rate to all products unless there are some special arrangements.*" This acts to impeach NWM's segmentation action regarding Pre-MN policies in the '1985 change'. Because the Pre-MN policyholders were never even given notice regarding the '1985 change', no special arrangements were made with these Pre-MN annuitants.

Mr. Fisher instigated action to seek approval from the New York and Wisconsin Insurance Commissioners for segmentation for the CRA's and the Pre-MN products. On 13 August 1984, he sent a letter (Exhibit 348) to Mr. Bernard Packer, the Assistant Chief Actuary for the New York State Insurance Department. In that letter he sought a reaction

9

R App 530

to NWM's '1985 change' plan and a meeting.  As to the Pre-MN annuities Mr. Fisher said NWM wanted to do the following:

> "We would like to put the dividend interest rate on a consistent basis with the new contracts to avoid any internal replacement now or in the future.  To accomplish that, we would like to identify a portfolio of assets for this block and invest it consistently, i.e., one to three years. As of June 30, 1984 the amount would be about $358 million.

In this letter Mr. Fisher goes on to tell the New York Insurance Department what NWM is going to do in communicating the '1985 change' to the in-force Pre-MN annuitants in order to obtain New York's " ... temporary approval."  The actions that he says will be taken include the following:

1.  "The November 1, 1984 dividend information release to agents and press releases picked up by newspapers would mention the interest factor for the 1985 scale and would mention a restructuring of the investment account for annuities to make 1986 and subsequent scales more current."

2.  "The 1984 annual report published in spring 1985 would again mention the change."

3.  "Finally, a stuffer with dividend notices on 1985 anniversaries for annuity policyholders would explain the dividend rate for the policy year just completed and mention that the rate for the upcoming year will be a more current rate which will reflect shorter-term investments."

The letter goes on to state that:

> "We think that this will constitute adequate notification of our change in

10

*investment philosophy for annuities to
our policyholders.*" (Underlining added)

This communication notes then that temporary
approval is sought for the proposed '1985 change'
and that NWM itself says what it believes would
constitute adequate notice of the changes to Pre-
MN annuitants. Mr. Fisher says none of the three
conditions noted in the 13 August 1984 letter were
met. This is corroborated, he notes, in the
official records of NWM regarding these three
matters. In Exhibit 66 to NWM agents false
information (superior product) is given by NWM and
agents are told to recommend no exchange or
replacement of the Pre-MN policies. Exhibit 66
(NWM's Manual to field agents) is false in that it
calls the new CRA a superior product and that
wouldn't be the case unless interest rates were to
go/stay up. Also, the Pre-MN annuitants had more
control over their funds (loans and no penalty for
surrender). Although NWM claims to have received
approval for the '1985 change' from the New York
Insurance Department, no evidence was presented
that NWM ever advised New York of investment fund
modifications made to the '1985 change' proposal
or of non-compliance with the 3 notification
guarantees made to inform Pre-MN annuitants in
this over 1/3 billion dollar matter.

Mr. Fisher sent another letter to Mr. Packer
regarding this matter on 26 October 1984 (Exhibit
108). It summarizes their face-to-face meeting in
New York on 25 September 1984. In the letter Mr.
Fisher provides assurances regarding 3 matters
that the New York State Insurance Department
wanted addressed. NWM did not back off of any of
the commitments it made to New York in the earlier
letter of Mr. Fisher on 13 August 1984. The State
of New York Insurance Department gave, on 27
December 1984, approval to NWM for the '1985
change' by means of the following language:

> "*Based upon your submission of August
> 13, 1984 and our meeting with you, Bill
> Snell, Rob Bluhm and Dan Gardner in our
> office on September 25th, your follow-up
> letter of October 26, 1984 reported
> accurately the agreements reached at
> that meeting. Relying on the*

11

> commitments made in your letter of
> October 26[th] we are approving your
> submission with respect to your
> identification of assets, for
> segmentation purposes only, as
> appropriate for Flexible and Single
> Premium Deferred Annuities as separate
> from all remaining assets."

It was Mr. Fisher's position that the State of New York Insurance Department gave NWM approval for the '1985 change' at issue for Pre-MN annuities.

The language in the CRA is different from the Pre-MN annuities as to dividends. In Exhibit 125 at Section 4.1 it is stated as to the new CRA product:

> " ... Since this policy is not
> expected to contribute to divisible
> surplus, it is not expected that any
> dividends will be paid."

In other words, the CRAs and the Pre-MN annuities after the '1985 change' would receive interest from the segmented bond portfolio and not dividends from the NWM general account portfolio.

Mr. Fisher noted that NWM wanted a gradual, and not a precipitous, drop in the interest rate/dividend that went to Pre-MN annuitants after the '1985 change'. It accomplished that result by adding funds to the new segmented bond portfolio for a number of years. See Exhibit 353. For instance, in 1986 it provided a loan from NWM surplus so as to provide an 11.15% dividend to Pre-MN annuitants when the bond fund only produced about 9%. Mr. Fisher rejected the idea that these supplements by NWM to the returns provided by the segmented bond fund were for the purposes of concealing from the Pre-MN annuitants the fact of the '1985 change'. That position is undercut by his discussion of Exhibit 32, his deposition statements regarding all annuity policyholders sharing in the divisible surplus of NWM and his August 1984 letter to the State of New York Insurance Department regarding the implementation of the '1985 change'. In Exhibit 33 Mr. Fisher discusses why the segmentation occurred as to Pre-

12

MN policies. After NWM sought permission for segmentation, Mr. Fisher, in explaining why NWM moved to segmentation, revises the historical record without adding further data to say that state insurance departments " ... *are requiring life insurance companies to 'match' maturities on assets and liabilities, to be able to demonstrate the self-supporting nature of each product line as a consequence of the Baldwin-United debacle."*

Mr. Fisher said that NWM did not fund the bond fund as it told New York it would. The investments were not 4 years or less. Equities were included as the fund was established. The amount placed into the bond fund was not that noted in the letters exchanged. Supplements were made for many years to gradually move the Pre-MN policies to the bond fund so that they would grow only through interest payments.

Mr. Fisher's presentation was very unusual in the following respects and these go to credibility, believability, inferences and the weight to be given to his testimony:

1.  He only testified as an adverse witness on direct for the Plaintiff. His testimony was important and hotly contested. The Defendant, after direct examination, announced that it was reserving cross examination of this witness for its Case-in-Chief. Yet, Mr. Fisher was never called to testify by Defendant, nor was any explanation given for his not being called in the Defendant's Case-in-Chief. The court has never seen a civil case where a/the major witness for a party in a contested matter only gave testimony for the adverse party and no rehabilitation and/or other direct testimony was provided through him for the party for whom he worked and with whom his interests appeared to lie. This is particularly the case where much of this witness's testimony and its inferences were damaging to the Defendant's positions. This witness was on the stand for many hours over 2 days and his

13

own testimony established that he was or likely should be a knowledgeable person with regard to many of the actions that were taken by NWM concerning the '1985 change'. Certainly the decision on who to call as a witness is up to the parties, but this absence of calling a witness after announcing that NWM would do so is perplexing. No statement was given as to unavailability and no request to adjourn for cause was made regarding this witness.

2. The court staff advised that they could smell alcohol on the witness's breath on his first day of testimony. Counsel were advised of this on the record.

3. The witness was overtly hostile to Plaintiff's counsel. Conversely, counsel was respectful and courteous to the witness.

4. The witness called Plaintiff's counsel by his first name – even when cautioned by the court to stop doing so.

5. The witness pointed his finger repeatedly at Plaintiff's counsel. The body language, again, was overtly hostile.

6. The witness in the afternoon had his hands shake when confronted as to some answers. He also regularly smirked, squinted and twitched during and between questions and answers.

7. The witness came across as untruthful, evasive and not accepting of the responsibility that he had as NWM's lead agent and team captain regarding the '1985 change'. He appeared to consistently minimize and ignore his involvement regarding the '1985 change' as to the Pre-MN annuities. At one point he referred to only knowing what he was told over lunch when the credible evidence was that he was a/the central

14

figure in studying and implementing the '1985 change'. Memory problems existed as to documents he authored. That appeared contrived and situational. The evidence indicates this witness was in senior management as an actuary and was selected by competent management to take a/the lead role for NWM as to the '1985 change'. His 'running away' from knowledge of and responsibility for his and NWM's actions regarding the circumstances of the '1985 change' and the non-notification of the Pre-MN annuitants as to that 'change' leads directly to an inference that he and NWM knew that he/it was wrong to unilaterally implement the '1985 change' (including Pre-MN segmentation) and that notice should have been given (ala UPDATE 83 and the amendments made in 1976 and 1980), but that Defendant decided, for reasons that only benefited NWM, to conceal the '1985 change' from Plaintiff Class.

8. The witness muttered words when no question was before him and appeared argumentative often. This occurred even when he was given an opportunity for breaks during the trial.

**F.** **Lawrence V. Durland, Jr.** (Deposition)
This witness was the person who, as an employee of Towers, did the consulting for NWM regarding the possible development of a new Current Rate Annuity (hereafter CRA) product. He began this task on 15 February 1982. Exhibit 2. His primary contact person within NWM was Mr. Fisher. His final report is noted by Mr. Fisher in a July 1982 Memo to the NWM new product Planning Committee and again in Mr. Fisher's Memo if 30 July 1982. Exhibit 11. His final report recommendations included according to his testimony and as relevant to this dispute:

1. The development of a CRA product.

2. Segmentation of assets that would support the CRA. This was a new idea

15

that he brought to NWM.  He had
experience with this concept as opposed
to NWM's limited academic knowledge of
this developing financial tool.  He said
he knew of no insurance company that
implemented segmentation retroactively
to cover existing annuity policies.
Rather, the concept, when implemented,
was applied only in a prospective
manner.

3.    The segmentation would be prospective as
      to the new CRA's and would not include
      the existing annuity block of business.
      He emphasized, in support of this
      position, regulation, practical business
      practices and equity for the existing
      block of annuity business in terms of
      past treatment by NWM of these
      annuitants.  He believed that the New
      York State Insurance Department would
      not approve retroactive segmentation of
      the Pre-MN annuities into the new CRA
      segmented account.

4.    The existing annuities (Pre-MN
      annuities) could be converted to the new
      CRA segmented account if there was a
      written agreement entered into between
      NWM and the individual annuitants or
      through a subsidiary that could be
      created.

The actual Report of Mr. Durland could not be
located by NWM and was therefore not presented
into evidence.

G.    **Edward J. Zore**
      During the period when the '1985 change' was
      studied and implemented, he was a NWM Vice
      president and Treasurer.  Later he became Chairman
      and CEO of NWM.  He retired from NWM in July 2010.

      He noted that the NWM Pre-MN policies were long-
      term, accumulative, retirement-oriented products.
      He agreed with Exhibit 122 (the Wisconsin Guide to
      Annuity) that annuities should not be bought for
      the short term.  It was the long held position of
      NWM that its investment approach was long-term and

16

not one of following the vagaries of short-term
market swings. This was quite successful over the
decades for NWM. In the Annual Reports of NWM the
company stated that dividends were a way for
policyholders to share in the improved results of
this mutual insurance company. Exhibits 85A and
85B and multiple Annual Reports in evidence. Two
investments made by NWM in its general account
portfolio before the '1985 change' were the
purchase of broker-dealer Baird and MGIC. Just
these two investments produced well over one half
Billion dollars in unrealized long term capital
gains in the NWM general account portfolio. These
gains ultimately were realized after the '1985
change' and those significant dollar benefits
inured only to the life insurance segment within
NWM's general account portfolio. None of the gain
went to the Pre-MN policyholders because
segmentation placed all of these investments
totally in the insurance segment of the NWM
general account portfolio.

He was aware of the fact that the NWM Product
Planning Committee was considering the development
of a new CRA product. He knew that other senior
NWM management persons (Exhibit 28) had concerns
about the legality of converting the Pre-MN
annuities into a segmented account. He addressed
this subject in a cautionary Memo to the Committee
of 27 June 1984. He acknowledged that the new
product would have vetting by NWM's law
department, but no evidence of input from that
discipline was presented during the trial. The
new CRA product would have no loan option and it
produced a penalty if surrender were to occur. He
pointed out to the Committee that the
approximately $342 million dollars that would
constitute reserves under a united CRA/Pre-MN
segmented account were subject to a huge mismatch
since the market value of those reserves were " …
*approximately $24 million lower than book."*
Exhibit 23. At the time of this Memo Mr. Zore was
in charge of NWM's investments. He authored
another Memo (Exhibit 27) on 16 July 1984 wherein
he continued to note problems with the new CRA
product due to NWM's existing annuity book of
business. He supported segmentation, but noted
that the dividend then paid to Pre-MN
policyholders was as follows:

17

> *"The real problem is with the current*
> *FPA. We currently pay a dividend based*
> *on the General Account Portfolio."*

To resolve what he believed would be
disintermediation exchanges or borrowing by Pre-MN
annuities into the CRA product or surrenders of
the Pre-MN policies, he suggested that NWM engage
in intentionally obfuscating or confusing its Pre-
MN annuity policyholders. His words in the Memo
were as follows:

> *"We can't have the old FPA and the new*
> *CRA running side by side* <u>*so the old FPA*</u>
> <u>*has to be made to look like the new CRA*</u>
> <u>*even though the contract language might*</u>
> <u>*be different." (Underlining added)*</u>

AS noted above, he knew that the CRA product and
the Pre-MN annuities were different in many ways
including the 'no loan provision', interest
payments made as opposed to dividends, the
'surrender charge language', no front loading and
a 1.8% interest margin allowed for recovery of
costs. He further notes awareness of the
difficulties involved in transferring the Pre-MN
policies into the proposed segmented account given
NWM's history of paying annuity dividends from its
general account portfolio. In Exhibit 27 he
wrote:

> *"We can manage these assets a little*
> *more effectively than taking a general*
> *slice but we still end up with a*
> *portfolio initially that doesn't meet*
> *the needs of the FPA/CRA market.* <u>*In*</u>
> <u>*other words, we can't make a silk purse*</u>
> <u>*out of a sow's ear immediately. It will*</u>
> <u>*take time and there are costs involved."*</u>
> *(Underlining added)*

He also discusses the option of subsidizing the
annuity business and this was the approach that
was finally utilized by NWM. It was his position
that subsidizing the Pre-MN annuities after the
'1985 change' was not an effort by NWM to conceal
the fact of that change from the Pre-MN
policyholders. Rather, this subsidizing of the

18

Pre-MN policies was part of an effort by NWM to create a "soft landing" for this book of business as the change to paying 'interest only' from the new segmented bond fund occurred. See Exhibits 116, 118, 120 and 129. He led the NWM effort to actually place specific investments into the annuity segmented account. He noted that it did not concern him that the illustrations that were used in the marketing and selling of the Pre-MN annuities were portfolio-based and not limited to a segmented CRA bond fund. Also, he was aware that the investments within the segmented account were not of the type stated by NWM to the State of New York Insurance Department in securing its approval for the '1985 change'.

Mr. Zore did acknowledge the different rates paid by NWM to its life policies as compared to the Pre-MN policies. This is seen in Exhibit 528. In three of the 26 years since the '1985 change' NWM paid the Pre-MN policies a higher rate than was paid to the life policies. This occurred during the years (1988, 1989 and 1992) when NWM subsidized the Pre-MN segmented account interest earnings. In 2 of the 26 years the interest paid (1990 and 1991) on both books of business was the same. However, for 21 of the 26 years involved the Pre-MN annuitants were paid a lower annual interest rate than the dividend that was paid annually to life policyholders. The average difference was roughly from 1% to 3% less each year.

Mr. Zore said that annuity disintermediation was a significant problem for NWM at the time of the '1985 change'. The Pre-MN book of business had a high rate of both loans and contract-allowed surrenders. This rate of surrender was significantly higher than for the life book of business. Exhibit 532 shows that in the 3 year period from 1980 to 1982 the NWM surrender rate was roughly 3 times greater for annuity products than for life products. The lapse experience for the period 1983 to 1985 resulted in only 50% of the NWM policies sold with a 1980 date still being in effect as of the end of 1985. Exhibit 533. This was a significant issue that NWM management had to address under risk management. The annuity product was sold and managed as a long-term

19

retirement vehicle. However, because of the inverted yield curve (wherein short term rates were higher than long term rates and policyholders could borrow from or surrender annuity policies to get funds which could be invested at a higher rate than NWM's general account dividend could provide from its long term investments) annuity policyholders were withdrawing their funds through loans or surrenders at a significant rate. Mr. Zore said that the overall retention/persistency rate from year to year averaged for NWM about 95%. The volatility of a 50% lapse rate for annuities presented a real problem for the company. The annuity business represented about 4% of NWM's total book of business. The life insurance portion of NWM's business represented historically about 95% of its book of business. During the period of the inverted yield for interest rates in the late 1970's and early 1980's' life policies also borrowed at higher than historically normal (for NWM) rates. However, life policies did not present surrender problems as health eligibility for new life insurance can act as an impediment to securing replacement life insurance. He noted that market rates had fallen at the time the CRA product was introduced and therefore, the segmented account was funded with assets different than originally contemplated. In addition, the market value of the intended funds were less than the book value. Mr. Zore placed responsibility for NWM addressing disintermediation on the annuity book of business as opposed to the life book of business even though the life products dwarfed the annuity products. It was not credible. He further explained that NWM operated for the benefit of all of its policyholders.

H.  **James Murphy**
This witness was an employee and actuary for NWM from about 1966 to 1988. He had some direct knowledge of the '1985 change' and the investments made into the segmented fund for the Pre-MN annuities.

He stated he was in charge of an operation within NWM that was called 'UPDATE 83'. This activity encompassed roughly May 1982 (when the NWM Board

20

directed that the program be instituted) through early 1984. It involved a desire by NWM to amend its annuity in-force policies (Pre-MN annuities) so that the low interest rates (5% and 6%) on policy loans could be raised to 8% under a direct recognition system. It is argued by NWM that this 'UPDATE 83' initiative resolved the borrowing problem for both life and annuity policies. Defendant's brief at page 20. The need for this change was the inverted yield curve present in the market and its disintermediation impact on NWM. All annuity policyholders were to be contacted and written agreement to the change was proposed as to every annuity policy. In return for agreeing to the increase in the interest rates on any policy loans, NWM would agree to utilize an increased dividend rate on the non-borrowed value of the annuity policies. The exact terms of 'UPDATE 83' are not critical to the present dispute. What is important is that NWM spent, according to Mr. Murphy, about $19 million dollars in an effort to amend the Pre-MN annuity policies in the period 1982-1983. This was during the period that the '1985 change' was under consideration by NWM. In this effort NWM utilized an annuity illustration for the dividend that was based upon NWM's general account portfolio. Exhibits 124 63, 64 and 154. About 60% of the then-Pre-MN annuitants accepted the amendment requested in 'UPDATE 83' by NWM.

Mr. Murphy noted the major differences between the Pre-MN policies and the CRAs. See similar comments under Mr. Zore. He also discussed the differences between life and annuity policies. The new NWM CRA policies were sold beginning on 1 March 1985. Right up until that time NWM had its agents continue to sell the Pre-MN policies even though a decision had been made by NWM to introduce the new CRAs as of late 1984. The new CRAs were an interest rate product without any chance to share in the success of NWM and the return generated in its general portfolio account. NWM was concerned about the reaction anticipated from its field agents and the Pre-MN policyholders regarding the '1985 change' and any hard landing – i.e. substantial reduction in annuity interest provided to Pre-MN policies when juxtaposed to the general account portfolio dividend that had been paid in the past. The fear was of extremely high

notification costs if an UPDATE 83 notification
approach were utilized, likely annuity policy
surrenders and/or lawsuits since the change made
was unilateral and not based upon mutual agreement
like the 'UPDATE 83'. Exhibits 105 and 542 and
356. He responded to a NWM agent who was upset
about the '1985 change' by noting that
policyholders had too much control over their
money. Mr. Murphy acknowledged that NWM was the
author of the policy language he was critical of.
He participated in creating the soft landing
subsidy for Pre-MN policies after the '1985
change' was instituted. Exhibits 109, 116 and
117. It was his opinion that no amendment process
was needed for NWM to unilaterally implement the
'1985 change' as no contract language was
involved. This opinion was his without any
(evidence introduced) support from NWM legal
counsel at the time of the '1985 change'. He
viewed the change as an effort by NWM management
to better match assets to liabilities under the
new segmentation concept. This was important
given the loss produced in the Baldwin
mismatch where the liabilities were short term and
the assets were long term. It was his judgment
that the '1985 change' should, through
segmentation, impact in-force annuities as well as
the new CRA product as distinguished from NWM's
life segment in the general account portfolio. In
turn this was intended to produce overall
fairness.

Mr. Murphy said the unrealized capital gains
inuring to NWM's general portfolio account from
the MGIC and Baird investments that were made
before the '1985 change' was approximately $800
million dollars. Exhibit 110 also can be
considered.

He noted that the initial segmented fund for the
Pre-MN annuities had stocks and other investments
which NWM staff believed would produce a higher
return than just bonds during the gradual phase-in
period of about 5 to 8 years. To that produced
return (less taxes and expenses) would be added a
subsidy from NWM for the first roughly 5-plus
years.

He pointed out that there were 2 segments of

assets in the NWM general account. $18.9 billion
relate to life products and $1.3 billion relate to
annuities. Thus about 93.5% of the general
account portfolio related to life insurance
products.

The State of New York Insurance Department gave
NWM final approval for the '1985 change' on 26
February 1987. Exhibit 216. This occurred after
certain issues were raised and addressed for NWM
by the witness. NWM presented no evidence that it
ever advised New York of investment modifications
(either amount or period for the investments) made
to its presented '1985 change' or of its failure
to provide the 3 forms of notice to annuitants of
the '1985 change'. The Wisconsin Insurance
Department was then advised of that February 1987
approval by New York in a letter dated 13 March
1987 from Mr. Fisher. In Exhibit 217 NWM gave as
its reason for submitting this data to the
Wisconsin Insurance Department as follows:

> "We feel that the Wisconsin Insurance
> Department should be kept informed of
> these filings. If you have any
> questions, we would be happy to discuss
> them with you."

Conspicuously absent from this 1 page courtesy
information letter by NWM is any request for
approval of anything from the Wisconsin Insurance
Department in a matter affecting thousands of
policyholders and involving over 1/3 of a BILLION
DOLLARS! Earlier (Exhibit 424 of 12 October 1984
and Exhibit 420 of 11 September 1984) NWM and Mr.
Fisher had sent letters to the Director of the
Property and Casualty Rates and Forms Bureau of
the State of Wisconsin Insurance Department which
purport to get the Bureaus 'reaction' to the '1985
change' and then seeks to summarize the results of
a meeting between NWM persons and representatives
of the addressed Bureau. No representative from
the State of Wisconsin Insurance Department
testified at the trial. In Exhibit 420 Mr. Fisher
says that NWM would:

> "To accomplish that, we would like to
> identify a portfolio of assets for this
> block and invest it consistently, i.e.,

> *one to three years.  As of June 30, 1984*
> *the amount would be about $358 million."*

Mr. Murphy noted that the amount invested was not $358 million and that the portfolio of assets ultimately invested in the fund was not of one to three years duration.  There was no evidence presented that NWM advised the State of Wisconsin Insurance Department of any changes made in the '1985 change' or its implementation or notice not given to affected policyholders.  Also, no evidence was presented of any written approval by the Wisconsin Insurance Department regarding the '1985 change'.  It was the State of Wisconsin Insurance Department that had jurisdictional responsibility over Defendant regarding the '1985 change' – not the State of New York Insurance Department!

I.   **Samuel Travis Pritchett**
This witness was one of the experts for Plaintiff Class.  He reviewed all of the relevant data regarding the '1985 change'.  He said the LaPlant annuity contract and those of the other Pre-MN annuitants contained these features:

1.   They were long-term investment products focusing on retirement.  This is consistent with the language contained in the Wisconsin Buyers Guide to Annuities.  Exhibit 122.

2.   They were front-end loaded with a 6% to 10% charge.

3.   They were able to be surrendered without any charge being made to the policy.

4.   They were susceptible to having policy loans be made as to cash value.

5.   They received dividends based upon the company's general account portfolio earnings.

Historically NWM had paid dividends to the Pre-MN policies from the earnings of the NWM general account portfolio.  This was a diversified portfolio of several investment classes including,

24

among other investments, equities, bonds,
commercial mortgages, real estate and private
equity placements. He reviewed NWM's Annual
Statements and other public documents to say that
the investment philosophy of NWM was conservative
and emphasized long-term strategies. NWM believed
that this investment approach typically
outperformed short-term investments (and
particularly bonds). Exhibit 115. This continues
to be true today. He said that as of 31 December
2008 NWM's general account portfolio was 87% in
fixed income and 13% in equities. NWM's Annual
Reports reflected this philosophy. Exhibits 86A
and 87 as exemplars. Even NWM's communications to
Pre-MN annuitants noted its commitment to long
term investments and that the annuity dividends
were based upon the total company portfolio.
Exhibit 239.

The inverted yield curve of the late 1970's and
early 1980's created problems for NWM as current
market short-term yields exceeded the return
generated by the long term investments in its
general account portfolio which utilized the
Modern Portfolio Theory. When NWM adopted the
'1985 change' the company created an annuity
product that would earn interest via a segmented
account from current market rates and not a long-
term, diversified portfolio of investments. This
made sense to NWM as to new annuities and in order
for the company to be competitive in the annuity
marketplace. But NWM also segmented its existing
annuity book of business (Pre-NM annuities) into
what generally was referred to as a short term
bond fund. The effect of the '1985 change' on
Plaintiff Class is noted as page 20 of Exhibit 218
(Exhibit not received into evidence, but was
discussed by the witness). The lower returns (1%
to 3% yearly) to Pre-MN annuitants are reflected
in the chart on page 21 of Exhibit 218.

Professor Pritchett expressed the opinion that the
purpose of the segmentation of the Pre-MN
annuities was to neutralize the incentive of
policyholders to either borrow on their policies
and even induce them to reinvest. This was a
unilateral, material and fundamental change to the
Pre-MN annuities by NWM. This in turn confronted
the disintermediation problem for NWM regarding

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 28 of 254   Document 39-3   R App 546

the Pre-NM annuities. Since the new CRAs were market rate products, they didn't present significant disintermediation problems. It was his judgment that lower returns to Pre-MN annuitants were forseeable and predictable by NWM as a result of making the '1985 change'. The segmentation produced shorter maturities with lower returns and was not intended to include equities.

He testified to the following opinions:

1. The Pre-NM annuitants were mistreated by NWM and the unilaterally instituted '1985 change'.

2. The '1985 change was not good insurance management by NWM. The Pre-MN policies were to receive dividends based upon NWM's general account portfolio and not interest from a short-term bond fund (which NWM's Board subsidized for 8 years with a segmentation adjustment).

3. The investment philosophy switch by NWM in the '1985 change' meant that the Pre-MN policyholders would receive lower returns regarding the growth of their annuity policies over time going forward. This was exacerbated by the inequity of retaining all of the MGIC and Baird long-term capital gains only in the life segment.

4. The '1985 change' occurred without any modification in the wording of the Pre-MN policies. That contract language called for dividends from the company's general account portfolio.

5. The CRA's and the Pre-MN annuities are significantly different products. The differences involve load factor, right to borrow and terms, surrender charge, interest return from bond fund versus dividend from company earnings, guaranteed return and long term projected growth for the retirement investment.

26

The NWM data reviewed by this witness did not show any forced sale of assets by NWM due to annuity disintermediation. He said 96.3% of NWM's policies are not annuities. To the extent that the inverted yield curve produced a disintermediation problem for NWM, it was overwhelmingly the result of loans made on life insurance policies and not borrowing by the 3.7% of the policies that were annuities. In 1984 NWM had 31.5% of its policies with loans (per testimony and referral to page 10 of Exhibit 218). It is disingenuous to assert that Pre-MN annuities were the cause (or even a major cause) of disintermediation loans/losses experienced by NWM in the period leading up to the '1985 change'. That said it was still a problem for NWM to deal with in terms of developing an annuity product with asset and liability matching that would prospectively eliminate or reduce exposure to this negative consequence. None of this focuses upon NWM's decision to make segmentation retroactive to the Pre-MN annuity policies.

**J.**   **Mark G. Doll** (Deposition)
This witness has been an employee of NWM for 38 years. He is, since 2008, the Chief Investment Officer. He stated that Mr. Durland made the basic design for the new CRA product. Mr. Durland had recommended segmentation for the new CRAs only. An annuity is a long-term accumulation product. He viewed Mr. Fisher as the 'new product leader' during the 1982 to 1985 period. Before the '1985 change' NWM paid the Pre-MN policies a dividend based upon returns generated by the general account portfolio. The NWM agents sold and marketed the Pre-MN annuity product by using illustrations of dividends being paid based upon the general account portfolio. Whatever was the then-current dividend rate would be used as the law required, but it was always based upon the NWM general account portfolio.

When the actual segmented bond fund was created it was clear that cash/bond investments would not support the 11.15% interest rate that NWM's Board had said was initially to be paid to Pre-MN policies after the '1985 change'. The Annual Reports of NWM (1984-1987) did not describe the

segmentation of the Pre-MN annuities. Exhibits 85A, 86A and 87. The interest earnings from the segmented bond fund had to be supplemented by NWM in order to produce a higher (soft landing) return for the Pre-MN annuitants during the years immediately after the '1985 change'.

K. **Thomas Dyer**
This witness is a NWM employee. He began in 1970 as an actuarial trainee. He was familiar with UPDATE 83 wherein, based upon a written amendment of the annuity policy by the policyholder and NWM. Pre-MN annuitants received higher dividends in return for agreeing to accept an increase in the policy loan rate to 8%. About 2/3 of the policyholders accepted this amendment. A similar approach was used by NWM for amendments to life policies in 1976 and 1980.

Segmentation was a new investment risk concept to NWM in the 1982 to 1985 period. He knew the '1985 change' plan was to include various features that didn't happen. The amount placed into the bond fund was changed. The investment terms exceeded 3 to 4 years. He was not aware of any descriptive stuffer ever being included with the annual annuity statement to annuitants as notices regarding the '1985 change' made by NWM. In the vetting process as to the '1985 change' there was disagreement regarding whether notice needed to be given to Pre-MN policyholders. Exhibit 105. No opinion from the NWM law department on this subject was ever marked or offered into evidence. The Committee initially decided (worry over possible class action) to give notice to Pre-MN policyholders. Exhibit 106 and attachment. He was not involved with annuity products and hadn't obtained any NWM law department opinion , but he believed that NWM could modify how it would share its divisible surplus with annuity policyholders without having any formal amendment to the policy. This opinion does not carry much objective weight. He doesn't know how the final '1985 change' decision was made by NWM. This goes to the weight to accord his testimony.

L. **Theodore Affleck**
This was one of Plantiff's outside experts. He has worked in the insurance industry since 1969

and has an extensive and credible CV.  His Report
was received as Exhibit 209.

NWM characterized annuity policyholders as
'participating' which meant that they would share
in the annually determined divisible surplus of
the company.  On 3 occasions in 1976, 1980 and
1983, NWM determined that there was a need to
amend its in-force issued life or annuity
policies.  Each of those times the company went
through a process of giving notice to
policyholders and requesting formal and mutual
policy amendment.  The '1985 change' was a
departure from that that recent policy amendment
practice known to NWM.

The general account portfolio of NWM has been, at
all times involved in this matter, long-term and
broadly diversified.  This was suitable for both
life and annuity policies.  After the '1985
change' the past investment practice continued to
define the life portfolio, but the annuity segment
became short term with adjustments made by NWM for
the gradual phase in period.  In the 1970s and
1980s NWM was usually rated right near the top in
the return produced by its general account
portfolio.  The return of that portfolio then
supported the life and annuity dividend.  NWM
routinely touted its superior investment returns
of policy dividends as it competed in the
insurance marketplace.

The inverted yield curve that marked the late
1970s and early 1980s created problems for NWM as
the current market interest rate was higher than
the dividend produced from the company's divisible
surplus in the general account portfolio.  NWM
hired Towers to create a competitive annuity
product based upon market interest rates.  A CRA
product was developed under segmentation.  It was
recommended that the Pre-MN policies be exchanged
or converted into the new product by a solicited
agreement or a subsidiary.  Otherwise the Pre-MN
annuities should not be affected by the creation
of the new CRA product.  The NWM new Product
Committee headed by Mr. Fisher accepted the CRA
product, but rejected the strategy of notice to
Pre-MN policyholders and formal amendment to those
policies.  Rather, NWM acted unilaterally in

29

implementing the '1985 change'. The new CRAs were sold beginning 1 March 1985 as MN Series annuities. They and the Pre-MN annuities were then backed by shorter term investments/bonds that were segmented, but still a part of the general account portfolio of NWM. NWM never informed the Pre-MN policyholders of this policy change or asked consent for this change.

The Pre-MN policies were and are today front end loaded at 6% to 10%. The new CRAs have a rear end load. By combining them into one investment segment the Pre-MN policies have a disadvantage in terms of growth and long-term accumulation.

His opinions, in part, are;

1.  NWM acted unilaterally in making the '1985 change'. This was contrary to the Pre-MN annuity policy language and a departure from its past practice of giving notice and seeking a mutual amendment of any policy change. The policy language is unconditional.

2.  The Pre-MN contract gave the policyholder a right to a dividend based upon the divisible surplus of the company and not an interest rate return from a bond fund. NWM understood and marketed its annuities as long-term, retirement investment and not as short-term, lower market rate investments.

3.  NWM's adoption of segmentation was a material and substantial change in its investment philosophy as to annuities. Its internal **Columns** publication of 12 June 1985 referred to this as a significant change to the prior investment policy.

4.  The change in investment strategy for the Pre-MN policies was substantial and it produced materially lower returns for that book of business. The investment component is the single most important factor in determining the annual return for an annuity.

30

5. NWM should, as to the Pre-MN policies, have either given notice and sought mutual agreement for a policy amendment or simply allowed the Pre-MN annuitants to stay in the general account portfolio with respect to the determination of the annual divisible surplus.

6. NWM violated the covenant it had with the Pre-MN policyholders when it implemented the '1985 change' involving Pre-MN annuity segmentation. NWM benefited itself (resolved the disintermediation problem) at the expense of the Pre-MN annuitants. This consequence was then concealed intentionally from the Pre-MN annuitants. The field force was notified of the new interest to be paid on Pre-MN policies, but were not instructed to communicate that data to policyholders. NWM acted in an unfair manner and this produced a breach of good faith to the Pre-MN annuitants.

7. The Pre-MN product was sold by NWM as a loaded annuity where dividends would come from the general account portfolio and be based upon a broad, balanced and diversified body of investments. The short-term bond fund does not match that investment objective and the switch to that account under segmentation is unfair.

8. The Pre-MN policies lost the benefit of a substantial unrealized long term capital gains (investments in Baird and MGIC) as a result of the segmentation plan adopted unilaterally and without notice by NWM.

9. NWM misled state regulators when it said it would do things (notice to annuitants, notice to captive agents, funding of annuity segment, nature of investments, term of investments) and then did not do them and failed to

31

notify the regulators of those failures.

10. NWM failed to inform and train its captive agents regarding the '1985 change'. It also failed to instruct those captive agents to inform the Pre-MN policyholders of the details of the '1985 change'. Notice regarding the '1985 change' was necessary and it never happened.

11. NWM's Annual Reports consistently heralded its long term investment strategy as a means of allowing the policyholder to share in the improved results of the company. See comments of NWM President Schuenke and Annual Reports. Exhibits 269 to 309). In the 2006 annual Report NWM noted that policy owner value is ultimately dependent upon underlying investment performance. The Annual Reports from 1984 through 2009 fail to mention segmentation for the Pre-MN policies or the '1985 change'.

12. The Wisconsin Department of Insurance did not approve the '1985 change'. Approval would be expected to come in the form of a reply from the State of Wisconsin Insurance Department. It didn't. The New York approval included reliance upon NWM's earlier commitments as to notice to Pre-MN policyholders (Exhibit 75 where NWM set forth its OWN standard regarding notice of the '1985 change' to its Pre-MN policyholders as follows – *We think that this will constitute adequate notification of our change in investment philosophy for annuities to our policyholders.")* and the specifics as to the short-term bond fund. Exhibits 108 and 429. Mr. Murphy's 31 October 1986 letter to the New York State Insurance Department (Exhibit 213) discusses the updated segmentation plan of NWM. The witness does not agree that the interest rate risk is the same for annuity and life products. New York approved the updated

32

segmentation plan of NWM in Exhibit 216. That approval was then communicated to the State of Wisconsin Insurance Department for information purposes only and not for any official approval of this major change in the financial operation of NWM.

Mr. Affleck said that no other insurance company that he is aware of ever used segmentation in a retroactive manner. This is because of the harm it would do to the existing annuity policies and the violation it would represent regarding the fiduciary duty owed by the insurance company to its annuity policyholders.

The new CRA is not superior to the Pre-MN annuity product issued by NWM. Wisconsin Statutes, section 632.62(2) requires that the annuity policies of mutual insurance companies shall give its policyholders a full right to participate in the company's divisible surplus. Before the '1985 change' the Pre-MN policies did participate in NWM's divisible surplus, but not after that change. NWM recognized in it dividend practices over decades that annuity policies would get their dividend from the company's divisible surplus generated by its general account portfolio.

The policy loan problem of disintermediation during the period when the '1985 change' was vetted and implemented was overwhelmingly due to life insurance loans and not annuity loans. Annuities had a higher incidence of loans, but they represented a much smaller product base (4% or so of NWM's assets). The Pre-MN annuities did not significantly impact NWM in the period immediately before the '1985 change'. That said, it was still prudent for NWM to manage the annuity disintermediation problem – at least as to creating the new CRA product going forward. Mr. Fisher had estimated that the annuity disintermediation problem in the early 1980s had an impact of about $30 million on NWM.

M.  **Gerald Kreitzman**  (Deposition)
This witness is a Class member. He purchased his annuity in 1967. The agent was Mr. Lawrence. He also spoke once on the phone to an agent who

replaced Mr. Lawrence. The agent told Mr. Kreitzman that the annuity was a long-term investment. Illustrations were provided that showed his return as coming from a dividend based upon the company's divisible surplus. The agent told Mr. Kreitzman that he'd be like a shareholder. He was not informed of the '1985 change' and he would not have given consent to it.

**N.** **William J. Timmers, Jr.**
This witness was also a Class member. He purchased a NWM annuity in 1979 from Agent Thomas Rooyakers. The agent told him that he was buying a share of the company and that the annuity was a long-term investment. He never received notice from NWM regarding the '1985 change'. If he had received notice he would not have agreed to the '1985 change'.

**O.** **Robert L. Hoyer**
This witness was an expert for Plaintiff. He has an impressive CV as an actuary with 35 years of experience in the insurance industry and as a consultant . He has been involved in dividend matters with other insurance companies. His Report is found at Exhibit 200. He reviewed the record of this case regarding the '1985 change' made by NWM. He made the following opinion statements:

    1.    NWM's '1985 change' was improper, inappropriate, unfair, inequitable and not consistent with generally accepted practices and procedures in the life insurance industry and the generally accepted practices and procedures of the actuarial profession.

    2.    NWM's implementation of the '1985 change' violated Actuarial Standard of practice No. 15 – Dividend Determination and Illustration for Participating Individual Life Insurance Policies and Annuity Contracts.

    3.    The actions of NWM after the '1985 change' was implemented were improper, inappropriate, unfair, inequitable and not consistent with generally accepted

34

practices and procedures within the life insurance industry.

4. The '1985 change' and its implementation were of material and substantial importance to the rights of the Pre-MN policyholders. The Pre-MN policyholders had a right to share in the divisible surplus "of the company".

5. NWM did not have any valid justification for the '1985 change' and its implementation.

6. The interest payments made to Pre-MN policyholders after the '1985 change' were not the dividends to which they were contractually entitled and they were not an equitable share of NWM's divisible surplus. Segmentation adjustments were made from 1985 to 1993.

7. NWM failed to exercise good faith to the Pre-MN policyholders when it made the '1985 change' because it did not notify those policyholders of the '1985 change' and its consequential results.

8. The '1985 change' was not in the best interests of the Pre-MN annuitants. Dividends from the general account portfolio were more beneficial than lower interest from a short-term bond fund. NWM changed its annuity investment philosophy from a long-term, diversified portfolio to a short-term, bond portfolio even though the product was recognized as a long-term accumulation vehicle for retirement. While the change made sense as to the new CRA product given the then-present-in-the-market inverted yield curve, it was a radical and unacceptable change regarding the Pre-MN annuity product. Unilateral action was fraught by NWM with known pitfalls. Exhibits 52, 28 and 27.

9. The State of Wisconsin Insurance

35

Department did not at any time give approval to NWM for the '1985 change'. He is familiar with how approvals are obtained from State Insurance Departments. Here no document exists from the Wisconsin Insurance Department as to approval. Oral approval is not sufficient and it would not occur where the amount involved exceeded 1/3 BILLION dollars. The data NWM presented to New York regarding how the '1985 change' would impact Pre-MN annuitants was inadequate with regard to showing how the Pre-MN policies would be impacted under the contract language of those policies. The goal of the regulators is financial solvency and not reviewing submissions to see if they would constitute a contractual violation. Even if New York did approve the '1985 change' and its later modification, that would not eliminate NWM's contractual and legal obligations to the Pre-MN annuitants under the annuity contracts and Wisconsin law. NWM's failure to give full disclosure and to notify Wisconsin and New York Insurance Departments of specific plan modifications and its notice failures is evidence of bad faith, intent to conceal and manipulation of the regulators.

The annuity business of NWM represents about 3% to 5% of its in-force business. Life insurance constitutes over 90% of NWM's in-force business. Annuities are an accumulation product whose focus is long-tern and retirement. Prior to the '1985 change' NWM had its annuity policies receive dividends based upon the investment return generated by its divisible surplus. In the past NWM worked with its policyholders when it determined that a life or annuity policy should be amended. In the early 1980's NWM and its competitors were confronted with an inverted yield curve wherein short-term rates exceeded long-term rates/returns from the general account portfolio of the insurance companies. Segmentation became an approach that was used more and more in responding to the effects of the inverted yield

36

curve (policy loans and annuity surrenders) and the matching of assets to product liabilities. NWM hired the Towers consulting firm with respect to creating a new CRA product. The Towers Report recommended both the new CRA product and the use of segmentation within the general portfolio account. In addition, it recommended prospective use of segmentation so as to not impact Pre-MN policies. NWM decided, after internal vetting, to create the new CRA product and use segmentation broadly so as to also include both CRAs and the Pre-MN policies.

NWM intentionally acted to obscure the '1985 change' as to the Pre-MN book of business by a pegging process. It used surplus loans and supplements to provide a soft landing so that Pre-MN annuitants would not know that there policies had been modified by the '1985 change'. At the end of the grading-in period (1993), the Pre-MN policies received interest only under the growth component of their policies as opposed to dividends from the general account portfolio of NWM.

The '1985 change' was quite similar to the UPDATE 93 situation. Notice and mutual agreement as to any policy amendment were required by the contract language in the Pre-MN annuities as well as past practice by NWM. In the period before the '1985 change', annuity and life policies of NWM shared, under the experience factor class, in the returns generated by the aggregate or general account portfolio. NWM had acted in the past to join both its life and annuity products into an equivalent class (experience factor class) so that they would behave in an equivalent manner. There was only one investment class prior to the '1985 change'. The contribution factor precludes any unilateral modification of the single component within the experience factor class. NWM's past accounting for its life and annuity products precluded it from acting to now differentiate the life and Pre-MN books of business. Exhibit 95. There would be no similar prohibition regarding segmentation for the new CRA product.

The lack of notice and the soft landing actions of NWM made it impossible for Plaintiff Class to know

37

of the '1985 change'. This was exactly what Defendant intended. Exhibit 32. Exhibit 408 was prepared by NWM/Mr. Fisher and it shows the percentage losses experienced by the Pre-MN annuitants over a 22 year period (1986 to 2008). In just the year 2008 the difference between the earnings applied to the life products and the Pre-MN annuities was 315 basis points. That is significant!

**P.**   **Thomas Colbert**
This witness purchased 2 Annuities from NWM in 1983/1985. The agent's name couldn't be remembered. This NWM agent said Mr. Colbert would get a part of the company's profit. The annuity was sold on a long-term basis for retirement. He never received any notice from NWM regarding the '1985 change'.

**Q.**   **Caroline Meckes**
This witness is a Class member. She purchased a NWM annuity in 1966 from Agent Dean Lawrence. The agent told her in selling the annuity that her dividends would come from the earnings of the entire company.

**R.**   **William C. Koenig**   (Deposition)
This witness was an employee of Defendant. He was the Chief Actuary after Mr. Murphy left. He noted that NWM, as a mutual insurance company, had 1.7 million policyholders. There was discussion regarding these persons being owners of the company.

**S.**   **Chris Trost**
This person was a Defendant witness and he came across repeatedly as evasive. His NWM work CV is impressive. He has worked for NWM for 25 years (1985 to 2010). He is an actuary for annuity products. He monitors the Pre-MN block of business to insure that assets and liabilities match and he participates in the annual interest determination for this product. An example of his evasiveness would be his difficulty, as opposed to other Defendant witnesses, in addressing whether annuitants place their funds with NWM to be invested prudently. Also his Exhibit 189 which shows different dividends paid on different NWM products didn't show single premium life policies

38

before 1987 although he showed other products in those years. He appeared to be selecting only supportive data and excluding non-supportive information since the period prior to 1987 apparently had SPL and other life products having the same dividend. But the SPL product was modified/discontinued by NWM in 1987 by imposing a charge that was prospective only.

He reviewed Exhibit 528 which shows the dividend/interest rate paid or payable on life, Pre-MN policies and CRA policies for the years 1982 through 2011. This chart notes that Pre-MN policies are paid a higher rate of interest than CRA policies. It also shows that Pre-MN policies were paid a higher investment return than life policies during the years 1988, 1989 and 1992. This was during the soft landing period. Further Pre-MN policies received the same investment return as life policies during the years 1985, 1990 and 1991. This also was during the supplement period. In all other years the Pre-MN policies earned a lower investment return than the life policies that had their dividend determined by the earnings of the long-term segmented general account portfolio. The lower spread for the Pre-MN policies over this 29 year period was annually from 25 to 315 basis points. He said pegging or gaming did not occur although supplements were made to the Pre-MN policies and their earned rate (actual earnings less attributable expenses). The earned rate for the Pre-MN book was a guideline that was then considered by actuaries, Management Committee and the Board of Trustees. The divisible surplus is the amount earned in excess of what is needed to maintain NWM solvency. NWM uses the contribution principle to determine the actual earnings apportioned to each separate book of business. If the earnings are below the guaranty in a given policy, then the guaranteed amount is apportioned for that year.

He stated that annuity policies have a higher rate of surrender than do life policies. He also noted that annuities are a long-term accumulation product for retirement. The lower rate of interest paid to annuities as compared to the dividends paid to life policies reflects the shorter term investments and lower risk in the

39

investments in the Pre-MN segment within the general account portfolio of NWM. He believes that annuities represent 2% to 5% of NWM's assets and life products represent the rest (95% to 98%). He asserted that the Pre-MN annuity product was actually superior to the CRA annuity.

Of the 3,261 annuity policies sold by NWM in 1980, only 18% remain on the books by the year 2000. A $50,000 Single premium Pre-MN annuity would have earned about $97,000 more than a similar NWM CRA during the period 1985 to 2010. This shows fairness in how NWM has treated the Pre-MN book of business. While the Pre-MN annuitants get a lower investment return than the life policies, they get a higher return than the CRA policies.

Segmentation has been effective in managing the different risks in the various NWM products. Management constantly addresses risk from the different products, from interest rates (which are beyond NWM's control) and from investment vagaries. An example of this can be seen in the duration of investments for the life products as opposed to the closed book of Pre-MN annuities. Presently, the life segment has a 5 to 6 year duration whereas the Pre-MN annuities segment has a 2.4 to 2.7 year duration. The shorter duration reflects less risk and therefore usually a lower earned return. Exhibit 532 shows the different lapse and surrender rates for life and annuity products of NWM. This was properly a matter for management to deal with – particularly in the early 1980s. He said that the segmented return for the Pre-MN policies after the '1985 change' were due to the financial performance of only the assets in the segmented account. This was the case whether the general account portfolio and the divisible surplus remained constant or went up or down.

**T.** **Bruce W. Foundree**
This person testified as an expert for the Defendant. He is a lawyer and his CV is quite impressive. In the past (1980 to 1986) he was the Commissioner for the State of Iowa Insurance Department. He also has been involved in leadership positions with the National Association of Insurance Commissioners.

40

He reviewed the actions of NWM regarding the '1985 change'. It was his judgment that:

1. The review of NWM's '1985 change' by regulators in New York and Wisconsin was thorough. Full disclosure was made and questions posed by regulators were answered.

2. The New York Insurance department is the most stringent in the USA. It also has the largest staff. If an insurance company gets approval in New York, it likely can get approval in any state.

3. The New York Department of insurance did give approval to NWM regarding the '1985 change'. The regulators determined that NWM was complying with the Wisconsin law on both dividends and solvency.

4. The letter of 13 August 1984 to Mr. Packer (Exhibit 75) seeks approval of segmentation in an effort to match assets and liabilities for NWM's annuity products. There was no need for policyholder consent in advance. The regulators don't concern themselves with notice matters. That is an issue for management.

5. The Wisconsin insurance Department did not raise any issue as to notice.

6. The NWM letter of 25 October 1984 (Exhibit 108) summarized the meeting between staff from NWM and the New York Insurance Department. Fairness and solvency were addressed in light of Baldwin United debacle. Segmentation would be used to match assets to liabilities. This would include the Pre-MN policies.

7. In Exhibit 429, New York gave approval to NWM's segmentation proposal. This was augmented in 1986 by Exhibit 213 in which NWM details the '1985 change'. A

41

class of assets as opposed to cash would support the segmented annuities. There is no discussion of notice not being given. In Exhibit 216 the New York Insurance Department gave NWM approval for its proposed plan for segmentation of assets. That approval was updated over the years. Exhibits 456, 538, 473, 479 and 485. This indicates that the regulatory review was extensive.

8. Mr. Fisher on behalf of NWM wrote to the Wisconsin Insurance Department on 11 September 1984. He discussed segmentation and asked for a meeting to get the department's reaction. Nothing was said regarding notice to Pre-MN annuitants. A 2nd letter of 12 October 1984 reviews what occurred at the meeting (19 September 1984) between NWM staff and Wisconsin Department officials. Mr. Fisher summarized what NWM planned to do and why. The primary objective was to avoid risk through segmentation (match assets to product liabilities).

9. Mr. Foundree said that if the Wisconsin Department of Insurance disagreed with NWM's statement of approval that they would have quickly written back correcting the error. That did not happen and thus approval by Wisconsin did occur as to the '1985 change'.

10. NWM shared with the Wisconsin Department of Insurance the updated approval by New York in 1987. See Exhibit 217. Again, Wisconsin did not state any objection.

11. He noted that NWM had experienced a $30 million dollar loss from its annuity business in the period just before instituting the '1985 change' with its segmentation feature.

His written report is in the record as Exhibit 223. He said that the NWM request for regulatory approval of the '1985 change' was typical.

42

In his Report he notes that the formal statement
of reasons for the segmentation plan are:

> "*The interest rate risk … [for*
> *annuities] must be managed.*
>
> *It is felt that the most effective way*
> *to manage the interest rate risk is*
> *through the use of appropriate*
> *investments … those which most closely*
> *match … the liabilities of those lines*
> *of business.*
>
> *Segmentation allows the Company to make*
> *investments appropriate for the interest*
> *sensitive lines of business without*
> *requiring other lines of business to*
> *share directly in their experience.*
>
> *… [interest rate risks] have grown*
> *markedly in the last several years as*
> *the Company has written an every*
> *growing amount of annuity business.*"
> (Words typed as written in Report)

Mr. Foudree notes that the Wisconsin law regarding
the making of dividends is similar to the New York
law.  The actual approval for the '1985 change'
occurred by the written response from New York on
27 December 1984 (Exhibit 429) and 20 February
1986 (Exhibit 216).  The State of Wisconsin
Insurance Department approval came by inference in
that it did not respond in any way objecting to
NWM's characterization of regulatory approval by
Wisconsin.  Yet, in his Report at page 12 he
states that:

> "*It is the practice in the industry that*
> *when an insurance department responds in*
> *writing and gives its approval to a*
> *submission, an insurance company is*
> *entitled to rely on the agency's*
> *determination.  The company, in turn, is*
> *required to act in accordance with the*
> *agency's determination.*"  (Underlining
> added)

Here no written approval of any submission was made by or requested from the Wisconsin Insurance Department. The testimony statements indicate that NWM could infer approval by the State of Wisconsin Insurance Department not responding to NWM's letter of 12 October 1984. Mr. Foundree's Report impeaches his witness testimony since Wisconsin gave no written approval for the '1985 change' and approval by New York is not binding on Wisconsin. There was nothing for NWM to rely upon as regards a determination from the Wisconsin Department of Insurance.

He said he was not aware of any retroactive segmentation of annuity product(s) by a mutual insurance company. Yet that was what happened here.

**U.**   **Stephen N. Steinig**
This witness testified as an expert for Defendant. He has worked in the insurance business for 45 years and has an extensive CV. His primary experience was with New York Life. This similar mutual insurance company is a sibling competitor of NWM. Mr. Steinig is an actuary and he was New York Life's Chief Actuary in the late 1980s and 1990s. He was in charge of the annuity products for New York Life from 1995 to 1998. This witness was hostile to opposing counsel and often raised his voice on cross-examination. These facts should be reflected in the record of the case.

In describing how he became involved as an expert witness in this case, he stated that Defendant's counsel contacted him, described the case to him and then sent him some documents in the mail. He went on to say:

> "*When I read those documents and most particularly when I read the complaint, the complaint reads like I can tap on everything I felt I've learned over 45 years about mutualities and dividends and everything that I've learned about over the last 25 years about risk management. So I felt VERY EAGER TO DEFEND THOSE PRINCIPLES AND THOSE IDEAS if I was going to be ACCEPTED BY YOU AND BY NORTHWESTERN MUTUAL as an expert*

44

*witness.”* (Capitalization and underlining added)

This was a very odd moment in the trial. Mr. Steinig talked as if he wanted to convince NWM's counsel that he should be hired as one of their experts. The traditional notion regarding experts has to do with being accepted by the fact-finder as a credible expert under Wisconsin Jury Instructions – Civil 260. NWM had a right to select as an expert whomever they wanted to employ. Here, the retained expert notes that he employed his own marketing approach to that selection process. More worrisome, in terms of an expert's commitment to truth as opposed to picking sides in a conflict, is Mr. Foundree's statement about being 'eager' to testify in this case as an expert for NWM. This goes beyond simply having a positive personality regarding the events of life. The reasons, he states, for this eagerness was his wanting to 'defend' those principles and ideas that defined his parochial experience with mutualities and dividends and risk management over the past 25 to 45 years. The problem with that approach in marketing himself and then testifying as an expert and in wanting to defend his own learnings is that he deviates from the core function of the expert under Wisconsin Statutes, sections 907.02 and 907.03. The expert under Wisconsin law utilizes his/her knowledge and experience to formulate opinions (if s/he can do so) to aid the trier-of-fact in resolving conflict and ascertaining the truth. The expert's only allegiance is to truth. There is no place in the formulation of expert opinions for open bias or the seeking of a forum to defend his/her own life works or beliefs. Again, the commitment of the expert is to truth and not to a party or the act of selling himself to a party. The preconceived vision of this witness, as stated by himself, undermines the objectivity and credibility of his opinions and statements as an expert.

This attitude of open and fixed bias to a point of view as opposed to being a neutral commentator as to truth in his/her expert specialty is confirmed and made again later in the witness's testimony. On cross-examination by Plaintiff's counsel, an inquiry was made regarding exactly how he reached

his opinions that what NWM did (regarding whether matching was actually done between assets put in the segmented account and the liabilities of the Pre-MN annuities) was fair, proper, appropriate and equitable. He said he knew without checking the record or the facts, that matching was done by NWM actuarial staff. He refused to accept the hypothesis that matching had not occurred. He understood the words as to the possibility and the concept, but he would not bend. He said:

> "You and your question have asked me to assume certain things. I think you used that word two or three times, assume that this was done, assume that was done. I have every confidence and every reason to believe in the good faith of Northwestern Mutual and from its general reputation that I know of the company and of the Northwestern Mutual actuaries and of the state's reviewing these matters as well, such that if Northwestern Mutual actuaries tell the state we have gone about and conducted a fair separation of these assets and a appropriate separation of these assets, I accept that; and I know for sure."
> (Underlining added)

This expert would not even conceive of the possibility of NWM and its actuaries erred regarding the matching of assets with liabilities. He didn't even check! He defended his not reviewing that matter by affirming his faith in NWM and its actuaries as itself a verity and truth. NWM may be, in a general or even specific sense, the most principled and competent mutual insurance company that ever existed, but mistakes can still occur. The problem with Mr. Steinig's reasoning is that human beings do make mistakes – some intentional and some not. While experts in the field of forensic pathology are usually correct, even they make mistakes. DNA is discovered and science moves forward with that new insight. Trial judges and Supreme Courts make mistakes sometimes. Juries are regularly confronted with differing views by experts and they have to resolve those matters.

Mr. Steinig has an open and repeatedly articulated bias in favor of NWM and its actuaries and he would not even consider <u>the possibility of facts</u> that would get in the way of that bias. In his mind even to check out the facts would be a waste of his time since he knows in advance that the result of any inquiry will simply reaffirm his already preconceived views. Here his commitment while testifying as an expert witness was to that bias and not to aiding the trier-of-fact in an objective search for the truth. That bias must be considered in terms of impeachment and the credibility and weight to give to his testimony in this trial.

He said that mutual insurance companies have no stock owners. Management's commitment is to the policyholders. The goal of management and the company Board is to be fair and equitable. NWM has a stellar reputation in the insurance industry. Its annual earnings are among the industry's highest – if not the highest.

Actuarial Standards are guidelines for conduct. They don't bind insurance companies; only actuaries. He served on the Task Force responsible for the 2006 update of ASOP 15. It is his judgement that when experience changes within an experience factor class, the class can also change. That can even occur retroactively and it is supportive of the contribution principal. Dividends should be allocated in proportion to the contribution that the segment makes to the divisible surplus. The options of the Pre-MN policies to borrow and/or surrender are without value when compared to the new CRAs. He believes that the Pre-MN segment was not a closed block of business even though NWM, its officers (Mr. Koenig) and actuaries use that term to describe this group. He did acknowledge that the cash burden on NWM was due primarily to the life insurance portion of the business.

His Report is found at Exhibit 220. He expressed, among others, the following opinions:

1.   NWM's actions in creating and implementing the '1985 change' were "*fully in accord with industry standards of practice, the laws and*

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 50 of 254   Document 34-3   R App 568

*regulations concerning these matters, and the principles, spirit and letter of the applicable actuarial standard of practice."* They were proper, appropriate, fair and equitable.

2. Segmentation is the internal separation of an insurance company's general account assets into distinct segments or buckets, each of which is considered as supporting a distinct subset of the insurer's liabilities.

3. NWM's management and Board properly determined and apportioned the divisible surplus at all times after the '1985 change'. The contribution method was used to allocate dividends from the contribution made to surplus. This is so even though a different method of allocation was used as to the Pre-MN annuities before the '1985 change'. All dividends paid by NWM to its inforce block of annuities met all actuarial standards in ASOP 15 and otherwise present in business and industry practices.

4. Once segmentation was established as the bases for the allocation of the divisible surplus, it became improper to have annuities as a segment receive dividends on any bases other than that segment's contribution to the divisible surplus. This is so even though all of the assets of NWM stand behind all of its liabilities.

5. At the core of ASOP 15 is the principle that divisible surplus is distributed among policies in the same proportion as the policies are considered to have contributed to divisible surplus. When circumstances change, a modification can occur as to the experience factor class. Here that would be a change as to life and annuity dividends based upon segmentation.

6. The contracts for the Pre-MN annuitants does not specify how the divisible surplus will be determined. The '1985 change' was just a change in investment strategy in determining the divisible surplus. The contract was not

48

changed.

7.  Pegging is a generally accepted actuarial
    standard of practice. There was no pegging
    in this matter by NWM with regard to the
    '1985 change' or its gradual implementation.

8.  MWM complied fully with Wisconsin Statutes,
    section 632.62 in creating and implementing
    the '1985 change' and its updates.

Though not seeking or relying on law opinions, it
was his view that the dividend right of the Pre-MN
annuitant was not a contract right. His opinions
were given even though he knew of no mutual
insurance company that had ever acted to
retroactively impose segmentation. Also, he never
reviewed the segmented assets that he comments
upon as being wisely adjusted by NWM. At the
conclusion of his Report he takes the unusual step
of going out of his way to attack Plaintiff's
expert witnesses by name. This was done, not by
allowing others to see the rationality and force
of his work and opinions, but by asserting that
contrary opinions could <u>only</u> come from a
misreading or misunderstanding of the relevant
documents. It is noted here as just one more of
the unusual matters relating to this expert
witness.

## LAW

This dispute was tried to the Court. The obligation of

the Trial Court in these types of cases has been often

commented upon by our appellate courts. In **Ivalis v.**

**Curtis, 173 Wis. 2d 751, 762 (1993),** our Supreme Court said:

> "When the trial court acts as the finder of fact,
> it is the ultimate arbiter of credibility of
> witnesses, and where there is a conflict in the
> testimony, or more than one reasonable inference
> may be drawn, the appellate court is obliged to
> support the finding made by the trial court.
> **Onalska Elec. Heating Inc. v. Schaller**, **94 Wis. 2d**

49

*493, 501 (1980).*

In rendering a decision in this matter, the court will often exercise discretion in many areas including the credibility of witnesses. This concept also has been the subject of many case decisions. In **McCleary v. State**, **49 Wis. 2d 263, 277 (1971)**, retired Chief Justice Heffernan wrote for the Supreme Court:

> *"In the first place, there must be evidence that discretion was in fact exercised. Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards."*

The obligation of the court in this dispute is to declare the rights, status and duties of Plaintiff Class and Defendant insurance company under both the contract language of the Pre-MN annuities and the provisions of Wisconsin Statutes, section 632.62 (and particularly subsections (2) and (4)(b)). These declarations are to be made under Wisconsin's Declaratory Judgement Act at 806.04, Stats..

The Pre-MN contract language at issue regarding dividends includes the word 'shall'. This word is defined as being mandatory both in contracts and in statutes. This would be juxtaposed to something that is discretionary. Our Court of Appeals, as to the use of the word 'shall' in contracts and statutes, said in **State v. Borst**, **181 Wis. 2d**

118, 122 (**Ct**. **App**. 1993), as follows:

> *"The word 'shall' is normally understood to be mandatory."* (See also **181 Wis. 2d 633**)

In the context of a contract, case law has provided much instruction as to how meaning should be accorded to actual contract language. <u>**Hammel v. Ziegler Financing Corp.**</u>, 113 **Wis**. 2d 73, 76 (1983):

> *"The purpose of contractual construction is to ascertain the true intention of the parties as expressed by the contractual language, rather than put a trick interpretation or twist on one word.* <u>***Langer v. Stegerwald Lumber Co.***</u>***, 259 Wis. 189, 192 47 N.W. 2d 734, 735 (1951).*** *A reasonable meaning should be given to all provisions of an agreement so as not to render any part of the contract surplusage."*

The goal of the court in interpreting the agreement entered into by the litigants is to determine what they agreed to do. <u>**Sampson Investments v. Jondex Corp.**</u>, 176 **Wis**. 2d 55, 62 (1993).

> *"When interpreting a contract, "it must be borne in mind that the office of judicial construction is not to make contracts or to reform them, but to determine what the parties contracted to do; not necessarily what they intended to agree to, but what, in a legal sense, they did agree to as evidenced by the language they saw fit to use."*

Wisconsin approves of the use of dictionary definitions when interpreting documents and/or statutes that are unambiguous. <u>**State v. West**</u>, 181 **Wis**. 2d 792, 796 (Ct. **App**. 1994).

Annuities are considered in law as investments.

51

**Reichel v. Jung**, 2000 WI App. 151, para. 18, 237 Wis. 2d 853.

> *"While often issued by insurance companies, an annuity is more appropriately classified as an investment."*

Wisconsin Statutes, section 632.62(2) and (4) also creates certain statutory language that is imputed as a part of annuity contracts in this state.

> *"(2) PARTICIPATION. Every participating policy shall by its terms give its holder full right to participate annually in the part of the surplus accumulations from the participating business of the insurer that are to be distributed.*
>
> *and*
>
> *(4) DIVIDEND PAYMENTS. .. (b) Payment. Every insurer doing a participating business shall annually ascertain the surplus over required reserves and other liabilities. After setting aside such contingency reserves … , the remaining surplus shall be equitably apportioned and returned as a dividend to the participating policyholders or certificate holders entitled to share therein … "*

In **Noonan v. Northwestern Mut. Life Ins. Co**, 2004 WI App. 154, para. 23 and 25, 276 Wis. 2d 33, (hereafter **Noonan I**) the Court said regarding the position of NWM as a fiduciary as follows:

> *"In other words, Northwestern occupies a position of trust not just to determine the surplus, but to equitably apportion the surplus among all participating policies.*
>
> *…*

> *Here, the Noonans invested in annuities through Northwestern, and Northwestern has an obligation to act for the Noonans' and other annuity policyholders' benefit. The policyholders are dependent upon Northwestern's investment decisions and are thus in an inferior position to Northwestern. Consequently, Northwestern owes the policyholders a fiduciary duty."*

When considering the meaning of statutes, the first inquiry relates to whether or not the law is ambiguous. This term is addressed often in case law. In **In the Matter of Trust Estate of Rice**, **187 Wis. 2d 658, 662 (CT. App. 1994),** our Court of Appeals said:

> *"A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses."*

If a statute is not ambiguous, the Court's duty is to apply the contract language to the facts in the case. **City of Brookfield v. Public Service Commission**, **186 Wis. 2d 129, 138 (Ct. App. 1994).** If the statutory language is ambiguous, it then becomes the duty of the Court to " ... *look at the statutory context, subject matter, scope, history and object to be accomplished."* **Orth v. Ameritrade**, **187 Wis. 2d 162, 168 (Ct. App. 1994).** If an insurance contract is ambiguous, the language is to be construed against the drafting party (Here NWM). **Froedtert Mem'l Lutheran Hosp. v. Nat'l States Ins.**, **2009 WI 33, para 41, 317 Wis. 2d 54** and **Gen. Cas. Co. of Wis. V. Hills**, **209 Wis. 2d 167, 175**

**(1997).** If that were to be the case extrinsic evidence would come in regarding the general circumstances/context of the marketing and administering of the Pre-MN annuities. **Jorgenson v. Northern States Power Co.**, **60 Wis. 2d 29, 35 (1973).**

Similar language (to **TRUST** case above where the focus is statutory ambiguity) is used with respect to ambiguity in a contract. In **Yauger v. Skiing Enterprises Inc.**, **196 Wis. 2d 485, 499 (Ct. App. 1995),** it was stated:

> *"Whether a contract is ambiguous is a question of law. We test whether the term is reasonable or fairly susceptible of more than one construction. A clause is not ambiguous, however, merely because its language is general or broad."*

All contracts in Wisconsin have imputed into the agreements a duty of 'good faith'. **Hauer v. Union State Bank**, **192 Wis. 2d 576, 598 (Ct. App. 1995).**

> *"Wisconsin common law, like other states, reads the duty of good faith into every contract."*

As to insurance contracts, the court said in **Danner v. Auto-Owners Ins.**, **2001 WI 90, para 54, 245 Wis. 2d 49, 73:**

> *"Every insurance contract from its inception has an implied covenant of good faith and fair dealing between the insured and the insurer."*

The failure to fully provide necessary information is an example of the breach of the duty of good faith and fair dealing. **Kreckel v. Walbridge Aldinger Co.**, **2006 WI App**

168, para 20, 295 **Wis. 2d 649, 662.** In **Groshek v. Trewin**, 2010 **WI 51, para 15, 325 Wis. 2d 250, 261,** the Supreme Court said:

> *"At its core, a fiduciary's duty of loyalty involves a state of mind, so that a claimed breach of that duty goes beyond simple negligence."*

See also **Zastrow v. Journal Comm., Inc.**, 2006 **WI 72, para 29, 291 Wis. 2d 426, 444-5.** The Court noted that the disclosure of rights so that the other party could be aware of options was a factor to consider regarding a claim of a breach of the duty of loyalty. Context is important in the making of conclusions in this area. The greater the power and knowledge of one party, the higher the burden of good faith. In **Metropolitan Ventures, LLC v. GEA Associates**, 2006 **WI 71, para 36, 291 Wis. 2d 393, 416,** the Court said:

> *"The duty of good faith arises because parties to a contract, once executed, have entered into a cooperative relationship and have abandoned the wariness that accompanied their contract negotiations, adopting some measure of trust of the other party (Citation omitted) As the parties' performance in executing the contract increases, so too grows the 'scope and bite of the good faith doctrine'."*

The failure to perform a promise that is central to the contract is a breach. **Downey v. Bradley Center Corporation**, 188 **Wis. 2d 435, 441 (Ct. App. 1994),** states as follows:

> *"A breach of contract means the failure of a party to a contract to perform any promise which forms the whole or a part of the contract."*

For there to be a breach of a fiduciary duty, there also must be a breach of the underlying contract. **Vanguard Telecommunications v. so. N. Eng. Tel.**, 900 F. 2d 645, 653 (3rd Cir. 1990)

Witnesses for both sides can be impeached under Wisconsin Statutes, sections 906.07 and 906.08. In addition the court is to determine the credibility of witnesses by considering the witnesses interest in the result of the trial, conduct and demeanor on the witness stand, bias (if any), the clearness of the testimony, recollection and the opportunity the witness had to know about the matter. **Wisconsin Jury Instructions Civil, Number 215.**

Uncontradicted testimony may be considered by the court under discretion. However, if other evidence renders the uncontradicted testimony unreasonable, this should also be considered. **In re Marriage of Wiederholt v. Fisher**, 169 **Wis. 2d 524 (Ct. App. 1992).**

Wisconsin seeks to limit the ability of witnesses, including expert witnesses, to gratuitously comment on the truthfulness of other witnesses – particularly as to persons not known by the testifying witness. Under the Evidence Code for Wisconsin it is possible (where a foundation exists) to make limited comment on a person's reputation for truthfulness or untruthfulness. Wisconsin Statutes, section

906.08. This does not invite attacks by one expert against another expert with whom s/he does not agree. Such attacks by one expert against another with whom there is an opinion disagreement does not aid the search for truth. It results in name-calling or the introduction of other collateral (904.03 Stats.) matters and impedes the trial's search for the truth. In **State v. Bednarz**, **179 Wis. 2d 460, 465 (Ct. App. 1993),** the Court said:

> "*Under Wisconsin law, no witness, whether lay or expert, may testify 'that another mentally and physically competent witness is telling the truth.* **State v. Haseltine***, 120 Wis. 2d 92, 96 (Ct. App. 1984)."*

The point is made more directly in **State v. Richardson**, **189 Wis. 2d 418, 423 (Ct. App. 1994).**

> "*Expert testimony does not assist the fact finder if it conveys to the jury the expert's own beliefs about the veracity of another witness because such testimony usurps the jury's role."* *(Underlining added)*

Defendant asserts an ability to create and implement the '1985 change' under the "business judgment rule". This legal concept is dealt with in the Wisconsin case law. An example case cited by both parties is **Reget v. Paige**, **2002 WI App. 73, Paragraph 13-20, 242 Wis. 2d 278, 294-95.** Under this concept the actions of a corporation (its Board, officers, etc.) are presumed to be done in good faith and in an honest belief that the decisions were in the best

interests of the corporation.  Courts are not to substitute their judgment for the decisions made by a corporation.  However, the protection afforded by the business judgment rule does not apply if there is bad faith, fraud, overreaching, abuse of discretion, breach of fiduciary duty or a breach of contract.  **Yates v. Holt-Smith**, **2009 WI App 79, paragraph 22, 319 Wis. 2d 756, 771** and **Reget**, **supra.**.  In **Yates** the Court specifically said at paragraph 22 as follows regarding the applicability of the rule:

> *"The business judgment rule is designed to limit judicial involvement in business decision-making so long as a minimum level of care is exercised in arriving at a decision. (Citation omitted)  The rule is based on a presumption that the director of a corporation, in making business decisions, acted in good faith and with the honest belief that his or her decision was in the best interest of the company.  (Citation omitted)  Where applicable, the rule protects a director from liability for honest errors of judgment if he or she acted with good faith.  (Citation omitted)  The rule does not, however, shield a corporate director who has acted in bad faith."*

In this case NWM claims that the problems present in the marketplace allowed it to change the Pre-MN annuities.  Courts have commented upon the ability of a party to alter a contract under these types of circumstances.  Neither subsequent unprofitability or new economic burdens allow for unilateral contract modification.  **Neal-Cooper Grain Co. v. Texas Gulf Sulfur Co.**, **508 F. 2d 283, 293 (7th Cir. 1974).**

In **Noonan I** (Supra) at paragraph 16, the Court said with
respect to NWM's segmentation for the pre-MN policies as
follows:

> *"We conclude that whether the business judgment
> rule applies at this stage is irrelevant. In our
> view, the Noonans' breach of contract claim is not
> simply about apportionment of the divisible
> surplus. Rather, it is founded on Northwestern's
> decision to predetermine the source of the
> annuities' dividend – the short-term bond fund –
> irrespective of the overall divisible surplus."*

The business judgment rule does not protect a defendant from
liability for its alleged breach of contract, even if the
breach is objectively deemed a good business judgment.
**Anderson v. Nottingham Vil. Homeowner's Assn., Inc.**, 2007 NY
**Slip Op. 00944, 2 (N.Y. App. Div. 2007).**

The Board of an insurance company has broad discretion
to make dividend determinations. **Prudential Ins. Co. of Am.
v. Miller Brewing Co.**, 789 F. 2d 1269, 1279 (7th Cir. 1986).

It has been found that Defendant owes a fiduciary duty
to Plaintiff Class according to the **Noonan I** (Supra)
decision at **276 Wis. 2d 33**. The reasoning underlying that
conclusion relates to the mandate in Wisconsin Statutes,
section 632.62(4)(b) – a mutual insurance company is to
equitably apportion its divisible surplus and return it as a
dividend to the participating policyholders. Under that
section of Wisconsin law Defendant occupies a position of

trust in relation to Plaintiff Class who, being in an
'inferior position' regarding the money they invested with
NWM, depended upon NWM's investment decisions for growth in
their long term annuity product. That fiduciary duty
includes the obligation to not act just in one's own self
interest, to protect the rights of the Pre-MN annuitants and
to notify the Pre-MN annuitants of all information relevant
to their interests. **Zastrow v. Journal Commc'ns, Inc.**, 2006
**WI 72, paragraphs29, 34, 291 Wis. 2d 426, 444-5.**

The allegations (and responses thereto) of wrongdoing
in this case include fraud and bad faith (see, for example,
Defendant's Brief at page 14). The burden of demonstrating
wrongdoing is on Plaintiff Class. **Senty v. Senty**, 2006 **WL**
**770479, at \*4 (Wis. Ct. App. 2006)** and **Lundin v. Shimanski**,
**124 Wis. 2d 175, 184 (1985).** That burden is high and
Wisconsin case law has commented upon the difficulties
involved in establishing fraud which, by its nature, is
often hidden and seen perhaps only in the interstices.
Reference is made to the comments of Justice Gordon in **Jewel**
**v. United Fire and Casualty Co.**, 25 Wis. 2d 509, 515 (1964),
regarding the establishment of fraudulent wrongdoing:

> "'*Fraud is infinite in variety,*' said Lord
> *MacNaughten;* '*sometimes it is audacious and*
> *unblushing; sometimes it pays a sort of homage to*
> *virtue, and then it is modest and retiring; it*
> *would be honesty itself if it could only afford*
> *it.*' **Reddaway v. Banham**, *A.C. 199, 221 (1896).*

> It is one thing to be aware or suspicious of the many forms which fraud can take; it is another thing to find it proved. '*Fraud generally lights a candle for justice to get a look at it,*' goes *the saying.*" (Underlining added)

Facts and the reasonable inferences that flow from them are used to prove/rebut the assertions made regarding this alleged misconduct.

An option that exists for the parties in Wisconsin in a matter sounding under declaratory judgment is supplemental relief based upon the declaratory rulings made. See Wisconsin Statutes, section 806.04(8). A court has an inherent ability to utilize continuing jurisdiction in order to make its rulings under declaratory judgment effective. Ultimately that matter is addressed to the interests of justice under discretion. The insights gained after a long and contested trial with multiple pretrial and trial motion rulings are factors to consider regarding whether or not to retain ongoing jurisdiction for any supplemental proceedings. Any act of continuing jurisdiction cannot be a basis for extending the scope or pleaded nature of the case itself.

Reference is also made to certain of the legal instructions found in Wisconsin Jury Instructions – Civil. Circumstantial Evidence at number 230 is important here regarding (as an exemplar) approval or non-approval by regulatory agencies. Expert testimony was presented in the

trial and the experts disagreed. Instruction 260 will be helpful regarding weight of evidence and conflict resolution as to reasons or bias supporting their conclusions. Instruction 3044 goes to the point that the duty of good faith can be breached even if no specific term is violated.

## DISCUSSION

The resolution of this dispute is dependent upon both the determination of the facts and the proper application of the law. The court notes that a number of the legal theories postulated in this case, including defenses, are applicable only if certain facts do or do not exist under the credible record established by the parties. Said differently, a legal concept ( breach of contract, business judgment rule, good faith, regulatory approval, etc.) may exist theoretically in the law in Wisconsin, but its application or use in a given case is dependent upon the facts established by the credible evidence.

Plaintiff generally asserts the following:

    1.   Pre-MN Annuity contract was breached under express contract language and Wisconsin Statute, section 632.62(2) and (4).

    2.   NWM breached its duties of good faith and fair dealing.

    3.   NWM breached its fiduciary duties.

    4.   Cross-subsidy, disintermediation, regulatory approval and business judgment rule are

62

without merit and do not justify the '1985 change'.

Defendant generally counters with the following assertions:

1. NWM did not breach the Pre-MN contract by adopting and implementing the '1985 change'.

2. NWM did not breach the implied covenant of good faith.

3. The business judgment rule protects NWM's discretion to annually determine, modify and allocate dividends among its policyholders. This was just a mechanism NWM chose to match appropriate assets to Pre-MN annuity liabilities.

4. NWM did not act in bad faith.

5. NWM made full disclosure to regulators of '1985 change'. Those regulators approved the '1985 change'. Notice to Pre-MN annuitants was never required.

6. NWM was allowed to implement Pre-MN segmentation under the contribution principle and ASOP 15.

7. This matter cannot be transformed into an action for damages.

Some of these issues are resolvable by reference to the law, but most require that facts first be determined. Examples of some of the factual matters to be determined in this case are:

a. Was their bad faith and unfair dealing as alleged?

b. Was there a genuine basis for the gradual phase-in of the '1985 change'?

63

c. Does the business judgment rule apply here?

d. What were the motives of NWM in creating and implementing the '1985 change'?

e. Is 'UPDATE 83' comparable to the '1985 change' with respect to notice?

f. Was the '1985 change' necessary for the Pre-MN annuitants?

g. Was full disclosure made to regulatory entities of the '1985 change'?

h. Was notice promised by NWM to Pre-MN annuitants in its regulatory filings?

i. Did regulators approve the '1985 change'?

j. Did NWM have fiduciary obligations to the Pre-MN annuitants and, if so, were those duties violated?

The parties presented/cross examined witnesses and introduced exhibits to support their respective positions. The court will comment on certain portions of the record and ultimately make findings and conclusions in this declaratory judgment matter. Those final findings and conclusions will reflect, where necessary, the exercise of discretion.

A. **Testimony by the Pre-MN annuitants on how NWM marketed the Pre-MN product**

In all 8 persons testified as persons who purchased Pre-MN annuities. They were Noonan, Williams, Reichart, LaPlant, Kreitzman, Timmers, Colbert and Meckess. These persons established that NWM intentionally marketed and sold the Pre-MN annuities as long-term retirement products. Note that the evidence goes, not to the motivation of Plaintiff

Class members in purchasing the annuities, but to the motivation and strategy of Defendant in selling this annuity product to the public. In addition, NWM's agents marketed these annuities to Plaintiff Class as investments that would grow over the years from dividends based upon the earnings from the general account portfolio of NWM.

These fact conclusions are also supported by testimony from Mr. Fisher, Mr. Murphy, Mr. Dyer and, particularly, Mr. Zore. These are/were NWM employees who were involved with creating and/or implementing the '1985 change'.

Outside of testimony, these facts are corroborated by practices that are reflected in the record:

1. The payment of dividends to Plaintiff Class before the '1985 change' was solely from the earnings (divisible surplus) produced by the general account portfolio of NWM.

2. The dividends paid before the '1985 change' involved NWM's use of the contribution principle. Life and annuity products were both provided dividends from the divisible surplus generated by the general account portfolio of NWM.

3. NWM's general account portfolio before the '1985 change' was reflective of only one investment class that included life and annuity policies. There was only one experience factor class. The experience for life and annuity products was basically the same within the general account portfolio and the divisible surplus it produced including that NWM's Board did utilize the contribution principle.

4. Segmentation was never used by NWM before the '1985 change'.

5. The investments in the NWM general account portfolio were long-term and included equities since these would grow more than bond or short-term investments over time.

The importance of the foregoing is that the Pre-MN annuities were sold as long-term, growth, retirement investments and they were backed by a general fund that had a managed long-term, growth strategy. The yearly dividends for the annuities came from this general account portfolio and its divisible surplus. The change to backing the Pre-MN annuities with a segmented fund within the general account portfolio that included shorter-term investments/bonds was intended by NWM to aid it as it introduced its new CRA and intended to produce a lower investment return for the Pre-MN policies over time than would have been the case without the '1985 change'. This was a substantial and material change to the Pre-MN contracts and absolutely in conflict with NWM's actual marketing of this annuity product to Plaintiff Class. The differences in dividend earnings (life policies versus Pre-MN annuities) after the '1985 change' are demonstrated in Exhibit 408. Those differences are substantial and material.

B. **Credibility issues as to testifying EXPERTS**

Plaintiff experts Pritchett, Affleck and Hoyer came across as knowledgeable, objective within their discipline and able to defend their opinions on cross-examination.

66

They were believable and very persuasive. Annuities sold
prior to the '1985 change' were in the same investment class
as life policies. The divisible surplus for both books of
business were determined by using the contribution principle
with respect to earnings from the general account portfolio.
That concept determines a Dividend Interest Rate based on
the net return on invested assets. Because the annuities
were in the same investment class as the life products, the
Dividend Interest Rate for each was generally the same
(subject to minor differences mostly related to tax
matters). Since annuities were long-term, retirement
investments, the annual dividend return was critical to the
investment growth of the policies. Any change in NWM
investment philosophy for annuities was a major matter and
the policyholders had a right to notice regarding that
change. The clear and unambiguous language of the Pre-MN
policies required that each policy share in the divisible
surplus of the company. Nowhere is the dividend stated to
be from a separate or segmented account. That could happen
for a new annuity product such as the CRA, but not for the
in-force annuities (unless a policy amendment was agreed
to). The entire past practice of providing dividends to the
Pre-MN annuitants from the earnings in the general account
portfolio was consistent with Plaintiff's position. There
were 3,644 Pre-MN annuities issued in Wisconsin per Exhibit

406.

In the late 1970's and early 1980's there was a market condition which had short term interest rates exceeding long term rates – the so-called inverted yield situation. This resulted in a high rate of annuity surrenders and an increase in policy borrowing. A similar problem existed for the life products in terms of borrowing. However, since the life products were about 95% of NWM's business this life borrowing dwarfed the annuity disintermediation problem relating to surrenders and borrowing, even though the annuity disintermediation incidence was higher. NWM confronted this problem by UPDATE 83 (increasing borrowing rates by policy amendments) and by creating the CRA product.

Defendant's non-employee experts Foundree and Steinig were weak witnesses and not persuasive. Each gave general support for the positions taken in this litigation by NWM. In his Report, Mr. Foundree discusses how an insurance company has a right to rely on the written response from the regulator. In this dispute, Wisconsin never provided any written response for NWM to rely on. He asserts that Wisconsin's approval for the '1985 change' come about as an inference from a NWM letter that was never responded to. Mr. Foundree also acknowledges that he knows of no other insurance company that retroactively applied segmentation to its existing book of annuity business. However, he still

68

averred that retroactive segmentation was appropriate here as reflective of an industry standard. Mr. Foundree was a formidable expert witness, but he was not anywhere as credible, believable and persuasive as Plaintiff's experts.

Mr. Steing was lacking in credibility as an expert with respect to his opinions. His situation was more serious than was Mr. Foundree. He was overtly biased in favor of a party and did not come across as committed to truth. He acted as if he were a litigant and he sought to defend principles that, for over 40 years, were his life's work. He did not seek so much to explain based upon his expertise as to defend what he believed needed to be defended. He was so in awe of NWM and its actuaries that he expressed opinions without verifying (or even seeing any need to verify) underlying data. When confronted with that, he excused his not even checking underlying data by saying he knew for SURE (inherently and without verification) that the underlying facts were as Defendant and its agents said them to be. On a separate point, he claimed the Pre-MN block of business was not a closed block of business when NWM officials referred to it as such. He further went outside of his area of expertise in stating that the dividend right of the Pre-MN annuitants was legally not a contract right. There is no indication in the record that he obtained any legal review of this matter before expressing that opinion.

This in turn was used to support his position regarding the not giving of notice to the Pre-MN annuitants. Finally, he decided it was necessary to impugn opposing experts by name; not by the strength of his work and opinions, but by concluding that those who disagreed with his opinions were wrong for the reasons he stated. As the case law points out that type of attack doesn't help the trier-of-fact in the search for the truth.

NWM knew as predictable or should have known that the interest return for the Pre-MN policies would be less than the return from the general account portfolio following the '1985 change'. This was a substantial and material change to the Pre-MN contracts regarding dividends. See Exhibit 408. In addition the Pre-MN annuities unfairly lost the benefit of the unrealized capital gains that were in their general account portfolio before the '1985 change'. The dividends were a way for policyholders to share in the growth of NWM. The dividends under the contract were intended to reflect a portfolio-based return. This was particularly the case given that the policies were participating within this mutual insurance company.

Plaintiff's experts are much more credible than Defendant's experts. This is a finding made in the exercise of discretion and under Wisconsin Jury Instructions – Civil, Number 260. Specific fact and law findings will be made

later in the decision that will reflect this ruling.

C. **Witness Fisher**

This witness was not credible. The Fact portion of this decision reflects the reasons for this discretionary conclusion. This witness was unusual. He appeared angry. He was the primary NWM person in charge of the '1985 change' and thus a very important witness. That said, his testimony reflected a lack of responsibility for and knowledge of the '1985 change'. After his being called and testifying as an adverse witness by Plaintiff and the need for clarification and rehabilitation being apparent, Defendant's counsel indicated that rather than examining him then (at the end of direct testimony), the Defense was reserving the right to question him until the presentation of their case-in-chief. However, this witness was never called again and no statement as to why is in the record. The witness appeared untruthful and evasive.

D. **Other Defendant witnesses**

NWM presented a number of other witnesses who had knowledge regarding the '1985 change'. As reflected under Facts, many were themselves experts in certain areas as well as being anecdotal chroniclers.

**Mr. Zore** had financial expertise as well as being a senior management person during the time the '1985 change' was created and implemented. In his financial role, he saw

71

some real problems with creating the new CRA product. The primary problems had to do with the fact that the asset fund that would support the new segmentation had a market value that was millions under its book value and his belief that the new CRA's and the Pre-MN's would compete with each other. He also discussed disintermediation as resulting from both then-current market rates and the anticipated annuity product competition. He knew that NWM carried substantial (+ $800 million) unrealized long term capital gains from MGIC and Baird investments that would be lost to Plaintiff Class under segmentation. As VP and Treasurer (in the mid 1980s) he knew that the general account portfolio was oriented to the long term and the segmented fund would be short to intermediate term and that these differences had tremendous impact over the long term for annuity policyholders. He understood that the history for dividends for the life and annuity products was one of BOTH being on NWM's general account portfolio. His answer to the conundrums faced by NWM was to tell lies and manufacture reality. Mr. Zore wanted NWM staff to make it seem that the new CRAs and the old Pre-MNs were alike. He knew the 2 forms of annuity products were not the same. He approved/suggested subsidizing the Pre-MN policies for many years. The overwhelming credible evidence is that this supplementing/soft landing was done intentionally to conceal

72

R-App 593

the '1985 change' from the Pre-MN annuitants.

Mr. Zore was one of the persons within NWM who wanted concealment of the '1985 change' from Plaintiff Class members. He also had significant responsibility, under the credible evidence, for implementing a modified segmentation (short to intermediate-term) fund (different from what NWM told the New York regulator) with a subsidy in order (in both cases) to produce a higher return than the segmented fund alone would earn so as to prevent Pre-MN annuitants from knowing about the '1985 change'. It did not bother him that NWM had marketed the Pre-MN annuities based upon an anticipated dividend from the general account portfolio's divisible surplus and that this dividend had always been paired with the life dividend that was funded from the same source. He knew that the segmented annuity fund would, over time, produce a return that was less than the anticipated return from the general account portfolio.

The reasonable inference from the credible evidence is that others at NWM on this matter followed Mr. Zore's lead. He wanted the new CRA product. He wanted segmentation. Even though he knew (or should have known) that the old and new annuity products were substantially different, he wanted them to be made to look alike. He wanted, in 1985, protection from likely annuity surrenders, protection from high notification costs ($20 million plus for UPDATE 83),

protection from annuity exchanges given the new CRA product
and protection from lawsuits.  It was believed that these
consequences could come about, it can be reasonably
inferred, by intentionally concealing what NWM had done in
the '1985 change'.  The vetting process indicates that
nothing that happened regarding the '1985 change' was
accidental.  Everything was intentional.  Mr. Zore was
involved throughout with respect to the creation,
implementation and concealment of the '1985 change'.

**Mr. Dyer and Mr. Murphy** indicated that UPDATE 83 was
not similar to the '1985 change'.  The credible evidence
indicates to the contrary.  Beyond that, they knew that NWM
had also acted to give notice to its policyholders in 1976
and 1980 when policy changes were sought.  Neither person
noted any input from the NWM law department (in house or out
counsel) regarding the legality of either:

     1.   Retroactive segmentation for Pre-MN policies

     2.   Not giving notice to policyholders

Yet, both believed that NWM could implement segmentation
retroactively and that policyholder notice was not needed.

    Mr. Murphy expressed the personal belief that NWM's
Pre-MN policies gave those policyholders too much control
over their money.  Yet, it was NWM that created the policy
language that gave policyholders the right to obtain loans
at low cost and to surrender without any penalty.  The views

74

articulated by Mr. Murphy as to the Pre-MN annuitants
express his bias against these policyholders and their
rights.  He feels that his employer was being harmed
unfairly by Plaintiff Class and it didn't matter that NWM,
and not the Plaintiff Class, had created this contract
inequity.  In his view, people should not have too much
control over their money and NWM should have an ability to
unilaterally remedy that situation.  It did not matter to
him that about 1/3 of a billion dollars was involved and
that Wisconsin regulatory approval was "an inference" from
not responding to a letter.  This witness has an unfair bias
against Plaintiff Class and that directly impacts his
credibility in a negative manner.

Mr. Dyer is a NWM employee.  Initially he was an
actuary, but over time, he has worked in many Defendant
departments.  He has not been assigned to work in the
annuity area of NWM.  He didn't indicate having secured any
law opinion regarding whether notices were or were not
required as a condition for modification of the Pre-MN
policies.  Yet, he expressed the opinion that NWM could
unilaterally modify the Pre-MN policies.  The opinion, as to
weight, is impacted by the bases articulated by its author.

**Mr. Doll** is NWM's Chief Investment Officer.  He said
that the Consultant, Mr. Durland, did recommend the new CRA
product.  However, he only recommended segmentation for the

R App 596

new CRAs and not retroactively for the Pre-MN annuitants.
He said Mr. Fisher was the new product (CRA) leader for NWM
in the 1982 to 1985 period. The Pre-MN policies were
marketed by NWM's agents with illustrations as to dividends
being based upon a divisible surplus earned by the general
account portfolio. He said that NWM's Annual Reports did
not describe the Pre-MN segmentation or the giving of
supplements to that book of business from 1985 to 1993.

**Mr. Trost** has his credibility affected by evasiveness.
He attempted to unfairly present evidence as noted under
Facts. He did say that supplements were paid to Pre-MN
policies for many years. In the early 1980s, he noted that
there was a very high rate of surrenders for NWM's annuity
products. After the '1985 change' the Pre-MN annuitants
received earnings from the segmented account (plus
supplements during 1986 to 1993) only as opposed to any
dividend from the divisible surplus produced by earnings
from the general account portfolio.

E. **NWM's statement of "adequate notice standard"**

On 13 August 1984 (Exhibit 75) NWM indicated in writing
to the New York State Insurance Department what it would do
regarding notice to it policyholders of the '1985 change'.
Basically, it said it would do the following:

> 1. Its 1 November 1984 dividend information
>    release to NWM agents and the press would
>    note the proposed change.

2. Its 1984 Annual Report would mention the '1985 change'.

3. A stuffer would be enclosed with dividend notices on the 1985 anniversaries for the annuity policyholders, which would explain the '1985 change'.

None of these notice events occurred. In addition, it needs to be noted that Defendant expressed in this written document its belief regarding what would legally constitute <u>adequate notice</u> to the Pre-MN annuitants. Exhibit 75 states at page three as follows:

> *"We think that this will constitute adequate notification of our change in investment philosophy for annuities to our policyholders."*

This statement is crucial in that it reflects what NWM ITSELF viewed as adequate notice to Plaintiff Class. When none of the notices were given, NWM acted to conceal the fact of the '1985 change' and changed its position on notice to Plaintiff Class. The NWM statement of what constitutes adequate notice to the Pre-MN annuitants of the '1985 change' exists as the notice standard both within and outside of the regulatory process. This approach is also consistent with UPDATE 83 and the NWM contract amendments from 1976 and 1980.

The hired consultant recommended a new CRA product. The corporation took 2 years vetting the proposal, not because it wasn't viewed as a good idea, but out of normal

business caution heightened by two special concerns:

1. The likely interaction between the old (Pre-MN) annuities and the new CRAs and how to mitigate any negatives there.

2. The new segmentation concept had to be considered as possibly impacting on NWM's overall business.

When all the talking and meetings had ended, NWM decided to go ahead but with modifications to the consultant's recommendations. It then opted for lies over truth and concealment over openness. It spoke in Annual Reports of conservative long-term investing for the benefit of policyholders (including annuitants) while intentionally creating a short-to-intermediate segment fund for the Pre-MN annuity policies. It didn't give policyholders, its agents and the press the notice of the '1985 change' that it told the regulator it would and that it said was needed under a standard of "adequate" notice. It hid the '1985 change' from the very policyholders who its officials testified were/are the owners of the mutual insurance company. And these intentional actions continued for over a quarter of a century.

F. **Regulatory approval**

The credible evidence does not support a finding that State of Wisconsin Insurance Department ever approved the '1985 change'. Plaintiff's experts and Class member Noonan are persuasive on this point. Further, it is not credible

that a matter involving over 1/3 of a BILLION dollars would have approval occur only as an inference from the regulator not responding to a letter from Defendant. In addition, NWM's failure to comply with its articulated notice actions that were made to the New York Insurance Department is an intentional violation of good faith and fair dealing to the policyholders and the regulators. The failure to give notice which NWM said was necessary in a legal sense constituted a breach of the Pre-MN annuity contract(s). No approval occurred by the New York Insurance Department of the '1985 change' since NWM never complied with the notice conditions it gave to that regulatory body. In addition, NWM did not fully apprise the New York Insurance Department of the terms of the individual annuity contracts which were breached by any segmentation approval. In any event, no approval by New York (if that occurred) affected the fact that Wisconsin never approved the '1985 change'.

G. **Tower Report and NWM's modification of it**

Mr. Durland wrote a report that recommended to NWM the development of a CRA product and the utilization of segmentation within the general account portfolio. The Report did not recommend retroactive application of segmentation with regard to the Pre-MN block of business. The goal was to better match investment assets to annuity liabilities going forward. The new product as created by

79

NWM had the CRAs getting interest from their separate current rate fund as opposed to a dividend from the divisible surplus produced by the general account portfolio. When the CRA product was introduced, it was recognized by NWM that the old and new annuities would compete with one another – the 'flip flop' situation. The remedy by NWM and Mr. Zore was to have the 2 annuity products APPEAR to match each other in performance. This was at the heart of the submission by NWM to the New York Insurance Department. In addition, to notice matters, NWM said it would create a segment of portfolio assets (1 to 3 year [later changed to up to 4 year debt instruments] debt instruments from $358 MILLION of its cash) for its annuity products. The final segmentation did not adhere to this proposal and NWM never advised either regulator of its unilateral changes to its segmentation proposal regarding the '1985 change'. Implicit in New York's approval(s) was the requirement that ALL NWM statements made in seeking the approval would be fully complied with. Again, this involved over 1/3 BILLION dollars! When interest rates trended down at the time the CRA was introduced as NWM's sole annuity product, management and the Board decided to supplement (grading in /supplementation adjustment) the return that was generated by the Pre-MN segmented account. The result was that for about 7 years the return for the Pre-MN policies were

80

generally the same as the life policies. After 1993, the Pre-MN policies earned only the return (interest) from their segmented short-to-intermediate fund. This was substantially less that the dividend provided, via the divisible surplus from the general account portfolio, to NWM's life policies. NWM advised and misled their agents that the CRAs were superior to the Pre-MN annuities even though it knew this was not true.

The credible evidence indicates that the motive of NWM in making the '1985 change' was to allow for the marketing and sales of the new CRAs without being burden by the adverse effects inuring in the marketplace (flip-flopping) from the co-existence of the Pre-MN policies and their dividends based upon a divisible surplus produced by the general account portfolio earnings. This was parochial to NWM and produced no benefit to the Pre-MN policyholders. In fact, the credible evidence indicates that the '1985 change' was adverse to the interests of Plaintiff Class. The credible evidence does not support NWM's contentions that the '1985 change' was allowed under the business judgement rule, was needed to cure cross-subsidization, was necessary to counter corporate cash flow needs and/or was needed to match cash flow experience to annuity liabilities.

NWM intentionally violated generally accepted practices and procedures within the insurance industry by unilaterally

segmenting the assets supporting the Pre-MN annuities. This action substantially and materially and fundamentally changed the contract terms (and expectations) as to dividends between Plaintiff Class and Defendant. It also changed the underlying nature of the Pre-MN annuity investments. The disparate treatment, after the '1985 change', of experience factor classes violated the contribution principle used by NWM for its life and annuity products. Consistency, past corporation practice, the unambiguous Pre-MN contracts, the unambiguous Wisconsin law and ASOP standards were all intentionally ignored by NWM. That this unilateral and inequitable change in investment strategy was made without notice to Plaintiff Class in turn constitutes a violation of the duty of good faith, loyalty and fair dealing by NWM. NWM's conduct was in fact in bad faith. The conduct of NWM, at all times material, was intentional and outrageous and in total disregard of the rights of Plaintiff Class.

NWM had a right to create a new annuity product and to stop selling the Pre-MN policies. It had a right to utilize segmentation and to apply that to the new CRA product. None of that is at issue under the business judgment concept presented as a defense by NWM for its actions regarding the '1985 change'. The narrow issue of this case focuses on NWM's actions in unilaterally creating, implementing and

concealing the '1985 change' which fundamentally changed the Pre-MN annuity contract. Both the unambiguous contract and the unambiguous statutory law prohibit NWM's actions relating to the '1985 change'.

H. **Breach of contract**

The wording of the Pre-MN contract is unambiguous. The word 'dividend' and the phrase 'of the Company' were written by NWM and they are not qualified in any manner. The contract requires that the Pre-MN dividends be based upon the divisible surplus generated by the general account portfolio of the company and not interest generated from some separate, segmented account. If such a modification as contemplated in the '1985 change' were to occur it would have to be the result of a mutual amendment. Precedent for this exists as well in amendments sought by NWM regarding insurance contracts in 1976, 1980 and UPDATE 83. In this case NWM told the New York regulator that NOTICE would be given in 3 forms and said that this notice of the '1985 change' was adequate. Thereafter it did not give any of the notices it said it would. Rather, the credible evidence indicates it intentionally concealed the '1985 change' from Defendant Class. NWM marketed the Pre-MN annuities as a long-term, retirement and investment product. The '1985 change' fundamentally changed the contract from a long-term investment to a short or intermediate-term investment. The

foreseeable impact of that change has been a quarter of a century of lower annuity growth for Plaintiff Class annuitants.

Wisconsin Statutes, section 632.62(2) and (4) unambiguously require that Plaintiff Class, as participating policyholders, SHALL participate annually ( "... *full right to participate annually* ..." ) in the part of the surplus accumulation, if any, from the participating business that is distributed.  This surplus is required to be equitably apportioned and returned as a dividend.  That law (in terms of the parties understanding of the statute) was followed every year prior to 1985 as NWM determined its divisible surplus, under the contribution principle, from the general account portfolio and gave essentially the same portfolio-based dividends to life and annuity policies.  NWM further trumpeted its strategy of long-term investing and the award of dividends to its policyholders in its Annual Reports and at conferences.  NWM/Mr. Zore claimed at all times before 1985 that its dividends were portfolio-based.  After the '1985 change' the interest/dividends paid to Pre-MN annuitants were not the result of the divisible surplus produced by the general account portfolio.  Rather, the interest/dividend paid to Pre-MN policies was solely a result of earnings from a separate segmented account and supplements paid during 1986 to 1993.

84

NWM acted intentionally in creating, implementing and concealing the '1985 change'.

I. **Business Judgment Rule does not apply to NWM's actions regarding the Pre-MN annuitants**

As noted in the Law section, good faith is required in order for the concept to apply. Further, there cannot be breach of contract by the business actors (see H above). Both of those predicates are absent here. The actions of NWM in creating, implementing and concealing the '1985 change' benefited it, but not Plaintiff Class. The annuitants were harmed materially by NWM. Plaintiff Class received a lower investment return as the annuity was fundamentally changed without notice or concurrence by both parties.

The contract was intentionally breached. This includes a breach of the covenant of good faith, loyalty and fair dealing. The Rule (even if all other conditions were met) does not excuse NWM from complying with the Pre-MN contracts and Wisconsin Statutes, section 632.62(2) and (4).

J. **Breach of fiduciary duty**

NWM occupies the position of a fiduciary regarding the Pre-MN annuitants as to dividends that are in dispute in this case. See **Noonan I at 47, para 24.** This conclusion rests in part on the inequality of the relative positions of Plaintiff and Defendant regarding the management of each

85

annuity investment. NWM (and its officers, employees and trustees) has a superior position regarding knowledge and control of policy investments. This duty is to act with loyalty, good faith, diligence and honesty toward the Pre-MN annuitants. When a major change in investment philosophy is occurring the duty, at a minimum, is to give the annuitants notice of a proposed change. Action cannot be taken which would deprive the Plaintiff Class of the benefits and profits from their annuity investments. As Plaintiff points out, defendant violated their fiduciary duty by:

1. Failing to give full and fair notice of the '1985 change' and its likely impact.

2. Acting to conceal the fact of the '1985 change' and its impact.

3. Misrepresenting the '1985 change' to its captive agents.

4. Not instructing the agents to inform Plaintiff Class of the '1985 change and its impact.

5. Intentionally misrepresenting the Pre-MN annuities as long-term investments when the '1985 change' had modified the dividend basis to short or intermediate term investments.

6. NWM and its agents acted only in the interests of NWM and its new CRA product when the '1985 change' was created, implemented and concealed.

7. Having all Pre-MN interest/dividends since 1985 based unfairly on the segmented account (and supplements from 1986 to 1993) created in the '1985 change'. The breach was of a continuing nature.

86

8.    Plaintiff Class was, and continues to be, injured by the '1985 change'.

9.    All of NWM's breaches of its fiduciary duty were done in an intentional disregard of the rights of Plaintiff Class within the meaning of Wisconsin statutes, section 895.043(3).


## DECLARATORY RULINGS

Based upon the foregoing and the entire record of this case, the prior findings and conclusions under Facts, Law and Discussion are affirmed and these additional DECLARATIONS are made:

### GENERAL

1.    NWM is a mutual insurance company organized under the laws of Wisconsin. It is domiciled and headquartered in Wisconsin. It has no stockholders. Rather, its members are its policyholders. Members exercise control through an elected Board of Trustees. NWM is subject to Wisconsin Statutes, section 632.62 and other laws of Wisconsin with respect to the determination, allocation and payment through dividends of its divisible surplus to its participating policyholders.

2.    Plaintiff and Class members are persons who purchased Pre-MN annuity contracts from NWM before 1 March 1985. In marketing and selling those Pre-MN annuities to Plaintiff Class, NWM said the annuities were long-term retirement investments that would grow over time from dividends paid to the annuitants which would be based upon earnings made by NWM's general account portfolio. That is in fact how dividends were paid to all the Pre-MN annuitants up until the '1985 change' took place.

3.    The Pre-MN annuity contracts at issue are participating contracts and Plaintiff Class persons are owners/members of NWM. The contracts are unambiguous and they were drafted solely by

87

R. App 608

NWM. The dividend that is to be paid to Pre-MN annuitants is to come from the divisible surplus of the Company that is produced by the general account portfolio and not from the earnings of a segmented account alone. The '1985 change' constitutes a breach of the Pre-MN annuity contract in that it materially and substantially changes, in a unilateral manner, the bases for determining and paying the Pre-MN annuity dividend. This is contrary to the express intent of the parties in the Pre-MN annuity contract. The word 'shall' in the contract connotes a mandatory obligation.

4. The terms of Wisconsin Statutes, section 632.62 (and particularly subsections (2) and (4)) are incorporated as a matter of law into the Pre-MN annuity contracts. That law is unambiguous and is mandatory in that it includes the word 'shall' repeatedly. It requires NWM to determine the divisible surplus, if any, of the Company and then equitably apportion it among the policyholders and then credit to each Pre-MN annuitant an equitable share (called a dividend) of that divisible surplus. Nowhere does the law say that the dividend or divisible surplus is to be paid from a segmented account within the general account portfolio. This statutory law does not allow NWM to unilaterally establish a segmented account within its general account portfolio to exclusively be used to determine the dividend/interest to be paid annually to Pre-MN policyholders. The segmented account would not give the Pre-MN policies a 'full right' to participate in the surplus accumulations of NWM. Also, any segmented dividend would not be an equitable apportionment for the Pre-MN annuities of the NWM 'remaining surplus'.

5. Under the Pre-MN annuity contract, Plaintiff Class had and have a full right to receive dividends based upon NWM's annual divisible surplus, if any. This contract right exists both before and after the '1985 change' because of the language in the annuity contracts. At all times before the '1985 change' the divisible surplus was realized from earnings produced by NWM's general account portfolio. NWM and its Board determined at all times the investments that would be made in the

88

general account portfolio.  The '1985 change' was a material and significant change to the Pre-MN annuity contracts.

6.   At all relevant times NWM owed and owes Plaintiff Class members the contractual duty of good faith, loyalty and fair dealing in the performance of its duties under the Pre-MN contracts.

7.   At all relevant times NWM owed and owes Plaintiff Class members a fiduciary duty with respect to their dividend rights under the Pre-MN annuity contracts.

8.   NWM's general account portfolio at all times relevant before the '1985 change' had a single experience factor class that included both life and annuity policies.  The existence of this past 'single factor class' precluded (in addition to other reasons stated herein) NWM from creating a separate segmented account within the general account portfolio for Pre-MN annuitants under the '1985 change'.  A separate segmented account could, however, be created prospectively for the new (as of 1 March 1985) CRA annuities.

9.   NWM is liable for the actions of it agents including it officers, trustees, employees and captive sales agents.  All of NWM's agents involved in the '1985 change' owe and owed fiduciary, good faith, loyalty and fair dealing duties to Plaintiff Class.  NWM is liable for the breach of any of those duties to any Pre-MN annuitant by any of its agents.

10.  This dispute concerns the creation of a segmented asset account by NWM for Pre-MN annuities under the '1985 change'.  After this segmented account was created, interest/dividends for the Pre-MN policies were based upon the earnings of that account, except that for the period (1986 to 1993) when supplements were added by NWM.  These earnings from the segmented account were on balance significantly below the earnings produced by the general account portfolio of NWM.  In turn, this meant that the divisible surplus and dividends/interest was lower for Pre-MN annuities. The reason for this lower rate of earnings for the segmented account was that the general account

89

portfolio was invested in long-term instruments
(including equities) and the segmented account was
invested in short and intermediate-term
instruments.  The credible evidence established
that, over time, long-term investments outperform
short and intermediate-term investments.

11.  As of 1 March 1985, NWM stopped selling Pre-MN
annuities and they then became a closed block of
policies.  The '1985 change' and related conduct
of NWM were done as to that block of Pre-MN
annuities as a whole.  None of the Pre-MN
annuitants were treated separately.  As of I March
1985, there were 3,644 Pre-MN annuities issued
just in Wisconsin and 35,261 Pre-MN annuities were
in the entire NWM block.

12.  NWM told its regulators that it would give
'adequate notice' of the '1985 change' to its
agents, the press and the Pre-MN annuitants.  It
intentionally did not do so.  This was a breach of
the Pre-MN annuity contracts.  Notice of this
change was required.  Amendment of the Pre-MN
contract by means of the material and substantial
'1985 change' required mutual agreement.  NWM knew
that notice and mutual agreement were necessary to
implement the '1985 change' as evidenced by <u>recent</u>
NWM instigated insurance policy changes in 1976,
1980 and UPDATE 83.

13.  NWM paid a supplement to Pre-MN policies during
the period 1986 to 1993.  The credible evidence
establishes that the intent of NWM in gradually
converting the Pre-MN dividends/interest from the
divisible surplus generated by the general account
portfolio to solely the earnings of the segmented
account was to 'cover up and conceal' the '1985
change' from the Pre-MN annuitants.  This
constituted bad faith, a breach of fiduciary duty,
disloyalty and unfair dealing.  The reason for
concealing the '1985 change' was to aid NWM only
in the introduction and stability of its new (in
1985) CRA annuity product.

14.  NWM has not established factually its defenses of
the right to implement the '1985 change' under the
business judgement rule, the altruistic using of
supplements just to create a soft landing for the
Pre-MN annuities, cross-subsidization as the basis

for implementing the '1985 change', the need to create and implement the '1985 change to counter a corporate cash flow problem and the necessity for the '1985 change' being the need to match annuity assets/cash flow expenses to annuity liabilities. NWM has not established that it obtained regulatory approval for the '1985 change'. NWM has not established that, having told the New York regulator that it would give various notices regarding the '1985 change, it was subsequently relieved from doing what it said it would do. Additionally, NWM has not established that it had a right under the Pre-MN annuity contract or the law to unilaterally amend the Pre-MN annuity contracts by creating and implementing the '1985 change' with or without regulatory approval.

15. NWM knew at the time it implemented the '1985 change' that no other insurance company had applied segmentation in a retroactive manner as to an existing book of business.

16. NWM knew that the CRAs were not superior to the Pre-MN annuity product. Differences included, front loading, long-term investing for higher dividends over time, no penalty to surrender, policy loans and no general expense fee. Yet, NWM touted the CRA as a superior product as a part of its effort to conceal the '1985 change'.

17. An intended consequence of the '1985 change' was to divest the Pre-MN annuitants from the economic benefit inuring from just under 1 BILLION dollars in unrealized capital gains in the general account portfolio from investments in MGIC and Baird. This was unfair and not equitable.

**Breach of Pre-MN annuity contracts**

18. By basing the Pre-MN annuity dividends for all years since 1985 on the interest earned by the segmented account (note that supplements paid for period 1985 to 1993) rather than from NWM's general account portfolio, NWM breached its contractual duties to determine, allocate and credit to Plaintiff Class their equitable and proper share of the Company's divisible surplus as required by the contract and law.

19. The express language of the Pre-MN annuities, the implied duties of good faith and fair dealing and the incorporated statutory provisions (together and/or alone) did not permit the '1985 change' or the annual dividend determinations made by NWM to the '1985 change'.

20. Since 1985 and pursuant to the '1985 change', NWM has determined Pre-MN annuity dividends before and independent of the determination of its surplus and divisible surplus. This is in violation of Wisconsin Statute, section 632.62.

21. The Pre-MN annuity dividends since 1985 have borne no true relationship to NWM's determination of its surplus and divisible surplus. This is in violation of Wisconsin Statute, section 632.62.

22. NWM has injured and infringed upon the Pre-MN annuitants by implementing and concealing the '1985 change'. The Pre-MN annuitants lost their full right to share in NWM's divisible surplus as the NWM-intended means to grow their annuity investments.

23. Since 1985, the Pre-MN annuitants have not received an equitable share of NWM's divisible surplus as dividends.

24. NWM has breached the terms of the Pre-MN annuity contracts each year since 1985 by basing dividends on the yield of a segmented account rather than on the divisible surplus of the Company.

25. Each of NWM's breaches of contract was done in an intentional disregard of the rights of the Pre-MN annuitants within the meaning of Wisconsin Statutes, section 895.043(3). NWM breached its implied contractual duties of good faith, loyalty and fair dealing in the following respects:

    a.   Adopting and implementing the '1985 change' for the purpose of enhancing the marketability of its new CRA at the expense of the Pre-MN annuitants.

    b.   Failing to obtain the informed written consent of the Pre-MN annuitants for the '1985 change'.

92

c.   Failing to provide Pre-MN annuitants with direct notice and a full explanation of the '1985 change'.

d.   Adopting a so-called 'soft landing' to phase in the '1985 change' over several years so as to conceal from the Pre-MN annuitants the new method for determining their dividends and the adverse economic effects likely to result from NWM's failure to pay dividends based on their equitable share of the divisible surplus of the Company.

e.   Failing each year since 1985 to pay dividends based on the Company's divisible surplus, as promised in the contracts, without the knowledge and consent of the Pre-MN annuitants.

f.   Making the '1985 change' which materially injured the Pre-MN annuitants' right to receive the benefit of the contract.

g.   Crediting dividends pursuant to the '1985 change' which did not meet the reasonable expectations which an ordinary, reasonable and prudent Pre-MN annuitant would have had as of the time the Pre-MN annuity agreement was made.

**Breach of Fiduciary Duty**

26.  NWM breached its fiduciary duties to the Pre-MN annuitants in the following respects:

a.   Intentionally failing to disclose material information relevant to the Pre-MN annuitants' rights, including particularly the failure to disclose the '1985 change' and its potential effects on their dividends and the growth of their investment over time.

b.   Actively and intentionally acting to minimize (or eliminate) the possibility that the Pre-MN annuitants would learn of the '1985 change' and its effects.

c.   Intentionally failing to act in the Pre-MN

93

annuitants' best interests in making the '1985 change'.

    d.   Intentionally placing its own economic interest in marketing the new CRAs ahead of the interests of the Pre-MN annuitants in making the '1985 change'.

    e.   Making dishonest and misleading statements in and after 1985 with respect to NWM's continuing strategy of balanced, diversified, long-term investments, when in fact it had switched the basis for Pre-MN annuity dividends to a relatively short-term oriented portfolio of debt investments.

    f.   Acting inequitably against Pre-MN annuitants both in the process by which it adopted and implemented the '1985 change' and in the determination annually thereafter of the Pre-MN annuitants' dividends based upon the '1985 change'.

27.    Each of NWM's breaches of fiduciary duties was done in an intentional disregard of the rights of the Pre-MN annuitants within the meaning of Wisconsin Statutes, section 895.043(3).

28.    The officers, employees and trustees of NWM that were involved in the '1985 change' breached their fiduciary duties to the Pre-MN annuitants in authorizing and making the '1985 change' and in determining dividends annually thereafter based on the '1985 change'. NWM is vicariously liable for that noted conduct.

29.    Each of the breaches of fiduciary duties by the officers, employees and trustees of NWM referred to above were done in an intentional disregard of the rights of the Pre-MN annuitants within the meaning of Wisconsin Statutes, section 895.043(3).

**Impact and Causation**

**30.**    By virtue of NWM's breaches of the Pre-MN annuity contracts and as a proximate result of NWM's breaches of its fiduciary duties and of the breaches by its officers, employees and trustees for which NWM is vicariously liable, and each of

94

them, the Pre-MN annuitants were materially and substantially infringed upon and the Pre-MN annuitants sustained injury and damages.

## Defense of Business Judgment Rule

31. The business judgment rule is not available as a defense for the actions of NWM for the following reasons:

    a. The rule is irrelevant to NWM's failure to comply with its contractual and statutory duties in regard to its annual determination of surplus and divisible surplus, and then equitably apportioning the divisible surplus among its participants'

    b. NWM breached its contract with the Pre-MN annuitants.

    c. NWM failed to act in good faith toward and to deal fairly and with loyalty with the Pre-MN annuitants.

    d. NWM did not act equitably toward the Pre-MN annuitants.

    e. NWM and its officers, employees and trustees involved in the '1985 change' breached their fiduciary duties to the Pre-MN annuitants in connection with the '1985 change' and the dividend determinations made pursuant to that '1985 change'.

## Court retains jurisdiction

32. The court exercises discretion to retain jurisdiction in this matter with respect to considering any further or supplemental relief allowed as necessary and proper under law in this matter. This dispute is complicated and contains many issues. Intentional and repeated concealment of wrongdoing over a period of a quarter century took place. It will be a more efficient use of limited resources in this complicated matter to have the court that heard the trial also deal with supplemental relief issues, if any occur.

95

## DECLARATORY JUDGMENT

IT IS THE ORDER of the Court that Judgement is to be entered in this matter under Wisconsin Statutes, section 806.04 and in accord with the entire Decision and the Declarations stated in this Decision.

Dated this __6__ day of March 2011

BY ORDER OF THE COURT:

_____
Dennis J. Flynn
Reserve Circuit Judge

Copies to be provided by the CLERK to:

**For Plaintiff**

Attorney George P. Kersten
Kersten & McKinnon, S.C.
11518 N. Port Washington Road
Suite 104
Mequon, WI   53092

96

**For Defendant**

Attorney Eric J. Van Vugt
Quarles & Brady, LLP
411 East Wisconsin Avenue
Milwaukee, WI   53202-4497

R-App 618

STATE OF WISCONSIN      CIRCUIT COURT      MILWAUKEE COUNTY

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

                    Plaintiffs,

          vs.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

                    Defendant.

Case No.    08-CV-11988

Code:      30701
Declaratory Judgment

---

## REPORT TO THE COURT REGARDING CLASS NOTICE

Pursuant to this Court's December 14, 2009 Order For Dissemination of Class Notice, counsel for the Class file herewith the attached Exhibit A containing copies of the opt-out forms of all persons who have elected to opt out of the Class.

The Court's Order required counsel to send, by first-class U.S. mail, a copy of the approved Notice with attached opt-out form to each Class member at his or her last-known address, between 15 and 30 days from December 14, 2009. On January 11, 2010, using an address list of Class members provided by

Northwestern Mutual, the Notice was sent by first-class U.S. mail to the 3,358 persons on that list.[1]

The Notice required persons desiring to opt out of the Class to sign the attached opt-out form and mail it to Class counsel no later than February 25, 2010. As of March 30, 2010, a total of 115 individuals have elected to opt out of the Class, as expressed in Exhibit A hereto.[2]

Dated March 31, 2010.

Respectfully submitted,

KERSTEN & McKINNON, SC
STRAUS & BOIES, LLP
GUERRIERI, EDMOND, CLAYMAN &
    BARTOS, PC
GALANIS, POLLACK, JACOBS &
    JOHNSON, SC
Attorneys for the Class

By:_____

George P. Kersten
State Bar No. 1008099

---

[1] Of the 3,358 Notices mailed, 579 were returned by the Post Office. Notice was not sent to an additional 33 Class members for whom a valid mailing address could not be determined. These 612 Class members not receiving the Notice are listed on Exhibit B.

[2] Two annuitants, Janet Kozerski (a Northwestern Mutual employee) and Edward Gmach (parent of a Northwestern Mutual employee), received the Notice but were later determined to be excluded from the Class due to their affiliation with Northwestern Mutual.

2

## CERTIFICATE OF SERVICE

I certify that on this 31st day of March 2010 I served a copy the this Report to the Court Regarding Class Notice, with attached exhibits, upon defense counsel at their address of record by first class U.S. mail.

_____
George P. Kersten

## Dividend Interest Rates vs. Current Rate Annuity Credit Rates

| Year | Life | Pre-MN | CRA* |
|------|------|--------|------|
| 1982 | 10.15% | 9.75% | -- |
| 1983 | 11.00% | 10.85% | -- |
| 1984 | 11.15% | 11.00% | -- |
| 1985 | 11.15% | 11.15% | -- |
| 1986 | 11.25% | 11.00% | 8.25% |
| 1987 | 11.00% | 10.75% | 6.25% |
| 1988 | 10.25% | 10.75% | 7.50% |
| 1989 | 10.00% | 10.75% | 8.50% |
| 1990 | 10.00% | 10.00% | 7.75% |
| 1991 | 10.00% | 10.00% | 7.40% |
| 1992 | 9.25% | 9.50% | 5.50% |
| 1993 | 9.25% | 8.50% | 5.40% |
| 1994 | 8.50% | 7.50% | 4.50% |
| 1995 | 8.50% | 7.00% | 7.30% |
| 1996 | 8.50% | 7.00% | 4.65% |
| 1997 | 8.50% | 6.50% | 5.35% |
| 1998 | 8.80% | 6.50% | 5.20% |
| 1999 | 8.80% | 6.50% | 4.50% |
| 2000 | 8.80% | 6.50% | 6.25% |
| 2001 | 8.80% | 6.50% | 5.45% |
| 2002 | 8.60% | 6.25% | 4.20% |
| 2003 | 8.20% | 5.75% | 3.00% |
| 2004 | 7.70% | 5.00% | 2.15% |
| 2005 | 7.50% | 4.65% | 2.60% |
| 2006 | 7.50% | 4.35% | 3.65% |
| 2007 | 7.50% | 4.35% | 4.00% |
| 2008 | 7.50% | 4.35% | 3.50% |
| 2009 | 6.50% | 4.35% | 3.25% |
| 2010 | 6.15% | 4.45% | 1.85% |
| 2011 | 6.00% | 4.60% | 1.25% |

\* For January new issues ($50,000 size contract).

**TRIAL
EXHIBIT
528**



Northwestern
Mutual Life•

February, 1985

**INFORMATION RELEASE TO ALL AGENTS**

**RE:   MN Series Annuities**

On March 1, 1985, the MN Series Flexible Premium Annuity (FPA) and Single Premium Retirement Annuity (SPRA) will be introduced. The primary features will be back-end loading, a current interest approach, and favorable terms for exchanges from the variable annuities. Such exchanges, however, cannot be accommodated until June 1, 1985.

**I.   Flexible Premium Annuity**

**A.   Markets**

The FPA continues to be used in all four tax-qualified markets - Corporate Pension, HR-10, TDA, IRA - as well as the personal market. Due to the 1984 Stark-Moore tax bill, the pricing (loading and interest) will be identical for qualified and personal policies.

**B.   Loading**

There will be no "front-end" load, no policy fee, and no deduction for state premium taxes. Instead, there will be a surrender charge of 7% in the policy year the premium is paid, declining 1% as of each subsequent policy anniversary, until it reaches 0% after seven anniversaries have passed since the premium was paid. The surrender charge is applied to the amount of the premium, not interest growth. Partial surrenders are treated as a "premium first/interest last" and "first in/first out" basis. The surrender charge will be waived if a variable payment plan is elected or if a fixed life income payment plan is elected on or after the 10th policy anniversary.

**C.   Interest**

Each premium will be credited with a rate of interest effective for the remainder of the month plus one year. New interest rates will be declared by the Company each month for premiums paid in that month. The declared interest rates will always be greater than or equal to the minimum guaranteed rate of 3½%. After the one year period from the end of the month of deposit, the premium plus interest will be renewed for another year at the then applicable rate for renewing deposits, which may be different from the rate applied to new premium payments.

**D.   Accumulation Value; Cash Value**

The total of premiums plus interest at any point in time is called the Accumulation Value. The Cash Value is the Accumulation Value, less the surrender charge.

**E.   Market Value Adjustment - Not on FPA**

There will be no market value adjustment on FPA surrenders because interest rates are declared for only one year at a time. However, in the contract, the Company reserves the right to credit or charge a market value adjustment. The provision was put in the contract in case there are some changes in the regulatory environment and competitive environment that would permit longer term interest guarantees which would require a market value adjustment. We would then be able to offer these guarantees without refiling the contracts with the state insurance departments.

**NML2 0507**

Trial Exhibit
No. 66

EXHIBIT
66
2/19/10 gap

**F.   Minimums, Issue Ages, Maturity Ages**

The minimum policy size is based on a dual standard. For a "premium controls" policy, each premium must be at least $25. For a "monthly income controls" policy (e.g., a defined benefit pension plan) the minimum monthly retirement income is $10.

Any maturity age between 60 and 85 may be selected, except that the upper limit is 75 for TDA's and 70 for IRA's. The issue age may be any age starting at zero for the personal market and 15 for the tax-qualified markets up to two years prior to the maturity age. It is recommended that the issue age be at least 10 years prior to the maturity age, so that surrender charges may be completely avoided by selecting a life income payment plan.

**G.   Guaranteed Payment Plan Rates; Premiums per $10 Guaranteed Monthly Income**

Guaranteed payment plan rates have been changed. They will now be based on a more current mortality table, the 1983 Table a. Because of improved mortality, the result is lower guaranteed payment plan rates and therefore higher premiums per $10 of guaranteed monthly income.

FPA at 65 Male Premiums
Per $10 Monthly Income
on a C-10 Basis

| Issue Age | MM Basic Gross | MN Gross | Percent Increase |
|---|---|---|---|
| 25 | $ 19.58 | $ 20.16 | 3.0% |
| 35 | 30.64 | 31.51 | 2.8 |
| 45 | 50.70 | 53.56 | 5.6 |
| 55 | 111.05 | 116.83 | 5.2 |

**H.   Illustrative Accumulation Values, Cash Values**

The following is a comparison of MN to MM under the 1985 Dividend Scale at three hypothesized interest rates.

FPA at 65 Total Cash Values
$1,000 Annual Premium

| Duration | MM Total Cash Value | MN 8% AV | MN 8% CV | MN 10% AV | MN 10% CV | MN 12% AV | MN 12% CV |
|---|---|---|---|---|---|---|---|
| 1 | $ 1,033 | $ 1,080 | $ 1,020 | $ 1,100 | $ 1,040 | $ 1,120 | $ 1,060 |
| 3 | 3,460 | 3,506 | 3,356 | 3,641 | 3,491 | 3,779 | 3,629 |
| 5 | 6,457 | 6,335 | 6,135 | 6,715 | 6,515 | 7,115 | 6,915 |
| 10 | 17,412 | 15,645 | 15,435 | 17,531 | 17,321 | 19,654 | 19,444 |
| 20 | 67,526 | 49,422 | 49,212 | 63,002 | 62,792 | 80,698 | 80,488 |

**I.   Waiver of Premium**

The Waiver of Premium rider will be available for any maturity age between 60 and 70, inclusive. The premium rates for this benefit will be the same as MM.

**J.   No Policy Loans**

Because of the complexities of a current rate product, and the potential risk of investment selection against the Company, there will not be a policy loan provision at this time. However, the Company is looking into developing a policy loan amendment, to be available only in certain markets, for introduction some time in 1986. It will probably be a market loan rate with direct recognition provision with restrictions on usage and payback.

**NML2 0508**

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 106 of 254   Document 24   R App 624

ML2 NML2 0508

**K. No Dividends**

No dividends, per se, are anticipated on this policy because there is no loading to refund, no mortality charge to refund, and excess interest flows directly into the Accumulation Value. However, the contract does contain a dividend provision because we are a mutual company and conceivably there may be a way to pay dividends at some time in the future.

**II. Single Premium Retirement Annuity**

**A. Markets**

The SPRA continues to be used in all four tax-qualified markets - Corporate Pension, HR-10, TDA, IRA - as well as the personal market. Due to the 1984 Stark-Moore tax bill, the pricing (loading and interest) will be identical for qualified and personal policies.

**B. Loading**

There will be no "front-end" load, no policy fee, and no deduction for state premium taxes. Instead there will be a surrender charge of 7% in the first policy year, declining 1% as of each policy anniversary, until it reaches 0% on the seventh policy anniversary. The surrender charge is applied to the single premium, not interest growth. Partial surrenders are treated on a "premium first/interest last" basis. The surrender charge will be waived if a variable payment plan is elected or a fixed life income payment plan is elected on or after the fifth policy anniversary.

**C. Interest**

There will be a one year and a three year interest option available, however, the latter will not be available within three years and one month of the maturity date. In addition, the three year option may not be available in some states; affected General Agents will be notified. If the one year option is selected, the premium will be credited with the one year rate of interest effective for the remainder of the month plus one year. If the three year option is selected, the premium will be credited with the three year rate of interest effective for the remainder of the month plus three years. New one and three year interest rates will be declared each month for policies sold in that month. The declared interest rates will always be greater than the minimum guaranteed rates of 5½% in the first 20 years and 3½% thereafter. After the declared interest period, the premium plus interest will be renewed for the same one or three year period, unless changed by the policyowner, at the applicable rate for renewing deposits, which may be different from the rate applied to new single premium contracts issued at that time.

**D. Accumulation Value; Cash Value**

The total of the single premium plus interest at any point in time is called the Accumulation Value. The Cash Value is the Accumulation Value, plus any market value adjustment (positive or negative), less the surrender charge.

**E. Market Value Adjustment on Three Year Rate**

There will be no market value adjustment (MVA) for surrenders on the one year rate but there will be an MVA for surrenders on the three year rate. The contract is written generally to permit it on both but we will only use it on the three year rate. It is computed as follows:

$$MVA = (X-Y)(\frac{n}{12})(AV)$$

where
$$
\begin{array}{ll}
MVA = & \text{the market value adjustment} \\
X = & \text{the interest rate the contract is growing at} \\
Y = & \text{the interest rate in effect at the time of surrender} \\
n = & \text{the number of months remaining in the three year period} \\
AV = & \text{the Accumulation Value of the policy at the time of surrender}
\end{array}
$$

**NML2 0509**

However, the MVA is limited on the down side so that the Cash Value is always at least 93% of the Accumulation Value.

$$AV + MVA\text{-}SC \geq .93(AV)$$

Note that the MVA may be positive or negative and at the end of the three year declared period, it is zero.

**F. Minimums, Issue Ages, Maturity Ages**

The minimum premium is $3,500.

Any maturity age between 60 and 85 may be selected, except that the upper limit is 75 for TDA's and 70 for IRA's. The issue age may be any age starting at zero for the personal market and 15 for the tax-qualified markets up to the maturity age. It is recommended that the issue age be at least five years prior to the maturity age, so that surrender charges may be completely avoided by selecting a life income payment plan.

**G. Guaranteed Payment Plan Rates**

Guaranteed payment plan rates have been changed. They will now be based on a more current mortality table, the 1983 Table a. Because of improved mortality, the result is lower guaranteed payment plan rates.

Guaranteed Monthly Income C-10
Male SPRA at 65
$10,000 Single Premium

| Issue Age | MM | MN | Percent Decrease |
|---|---|---|---|
| 25 | $342.51 | $329.18 | 3.9% |
| 35 | 254.14 | 244.48 | 3.8 |
| 45 | 198.74 | 186.15 | 6.3 |
| 55 | 128.03 | 120.42 | 5.9 |

**H. Illustrative Accumulation Values, Cash Values**

The following is a comparison of MN to MM under the 1985 Dividend Scale at three hypothesized interest rates.

SPRA at 65 Total Cash Values
$10,000 Single Premium

| | | MN | | | | | |
|---|---|---|---|---|---|---|---|
| | MM Total | 8% | | 10% | | 12% | |
| Duration | Cash Value | AV | CV | AV | CV | AV | CV |
| 1 | $10,559 | $10,800 | $10,200 | $11,000 | $10,400 | $11,200 | $10,600 |
| 3 | 13,045 | 12,597 | 12,197 | 13,310 | 12,910 | 14,049 | 13,649 |
| 5 | 16,117 | 14,693 | 14,493 | 16,105 | 15,905 | 17,623 | 17,423 |
| 10 | 27,343 | 21,589 | 21,589 | 25,937 | 25,937 | 31,058 | 31,058 |
| 20 | 78,694 | 46,609 | 46,609 | 67,274 | 67,274 | 96,462 | 96,462 |

**I. No Policy Loans**

Because of the complexities of a current rate product, and the potential risk of investment selection against the Company, there will not be a policy loan provision at this time. However, the Company is looking into developing a policy loan amendment, to be available only in certain markets, for introduction some time in 1986. It will probably be a market loan rate with direct recognition provision with restrictions on usage and payback.

**NML2 0510**

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 108 of 254   Document 110-51   NML2 0510
R-App 626

**J. No Dividends**

No dividends, per se, are anticipated on this policy because there is no loading to refund, no mortality charge to refund, and excess interest flows directly into the Accumulation Value. However, the contract does contain a dividend provision because we are a mutual company and conceivably there may be a way to pay dividends at some time in the future.

**III. Exchanges From Variable Annuities**

Exchanges from variable annuities (VA's) to the new FPA's and SPRA's will be permitted on terms more favorable than a surrender and new purchase. For an exchange from a back-end loaded VA, the surrender charge will be carried over to the new contract (rather than assessed) and will decline under the new contract over time. There will be a $5 expense charge, the same as for transfer between VA Divisions.

THIS EXCHANGE PRIVILEGE WILL BE AVAILABLE BEGINNING JUNE 1, 1985. Further information and new exchange forms will be distributed during May.

**IV. In-force FPA's and SPRA's**

In-force FPA's and SPRA's will be unaffected except for the dividend interest rate in future years. The 1985 Dividend Scale interest rate for annuities is 11.15%. Over the next five years, the investment basis will grade into the basis for the new product, which will be a newly established annuity investment portfolio emphasizing current yield. Thus, in-force policies will be consistent with new policies in the future but will actually carry an advantage temporarily due to the higher portfolio rate. For that reason, it is not advisable to replace accumulated values in an in-force annuity with a new policy.

The loading structure on in-force policies will not change. Future premiums paid on these policies will be subject to a front-end load but will earn about ¾% higher interest on the average than the new policies with back-end loading, after they are on the same investment basis.

If a client wants a specific comparison of the results of continuing premiums to his existing FPA or allowing it to go paid-up with future premiums to be made to a new FPA, you will be able to accommodate him with several ledgers.

(1)   in-force ledger of existing FPA with continuing premiums, versus

(2)   in-force ledger of existing FPA with change to paid-up on next anniversary, plus

(3)   custom ledger for new FPA issue.

**V. New Annuity Application**

A new annuity application will be introduced on March 1, 1985 in states that have approved the MN series. The new application 90-1900(0385) should be used to apply for any deferred annuity: MN FPA; MN SPRA; and the current MM VA. Because the application changes are reflected on the New Business system field input screens you **must** use the new application on March 1 or when your state approves the MN series whichever is later. A separate annuity application release will provide additional information.

**VI. Dating on MN Series Annuities**

An MN Series annuity policy (qualified and non-qualified) will be issued only on an Annuity Application 90-1900 that is completed and signed on or after March 1, 1985. Backdating will **not** be permitted except up to 90 days on TDA's and on certain qualified corporate pension policies and then only with prior approval from Employee Plans and the Annuity Division of POS.

In states that have not approved the MN Series by March 1, we will continue to issue MM annuities. General Agencies with territory in those states will be notified if introduction of the new series is delayed.

**NML2 0511**

**VII.    Rate Materials**

Illustrative Accumulation Values based on 8%, 10% and 12% for the MN FPA and SPRA are included in the new FPA/SPRA section of your ratebook which is being distributed. If your state has approved the new contracts, replace the current section. Otherwise, file it at the back of the current section until your state approves.

Custom ledgers and proposals will be available in mid-February.

*Richard F. Fisher*

**Richard F. Fisher**
**Associate Actuary**

**NML2 0512**



*Introducing
Northwestern Mutual's
New FPA-SPRA*

Trial Exhibit
No. 67

EXHIBIT
67
2/19/10 gp

TO: **MN-FPA Implementation Team**   **Marketing Departments**

| | | | | |
|---|---|---|---|---|
| S. Catlett | E13E | B. Carlson | 416 |
| S. Daggett | E6K | W. Wojcik | E13E |
| M. Doll | E13O | T. Christenson | E6R |
| J. Gillespie | 541 | D. Tamcsin | E5A |
| D. Hoglund | 747 | R. Holmes | E5B |
| K. Nelson | E4D | W. Beckley | E5C |
| J. Peterson | E8B | R. McMaster | E5D |
| R. Fisher | 720 | J. Bullock | E5D |
| L. Stecklein | E4Q | W. Barlow | E6F |
| S. Strommen | 540 | D. Hart | E6L |

**Actuarial Department**

J. Murphy          716

RECEIVED
FEB 26 1985
H. L. HALL

FROM:     John O. Schnorr

DATE:     February 26, 1985

SUBJECT:  MN-FPA/SPRA Agent Introductory Kit


A kit similar to the attached was mailed to each full-
time , emeritus GA and DA on 2/21/85-2/25/85.  The tech-
nical releases, notebook pages, and sample app and IRA
forms were mailed to part-time and college agents and
the Home Office release list.

The supply of complete kits is limited.  Please share
the attached kit with your associates.


**NML2 0543**

# CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Sales Orientation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Product Orientation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

The Ideal Sales Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-5

The Basic New Product Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6-8

The Flexible Premium Annuity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9-10

The Single Premium Retirement Annuity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Additional Product Features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12-13

Application Input and Policy Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14-15

Updating and Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16-17

Target Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18-19

Prospecting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Technical and Sales Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-30
                                                                                                    and back pocket

*The information in this book is intended solely for use by Northwestern Mutual Life Insurance Company Agents to evaluate NML's new Flexible Premium Annuity and Single Premium Retirement Annuity. With the exception of pages 24-27 and the sales brochures contained in the back pocket, it may not be photocopied or distributed to the general public as sales literature.*

NML2 0544

# SALES ORIENTATION

There is good money to be made selling annuities.

Annuities can be a consistent, easily managed, steady contributor to your business right now — and ultimately should be an essential ingredient to your overall career development and ongoing success.

An annuity is basically a simple product, easily targeted and presented.

It is a popular investment vehicle that serves a wide variety of needs . . .

Just by the nature of selling life insurance, you already come into daily contact with individuals who may also be prime candidates for an annuity.

The identification of these potential buyers can be quickly accomplished in the course of your regular factfinding process.

Equally important . . .

Just the capability of offering these quality annuity products can help open new prospecting avenues and help you serve your existing policyowners even better.

NML2 0545

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 114 of 254   Document 30-3   632
NML2_0545

# PRODUCT ORIENTATION

The innovations for these new products began at the highest levels of policy and decision-making at the Northwestern. It was determined that a new funding mechanism was necessary to support these annuities. As a result, a separate investment portfolio has been created to provide for a return based on current interest rates.

These current interest rates will be guaranteed in advance for one year, or for a three-year option that can be selected exclusively on SPRA contracts.

The product design itself has been altered to take better advantage of current market trends, eliminating the front-end load feature in favor of a declining surrender charge.

We've also added considerable flexibility to the new products, affording both agent and client a number of options with which to maximize earnings.

All NML agents are eligible to sell these products. There are no special licensing requirements, and we've streamlined the administration process to facilitate your ability to work with them.

Given all the new features, enthusiastic Home Office support, and the detailed information and ideas presented in this book — these new annuities are very attractive offerings for the marketplace that you can quickly bring on line and easily sell.

3

NML2 0546

NML2_0546

# THE IDEAL SALES POSITION

Since an annuity is fundamentally a promise to pay a return on an investment at a future date, one of the most important elements influencing its sale is the strength and character of the company that stands behind that promise.

When a customer invests with any given organization, he's got to know that when it comes time to enjoy the returns, that company will still be around to reward him.

On this issue — earning a client's trust — you inherently have a tremendous advantage over your competition in selling these new products, because you're representing Northwestern Mutual Life. Our integrity stands without question.

We're a true mutual company. Everything we can possibly earn through thoughtful and prudent investments is shared with our policyowners.

This is the tradition of the Northwestern; a 128-year history of unparalleled strength and performance; a well deserved reputation for the highest quality products and service.

Northwestern Mutual has always enjoyed widespread recognition as one of the finest life insurance companies in the world. We've been consistently rated "A+" by A.M. Best, the premiere authority evaluating the insurance industry. And throughout 1983-1985, NML has been ranked as the most admired of the nation's top 10 life insurance companies in a *Fortune* survey polling more than 7,000 executives, outside directors and financial analysts.

We will always endeavor to maintain this leadership position through a commitment to excellence that directly benefits every NML policyowner.

4

NML2 0547

Granted — these facts and ideals may be common knowledge to you. But their importance and influence in effectively positioning your sale of our new annuity products cannot be emphasized enough. This is a foundation that no interested prospect can afford to ignore.

Safety is a major concern to the potential annuity customer. This is not just our perception. It's been documented in independent research, including studies by LIMRA.

Today, in particular, this has become a serious public issue due to the disastrous experiences of Baldwin United and a few other organizations that aggressively built up annuity business but are now faced with conditions where they may not be able to fulfill their promised rates of return.

Questions of safety can only be resolved through a client's faith and belief in a company's commitment and ability to support its products and promises.

The philosophy of the Northwestern . . .

The proven performance of our investment expertise . . .

Our dedication to the best interests of our policyowners . . .

All of these elements combine to literally form a base for your presentation of our new products and can open doors to a broad and interested audience and tremendous sales success.

5

NML2 0548

# THE BASIC NEW PRODUCT DESIGN

We believe you have the ideal positioning advantage to actively pursue annuity sales.

Still . . .

Even the best imaginable sales position must be matched with an equally impressive product.

NML has had FPA/SPRA products available for some time. But frankly, until now, these products have not been that competitive.

We've known that new products were necessary, but we did not wish to make any snap decisions or quick judgments simply for the sake of expediency.

We took a hard look at our previous products, a hard look at the marketplace, and thoroughly examined all of the elements that required alteration.

Our objective here — as in every case of NML product innovation — was to comprehensively design and implement the best possible offering.

In this regard, the new annuity products available to you today incorporate several new features, each precisely calculated to best compete in the current market environment.

First of all, our previous products had a front-end load. This allowed NML to recover expense costs immediately from the client's funds, subsequently investing the balance to earn interest. Out of every $100 premium payment, we would initially subtract as much as $6 to cover our expenses.

6

NML2 0549

This feature placed us at a distinct disadvantage in comparison with savings certificates, money market funds, and other annuities that did not utilize a front-end load.

In order to make our new products more competitive with current market alternatives, we've replaced the front-end load with a declining surrender charge. This is assessed only in the event that funds are withdrawn prior to the eighth year following their payment.

With our previous products, we were unable to guarantee interest rates in advance. Financial return was based on an understanding that clients would receive their applicable share of any interest NML earned by investing their money. This was provided in the form of a dividend at the end of the policy year.

With our new products, not only are we able to create a sense of certainty in the mind of the investor by guaranteeing an interest rate in advance — like a bank savings certificate — but we've also developed a means to make our new products much more responsive to current interest rates.

A "segregated portfolio" has been established to support our new fixed annuities. A portion of NML's total portfolio has essentially been carved out and exclusively directed to serve this block of business.

This new portfolio makes our annuities much more "interest-sensitive" to changing investment climates.

7

NML2 0550

By linking our products to "new money" interest rates, we achieve the capability to react faster to the market and remain competitive with comparable alternatives. This "new money" funding approach can subject our annuity rates to the downward as well as upward trends that occur in short-term investments.

It is most unlikely that we will ever promise the highest rate of return in the marketplace. To speculate in this manner involves higher levels of risk than we are willing to impose on our policyowners.

But we fully intend to be competitive on our rates of return, and we will consistently rank above average. This is the whole point of our new annuities' funding strategy.

But beyond just the interest rate, a prospect must consider the whole annuity "package": safety, fees, payout rates and flexibility, and more.*

We believe your most effective sales scenario is one consistent with our tradition — a presentation integrating NML's quality, performance and safety.

All of the new annuity features we've noted are offered to NML clients through both our new FPA and SPRA products. Each is structured somewhat differently, to serve a specific customer's preference for the type of premium payments each person may wish to make.

*The "total package" of our new FPA is compared to the flexible premium annuities of several major competitors on pages 28-29 of this book.

8

NML2 0551

# THE FLEXIBLE PREMIUM ANNUITY

The FPA enables people to pay in any amount, any time they choose, with the minimum payment being only $25.

The current interest rate at the time of each payment is guaranteed for one year. The rate for future premiums may fluctuate from month to month.

Each succeeding year each premium, plus interest, is rolled over automatically and given a new one-year guarantee at the applicable rate at that time. That rate may differ from the rate being offered for new premium payments.

The amount of contribution in any given year can be increased, decreased, or totally stopped and then resumed again at a future date.

The declining surrender charge on this contract is applied only to premiums, not to any accumulated interest.

Beginning at 7% in the policy year in which a premium is paid, the charge reduces by 1% per year at each subsequent policy anniversary. Each new premium payment, regardless of when made, starts out with a 7% surrender charge.

NML2 0552

R-MP_NML2_0552

There is no surrender charge on any amounts that have remained with the Company more than seven years.

In the event of a partial surrender, it is assumed that premiums paid first would be surrendered first. A client in this situation would thus be assessed the lowest applicable percentages in calculating the charge. Accumulated interest is assumed to be surrendered last.

Please note the distinction between the different timing systems involved with surrender charges and guaranteed interest rates for this product.

Since the FPA literally allows payments to be made at any time, the annual renewal of a guaranteed interest rate applies specifically to the anniversary of each individual payment.

The surrender charge, however, is simply measured on the basis of the policy anniversary and applies equally to all premiums paid within a given policy year.

*More detailed information about the FPA is provided in the Technical and Sales Support section of this book and the Actuarial Information Release located in this book's back pocket container.*

10

NML2 0553

# THE SINGLE PREMIUM
# RETIREMENT ANNUITY

The SPRA is designed for someone who has accumulated a substantial block of money, and simply wishes to invest that lump sum. Once this single premium is invested, with the minimum being $3,500, then no additional premiums are allowed.

SPRA clients can choose either a one-year or a three-year guarantee on their interest rate. At the expiration of the guarantee period, the single premium, plus interest, is reinvested automatically for a similar period of years, with a new interest rate guarantee given at the applicable rate at the appropriate time. That rate may differ from the rate being offered for new single premium payments.

The declining surrender charge functions in the same manner as the FPA, beginning at 7% in the first policy year and then reducing 1% per year at each policy anniversary. The percentage is applied only to the single premium, not to accumulated interest. In the event of a partial surrender, the accumulated interest is assumed to be surrendered last.

If a client has elected a three-year interest guarantee, and surrender occurs before the end of the three-year period, the policy may also be subject to a Market Value Adjustment (MVA) if interest rates at the time of surrender are different than the original guaranteed rate.

The MVA may be either positive or negative, but a negative MVA will be limited so that the appropriate surrender charge plus the MVA will not exceed 7% of the accumulation value.

*More detailed information about the SPRA is provided in the Technical and Sales Support section of this book and the Actuarial Information Release located in this book's back pocket container.*

11

NML2 0554

NML2_0554

# ADDITIONAL PRODUCT FEATURES

Both the FPA and SPRA contracts generally enable the owner to set a maturity date anywhere between age 60 and 85.

FPA contracts require a minimum two-year deferral from the issue date to maturity date. As a practical matter, an FPA should be purchased at least 10 years before the maturity date, and an SPRA at least five years before the maturity date, in order to avoid surrender charges upon annuitization.

The maximum amount for either contract is one million dollars, although special requests for larger amounts will be considered.

Both our Flexible Premium and Single Premium Annuities also provide certain advantages that other investment products cannot match.

For instance — clients holding one of our new annuities to its maturity can select any one of several payout options.

They may choose to take a lump-sum withdrawal.

They may choose an installment option, receiving a specified number of dollars over a defined period of time.

12

NML2 0555

They may also choose our life income settlement option. In this case, they would receive a specified number of dollars for the rest of their lives — no matter how long they live.

A life insurance company is the only financial institution that can *guarantee* monthly income for life.

As an added benefit for NML clients . . .

We'll waive the surrender charge on all premiums in an FPA policy if a life income payment plan is selected on or after the 10th policy anniversary . . .

We'll waive the surrender charge on an SPRA premium if a life income payment plan is selected on or after the fifth policy anniversary.

Another special NML feature is the fact that we're continuing to offer a disability waiver benefit on our new FPA contract.

This waiver benefit guarantees that a client's savings objectives will be met. If a long-term disability should occur prior to age 65, NML will make premium payments to the contract on behalf of the policyowner based on the average premium received for three years prior to the disability.

13

NML2 0556

R_MP_NML2_0556

# APPLICATION INPUT
# AND POLICY SERVICE

Our new annuity contracts will be issued through the traditional LINK input system.

A new application form has been designed for your use with *all* annuity products. After LINK input, this application is to be forwarded to the Annuity Services Division of the Policyowner Services Department.

It is vitally important that your LINK input is promptly executed, because the effective interest rate on a contract will be based upon — and interest will accrue from — the date of LINK input.

A key to your ability to sell our new annuity products will be knowledge of the current interest rate being offered by NML, which will be declared in advance monthly.

There will be three rates — one for FPA payments, one for an SPRA with a one-year interest rate guarantee, and one for an SPRA with a three-year interest rate guarantee.

14

NML2 0557

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 126 of 254   Document 30-2   MLP-NML2-0557

Information pertaining to our current interest rates will be provided in several sources.

Most important, either you or a client can call the toll-free telephone number *1-800-558-9990 (1-800-242-9941 in Wisconsin)* for these rates at any time.

They will also be published in each *Gazette* edition, which is sent to field management each week.

In addition, beginning in mid-1985 you will be able to obtain them from the LINK system on the new PSI screen #12.

Custom ledgers and special market proposals will be available on the IBM personal computer. The interest rate is variable — the computer allows use of any rate between 3.50% and 15.00%. We recommend you use the current rate as published.

The traditional policy service tools — PSI screens, In-Force Ledgers, and Policy Data Reviews — have all been modified to incorporate changes in the new policies.

*A sample IRA proposal is shown on page 23 of this book. A blank application, an IRA financial disclosure statement and an application information release are contained in this book's back pocket container.*

15

NML2 0558

MP_NML2_0558

# UPDATING AND EXCHANGES

Another value associated with our new annuities is flexibility.

An exchange privilege will be made available to existing policyowners beginning JUNE 1, 1985, with the appropriate forms provided shortly prior to that date.

When an exchange is made, the money in the new contract will still be subject to the same surrender charge that existed with the previous contract. In effect, any applicable surrender charge is just carried over to the new contract.

In terms of new sales, our new annuities replace products that had been offered under the same names. While it is possible to exchange in-force FPA's and SPRA's for the new versions, we do not anticipate any significant client demand to do so.

Even though we are introducing superior new products, we're simultaneously "updating" the existing policies by gradually converting them over the next several years to the same investment basis as the new annuities.

The end result is that both old and new annuities will have approximately equivalent values, and thus there is essentially no reason to make an exchange.

However, some policyowners may not want to continue paying the 6% front-end load on future deposits to their existing FPA's. They may allow their old contracts to lapse to paid-up and apply for new FPA's so that future contributions can be made on a no-load basis.

16

NML2 0559

ML_NML2_0559

Variable annuities have a completely different investment base.

Some existing clients may be interested in exchanging their variable annuities — which have no guarantee of either principal or interest — for new FPA's, which guarantee interest in advance and also guarantee principal. Such exchanges will be available beginning JUNE 1, 1985.

OWNERS OF TAX-QUALIFIED VARIABLE ANNUITIES AWAITING THE FPA EXCHANGE PRIVILEGE ON JUNE 1 — WHO WISH TO AVOID THE POTENTIAL VOLATILITY OF STOCK OR BOND MARKETS — SHOULD PAY ANY *NEW* PREMIUMS INTO A NEW FPA AND TRANSFER EXISTING VA FUNDS TO THE VA MONEY MARKET DIVISION DURING THE INTERIM PERIOD OF TIME.

Clients who desire to maximize investment diversity could place part of their investment in each of two contracts — one FPA and one VA. This gives them a "five fund" option — new deposits could be made to *any* of the four available VA funds, or the fixed FPA "fund." The ratio of new deposits could be changed at any time.

In addition to its prospecting value, we believe that the versatile "five fund" aspect of our new products should also be especially useful as a tool for maintaining existing annuity business.

NML2 0560

# TARGET MARKETS

An annuity should be looked upon as a long-term investment. Its primary purpose is to serve as a retirement funding vehicle where — under current tax laws — all income tax is deferred until withdrawals occur.

Our new Flexible Premium Annuity can be used for tax-deductible ("tax-qualified") retirement plans and after-tax ("non-qualified") personal savings as well.

## IRA — INDIVIDUAL RETIREMENT ANNUITY

Any working individual can invest up to $2,000 per year on a tax-deductible basis. Earnings are not taxed until withdrawal.

## TDA — TAX-DEFERRED ANNUITY

Employees of public schools or 501(c)(3) tax-exempt organizations qualify for a special retirement plan. They may invest up to 1/6 of their gross salary each year on a tax-deductible basis. Earnings are not taxed until withdrawal.

## PENSION AND PROFIT-SHARING PLANS

Employers may purchase annuities for their employees under a plan up to the lesser of 25% of compensation or $30,000 per year. The employer receives a tax deduction, the employee does not have to include the contribution in his income, and earnings grow tax-deferred until withdrawal.

18

NML2 0561

## PERSONAL INVESTMENT (NON-QUALIFIED) ANNUITY

Anyone may invest after-tax dollars in any amount desired. Earnings grow on a tax-deferred basis until withdrawal.

We envision the primary use for our Single Premium Retirement Annuity in the area of non-qualified personal investment annuities. An SPRA may be an ideal investment for someone who has received a gift or inheritance, won a lottery, or sold a home or business.

This is because an annuity compounding at 10% annually, for example, with taxes payable only at withdrawal can provide a much greater accumulation than a savings certificate or money market fund paying 10%, but compounding at 6.7% annually, *after taxes* at a 33% marginal rate.

People who receive lump-sum distributions upon termination of employment or termination of their pension plan are also prime prospects for an SPRA to continue tax sheltering their earnings in a rollover IRA or a non-qualified annuity.

Our FPA and SPRA provide equivalent long-term values for both tax-qualified and non-qualified sales. As a result of the 1984 Tax Act, there is no longer a rate disadvantage for non-qualified sales.

Contracts for either of our new products can be issued from age 0 to 83 in the non-qualified market, and from age 15 to 83 in the qualified markets. "Suitability" should be reviewed carefully with the prospect — the annuity should fit well into the overall financial plan of the individual and should be issued sufficiently far in advance of the maturity date to avoid surrender charges upon settlement under a life income payment plan.

*Several specific sales ideas are provided on pages 24-27 of this book.*

19

NML2 0562

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 131 of 254   Document 30-2, 649
ML_NML2_0562

# PROSPECTING

Generally speaking, with our new FPA/SPRA products you'll find all kinds of market opportunities available to you.

Virtually anyone can purchase an annuity.

Your primary prospects include people who are retirement aware . . .

People concerned about future financial security . . .

People who've been content to keep their savings in a bank account . . .

People who are not only looking for a solid investment, but also want to take advantage of tax deductions or deferrals.

One of the first places to turn to for an annuity prospect is your own client file. Currently 96.5% of NML's existing policyowners do *not* have an NML annuity.

Many new prospects can also be found in the course of your life insurance factfinding process, just by zeroing in on available disposable income and personal tax considerations.

At the same time, annuities themselves can help put you in front of potential new life insurance prospects as well. Everyone today seems to be curious about tax shelters and investment options. This gives you an excellent means to set the stage for cross-referencing life insurance needs in the course of discussing annuities.

> *Several prospecting letters for the various markets are available in the agent's PROSPECTING LETTER KIT (29-0521-01). Three new sales brochures have been created for these new products. A sample of each has been included in the back pocket container of this book.*

20

NML2 0563

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 132 of 254   Document 39-3   650

NML2_0563

# SUMMARY

We don't expect you to dedicate a major portion of your time exclusively to the sale of annuities.

But look at it realistically:

The sale of annuities can be a very important part of your business.

It's a source of steady income, with minimal work involved.

It's an easy product to present, and easy for your client to understand.

It makes a good companion sale to any of your other NML products.

Because annuities are tax shelters, they can actually "create" more money for future life insurance purchases.

You receive pension credits and other enhancements to your compensation by selling NML annuities.

Finally — and perhaps most important — being able to knowledgeably and effectively compete in the annuities field greatly expands your sales role and capabilities, increases your overall credibility as an insurance and financial counselor, and ultimately builds a stronger foundation for all of your business activities.

21

NML2 0564

# TECHNICAL AND SALES SUPPORT

The information contained on the following pages, and in the back pocket container of this book will help you to:

a) Identify possible sales approaches focusing on annuity tax savings which will help you compete effectively with certificates of deposit, money market funds, and other fully-taxable investments.

b) Understand the "total package" of FPA/SPRA contract provisions, and how the FPA compares to flexible premium annuities issued by several major competitors.

c) Understand how competitive pressures in the market place could lead to a system of "layered" or "split" interest rates — different rates for "old money" (prior deposits being reinvested) than for "new money" (new and renewal premiums received).

$*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$ $*$

1. IRA Sales Proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2. Sales Ideas
   a. Tax Deferral Advantages of a $10,000 Single Premium Annuity . . . . . . . . . . . . 24
   b. Use Annuity Tax Savings to Buy Life Insurance *NOW* . . . . . . . . . . . . . . . . . . . . 25
   c. Non-Qualified Annuity — Better Than a Rollover IRA? . . . . . . . . . . . . . . . . . . 26
   d. "Super IRA" for the NML Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3. Competition '85: Flexible Premium Annuity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

4. "Layering" of New and Renewal Annuity Interest Rates . . . . . . . . . . . . . . . . . . . . 30

5. Sales Brochures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Back Pocket
   a. A Premium Plan for a Flexible Future (#31-3436)
   b. Let Your Windfall Profit (#31-3437)
   c. NML Answers Your Questions on Annuities (#29-3834)

6. Actuarial Information Release (#31-3438-02) . . . . . . . . . . . . . . . . . . . . . . . Back Pocket

7. Annuity Application Information Release (#31-3438-03) . . . . . . . . . . . . . Back Pocket
   a. Blank Application (#90-1900)
   b. Blank IRA Financial Disclosure (#31-3352-01)

22

Case 2:11-cv-00910-LA    Filed 07/01/13    Page 134 of 254    Document 39-2    NML2_0565

# IRA SALES PROPOSAL

Custom Ledgers and special market (H.R.-10, TDA, IRA, and SPDA) proposals for the new FPA/SPRA products are available on the IBM personal computer. You can illustrate any maturity age greater than the applicant's present age and any interest rate between 3.50% and 15.00%, although we recommend that you use the current rate as published. The new FPA/SPRA Custom Ledgers allow you to illustrate an annual premium *plus* an initial lump sum payment, as you might do if you are "rolling over" a prior investment from another company to NML. For further information please refer to Section 1A and 2G of the Custom Proposal Guide.

An abbreviated (years 11-20 would normally be illustrated) IRA proposal is shown below.

```
FLEXIBLE PREMIUM ANNUITY AT 70 PLAN UNDER AN INDIVIDUAL RETIREMENT ANNUITY PLAN
FOR JOHN CLIENT   AGE 35  MALE

ANNUAL PREMIUM      $2,000.00

------ FEDERAL TAX EFFECTS ILLUSTRATIVE - ASSUMED 30% TAX BRACKET AND COMPENSATION ADEQUATE FOR DEDUCTIONS SHOWN -------
           1         2         3         4        5          6          7         8
  END     TAX                 NET      CASH VALUES       VALUE IN    TOTAL    ACCUMULATION
   OF   QUALIFIED            AFTER TAX                    EXCESS OF   ACCUM.   VALUE @70 IF
  YEAR   PAYMENTS   SAVINGS  PAYMENTS  TOTAL*   GUAR.     NET*       VALUE*   PREMS. STOPPED*

    1      2000       600      1400     2080     1950       680       2200       56203
    2      4000      1200      2800     4400     3992      1600       4620      107299
    3      6000      1800      4200     6982     6129      2782       7282      153744
    4      8000      2400      5600     9850     8365      4250      10210      195974
    5     10000      3000      7000    13031    10700      6031      13431      234361
    6     12000      3600      8400    16554    13138      8154      16974      269264
    7     14000      4200      9800    20451    15683     10651      20871      300971
    8     16000      4800     11200    24739    18317     13539      25159      329809
    9     18000      5400     12600    29454    21042     16854      29874      356047
   10     20000      6000     14000    34642    23864     20642      35062      379866

                *    *    *    *    *    *    *    *    *    *    *    *    *

  @62     54000     16200     37800   265999    90161    228199     266419      570937
  @65     60000     18000     42000   361466   106439    319466     361886      582637
  @70     70000     21000     49000   595833   137595    546833     596253

PREMIUMS              ANNUAL       BASED ON GUAR. ACCUMULATION VALUE      @62       @65       @70
     ANNUITY........  2000.00      MONTHLY INC. - C-10                  501.82    634.74    902.62
     WAIVER.........    40.00      BASED ON TOTAL ACCUMULATION VALUE*
  SUBJECT TO UNDERWRITING LIMITS   MONTHLY INC. - CURR-10**            2853.36   3995.23   6952.32
                                      ** BASED ON CURRENT RATES - SUBJECT TO CHANGE

*VALUES BASED ON AN ASSUMED INTEREST RATE OF 10.00%. THE CURRENT DECLARED RATE IS AVAILABLE FROM YOUR AGENT.
CHANGES IN THE RATE OF INTEREST WILL CHANGE VALUES. NOT AN ESTIMATE OR GUARANTEE OF FUTURE RESULTS.
THE ABOVE VALUES ASSUME PREMIUMS ARE PAID WHEN DUE.
MM                                                SUBMITTED BY NORM WESTON, CLU, CHFC
```

NML2 0566

MEP_NML2_0566

# TAX DEFERRAL ADVANTAGES OF
# A $10,000 SINGLE PREMIUM ANNUITY

|  |  | 10 YEARS | 20 YEARS | 30 YEARS |
|---|---|---|---|---|
| **25% Tax**<br>$24,600 to<br>$29,900 | CD or Money Market Fund | $20,610 | $42,479 | $87,550 |
|  | Annuity Accumulation | $25,937 | $67,275 | $174,494 |
|  | Annuity After Tax* | $21,953 | $52,956 | $133,371 |
| **33% Tax**<br>$35,200 to<br>$45,800 | CD or Money Market Fund | $19,127 | $36,584 | $69,973 |
|  | Annuity Accumulation | $25,937 | $67,275 | $174,494 |
|  | Annuity After Tax* | $20,678 | $48,374 | $120,211 |
| **42% Tax**<br>$60,000 to<br>$85,600 | CD or Money Market Fund | $17,573 | $30,883 | $54,271 |
|  | Annuity Accumulation | $25,937 | $67,275 | $174,494 |
|  | Annuity After Tax* | $19,244 | $43,219 | $105,407 |
| **49% Tax**<br>$109,400 to<br>$162,400 | CD or Money Market Fund | $16,445 | $27,043 | $44,471 |
|  | Annuity Accumulation | $25,937 | $67,275 | $174,494 |
|  | Annuity After Tax* | $18,128 | $39,210 | $93,892 |

Under current income tax laws, earnings on amounts invested in a single premium annuity are not taxed until they are withdrawn from the contract. Earnings on many other investments, including bank certificates of deposit or money market funds, are taxed each year as earned.

As the tables above show, this tax deferral advantage of an annuity means your investment can accumulate much faster than in a C.D. or money market fund, and can produce substantially higher values even *after* payment of taxes at withdrawal.

The "Annuity Accumulation" values shown above are based upon a hypothetical annual growth rate of 10%. This is not an estimate or guarantee of future results. The "C.D. or Money Market Fund" values shown above are based upon a hypothetical annual growth rate of 10% *less taxes* at the rate indicated (e.g. 10% less 25% tax = 7.5%). Tax rates are for a married couple filing a joint return for 1984.

*The "Annuity After Tax" values above assume periodic installment payments over a sufficient period of years to remain in the tax bracket indicated. If you withdraw amounts from your annuity after retirement age, you may actually be in a lower tax bracket and you may be entitled to additional tax exemptions and credits, resulting in an even greater tax advantage.

*Northwestern Mutual offers annuity contracts which may be used to accomplish the objectives shown in this hypothetical illustration. Ask your Agent for more information, including a table of guaranteed cash values and projected accumulation values.*

24

NML2 0567

RT_App_0654
ML_NML2_0567

# USE ANNUITY TAX SAVINGS TO BUY LIFE INSURANCE *NOW*

Suppose you have a 35 year old client who needs $100,000 more EOL life insurance. The client "can't afford" EOL — he wants to buy "super cheap term." An annuity could help you "find" the extra money he needs to buy EOL.

Assume your client has a $3,000 bank certificate of deposit earning 10% that he intends to hold until he retires at age 65. If he's in a 33% tax bracket every year, his investment will grow at a *net* rate of 6.7%, resulting in a $20,992 value at age 65. How little would he have to invest in an annuity earning the same 10% *with income taxes deferred until withdrawal* to achieve the same $20,992 *after taxes* at age 65? The answer — only $1,747.

|  | Annuity | Certificate of Deposit |
| --- | --- | --- |
| Initial Investment at age 35 | $ 1,747 | $ 3,000 |
| Accumulation at age 65 (10%*) | 30,484 | 20,992 |
| Taxes Payable at age 65 (33%**) | 9,483 | ~ 0 |
| Net After Taxes at age 65 | $21,001 | $20,992 |

\*10% is a hypothetical interest rate, not an estimate or guarantee of furture results. The "Certificate of Deposit" values are based upon an *after-tax* (33% bracket) growth rate of 6.7%.

\*\*"Taxes payable at 65" assumes periodic installment payments over a sufficient period of years to remain in the tax bracket indicated. You may actually be in a lower tax bracket after retirement and you may be entitled to additional tax exemptions and credits.

How can the policyowner spend the "extra' $1253? On anything he chooses, including the first year's premium for a life insurance policy. A $1253 premium would pay:

|  | 90 Life | EOL | EOT |
| --- | --- | --- | --- |
| Male (Age 35-Select) | $73,832 | $117,429 | $196,025 |
| Female (Age 35-Select) | $78,535 | $128,438 | $214,063 |

Where do subsequent years' premiums come from? An additional $3,000 he's saved in a C.D. or money market fund during each year. Or, perhaps he has a $25,000 or $30,000 C.D. that could be liquidated over 8-10 years to "short pay" the life insurance policy.

If you know the amount that a client presently has invested in a certificate of deposit or money market fund ("CD"), the interest rate ("i"), the client's tax bracket ("T"), and the number of years until retirement ("n"), you can calculate the annuity single premium ("A") which will produce the same *after tax* results at retirement by solving for "A" using the following formula:

$$(1\text{-}T) [A (1 + i)^n - A] + A = CD [1 + i (1 - T)]^n$$

*Northwestern Mutual offers annuity contracts which may be used to accomplish the objectives shown in this hypothetical illustration. Ask your Agent for more information, including a table of guaranteed cash values and projected accumulation values.*

25

NML2 0568

# NON-QUALIFIED ANNUITY —
# BETTER THAN A ROLLOVER IRA?

Assume your client received a $10,000 "lump sum distribution" from a tax qualified pension or profit sharing plan. If he "rolls it over" to an IRA, he postpones all income taxes until withdrawal from the IRA, but then pays taxes at his *marginal tax rate*.

A better plan may be to pay taxes at the time of the "lump sum distribution" using the special "ten-year averaging" tax provision. This special tax break treats the lump sum distribution as if 1/10 of it were received in each of the next 10 years, and taxed as if the recipient were a single taxpayer with *no other income*. For a $10,000 lump sum distribution, the total tax would be only $550, *regardless of the taxpayer's marginal tax bracket*. See IRS Form 4972 for more information.

If the remaining $9450 were invested in a non-qualified annuity, the client continues to receive the benefits of tax-sheltered earnings until withdrawal, when he gets to recover his $9450 investment tax free. Up to a certain point (22 years in this example) this approach is more tax efficient than a rollover IRA, as the chart below shows. An IRA would be preferable if the annuity withdrawal is deferred longer than 22 years. The "breakeven point" will vary, depending upon the size of the "lump sum distribution," the tax bracket at withdrawal from the annuity , and the accumulation interest rate.

|  | IRA Rollover | 10 Yr. Averaging/ Non-Qualified Annuity |
|---|---|---|
| Lump Sum Distribution | $10,000 | $10,000 |
| Lump Sum Distribution Tax | 0 | 550 |
| Net to Invest | 10,000 | 9,450 |
| Accumulation — 10 Years @ 10%* | 25,937 | 24,511 |
| Taxes (33%**) at Withdrawal — Post 59½ | 8,559 | 4,970 |
| Net After Taxes | 17,378 | 19,541 |
| Accumulation — 22 Years @ 10%* | 81,403 | 76,926 |
| Taxes (33%**) at Withdrawal — Post 59½ | 26,863 | 22,267 |
| Net After Taxes | 54,540 | 54,659 |
| Additional Factors to Consider: | | |
| Pre-59½ Withdrawal Penalty Tax | 10% | 5% |
| Distribution Must Begin @ Age 70½ | Yes | No |

\*10% is a hypothetical interest rate — not an estimate or guarantee of future results.

\*\*"Net After Taxes" assumes periodic installment payments over a sufficient number of years to remain in the tax bracket indicated. If you withdraw amounts from your annuity after retirement age, you may be in a lower tax bracket and you may be entitled to additional tax exemptions and credits.

*Northwestern Mutual offers annuity contracts which may be used to accomplish the objectives shown in this hypothetical illustration. Ask your Agent for more information, including a table of guaranteed cash values and projected accumulation values.*

26

NML2 0569

# "SUPER IRA" FOR THE NML AGENT

Would you like to put more than $2,000 into your IRA for 1984? You can if you have 1984 commission income from sources other than Northwestern Mutual. You can contribute up to 15% of your "outside income" or $30,000, whichever is less. And you can use the same IRA you currently use for your regular $2,000 IRA contributions. How? With a "Super IRA" — a Northwestern Mutual Simplified Employee Pension Plan.

You're considered to be an employee of NML for retirement plan purposes — NML pays the employer portion of Social Security taxes for you and contributes to the Agents' Retirement Plan based on your NML commissions. But the IRS considers you self-employed with regard to your non-NML commissions. And, as a self-employed person, you're eligible to establish your own retirement plan.

Since the amount of your non-NML commissions is probably fairly low, and you won't be able to put much into your retirement plan, why bother with all of the red tape and expense of a complicated "H.R.-10" plan? Why not contribute 15% of your non-NML commissions to your own Simplified Employee Pension Plan (SEPP)? Here's an example of how it could work for you.

| | NML | Non-NML | Total |
|---|---|---|---|
| Gross Commission | $40,000 | $10,000 | $50,000 |
| Business Expenses | 8,000 | 2,000 | 10,000 |
| Net Business Income Before "Super IRA" | 32,000 | 8,000 | 40,000 |
| "Super IRA" Contribution | N/A | 1,043* | 1,043 |
| Net Business Income After "Super IRA" | 32,000 | 6,957 | 38,957 |
| *15% of Net Business Income *After* "Super IRA" | | | |

And, you can add your regular IRA contribution of $2,000 for a total IRA contribution of $3,043!

All you have to do to set up your "Super IRA" for 1984 is to execute a *one page* document (IRS Form 5305-SEP) and make your payment to your Northwestern Mutual IRA on or before April 15, 1985. Complete instructions, and all of the materials you'll need, can be obtained by ordering an "IRA+" (Simplified Employee PensionPlan) case kit (31-3301) from the Field Orders Division. *NOTE:* If you have any employees who meet the plan's eligibility requirements, you'll have to make a contribution for them, too.

You're not the only one who can benefit from a "Super IRA" for outside income. Do you have a client who works part-time as a consultant? Runs a tax return preparation business? Receives compensation for serving on a corporate board of directors? Anyone with earned income from a second or "hobby" business can still qualify for a "Super IRA" deduction for 1984 for up to $30,000 or 15% of that earned income, whichever is less.

*Northwestern Mutual offers annuity contracts which may be used to accomplish the objectives shown in this hypothetical illustration. Ask your Agent for more information, including a table of guaranteed cash values and projected accumulation values.*

27

NML2 0570

*The information on this page is intended solely for use by Northwestern Mutual Life Insurance Company agents to evaluate NML's new Flexible Premium Annuity. It may not be photocopied or distributed to the general public as sales literature.*

# COMPETITION '85—FLEXIBLE PREMIUM ANNUITY

An annuity is a promise to pay a return on an investment at a future date, usually in the form of a monthly income for life. While the current interest crediting rate is important, perhaps even more important for the long term is the safety of the company, its ability to fulfill its promise, annual charges for administration and investment of the funds, surrender charges in the event of early withdrawal, and annuity payout rates at maturity. The following table compares these features and others — the "total annuity package" — of 6 major competitors issuing individual IRA contracts.

| Company | Northwestern Mutual Life Insurance Company | Bankers Life Company | Great-West Life Assurance Company | IDS Life Insurance Company | Lincoln National Pension Insurance Company | New York Life Insurance and Annuity Corporation |
|---|---|---|---|---|---|---|
| A. M. Best Rating | A+ | A+ | A+ | A | A+ | A+ |
| Policy Name | Flexible Premium Annuity (MN Series) | CYA Pension Builder | STRATA (Flexible Payment Annuity) | Combination Retirement Annuity | Individual Fixed Annuity | Flexible Premium Retirement Annuity |
| Current Interest Rate (1/31/85) | * | a) 8.75%** b) 10.15%** c) 10.90%** | 11.75% | 11.00% (10.50% eff. 2/11/85) | 10.75% | 10.00% (10.50% for $2,000 annual premium) |
| Length of Current Interest Guarantee | 1 year from date of deposit | a) To end of current plan year, then 100% "rolls forward" b) To end of current plan year, then 20% "rolls forward" each year for 5 years c) To end of 5th plan year, then 100% "rolls forward" | Date of deposit to 12/31 | 1 year from date of deposit | 3 calendar quarters from date of deposit | 1 year from date of deposit |
| Minimum Interest Rate | 3.5% | 4.5% years 1-10 3.0% years 11+ | 3.5% | 4.0% | 4.5% years 1-5 4.0% years 6-10 3.5% years 11+ | 4.0% |

NML2 0571

| | | | | | | |
|---|---|---|---|---|---|---|
| **Front End Load** | None | None | $1 per payment | None | None | None |
| **Annual Maintenance Fee** | None | .5% of first $50,000 plus $25 | $10 per year | $30 per year | $25 per year | Lesser of 1% or $30 |
| **Surrender Charge (s/c)** | 7% year 1; declines 1% per year; 0% after 7 years | 7%, on "roll forward" amounts only; charge declines .7% for each year owner covered under plan | 10% maximum year 1; declines to 0% after 10 years | 7% years 1-5; declines 1% per year; 0% after 11 years | One free withdrawal up to 15% each year, then 8% years 1-5 4% years 6-10 0% after 10 years | 7% years 1-4; declines 1% per year; 0% after 10 years |
| **Settlement Options (Age 65 Male, C-10, per $1,000)** | | | | | | |
| Guaranteed | $6.08** | $6.25 | $5.80 | $6.35 | $5.74 | $6.20 |
| Current (1/31/85) | $11.04 | $10.056 | $10.98 (unisex) | $10.13 | $10.26 | $10.78 |
| **State Premium Tax Paid By** | Company | Company | Annuitant | Annuitant | Annuitant | Annuitant |
| **Waiver of Premium Benefit** | Yes | No | No | No | No | Yes |

NOTES: *Product not available on 1/31/85; Rates for 3/1/85 introduction will be determined 2/21/85.

**Assumes settlement in 21st to 25th policy year. Higher if settled earlier; lower if settled later.

*The Information on this page is intended solely for use by Northwestern Mutual Life Insurance Company agents to evaluate NML's new Flexible Premium Annuity. It may not be photocopied or distributed to the general public as sales literature.*

**NML2 0572**

# "LAYERING" OF NEW AND RENEWAL ANNUITY INTEREST RATES

In order to offer competitive rates of interest for one year and three year investments in our new FPA and SPRA contracts, and to be able to earn a sufficient margin to cover distribution expenses and Home Office expenses, the Company may have to invest in securities which have maturities longer than the length of the guarantee which the Company makes to the policyowner. For example, if "market rates" (U.S. Treasury bills, bank certificates of deposit, or other investments with no distribution expenses) for one year investments are paying 10%, NML may have to invest in two year, three year, or even five year securities in order to earn enough to pay, after deduction for appropriate expense margins, a competitive rate.

As long as interest rates remain constant, this portfolio works well for the Company *and* the policyowner. The policyowner gets a competitive rate, which will probably be even higher than he could get with a one year Treasury bill or C.D. *And,* he also receives valuable annuity rights and guarantees he would not have with the other investments.

However, if interest rates rise dramatically over a short period of time, the Company may find itself holding investments earning last year's lower rates while the policyowner expects last year's premium payment to be "rolled over" at higher current rates. The Company could not pay these higher current rates on "rolled over" amounts without incurring a loss. In order to avoid a loss and protect the interests of *all policyowners* by not "guaranteeing" more than it can earn (remember what happened to Baldwin-United, Charter and Capitol Life?), the Company may at times have to pay a slightly lower interest rate to amounts which are being "rolled over" (where no new money is available for investment at current rates) than it pays for new premiums (which can immediately be invested by NML in new securities at current rates).

For example, if NML had a $500 million block of existing annuity business and new/renewal premiums totalling $100 million, and if "market rates" jumped from 10% to 13% in just one year, it is possible that NML could be paying 13% on new and renewal premiums, and 11.5% on "rollover" amounts from prior years' investments. Because the portfolio consists of short term securities, the "rollover" rate would quickly climb up to the "new money" rate, as maturing securities were reinvested at higher rates.

Conversely, if "market rates" dropped from 13% to 10% in just one year it is possible that NML would pay a higher rate on "rollover amounts" than on new and renewal premiums.

NML will manage the new annuity investment portfolio in such a manner as to minimize as much as possible the likelihood of such a "layered rate" or "split rate" approach to crediting interest on new premiums and "rollover" amounts. However, the Company must reserve that option in order to protect the interests of *all* of its policyowners.

Such "layered rates" are not uncommon with annuity contracts, especially in times of rapidly rising interest rates. Most group annuity and guaranteed income contracts (GICs), and many individual annuity contracts that credit interest on an "investment year" basis, reserve the right to use "layered rates," even though they may not actually use them during a certain period, such as the current one, when interest rates are generally stable or falling.

Again, the Company will do all that it can to minimize the likelihood of "layered rates." Nevertheless, you should be aware of this possibility and what "layered rates" could mean to your policyowner.

NML2 0573

R-App. 660
NML_NML2_0573

**Northwestern**
**Mutual Life**

Northwestern Mutual Life Insurance Company · Milwaukee

11-3418 01

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 143 of 254   Document 30-3   661

ML_FNM02_0574

# Change to current rate method on annuities expected to meet with consumer satisfaction

The switch to a current rate basis for crediting interest on the company's MN series Flexible and Single Premium Annuities is a significant break with Northwestern Mutual tradition. It means that the company's annuity products will more closely shadow fluctuations in rates for "new money" CD's and U.S. Treasury bills. That is according to John Schnorr, Assistant Manager of Employee Plans.

Says Schnorr, "The financial markets have changed — and continue to change at an ever-increasing pace. There are many more investment alternatives than there were 10 years ago. Modern consumers are highly educated — sophisticated in their knowledge of what alternatives are available to them.

"Also, the media constantly bombard them with news articles and advertisements, almost all of which focus on 'current' interest rates. In this environment, most consumers expect their investments to be paying whatever these 'current' rates happen to be."

For years, according to Schnorr, Northwestern Mutual has been a staunch advocate of the "portfolio" method of crediting dividends to its life insurance and annuity contracts. The switch from the portfolio method, backed by longer term investments, to the current rate method, backed by short- to intermediate-term investments, will be made only for annuity products. It represents the company's acknowledgement that an annuity owner is constantly comparing his investment with other alternatives and will probably be more satisfied over the long-term with an investment that closely tracks CD and T-bill rates — interest rates that consumers are likely to be familiar with.

The switch to a current rate crediting approach for annuities is expected to mean greater persistency and less service work for agents.

Schnorr explains, "During the interest rate 'spike' from 1972-1976, annuity surrenders jumped from $7 million to $20 million per year. During the next interest rate spike from 1978-1982, annuity surrenders jumped as high as $79 million in one year. The reason for these high levels of surrenders? The company's portfolio-based annuity dividend interest rate climbed much more slowly than the volatile short-term interest rates available with CD's, Treasury bills and competitors' annuities. The new annuities will more closely track these short-term rates, thus avoiding another period of high surrenders during an interest rate spike.

"On the other hand, it was also detrimental for the company, and policyowners as a whole, when the old portfolio dividend interest rate exceeded the 'current' rates. New policyowners 'dumped in' money at times when the company could invest it only at a rate — after deduction of required margins to cover expenses — that was below the declared portfolio dividend interest rate.

"To avoid surrenders when market rates are above the company's portfolio rates, and to avoid portfolio dilution when market rates are below what the company's offering," says Schnorr, "the Northwestern decided that the best interest of the policyowners would be served if annuity interest rates were based on current market rates."

The goal of the new annuities, according to Schnorr, is to provide the most competitive yield within acceptable risk parimeters and to cover the various expenses involved. This requires a flexible investment strategy — a new interest rate will be declared every month for premiums received during that month. This assures that

NML's interest rates will stay up-to-date and competitive. It also means that they can go up — or down — from month to month.

Premiums received from the sale of new annuities will be invested in predominantly short- to intermediate-term bonds with a weighted average life from two to five years. Maturity structure will vary, depending on the shape of the yield curve and interest rate projections. The average quality of investments is expected to be investment grade securities with ratings in the range of A to Baa.

While the investment basis for the new annuities is based on specific short- to intermediate-term investments, the guarantees of principal and interest are general obligations of the company and are backed by the company's $16 billion total portfolio.

For inforce annuity contracts, the dividend structure will gradually be changed to the new investment basis over a period of several years, beginning in 1986. The current rate approach will *not* be used for any of the company's life insurance policies.

Concludes Schnorr, "We think the new current rate approach is ideal for the company's annuity products. It assures that the company will always be competitive with other short-term rates with which the policyowner is familiar. That could very easily mean fewer surrenders in periods of fluctuating interest rates, and that can ultimately mean better persistency and better overall value for all annuity policyowners."

The current rates for deposits to the new annuity contracts can be obtained by calling toll-free 1-800-558-9990 (except Alaska and Wisconsin) or 1-800-242-9941 in Wisconsin. New rates will be announced on the first business day of each month.

NML2 0489

Trial Exhibit No. 73

EXHIBIT 73

June 7, 1990



Re: 

We received your letter inquiring about the differences between dividends on annuities and life insurance policies.

Annuities and life insurance policies are treated differently with respect to dividends. This is due to the fact that assets for each of the portfolios are invested differently. Each portfolio has different strategies and investment goals. Dividend interest rates for individual policies are based on portfolio investment results.

The dividend interest rate for annuities for 1990 is 10.00%. This is a decrease from the 1989 rate of 10.75%. Life policies dividend interest rate remained the same at 10.00% from 1989 to 1990. However, life policies had an increase in expense costs that is used in calculating the dividend interest rate. The increase in expenses is primarily due to an increase in the cost of maintaining policies.

Your policy has a loan interest rate of 6.00%. The policy has direct recognition which provides a higher interest rate for unborrowed cash value. Because your policy has direct recognition and no loans, you receive a 10.00% dividend interest rate on non-borrowed cash value. The dividend interest rate on any borrowed portion would be 5.15%.

A life policy with direct recognition and a 6.00% loan rate would receive a 10.00% dividend interest rate on the non-borrowed cash value and 5.30% on the borrowed portion.

I hope this information is helpful to you.


Stephanie Della
Service Correspondent
Executive Benefits Division
Policyowner Services Department

djw
cc: 005

56842

CONFIDENTIAL   MB2_NML_6684

**laberge, shelly**

| | |
|---|---|
| **From:** | LABERGE, SHELLY |
| **Sent:** | Tuesday, April 07, 1998 3:02 PM |
| **Subject:** | Dividend interest rate |

███████ let me assure you we are not discriminating against you by paying your annuity a lower dividend rate than what is quoted in our Annual Report.  The rates earned between life insurance and annuities have been different since 1986.  Prior to this, the two product lines shared the same dividend interest rate.  A change was made to reflect differences in how NML invests the assets underlying these two products.  The main reason and need for this is because the cash flow of money into and out of our annuities does not give the same commitment to future premium flows as we see with life insurance. In addition, annuity contracts have a greater likelihood of being withdrawn than we see with life insurance.   This volatility of cash flow dictates that NML invest in shorter term investments.  Additionally, we do not have any riskier, higher yielding assets such as common stock or real estate underlying our annuity business.  This impact means the annuity dividend rate will be more responsive to changes in market interest rates. If interest rates were to reverse their downward trend, annuity rates could again exceed life insurance rates, similar to what we saw in the late 80's.  For now, however, they remain lower. As you can see, it is not you or your annuity that causes the lower rate but rather the underlying investments associated with annuities that are different than those used for life insurance.

CONFIDENTIAL   MB2_NM_6702

KELLY J. RUEGA
Senior Customer Service Representative
Annuity Administration
Annuity & Accumulation Products Dept.



September 14, 1999



RE:

In your recent letter to ▮▮▮▮▮▮ you questioned why your annuity had a decreasing investment return while the annual report stated record returns.

Let me begin by assuring you the values in your annuity are correct; however, let me explain the differences you raised. Much of the explanation involves the differences in investment portfolios between life insurance and annuities. Our fixed annuities are invested in short term investments, such as bonds and mortgages with maturity periods of less than five years. The 8.80% you have referred to is the company's overall portfolio rate for our *Life Insurance* products, which invest in larger term bonds, stock, and real estate investments.

The following is a calculation summarizing the method used to obtain your current cash value:

|  |  |  |
|---|---|---|
| Total Cash Value as of 8/1/1998 | $57,663.85 | |
| Total Cash Value as of 8/1/1999 | $61,823.03 | |

| | | |
|---|---|---|
| Your basic Annual Annuity Premium | $ | 416.60 |
| Annual Policy Fee (416.60-6.00) | $ | 6.00 |
| | $ | 410.60 |
| | | |
| Current Load 6.00% (410.60 x .06) | $ | 24.64 |
| Net Premium (410.60 – 24.64) | $ | 385.96 |
| | | |
| Beginning Year Cash Value (8/1/1998) | $57,049.81 | |
| Interest (58,049.81 x .065) | $ 3,773.24 | |
| End of Year Cash Value (8/1/1999) | $61,823.05 | |
| | | |
| **Declared Total Cash Value** | **$61,823.05** | |

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202 • 414 271-1444

CONFIDENTIAL

MB2_NM_0714

September 14, 1999
Page 2

You asked if there was an advantage to continuing payments to this annuity. The current declared interest rate for this annuity is greater than rates offered for our Variable Annuity Guaranteed Interest Fund. In addition, your current policy cash value provides a death benefit and payment plan options only offered through an Insurance Company. Like all investments vehicles, an annual review of your investment objectives and time horizon along with investment options available should be compared routinely to achieve your maximum financial goals. Your Northwestern Mutual Life Agent would be happy to assist you with your investment goals.

Thank you for entrusting us with you business these past 34 years and allowing us to serve you. If I can be of further assistance please feel free to contact me at 1-888-455-2232.

Sincerely,

Kelly Krueger

cc: Lars Holmberg • 702-369-0405
    Ste 100 • 3773 Howard Hughes Pkwy • Las Vegas NV  89109                      127/65160

CONFIDENTIAL



May 9, 2000

Daniel A. Noonan & Katherine D. Noonan
2414 E. Newberry Blvd.
Milwaukee, WI 53211

Re: Katherine D. Noonan   Contract #7182718

Dear Mr. And Mrs. Noonan:

Dan Madigan's letter of May 5, 2000 to Mike Jaquint concerning your contracts has been referred to me for reply.

The correspondence leading up to this May 5 letter concerned only Mrs. Noonan's contract. My guess is that since Mr. Noonan's contract had loans against it, but Mrs. Noonan's did not, the focus was on Mrs. Noonan's contract.

Back in the early 1980s, the Company became concerned about the portfolio dividend interest rate becoming widely different from prevailing new money rates. When our quoted rate on annuities was not competitive with rates available on alternative investments, annuity premiums fell sharply and surrenders increased sharply. This was more true on annuities than on life insurance because annuities have flexible premiums, low replacements costs, and no insurability issues.

In response to pressure from the field force, the Company introduced on 3/1/85 the MN Series FPA (called the "Current Rate Annuity"). The product would provide a competitive current rate and also protect the company from disintermediation losses when interest rates rise on a product that does not have a market value adjustment on surrender.

On 5/31/85, the Company "segmented" its assets, establishing a separate investment portfolio for the Current Rate Annuity and also for the in-force annuities. The new portfolio for Pre-MN annuities would be debt instruments with a roughly five year duration and would produce a dividend basis that would more closely track current rates than the life portfolio which had a longer duration and equity components such as real estate, stocks, and various illiquid investments like investments in subsidiaries. The practice of asset segmentation had become common for life insurance companies. Our segmentation plan was filed and approved by both the Wisconsin Insurance Department and the New York Insurance Department.

Trial Exhibit
No. 316

EXHIBIT
8
1-6-05

The new portfolio was first reflected in the 1986 dividend rate which was 11%. It was understood that it would track quicker to trends in interest rates, either up or down, and because annuity holders are more inclined to move assets out of the company when rates are relatively higher, tracking quickly is important for annuities. The 1986 Dividend Information Release stated "The dividend interest rate for deferred annuities will reflect the investment experience of a portfolio designed to be appropriate for interest sensitive products." The attached table shows the annual dividend interest rates credited to life polices and to Pre-MN series annuity contracts from 1986 to 2000.

It has turned out that over the period from 1986 to 2000 interest rates have trended lower. The annuity rate averaged a lower rate than the life rate over this period as the table shows. It could have gone the other way and it still might in the future. Nobody can predict future trends in interest rates (except with the benefit hindsight, it seems that it is human nature for one to say that he knew what was going to happen). But in any event the rates paid on Pre-MN annuities have been competitive with similar investments.

I hope this has provided you with a better explanation of what the Company did, why it did it, and what impact it had on your contract.


Sincerely,

*Rick Fisher*

Richard F. Fisher


Cc: Daniel F. Madigan III, ChFC, CLU

| | Dividend Interest Rates | |
|------|------|------------|
| Year | Life | Pre-MN FPA |
| 1986 | 11.25 | 11.00 |
| 1987 | 11.00 | 10.75 |
| 1988 | 10.25 | 10.75 |
| 1989 | 10.00 | 10.75 |
| 1990 | 10.00 | 10.00 |
| 1991 | 10.00 | 10.00 |
| 1992 | 9.25 | 9.50 |
| 1993 | 9.25 | 8.50 |
| 1994 | 8.50 | 7.50 |
| 1995 | 8.50 | 7.00 |
| 1996 | 8.50 | 7.00 |
| 1997 | 8.50 | 6.50 |
| 1998 | 8.80 | 6.50 |
| 1999 | 8.80 | 6.50 |
| 2000 | 8.80 | 6.50 |

PreMNFPADiv.xls

R-App 669

2012 WL 1900114
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

MAI NHIA THAO, individually and on behalf
of a class of others similarly situated, Plaintiff,

v.

MIDLAND NATIONAL LIFE
INSURANCE COMPANY, Defendant.

No. 09–C–1158.   |   May 24, 2012.

**Attorneys and Law Firms**

Jacques C. Condon, K. Scott Wagner, Hale & Wagner SC, Milwaukee, WI, John J. Schirger, Matthew W. Lytle, Stephen R. Miller, Miller Schirger LLC, Lee R. Anderson, Patrick J. Stueve, Richard M. Paul, III, Kansas City, MO, for Plaintiff.

Henry Pietrkowski, Chicago, IL, Linda B. Oliver, Robert D. Phillips, Jr., William H. Higgins, San Francisco, CA, Paul F. Heaton, Heaton Trial Law SC, Milwaukee, WI, for Defendant.

**Opinion**

### *DECISION AND ORDER*

LYNN ADELMAN, District Judge.

**\*1** Mai Nhia Thao seeks to represent a class comprising owners of certain life insurance policies issued by Midland National Life Insurance Company ("Midland"). Before me now is Thao's motion to certify this case as a class action pursuant to Federal Rule of Civil Procedure 23.[1]

Thao asks that I certify the following class and designate her as the class representative:

> All persons who reside in the states of AZ, AR, CA, CO, CT, FL, GA, IL, IN, IA, KS, KY, LA, MD, MA, MI, MN, MS, MO, NE, NV, NC, ND, OH, OK, PA, SC, SD, TX, UT, VA, WA or WI and purchased or owned during the applicable statute of limitations a life insurance policy issued by Defendant based on any of

the following base policy forms: L128, L129, L130, L131, L133, L134, L136, and L138.

The base policy forms identified in the class definition are components of universal life insurance policies. Universal life insurance can be contrasted with term life insurance and whole life insurance. With term life insurance, the insured pays a premium in exchange for a death benefit that the insurer pays to the beneficiary only if the insured dies during the term of the policy. *See* 1 Jeffrey E. Thomas & Francis J. Mootz III, *New Appleman on Insurance Law Library Edition* § 1.08[2][b][ii] (2011). With whole life insurance, the insured pays a premium in exchange for both a death benefit (the insurance component) and a savings plan (the savings component). The savings component can be described as an investment that gets bigger over the term of the policy. Should the insured choose to do so, she can "surrender" the policy in exchange for whatever cash value has accumulated in the savings component at the time of the surrender. *Id.*

Universal life insurance, like whole life insurance, has both an insurance component and a savings component. Universal life is different than whole life in essentially two ways—flexibility and transparency. Universal life is said to be more flexible than whole life because it allows the insured to make various decisions over the life of the policy. With whole life, the insured pays a fixed premium over the life of the policy, and the death benefit is fixed at the policy's face value. With universal life, the insured can pay premiums in almost any amount at almost any time and may increase or decrease the amount of the death benefit at any time (subject to certain limits). *See* Richard G. Schectman, *New Concepts in Life Insurance Planning: Universal Life,* 13 Cumb. L.Rev. 219, 222 (1982). Relatedly, the insured can use the savings component to pay for the death benefit. That is, instead of making premium payments, the insured can allow the cost of the insurance component to be deducted from the savings component. So long as the policy's cash value is sufficient to pay the cost of the death benefit, skipping a premium does not result in the policy's lapsing. *Id.* at 224. Universal life is said to be more transparent than whole life because the policyholder receives periodic statements detailing how her premiums are being used. The statements itemize the various costs, fees and expenses that the insurer deducts from her premiums. With whole life, the policyholder typically does not know how her premiums are being used. *Id.* at 224–25; Douglas I. Friedman, *Universal Life: Product Development and Tax Aspects,* 13 Cumb. L.Rev. 499, 503–04 (1982).

R-App 670

**\*2** The mechanics of the Midland universal life policies at issue in this lawsuit are as follows: When a policy is purchased, the policyholder pays an initial premium and specifies the amount of the death benefit. Midland deducts a "premium load" from this initial payment and then applies the rest to the "policy fund," which is the savings component. If the policyholder makes additional premium payments, Midland adds that payment to the policy fund. Each month, Midland calculates the policy fund by taking the existing amount in the fund, adding any premium payments (and any interest earned on the savings component), and subtracting various charges. If after the relevant additions and subtractions are made there is still money left in the policy fund, then the policy will continue in force. If there is no money left in the policy fund, then (subject to certain exceptions), the policy will terminate.

The focus of this lawsuit is on the cost-of-insurance charge, which is one of the charges that Midland deducts from a policyholder's policy fund each month. In general, "cost of insurance" refers to the amount that an insurance company charges to cover its risk—i.e., the cost of paying the death benefit upon the death of the insured. Midland's policies specify that Midland will calculate cost-of-insurance charges by multiplying a "cost-of-insurance rate" by the difference between the amount of the death benefit and the amount of the policy fund.[2] The cost-of-insurance rate is taken from a set of tables produced by Midland's actuaries. Each policy type—that is, each Midland "product"—will have its own set of tables. The rates on the tables are organized by certain characteristics: the insured's age when the policy was issued ("issue age"), the number of years the policy has been in force ("policy years"), the insured's sex, the amount of the death benefit (the "specified amount"), and the insured's "premium class" (which is determined by certain characteristics that affect the insured's mortality risk, such as whether the insured uses tobacco or participates in hazardous activities). These characteristics determine which rate Midland will apply to a given policyholder at a given time. For example, suppose that the insured is a female nonsmoker (as Thao is) who purchased a Century Universal Life–G policy with a $100,000 death benefit (as Thao did). To calculate her cost-of-insurance rate for a particular month, Midland will first find the set of tables designed for the Century Universal Life–G product. It will then find the table in that set that contains rates for female non-smokers who selected a death benefit of between $100,000 and $1 million.[3] The table will have cost-of-insurance rates organized by issue age and policy years-the rows are issue ages and the columns are policy years. Thus,

assuming that the insured was twenty-six when the policy was issued and the policy has been in force for ten years, Midland will select the rate in the cell of the table located at the row corresponding to age twenty-six and the column corresponding to ten years' duration. Midland will then plug that rate into the cost-of-insurance formula to determine the cost-of-insurance charge.

**\*3** Thao's contention in this lawsuit is that Midland has been setting its cost-of-insurance rates in a way that is inconsistent with the following provision in her policy: "Cost of Insurance rates are based on the Issue Age, completed Policy Years, Sex, Specified Amount, and Premium Class of the Insured." Thao Policy § 7.7, ECF No. 57–1. Now, Midland's cost-of-insurance rates are in some sense "based on" issue age, policy years, sex, specified amount, and premium class in that, as explained above, Midland's cost-of-insurance rate tables are organized by these five factors. However, Thao contends that the policy language requires more than using tables organized by the five factors. According to her, the policy language imposes a constraint on how Midland sets the rates that appear in the cells of the tables. She contends that the policy language required Midland to consider nothing other than the five factors listed in the policy—which are all factors related to mortality expectations—when setting those rates. Thao contends that, contrary to this language, Midland considered factors unrelated to mortality expectations when setting its rates.

Thao contends that this case is appropriate for class treatment. She points out that all of the proposed class members' policies incorporate one of nine base policy forms and that each of the nine forms contains the same or virtually the same operative language as her policy. She also points out that there are no significant differences in state contract law or individualized issues concerning extrinsic evidence that might result in the policies' having different meanings for different class members. Thus, argues Thao, whether the policies allowed Midland to consider factors unrelated to mortality expectations when setting cost-of-insurance rates is a common question of law or fact. *See* Fed.R.Civ.P. 23(a)(2).

It is true that whether Midland acted contrary to language that appears in all of the proposed class members' policies is a common question of law or fact. The operative language in all of the base policy forms is the same or virtually the same, and differences in state law and extrinsic evidence will likely not result in different meanings for different class members. Thus, there is likely a single answer for all

policyholders: either the policies allowed Midland to consider factors unrelated to mortality expectations when setting its cost-of-insurance rates, or they did not. However, it does not follow that this case is appropriate for class treatment. This is so because, as we will see, the class members may not agree on what the answer to the common question should be. Some class members might prefer rates that are not based exclusively on mortality expectations, while other class members might, like Thao, prefer rates that are based exclusively on mortality expectations. Put differently, there may not be a common claim that Thao can litigate on behalf of a class of policyholders. Thus, in the remainder of this opinion, I examine whether Thao's individual claim is representative of claims that other Midland policyholders might have.

*4  Thao's individual claim is that Midland is overcharging her. More specifically, she claims that Midland is deducting too much from her policy fund each month because the cost-of-insurance charge is based on rates that are higher than they would be if Midland had set its cost-of-insurance rates using only the five factors listed in the policy. Essentially, Thao claims that if Midland had set its rates using a methodology based exclusively on the five factors, all of the numerical values in the table containing her cost-of-insurance rates would be either lower than they are now or unchanged.[4] According to Thao, all of the other proposed class members have the same claim against Midland. She contends that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. Thus, argues Thao, all members of the proposed class have a claim against Midland that arises out of Midland's use of improper cost-of-insurance rates. She believes that each proposed class member would want (1) declaratory and injunctive relief requiring Midland to adjust its rates so that they are based exclusively on the five factors and (2) a refund of the excess cost-of-insurance charges paid in the past on account of Midland's using rates that were based on other factors.

The key premise in Thao's argument for class certification is that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. If this premise is false—if, for example, a set of rates based exclusively on the five factors would result in *higher* rates for certain policyholders—then the members of the proposed class would not have a common

claim against Midland.[5] Only those members who would pay lower rates would have a claim, because only those members would have been injured by Midland's conduct. *See Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011) (holding that to show commonality plaintiff must show that the class members have suffered the same injury); *Bieneman v. City of Chicago,* 864 F.2d 463, 465–66 (7th Cir.1988) (individual opposed to noise created by O'Hare airport could not represent a class of property owners in area around airport because some property owners benefitted from proximity to airport). Thus, before the class proposed by Thao may be certified, Thao must prove—not merely assert—that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. *See Wal–Mart,* 131 S.Ct. at 2551–52 (satisfaction of all Rule 23 requirements must be proved, not merely asserted, even if proving those requirements requires resolving an issue relevant to the merits of the underlying claim); *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675–76 (7th Cir.2001) (same).

*5  In an attempt to prove that under her interpretation of the policies all policyholders would pay lower cost-of-insurance rates, Thao points to a collection of spreadsheets known as the "COI Solver" workbooks. *See* Pl.'s Br. in Supp. at 7–8, ECF No. 57. In the next few pages of this opinion, I will explain what these workbooks are and why they are important to plaintiff's argument for class certification.

The COI Solver workbooks are a set of Excel spreadsheets that Midland's actuaries developed and used in the course of designing the policies at issue in this case. *See* Bill Decl. ¶¶ 24–27, 37, 39, ECF No. 64. As Midland seems to be using the term, "designing" refers to the overall process of setting the rates that will determine the various credits to and deductions from a policy that Midland will make over the life of that policy. *Id.* ¶ 24. The cost-of-insurance rates are set during this process, but other rates, such as interest-crediting rates, are also set during this process. In designing a policy, Midland's actuaries attempt to set rates that will both further the policyholder's objectives in purchasing the policy and earn Midland a reasonable profit. *Id.* ¶¶ 24, 28. Although Midland's objective—making money—is the same in every policy, the policyholder's objectives may be different. For example, some policyholders might want a policy that is designed to have a high cash surrender value at a certain point in time, while other policyholders might want a policy that is

designed to have a high death benefit and lower cash value. *Id.* ¶ 24.

Part of Midland's design process is known as "pricing." *Id.* ¶¶ 31–38. During pricing, Midland's actuaries feed a proposed set of rates into a computer program to examine various financial metrics relating to Midland's profitability (such as cash flow and distributable earnings). The actuaries assign probabilities to uncertain future events and feed those probabilities into the program along with the proposed rates. After running the program, the actuaries use the results to get a sense of what is likely to happen in the future if Midland adopts the proposed rates. The goal of this process is to determine whether the rates are viable—not so low that Midland loses money, but not so high that Midland loses business to its competitors. If after testing the proposed rates Midland's actuaries determine that the rates are problematic, they will make adjustments. The actuaries might revise a

single rate scale or multiple rate scales, and the cost-of-insurance rate scale is one of the scales that might be adjusted.

The purpose of the COI Solver workbooks is to expedite the process of developing scales of cost-of-insurance rates for testing in the pricing program. *Id.* ¶¶ 37 & 39. As noted, the workbooks are Excel spreadsheets. Numerical values are entered into the cells of the spreadsheets in a manner that allows arithmetical operations to be performed in accordance with specified formulas. A workbook for a particular policy will contain many spreadsheets-one for every permutation of policyholder characteristics (issue age, sex, premium class, etc.). Here is an excerpt from a COI Solver spreadsheet for a particular Midland product (labeled "UL–CV") and permutation of policyholder characteristics (male nonsmoker "MN", issue age 35, and band 2):

| UL-CV | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Class: | MN | | | | | | | | | |
| Age: | 35 | | | | | | | | | |
| Band: | 2 | | | | | | | | | |
| | | Pricing Mortality (Att. Age) | Select Factor | Product | Add-On | Mult of Add-On | Tot Add-On | Product + Add-On | 2001 CSO Composite Guar COI | Minimum Column I-J | XLCV2 Mo COI |
| Age | Pol Yr | | | | | | | | | | |
| 40 | 6 | 0.06 | 0.99 | 0.06 | 0.050 | 1.00 | 0.05 | 0.11 | 0.14 | 0.11 | 0.11 |
| 51 | 17 | 0.19 | 0.88 | 0.16 | 0.030 | 1.00 | 0.03 | 0.19 | 0.36 | 0.19 | 0.19 |
| 52 | 18 | 0.21 | 0.87 | 0.18 | 0.020 | 1.00 | 0.02 | 0.20 | 0.39 | 0.20 | 0.20 |
| 53 | 19 | 0.23 | 0.86 | 0.20 | 0.010 | 1.00 | 0.21 | 0.21 | 0.44 | 0.21 | 0.21 |
| 54 | 20 | 0.26 | 0.85 | 0.22 | 0.000 | 1.00 | 0.00 | 0.22 | 0.49 | 0.22 | 0.22 |

**\*6** When Midland's actuaries create a spreadsheet for a given permutation of policyholder characteristics, they start by entering a base scale of numbers into one of the columns. Each row of the spreadsheet represents a policy year. Any set of numbers having some reasonable pattern could be used as a base scale. *Id.* ¶ 40. However, Midland's actuaries have chosen to use numbers that resemble (but do not match) Midland's "pricing mortality" rates.[6] *Id.* The reason for this is that mortality rates generally increase with age, and in most policies the design objectives will call for cost-of-insurance rates that increase with age. Thus, using an approximation of Midland's pricing-mortality rates as a base scale gives the actuaries a convenient starting point. *Id.* However, there is nothing special or significant about the actuaries' decision to use an approximation of Midland's pricing-mortality rates as a base scale. The actuaries could just as easily have used any one of a number of different mortality tables published for use in actuarial science. *Id.* ¶¶ 40–41. Or the actuaries could have used something other than a mortality table. For example, in

one Midland policy (which plaintiff has excluded from the class definition), the actuaries used reinsurance premium rates as the base scale. *Id.* ¶ 41.

The column of the COI Solver spreadsheet containing the base scale for a particular permutation of policyholder characteristics is labeled "Pricing Mortality."[7] To turn this base scale into usable cost-of-insurance rates, the COI Solver spreadsheet relates the numerical values in the Pricing Mortality column to values in other columns in accordance with a specified formula. One of the other columns is the "Select Factor" column. The first step in turning the base scale into cost-of-insurance rates is to multiply the values in the Pricing Mortality column by the values in the Select Factor column. The numerical values that result from this operation appear in the column labeled "Product."[8] The value in the Select Factor column is usually one or below for non-tobacco users and one or above for tobacco users, and thus the Select Factor usually decreases the numbers in the base scale for

non-tobacco users and increases them for tobacco users. *Id.* ¶ 45. However, the value of the Select Factor generally decreases as the number of policy years increases-that is, the value gets smaller as it moves down the Select Factor column and into the lower rows, which represent later policy years. Thus, use of the Select Factor has the effect of producing lower rates in later policy years. *Id* . ¶ 49.

Three columns in the COI Solver spreadsheet involve something known as the "Add–On." As we will see, the Add–On is the centerpiece of Thao's theory for class certification. The three columns are labeled "Add–On," "Mult of Add–On," and "Tot Add–On ." The values in the Add–On column are taken from a separate spreadsheet in the workbook labeled "Expense Add–On." *Id.* ¶ 48. This spreadsheet is organized by issue age and policy year. *Id.* ¶ 47. According to Midland, the values that appear in the cells of the Expense Add–On spreadsheet do not represent any particular cost, expense, or mortality characteristic. Instead, those numbers are nothing more than a scale that Midland adjusts as needed to meet design objectives—i.e., producing cost-of-insurance rates that meet policyholder objectives and Midland's objective of earning a reasonable profit. *Id.*

 **\*7**  Once the values in the Expense Add–On spreadsheet are imported into the COI Solver spreadsheet, the values in the Add–On column are multiplied by the values in the Multiple of Add–On column (which are determined by the sex, premium class and specified amount of the policyholder), and the result of this operation appears in the Total Add–On column. *Id.* The values in the Total Add–On column are then added to the values in the Product column. The result of this operation appears in the "Product

 🔑 Add–On" column.

The Add–On is generally structured so that its value declines towards zero over some initial number of policy years. *Id.* ¶ 49. That is, the greatest numerical values in the Add–On and Total Add–On columns generally appear at the top of the columns (i.e., in the rows representing early policy years), and then the values gradually decline towards zero, and eventually become zero, as they move down the columns. Thus, the purpose of the Add–On is to adjust the base rate upwards during the initial years in which the policy is in force. This is contrary to what Midland would do if the Add–On were related to mortality characteristics, since the risk of dying generally increases with age rather than decreases. However, for various reasons, including producing favorable tax consequences, some policyholders prefer to pay higher

rates in earlier policy years in exchange for lower rates in later policy years. *Id.* ¶ 50. Using the Add–On, which generally produces higher rates in earlier years, in conjunction with the Select Factor, which generally produces lower rates in later years, helps Midland's actuaries produce a rate scale that achieves this particular policyholder objective. *Id.* ¶¶ 49–50.

The final step in the COI Solver process is to determine the final rate for testing. This is done by comparing the value in the Product

 🔑 Add–On column for a particular policy year to the value in the column labeled "Composite Guar COI," which is the maximum cost-of-insurance rate allowed under the policy. [9] *Id.* ¶ 42. If the value in the Product

 🔑 Add–On column is less than the value in the Composite Guarantee column, then the value in the Product

 🔑 Add–On column becomes the cost-of-insurance rate for that policy year. Otherwise, the value in the Composite Guarantee column becomes the cost-of-insurance rate for that policy year. The cost-of-insurance rate scale thus appears in the column labeled "Mo COI." This is the rate scale that Midland's actuaries will feed into their pricing program to determine whether that scale—together with all other rate scales for the policy under consideration—will produce the desired results. If after testing the actuaries determine that adjustments to the cost-of-insurance rate scale are needed, the actuaries will adjust the values in the Add–On and Select Factor columns (and possibly other columns that I have not discussed) as needed to produce a revised cost-of-insurance rate scale for testing. *Id.* ¶¶ 44 & 50. This process will continue through as many iterations as needed to produce a rate scale that satisfies all of the objectives for the policy under consideration. *Id.* ¶ 37. Once Midland's actuaries find that rate scale, Midland will use it to construct the cost-of-insurance rate tables for that policy.

 **\*8**  Having explained the function of the COI Solver workbooks, I can explain why they are important to Thao's theory for class certification. Recall that a class may be certified only if Thao can show that all class members would pay lower cost-of-insurance rates than they do now if Midland's rates were based exclusively on the five factors listed in the policies. In an attempt to make this showing, Thao focuses on the Add–On. The Add–On has the effect of producing higher cost-of-insurance rates during early policy years because the value of the Add–On, which is positive in early policy years, is added to the Product (i.e., the base scale multiplied by the Select Factor). Thus, as a matter of arithmetic, if the Add–On were removed from Midland's

cost-of-insurance rates—that is, if the values in the Add–On columns were all set to zero—all class members would pay lower cost-of-insurance rates than they do now in early policy years, but their rates in later years (in which the Add–On is already zero) would not change. Thao contends that all class members thus have a claim against Midland for removal of the Add–On.

The problem for Thao is that her theory for class certification does not match her theory for the merits of this case. In order to obtain class certification, Thao argues that Midland must recalculate all of its cost-of-insurance rates after removing the Add–On from the COI Solver workbooks. However, that remedy is not consistent with Thao's interpretation of the policy language. Under Thao's interpretation of the policy language, cost-of-insurance rates must be based exclusively on Midland's mortality expectations— i.e., Midland's estimates of future death rates for groups of policyholders as determined by age, sex, tobacco use, etc. However, no column in the COI Solver workbooks contains Midland's mortality expectations. Although the base scale is loosely related to mortality expectations in that its values are larger in later policy years than in earlier policy years, the base scale does not itself constitute Midland's mortality expectations for any set of policyholder characteristics. *See* Bill Decl. ¶¶ 40–41, 63. Likewise, although the value of the Select Factor is generally larger for tobacco users than for non-tobacco users, the Select Factor does not reflect Midland's expectations regarding the effect of tobacco use on mortality. *Id.* ¶ 47 (stating that the Select Factor has no independent meaning). Removing the Add–On would leave the base scale multiplied by the Select Factor, but since neither the base scale nor the Select Factor (nor the product of the two) is based on Midland's mortality expectations, removing the Add–On from the rates produced by the COI Solver workbooks would not transform a rate scale that is not based exclusively on mortality expectations into one that is. Thus, even if Thao is correct on the merits and the policy language requires Midland to base its cost-of-insurance rates exclusively on mortality expectations, it would not follow that removing the Add–On would bring Midland's existing rates into line with that language.

*9 In an attempt to show that removal of the Add–On is consistent with her interpretation of the policy language, Thao contends that the Add–On represents a surcharge for Midland's "expenses." However, even if the Add–On were a surcharge for expenses, which it is not, [10] that would not change the fact that removing the Add–On from Midland's existing rates would not leave rates that are based exclusively on mortality expectations. No matter what the Add–On is or what it represents, it simply is not the case that removing the Add–On from Midland's current rates would produce rates based exclusively on mortality expectations. Again, since no part of the COI Solver workbooks is based on mortality expectations in the first place, removing the Add–On from those workbooks would not result in the creation of rates based exclusively on mortality expectations.

Thus, Thao's removal-of-the-Add–On remedy is not consistent with her interpretation of the policy language. And when we set that remedy aside, we can see that the class does not have a common claim against Midland. This is best illustrated by showing what would happen if Thao's interpretation of the policy language were adopted, as I do below.

Recall that under Thao's interpretation of the policy language, Midland's cost-of-insurance rates must be based exclusively on mortality expectations. There is one rate scale that Midland uses that is based exclusively on mortality expectations, and that is Midland's pricing-mortality rates. *See* Bill Decl. ¶ 53 (explaining that pricing-mortality rates are estimates of uncertain future death rates). [11] However, many class members would prefer Midland's current cost-of-insurance rates to rates based on Midland's pricing-mortality rates. In many (if not all) policies, Midland's current rates are higher than pricing-mortality rates during early policy years and lower than pricing-mortality rates in later policy years. *Id.* ¶ 50. That is because the design objectives for those policies called for charging a cost-of-insurance rate that is higher than expected mortality in early policy years in exchange for charging a rate that is lower than expected mortality in later policy years, as illustrated in the following graph:



This graph is for a particular policy design (UL–CV) and a particular permutation of policyholder characteristics (male, non-tobacco premium class, issue age forty-five, and specified amount falling within band two). What it shows is that until about the fifteenth policy year, Midland's current cost-of-insurance rates are higher than they would be if Midland had used its pricing-mortality rates as its cost-of-insurance rates. However, in later policy years, Midland's cost-of-insurance rates are lower than they would be if Midland had used its pricing-mortality rates. Many policyholders will prefer to pay higher rates in early policy years in exchange for lower rates later in life—that is, they will prefer the shape of the cost-of-insurance curve to the shape of the pricing-mortality curve. One reason why they may prefer the shape of the cost-of-insurance curve is that it has certain tax advantages. *Id.* In any event, whatever their motives may be, the fact is that some policyholders will prefer Midland's current cost-of-insurance rates to rates based on pricing mortality. Thus, many class members would prefer Midland's interpretation of the policy language to Thao's.

**\*10** In an effort to avoid this problem, Thao devised her removal-of-the-Add-On remedy, which basically results in bringing the cost-of-insurance rates down to pricing-mortality rates in early policy years but leaving the lower-than-pricing-mortality rates in place in later policy years. However, as already discussed, removing the Add–On from Midland's current rates is not a remedy that follows from Thao's interpretation of the policy language.

The problems identified above show that the class that Thao seeks to represent does not comprise policyholders with a common grievance against Midland. Instead, the class contains many policyholders who would prefer Midland's interpretation of the policy to Thao's. Thus, Thao's motion for class certification will be denied. To the extent that any individual policyholders feel that they are being injured by Midland's current cost-of-insurance rates, they must bring their own individual suits.

The remaining issue is Midland's motion to strike, which I can deal with quickly. Midland moves to strike the expert reports that Thao attached to her reply brief along with all arguments in the reply brief that are based on such reports on the ground that those materials should have appeared in Thao's opening brief rather than in her reply brief. However, I conclude that the reports and the arguments employing them were properly included in Thao's reply brief, as they are directly responsive to arguments made in Midland's brief in opposition and supporting materials.

Accordingly, **IT IS ORDERED** that Thao's motion for class certification is **DENIED.**

**IT IS FURTHER ORDERED** that Midland's motion to strike is **DENIED.**

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **June 7, 2012 at 11:00 a.m.** for the purpose of determining whether further proceedings are necessary. The parties should confer in advance of the call and be prepared to propose a plan for proceeding. Counsel must call the court at 414/297–1285 to advise of their participation.

Footnotes

1    Also before me is Midland's motion to strike the reports of Thao's expert witnesses and portions of her reply brief. I briefly address that motion at the end of this opinion.

2    Cost of Insurance = Cost-of-insurance rate x (Amount of death benefit-Amount of policy fund).

3    Midland generally uses three different "bands" for purposes of factoring the specified amount into its rates: (1) less than $100,000, (2) $100,000 to $1 million, and (3) over $1 million. *See* Bill Decl. ¶ 13, ECF No. 64. Thus, the table that Midland would use for Thao would be the table for female nonsmokers, band two.

4    As we will see, under Thao's theory, cost-of-insurance rates would be lower in early policy years than they are under Midland's current rates but the same as Midland's current rates in later policy years.

5    Even if this premise is true, this case might not be appropriate for class treatment. *See* Midland's Br. in Opp. at 14–16, ECF No. 61. However, since it turns out that this premise is false, I will not consider whether a class could be certified if the premise were true.

6    Pricing-mortality rates are estimates of uncertain future death rates. *See* Bill Decl. ¶ 53. Midland's actuaries develop such estimates and feed them into the pricing program during the pricing process. *Id.*

7    This label is misleading. As discussed, the base scale only approximates Midland's pricing-mortality rates. Thus, the numbers in the "Pricing Mortality" column are not the numbers that Midland would use if it were using its actual pricing-mortality rates as the base scale.

8    Note that the product of the value in the Pricing Mortality column and the value in the Select Factor column is rounded to two decimal places. Thus, in the UL–CV excerpt, in the first row the Pricing Mortality value is 0.06, the Select Factor value is 0.99, and the Product value is 0.06—i.e., 0.0594 rounded to two decimal places.

9    When Midland issues a policy, it attaches a table of guaranteed maximum cost-of-insurance rates. *See* Thao Policy, ECF No. 57–1 at 13–14. Midland guarantees that the policyholder's cost-of-insurance rate will never be higher than the specified maximum rates. The Composite Guarantee column in a COI Solver spreadsheet is intended to make sure that the spreadsheet does not produce a rate scale that includes rates that exceed the specified maximum.

10    Thao just asserts that the Add–On is a surcharge for expenses, and she has no evidence that supports her assertion. The only evidence in the record on whether the Add–On is a surcharge for expenses is in the declaration of the Midland actuary who invented the Add–On, and according to him the Add–On has nothing to do with expenses. *See* Bill Decl. ¶¶ 47–48, ECF No. 64.

11    Remember that Midland's pricing-mortality rates are not the rates that appear in the Pricing Mortality columns of the COI Solver workbooks.

---

**End of Document**            © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Unpublished Disposition

726 N.W.2d 356

See Rules of Appellate Procedure, Rule 809.23(3),
regarding citation of unpublished opinions.
Unpublished opinions issued before July 1, 2009, are
no precedential value and may not be cited except
in limited instances. Unpublished opinions issued on
or after July 1, 2009 may be cited for persuasive value.
NOTE: THIS OPINION WILL NOT APPEAR
IN A PRINTED VOLUME. THE DISPOSITION
WILL APPEAR IN A REPORTER TABLE.
Court of Appeals of Wisconsin.

Catherine D. NOONAN and Daniel
A. Noonan, Plaintiffs-Appellants,

v.

The NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, Doe A; Doe
B; Doe C; Insurer X; Insurer Y and
Insurer D, Defendants-Respondents.

No. 2005AP1683.    Nov. 16, 2006.

Appeal from an order of the circuit court for Milwaukee
County: Earl Schmidt, Judge. Affirmed.

Before DYKMAN, DEININGER and HIGGINBOTHAM,
JJ.

**Opinion**

¶ 1 DYKMAN, J.

*1 Catherine and Daniel Noonan (Noonans) appeal from
an order denying their motion for class certification in their
action for breach of contract and breach of fiduciary duty
against The Northwestern Mutual Life Insurance Company
(NML). Noonans contend that the circuit court erroneously
denied class certification because, on the facts in the record,
all three criteria for class certification are met and no facts
indicate a class action would be unmanageable. We conclude
that the circuit court's decision to deny class certification,
because a class action would be unmanageable, is supported
by the record, and is not an erroneous exercise of discretion.
Accordingly, we affirm.

**Background**

¶ 2 The following facts are taken from the circuit court's
decision to deny class certification. [1] NML sells financial
instruments, such as annuities and life insurance policies,
through independent agents throughout the United States. In
1976, Noonans purchased NML annuity contracts through
one of NML's agents, Daniel Madigan. The contracts
provided Noonans with a share of the divisible surplus of
NML, called "dividends."

¶ 3 When Noonans purchased their annuity contracts, most
of NML's financial instruments were invested in long-term
securities. However, in the early 1980s, high interest rates
caused some NML annuity owners to redeem their annuities
because short-term bonds were more lucrative. Because
their portfolio was uncompetitive in that market, in the
mid-1980s NML altered the basis for paying dividends for
their annuities, creating a "segmented account" that paid
dividends using a higher interest rate.

¶ 4 Noonans allege they first realized a change had been made
in the distribution of dividends for their NML annuities in
2000. They sued NML for breach of contract and breach of
fiduciary duty, seeking actual and punitive damages. After
we reversed the circuit court's judgment and order granting
NML's motion to dismiss, *see Noonan v. Northwestern Mut.
Life Ins. Co.,* 2004 WI App 154, ¶ 2, 276 Wis.2d 33, 687
N.W.2d 254, Noonans moved for class certification. The
parties briefed and argued the issue of class certification to
the circuit court, which denied the motion. Noonans appeal
from the denial of class certification. [2]

**Standard of Review**

¶ 5 We review a circuit court's denial of class certification
for an erroneous exercise of discretion. [3] *Sisters of St.
Mary v. AAER Sprayed Insulation,* 151 Wis.2d 708, 713,
445 N.W.2d 723 (Ct.App.1989) (citation omitted). "A trial
court properly exercises its discretion if it examines the
relevant facts, applies a proper legal standard and, using a
demonstrated rational process, reaches a conclusion that a
reasonable judge could reach." *Id.* (citation omitted). A proper
exercise of discretion relies on facts in the record or inferences
reasonably derived from the record. *Goberville v. Goberville,*
2005 WI App 58, ¶ 7, 280 Wis.2d 405, 694 N.W.2d 503
(citation omitted). Further, while a circuit court is required
to articulate its reasoning, we may look to the record to find
support for the circuit court's decision if that reasoning is not

clear. *Id.* (citing *Vier v. Vier,* 62 Wis.2d 636, 639-40, 215 N.W.2d 432 (1974)).

¶ 6 We are not persuaded by Noonans's recitation of federal cases demonstrating that some federal circuits give less deference to denials of class certification than other discretionary decisions. *See, e.g., Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993) (concluding that "abuse of discretion can be found more readily on appeals from the denial of class status than in other areas, for the courts have built a body of case law with respect to class action status") (citation omitted). We rely on Wisconsin case law, which compels us to grant a circuit court's findings as to the manageability of a class action "a wide range of discretion." *Sisters of St. Mary,* 151 Wis.2d at 714, 445 N.W.2d 723 (citation omitted).

**\*2** ¶ 7 We uphold a circuit court's discretionary decision unless discretion was erroneously exercised, even if the trial court did not make its reasoning clear and even if we would have reached a different decision ourselves. *See, e.g., Vier,* 62 Wis.2d at 641, 215 N.W.2d 432 (affirming circuit court even though it did not explain the reason for its decision and even though supreme court may have reached a different decision in its place, because circuit court's decision was not unreasonable).

### Discussion

¶ 8 Under WIS. STAT. § 803.08, a party seeking class certification must establish three elements: commonality, numerosity, and adequate representation. *See Sisters of St. Mary,* 151 Wis.2d at 713-14, 445 N.W.2d 723. In deciding whether to certify a class, the circuit court also addresses the basic question of manageability, determining "whether the advantages of disposing of the entire controversy in one proceeding are outweighed by the difficulties of combining divergent issues and persons." *Id.* at 714, 445 N.W.2d 723 (citations omitted). If all three elements of class certification are met, it is in the public interest to certify the class. *Id.* (citing *Mercury Records v. Econ. Consultants,* 91 Wis.2d 482, 490, 283 N.W.2d 613 (Ct.App.1979)). However, even if all three elements of class certification are met, a circuit court may deny certification if it reasonably determines that the case would be unmanageable as a class action. *Id.* at 715, 445 N.W.2d 723. Here, the parties do not dispute that the elements of numerosity and adequacy are met. They argue over whether commonality is met and whether the circuit court properly determined that the case would be unmanageable as a class action. We conclude that the court's decision that a class

action would be unmanageable in this case is supported by the facts in the record, and that it therefore properly exercised its discretion when it denied class certification.[4]

¶ 9 The determination of manageability is "primarily a factual one with which a [trial] court generally has a greater familiarity and expertise than does a court of appeals." *Id.* at 714, 445 N.W.2d 723. A circuit court, in determining class certification, must resolve "whether, considering the effect of all of the burdens [of class certification] together, which includes any synergistic effect those burdens may have, the burdens of a class action outweigh the benefits." *Id.* at 716, 445 N.W.2d 723. The court may consider difficulties it anticipates during discovery, trial, and jury verdict in reaching its decision on manageability. *See iid.* at 716-19.

¶ 10 Here, the circuit court identified choice of law and damages issues for plaintiffs from all fifty states who obtained their annuities under disparate scenarios as contributing to the unmanageability of a class action. Noonans argue that the circuit court erroneously relied on those factors and failed to weigh the potential benefits of a class action in determining that a class action would be unmanageable. We disagree.

**\*3** ¶ 11 Noonans first contest the circuit court's reliance on its finding that multiple states' laws may apply to various aspects of this case in determining that a class action would be unmanageable.[5] They argue that the circuit court's reliance on choice of law issues as a factor against class certification was an error of law because Wisconsin case law mandates that Wisconsin law apply to each issue in this case, relying on *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 270 Wis.2d 356, 677 N.W.2d 298. We disagree.

¶ 12 In *Beloit,* the supreme court concluded that, under WIS. STAT. § 180.1704 (1999-2000) and Wisconsin case law, Wisconsin law applied to an action for breach of fiduciary duty by a liquidating trust against a corporation incorporated in Delaware but domiciled in Wisconsin. *Beloit,* 270 Wis.2d 356, ¶¶ 1-3, 677 N.W.2d 298. In reaching that conclusion, the *Beloit* court first held that § 180.1704 put the Delaware corporation on notice that it would be subject to Wisconsin law if it transacted business in Wisconsin. *Id.,* ¶ 23. Then, the court explained that Wisconsin case law sets out two tests for determining choice of law. First, courts look to "whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling." *Id.,* ¶ 24 (citation omitted). Then, courts analyze the five factors set forth in *Heath v. Zellmer,* 35 Wis.2d 578, 595, 151 N.W.2d 664

(Ct.App.1967): "(1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." *Id.,* ¶ 25, 151 N.W.2d 664. The *Beloit* court concluded that both tests supported applying Wisconsin law. *Id.,* ¶¶ 24-32.

¶ 13 We are not convinced that *Beloit* mandates Wisconsin law apply uniformly in this case. First, neither test is as clearly met here as in *Beloit.* In *Beloit,* the first test was met because the corporation's contacts with Delaware were limited to incorporation and filing bankruptcy there while every other significant event occurred in Wisconsin, so that "application of Delaware law ... would constitute officious intermeddling with the laws of Wisconsin." *Id.,* ¶ 24. Here, in contrast, the putative class contains members who purchased annuities in all fifty states, from independent agents. Thus, the contacts of foreign states are not so minimal here as to exclude their laws as "officious intermeddling." The court also relied on the corporation's minimal contact with Delaware and its extensive contact with Wisconsin in concluding all five *Heath* factors were met. *Id.,* ¶¶ 26-31, 151 N.W.2d 664. Because the putative class members in this case are domiciled and purchased their annuities from agents in all fifty states, the *Heath* factors do not weigh as heavily toward the application of Wisconsin law as they did in *Beloit.* [6]

¶ 14 Noonans also rely on *Schlosser v. Allis-Chalmers Corp.,* 86 Wis.2d 226, 239, 271 N.W.2d 879 (1978) (*Schlosser II* ), in which the supreme court stated that Wisconsin "follows the 'grouping of contacts' approach to determine which state law applies to resolve questions of contract. By this method the law of the state with which the contract has its most significant relationship applies." [7] Noonans contend that because NML is a Wisconsin company, has its home office here, and manages annuities here, Wisconsin has the most significant relationship to the contracts in this case and thus Wisconsin law controls. However, as the circuit court noted, this case is distinguishable from *Schlosser II.* Here, each putative class member individually purchased their annuities, while in *Schlosser II,* the life insurance policy was issued as a term of employment. *See Id.* While the plaintiff class members in *Schlosser II* lived and worked in various states, they were all subject to the same master insurance plan purchased by Allis-Chalmers for their benefit. *Id.* at 235, 239-41, 271 N.W.2d 879. They all received the same letter notifying them of the change in their benefits. *Id.* at 235, 271 N.W.2d 879. Further, the *Schlosser II* court relied on the following comment in the Second Restatement of Conflict of Laws:

*\*4 h. Group life insurance.* In the case of group life insurance, rights against the insurer are usually governed by the law which governs the master policy. This is because it is desirable that each individual insured should enjoy the same privileges and protection. So where an employer arranges for group life insurance for its employees, the rights of a particular employee against the insurer will usually be determined, in the absence of an effective choice-of-law clause and at least as to most issues, not by the local law of the state where the employee was domiciled and received his certificate but rather by the law governing the master policy with respect to that issue. This will usually be the state where the employer has his principal place of business.

*Id.* at 239-40 n. 2, 271 N.W.2d 879 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 192 cmt. h (1971)). Here, there are more significant contacts with the various states involved than in *Schlosser II,* and thus a "grouping of contacts" inquiry requires a more arduous judicial task and its result is less certain.

¶ 15 In addition, the *Schlosser II* court identified the following five factors from § 188 of the Second Restatement following its explanation of the "grouping of contacts" rule: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188). Because the contracts at issue here were negotiated and purchased in various states and the putative class members continue to reside there, these factors do not clearly establish that Wisconsin law applies.

¶ 16 Noonans also contend that Wisconsin's statute of limitations necessarily applies to all class members, and therefore any concern the circuit court had over the application of various statutes of limitation was erroneous. [8] Noonans rely on *Abraham v. General Cas. Co. of Wisconsin,* 217 Wis.2d 294, 576 N.W.2d 46 (1998), which explains the "final significant event" test for determining which state's statute of limitations will apply for an action sounding in contract. [9] The *Abraham* court concluded that "a claim sounding in contract is a 'foreign cause of action' when the final significant event giving rise to a suable claim occurs outside the state of Wisconsin." *Id.* at 311, 576 N.W.2d 46. There, Abraham was a Wisconsin resident with an insurance policy issued by General Casualty, a Wisconsin corporation. *Id.* at 306, 576 N.W.2d 46. The insurance

contract was negotiated and issued in Wisconsin. *Id.* The only event that occurred outside of Wisconsin was the injury for which Abraham sought insurance coverage. *Id.* at 299-300, 576 N.W.2d 46. The ***Abraham*** court concluded that the Wisconsin statute of limitation applied because Abraham had a "suable claim" for breach of contract when General Casualty denied his claim for underinsured motorist benefits in Wisconsin, rather than when he was injured in Florida. *Id.* at 312-13, 576 N.W.2d 46.

*\*5* ¶ 17 ***Abraham,*** however, is distinguishable on its facts. Abraham had a cause of action when his benefits were denied. That occurred entirely in Wisconsin. General Casualty denied the benefits and Abraham was notified of that denial in Wisconsin. There was no complexity in determining that the "final significant event" giving rise to his suable claim thus occurred in Wisconsin. Here, the facts are more varied. The putative class members reside in all fifty states. Their suable claims arose when NML breached their contracts, if it did. But where, and when, did this "final significant event" occur? We, and the circuit court, are left with the ambiguity discussed in the concurring opinion in ***Abraham:***

> Does [the final significant event] occur in the state where the party in breach is located? Does it occur in the state wherein the injured party resides? Does it occur in the state where the ... contract was negotiated or purchased? Does it occur in the state from which the breach is communicated?

*Id.* at 315, 576 N.W.2d 46 (Bradley, J., concurring). The circuit court reasonably identified the resolution of such questions as to each putative class member, and the application of potentially differing statutes of limitations, as an obstacle to class certification.[10] The varied factual scenarios under which the plaintiffs entered into their contracts and then learned of NML's breach provide support for the court's conclusion that the potential application of various statutes of limitation contributed to the unmanageability of a class action.

¶ 18 Thus, Wisconsin law would not clearly apply to each aspect of a class action in this case, as the Noonans contend. On the motion for class certification, the parties briefed and argued the issue of which state's laws would apply, and the circuit court reasonably found that the varied factual scenarios for each putative class member rendered the determination and application of choice of law for all putative class members unmanageable. For example, as NML argues, whether NML owed each plaintiff a fiduciary duty would vary depending on the applicability of individual state laws.[11] As we held

in our previous decision in this case, Noonans's allegations state a claim for breach of fiduciary duty under Wisconsin law. *Noonan,* 276 Wis.2d 33, ¶¶ 19-26, 687 N.W.2d 254. Whether the other putative class members state a claim for breach of fiduciary duty under their respective state laws has not yet been decided. *See id.* (relying on Wisconsin law in determining that NML owes Noonans a fiduciary duty). If other states' laws control the breach of fiduciary duty claim in this case, the application of those potentially differing laws would certainly render this case unmanageable. *See, e.g., Sisters of St. Mary,* 151 Wis.2d at 718, 445 N.W.2d 723.

*\*6* ¶ 19 Also, the circuit court recognized that the application of different states' laws to the putative class members' breach of contract claims would prove unmanageable.[12] As NML correctly asserts, the states have widely differing rules for the interpretation of contracts, most significantly concerning parol evidence.[13] Thus, the determination of which state's laws apply for the interpretation of the contracts at issue, and the resulting application of those rules to the contracts of each putative class member, was a reasonable factor for the circuit court to consider.[14]

¶ 20 Because it is not clear from the record that Wisconsin law definitively controls, the circuit court was justified in identifying the forgoing choice of law concerns as rendering a class action unmanageable.[15] We therefore conclude that it did not erroneously exercise its discretion in relying on this factor.

¶ 21 Noonans also contend that the circuit court erred by considering individual agent/plaintiff relationships as relevant to a determination of individual damages. They contend that the cases on which the circuit court relied were limited to claims for fraudulent misrepresentation, thus necessitating an analysis of individual sales, while here the conduct of the home office, not the individual agents, is relevant. We conclude that the trial court correctly identified individual interactions between agents and purchasers as relevant to a determination of damages for Noonans's claims for breach of contract and breach of fiduciary duty.[16]

¶ 22 Contrary to Noonans's assertion, the federal cases on which the circuit court relied were not limited to actions for fraudulent misrepresentation. In *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 275-77 (W.D.Mo.2000), for example, the court found that the plaintiff's claims were too individualized and fact specific to support class certification for claims including fraudulent inducement,

breach of fiduciary duty, and breach of contract in connection with the defendant's sale of life insurance policies. The court explained that individual agent/purchaser interactions would be relevant to proving reliance in the fraudulent inducement claim, and would also be necessary for proving the existence of a fiduciary duty and interpreting the ambiguous insurance contract. *Id.* at 277-82.

¶ 23 In *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 219 (W.D.Mich.1998), the court denied class certification for plaintiffs' claims, including their claims for fraud, breach of fiduciary duty, and breach of contract for the defendant's sale of misleading insurance policies. The court found that class certification was inappropriate under FED.R.CIV.P. 23(b)(3) because plaintiffs had "failed to show that the disparate legal and factual issues posed by this case are manageable in trial." *Id.* at 223. In reaching this conclusion, the court explained that the class action would require introduction of agent/purchaser interactions, because "the information ... was generally communicated to consumers, if at all, through varying oral representations," so that "adjudication of the claims will ... unavoidably require individualized treatment." [17] *Id.* at 224.

 *7 ¶ 24 Here, the court found that a class action would entail the introduction of an unmanageable amount of evidence of agent/purchaser interactions to determine damages and affirmative defenses. [18] The circuit court had sufficient material from which to conclude that individual agent/purchaser interactions would need to be introduced during trial to determine damages, based on the varied factual scenarios under which individual plaintiffs obtained annuities and learned of the alleged breach. [19] Because the circuit court explained the factors it considered in determining the issue of individual damages would render a class action unmanageable, and reached a decision a reasonable judge could reach, we conclude it did not erroneously exercise its discretion in relying on this factor.

¶ 25 Further, Noonans assert that the circuit court erroneously disregarded the "common fund" method typically used in class actions in finding that the jury would have to determine damages as to each individual plaintiff. In support, Noonans argue that *Schlosser v. Allis-Chalmers Corp.,* 65 Wis.2d 153, 168-72, 222 N.W.2d 156 (1974) (*Schlosser I* ), compels class certification in this case. *Schlosser I,* however, is inapposite. In *Schlosser I,* the supreme court upheld the circuit court's determination that a class action could be maintained. *Id.* The *Schlosser I* court concluded that the circuit court reasonably

certified the class because it could easily resolve the issue of separately triable damages, and accordingly affirmed. Here, Noonans urge us to reverse the circuit court's denial of class certification, arguing that its finding that the potentially disparate damage awards contributed to the unmanageability of a class action was unreasonable. As in *Schlosser I,* we conclude that the circuit court's decision was reasonable and we therefore will not disturb it.

¶ 26 The circuit court found that a jury verdict would "inquire as to damages and not as to a formula" and that "[i]ndividual damage awards will have to be fleshed out for the jury." We are not convinced that the court's failure to specifically address a "common fund" method for determining damages for the class means that it erroneously exercised its discretion. Noonans thoroughly argued in their brief to the circuit court on their motion for class certification how they believed damage awards could be easily handled by the circuit court in a class action. [20] However, the circuit court concluded the issue of damages nonetheless contributed to the unmanageability of a class action. [21] A reasonable judge could conclude that despite the availability of case management techniques in determining damages, the complicated factual scenarios in this case under which those damages arose rendered a class action unmanageable. [22] As we explained in *Sisters of St. Mary:*

 *8 "Where the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation, the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created 'make the damage aspect of [the] case predominate,' and render the case unmanageable as a class action."

The trial court's conclusion that the present case falls into the latter category rather than the former is not unreasonable.

*Sisters of St. Mary's,* 151 Wis.2d at 720-21, 445 N.W.2d 723 (citations omitted).

¶ 27 Noonans also assert any reliance by the circuit court on affirmative defenses or mitigating factors for determining

damages-if NML can establish that any putative class members learned of the 1985 change to dividend distribution and accepted it-was erroneous because there was no record to support that finding. We disagree.

¶ 28 In its brief in opposition to class certification, NML argued that some of the putative class members either waived or are estopped from asserting claims because they knew of the 1985 change and accepted it. The record reflects that NML's independent agents had been informed of the change, and that it was the agents' job to communicate information to annuity owners. Thus, it was logical for the circuit court to infer that some agents had communicated the 1985 change in dividend distribution to their clients. If those putative class members knew of the change and accepted it, this would raise the issue of whether they waived their right to enforce the previous provisions, depending on which state's laws would apply. *See* 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 39:25 (4th ed.2000) (discussing differing states' views on waiver of contract provisions).

¶ 29 Finally, Noonans argue that the circuit court was required to balance the benefits and burdens of class action certification, and here ignored all the benefits in reaching its decision. However, on our review of the record, we conclude that Noonans adequately presented all those benefits to the circuit court for its consideration. [23] On our own review of those benefits and the burdens already explained, we conclude that a reasonable judge could find that class certification was nonetheless unmanageable in this case. Accordingly, we affirm.

**\*9**  Order affirmed.

Not recommended for publication in the official reports.

Parallel Citations

726 N.W.2d 356 (Table), 2006 WL 3314622 (Wis.App.), 2007 WI App 1

Footnotes

1    For a more detailed factual background, *see Noonan v. Northwestern Mut. Life Ins. Co.,* 2004 WI App 154, ¶¶ 3-9, 276 Wis.2d 33, 687 N.W.2d 254.

2    We granted Noonan's petition for leave to appeal the denial of class certification pursuant to WIS. STAT. § 808.03(2) (2003-04). All references to the Wisconsin Statutes are to the 2003-04 version unless otherwise noted.

3    Noonans concede that the standard of review for a denial of class certification is for an erroneous exercise of discretion, but assert that discretionary determinations based on erroneous views of the law are not given any deference. *See Consumer's Co-Op of Walworth County v. Olsen,* 142 Wis.2d 465, 473, 419 N.W.2d 211 (1988). This correctly states the erroneous exercise of discretion standard of review, but does not convince us to change that standard to a less deferential one. Because we conclude that the legal criteria for class certification were properly identified and applied to the facts in this case, we do not further question the circuit court's exercise of its discretion.

4    The circuit court said, in denying class certification: "Because the jury trial to determine the issues of breach of contract, breach of fiduciary duty, punitiveness and concomitant damages will not be manageable as a class action, the Court denies the motion." The court's ruling on commonality is not clear. However, because a court may deny certification because of unmanageability even if all the criteria for certification are met, the circuit court's denial of certification on a reasonable finding of unmanageability is dispositive. *See Sisters of St. Mary,* 151 Wis.2d at 715, 445 N.W.2d 723; *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 277 n. 5 (W.D.Mo.2000); *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 220 (W.D.Mich.1998); *Keyes v. Guardian Life Ins. Co. of Am.,* 194 F.R.D. 253, 256 (S.D.Miss.2000); *Parkhill v. Minnesota Mut. Life Ins. Co.,* 188 F.R.D. 332, 340 (D.Minn.1999). Thus, we need not determine whether commonality was met.

5    The parties do not contest that the policies at issue do not have a choice of law provision, and thus choice of law must be determined by case law.

6    We need not extensively analyze each factor under *Heath v. Zellmer,* 35 Wis.2d 578, 595, 151 N.W.2d 664 (Ct.App.1967), nor conclude which state's laws will apply to which issues in this case. For the purposes of concluding that the circuit court reasonably identified choice of law issues as contributing to the unmanageability of a class action, it suffices for us to distinguish this case from *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 270 Wis.2d 356, 677 N.W.2d 298, because this case is much less clearly governed solely by Wisconsin law.

7    As highlighted during oral arguments to this court, which test to follow when deciding choice of law in Wisconsin is less than clear. In *Schlosser v. Allis-Chalmers Corp.,* 86 Wis.2d 226, 239-40, 271 N.W.2d 879 (1970) (*Schlosser II* ), for example, the court stated it followed the "grouping of contacts" test but also relied on the five *Heath* factors. However, we need not resolve the state of choice of law in Wisconsin today. We conclude that under the various tests for choice of law identified and argued by the parties,

the circuit court did not erroneously exercise its discretion in relying on choice of law concerns in deciding a class action would be unmanageable.

8     The court said: "NML has concerns about the applicability of the other state laws. Noonans argue that the laws of the forty-nine other states where the contracts were actually sold are not relevant. Statutes of limitation, for example, may very well be relevant."

9     *Abraham v. General Cas. Co. of Wisconsin,* 217 Wis.2d 294, 296 n. 1, 576 N.W.2d 46 (1998) interpreted Wisconsin's borrowing statute, which states:

> **Application of foreign statutes of limitation. (1)** If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies has expired, no action may be maintained in this state.
>
> **(2)** If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies to that action has not expired, but the applicable Wisconsin period of limitation has expired, no action may be maintained in this state.
>
> *Id.*(quoting WIS. STAT. § 893.07 (1993-1994), which is identical to the current version).

10     *See, e.g.,* COLO.REV.STAT. ANN. § 13-80-101 (West 2006) (three-year statute of limitations for breach of contract in Colorado); CAL. CIV. PRO.CODE § 337 (West 2006) (four-year statue of limitation for breach of contract in California).

11     We note that the circuit court did not explain this reasoning for its decision. However, it did specifically find that a jury trial to determine breach of fiduciary duty would be unmanageable and later qualified this concern with choice of law for statutes of limitations with the phrase "for example," indicating other choice of law concerns were present. We conclude that such concerns were reasonable, and applied to the issue of fiduciary duties.

12     The court concluded that a jury trial to determine breach of contract would be unmanageable, and later said: "The Noonans also made shortshrift of other concerns NML have over commonality regarding equitable remedies the law has developed to take the harshness out of unambiguous contracts, e.g. waiver, estoppel, etc. These remedies may be applicable to any number of the proposed class depending on their individual facts." After stating its concern over choice of law issues, the court said: "The Court is not aware what the adversarial strategies of the parties will be, but it is more likely than not that many fact situations between clients and independent agents will be material and probative." While the court's reasoning is not clear from its opinion, we conclude on our own review of the record that the court was reasonable in concluding that the potential application of differing state laws to the interpretation of the contracts at issue contributed to the unmanageability of a class action.

13     We have decided that, under Wisconsin law, the Noonans's contracts are unambiguous in stating "that annuity policyholders 'will share in the divisible surplus of the Company' and the 'share shall be determined annually and credited as a dividend,' " and thus Noonans state a claim for breach of contract in their complaint. *Noonan,* 276 Wis.2d 33, ¶ 17, 687 N.W.2d 254. However, the states have developed different tests for determining whether a contract is ambiguous, and thus the absence of ambiguity under Wisconsin law does not necessarily translate into the absence of ambiguity if other states' laws apply. *See, e.g., Dieter v. Chrysler Corp.,* 2000 WI 45, ¶ 15, 234 Wis.2d 670, 610 N.W. 2. 832 ("Contractual language is ambiguous only when it is reasonably and fairly susceptible to more than one construction.") (citation omitted); *Bunkers v. Jacobson,* 653 N.W.2d 732, 738 (S.D.2002) ("Ambiguity exists when [the contract] is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.") (citation omitted); *Petovello v. Murray,* 139 Mich.App. 639, 362 N.W.2d 857, 858 (Mich.Ct.App.1984) ("It is a fundamental principal of law that, if the language of a written contract is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous, and a factual development is necessary to determine the intent of the parties."). Furthermore, the states have developed differing laws on the use of extrinsic evidence to help interpret contracts. *See, e.g., Jake C. Byers, Inc. v. J.B.C. Invs.,* 834 S.W.2d 806, 811 (Mo.Ct.App.1992) ("In the absence of fraud, accident, mistake, or duress, the parol evidence rule prohibits evidence of prior or contemporaneous oral agreements which vary or contradict the terms of an unambiguous, final and complete writing.") (citations omitted); *Mercury Inv. Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 529 (Okla.1985) ("While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of the agreement.") (citations omitted); *Hibbett Sporting Goods, Inc., v. Biernbaum,* 375 So.2d 431, 434 (Ala.1979) ("Where there exists doubt that the written agreement was ever intended to reflect the full agreement of the parties, the courts of this State have not hesitated to admit contradictory parol evidence of their true agreement.") (citations omitted).

14     We are not convinced by Noonans's assertion that the court was required to disregard the individual purchases of contracts and focus solely on the similarity of contract language among all putative class members. The circumstances under which each putative class member purchased annuities and where each "final significant event" occurred is relevant under Wisconsin law for determining which state's law to apply to a breach of contract claim. *See Abraham,* 217 Wis.2d at 315, 576 N.W.2d 46 (Bradley, J., concurring); *Schlosser II,* 86 Wis.2d at 239 n. 2, 271 N.W.2d 879.

15     The parties disagree over whether punitive damages are also a potential choice of law issue. Noonans contend that punitive damages are necessarily controlled by Wisconsin law while NML contends that they are not, claiming that such damages would be available under some states' laws and not others. We need not resolve this issue. The circuit court's order denying class certification does

not appear to consider punitive damages as a potential choice of law concern. Rather, the court specifies its concern over punitive damages as the issue of individual determinations, citing recent Wisconsin cases.

16    Manageability under WIS. STAT. § 803.08 mirrors the question of manageability under FED.R.CIV.P. 23(b)(3). *Sisters of St. Mary,* 151 Wis.2d at 713-14, 445 N.W.2d 723. The circuit court thus correctly relied for guidance on federal cases discussing class certification under FED.R.CIV.P. 23(b)(3).

17    *See also Parkhill,* 188 F.R.D. at 335, 342-45 (denying class certification for plaintiff's claims for breach of contract and breach of Minnesota's consumer protection statutes because both claims would require evidence of individual contract purchases).

18    The court was "especially concerned with the punitive damages question and award," noting that recent Wisconsin cases may indicate higher evidentiary standards for the defense of punitive damages. *See, e.g., Strenke v. Hogner,* 2005 WI 25, ¶¶ 38-41, 279 Wis.2d 52, 694 N.W.2d 296 (concluding that punitive damages in Wisconsin require that the defendant's actions were "deliberate," "actually disregard[ed] the rights of the plaintiff," and were "sufficiently aggravated to warrant punishment by punitive damages," thus requiring evidence establishing punitive damages are warranted by clear and convincing evidence). (Citations omitted.) Noonans contend that this is a non-issue because punitive damages are only available in Wisconsin on the breach of fiduciary duty claim, not on the claim for breach of contract, and focus exclusively on the actions of the top management. We again note that this argument fails because this case is not clearly governed solely by Wisconsin law. Further, we do not analyze this concern of the trial court in isolation, but together with the other burdens to class certification. In their entirety, those burdens support the circuit court's decision to deny class certification.

19    Both parties submitted documents detailing the method by which dividends were originally distributed under the Noonans's annuities and how the 1985 change affected dividend distribution. As already noted, the parties also agreed that the putative class contained members from all fifty states and that each purchased their annuities from independent agents.

20    Noonans argued:

> If the class makes a recovery by settlement or judgement, administration of the recovered fund occurs, in which the formula and procedure for distribution of the recovery among the class members are determined and implemented. 5 Newberg, ch. 10, 11. The administration and distribution process is usually handled by a court-appointed administrator.
>
> ....
>
> Any dollar differential between amounts due annuities, including both those still in the "deferral" period and those which have terminated or reached maturity since March 1, 1985, would in the normal course be recognized in the distribution formula applied in the administration of any Class recovery.

21    While the circuit court did not explain its analysis of those available methods for managing damages among the putative class, we conclude that is not fatal to its decision. We may look beyond the actual decision for support for a circuit court's exercise of its discretion. *See Vier v. Vier,* 62 Wis.2d 636, 639-40, 215 N.W.2d 432 (1974).

22    We also note that a circuit court may reasonably deny class certification despite the availability of case management techniques. *See Sisters of St. Mary,* 151 Wis.2d at 718, 445 N.W.2d 723.

23    Noonans argued:

> The actions of NML complained of here were directed against the Class, not individually against the named plaintiffs or any other individual member of the Class. The dividend rights of the entire Class were adversely impacted in the same, class-wide way. There are far too many injured annuity owners to even consider separate actions. The rights of the Class are in good hands. It would be unjust and against the public interest to deny class certification in these circumstances.

**End of Document**                                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.


--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

**H**

Only the Westlaw citation is currently available.

Supreme Court of the United States
**AMERICAN EXPRESS** CO., et al., Petitioners
v.
**ITALIAN COLORS** RESTAURANT et al.

No. 12–133.
Argued Feb. 27, 2013.
Decided June 20, 2013.

**Background:** Merchants filed class action antitrust suit against charge-card issuer. The United States District Court for the Southern District of New York, George B. Daniels, J., 2006 WL 662341, granted issuer's motion to compel arbitration and dismissed the underlying claims. Merchants appealed. The United States Court of Appeals for the Second Circuit, Pooler, Circuit Judge, 554 F.3d 300, reversed, finding that class-action waiver provision contained in mandatory arbitration clause in card acceptance agreement was unenforceable. Issuer petitioned for writ of certiorari. The Supreme Court granted writ, ––– U.S. ––––, 130 S.Ct. 2401, 176 L.Ed.2d 920, and vacated and remanded for reconsideration in light of its decision in *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.* The Court of Appeals, Pooler, Circuit Judge, 634 F.3d 1, again reversed the district court, but placed a hold on mandate in order for issuer to petition for writ of certiorari. While mandate was on hold, Supreme Court issued its decision in *AT&T Mobility LLC v. Concepcion,* ––– U.S. ––––, 131 S.Ct. 1740, 179 L.Ed.2d 742, addressing the issue of class-action waivers. The Court of Appeals, Pooler, Circuit Judge, 667 F.3d 204, again reversed the district court and remanded with instructions, and reconsideration en banc was denied, 681 F.3d 139. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held that:

(1) no contrary congressional command overrode the overarching principle, reflected in the text of the Federal Arbitration Act (FAA), that arbitration was a matter of contract, as would require a court to reject merchants' contractual waiver of class arbitration, and

(2) judge-made exception to FAA's enforcement of arbitration agreements did not apply to merchants' contractual waiver of class arbitration.

Court of Appeals reversed.

Justice Thomas filed a concurring opinion.

Justice Kagan filed a dissenting opinion, in which Justices Ginsburg and Breyer joined.

Justice Sotomayor took no part in the consideration or decision of the case.

West Headnotes

**[1] Alternative Dispute Resolution 25T** 🔑114

25T Alternative Dispute Resolution
　25TII Arbitration
　　25TII(A) Nature and Form of Proceeding
　　　25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases

The text of the Federal Arbitration Act (FAA) reflects the overarching principle that arbitration is a matter of contract, and consistent with that text, courts must rigorously enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes, and the rules under which that arbitration will

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

be conducted. 9 U.S.C.A. § 2.

**[2] Alternative Dispute Resolution 25T ☞112**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk112 k. Contractual or Consensual Basis. Most Cited Cases

    The overarching principle, reflected in the text of the Federal Arbitration Act (FAA), that arbitration is a matter of contract holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been overridden by a contrary congressional command. 9 U.S.C.A. § 2.

**[3] Alternative Dispute Resolution 25T ☞134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most Cited Cases

    No contrary congressional command overrode the overarching principle, reflected in the text of the Federal Arbitration Act (FAA), that arbitration was a matter of contract, as would require the court to reject merchants' waiver of class arbitration in their contract with charge-card issuer, which waiver the issuer sought to enforce with respect to merchants' federal antitrust claims against issuer; even if costs for merchants to individually arbitrating their antitrust claims exceeded potential recovery for each merchant, federal antitrust laws did not guarantee an affordable procedural path to the vindication of every claim or evince an intention to preclude a waiver of class-action procedure, and congressional approval of the federal rule of civil procedure allowing class proceedings did not establish an entitlement to class proceedings for the vindication of statutory rights. 9 U.S.C.A. § 2; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Statutes 361 ☞1075**

361 Statutes
    361III Construction
        361III(A) In General
            361k1074 Purpose
                361k1075 k. In General. Most Cited Cases

    No legislation pursues its purposes at all costs.

**[5] Federal Civil Procedure 170A ☞181.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak181.5 k. Antitrust Plaintiffs. Most Cited Cases

    The federal antitrust laws do not evince an intention to preclude a waiver of class-action procedure. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[6] Alternative Dispute Resolution 25T ☞251**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(F) Arbitration Proceedings
            25Tk251 k. Mode and Course of Proceedings in General. Most Cited Cases

    Congressional approval of the federal rule of civil procedure allowing class proceedings did not establish an entitlement to class proceedings, in arbitration, for the vindication of statutory rights. Fed.Rules

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

Civ.Proc.Rule 23, 28 U.S.C.A.

**[7] Alternative Dispute Resolution 25T ⇌251**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(F) Arbitration Proceedings
     25Tk251 k. Mode and Course of Proceedings in General. Most Cited Cases

Federal law does not secure a nonwaivable opportunity to vindicate federal policies in arbitration by satisfying the procedural strictures for class certification or by invoking some other informal class mechanism in arbitration. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[8] Alternative Dispute Resolution 25T ⇌134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(B) Agreements to Arbitrate
     25Tk131 Requisites and Validity
     25Tk134 Validity
     25Tk134(1) k. In General. Most Cited Cases

Judge-made exception to overarching principle reflected in text of Federal Arbitration Act (FAA) that arbitration is a matter of contract, which exception allows courts to invalidate arbitration agreements that prevent effective vindication of a federal statutory right, finds its origin in the desire to prevent prospective waiver of a party's right to pursue statutory remedies, and the exception certainly covers a provision in an arbitration agreement forbidding the assertion of certain statutory rights, and perhaps covers filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable, but the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy. 9

U.S.C.A. § 2.

**[9] Alternative Dispute Resolution 25T ⇌134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(B) Agreements to Arbitrate
     25Tk131 Requisites and Validity
     25Tk134 Validity
     25Tk134(1) k. In General. Most Cited Cases

Judge-made exception to overarching principle reflected in text of Federal Arbitration Act (FAA) that arbitration is a matter of contract, which exception allowed courts to invalidate arbitration agreements that prevented effective vindication of a federal statutory right, did not apply to merchants' waiver of class arbitration in their contract with charge-card issuer, which waiver the issuer sought to enforce with respect to merchants' federal antitrust claims against issuer; exception originated in desire to prevent prospective waiver of a party's right to pursue statutory remedies, but merchants' allegation that it was not worth the expense involved in individually proving their federal statutory remedies did not eliminate the right to pursue those remedies, and class-action waiver merely limited arbitration to the two contracting parties. 9 U.S.C.A. § 2.

**[10] Alternative Dispute Resolution 25T ⇌134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(B) Agreements to Arbitrate
     25Tk131 Requisites and Validity
     25Tk134 Validity
     25Tk134(1) k. In General. Most Cited Cases

The Federal Arbitration Act's (FAA) command to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims, since that interest is unrelated to the FAA. 9 U.S.C.A. § 2.

[11] Alternative Dispute Resolution 25T ⚖114

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
        25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases

The Federal Arbitration Act (FAA) favors the absence of litigation when that is the consequence of a contractual class-action waiver, since the FAA's principal purpose is the enforcement of arbitration agreements according to their terms. 9 U.S.C.A. § 2.

*Syllabus* FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1** An agreement between petitioners, American Express and a subsidiary, and respondents, merchants who accept American Express cards, requires all of their disputes to be resolved by arbitration and provides that there "shall be no right or authority for any Claims to be arbitrated on a class action basis." Respondents nonetheless filed a class action, claiming that petitioners violated § 1 of the Sherman Act and seeking treble damages for the class under § 4 of the Clayton Act. Petitioners moved to compel individual arbitration under the Federal Arbitration Act (FAA), but respondents countered that the cost of expert analysis necessary to prove the antitrust claims would greatly exceed the maximum recovery for an individual plaintiff. The District Court granted the motion

and dismissed the lawsuits. The Second Circuit reversed and remanded, holding that because of the prohibitive costs respondents would face if they had to arbitrate, the class-action waiver was unenforceable and arbitration could not proceed. The Circuit stood by its reversal when this Court remanded in light of *Stolt–Nielsen S.A. v. AnimalFeeds International Corp.,* 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605, which held that a party may not be compelled to submit to class arbitration absent an agreement to do so.

*Held* : The FAA does not permit courts to invalidate a contractual waiver of class arbitration on the ground that the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery. Pp. ——– ——.

(a) The FAA reflects the overarching principle that arbitration is a matter of contract. See *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, ——, 130 S.Ct. 2772, 177 L.Ed.2d 403. Courts must "rigorously enforce" arbitration agreements according to their terms, *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158, even for claims alleging a violation of a federal statute, unless the FAA's mandate has been " 'overridden by a contrary congressional command,' " *CompuCredit Corp. v. Greenwood,* 565 U.S. ——, ——, 132 S.Ct. 665, 181 L.Ed.2d 586. Pp. —— – ——.

(b) No contrary congressional command requires rejection of the class-arbitration waiver here. The antitrust laws do not guarantee an affordable procedural path to the vindication of every claim, see *Rodriguez v. United States,* 480 U.S. 522, 525–526, 107 S.Ct. 1391, 94 L.Ed.2d 533, or "evince an intention to preclude a waiver" of class-action procedure, *Mitsubishi Motors Corp. v. Soler–Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444. Nor does congressional approval of Federal Rule of Civil Procedure 23 estab-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

lish an entitlement to class proceedings for the vindication of statutory rights. The Rule imposes stringent requirements for certification that exclude most claims, and this Court has rejected the assertion that the class-notice requirement must be dispensed with because the "prohibitively high cost" of compliance would "frustrate [plaintiff's] attempt to vindicate the policies underlying the antitrust" laws, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 167–168, 175–176, 94 S.Ct. 2140, 40 L.Ed.2d 732. Pp. —— – ——.

(c) The "effective vindication" exception that originated as dictum in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444, also does not invalidate the instant arbitration agreement. The exception comes from a desire to prevent "prospective waiver of a party's right to pursue statutory remedies," *id., at* 637, n. 19, 105 S.Ct. 3346; but the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy. Cf. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 32, 111 S.Ct. 1647, 114 L.Ed.2d 26; *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 530, 534, 115 S.Ct. 2322, 132 L.Ed.2d 462. *AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742, all but resolves this case. There, in finding that a law that conditioned enforcement of arbitration on the availability of class procedure interfered with fundamental arbitration attributes, *id., at* ——, 131 S.Ct. 1740, the Court specifically rejected the argument that class arbitration was necessary to prosecute claims "that might otherwise slip through the legal system," *id., at* ——, 131 S.Ct. 1740. Pp. —— – ——.

**\*2** 667 F.3d 204, reversed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion. KAGAN, J., filed a dissenting opinion,

in which GINSBURG and BREYER, JJ., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.

Michael Kellogg, Washington, DC, for Petitioners.

Paul D. Clement, Washington, DC, for Respondents.

Malcolm L. Stewart, for the United States as amicus curiae, by special leave of the Court, supporting the Respondents.

Louise M. Parent, Mark G. Califano, Bernadette Miragliotta, American Express Travel Related Services, Inc., New York, NY, Julia B. Strickland, Stroock & Stroock & Lavan LLP, Los Angeles, CA, Michael K. Kellogg, Counsel of Record, Derek T. Ho, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, for Petitioners.

Deepak Gupta, Brian Wolfman, Gregory A. Beck, Jonathan E. Taylor, Gupta Beck PLLC, Washington, DC, Paul D. Clement, Counsel of Record, Michael H. McGinley, Bancroft PLLC, Washington, DC, for Respondents.

For U.S. Supreme Court Briefs, See:2012 WL 6755152 (Pet.Brief)2013 WL 267025 (Resp.Brief)

Justice SCALIA delivered the opinion of the Court.

We consider whether a contractual waiver of class arbitration is enforceable under the Federal Arbitration Act when the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery.

I

Respondents are merchants who accept American Express cards. Their agreement with petitioners—American Express and a wholly owned subsidiary—contains a clause that requires all disputes between the parties to be resolved by arbitration. The agreement also provides that "[t]here shall be no right

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

or authority for any Claims to be arbitrated on a class action basis." *In re American Express Merchants' Litigation,* 667 F.3d 204, 209 (C.A.2 2012).

Respondents brought a class action against petitioners for violations of the federal antitrust laws. According to respondents, American Express used its monopoly power in the market for charge cards to force merchants to accept credit cards at rates approximately 30% higher than the fees for competing credit cards.[FN1] This tying arrangement, respondents said, violated § 1 of the Sherman Act. They sought treble damages for the class under § 4 of the Clayton Act.

> FN1. A charge card requires its holder to pay the full outstanding balance at the end of a billing cycle; a credit card requires payment of only a portion, with the balance subject to interest.

**\*3** Petitioners moved to compel individual arbitration under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* In resisting the motion, respondents submitted a declaration from an economist who estimated that the cost of an expert analysis necessary to prove the antitrust claims would be "at least several hundred thousand dollars, and might exceed $1 million," while the maximum recovery for an individual plaintiff would be $12,850, or $38,549 when trebled. App. 93. The District Court granted the motion and dismissed the lawsuits. The Court of Appeals reversed and remanded for further proceedings. It held that because respondents had established that "they would incur prohibitive costs if compelled to arbitrate under the class action waiver," the waiver was unenforceable and the arbitration could not proceed. *In re American Express Merchants' Litigation,* 554 F.3d 300, 315–316 (C.A.2 2009).

We granted certiorari, vacated the judgment, and remanded for further consideration in light

of *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), which held that a party may not be compelled to submit to class arbitration absent an agreement to do so. *American Express Co. v. Italian Colors Restaurant,* 559 U.S. 1103, 130 S.Ct. 2401, 176 L.Ed.2d 920 (2010). The Court of Appeals stood by its reversal, stating that its earlier ruling did not compel class arbitration. *In re American Express Merchants' Litigation,* 634 F.3d 187, 200 (C.A.2 2011). It then *sua sponte* reconsidered its ruling in light of *AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), which held that the FAA pre-empted a state law barring enforcement of a class-arbitration waiver. Finding *AT&T Mobility* inapplicable because it addressed pre-emption, the Court of Appeals reversed for the third time. 667 F.3d, at 213. It then denied rehearing en banc with five judges dissenting. *In re American Express Merchants' Litigation,* 681 F.3d 139 (C.A.2 2012). We granted certiorari, 568 U.S. ——, 133 S.Ct. 594, 184 L.Ed.2d 390 (2012), to consider the question "[w]hether the Federal Arbitration Act permits courts ... to invalidate arbitration agreements on the ground that they do not permit class arbitration of a federal-law claim," Pet. for Cert. i.

## II

**\*4** [1][2] Congress enacted the FAA in response to widespread judicial hostility to arbitration. See *AT&T Mobility, supra,* at ——, 131 S.Ct., at 1745. As relevant here, the Act provides:

> "A written provision in any maritime transaction or contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

This text reflects the overarching principle that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

R-App 691

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

arbitration is a matter of contract. See *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, ——, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010). And consistent with that text, courts must "rigorously enforce" arbitration agreements according to their terms, *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), including terms that "specify *with whom* [the parties] choose to arbitrate their disputes," *Stolt–Nielsen, supra,* at 683, 130 S.Ct. 1758, and "the rules under which that arbitration will be conducted," *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). That holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been ' "overridden by a contrary congressional command.' " *CompuCredit Corp. v. Greenwood,* 565 U.S. ——, ——, 132 S.Ct. 665, 668–669, 181 L.Ed.2d 586 (2012) (quoting *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)).

### III

[3][4] No contrary congressional command requires us to reject the waiver of class arbitration here. Respondents argue that requiring them to litigate their claims individually—as they contracted to do—would contravene the policies of the antitrust laws. But the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim. Congress has taken some measures to facilitate the litigation of antitrust claims—for example, it enacted a multiplied-damages remedy. See 15 U.S.C. § 15 (treble damages). In enacting such measures, Congress has told us that it is willing to go, in certain respects, beyond the normal limits of law in advancing its goals of deterring and remedying unlawful trade practice. But to say that Congress must have intended whatever departures from those normal limits advance antitrust goals is simply irrational. "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States,* 480 U.S. 522, 525–526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (*per curiam* ).

[5] The antitrust laws do not "evinc[e] an intention to preclude a waiver" of class-action procedure. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The Sherman and Clayton Acts make no mention of class actions. In fact, they were enacted decades before the advent of Federal Rule of Civil Procedure 23, which was "designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The parties here agreed to arbitrate pursuant to that "usual rule," and it would be remarkable for a court to erase that expectation.

[6][7] Nor does congressional approval of Rule 23 establish an entitlement to class proceedings for the vindication of statutory rights. To begin with, it is likely that such an entitlement, invalidating private arbitration agreements denying class adjudication, would be an "abridg[ment]" or "modif[ication]" of a "substantive right" forbidden to the Rules, see 28 U.S.C. § 2072(b). But there is no evidence of such an entitlement in any event. The Rule imposes stringent requirements for certification that in practice exclude most claims. And we have specifically rejected the assertion that one of those requirements (the class-notice requirement) must be dispensed with because the "prohibitively high cost" of compliance would "frustrate [plaintiff's] attempt to vindicate the policies underlying the antitrust" laws. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 166–168, 175–176, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). One might respond, perhaps, that federal law secures a nonwaivable *opportunity* to vindicate federal policies by satisfying the procedural strictures of Rule 23 or invoking some other informal class mechanism in arbitration. But we have already rejected that proposition in *AT&T Mobility,* 563 U.S., at ——, 131 S.Ct., at 1748.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

IV

**\*5** Our finding of no "contrary congressional command" does not end the case. Respondents invoke a judge-made exception to the FAA which, they say, serves to harmonize competing federal policies by allowing courts to invalidate agreements that prevent the "effective vindication" of a federal statutory right. Enforcing the waiver of class arbitration bars effective vindication, respondents contend, because they have no economic incentive to pursue their antitrust claims individually in arbitration.

The "effective vindication" exception to which respondents allude originated as dictum in *Mitsubishi Motors,* where we expressed a willingness to invalidate, on "public policy" grounds, arbitration agreements that "operat [e] ... as a prospective waiver of a party's *right to pursue* statutory remedies." *473 U.S., at 637, n. 19, 105 S.Ct. 3346* (emphasis added). Dismissing concerns that the arbitral forum was inadequate, we said that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id., at 637, 105 S.Ct. 3346.* Subsequent cases have similarly asserted the existence of an "effective vindication" exception, see, *e.g., 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 273–274, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009)*; *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)*, but have similarly declined to apply it to invalidate the arbitration agreement at issue.[FN2]

> **FN2.** Contrary to the dissent's claim, *post,* at ——— – ———, and n. 3 (opinion of KAGAN, J.), the Court in *Mitsubishi Motors* did not hold that federal statutory claims are subject to arbitration so long as the claimant may effectively vindicate his rights in the arbitral forum. The Court expressly stated that, "at this stage in the proceedings," it had "no occasion to speculate" on whether the arbitration agreement's potential deprivation of a

claimant's right to pursue federal remedies may render that agreement ble. *473 U.S., at 637, n. 19, 105 S.Ct. 3346.* Even the Court of Appeals in this case recognized the relevant language in *Mitsubishi Motors* as dicta. *In re American Express Merchants' Litigation, 667 F.3d 204, 214 (C.A.2 2012).*

[8][9] And we do so again here. As we have described, the exception finds its origin in the desire to prevent "prospective waiver of a party's *right to pursue* statutory remedies," *Mitsubishi Motors, supra, at 637, n. 19, 105 S.Ct. 3346* (emphasis added). That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights. And it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable. See *Green Tree Financial Corp.–Ala. v. Randolph, 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)* ("It may well be that the existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights"). But the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy. See *681 F.3d, at 147* (Jacobs, C.J., dissenting from denial of rehearing en banc).[FN3] The class-action waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938, see *Fed. Rule Civ. Proc. 23, 28 U.S.C., p. 864 (1938 ed., Supp V)*; *7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1752, p. 18 (3d ed. 2005)*. Or, to put it differently, the individual suit that was considered adequate to assure "effective vindication" of a federal right before adoption of class-action procedures did not suddenly become "ineffective vindication" upon their adoption.[FN4]

> **FN3.** The dissent contends that a class-action

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

waiver may deny a party's right to pursue statutory remedies in the same way as a clause that bars a party from presenting economic testimony. See *post,* at ——, ——. That is a false comparison for several reasons: To begin with, it is not a given that such a clause would constitute an impermissible waiver; we have never considered the point. But more importantly, such a clause, assuming it makes vindication of the claim impossible, makes it impossible not just as a class action but even as an individual claim.

FN4. Who can disagree with the dissent's assertion that "the effective-vindication rule asks about the world today, not the world as it might have looked when Congress passed a given statute"? *Post,* at ——. But time does not change the meaning of effectiveness, making ineffective vindication today what was effective vindication in the past. The dissent also says that the agreement bars other forms of cost sharing—existing before the Sherman Act—that could provide effective vindication. See *post,* at —— – ——, and n. 5. Petitioners denied that, and that is not what the Court of Appeals decision under review here held. It held that, because other forms of cost sharing were not economically feasible ("the *only economically feasible* means for ... enforcing [respondents'] statutory rights is *via a class action* "), the class-action waiver was unenforceable. 667 F.3d, at 218 (emphasis added). (The dissent's assertion to the contrary cites not the opinion on appeal here, but an earlier opinion that was vacated. See *In re American Express Merchants' Litigation,* 554 F.3d 300 (C.A.2 2009), vacated and remanded, 559 U.S. 1103, 130 S.Ct. 2401, 176 L.Ed.2d 920 (2010).) That is the conclusion we reject.

**\*6** A pair of our cases brings home the point.

In *Gilmer, supra,* we had no qualms in enforcing a class waiver in an arbitration agreement even though the federal statute at issue, the Age Discrimination in Employment Act, expressly permitted collective actions. We said that statutory permission did " 'not mean that individual attempts at conciliation were intended to be barred.' " *Id., at 32, 111 S.Ct. 1647.* And in *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995), we held that requiring arbitration in a foreign country was compatible with the federal Carriage of Goods by Sea Act. That legislation prohibited any agreement " 'relieving' " or " 'lessening' " the liability of a carrier for damaged goods, *id., at 530, 534, 115 S.Ct. 2322* (quoting 46 U.S.C.App. § 1303(8) (1988 ed.))—which is close to codification of an "effective vindication" exception. The Court rejected the argument that the "inconvenience and costs of proceeding" abroad "lessen[ed]" the defendants' liability, stating that "[i]t would be unwieldy and unsupported by the terms or policy of the statute to require courts to proceed case by case to tally the costs and burdens to particular plaintiffs in light of their means, the size of their claims, and the relative burden on the carrier." 515 U.S., at 532, 536, 115 S.Ct. 2322. Such a "tally[ing] [of] the costs and burdens" is precisely what the dissent would impose upon federal courts here.

[10][11] Truth to tell, our decision in *AT&T Mobility* all but resolves this case. There we invalidated a law conditioning enforcement of arbitration on the availability of class procedure because that law "interfere [d] with fundamental attributes of arbitration." 563 U.S., at ——, 131 S.Ct., at 1748. "[T]he switch from bilateral to class arbitration," we said, "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id., at ——, 131 S.Ct., at 1751.* We specifically rejected the argument that class arbitration was necessary to prosecute claims "that might otherwise slip through the legal system." *Id., at ——,*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

131 S.Ct., at 1753.[FN5]

> **FN5.** In dismissing *AT&T Mobility* as a case involving pre-emption and not the effective-vindication exception, the dissent ignores what that case established—that the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims. The latter interest, we said, is "unrelated" to the FAA. 563 U.S., at ——, 131 S.Ct., at 1752–1753. Accordingly, the FAA does, contrary to the dissent's assertion, see *post,* at ——, favor the absence of litigation when that is the consequence of a class-action waiver, since it is " 'principal purpose' " is the enforcement of arbitration agreements according to their terms. 563 U.S., at ——, 131 S.Ct., at 1748 (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 487, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).

3

**\*7** The regime established by the Court of Appeals' decision would require—before a plaintiff can be held to contractually agreed bilateral arbitration—that a federal court determine (and the parties litigate) the legal requirements for success on the merits claim-by-claim and theory-by-theory, the evidence necessary to meet those requirements, the cost of developing that evidence, and the damages that would be recovered in the event of success. Such a preliminary litigating hurdle would undoubtedly destroy the prospect of speedy resolution that arbitration in general and bilateral arbitration in particular was meant to secure. The FAA does not sanction such a judicially created superstructure.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

Justice SOTOMAYOR took no part in the consideration or decision of this case.

Justice THOMAS, concurring.

I join the Court's opinion in full. I write separately to note that the result here is also required by the plain meaning of the Federal Arbitration Act. In *AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), I explained that "the FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress." *Id.,* at ——, 131 S.Ct., at 1753 (concurring opinion). In this case, Italian Colors makes two arguments to support its conclusion that the arbitration agreement should not be enforced. First, it contends that enforcing the arbitration agreement "would contravene the policies of the antitrust laws." *Ante,* at ——. Second, it contends that a court may "invalidate agreements that prevent the 'effective vindication' of a federal statutory right." *Ante,* at ——. Neither argument "concern[s] whether the contract was properly made," *Concepcion, supra,* at ——, 131 S.Ct., at 1756 (THOMAS, J., concurring). Because Italian Colors has not furnished "grounds ... for the revocation of any contract," 9 U.S.C. § 2, the arbitration agreement must be enforced. Italian Colors voluntarily entered into a contract containing a bilateral arbitration provision. It cannot now escape its obligations merely because the claim it wishes to bring might be economically infeasible.

Justice KAGAN, with whom Justice GINSBURG and Justice BREYER join, dissenting.

**\*8** Here is the nutshell version of this case, unfortunately obscured in the Court's decision. The owner of a small restaurant (Italian Colors) thinks that American Express (Amex) has used its monopoly power to force merchants to accept a form contract

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

violating the antitrust laws. The restaurateur wants to challenge the allegedly unlawful provision (imposing a tying arrangement), but the same contract's arbitration clause prevents him from doing so. That term imposes a variety of procedural bars that would make pursuit of the antitrust claim a fool's errand. So if the arbitration clause is enforceable, Amex has insulated itself from antitrust liability—even if it has in fact violated the law. The monopolist gets to use its monopoly power to insist on a contract effectively depriving its victims of all legal recourse.

And here is the nutshell version of today's opinion, admirably flaunted rather than camouflaged: Too darn bad.

That answer is a betrayal of our precedents, and of federal statutes like the antitrust laws. Our decisions have developed a mechanism—called the effective-vindication rule—to prevent arbitration clauses from choking off a plaintiff's ability to enforce congressionally created rights. That doctrine bars applying such a clause when (but only when) it operates to confer immunity from potentially meritorious federal claims. In so doing, the rule reconciles the Federal Arbitration Act (FAA) with all the rest of federal law—and indeed, promotes the most fundamental purposes of the FAA itself. As applied here, the rule would ensure that Amex's arbitration clause does not foreclose Italian Colors from vindicating its right to redress antitrust harm.

The majority barely tries to explain why it reaches a contrary result. It notes that we have not decided this exact case before—neglecting that the principle we have established fits this case hand in glove. And it concocts a special exemption for class-arbitration waivers—ignoring that this case concerns much more than that. Throughout, the majority disregards our decisions' central tenet: An arbitration clause may not thwart federal law, irrespective of exactly how it does so. Because the Court today prevents the effective vindication of federal statutory rights, I respectfully

dissent.

I

Start with an uncontroversial proposition: We would refuse to enforce an exculpatory clause insulating a company from antitrust liability—say, "Merchants may bring no Sherman Act claims"—even if that clause were contained in an arbitration agreement. See *ante,* at ——. Congress created the Sherman Act's private cause of action not solely to compensate individuals, but to promote "the public interest in vigilant enforcement of the antitrust laws." *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). Accordingly, courts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or any other contract. See *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, and n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The same rule applies to other important federal statutory rights. See *14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 273, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009) (Age Discrimination in Employment Act); *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (Fair Labor Standards Act). But its necessity is nowhere more evident than in the antitrust context. Without the rule, a company could use its monopoly power to protect its monopoly power, by coercing agreement to contractual terms eliminating its antitrust liability.

If the rule were limited to baldly exculpatory provisions, however, a monopolist could devise numerous ways around it. Consider several alternatives that a party drafting an arbitration agreement could adopt to avoid antitrust liability, each of which would have the identical effect. On the front end: The agreement might set outlandish filing fees or establish an absurd (*e.g.,* one-day) statute of limitations, thus preventing a claimant from gaining access to the arbitral forum. On the back end: The agreement might remove the arbitrator's authority to grant meaningful

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

relief, so that a judgment gets the claimant nothing worthwhile. And in the middle: The agreement might block the claimant from presenting the kind of proof that is necessary to establish the defendant's liability—say, by prohibiting any economic testimony (good luck proving an antitrust claim without that!). Or else the agreement might appoint as an arbitrator an obviously biased person—say, the CEO of Amex. The possibilities are endless—all less direct than an express exculpatory clause, but no less fatal. So the rule against prospective waivers of federal rights can work only if it applies not just to a contract clause explicitly barring a claim, but to others that operate to do so.

**\*9** And sure enough, our cases establish this proposition: An arbitration clause will not be enforced if it prevents the effective vindication of federal statutory rights, however it achieves that result. The rule originated in *Mitsubishi,* where we held that claims brought under the Sherman Act and other federal laws are generally subject to arbitration. *473 U.S., at 628, 105 S.Ct. 3346.* By agreeing to arbitrate such a claim, we explained, "a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Ibid.* But crucial to our decision was a limiting principle, designed to safeguard federal rights: An arbitration clause will be enforced only "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." *Id., at 637, 105 S.Ct. 3346.* If an arbitration provision "operated ... as a prospective waiver of a party's right to pursue statutory remedies," we emphasized, we would "condemn[ ]" it. *Id., at 637, n. 19, 105 S.Ct. 3346.* Similarly, we stated that such a clause should be "set [ ] aside" if "proceedings in the contractual forum will be so gravely difficult" that the claimant "will for all practical purposes be deprived of his day in court." *Id., at 632, 105 S.Ct. 3346* (internal quotation marks omitted). And in the decades since *Mitsubishi,* we have repeated its admonition time and again, instructing courts not to enforce an arbitration agreement that effectively (even if not explicitly) forecloses

a plaintiff from remedying the violation of a federal statutory right. See *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 540, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995); *14 Penn Plaza,* 556 U.S., at 266, 273–274, 129 S.Ct. 1456.

Our decision in *Green Tree Financial Corp.–Ala. v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), confirmed that this principle applies when an agreement thwarts federal law by making arbitration prohibitively expensive. The plaintiff there (seeking relief under the Truth in Lending Act) argued that an arbitration agreement was unenforceable because it "create[d] a risk" that she would have to "bear prohibitive arbitration costs" in the form of high filing and administrative fees. *Id., at 90, 121 S.Ct. 513* (internal quotation marks omitted). We rejected that contention, but not because we doubted that such fees could prevent the effective vindication of statutory rights. To the contrary, we invoked our rule from *Mitsubishi,* making clear that it applied to the case before us. See *531 U.S., at 90, 121 S.Ct. 513.* Indeed, we added a burden of proof: "[W]here, as here," we held, a party asserting a federal right "seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id., at 92, 121 S.Ct. 513.* Randolph, we found, had failed to meet that burden: The evidence she offered was "too speculative." *Id., at 91, 121 S.Ct. 513.* But even as we dismissed Randolph's suit, we reminded courts to protect against arbitration agreements that make federal claims too costly to bring.

**\*10** Applied as our precedents direct, the effective-vindication rule furthers the purposes not just of laws like the Sherman Act, but of the FAA itself. That statute reflects a federal policy favoring actual arbitration—that is, arbitration as a streamlined "method of resolving disputes," not as a foolproof way of kill-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

R-App 697

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

ing off valid claims. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Put otherwise: What the FAA prefers to litigation is arbitration, not *de facto* immunity. The effective-vindication rule furthers the statute's goals by ensuring that arbitration remains a real, not faux, method of dispute resolution. With the rule, companies have good reason to adopt arbitral procedures that facilitate efficient and accurate handling of complaints. Without it, companies have every incentive to draft their agreements to extract backdoor waivers of statutory rights, making arbitration unavailable or pointless. So down one road: More arbitration, better enforcement of federal statutes. And down the other: Less arbitration, poorer enforcement of federal statutes. Which would you prefer? Or still more aptly: Which do you think Congress would?

The answer becomes all the more obvious given the limits we have placed on the rule, which ensure that it does not diminish arbitration's benefits. The rule comes into play only when an agreement "operate[s] ... as a prospective waiver"—that is, forecloses (not diminishes) a plaintiff's opportunity to gain relief for a statutory violation. *Mitsubishi,* 473 U.S., at 637, n. 19, 105 S.Ct. 3346. So, for example, *Randolph* assessed whether fees in arbitration would be "prohibitive" (not high, excessive, or extravagant). 531 U.S., at 90, 121 S.Ct. 513. Moreover, the plaintiff must make that showing through concrete proof: "[S]peculative" risks, "unfounded assumptions," and "unsupported statements" will not suffice. *Id.,* at 90–91, and n. 6, 121 S.Ct. 513. With the inquiry that confined and the evidentiary requirements that high, courts have had no trouble assessing the matters the rule makes relevant. And for almost three decades, courts have followed our edict that arbitration clauses must usually prevail, declining to enforce them in only rare cases. See Brief for United States as *Amicus Curiae* 26–27. The effective-vindication rule has thus operated year in and year out without undermining, much less "destroy [ing]," the prospect of speedy dispute resolution that arbitration secures. *Ante,* at ——.

And this is just the kind of case the rule was meant to address. Italian Colors, as I have noted, alleges that Amex used its market power to impose a tying arrangement in violation of the Sherman Act. The antitrust laws, all parties agree, provide the restaurant with a cause of action and give it the chance to recover treble damages. Here, that would mean Italian Colors could take home up to $38,549. But a problem looms. As this case comes to us, the evidence shows that Italian Colors cannot prevail in arbitration without an economic analysis defining the relevant markets, establishing Amex's monopoly power, showing anticompetitive effects, and measuring damages. And that expert report would cost between several hundred thousand and one million dollars. [FN1] So the expense involved in proving the claim in arbitration is ten times what Italian Colors could hope to gain, even in a best-case scenario. That counts as a "prohibitive" cost, in *Randolph 's* terminology, if anything does. No rational actor would bring a claim worth tens of thousands of dollars if doing so meant incurring costs in the hundreds of thousands.

> FN1. The evidence relating to these costs comes from an affidavit submitted by an economist experienced in proving similar antitrust claims. The Second Circuit found that Amex "ha[d] brought no serious challenge" to that factual showing. See, *e.g.,* 667 F.3d 204, 210 (2012). And in this Court, Amex conceded that Italian Colors would need an expert economic report to prevail in arbitration. See Tr. of Oral Arg. 15. Perhaps that is not really true. A hallmark of arbitration is its use of procedures tailored to the type of dispute and amount in controversy; so arbitrators might properly decline to demand such a rigorous evidentiary showing in small antitrust cases. But that possibility cannot disturb the factual premise on which this case comes to us, and which the majority accepts: that Italian Colors's tying claim is an ordinary

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

kind of antitrust claim; and that it is worth about a tenth the cost of arbitration.

**\*11** An arbitration agreement could manage such a mismatch in many ways, but Amex's disdains them all. As the Court makes clear, the contract expressly prohibits class arbitration. But that is only part of the problem.[FN2] The agreement also disallows any kind of joinder or consolidation of claims or parties. And more: Its confidentiality provision prevents Italian Colors from informally arranging with other merchants to produce a common expert report. And still more: The agreement precludes any shifting of costs to Amex, even if Italian Colors prevails. And beyond all that: Amex refused to enter into any stipulations that would obviate or mitigate the need for the economic analysis. In short, the agreement as applied in this case cuts off not just class arbitration, but any avenue for sharing, shifting, or shrinking necessary costs. Amex has put Italian Colors to this choice: Spend way, way, way more money than your claim is worth, or relinquish your Sherman Act rights.

> FN2. The majority contends that the class-action waiver is the only part we should consider. See *ante,* at —— – ——, n. 4. I explain below why that assertion is wrong. See *infra,* at —— – ——.

So contra the majority, the court below got this case right. Italian Colors proved what the plaintiff in *Randolph* could not—that a standard-form agreement, taken as a whole, renders arbitration of a claim "prohibitively expensive." 531 U.S., at 92, 121 S.Ct. 513. The restaurant thus established that the contract "operate[s] ... as a prospective waiver," and prevents the "effective[ ] ... vindicat[ion]" of Sherman Act rights. *Mitsubishi, 473 U.S., at 637, and n. 19, 105 S.Ct. 3346.* I would follow our precedents and decline to compel arbitration.

II

The majority is quite sure that the effective-vindication rule does not apply here, but has precious little to say about why. It starts by disparaging the rule as having "originated as dictum." *Ante,* at ——. But it does not rest on that swipe, and for good reason. As I have explained, see *supra,* at —— – ——, the rule began as a core part of *Mitsubishi* : We held that federal statutory claims are subject to arbitration "*so long as* " the claimant "effectively may vindicate its [rights] in the arbitral forum." 473 U.S., at 637, 105 S.Ct. 3346 (emphasis added). The rule thus served as an essential condition of the decision's holding.[FN3] And in *Randolph,* we provided a standard for applying the rule when a claimant alleges "prohibitive costs" ("Where, as here," etc., see *supra, at* ——), and we then applied that standard to the parties before us. So whatever else the majority might think of the effective-vindication rule, it is not dictum.

> FN3. The majority is dead wrong when it says that *Mitsubishi* reserved judgment on "whether the arbitration agreement's potential deprivation of a claimant's right to pursue federal remedies may render that agreement unenforceable." *Ante, at* ——, n. 2. What the *Mitsubishi* Court had "no occasion to speculate on" was whether a particular agreement *in fact* eliminated the claimant's federal rights. 473 U.S., at 673, n. 19, 105 S.Ct. 3375. But we stated expressly that if the agreement did so (as Amex's does), we would invalidate it. *Ibid.;* see *supra,* at ——.

The next paragraph of the Court's decision (the third of Part IV) is the key: It contains almost the whole of the majority's effort to explain why the effective-vindication rule does not stop Amex from compelling arbitration. The majority's first move is to describe *Mitsubishi* and *Randolph* as covering only discrete situations: The rule, the majority asserts, applies to arbitration agreements that eliminate the "right to pursue statutory remedies" by "forbidding the assertion" of the right (as addressed in *Mitsubishi* )

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

or imposing filing and administrative fees "so high as to make access to the forum impracticable" (as addressed in *Randolph* ). *Ante,* at ——— (emphasis deleted; internal quotation marks omitted). Those cases are not this case, the majority says: Here, the agreement's provisions went to the possibility of "*proving* a statutory remedy." *Ante,* at ——.

**\*12** But the distinction the majority proffers, which excludes problems of proof, is one *Mitsubishi* and *Randolph* (and our decisions reaffirming them) foreclose. Those decisions establish what in some quarters is known as a principle: When an arbitration agreement prevents the effective vindication of federal rights, a party may go to court. That principle, by its nature, operates in diverse circumstances—not just the ones that happened to come before the Court. See *supra,* at ——— – ———. It doubtless covers the baldly exculpatory clause and prohibitive fees that the majority acknowledges would preclude an arbitration agreement's enforcement. But so too it covers the world of other provisions a clever drafter might devise to scuttle even the most meritorious federal claims. Those provisions might deny entry to the forum in the first instance. Or they might deprive the claimant of any remedy. Or they might prevent the claimant from offering the necessary proof to prevail, as in my "no economic testimony" hypothetical—and in the actual circumstances of this case. See *supra,* at ———. The variations matter not at all. Whatever the precise mechanism, each "operate[s] ... as a prospective waiver of a party's [federal] right[s]"—and so confers immunity on a wrongdoer. *Mitsubishi,* 473 U.S., at 637, n. 19, 105 S.Ct. 3346. And that is what counts under our decisions.[FN4]

> **FN4.** *Gilmer* and *Vimar Seguros,* which the majority relies on, see *ante,* at ——, fail to advance its argument. The plaintiffs there did not claim, as Italian Colors does, that an arbitration clause altogether precluded them from vindicating their federal rights. They averred only that arbitration would be less

convenient or effective than a proceeding in court. See *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31–32, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). As I have explained, that kind of showing does not meet the effective-vindication rule's high bar. See *supra,* at ——.

Nor can the majority escape the principle we have established by observing, as it does at one point, that Amex's agreement merely made arbitration "not worth the expense." *Ante,* at ——. That suggestion, after all, runs smack into *Randolph,* which likewise involved an allegation that arbitration, as specified in a contract, "would be prohibitively expensive." 531 U.S., at 92, 121 S.Ct. 513. Our decision there made clear that a provision raising a plaintiff's costs could foreclose consideration of federal claims, and so run afoul of the effective-vindication rule. The expense at issue in *Randolph* came from a filing fee combined with a per-diem payment for the arbitrator. But nothing about those particular costs is distinctive; and indeed, a rule confined to them would be weirdly idiosyncratic. Not surprisingly, then, *Randolph* gave no hint of distinguishing among the different ways an arbitration agreement can make a claim too costly to bring. Its rationale applies whenever an agreement makes the vindication of federal claims impossibly expensive—whether by imposing fees or proscribing cost-sharing or adopting some other device.

That leaves the three last sentences in the majority's core paragraph. Here, the majority conjures a special reason to exclude "class-action waiver[s]" from the effective-vindication rule's compass. *Ante,* at ——— – ———, and n. 4. Rule 23, the majority notes, became law only in 1938—decades after the Sherman Act. The majority's conclusion: If federal law in the interim decades did not eliminate a plaintiff's rights under that Act, then neither does this agreement.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

**\*13** But that notion, first of all, rests on a false premise: that this case is only about a class-action waiver. See *ante,* at ——, n. 4 (confining the case to that issue). It is not, and indeed could not sensibly be. The effective-vindication rule asks whether an arbitration agreement *as a whole* precludes a claimant from enforcing federal statutory rights. No single provision is properly viewed in isolation, because an agreement can close off one avenue to pursue a claim while leaving others open. In this case, for example, the agreement could have prohibited class arbitration without offending the effective-vindication rule *if* it had provided an alternative mechanism to share, shift, or reduce the necessary costs. The agreement's problem is that it bars not just class actions, but also all mechanisms—many existing long before the Sherman Act, if that matters—for joinder or consolidation of claims, informal coordination among individual claimants, or amelioration of arbitral expenses. See *supra,* at ——. And contrary to the majority's assertion, the Second Circuit understood that point: It considered, for example, whether Italian Colors could shift expert expenses to Amex if its claim prevailed (no) or could join with merchants bringing similar claims to produce a common expert report (no again). See 554 F.3d 300, 318 (2009). It is only in this Court that the case has become strangely narrow, as the majority stares at a single provision rather than considering, in the way the effective-vindication rule demands, how the entire contract operates.[FN5]

> FN5. In defense of this focus, the majority quotes the Second Circuit as concluding that "the *only economically feasible* means" for Italian Colors to enforce its statutory rights "is via a class action." *Ante,* at —— – ——, n. 4 (quoting 667 F.3d, at 218; internal quotation marks omitted; emphasis added by the Court). But the Court of Appeals reached that conclusion only after finding that the agreement prohibited all *other* forms of cost-sharing and cost-shifting. See 554 F.3d

300, 318 (2009). (That opinion was vacated on other grounds, but its analysis continued to inform—indeed, was essential to—the Second Circuit's final decision in the case. See 667 F.3d, at 218.) The Second Circuit therefore did exactly what the majority refuses to do—look to the agreement as a whole to determine whether it permits the vindication of federal rights.

In any event, the age of the relevant procedural mechanisms (whether class actions or any other) does not matter, because the effective-vindication rule asks about the world today, not the world as it might have looked when Congress passed a given statute. Whether a particular procedural device preceded or post-dated a particular statute, the question remains the same: Does the arbitration agreement foreclose a party—right now—from effectively vindicating the substantive rights the statute provides? This case exhibits a whole raft of changes since Congress passed the Sherman Act, affecting both parties to the dispute—not just new procedural rules (like Rule 23), but also new evidentiary requirements (like the demand here for an expert report) and new contract provisions affecting arbitration (like this agreement's confidentiality clause). But what has stayed the same is this: Congress's intent that antitrust plaintiffs should be able to enforce their rights free of any prior waiver. See *supra,* at —— – ——; *Mitsubishi,* 473 U.S., at 637, n. 19, 105 S.Ct. 3346. The effective-vindication rule carries out that purpose by ensuring that any arbitration agreement operating as such a waiver is unenforceable. And that requires courts to determine in the here and now—rather than in ye olde glory days—whether an agreement's provisions foreclose even meritorious antitrust claims.

Still, the majority takes one last stab: "Truth to tell," it claims, *AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), "all but resolves this case." *Ante,* at ——. In that decision, the majority recounts, this Court held

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

that the FAA preempted a state "law conditioning enforcement of arbitration on the availability of class procedure." *Ibid.*; see 563 U.S., at ——, 131 S.Ct., at 1748. According to the majority, that decision controls here because "[w]e specifically rejected the argument that class arbitration was necessary." *Ante,* at ——.

*14 Where to begin? Well, maybe where I just left off: Italian Colors is not claiming that a class action is necessary—only that it have *some* means of vindicating a meritorious claim. And as I have shown, non-class options abound. See *supra,* at ——. The idea that *AT&T Mobility* controls here depends entirely on the majority's view that this case is "class action or bust." Were the majority to drop that pretense, it could make no claim for *AT&T Mobility* 's relevance.

And just as this case is not about class actions, *AT&T Mobility* was not—and could not have been—about the effective-vindication rule. Here is a tip-off: *AT&T Mobility* nowhere cited our effective-vindication precedents. That was so for two reasons. To begin with, the state law in question made class-action waivers unenforceable even when a party *could* feasibly vindicate her claim in an individual arbitration. The state rule was designed to preserve the broad-scale "deterrent effects of class actions," not merely to protect a particular plaintiff's right to assert her own claim. 563 U.S., at ——, 131 S.Ct., at 1745. Indeed, the Court emphasized that the complaint in that case was "most unlikely to go unresolved" because AT & T's agreement contained a host of features ensuring that "aggrieved customers who filed claims would be essentially guaranteed to be made whole." *Id., at* ——, 131 S.Ct., at 1753 (internal quotation marks and brackets omitted). So the Court professed that *AT&T Mobility* did not implicate the only thing (a party's ability to vindicate a meritorious claim) this case involves.

And if that is not enough, *AT&T Mobility* involved a *state* law, and therefore could not possibly

implicate the effective-vindication rule. When a state rule allegedly conflicts with the FAA, we apply standard preemption principles, asking whether the state law frustrates the FAA's purposes and objectives. If the state rule does so—as the Court found in *AT&T Mobility*—the Supremacy Clause requires its invalidation. We have no earthly interest (quite the contrary) in vindicating that law. Our effective-vindication rule comes into play only when the FAA is alleged to conflict with another *federal* law, like the Sherman Act here. In that all-federal context, one law does not automatically bow to the other, and the effective-vindication rule serves as a way to reconcile any tension between them. Again, then, *AT&T Mobility* had no occasion to address the issue in this case. The relevant decisions are instead *Mitsubishi* and *Randolph.*

3

*15 The Court today mistakes what this case is about. To a hammer, everything looks like a nail. And to a Court bent on diminishing the usefulness of Rule 23, everything looks like a class action, ready to be dismantled. So the Court does not consider that Amex's agreement bars not just class actions, but "other forms of cost-sharing ... that could provide effective vindication." *Ante,* at ——, n. 4. In short, the Court does not consider—and does not decide—Italian Colors's (and similarly situated litigants') actual argument about why the effective-vindication rule precludes this agreement's enforcement.

As a result, Amex's contract will succeed in depriving Italian Colors of any effective opportunity to challenge monopolistic conduct allegedly in violation of the Sherman Act. The FAA, the majority says, so requires. Do not be fooled. Only the Court so requires; the FAA was never meant to produce this outcome. The FAA conceived of arbitration as a "method of *resolving* disputes"—a way of using tailored and streamlined procedures to facilitate redress of inju-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

ries. *Rodriguez de Quijas,* 490 U.S., at 481, 109 S.Ct. 1917 (emphasis added). In the hands of today's majority, arbitration threatens to become more nearly the opposite—a mechanism easily made to block the vindication of meritorious federal claims and insulate wrongdoers from liability. The Court thus undermines the FAA no less than it does the Sherman Act and other federal statutes providing rights of action. I respectfully dissent.


U.S.,2013.
American Exp. Co. v. Italian Colors Restaurant
--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332


END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

R-App 703



Circuit Court of Florida.
Pinellas County
Kenneth W. HERETICK, On Behalf of Himself and All Others Similarly Situated, Plaintiff,
v.
THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Defendant.
No. 02-1061-CI-11.
June 23, 2003.

General Division

Order Granting Defendant's Motion to Dismiss Plaintiff's Amended Complaint

Hon. Susan F. Schaeffer.

FACTS

Mr. Heretick filed a class action alleging a scheme to overcharge policyholders. In essence, he alleged that there is a Premium Tax assessed against Northwestern Mutual on the premiums paid for insurance policies sold in Florida. Mr. Heretick initially alleged that instead of Northwestern Mutual including the exact Florida Premium tax in the costs of the premium it charges to its Florida policy-holders, Northwestern Mutual calculates the average of all states' premium taxes and uses this average in the costs of the insurance premiums charged to Florida policy-holders. Initial Complaint at ¶¶ 2,8. Mr. Heretick initially claimed that every time a policyholder made a premium payment to Northwestern Mutual, they were overcharged because their premiums included an amount to cover the average cost for all states' premium taxes, rather than just the premium tax for Florida. E.g. Initial Complaint at ¶¶ 2, 8. Mr. Heretick also claimed that the manner in which Northwestern Mutual calculated the premium tax as a cost of Northwestern Mutual reduced the cash value of his policies. Initial Complaint at ¶ 10.

On August 26,2002, the Court rejected Mr. Heretick's contract theory, based on the clear terms of the contract. During that hearing the Court reviewed the three policies at issue, which were purchased by Mr. Heretick in 1978, 1984 and 1990, respectively. The Court found that the insurance contracts were clear and unambiguous, provided insurance coverage for a set fee (the premium) and contained no representation or promises about the premium tax or the cal-culation of Northwestern Mutual's costs. The court found that the Plaintiff got what he bargained for. By order dated October 18, 2002 (superseding an order dated September 30, 2002), the Court dismissed the complaint and gave the Plaintiff leave to amend. Because plaintiff got what he paid for, the Court concluded that "if your complaint is talking about... an overcharge of premiums, I don't think you can amend your complaint and state a cause of action in any event ever." Transcript of August 26, 2002 hearing at 47.

THE AMENDED COMPLAINT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The basic factual allegations of the Amended Complaint are the same: Mr. Heretick still complains about Northwestern Mutual including in its costs the average of all states' premium taxes rather than just Florida's. Amended Complaint at ¶¶ 2,8. In the Amended Complaint Plaintiff characterizes these facts differently by claiming: 1) an effect on dividends rather than premium payments and 2) adds a fiduciary duty claim. Amended Complaint at ¶¶ 12, 51-55.

While still complaining repeatedly of "overpayments" of premiums in the Amended Complaint, plaintiff now adds the claim that he has "not received an equitable distribution of annual dividends" because he has "subsidiz[ed] premium tax payments in higher tax states." Amended Complaint at ¶ 10.

Yet, Plaintiffs real issue remains the same: Northwestern Mutual's calculation of its costs and how that affects what he pays and receives under the policy. The second change to plaintiffs amended complaint is the addition of Count V asserting a breach of fiduciary duty.

LEGAL ANALYSIS AND RULING

The practice complained of is Northwestern Mutual's alleged practice of averaging certain costs and spreading those costs over a large population of its customers. The Northwestern Mutual policies are clear and unambiguous and do not mention the payment or calculation of Premium Taxes as a cost in any context, whether that context be premiums, cash value or dividends. It makes no difference whether plaintiff alleges that this practice affects him through an "overcharge" of premiums, lower cash values or through a dividend that is too small. No matter how it is worded, the contract claim fails because, as the Court has already concluded, the contract is clear and unambiguous and it says nothing at all about premium taxes or other costs. The insurance contract (policy) does not prohibit Northwestern Mutual from averaging all of its costs, including premium tax costs, in its calculation of premiums or dividends.

Nor can Mr. Heretick rely on the concept of "good faith and fair dealing". A party cannot use the "good faith and fair dealing" concept to modify the terms of a contract *City of Riviera Beach v. John's Towing, 691* So.2d 519, 521 (Fla. 4th DCA 1997). The duty of good faith and fair dealing must relate to the performance of an actual term of the contract *Burger King Corp. v. Weaver, 169 F. 3d 1310, 1317-18 (11th Cir. 1999)*; *Gibbs Property Corp. v. Cigna Corp., 196 F.R.D. 430.441 (M.D. Fla. 2000)*; *Hospital Corp. of America v. Florida Medial Center Inc., 710 So.2d 573, 575 (Fla. 4th DCA 1998)*. A cause of action for breach of good faith and fair dealing will not stand absent a breach of a specific contract provision. *Gibbs Properties, 196 F.R.D. at 441.*

INSURANCE POLICY CASES/BUSINESS JUDGMENT

When the insurance policy itself contains nothing in it which precludes the actions of the insurer, the insurance company may act according to its business judgment without breaching the contract. *Cohen v. Prudential Ins. Co. 155 A. 2d 304, 312 (NJ. Super. Ct. 1959)*; *Rebbert v. The New England Mutual Life Ins. Co.* Index No. 600457/97 (N.Y. Sup. Ct. April 7, 1998) *aff'd* 691 N.Y.S. 2d 836 (N.Y.A.D. 1st Dept. June 8, 1999); *Priori v. Prudential Ins. Co. of America, 92 F. Supp. 2d 1264, 1268 (M.D. Ala. 2000)*; *Rhine v. New York Life Ins. Co., 273 N.Y. 1 (N.Y. Ct. App. 1936)*; *Ball v. Florida Podiatrist Trust, 620 So.2d 1018, 1019 (Fla. 1st DCA 1993)* (finding nothing in the insurance policy which would prohibit the exercise of discretion). Each of these cases stand for the proposition that, where there was no express contractual provision in an insurance policy mandating a particular dividend apportionment method-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ology, the plaintiffs' contract claim must fail. The amount and distribution of dividends to be paid to the insureds is within the discretion of the directors of a mutual insurance company.

Mr. Heretick's policies do not preclude Northwestern Mutual from accumulating all of its expenses and apportioning them among its policyholders, as many other businesses in America apportion their costs.

The business judgment rule provides that a company's allocation of expenses or dividends is a discretionary determination that can be disturbed only if the plaintiff can show bad faith, willful neglect, or an abuse of discretion by the company's board. *See, e.g., Fleischer v. Pelton Steel Co.,* 198 N.W. 444,446-67 (Wis. 1924). Here plaintiff has not plead bad faith, willful neglect or abuse of discretion.

Each of the insurance cases cited herein rejected a policyholder's challenge to a dividend apportionment decision because those decisions are left to the sound discretion of the Board. *See also Reget v. Paige,* 626 N.W. 2d 302, 312 (Wis. Ct. App. 2001); *Coduti v. Hellwig, 469* N.E. 2d 220, 226 (Ill. App. Ct. 1984); *See, e.g., Harris Trust & Savings Bank v. John Hancock Mut. Life Ins. Co.,* 767 F. Supp. 1269. 1280-81 (S.D.N.Y. 1991).

The Business Judgment Rule has also been applied to challenges regarding the accounting and allocation of company expenses. *Barnes v. State Farm Mutual Auto Ins. Co.,* 16 Cal. App. 4th 365 (Cal. App. 1993). Here plaintiff asks this court to re-write his policy, insert a promise never made and direct the manner in which Northwestern Mutual accounts for company expenses and apportions dividends. The case law clearly prohibits this.

Plaintiffs citation to the so-called "cruise industry cases" *[Latman v. Costa Cruise Lines,* 758 So 2d 699 (Fla. 3 rd DCA 2000); *Premier Cruise Lines v. Picant,* 746 So. 2d 1132 (Fla. 5th DCA 1999)] is unavailing. First, these cases are Deceptive and Unfair Trade Practice cases, not contract cases. No such claim is pending here. Second, the basis of those cases was an allegation that the cruise line in question specifically represented to the passenger that it was collecting a "port tax" owed by the passenger, but did not, in turn, remit that tax to the state. Here, of course, there is no allegation that Northwestern Mutual did not pay its Premium Taxes. More importantly, as noted above. Northwestern Mutual made no representation about premium taxes, or any other cost, to its policyholders.

## FIDUCIARY DUTY

Plaintiffs only "new" claim is that Northwestern Mutual breached its fiduciary duty to him when it allegedly reduced his dividends by taking into account the average cost of premium taxes in all states rather than just the cost of the Florida premium tax.

This claim fails since there is no fiduciary relationship between a mutual insurer and its insured regarding the insurance relationship reflected in the insured's policy.[FN1] *See In re Metropolitan Life Derivative Lit.,* 935 F. Supp. 286, 293 (S.D.N.Y. 1996) ("the relationship between a mutual insurer and a policyholder 'is not of a fiduciary nature' but is instead that of a debtor and creditor"); *Fidelity & Cas. Co. of N.Y. v. Metropolitan Life Ins. Co.,* 248 N.Y.S. 2d 559, 565 (N.Y. Sup. Ct. 1963) ("the relationship [between mutual insurance company and policyholder] is not of a fiduciary nature"). *McCord v. Minnesota Mutual Life Ins. Co.,* 138 F. Supp. 2d 1180, 1193 (D. Minn. 2001) ("insurance sales relationship does not create a fiduciary relationship").

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1. The Court has considered the claims as pleaded in both plaintiffs Amended Complaint and proposed Second Amended Complaint and finds that both statements of the claim fail for the reasons stated herein.

The reason for this rule is that the relationship between a mutual insurance company and the policyholder is defined by the contract and "whatever rights a member of a mutual company has are delineated by the terms of the contract, and come from it alone." *Andrews v. Equitable Life Assur. Soc. of U.S.,* 124 F.2d 788, 789 (7th Cir. 1942); *see also Brown v. Equitable Life Assur. Soc,* 142 F. 835, 839 (S.D.N.Y. 1906) ("the rights and liabilities out of such a relationship spring entirely from the contract and are simply those of creditor and debtor"); *Silverman v. Liberty Mut. Ins. Co.,* 13 Mass L. Rptr. 303, 2001 WL 810157, * 6 (Mass. Supp. CL July 11, 2001) ("with respect to matters concerning the contractual rights of insureds in a mutual insurance company, the mutual insurance company has no fiduciary duty to its insured").

Plaintiff cites three cases for the proposition that a mutual company owes its insured a fiduciary duty: *Doyle v. Union Insurance Company* 202 Neb. 599 (Neb. 1979); *Rowen v. LeMars Insurance Company,* 282 N.W. 639 (Iowa 1979); *and Silverman v. Liberty Mut. Ins. Co. Id* (cited by defendants also). Having reviewed these cases it is apparent that the fiduciary duty discussed relates to an entirely different context than the context of the insurance policy relationship. In all of these cases, the Mutual company was "demutualizing" or selling its assets and converting to a stock company. In that context the courts held that the principal officers of the insurance companies had a fiduciary duty not to defraud, not to make inadequate disclosures and not to participate in self-dealing. For instance, in *Doyle* the court held that a "one man board of directors" arranged for a deal that benefited himself. In *Rowen* the court held that there were improper payments to the most influential person in management and that the same person sold a corporate opportunity for personal gain. *Silverman* is most instructive since, in the context of deciding whether or not a fiduciary duty existed, the court described two entirely different kinds of relationships mutual insurance companies have with their policyholders. First, the court held that in matters dealing with the contractual rights of insureds (such as their insurance policies) the company has no fiduciary duty to the insured. Second, the court held that it is only in the narrow area regarding a mutual company's request to its mutual policy-holders to surrender their entire equity in a demutualization transaction, that the company owes a fiduciary duty to the policy holder to make accurate disclosures and not engage in self-dealing. Therefore, these cases are consistent with the cases cited by Northwestern Mutual holding that there is no fiduciary relationship between a mutual insurance company and its insureds with respect to the insurance contract (policy) relationship.

UNJUST ENRICHMENT

Plaintiff also has a claim for unjust enrichment. However, unjust enrichment claims are only permitted where there is no contract governing the rights of the parties. The existence of a written contract precludes claims of unjust enrichment. *Dick Winning Chrysler Plymouth v. Chrysler Motors Corp.* 750 F.2d 895 (11th Cir. 1985); *Hazen v. Cobb* 96 Fla. 151 (Fla. 1928); *Nautica International Inc. v. Intermarine USA LP.* 5 F. Supp. 2d 1333, 1341 (S.D. Fla. 1998); *Hoon v. Pate Construction Co.* ,607 So. 2d 423,427 (Fla. 4th DCA 1992); *Poe v. Levy.* 411 So. 2d 253,256 (Fla. 4th DCA 1982).

Plaintiff claims, however, that if the breach of contract claim is dismissed, then he should be allowed to pursue a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

quasi-contract claim. Dismissal of a breach of contract claim leaves the contract intact. It is the existence of the contract - not the success or failure of a motion to dismiss the contract claim - that defeats the quasi contract claim.

## MONEY HAD AND RECEIVED

Plaintiffs claim of "money had and received" is a quasi contract claim just like unjust enrichment In fact, Florida courts consider these two claims to be interchangeable and identical. *Equilease Corp. V Hentz,* 634 F2d 850, 853 (5th Cir 1981); *Barry v. Hialeah Miami Springs Medical Fund,* 184 B.R. 611,612 (S.D. Fla. 1995). Where a valid contract exists there can be no claim for "money had and received". *Meehan v Grimaldo & Grimaldi,* 240 F2d 775 (5th Cir. 1957).

## EQUITABLE CLAIMS

### Existence of Contract Bars Claims Even if Contract Claim Falls

Plaintiff has asserted that the rules of pleading permit him to plead contract and equitable theories in the alternative. This argument misses the point. The only reason to allow pleading in the alternative is where there is some factual dispute as to whether or not there is a contract. In other words, you can only plead in the alternative if there is a chance that there is no formal contract, so that the plaintiff may still assert an equitable claim. But in the instant case, both parties acknowledge, and it is established beyond a doubt, that a formal written contract exists. When a formal written contract exists, under Florida law, there can be no equitable claim, even if the contract claim is dismissed. In short, it is the existence of the contract, not the success or failure of a particular contract claim, that is dispositive.

The Florida Supreme Court has expressly made this point in *Hazen v. Cobb,* 117 So. 853 (Fla. 1928). In that case, the court used historical common law terms to describe the causes of action, "general assumpsit." for money had and received, and "special assumpsit," for an action on an express contract. The court made clear that this rule of pleading alternate causes of action for quasi-contract cases does not trump the substantive rule of law:
it still remains highly important to good pleading and the efficient administration of justice that the distinction between general and special assumpsit be preserved

It is a well settled rule that, when an express simple contract is open and unexecuted, and plaintiff proceeds for a breach of it, he must declare specially. General assumpsit will not lie. The law will not imply a contract where a valid express one exists.

*Id.* at 164-65. *See also See also Garcia v. Cosicher, 504 So. 2d* 462, 463 n. 2 (Fla. 3d DCA 1987) (recovery cannot "be justified on a quantum merit theory, in light of the express contract between the parties"); *Bowleg v. Bowe,* 502 So. 2d 71, 72 (Fla. 3d DCA 1987).

## EQUITABLE CLAIMS

### Failure to Plead Elements

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The undisputed existence of a contract ends the matter, but that is not the only reason the equitable claims must be dismissed. Plaintiff fails to plead a case of unjust enrichment or money had and received. At a prior hearing the Court commented:

they [Northwestern Mutual] are not telling me [they are collecting 2% because they have to pay it to the government]. They are just telling me here is what you want [in the way of insurance benefits]. Here is the cost of this, and I'm paying it, and I've agreed to. They've agreed to charge it and I've agreed to pay it. So how can they be unjustly enriched?

August 26, 2002 Transcript at 31-32.

Unjust enrichment and money had and received are intended to prevent a "double recovery" or "something for nothing." The formal elements of unjust enrichment are "[1] a benefit conferred upon a defendant by the plaintiff, [2] the defendant's appreciation of the benefit, and [3] retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Rite-Way Painting and Plastering, Inc. v. Tetor, 582 So. 2d 15, 17 (Fla. 2d DCA 1991)*. Similarly, the elements of money had and received are that the money be "erroneously paid or received by a defendant when to permit the defendant to keep the money would unjustly deprive the plaintiff of his ownership of the money." *Sharp v. Bowling, 511* So. 2d 363 (Fla. 5th DCA 1987).

The facts pleaded by Mr. Heretick are that Northwestern Mutual averaged all of its premium taxes rather than charged the Florida Premium Tax. This allegation is not sufficient to support his equitable claims. Mr. Heretick has not paid his premium twice, or paid his premium and then not gotten the insurance benefits in return.

## EQUITABLE THEORIES

### Plaintiffs Caselaw

The Plaintiff cites *Timberland Consolidated Partnership v. Andrews Land and Timber, Inc.,* 27 Fla. L. Weekly D1 168 (Fla. 5th DCA 2002) for the proposition that he can plead both a contract and equitable claim. In that case the court merely held that a timber owner could not both keep the timber harvester's deposit, paid to secure his right to harvest timber, and sell the same timber to someone else. That case says nothing about the use of quasi contract theories as a remedy for a written contract claim

The second case Plaintiff relies on in this regard is *Greenfield v. Manor Care, Inc., 705* So. 2d 926 (4th DCA 1997), *rev* denied, 717 So. 2d 534 (Fla. 1998), overruled on other grounds by *Beverly Enterprises-Florida, Inc. v. Knowles, 766 So. 2d 335 (Fla. 4th DCA 2000)*.

There the patient had a contract with the nursing home which covered basic daily care but provided that " 'any special nursing care or any special equipment or services shall be in addition to the daily rate' " 705 So. 2d at 928. In addition, in a passage emphasized by the court, the contract provided that failure to pay for such additional services would result in *"immediate removal of Patient from the Facility." Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The plaintiff alleged that the nursing home had "systematically inflated prices [for additional goods and services] by 'consciously and deliberately adding on, marking up and overcharging' " for those services. The court held that "since the contract between [the parties] did not expressly set the governing prices within its four corners, [defendant] was bound by a reasonableness requirement" 705 So. 2d at 929. In other words, the contract was missing an essential term: price.

*Greenfield* has nothing to do with the present case. There is no missing "pricing term" that has to be supplied by equitable analysis. The premiums in Heretick's policies were clearly reflected for the insurance coverage sought. Nor is there any overreaching alleged, such as those in *Greenfield* with respect to an elderly, ill patient. Here, the insurance contracts expressly provide that "this policy with the attached application is the entire contract." (§ 1.4). Plaintiff paid the agreed premium and got the agreed benefits.

CONCLUSION

For all of these reasons all counts in the Amended Complaint and proposed Second Amended Complaint (except the Declaratory Judgment count) are dismissed with prejudice. The Court will provide Northwestern Mutual ten (10) days from the date this Order is issued to file a memorandum with the Court to address the Plaintiffs claim for Declaratory Judgment in light of the Court's ruling. Plaintiff shall have ten (10) days to respond. The Court then will issue an order (with or without oral hearing) as to the Declaratory Judgment count.

DONE AND ORDERED in Chambers at St. Petersburg, Pinellas County, Florida, this 23 day of June, 2003.

<<signature>>

HON. SUSAN F. SCHAEFFER

Copies furnished to:

John A. Yanchunis, Esq.

Marty Steinberg, Esq.

John S. Martin, Esq.

Heretick v. The Northwestern Mut. Life Ins. Co.
2003 WL 25694174 (Fla.Cir.Ct. ) (Trial Order )

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

In re Conseco Ins. Co. Annuity Marketing & Sales..., Not Reported in...

RICO Bus.Disp.Guide 11,235

2007 WL 486367
United States District Court, N.D. California,
San Jose Division.

In re CONSECO INSURANCE CO. ANNUITY
MARKETING & SALES PRACTICES LITIG.
This document relates to: Both Actions.

Nos. C-05-04726 RMW, C-06-00537
RMW.    |    Feb. 12, 2007.

**Attorneys and Law Firms**

Andrew S. Friedman, Elaine A. Ryan, Howard D. Finkelstein, John J. Stoia, Jr., Michael D Thamer, Patricia N. Syverson, Phong L. Tran, Rachel Lynn Jensen, Steven M. Jodlowski, Theodore Joseph Pintar, Ingrid M. Evans, Stephen R. Basser, Christa L. Collins, J. Andrew Meyer, John A. Yanchunis, Louise H. Renne, Helen I. Zeldes, for Plaintiffs.

James J Dries, Mark L Karasik, Thomas A. Doyle, Heather B. Hoesterey, Linda B. Oliver, Robert D. Phillips, Jr., for Defendant.

**Opinion**

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS; DENYING MOTION TO STRIKE**

RONALD M. WHYTE, United States District Judge.

 **\*1** Defendant Conseco Insurance Company moves to dismiss all causes of action in the operative complaint. For the reasons set forth below, the court grants the motion in part and denies it in part. The court also denies plaintiffs' motion to strike.

**I. BACKGROUND**

The parties stipulated to consolidate two actions separately filed by Robert Hansen and Friou Jones. The operative complaint is styled as a "Consolidated and Amended Class Action Complaint"[1] ("CACAC") and contains nine enumerated claims for relief. The two named plaintiffs are Hansen, a resident of California, and Jones, a resident of Florida. The following facts are taken from the CACAC and are assumed to be true for the purposes of Conseco's motion to dismiss.

Hansen purchased a Conseco annuity in March 2000, financing the purchase by selling an annuity issued by another company. Hansen's Conseco annuity will mature in 2027 and withdrawals before 2015 will incur substantial penalties. Hansen was sixty-eight years old when he purchased his annuity from Conseco.[2] In 2003, Jones purchased a Conseco annuity, financing the purchase by selling an annuity issued by another company. Jones's Conseco annuity will take five years to vest and Jones will be eighty-six years old when it does. Penalties for substantial withdrawals remain in effect for another four years thereafter.

Conseco, the sole defendant, sells annuities. Conseco, according to plaintiffs, engages in a wide variety of unsavory practices when marketing annuities to persons sixty-five years of age and older. Conseco and its sales agents purposefully misrepresent the characteristics of the deferred annuities they sell to older persons. The gravamen of plaintiffs' case is that Conseco's deferred annuities are generally inappropriate for people over sixty-five years of age because an older person who buys a deferred annuity is likely to die before it fully vests; this makes such an annuity a poor investment vehicle, and persons sixty-five and older would not buy these annuities if Conseco adequately disclosed the terms of the annuities before purchase.

**II. ANALYSIS**

**A. General Arguments for Dismissal**

**1. Extraterritorial Application of California Law**
Conseco moves to dismiss all Jones's claims based on California statutes. Conseco argues that Jones, a Florida resident, has pled no connection between Conseco's conduct regarding him and California, making application of California law to Jones's claims impermissible. Jones has withdrawn his claims for financial elder abuse, unfair competition, false or misleading advertising, and fraudulent concealment. Those four causes of action are, therefore, dismissed with prejudice as to Jones.

**2.** *Burford* **Abstention**
Under the doctrine of *Burford* abstention, federal courts should decline to exercise jurisdiction where necessary

In re Conseco Ins. Co. Annuity Marketing & Sales..., Not Reported in...

RICO Bus.Disp.Guide 11,235

to avoid interference with a complex scheme of state administrative regulation. *See Burford v. Sun Oil Co.,* 319 U.S. 315 (1943). The Supreme Court has summarized the doctrine as follows:

> **\*2** Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Public Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361 (1989) (internal quotation marks omitted). The doctrine is applicable only to suits for equitable or other discretionary relief; it cannot be applied to a suit for damages. *See United States ex rel. ACCA Constr. Servs., LLC v. F.A.S. Dev. Co.,* 304 F.Supp.2d 1359, 1362 (N.D.Ga.2004). Although plaintiffs have indicated they may seek class certification at least in part under Rule 23(b)(2),[3] this appears to be in large part an action for monetary damages. This is, therefore, not a situation for the court to decline to exercise jurisdiction under *Burford.*

### 3. Primary Jurisdiction

In a case involving a complaint very similar to the one in this case (and the same law firm on each side), the Central District of California ruled that abstention under the primary jurisdiction doctrine was inappropriate. *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.,* 436 F.Supp.2d 1095, 1098, 1104-06 (C.D.Cal. Jun. 12, 2006) (Snyder, J.). The court's detailed analysis there is equally applicable to Conseco's argument here, and Conseco's motion to dismiss under the primary jurisdiction doctrine is likewise denied.

### B. Arguments for Dismissal Specific Claims for Relief

The court will otherwise analyze Conseco's motion to dismiss claim by claim.

### 1. Racketeering

Plaintiffs' first cause of action is for violations of the Rackeer Influenced and Corrupt Organizations Act ("RICO"), specifically 18 U.S.C. § 1962(a)-(d). "The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,* 431 F.3d 353, 361 (9th Cir.2005).

### a. Pleading Requirements

Title 18 U.S.C. § 1962(a) provides, in part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**\*3** The Ninth Circuit addressed the heightened pleading burden of § 1962(a) in *Wagh v. Metris Direct, Inc.,* 348 F.3d 1102 (9th Cir.2003). In order for a plaintiff "to have standing to sue under §§ 1962(a) and 1964(c), he must have alleged that funds derived from the alleged racketeering activity ... were used to injure him." *Wagh,* 348 F.3d at 1110. Plaintiffs' argument that they need not "specifically allege a distinct investment injury," Opp'n at 14, is contrary to *Wagh.*[4] Plaintiffs therefore lack standing to sue under § 1692(a).

Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct

In re Conseco Ins. Co. Annuity Marketing & Sales..., Not Reported in...

RICO Bus.Disp.Guide 11,235

of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The Ninth Circuit has explained that

> In order to plead a Section 1962(c) violation, [a plaintiff] must allege that [the defendants] were associated with an 'enterprise' within the meaning of RICO. The definition of 'enterprise' encompasses both groups with a formal legal structure and those whose members merely associate in fact. Either way, however, a group does not constitute an enterprise unless it exists independently from the racketeering activity in which it engages. At minimum, it must have some sort of structure for the making of decisions and some mechanisms for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis. A group whose members collectively engage in an illegal act, in-and-of-itself, does not constitute an 'enterprise' for the purposes of RICO.

*Simon v. Value Behavioral Health, Inc.,* 208 F.3d 1073, 1083 (9th Cir.2000) (citations, ellipses, and some quotation marks omitted). Allegations that defendants merely collaborated on a fraudulent scheme are insufficient. *Id.* at 1083-84. "[T]he involvement of a corporation, which has an existence separate from its participation in the racketeering activity, can satisfy the enterprise element's requirement of a separate structure." *Chang v. Chen,* 80 F.3d 1293, 1300 (9th Cir.1996). "At a minimum, to be an enterprise, an entity must exhibit some sort of structure for the making of decisions, whether it is hierarchical or consensual." *Id.* at 1299 (quotation marks and ellipses omitted). "The structure should provide some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis." *Id.* (quotation marks omitted). The Supreme Court has also stated that liability under § 1962(c) "depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993). To summarize, plaintiffs cannot satisfy the requirement that they plead an enterprise merely by pleading that a corporation participated in the

alleged enterprise or that the business of the enterprise is co-extensive with the ordinary business of the defendant.

**\*4** Yet plaintiffs here argue that they may do precisely that. Plaintiffs plead the existence of an "Elder Abuse Annuity Enterprise" which "functions by providing financial, long-term care or estate planning, consultation, advice and related services, as well as deferred annuity products," many of which "are legitimate and non-fraudulent." CACAC ¶ 71. Plaintiffs have, in essence, admittedly pled that the business of the alleged enterprise is also the ordinary business of Conseco and its affiliates. Plaintiffs have not sufficiently pled a § 1962 claim.

Although stating it contests plaintiff's claim under § 1962(b), Conseco does not present any argument that plaintiffs' cause of action does not satisfy the requirements of § 1962(b). Plaintiffs' RICO cause of action, therefore, will not be dismissed as insufficiently pled.

### b. Statute of Limitations

The statute of limitations for RICO claims is four years. In the Ninth Circuit, "a civil RICO cause of action arises when the plaintiff knows or should know that she has been injured." *Grimmett v. Brown,* 75 F.3d 506, 512 (1996). This is known as the "injury discovery rule." *Id.* at 510. "The plaintiff need not discover that the injury is part of a pattern of racketeering for the period to begin to run." *Id.* (quotation marks omitted). Ordinarily, "the question of whether a plaintiff knew or should have become aware of a fraud" is a question of fact for a jury. *Living Designs,* 431 F.3d at 361.

Hansen purchased his annuity in 2000 and sold it in 2004. If he knew or should have known of his injury at the time of purchase, his claim is time-barred. Hansen argues that he was unaware of Conseco's fraudulent conduct until he sold his Conseco annuity. Conseco's arguments for dismissal are based primarily on *Acebey v.. Shearson Lehman Bros.,* 62 F.3d 1423 (Table), 1995 WL 470857 (9th Cir.1995). *Acebey* is not citable and the court will therefore not consider Conseco's arguments for dismissal of Hansen's RICO claim as untimely.[5]

Conseco's motion to dismiss plaintiffs' RICO cause of action based upon §§ 1962(b) and (d) is denied. Plaintiffs' claims under §§ 1962(a) and (c) are dismissed with leave to amend.[6]

In re Conseco Ins. Co. Annuity Marketing & Sales..., Not Reported in...

RICO Bus.Disp.Guide 11,235

## 2. Financial Elder Abuse

California's Elder Abuse Act is codified as California Welfare and Institutions Code §§ 15600-15675. Hansen's second cause of action is for financial elder abuse in violation of § 15610.30, which provides in pertinent part:

(a) "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

(1) Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

(2) Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

(b) A person or entity shall be deemed to have taken, secreted, appropriated, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates or retains possession of property in bad faith.

**\*5** (1) A person or entity shall be deemed to have acted in bad faith if the person or entity knew or should have known that the elder or dependent adult had the right to have the property transferred or made readily available to the elder or dependent adult or to his or her representative.

Conseco argues that financial elder abuse must be proven by clear and convincing evidence. Hansen does not dispute that this is true. In *Benun v. Superior Court,* the California Court of Appeal stated, "To establish elder abuse, a plaintiff must show defendant was guilty of 'recklessness, oppression, fraud, or malice in the commission of [physical, neglectful, or financial elder abuse].' (Welf. & Inst.Code, § 15657.)" *Benun,* 123 Cal.App.4th 113, 119 (2004).

Hansen does argue that he has adequately pled financial elder abuse and that his evidentiary burden is not relevant on a motion to dismiss. In the complaint, Hansen basically states that Conseco agents bamboozled him into purchasing a Conseco annuity, which then subjected him to early withdrawal penalties, fees, and arbitrarily-capped interest rates. It is not impossible for Hansen to present facts and convince a jury that the annuity transaction resulted in wrongful retention (or retention with fraudulent intent) of Hansen's funds by Conseco.

Conseco also argues that the complaint discloses that the statute of limitations has run on this cause of action. Conseco argues that the statute of limitations for financial elder abuse is the general one of California Code of Civil Procedure § 338(a), three years, and Hansen does not contest this. Hansen instead argues that he was not aware of his cause of action until 2004, making this cause of action timely.

Generally, California law allows tolling of the statute of limitations under the discovery rule; that is, "the statute of limitations does not begin to run until the plaintiff discovered or had notice of all facts which are essential to the cause of action." *Saliter v. Pierce Bros. Mortuaries,* 81 Cal.App.3d 292, 296 (1978). The rationale behind this exception is that statutes of limitations "should not be interpreted so as to bar a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence." *Id.* at 297. "In order to invoke this special defense to the statute of limitations, the plaintiff must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence. *Id.* "Resolution of a statute of limitations defense normally is a factual question for the trier of fact." *City of San Diego v. U.S. Gypsum Co.,* 30 Cal.App. 4th 575, 582 (1994). However, "[m]ere conclusory assertions that delay in discovery was reasonable are insufficient." *Saliter,* 81 Cal.App.3d at 297.

The allegations in the complaint that Hansen did not discover his cause of action until 2004 are conclusory. Hansen merely states that "[d]ue to his age and other factors, including without limitation, the concealment and other misconduct by defendant and its sales agents, including Zehner, Mr. Hansen did not discover until 2004 that the Conseco deferred annuity product recommended and sold to him w[as] wholly unsuitable for his insurance and financial needs." CACAC ¶ 66. As the CACAC on its face suggests that Hansen's claim is untimely, it is one upon which relief cannot be granted. Conseco's motion to dismiss Hansen's financial elder abuse cause of action is granted with leave to amend to plead facts that show the statute of limitations has not run.

## 3. Unfair Competition

**\*6** Hansen's third cause of action is for unfair competition in violation of California Business and Professions Code § 17200 ("UCL"). Hansen purchased an annuity from Conseco in 2000 and filed his initial complaint in 2005; Hansen states that he discovered his claims against Conseco in 2004.

In re Conseco Ins. Co. Annuity Marketing & Sales..., Not Reported in...

RICO Bus.Disp.Guide 11,235

Conseco argues that Hansen's UCL claim is barred by the four-year statute of limitations. As the California Court of Appeal has noted:

> An action for unfair competition under Business and Professions Code section 17200 "shall be commenced within four years after the cause of action accrued." (Bus. & Prof.Code, § 17208.) The "discovery rule," which delays accrual of certain causes of action until the plaintiff has actual or constructive knowledge of facts giving rise to the claim, does not apply to unfair competition actions.

*Snapp & Assocs. Ins. Servs. v. Robertson,* 96 Cal.App. 4th 884, 891 (2002). That Hansen has alleged he did not discover his UCL claim against Conseco until 2004 is therefore irrelevant; the statute of limitations ran in 2004, before Hansen filed suit. Conseco's motion to dismiss Hansen's UCL cause of action is therefore granted. Hansen cannot overcome the statute of limitations defect by alleging late discovery of his claim. Therefore, he is given leave only to state facts that show fraudulent concealment of the basis of his claim. *See Gibson v. U .S.,* 781 F.2d 1334, 1345 (9th Cir.1986).

**4. False or Misleading Advertising**

Hansen's fourth cause of action is for false or misleading advertising, in violation of California Business and Professions Code § 17500. Conseco argues that the same statute of limitations that applies to UCL claims applies to false or misleading advertising claims and that the discovery rule is again inapplicable. Hansen does not contest this. Hansen's false or misleading advertising cause of action is therefore dismissed with leave to amend.

**5. Breach of Fiduciary Duty**

Plaintiffs' fifth cause of action is for common-law [7] breach of fiduciary duty. The elements of this cause of action under California law are (1) "the existence of a fiduciary relationship," (2) breach of that fiduciary relationship, and (3) "damage proximately caused by that breach." *Pierce v. Lyman,* 1 Cal.App. 4th 1093, 1101 (1991).

Conseco argues that this claim is subject to the four-year statute of limitations of California Code of Civil Procedure § 343, which Hansen does not dispute. [8] As Hansen purchased his Conseco annuity in 2000, the statute of limitations on his claim presumptively ran in 2004. [9] Hansen's claim that he could not discover the harm Conseco caused him earlier is conclusory and therefore legally insufficient. *See* CACAC ¶

66. Conseco's motion to dismiss Hansen's breach of fiduciary duty claim as time-barred is granted with leave to amend. *See Saliter,* 81 Cal.App.3d at 297.

Conseco also argues that California law does not impose on an insurer a fiduciary duty towards an insured. In another context, the California Court of Appeal has stated as much: "The relationship between an insurer and a prospective insured is not a fiduciary relationship." *Cal. Serv. Station & Auto. Repair Ass'n v. Am. Home Co.,* 62 Cal.App. 4th 1166, 1173 (1998). Likewise, another district court has determined that, as a matter of California law, an insured cannot maintain a claim against an insurer for breach of fiduciary duty. *See Almon v. State Farm Fire & Cas. Co.,* 724 F.Supp. 765, 766 (S.D.Cal.1989). The most recent discussion of this issue by a California court that the parties mentioned is *Tran v. Farmers Group, Inc.,* where the California Court of Appeal stated that "California courts have refrained from characterizing the insurer-insured relationship as a fiduciary one." 104 Cal.App. 4th 1202, 1211 (2002).

 **\*7** Plaintiffs argue that under California law, an insurer owes an insured duties akin to those that arise in a fiduciary relationship. The court in *Tran* acknowledged this but nonetheless explained

> [The California] Supreme Court declared: "The insurer-insured relationship is not a true fiduciary relationship in the same sense as the relationship between trustee and beneficiary, or attorney and client. It is, rather, a relationship often characterized by unequal bargaining power in which the insured must depend on the good faith and performance of the insurer. This characteristic has led the courts to impose special and heightened duties, but while these special duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, not because the insurer is a fiduciary."

> We agree with the authorities suggesting that an insurer's breach of its fiduciary-like duties is adequately redressed by a claim for breach of the covenant of good faith and fair dealing implied in the insurance contract.

*Id.* at 1212 (citations, brackets, ellipses and some quotation marks omitted). Therefore, as a matter of California law, no true fiduciary duty arises from the insurer-insured relationship and an insured therefore cannot maintain a claim for breach of fiduciary duty based solely on the insurer-insured relationship.

Plaintiffs also argue that the relationship between Conseco and the plaintiffs was more than just an insurer-insured relationship. Plaintiffs claim that Conseco was aware that its affiliated agents did such things as hold "estate planning seminars" to "to gain the trust of seniors by presenting themselves as expert financial advisors." CACAC ¶ 34. Even though as a matter of California law an insurer does not owe an insured a fiduciary duty, the insurer-insured relationship does not prevent the formation of a fiduciary relationship based on other acts or representations. *See Solomon v. N. Am. Life & Cas. Ins. Co.,* 151 F.3d 1132, 1138 (9th Cir.1998). A fiduciary relationship may arise where one holds himself out as acting in a position of trust, such as an agent or stockbroker. *See, e.g., Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690, 709 (1968).

However, nowhere in the complaint do the plaintiffs allege Conseco itself did anything or held itself out in a manner that would lead to imposition of a fiduciary relationship upon it. In *Migliaccio,* the court denied the defendant insurance companies' motion to dismiss a breach of fiduciary duty claim in part because the plaintiffs there alleged that the insurance companies "trained their sales agents to lure seniors citizens [sic] into their confidence by offering assistance with estate and financial planning ." 436 F.Supp.2d at 1108. The CACAC, however, does not contain similar allegations of any direct action taken by Conseco. There is thus no basis for imposing any fiduciary duty to plaintiffs upon Conseco, and Conseco's motion to dismiss this claim as to both plaintiffs is granted on this alternative ground.

### 6. Aiding and Abetting Breach of Fiduciary Duty

 **\*8**  Plaintiffs' sixth cause of action is for common-law aiding and abetting breach of fiduciary duty. Plaintiffs allege that Conseco and unnamed independent marketing organizations ("IMOs") worked together to breach their fiduciary duties to Hansen and Jones.

In California, a claim for aiding and abetting a tort requires two things: knowledge of the underlying tort, and substantial assistance in its commission. "Liability may ... be imposed on one who aids and abets the commission of an intentional tort if the person ... knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act." *Saunders v. Superior Court,* 27 Cal.App. 4th 832, 846 (1994). Or, as another court put it, "California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific

primary wrong the defendant substantially assisted." *Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal.App. 4th 1138, 1147 (2005).

The parties' arguments regarding dismissal on statute-of-limitations grounds of Hansen's aiding and abetting claim are identical to their arguments on the breach of fiduciary duty claim. For the reasons stated in the previous section, Conseco's motion to dismiss Hansen's aiding and abetting claim as time-barred is granted with leave to amend.

Jones alleges that Peter Cataldo, "a duly-appointed Conseco sales agent," convinced Jones to purchase a Conseco annuity by not disclosing to Jones that the annuity "had a minimum holding period of five years." CACAC ¶¶ 10, 56. However, under this claim for relief, plaintiffs claim only that IMOs, rather than individual sales agents, acted in concert with Conseco. As pled, Jones cannot recover for aiding and abetting a breach of fiduciary duty, and Conseco's motion to dismiss is granted as to that claim.

### 7. Fraudulent Concealment

Hansen's seventh cause of action is for fraudulent concealment, in violation of California Civil Code § 1710. Conseco argues that this claim is time-barred. California Code of Civil Procedure § 338(d) provides a three-year statute of limitations for actions based on "fraud or mistake." As a matter of California law, if the complaint discloses that a fraud claim was filed outside of the limitations period, a plaintiff must "affirmatively allege facts in his complaint showing that he was not negligent in failing to make discovery sooner" or "affirmatively establish facts in his complaint that he was not on inquiry notice," otherwise the complaint is subject to dismissal at the pleading stage. *See Denholm v. Houghton Mifflin Co.,* 912 F.2d 357, 362 (9th Cir.1990).

In *Denholm,* the Ninth Circuit held that the following pleading was too conclusory and thus legally insufficient to avoid dismissal: "Plaintiff discovered the fraud in March, 1984 when he learned that Defendants published a new mathematics program employing different authors. Prior to March, 1984, Plaintiff had no reason to suspect that Defendants would not employ him as promised." *Id.* Hansen's attempt to plead around the statute of limitations is similarly conclusory: "Due to his age and other factors, including without limitation, the concealment and other misconduct by defendant and its sales agents, including Zehner, Mr. Hansen did not discover until 2004 that the Conseco deferred annuity product recommended and sold to him were [sic] wholly unsuitable for his insurance and financial needs. At such

In re Conseco Ins. Co. Annuity Marketing & Sales..., Not Reported in...

RICO Bus.Disp.Guide 11,235

time, Mr. Hansen terminated his Conseco annuity and was assessed a substantial surrender charge by defendant which further damaged plaintff." CACAC ¶ 66. Conseco's motion to dismiss Hansen's fraudulent concealment claim as untimely is therefore granted.

### 8. Breach of the Duty of Good Faith and Fair Dealing

**\*9** Plaintiffs' eighth cause of action is for breach of the implied covenant of good faith and fair dealing. In their complaint, plaintiffs allege that the adverse financial effects they suffered at the hands of Conseco from the purchase of Conseco annuities were allowed by (albeit undisclosed) terms of the annuity contracts. *See* CACAC ¶¶ 44-46. That the terms of the contact were highly unfavorable to plaintiffs cannot constitute a breach of the implied covenant. *See Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 349-50 (2000); *Carma Developers (Cal.) v. Marathon Dev. Cal.,* 2 Cal.4th 342, 374 (1992).

However, plaintiffs argue that this cause of action is based at least in part on an alleged violation of California Insurance Code § 785(a), which provides that "All insurers, brokers, agents, and others engaged in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing. This duty is in addition to any other duty, whether express or implied, that may exist." Plaintiffs also claim California Insurance Code § 332 imposes duties on Conseco; that section provides that "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

Jones, however, has alleged no connection between his claims and California; he therefore cannot rely on California statutes in this action. *See Diamond Multimedia Sys. v. Superior Court,* 19 Cal.4th 1036, 1059 n. 20 (1999). Jones therefore has no basis for a claim for a breach of the implied covenant.

Conseco argues that this cause of action is subject to a two-year statute of limitations, which plaintiffs do not contest. A breach of the implied covenant is subject to a two-year statute of limitations. *Love v. Fire Ins. Exchange,* 221 Cal.App.3d 1136, 144 n. 4 (1990). Insurance Code § 785(a) applies to "prospective" insurers; any breach therefore had to occur before Hansen purchased a Conseco annuity in 2000. However, as Hansen sold his Conseco annuity in 2004 and filed suit in 2005, the court cannot say that as a matter of

law any breach of Insurance Code § 332 occurred more than two years before Hansen initiated this action. Although not detailed, Hansen has alleged that certain relevant facts were not disclosed to him by Conseco. *See* CACAC ¶¶ 63-65.

### 9. Unjust Enrichment or Constructive Trust

Plaintiffs have captioned their last cause of action "Unjust Enrichment and Imposition of Constructive Trust." [10] Conseco moves to dismiss this claim as to Hansen as barred by the four-year statute of limitations of California Code of Civil Procedure § 343. [11] As Hansen purchased his Conseco annuity in 2000, the statute of limitations on his claim presumptively ran in 2004. [12] Hansen's claim that he could not discover the harm Conseco caused him earlier is conclusory and therefore legally insufficient. *See* CACAC ¶ 66. Conseco's motion to dismiss Hansen's unjust enrichment claim as time-barred is granted.

**\*10** Conseco argues that as Jones has withdrawn his California statutory claims, his California common-law claims must be dismissed as well. Conseco cites to *Mitchell v. National Automobile & Casualty Insurance Co.,* 38 Cal.App.3d 599, 606 (1974), in support of this proposition. The court in *Mitchell* stated that "when a common count is based upon the same facts specifically pleaded in another count which is subject to demurrer, the common count is likewise subject to demurrer." *Id.* As Jones's statutory claims were withdrawn rather than dismissed, *Mitchell* is inapplicable and Conseco's motion to dismiss this claim is denied as to Jones.

### C. Motion to Strike

In its motion to dismiss, Conseco included a section entitled "INTRODUCTION AND STATEMENT OF ASSUMED FACTS." Plaintiffs move under Rule 12(f) to strike the factual allegations introduced in Conseco's motion to dismiss. As the court has not relied on any of these extraneous factual assertions in ruling on Conseco's motion to dismiss, plaintiffs' motion to strike is denied as moot. *See Migliaccio,* 436 F.Supp.2d at 1109-10. In any event, a motion is not a pleading and therefore may not be, under the express language of Rule 12(f), the subject of a motion to strike. *See Sidney-Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885-86 (9th Cir.1983).

### D. Requirements of Future Complaints

Although the court is requiring more specificity, this does not mean that the complaint should be longer. In fact, it should be substantially shorter.

### 1. Rule 9(b)

At the hearing on these motions, plaintiffs insisted that this is, at heart, a fraudulent nondisclosure case. It appears, however, that this case turns in part on some disclosure. Rule 9(b) requires that "all averments of fraud ... be stated with particularity." As the Ninth Circuit has explained, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1404 (9th Cir.1996).

For example, here plaintiffs need to provide details along the lines of the following: "On November 2, 2000, Jenkins said to Smith that the ABC annuity would be a good investment because it paid at least 3 percent interest tax-free and could be redeemed at any time. Jenkins knew when he made these statements but did not tell Smith that ABC retained complete discretion to adjust the rate above 3 percent; ABC rarely paid interest above 3.5 percent; ABC had never paid interest above 4 percent; ABC charged various expenses to annuitants, such as management salaries, trading fees, and administrative overhead, reducing the rate of return; the rate of return for the ABC annuity for the preceding four years had been from -1.7 to 2.1 percent; and only annuitants with net worths of less that $200,000 were eligible for the tax-exempt feature fo the ABC annuity.

### 2. Statute of Limitations

 **\*11** If plaintiffs wish to have an applicable statute of limitations tolled, they must allege *facts* explaining why the statute of limitations should be tolled either under the late discovery rule or because there was a fraudulent disclosure.

### III. ORDER

For the foregoing reasons, Conseco's motion to dismiss is

1. denied as to the RICO cause of action under 18 U.S.C. §§ 1962(b) and (d) and granted as to claims under §§ 1962(a) and (c) (if plaintiffs amend their complaint, violations of different subsections of 18 U.S.C. § 1962 should be pled as a separate counts);

2. granted as to the financial elder abuse cause of action, with leave to amend as to Hansen;

3. granted as to the UCL cause of action with leave to amend as to Hansen;

4. granted as to the false advertising cause of action with leave to amend as to Hansen;

5. granted without prejudice as to the breach of fiduciary duty cause of action;

6. granted without prejudice as to the aiding and abetting a breach of fiduciary duty cause of action;

7. granted as to the fraudulent concealment cause of action, with leave to amend as to Hansen;

8. denied as to Hansen and granted without prejudice as to Jones on the breach of the duty of good faith and fair dealing cause of action; and

9. granted without prejudice as to Hansen and denied as to Jones on the unjust enrichment cause of action;

and plaintiffs' motion to strike is denied.

### Parallel Citations

RICO Bus.Disp.Guide 11,235

---

Footnotes

1    No class has been certified under Rule 23.

2    Hansen's age does not appear in the operative complaint. However, in his initial complaint, he stated that he was sixty-eight years old when he purchased the Conseco annuity.

3    A class may be certified under Rule 23(b)(2) where a defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

---

In re Conseco Ins. Co. Annuity Marketing & Sales..., Not Reported in...

RICO Bus.Disp.Guide 11,235

4    Plaintiffs seem to recognize this, arguing that "plaintiffs have sufficiently alleged injury arising from defendant's 'use' of racketeering income, at least on a class-wide basis." Opp'n at 15. However, there must be a named plaintiff with standing to bring a claim before the court can consider putative class members. *See Allen v. Wright,* 468 U.S. 737, 751 (1984).

5    In any event, the court cannot say as a matter of law that Hansen should have known in 2000 of his alleged injury. *See Living Designs,* 431 F.3d at 361.

6    If plaintiffs amend their complaint, for clarity, violations of different subsections of § 1962 should be pled as separate RICO counts.

7    A federal court sitting in diversity applies the choice-of-law rules of the forum state, here, California. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501, 1506 (9th Cir.1993). California courts use "governmental interest" analysis to determine which jurisdiction's law to apply. *Id.* Presumptively, California law applies; a California court will use the law of another jurisdiction only if a party shows that the law of that other jurisdiction is materially different from California law and that that other jurisdiction has a greater interest in having its law applied than does California. *McGhee v. Arabian Am. Oil Co.,* 871 F.2d 1412, 1422 (9th Cir.1989). Plaintiffs do not in their complaint state what law their breach of fiduciary duty claim is based upon, but a California court would apply the California common law of breach of fiduciary duty.

8    Section 343 sets a four-year statute of limitations for causes of action "not hereinbefore provided for."

9    Jones purchased his Conseco annuity in 2003, and Conseco does not argue that his claim for breach of fiduciary duty is barred by the statute of limitations.

10    Imposition of a constructive trust is a remedy for fraud. "A constructive trust is an equitable remedy preventing unjust enrichment, compelling the restoration of property to another when it has been acquired through fraud ... unless the holder has some other or better right to the property." *Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg,* 216 Cal.App.3d 1139, 1154 (1989) (citations omitted). A constructive trust may only be imposed where the following three conditions are satisfied: (1) the existence of a *res* (property or some interest in property); (2) the right of a complaining party to that *res;* and (3) some wrongful acquisition or detention of the *res* by another party who is not entitled to it. *Communist Party v. 522 Valencia, Inc.,* 35 Cal.App. 4th 980, 990 (1995).

11    The court notes that the parties gave scant attention to this cause of action in their briefs.

12    Jones purchased his Conseco annuity in 2003, and Conseco does not argue that his claim for unjust enrichment is barred by the statute of limitations.

---

**End of Document**      © 2013 Thomson Reuters. No claim to original U.S. Government Works.


H

Superior Court of Maine.
MAINE FARMS VENISON, INC., et al., Plaintiffs,
v.
PEERLESS INSURANCE CO., Defendant.
No. CV-01-005.
April 18, 2002.

Order on Pending Motions

This case arises from a claim by plaintiffs Maine Farms Venison, Inc. and James Maxmin (collectively, "MFV") against MFV's insurer, Peerless Insurance Co., to collect for the death of a large number of insured deer on MFV's venison farm who allegedly died as a result of lightning on September 16 or 17, 1999. The relevant insurance policy provides that Peerless will pay for "direct loss caused by ... lightning" up to a limit of $250 per animal.

Before the court are eight motions: (1) a motion by Peerless to strike MFV's expert designations as untimely and insufficient; (2) a motion by MFV to extend its deadline for making expert designations; (3) a motion by MFV to strike Peerless's supplemental designation of expert witnesses; (4) a motion by Peerless to extend its time in which to make a supplemental expert designation; (5) a motion by MFV to extend its time to make expert designations in response to Peerless's supplemental designation; (6) a motion by Peerless for partial summary judgment with respect to MFV's claims relating to attorney Marjerison; (7) a motion in limine by Peerless challenging the qualifications of MFV's experts; and (8) a motion by Peerless for summary judgment in all respects.

These motions are necessarily interrelated. For instance, the outcome of the summary judgment motions depends to some extent on whether MFV's experts should be stricken and whether their opinions are admissible. Moreover, the issue of whether supplemental expert designations by Peerless should be allowed may be mooted depending on the outcome of its motion to strike and its summary judgment motions. The combined effect of these motions has been to create a form of judicial gridlock because none of the motions can be decided until all are addressed. Oral argument was held on November 29, 2001, and the court has been considering these motions and reviewing the record since that date.

### 1. *Timing of MFV's Expert Designations*

Under the circumstances of this case, given Peerless's original acquiescence in the delayed designations and MFV's showing of excusable neglect, the court will not strike the expert designations of Maxmin, Scott, and Quinn[FN1] because they were late and will grant MFV's October 10, 2001 motion to extend its designation deadline.

> FN1. The record demonstrates that although no timely designation was made for Kithil, the information that would have been contained in an expert designation had been provided to Peerless in a timely fashion.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. *Sufficiency of MFV's Expert Designations*

In many respects, even if their delay was excusable, MFV's designations as finally filed are nonetheless insufficient. The February 21, 2001 scheduling order entered in this case directed MFV to provide "a complete statement of the information and reports required by M.R. Civ. P. 26(b)(4)(A)(i)". That rule requires that a party provide the substance of the facts and opinions to which each expert is expected to testify and a summary of the grounds for each opinion. Nevertheless, by way of example, the designation of veterinarian Robert Scott provides his opinion by virtue of a rambling email that fails to set forth any grounds for his opinion that lightning was the cause of death and is largely devoted to opinions with respect to Peerless's handling of the claims -- opinions that Scott is not qualified to offer. Rather than seeking a Rule 26(g) conference to challenge the adequacy of this designation, however, Peerless made a motion to strike and thereafter took Scott's deposition. In that deposition, Scott elaborated upon the basis for his reasoning and appears to have provided fair notice of his opinions.

The designations of MFV's other experts are similarly deficient in many respects. Once again, however, depositions have been taken in which further elaboration has been provided.[FN2] Under these circumstances, the court denies the motion to strike based on the inadequacy of the designations. MFV's experts will be precluded at trial from offering in MFV's direct case any opinions not disclosed to Peerless in MFV's designations or in the depositions of MFV's experts.[FN3]

> FN2. The court understands that a defendant faced with inadequate expert designations from a plaintiff faces a dilemma in deciding whether to proceed with depositions. The taking of such depositions may appear to be necessary in order to meet the discovery deadline. However, if the appropriate elaboration of an opinion is provided at a deposition, the defendant can no longer claim to be in the dark as to the expert testimony to be offered. A defendant's remedy, as the court sees it, is for a defendant to promptly seek to resolve an inadequate designation with opposing counsel and then, if necessary, to promptly seek recourse from the court. *See* M.R. Civ. P. 26(g)(1). If the designation is inadequate, the court can order it supplemented. If the designation is not thereafter supplemented, the court can bar the expert from testifying and preclude the need for a deposition. But a defendant who would have been entitled to an order requiring further supplementation if an inadequate designation had been promptly brought to the court's attention should not be entitled to broader relief if it does not request the court to order supplementation and instead takes the expert's deposition and then argues that the expert should simply be barred by virtue of the inadequate designation.

> FN3. With respect to Peerless's challenge to the proposed expert testimony of Maxmin, the dispositive issue is whether Peerless has adequate notice of Maxmin's damage calculations and whether those calculations are too speculative to be admissible. On this record, the court cannot decide those issues. If Maxmin offers damage testimony at trial that was not previously disclosed to Peerless during discovery, Peerless will have the opportunity to object. Similarly, if Peerless contends that any portion of Maxmin's proposed damage testimony is too speculative to be admissible, it may raise that issue with the trial justice at or before trial.

The court will therefore turn to Peerless's motions for summary judgment and defer Peerless's in limine challenge to MFV's experts Kithil, Quinn, and Scott until the summary judgment motions have been addressed.

3. *Summary Judgment*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The general principles with respect to summary judgment are well settled. Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In ruling on a motion for summary judgment, "the court is to consider *only* the portions of the record referred to, and the material facts set forth, in the [parties' Rule 56(h)] statements." *See Handy Boat Service, Inc. v. Professional Services, Inc., 1998 ME 134, ¶ 16, 711 A.2d 1306, 1310* (construing former Rule 7(d) -- emphasis in original). The facts must be considered in the light most favorable to the non-moving party. *E.g., Panasonic Communications & Systems Co. v. State of Maine, 1997 ME 43, ¶ 10, 691 A.2d 190, 194.* Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Harkness v. Fitzgerald, 1997 ME 207, ¶ 5, 701 A.2d 370, 372.*

In this case the principle that the court must look only to the Rule 56(h) statements and the record references cited therein, *see Levine v. R.B.K. Caly Corp.,* 2001 ME 27 ¶ 9, 770 A.2d 653, 656 (court is neither required *nor permitted* to independently search the record to find support for facts averred by a party on a motion for summary judgment), is particularly important because MFV has not in certain instances offered any record references to support its denials of statements in Peerless's Rule 56(h)(1) statement and in other instances the record references cited by MFV do not support its denials. Moreover, MFV has not offered any statement of *additional* facts -- beyond its responses to the facts contained in Peerless's Rule 56(h)(1) statement.[FN4] Whether summary judgment should be granted, therefore, depends on whether, in those cases where MFV has disputed Peerless's statement of facts and properly provided record references, it has demonstrated the existence of a genuine dispute for trial.

FN4. See M.R. Civ. P. 56(h)(2) (3d sentence).

### 1. *Contract Claim*

The court concludes that MFV has demonstrated that there is a disputed issue for trial as to whether the deer were struck by lightning. This dispute arises from the statements of Waltz and his wife that lightning was observed[FN5] and Dr. Scott's opinion that the posture of the deer carcasses indicated their death was caused by lightning. MFV Rule 56(h) statement ¶ 33, *citing* Scott Dep. 66. In reaching this conclusion, it is not necessary to reach the admissibility of Kithil's testimony, but it is necessary to consider Peerless's challenge to the credentials of Dr. Scott. Peerless points out that Scott has not actively practiced as a veterinarian since 1990, is currently employed as a substitute teacher in Minnesota, and has never conducted an autopsy of an animal allegedly killed by lightning. Peerless Rule 56(h)(1) statement at ¶¶ 119-22 (admitted). However, for purposes of summary judgment, the court concludes that any weaknesses in Dr. Scott's credentials go to weight rather than admissibility.

FN5. *See* Peerless Rule 56(h) statement at ¶¶ 16-17; MFV Rule 56(h) statement at ¶¶ 16-17. Although he did not hear thunder, Waltz testified that he saw a brilliant blue flash of light. Waltz Dep. 36, 38. According to Waltz's deposition (id.), his wife contemporaneously stated that the flash was lightning - a statement that for purposes of summary judgment, the court will assume would be admissible under M.R. Evid. 801(1) or 801(2). (Whether that statement is ultimately admissible will be left to the judge presiding at trial). While Peerless has offered considerable evidence to controvert these facts, that evidence goes to weight and does not entitle Peerless to summary judgment.

### 2. *Unfair Claim Practices/Fraud/Bad Faith/Misrepresentation*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

MFV's claims for violations of the unfair claims practice statute and for fraud and misrepresentation (counts II-IV of the complaint), fairly construed in light of the arguments presented in MFV's pleadings, also include claims for breach of alleged fiduciary duty and breach of the implied covenant of good faith and fair dealing. These claims are challenged both by Peerless's overall motion for summary judgment and, in part, by Peerless's previously filed motion for partial summary judgment.

In this instance, since MFV did not file any statement of material facts opposing Peerless's motion for partial summary judgment -- which relates solely to the issue of whether MFV may base its claims in counts II through IV on correspondence to and from Attorney Marjerison or on the conduct of Attorney Marjerison -- the correspondence attached to that motion is acknowledged to be accurate and the only issue is whether that correspondence generates any disputed issue for trial. On Peerless's overall summary judgment motion, MFV has disputed certain facts but has chosen not to submit any additional facts.[FN6] As noted above, therefore, the dispositive issue on Peerless's motion for summary judgment is whether the facts which MFV disputes in its Rule 56(h)(2) statement and the portions of the record cited by MFV in its Rule 56(h)(2) statement are sufficient to demonstrate the existence of factual disputes for trial.

> FN6. MFV refers to certain other portions of the record in its opposition to both Peerless's motion for summary judgment and its motion for partial summary judgment but because those were not cited in a statement of material facts pursuant to Rule 56(h)(2), they cannot be considered by the court in ruling on the motions.

### A. *MFV's Bad Faith Claims*

At the outset, although MFV's memoranda of law argue that Peerless had a fiduciary duty to MFV, it has offered no authority for the proposition that such a duty exists as a matter of law. Nor has MFV offered any facts that could support a claim that MFV actually placed special trust and confidence in Peerless and that there existed a disparity in position or influence between the parties. *See, e.g., Brae Asset Fund LP v. Adam,* 661 A.2d 1137, 1140 (Me. 1995). To the extent, therefore, that MFV posits any alleged fiduciary duty that goes beyond either an insurer's statutory duty of good faith under 24-A M.R.S.A. § 2436-A (1999) or its implied contractual obligation of good faith and fair dealing, *see Greenvall v. Maine Mutual Fire Insurance Co.,* 1998 ME 204, ¶ 14, 715 A.2d 949, 955, MFV's fiduciary duty arguments are misplaced.

MFV's claims that Peerless violated its statutory and contractual obligations of good faith and committed fraud and misrepresentation are based on the following contentions:
• that Peerless allowed MFV to believe that it had purchased an all risk policy instead of a named peril policy.
• that MFV was advised or influenced by Peerless to bury the dead deer under circumstances that later precluded MFV from meeting its burden of proof of demonstrating that lightning caused the deaths;
• that Peerless influenced MFV to file a claim for less than the full number of deer by leading MFV to believe that fawns were not covered[FN7];

> FN7. This particular alleged claim of misrepresentation is essentially defensive in nature since MFV has raised it to counter Peerless's contention that MFV made material misrepresentations as to the number of deer killed, thereby voiding its coverage. This issue will be addressed separately below.

• that Peerless delayed in providing certain information to MFV and improperly lulled MFV into thinking that Peerless would assist it in developing the information necessary to pursue MFV's claim; and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

• that Peerless's counsel made various misrepresentations to MFV.

## B. *Alleged Misrepresentations as to "All Risk" Policy*

On this issue MFV contends that when James Maxmin, MFV's principal, obtained MFV's insurance policy from an insurance agent representing Peerless, he sought an all-risk policy and believed he had obtained such a policy. Maxmin Dep. 61-62. It is undisputed that the policy is actually a "named risk" policy. Peerless Rule 56(h)(1) statement ¶¶ 1-2. It is also undisputed that Maxmin read the policy when he obtained it. Maxmin Dep. 62, 64. Maxmin does not offer any evidence that he was ever told by Peerless or any agent of Peerless that the policy was an all-risk policy. However, proof of an affirmative misrepresentation may not be necessary to establish coverage by estoppel.[FN8]

> FN8. *See Kraul v. Maine Bonding & Casualty Co., 600 A.2d 389, 391 n. 4 (Me. 1991)*, *cert. denied,* 504 U.S. 959 (1992). The Law Court has observed that a claim for coverage beyond the express terms of a policy, based on misrepresentations or unreasonable conduct by the insurer or its agent, should be analyzed as an estoppel issue. *See Maine Mutual Fire Ins. Co. v. Grant, 674 A.2d 503, 504 n.1 (Me. 1996).*

Nevertheless, MFV cannot establish any disputed issue for trial as to whether it justifiably relied upon any conduct by Peerless's agent that might have been unreasonable and that might have led MFV to believe it had obtained an all risk policy. This is because MFV has not successfully disputed ¶ 7 of Peerless's Rule 56(h)(1) statement that no insurer in the State of Maine offers an all risk policy for livestock coverage. The facts offered by MFV in opposition to ¶ 7 all relate to Maxmin's alleged understanding at the time the policy was issued, but he cannot establish justifiable reliance on that understanding unless he could have obtained an all risk policy if he had known the actual facts. *See Maine Mutual Fire Ins. Co. v. Grant, 674 A.2d at 505* (no showing that plaintiff could have obtained umbrella coverage elsewhere); *Kraul v. Maine Bonding & Casualty Co., 600 A.2d at 391* (no reliance, *inter alia,* because coverage desired was not available).

Summary judgment is therefore granted to Peerless on MFV's claims that Peerless misrepresented that MFV had all risk coverage or that Peerless is estopped from denying that MFV had all risk coverage.[FN9]

> FN9. As noted below, however, there may still be a question whether Peerless ever misled MFV as to whether MFV was required to demonstrate that lightning caused the death of the deer.

## C. *Decision to Bury the Dead Deer*

Probably the most significant of MFV's remaining claims of misrepresentation and bad faith concerns the burial of the dead deer before any autopsy was taken. It appears to be undisputed that although some deer carcasses were disinterred and examined a number of days later, too much time had passed by that time. An autopsy in the immediate aftermath of the deaths would potentially have been more informative. On this issue MFV's Frank Waltz acknowledged at his deposition that after finding the dead deer he relied on the advice of Dr. Pierce, a veterinarian unaffiliated with Peerless, that the deer carcasses should be burned or buried. Waltz Dep. 58-59. That same day, a representative of Peerless named Hilton inspected the deer and Waltz acknowledges Hilton told him that he should try to freeze one deer so that it would be available for inspection. Waltz Dep. 73. At his deposition Waltz further testified, however, that Hilton also said that if no deer could be preserved, "it would be all right". *Id.* 76. Waltz subsequently has filed an affidavit stating that he would not have buried the deer without Hilton's acqui-

escence. Waltz has further testified that he called various members of his family in an effort to freeze one of the deer but those family members were unwilling or unable to put a deer in their freezer. All the deer were buried with a backhoe the next day.

On summary judgment, the court cannot make determinations as to credibility. Given MFV's burden to prove that the deaths were caused by lightning, Waltz's allegation that Hilton told him that "it would be all right" if no deer could be preserved is sufficient to create a disputed issue for trial as to whether Peerless breached its implied contractual duty of good faith or made a knowing misrepresentation as to policy provisions. 24-A M.R.S.A. § 2436-A(1)(A). At least arguably, this led MFV to bury the deer without getting an autopsy or without making certain that one of the carcasses was frozen and left MFV unable to meet its burden of proof. Also potentially relevant in this connection is whether Peerless misled MFV as to whether MFV was required to demonstrate that lightning caused the death of the deer.

Summary judgment is therefore denied with respect to MFV's claims of unfair claims practices and misrepresentation to the extent those claims relate to the burial of the deer without an autopsy or without freezing a carcass to preserve it for later examination.

### D. *MFV's Remaining Bad Faith and Misrepresentation Claims*

The court has carefully examined MFV's remaining misrepresentation and bad faith claims and concludes that MFV has failed to generate any disputed issues for trial. It is undisputed that Peerless wrote within five days of the discovery of the dead deer to advise MFV that there was a question whether the loss was covered and that Peerless denied the claim on November 4, 1999, while leaving the door open to the submission of further information. In its Rule 56(h)(2) statement opposing Peerless's motion for summary judgment, MFV has raised no other facts demonstrating that there are disputed issues for trial on its statutory unfair claims practices count, on its implied contractual duty of good faith claims, or on its fraud and misrepresentation claims.

Specifically, except as noted above, MFV has not offered any facts in its Rule 56(h)(2) statement sufficient to warrant a trial on any other alleged knowing misrepresentations with respect to pertinent facts or policy provisions with respect to coverage. 24-A M.R.S.A. §2436-A(1)(A). There is no evidence that Peerless failed to acknowledge and review MFV's claim within a reasonable time, 24-A M.R.S.A. §2436-A(1)(B), or that Peerless failed to affirm or deny coverage, reserving appropriate defenses, within a reasonable time. 24-A M.R.S.A. § 2436-A(1)(D).[FN10] Finally, whatever else can be stated as to this case, the summary judgment record establishes that this is not a case in which Peerless's liability ever became "reasonably clear." 24-A M.R.S.A. § 2436-A(1)(E).

> FN10. Indeed, one of the claims made by MFV's proposed expert with respect to insurance practices is that Peerless may have responded too quickly. However, that expert also agreed that Peerless had performed a very good investigation of MFV's claim. Quinn Dep. 95.

Similarly, while MFV claims that Peerless treated it like a third party instead of a first party insured, MFV has offered no facts to support that claim in its Rule 56(h)(2) statement. It may be questioned whether this claim even if proven would establish a violation of Peerless's contractual duty of good faith -- in the absence of actual instances of bad faith or unfairness -- but on this record that question need not be reached. The purpose of the 2001 amendments to Rule 56(h) was to codify the Law Court's existing jurisprudence with respect to summary judgment, *see Kezer v. Mark Stimson Associates,* 1999 ME 184, ¶ 2 n. 1, 742 A.2d 898, 900 n. 1, and to require a party opposing summary judgment to set forth all its factual disputes and all its supporting

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

record references in its statement of material facts so that the court is not faced with the prospect of having to comb the entire record. To the extent that MFV argues that it has evidence to support its bad faith claim beyond that contained in its Rule 56(h)(2) statement, its arguments are unavailing.

That leaves for consideration only the issues raised on Peerless's motion for partial summary judgment, which relates to alleged claims of misrepresentation arising from the conduct of attorney Marjerison once he became involved on December 2, 1999.[FN11] On the record as it stands for purposes of summary judgment, MFV has not demonstrated that there are any disputed issues for trial as to whether attorney Marjerison made any misrepresentations or engaged in any unreasonable delay after the proof of claim was submitted. In addition, MFV has not demonstrated any disputed issues for trial on the issues of whether it was prejudiced by any possible delays[FN12] nor has it demonstrated any justifiable reliance on the statements that it contends were misrepresentations. To the contrary, MFV's correspondence demonstrates that it challenged and doubted Marjerison's statements as well as those previously made by Peerless. *See, e.g.,* Exhibits 3, 6, 9, 11, 12, 13, 15, 18, 19, 22 and 24 to Peerless's motion for partial summary judgment.

> FN11. This motion was apparently filed separately because of counsel's view that it was necessary to resolve as soon as possible the issue of whether attorney Marjerison was a potential witness and might have to withdraw. However, this motion was not scheduled for a hearing until Peerless's overall motion for summary judgment had been finally briefed, and the motions were ultimately heard together on November 29, 2001.

> FN12. After the deer were buried without any carcass being frozen - an issue as to which, as noted above, there is a dispute as to the parties' respective responsibility - MFV has offered no basis to suggest that any delay by Peerless in responding to its sometimes intemperate letters or in providing information resulted in any prejudice to its claim.

With the exception stated in subsection C above, therefore, Peerless's motion for summary judgment on counts II-IV of the complaint is granted. Moreover, to the extent that MFV is alleging independent tort claims in courts III and IV, rather than claims for misrepresentation in violation of the implied contractual duty of good faith, its claims are foreclosed by *Stull v. First American Title Insurance Co.,* 2000 ME 21 ¶¶ 14-15, 745 A.2d 975, 980-81 (unless independent tortious conduct can be shown beyond alleged contractual violations, insured is limited to remedies for breach of contract). *See Marquis v. Farm Family Mutual Insurance Co.,* 628 A.2d 644, 652 (Me. 1993). As a result MFV's claims in counts II through IV based on the burial of the deer will be limited to its statutory claim for misrepresentation under 24-A M.R.S.A. § 2436-A(1)(A) and its claim for alleged breach of an insurer's contractual duty of good faith.

*3. Peerless's Contention That Any Coverage Is Voided By MFV's False Statements With Respect To The Number Of Deer Killed*

Peerless contends that any coverage for which it potentially might be responsible has been voided by MFV's varying statements as to the number of deer killed. This argument is based on a provision in the insurance contract that coverage is not provided to insureds who at any time
1. Intentionally concealed or misrepresented a material fact;
2. Engaged in fraudulent conduct; or
3. Made a false statement relating to this insurance.

Exhibit N to Peerless motion for summary judgment.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Assuming that statements made in connection with claims as opposed to insurance applications fall under this provision,[FN13] the court concludes that this is an issue that cannot be decided on summary judgment. To be sure, Peerless has demonstrated beyond dispute that MFV originally claimed 84 deer were killed and has subsequently offered at least five other totals: 166, 154, 191, 170, and 187 to 190. *See* Peerless Rule 56(h)(1) statement ¶¶ 82, 85, 86, 87, 88 (undisputed) and MFV's memo in opposition to summary judgment at 13. MFV's response, however, is that Waltz and MFV's proof of claim originally reported only 84 deer because Peerless incorrectly or falsely advised MFV that fawns were not covered and that the differing numbers subsequently reported represent understandable confusion as to the number of fawns killed in addition to the original 84 does reported.

> FN13. MFV does not contest this issue. However, it does point out that since Peerless had already denied its claim when only 84 deer had been reported killed, Peerless cannot claim to have relied on any later statements by MFV increasing the number claimed.

The primary point in dispute is whether the 84 deer originally reported included fawns. On this issue, although Peerless offers considerable evidence casting doubt on MFV's version of events,[FN14] the court is presented with credibility issues that cannot be decided on summary judgment. Moreover, to the extent that Peerless is arguing that because various different numbers have been presented by MFV and only one number can be correct, MFV has necessarily made several "false statements," the court does not interpret the insurance policy so inflexibly. Representations in insurance *applications* may void policies if those representations are either fraudulent or material. *See* 24-A M.R.S.A. § 2411 (1999). However, in the context of statements made during the claims process, as opposed to the application process, the court interprets the provision excluding coverage to insureds who make "false statements" to apply at most to statements that are either knowingly or at least recklessly false. Otherwise wholly innocent but incorrect statements made in the course of the claims process could void coverage.

> FN14. Primarily this is because Waltz's recorded statement, conceded to be accurate for purposes of summary judgment, *see* Peerless Rule 56(h)(1) statement ¶ 43, states that 84 deer were discovered dead - "50 breed age doe and *34 between the yearling and the fawns, you know, that were born in June,* there was 34 fawns and 50 big deer." Ex. O to Peerless motion for summary judgment at 6-7 (emphasis added). Waltz's mention of 34 yearlings and "fawns ... born in June" is directly inconsistent with the later assertions by Waltz and Maxmin that fawns were not included in the 84 deer originally reported. This is only one of several inconsistencies with respect to MFV's current position as to the number of deer killed.

### 4. *MFV's Defamation and Intentional Interference with Advantageous Economic Relationship Claims*

MFV's defamation claim is based on the allegation that a Peerless representative made defamatory statements to Dr. Donald Hoenig and thereby persuaded him not to assist MFV and not to be a witness with respect to MFV's insurance claim. Specifically, MFV alleges that Hoenig was told that some deer were still alive on September 18, and that as a result Peerless must have stated or suggested that MFV was lying in making its lightning claim. However, both Dr. Hoenig and the Peerless representative involved have submitted sworn affidavits denying that Dr. Hoenig was ever told that deer were alive on September 18 and denying that any effort was made to convince or intimidate Hoenig not to be a witness.

MFV has failed to generate any disputed issues of fact with respect to this issue. Its only evidence to contradict the Hoenig and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Weymouth affidavits consists of certain cryptic comments which Waltz alleges Hoenig made to him and which MFV infers are inconsistent with Hoenig's statement that he was never told deer were alive on September 18. However, Hoenig is not a party to this action. Anything that Waltz alleges that Hoenig said to him is inadmissible hearsay -- possibly admissible to impeach Hoenig if Hoenig testifies at trial but not competent to constitute evidence on the merits of MFV's defamation claim. Accordingly, since MFV has offered no admissible evidence that it was ever defamed, summary judgment is granted to Peerless as to count V.

MFV's defamation claim is subject to dismissal for another reason. Even if MFV's evidence were admissible, MFV does not know and has no evidence as to the exact defamatory statements allegedly made to Hoenig. It has only offered supposition that those alleged statements accused MFV of dishonesty or criminal conduct. Defamation must be pled and proven with specificity, not supposition. *E.g. Picard v. Brennan,* 307 A.2d 833, 834-35 (Me. 1973).

According to its opposition to Peerless's motion for summary judgment, MFV's claim for intentional interference with advantageous economic relations (count VI) is also based at least in part on Peerless's alleged statements to or interference with Hoenig. Because MFV has no admissible evidence on those issues for the reasons set forth above, summary judgment must also be granted to Peerless on count VI as it relates to Hoenig. To the extent that MFV argues more broadly that Peerless's handling of its claim constituted intentional interference with an advantageous relationship, count VI must also be dismissed because -- if Peerless breached its contract -- MFV's remedy is contractual. MFV has offered no authority for the proposition that a party alleging breach of contract can also pursue a tort claim for intentional interference against the other party to the contract, and the court is aware of no such authority. Finally, MFV has also not demonstrated that there are disputed issues for trial with respect to the kind of fraud or intimidation necessary to sustain an intentional interference claim.

### 5. *Punitive Damages*

Summary judgment is also granted for Peerless on MFV's claim for punitive damages. This is true for two reasons. First, punitive damages are not available in contract actions. *E.g., Drinkwater v. Patten Realty Corp.,* 563 A.2d 772, 776 (Me. 1989). MFV's independent tort claims for defamation and intentional interference have been dismissed, and the Law Court has made clear that a party alleging breach of an insurer's duty of good faith is entitled to contractual remedies rather than tort remedies. *E.g., Stull v. First American Title Insurance Co.,* 2000 ME 21, ¶¶ 14-15, 745 A.2d at 980-81; *Marquis v. Farm Family Mutual Ins. Co.,* 628 A.2d at 652.

Second, even assuming that MFV's tort claims for fraud and misrepresentation survive, even though they are not independent of its contractual claims, MFV has not demonstrated the existence of any disputed issues on which it could demonstrate by clear and convincing evidence at trial that Peerless acted with actual malice in this case or engaged in such outrageous conduct that malice could be implied. *See Gayer v. Bath Iron Works,* 687 A.2d 617, 622 (Me. 1996).

### 6. *Remaining Issues*

#### A. *Peerless's Motion in Limine*

Peerless's challenge to the expert testimony of Scott, Kithil, and Quinn is contained in its motion in limine. While the court is prepared to rule on the broad issues raised in that motion, the exact boundaries of the expert testimony to be admitted at trial

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

must in many instances be determined by the trial justice.

As set forth above, Peerless's challenge to Scott's expert testimony as to the cause of death is rejected, at least at this stage. Scott will not, however, be permitted to offer alleged expert testimony as to the profitability of MFV or to alleged bad faith on the part of Peerless or to any opinion not disclosed to Peerless in Scott's designation or deposition. The record, moreover, also suggests that MFV may seek to offer testimony from Scott that goes beyond his expertise. To the extent that Scott seeks to offer expert opinions as to meteorologic issues or as to the properties of lightning (*e.g.,* Scott Dep. 59-60), it is far from clear that such testimony would be admissible. It is for the trial justice, however, to determine the line between appropriate veterinary testimony based on Scott's experience and training and testimony that is beyond Scott's expertise.

With respect to Peerless's challenge to the expert testimony of Richard Kithil, Kithil at his deposition disclaimed expertise with respect to electricity or electrical engineering, with respect to veterinary medicine, and with respect to meteorology. Kithil Dep. 25-26. Thus, his proposed expert testimony should be scrutinized with some care. Moreover, Kithil's various reports demonstrate that he is eager to offer testimony on issues (e.g., myocardial damage, opisthotonos) that are outside any expertise he may possess. Finally, like those of Scott, Kithil's opinions as to Peerless's handling of the claim and its alleged bad faith are inadmissible.

Nevertheless, although Kithil is self taught, he appears to possess considerable knowledge and experience with respect to lightning protection and detection, and the court is not prepared at this stage to exclude his testimony with respect to the efficiency of the lightning detection network[FN15] and with respect to indicators of the presence of lightning (e.g., alleged evidence of "treeing"). This will only be true, however, to the extent that Kithil can demonstrate a sufficient scientific or otherwise reliable basis with respect to such testimony. Thus, while Kithil cannot offer an opinion as to cause of death per se, he may be able to offer an opinion as to whether a lightning strike occurred at MFV on September 16 or 17, 1999.

> FN15. Peerless argues that Kithil's criticisms of the National Lightning Detection Network's efficiency are out of date. This would appear to go to weight, not admissibility.

Peerless has, however, raised sufficient issues as to whether certain aspects of Kithil's testimony have a reliable scientific basis that the trial justice, in his or her discretion, may wish to hold a further hearing outside the presence of the jury before allowing him to testify.[FN16] For instance, Kithil's opinions with respect to a blown fuse in the fence charger appear to be suspect given, *inter alia,* his lack of knowledge as to the placement of the fuse and the circuitry involved. Kithil Dep. 83-85.

> FN16. See, e.g., *State v. MacDonald* 1998 ME 212, ¶¶ 4-5, 7, 718 A.2d 195, 197-98, *citing* *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 589-90 (1993).*

With respect as to proposed expert testimony of Quinn, the court concludes that the issues raised by Peerless with respect to Quinn's credentials go to weight rather than admissibility. However, the court concludes that Quinn's somewhat equivocal testimony[FN17] with respect to Peerless's alleged lack of good faith is not admissible. The only grounds Quinn cites for his opinion are that Peerless issued a reservation of rights letter too early,[FN18] that it should have reserved its rights verbally rather than in writing, that Peerless retained counsel before MFV did,[FN19] and that Peerless should have "considered" compromising the case. Quinn Dep. 26-29, 95. These opinions are not based on any industry standard but rather on Quinn's own personal practice and his personal beliefs. *Id.* 29, 31, 41, 48.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. *Compare* Quinn Dep. 96 with *id.* 98-99.

FN18. Quinn does not attempt to reconcile this opinion with Peerless's statutory obligation to affirm or deny coverage, reserving appropriate defenses, within a reasonable time. 24-A M.R.S.A. § 2436-A(1)(D).

FN19. The record reflects that when Peerless retained counsel it thought, based on MFV's correspondence, that MFV had already done so. *See* Exhibits 26 and 27 to Peerless motion for partial summary judgment.

While the opinion that Peerless treated MFV like a third party rather than a first party insured *might* be admissible if based on some industry standard, Quinn's testimony -- which amounts to the assertion that he would have handled the claim differently based on his personal practice -- does not constitute expert testimony that would be helpful to the trier of fact in this case. That would be true even if MFV were entitled to proceed at trial with a broadscale attack on Peerless's handling of the claim. Given that summary judgment has been granted dismissing MFV's claims of bad faith with the limited exception of claims specifically relating to Peerless's role in allowing the deer to be buried, Quinn's proposed testimony is no longer relevant. Peerless's motion in limine to preclude Quinn's testimony is granted.

### B. *MFV's Challenge to Peerless's Supplemental Designation*

Finally, there is the issue of whether Peerless's supplemental designation of experts should be stricken. Peerless's response is that in light of the inadequacy of MFV's designations, it did not know what issues its experts would have to respond to until it took the depositions of MFV's experts. Although the court is far from happy with the way the designations of experts were handled in this case, it concludes, in light of its ruling excusing MFV's late and in many cases inadequate designations, that it should permit Peerless to supplement its expert designations as requested.[FN20]

FN20. That leaves only MFV's October 22, 2001 motion to further extend the time for expert designations in order to offer rebuttal testimony (and perhaps an additional expert) in response to Peerless's supplemental designations. To the extent that MFV seeks to offer a new rebuttal expert, its motion is denied. While rebuttal experts may be permissible under certain circumstances (as where a defendant offers expert testimony on an entirely different subject than the subjects covered by plaintiffs experts), MFV has not demonstrated that this case presents such circumstances. At the same time, it is possible that there may be some role for MFV's existing experts, Scott and Kithil, to offer limited rebuttal testimony if such testimony is truly in the nature of rebuttal to the testimony presented by Peerless's experts. This issue must necessarily be left to the trial justice.

The entry shall be:

1. Plaintiff's motion for leave to file its expert designations dated June 19, 2001 is granted, and defendant's motion to strike plaintiffs' experts based on untimely and inadequate designations is denied. Plaintiffs' motion to strike defendant's supplemental designation of experts is denied, and defendant's motion to allow its October 12, 2001 supplemental expert designations is granted. Plaintiffs' motion for a further extension in which to offer further expert designations in response to defendant's supplemental designation is denied.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. Defendant's motion for partial summary judgment dismissing plaintiffs' claims for unfair claims practices, fraud, and misrepresentation based on the actions of Peerless's counsel on or after December 2, 1999 is granted. Defendant's motion for summary judgment dismissing counts V and VI of the complaint and dismissing plaintiffs' claim for punitive damages is granted. Defendant's motion for summary judgment dismissing counts II, III, and IV of the complaint is granted *except* as to plaintiffs' statutory claim for unfair claims practices and its contractual claim for breach of the contractual duty of good faith and fair dealing. Those latter claims shall be limited to Peerless's alleged role with respect to the burial of the deer and the failure to obtain a useful autopsy. Defendant's motion for summary judgment is denied as to count I of the complaint.

3. Defendant's motion in limine is granted as to the testimony of Quinn and is granted in part as to the testimony of Scott and Kithil to the extent stated in this order.

Dated: April 17, 2002                              <<signature>>

                                                   Thomas D. Warren

                                                   Justice, Superior Court

MAINE FARMS VENISON, INC., et al., Plaintiffs, v. PEERLESS INSURANCE CO., Defendant.
2002 WL 33946004 (Me.Super. ) (Trial Order )

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

1995 WL 115416
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

John GARVEY

v.

NATIONAL GRANGE MUTUAL
INSURANCE COMPANY.

CIV. A. 95–0019.  |  Mar. 16, 1995.

**Opinion**

## MEMORANDUM AND ORDER

HUTTON

*1 Presently before the Court are defendant National Grange Mutual Insurance Company's ("National Grange") Motion to Dismiss and/or Strike Plaintiff's Complaint and plaintiff's opposition thereto.

## I. BACKGROUND

Plaintiff was the owner of a deli and catering business called Creative Cuisine, located at 4 East Bristol Road, Feasterville, Pennsylvania. The property was insured by a policy issued by defendant National Grange. On June 29, 1993, a fire destroyed the contents of the business. Plaintiff hired Philadelphia Public Adjusters, which communicated losses to defendant. After an investigation, defendant denied coverage of plaintiff's claim.

Plaintiff instituted this action, seeking to obtain coverage for the claim. Plaintiff argues that defendant is obligated by the terms of the insurance contract to indemnify plaintiff's losses. Specifically, plaintiff alleges breach of contract (counts I and II), bad faith (count III), breach of fiduciary duty (count IV), deceit (count V), and intentional interference with a protected property interest (count VI).

Defendant now seeks to dismiss the complaint for failure to state a claim upon which relief can be granted, as well as to strike various portions of the complaint that are redundant and/or immaterial, pursuant to Rule 12(f).

## II. DISCUSSION

### A. *Standard*

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a). Defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss, this Court shall take all allegations contained in the complaint as true and construe them in the light most favorable to the plaintiff. *H.J. Inc. v. Northwest Bell Tel. Co.,* 492 U.S. 229, 249–50 (1989). The complaint shall only be dismissed if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)); *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

Pursuant to Rule 12(f), moreover, "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f).

### B. *Breach of Contract*

Counts I and II of the complaint both allege breach of contract by the defendant for failure to pay the claim. Plaintiff seeks to recover, in addition to compensatory damages normally recoverable under a breach of contract claim, certain "special damages" that he claims resulted from the alleged breach. Under Pennsylvania law, such special damages are only recoverable for breach of contract where they fall within the following guidelines:

> Where one party to a contract, without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provides otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach; or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty. *Taylor v. Kaufhold,* 368 Pa. 538, 546, 84 A.2d 347 (1951).

**\*2** *Mellon Bank, N.A. v. Aetna Bus. Credit,* 500 F.Supp. 1312, 1317 (W.D. Pa.1980).

Pennsylvania courts have also refused to allow punitive damages for breach of contract. *Id.* at 1321; *Rittenhouse Regency Affiliates v. Passen,* 482 A.2d 1042 (Pa.Super. Ct.1984); *Mazzula v. Monarch Life Ins. Co.,* 487 F.Supp. 1299, 1301 (E.D.Pa.1980). Recovery for loss of good will is similarly not permitted for breach of contract. *National Controls Corp v. National Semiconductor Corp.,* 833 F.2d 491, 495 (3d Cir.1987). And "[e]ven where the plaintiff's claim truly represents a claim for lost profits, rather than loss of good will, it may be rejected as speculative and unrecoverable." *Id.* Finally,

> damages for emotional distress are not ordinarily allowed in actions for breach of contract. There are only two exceptions. The first is where the emotional distress accompanies bodily injury. This usually takes the form of an action in tort. The second exception occurs where the breach is of such a type that serious emotional disturbance is a particularly likely result.... Although it is recognized that in certain cases a breach of contract can be tortious, ... the essence of such a tort must be extreme and outrageous conduct. "Liability has been found only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*"

*Rittenhouse Regency,* 482 A.2d at 1043.

In the case presently before the Court, plaintiff seeks to recover the following damages under the first breach of contract claim: (1) loss of equipment; (2) betterment; (3) income; (4) goodwill; (5) loss of his business lease; (6) loss of the opportunity to purchase the damaged building; (7) loss of the ability to restore his business operation and repair or replace his equipment; (8) loss of good will; (9) humiliation; and (10) attorneys' fees. The second count for breach of contract substantially restates these claims, specifically those for the lost opportunity to purchase the premises and the loss of the lease.

Plaintiff has, at least at this stage, adequately pled his claim for breach of contract and resulting consequential damages, except punitive damages and loss of good will. Plaintiff alleges that the damages were in direct contemplation of the defendant when the defendant failed to pay on the claim.

Therefore, taking such allegations as true, plaintiff's first breach of contract claim is adequate.

Punitive damages are not allowed under Pennsylvania law, and thus plaintiff's claim for punitive damages under breach of contract will be dismissed. In addition, plaintiff has not pled the loss of good will claim properly; he has failed to make any allegation that defendant acted in a way "*so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*"

**\*3** The second breach of contract claim, however, is entirely repetitive and redundant and there is no reason not to strike it, pursuant to Rule 12(f). Accordingly, Count II is dismissed.

## C. *Bad Faith*

There is no common law remedy under Pennsylvania law for bad faith on the part of insurers. *Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 750 (3d Cir.1994). However, the Pennsylvania legislature has created a statutory remedy for bad faith conduct. 42 Pa.C.S.A. § 8371. Section 8371 reads:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

> (2) Award punitive damages against the insurer.

> (3) Assess court costs and attorney fees against the insurer.

The Third Circuit, in *Polselli,* explored the meaning of "bad faith" in § 8371:

> Section 8371 does not define the term "bad faith." The Pennsylvania rules of statutory construction provide that words and phrases that "have acquired a peculiar and appropriate meaning ... shall be construed according to such peculiar and appropriate meaning...." 1 Pa. Con. Stat. Ann. § 1903 (Supp.1992). In the insurance context, the term "bad faith" has acquired a peculiar and universally acknowledged meaning:

> > *Insurance.* "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes

of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of selfinterest or ill will; mere negligence or bad judgment is not bad faith.

Black's Law Dictionary 139 (6th ed.1990) (citations omitted).... Thus, only mere negligence on the part of the insurer is insufficient to constitute bad faith; recklessness, however, can support a finding of bad faith.

*Id.* at 751. Plaintiff must ultimately establish that defendant's denial of his claim was unreasonable, and that the insurer acted with knowledge or reckless disregard of the lack of a reasonable basis. *Montgomery v. Federal Ins. Co.,* 836 F.Supp. 292, 298 (E.D.Pa.1993).

In the instant complaint, plaintiff adequately pleads a claim for bad faith. For example, the complaint alleges that the insurer failed to make payments even though the insurer "knew or should have known that Plaintiff was entitled to such payments under the terms of the insurance contract"; and that the insurer failed "to do a reasonable and prompt investigation and process plaintiff's claim for benefits under the insurance contract." The plaintiff must eventually show that the defendant in fact acted with reckless disregard; for now, however, taking all allegations as true, Count III for bad faith will not be dismissed.

**D.** *Breach of Fiduciary Duty*
**\*4** "The mere fact that an insurer and an insured enter into an insurance contract does not automatically create a fiduciary relationship.... However, the contract and the duties it imposes can give rise to a fiduciary relationship between the parties." *Connecticut Indemnity Co. v. Markman,* 1993 WL 304056, \*5 (E.D. Pa. Aug. 6, 1993). "No Pennsylvania law establishes a fiduciary duty based on the duty of good faith and fair dealing. Thus, ... [an] alleged failure to exercise the duty of good faith and fair dealing does not give rise to an actionable claim for a breach of fiduciary duty." *Id.* at \*6.

Despite creative attempts by the plaintiff to turn the insurance contract into a fiduciary relationship, plaintiff's complaint here alleges nothing more than a breach of contract based on good faith and fair dealing. Counts I and III, for breach of contract and bad faith, address those claims. Accordingly, Count IV will be dismissed.

**E.** *Deceit*
The elements of a deceit action in Pennsylvania are: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention that another person will thereby be induced to act or refrain from acting; (4) justifiable reliance by the recipient; and (5) damage to the recipient. *Neal v. Schnader, Harrison, Segal & Lewis,* 1994 WL 220274, \*2 (E.D. Pa. May 18, 1994), *aff'd,* 43 F.3d 1462 (3d Cir.1994). A promise or statement of intention may only be the basis for a deceit action if the statement was false when made. Simple nonperformance is not enough to establish that a promise or statement of intention was false when made, nor may fraudulent intent be inferred from subsequent events. *Id.*

Plaintiff's complaint adequately pleads each of these elements. The complaint alleges that the promise to pay was made, with no intention of performing the promise; that plaintiff relied on such a promise and entered into the insurance contract and that defendant intended to induce plaintiff to rely on the promise; and that plaintiff suffered damages as a result of the alleged deceit. Moreover, the insurance contract, noting dates and times of the promise, was attached to and made part of the complaint, thereby satisfying the particularity requirement of Rule 9(b). Accordingly, Count V for deceit will not be dismissed.

**F.** *Intentional Interference with Protected Property Interest*
Plaintiff's final claim is novel and unsupported. He titles it "intentional interference with protected property interest," but it is actually nothing more than a tort claim that arose from the alleged breach of contract. Such a theory of recovery has been explicitly rejected by the Pennsylvania courts: "We find no Pennsylvania authority that permits a recovery in a tort action ... where the only alleged tortious act was a breach of contract." *Standard Pipeline Coating Co., Inc. v. Solomon & Teslovich,* 496 A.2d 840, 843 (Pa.Super. Ct.1985).

Nor can plaintiff's claim be recast as one for intentional interference with prospective contractual relations. To establish that claim, a plaintiff must show: (1) a prospective contractual relationship; (2) the purpose or intent to harm by preventing the relationship from occurring; (3) the absence of privilege or justification; and (4) actual harm or damage as a result of the conduct. *In re One Meridian Plaza Fire Litigation,* 820 F.Supp. 1460, 1477 (E.D.Pa.1993). There must be an allegation that defendant acted with the "specific purpose of causing harm to the plaintiff." *Atlantic Paper*

*Box Co. v. Whitman's Chocolates,* 844 F.Supp. 1038, 1047 (E.D.Pa.1994). Finally, "[w]here a defendant's breach of his contract with the plaintiff has only an incidental consequence of affecting plaintiff's business relationships with third persons, an action lies only in contract for defendant's breaches, including any recoverable consequential damages." *Chrysler Credit Corp. v. B.J.M., Jr., Inc.,* 834 F.Supp. 813, 843 (E.D.Pa.1993).

**\*5** Here, plaintiff has not alleged any third-party contract. His only allegation is that defendant willfully breached the contract. That allegation is adequately covered by counts I and III. Therefore, Count VI will be dismissed.

An appropriate Order follows.

### ORDER

AND NOW, this 15th day of March, 1995, upon consideration of Defendant National Grange Mutual Insurance Company's Motion to Dismiss and/or Strike Plaintiff's Complaint and Plaintiff's opposition thereto, IT IS HEREBY ORDERED that Defendant's Motion is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Counts II, IV, and VI are DISMISSED with prejudice.

---

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**2008 WL 5737364**
Only the Westlaw citation is currently available.
United States District Court,
D. New Mexico.

Quinn WOODARD, on behalf of himself and
a class of others similarly situated, Plaintiff,
v.
FIDELITY NATIONAL TITLE INSURANCE
COMPANY, a foreign corporation, Defendant.

No. CIV 06-1170 RB/WDS.  |  Dec. 8, 2008.

West KeySummary

| 1 | **Federal Civil Procedure** |
|---|---|

   ☞ Consumers, purchasers, borrowers, and debtors

Putative class representative failed to meet the burdens for class certification due to the multi-state nature of a proposed class action. The putative representative had claimed that a title insurance company had charged title insurance rates prohibited by law in five different states. Although the alleged injury was factually similar for every member of the putative class, there were materially different standards of liability among the five jurisdictions for claims brought on behalf of the putative class. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

6 Cases that cite this headnote

**Attorneys and Law Firms**

Benjamin A. Schwartzman, Schwartzman Law Group, LLC, Boise, ID, Paul M. Weiss, Freed & Weiss LLC, Chicago, IL, Wade L. Woodard, Richard Burke, St. Louis, MO, Whitney Buchanan, Whitney Buchanan PC, Albuquerque, NM, for Plaintiff.

David W. Peterson, William Spencer Reid, Keleher & McLeod, PA, Albuquerque, NM, Kimberly W. Osenbaugh,

David C. Neu, K & L Gates LLP, Thomas E. Kelly, Seattle, WA, for Defendant.

**Opinion**

### *MEMORANDUM OPINION AND ORDER*

ROBERT C. BRACK, District Judge.

**\*1** **THIS MATTER** comes before the Court on Plaintiff's Motion for Class Certification, filed on March 5, 2008. Having considered the submissions, applicable law, and being otherwise fully advised, Plaintiff's Motion for Class Certification is **DENIED.**

### I. BACKGROUND.

Plaintiff Quinn Woodard refinanced the mortgage on his 8016 Waterbury Avenue, NW, Albuquerque home in May 2005. As part of the transaction, Plaintiff's lender required Mr. Woodard to purchase a lender's title insurance policy, indemnifying the lender should a defect arise in the title. Plaintiff purchased a lender's title insurance policy from Defendant Fidelity National Title Insurance Company (hereinafter "Fidelity"). Mr. Woodard alleges that the premium fee Fidelity charged him for title insurance exceeded the statutorily-mandated rate. On December 1, 2006, Mr. Woodard commenced this suit on behalf of himself and all others similarly situated in Arizona, Idaho, New Mexico, Oregon, and Washington. Among Mr. Woodard's initial claims, the following causes of action survived Defendant's Motion to Dismiss, pursuant to Rule 12(b)(6): Claim for Declaratory Relief, Breach of Implied Contract, Violation of Consumer Protection Statutes, Conversion, Unjust Enrichment, and Breach of Duty of Good Faith and Fair Dealing. On March 5, 2008, Mr. Woodard filed his Motion for Class Certification. Plaintiff seeks to certify the following class:

> Persons in the states of Arizona, Idaho, New Mexico, Oregon, and Washington who, in connection with a mortgage refinancing, paid a title insurance premium for a Fidelity title insurance policy, the amount of which exceeded the rate on file in those states and/or exceeded a lower, refinance rate for which such persons qualified.

## II. APPLICABLE STANDARDS.

As the party seeking class certification, Plaintiff has the burden of demonstrating "under a strict burden of proof" that the requirements for a class action under Rule 23 are "clearly met." *Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir.1988). In analyzing whether a plaintiff has met that burden, the Court "must accept the substantive allegations of the complaint as true;" however, the Court will not "blindly rely on conclusory allegations which parrot Rule 23" and may also take into consideration legal and factual issues presented by Plaintiff's complaint. *Shook v. El Paso County,* 386 F.3d 963, 968 (10th Cir.2004).

### A. Federal Rule of Civil Procedure 23(a).

Pursuant to Rule 23(a), a class may be certified only if all four of the following prerequisites are demonstrated by the Plaintiff: (1) Numerosity, "the class is so numerous that joinder of all members is impracticable;" (2) Commonality, "there are questions of law or fact that are common to the class;" (3) Typicality, "the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and (4) Adequacy of representation, "the representative parties will fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(a).

### 1. Numerosity.

 **\*2** The burden is upon the party seeking to represent a class to establish that the class is so numerous as to make joinder impracticable. *Peterson v. Okla. City Housing Auth.,* 545 F.2d 1270, 1273 (10th Cir.1976). "In class action suits there must be presented some evidence of established, ascertainable numbers constituting the class in order to satisfy even the most liberal interpretation of the numerosity requirement." *Rex v. Owens ex rel. State of Okl.,* 585 F.2d 432, 436 (10th Cir.1978). When the identity of class members is difficult to ascertain, plaintiffs need not allege the exact number of class members; however, they must produce some level of evidentiary support for a reasonable estimate of the number of class members who may be involved. *See Id.* at 435-36; *Trevizo v. Adams,* 455 F.3d 1155, 1162 (10th Cir.2006). Indeed, a numerosity determination may not be based on mere speculation. *See Peterson,* 545 F.2d at 1273.

### 2. Commonality.

The Supreme Court has held members of a putative class must "possess the same interest and suffer the same injury."

*General Tele. Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). This commonality requirement is met if putative class members' grievances share a common question of law or of fact. *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1288 (10th Cir.1999). Commonality requires that only a single issue be common to the class. *Id.*

### 3. Typicality.

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23. Typicality serves as a guidepost for determining whether, under the particular circumstances of the lawsuit, the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *General Tele. Co. of Southwest,* 457 U.S. at 158 fn. 13. "[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.1988).

### 4. Adequacy of Representation.

Adequacy of representation raises concerns about the competency of class counsel and conflicts of interest. *General Tele. Co. of Southwest,* 457 U.S. at 158 fn. 13. The Court is required to rigorously investigate two questions in order to determine legal adequacy of representation: (1) Do the named plaintiff and his counsel have any conflicts of interest with other class members? (2) Will the named plaintiff and his counsel prosecute the action vigorously on behalf of the class? *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187-88 (10th Cir.2002).

### B. Federal Rule of Civil Procedure 23(b)(3).

Under Rule 23(b)(3), a class action may only be maintained if "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and the proposed class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to the Court's inquiry into the predominance and superiority requirements: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against

the class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed.R.Civ.P. 23(b)(3).

**1. Predominance.**

**\*3** Predominance requires that the issues in a class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof. *See* Fed.R.Civ.P. 23(b)(3). In a multi-state class action suit, determining which state's or states' substantive laws will apply to putative class members' claims, as a practical matter, can be the determinative issue for purposes of predominance analysis.

**2. Superiority.**

The superiority requirement necessitates that the Court engage in the pragmatic exercise of determining whether a particular class action is preferable to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed.R.Civ.P. 23(b)(3).

**III. DISCUSSION.**

In this case, the Court concludes that Plaintiff has failed to meet his burden under Rule 23 to establish numerosity, typicality, adequacy, predominance, and superiority. Because the requirements of Rule 23 tend to overlap, the Court will address them together, within the context of each particular facet of the Plaintiff's suit that makes certification inappropriate. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626 fn. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *General Tele. Co. of Southwest v. Falcon,* 457 U.S. 147, 158 fn. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

The Court notes, as a preliminary matter, that Plaintiff is correct in his assertion that the proposed class definition is qualitatively identical to several other class actions which have garnered certification, with the only difference being that Plaintiff here seeks to certify a multi-state class. *See, e.g., Chesner v. Stewart Title Guar. Co.,* 2008 WL 553773 (N.D.Ohio 2008); *Randleman v. Fidelity National Title Ins. Co.,* 251 F.R.D. 267 (N.D.Ohio 2008); *Woods v. Stewart Title Guar. Co.,* 2007 WL 2872219 (D.Md.2007). It is, however, the multi-state nature of the proposed class action that renders the putative class unsuitable for certification. Contrary to Plaintiff's assertion that every title premium overcharge case to date has received class certification,

an almost identical multi-state class action suit against a title insurer brought in the District of Kansas also failed to meet the requirements for certification under Rule 23. *See Doll v. Chicago Title Ins. Co.,* 246 F.R.D. 683 (D. Kansas 2007). More generally, courts have routinely refused to grant class certification in multistate class suits involving the type of manageability problems that arise when a single court would be required to apply varying standards of liability to multiple causes of action and determine punitive damages under the laws of various states. *See, e.g., Chilton Water Auth. v. Shell Oil Co.,* 199 WL 162800, at *8 (M.D.Ala.1999); *Mack v. General Motors Acceptance Corp.,* 169 F.R.D. 671, 678-79 (M.D.Ala.1996); *Haley v. Medtronic, Inc.,* 169 F.R.D. 643, 653-54 (C.D.Cal.1996); *In re Tri-State Crematory Litig.,* 215 F.R.D. 660, 679 (N.D.Ga.2003); *In re Baycol Prods. Litig.,* 218 F.R.D. 197, 215 (D.Minn.2003); *In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. 271, 294 (S.D.Ohio 1997); *Harding v. Tambrands Inc.,* 165 F.R.D. 623, 629-32 (D.Kan.1996); *Commander Props. Corp. v. Beech Aircraft Corp.,* 164 F.R.D. 529, 541 (D.Kan.1995); *Roh lfing v. Manor Care, Inc.,* 172 F.R.D. 330, 341-42 (N.D.Ill.1997); *Doll,* 246 F.R.D. at 691-94.

**\*4** Although the alleged injury in this case is factually similar for every member of the putative class, there are materially different standards of liability among the five jurisdictions for claims brought by Plaintiff on behalf of the putative class. As a result, Plaintiff's claims are not typical of the claims of putative members of other states. *See General Tele. Co. of Southwest,* 457 U.S. at 158. Similarly, based on the fact that Plaintiff's legal claims would be evaluated under different legal standards than those of putative class members from other states, the Court is unable to find that Plaintiff can adequately represent the interests of the proposed members of this multi-state class. *Adamson,* 855 F.2d at 676. Furthermore, the issues in a class action that are subject to generalized proof must predominate over those issues that are subject only to individualized proof. *See* Fed.R.Civ.P. 23(b)(3). The varying standards of liability among the five jurisdictions for putative class members' claims destroys Plaintiff's ability to present generalized proof for the claims of all class members, thereby undermining predominance. *See Id.* Finally, the complexity of applying the differing laws of the five states to the putative class members' claims makes the class action unmanageable and weighs against a finding that the proposed multi-state class action would be superior to alternative methods of adjudication. *See* Fed.R.Civ.P. 23(b)(3)(D). While the small amount of the alleged overcharges makes a class action superior to requiring individual claims against Fidelity, the

proposed class is not preferable to the obvious alternative of single-state class action suits brought separately in the state courts of each of the five jurisdictions. Indeed, the interests of putative class members would be much better served by single-state class action suits brought by a plaintiff only on behalf of individuals located within his or her home state. *See Wilcox v. Commerce Bank of Kansas City,* 474 F.2d 336, 345-46 (10th Cir.1973).

**A. Certification Issues Arising From Conflicts of Laws.**

Plaintiff's argument that the laws applicable to putative class members' claims are substantively the same across all jurisdictions is incorrect. A careful review of the laws of the five jurisdictions reveals a number of conflicts of law which are material to this case. Although the laws of the five states often differ only in nuances, the Court finds that some of these nuances would be important to the legal resolution of putative class members' claims in this suit. In addition, the varying standards of liability across the five jurisdictions would undermine typicality, adequacy of representation, predominance, and superiority. Furthermore, simply applying New Mexico's substantive law to all claims would violate the Due Process Clause and the Full Faith and Credit Clause. *See Phillips Petroleum Co.,* 472 U.S. at 818; *Sun Oil Co. v. Wortman,* 486 U.S. 717, 729, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988). Indeed, the Supreme Court has instructed that, in multi-state class action suits, the substantive law of the forum state only may be applied (1) when the laws of the relevant states do not actually conflict or (2) where the forum state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.* If the laws of the relevant states conflict, and if the forum state lacks a significant state interest in the lawsuit, then this Court, sitting in diversity, must resolve the conflicts in accordance with the choice of law rules of the forum state. *See Sun Oil Co.,* 486 U.S. at 722. Incidentally, New Mexico has adopted the Restatement (Second) of Conflicts of Law for choice of law issues arising in multi-state class action lawsuits. *Ferrell v. Allstate Ins. Co.,* 144 N.M. 405, 188 P.3d 1156, 1164 (N.M.2008).

**\*5** Under the Restatement (Second) of Conflicts of Law, the rights and duties of the parties with respect to issues in contract are determined by the local law of the state which has the most significant relationship to the transaction and the parties, generally the state in which the contract was negotiated and formed. Restatement (Second) of Conflict of Laws § 188 (1971). Similarly, the rights and liabilities of

the parties with respect to issues in tort are determined by the local law of the state which has the most significant relationship to the injurious event, generally the state in which the conduct causing the injury occurred. Restatement (Second) of Conflict of Laws § 145 (1971). The contract and tort claims at issue in this case are most significantly related to the states in which the title insurance contracts were made and in which the alleged injuries occurred; therefore, the claims of nonresident class members require adjudication under the laws of the putative class members' home states. *Ferrell,* 188 P.3d at. 1173. Furthermore, claims arising under the five states' Consumer Protection/Consumer Fraud Statutes require adjudication under the particular statutory frameworks set forth by each state's statute. The need to examine and apply the laws of each of the five states renders the proposed class action unmanageable and certification of the class unacceptable. Indeed, because variations in the laws of the five states swamp any common issues and defeat predominance, the Court must deny certification of the proposed class.

**1. Violation of Consumer Protection/Consumer Fraud Statutes.**

The Consumer Protection/Consumer Fraud Statutes of the five jurisdictions materially conflict in a number of ways, including the type of acts covered by the statutes, statutory exclusions, and specified scienter requirements. For example, Oregon and Washington's Consumer Protection Statutes merely require an unfair or deceptive act made in the course of trade or commerce in order to establish liability. *See* OR.Rev.Stat. § 646.608 (2003); Wash. Rev.Code § 19.86.020 (1961). Arizona's Consumer Fraud Statute, on the other hand, requires a deceptive act, misrepresentation, or omission of a material act with intent that others rely upon the concealment, suppression or omission in connection with the sale of any merchandise. *See* Ariz.Rev.Stat. Ann. § 44-1522 (1992). New Mexico's Consumer Fraud Statute requires an unfair or deceptive trade practice knowingly made in connection with the sale of goods or services. N.M. Stat. § 57-12-2 (2003). Finally, Idaho's Consumer Protection Act specifically excludes claims based on unfair or deceptive acts or practices in the business of insurance. *See* Idaho Code Ann. § 48-605(3) (1971). In other words, putative class members in Oregon and Washington would merely have to demonstrate that it was unfair or deceptive for Fidelity to overcharge them for title insurance. Putative class members in Arizona would be required to make an additional showing of intent, and putative class members in New Mexico would be required to make a different additional showing that Fidelity knowingly

overcharged them for title insurance. Finally, putative class members in Idaho would not even have a claim under their state's Consumer Protection Act. These varying standards of liability would render the case difficult to manage, undermine Plaintiff's ability to fairly and adequately protect the interests of class members from other jurisdictions, and destroy any possibility of adjudicating putative class members' claims in accordance with a generalized standard of proof. *See General Tele. Co. of Southwest,* 457 U.S. at 158. Thus, the differing standards of liability under the five states' Consumer Protection/Consumer Fraud Statutes would undermine the Rule 23 requirements of typicality, adequacy of representation, predominance, and superiority.

### 2. Unjust Enrichment.

**\*6** The elements of unjust enrichment also conflict in legally significant ways among the five jurisdictions.[1] In Arizona, five elements must be proved to make a case of unjust enrichment: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment, and (5) an absence of a remedy provided by law. *City of Sierra Vista v. Cochise Enter., Inc.,* 144 Ariz. 375, 381, 697 P.2d 1125, 1131 (Ariz.Ct.App.1984). In Idaho, Oregon, and Washington, on the other hand, three elements must be established for unjust enrichment: (1) there must be a benefit conferred on one party by another; (2) the party receiving the benefit must have an appreciation or knowledge of the benefit, and (3) the receiving party must accept or retain the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value. *Dragt v. Dragt/DeTray, LLC,* 139 Wash.App. 560, 576, 161 P.3d 473, 482 (Wash.Ct.App.2007); *Summer Oaks Ltd. Partnership v. McGinley,* 183 Or.App. 645, 654, 55 P.3d 1100, 1105 (Or.App.2002); *Aberdeen-Springfield Canal Co. v. Peiper,* 133 Idaho 82, 88, 982 P.2d 917, 923 (Idaho 1999). In New Mexico, however, to prevail on an unjust enrichment claim, a plaintiff only must show that (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust. *Ontivero Insulation Co., Inc. v. Sanchez,* 129 N.M. 200, 203, 3 P.3d 695, 698 (N.M.Ct.App.2000). As a legal matter, the different showings required by putative class members from different jurisdictions to prove unjust enrichment would undermine Plaintiff's ability to present generalized proof for all putative class members' unjust enrichment claims. *See* Fed.R.Civ .P. 23(b)(3). Similarly, Plaintiff's ability to fairly and adequately

represent putative class members from other jurisdictions would also be compromised, inasmuch as his claims would be evaluated under a different standard of liability and require different evidence. Thus, the different standard of liability across the five states destroy typicality, adequacy of representation, predominance, and superiority. As a practical matter, applying the different standards of liability for putative class members from different states would almost certainly confuse the jury. These type of manageability issues that would arise when a single court is required to apply varying standards of liability to multiple causes of action undermine superiority. *See* Fed.R.Civ.P. 23(b)(3).

### 3. Conversion.

The law of conversion among the five jurisdictions also conflicts in material ways, including different scienter requirements. Arizona and Oregon have adopted the Restatement (Second) of Torts, which defines conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller v. Hehlen,* 209 Ariz. 462, 472, 104 P.3d 193, 203 (Ariz.Ct.App.2005); *Willamette Quarries, Inc. v. Wodtli,* 308 Or. 406, 413, 781 P.2d 1196, 1201 (Or.1989). Under Idaho law, conversion is "an act of dominion wrongfully exerted over the personal property of another in denial or in unwarranted interference with his rights therein." *Adair v. Freeman,* 92 Idaho 773, 777, 451 P.2d 519, 523 (Idaho 1969). New Mexico has defined conversion as a "wrongful detention amounting to repudiation of the owner's rights or any exercise of dominion inconsistent with such rights." *Apodaca v. Unknown Heirs,* 98 N.M. 620, 624, 651 P.2d 1264, 1268 (1982). Under Washington law, conversion is "the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession." *In re Marriage of Langham and Kolde,* 153 Wash.2d 553, 564, 106 P.3d 212, 218 (Wash.2005). Of particular significance to this case, the law of New Mexico allows for a wrongful retention of funds to constitute conversion, but the other four states, with the possible exception of Idaho, require an affirmative act for the tort of conversion. *Apodaca,* 98 N.M. at 624, 651 P.2d at 1268. Because the proposed class representative, Plaintiff, would be required to demonstrate conversion under a different and less stringent standard of liability, his claim is not typical of putative class members from the other four jurisdictions, nor is he an adequate representative of putative class members from the other four jurisdictions. *See Adamson,* 855 F.2d at 676. Furthermore, predominance is undermined because

putative class members' conversion claims would not be subject to generalized proof. *See* Fed.R.Civ.P. 23(b)(3).

**4. Breach of the Duty of Good Faith and Fair Dealing.**

**\*7** In each of the five jurisdictions, the essence of the duty of good faith and fair dealing is that neither party will act to impair the right of the other to receive benefits which flow from their agreement or contractual relationship. *See Beaudry v. Insurance Co. of the West,* 203 Ariz. 86, 91, 50 P.3d 836, 841 (Ariz.Ct.App.2002); *Taylor v. Browning,* 129 Idaho 483, 490, 927 P.2d 873, 880 (Idaho 1996); *Sanders v. FedEx Ground Package System, Inc.,* 144 N.M. 449, 188 P.3d 1200, 1203 (N.M.2008); *Best v. U.S. Nat. Bank of Oregon,* 303 Or. 557, 565, 739 P.2d 554, 559 (Or.1987); *Badgett v. Security State Bank,* 116 Wash.2d 563, 570-72, 807 P.2d 356, 360-61 (Wash.1991). However, the legal scope and requirements of a claim for breach of the duty of good faith and fair dealing differ markedly among the five states. The differences create a situation in which putative class members in Arizona and Oregon have relatively straightforward claims for breach of the duty of good faith and fair dealing. *See Beaudry,* 203 Ariz. at 91, 50 P.3d at 841; *Best,* 303 Or. at 565, 739 P.2d at 559. However, putative class members in Idaho and Washington cannot state a claim for breach of the duty of good faith and fair dealing upon which relief can be granted. *See Taylor,* 129 Idaho at 490, 927 P.2d at 880; *Badgett,* 116 Wash.2d at 570-72, 807 P.2d at 360-61. Putative class members in New Mexico, including the Plaintiff, have only a novel claim requiring particularized evidentiary showings. [2] *See Sanders,* 144 N.M. at 449, 188 P.3d at 1203. Because the elements of Plaintiff's legal claim for breach of the duty of good faith and fair dealing, under New Mexico law, are materially different from those of the putative class members from the other four states, Plaintiff fails to meet the typicality requirement. *Adamson,* 855 F.2d at 676. Similarly, based on the fact that Plaintiff's legal claims would be evaluated under different legal standards than those of putative class members from other states, the Court is unable to find that Plaintiff can adequately represent the interests of the proposed members of this multi-state class. *See General Tele. Co. of Southwest,* 457 U.S. at 158 fn. 13. Furthermore, predominance is undermined because putative class members' conversion claims would not be subject to generalized proof. *See* Fed.R.Civ.P. 23(b)(3).

**5. Punitive Damages.**

The law in the five different jurisdictions concerning punitive damages varies greatly, including with respect to the following issues: specific exclusions for punitive damages

for particular claims, the conduct by the defendant that must be shown, the degree of harm that must be demonstrated, different standards of proof required, particularized pleading requirements, special rules for corporate defendants, and different scienter requirements. *See Medasys Acquisition Corp. v. SDMS, P.C.,* 203 Ariz. 420, 423-24, 55 P.3d 763, 766-67 (Ariz.2002); *Vaughn v. Monroe,* 113 Or.App. 647, 649, 833 P.2d 1331, 1333 (Or.Ct.App.1992); *Dailey v. North Coast Life Ins.,* 129 Wash.2d 572, 575, 919 P.2d 589, 590-91 (Wash.1996); *Chavarria v. Fleetwood Retail Corp.,* 140 N.M. 478, 486-88, 143 P.3d 717, 725-27 (N.M.2006); *Erhardt v. Leonard,* 104 Idaho 197, 202, 657 P.2d 494, 499 (Idaho Ct.App.1983); *Country Escrow Service v. Janes,* 121 Ariz. 511, 513, 591 P.2d 999, 1001 (Ariz.Ct.App.1979); *Ontiveros Insulation Co., Inc. v. Sanchez,* 129 N.M. 200, 203-04, 3 P.3d 695, 698-99 (N.M.Ct.App.2000); *Beaudry v. Insurance, LLC,* 203 Ariz. 86, 92, 50 P.3d 836, 842 (Ariz.Ct.App.2002); *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.,* 137 N.M. 524, 537, 113 P.3d 347, 360 (N.M.Ct.App.2005); *Weaver v. Austin,* 184 Or. 586, 600, 200 P.2d 593, 601 (Or.1948); *Gunter v. Murphy's Lounge, LLC,* 141 Idaho 16, 29, 105 P.3d 676, 689 (Idaho 2005); OR.Rev.Stat. § 646.638(1) (2003); Wash. Rev.Code § 19.86.090 (1961); N.M. Stat. § 57-12-10(B) (2003); Idaho Code Ann. § 48-605(3) (1971). Because the legal standards for punitive damages differ markedly among the five states, typicality, adequacy of representation, and predominance are clearly undermined. *See General Tele. Co. of Southwest,* 457 U.S. at 158 fn. 13; Fed.R.Civ.P. 23(b)(3). More practically, Plaintiff has failed to articulate a manageable solution to the problems arising from applying varying laws from five different jurisdictions concerning punitive damages. The complexity of the jury instructions for putative class members' punitive damage claims would almost certainly present a major procedural barrier in this case. Moreover, apart from any procedural difficulties, Plaintiff has failed to persuade the Court that a jury could be clearly instructed regarding, and properly apply, varying laws from five different jurisdictions concerning punitive damages. These types of manageability issues have generally prevented courts from granting class certification in cases involving claims for punitive damages. *See, e.g., Chilton Water Auth.,* 199 WL 162800 at \*8; *Mack,* 169 F.R.D. at 678-79; *Haley,* 169 F.R.D. at 653-54; *In re Tri-State Crematory Litig.,* 215 F.R.D. at 679; *In re Baycol Prods. Litig.,* 218 F.R.D. at 215; *In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. at 294.

**B. Failure to Demonstrate Numerosity.**

**\*8** Plaintiff has failed to provide any evidence that could reasonably demonstrate the class he proposes is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a). Instead, Plaintiff merely asserts his "belief" that "the class is comprised of thousands of individuals" and that "[n]umerosity is easily satisfied" (Doc. 37). Unsubstantiated assertions and speculative beliefs, however, are insufficient to demonstrate numerosity under the "strict burden of proof" required for class certification. Reed, 849 F.2d at 1309.

Plaintiff also argues that Defendant has conceded numerosity. The Court finds no basis in the record for this assertion. Furthermore, as a legal matter, a defendant cannot merely concede numerosity. See Amchem Products, Inc., 521 U.S. at 621-22. The Federal Rules of Civil Procedure set the requirements for maintaining a class action which this Court is bound to enforce, and a hypothetical concession by one party cannot abrogate the requirements for class certification. See Id.

The amount in controversy requirement for a class action founded on diversity jurisdiction partially informs this Court's strict scrutiny of numerosity in this case. Indeed, in a class action suit founded upon diversity, the Court finds it would be an exercise in futility to certify a class that is not numerous enough to reasonably meet the jurisdictional requirements of 28 U.S.C. § 1332(d)(2). As a practical matter, this requires the Plaintiff to demonstrate that the proposed class is comprised of a sufficiently large number of claims to meet the $5,000,000 amount in controversy requirement of 28 U.S.C. § 1332(d)(2). Based on Plaintiff's allegation that he was overcharged by $370, it would require approximately 13,514 similar claims to exceed the $5,000,000 amount in controversy threshold for a class action based on diversity jurisdiction. 28 U.S.C. § 1332(d)(2). The "strict burden of

proof" required to demonstrate numerosity, coupled with considerations related to the jurisdictional requirements for a class action founded upon diversity, demand much more than Plaintiff's assertion of his unsubstantiated belief that the proposed class is composed of thousands of individuals. Reed, 849 F.2d at 1309; 28 U.S.C. § 1332(d)(2).

In Chesner v. Stewart Title Guar. Co., a similar class action lawsuit against a title insurance company, plaintiffs persuasively established numerosity by conducting a sample review of files from the relevant title insurance agents and demonstrating, through statistical analysis and testimonial evidence, that at least several thousand individuals had been overcharged for title insurance. 2008 WL 553773 at \*5. Plaintiff's failure to do the due diligence necessary to provide similar evidentiary support for his numerosity claim not only precludes this Court from certifying the proposed class on numerosity ground, but also calls into question whether Plaintiff and his counsel would expend the effort necessary to prosecute this action vigorously on behalf of the class. Rutter & Wilbanks Corp., 314 F.3d 1180, 1187-88 (10th Cir.2002).

## IV. CONCLUSION.

**\*9** Plaintiff has failed to meet the requirements for certifying the proposed multi-state class, including the numerosity, typicality, and adequacy of representation requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3). [3] [4]

**WHEREFORE,**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Class Certification is **DENIED.** [5]

---

Footnotes

1   In each of the five states, putative class members' claims for breach of implied contract would merge with their unjust enrichment claims. See Barmat v. John and Jane Doe Partners A-D, 155 Ariz. 519, 523, 747 P.2d 1218, 1222 (Ariz.1987); Continental Forest Products, Inc. v. Chandler Supply Co., 95 Idaho 739, 743, 518 P.2d 1201, 1205 (Idaho 1974); Tom Growney Equipment, Inc. v. Ansley, 119 N.M. 110, 112, 888 P.2d 992, 994 (N.M.Ct.App.1994); Jaqua v. Nike, Inc., 125 Or.App. 294, 298, 865 P.2d 442, 445 (Or.Ct.App.1993); Lynch v. Deaconess Medical Center, 113 Wash.2d 162, 164-65, 776 P.2d 681, 682-83 (Wash.1989).

2   Under Arizona law, a party may breach its duty of good faith without actually breaching an express covenant in the contract. Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund, 201 Ariz. 474, 491, 38 P.3d 12, 29 (Ariz.2002). In Idaho, the covenant of good faith and fair dealing "arises only regarding terms agreed to by the parties." Taylor, 129 Idaho at 490, 927 P.2d at 880. In New Mexico, breach of the implied covenant of good faith and fair dealing requires "a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." Sanders, 188 P.3d at 1203. Under Oregon law, a party is presumed to have acted in bad faith, in breach of the doctrine of good faith and fair dealing, when (1) a party has the right to a specific price term and (2) the other party sets the price term either too high or too low. See Best,

303 Or. at 565, 739 P.2d at 559. In Washington, the duty of good faith implied in every contract does not exist apart from the terms of the agreement. *Badgett,* 116 Wash.2d at 572, 807 P.2d at 361.

3    Because Plaintiff has failed to meet the requirements for certifying the proposed multi-state class, it is unnecessary for the Court to examine whether Mr. Woodard has standing to represent class members outside of New Mexico.

4    This Memorandum Opinion and Order renders Defendant's outstanding motions moot.

5    Given its denial of class certification, this lawsuit does not meet the amount in controversy requirement for diversity jurisdiction. 28 U.S.C. § 1332. The Court, therefore, must dismiss Plaintiff's claims for lack of jurisdiction.

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 1628000
Only the Westlaw citation is currently available.
United States District Court, M.D.
Alabama, Northern Division.

CHILTON WATER AUTHORITY, et al., Plaintiffs,

v.

SHELL OIL COMPANY, d/b/a SHELL
CHEMICAL COMPANY, Defendant.

No. CIV.A. 98–T–1452–N. | May 21, 1999.

**Attorneys and Law Firms**

F. Hilton–Green Tomlinson, Pritchard, McCall & Jones, Birmingham, George M. Fleming, D'Lisa R. Simmons, Fleming, Hovenkamp & Grayson, PC, Robert N. Hinton, Frank W. Gerold, Robert N. Hinton & Associates, Houston, TX, for Chilton Water Authority, individually and on behalf of all others similarly situated, Phil Campbell Water Works & Sewer Board, individually and on behalf of all others similarly situated, Franklin County Water Service Authority, individually and on behalf of all others similarly situated, plaintiffs.

Peter S. Fruin, Catherine Wolter Main, Maynard, Cooper & Gale, P.C., Montgomery, Gregory H. Hawley, Stephen Foster Black, Maynard, Cooper & Gale, P.C., Birmingham, for Shell Oil Company dba Shell Chemical Company, defendants.

**Opinion**

**ORDER**

THOMPSON, District J.

**\*1** Plaintiffs Chilton Water Authority, Phil Campbell Water Works & Sewer Board, and Franklin County Water Service Authority filed this nationwide class action on behalf of themselves and all others similarly situated against defendant Shell Oil Company. Plaintiffs raise state-law claims of negligence, strict liability, and fraud. The court has diversity-of-citizenship jurisdiction over plaintiffs' claims pursuant to 28 U.S.C.A. § 1332(a). This lawsuit is currently before the court on three motions filed by Shell: (1) a motion to dismiss plaintiffs' strict liability claim; (2) a motion for more definite statement of plaintiffs' fraud claim; and (3) a motion to strike plaintiffs' class allegation. For the reasons that follow, the

court will deny the motions to dismiss and for more definite statement and will grant the motion to strike.

**I. FACTUAL SUMMARY**

The facts, as stated by plaintiffs, are as follows: Each of the three named plaintiffs operates a public water distribution system which serves some or all of the residents in and around the Alabama county in which it is located. [1] Plaintiffs' public water distribution systems are composed, in part, of polybutylene ("PB") pipe. [2] PB is a by-product of Shell's oil refining process. [3]

In the late 1970s, Shell began marketing PB water systems for the potable water distribution market. [4] Shell sold PB to pipe extruders who manufactured tubing from the PB for use in potable water systems. [5] Shell represented to builders, plumbers, municipalities, distributors, governmental bodies, and end users that the PB pipe would exceed the lifetime of conventional materials, would last 50 years, was inert, and had benefits in excess of any other plumbing pipe sold in America. [6] Shell also represented that it had extensively tested PB and that it was suitable for use in normal potable water. [7] Shell made these representations, in part, through brochures and manuals, which were disseminated throughout the construction and plumbing industries. [8] Through its marketing efforts, Shell desired to win widespread local regulatory approval of PB water systems. [9]

Plaintiffs contend that PB water systems, including their own, have been a disaster. [10] The PB pipe in plaintiffs' systems has prematurely failed. [11] These failures have caused many problems, including property damage, delays, and water loss, and have resulted in the necessity to replace plaintiffs' water distribution systems. [12] Plaintiffs seek to represent a class of:

"All persons or entities who own, operate or previously owned or operated public or private water supply or distribution systems in the United States composed in whole or in part of PB pipe manufactured following January 1, 1978, which PB pipe was in whole or in part or by component manufactured, designed and/or supplied by Shell, provided however that the class shall be limited to those persons or entities who receive the best practicable

notice of this action and are afforded an opportunity to be heard and participate in this litigation whether in person or through counsel. Any absent plaintiff may remove itself from the class by 'opting out' or requesting exclusion from the class. Provided however, that the following person/entities are excluded from the Class:

> **\*2** a) All persons or entities that have previously settled either by trial or otherwise their claims against Shell or are presently in litigation with Shell at the time of filing of this action, arising from the sale, use, design, marketing or manufacture of polybutylene, and/or polybutylene plumbing systems." [13]

Count one of plaintiffs' complaint alleges negligence; count two alleges strict liability; and count three alleges fraud. [14] Plaintiffs request compensatory and punitive damages, costs, and attorney's fees. [15]

## II. DISCUSSION

### A. Motion to Dismiss

In considering a defendant's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court accepts the plaintiff's allegations as true, *see Andreu v. Sapp.,* 919 F.2d 637, 639 (11th Cir.1990), and construes the complaint liberally in the plaintiff's favor. *See Duke v. Cleland,* 5 F.3d 1399, 1402 (11th Cir.1993). The lawsuit may not be dismissed unless the plaintiff can prove no set of facts supporting the relief requested. *See id.*

Shell argues that "Count Two of Plaintiff[s'] complaint is due to be dismissed as a matter of law because Alabama does not recognize any cause of action for strict liability." [16] Shell relies on *Atkins v. American Motors Corp.,* 335 So.2d 134 (Ala.1976). [17] Plaintiffs respond that Texas law applies, and that, under Texas law, they have stated a cause of action. *See, e.g., Firestone Steel Products Co. v. Barjas,* 927 S.W.2d 608 (Tex.1996); *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379 (Tex.1995).

The court need not resolve whether Texas or Alabama law applies, for, assuming that Alabama law applies, plaintiffs have still stated a claim for which relief can be granted. In *Atkins,* James Atkins was operating a 1970 Gremlin automobile when a Lincoln Continental struck him from the rear. 335 So.2d at 137. The impact caused the passenger

compartment of Atkins's vehicle to fill with burning gasoline. *See id.* Atkins suffered several burns from which he died several hours later. *See id.*

Atkins's administratrix brought a wrongful death suit against American Motors, contending that the vehicle was defective in manufacture and design. *See id.* The complaint alleged the elements of strict liability found in § 402A of the Second Restatement of Torts. *See id.* at 136–37. [18] The trial court dismissed the complaint, finding that it did not state a cause of action. *See id.* at 136. The Alabama Supreme Court reversed and remanded. *See id.*

While rejecting the Second Restatement's concept of pure strict liability, the Alabama Supreme Court held that "a complaint substantially following the Restatement's elements of liability will withstand a motion to dismiss." *Id.* at 137. The court distinguished its holding from one allowing strict liability by stating that under its holding the concept of fault is retained as a necessary element of liability. *See id.* "[T]he practical distinction, then, between our holding and the Restatement is that our holding will allow certain affirmative defenses not recognized by the Restatement's no-fault concept of liability." *Id.* The court characterized its holding as one adopting a rule of negligence *per se* when a defendant sells a product dangerously unsafe or unsafe when it is put to its intended use. *See id.* at 140.

**\*3** In *Casrell v. Altec Indus., Inc.,* 335 So.2d 128 (Ala.1976), the Alabama Supreme Court named the rule it expounded in *Atkins,* whereby a plaintiff may establish a *prima facie* case by substantially alleging the elements of § 402A of the Second Restatement of Torts, the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). *See* 335 So.2d at 132 n. 1. A plaintiff states a claim under the AEMLD if in his complaint he substantially alleges:

> "[H]e suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

*Id.* at 132–33; *see also Atkins,* 335 So.2d at 141.

Plaintiffs have alleged each element of an AEMLD claim in count two of their complaint. Specifically, plaintiffs have alleged that (1) they have suffered damages to their property as a result of Shell's selling the PB plumbing systems, components, and materials used therein in a defective condition unreasonably dangerous to plaintiffs as the ultimate users; [19] (2) Shell is engaged in the business of selling the PB plumbing systems, components, and materials used therein; [20] and (3) the PB plumbing systems, components, and materials therein reached plaintiffs in substantially the same condition in which they were sold, or in the condition in which they were expected to reach the ultimate consumer . [21] Consequently, although Shell is correct that Alabama does not recognize a cause of action for strict liability, plaintiffs have stated an AEMLD claim. [22] The court will construe plaintiffs' strict liability claim as an AEMLD claim. Shell's motion to dismiss count two of plaintiffs' complaint will be denied. [23]

### B. Motion for More Definite Statement

Shell contends that plaintiffs have failed to plead their fraud claim with particularity. [24] Specifically, Shell argues that plaintiffs' complaint fails to (1) describe whether Shell's alleged misrepresentations or omissions occurred in written or oral communications; (2) state whether such communications were actually made to the named plaintiff class representatives; (3) state the dates and times of such communications; (4) describe the persons making such communications on behalf of Shell; and (5) specify the persons hearing or receiving such communications on behalf of the class representatives. [25] Shell, therefore, asks the court to strike plaintiffs' fraud claim, or in the alternative require plaintiffs to state their allegations with more particularity. [26]

In response, plaintiffs argue that their fraud claim satisfies the requirements of Federal Rule of Civil Procedure 9(b). [27] However, in the event that the court finds their fraud claim is not pleaded with particularity, plaintiffs ask the court to grant them leave to amend their complaint. [28]

**\*4** "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purpose of Rule 9(b) is to provide the defendant with fair notice of the " 'precise

misconduct with which [it is] charged' " and to protect it " 'against spurious charges of immoral and fraudulent behavior." ' *Durham v. Business Management Assoc.,* 847 F.2d 1505, 1511 (11th Cir.1988) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179 (1985)). The Eleventh Circuit Court of Appeals, however, has stated that the application of the rule must not defeat the concept of notice pleading. *See Durham,* 847 F.2d at 1511. "Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule." *Id.* at 1512.

In light of these principles, the court will assess plaintiffs' complaint against each of Shell's five objections thereto. First, Shell contends that plaintiffs fail to describe whether Shell's alleged misrepresentations or omissions occurred in written or oral communications. Shell is incorrect. Plaintiffs allege that, "During the course of marketing PB pipe ... SHELL has made numerous material misrepresentations ... both orally and in writing." [29]

Second, Shell argues that the complaint fails to state whether such communications were actually made to plaintiffs. The court again disagrees. Plaintiffs allege that Shell "expressly represented to the public, including Plaintiffs, that the polybutylene tubing had been extensively tested and was suitable for use as water pipe in normal potable water." [30] Furthermore, plaintiffs imply throughout their complaint that Shell communicated the alleged misrepresentations to plaintiffs themselves. For instance, plaintiffs allege that Shell made false representations upon which it intended or could expect plaintiffs to rely and that plaintiffs did in fact rely on these representations to their detriment. [31]

Third, Shell argues that plaintiffs have not stated the dates and times of the alleged misrepresentations. Shell is correct. Nevertheless, plaintiffs' failure to plead these particulars is alone not sufficient to defeat particularity. *See Durham,* 847 F.2d at 1512. As long as it otherwise provides a modest degree of precision and substantiation to plaintiffs' fraud claim, the compliant does not need to state the date, time, or place of the allegedly fraudulent conduct. *See id.; Seville Indus. Mach. Corp.,* 742 F.2d at 791; *but see Cooper v. Blue Cross and Blue Shield of Fla., Inc.,* 19 F.3d 562, 568 (11th Cir.1994) (stating that the plaintiff's complaint must allege the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them).

**\*5** Fourth, Shell contends that the complaint fails to describe the persons making the alleged misrepresentations on behalf of Shell. Shell is again correct. The compliant does, however, imply that many or all of the misrepresentations were made through Shell's marketing campaign, which included brochures and manuals, as well as oral statements. [32] More importantly, plaintiffs quote or paraphrase several of Shell's "false and misleading oral and written statements." [33] These quotes place Shell on notice of " 'the precise misconduct with which [it is] charged." ' *Durham,* 847 F.2d at 1511 (quoting *Seville Indus. Mach. Corp.,* 742 F.2d at 791).

Finally, Shell argues that the complaint fails to specify the persons hearing or receiving such communications on behalf of plaintiffs. Shell is correct. Nevertheless, plaintiffs failure to plead the names of specific individuals is irrelevant in light of the above analysis. Although plaintiffs have not pleaded every detail relevant to their fraud claim, Rule 9(b) does not require them to do so. Rule 9(b) requires only that plaintiffs plead with particularity the "circumstances constituting fraud." While plaintiffs' complaint is not a model of clarity and organization, the court finds, for the above stated reasons, that plaintiffs have pleaded the circumstances of Shell's alleged fraud with particularity. The complaint provides Shell with adequate information from which it can appropriately answer plaintiffs' allegation of fraud. Consequently, Shell's motion for more definite statement will be denied.

### C. Motion to Strike

Shell moves to strike plaintiffs' class allegations on the ground the class is unmanageable, since the court must apply the laws of the 50 states to each of plaintiffs' three claims. [34] Plaintiffs respond by arguing that given Shell's nexus with Texas and Texas's interest in the litigation, the court should apply the substantive law of only Texas to each claim. [35] Plaintiffs, therefore, conclude that the class is manageable. [36]

A class action may be maintained only when it satisfies the four requirements of Federal Rule of Civil Procedure 23(a) [37] and at least one of the requirements of Rule 23(b). *See Heaven v. Trust Co. Bank,* 118 F.3d 735, 737 (11th Cir.1997); *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 456 (11th Cir.1996), *cert. denied,* 519 U.S. 1149, 117 S.Ct.

1082 (1997). [38] The party seeking class certification bears the burden of establishing each of these prerequisites. *See Heaven,* 118 F.3d at 737; *Hudson,* 90 F.3d at 456.

Shell does not dispute that plaintiffs have satisfied the elements of Rule 23(a). Instead, Shell contends that under Alabama's choice of law rule plaintiffs cannot, as a matter of law, satisfy Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3). [39] Rule 23(b)(3) requires that common issues of law and fact predominate over individual issues and that a class action is a superior means to litigate the rights of the class members. " 'In other words, the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." ' *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997) (quoting *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1557–58 (11th Cir.1989)). This predominance inquiry is far more demanding than Rule 23(a)'s commonality requirements. *See id.* In deciding whether the predominance and superiority requirements are met, the court may take into account variations in state law, *see Castano v. American Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996), and problems of manageability. *See Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014, 1023 (11th Cir.1996).

**\*6** "Federal courts sitting in diversity apply the forum state's choice-of-law rules." *Boardman Petroleum, Inc. v. Federated Mut. Insur. Co.,* 135 F.3d 750, 752 (11th Cir.1998); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021 (1941). Alabama's choice of law rule in tort cases is *lex loci delicti. See Fitts v. Minnesota Mining & Mfg. Co.,* 581 So.2d 819, 823 (Ala.1991). Under *lex loci delicti,* "an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Id.* at 820. Because each of plaintiffs' cause of action is in tort, the court must determine each of the putative class member's rights under the law of the state in which the putative class member was injured. The putative class members are "[a]ll persons or entities who own, operate or previously owned or operated ... water supply or distribution systems in the United States composed in whole or in part of PB pipe." [40] Implicit in plaintiffs' claim is that members of the putative class were injured in potentially each of the 50 states. Consequently, if it certifies the class, the court may have to apply the law of each of the 50 states to each substantive issue involved in this matter.

Plaintiffs do not argue that the application of *lex loci delicti* satisfies the predominance and superiority aspects of their class. Instead, plaintiffs argue that the application of *lex loci delicti* is arbitrary and fundamentally unfair, and, therefore, unconstitutional under *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965 (1985). [41] Plaintiffs contend that under *Shutts* the court should apply the substantive law of Texas to each putative class member's claim. [42] Plaintiffs have misinterpreted the *Shutts* holding: it does not preclude the application of *lex loci delicti* in this matter.

In *Shutts,* the respondents brought a nationwide class action against the petitioner in Kansas state court, seeking to recover interest and royalty payments which had been delayed by the petitioner. 472 U.S. at 799, 105 S.Ct. at 2968. Over the petitioner's objection, the trial court applied Kansas substantive law to every claim in the dispute, even though many of the putative class members and royalty arrangements did not have any connection with Kansas. *See id.* at 802–03, 105 S.Ct. at 2969–70. The Kansas Supreme Court affirmed. *See id.* at 803, 105 S.Ct. at 2969.

The petitioner argued to the United States Supreme Court that "total application of Kansas substantive law violated the constitutional limitations on choice of law mandated by the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV, § 1." *Id.* at 816, 105 S.Ct. at 2976. The Supreme Court agreed, and reversed and remanded the choice-of-law issue. *See id.* at 823, 105 S.Ct. at 2980. The Court reasoned that the Kansas's courts applied Kansas law to every claim in the case, notwithstanding that over 99% of the gas leases and 97% of the putative class members had no apparent connection to Kansas except for the lawsuit. *Id.* at 814–15, 105 S.Ct. at 2976. Consequently, the Court held that, given Kansas's lack of " 'significant contact or significant aggregation of contacts' " to the claims unrelated to that state, the application of Kansas substantive law to every claim in the case was arbitrary and unfair. *Id.* at 821–22, 105 S.Ct. at 2979 (quoting *Allstate Ins. Co. v.. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 639–40 (1981)).

 **\*7** Unlike *lex fori* (the choice of law rule applied by the Kansas courts in *Shutts* ), application of *lex loci delicti* here ensures that the substantive law applied to each putative class member's claim will be that of the state in which the injury occurred. The state in which an injury occurred has, by definition, "a significant contact or aggregation or contacts" with the class member injured there. Furthermore, the *Shutts* Court stated that the expectations of the parties is an

important consideration underlying its holding's requirement of fairness. *See id.* at 822, 105 S.Ct. at 2979–80. "There is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control." *Id.* at 822, 105 S.Ct. at 2980. In contrast, here, it is undeniable that the putative class members and Shell reasonably expected at the time of transacting over the PB pipe that the place where the pipe was utilized, and, therefore, any injury resulting therefrom would most likely occur, would be the forum from which the substantive law governing any litigation involving the pipe would come. Therefore, the parties' expectations are not subverted by applying *lex loci delicti,* and its application in this matter is neither unfair nor arbitrary. The court will now determine whether, in light of its obligation to apply *lex loci delicti,* individual issues of law or fact predominate over common issues causing manageability problems that render class treatment an inferior method of resolving this litigation.

Plaintiffs have alleged claims of negligence, strict liability, and fraud. Attempting to resolve these claims on a class basis presents concerns regarding each claim's elements of proof and the legal and factual problems they present. The court's foremost concern involves plaintiffs' fraud claim. As this court has recently discussed, fraud is inherently an inappropriate claim to be resolved on a nationwide class basis. *See Mack v. General Motors Acceptance Corp.,* 169 F.R.D. 671, 677–78 (M.D.Ala.1996).

In *Mack,* the court found that class certification was inappropriate because, among other things, variations in the laws of the 50 states applicable to the plaintiff's fraud and other state-law claims rendered the class unmanageable. *See id.* at 679. The court found that the elements of the class-wide fraud claims are essentially the same regardless of which state's law is applied. *See id.* at 677. "Under the law of every state, a plaintiff seeking to prevail on a fraud by suppression claim must show, *inter alia,* a duty to disclose and detrimental reliance on the part of the plaintiff." *Id.* at 677 (citing opinions from several state appellate courts announcing the elements of fraud in their states). The court, however, recognized that states impose varying standards to determine whether there is a duty to disclose. *See id.* (citing *Castano,* 84 F.3d at 743). Similarly, the court found that the law on reliance differs from state to state. *See id.* at 678. For instance, some states require justifiable reliance, while others require reasonable reliance. *See id.* As a result, the court concluded its fraud analysis by stating: "This case is the antithesis of a class action. Indeed, in this case, the issues relating to the individual claims

overwhelm and muddle any class issues which may exist. The legal problems associated with varying state law and the factual problems associated with the proof of the fraud claims make the plaintiff's state law claims wholly inappropriate for class treatment." *Id.* The court's conclusion in *Mack* is equally applicable to plaintiffs' fraud claim.

 **\*8** The same problems which plague plaintiffs' fraud claim also plague their negligence claim. " 'The law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause, may ... differ among the states only in nuance, ... [b]ut nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts." ' *In re American Med. Sys., Inc.,* 75 F.3d 1069, 1085 (6th Cir.1996) (quoting *In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1300 (7th Cir.1995), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184 (1995)). If more than a few states' negligence laws differ, and plaintiffs have not proffered any authority that they do not, the court would face a nearly impossible task of instructing the jury on the relevant law. *See id.* [43]

Finally, plaintiffs seek punitive damages on behalf of the class. This fact also complicates resolution of this matter on a class basis. States differ in their treatment of punitive damages. *See Mack,* 169 F.R.D. at 678. "In Alabama, for example, there is no cap on punitive damages while in other

states there are. Thus, each claim will have to be examined in light of the punitive damages law of that state." *Id.* at 678–79.

As the foregoing analysis demonstrates, resolution of this matter on a class basis would require the court to apply multiple variations of state law to several claims and innumerable claimants. Plaintiffs have failed to establish, in light of these variations, the necessary elements of predominance and superiority. Consequently, the court finds that this suit would be unmanageable as a class. Shell's motion to strike plaintiffs' class allegations will, therefore, be granted.

### III. CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

(1) Defendant Shell Oil Company's motion to dismiss, filed February 3, 1999, is denied;

(2) Defendant Shell Oil Company's motion for more definite statement, filed February 3, 1999, is denied; and

(3) Defendant Shell Oil Company's motion to strike, filed February 3, 1999, is granted.

It is further ORDERED that the motion for stay filed by defendant Shell Oil Company on May 14, 1999, is denied.

Footnotes

| | |
|---|---|
| 1 | *See* Complaint filed on December 29, 1998, ¶¶ 1–3. |
| 2 | *See id.* ¶ 15. |
| 3 | *See id.* ¶¶ 7–8. |
| 4 | *See id.* ¶ 7. |
| 5 | *See id.* ¶ 8. |
| 6 | *See id.* ¶ 9. |
| 7 | *See id.* ¶ 12. |
| 8 | *See id.* ¶ 11. |
| 9 | *See id.* ¶ 12. |
| 10 | *See id.* ¶ 15. |
| 11 | *See* Complaint, etc., ¶ 15. |
| 12 | *See id.* |
| 13 | *Id.* ¶ 23. |
| 14 | *See id.* ¶¶ 32–48. |
| 15 | *See id.* ¶¶ 49, 53. |
| 16 | Motion to Dismiss, Motion for More Definite Statement, and Motion to Strike filed by defendant on February 3, 1999, ¶ 13. |
| 17 | *See id.* |

18   Specifically, the complaint alleged that: (1) the defendant, as manufacturer, proximately caused the plaintiff's intestate's death by selling a product in a defective condition which was unreasonably dangerous to him as its ultimate user; (2) the defendant was engaged in the business of selling such product; and (3) the product was expected to, and did, reach the user without substantial change in the condition in which it was sold. *See Atkins,* 335 So.2d at 136.

19   *See* Complaint, etc., ¶¶ 15, 38.

20   *See id.* ¶ 37.

21   *See id.*

22   The Alabama Supreme Court has suggested that the best method of alleging an AEMLD claim is for a plaintiff to include a statement in its complaint to the effect that " 'this action is brought under the Alabama Extended Manufacturer's Liability Doctrine." ' *Casrell,* 335 So.2d at 132 n. 1. Because plaintiffs have pleaded each element of an AEMLD claim, the court finds that their failure to label their claim as suggested by the Alabama Supreme Court, or otherwise as an AEMLD claim, is inconsequential.

23   Shell argues that plaintiffs cannot maintain an AEMLD claim because they have alleged that Shell manufactured PB, a raw material, which is only later extruded into pipe, the end product, and thus the second element of an AEMLD claim—that the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold—cannot be met. *See* Motion to Dismiss, etc., at 4 n. 2. Plaintiffs do allege that Shell produces PB, the raw material. *See* Complaint, etc., ¶ 8. However, they also allege that "Shell designed, manufactured, assembled, marketed, and sold or otherwise introduced into the stream of commerce the PB pipe, PB plumbing systems and materials used in components thereof," and that "[t]he PB plumbing systems or components or materials used in components thereof reached the ultimate users, such as Plaintiffs herein, in substantially the same condition in which they were sold by SHELL, or in the condition in which they were expected to reach the ultimate consumer." *Id.* at 37. The court does not find any contradiction in plaintiffs' allegations that Shell produced both the raw material and, at least in part, the end product. After discovery, Shell's argument to the contrary may be substantiated. At this stage in the proceedings, however, the court is obligated to construe the complaint liberally in plaintiffs' favor. *See Duke,* 5 F.3d at 1402. The court, therefore, finds Shell's argument to be without merit.

24   *See* Motion to Dismiss, etc., ¶ 14.

25   *See id.* ¶ 15.

26   *Id.* ¶ 16.

27   *See* Response filed by plaintiffs on March 1, 1999, ¶ 2.

28   *See id.* ¶ 4.

29   Complaint, etc., ¶ 41.

30   *Id.* ¶ 12.

31   *See id.* ¶¶ 42–44.

32   *See id.* ¶¶ 10–13.

33   *Id.* ¶ 13. For instance, " 'Pipe made with Duraflex polybutylene resin from SHELL CHEMICAL COMPANY is the toughest *and* the most economical plumbing you can buy" '; " 'When you match Duraflex pipe against copper, galvanized, CPVC or any other plumbing material used for hot and cold water service you'll see there's no comparison. You won't find a better pipe for homes, townhouses and apartment buildings at any price" '; " 'Pipe made with Duraflex polybutylene resin offers added protection because it won't corrode, rust or rot. Duraflex resin is inert, so it resists the corrosive elements in water than [sic] can eventually eat holes in metallic pipe." 'Complaint, etc., ¶ 13.

34   *See* Brief in Support of Motion to Strike, filed by defendant on February 3, 1999, at 2, 5–6.

35   *See* Brief in Opposition, filed by plaintiffs on March 1, 1999, at 12, 15.

36   *See id.* at 15.

37   Rule 23(a) states in its entirety:

>"One of more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

38   Rule 23(b) states in its entirety:

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incomparable standards of conduct for the party opposing the class, or

**R-App 751**

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

39    *See* Complaint, etc., ¶¶ 27–31.

40    *Id.* ¶ 23.

41    *See* Brief in Opposition, filed by plaintiffs on March 1, 1999, at 4–10.

42    *See id.* at 8–10.

43    The court does not have a duty to survey each state's law to determine whether the negligence, or other relevant, law of the 50 states is of sufficient commonality for plaintiffs' class claim to pass muster under Rule 23(b)(3). That burden falls on plaintiffs. "[N]ationwide class action movants must creditably demonstrate, through an 'extensive analysis' of state law variations, 'that class certification does not present insuperable obstacles.' " *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (D.C.Cir.1986) 482 U.S. 915, 107 S.Ct. 3188 (1987) (quoting *In re Asbestos Sch. Litig.,* 789 F.2d 996, 1010 (3d Cir.1986), *cert denied sub nom Celotex Corp. v. School Dist. of Lancaster,* 479 U.S. 852, 107 S.Ct. 182 (1986)). Plaintiffs have not made any attempt to survey, let alone provide an extensive analysis of, the negligence laws of the 50 states.

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 234 of 254   Document 30-3

R-App 752



Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
Beverly T. KINDSCHUH, Plaintiff,
v.
CITY OF FOND DU LAC, Defendant.

No. 09–C–214.
April 14, 2010.

Beverly T. Kindschuh, Fond Du Lac, WI, pro se.

Matthew L. Granitz, Joseph M. Wirth, Piper & Schmidt, Milwaukee, WI, for Defendant.

**DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

AARON E. GOODSTEIN, United States Magistrate Judge.

**I. PROCEDURAL HISTORY**

*1 On February 27, 2009, Beverly T. Kindschuh (hereinafter "Kindschuh"), proceeding pro se, filed a lawsuit against the City of Fond du Lac (hereinafter "City"), her former employer. The complaint also named individual City employees and the Kindschuh's prior attorney. Kindschuh's complaint contains four independent causes of action. First, Kindschuh pursues a federal employment discrimination claim. She alleges that the City discriminated against her on account of her medical condition/disability in violation of her civil rights. Second, Kindschuh pursues a contract claim. She alleges that when negotiating the settlement agreement the City did not tell her the truth and that therefore the settlement agreement is voidable at her option. Third, Kindschuh pursues tort claims. She alleges that the City both intentionally misrepre-

sented and fraudulently induced her to sign the settlement agreement. She also alleges that at the time of her resignation, City employees intentionally withheld or negligently failed to provide her with certain retirement forms/information on disability benefits that caused her financial loss. Fourth, Kindschuh raises a claim of legal malpractice against her prior attorney.

On April 17, 2009 Kindschuh filed a repetitious claim accusing attorney Curry First (hereinafter "First") of legal malpractice. (Case No. 09–C–397, Docket No. 31 at 1.) First represented Kindschuh in her 2001 federal employment discrimination lawsuit. (Docket No. 19.)

On April 21, 2009 this case was reassigned to this court (Docket No. 11.) and thereafter, all parties had consented to the jurisdiction of the magistrate judge. (Docket Nos. 13, 25, 32.)

On May 4, 2009 First filed a motion to dismiss. (Docket No. 18.) Kindschuh responded and First replied. (Docket Nos. 27, 30.) This court granted First's motion to dismiss on June 19, 2009. (Docket No. 37.)

On September 24, 2009 Kindschuh moved to amend the complaint to remove all individually named persons associated with the City. (Docket No. 38.) The court now grants Kindschuh's motion to amend. In a letter to the court dated October 6, 2009 the attorney for the defendant stated he did not object to Kindschuh's motion to amend. (Docket No. 40.) In addition, Kindschuh failed to properly serve the individually named persons associated with the City in the original claim.

On November 30, 2009, the defendant filed a motion for summary judgment. (Docket No. 45.) Kindschuh has responded and the defendant has re-

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

plied. (Docket Nos. 64, 65.) The pleadings on the defendant's motion are closed and the matter is ready for resolution.

## II. FACTS

Based upon the materials submitted, the undisputed material facts relevant to the resolution of the pending motion are as follows. Kindschuh began her employment with the City in 1989 as a bus driver. (Docket No. 50 at 54.) She later transferred to the City's parks department where she was employed full-time until she resigned in January 2002 pursuant to a settlement agreement. (Docket Nos. 47 at 2, 50 at 66.) The City has not employed Kindschuh since her resignation. (Docket No. 50 at 61.)

**\*2** Kindschuh filed the present lawsuit on February 27, 2009. (Docket No. 1.) This lawsuit concerns Kindschuh's prior employment with the City and the City's conduct regarding Kindschuh's resignation.

While employed, Kindschuh filed three state employment discrimination complaints and one federal employment discrimination lawsuit in the Eastern District of Wisconsin. (Docket Nos. 48 at 6–7, 49 at 2–3, 49 at 62–65, 50 at 47–52.)

In 1999, Kindschuh filed her first discrimination complaint with the Wisconsin Equal Rights Division (hereinafter "ERD") against the City alleging that the City was discriminating against her on account of her gender. (Docket No. 48 at 6–7.) She alleged that she had to spray pesticides and perform clerical duties while males co-workers did not, that she was given more responsibility than male co-workers (so that her supervisor could more easily criticize her), that she was held to a higher standard regarding job performance than male co-workers and that male co-workers and her supervisor created a sexually hostile working environment. (Docket No. 48 at 6–7.) The City denied all allegations. (Docket No. 48 at 12.)

In 2000, Kindschuh filed her second discrimination complaint with the ERD against the City alleging that she received a verbal reprimand and was the subject of a mandatory referral to the Employment Assistance Program on account of her gender and in retaliation for the 1999 complaint. (Docket No. 49 at 3.) The City again denied all allegations. (Docket No. 49 at 5.)

In March of 2001, Kindschuh filed her third discrimination complaint with the ERD. (Docket No. 49 at 63.) Kindschuh alleged that the City was allowing sexual harassment to continue, that she was held to a higher standard than male co-workers in disciplinary matters and that City employees were forcing her to operate unsafe equipment and to perform tasks that were beyond her medical restrictions in retaliation for her 1999 and 2000 complaints. (Docket No. 49 at 63–65.) The City again denied all allegations. (Docket No. 50 at 1.)

In July of 2001, Kindschuh filed a federal lawsuit in the Eastern District of Wisconsin (Case No. 01–C–694) accusing the City of discrimination based on her gender, age and medical condition/disability, sexual harassment, a hostile work environment and threats of punishment/termination by her supervisor. (Docket No. 50 at 47–52.) The City filed its answer denying all allegations and affirmatively alleging that the court was without jurisdiction to consider those claims not raised in her 2001 ERD complaint. (Docket No. 50 at 53–59.)

In early January of 2002, Kindschuh and the City entered into a settlement agreement. (Docket No. 50 at 60–66.) The settlement agreement required Kindschuh to release all of her claims, dismiss all pending actions, and resign from her employment. (Docket No. 50 at 62–63.) The settlement agreement specifically identified the three ERD complaints and the pending court action. In return, the City agreed to pay Kindschuh $80,000.00 in damages and to provide health insurance benefits to Kindschuh for two years or until

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

she obtained other employment that offered health insurance benefits. (Docket No. 50 at 61–62.) Kindschuh was represented by counsel during these settlement negotiations. (Docket No. 1.) The federal action was dismissed on January 10, 2002. (Docket No. 50 at 72–74.)

**\*3** In August 2006 Kindschuh filed a state action in Dane County against the Wisconsin Retirement Board regarding retirement benefits. (Docket No. 50 at 76.) The claim was dismissed on December 1, 2006 and the motion for reconsideration was denied on December 22, 2006. (Docket No. 50 at 79.)

### III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir.1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir.1989).

Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir.1993).

### IV. ANALYSIS

A) THE COURT GRANTS SUMMARY JUDGMENT FOR THE DEFENDANT ON KINDSCHUH'S FEDERAL EMPLOYMENT DISCRIMINATION CLAIM.

The defendant moves for summary judgment asserting that Kindschuh's federal employment discrimination claim is barred by the doctrine of claim preclusion and the statute of limitations.

The doctrine of claim preclusion requires litigants to join in a single lawsuit all legal and remedial theories based on the same, or nearly the same, factual allegations. Highway J. Citizens Group v.. U.S. Dept. of Transp., 456 F.3d 734, 740 (7th Cir.2006). The purpose of claim preclusion is to maintain social order by ensuring the finality of judicial decisions. Car Carriers, Inc. v. Ford Motor Co., 789 F.2d 589, 593 (7th Cir.1986). Claim preclusion requires that matters contested and settled by parties be considered forever settled between the parties. Car Carriers, 789 F.2d at 594 (quoting Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522, 525 (1931)).

A defendant seeking dismissal of a claim with the doctrine of claim preclusion must satisfy three requirements: (1) an identity of the parties or their privies; (2) a final judgment on the merits has previously been rendered; and (3) an identity of the causes of action. Highway J. Citizens Group, 456 F.3d at 741. The defendant contends that the present action and the 2001 federal lawsuit satisfy the three requirements. The court will address each.

**\*4** The defendant has satisfied the first require-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

ment of claim preclusion, an identity of the parties. In the 2001 lawsuit, the plaintiff was Kindschuh and the defendant was the City. (Docket No. 40 at 72.) In the present lawsuit, the remaining parties are plaintiff Kindschuh and the defendant City. (Docket No. 25.) Therefore, the parties are identical in both lawsuits and the defendant has satisfied the first requirement.

The defendant has satisfied the second requirement of claim preclusion, a final judgment on the merits has previously been rendered. For purposes of claim preclusion, the Seventh Circuit has routinely held that an order for dismissal with prejudice is a "final judgment on the merits." *Brooks–Ngwenya v. Indianapolis Public Schools,* 564 F.3d 804, 808 (7th Cir.2009); *see also Golden v. Barenborg,* 53 F.3d 866, 871 (7th Cir.1995).

Kindschuh signed the "Stipulation and Order for Dismissal" on December 26, 2001. (Docket No. 50 at 72.) Attorney Zierdt, on behalf of the City, signed the "Stipulation and Order for Dismissal" on January 2, 2002. (Docket No. 50 at 72.) This order stated "[i]t is hereby stipulated between ... Kindschuh ..., and the City ..., that the [matter] may be dismissed as to any and all causes of action, claims, counterclaims and cross-claims, *with prejudice* ...." (Docket No. 50 at 72.) (emphasis added). Judge William E. Callahan ordered the matter dismissed *with prejudice* on January 10, 2002. (Docket No. 50 at 73.) (emphasis added). Therefore, a final judgment on the merits has previously been rendered and the defendant has satisfied the second requirement.

The defendant has satisfied the third requirement of claim preclusion, an identity of the causes of action. To determine whether the present cause of action is the same as, or has "identity" with, the prior cause of action, the Seventh Circuit routinely uses the "same transaction test." *Car Carriers,* 789 F.2d at 593; *see also Alexander v. Chicago Park District,* 773 F.2d 850, 854 (7th Cir.1985); *Wakeen v. Hoffman House, Inc.,* 724 F.2d 1238, 1241 (7th Cir.1981); *Harper*

*Plastics, Inc. v. Amoco Chemicals Corp.,* 657 F.2d 939, 944 (7th Cir.1981).

Under the "same transaction test", a "transaction" is a "single core of operative facts which give rise to a remedy." *Car Carriers,* 789 F.2d at 593. To determine whether the "transaction" is the same in both claims the court looks to "whether [both] claims turn on the same facts." *Andersen v. Chrysler Corp.,* 99 F.3d 846, 852 (7th Cir.1996). If the facts that the plaintiff must prove in both claims are substantially similar, the two claims "turn on the same facts" and are one for purposes of claim preclusion. *Id.* To ensure fairness to litigants, the court examines the facts at a sufficient level of specificity. *Id* at 852–853, 854.

The "same transaction test" yields the conclusion that the present lawsuit and the 2001 lawsuit arise from the same "transaction." Kindschuh is complaining of the same wrongful acts by the City as she did in the 2001 lawsuit.

**\*5** In the 2001 lawsuit, Kindschuh alleged that the City was discriminating against her on account of her gender, age and medical condition/disability. (Docket No. 50 at 49–50.) Focusing on her medical condition/disability allegation, in 2001 Kindschuh wrote in her complaint that the City was discriminating against her based on her "medical condition, ADA." (Docket No. 50 at 49.) The City directly responded to Kindschuh's allegation of discrimination based on her medical condition. In paragraph seven of the answer to the 2001 complaint the defendant stated, "[City denies that it] discriminated against plaintiff on the basis of her medical condition, or in any other respect...." (Docket No. 50 at 55.) Furthermore, the "Settlement Agreement and Full and Final Release of Claims" states "the City denied and continues to deny that it violated the ... Americans [w]ith Disabilities Act ... or any other federal, state or municipal statute, regulation, order or rule relating to employment discrimination or unfair employment treatment of any kind." (Docket No. 50 at 61.)

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

In the present lawsuit, Kindschuh once again alleges that the City discriminated against her on account of her medical condition/disability saying "[e]mployer could not see illness civil rights violation I believe happened here." (Docket No. 1 at 3.) The City could not have discriminated against Kindschuh in any new or different ways because she has not been employed by the City since her resignation in December 2001. (Docket No. 50 at 61.)

Both the 2001 federal employment discrimination claim and the present federal employment discrimination claim "turn on the same facts", whether the City's actions toward Kindschuh during her employment amount to discrimination based on her medical condition/disability. The "transaction" is therefore the same in both lawsuits and Kindschuh is barred from proceeding with her federal employment discrimination claim by the doctrine of claim preclusion.

The defendant has satisfied the three requirements of claim preclusion. Because Kindschuh's federal employment discrimination claim is barred by claim preclusion, the court need not address whether the claim is also barred by the statute of limitations.

B) THE COURT GRANTS SUMMARY JUDGMENT FOR THE DEFENDANT ON KINDCHUH'S CONTRACT CLAIM.

The defendant moves for summary judgment asserting that the statute of limitations bars Kindschuh from bringing a contract claim regarding the settlement agreement. Kindschuh claims that she would not have signed the settlement agreement had she "been told the truth." The settlement agreement is a contract. Therefore, Wisconsin contract law governs.

In Wisconsin, the statute of limitations for contract matters is six years. Wis. Stat § 893.43 (1996). An action upon a contract must be commenced within six years after the cause of action accrues or the action is barred. § 893.43.

There are two conflicting public policy issues raised by statutes of limitations. On one hand, the judicial system wants to "discourage stale and fraudulent claims." Hansen v. A.H. Robins, Inc., 113 Wis.2d 550, 558, 335 N.W.2d 578, 582 (Wis.1983). On the other hand, the judicial system wants to allow "meritorious claimants, who have been as diligent as possible, an opportunity to seek redress for injuries sustained." Id.

**\*6** In balancing these policy issues, the Wisconsin Supreme Court decided not to apply the discovery rule to contract claims. CLL Associates Ltd. Partnership v. Arrowhead Pacific Corp., 174 Wis.2d 604, 617, N.W.2d 115, 120 (Wis.1993). Therefore, under Wisconsin Statute 893.43 "a contract cause of action accrues at the moment the contract is breached, regardless of whether the injured party knew or should have known that the breach occurred." Id at 607, 116.

Since Kindschuh alleges that representations made in regard to the agreement were not true or misleading her contract cause of action accrued when the settlement agreement was signed. Kindschuh signed the agreement on December 26, 2001 and the City signed the agreement a week later on January 2, 2002. (Docket No. 50 at 66.) To be timely, Kindschuh was required to commence the present action no later than January 2, 2008. Kindschuh filed the present lawsuit over one year later on February 27, 2009. (Docket No. 1.) Therefore, Kindschuh's contract claim is barred by the statute of limitations.

The court has the discretion to toll the statute of limitations by applying the doctrine of estoppel by fraudulent concealment. If applied, the defendant is precluded from relying on the statute of limitations as a defense to a lawsuit. To toll the statute of limitations with the doctrine of estoppel by fraudulent concealment the court must find that the "defendant's conduct

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

and representations were so unfair and misleading as to outbalance [the] public's interest in setting limitation on [the] action." *Bell v.. City of Milwaukee, 514 F.Supp. 1363, 1371 (E.D.W.I. 1981).*

Kindschuh has failed to allege sufficient evidence that the City made representations that were "so unfair and misleading" for the court to exercise its discretion and apply the doctrine of estoppel. Kindschuh stated that she would not have signed the agreement had she "been told the truth." (Docket No. 1 at 5.) She has never clarified or developed this statement. Kindschuh has failed to set forth with particularity the alleged misrepresentations. Vague characterizations, with little to no evidence of specific facts, will not persuade the court to deny a proper motion for summary judgment. *Brooks v. University of Wisconsin Bd. of Regents, 406 F.3d 476, 481 (7th Cir.2005).* Therefore, the court will not apply the doctrine of estoppel by fraudulent concealment to toll the statute of limitations barring Kindschuh's contract claim.

C) THE COURT GRANTS SUMMARY JUDGMENT FOR THE DEFENDANT ON KINDSCHUH'S TORT CLAIMS.

The defendant moves for summary judgment asserting that Wisconsin's governmental immunity statute and statutes of limitations bar Kindschuh from bringing tort claims regarding the settlement agreement and her resignation.

Kindschuh alleges that City employees committed various torts regarding the settlement agreement and her resignation. Regarding the settlement agreement, Kindschuh alleges that City employees both intentionally misrepresented and fraudulently induced her to sign the settlement agreement. Regarding her resignation, Kindschuh alleges that City employees both intentionally withheld or negligently failed to provide her with certain retirement forms/information on disability benefits. Wisconsin tort law governs.

*7 The Wisconsin governmental immunity statute states

"[n]o suit may be brought against any ... governmental subdivision or agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such .... subdivision or agency ... or against its officers, officials, agents or employees for acts done in the exercise of legislative [or] quasi-legislative ... functions."

*Wis. Stat. § 893.80*(4) (2006). Pursuant to this statute, a government body is immune from suit when the act complained of is either an intentional tort or involves discretion. *Envirologix Corp. v. City of Waukesha, 192 Wis.2d 277, 288 531 N.W.2d 357, 363 (Wis.Ct.App.1995)* (the terms "legislative, quasi-legislative, judicial or quasi-judicial" are synonymous with discretionary).

Before Kindschuh can proceed with her tort claims she must first overcome the City's defense of governmental immunity. *Umansky v. ABC Ins. Co., 2009 WI 82, 319 Wis.2d 622, ¶ 14, 769 N.W.2d, 1, ¶ 14 (2009).* There are four exceptions to the doctrine of governmental immunity that have developed in order to balance "the need of public officers to perform their functions freely and the right of an aggrieved party to seek redress." *Bicknese v. Sutula, 2003 WI 31, 260 Wis.2d 713, ¶ 17, 660 N.W.2d 289, ¶ 17* (quoting *Lister v. Bd. of Regents of University Wisconsin System, 72 Wis.2d 282, 300, 240 N.W.2d 610, 621 (Wis.1976)).* "Public officer immunity does not apply to: (1) the performance of ministerial duties; (2) the performance of duties with respect to a "known danger;" (3) actions involving medical discretion; and (4) actions that are "malicious, willful, and intentional." " *Bicknese,* 260 Wis.2d at ¶ 17, 660 N.W.2d at ¶ 17. Of these four, only the performance of ministerial duties and actions that are "malicious, willful, and intentional" are arguably applicable.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

Governmental immunity does not bar a lawsuit if a public officer negligently performs a ministerial duty. *Kimps v. Hill,* 200 Wis.2d 1, 10, 546 N.W.2d 151, 156 (Wis.1996). "A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Kierstyn v. Racine Unified School Dist.,* 228 Wis.2d 81, 91, 596 N.W.2d 417, 422 (Wis.1999).

Kindschuh submitted certain provisions of the Wisconsin Retirement System (WRS) Administration Manual to the court. It appears that Kindschuh alleges specifically that the City intentionally withheld or negligently failed to provide her with the "Request for Benefit Information (ET–7301)" as she circled provisions pertaining to this document. (Docket Nos. 43 at 42 and 44.) Chapter two, titled "Employer Responsibilities", states that each WRS participating employer must designate an agent to act on behalf of WRS and that this agent, in advising employees, is responsible for providing a "Request for Benefit Information (ET–7301)" to an employee who terminates employment or plans to retire. (Docket No. 43 at 56–57.) Chapter seventeen, titled "Benefits", states, under the heading "Advising Employees or Survivors", that an employee must be provided with a "Request for Benefit Information (ET–7301)" when the employee terminates employment, plans to retire, or becomes disabled. (Docket No. 43 at 43.)

**\*8** The defendant argues that City employees' responsibilities regarding the "Request for Benefit Information (ET–7301)" were advisory. The defendant continues that because giving advice is a discretionary action, the City employees' actions are cloaked with governmental immunity. The defendant relies on *Kierstyn v. Racine Unified School Dist.,* where the Wisconsin Supreme Court held that incorrect advice given by a benefit specialist was discretionary and

cloaked with immunity, and *Scott v. Savers Property Casualty Ins. Co.,* where the Wisconsin Supreme Court held that a high school guidance counselor's incorrect advice on NCAA complaint courses was discretionary and cloaked with immunity. *Kierstyn,* 228 Wis.2d 81; *Scott v. Savers Property Casualty Ins. Co.,* 2003 WI 60, 262 Wis.2d, 663 N.W.2d 715.

Although it is true that the provisions of the WRS Administration Manual reference advising employees, it is not clear that any advisory action is actually involved in the distribution of the "Request for Benefit Information (ET–7301)." Instead, the provisions simply require the City employee, at some time, to provide an employee who terminates employment or plans to retire with the "Request for Benefit Information (ET–7301)." The provisions referenced do not give the City employee the discretion to not provide an employee with the "Request for Benefit Information (ET–7301)." At this early juncture and based on the facts presented, the court cannot conclude that the City has demonstrated with clarity and without controversy that the provisions of the WRS Administration Manual did not impose a ministerial duty on City employees to provide a "Request for Benefit information (ET–7301)" to Kindschuh at the time of her resignation. Therefore, summary judgment based on governmental immunity will not be granted in favor of the defendant on Kindschuh's allegations that City employees both intentionally withheld or negligently failed to provide her with certain retirement forms/information on disability benefits.

The court also recognizes that governmental immunity does not bar a lawsuit if a public officer acts "maliciously, willfully and intentionally" within the scope of his/her employment and injures another. *Bicknese,* 260 Wis.2d at 297, 660 N.W.2d at 728. "Malicious, willful and intentional" must be read in the conjunctive. *Id.* For the exception to apply, the employee must have acted maliciously with the intent to injure. *Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

In her opposition document entitled "Motion in Response to Motion for Summary Judgment", Kindschuh states that it was malice for City employees to withhold information regarding her resignation. (Docket No. 64 at 3.) This statement is conclusory and is not factually supported. According to the Seventh Circuit "conclusory allegations are not sufficient to raise genuine issues of material fact." *Hall v. Printing Graphic Arts Union, Local No. 3,* 696 F .2d 494, 500 (7th Cir.1982). Therefore, the "malicious, willful and intentional" exception will not preclude the court from granting the City's motion for summary judgment on Kindschuh's tort claims.

**\*9** Although the defense of governmental immunity does not cover all of Kindschuh's tort claims, as will be now discussed, these claims cannot survive the applicable statutes of limitations.

With respect to tort actions, Wisconsin has adopted the discovery rule. Pursuant to the discovery rule, "tort claims accrue and the statute of limitations begins to run on the date that the injured party discovers, or with reasonable diligence should have discovered, the tortious injury, whichever occurs first." *CLL Associates LTD Partnership,* 147 Wis.2d at 609, 497 N.W.2d at 117. In this case, applicable statutes of limitations are two years for intentional torts, six years for negligence affecting plaintiff's rights and six years for fraudulent misrepresentation. Wis. Stat. § 893.57 (2006); Wis. Stat. § 893.53 (2006); Wis. Stat § 893.93 (2006).

The defendant has alleged that all applicable statutes of limitations have run and Kindschuh is thereby barred from bringing a tort claim. The defendant states that Kindschuh must have brought an action based on intentional misrepresentation by December 2003 and brought an action based on negligence by December 2007. (Docket No. 46 at 10.) The defendant labels fraudulent misrepresentation an intentional tort and while the court believes fraudulent misrepresentation has a six-year statute of limitations

according to Wisconsin Statute 893.91(1)(b), the defendant nonetheless has alleged that the statute of limitations on Kindschuh's fraudulent misrepresentation claim has run. The defendant is commencing the statute of limitations in December 2001, the month that Kindschuh signed the settlement agreement and thereby resigned from her employment.

Kindschuh presented no evidence of the dates she discovered the alleged tortious injuries nor has she disputed the defendant's allegations that the statutes of limitations have run. Federal Rule of Civil Procedure 56(e) states "[w]hen a motion for summary judgment is made and supported ..., an adverse party ... must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e). Summary judgment is appropriate on Kindschuh's tort claims because she has presented no factual basis to support the conclusion that she became aware of the alleged torts on dates that comply with the statutes of limitations.

As was discussed earlier in this opinion, the court has the discretion to toll the statutes of limitations by applying the doctrine of estoppel by fraudulent concealment. *Bell,* 514 F Supp 1363 (E.D. WI 1981). Again, the court will not apply the doctrine of estoppel by fraudulent concealment because Kindschuh has not made allegations of "unfair and misleading" behavior other than vague characterizations supported by little to no evidence. *Brooks,* 406 F.3d 476, 481 (7th Cir.2005).

**V. CONCLUSION**

The court grants summary judgment for the defendant on Kindschuh's federal employment discrimination claim because the defendant has satisfied the requirements of the doctrine of claim preclusion. The parties in the 2001 lawsuit and the present lawsuit are the same, the 2001 lawsuit terminated with a final judgment on the merits and the "same transaction test" yields the conclusion that there is identity of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)
**(Cite as: 2010 WL 1507883 (E.D.Wis.))**

causes of action. Kindschuh is therefore barred by the doctrine of claim preclusion from suing the City once again for discrimination based on her medical condition during her employment.

**\*10** The court grants summary judgment for the defendant on Kindschuh's contract claim because the claim is barred by the statute of limitations. To be timely, Kindschuh must have filed a claim on the contract no later than January 2, 2008. She filed this claim on February 27, 2009.

The court grants summary judgment for the defendant on all Kindschuh's tort claims pursuant to applicable statutes of limitations. Kindschuh did not provide any evidence to the court that she remained unaware of the alleged torts until dates that would avoid bar by the statute of limitations. Further, Kindschuh has not alleged sufficient evidence to the court for the court to consider tolling the statute with the doctrine of estoppel by fraudulent concealment.

**IT IS THEREFORE ORDERED** that the defendant's motion for summary judgment, (Docket No. 45) is **granted.** The clerk shall enter judgment dismissing the complaint and this action without costs to either party.

E.D.Wis.,2010.
Kindschuh v. City of Fond Du Lac
Not Reported in F.Supp.2d, 2010 WL 1507883 (E.D.Wis.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 261265
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

Rob BOELK, Jerry Seger, Dave Jacak,
Greg Congdon, David Moffitt and Jeff
Sopel, on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
AT & T TELEHOLDINGS, INC., Wisconsin
Bell, Inc., Ameritech Services, Inc.
And AT & T Services, Inc., Defendants.

No. 12–cv–40–bbc.  |  Jan. 10, 2013.

**Attorneys and Law Firms**

Michael R. Bauer, Peggy A. Lautenschlager, Bauer & Bach,
LLC, Sarah E. Siskind, Miner, Barnhill & Galland, P.C.,
Madison, WI, Nancy L. Maldonado. Miner, Barnhill &
Galland, P.C., Chicago, IL, for Plaintiffs.

Kendall W. Harrison, Bryan J. Cahill, Godfrey & Kahn, S.C.,
Madison, WI, for Defendants.

**Opinion**

**OPINION AND ORDER**

BARBARA B. CRABB, District Judge.

**\*1** This is a proposed collective action under the Fair
Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219, and
a proposed class action under Fed.R.Civ.P. 23. Plaintiffs
Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon, David
Moffitt and Jeff Sopel contend that defendants AT & T
Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services,
Inc. and AT & T Services, Inc. violated the FLSA and
Wisconsin law (Wisconsin Wage Payment Act, Wis. Stat.
§§ 104.02, 109.03, Wis. Admin. Code § DWD 272.04,
274.02, 272.12(2)(c)) by failing to pay wages for meal breaks.
According to plaintiffs, defendants imposed such severe
restrictions on what plaintiffs could do during the breaks
that the breaks should have been compensated. Additionally,
plaintiffs contend that defendants' performance and efficiency
rating system compels plaintiffs to work through their meal
breaks without reporting the work. Plaintiffs contend that

defendants knew or should have known that plaintiffs were
working through their meal breaks.

Plaintiffs brought this lawsuit on behalf of a class composed
of defendants' current and former field technician working
in Wisconsin. They have now moved for conditional
certification of an opt-in collective action under 29 U.S.C. §
216(b), class certification of Rule 23 class and authorization
to notify potential class members of their right to join this
case. Dkt. # 28. Defendants oppose the motion, contending
that plaintiffs' claims depend on the resolution of too many
individualized issues. Defendants also filed a motion for leave
to file a sur-reply, dkt. # 102, to which plaintiffs responded by
filing a motion to strike, or in the alternative, to file a response
to defendants' sur-reply. Dkt. # 107. Additionally, defendants
filed a motion requesting oral argument. Dkt. # 111.

After reviewing the facts in the record, I conclude that this
case cannot proceed as a class or collective action. With
respect to Rule 23, plaintiffs have failed to identify a common
issue of law or fact central to their claims that could be
resolved on a classwide basis. Moreover, even if plaintiffs
had identified a common issue, individual issues would
predominate in this case, making the case unmanageable. For
the same reasons, plaintiffs have failed to show that their
situation is sufficiently similar to potential opt-in plaintiffs
that it would be appropriate to conditionally certify this
action under § 216(b) of the FLSA. Therefore, I am denying
plaintiffs' motion for class and collective certification in full.
I am granting the parties' requests to file sur-replies, though
neither sides' filing had any effect on the ultimate decision.
Finally, I am denying defendants' request for oral argument
as unnecessary.

In determining whether the class should be certified, I
considered the allegations in the complaint and the affidavits
and depositions that have been submitted. *Sharpe v. APAC
Customer Services, Inc.,* 2010 WL 135168, \*1 (W.D.Wis.
Jan. 11, 2010); *Sjoblom v. Charter Communications, LLC,*
571 F.Supp.2d 961, 964 (W.D.Wis.2008).

**FACTS**

**A.** *Defendants' Business*

**\*2** Defendants AT & T Teleholdings, Inc., Wisconsin Bell,
Inc., Ameritech Services, Inc. and AT & T Services, Inc
are telecommunications companies operating a network of

longdistance telephone, internet and television service for business and residential customers throughout the country. (The parties do not distinguish among defendants, so I will refer to them collectively as "defendants" throughout this opinion.) Within the Wisconsin network, there are three departments: Installation and Repair, Construction and Engineering and U–Verse. Defendants operate 37 garages in Wisconsin from which technicians work.

### B. *Defendants' Policies*

#### 1. *All work hours must be reported and paid*

Defendants have a policy that technicians must report and be paid for all hours worked. The training materials for managers remind managers to insure that "non-exempt employees begin their meal periods on time, take the entire time allotted, and perform no work during the period." The materials also remind managers to insure that their employees are not working off the clock and that they are recording all of the time they work.

#### 2. *Productivity, quality and efficiency*

Defendants also have policies encouraging efficient and quality work. Before 2010, the slogan for defendant's performance expectation was "4 good jobs in 8," meaning that technicians were expected to complete four quality jobs in every eight-hour day, without overtime. Since 2010, defendant has used a performance system called Management System and Operating Control. As part of the system, studies were conducted to determine the average amount of time for completing each of approximately 2,000 jobs. The extent to which technicians complete jobs within these targets is used to determine their efficiency. The system records precise dispatch and driving times for each assigned job and measures each technician's efficiency by dividing expected times established for each job by the time the technician actually takes to do them. Defendants post the technicians' scores at garages at least monthly, in rank order. A ranking in the bottom twenty percent (or below the goal) can put a technician into Performance Improvement Plan status and on track to possible discipline or termination.

Defendants track the technicians' activities and whereabouts throughout the day using a GPS Vehicle Tracking System. GPS devices in the technicians' vehicles report where each vehicle goes, how fast it goes, every time it stops for a minute or more, where and how long it stops and whether it is idling or the ignition is turned off. Managers use "near real-time inquiries and analysis" from the GPS data "to identify patterns of inefficient travel, inefficient work methods, and other productivity inhibitors."

In addition to the productivity and efficiency measures, technicians are evaluated under other performance standards, including the frequency with which a job needs to be reserviced, customer experience, quality of work, observing company policy, attendance and punctuality, dependability and safety.

#### 2. *Meal break*

**\*3** Defendants' policies provide for an unpaid meal break to be taken at some point during or between the third and sixth hours of the shift. The length of the daily meal break depends on the department in which the technician works. Technicians in Construction and Engineering and U–Verse have one 30–minute meal break each shift. In January 2010, the meal break for Installation and Repair technicians was extended from 30 to 45 minutes. Technicians do not clock in and out for meals and are not required to report to payroll the times they actually start and end their meal breaks. Defendants do not track technicians' meal breaks with the GPS system.

Technicians are subject to certain restrictions on how they are allowed to use meal break time. The meal break restrictions applicable to Installation and Repair and Construction and Engineering technicians are set forth primarily in defendants' "2008 Non–Management Employee Expectations." Under the Expectations, technicians are expected not to drive "off route" between one job to the next; not to use company vehicles for personal business; and not to read, nap or operate electronic equipment in the vehicles. They may not idle company vehicles for personal comfort, such as to heat or cool the vehicle, but may idle vehicles for safety or health reasons. Technicians may be subject to corrective action for violating these policies. (A different set of guidelines, the U–Verse Field Operations Premises Technician Guidelines, applies to U–Verse technicians. Dkt. # 36–8. It contains similar restrictions.)

### C. *Testimony of Named Plaintiffs and Other Technicians*

Plaintiffs are current and former field technicians employed by defendants in Wisconsin. They began their shifts at garages throughout the state and were then dispatched to job

sites in company vehicles where they installed, maintained and repaired elements of the company's telecommunications network. They worked shifts of 8.5 or 8.75 hours, which included one unpaid meal break of 30 or 45 minutes.

All named plaintiffs submitted declarations stating that they were aware of the meal break restrictions imposed by defendants. Several declared that because of the meal break restrictions, they were unable to fill the 30 or 45 minute meal break and typically ate lunch while driving from job to job, spending between five and 20 minutes eating. Some read about their next jobs during their meal breaks and others talked to their supervisors on the phone. Some were interrupted by customers in public places. Some technicians believed they could increase their productivity ratings by using all or part of their meal break for work. All plaintiffs declared that either the meal break restrictions or the pressure from the performance rating system caused them to work during all or part of their meal breaks without reporting the work to their supervisors or on their time sheets.

Plaintiffs and other technicians testified during their depositions that whether the meal break restrictions affected their meal breaks depended on the day, their route location and their supervisor's interpretation of the restrictions. For example,

> **\*4** • Plaintiff Seger testified that whether something was "out of route" depended on the supervisor's definition, and whether he wanted or needed to go out of route for lunch depended on where he was assigned on a particular day. Seger Dep., dkt. # 71, at 141–42, 148. If he was assigned to an urban location, it was easy to find a place "on route" to eat. *Id.* at 148. He also testified that the out of route restriction would not prevent him from stopping for lunch at a fast food restaurant or his house if it was on route. *Id.* at 142.

> • Plaintiff Congdon testified that his proximity to restaurants depended on his route. Congdon Dep., dkt. # 72, at 138. Congdon testified that he sometimes studied his college materials or napped in his vehicle, sometimes did personal errands, depending on his supervisor, and frequently got hair cuts on his lunch break, at a salon that was on route. *Id.* at 81–82, 106–08. Congdon also testified that he idled his truck for warmth during his meal breaks in the winter. *Id.* at 108.

> • Plaintiff Moffitt testified that he met other technicians and supervisors for lunch and that technicians sometimes drove out of route to meet each other for lunch, depending on the day. Moffitt Dep., dkt. # 73, at 135–36. He testified that the out of route restrictions did not affect him because "most places that we're at, going from one place to another, you would have the ability to get something to eat, either leaving or getting into the next town." *Id.* at 185. He also testified that he runs his truck when necessary to use the heater and understands and complies with the expectation that he idle his truck as needed if there is a safety concern. *Id.* at 161, 164, 247.

> • Plaintiff Sopel testified that he has never had trouble keeping warm in his truck, Sopel Dep., dkt. # 74, at 79–80, and that restrictions prohibiting him from driving out of route had no affect on him because he "never ha[d] a reason to go out of route." *Id* . at 167. He stated that he had "no issues" with the restrictions on his meal breaks. *Id.* at 176.

> • Plaintiff Jacak testified that he usually went out to eat for lunch, depending on where he was, Jacak Dep., dkt. # 75, at 59, 174, and that "so many things [ ] change from week to week." *Id* . at 33–35. He also testified that the "out of route" rules "change by whoever you talk to," and that he and "[e]verybody" else have gone "out of route" to go to a restaurant. *Id.* at 172, 174. He stated that the idling rule was "just like any rule that's out there, you know, some of them get looked over and some of them get hammered on and it depends on who the boss is and what rule it is, I guess." *Id.* at 182–83. He testified that he idled his truck to get warm or cool. *Id.* at 184, 188.

> • Plaintiff Boelk testified that his supervisors allowed him to read newspapers in his truck during meal breaks, Boelk Dep., dkt. # 76, at 68, that he could request permission from a supervisor to have lunch at home, *id.* at 62, and that whether technicians can congregate for lunch depended on the location. *Id.* at 173.

> **\*5** • Potential opt-in plaintiff Bolwerk testified that if he had asked his supervisor permission to got out of route to do a personal errand on his meal break, he is "sure" he would have been permitted to do so. Bolwerk Dep., dkt. # 77, at 81.

> • Potential opt-in plaintiff Gustavus testified that during his meal breaks, he was able to go to restaurants, shop or stop at home, and that it was generally easy to visit restaurants on route. Gustavus Dep., dkt. # 78, at 53–54, 57–58.

Plaintiffs and other technicians testified that whether they took a full meal break or reported all the time they worked depended on the day, the volume of work and their supervisor. For example,

- Plaintiff Congdon testified that whether he took a lunch, how long the lunch was and whether he reported it depended on the day. Congdon Dep., dkt. # 72, at 51, 79. Some days he took a full 45 minute lunch; some days he worked through his lunch, reported the work and was paid overtime for it; some days he worked through lunch and left early; and on other days, he did not take a 45 minute lunch but reported taking one. *Id.* He stated that "[e]very day [was] unpredictable." *Id.* at 31–32.

- Plaintiff Seger testified that he sometimes reported the time he worked during lunch as overtime. Seger Dec., dkt. # 33, ¶ 31. He also testified that he did not really understand how the productivity rating system worked, Seger Dep., dkt. # 71, at 184, but that he occasionally looked at his efficiency numbers that were posted. *Id.* at 186. He testified that he had low efficiency ratings because he was assigned more difficult jobs. *Id.* at 56. He stated that if he had been given easier jobs, like other technicians, he would have had less pressure. *Id.*

- Plaintiff Moffitt testified that he if he took a shortened lunch, he did not report it, unless he worked through lunch completely. Moffitt Dec., dkt. # 32, at 20. He also testified that he did not like taking his full meal breaks because he does not like "spend[ing] time sitting idle," and would rather start his next job. Moffitt Dep., dkt. # 73, at 144. Additionally, he testified that how busy he was on a particular day depended on whether he was working the day or night shift and how large a territory he covered. *Id.* at 57–58, 69–71. When he had a small territory, he did not have enough jobs to fill the day. *Id.* at 56–57. He also testified that some departments require technicians to work harder than others and that some managers are more aggressive than others. *Id.* at 51.

- Plaintiff Jacak testified that when he did not take a lunch break, he asked permission from his supervisor to leave work early and be paid for eight hours, or to be approved for overtime. Jacak Dep., dkt. # 75, at 57, 66. He testified that he generally takes a 45 minute lunch, *id.* at 59, but that other technicians do not, depending on the day and whether they are trying to increase their efficiency numbers. *Id.* at 48–49, 56, 58–59.

*6 • Plaintiff Sopel testified that he worked more than eight hours almost every day because of "forced overtime." Sopel Dep., dkt. # 74, at 28, 207–08. He was paid overtime premium for any hours worked above eight. *Id.* at 31. Whether he took a meal break depended on how much work was available, *id.* at 32, and whether he could achieve good productivity ratings depended on the difficulty of jobs he was assigned. *Id.* at 134–35. He also testified that U–Verse managers were particularly harsh and threatening and affected his motivation. *Id.* at 145.

- Potential opt-in plaintiff Bolwerk testified that his lunch practices "had a lot to do with what [he] was doing that day." Ordinarily, he would take a full lunch if he worked air pressure jobs but other times he would take a "quick, quick lunch" depending on the amount of jobs in the load." Bolwerk Dep., dkt. # 77, at 69. He also testified that he would take no lunch at all when he had long drives between jobs, but that it was not very often that he was not near a gas station or fast food place to eat. *Id.* at 34. Bolwerk testified that he was never pressured about his performance rankings and that he always had good rankings. *Id* . at 81.

### D. *Defendants' Knowledge of Underreporting*

Some plaintiffs testified that their supervisors knew of their short lunch breaks or encouraged them to shorten or skip meal breaks. In particular, plaintiff Sopel stated that he was encouraged by supervisors to improve his productivity by eating lunch while driving to the next job. Plaintiff Boelk told a garage manager in Beaver Dam that technicians were already working through meal breaks and could do no more to meet the company's productivity goals. Other plaintiffs testified that their supervisors would have no way of knowing whether they or other technicians were working during their meal breaks.

The parties dispute whether any corporate officer knew that technicians underreported the time they worked during meal breaks. Plaintiff Boelk says he told Peggy Texeira, defendants' labor relations manager, that he and other technicians believed that the restrictions on the meal breaks combined with the efficiency ranking system were pushing technicians to work through meal breaks. Boelk also says that Texeira told him that she knew technicians were working through their meal breaks without reporting. Texeira denies

R. App 765

knowing that any technician worked through his meal break to boost his efficiency scores or for any other reason without being paid for the time.

## OPINION

### A. *Class Certification under Fed.R.Civ.P. 23*

Plaintiffs seek Rule 23 certification of their claims under the Wisconsin Wage Payment Act on behalf of all current and former field technicians employed by defendants in Wisconsin since January 18, 2009. Plaintiffs are asserting two claims under the Wisconsin Wage Payment Act and its accompanying regulations: (1) companywide restrictions on where technicians can take their lunch breaks and what they cannot do during the breaks so restricted the technicians' use of the breaks as to render the breaks not bona fide and therefore, compensable work; and (2) combined with defendants' productivity and efficiency ranking system, the restrictions caused technicians to work during their meal breaks without pay.

**\*7** Before the court may certify a class, the plaintiffs seeking certification must satisfy the requirements of both subsection (a) and (b) of Rule 23. *Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir.1992). First, plaintiffs must show that they can sue as representative parties on behalf of others by meeting the four prerequisites laid out in Rule 23(a): (1) numerosity, that "the class is so numerous that joinder of all members is impracticable"; (2) commonality, that "there are questions of law or fact common to the class"; (3) typicality, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) adequacy, that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Next, plaintiffs must show that the proposed class action "may be maintained" as one of the four types of class actions permitted under Rule 23(b).

Defendants do not challenge plaintiffs' ability to satisfy the numerosity requirement of Rule 23(a), and, because plaintiff has adduced evidence that there are approximately 1,300 people falling within the proposed class definition, I conclude that numerosity is satisfied. However, defendants contend that plaintiffs cannot satisfy any of the remaining Rule 23(a) requirements. Additionally, defendants contend that plaintiffs' proposed class does not satisfy the predominance

and superiority requirements of Rule 23(b)(3) and cannot be maintained under any other subsection of Rule 23(b)(3).

### 1. *Commonality*

A plaintiff can meet the commonality requirement if "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The Supreme Court has instructed district courts that they are to perform a "rigorous analysis" to determine that the commonality requirement is satisfied, "because actual, not presumed, conformance with Rule 23(a) remains indispensable." *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551–52 (2011) (citation omitted). As the Supreme Court explained in *Dukes,* plaintiffs cannot satisfy the commonality requirement simply by crafting a common question:

> Reciting [general common] questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members have 'suffered the same injury.' This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

**\*8** *Id.* In other words, the common question must be one that will resolve an essential fact or issue of the plaintiffs' claim. *Ross v. RBS Citizens, N.A.,* 667 F.3d 900, 908 (7th Cir.2012) (what matters for class certification is whether claim rests on factual and legal questions that are common to class and whether resolution of one or more of these questions is "apt to drive the resolution of the litigation").

With this is mind, I turn to plaintiffs' two claims.

**a. Plaintiffs' claim that their meal breaks should have been compensated because they were overly restrictive**
Plaintiffs' first claim is that defendants violated Wisconsin law by failing to pay plaintiffs for the mandatory 30 or 45 minute meal breaks. Under Wisconsin law, employers must pay their employees for all hours worked, which means "all time spent in 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business.' " Wis. Admin. Code § DWD 272.12(1). Employers do not have to pay employees for rest and meal periods if the meal period is a "[b]ona fide meal period of 30 minutes or more." *Id.* § DWD 272.12(2)(c). A lunch break does not qualify as bona fide, unless the employee taking it is "completely relieved of duty" and not "required to perform any duties, whether active or inactive, while eating." *Id.*

Plaintiffs' theory is that their mandatory meal breaks were "rendered not bona fide" by the restrictions defendants placed on what field technicians could do during the breaks. Plts.' Br., dkt. # 37, at 12; Plts.' Reply Br., dkt. # 98, at 1 (claim is that "array of restrictions so limits what they can do during lunch as to preclude meaningful use of the break for personal pursuits"). According to plaintiffs, they typically ate a sack lunch or grabbed a quick lunch at a fast food establishment or convenience store. This took only a few minutes, leaving technicians with several minutes of their 30 or 45 minute break for other activities. However, plaintiffs contend that because they were prohibited from driving off-route, idling for comfort, using company vehicles for personal business or for reading, napping or using electronic equipment, they could not actually use the remaining time for personal pursuits. There were simply too many restrictions on what they were permitted to do. Plaintiffs contend that, by themselves, these restrictions render their meal breaks compensable work time. Plaintiffs contend that the proposed class satisfies the commonality requirement with respect to this claim because the primary question that must be resolved is common to all class members, namely, whether the restrictions limited technicians' breaks so much that the breaks should have been compensated.

As an initial matter, plaintiffs have not framed their common question in terms of the actual elements of a claim under Wisconsin or federal law. (Both parties agree that federal law is used to interpret Wisconsin wage laws in this area. Dfts.' Br., dkt. # 51, at 28; Plts.' Reply Br., dkt. # 98, at 11.) This is important because, as the Supreme Court made clear in Dukes, commonality is not simply a matter of common questions, "even in droves," but rather, whether the class proceeding can generate "common *answers* apt to drive the resolution of the litigation." *Id.* at 2551 (emphasis in the original). That requires a close scrutiny into the class allegations and in some circumstances, even a consideration of merits questions to determine whether the lawsuit can generate common answers that are central to the validity of the plaintiffs' claim. *Id.* at 2551–52. *See also Messner v. Northshore* University Health System, 669 F.3d 802, 815 (7th Cir.2012) (consideration of class certification begins with elements of plaintiffs' claim).

**\*9** Plaintiffs have cited nothing in Wisconsin or federal law supporting the proposition that employers must pay employees for meal breaks simply because the employee is restricted in what he can do during the break, regardless whether the employees are performing work for the employer. Under plaintiffs' theory, they should be paid, even if they are just sitting in their trucks, because defendants' restrictions prohibit them from doing the things they would like to be doing with their meal breaks. Plts.' Reply Br., dkt. # 98, at 9. However, the law requires only that employees be compensated for performing "work." Wis. Admin. Code § DWD 272.12(2)(c). *See also Musch v. Domtar Industries, Inc.,* 587 F.3d 857, 859 (7th Cir.2009) (employees must be paid for time spent engaged in "physical or mental exertion ... controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."); Wis. Admin. Code § DWD 272.12(1)(a) (applying same standard).

As the court of appeals has explained in cases involving similar meal break claims, the relevant question is whether meal break restrictions resulted in the employee's devoting his time and attention "predominantly for the benefit of the employer," in other words, whether the officers were unable "comfortably and adequately to pass the mealtime because the officer's time or attention [was] devoted primarily to

official responsibilities." *Alexander v. City of Chicago,* 994 F.2d 333, 337 (7th Cir.1993). *See also id.* at 341 (Crabb, J. concurring) ("The regulations do not affirmatively require the performance of active duties or so restrict the officer's choice of location and activities as to make his lunch break the equivalent of work time. It is the allegation of frequent interruptions that raises the possibility that the officers could show that their 'attention is devoted primarily to official responsibilities' during meal periods."). In *Leahy v. City of Chicago,* 96 F.3d 228, 232 (7th Cir.1996), the court confirmed that the relevant question is whether restrictions on meal breaks constituted "work." In that case, police officers contended that the extent of restrictions on their meal breaks required that they be compensated under the FLSA. In affirming dismissal of the collective action, the court of appeals explained that

> [t]he situation here—a police department of some 12,000 officers in different districts with different shift schedules and different exigencies arising each day that might affect officers' meal periods—is not conducive to a one-shot solution. The officers want just such a solution: because some officers on some days miss all or part of their meal periods, the plaintiffs want all meal periods to be compensable work time. That would brook a result we cannot sanction, where officers might be paid for doing nothing more than eating during their meal periods.

*Id.* at 232. *See also Jonites v. Exelon Corp,* 522 F.3d 721, 725–26 (7th Cir.2008) (rejecting as "preposterous" argument that because some employees may sometimes do some work at lunch, all employees are entitled to pay during their lunch breaks).

**\*10** Thus, the relevant question for plaintiffs' claim is whether the meal break restrictions resulted in field technicians' engaging in activities that predominantly benefited defendants during their meal breaks. *White v. Baptist Memorial Health Care Corp.,* 699 F.3d 869, 873 (6th Cir.2012) ("As long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation"

for the break); *Haviland v. Catholic Health Initiatives–Iowa Corp.,* 729 F.Supp.2d 1038, 1063 (S.D.Iowa 2010) ("[I]n determining whether the restrictions on the [plaintiffs'] meal break time make [ ] the time spent predominantly for Plaintiffs' benefit or for [defendant]'s benefit, the Court must look not just at what Plaintiffs *could not do* during their lunch breaks; it must also look at what Plaintiffs *could,* and *in fact did,* do during their lunch breaks.") (emphasis in original).

When the common question is framed in these terms, whether the meal break restrictions resulted in the technicians performing activities for the benefit of defendants, instead of themselves, it becomes clear that the question cannot be resolved on a classwide basis. Plaintiffs submitted little evidence to support a finding that field technicians who took meal breaks commonly ended up engaging in activities for the benefit of defendants during those breaks. Even setting aside that issue (which is arguably a merits issue), the facts in the record show that whether any meal break restriction foreclosed a technician's use of his break for his own purposes depended on the circumstances. Whether the restriction on driving "out of route" for lunch on a particular day would result in not being able to stop at a restaurant or fast food establishment for 30 or 45 minutes depended on the location, job assignment and particular supervisor. Similarly, whether a technician could conduct personal errands depended on his route location and the discretion of his supervisor. Whether the restriction on reading personal materials in a truck had any effect on a technicians' use of his meal break depended on whether the technician wanted to read, whether he could read at a fast food establishment, a park or somewhere else and whether his supervisor enforced the prohibition against reading in company vehicles. The rules regarding idling affected technicians differently depending on the weather and the proximity to indoor establishments where the technician could spend a meal break. These differences between the technicians' experiences and supervisor discretion make it impossible to generate common answers on a classwide basis. *Bolden v. Walsh Construction Co.,* 688 F.3d 893, 896 (7th Cir.2012) ("[W]hen multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question."); *Vang v. Kohler Co.,* Case No. 12–8029, 2012 WL 3689501, \*1 (7th Cir. Aug. 28, 2012) (unpublished) (vacating and remanding wage and hour class certification decision "to determine whether this suit concerns one firm-wide policy or congeries of supervisor-level practices").

**\*11** It is true, as plaintiffs' argue, that courts frequently conclude that class treatment is appropriate in cases in which plaintiffs are challenging company-wide official or unofficial policies that result in violations of the law. In the two cases on which plaintiffs rely most heavily, *Ross,* 667 F.3d 900, and *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 672 F.3d 482, 484 (7th Cir.2012), the court of appeals concluded that commonality was satisfied and rejected the defendants' arguments that it was defeated by individualized differences in the class members' circumstances and supervisors. In both cases, the plaintiffs were challenging corporate policies or practices of classwide application. *Ross,* 667 F.3d at 902–03 (Charter One's alleged enforcement of an unofficial policy denying lawfully due overtime); *McReynolds,* 672 F.3d at 483 (company-wide policy allowing brokers to form "teams" and another basing account distributions on competing brokers' past success, resulting allegedly in racial discrimination).

However, in those cases, the court of appeals was satisfied that the plaintiffs had presented proof that any violations of the law were caused by policies enforced at the corporate level, rather than by individual supervisors. *McReynolds,* 672 F.3d at 489 (distinguishing *Dukes* on grounds that plaintiffs in *Dukes* were challenging actions of local management, rather than corporate policy); *Ross,* 667 F.3d at 909 (distinguishing *Dukes,* in part, because plaintiffs had submitted significant evidence in *Ross* of company-wide policy and limited supervisor discretion). In this case, by contrast, plaintiffs have failed to submit proof showing that the companywide meal break restrictions deprived plaintiffs and other technicians of bona fide meal breaks. Additionally, the evidence they submitted suggests that local supervisors had significant discretion in the enforcement of the meal break restrictions. Thus, plaintiffs have failed to show that there are common questions that could be resolved on a classwide basis using common proof. *Gonzalez v. Millard Mall Services, Inc.,* 281 F.R.D. 455, 463 (S.D.Cal.2012) (district courts "den[y] class certification where a plaintiff has failed to show common proof that its employer prevented the putative class from taking required breaks"); *Brown v. Federal Express Corp.,* 249 F.R.D. 580, 587 (C.D.Cal.2008) (plaintiffs showed no method of common proof to establish that defendant's policies prevented putative class from taking required breaks). *See also Espenscheid v. DirectSat USA,* Case No. 09–cv–625–bbc, 2011 WL 2009967, \*5 (W.D.Wis. May 23, 2011) (decertifying Rue 23 class action and FLSA collective action because "proof of plaintiffs' claims depends on how individual technicians responded to the numerous policies

and practices at issue in this case" and "the evidence shows that opt-in plaintiffs and class members have different work experiences and were affected by defendants' policies in different ways"); *Ruiz v. Serco, Inc.,* Case No. 10–cv–394–bbc, 2011 WL 7138732, at \*6 (W.D.Wis. Aug. 5, 2011) ("[T]he answer to th[e common] question must be susceptible to proof that can be extrapolated to the class plaintiffs seek to represent.").

**b. Plaintiffs' claim that they are owed compensation for unpaid meal breaks during which plaintiffs actually worked**

**\*12** Plaintiffs' second claim is that the combination of the meal break restrictions and defendants' efficiency and performance system caused them to work during their unpaid meal breaks without reporting their time. In light of defendants' policy mandating that employees report and be paid for all hours worked, the crucial question with respect to this claim is *why* plaintiffs and other technicians worked through all or part of their meal breaks without reporting their doing so. Plaintiffs have failed to show that this question could be resolved on a classwide basis. Although plaintiffs and other technicians submitted declarations stating that they often worked through meal breaks because of the meal break restrictions, the productivity rating system or a combination of both, it is clear from the deposition testimony of plaintiffs and other technicians that the reason for doing so depended on the circumstances, which varied on a day-to-day basis. As discussed above, whether technicians decided to work through meal breaks because of the meal break restrictions depended on the day, the volume of work, the route, the supervisor and the technician's individual needs and desires.

Similarly, whether a technician felt rushed in completing jobs or pressure from the performance scoring and ranking system depended on the size of the territory to which the technician was assigned, the number of technicians available to cover the territory, the type of job assigned, the technicians' experience and supervisors' varying expectations. In light of these variables, the common questions central to plaintiffs' claim could not be resolved on a classwide basis. *York v. Starbucks Corp.,* Case No. 08–07919, 2011 WL 8199987, \*26 (C.D.Cal. Nov. 23, 2011) (concluding that meal break claims failed to meet Rule 23 commonality requirement because plaintiff conceded that "whether an employee took a proper meal break depended on who was running the shift ... which indicates that violations resulted from individual action and not a corporate-wide policy or practice.... [A]n evaluation of a meal break claim as to any individual would involve a

R. App. 769

variety of particularized factors that would not necessarily impact any other company employee.").

### 2. *Predominance under Rule 23(b)(3)*

Because I conclude that plaintiffs cannot satisfy the commonality requirement of Rule 23(a), I need not address the remaining factors of Rule 23(a) or whether plaintiffs may maintain a class under Rule 23(b). However, I will address subsection (b)(3) briefly because it is clear that even if plaintiffs had been able to satisfy the commonality requirement, they would be unable to satisfy the predominance requirement of Rule 23(b)(3).

As an initial matter, plaintiffs argue briefly that this action could be maintained under Rule 23(b)(2) or (b)(3). However, it would not be appropriate to certify this action under Rule 23(b)(2). Rule 23(b)(2) permits classes for actions in which "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "[C]ertification under Rule 23(b)(2) 'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.' " *Kartman v. State Farm Mutual Automobile Insurance Co.,* 634 F.3d 883, 888 (7th Cir.2011) (citation omitted). Additionally, courts should not certify classes under Rule 23(b)(2) solely to lay the groundwork for subsequent individualized monetary damage awards. *Dukes,* 131 S.Ct. at 2557. *See also Jamie S. v. Milwaukee Public School,* 668 F.3d 481, 499 (7th Cir.2012) ("[A] claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final."); *Randall v. Rolls–Royce Corp.,* 637 F.3d 818, 826 (7th Cir.2011) ("[C]alculating the amount of back pay to which the members of the class would be entitled if the plaintiffs prevailed would require 500 separate hearings ... An injunction thus 'would not provide' relief as required by Rule 23(b)(2)."); *Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 978 (5th Cir.2000) (class certification not permitted where class members "have nothing to gain from an injunction, and the declaratory relief they seek serves only to facilitate the award of damages").

**\*13** In this case, it is clear that plaintiffs' primary claim is for monetary damages: they want to recover back pay for their unpaid meal breaks. Plaintiffs requested only broad declaratory relief and did not specify any particular injunctive relief that would remedy their injuries. Some of the named

plaintiffs are no longer employees of defendants and would receive final relief only from monetary damages. Thus, a declaration regarding the illegality of defendants' policies would not be a "final remedy" for purposes of Rule 23(b)(2); it would "merely lay an evidentiary foundation for subsequent determinations of liability." *Randall,* 637 F.3d at 826.

This leaves Rule 23(b)(3), which requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615–16 (1997). Although similar to the commonality requirement under 23(a)(2), the predominance requirement is more demanding and is meant to test "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. To determine whether the liability issues would require individual fact-intensive determinations or whether they are subject to class-wide proof, the court examines such factors as the substantive elements of plaintiffs' claims, the proof necessary for those elements and the manageability of trial on those issues. *Farmer v.. DirectSat USA, LLC,* 08 C 3962, 2010 WL 3927640, \*22 (N.D.Ill. Oct. 4, 2010)

For the same reasons described above in discussing commonality, plaintiffs cannot show that common questions of law and fact predominate. Determining whether a given employee suffered a meal break violation will depend largely on numerous highly fact-specific inquiries as to the reason why a technician worked during all or part of his meal break on a particular day, including the volume of jobs, the territory and route on that day, the number of other technicians available for work, the technician's personal preferences and the particular supervisor involved. Thus, it would be exceedingly difficult to determine in one proceeding whether particular restrictions or productivity ranking concerns had any effect on a technician's meal break or reporting practices on a particular day. Under the circumstances, the case would be unmanageable as a class action. Therefore, plaintiffs cannot maintain this action under Rule 23(b). *Kenny v. Supercuts, Inc.,* 252 F.R.D. 641, 646 (N.D.Cal.2008) (denying class certification because individual issues would predominate as court would need to determine why each class member did not clock out for meal break on any particular day); *Salazar v. Avis Budget Group, Inc.,* 251 F.R.D. 529, 534 (S.D.Cal.2008) (denying class certification because individual issues would predominate in

determining whether defendants forced plaintiffs to forgo missed meal periods).

### 3. *Rule 23(c)(4)*

**\*14** Plaintiffs contend that if the court concludes that their claims cannot be certified under Rule 23(b), the court should certify the "common issues" under Rule 23(c)(4). That rule states that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed.R.Civ.P. 23(c)(4). However, plaintiffs do not identify any common issues that could be resolved on a classwide basis. The only issues identified are those discussed above. Because plaintiffs failed to show that any common issue central to their claims could be resolved on a classwide basis, I will not certify any issue under Rule 23(c)(4). Therefore, I am denying plaintiffs' motion for class certification under Rule 23 in full.

### B. *Conditional Certification of FLSA Collective Class Action*

Plaintiffs have also moved for conditional certification of a collective action for alleged violations of the FLSA's overtime compensation provision. Under that provision, "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Plaintiffs contend that defendants' failure to pay plaintiffs for their meal breaks resulted in plaintiffs working more than 40 hours each week without receiving overtime compensation. Under § 216(b), plaintiffs may bring a collective action under the overtime provision "for and [o]n behalf of himself or themselves and other employees similarly situated."

This court has adopted a two-step process for class certification under the FLSA. *Espenscheid v. DirectSat USA, LLC,* 2010 WL 2330309, *6 (W.D.Wis. June, 7, 2010); Kelly v. Bluegreen Corp.,* 256 F.R.D. 626, 628–89 (W.D.Wis.2009). At the first step, plaintiffs must make "a modest factual showing" that they are similarly situated to potential class members and that they and potential class members were "victims of a common policy or plan that violated the law." *Kelly,* 256 F.R.D. at 629–30. If this showing is made, the court conditionally certifies a class and authorizes notice to potential class members and the parties conduct discovery. *Austin v. CUNA Mutual Insurance*

*Society,* 232 F.R.D. 601, 605 (W.D.Wis.2006). The second step occurs at the close of discovery upon a motion for decertification from the defendant. At that point the court determines whether the plaintiffs are in fact similarly situated to those who have opted in. *Id.*

Plaintiffs contend that because this case is at the first stage of the process, they are required to make only a modest factual showing that they are similarly situated to the potential class members. However, the primary purpose of the two-stage process is to allow the parties to conduct discovery on the issue whether plaintiffs are similarly situated to class members. In this case, the parties have conducted significant discovery. The record contains several declarations from field technicians, depositions of all six named plaintiffs, depositions of two individuals who consented to opt in should a class be certified, and a Fed.R.Civ.P. 30(b)(6) deposition by plaintiffs. Under the circumstances, it is appropriate to apply more scrutiny to plaintiffs' claim than would normally be applied at the conditional certification stage. *Hawkins v. Alorica, Inc.,* Case No. 2:11–CV–00283–JMS, 2012 WL 4391095 (S.D.Ind. Sept. 25, 2012) (applying "intermediate level of scrutiny" to conditional certification where substantial discovery had been conducted but was not yet complete); *Scott v. NOW Courier, Inc.,* Case No. 1:10–CV–971–SEB–TAB, 2012 WL 1072751 (S.D.Ind. Mar. 29, 2012) (same); *Purdham v. Fairfax County Public Schools,* 629 F.Supp.2d 544, 547 (E.D.Va.2009) (if court can determine at condition certification stage that notice is not appropriate, court can "collapse the two stages of the analysis and deny certification outright").

**\*15** The facts in the record fail to establish that plaintiffs and potential class members were victims of a common policy or plan that resulted in common injuries. As explained above with respect to plaintiffs' Rule 23 motion, plaintiffs' experiences with the meal break restrictions were not common and varied depending on their individual practices and particular supervisor. Additionally, plaintiffs' own deposition testimony proves how variable their experiences were with respect to the way performance standards affected their day-today work activities and with respect to how other factors affected their work. Accordingly, for the reasons already explained, I find that plaintiffs have not shown that they are similarly situated to potential class members. Therefore, I will deny their motion for conditional certification under § 216(b).

**ORDER**

IT IS ORDERED that

1. The motion to file sur-reply filed by defendants AT & T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc. and AT & T Services, Inc., dkt. # 102, is GRANTED.

2. The motion to respond to defendants' sur-reply filed by plaintiffs Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon, David Moffitt and Jeff Sopel, dkt. # 107, is GRANTED, and the motion to strike is DENIED.

3. Plaintiffs' motion for class certification under Fed.R.Civ.P. 23 and conditional certification under § 216(b) of the Fair Labor Standards Act, dkt. # 28, is DENIED.

4. Defendants' motion for oral argument, dkt. # 111, is DENIED.

5. The case will proceed with the claims of the named plaintiffs.

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

---