# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                                     Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

# NORTHWESTERN MUTUAL'S MEMORANDUM OF LAW IN SUPPORT OF

# ITS MOTION TO EXCLUDE THE REPORT AND OPINIONS OF PLAINTIFFS'

# PROPOSED EXPERT ROBERT HOYER

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.    Plaintiffs' Failed Attempts in Noonan to Prove Common Injury and Damages ...................... 2

II.    Plaintiffs' Maneuvers to Avoid the Noonan Decisions That Found No Common Injury or Damages ............................................................................................................................. 4

III.    Mr. Hoyer Advocates a Simplistic Damages Mode .............................................................. 5

ARGUMENT ................................................................................................................... 6

I.    The *Daubert* Standard Applies to Mr. Hoyer's Opinions ................................................... 7

    A.    *Daubert* Applies at the Class Certification Stage .................................................. 7

    B.    Under *Daubert*, Mr. Hoyer's Report Must Be Reliable and Relevant .......................... 7

    C.    Relevant *Daubert* Guideposts for Evaluating Mr. Hoyer's Opinion .......................... 8

        1.    The expert must employ reasoned analysis that relies on data and can be tested ....................................................................................................... 8

        2.    The expert's report must explain the methodology underlying the opinion ...................................................................................................... 9

        3.    The expert cannot rely on his expertise as a proxy for reasoned analysis. ...................................................................................................... 10

II.    Mr. Hoyer's Opinions Are Unreliable and Therefore Inadmissible ........................................ 11

    A.    A Theme of Unjustified Assumptions Supported By Unwritten "Analyses" ............. 11

    B.    Mr. Hoyer's Opinions Are Unreliable Because He Fails Entirely to Address the Alternative "But For" Worlds Where NM Gave Notice or Sought Consent, and The Evidence Shows Their Impact on the Calculation of Damages ........................... 12

    C.    Mr. Hoyer's Model—Which Calculates Damages Only in the But-For World Where NM Did Not Make the 1985 Change—Arbitrarily and Incorrectly Assumes the But-For Annuity DIR Would Be the Same as the Life Insurance DIR ........................................................................................................... 14

    D.    Mr. Hoyer's Model Fails to Account for the Individualized Investment Decisions that Policyholders Would Have Made ......................................................... 17

i

E.      Mr. Hoyer's Model Misstates Policyholders' Damages By Failing to Consider When Policy-Related Transactions Actually Occurred ................................................... 18

F.      Mr. Hoyer's Model Does Not Account for Pre-MN Policyholders Who Agreed to Update '83 After 1985 .................................................................................... 20

G.      Mr. Hoyer's Model Ignores the Significant Number of Class Members Who Were Not Injured By—Or Even Benefitted From—The 1985 Change ................... 21

CONCLUSION .......................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Honda Motor Co., Inc., v. Allen,*
  600 F.3d 813 (7th Cir. 2010) ...................................................................1, 7, 9, 10

*Bradley v. Brown,*
  852 F. Supp. 690 (N.D. Ind. 1994), *aff'd*, 42 F.3d 434 (7th Cir. 1994) .................6

*Clark v. Takata Corp.,*
  192 F.3d 750 (7th Cir. 1999) .................................................................................9

*Comcast Corp. v. Behrend,*
  133 S.Ct. 1426 (2013) ...........................................................................................9

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) .......................................................................................passim

*Durkin v. Equifax Check Services, Inc.,*
  406 F.3d 410 (7th Cir. 2005) ...............................................................................10

*Ervin v. Johnson & Johnson, Inc.,*
  492 F.3d 901 (7th Cir. 2007) .................................................................................8

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) .............................................................................................10

*Gen. Tel. Co. v. Falcon,*
  457 U.S. 147 (1982) ...............................................................................................7

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999) .......................................................................................... 8, 10

*Lang v. Koh's Food Stores, Inc.,*
  217 F3d 919 (7th Cir. 2000) ...................................................................................8

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,*
  387 F. Supp. 2d 794 (N.D. Ill. 2005) ................................................................. 9, 10

*Messner v. Northshore Univ. HealthSystem,*
  669 F.3d 802 (7th Cir. 2012) .................................................................................7

*Mid-State Fertilizer Co. v. Exchange National Bank,*
  877 F.2d 1333 (7th Cir.1989) ..............................................................................10

*Mihailovich v. Laatsch,*
  359 F.3d 892 (7th Cir. 2004) .................................................................................8

*Naeem v. McKesson Drug Co.,*
    444 F.3d 593 (7th Cir. 2006) ..................................................................................8

*Noonan v. Northwestern Mutual Life Ins. Co.,*
    2005 WL 6216361 (Wis.Cir. July 6, 2005) ..............................................................2

*Noonan v. Northwestern Mutual Life Ins. Co.,*
    726 N.W.2d 356 (Wis. Ct. App. 2006) (*Noonan II*) ..............................................3

*Porter v. Whitehall Labs., Inc.,*
    9 F.3d 607 (7th Cir. 1993) ......................................................................................8

*Real Estate Value Co. v. USAir, Inc.,*
    979 F. Supp. 731 (N.D. Ill. 1997) ..........................................................................6

*Reed v. City of Chicago,*
    01 C 7865, 2006 WL 1543928 (N.D. Ill. June 1, 2006) .......................................10

*Salgado v. Gen. Motors Corp.,*
    150 F.3d 735 (7th Cir. 1998) ..................................................................................9

*Sisters of St. Mary v. AAER Sprayed Insulation,*
    445 N.W.2d 723 (Ct.App. 1989) ............................................................................3

*Thao v. Midland Nat. Life Ins. Co.,*
    2012 WL 1900114 (E.D. Wis. May 24, 2012) ......................................................21

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ....................................................................................... 7, 21

*Zenith Electronics Corp. v. WH-TV Broad. Corp.,*
    395 F.3d 416 (7th Cir. 2005) ......................................................................8, 10, 11

**Rules**

Fed. R. Civ. P. 26 ..........................................................................................................9

Fed. R. Evid. 702 ..............................................................................................7, 8, 9, 10

iv

# INTRODUCTION

After two unsuccessful attempts at certification of a nationwide damages class action against Northwestern Mutual ("NM") in the *Noonan* Wisconsin state case, plaintiffs seek certification once again, claiming that, beginning in 1985, NM committed breach of contract, breach of the implied duty of good faith and fair dealing, and breach of its fiduciary duties by changing the methodology used to calculate plaintiffs' yearly dividends on the class of annuity at issue ("Pre-MN annuity"). As the foundation of their request for certification, plaintiffs now present the expert opinions of Robert Hoyer in an effort to establish that damages may be calculated on a classwide basis without individual inquiry.

