# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                             Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

**APPENDIX TO NORTHWESTERN MUTUAL'S MEMORANDUM OF LAW IN**

**SUPPORT OF ITS MOTION TO EXCLUDE THE REPORT AND OPINIONS OF**

**PLAINTIFFS' PROPOSED EXPERT ROBERT HOYER**

**Volume I of II**

**Items 1 – 9**

**Pages 1 - 211**

---

## Index to Northwestern Mutual's Appendix

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 1 | Noonan v. Northwestern Mutual Life Ins. Co., Case No. 01-CV-12349, 1/18/05 Plaintiffs' Br. in Support of Motion for Class Certification, | Jan. 18, 2005 | 1 | I |
| 2 | Noonan v. Northwestern Mutual Life Ins. Co., Case No. 01-CV-12349, 4/30/07 Plaintiffs' Br. in Support of Motion for Class Certification | Apr. 30, 2007 | 3 | I |
| 3 | Noonan, Decision on Motions to Certify for Class Action | Jan. 25, 2008 | 10 | I |
| 4 | LaPlant, Decision and Order on Motion of Plaintiff for Class Certification | Oct. 26, 2009 | 21 | I |
| 5 | Motion Hearing Transcript | Oct. 12, 2009 | 39 | I |
| 6 | Decision on Motion of Defendant to Dismiss | Jun. 15, 2009 | 45 | I |
| 7 | Robert L. Hoyer Expert Report | Mar. 4, 2013 | 47 | I |
| 8 | Robert L. Hoyer Deposition Transcript | May 17, 2013 | 73 | I |
| 9 | Michael J. Moore Expert Report | June 28, 2013 | 133 | I |
| 10 | Plaintiffs Proposed Findings of Fact, Conclusions of Law and Order for Judgment | Dec. 20, 2010 | 212 | II |
| 11 | Robert L. Hoyer Expert Report | June 30, 2013 | 241 | II |
| 12 | Ravi Dhar Expert Report | July 01, 2013 | 245 | II |
| 13 | Report to the Court Regarding Class Notice | Mar. 31, 2010 | 278 | II |
| 14 | Letter | June 07, 1990 | 281 | II |
| 15 | Email | Apr. 07, 1998 | 282 | II |
| 16 | Letter | Sep. 14, 1999 | 283 | II |
| 17 | Trial Transcript, a.m. | Nov. 08, 2010 | 285 | II |
| 18 | Marleen LaPlant Deposition Transcript | Sept. 09, 2009 | 291 | II |
| 19 | Trial Ex 528: Dividend Interest Rates vs. Current Rate Annuity Credit Rates | | 296 | II |
| 20 | Affidavit of Jason T. Klawonn | June 27, 2013 | 297 | II |
| 21 | Noonan v. Northwestern Mutual Life Ins. Co., 726 N.W.2d 356 (Wis. Ct. App. 2006) | Nov. 16, 2006 | 301 | II |
| 22 | Noonan v. Northwestern Mutual Life Ins. Co., 2005 WL 6216361 (Wis.Cir. July 6, 2005) | July 6, 2005 | 309 | II |
| 23 | Thao v. Midland Nat. Life Ins. Co., 2012 WL 1900114 (E.D. Wis. May 24, 2012) | May 24, 2012 | 313 | II |
| 24 | Reed v. City of Chicago, 01 C 7865, 2006 WL 1543928 (N.D. Ill. June 1, 2006) | June 1, 2006 | 321 | II |

STATE OF WISCONSIN      CIRCUIT COURT      MILWAUKEE COUNTY

CATHERINE D. NOONAN and
DANIEL A. NOONAN,

                Plaintiffs,      Declaratory Relief
      vs.                    Case Code:  30301

THE NORTHWESTERN MUTUAL LIFE      Case No. 01 CV 12349
INSURANCE COMPANY, et al.,

                Defendant.

---

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

---

## INTRODUCTION

CONTAINS CONFIDENTIAL INFORMATION

This motion is governed by Wisconsin Statutes § 803.08 and the cases interpreting it. These are summarized in the Wisconsin section of the American Bar Association's *Survey of State Class Action Law – 2004*, accompanying this memorandum as Exhibit 1. The Court of Appeals decision herein (Exhibit 2) also impacts importantly on this motion.

Newberg, *Class Actions* (4th Ed.), notes that the usual first step in the management of a class action is a court ruling on whether the case meets the criteria for class treatment and therefore should be "certified" as a class action. *Id.*, vol. 3, §§ 7:6, 7:7. That determination is based on the pleadings, supplemented by relevant factual data the parties may submit. *Id.*, § 7:8.

This motion asks the Court to certify the following plaintiff Class:

> All persons who directly or indirectly owned NML dividend paying individual deferred annuities ("Participating Annuities") in force as of March 1, 1985, and the successors in interest of those persons.

Upon certification, notice is given to the members, describing the case and giving them the right to "opt out" of the class within a specified time.[1] 3 Newberg, §§ 8:1, 8:31. The case then proceeds in the ordinary course through trial.[2] *Id.* Through its case management powers the Court can modify its class-related rulings at any time (e.g., by refining the class definition, creating sub-classes, ordering separate trials of individualized issues or decertifying the class) as circumstances may require. *Id.*, § 8:12.

If the class makes a recovery by settlement or judgment, administration of the recovered fund occurs, in which the formula and procedure for distribution of the recovery among the class members are determined and implemented. 5 Newberg, ch. 10, 11. The administration and distribution process is usually handled by a court-appointed administrator. *Id.*

This case is unusually well suited for class treatment. This is reflected in the briefing of all parties in connection with the dismissal motion and related appeal and in

--------------------------------

[1] Those who "opt out" are not bound by the judgment ultimately entered in the case, and do not participate in any benefits achieved for the class. Newberg, § 8:31.

[2] The trial in some cases is limited to issues the Court has determined deserve class-wide treatment, followed by hearings on individualized issues if necessary. E.g., *Goebel v. First Federal Savings & Loan Association*, 83 Wis. 2d 668, 681-82, 266 N.W. 2d 352 (1978). For the reasons set forth below, this case will not require such bifurcation.

2

STATE OF WISCONSIN        CIRCUIT COURT        MILWAUKEE COUNTY

CATHERINE D. NOONAN and
DANIEL A. NOONAN,

               Plaintiffs,       Declaratory Relief
       vs.                  Case Code:  30301

THE NORTHWESTERN MUTUAL LIFE    Case No. 01 CV 12349
INSURANCE COMPANY, et al.

               Defendant.

---

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTIONS:   (1) TO CERTIFY CLASS TRIAL OF COUNT ONE (DECLARATORY RELIEF) AND CLASS-WIDE ISSUES OF COUNT TWO (BREACH OF CONTRACT), AND (2) FOR PARTIAL SUMMARY JUDGMENT

---

### INTRODUCTION

This brief is filed to support the following motions:

First, motions to certify Count One (declaratory relief) and certain class-wide issues in Count Two (breach of contract) of the Amended Complaint for class trial. The limited nature of the issues to be certified and applicable law satisfy the concerns expressed in this Court's earlier decision.

Second, for partial summary judgment finding that the annuity contracts have been breached, because discovery has confirmed beyond dispute that NML committed the acts which the Court of Appeals has held breach the dividend requirements of the contracts.

## STATEMENT OF THE CASE

The plaintiffs' allegations are described in *Noonan v. Northwestern Mut. Life Ins. Co.*, 2004 WI App. 154, 276 Wis. 2d 33, 687 N.W.2d 254 ("*Noonan I*") (App. 1-19),[1] and referenced by this Court (App. 23) and the Court of Appeals' recent unpublished decision ("*Noonan II*") (App. 29):

> The Noonans' complaint states that they own deferred annuity contracts issued by Northwestern. They purchased the annuities in 1976. The annuities are "participating" and the contracts originally stated:
>
> > "This policy shall share in the divisible surplus, if any, of the Company. This policy's share shall be determined annually and credited as a dividend. Payment of the first dividend is contingent upon payment of the premium or premiums for the second policy year and shall be credited proportionately as each premium is paid. Thereafter, each dividend shall be payable on the policy anniversary."
>
> In 1983, some policyholders, including one of the Noonans, approved an amendment to their annuity contracts. The amendment provided that annual dividends would be computed based on net value after deducting policy loans:
>
> > "This policy will share in the divisible surplus of the Company. This surplus is determined each year. The policy's share will be credited as a dividend on the policy anniversary. This dividend will reflect the mortality, expense and investment experience of the Company and will be affected by any policy indebtedness during the policy year."
>
> Until 1985, dividends were paid based on Northwestern's overall financial performance measured by the return on a general account portfolio of investments. These included securities, real estate, business enterprises and other investments.
>
> In 1985, Northwestern changed the way it distributed dividends to annuity policyholders. Northwestern created a segmented account invested in short-term bonds.

---

[1] Accompanying this brief is an appendix containing the Court of Appeals' decisions in this case and this Court's earlier class action decision, which are cited as "App. ___" or by decision name (*e.g.*, "*Noonan I*"). Included in the appendix also are exhibits filed in additional support of the renewed motion for class certification. Cited herein also (as "Exhibit ____") are exhibits filed January 18 and March 11, 2005 in three volumes entitled "Affidavit Identifying Plaintiffs' Pre-Trial Exhibits." These exhibits, principally NML documents and the deposition of its principal spokesperson, Richard Fisher, support class certification and partial summary judgment.

2

Owners of annuities then received a share of interest earned on the short-term bonds only. The Noonans learned of the change in 2000 and commenced this action against Northwestern and its officers and directors.

The court described the breach of contract claim as follows (*Noonan I*, ¶ 11):

> The Noonans first claim that Northwestern breached the annuity contracts. They contend the plain language of the contracts gives them a right to 'share in the divisible surplus of the company'. . . . The Noonans claim they had been excluded from sharing the annual divisible surplus because they have only received interest from a separate short term bond account.

The Court held it would be a breach of contract to provide only interest from a pre-determined short-term bond fund since that is not a genuine sharing in NML's divisible surplus (*id.* at ¶ 17):

> The contracts state that annuity policyholders 'will share in the divisible surplus of the company' and the 'share will be determined annually and credited as a dividend'. . . . Here, Northwestern made the allocation to annuity policyholders before it determined the surplus. This is contrary to the terms of the annuity contracts and the statute. Thus, the Noonans have alleged sufficient facts to state a claim that Northwestern breached the annuity contracts.

In a follow-up decision denying reconsideration, the Court of Appeals reaffirmed that "Northwestern made the allocation to annuity policyholders before it determined the surplus." App. 20.

On remand, discovery confirmed beyond dispute that, beginning in 1985, NML has given annuitants only the interest on a predetermined "segregated account" of short-term bonds rather than the share of the company's overall surplus required by the contract language and applicable statute. This evidence is set forth in Part Two of this brief, supporting the plaintiffs' motion for partial summary judgment.

3

Certain undisputed basic facts relate also to the certification issues covered in Part One of this brief:

1.   By 1985, in response to the interest rate market, NML had created a new "current rate annuity" called the "MN series" of annuities.

2.   When it started marketing the "MN" series, NML stopped selling the earlier annuities, which it thereafter called "Pre-MN annuities." The Pre-MN annuities thus became a "closed block" (*i.e.*, a block of business no longer publicly sold). The Class as now defined is limited to owners of Pre-MN annuities as of January 1, 1996 (*i.e.*, within the 6-year statute of limitations for breach of contract).

3.   *All* conduct of NML complained of relates exclusively to acts *within NML:* creating the "segregated account" and, after a 5-year phase-in, giving the block of Pre-MN annuities only the interest earned on that short-term bond account each year, rather than a true dividend out of NML's balanced, general account portfolio."

4.   The NML conduct complained of was unquestionably action taken against the *closed block* of Pre-MN annuities *as a whole. See, e.g.*, the NML Board of Trustees documents for each year, wherein the Pre-MN "closed block" of annuities is given only the interest on the predetermined segregated account for so-called "dividends," Exhibits 14-32; *see also,*

4

*Noonan I*, ¶ 17, holding that, "Here, [NML] made the allocation to annuity policyholders before it determined the surplus. This is contrary to the terms of the annuity contracts and the statute."

## ARGUMENT

## PART ONE: CLASS CERTIFICATION

## <u>INTRODUCTION</u>

Unlike the original motion, these motions ask the Court only to certify issues common to the following Class under Counts One (Declaratory Relief) and Two (Breach of Contract) of the Amended Complaint:

> All persons and successors in interest to persons who, as of January 1, 1996, directly or indirectly owned NML participating individual deferred annuities which were issued prior to March 1, 1985 and were in the deferred (accumulation) phase as of January 1, 1996.

This Court earlier found that certifying all issues under all claims as a class action rendered the case "unmanageable." App. 21. The Court was "especially concerned with the punitive damages question and award." App. 23. The Court of Appeals affirmed in an unpublished decision ("*Noonan II*," App. 28-47), finding it within the trial court's discretion even though the appellate court might have reached a different result. *Noonan II*, ¶¶ 5, 7, 26, 29 and fn 12, 21.

The concerns earlier expressed by this Court are eliminated by our revised request limiting class certification to certain class-wide issues for three main reasons.

5

App. 007

from the return on NML's long-term-oriented portfolio of investments. *See,* NML July 1982 Memorandum, Exhibit 9. Not only were new annuity sales declining sharply, but annuitants desiring to play the money market were borrowing on their annuity policies (at guaranteed interest rates such as 5%) or cashing them in and investing in high interest CDs or other competing products. *Id.,* p. 1. In NML's view (as voiced by its chief actuary), the annuitants "simply had too much control over their money." Exhibit 10.

In response, NML decided to create a new annuity product called a "current rate annuity," or "CRA." This was designated the "MN" series of annuities[4] and was ready to be marketed by 1985.

Importantly, the new MN annuity was designed so that in practice it would *not* receive dividends. Exhibit 11, p. 541. Instead, it was credited with a current interest rate earned by a "segmented" account made up of short-term bonds (in effect, an annuitant's pro rata share of the interest earned on that account). This was explained in NML's February, 1985 "Information Release to All Agents" describing the new annuity (Exhibit 11, p. 541):

> **J.     No Dividends**
>
> No dividends, per se, are anticipated on this policy because there is no loading to refund, no mortality charge to refund, and excess interest flows directly into the Accumulation Value. However, the contract does contain a dividend

---

[4] NML gives a letter designation to each new policy form it creates. By 1985 when the new annuity form came on the market, the next available designation was "MN."

8

App. 008

provision because we are a mutual company and conceivably
there may be a way to pay dividends at some time in the
future.

During the time NML was designing this MN ("No Dividend") annuity, it planned

also to unilaterally change the nature of the annuities already in force (called within NML

the "Pre-MN" annuities). The owners of these "Pre-MN" annuities constitute the plaintiff

Class which is the subject of this motion. NML senior actuary Fisher estimates this Class

consists of between 30,000 and 40,000 people. Exhibit 8, pp. 54-56. NML's unilateral

change in the Class's "Pre-MN" annuities is the basis for this law suit.

A July 16, 1984 NML memorandum by then Vice President (now CEO) Edward

Zore explains NML's thinking during the development of its new "current rate annuity"

(which Zore refers to as the "CRA product" and ultimately was designated the "MN"

annuity): "The real problem is with the [old, in-force or 'Pre-MN' annuities]."

According to Zore, "we cannot have the old [in-force annuities] and the new CRA

running side-by-side, *so the old [in-force annuity] has to be made to look like the new*

*CRA even though the contract language might be different*." Exhibit 12, p. 929 (emphasis

added).[5]

_____

[5] In Exhibit 12, Zore refers to the existing (Pre-MN) annuities as "the current
FPA" and "the old FPA." At the time this memorandum was written, the version of the
participating, deferred annuity being sold was called the "Flexible Premium Annuity"
(the "FPA"), in which the annuitant could pay in as much or as little as desired over the
deferred period. Most of the participating, deferred annuities on NML's books as of the
early 1980's were FPA's, although there were some deferred, participating annuities
dating from earlier years. In addition, NML sold single premium participating, deferred
(continued...)

9

CATHERINE D. NOONAN and
DANIEL A. NOONAN,
           Plaintiffs,

versus                      CASE NUMBER: 01-CV-12349

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, DOE A;
DOE B; DOE C; INSURER X;
INSURER Y and INSURER D,
           Defendants,



FILED

JAN 29 ...

Clerk of Circuit Court

---

## DECISION ON MOTIONS TO CERTIFY FOR CLASS ACTION AND SUMMARY JUDGMENT

---

### APPEARANCES

Kersten & McKinnon, S.C., by E. Campion Kersten and George Kersten, for Plaintiffs.