Mr. Hoyer's opinions fall far short of the admissibility standards set by the Supreme Court and the Federal Rules of Evidence. *Daubert* requires an expert to apply reasoned analysis to all relevant data, using a scientifically recognized method that permits testing of the expert's conclusions. *American Honda Motor Co., Inc., v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) ("[E]ven the most 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.'" (citations omitted)). An expert must provide a complete and detailed written report in order to ensure the validity of the expert's opinions. And an expert cannot rely solely on his conclusions to justify his conclusions.

Mr. Hoyer fails all of these requirements. First, Mr. Hoyer's opinions rest on what he characterizes as "analyses" (not calculations), which in substance amount to conclusory assumptions untethered to specific evidence and not amenable to testing. Second, Mr. Hoyer simply explains away as "immaterial" certain facts that undercut his "analyses" without demonstrating that they in fact are immaterial. Third, Mr. Hoyer's report fails to explain the methodology underlying various assumptions. Finally, in various contexts Mr. Hoyer impermissibly presumes that his experience

1

suffices as a proxy for reasoned analysis. In sum, Mr. Hoyer has not offered a reliable or comprehensible model for damages on a classwide basis in this case. This Court should grant NM's motion and exclude Mr. Hoyer's report and opinion.

## BACKGROUND

I. **Plaintiffs' Failed Attempts in Noonan to Prove Common Injury and Damages**

This court is far from the first to consider whether a putative nationwide class of Pre-MN annuitants should be certified. In the *Noonan* case, the Wisconsin trial and appellate courts both rejected plaintiffs' attorneys' requests for certification, in large part because damages determinations would have to be made individually.

The *Noonan* plaintiffs originally asked the court to certify a nationwide class of all persons who owned Pre-MN policies as of March 1, 1985. (App. 2, *Noonan v. Northwestern Mutual Life Ins. Co.*, Case No. 01-CV-12349, 1/18/05 Plaintiffs' Br. in Support of Motion for Class Certification, at 2.)[1]. The trial court refused to do so, rejecting the plaintiffs' claim that:

> any distinctions as to individual damages, if any, can be determined by a formula after the trial is over. The Court believes that a proper verdict will inquire as to damages and not as to a formula. **Individual damage awards will have to be fleshed out for the jury**.

*Noonan v. Northwestern Mutual Life Ins. Co.*, 2005 WL 6216361, at *2 (Wis.Cir. July 6, 2005) (App. 310.) (emphasis added). Then, as now, NM had the right to determine whether and when each individual class member received notice of the 1985 Change—an inherently individual determination that would affect the amount of damages each class member would be entitled to receive. *See id.* The court also was troubled by the prospect of potentially having to determine punitive damages, as it would require testimony regarding each plaintiff's conversations with the agents who sold the Pre-MN policies. *See id.*

---

[1] The materials cited in this brief are included in the accompanying appendix and cited as "App." The appendix also includes any unpublished authority cited herein.

The appellate court affirmed the trial court's decision. It held that the district court did not abuse its discretion in finding that damages could not be determined by formula, but would have to be fleshed out individually, and that "the complicated factual scenarios in this case under which … damages arose rendered a class action unmanageable." *Noonan v. Northwestern Mutual Life Ins. Co.*, 726 N.W.2d 356, at *7 (Wis. Ct. App. 2006) (*Noonan II)* (App. 305.) The court quoted approvingly a state court case affirming—consistent with the Seventh Circuit—the principle that

> where the issue of damages and impact does not lend itself to … a mechanical calculation, but requires separate mini-trials of an overwhelmingly large number of individual claims, courts have found that the staggering problems of logistics thus created 'make the damage aspect of [the] case predominate, and render the case unmanageable as a class action.

*Id.* at *8 (quoting *Sisters of St. Mary v. AAER Sprayed Insulation*, 445 N.W.2d 723, 728 (Ct.App. 1989) (citations omitted)).

The *Noonan* plaintiffs then reframed their certification request, asking the trial court to certify (1) a nationwide class based solely on the breach of contract claim, with a fallback request for certification of only Wisconsin claimants; and (2) a nationwide declaratory relief class. (App. 7, *Noonan v. Northwestern Mutual Life Ins. Co.*, Case No. 01-CV-12349, 4/30/07 Plfs' Br. in Support of Motion for Class Certification at 5).) Again, the court denied plaintiffs' motion, finding that it suffered much the same infirmities as plaintiffs' first motion. (App. 4, 8, 9, *Noonan v. Northwestern Mutual Life Ins. Co.*, Case No. 01-CV-12349, Decision on Motions to Certify for Class Action and Summary Judgment, at 2, 8-9 (Jan. 25, 2008).). The court reiterated that a "proper verdict" in the nationwide contract-breach class "will inquire as to individual damages and not as to a formula", and that individual awards "will have to be fleshed out for the jury." (*Id.* at 4, App. 6.) The trial court denied the Noonan plaintiffs' request for a declaratory relief class because "again, the jury will be asked to make individual damage awards." (*Id.*) In addition, the plaintiffs could not properly seek a declaratory judgment when they sought a money judgment, and the choice of law issue raised the

3

question of what state law would apply to damages, as well as other issues. (*Id.* at 8-9, App. 8-9.) The Court of Appeals denied plaintiffs' request for discretionary review.

## II.    Plaintiffs' Maneuvers to Avoid the Noonan Decisions That Found No Common Injury or Damages

In this case, plaintiffs sought and obtained certification in state court of a declaratory relief action, which did not seek damages in the pleadings, on behalf of a class of Wisconsin residents. This was a strategic decision made to avoid the *Noonan* decisions rejecting certification in part due to individualized damages issues. (*See* App. 37-38, 10/26/09 Order at 41-42; *see also* App. 41-42, 10/12/09 Transcript at 13-14 (telling court that "individualized defense theories are simply not relevant to the declaratory judgment. . . . They go to defending against individualized damages claims, and that's not the case here . . . .").)