Quarles & Brady, LLP., by Eric J. Van Vugt, Christina Hernandez-Malaby, Ray Manista and Rodd Schneider.

### DECISION

The plaintiffs, Noonans, bring motions for class-wide certification and partial summary judgment. The class-wide certification motion has 2 counts:

Count 1 is for class-wide certification based on declaratory relief;

Count 2 is for class-wide certification based on breach of contract with a fall-back position to certify only Wisconsin cases.

The second motion is for summary judgment on the breach of contract claim for the putative class.

The Court has received the parties' briefs and heard arguments on June 25, 2007. The Court will first consider Count 2 of the first motion, including the fall back position for Wisconsin cases only, and then Count 1 of the first

1

motion. The second motion for partial summary judgment will be considered last.

The Court starts then with Count 2 of the first motion. The Court denies Count 2, including the fall-back position for Wisconsin claimants only, because the jury trial to determine the issues of breach of contract and concomitant damages will not be manageable as a class action. This determination is augmented by lack of commonality for breach and damages.

With regard to Count 1 of the first motion, it requests the Court to declare that NML violated §806.04 Wis Stats., sometime around 1985-1986. Because declaratory relief should not be certified when the relief sought is monetary damages, and there will be manageability problems when the individual monetary damages are resolved, the Court denies Count 1 of the first motion.

With regard to the second motion for partial summary judgment for the putative class, because the Court has denied the motions for class certification, it cannot consider summary judgment for a class that does not exist. Therefore, the Court denies the second motion for procedural reason.

## LAW

Regarding Count 2 of the first motion, Wisconsin does not have many cases dealing with the class action statute, §803 Wis. Stats. The lead case, *Schlosser v. Allis Chalmers Corp.*, 86 Wis.2d 226, 271, N.W. 2d 879 (1978), states that the proposed class must have commonality, numerosity and adequate representation. In addition, a fourth factor, manageability, is cited in *Cruz v. All Saints Healthcare Systems, Inc.*, 2001 WI App 67, 242 Wis 2d 432, 625 N.W. 2d 344 (Ct, App. 2001).

There is also an unpublished decision **Noonan v. Northwestern Mutual Life Insurance Company,** No. 2005 AP1683, 2006 WL 3314622 (CT App 2006) **(Noonan II)** which affirmed this Court's first denial of Noonans' request for class action certification and deals with class action law as it applies to the facts of this case.

Regarding Count 1 of the first motion, there is the Wisconsin declaratory judgment statute, §806.04 (2) Wis. Stats. Also there is §632.62 Wis. Stats. which imposes duties on mutual companies like NML. The Court Notes *Thompson v. Robertson*, 58 Wis 2d 730.207 N.W. 2d 675, 676 (1973) which held that declaratory judgment should not be used where ordinary remedies exist such as an action in tort for money damages. And **Aslanukov v. Amer. Express Travel Related Serv. Co., Inc.,** 426 F. Supp 2d 888, 891 (W.D. Wis 2006) stands for the proposition that declaratory judgment should be to stop a

wrong before it occurs. And there is **Jefferson v. Ingersoll Intl., Inc,** 195 F. 3d 894, 898 (7td Cir. 1999) which held that declaratory judgments should not be used for class determination when the relief sought relates primarily to money damages.

Regarding the second motion requesting summary judgment for a putative class that now does not exist, the Court cites **Peritz v. Liberty Loan Corp.,** 523 F2d 349, 353-54 (7th Cir. 1975).

## FACTS and BACKGROUND

The defendant, NML, is a mutual financial institution that offers financial instruments, e.g. annuities, life insurance policies, etc. These instruments are pedaled and sold by independent agents throughout the United States. There are thousand of policies. The agents do not exclusively sell NML policies. Noonans purchased NML annuity contracts in 1976 through an agent, Daniel Madigan. The terms of the annuity permitted Noonans to share in the divisible surplus of NML, called dividends. At that time most of NML's instruments were in long-term securities, real estate and business endeavors. In the early 1980s when interest rates cycled up, perhaps even spiked, some NML annuity holders cashed in their long-term annuities because bank certificates of deposits and other short-term bonds were more lucrative. An officer of NML indicated NML's annuity portfolio was uncompetitive causing clients to surrender contracts and created marketing problems for agents.[1]

In response, NML in 1985 or 1986 changed, allegedly unilaterally according to the complaint, the basis for payment of the annual dividends for the annuities by creating a "segmented account" that paid dividends on short-term high interest bonds. That resulted in a higher return for the annuities for several years, but when interest rates cycled down, the longer-term equities paid more. Noonans allege they first noticed in 2000 that their annuities were worth materially less than they would be had the change not been made. They sued NML for breach of contract and breach of fiduciary duty, seeking actual and punitive damages.

After the Appellate Court reversed a Circuit Court's judgment and order granting NML's motion to dismiss and denied NML's motion for reconsideration, **Noonan v Northwestern, Mut. Life Ins. Co.,** 2004 WI App 154, 276 Wis 2d 33.687 N.W. 2d 254, **(Noonan I)**, Noonans moved for class certification. This Court denied the motion for class certification and was affirmed by the Appellate Court, **Noonan II**, with petition for review denied by the Supreme Court.

---

[1] The Court notes that the NML Board must have also noticed money trickling out of the money/assets reservoir that NML has to maintain the value of its outstanding policies.

3

Noonans then bring these motions as previously outlined. However, Noonans have changed the putative class to those policy holders who are owners of the annuities in question as of January 1, 1996 as opposed to 1985 in the **Noonan II** motions.

Noonans have also withdrawn their fiduciary duty claim from these motions. The fiduciary duty claim still seeking actual and punitive damages would attach solely to the Noonans at trial. [2]

## REASONING
### Count 2 of First Motion

The Court's concerns about a class action, as indicated in its previous decision, have not been assuaged by Noonans' withdrawal of the fiduciary duty claim from this class action request but have been buttressed by the rationale and lucidity of **Noonan II.**

There is no dispute in this case with regard to the competence of Noonans to represent all members of the putative class. There is no dispute with the numerosity criterion except if the testimony and evidence possessed by many or all of the putative class members are material and probative, and not redundant, then the judicial efficiency purpose of the one class action is defeated. There is a dispute over commonality and manageability.[3] There is a presumption in favor of class actions, **Nat. Bank, Jackson, Miss v. Roper,** 445 v.s. 326, 339 (1980).

Noonans appear to argue that the whole question of class action certification begins and ends with NML's alleged unilateral change of the pre-1984-85 annuity contracts. They argue that any distinctions as to individual damages, if any, can be determined by a formula administered by a special master after the trial is over for breach of contract and a lump sum damage award is made. The Court believes that a proper verdict will inquire as to individual damages and not as to a formula. Individual damage awards will have to be fleshed out for the jury.

There will be a considerable lack of commonality on the breach and damage questions. The Court notes that the purchasing of an annuity is not like receiving insurance ancillary to employment as in **Schlosser** or the cost of medical records ancillary to medical treatment as in **Cruz.** The majority of

---

[2] For a more detailed factual background, see **Noonan I.**

[3] Because Count 2 is an identical motion, except for different policy holders, as the motion which was the subject of **Noonan II.** most of the reasoning for Count 2 will be repetitive of what the Court wrote in that case. The Court does not quote extensively from **Noonan II,** but it will expand its reasoning where **Noonan II** appears to call for it.

4

other cases cited by plaintiffs in which a class action certification was granted are similar such fact situations. On the other hand, the purchase of an annuity involves big plan, big money and big monitor ever after. The monitoring would probably involve talking with the independent agents who sold the policies. The Court notes that Noonans began by talking to their agent when they had a question about the 1985-86 change. Then they addressed NML corporate officials. These conversations are not going to follow a pattern, but they will be material and probative as to breach and damages. Upon discovery, these conversations could give rise to NML's request for jury instructions peculiar to a certain claimant that could bear on the breach and damages questions. Noonans could request other countering instructions for that certain claimant.

If the claimant is a Wisconsin resident, subject to Wisconsin law, those instructions could relate to duty to mitigate.[4] The Court has to be concerned about who is going to assess the credibility of claimants under oath.[5] Noonans assert that a special master could administer an oath and ask some questions once the lump sum award is made as envisioned by Noonans.[6] The Court has no problem with a master administering an oath. It is a ministerial function. But assessing credibility, the Court believes credibility is very much a jury function.[7] The Court believes the same jury function attaches to the other standard jury instructions referred to in this decision. The Court would be concerned about NML's civil process rights, as it understands the facts in this case, were it to decide otherwise.[8] All of these commonality concerns will make a class action suit difficult, if not unworkable for the jury with a verdict of very many pages.

And the Court has to respond to NML's concerns about the choice of law issue. Noonans argue that the laws of the forty-nine states where the contracts were actually sold are not relevant. The Court believes statutes of limitation, for example, may very well be relevant. There will also be differences in the parol evidence rules. **Noonan II** is so clear on this choice of law issue that the Court does not think there is much more it can say.[9] This Court agrees with the **Noonan II** rationale.

---

[4] See Instructions Wis II-Civil: 3074 Damages: Duty to Mitigate.
[5] Noonans guesstimate the average individual claim will be ten thousand dollars. Although this average may fit a class action claim, ten thousand dollars is still double the small claims jurisdiction in Wisconsin today. The Court has no figures as to what the high end dollar amount of the range of claims is, see page twenty "Plaintiffs' Brief in Support of Motions."
[6] See page 12, "Plaintiffs' Brief in Support of Motions."
[7] See instruction Wis II-Civil: 300 Credibility of Witnesses.
[8] The Court has expanded its concerns about commonality problems in this decision. It is in response to the **Noonan II** Court's footnote 4, on page 5.
[9] Footnote 9, page 13, **Noonan II** even indicates the states have developed differing tests for determining whether a contract is ambiguous.

5

However the Court notes that the conversations that any claimant had with the independent agent who sold him/her a policy will be material and probative as to breach of contract also.[10]  These conversations would demonstrate lack of commonality on the breach question.  Again the Court anticipates that discovery will result in the parties requesting jury instructions peculiar to one claimant bearing on breach.  If the claimant is a Wisconsin resident, subject to Wisconsin law, these could relate to estoppel, waiver, waiver of strict performance and modification by conduct.[11]  The Court at this time can only imagine what other states' jury instructions are.

Given these concerns, the Court looks for guidance from case law.  Both parties have cited numerous cases.  The parties have argued over their applicability given their respective interest in this case.  The Court finds no Wisconsin case on point with regard to the fact situation here present.  None of the Wisconsin cases, including **Schlosser,** have the independent agent whose skills are almost totally determinative of the sale of financial instruments.  The cases that have that factor are federal cases and one Pennsylvania state case. Noonans argue that these cases are not on point because they deal with misrepresentation causes of action.  In the Court's view, the underlying cause of action is not the relevant point, but the independent agent factor that gets the financial instruments out there and keeps them there is.  And it is the give and take between the client and agent that will generate material and probative testimony in this case, particularly as to whether there was notice of the 1985-86 change.  In all the cases cited that had the agent factor, none were certified for class action.  And each of these cases expressed one or more of the concerns the Court mentioned above, **Adams v. Kansas City Life Co.,** 192 F.R.D. 274 (W.D. Mo 2000), **Cunningham v. PFL Life Insurance Com.,** 1999 WL 365879 (N.D. Iowa), **Jackson National Life Insurance Co. Premium Litigation,** 183 F.R.D. 217 (W.D. Mich. 1998), **Keyes v. Guardian Life Insurance Co.,** 194 F.D.R. 253 (S.D. Miss 2000), **Parkhill v. Minnesota Life,** 188 F.R.D. 332 (D. Minn 1999), **Zarella v. Minnesota Life Ins. Co.,** 1999 WL 22623 (R.I. Super, Apr. 4, 1999) **Janick v. Prudential Ins. Co. of America,** 305 Pa Super., 120, 451 A.2d 451 (1982).

The Court notes that throughout their arguments, Noonans have suggested that bifurcation especially of the damage questions is the way to go, i.e., the jury awards a lump sum and a special master divides it up.  The Court believes only a jury can make the proper assessment of individual damages in this case.   And if the testimony can be discovered from twenty plus years ago and brought to the trial over the inconvenient out state miles, the Court

---

[10] The Court desires to make clear that client/agent conversations may lead to material and probative facts for both the breach and damages issues of the trial.  Footnote twelve, page 12 and 13, **Noonan II** indicated ambiguity on the Court's part in its previous decision where it appeared to relate the client/agent conversations to the choice of law issue only.

[11] See Instructions Wis Il-Civil: 3074 Estoppel. 3057 Waiver. 3058 Waiver of Strict Performance, and 3032 Modification by Conduct.

6

envisions interminable objections and offers of proof, interminable jury in and jury out. The Court thinks as a class action little time will be saved.

And how can the Court meaningfully give NML a proper forum on the individual fiduciary duty breach claim with its lurking punitive damage claim? The Court believes the fiduciary duty claim will also be tried at the same time. How will the jury be able to handle the punitive damage question of that claim if it does not hear the whole story of what NML is alleged to have done? The degree of egregiousness of the defendant's actions bear directly on punitiveness. The jury needs to hear the whole story from breach to individual damages.

The Court does not believe Noonans are seeking a second full-blown trial for the fiduciary duty claim. And if the one trial has both the class action breach claim and the individual fiduciary claim the Court has to be concerned about jury confusion because the class action may make the individual fiduciary claim for punitive damages appear more egregious than if heard solely, see **In re Methyl Tertiary Butyl Ether Prods. Liab. Litif.**, 209 F.R.D. 323 (S.D. N.Y. (2002).

The Court has to be careful about the punitive damage question because recent Wisconsin Supreme Court decisions may very well require a greater evidentiary effort by NML to defend the punitive claim, **Strenke v. Hogner**, et al, 286 WI2d 660 (2006), and **Wischer v. Mitsubishi Hearing Industry Am,** 279 WI 2d 4, (2006). And again the jury needs to hear all of it. Bifurcation is not a fair option here.

Further as to a special master, the Court does not believe that option permits the master to make the equivalent of jury decisions as to credibility, waiver, estoppel and mitigation of damages.

For all these reasons, and especially the rationale of **Noonan II,** the Court denies Count 2 of the first motion for class action certification.

### COUNT 2 OF FIRST MOTION
### <u>(Fall-Back Position for Wisconsin Claimants Only)</u>

This is a tougher call for the Court to make principally because a certification for only Wisconsin claimants resolves the choice of law issue. There may be a claim here and there showing claimants have changed state residency where a choice of law issue could still arise. But the elimination of that issue augurs much in Noonans' favor.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 18 of 74   Document 42   App. 016

Originally when the Court wrote its first decision in June 2005, it considered this position because it saw the utilization of same in **Janick**. The fall-back position for only Wisconsin claimants was not advanced by Noonans at that time. The Court believes during the final arguments on March 15, 2005, NML suggested the Court should consider such a fall-back position if the Court determined a class action was justified under these facts. The Court does not believe NML agreed to the fall-back position.

The Court's brief foray into this issue at that time led it to conclude that so many facts would get into the record that would be peculiar to individual claimants only, both with regard to breach and damages, that the trial would not be manageable even when only Wisconsin law applied. The Court did not think jurors should be asked to keep individual scorecards on however many Wisconsin claimants showed up. And the Court thought there would be many once the word got out that claims could be substantial.

Today the Court has made a more thorough analysis, and its conclusion is the same. The Court does not think it serves any purpose to reiterate everything it has just written regarding its reasoning on the Count 2 all-state class wide motion. All the reader has to do is overlook any reference to the choice of law issue and you will have the Court's reasoning regarding the Wisconsin only fall-back position. The Court does emphasize that the breach and damage questions are decidedly more complicated here than in **Janick**. Therefore certification would likewise be unmanageable here even though likely having fewer claimants.

## COUNT 1 OF FIRST MOTION

This parallel class action claim is an attempt to obtain a class action by circumventing the denial of same in **Noonan II**. Noonans apparently think that if you arrive at their class action objective by another route all the problems with manageability affirmed in **Noonan II** will disappear.