In granting Ms. LaPlant's motion for a state declaratory relief class, the Wisconsin trial court rejected NM's argument that it would still require adjudication of damages on an individualized basis. (App. 22-23, 37-38, 10/26/09 Order at 26-27, 41-42.) The court had acknowledged in an earlier decision that "an action seeking damages would be more complicated and issue-intense than a cause of action that does not include damages." (App. 46, 6/15/09 Order at 33.) But in certifying the narrowed class, the court reasoned that "the case before us does not seek damages under declaratory judgment" and concluded that all matters "raised as affirmative defenses relate to laches, estoppel, waiver, statute of limitations and accord and satisfaction . . . [T]hose asserted defenses relate to damages and that is not a matter before us in this case." (App. 29, 37, 38, 10/26/09 Order at 33, 41-42.)

Plaintiffs now ask this Court to certify a nationwide damages class, despite the adverse *Noonan* rulings.

4

### III. Mr. Hoyer Advocates a Simplistic Damages Model

Plaintiffs' attorneys asked Mr. Hoyer to create a methodology for calculating "prospective relief" for the class members, which he interpreted to mean crediting their accounts with "the additional amount that would have accumulated 'But-For' the 1985 Change (the "Difference")," and then calculating future dividends in the same way on the revised cash values of those accounts. (App. 49, 3/4/13 Hoyer Report ¶¶ 6, 7.) Mr. Hoyer also was asked to opine whether his methodology could be applied to the class members "on a common basis using a mechanical calculation", and whether it could be applied to calculate the "Difference" for "annuitants with policies no longer in-force resulting from the 1985 Change." (*Id.* ¶ 6, App. 49.)

In an effort to compress a complex analysis into a "mechanical calculation", Mr. Hoyer's "methodology" makes a number of key and unfounded assumptions. Mr. Hoyer begins by determining what the Pre-MN annuity policy dividend interest rate ("DIR") would have been if NM had not made the 1985 Change. He concludes that the DIR for each class member would depend on only two factors: (1) whether or not the policy had direct recognition, under which the DIR would vary depending on when and how much each policyholder borrowed against his or her policy and the policy loan rate; and (2) the policy loan rate specified in the policy. (*Id.* ¶ 21, App. 52.)

For policies with direct recognition and no loan balance, Hoyer assumes the but-for DIR is equal to the corresponding DIR for life insurance policies. (*Id.* ¶ 24, App. 52.) Where a policy with direct recognition has a loan balance, Hoyer assumes the but-for DIR on borrowed funds is the same as the DIR in the actual world because it is based on the policy loan rate. (*Id.* ¶ 27, App. 53.) For policies without direct recognition, Hoyer assumes the but-for DIR is the weighted average of the but-for direct recognition DIRs on borrowed and non-borrowed funds for each different policy loan rate. (*Id.* ¶ 28, App. 54.)

Hoyer then applies his various but-for DIRs to determine the accumulated "Difference" for

<div align="center">5</div>

each putative class member, which he says depends on "[t]he cash value of a Pre-MN annuitant's account," which "at any point in time is based on the history of cash deposits, expense charges, policy loans, withdrawals, and the history of DIRs used to determine policyholder dividends credited to the account." (*Id.* ¶ 20, App. 52.) First, Hoyer assumes that each putative class member would have deposited the same amounts, borrowed the same amounts, and terminated their policies at the same time in the but-for world as in the actual world. (App. 52, Hoyer Rep. ¶ 22; App. 89, Hoyer 5/17/13 Dep. 65:1-8.) Second, Hoyer assumes that all deposits, withdrawals (including borrowings), and surrenders occurred at the end of each year, (App. 60, Hoyer Rep. ¶ 43), despite acknowledging that the timing of deposits, withdrawals, and surrenders in a given year affects the "Difference." (*Id.* ¶ 37, App. 59.) Third, Hoyer does not attempt to calculate the "Difference" for policies surrendered or otherwise terminated before 1993. (*Id.* ¶ 36, App. 58.) Finally, Hoyer performs an individual calculation for each putative class member based on whether direct recognition applies, policy loan rate, expense charge rate, and timing and amount of deposits, withdrawals, borrowings, and surrenders. (App. 63-65, Hoyer Rep. ¶¶ 49-52 (LaPlant example).)

As discussed further below, Hoyer's damages model not only makes a number of key assumptions that are not borne out by the facts, but it also ignores alternate theories of liability as well as relevant factors that must be considered in any valid calculation of damages, and which complicate that calculation to such a degree that a reliable classwide "mechanical" damages calculation becomes impossible.

## **ARGUMENT**

As the proponent of Mr. Hoyer's proffered expert report and opinions, plaintiffs "bear[]the burden of establishing its admissibility by a preponderance of proof." *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 743-44 (N.D. Ill. 1997) citing *Bradley v. Brown*, 852 F. Supp. 690, 697 (N.D. Ind. 1994), *aff'd*, 42 F.3d 434 (7th Cir. 1994)); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,

6

592 n.10 (1993). Plaintiffs cannot meet this standard because Mr. Hoyer's report and opinions are unreliable and unsupported.

# I.     The *Daubert* Standard Applies to Mr. Hoyer's Opinions

## A.     *Daubert* Applies at the Class Certification Stage

This court must undertake "a rigorous analysis" under Rule 23 before certifying a class. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). This "rigorous analysis" includes an assessment of any expert testimony offered in support of class certification. When an expert's "report or testimony is critical to class certification ... a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion. That is, the district court must perform a full *Daubert* analysis before certifying the class if the situation warrants." *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010). *Accord Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2553-54 (2011) (expressing doubt over district court's conclusion that "*Daubert* did not apply to expert testimony at the certification stage of class-action proceedings").(citation omitted). "[E]xpert testimony that is not scientifically reliable should not be admitted, even 'at this early stage of the proceedings.'" *Am. Honda*, 600 F.3d at 819 (citation omitted). And failure to conduct such an analysis is reversible error. *American Honda,* 600 F.3d at 816-19 (reversing district court that granted class certification based on the testimony of an unreliable expert). In fact, the trial court should make a *Daubert* ruling even where it "has doubts about whether an expert's opinions may be critical for a class certification decision." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (explaining that the word "critical" in this context means "expert testimony important to an issue decisive for the motion for class certification.").