But before the Court returns to manageability and the resurrection of the choice of law issue, the Court addresses the legal appropriateness of bringing a declaratory judgment motion when a money judgment is sought. Noonans are seeking a money judgment.[12]  The Court believes case law does not favor declaratory judgment under the facts of this case. See **Jefferson v. Ingersoll,** In 41. Inc., 195 F. 3d 894, 898 1ta Cir. (1999). Twenty plus years ago NML made a decision for which Noonans now seek a money judgment. Noonans have a proper legal avenue to address this alleged wrong with a breach of contract case, **Thompson v. Robertson,** 58 Wis. 2d 730, 207 N.W. 2d 675 676 (1973). And there is Aslanukov v **Amer. Express Travel Related Serv. Co.,**

---

[12] See proposed jury instruction page 12, Plaintiff's Brief in Support of Motions.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 19 of 74   Document 42  App. 017

**Inc.** 426 F. Supp 2d 888,891 (W.D. Wis 2006) which stands for the proposition that declaratory judgment should be used to stop a wrong before it occurs.

Noonans argue that these cases were later clarified and limited in **Lister v. Board of Regents**, 72 Wis 2d 282,307-08, 240 N.W. 2d 610 (1976) where that Court indicated declaratory relief is appropriate wherever it serves a useful purpose. The instant Court notes, though, that the **Lister** Court went on to say the **Lister** facts did not give rise to an action for damages by declaratory relief.

On balance then, the Court believes the motion for declaratory relief should be denied for that reason alone.

However, this motion for class-wide declaratory relief again resurrects the choice of law issue. Noonans argue the annuity contract is unambiguous, **Noonan I.** But **Noonan II** points out that states have developed differing tests for determining whether a contract is ambiguous.[13] Therefore, there is a question as to what state law the Court should use to answer the following questions advanced by Noonans for declaratory relief:

1) Whether the annuity contracts in question provide the right for dividends from NML's divisible surplus?;
2) Whether NML violated its duties under the contracts?;
3) What are the damages?.[14]

With regard to damages, again, the jury will be asked to make individual damage awards. The manageability problems relevant thereto, the Court has discussed at length, it believes, in Count 2 of the first motion. That reasoning is, again, applicable here.

Thus for reasons of legal inappropriateness and manageability problems the Court denies the motion for declaratory judgment.[15]

---

[13] See footnote 10, above.
[14] For a more precise rendition of the 3 questions, see pages 9 and 10, "Plaintiffs' Brief in Support of Motions".
[15] The Court notes that eliminating the breach question from the jury through declaratory relief would not eliminate the need for the jury to hear all the facts of the breach in order to determine claimed punitive damages under the trailing fiduciary breach claim.

9

## SUMMARY JUDGMENT
## THE SECOND MOTION

Now the Court addresses the motion for summary judgment Noonans make purportedly on behalf of a putative class in the first motion.

The Court notes that NML argues summary judgment cannot be granted on behalf of a class that does not exist, **Peritz v. Liberty Loan Corp.,** 523 F. 2d 349, 353-354 (7th Cir. 1975). The Court agrees.

Noonans do not request summary judgment solely for their individual clams for breach of contract and breach of fiduciary duty. All of Noonans' referrals to the annuities at issue in this lawsuit in their arguments for summary judgment are for a putative class. Noonans' arguments as here made are as if a certification for class action is in hand. It is not.

The Court notes further that NML goes on to argue in its brief in opposition to Noonans' motion for summary judgment that the Court should deny summary judgment for the Noonans individually. The Court is not inclined to permit NML to convert Noonans' motion into a vehicle to pursue its own theory of this case. Noonans in their reply brief do not acquiesce in NML's effort to limit summary judgment to Noonans only. Accordingly the Court declines NML's invitation to decide summary judgment on its merits.

Therefore, the Court denies the motion for procedural reason without addressing its merit.

Given that the Court finds that the problems with manageability and commonality outweigh the benefits of a class action and for the reasons stated and the cases cited, all of Noonans' motions are denied. Counsel for NML may prepare an order and forward it to Lisa Tietz, Deputy Clerk to Chief Judge Milwaukee County Courthouse, 901 North 9th Street, Room 609, Milwaukee, Wisconsin 53233, for my signature pursuant to Milwaukee County's "five-day rule".

10

Dated at Birnamwood, Wisconsin this the 25th day of January 2008.

**BY THE COURT:**

**Earl W. Schmidt**
**Reserve Judge**

1 i

App. 020



Marleen M. LaPlant, on her own behalf*
and on behalf of a class similarly
situated,
        Plaintiff,           *

Versus
                          *

The Northwestern Mutual Life
Insurance Company, a Wisconsin    *
mutual insurance corporation,
        Defendant.
                          *

**DECISION and ORDER on**

**MOTION of PLAINTIFF for**

**CLASS CERTIFICATION**

Case No. 08-CV-11988

Code:    30701
             Declaratory Judgment

FILED

OCT 2 6 2009

JOHN BARRETT
Clerk of Circuit Court

## Introduction

      The underlying action in this matter was filed on 26 August 2008. An

Answer and Affirmative Defenses were filed on 10 July 2009. The case was

assigned to this judge on 16 March 2009, as the fourth judge to preside over

the matter. An earlier Motion to Dismiss was resolved with a written decision

on 15 June 2009. A Hearing was held in Court on 10 July 2009, and dates

were set at that Hearing for the parties to file and respond to a Motion for

Class Certification since that was in dispute. A Hearing on this motion took

place in Court on 12 October 2009. The actual Motion for Class Certification

was filed by Plaintiff on 18 August 2009. It was thereafter amended on 19

> *policy covers cars registered in Wisconsin. Wisconsin is the state with which the policy has its most significant relationship. Wisconsin law, therefore, governs the interpretation of the insurance policy in the present case."*

This rule is particularly the case when the applicable contract terms are unchanged as to the annuitant sharing in the divisible surplus of the issuing insurance company .

Factors that make the case unmanageable under the noted legal standard, according to Defendant under its Answer and Affirmative Defenses, include matters such as damages, determining the date of knowledge of the "change" and the related statute of limitations, the dates and amounts of policy loans and their repayment, the amount of annuity consideration paid, the total amounts invested, dividends earned and different purchase dates, estoppel, waiver, laches, statute of limitations and accord and satisfaction.

It is Defendant's position that these multiple matters would confuse jurors and create the illusion of a strong class claim when that is not the case. In support of this position reference is made to **Methyl Tertiary Butyl Ether Prods. Liab. Litig.**, 209 F.R.D. 323 (S.D.N.Y. 2002), wherein the Court refused a motion to certify a class. It is argued by Defendant that class certification should not occur as "… thousands of individual suits will still be necessary to determine liability and damages". Plaintiff distinguishes this

*26*

case as being one where class certification was unreasonably sought regarding liability where such a universal finding was not situationally or factually possible. In **Jefferson v. Ingersoll Intern. Inc.**, **195 F.3d 894, 898 (7th Cir. 1999)**, the court stated, regarding when to allow class certification, as follows:

> *"As the Advisory Committee put it: "The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.""*

This was a case involving alleged racial discrimination in employment applications. The District Court limited the class to persons who actually applied for employment. Plaintiff wanted to have the class enlarged to include persons who were discouraged from applying for employment as well as persons who were allegedly improperly denied promotion. The decision focuses on when a class action could be maintained if there is a request, under federal Rule 23(b), for both equitable and monetary damages. Certification would occur if the monetary damages sought are more than incidental to the equitable relief demanded. The case before us involves contract matters and various affirmative defenses. In the formal pleadings, it does not seek damages.

Partial resolution of disputes under a declaratory judgment action should not be, Defendant asserts, certified for a class action. In support the

27

App. 023

case of **Sarafin v. Sears, Roebuck & Co., Inc.,** 446 F. Supp. 611, 615

**(N.D. Ill. 1978)** is cited.  That case does note the declaratory judgment/class

action standard to be applied in complex actions when the entire case is not

resolved.

> *"Therefore, relief is proper either '1) where the judgment will serve a useful purpose in clarifying and settling the legal relations issue; or 2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.*
>
> ...
>
> *Courts have declined to entertain actions for a declaratory judgment where the declaration would result in piecemeal litigation or would try particular issues without settling the entire controversy.*
>
> ...
>
> *It is not necessary to put the entire dispute to rest, but the issues must be separable so that an important and autonomous part of the controversy can be finalized.   6A Moore's Federal Practice, P 57.08(4) (2d ed. 1974)."*

The court must address, under the just noted law, the concepts of separability

of issue(s), importance of the issue, autonomous nature of the issue(s) and

whether that or those issues can be finalized.  Further, the existence of

hypothetical and/or minor non-resolvable issues does not automatically act to

deny class certification.  In **Miner v. The Gillette Co.,** 428 N.E. 2d 478, 485

**(Ill. 1981),** the court affirmed the certification of a class action for only

residents of Illinois even though all issues would not be resolved.

> *"This court in **Harrison Sheet Steel Co. v. Lyons** (citation)*

*28*

stated:

> *But the hypothetical existence of individual issues is not a*
> *sufficient reason to deny the right to bring a class action.*
> *Where it appears that the common issue is dominant and*
> *pervasive, something more than the assertion of*
> *hypothetical variations of a minor character should be*
> *required to bar the action."*

A claim is made that the proposed class is defective in that it would
include members who have no claims under the "surrender" contract language
or the statute of limitations. On this issue reference (and inclusion by that
reference) is made to the court's decision on the Motion to Dismiss regarding
the Statute of Limitations as to breach of contract (Wisconsin Statute, section
893.43) and breach of fiduciary duty (Wisconsin Statute, section 893.57).
Exceptions to the use of strict time limits exist regarding breach of contract
due to the concept of "continuing" breach actions. The Wisconsin discovery
rule is the exception to a fixed, statute of repose 2 year rule under breach of
fiduciary duty.

An argument by Defendant is made that Plaintiff should be precluded
from re-litigating class certification because of her alleged involvement as a
member of the **NOONAN** putative class. This was dealt with in the decision
on the Motion to Dismiss. However, it is claimed that discovery has
produced new information of "actual knowledge" by LaPlant of **NOONAN**
rulings and, thus, preclusion law does apply. The law in that Motion to

29

Dismiss decision is incorporated by reference and to save time and length here. The court reaffirms here that the referred-to decisions (two in the Court of Appeals and one in the Circuit Court) in the **Noonan** cases dealt with either no motion for class certification or a putative class that included all 50 states or involved a non-binding circuit court decision as to a Wisconsin-only class.

Consideration is a contract element which impacts a "new" contractual release matter in a situation where the parties to the new contract "already" have existing rights and duties under the annuity contract. One of those rights and duties relates to terminating or canceling the annuity contract. In **Bartley v. Thompson**, 198 Wis. 2d 323, 333 and 334 (Ct. App. 1995), the court stated:

> " *Bartley does not dispute the general rule that a promise to do something the promisor is already legally obligated to do, or the performance of an existing legal obligation, does not constitute sufficient consideration for a contract.*
> *...*
> *The trial court could properly conclude on these facts that his attempt to assert a breach-of-contract claim against the governor failed for lack of consideration.*"

Reasonable consideration is the test for the new contract matter relating to "release". **Brown v. Hammerill Paper Co.,** 88 Wis. 2d 224, 234 (1979).

> "*The issue of the intended scope of a release is not determined by the form of the instrument alone or by the mere use of the term "release" in the documents in question. It has been said*

*30*

> *that the ultimate test of the intended scope of such documents is whether the obligee has received "full satisfaction, or that which the law must consider as such"."*

Good faith is presumed and implied in all Wisconsin contracts.

**Wisconsin Natural Gas v. Gabe's Construction, 220 Wis. 2d 14, 21 (Ct. App. 1998).**

> *"Every contract implies good faith and fair dealing between the parties to it."*

Contract terms must be certain and unambiguous. As to ambiguity the court in **Younger v. Skiing Enterprises Inc., 196 Wis. 2d 485, 499 (Ct. App. 1995), said:**

> *Whether a contract is ambiguous is a question of law. We test whether the term is reasonable or fairly susceptible of more than one construction."*

If ambiguity does exist it is resolved against the drafting party (here Northwestern). The existence of a fiduciary responsibility is a factor that increases the fairness and noticability obligation of the drafter. The scope of a release is resolved by considering the intent of the parties. **Muchow v. Goding, 198 Wis. 2d 609, 629 (Ct. App. 1995).**

> *"The effect of a release of a claim against a particular person is a question of law. Before addressing that question, however, a court must determine the intended scope of the release and instruments related to it."*

An unconscionable contract is one where choice does not exist. In

*31*

**Kohler v. Wixen**, 204 Wis. 2d 327, 339 (Ct. App. 1996), the court said:

> "In Wisconsin "unconscionability has been defined as "the
> absence of a meaningful choice on the part of one party,
> together with contract terms that are unreasonably favorable to
> the other party."

Other courts have noted that it is defined as a contract that no man in his

senses and not under delusion would make, on the one hand, and as one

which no fair and honest man would accept, on the other. See **Discount**

**Fabric House v. Wisconsin Telephone**, 113 Wis. 2d 258, 261 (Ct. App.

**1983)**. Unconscionability is also impacted by looking to how the language in

the contract is or isn't highlighted so as to alert all and draw it to the attention

of those who would sign the release document. **Yauger, supra. at**

**paragraphs 18 and 19.**

## Discussion

In this matter the court must exercise discretion in reviewing the factors

that impact upon the class certification motion. Each factor will be dealt with

separately. In addition, certain matters are referred to in the legal briefs

which do not fall strictly under the legal elements to be addressed. These will

also be discussed.

**I. Commonality**

In order for the class to be certified the class members must have a

right or interest in common with the Plaintiff. Here it is possible to
reasonably conclude that Plaintiff and all members of the proposed class seek
the same outcome--a determination of the rights and duties of the pre-MN
annuitants and Northwestern under the original annuity contract language.
Defendant argues that if the divisible surplus were to be divided as Plaintiff
proposes that the position of some class members would be antagonistic. The
record discloses that Northwestern paid approximately $5,000,000,000 in
dividends just to its life policy holders in 2008. The approximate amount of
the differential owing to all of the Wisconsin pre-MN annuitants for 2008
would have been about $1,000,000 according to the affidavit of Mr. Hoyer. It
is possible to conclude that the impact on the life policy dividends under the
theory postulated by Defendant with regard to the pre-MN annuitants would
be almost nonexistent (0.02% annually). Any reduction in the overall
Northwestern surplus due to reallocation of it among differing policyholder
groups would not even minimally impact policyholders. It would not, under
the facts presented, result in any meaningful diminution of the available
divisible surplus. This claimed conflict does not rise to the level of creating a
legal antagonism in the proposed class. In any event, the case before us does
not seek damages under declaratory judgment. In argument on 12 October
2009, Defendant acknowledged that common issues do exist for members of

33

the proposed class. The real dispute, from Defendant's point of view, has to do with its belief that any decision in the class action would have to be relitigated in subsequent damage actions (which are not before us). Defense counsel went so far as to say that only 10% of the issues in dispute would be resolved, in its judgment, in a class action.

Plaintiff's interest in clarifying rights and duties under the pre-MN annuity contracts is consistent with all of the other policy holders. The threshold standard for commonality noted in **Cruz, supra.** ("…general understanding of the nature of the class claim alleged …") is not particularly high. Plaintiff here has met her burden of establishing commonality for class certification. Class antagonism has not been established as to Plaintiff or in juxtaposition to the class as a whole. The claims of class members are factually similar (same annuity language, no consent to 1985 change in how the divisible surplus would be determined and actions of Northwestern appear to be taken with respect to the pre-MN annuitants as a block). The controlling law in the declaratory judgment matter would be essentially the same for all class members. All class member share a common goal of obtaining a declaration of the rights and duties of the pre-MN annuitants and Northwestern as to the legality of the 1985 change in determining the divisible surplus and thereafter allocating policy dividends.

*34*

## II.   Numerosity

The record presented discloses that there are approximately 3,618 pre-MN annuities purchased by Wisconsin residents. Of that number only 659 continue to hold those pre-MN annuities. The diminishment of the original number is due to death, maturity of annuity such that distribution is occurring and/or surrender. The chart contained in Plaintiff's App. 35 demonstrates how the pre-MN annuitants were impacted by the 1985 change regarding divisible surplus. This exhibit was prepared by Northwestern's Senior Actuary. It is argued by Northwestern that many of those who are no longer owners of pre-MN annuities are ineligible to make any claim against Northwestern due to the passing of time periods under Wisconsin's statutes of limitation for breach of contract and breach of fiduciary duty. While not resolving those claims, it is clear that under Defendant's approach there are, at a minimum, perhaps a thousand or more persons who viably make up the proposed class. Under Plaintiff's reasoning there are over 3,600 in the proposed class. Under either approach, the number of proposed claimants is significant in its impact. It would be impracticable to bring all (whether 1,000 or 3,600) of the interested persons before the court.