## B.     Under *Daubert,* Mr. Hoyer's Report Must Be Reliable and Relevant

Expert testimony is admissible if it is based on "scientific, technical, or other specialized knowledge" that will "help the trier of fact." Fed. R. Evid. 702(a). Before considering an expert's

opinion, the trial court must ensure that (1) the expert's "reasoning or methodology underlying the testimony" is reliable; and (2) the expert's testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007); *see also Daubert*, 509 U.S. at 592-93. These reliability and relevance factors apply to all expert testimony, not just scientific testimony. *See* Fed. R. Evid. 702 advisory committee's note (2000 amends.); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999). In their role as gatekeepers of expert testimony, trial courts must exclude "'subjective belief or unsupported speculation.'" *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993) (quoting *Daubert*, 509 U.S. at 599).

### C.  Relevant *Daubert* Guideposts for Evaluating Mr. Hoyer's Opinion

The admissibility of an expert's opinion is gauged against a number of non-exclusive guideposts set forth in *Daubert* and its progeny, all of which serve to confirm that the expert has conducted a robust, complete and reliable evaluation. When measured against these guideposts, it is clear that plaintiffs cannot meet their burden, and Mr. Hoyer's opinions therefore are inadmissible.

#### 1.  The expert must employ reasoned analysis that relies on data and can be tested.

An expert's opinion is admissible "only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006), quoting *Lang v. Koh's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000); *see also Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (Easterbrook, J.) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result."). Thus, for example, an opinion comprising general observations untethered to specific evidence is not considered sufficiently reliable. *Naeem*, 444 F.3d at 608. The opinion also should be subject to verification through testing. *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir.

8

2004) (citing *Daubert*, 509 U.S. at 593-94).

Reliability also may be gauged by examining "[w]hether the expert has adequately accounted for obvious alternative explanations." *Am. Honda Motor Co.*, 600 F.3d at 817 (quoting Fed. R. Evid. 702 advisory committee's notes (2000 Amends.)). Of particular relevance here, a damages expert's methodology must account for all accepted theories of liability while excluding damages for any rejected theories. *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433-34 (2013) (model impermissibly included damages for rejected theories of liability).

### 2. The expert's report must explain the methodology underlying the opinion.

Not only must the expert's opinion rely on a robust methodology to be deemed reliable, that methodology must be apparent from the expert's report. To that end, an expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2) (emphasis added). The report must be "detailed and complete," and include "'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998).

The reason for requiring an expert to completely set forth the reasons for his opinion is self-evident: "Expertise is a rational process, and a rational process implies express reasons for judgment. An expert's opinion full of assertion but empty of reasons has no value and is devoid of persuasiveness and legal significance." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005) (internal citations omitted); *see also Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999) (even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.").

When the proponent of an expert witness cannot "demonstrate the reliability of the methodology employed by the expert," the court is required to exclude the testimony; the

9

"opportunity for vigorous cross examination and the presentation of contrary evidence... is not a basis for allowing otherwise inadmissible testimony to be admitted." *Loeffel Steel Prods., Inc.*, 387 F. Supp. 2d at 800 (citing *Daubert*, 509 U.S. at 596); *see also Am. Honda Motor Co.*, 600 F.3d at 818-19 (unreliable expert testimony "should not be admitted" even though it may be assailed through cross-examination).

Accordingly, where an expert "does not cite to any authority or describe how he formulated his opinions," his report must be rejected. *Reed v. City of Chicago*, 01 C 7865, 2006 WL 1543928, at *3(N.D. Ill. June 1, 2006) (App. 323.) (striking expert's report that states his opinions are based on "personal experience and conducted research" but failed to point to "any collaborating authority, or even describe how he came to such conclusions." (*Id.*); *see also Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 421 (7th Cir. 2005) (affirming exclusion of proposed testimony because expert linguist's report determined letters at issue were confusing without explaining how he came to that conclusion).

### 3. The expert cannot rely on his expertise as a proxy for reasoned analysis.

In particular, an expert's experience in the field alone is insufficient to bridge the gap between the materials an expert purportedly has relied upon in forming his opinion and the opinion itself. "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term…. As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005) (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir.1989)). Accordingly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

10

In *Zenith Electronics Corp.*, the Seventh Circuit affirmed the rejection of self-justifying testimony by damages expert Peter Shapiro, testimony that will sound familiar to any reader of Mr. Hoyer's deposition. The court explained:

> Shapiro himself all but conceded that he had not applied "reliable principles and methods". Asked repeatedly during his deposition what methods he *had* used to generate projections, Shapiro repeatedly answered "my expertise" or some variant ("my industry expertise", "[my] awareness," and "my curriculum vitae") which is to say that he either had no method or could not describe one. He was relying on intuition, which won't do.

*Zenith Electronics Corp.*, 395 F. 3d at 418 (emphasis in original).

## II.      Mr. Hoyer's Opinions Are Unreliable and Therefore Inadmissible

### A.      A Theme of Unjustified Assumptions Supported By Unwritten "Analyses"

As described below, Mr. Hoyer's opinions include repeated false assumptions, including apparent decisions to disregard relevant data that does not fit into his "mechanical" damages model. As a result, his opinions "fall[] far short of a complete damages methodology," and "ignore[] relevant annuity characteristics, rendering Mr. Hoyer's analysis inadequate as a basis for computing damages." (App. 169, Moore Rep. ¶ 93.) Nor do they "provide a methodology for proving impact or calculating damages on a class-wide basis." (*Id.*) In an effort to support his many mistaken assumptions, Mr. Hoyer repeatedly invoked "analyses" (as opposed to calculations) he claimed to have conducted but did not include in his report. Mr. Hoyer attempted to explain the difference: "Calculation is done to augment analysis as appropriate. Analysis incorporates numerical assessment. I did numerical assessment, not calculation." (App. 107, Hoyer 5/17/13 Dep. 140:21-140:24.)