Plaintiff has met her burden in establishing numerosity with respect to class certification.

35

## III. **Adequacy**

A number of issues are contested under this criteria. Defendant contends that this motion has been addressed three times previously over an eight year period. In a generic sense that rings true. However, LaPlant was not a party to any of those prior motions. In addition, the second Court of Appeals Decision in **Noonan** focused not on a Wisconsin-only class, but rather on a nation-wide class. It is not a decision which constitutes controlling precedent. The decisions of other circuit courts (including this court) on a Wisconsin-only class are/will also not be controlling precedent. There will be precedence at such time as our appellate court(s) render there wise and thorough ruling regarding the certification of a Wisconsin-only class in this dispute.. Defendant's contention that it has already obtained binding prior rulings on the class certification motion now before us is not accurate.

Next, it is claimed that Plaintiff cannot represent fairly the interests of the proposed class because she:

1. Surrendered her annuity in 2008

2. Signed a contract "releasing any claim" against Defendant

3. Has no possibility of future loss regarding divisible surplus payments.

The facts above do support the claim that Plaintiff did surrender her

*36*

App. 032

annuity on 3 July 2008. The issue, however, is what effect did that surrender have on Plaintiff's standing under the "adequacy" criteria for class certification. The contract document (Exhibit G to Defendant's legal brief) she signed in accomplishing that surrender was prepared by Northwestern alone. The document was titled ANNUITY DISTRIBUTION REQUEST. Plaintiff's Affidavit of 29 September 2009, and her rollover language in the surrender request document indicates that LaPlant wanted, as a part of her retirement planning, to have her annuity funds transferred to her Vanguard account. On page 4 of the ANNUITY DISTRIBUTION REQUEST, under the heading of AUTHORIZATION AND CERTIFICATION, it is stated at item 1 as follows:

> "*I am surrendering all or a portion of said contract and all claims thereunder to Northwestern Mutual.*" (Emphasis)

In the actual annuity contract from 1975, Plaintiff had the right to surrender her annuity policy for its cash value ( See Exhibit D to Defendants legal brief). Under the facts presented the court is able to determine that no additional consideration was paid for the Plaintiff's release of future claims against Northwestern when she surrendered her annuity policy. The law (**Bartley v Thompson**, **198 Wis. 2d 323, 333 (Ct. App. 1995**) is an exemplar) requires additional consideration for the new contractual release of

*37*

future claims against Northwestern.  In addition, Northwestern served as a fiduciary (conclusion reached in first Court of Appeals decision in **Noonan** and **Thorn Wire Hedge Co. v. Washburn & Moen Mfg. Co.**, **159 U.S. 423, 433 (1895)**.  Nothing in the ANNUITY DISTRIBUTION REQUEST, given that fiduciary position, highlights (by underlining or the use of bolding or shading) the release that is said to occur in item 1 on page 4 of the distribution contract.  Fundamental fairness did not occur.  The new release of future claims language was simply put into the ANNUITY DISTRIBUTION REQUEST without reasonably alerting LaPlant as to its presence or its content and impact.

In addition to the foregoing, the ANNUITY DISTRIBUTION REQUEST contract as prepared by Defendant alone constitutes an unconscionable contract under Wisconsin law ( **Younger, supra.**).  This is so for the following reasons which are arrived at from the record presented:

1.  Plaintiff is not given any meaningful choice with respect to the "release" since it is not emphasized or highlighted for purposes of notice.  Further, there is no space provided for the annuitant to strike the provision or modify it if she wished.  There is no reason for the annuitant to believe that the language of the contract does anything other than rollover her annuity funds into her Vanguard account.  The document appears to be intentionally misleading.

2.  The release terms favor only Northwestern.  This is unreasonable on its face and even more so in the absence

*38*

of any consideration and Northwestern's fiduciary status to the pre-MN annuitants.

3.    No fair and honest person possessed of his or her senses and not under delusion would accept such a one-sided release contract.

The extent of Plaintiff's individual claimed harm is limited by virtue of her annuity policy surrender in 2008. That fact does not mean that her position as the class representative is undermined. She shares in common with all members of the proposed class a desire to have the rights and duties if the pre-MN annuitants and Northwestern determined under the annuity contract at issue. Defendant has noted that it is possible that other class members may be deceased or may have also surrendered their policies or may now be receiving annuity payments. It would be arbitrary, a mistake of law, a denial of equal protection and an abuse of discretion for the court to allow only a person within the group of the existing 659 annuity policyholders to act as a class representative. No basis has been given in the record created which would allow the court to show favoritism and standing only to that subgroup of the pre-MN annuitants for purposes of adequacy.

Plaintiff's status as an adequate representative of the proposed class is not affected by the surrender of her annuity in 2008, by the signing of a release document prepared solely by Northwestern in the rollover of her

39

annuity into her Vanguard account or by her potential "past injury only" status regarding the divisible surplus being limited to the period before her annuity was surrendered.

Plaintiff has established that she is an adequate class representative. Her interests are not antagonistic to those of the absent/proposed class members. Just the opposite is the case under the record create here. Plaintiff has presented data regarding the qualifications, experience and overall competence of the proposed class counsel. That has not been challenged in any meaningful way by Defendant. The court has also had an opportunity to observe proposed class counsel on the "field of battle" in this matter. It is possible to say that counsel for <u>both</u> parties possess the abilities needed to effectively and competently represent their respective client(s). The court has reviewed Plaintiff's Exhibit 44 (pages 355 to 380) regarding the resumes/vitaes of proposed class counsel. A finding is made based upon the record presented that proposed class counsel are qualified, experienced and generally able to conduct the subject litigation for the proposed class.

## IV.    <u>Manageability</u>

Under this heading the court must determine whether the issues common to LaPlant and the other class members are outweighed by the issues particular to the individual class members. Defendant raises five separate

40

matters under this heading.

A.    <u>Individual defenses will necessarily need to be addressed.</u>

The matters raised as affirmative defenses relate to laches, estoppel, waiver, statute of limitations and accord and satisfaction.  It has not been established in the record that these are actual issues in the case.  Defendant has used in its brief, regarding these matters, the following language:

1.    "... agents <u>may</u> have discussed..."  Defendant's brief at p. 15.

2.    "... <u>may</u> be barred from bringing a claim on statute of limitation grounds ..."  Defendant's brief at p. 16.

3.    "... <u>may</u> be deemed to have knowingly accepted the change and/or waived any claim."  Defendant's brief at p. 16.

4.    "Northwestern Mutual has not affirmatively reached out to the thousands of policyholders and their agents to determine whether they knew of the change precisely because of the onerous nature of the task."  Defendant's brief at pages 16 and 17.

The matters raised as affirmative defenses are assumed to be accurate or potentially accurate by Defendant.  Whether that proves to be the case is unknown.  Actual evidence as to these claimed defensive matters is largely missing in the record.  There is an affidavit referred to in the Facts that rebuts the idea that agents ever gave notice to the involved annuitants or were even required to do so.  However, those asserted defenses relate to damages and

that is not a matter before us in this case. What is at issue is an annuity

contract and a request that the rights and duties if the parties be determined

under that contract.

There is not a legal requirement that an entire dispute be fully resolved

in order to address either declaratory judgment or certification of a class

action. See prior decision on Motion to Dismiss and **Serafin, supra.**.

However, the court must look to a number of factors in making its decision

and exercising discretion. These include:

1. Are the issues separable? Here a determination of the rights and duties of the parties to an annuity contract are clearly distinguishable from the affirmative defense issues raised (if in fact those matters come to be real and not just imaginary).

2. What is the importance of the issues? The use of a class action to address for all class members and Northwestern their rights and duties is significant. The issues raised by Defendant may or may not ever be supported by credible evidence. Even if the affirmative defense matters are supported by credible evidence, there would still be a real and important benefit to be derived from concluding a determination of rights and duties under the annuity contract.

3. Are the issues autonomous? It is clear that the defensive matters are separable from the contract determination issues. The words used have meanings. Very specific rules of law apply to contract interpretation in Wisconsin.

4. Can the autonomous part of the controversy be finalized? In this case it is possible to resolve the matter of the rights

1    STATE OF WISCONSIN: CIRCUIT COURT: MILWAUKEE COUNTY

2                         CIVIL DIVISION

3

4
     MARLEEN M. LAPLANT,

5
                         Plaintiff,

6
          vs.                    CASE NO. 2008CV011988

7
     NORTHWESTERN MUTUAL

8    LIFE INSURANCE COMPANY,

9                         Defendant.

10
     OCTOBER 12, 2009                    MOTION HEARING

11

12                  PROCEEDINGS HELD BEFORE

13              THE HONORABLE DENNIS FLYNN

14                     PRESIDING JUDGE

15
     APPEARANCES:

16
     GUERRIERI, EDMOND, CLAYMAN & BARTOS, P.C., 1625

17   Massachusetts Avenue, N.W., Suite 700, Washington,
     D.C. 20036-2243, by MR. JEFFREY A. BARTOS, Attorney

18   at Law, appeared on behalf of the Plaintiff.

19   KERSTEN & McKINNON, S.C., 11518 North Port
     Washington Road, Suite 104, Mequon, Wisconsin 53092,

20   by MESSRS. GEORGE P. KERSTEN, CAMPION KERSTEN, and
     KENAN KERSTEN, Attorneys at Law, appeared on behalf

21   of the Plaintiff.

22   STRAUS & BOIES, LLP, 4041 University Drive, Fifth
     Floor, Fairfax, Virginia 22030, by MR. TIMOTHY

23   BATTIN, Attorney at Law, appeared on behalf of the
     Plaintiff.

24
     GALANIS, POLLACK, JACOBS & JOHNSON, S.C., 839 North

25   Jefferson Street, Suite 200, Milwaukee, Wisconsin
     53202, by MR. JOHN GALANIS, MR. MARK B. POLLACK and

1  MS. MARIA s. LAZAR, Attorneys at Law, appeared on

2  behalf of the Plaintiff.

3

4  QUARLES & BRADY, LLP, 411 East Wisconsin Avenue,

5  Milwaukee, Wisconsin 53202-4497, by MR. ERIC J.

6  VAN VUGT and MS. CRISTINA D. HERNANDEZ-MALABY,

7  Attorneys at Law, appeared on behalf of the

8  Defendant.

9

10

11

12

13  Thomas A. Malkiewicz, RMR/CRR - Official Reporter

1  proposition.    That that would satisfy any
   Wisconsin law for what the courts talk about as
2
   exculpatory waivers, and before you engage in
3
   this act, you waive and release any claims
4
   against the other party.    This is no -- it's not
5
   even a close call.
6
               So I think Mrs. LaPlant is clearly an
7
   adequate representative, and this notion of
8
   release that is presented as the primary argument
9
   just doesn't stand.
10
               The second major issue that Northwestern
11
   Mutual raises are the manageability concerns, and
12
13 the -- the one I think that is most effort is
   expended on are the -- what are described as the
14
   individualized defenses; and Northwestern Mutual
15
   says, well, this case is really about damages and
16
   to litigate damages issues, we will have the
17
   right to probe for every class member issues of
18
   estoppel in its various guises and related
19
   equitable defenses.
20
               And I think we briefed that pretty fully
21
   in the reply.    There's just two things I want to
22
   say about that.    First and foremost is those
23
   individualized defense theories are simply not
24
   relevant to the declaratory judgment.    They're
25

1    really not at issue.    They go to defending
     against individualized damages claims, and that's
2    not the case here.
3
              I think a lot of Northwestern Mutual's
4    briefing is an attempt to characterize our case
5    as one for damages.    And it's not.    Characterized
6    correctly, those defenses really are not present
7    right now.
8
              Secondly, I would say, and again, we
9    address it in the brief at some length, the
10   burden of showing manageability as a -- as a
11   concern that would overwhelm the benefits of
12   class treatment, the burden of that is on
13   Northwestern Mutual, and the Supreme Court in
14   Schlosser pointed out the need for a defendant
15   who raises this sort of argument to present
16   evidence to show some basis for that conclusion.
17   And as we, I think, describe at some length,
18   Northwestern Mutual has not made that evidentiary
19   showing in any respect, has not met its burden.
20
              That all being said, and just to cut to
21   the chase, that's our position, Your Honor, that
22   the predominant issues in this case are class
23   wide.    There's no evidence to find that a class
24   treatment is not appropriate or would be
25

1    occur to the parties.

3
             Is there anything else now that should

4    be done?    First plaintiff?

5            MR. BARTOS:        Nothing, Your Honor.

6            THE COURT:        Defense?

7            MR. VAN VUGT:        No, Your Honor.    Thank

8    you.

9            THE COURT:        Thank you all for your

10
11   appearances today.      I appreciate it.

12           MR. BARTOS:        Thank you, Your Honor.

13
14                    *        *        *
15

16
17
18
19

20

21

22   STATE OF WISCONSIN
                           SS:
23     MILWAUKEE COUNTY

24                    I, THOMAS A. MALKIEWICZ, RPR, RMR,
       CRR, an Official Court Reporter in and for the
25     Circuit Court of Milwaukee County, do hereby certify
       that the foregoing is a true and correct transcript
26     of all the proceedings had and testimony taken in
2

the above-entitled matter as the same are contained

2

in my original machine shorthand notes on the said
3   trial or proceeding.

4   Dated this 14th day of October, 2009.

5   Milwaukee, Wisconsin.

6

7

8                                                    " '
                         d~A-~
9

10                       Thomas A. Malkiew1cz, RP , RMR, CRR
                         Official Reporter
11

12   another [13] 9/5 17/3 17/17 26/19 32/8

13                                          able [1] 36/24

14   $

15   36/1 37/7 42/17 42/18 42/20 42/21 48/7

16                                          about [22] 6/2 6/5 6/21 7/1
     8/3 9/4 9/6
17   48/14

18                                          11/4 13/2 13/16 13/23 15/18
     18/8 20/9
19    $200 [1] 42/7

20   answer [9] 18/20 27/10 27/15 31/14

21   l$200 000 r1l 42/8              21/2 23/21 25/23 25/24 30/18
     31/20
22

23   38/9 38/13 42/15 45/6 45/9

State of Wisconsin    Circuit Court          Milwaukee County

---

Marleen M. Plant, on her own behalf   *    **DECISION on MOTION**
and on behalf of a class similarly
situated,                                    **OF DEFENDANT TO**
            Plaintiff,                *
                                             **DISMISS**
Versus
                                      *
                                             Case No. 08-CV-11988
The Northwestern Mutual Life
Insurance Company, a Wisconsin        *    Code:    30701
mutual insurance corporation,                       Declaratory Judgment
            Defendant.
                                      *

---

## Introduction

The Summons and Complaint in this case were filed on 26 August

2008. Defendant filed a Motion to Dismiss on 20 October 2008. In addition

Defendant filed a Motion to Stay Discovery on that same date. The court has

been advised that, by mutual agreement, the parties have not proceeded with

discovery pending the resolution of the Motion to Dismiss. Both sides have

filed written briefs.

Initially the case was assigned to Judge Thomas R. Cooper. He

recused himself. Then the case was assigned to Judge Charles F. Kahn, Jr.

and a Request for Substitution was filed. Thereafter, the case was assigned to

the disputed dividend/divisible surplus language. The "a useful purpose"
standard is mandated in Wisconsin as a predicate to utilizing UDJA whether
the entire dispute is resolved or not. In a motion to dismiss the applicable
standard addresses the ability of the plaintiff to prevail under any conditions.
The Court is not able to conclude that after the rights and duties of the parties
to the annuity contract are determined that these parties would not then be
able to resolve the totality of their disagreement. Determining the rights and
duties of the parties under the annuity contract would serve a manifestly
useful purpose in resolving the conflict. Good faith, as opposed to obdurate
posturing, by all parties to a contract is presumed in Wisconsin. **Wisconsin
Natural Gas v. Gabe's Construction, 220 Wis. 2d 14, 21 (Ct. App. 1998)**.

This is particularly the case where the underlying UDJA law is itself an
ordinary remedy and construction, access and administration of that law is to
be broadly enabled. Certainly, an action seeking damages would be more
complicated and issue-intense than a cause of action that does not include
damages. The declaration of the rights and duties of the parties under the
contract(s) at issue could impact intertwined legal rights before future injuries
occur while at the same time addressing past and/or present wrongs, if any.
This is consistent with the purpose and intent of UDJA. It could also
determine under the contract(s) at issue that no past, present or future wrongs



EXPERT WITNESS REPORT:
ROBERT L. HOYER, FSA, MAAA
M. LaPLANT

VS.

NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY

MARCH 4, 2013



# I. Introduction

1. I am a Fellow of the Society of Actuaries (FSA) and a Member of the American Academy of Actuaries (MAAA) and have over thirty five years of life insurance industry experience. After graduation from Syracuse University and teaching at the high school and college levels, I began my insurance career in 1971 with Aetna Life & Casualty (Aetna). At Aetna I served in various capacities, becoming an officer of the company in 1977.

2. My consulting career began in 1980 with Price Waterhouse, where I served as Managing Partner and National Director of the firm's Actuarial Consulting Services Group. In 1989, I joined Arthur Andersen to become the Managing Partner of that firm's Actuarial Services practice. In 2002, I began a new venture, Hoyer Actuarial Litigation, LLC, as company principal. In each of these capacities, I have been retained by numerous state insurance departments, including those of New York, New Jersey, Connecticut, Texas, Maine, California, Florida, Colorado, Indiana, and New Hampshire, on consulting projects.

3. Over this extensive period, both as an officer and employee at Aetna, and a partner or principal at consulting firms, I have acquired an extensive, in-depth knowledge and understanding of the customs and practices of the life insurance industry. I have provided litigation support and expert reports, affidavits, and/or declarations in well over one hundred disputes, and have provided expert witness testimony in over twenty five cases. These cases include expert witness services for both plaintiffs and defendants. My present consulting practice focuses primarily on legal disputes within the life insurance industry.

4. Further, my knowledge and experience applies directly to the subject matter of the present dispute. For example, I have been engaged by numerous mutual life insurance companies regarding matters which involved policyholder dividends. A copy of my resume is enclosed as Appendix A.

5. On June 30, 2010, I submitted an Expert Report regarding my opinions on the actions of Northwestern Mutual Life Insurance Company ("NML") in 1985 of changing the basis for determining dividends for in-force annuitants (in this case, deferred annuity policyholders referred to as "Pre-MN annuity policyholders" or "Pre-MN annuitants") by segmenting a portion of its investment portfolio, and earmarking the resulting investment income to determine those dividends (the "1985 Change"). I was deposed on July 20, 2010 and provided trial testimony on November 16, 2010 and November 17, 2010. In addition to the large volume of NML records and deposition transcripts I reviewed in connection with this litigation for my 2010 report, deposition, and trial testimony, I have

1

reviewed the additional materials listed in Appendix B. I am being compensated at a
billing rate of $350 per hour. This is the only dispute in which I have testified in the last
four years.

6. The attorneys for the plaintiffs in this case have asked me the following:

   - To describe a reasonable methodology that would provide the basis for
     prospective relief for current Pre-MN annuity policyholders;

   - To indicate whether the methodology could be applied to all Pre-MN annuity
     policyholders on a common basis using a mechanical calculation; and

   - To determine if the same methodology can be applied to determine the
     "Difference" as defined (see below) to annuitants with policies no longer in-force
     resulting from the 1985 Change.

7. Prospective relief involves NML crediting to Pre-MN annuity policyholders' accounts the
   additional amount that would have accumulated "But-For" the 1985 Change (the
   "Difference"). NML would then be required to credit dividends thereafter on the revised
   cash values using a dividend interest rate ("DIR") that reflects the company's aggregate
   investment income dividend factor rather than the investment income factor associated
   with the segmented account of current rate investments.

8. As described in detail in this report, I have concluded that the Difference can reliably be
   determined. In this report, I demonstrate a methodology that allows a mechanical
   calculation of this amount, common to all Pre-MN annuity policyholders that can be
   applied to individual Pre-MN annuitants or specified groups. The data needed to perform
   the formulaic calculations is readily available to NML and requires no additional data
   from Pre-MN annuity policyholders. This same methodology can be used to calculate the
   Difference to former Pre-MN policyholders (whose policies are no longer active).

## II.  Background on Pre-MN Annuities

9. NML is a mutual life insurance company. As such, it has no stockholders but instead is
   owned by its participating policyholders. NML, like many insurance companies, has
   written a wide variety of annuity policies. "Immediate" annuities are policies that pay
   policyholders immediate periodic payments (frequently monthly) in exchange for a sum
   paid. Payments can be for the life of the annuitant, for a specified period, or for
   combinations thereof, and can also continue to a designated beneficiary.

10. The type of annuity at issue here is a "deferred" annuity. This form of annuity is an
    investment vehicle, in that the annuitant has made a contribution to the insurance

2

company (either a single deposit, or premium, or annual level deposits, or annual flexible deposits) and such contributions accumulate, but no periodic payments are made by the insurer to the annuitant. The annuitant can exercise any of the options specifically written in their policy, which frequently include the right to terminate the policy and withdraw the accumulated funds, to borrow a portion of the fund at a specified borrowing interest rate, or to convert the policy to an immediate annuity.[1]

11. NML charged the Pre-MN annuitants an expense (in the form of a "front-end load") on premium payments, including the initial payment. The contract issued to Ms. Maureen LaPlant ("LaPlant"), specified that the front-end load would be 10% of premiums plus $10 per year and $0.50 per deposit fee. By 1982, when NML introduced a revised deferred annuity policy type, the expense fee was 6%. It appears that this reduction in fees also applied to earlier annuity policy types.[2]

12. One of the features of a Pre-MN annuity is the right to take out loans secured by the cash value of the account. The unpaid loan balance accrues interest at a policy loan rate (5%, 6%, or 8%), as specified in the contract. At the time of termination, the cash value of the account is reduced by the level of indebtedness.

13. Pre-MN annuities are designated "participating," which means that they are entitled to share in NML's divisible surplus, in the form of dividends. NML uses formulas to determine dividends for all participating products, including life insurance policies and Pre-MN annuities. The Dividend Interest Rate ("DIR") is the rate of interest that policyholders receive on their cash value, and is used in NML's formula for calculating dividends.

## III.  "Update '83" and "Direct Recognition"

14. Prior to 1983, the DIR that a life insurance or annuity policyholder received did not depend on that policyholder's level of indebtedness. In late 1982, NML solicited policyholder agreement to a change in the manner in which dividends would be calculated beginning in 1983. NML called this solicitation and change "Update '83." Policyholders who accepted Update '83 were considered to have agreed to "Direct Recognition."[3] For policyholders with Direct Recognition, NML calculates dividends reflecting the extent to which policyholders borrowed cash value from their policies.[4] The DIR on the borrowed funds is based on the policy loan rate and does not depend on

---

[1] See, e.g., LaPlant Contract
[2] The relationship between the premiums paid and the cash value shown in the LaPlant annual statements are consistent with a 6% expense fee.
[3] Direct Recognition became a standard provision for new policies thereafter.
[4] Trial Exhibit 312

3

the performance of NML's investments, while the DIR on non-borrowed funds reflects the investment income from NML's investments.[5]

15. Without Direct Recognition, policyholders (both life insurance and annuity) receive a DIR that is a weighted average of the borrowed and non-borrowed DIRs under Direct Recognition.[6] The weights are the average amount borrowed and the average amount not borrowed in the year. With Direct Recognition there is a different DIR for borrowed funds for each of the three policy loan rates. Thus, there is a different DIR for each policy loan rate for those without Direct Recognition.[7]

## IV. The 1985 Change

16. At the completion of each policy year, NML calculates a policyholder dividend payable to or otherwise for the use of each policyholder. The primary component of the dividend is the return on the company's general account invested assets, and for many years prior to 1985 each policyholder shared in the overall yield, or "portfolio rate," generated by such assets.[8]

17. NML, consistent with generally accepted practices and procedures within the life insurance industry and the actuarial profession, uses the contribution principle to distribute divisible surplus to its participating policyholders. The contribution principle quantifies margins from return on invested assets (return, net of investment expenses and taxes), as well as margins on expenses (amounts charged to policyholders less actual costs) and mortality (charges assessed less actual amounts credited to policyholders) and distributes such divisible surplus to policyholders in relation to their proportionate contribution to the aggregate value. Prior to the 1985 Change, Pre-MN annuity policyholders were deemed to have contributed to surplus from returns on invested assets in the same way as life insurance policyholders.

18. In 1985, NML decided that it would no longer write new business on the Pre-MN form of annuity. At the same time, NML established a segregated asset portfolio of short-term income investments to support the Pre-MN annuity block, and began to use the segregated portfolio as a basis for subsequent policyholder dividends for those policies.

19. For several years after NML made the 1985 Change, it graded in the effect of the change such that the DIRs applied to Pre-MN annuitants' account values did not directly reflect the earnings on the current rate investments. Since the short-term investment yield was lower than the corresponding portfolio rate of return, the grading in adjustment resulted

---

[5] Trial Exhibit 312
[6] See, for example, Trial Exhibit 498.
[7] See Trial Exhibit 189
[8] Trial Exhibit 312

4

—

in subsidies paid to the Pre-MN annuitants. The subsidies paid to Pre-MN annuitants gradually decreased over time.[9] From 1993 through the current time frame, the Pre-MN annuitants received substantively lower dividends as a result of the 1985 Change.[10]

## V.  Determining the DIR But-For the 1985 Change

20. The cash value of a Pre-MN annuitant's account at any point in time is based on the history of cash deposits, expense charges, policy loans, withdrawals, and the history of DIRs used to determine policyholder dividends credited to the account.

21. The annual DIRs for Pre-MN annuitants vary based largely on two factors:

   - Whether or not the annuity policy is subject to Direct Recognition; and
   - The policy loan rate (5%, 6% or 8%) specified in the product.

22. The cash value of the account at any point in time But-For the 1985 Change can be determined using the same information that determined the actual cash value. Thus, just as the actual account cash values were calculated by NML as a function of cash deposits, expense charges, policy loans, withdrawals, and DIRs, the But-For account cash values can also be calculated in a comparable manner.

### A.  Direct Recognition

23. In NML documents, the DIR that is most often referred to is the rate applicable to life insurance policyholders with Direct Recognition and no loan balance.[11] The DIRs for policyholders without Direct Recognition are derived from this benchmark rate.

24. The But-For DIR, in my opinion, for Pre-MN annuitants who have Direct Recognition and have no loan balance is equal to the corresponding DIR for life insurance policyholders.

25. This conclusion is based on the following:

   - It comports with a reasonable Pre-MN policyholder's dividend expectations;
   - The historical comparability between DIRs for life insurance and annuity policyholders prior to the 1985 Change;
   - The investment income dividend factor is the most significant element in determining DIRs;
   - Prior to the 1985 Change, the investment income dividend factor was identical for life insurance and Pre-MN annuity policyholders; and

---

[9] Trial Exhibit 409
[10] Trial Exhibit 408
[11] For example, Trial exhibits 372-403

5

- The expense dividend factor for life and annuity policyholders has historically been comparable. Any disintermediation and/or dilution charges as suggested by Mr. Trost would be unwarranted, improper, and inequitable, so I make no adjustment for them.[12]

26. The resulting DIRs are shown in the table below:

**Table 1. DIRs for Non-Borrowed funds of Pre-MN Policyholders With Direct Recognition**

| Year | Annuity (Actual) | Life (Actual) | Annuity (But-For) |
|------|------|------|------|
| 1985 | 11.15% | 11.15% | 11.15% |
| 1986 | 11.00% | 11.25% | 11.25% |
| 1987 | 10.75% | 11.00% | 11.00% |
| 1988 | 10.75% | 10.25% | 10.25% |
| 1989 | 10.75% | 10.00% | 10.00% |
| 1990 | 10.00% | 10.00% | 10.00% |
| 1991 | 10.00% | 10.00% | 10.00% |
| 1992 | 9.50% | 9.25% | 9.25% |
| 1993 | 8.50% | 9.25% | 9.25% |
| 1994 | 7.50% | 8.50% | 8.50% |
| 1995 | 7.00% | 8.50% | 8.50% |
| 1996 | 7.00% | 8.50% | 8.50% |
| 1997 | 6.50% | 8.50% | 8.50% |
| 1998 | 6.50% | 8.80% | 8.80% |
| 1999 | 6.50% | 8.80% | 8.80% |
| 2000 | 6.50% | 8.80% | 8.80% |
| 2001 | 6.50% | 8.80% | 8.80% |
| 2002 | 6.25% | 8.60% | 8.60% |
| 2003 | 5.75% | 8.20% | 8.20% |
| 2004 | 5.00% | 7.70% | 7.70% |
| 2005 | 4.65% | 7.50% | 7.50% |
| 2006 | 4.35% | 7.50% | 7.50% |
| 2007 | 4.35% | 7.50% | 7.50% |
| 2008 | 4.35% | 7.50% | 7.50% |
| 2009 | 4.35% | 6.50% | 6.50% |
| 2010 | 4.45% | 6.15% | 6.15% |

Source: Exhibit 189.

27. For Pre-MN annuity policyholders that have Direct Recognition and have a loan balance, the But-For DIR applicable to their loan balance is the same as the actual DIR they received on their loan balance because this rate is based on the borrowing provision in their contracts which was not affected by the 1985 Change.

---

[12] Affidavit of Chris Trost, April 15, 2011, ¶4.

6

## B.  Without Direct Recognition

28. For the Pre-MN annuitants without Direct Recognition, the But-For DIRs are a function of But-For DIRs with Direct Recognition because, as described in Paragraph 15, the actual DIRs are a weighted average of the Direct Recognition DIRs. Therefore, for each year, there will be different But-For DIRs for each policy loan rate. The DIRs for Pre-MN annuitants that do not have Direct Recognition is given by the following formula:

> DIR (Borrowed with Direct Recognition) x (% Borrowed)
> + DIR (Non-borrowed with Direct Recognition) x (1-%Borrowed)
> = DIR (without Direct Recognition)

29. In 1985, the amount borrowed by Pre-MN annuity policyholders was treated as being 15% for all policy loan rates.[13] Thus, in 1985, for each policy loan rate, the without Direct Recognition actual DIR is 85% times the non-borrowed with Direct Recognition DIR plus 15% times the DIR on borrowed funds with Direct Recognition.

### Table 2. Calculation of 1985 Annuity Without Direct Recognition DIRs

| Policy Loan Rate | Borrowed Funds Rate | Non-Borrowed Funds Rate | 15% of Borrowed Funds Rate | 85% Non-Borrowed Funds Rate | Without Direct Recognition (Weighted Average) DIR |
|---|---|---|---|---|---|
| | (a) | (b) | (c)=0.15*(a) | (d)=0.85*(b) | (e)=(c)+(d) |
| 8% | 7.15% | 11.15% | 1.07% | 9.48% | 10.55% |
| 6% | 5.15% | 11.15% | 0.77% | 9.48% | 10.25% |
| 5% | 4.15% | 11.15% | 0.62% | 9.48% | 10.10% |

30. In other years, NML has not provided comparable weights, but because the actual DIRs with and without Direct Recognition have been provided, the underlying weights that NML used in each year can be derived as demonstrated for the 8% policy loan rate in 1985 using the formula above. The borrowed funds DIR was 7.15%; the non-borrowed funds DIR was 11.15%; and the without Direct Recognition rate was 10.55%. This verifies that the weight used for borrowed funds was 15.00%:

$$[7.15 \times \%B] + [11.15 \times (1 - \%B)] = 10.55$$
$$11.15 - 4.00 \,\%B = 10.55$$
$$-4.00 \,\%B = -0.60$$
$$\%B = 0.15$$
$$\%B = 15.00\%$$

---

[13] ML_NML3_0446

7

31. As shown in the table below, I performed equivalent calculations for all the other years using the data from Exhibit 189:

**Table 3. Actual DIRs for Pre-MN Annuitants and Borrowing Percentages Used in Non-Direct Recognition DIR Calculation**

| | Actual Non-Direct Recognition DIRs | | | Actual Direct Recognition DIRs | | | | Non-Direct Recognition: Borrowing Percentages Used | | |
| Year | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | Non-Borrowed (Annuity) | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 10.55% | 10.25% | 10.10% | 7.15% | 5.15% | 4.15% | 11.15% | 15.00% | 15.00% | 15.00% |
| 1986 | 10.55% | 9.85% | 9.30% | 7.15% | 5.15% | 4.15% | 11.00% | 11.69% | 19.66% | 24.82% |
| 1987 | 10.30% | 9.65% | 9.10% | 7.15% | 5.15% | 4.15% | 10.75% | 12.50% | 19.64% | 25.00% |
| 1988 | 10.30% | 9.65% | 9.10% | 7.15% | 5.15% | 4.15% | 10.75% | 12.50% | 19.64% | 25.00% |
| 1989 | 10.30% | 9.65% | 9.10% | 7.15% | 5.15% | 4.15% | 10.75% | 12.50% | 19.64% | 25.00% |
| 1990 | 9.65% | 9.00% | 8.55% | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% |
| 1991 | 9.65% | 9.00% | 8.55% | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% |
| 1992 | 9.20% | 8.65% | 8.15% | 7.15% | 5.15% | 4.15% | 9.50% | 12.77% | 19.54% | 25.23% |
| 1993 | 8.35% | 7.85% | 7.45% | 7.30% | 5.30% | 4.30% | 8.50% | 12.50% | 20.31% | 25.00% |
| 1994 | 7.50% | 7.10% | 6.70% | 7.30% | 5.30% | 4.30% | 7.50% | 0.00% | 18.18% | 25.00% |
| 1995 | 7.05% | 6.65% | 6.35% | 7.30% | 5.30% | 4.30% | 7.00% | 16.67% | 20.59% | 24.07% |
| 1996 | 7.05% | 6.65% | 6.35% | 7.30% | 5.30% | 4.30% | 7.00% | 16.67% | 20.59% | 24.07% |
| 1997 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 1998 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 1999 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 2000 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 2001 | 6.55% | 6.30% | 6.05% | 7.30% | 5.30% | 4.30% | 6.50% | 6.25% | 16.67% | 20.45% |
| 2002 | 6.30% | 6.10% | 5.85% | 7.30% | 5.30% | 4.30% | 6.25% | 4.76% | 15.79% | 20.51% |
| 2003 | 5.85% | 5.70% | 5.45% | 7.30% | 5.30% | 4.30% | 5.75% | 6.45% | 11.11% | 20.69% |
| 2004 | 5.10% | 5.05% | 4.85% | 7.30% | 5.30% | 4.30% | 5.00% | 4.35% | 16.67% | 21.43% |
| 2005 | 4.80% | 4.75% | 4.55% | 7.30% | 5.30% | 4.30% | 4.65% | 5.66% | 15.38% | 28.57% |
| 2006 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2007 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2008 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2009 | 4.50% | 4.50% | 4.35% | 7.40% | 5.40% | 4.40% | 4.35% | 4.92% | 14.29% | 0.00% |
| 2010 | 4.55% | 4.55% | 4.45% | 7.45% | 5.45% | 4.45% | 4.45% | 3.33% | 10.00% | 0.00% |

Source: Exhibit 189.