Yet Mr. Hoyer conceded that even these "analyses" were not contained in his report:

> I have done numerous, numerous analyses in developing and formulating this report, starting with, I'm using as an example, client—counsel asked me a question, can I respond to it. I do an analysis. I concluded yes, I can. That's just one example of an analysis and a conclusion. I don't have step by step how I reached that conclusion to get back to them. I don't think it's appropriate to put in the report. There is many analyses that I did. They're not step by step shown here.

11

(*Id.* at 127:12-21, App. 104.).

   **B.   Mr. Hoyer's Opinions Are Unreliable Because He Fails Entirely to Address
        the Alternative "But For" Worlds Where NM Gave Notice or Sought Consent,
        and The Evidence Shows Their Impact on the Calculation of Damages**

Mr. Hoyer's damages model addresses only plaintiffs' theory that NM should never have

made the 1985 Change at all. But plaintiffs have also claimed that NM breached the annuity

contracts, including the duty of good faith and fair dealing, and its fiduciary duties by failing to give

*notice* of the 1985 Change or seek *consent* for the 1985 Change. (*See, e.g.*, App.  217-236, Plfs. Proposed

FFCL at 55-74.) Mr. Hoyer has acknowledged that NM could have avoided liability by providing

notice and obtaining consent from the Pre-MN annuitants. (App. 242-243, Hoyer 6/30/2010 Rep.

¶¶ 88, 90.)

At the same time, Mr. Hoyer admits that his model does not make any attempt to calculate

damages in a but-for world where NM gave notice or sought consent. (App. 85, Hoyer 5/17/13

Dep. 51:18-52:2.) Mr. Hoyer also acknowledges that he disregarded any evidence regarding how

individual annuitants would have responded to notice or a request for consent to the 1985 Change:

   Q.   Do you think that different people might have done different things in
        response to notification and request for consent?

   A.   I will say again, different people can do different things on any issue
        irrespective of the 1985 change, it has nothing to do with that. I have no
        opinion as to what an individual would do in a given situation.

(App. 87, Hoyer 5/17/13 Dep. 60:1-7.) Nor did Mr. Hoyer explain in his report what the putative

class members would have done if NM had given them notice of the 1985 Change. (App. 86, Hoyer

5/17/13 Dep. 55:3-55:17; 56:1-56:17.)

Mr. Hoyer's failure to consider the impact on damages of individual responses to notice or a

request for consent renders his model fundamentally flawed. In fact, two types of evidence show

that in the but-for worlds of notice and consent, many putative class members either would not have

been damaged at all—since they either would not have objected to the 1985 Change or would have consented to it if asked—or they would have mitigated their damages by changing investment strategies. Each class member needs to be questioned in order to determine what they would have done in the alternative but-for worlds. (App. 154-159, Moore Rep. ¶¶ 48-70.)

First, as detailed by NM's experts' reports (App. 133, Moore Rep.; App. 245, Dhar Rep.), consumer behavioral science establishes that individual reactions to notice or a request for consent would vary depending on a host of factors. Those include each investor's reasons and motivations for choosing a specific investment; the extent to which each investor focuses on their overall portfolio rather than individual returns; whether each investor relies on his or her agent, and if so how the agent would have explained the change; investor expectations regarding future returns and whether a particular investor would have preferred the investment represented by the 1985 Change; the extent to which each investor was concerned with short-term or long-term returns; and how each investor would have reacted to notice, with possible responses ranging from holding onto the Pre-MN policies to effectively mitigating damages by changing investment strategies. (App. 150-161, 163-164, 166-168, Moore Rep. ¶¶ 39-47, 51-60, 64-70, 77-80, 84-90; App. 251-252, Dhar Rep. ¶¶ 16-21.)

Second, case-specific evidence of class member behavior with respect to the Pre-MN annuities demonstrates that many class members would not have objected to the 1985 Change. For example, over 1,600 putative class members (about 9% of the total) purchased NM's Current Rate Annuity ("CRA") insurance product during the class period. That product was funded with short-term investments. Roughly 43% of Pre-MN annuitants with policies in force on March 31, 1985 (owners of roughly 45% of policies at issue) also agreed to a different change to Pre-MN dividend calculations, Update '83, which altered the way NM calculated dividends for policyholders who borrowed on their policies. (App. 196, Moore Rep. Ex. 1.) In addition, 4% of the statewide class

13

who received notice after the class was certified chose to opt out of the class. (*See* App. 279, Report on Class at 2 and n.1.) Mr. Hoyer admits he did not consider the CRA product in his analysis and considered it to be irrelevant. (App. 80, Hoyer 5/17/13 Dep. 29:11-13; 30:2-10.)

Perhaps most importantly, in numerous ways many policyholders had actual notice that annuity and life insurance dividends differed and that they were based on different investment portfolios. *See, e.g., Noonan*, 726 N.W.2d 356, at ¶ 28 (finding NM's agents were informed of change and were obligated to inform annuitants); *see also* various NM communications. (App. 282, 6/7/1990 Letter; App. 283, 4/7/1998 Email; App. 284, 9/14/1999 Letter; App. 287-288, 11/8/10 am Trial Tr. 66:7-68:16 (explaining how Noonans learned of 1985 Change).)

Mr. Hoyer himself acknowledged that policyholders with both annuity and life insurance policies would have "began to become aware [of the change] when the rates for life and annuities started to diverge somewhat," stating that the annuity rate was "substantively lower" as of 1993, and that even class members who only owned annuity policies would have noticed the change at some point. (App. 124-125, Hoyer 5/17/13 Dep. 205:21-206:8, 208:2-9; 208:16-209:9.)

Other class members, including Ms. LaPlant herself, became aware of the 1985 Change once the *Noonan* class action was filed and continued to hold their policies. (App. 293-294, LaPlant 9/9/09 Dep. 37:14-38:5 (became aware of Noonan in 2002); App. 38, Moore Rep. ¶ 6) (surrendered policy in July 2008).) Mr. Hoyer admits that he did nothing to investigate the extent to which individual class members had actual notice of the 1985 Change. (App. 124-125, Hoyer 5/17/13 Dep. 205:21-206:8; 208:10-15; 209:25-210:7.)