Note: Shaded values taken from Exhibit 189. Other values are calculated.

8

32. The level of borrowing that NML used in the derivation of the non-Direct Recognition DIRs appears inconsistent with the actual level of borrowing that occurred for Wisconsin Pre-MN annuitants. As shown in the following table, the level of borrowing appears not to exceed 4.5% in any year starting in 1985:

### Table 4. Wisconsin Pre-MN Annuities Cash Values and Indebtedness

| Year | Gross Cash Value | Indebtedness | Net Cash Value | Indebtedness as Percent of Gross Cash Value |
|------|------------------|--------------|----------------|---------------------------------------------|
| 1985 | $43,576,250 | $ 1,971,773 | $ 41,604,477 | 4.5% |
| 1986 | 46,515,398 | 1,977,667 | 44,537,731 | 4.3% |
| 1987 | 49,240,458 | 1,702,754 | 47,537,704 | 3.5% |
| 1988 | 52,308,717 | 1,428,074 | 50,880,643 | 2.7% |
| 1989 | 52,550,391 | 1,314,991 | 51,235,400 | 2.5% |
| 1990 | 55,103,202 | 1,266,997 | 53,836,205 | 2.3% |
| 1991 | 58,527,349 | 1,269,404 | 57,257,945 | 2.2% |
| 1992 | 60,410,270 | 1,293,373 | 59,116,897 | 2.1% |
| 1993 | 62,771,819 | 1,277,299 | 61,494,520 | 2.0% |
| 1994 | 63,081,508 | 1,184,863 | 61,896,645 | 1.9% |
| 1995 | 61,187,101 | 996,143 | 60,190,958 | 1.6% |
| 1996 | 58,615,326 | 986,737 | 57,628,589 | 1.7% |
| 1997 | 53,743,167 | 597,396 | 53,145,771 | 1.1% |
| 1998 | 50,502,411 | 558,056 | 49,944,355 | 1.1% |
| 1999 | 47,405,832 | 618,878 | 46,786,954 | 1.3% |
| 2000 | 44,674,628 | 651,528 | 44,023,100 | 1.5% |
| 2001 | 43,648,853 | 698,182 | 42,950,671 | 1.6% |
| 2002 | 42,408,632 | 661,378 | 41,747,254 | 1.6% |
| 2003 | 42,156,461 | 692,979 | 41,463,482 | 1.6% |
| 2004 | 38,625,409 | 624,205 | 38,001,204 | 1.6% |
| 2005 | 37,093,847 | 661,089 | 36,432,758 | 1.8% |
| 2006 | 34,552,405 | 568,120 | 33,984,285 | 1.6% |
| 2007 | 31,687,472 | 569,524 | 31,117,948 | 1.8% |
| 2008 | 29,888,383 | 466,566 | 29,421,817 | 1.6% |
| 2009 | 29,580,122 | 501,612 | 29,078,510 | 1.7% |

Source: Trial Exhibit No 407.

33. But-For the 1985 Change, NML would still have calculated the non-Direct Recognition DIRs as a weighted average between the borrowed and non-borrowed Direct Recognition

9

DIRs. Therefore, to calculate the But-For non-Direct Recognition DIRs, it is also necessary to take a weighted average of the But-For Direct Recognition DIRs. As described above, the But-For Direct Recognition DIRs for borrowed funds is the same as the corresponding actual annuity DIR while the But-For Direct Recognition DIR for non-borrowed funds equals the corresponding life insurance DIR.

34. In Table 5, I calculate the But-For non-Direct Recognition DIRs for each year and each policy loan rate:

### Table 5. Calculation of But-For Non-Direct Recognition DIRs

| | But-For Direct Recognition DIRs | | | | Non-Direct Recognition: Average Percent Borrowed | | | But-For Non-Direct Recognition DIRs | | |
|------|------|------|------|------|------|------|------|------|------|------|
| Year | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | Non Borrowed | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate |
| 1985 | 7.15% | 5.15% | 4.15% | 11.15% | 15.00% | 15.00% | 15.00% | 10.55% | 10.25% | 10.10% |
| 1986 | 7.15% | 5.15% | 4.15% | 11.25% | 11.69% | 19.66% | 24.82% | 10.77% | 10.05% | 9.49% |
| 1987 | 7.15% | 5.15% | 4.15% | 11.00% | 12.50% | 19.64% | 25.00% | 10.52% | 9.85% | 9.29% |
| 1988 | 7.15% | 5.15% | 4.15% | 10.25% | 12.50% | 19.64% | 25.00% | 9.86% | 9.25% | 8.73% |
| 1989 | 7.15% | 5.15% | 4.15% | 10.00% | 12.50% | 19.64% | 25.00% | 9.64% | 9.05% | 8.54% |
| 1990 | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% | 9.65% | 9.00% | 8.55% |
| 1991 | 7.15% | 5.15% | 4.15% | 10.00% | 12.28% | 20.62% | 24.79% | 9.65% | 9.00% | 8.55% |
| 1992 | 7.15% | 5.15% | 4.15% | 9.25% | 12.77% | 19.54% | 25.23% | 8.98% | 8.45% | 7.96% |
| 1993 | 7.30% | 5.30% | 4.30% | 9.25% | 12.50% | 20.31% | 25.00% | 9.01% | 8.45% | 8.01% |
| 1994 | 7.30% | 5.30% | 4.30% | 8.50% | 0.00% | 18.18% | 25.00% | 8.50% | 7.92% | 7.45% |
| 1995 | 7.30% | 5.30% | 4.30% | 8.50% | 16.67% | 20.59% | 24.07% | 8.30% | 7.84% | 7.49% |
| 1996 | 7.30% | 5.30% | 4.30% | 8.50% | 16.67% | 20.59% | 24.07% | 8.30% | 7.84% | 7.49% |
| 1997 | 7.30% | 5.30% | 4.30% | 8.50% | 6.25% | 16.67% | 20.45% | 8.43% | 7.97% | 7.64% |
| 1998 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 1999 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 2000 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 2001 | 7.30% | 5.30% | 4.30% | 8.80% | 6.25% | 16.67% | 20.45% | 8.71% | 8.22% | 7.88% |
| 2002 | 7.30% | 5.30% | 4.30% | 8.60% | 4.76% | 15.79% | 20.51% | 8.54% | 8.08% | 7.72% |
| 2003 | 7.30% | 5.30% | 4.30% | 8.20% | 6.45% | 11.11% | 20.69% | 8.14% | 7.88% | 7.39% |
| 2004 | 7.30% | 5.30% | 4.30% | 7.70% | 4.35% | 16.67% | 21.43% | 7.68% | 7.30% | 6.97% |
| 2005 | 7.30% | 5.30% | 4.30% | 7.50% | 5.66% | 15.38% | 28.57% | 7.49% | 7.16% | 6.59% |
| 2006 | 7.40% | 5.40% | 4.40% | 7.50% | 4.92% | 14.29% | 0.00% | 7.50% | 7.20% | 7.50% |
| 2007 | 7.40% | 5.40% | 4.40% | 7.50% | 4.92% | 14.29% | 0.00% | 7.50% | 7.20% | 7.50% |
| 2008 | 7.40% | 5.40% | 4.40% | 7.50% | 4.92% | 14.29% | 0.00% | 7.50% | 7.20% | 7.50% |
| 2009 | 7.40% | 5.40% | 4.40% | 6.50% | 4.92% | 14.29% | 0.00% | 6.54% | 6.34% | 6.50% |
| 2010 | 7.45% | 5.45% | 4.45% | 6.15% | 3.33% | 10.00% | 0.00% | 6.19% | 6.08% | 6.15% |

Sources: Tables 1 and 3.

35. In Table 6 below, I compare the But-For DIRs with the corresponding actual DIRs:

**Table 6. Actual and But-For DIRs for Pre-MN Annuitants without Direct Recognition**

| Year | Actual | | | But-For | | | Difference | | |
|---|---|---|---|---|---|---|---|---|---|
| | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate | 8% Policy Loan Rate | 6% Policy Loan Rate | 5% Policy Loan Rate |
| 1985 | 10.55% | 10.25% | 10.10% | 10.55% | 10.25% | 10.10% | 0.00% | 0.00% | 0.00% |
| 1986 | 10.55% | 9.85% | 9.30% | 10.77% | 10.05% | 9.49% | 0.22% | 0.20% | 0.19% |
| 1987 | 10.30% | 9.65% | 9.10% | 10.52% | 9.85% | 9.29% | 0.22% | 0.20% | 0.19% |
| 1988 | 10.30% | 9.65% | 9.10% | 9.86% | 9.25% | 8.73% | -0.44% | -0.40% | -0.38% |
| 1989 | 10.30% | 9.65% | 9.10% | 9.64% | 9.05% | 8.54% | -0.66% | -0.60% | -0.56% |
| 1990 | 9.65% | 9.00% | 8.55% | 9.65% | 9.00% | 8.55% | 0.00% | 0.00% | 0.00% |
| 1991 | 9.65% | 9.00% | 8.55% | 9.65% | 9.00% | 8.55% | 0.00% | 0.00% | 0.00% |
| 1992 | 9.20% | 8.65% | 8.15% | 8.98% | 8.45% | 7.96% | -0.22% | -0.20% | -0.19% |
| 1993 | 8.35% | 7.85% | 7.45% | 9.01% | 8.45% | 8.01% | 0.66% | 0.60% | 0.56% |
| 1994 | 7.50% | 7.10% | 6.70% | 8.50% | 7.92% | 7.45% | 1.00% | 0.82% | 0.75% |
| 1995 | 7.05% | 6.65% | 6.35% | 8.30% | 7.84% | 7.49% | 1.25% | 1.19% | 1.14% |
| 1996 | 7.05% | 6.65% | 6.35% | 8.30% | 7.84% | 7.49% | 1.25% | 1.19% | 1.14% |
| 1997 | 6.55% | 6.30% | 6.05% | 8.43% | 7.97% | 7.64% | 1.88% | 1.67% | 1.59% |
| 1998 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 1999 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 2000 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 2001 | 6.55% | 6.30% | 6.05% | 8.71% | 8.22% | 7.88% | 2.16% | 1.92% | 1.83% |
| 2002 | 6.30% | 6.10% | 5.85% | 8.54% | 8.08% | 7.72% | 2.24% | 1.98% | 1.87% |
| 2003 | 5.85% | 5.70% | 5.45% | 8.14% | 7.88% | 7.39% | 2.29% | 2.18% | 1.94% |
| 2004 | 5.10% | 5.05% | 4.85% | 7.68% | 7.30% | 6.97% | 2.58% | 2.25% | 2.12% |
| 2005 | 4.80% | 4.75% | 4.55% | 7.49% | 7.16% | 6.59% | 2.69% | 2.41% | 2.04% |
| 2006 | 4.50% | 4.50% | 4.35% | 7.50% | 7.20% | 7.50% | 3.00% | 2.70% | 3.15% |
| 2007 | 4.50% | 4.50% | 4.35% | 7.50% | 7.20% | 7.50% | 3.00% | 2.70% | 3.15% |
| 2008 | 4.50% | 4.50% | 4.35% | 7.50% | 7.20% | 7.50% | 3.00% | 2.70% | 3.15% |
| 2009 | 4.50% | 4.50% | 4.35% | 6.54% | 6.34% | 6.50% | 2.04% | 1.84% | 2.15% |
| 2010 | 4.55% | 4.55% | 4.45% | 6.19% | 6.08% | 6.15% | 1.64% | 1.53% | 1.70% |

Source: Tables 3 and 5.

# VI. Calculating the Difference in Cash Values Due to the 1985 Change

## A. Starting Period

36. While the impact to Pre-MN annuity policyholders began at the inception of the 1985 Change, for purposes of this analysis, numerical values will be determined beginning in 1993.[14]

---

[14] NML graded in the 1985 Change to temper the numerical effects until 1993.

11

## B.    Deposit Payments

37. As Pre-MN annuity policyholders make deposits, expenses are charged as either 10% or 6% of the gross deposits.[15]  At the end of a year in which a deposit is made, the net deposit is increased by the DIR adjusted for the number of days between the net deposit date and the policy anniversary.   Therefore, the timing of deposits within a year has an effect on the accumulated fund balance after the DIR is applied.

## C.    Withdrawals and Borrowing

38. Withdrawals of partial accumulated fund values are treated as negative deposits in the year of withdrawal.

39. For those policies without Direct Recognition, borrowing and level of indebtedness play no role in the calculation of the Difference because the DIR applies to the cash value of the account irrespective of the level of the indebtedness.

40. For those policies with Direct Recognition, the level of indebtedness does matter because there is a different DIR paid on borrowed and non-borrowed funds.  Taking out a loan is comparable to a withdrawal, or a negative net deposit, while repayments of loans are comparable to positive net deposits.  The difference between loans and withdrawals is that loans accrue interest at the policy loan rate which is only partially offset by the DIR on borrowed funds.  If there were no difference between the policy loan rate and the DIR on borrowed funds, taking a loan would be identical to a withdrawal for purposes of calculating the Difference.

41. The basic information necessary to adjust the But-For cash values for borrowing activity is the level of indebtedness on an annual basis.  Because the policy loan rate is known (and thus, the amount of interest which accrues on the loan), the change in indebtedness provides information on new funds borrowed net of loan repayments.

## D.    The Role of the DIR in Difference Calculations

42. As described above, the DIR used in the calculation of account values depends on whether Direct Recognition applies and for those without Direct Recognition, the policy loan rate.

---

[15] In addition, the LaPlant contract specifies a $10 expense taken out of the first deposit made in each year as well as a $0.50 charge per payment.