C. **Mr. Hoyer's Model—Which Calculates Damages Only in the But-For World Where NM Did Not Make the 1985 Change—Arbitrarily and Incorrectly Assumes the But-For Annuity DIR Would Be the Same as the Life Insurance DIR**

Hoyer assumes the DIRs for Pre-MN annuities in the but-for world would be the same as the DIRs for life insurance policies in the actual world. (App. 52-53, 3/4/13 Hoyer Report ¶¶

14

24-26.) This assumption is inconsistent with the evidence and would overstate damages. Before the 1985 Change, the yearly DIRs for life insurance and Pre-MN annuities typically were not the same, and the size of the difference varied year-to-year. (App. 296, Trial Ex. 528 (showing DIRs for 1982-1985 and beyond).) Moreover, in years where they were different, the Pre-MN annuity DIR was *generally lower* than the life insurance DIR. (App. 162, Moore Rep. ¶ 76, Ex. 10; App. 296, Trial Ex. 528 (DIRs for 1982-1985).) That is because NM applied different charges to annuity and life policies prior to the 1985 Change, a practice that plaintiffs do not contend was improper. (App. 299, Klawonn Aff. ¶ 12.)

When Mr. Hoyer was pressed to describe how he reached his conclusion that the life rate DIR would have been the same as the Pre-MN DIR in the but-for world, he first claimed he had calculated the DIRs' differential but then admitted that he had not actually performed any calculations. Instead, he conducted an "analysis", one that he was unable to cogently explain:

Q.  Did you attempt to yourself calculate on a yearly basis what the differential in the life rate DIR and the Pre-MN DIR would have been had there not been the 1985 Change?

A.  Yes.

Q.  And what was your conclusion?

A.  That there is an immaterial difference between the two as stated in my report; and that the life rate, which is a benchmark rate, which is a readily available rate, which is well defined and understood, was not only reasonable, but the -- the most accurate representation of what the annuity rate should be.

**Q.  Are there any calculations anywhere in your report to reflect the analysis that you have just described?**

**A.  No, there are not.**

**Q.  Where could I find those calculations?**

**A.  I don't think they exist.**

Q.  So you did not do any calculations to determine the reasonableness of your

assumption that the life and Pre-MN DIRs would be identical to one another in the "but-for" world even though they were not in the actual world prior to the 1985 Change?

A.      **I did not do such calculations because I conclude that such calculations are irrelevant and unnecessary. I do analysis and I make conclusions.** Sometimes I adjunct my analysis with quantification, but that's hardly a basis for an opinion in all instances.

(App. 100, Hoyer 5/17/13 Dep. 110:21-111:23 (emphases added).) When asked how NM's expert could replicate Mr. Hoyer's "analysis", Hoyer could only cite to a paragraph in his report that contained some unsupported and generic bullet point assertions.[2] (App. 102, Hoyer 5/17/13 Dep. 119:4-119:12; 119:22-120:11.)

Ultimately, Mr. Hoyer insisted that his training and experience made his conclusion reliable:

Q.      Mr. Hoyer, we were talking before lunch about an analysis you had done to determine that it was reasonable to assume that the Pre-MN annuity rate and life rate would have been the same in the "but-for" world. Do you recall those questions and answers?

A.      Yes, sir.

Q.      How would I go about recreating the analysis that you did to come to your conclusion regarding the reasonableness of that assumption?

A.      **Well, I think you would start by taking actuarial exams.**

Q.      What else would I do to actually recreate the analysis that you did?

A.      **If you get through that, after that many years, I will tell you the rest.**

---

[2] Paragraph 25 of Mr. Hoyer's report states:

This conclusion [that the But-For DIR is equal to the life insurance DIR] is based on the following:

•      It comports with a reasonable Pre-MN policyholder's dividend expectations;

•      The historical comparability between DIRs for life insurance and annuity policyholders prior to the 1985 Change;

•      The investment income dividend factor is the most significant element in determining DIRs;

•      Prior to the 1985 Change, the investment income dividend factor was identical for life insurance and Pre-MN annuity policyholders; and

•      The expense dividend factor for life and annuity policyholders has historically been comparable. Any disintermediation and/or dilution charges as suggested by Mr. Trost would be unwarranted, improper, and inequitable, so I make no adjustment for them. (App. 52)

16

> **But that's obviously the basis for any analysis I do is the experience and training that I have. So it's very difficult for me to answer the question because it certainly is a function of everything I have ever done in the industry.**

(App. 101, Hoyer 5/17/13 Dep. 117:8-118:2 (emphases added).)

### D. Mr. Hoyer's Model Fails to Account for the Individualized Investment Decisions that Policyholders Would Have Made

Hoyer's model assumes that each investor would have made exactly the same policy investment, borrowing, withdrawal and surrender decisions had NM not made the 1985 Change. (App. 51, Hoyer 3/4/13 Rep. ¶ 20.) This is a faulty assumption, as Mr. Hoyer largely concedes:

> Q. If, however, Northwestern Mutual had never implemented the 1985 Change, would you have any reason to believe that the cash deposits would have been of the same amount and at the same time as they were in the actual world?
>
> A. They would certainly not have been.

(App. 89, Hoyer 5/17/13 Dep. 65:9-14; for comparable concessions, *see also id.* at 71:14-18, 71:22-72:8, 73:4-9, 91:17-92:1, 95:16-96:1, App. 90-91, 95-96.)

Academic literature and third-party research confirm that absent the 1985 Change, investors would have made different loan and deposit decisions. For example, the long-term portfolio would have provided lower dividends for a few years between 1985 and 1993. (App. 162, 201-202, Moore Rep. ¶ 74, Exs. 6, 7.) Basic economics dictates that some investors who retained their Pre-MN annuities would have divested themselves, or invested less, if they had received the lower rate of return corresponding to the life insurance DIR in the actual world before 1993. (*Id.* ¶¶ 88-89, App. 167-168.) Policyholders likely would have responded differently in the years after 1993 in the but-for world where returns would have been higher on a yearly basis. (*Id.* ¶¶ 92-98, App. 168-170.) Some investors, for example, would have invested less money and terminated earlier because the amount of money in the annuity reached a particular investment goal more quickly, or they may have borrowed more because more money was available. (*Id.* ¶ 78, App. 163.) Absent individualized

17

inquiry, there is simply no way to know. Mr. Hoyer assumes away this problem.