12

43. The following table shows the accumulation rates of a net deposit based on the year in which it was made (columns) and the year in which it was surrendered (rows) for non-borrowed funds of Pre-MN annuities with Direct Recognition. I assumed deposits and surrenders occurred at the end of the year. For example, as highlighted, a net deposit of $1.00 at the end of 1997 accumulated to $1.37 if surrendered at the end of 2002:

Table 7. Actual Accumulation Rates of Net Deposits Made by Pre-MN Annuitants with Direct Recognition Deposited in Column Year and Withdrawn in Row Year

| With Direct Recognition Actual Rate | Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1115 | 1985 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1100 | 1986 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1075 | 1987 | 1.37 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1075 | 1988 | 1.51 | 1.36 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1075 | 1989 | 1.68 | 1.51 | 1.36 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1100 | 1990 | 1.84 | 1.66 | 1.49 | 1.35 | 1.22 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1991 | 2.03 | 1.82 | 1.64 | 1.48 | 1.34 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0950 | 1992 | 2.22 | 2.00 | 1.80 | 1.63 | 1.47 | 1.32 | 1.20 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 1993 | 2.41 | 2.17 | 1.95 | 1.76 | 1.59 | 1.44 | 1.31 | 1.19 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0750 | 1994 | 2.59 | 2.32 | 2.10 | 1.90 | 1.71 | 1.55 | 1.40 | 1.28 | 1.17 | 1.08 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0700 | 1995 | 2.77 | 2.49 | 2.25 | 2.02 | 1.83 | 1.65 | 1.50 | 1.37 | 1.25 | 1.15 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0700 | 1996 | 2.97 | 2.67 | 2.40 | 2.17 | 1.96 | 1.77 | 1.61 | 1.46 | 1.34 | 1.23 | 1.14 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0690 | 1997 | 3.16 | 2.84 | 2.56 | 2.31 | 2.09 | 1.88 | 1.71 | 1.55 | 1.42 | 1.31 | 1.22 | 1.14 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0650 | 1998 | 3.36 | 3.03 | 2.73 | 2.46 | 2.22 | 2.01 | 1.82 | 1.66 | 1.51 | 1.40 | 1.30 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 1999 | 3.68 | 3.22 | 2.90 | 2.62 | 2.37 | 2.14 | 1.94 | 1.77 | 1.61 | 1.49 | 1.38 | 1.29 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0950 | 2000 | 3.81 | 3.43 | 3.09 | 2.79 | 2.52 | 2.28 | 2.07 | 1.88 | 1.72 | 1.58 | 1.47 | 1.38 | 1.29 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 2001 | 4.06 | 3.66 | 3.29 | 2.97 | 2.68 | 2.42 | 2.20 | 2.00 | 1.83 | 1.69 | 1.57 | 1.47 | 1.37 | 1.29 | 1.21 | 1.13 | 1.07 | 1.00 | X | X | X | X | X | X | X | X | X | X |
| 1.0625 | 2002 | 4.32 | 3.88 | 3.50 | 3.16 | 2.85 | 2.58 | 2.34 | 2.13 | 1.94 | 1.79 | 1.67 | 1.56 | 1.46 | **1.37** | 1.28 | 1.21 | 1.13 | 1.06 | 1.00 | X | X | X | X | X | X | X | X | X |
| 1.0575 | 2003 | 4.56 | 4.11 | 3.70 | 3.34 | 3.02 | 2.72 | 2.48 | 2.25 | 2.05 | 1.88 | 1.76 | 1.65 | 1.54 | 1.45 | 1.36 | 1.27 | 1.20 | 1.12 | 1.06 | 1.00 | X | X | X | X | X | X | X | X |
| 1.0500 | 2004 | 4.79 | 4.31 | 3.88 | 3.51 | 3.17 | 2.85 | 2.60 | 2.36 | 2.16 | 1.99 | 1.85 | 1.73 | 1.62 | 1.52 | 1.43 | 1.34 | 1.26 | 1.18 | 1.11 | 1.05 | 1.00 | X | X | X | X | X | X | X |
| 1.0475 | 2005 | 5.02 | 4.51 | 4.07 | 3.67 | 3.31 | 2.99 | 2.72 | 2.47 | 2.26 | 2.08 | 1.94 | 1.81 | 1.69 | 1.59 | 1.49 | 1.40 | 1.31 | 1.23 | 1.16 | 1.10 | 1.05 | 1.00 | X | X | X | X | X | X |
| 1.0475 | 2006 | 5.23 | 4.71 | 4.24 | 3.83 | 3.46 | 3.12 | 2.84 | 2.58 | 2.36 | 2.17 | 2.02 | 1.89 | 1.77 | 1.66 | 1.56 | 1.46 | 1.37 | 1.28 | 1.21 | 1.15 | 1.09 | 1.04 | 1.00 | X | X | X | X | X |
| 1.0435 | 2007 | 5.46 | 4.91 | 4.43 | 4.00 | 3.61 | 3.26 | 2.96 | 2.69 | 2.46 | 2.27 | 2.11 | 1.97 | 1.84 | 1.73 | 1.62 | 1.52 | 1.43 | 1.34 | 1.27 | 1.20 | 1.14 | 1.09 | 1.04 | 1.00 | X | X | X | X |
| 1.0435 | 2008 | 5.70 | 5.13 | 4.62 | 4.17 | 3.77 | 3.40 | 3.09 | 2.81 | 2.57 | 2.37 | 2.20 | 2.06 | 1.92 | 1.80 | 1.69 | 1.59 | 1.49 | 1.40 | 1.32 | 1.25 | 1.19 | 1.14 | 1.09 | 1.04 | 1.00 | X | X | X |
| 1.0435 | 2009 | 5.95 | 5.35 | 4.82 | 4.35 | 3.93 | 3.55 | 3.23 | 2.93 | 2.68 | 2.47 | 2.30 | 2.15 | 2.01 | 1.88 | 1.77 | 1.66 | 1.56 | 1.46 | 1.38 | 1.30 | 1.24 | 1.19 | 1.14 | 1.09 | 1.04 | 1.00 | X | X |
| 1.0445 | 2010 | 6.21 | 5.59 | 5.04 | 4.55 | 4.10 | 3.71 | 3.37 | 3.06 | 2.80 | 2.58 | 2.40 | 2.24 | 2.09 | 1.97 | 1.85 | 1.73 | 1.63 | 1.53 | 1.44 | 1.36 | 1.30 | 1.24 | 1.19 | 1.14 | 1.09 | 1.04 | 1.00 | X |
| 1.0300 | 2011 | 6.40 | 5.76 | 5.19 | 4.68 | 4.23 | 3.82 | 3.47 | 3.16 | 2.88 | 2.65 | 2.47 | 2.31 | 2.16 | 2.03 | 1.90 | 1.79 | 1.68 | 1.57 | 1.48 | 1.40 | 1.33 | 1.28 | 1.22 | 1.17 | 1.12 | 1.08 | 1.03 | 1.00 |
| 1.0300 | 2012 | 6.59 | 5.93 | 5.34 | 4.82 | 4.35 | 3.93 | 3.57 | 3.25 | 2.97 | 2.74 | 2.54 | 2.38 | 2.22 | 2.09 | 1.96 | 1.84 | 1.72 | 1.62 | 1.53 | 1.44 | 1.37 | 1.31 | 1.26 | 1.21 | 1.16 | 1.11 | 1.06 | 1.03 |

Calculated as the product of Actual Rates from year of contribution through year of withdrawal. Assumes end of year deposits and withdrawals and no borrowing. Highlighted value of 1.37 represents the accumulation of one net dollar deposited at the end of 1997 and withdrawn in the end of 2002. The 2011 and 2012 rates are based on the guaranteed minimum interest rate in the LaPlant contract because Exhibit 185 ends in 2010. These rates could be updated with additional data.

13

Case 2:11-cv-00991-LA   Filed 03/04/13   Page 62 of 74   Document 43-2   App. 060   740

44. The following table shows how the same $1.00 would have accumulated But-For the 1985 Change by replacing the actual DIRs with the But-For DIRs. This table indicates that a $1.00 net deposit invested at the end of 1997 would have accumulated to a cash value of $1.52 by 2002:

Table 8. But-For Accumulation Rates of Net Deposits Made by Pre-MN Annuitants with Direct Recognition Deposited in Column Year and Withdrawn in Row Year

| With Direct Recognition But-For Rate | Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.1115 | 1985 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1125 | 1986 | 1.24 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1100 | 1987 | 1.37 | 1.23 | 1.11 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1025 | 1988 | 1.51 | 1.36 | 1.22 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1989 | 1.66 | 1.50 | 1.35 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1990 | 1.83 | 1.65 | 1.48 | 1.33 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.1000 | 1991 | 2.01 | 1.81 | 1.63 | 1.47 | 1.33 | 1.21 | 1.10 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0625 | 1992 | 2.20 | 1.98 | 1.78 | 1.60 | 1.45 | 1.32 | 1.20 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0925 | 1993 | 2.40 | 2.16 | 1.94 | 1.75 | 1.59 | 1.44 | 1.31 | 1.19 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0950 | 1994 | 2.61 | 2.35 | 2.11 | 1.90 | 1.72 | 1.57 | 1.42 | 1.30 | 1.19 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 1995 | 2.83 | 2.55 | 2.29 | 2.06 | 1.87 | 1.70 | 1.55 | 1.41 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 1996 | 3.07 | 2.76 | 2.48 | 2.24 | 2.02 | 1.84 | 1.68 | 1.52 | 1.40 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0850 | 1997 | 3.33 | 3.00 | 2.69 | 2.43 | 2.20 | 2.00 | 1.82 | 1.65 | 1.51 | 1.39 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0630 | 1998 | 3.62 | 3.26 | 2.93 | 2.64 | 2.40 | 2.18 | 1.98 | 1.80 | 1.65 | 1.51 | 1.39 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0880 | 1999 | 3.94 | 3.55 | 3.19 | 2.87 | 2.61 | 2.37 | 2.15 | 1.96 | 1.79 | 1.64 | 1.51 | 1.39 | 1.28 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X | X |
| 1.0890 | 2000 | 4.29 | 3.86 | 3.47 | 3.13 | 2.84 | 2.58 | 2.34 | 2.13 | 1.95 | 1.78 | 1.65 | 1.52 | 1.40 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X | X |
| 1.0940 | 2001 | 4.67 | 4.20 | 3.78 | 3.40 | 3.09 | 2.80 | 2.55 | 2.32 | 2.12 | 1.94 | 1.79 | 1.65 | 1.52 | 1.40 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X | X |
| 1.0820 | 2002 | 5.07 | 4.56 | 4.10 | 3.69 | 3.35 | 3.05 | 2.77 | 2.52 | 2.30 | 2.11 | 1.94 | 1.79 | 1.65 | 1.52 | 1.40 | 1.29 | 1.18 | 1.09 | 1.00 | X | X | X | X | X | X | X | X | X |
| 1.0640 | 2003 | 5.49 | 4.94 | 4.44 | 4.00 | 3.63 | 3.30 | 3.00 | 2.72 | 2.49 | 2.28 | 2.10 | 1.94 | 1.79 | 1.65 | 1.51 | 1.39 | 1.28 | 1.18 | 1.08 | 1.00 | X | X | X | X | X | X | X | X |
| 1.0770 | 2004 | 5.91 | 5.32 | 4.78 | 4.30 | 3.90 | 3.53 | 3.23 | 2.93 | 2.68 | 2.46 | 2.27 | 2.09 | 1.92 | 1.77 | 1.63 | 1.50 | 1.38 | 1.27 | 1.17 | 1.08 | 1.00 | X | X | X | X | X | X | X |
| 1.0750 | 2005 | 6.35 | 5.71 | 5.14 | 4.63 | 4.20 | 3.82 | 3.47 | 3.15 | 2.89 | 2.64 | 2.43 | 2.24 | 2.07 | 1.91 | 1.75 | 1.61 | 1.48 | 1.36 | 1.25 | 1.16 | 1.08 | 1.00 | X | X | X | X | X | X |
| 1.0750 | 2006 | 6.83 | 6.14 | 5.52 | 4.97 | 4.51 | 4.10 | 3.73 | 3.39 | 3.10 | 2.84 | 2.62 | 2.41 | 2.22 | 2.05 | 1.88 | 1.73 | 1.59 | 1.46 | 1.35 | 1.24 | 1.17 | 1.08 | 1.00 | X | X | X | X | X |
| 1.0750 | 2007 | 7.34 | 6.60 | 5.94 | 5.35 | 4.85 | 4.41 | 4.01 | 3.64 | 3.34 | 3.05 | 2.81 | 2.59 | 2.39 | 2.20 | 2.02 | 1.86 | 1.71 | 1.57 | 1.45 | 1.34 | 1.24 | 1.16 | 1.08 | 1.00 | X | X | X | X |
| 1.0750 | 2008 | 7.89 | 7.10 | 6.38 | 5.75 | 5.21 | 4.74 | 4.31 | 3.92 | 3.57 | 3.28 | 3.02 | 2.79 | 2.57 | 2.37 | 2.18 | 2.00 | 1.84 | 1.69 | 1.56 | 1.44 | 1.34 | 1.24 | 1.16 | 1.08 | 1.00 | X | X | X |
| 1.0650 | 2009 | 8.40 | 7.56 | 6.80 | 6.12 | 5.55 | 5.04 | 4.59 | 4.17 | 3.82 | 3.50 | 3.22 | 2.97 | 2.74 | 2.52 | 2.32 | 2.13 | 1.96 | 1.80 | 1.66 | 1.53 | 1.42 | 1.32 | 1.23 | 1.14 | 1.07 | 1.00 | X | X |
| 1.1015 | 2010 | 8.92 | 8.02 | 7.21 | 6.50 | 5.89 | 5.36 | 4.87 | 4.43 | 4.05 | 3.71 | 3.42 | 3.15 | 2.90 | 2.68 | 2.46 | 2.26 | 2.08 | 1.91 | 1.76 | 1.63 | 1.51 | 1.40 | 1.31 | 1.22 | 1.13 | 1.06 | 1.00 | X |
| 1.0300 | 2011 | 9.19 | 8.27 | 7.43 | 6.69 | 6.07 | 5.52 | 5.02 | 4.56 | 4.18 | 3.82 | 3.52 | 3.25 | 2.99 | 2.76 | 2.53 | 2.33 | 2.14 | 1.97 | 1.81 | 1.67 | 1.55 | 1.45 | 1.35 | 1.26 | 1.16 | 1.09 | 1.03 | 1.00 |
| 1.0300 | 2012 | 9.46 | 8.51 | 7.65 | 6.89 | 6.25 | 5.68 | 5.17 | 4.70 | 4.30 | 3.94 | 3.63 | 3.34 | 3.08 | 2.84 | 2.61 | 2.40 | 2.21 | 2.03 | 1.87 | 1.73 | 1.60 | 1.49 | 1.39 | 1.29 | 1.20 | 1.13 | 1.06 | 1.03 |

Calculated as the product of But-For Rates from year of contribution through year of withdrawal. Assumes end of year deposits and withdrawals and no borrowing. Highlighted value of 1.52 represents what the accumulation of one net dollar deposited in the end of 1997 and withdrawn in the end of 2002 would have been had annuities accumulated at the But-For rates. The 2011 and 2012 rates are based on the guaranteed minimum interest rate in the LaPlant contract because Exhibit 180 ends in 2010. These rates could be updated with additional data.