### E. Mr. Hoyer's Model Misstates Policyholders' Damages By Failing to Consider When Policy-Related Transactions Actually Occurred

For the sake of "simplicity" and "understandability" (App. 83, Hoyer 5/17/13 Dep. 42:20-21), Hoyer assumed that all transactions, including the payment of premiums, withdrawals, and policy loans, occurred at the end of the year. (*Id.* at 42:19-43:8, 84:22-25, App. 83, 93.) Hoyer acknowledges that this assumption results in under- or over-estimations of actual damages for each class member. (*Id.* at 83:9-86:2, 88:4-18, App. 93-94.) For instance, Hoyer concedes that his assumption underestimates damages for putative class members who did not borrow or make withdrawals, since the accumulated difference in their accounts would be greater if the actual premium payment date prior to the end of the year were used. (*Id.* at 44:3-44:15, App. 83.) Hoyer also admits that his assumption that policyholders who surrendered their policies did so at the end of the year tends to overstate damages. (*Id.* at 92:20-92:24, App. 95.)

Yet Hoyer makes the unsubstantiated claim that such errors are immaterial, based on his unwritten "analyses". For example, when asked where in the report he calculated the impact of his assumption that all deposits occurred at the end of the year, Mr. Hoyer replied:

> A.  That's not in my report because I did not do a quantification, I did an analysis and concluded that such differential would be immaterial to the aggregate quantification of difference, and the aggregate quantification would be aggregate for the entire policy group or aggregate for an individual.

(*Id.* at 86:8-86:14, App. 95.) Mr. Hoyer conceded that his "analysis" consisted of "look[ing] at the formula and determin[ing] that the formula is applicable and is a realistic and reasonable representation of the difference and that that assumption, while tending—tending to be conservative is immaterial." (*Id.* at 88:10-88:14, App. 94.)

Similarly, when asked to justify his claim that the overestimation of the "Difference" resulting from the assumption of year-end policy surrenders was immaterial, Mr. Hoyer again

attempted to explain his "analysis":

> A.  I did analysis of that, not quantification, but analysis of that to enable me to opine that such differential is immaterial.
>
> Q.  What analysis did you do specifically, sir?
>
> A.  I looked at values and looked at the methodology and mathematically analyzed the extent to which I would either be high or low given a given cash transaction; concluded that since I'm making the same assumption on both deposits and withdrawals, that there is certainly a mitigation one to the other. However, for most policies, deposits are greater than withdrawals, for especially in-force policies, and hence the tendency would be a conservative estimation, but not a material one.
>
> ....
> Q.  You have made no effort to actually quantify what the amount of overestimation based on the assumption of end-of-year surrenders would be versus the underestimation for the assumption of end of year deposits?
>
> A.  That's not correct. I have done analysis to enable me to conclude that such differential is immaterial, so I did enough analysis to reach that opinion. A quantification, which is a numerical determination, is not what I did. I did an analysis to enable the conclusion.

(*Id.* at 93:22-94:10, 94:18-95:3, App. 86.)

Mr. Hoyer then summed up the way NM's experts could test the validity of his claim that

assuming all deposits, withdrawals and surrenders occurred at year-end was "conservative" and yet

also immaterial:

> A.  They would simply look at the implications of those values and estimate what, if any, disparity would result from using that assumption and proceed accordingly. I have done so, I have analyzed the implications and concluded that it's immaterial.

(*Id.* at 125:9-13, App. 104.) But again, Mr. Hoyer did not include his "analysis" in his report:

> Q.  But where in the report do you include the actual analysis itself that led you to conclude that the assumptions you were making were conservative?
>
> MR. KERSTEN: Objection as repetitious. Go ahead and answer the question.
>
> THE WITNESS: I made many, many analyses, starting with can I respond to counsel's questions of me. There is nothing in my report that writes out in detail step by step what each of those analyses were. As that example, **I concluded and responded to client -- to counsel that I can respond to**

19

**their question positively and a formulaic mechanical process can be developed and proceeded accordingly. I did not put in my report precisely how I reached that conclusion nor do I think it's appropriate.** That's not what they asked. They asked can I do it, I analyzed, concluded I could. It's not in the report.

(*Id.* at 126:7-24, App. 104 (emphasis added).)

In the end, Mr. Hoyer relied on his experience to justify his assumption:

Q.     You did not, however, do any actual quantification or calculations in performing that analysis?

A.     Only because **having done thousands of comparable analyses it was my opinion that a quantification was unnecessary** to formulate that opinion -- a numerical calculation. I did an analytical calculation.

(App. 104, Hoyer 5/17/13 Dep. 125:14-19 (emphasis added).)

**F.     Mr. Hoyer's Model Does Not Account for Pre-MN Policyholders Who Agreed to Update '83 After 1985**

Hoyer assumes that every putative class member either did or did not have direct recognition, which affects how dividends are determined for annuitants who borrowed against their policies, for the entire class period.[3] However, over 100 of the putative class members did not sign Update '83 until 1985 or later. (App. 207, Moore Rep. Ex. 12.) Hoyer's model could not calculate the "Difference" for these policyholders—individual calculations, charts and tables would need to be created for each individual based on when their policies changed from direct to non-direct recognition. (App. 174, Moore Rep. ¶ 108.)

Rather than address the problem created by these putative class members, Hoyer effectively assumed the issue was immaterial to his model. Mr. Hoyer testified that his unwritten "analysis"

---

[3] For policies with direct recognition, the DIR depends on when and how much each policyholder borrowed against his policy and the policy loan rate—meaning that each policyholder with direct recognition could have a unique DIR each year depending on when and how much money was borrowed and when and how much money was repaid. (*See* App. 50-51, Hoyer Rep. ¶ 14.) Because an individual class member's "Difference" depends on the cumulative impact of past DIRs, in order to calculate the "Difference" for annuitants who signed Update '83 after March 31, 1985, Hoyer would need to create different individualized grids for the periods before and after the annuitant switched to direct recognition. (App. 174, Moore Rep. ¶ 108.)