14

45. The following table shows the Difference in Rates in accumulations of net deposits due to the 1985 Change. The values in the table are found by subtracting the actual accumulation rates from the But-For accumulation rates. For example, the table indicates that a $1.00 net deposit invested in 1997 and surrendered in 2002 would have accumulated an additional $0.15 But-For the 1985 Change:

Table 9. Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants with Direct Recognition Deposited in Column Year and Withdrawn in Row Year

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1993 | -0.01 | 0.00 | -0.01 | -0.01 | 0.00 | 0.01 | 0.01 | 0.01 | 0.01 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 0.02 | 0.02 | 0.01 | 0.00 | 0.01 | 0.02 | 0.02 | 0.02 | 0.02 | 0.01 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 0.06 | 0.05 | 0.04 | 0.03 | 0.04 | 0.05 | 0.04 | 0.04 | 0.04 | 0.03 | 0.01 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 0.11 | 0.09 | 0.08 | 0.07 | 0.07 | 0.08 | 0.07 | 0.06 | 0.06 | 0.05 | 0.03 | 0.01 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 0.17 | 0.15 | 0.13 | 0.12 | 0.11 | 0.12 | 0.11 | 0.10 | 0.09 | 0.08 | 0.06 | 0.04 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 0.26 | 0.24 | 0.21 | 0.18 | 0.17 | 0.17 | 0.16 | 0.14 | 0.13 | 0.11 | 0.09 | 0.07 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 0.36 | 0.33 | 0.29 | 0.25 | 0.24 | 0.23 | 0.21 | 0.19 | 0.18 | 0.15 | 0.13 | 0.10 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 0.48 | 0.43 | 0.38 | 0.33 | 0.31 | 0.30 | 0.27 | 0.25 | 0.23 | 0.20 | 0.17 | 0.14 | 0.11 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X | X |
| 2001 | 0.61 | 0.54 | 0.48 | 0.43 | 0.40 | 0.38 | 0.35 | 0.31 | 0.29 | 0.26 | 0.22 | 0.18 | 0.15 | 0.11 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X | X |
| 2002 | 0.75 | 0.68 | 0.60 | 0.53 | 0.50 | 0.47 | 0.43 | 0.39 | 0.36 | 0.32 | 0.28 | 0.23 | 0.20 | 0.15 | 0.12 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X | X |
| 2003 | 0.92 | 0.83 | 0.74 | 0.66 | 0.61 | 0.57 | 0.52 | 0.47 | 0.44 | 0.39 | 0.34 | 0.29 | 0.25 | 0.20 | 0.16 | 0.12 | 0.08 | 0.05 | 0.02 | 0.00 | X | X | X | X | X | X | X | X |
| 2004 | 1.11 | 1.00 | 0.89 | 0.80 | 0.74 | 0.69 | 0.63 | 0.57 | 0.53 | 0.47 | 0.41 | 0.36 | 0.31 | 0.26 | 0.20 | 0.16 | 0.12 | 0.09 | 0.05 | 0.03 | 0.00 | X | X | X | X | X | X | X |
| 2005 | 1.34 | 1.20 | 1.07 | 0.96 | 0.98 | 0.82 | 0.75 | 0.68 | 0.63 | 0.56 | 0.50 | 0.43 | 0.38 | 0.32 | 0.26 | 0.21 | 0.17 | 0.13 | 0.09 | 0.06 | 0.03 | 0.00 | X | X | X | X | X | X |
| 2006 | 1.59 | 1.42 | 1.28 | 1.14 | 1.05 | 0.98 | 0.89 | 0.81 | 0.75 | 0.67 | 0.60 | 0.52 | 0.46 | 0.39 | 0.33 | 0.27 | 0.22 | 0.17 | 0.13 | 0.10 | 0.06 | 0.03 | 0.00 | X | X | X | X | X |
| 2007 | 1.88 | 1.69 | 1.51 | 1.35 | 1.24 | 1.15 | 1.05 | 0.95 | 0.89 | 0.79 | 0.71 | 0.62 | 0.55 | 0.47 | 0.40 | 0.34 | 0.27 | 0.23 | 0.18 | 0.14 | 0.10 | 0.07 | 0.03 | 0.00 | X | X | X | X |
| 2008 | 2.19 | 1.97 | 1.76 | 1.58 | 1.45 | 1.34 | 1.22 | 1.11 | 1.02 | 0.92 | 0.82 | 0.73 | 0.65 | 0.56 | 0.48 | 0.41 | 0.34 | 0.29 | 0.24 | 0.19 | 0.15 | 0.11 | 0.07 | 0.03 | 0.00 | X | X | X |
| 2009 | 2.46 | 2.21 | 1.97 | 1.77 | 1.62 | 1.50 | 1.36 | 1.24 | 1.14 | 1.03 | 0.93 | 0.82 | 0.73 | 0.64 | 0.55 | 0.47 | 0.40 | 0.34 | 0.28 | 0.23 | 0.18 | 0.14 | 0.09 | 0.06 | 0.02 | 0.00 | X | X |
| 2010 | 2.71 | 2.44 | 2.19 | 1.95 | 1.79 | 1.75 | 1.50 | 1.37 | 1.26 | 1.13 | 1.02 | 0.91 | 0.81 | 0.71 | 0.61 | 0.53 | 0.45 | 0.38 | 0.32 | 0.27 | 0.21 | 0.17 | 0.12 | 0.08 | 0.04 | 0.02 | 0.00 | Y |
| 2011 | 2.79 | 2.51 | 2.24 | 2.01 | 1.84 | 1.70 | 1.55 | 1.41 | 1.29 | 1.17 | 1.05 | 0.94 | 0.83 | 0.73 | 0.63 | 0.54 | 0.46 | 0.39 | 0.33 | 0.27 | 0.22 | 0.17 | 0.12 | 0.08 | 0.04 | 0.02 | 0.00 | 0.00 |
| 2012 | 2.87 | 2.58 | 2.31 | 2.07 | 1.89 | 1.75 | 1.59 | 1.45 | 1.33 | 1.20 | 1.08 | 0.97 | 0.86 | 0.75 | 0.65 | 0.56 | 0.48 | 0.40 | 0.34 | 0.28 | 0.23 | 0.18 | 0.13 | 0.08 | 0.04 | 0.02 | 0.00 | 0.00 |

Calculated as the difference of a cell from Table 7 and the equivalent cell from Table 8. Assumes end of year deposits and withdrawals and no borrowing. Highlighted value of 0.15 represents the additional accumulation of one net dollar deposited at the end of 1997 and withdrawn at the end of 2002 But-For the 1985 Change.

46. Comparable sets of tables can be made for each policy loan rate for annuitants without Direct Recognition. Thus, there will be a total of four Difference in Rates tables.

## E. Steps in Determining the Difference But-For the 1985 Change

47. The Difference in the account values for each Pre-MN annuity policyholder can be calculated using the following steps:

Step 1: Determine which Difference in Rates table to use based on whether the annuitant had Direct Recognition and the policy loan rate.

Step 2: Based on the annuitant's termination year (2012 if the annuity remains in-force), look at the appropriate row of the Difference in Rates table.

Step 3: Determine the net deposit amount by year (withdrawals and policy loans being treated as negative net deposits, and policy loan repayments treated as positive net deposits).[16]

---

[16] Policy loans and policy loan repayments are only treated as negative net deposits for policyholders with Direct Recognition. The interest accrued on the policy loan, less the amount of dividend interest earned on the borrowed funds, is also treated as a negative net deposit for policyholders with Direct Recognition.

15

**Step 4**: Multiply the Step 2 Difference in Rates by the corresponding net deposits in Step 3.

**Step 5**: Add the values calculated in Step 4.

**48.**　　This report illustrates how Differences can be calculated in a mechanical way for each individual annuitant with basic annual information and a limited number of variables. Assumptions of end of year deposits tend to underestimate Differences. The ultimate calculations can take into account exactly when in the year deposits were contributed, withdrawals were taken, funds were borrowed, loans were repaid and dividends were credited (that is, policy anniversary date). Factoring in these dates will not make the calculations any less formulaic.

## F.　　LaPlant Example

49. I reviewed a limited set of account statements from Ms. LaPlant. This included her "Policy Anniversary Report," issued each year on her policy anniversary date of May 1, from 1986 to 2000. These reports include her total cash value and her total "paid-in to date" (her total deposits throughout the life of the annuity). Looking at the 1986 statement, her account value as of May 1, 1986 can be determined. Looking at the change in the "paid-in to date," her total contributions each year can be determined. Other documents indicate that she did not make deposits after 2000. This information, summarized in the table below, provides sufficient information to calculate Differences in her cash value:

**Table 10. LaPlant Beginning Balance
and Deposits**

| Policy Year[a] | Gross Deposit | Net Deposit [b] |
|---|---|---|
| 1986 | $ 11,624 [c] | $ 11,624 [c] |
| 1987 | 2,000 | 1,870 |
| 1988 | 2,000 | 1,870 |
| 1989 | - | - |
| 1990 | 4,000 | 3,750 |
| 1991 | - | - |
| 1992 | 2,000 | 1,870 |
| 1993 | - | - |
| 1994 | - | - |
| 1995 | - | - |
| 1996 | - | - |
| 1997 | - | - |
| 1998 | 3,890 | 3,646 |

Sources: Policy Anniversary Reports of Marleen
LaPlant and ML2_NM_0001-0111

[a] Policy year is the year from May 2 of the previous
year until May 1 of the year stated.

[b] Calculated as Gross Contributions minus 6% load,
and $10 per year and $0.50 per payment charge.
LaPlant made two payments in 1990 and 1998.

[c] Represents Total Cash Value on May 1, 1986.

50. In order to determine the appropriate adjustments to LaPlant's cash values, I follow the
five step process outlined above:

**Step 1**: As LaPlant had Direct Recognition, use the Difference in Rates table
applicable to Pre-MN annuitants with Direct Recognition.

**Step 2**: Because LaPlant's account matured in 2008, use the row labeled 2008 for
the Difference in Rates.

**Step 3**: The net deposit amounts by year were identified in the previous table.

**Step 4:** Multiply the net deposits by year by the corresponding Difference in
Rates.

**Step 5**: Add the values calculated in Step 4.

17

51. This process is demonstrated in the table below:

**Table 11. Difference in
LaPlant's Cash Value due to
1985 Change**

| Year | Net Contributions | Difference in Rates | Difference |
|------|------------------|---------------------|-----------|
| 1986 | $ 11,624 | 1.76 | $ 20,458 |
| 1987 | 1,870 | 1.58 | 2,965 |
| 1988 | 1,870 | 1.45 | 2,712 |
| 1990 | 3,750 | 1.22 | 4,575 |
| 1992 | 1,870 | 1.02 | 1,907 |
| 1998 | 3,646 | 0.48 | 1,750 |
| Total | | | $ 34,357 |

52. The Difference to Ms. LaPlant's cash value, shown above, is conservatively stated because net deposits were assumed to be invested as of the end of each policy year. If NML provided actual dates for each net deposit, the calculations would be based on a proration of the Difference in Rates table values for the two surrounding calendar years and a larger adjustment would result.

## VII. Conclusions

53. NML credits dividends on a formulaic basis to all of its policyholders. The methodology presented in this report to calculate the But-For DIRs and related Differences to cash values is consistent with that process and also uses a formulaic approach. The information necessary to perform this analysis for Pre-MN annuitants should be readily available from NML and should require no additional information from policyholders.

54. If the 1985 Change had not been effected, Pre-MN annuity policyholders would have received a higher DIR beginning at least as early as 1993 and continuing each year through the present. This report quantifies the DIRs which would have been credited to Pre-MN annuity policyholders But-For the 1985 Change. The DIRs for Pre-MN annuity policyholders with Direct Recognition and no loan balance would have been the same as the DIRs for corresponding life insurance policies. This But-For DIR is used to mechanically calculate the But-For DIR for those without Direct Recognition.

18

55. My methodology can be applied to remaining in-force Pre-MN annuitants to adjust their accounts to reflect the appropriate cash values upon which future dividends (reflecting the portfolio rate) should be applied. The same methodology can be used to calculate the additional accumulations that would have occurred for Pre-MN annuity policyholders that are no longer in-force.

Respectfully submitted,

Robert L. Hoyer, FSA, MAAA
Hoyer Actuarial Litigation, LLC
7708 Classics Drive
Naples, Florida 34113
(239) 776-7622
March 4, 2013

19

# Appendix A
# Resume of Robert L. Hoyer
# FSA, MAAA

<u>Position :</u>

Principal – Hoyer Actuarial Litigation, LLC

<u>Contact Information :</u>

Hoyer Actuarial Litigation, LLC

7708 Classics Drive

Naples, Florida 34113

Telephone : (239) 776-7622

Cell : (860) 716-6757

Email : hoyer.rl@gmail.com

<u>Education :</u>

FSA – Fellow of the Society of Actuaries (1977)

MAAA – Member of the American Academy of Actuaries (1980)

B.S. – Mathematics, Syracuse University (1969)

<u>Range of Experience :</u>

Provides litigation support and expert witness testimony regarding insurance and health care related disputes. Has testified on a wide variety of issues before municipal and district courts, bankruptcy court, regulatory hearings, legislative sessions, tax hearings, and SEC reviews. Topics involved in such projects include management effectiveness, reinsurance, health care pricing, rehabilitation structuring, acquisition appraisal, profit, risk, surplus analyses, life insurance sales practices, and pension disputes. Also provides general actuarial consulting in non-litigation scenarios.

20

Representative Clients – Insurance Companies :

- American Bankers Insurance Group
- CIGNA Corporation
- Equitable Life
- John Alden Life
- Legal and General Insurance
- Lutheran Brotherhood
- Massachusetts Mutual Life
- Mortgage Guaranty Insurance
- National Life of Vermont
- New York Life
- Northwestern Mutual Life
- Penn Mutual Life
- Phoenix Home Life
- Provident Mutual Life
- Prudential
- Sun America
- The Hartford
- Transamerica
- Travelers Corporation
- Union Central Life

Representative Clients – Health Care Entities :

- Aetna
- Alta Bates Medical Group
- Anchor -- Access HMO
- Blue Cross / Blue Shield of Missouri
- Blue Cross / Blue Shield of South Carolina
- Catholic Healthcare West
- ConnectiCare HMO
- Group Health Northwest
- Health Care Service Corporation
- Health Insurance Association of America
- Health New England HMO
- Health Source HMO
- Hitchcock Health Clinic
- Hudson IPA
- Kaiser Permanente
- Kentucky Health Purchasing Alliance
- Life Care Services
- Mac Neal Health Care

21

- Magellan Health Care
- National Vision Association
- Oxford Health Plan
- Rockford Health Plan
- Stamford Health Services
- Sutter Health Plan
- United Health Care
- University of Texas Medical Plan
- Western Health Advantage

Representative Clients – Non-Insurance Entities :

- Amoco
- Avis
- Bankers Trust
- Bank of America
- Barnett Bank
- Bausch & Lomb
- Bethlehem Steel
- Borden
- Bristol – Meyers
- Brown & Williamson
- Chase Manhattan Bank
- Chemical Bank
- Chevron
- Commonwealth Edison
- Compaq
- Continental Grain
- Crown, Cork & Seal
- Dana
- Dart
- Dole Foods
- Dresser
- Dupont
- Electric Boat
- Exxon
- FIAT
- Fleet Bank
- Flowers
- Goodyear
- Goldman Sachs
- Great Western
- GTE

22

- Guinness
- Hertz
- Hillenbrand
- Honeywell Bull
- Huntsman Corporation
- IBM
- Ingersoll Rand
- K – Mart
- Kaiser Aluminum
- Kansas City Southern
- Kaufman & Broad
- Kelloggs
- Kodak
- Kraft
- Liz Claiborne
- London Fog
- Levi Strauss
- Marriott
- Merrill Lynch
- Morgan Guaranty
- Munsingwear
- Owens – Corning
- Phillip Morris
- Pitney Bowes
- Quaker Oats
- Ralston Purina
- R.J. Reynolds
- Santa Fe
- Stanadyne
- Texaco
- Toyota
- United Technologies
- Walt Disney
- Westinghouse
- Weyerhauser

23

Professional and Business History :

Hoyer Actuarial Litigation, LLC (2002-    ) – Principal.

Arthur Andersen LLP – Managing Partner of Actuarial & Insurance Services (1989-2002).

Price Waterhouse – Managing Partner of Actuarial Consulting (1984-1989); Senior Manager (1882-1984); Manager (1980-1982).

Aetna Life & Casualty (1971-1980); Officer (1977-1980).

Middletown Township High School – Teacher of Physics and Calculus (1969-1971).

Syracuse University – Instructor of Psychometrics (1968-1969).

Fellow of the Society of Actuaries (1977).

Member of the American Academy of Actuaries (1980).

Authored articles regarding insurance company federal income tax legislation and implications in the Actuarial Digest and the National Underwriter.

Speaker at numerous industry, client, and firm-sponsored seminars on a variety of insurance and health care topics.


Other Professional Activities :

Syracuse University – School of Management Accounting Advisory Board, Society of Fellows, and Ambassador Leadership Programs.

24

# Appendix B
# Additional Documents Reviewed

In additional to documents reviewed for my June 30, 2010 report, July 20, 2010 deposition and November 16 and 17, 2010 trial I reviewed the following:

Expert Reports
- Theodore E. Affleck, CLU (6/30/2010)
- Bruce W. Foudree (8/6/2010)
- S. Travis Pritchett (7/2/2010)
- Stephen N. Steinig (8/6/2010)

Affidavits
- Nicholas Sales (11/17/2011)
- Chris Trost (6/30/2010)

Trial Exhibits
- 121
- 189
- 266
- 312
- 318-335
- 356
- 372-414
- 498

Policy Anniversary Reports of Marleen LaPlant

Appendix to Brief of Plaintiffs-Appellees, Volume II, United State Court of Appeals for the Seventh Circuit, Case No.12-3264

Other Bates Stamped Documents
- ML2_NM_0001-0111
- ML2_NM_5552
- ML2_NM_4552-4573

Affidavits Submitted in Beverly E. Krueger v The Northwestern Mutual Life Insurance Company, United States District Court for the Northern District of Florida, Case No. 1:10-cv-00128-SPM
- Chris G. Trost (4/15/2011)
- Nicholas Sales (8/13/2010)

25