20

consisted of:

> A.  … looking at the values that we have developed and by saying what if a different treatment had been utilized and in applying that in a numerical sense, I conclude that there is no material difference.
>
> Q.  How would an actuarial expert recreate that analysis that you just described?
>
> A.  By doing just what I just described. By looking at the values that are shown in this report and hypothetically applying them to those two scenarios. And when you do so, you will get no material distinction.
>
> Q.  **Did you in any way memorialize in writing the process of the analysis that you performed that you just described?**
>
> A.  **No, because it's irrelevant to the conclusions that I reached.** Irrelevant in the sense that I have considered alternatives and I am -- and I concluded that in my opinion that this formula meets the objectives and it attains the goals that I have said in the report and that there is no outliers or fluctuations or considerations or anything else of a material nature that I have not considered.

(App. 108, 106-107, Hoyer dep. at 141:4-141:25; *see also id.* at 136:20-137:17, App. 106-107.)

### G.  Mr. Hoyer's Model Ignores the Significant Number of Class Members Who Were Not Injured By—Or Even Benefitted From—The 1985 Change

Mr. Hoyer disregards the many class members were not injured, whose presence means that damages cannot be calculated on an aggregate, classwide basis, and therefore that the putative class cannot be certified. *See Wal-Mart*, 131 S.Ct. at 2551 (class cannot be certified unless plaintiffs prove that "the class members have suffered the same injury" (internal quotations omitted)); *Thao v. Midland Nat. Life Ins. Co.*, 2012 WL 1900114 at *4 (E.D. Wis. May 24, 2012) (App. 315.) (same).

Here, the proposed class includes a substantial number of putative class members who either were not harmed or who benefited from the 1985 Change. Roughly 18% of the putative class (3,541 putative class members) surrendered or otherwise terminated their policies between 1989 and 1993 when the cumulative rate of return in almost all cases would have been higher in the actual world than in the but-for world. (App. 198, 203, Moore Rep. Exs. 3, 8.)

21

Mr. Hoyer conceded that it was not until 1993 that class members received what he viewed as meaningfully less money than other class members. (App. 51-52, Hoyer 3/4/13 Rep. ¶ 19 ("From 1993 through the current time frame, the Pre-MN annuitants received substantively lower dividends as a result of the 1985 Change.").) And he reiterated this concession at his deposition.

Q.    And I just want to be clear: In the group of putative class members, were there some who surrendered their policies at a particular time such that those individuals were not financially harmed by the 1985 Change?

A.    That is correct.

(App. 112, Hoyer 5/17/13 Dep. 158:12-17.) He even conceded that some putative class members were as much as two-percent better off financially than they otherwise would have been. (*Id.* at 161:1-11, App. 113.)

Hoyer nevertheless claims that the number of policyholders who benefited from the 1985 Change was "a very small amount" (*id.* at 158:12-20, App. 112.), and the extent to which those class members benefited was "immaterial" (though left uncalculated), (*id.* at 147:14-148:10, 157:9-16, App. 109). His claim is contradicted by the numbers. Roughly 45% of putative class members surrendered or otherwise terminated their policies before year-end 1993. (App. 204, Moore Rep. Ex. 9.) The rate of return enjoyed by Pre-MN annuitants in the actual world was the same as or higher than Hoyer's but-for rate of return in all but three years between 1985 and 1993. (App. 53, Hoyer 3/4/13 Rep. ¶ 26.) And 3,541 putative class members (or ~18% of the putative class) surrendered or otherwise terminated their policies between 1989 and 1993 when the cumulative rate of return in almost all cases would have been higher in the actual world than in the but-for world. (App. 198, 203, 204, Moore Rep. Exs. 3, 8, 9.)

## CONCLUSION

Mr. Hoyer's proposed opinions and report are unreliable and therefore inadmissible. His damages model makes many key assumptions, including: 1) the but-for worlds in which NM

provided notice or asked for consent to the 1985 Change were irrelevant; 2) in Mr. Hoyer's model (which addresses only the but-for world in which NM did not make the 1985 Change), the annuity DIR would be the same as the life insurance DIR; 3) policyholders would have made exactly the same investment decisions; 4) all policy-related transactions occurred at the end of each calendar year; 5) every putative class member with direct recognition signed Update '83 before the 1985 Change was implemented; and 6) the class members who either were not injured or benefitted from the 1985 Change were irrelevant to his model.

The evidence shows that those assumptions are demonstrably false. But when confronted during his deposition with actual facts contrary to his assumptions, Mr. Hoyer repeatedly asserted that such realities had an immaterial impact. Rather than providing a detailed, logical, testable explanation as to why they were immaterial, Mr. Hoyer fell back on reciting bare-bones unwritten "analyses" and his experience. This is insufficient to pass muster under *Daubert* and settled Seventh Circuit precedent.

For these reasons, Northwestern Mutual respectfully requests that the Court grant its motion to exclude the report and opinion of Robert Hoyer.

Dated this 1st day of July, 2013.

<div style="margin-left:3em">

By:      */s/ Adam Hoeflich*                 
Adam Hoeflich (*pro hac vice*)

           Attorneys for Defendant
           The Northwestern Mutual Life Insurance Company

Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile:  (312) 494-4440
Email:  adam.hoeflich@bbhps.com

Sean C. Grimsley (*pro hac vice*)
John M. Hughes (*pro hac vice*)
Bartlit Beck Herman Palenchar & Scott LLP

</div>

23

1899 Wynkoop Street, 8th Floor
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile:  (303) 592-3140
Email:  sean.grimsley@bbhps.com
          john.hughes@bbhps.com

Eric J. Van Vugt (Wis. Bar No. 1017336)
Joshua D. Maggard (Wis. Bar No. 1061378)
Quarles & Brady LLP
411 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 277-5625
Facsimile:  (414) 978-8625
Email:  eric.vanvugt@quarles.com
          joshua.maggard@quarles.com

24

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served via the ECF system which will send a

notice of electronic filing to the following: George Kersten, Jeffrey A. Bartos, Mark B. Pollack.

s/ Joshua D. Maggard

4828-2701-9028, v.  2-2701-9028, v. 1