```
                UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF WISCONSIN
------------------------------------------------------
MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

                Plaintiffs,

         vs.                     Case No. 2:11-CV-00910

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, a
Wisconsin Mutual Insurance Corporation,

                Defendant.
------------------------------------------------------



          VIDEOTAPED DEPOSITION OF ROBERT L. HOYER

                  Friday, May 17th, 2013

                         9:00 a.m.

                            at

                    QUARLES & BRADY, LLP
                  411 East Wisconsin Avenue
                    Milwaukee, Wisconsin


             Reported by Carla J. Miller, RPR, CRR
```

```
          Videotaped Deposition of ROBERT L. HOYER, a
witness in the above-entitled action, taken at the
instance of the Defendants, pursuant to the rules of
Federal Civil Procedure, pursuant to Notice of
Deposition, before Carla J. Miller, Registered
Professional Reporter and Certified Realtime
Reporter, in and for the State of Wisconsin, at
QUARLES & BRADY, LLP, 411 East Wisconsin Avenue,
Milwaukee, Wisconsin, on the 17th day of May, 2013,
commencing at 9:00 a.m. and concluding at 3:58 p.m.

A P P E A R A N C E S:
          KERSTEN & McKINNON, S.C., by
             MR. GEORGE P. KERSTEN and
             E. CAMPION KERSTEN
             11518 North Port Washington Road, Suite 104
             Mequon, Wisconsin, 53092
             Appeared on behalf of the Plaintiffs

          BARTLIT BECK HERMAN PALENCHAR & SCOTT, by
             MR. SEAN C. GRIMSLEY and MR. ADAM HOEFLICH
             1899 Wynkoop Street
             Denver, Colorado, 80202
             Appeared on behalf of the Defendants

          NORTHWESTERN MUTUAL, by
             MR. RODD SCHNEIDER
             720 East Wisconsin Avenue
             Milwaukee, Wisconsin, 53202

ALSO PRESENT:  Mr. Mark Lyle, Ryker & Lyle Legal
               Video Service
```

```
                     I N D E X
EXAMINATION                                  PAGE
BY MR. GRIMSLEY                                5
   MR. KERSTEN                               212
   MR. GRIMSLEY                              212


                   E X H I B I T S
                       (NONE)

EXHIBIT NO.                             PAGE IDENTIFIED

No. 1 - Hoyer Actuarial Litigation invoice      8

No. 2 - Nathan Associates invoice              10

No. 3 - Hoyer Actuarial Litigation report
        dated 3/4/13                           14

No. 4 - Plaintiffs' Motion for an Order
        Redefining the Class and for           48
        Related Relief

No. 5 - Dividend Interest Rates chart          99

No. 6 - Hoyer Actuarial Litigation report
        dated 6/30/10                         122

No. 7 - Trial Exhibit 127 chart               158

No. 8 - Affidavit of Robert Hoyer             172

No. 9 - Affidavit of Christ Trost             193


              (Exhibits filed with original
               transcript, copies to counsel.)
```

```
           TRANSCRIPT OF PROCEEDINGS
          THE VIDEOGRAPHER:  We are on the record.
This is the beginning of disk one of the deposition
of Robert Hoyer.  It's being taken at the instance of
the Defendants in the matter of Marleen LaPlant
versus Northwestern Mutual Company -- Northwestern
Mutual Insurance Company.
          The case is pending in the U.S.
District Court, Eastern District of Wisconsin, No.
11-CV-910.
          Today we're at the offices of Quarles
& Brady, 411 East Wisconsin Avenue, Milwaukee
Wisconsin.  Today's date, May 17th, 2013.  The time,
9:07 a.m.
          My name is Mark Lyle, today's
videographer with Ryker & Lyle Legal Video Service,
and the court reporter is Carla Miller, and we're
here on behalf of Gramann Reporting.
          First we will have counsel introduce
themselves and state who they represent, and then the
court reporter will swear in the witness.  We will
begin with the Plaintiff, please.
          MR. KERSTEN:  For the Plaintiff, George
Kersten and Campion Kersten of Kersten & McKinna for
the Plaintiffs.
```

1  MR. GRIMSLEY: For Northwestern Mutual,
2  Sean Grimsley and Adam Hoeflich of Bartlit Beck, and
3  we also have Rodd Schneider of Northwestern Mutual.
4  WHEREUPON,
5         ROBERT L. HOYER
6  Called for examination by and on
7  behalf of the Defendants, being first duly sworn,
8  was examined and testified as follows:
9         E X A M I N A T I O N
10 BY MR. GRIMSLEY:
11 Q  Good morning, Mr. Hoyer.
12 A  Good morning.
13 Q  Do you recall that you were deposed previously in the
14    LaPlant matter?
15 A  I was deposed on this case. I'm not sure precisely
16    it was LaPlant. There's been a couple of different
17    cases.
18         MR. KERSTEN: Before we begin with the
19    substance of the deposition, I would like the record
20    to show that we were not given notice of the
21    videotaping of this deposition. And I believe we
22    should go ahead with the videotape, but we reserve
23    the right to its use. We want to reflect on whether
24    or not it is usable, but I think we should go ahead
25    and we will just reserve our right to object to the

1     use of the video.
2         MR. GRIMSLEY: It was my understanding that
3     in this case the parties have been using a relatively
4     informal method of noticing depositions, including
5     just sending emails without an actual notice, but we
6     can obviously take this issue up at a later time. I
7     appreciate that you will let it go forward with the
8     videotape.
9         MR. KERSTEN: Fine. Let's do that. Just
10    to let you know, I think generally, at least we have
11    followed the practice, that if something is going to
12    be videotaped, if a deposition is going to be
13    videotaped, we generally gave notice of that. I
14    don't know of any exceptions to that, but we can talk
15    about that later.
16 BY MR. GRIMSLEY:
17 Q  Well, you put on a suit today, haven't you, sir?
18 A  Yes, I have.
19 Q  Is there any way differently you would have dressed
20    had you known this would have been on videotape
21    today?
22 A  No.
23 Q  Is there anything differently you would have done to
24    prepare had you known this was going to be on
25    videotape today?

1  A  No.
2  Q  You do recall having a deposition in Milwaukee at
3     some point in time in this matter?
4  A  Yes, sir.
5  Q  Did you review that deposition transcript?
6  A  At the time I did, yes, sir.
7  Q  Did you find anything in that deposition transcript
8     that you disagreed with?
9  A  No, sir.
10 Q  Since that time have you thought of anything in that
11    deposition transcript that you disagree with?
12         MR. KERSTEN: Object as irrelevant.
13         THE WITNESS: I have not thought of that
14    deposition in some time.
15 BY MR. GRIMSLEY:
16 Q  But there is nothing, then, today that you can think
17    of specifically that you would disagree with in your
18    prior deposition?
19         MR. KERSTEN: Same objection.
20         THE WITNESS: On a different matter than
21    the basis for today's report, there is nothing that
22    comes to mind.
23 BY MR. GRIMSLEY:
24 Q  Is there anything regarding the basis of the report
25    we're going to be talking about today that you can

1     think of that was incorrect about your prior
2     deposition?
3  A  No, sir.
4         (Deposition Exhibit No. 1-2 were marked for
5     identification.)
6  BY MR. GRIMSLEY:
7  Q  I'm going to show you what's being marked as Hoyer
8     Deposition Exhibit 1 and Hoyer Deposition Exhibit 2.
9     Let me just give copies to counsel.
10         Do you recognize Hoyer Deposition
11    Exhibit 1?
12 A  Yes, sir.
13 Q  What is that?
14 A  That is a bill that I sent in this matter.
15 Q  This is a bill for the work that you did in preparing
16    the report that you served on March 4th, 2013?
17 A  Yes, sir.
18 Q  It says that you spent 44.5 hours on that report.
19 A  That is correct.
20 Q  Is that the sum total of time that you spent on
21    preparing the March 4th, 2013 report?
22 A  Yes, sir.
23 Q  When did you start working on the March 4th, 2013
24    report?
25 A  I don't recall specifically, but it was approximately

```
 1       February 1, thereabouts.
 2  Q    So the work you did would have principally been in
 3       February of 2013?
 4  A    Certainly in the beginning of March.
 5  Q    Nothing, though, that you can think of before
 6       February 1st, 2013?
 7  A    Well, I have worked on this case prior to that, and
 8       certainly my cumulative knowledge and reviewing of
 9       documents was encompassed within this final -- this
10       report.
11  Q    But with regard to actually preparing the report,
12       your work began in February of 2013?
13  A    New work specifically designed or directed towards
14       this report began at that time.
15  Q    You work for Hoyer Actuarial Litigation, LLC?
16  A    Yes, sir.
17  Q    Are you the only employee of Hoyer Actuarial
18       Litigation, LLC?
19  A    I'm the principal and the only employee, if you use
20       that term.
21  Q    Are there any other employees at Hoyer Actuarial
22       Litigation, LLC that are paid by that entity besides
23       you?
24  A    Paid by that entity.  From time to time on various
25       cases I have used subcontractors to augment the work
```

```
 1       that I do.
 2  Q    Have you used subcontractors in this case?
 3  A    I'm not sure how you would describe, Nathan
 4       Associates worked with me.  They were not a
 5       subcontractor to me because they were not paid by me
 6       so I'm not sure how you're using that term
 7       "subcontractor."
 8  Q    Do all funds that are paid to Hoyer Actuarial
 9       Litigation, LLC go to you after cost and expenses are
10       paid?
11  A    Yes, sir.
12  Q    You mentioned Nathan Associates.  Please look at
13       Hoyer Deposition Exhibit 2.  What is Hoyer Deposition
14       Exhibit 2?
15  A    I have not seen this document prior to you handing it
16       to me.
17  Q    Okay.  Who is Nathan Associates?
18  A    They are an economic consulting firm that does work
19       in computer area.
20  Q    Did individuals at Nathan Associates assist you in
21       preparing the May 4th, 2013 report?
22  A    They did various work at my direction, yes, sir.
23  Q    And just looking at the hours, I don't want to ask
24       you about what type of work they actually did, but
25       just looking at the hours, does this to your mind
```



```
 1       accurately reflect the number of hours that was spent
 2       by individuals at Nathan Associates on the March 4th,
 3       2013 report?
 4  A    I have no idea how many hours they spent.  I have not
 5       seen this report prior and I did not control their
 6       hours.
 7  Q    Who to your knowledge controlled their hours?
 8  A    I know other individuals who were involved, but I'm
 9       not sure how to answer that question because I'm
10       not -- I'm not sure how that exactly worked.
11  Q    Look back at Deposition Exhibit 1.  You will notice
12       that -- It's on Page 2.  It says, "Billing for
13       actuarial services in connection with the dispute
14       Krueger versus Northwestern Mutual Life Insurance
15       Company."
16  A    Yes, sir.
17  Q    You are aware that the case that we are sitting and
18       discussing today is the LaPlant matter in Wisconsin?
19  A    That's correct.  Krueger is a misnomer in this case.
20  Q    So you did bill separately for the Krueger case
21       versus the LaPlant case?
22  A    I have been involved in that case as well.
23  Q    But do you bill separately for those two cases?
24  A    Well, I bill for the work that I do.  And if it was
25       on a different case, I would bill separately for
```

```
 1       that.
 2            MR. KERSTEN:  Counsel, if it helps, we will
 3       stipulate that's a typo.
 4            MR. GRIMSLEY:  That's fine.  I just wanted
 5       to know if there was some umbrella name under which
 6       he's billing rather than billing by case.
 7            MR. KERSTEN:  No.  No, that's just a typo
 8       apparently.  That's my understanding.
 9  BY MR. GRIMSLEY:
10  Q    All said, how much has Hoyer Actuarial Litigation,
11       LLC been paid for its work for plaintiffs' attorneys
12       on matters involving Pre-MN annuities and Northwest
13       Mutual?
14  A    Offhand I have no idea because we're talking over a
15       period of several years.
16  Q    This is the only case that you have actually
17       testified in in the last five years?
18  A    Yes, sir.
19  Q    But you have no idea how much money roughly you would
20       have made from these cases?
21  A    I'm not sure because of the duration involved.
22  Q    What percentage of Hoyer Actuarial Litigation's fees
23       over the past five years have been from cases related
24       to Pre-MN annuities and Northwestern Mutual?
25  A    A small percentage.
```

1  Q   Give me a rough idea.
2  A   I don't recall precisely or even approximately how
3      much my total billings on this -- these related cases
4      have been, so it's very difficult for me to estimate
5      how much of that is relative to my total billings.  I
6      would have to go do an analysis to get you a
7      legitimate answer.
8  Q   Has it been, just rough ballpark, 5 percent,
9      10 percent, 15 percent?
10 A   In that range.
11 Q   10 percent then is a fair --
12            MR. KERSTEN:  Objection as repetitious.
13            THE WITNESS:  I say I do not know, I
14     haven't done that analysis, but that is a ballpark
15     rough estimate.
16 BY MR. GRIMSLEY:
17 Q   How much does Hoyer Actuarial Litigation make per
18     year roughly?
19            MR. KERSTEN:  Objection as irrelevant.
20            THE WITNESS:  Since I do consulting work,
21     it varies considerably from year to year.
22 BY MR. GRIMSLEY:
23 Q   How much did Hoyer Actuarial Litigation make last
24     year?
25            MR. KERSTEN:  Same objection.

1            THE WITNESS:  Yeah, I don't know.
2  BY MR. GRIMSLEY:
3  Q   You have no idea?
4  A   I have -- Only ballpark.
5  Q   We just had tax season.  You have no idea?
6  A   I don't know, 100,000.  I'm retired.
7            (Deposition Exhibit No. 3 was marked for
8      identification.)
9  BY MR. GRIMSLEY:
10 Q   I'm going to hand you what has been marked as
11     Deposition Exhibit 3.  You will see that this is a
12     report from you dated March 4th, 2013; is that
13     correct?
14 A   Yes, sir.
15 Q   Please look that over and let me know if this is the
16     March 4th, 2013 report that you prepared on behalf of
17     Plaintiffs' counsel in this case.
18 A   It appears to be.
19 Q   Please go to Page 2 of the report.
20 A   (Witness complies.)
21 Q   Paragraph 6.  And it lists -- And it says there, "The
22     attorneys for the Plaintiffs in this case have asked
23     me the following."  Do you see that?
24 A   Yes, sir.
25 Q   And then there are three bullet points there.

1  A   Yes, sir.
2  Q   That was the assignment that you were provided for
3      this report?
4  A   That was the assignment I was provided for this
5      report, yes, sir.
6  Q   Do these three items accurately represent your entire
7      assignment for this report?
8  A   Yes, sir.
9  Q   This was everything you were asked to do?
10 A   That is correct.
11 Q   Did you do anything beyond answering these three
12     particular questions for purposes of putting together
13     this report?
14 A   It's difficult for me to answer that question because
15     I'm not sure how you mean that.  Certainly in
16     answering these three questions, as I proceeded with
17     my work towards these three questions, I made
18     observations based on information and conveyed them
19     to counsel.
20 Q   But these three items were your assignment in the
21     case?
22 A   Yes, sir.
23 Q   Now, I don't see anything in these three bullet
24     points about damages.  Were you asked to calculate
25     what the damages would be in this case?

1  A   "Damages" can be defined as a legal term.  Are you
2      using that as a legal term?
3  Q   Yes.
4  A   Well, I'm not an attorney, so I'm -- I have no
5      opinion as to the legalese of "damages."  I can talk
6      to damages if you're using the definition from a
7      dictionary.
8  Q   Did you in any way attempt to fit what you were doing
9      in this report to any sort of legal definition of
10     damages?
11 A   No, sir, I did not.
12 Q   Were you asked to do that by Plaintiffs' counsel?
13 A   No, they did not.  If they did, I would say I'm not
14     an attorney.
15 Q   Did you do anything in this report to attempt to
16     calculate what punitive damages might be in this
17     case?
18 A   Now, that term is not used in this report and I did
19     no analysis in that direction.
20 Q   Did you do anything to determine what type of
21     interest rates might apply to any sort of judgment in
22     this case?
23 A   Again, that's not --
24            MR. KERSTEN:  Objection -- Excuse me.  I
25     want to object on the grounds that it is ambiguous as

1    to whether you mean pre-judgment or post-judgment
2    interest.
3    BY MR. GRIMSLEY:
4    Q    Sir, did you do anything with regard to calculating
5         interest as to any judgment, whether it's
6         pre-judgment or post-judgment in this case?
7    A    That was not included in Paragraph 6 and I did not do
8         any such analysis.
9    Q    In your analysis, did you take into consideration the
10        potential impact of any statutes of limitations in
11        this case?
12   A    For purposes of this report I did not.
13   Q    Were you asked to do so by any of the lawyers?
14   A    Again, I'm not an attorney.  If they asked me to
15        review statutes of limitations, I would say that's
16        beyond my scope and capability, but I did not in this
17        instance.
18   Q    Did the lawyers provide you any assumptions that you
19        should make with regard to statutes of limitations?
20             MR. KERSTEN:  Objection as irrelevant.
21             THE WITNESS:  No, that -- that never
22        surfaced in our discussions.
23   BY MR. GRIMSLEY:
24   Q    Did the lawyers for Plaintiffs ask you to assume
25        anything about the impact that various state laws

1         might have on your calculations?
2              MR. KERSTEN:  Same objection.
3              THE WITNESS:  No, I -- they did not specify
4         such.
5    BY MR. GRIMSLEY:
6    Q    You did not, in fact, take into account the impact
7         that different state laws might have on your opinion?
8              MR. KERSTEN:  Same objection.
9              THE WITNESS:  No, I did not, and I do not
10        think that's -- impacts my analysis in any way.
11   BY MR. GRIMSLEY:
12   Q    You have not provided in this report a basis for
13        determining punitive damages on a class-wide basis
14        using common proof, have you?
15   A    That term "punitive damages" is not mentioned in my
16        report.  And your last part of your question appears
17        to be another legal term which, again, is not part of
18        my analysis.
19   Q    Well, you were asked to determine what the
20        accumulated difference was on policies on a
21        class-wide basis; correct?
22   A    On both a class-wide basis and an individual basis,
23        yes, sir.
24   Q    Now I'm asking about punitive damages then.  You have
25        not done anything to calculate what punitive damages

1         might look like on a class-wide or individual basis?
2    A    It's not mentioned here, I was not asked it, and I
3         render no opinion in that regard.
4    Q    Okay.  You don't know, in fact, how somebody would go
5         about determining punitive damages on a class-wide
6         basis, do you?
7    A    I'm not an attorney, I have no opinion.
8    Q    I want to look at the first bullet point in Paragraph
9         6.  It says, "To describe a reasonable methodology
10        that would provide the basis for prospective relief
11        for current Pre-MN annuity policyholders."  What do
12        you mean by "prospective relief"?
13   A    Prospective relief as I have analyzed it and as I
14        discussed with counsel, in my opinion, takes two
15        forms:  A difference to date for those individuals
16        that are remaining in force and fair and equitable
17        treatment of those individuals prospectively from
18        point of that adjustment.
19   Q    "Prospective relief" is, to your understanding, a
20        legal term?
21   A    To my understanding I am using it as a dictionary
22        term.
23   Q    Okay.  You said that part of the prospective relief
24        for in-force policyholders would be payment based on
25        past accumulated differences?

1    A    Would be a current payment based on historical
2         activity, so that would be what I would consider to
3         be the first part of prospective relief for those
4         policyholders.
5    Q    How is that prospective relief if you're paying money
6         into an account based on things that have happened in
7         the past?
8    A    Because it's only the first part of prospective
9         relief, and the second part is in fact into the
10        future and what would be fair and equitable
11        thereafter, so it's a part of.
12   Q    Wouldn't it be --
13   A    You cannot give prospective relief until a proper
14        reflection of past differences is done.
15   Q    But part of that prospective relief would, in fact,
16        be retrospective in nature?
17   A    It would be current in nature.
18   Q    It would be based on things that happened in the past
19        and there would be money provided by Northwestern
20        Mutual to an account based on things that happened in
21        the past?
22   A    It would be current adjustment based on historical
23        activity, yes, sir.
24   Q    Is that damages?
25   A    In my dictionary term, it's certainly a part of what

 

1     I would consider damages. You have brought up that
2     term as a legal term. I have no opinion as to how
3     that fits your legal definition.
4 Q  With regard to the prospective aspect of this relief,
5     which would involve paying up additional money in the
6     future to match the life rate DIR, what would happen
7     in the future if the Pre-MN annuity rate in the
8     actual world exceeded the life DIR?
9         MR. KERSTEN: Object as to the ambiguity of
10    that question.
11        THE WITNESS: I'm not sure what you have
12    asked. I just don't understand what you're saying.
13 BY MR. GRIMSLEY:
14 Q  You understand that you have in your report put
15    forward something called a but-for DIR?
16 A  Yes, sir.
17 Q  And the but-for DIR in your report is the DIR you say
18    should have applied if -- to Pre-MN annuities if
19    Northwestern Mutual had not made the 1985 change?
20 A  That is correct.
21 Q  We also have the Pre-MN annuity DIR in the actual
22    world, don't we? Meaning the Pre-MN annuity DIR in
23    the world where the 1985 change occurred?
24 A  Yes, sir, we do.
25 Q  What if in the future the Pre-MN annuity DIR in the

1     actual world with a segmented account actually were
2     to surpass or be higher than the life rate DIR in the
3     actual world --
4         MR. KERSTEN: Objection --
5 BY MR. GRIMSLEY:
6 Q  -- how would the prospective relief work in that
7     situation?
8         MR. KERSTEN: Objection as without
9     foundation.
10        THE WITNESS: Well, I think that's a
11    hypothetical question, because what I'm saying in my
12    report is that fair and equitable treatment of these
13    policyholders would put them on the basis of
14    dividends which result from an aggregate portfolio
15    approach to investments. And if that were the case,
16    I'm not sure how that hypothetical could exist.
17 BY MR. GRIMSLEY:
18 Q  Well, let's say there is a world in which say in 2015
19    short-term interest rates once again invert and
20    overtake long-term investment rates such that in the
21    actual world in 2015 the Pre-MN annuity holder is
22    actually better off with the Pre-MN annuity rate than
23    with the life rate.
24        MR. KERSTEN: Objection as to the --
25 BY MR. GRIMSLEY:

1 Q  What would you do in that situation with your
2     prospective relief?
3         MR. KERSTEN: Objection, the question is
4     self-contradictory and ambiguous.
5         MR. GRIMSLEY: It's not self-contradictory.
6         MR. KERSTEN: I believe it is.
7         THE WITNESS: I think I understand your
8     question, but I -- Again, the reason why I'm having a
9     little trouble with it is simply that I am saying
10    that there would not be or should not be a segregated
11    portfolio that without the '85 change all
12    policyholders, life and annuity and Pre-MN annuity,
13    would be treated as a singular portfolio investment
14    pot. So what you're saying is if sometime in the
15    future a short-term yield -- Well, there wouldn't be
16    a short-term yield relative to Pre-MN annuitants.
17    They would be put in the aggregate yield, the
18    portfolio yield of the company, so I -- it's possible
19    that an inversion curve could happen in the future,
20    but I don't think Pre-MN annuitants would be in that
21    segregated account prospectively.
22 BY MR. GRIMSLEY:
23 Q  So I want to understand how your prospective relief
24    would actually work mechanically. I understood that
25    you were opining that each year there would be an

1     adjustment to the Pre-MN annuity DIR to bring it up
2     to or down to the life DIR; is that correct?
3 A  No, that is not what I'm saying.
4 Q  Are you saying that there would no longer be any
5     segmentation going forward and everybody would then
6     be in the same pot?
7 A  Well, if the court were to say that this is an
8     appropriate prospective relief, it would be as-if, so
9     there would be no basis to maintain a segregated
10    account if the Court directs the company to utilize
11    an overall portfolio rate, so it's a hypothetical
12    that does not exist.
13 Q  But you can imagine that there might be situations in
14    the future where annuity policyholders might be
15    better off under the segmented portfolio rate than
16    under the life rate; correct?
17        MR. KERSTEN: Objection as without
18    foundation.
19        THE WITNESS: No, I don't believe that
20    could happen.
21 BY MR. GRIMSLEY:
22 Q  You don't believe there may never be an inverted
23    yield curve again?
24 A  That's not what I said. I said the prospective
25    relief, as I described here, which is two part, the

 

```
 1     determination of a current adjustment and a
 2     prospective dividend interest rate based on portfolio
 3     yield in combination, that being prospective relief,
 4     will always, always be better for Pre-MN annuitants
 5     than where they -- the way they have been treated and
 6     using a segregated account in the future.
 7  Q  Even if the segregated account in the future would in
 8     fact make more money than the non-segregated account?
 9  A  It would never make a greater difference than the
10     prospective relief that I have described here.
11  Q  So you are saying in the actual world, the current
12     world, where the 1985 change took place, there is
13     never a point in the future where the Pre-MN annuity
14     might do better than the general portfolio?
15  A  That the prospective relief that I have described
16     here, which is made up of two parts, an adjustment
17     based on -- a current adjustment based on historical
18     values plus prospective dividend interest rates based
19     on a portfolio yield, that that in combination will
20     always, always, always overcome a momentarily
21     inversion curve possibly at some time in the future.
22  Q  You can't predict what's going to happen with
23     interest rates in the future, can you, sir?
24  A  No one can.  However, if one were to look at
25     Northwestern's annual reports, they certainly purport
```

```
 1     to indicate that policyholders will be treated better
 2     or better off using various terms under the
 3     investment portfolio that they have utilized.  So
 4     they, in fact, do exactly what you're saying.
 5         MR. GRIMSLEY:  Move to strike after
 6     "however."
 7  BY MR. GRIMSLEY:
 8  Q  Sir, you cannot yourself predict what's going to
 9     happen with interest rates in the future, can you?
10  A  I cannot.
11  Q  If you could do that you would be incredibly wealthy;
12     wouldn't you, sir?
13  A  I'm not sure.
14  Q  If you could predict them accurately?
15         MR. KERSTEN:  Counsel, what's the point of
16     this question?
17         MR. GRIMSLEY:  Objection to form is --
18         MR. KERSTEN:  I object as to form.  I don't
19     think it's appropriate.
20         THE WITNESS:  I don't know.  I'm not sure.
21  BY MR. GRIMSLEY:
22  Q  But you're not incredibly wealthy, are you, sir?
23         MR. KERSTEN:  Objection as irrelevant.  You
24     don't have to give your personal -- you don't have to
25     give your personal financial statement unless,
```

```
 1     counsel, you have got some basis that you can tell me
 2     about that it permits you to inquire as to his
 3     personal finances.  Do you have such a basis or don't
 4     you?
 5         MR. GRIMSLEY:  Are you going to instruct
 6     him not to answer?
 7         MR. KERSTEN:  No, I'm going to ask you to
 8     desist from irrelevant questions.  And if you have a
 9     basis, I would like to know, otherwise I will
10     instruct him on his need to give his personal
11     financial situation.  I don't think that bears on the
12     issues in the case.
13         MR. GRIMSLEY:  Then instruct him not to
14     answer.
15         MR. KERSTEN:  I will so instruct him unless
16     you can tell me what conceivable relevance it has and
17     I am happy to consider that right now.
18         MR. GRIMSLEY:  The conceivable relevance is
19     if he can predict interest rates, like he's saying
20     others in the past should have done, or did in fact
21     do, he would be an incredibly wealthy man.  He's not
22     incredibly wealthy.
23         MR. KERSTEN:  You have asked that question
24     and he has answered it.  What I want you to do is
25     tell me the relevance of his giving his personal
```

```
 1     financial situation --
 2         MR. GRIMSLEY:  Instruct him not to answer
 3     then.
 4         MR. KERSTEN:  -- and I will be happy to
 5     instruct him that he can answer if you give me any
 6     suggestion why that's relevant.
 7         MR. GRIMSLEY:  I gave you what it is.  If
 8     you want to instruct him not to answer on the basis
 9     of what I've told you, then do so.
10         MR. KERSTEN:  If you have nothing more to
11     say on its relevance, then I instruct you not to
12     answer as to your own personal financial net worth.
13     Basically that's what he seems to be asking here, and
14     he refuses -- defense counsel refuses to tell me any
15     conceivable bearing that might have on the issues in
16     the case.  So I tell you, you need not answer and
17     should not answer any questions dealing with your own
18     personal net worth.
19  BY MR. GRIMSLEY:
20  Q  You're aware, sir, that there are other policies
21     besides life policies that Northwestern Mutual sells,
22     including short-term annuities such as the CRA?
23  A  I'm not even sure how you would describe that.  I'm
24     aware of that they have other policies, yes, sir.
25  Q  You're familiar with something called the current
```

**Page 29**

1  rate annuity?
2  A  Yes, sir.
3  Q  That's a product that Northwestern Mutual began
4     selling as of 1985?
5  A  That's correct.
6  Q  People have actually bought that policy?
7  A  I believe so.
8  Q  Does that suggest to you that some people have
9     preferences for instruments that allow for short-term
10    interest rate investments?
11 A  I did not analyze that product, so I'm not sure how
12    that product was set up, only that it was different
13    than the Pre-MN annuitants.
14 Q  Do you know anything about how that product was set
15    up in terms of the terms of the current rate annuity?
16 A  I know something; but, again, I didn't analyze it.
17 Q  Do you know whether, in fact, it's actually a
18    participating policy?
19 A  I'm not sure if it is.
20 Q  But you do know that it's actually pegged to
21    short-term interest rates?
22 A  I'm not sure that it is.
23 Q  You have no knowledge whatsoever sitting here today?
24 A  As I say, I looked at that policy years ago and I
25    don't recall precisely nor does it impact on my

**Page 30**

1     analysis today.
2  Q  Do you think it would be interesting to know whether
3     there are putative class members who actually
4     purchase the CRA?
5  A  It's irrelevant to my analysis.
6  Q  You don't find it relevant that some people have
7     purchased an annuity product that is actually pegged
8     to short-term interest rates at the same time as
9     holding the Pre-MN annuity?
10 A  Absolutely not.
11 Q  Look at the second bullet point, please.  It says,
12    "To indicate whether the methodology could be applied
13    to all Pre-MN annuity policyholders on a common basis
14    using a mechanical calculation."  What did you mean
15    by that?
16 A  That whether a methodology would be applicable to
17    individuals and whether it would be a fair and
18    reasonable representation of any difference and to
19    indicate whether that methodology would encompass any
20    subtleties product to product, whatever.
21 Q  What do you mean by "subtleties product to product"?
22 A  Any specific difference that might exist between one
23    policyholder's policy and another.
24 Q  What differences between various policies of the
25    putative class members did you take into account in

**Page 31**

1     coming up with your opinions in this report?
2  A  All of them.
3  Q  What in your mind is "all of them"?
4  A  In my mind "all of them" means all of them.  I was --
5     We looked at various policies, we looked at
6     distinctions that may exist or might exist or
7     whatever, and we incorporated them into our
8     methodology.
9  Q  You are aware that there are three different types of
10    annuity policies that are held by the putative class
11    members, namely something called an FPA, or a
12    flexible premium annuity; a single premium retirement
13    annuity, or an SPRA; and a retirement annuity, an RA?
14 A  You're throwing out terms that I would have to review
15    specific notes or review my analysis to determine if
16    your exact representation is accurate and
17    all-encompassing.  I am aware that those type of
18    differences were precisely what I was just talking
19    about when I said whether a common methodology would
20    apply to different kinds of policies.
21 Q  Is there anyplace in your report that you can point
22    to where you discuss whether or not there are, in
23    fact, differences that are relevant to your analysis
24    between the three different types of policies I just
25    asked you about?

**Page 32**

1  A  Yes.
2  Q  Where?
3  A  Several places in my report I say that I am providing
4     the answer to the question that counsel provided to
5     me, which is, could a common methodology apply across
6     the entire Pre-MN annuitant group, and I conclude
7     that the common methodology in fact does apply to all
8     such policies.  So what I'm saying is that yes I have
9     considered differences, and I am telling counsel that
10    I can opine positively that the methodology laid out
11    in my report encompasses all such of those policies.
12 Q  But you understand the report is one of the only
13    things I get to see that reveals the analysis that
14    you provided, so I'm asking you about what the
15    differences are that you identified and why you
16    determined that those differences were not relevant
17    for purposes of the actual answer you came up with,
18    okay?
19 A  I developed a methodology and looked at every
20    difference that I could surface with and see within
21    policies and responded to counsel via this report
22    that this is the methodology that encompasses all
23    Pre-MN annuitant policies reasonably.
24 Q  What specific differences between policies did you
25    look at and consider in coming to the opinions set

   forth in your report?
           MR. KERSTEN:  Counsel, just as moment.  I
   object as to the ambiguity, and I have a feeling
   you're not -- there is an ambiguity that you may not
   be aware of.
           MR. GRIMSLEY:  George, please -- literally,
   please, just object to form.
           MR. KERSTEN:  I am.  I'm objecting to the
   ambiguous form of that question.
BY MR. GRIMSLEY:
Q  You said that you had identified differences between
   the policies and you made a determination that with
   regard to the opinions in your report those
   differences did not matter; correct?
A  That is correct.  This methodology encompasses those
   differences and treats them fairly.
Q  What specific differences did you identify and
   analyze to come to your conclusion that such
   differences would not matter to the conclusions set
   forth in your report?
           MR. KERSTEN:  Same objection as before.
           THE WITNESS:  Well, you have surfaced in
   your previous question with certain types of
   policies.  That certainly is a difference which I
   considered.  Another difference, which is shown in

   the report, is that there might be from policy to
   policy a different policy loan rate.  That's a
   difference between policies.  And the analysis and
   the formula says that difference needs to be adjusted
   for in the formula, and so throughout the report the
   formula recognizes that difference between policies.
           The report also specifies that there
   is a substantive difference between policies as to
   whether the policyholder has accepted or agreed to
   direct recognition, which is a technical term that we
   have defined throughout this case, or not, and the
   formula calculates differently for those -- that
   difference in policies.  So I analyzed and considered
   as many differences as were able to surface among
   policies and policyholders, certain of which is
   specified in the report, a call for an adjustment in
   the formula.
           MR. KERSTEN:  Counsel, just so you're
   aware, that was the ambiguity I was concerned with
   that has now been clarified.
BY MR. GRIMSLEY:
Q  You identified a few differences that you did take
   into account in your report, some of which didn't
   find their way into the methodology because you said
   they didn't need to and some of which did.  Are there

   any other differences between the various policies or
   policyholders that you took into account and analyzed
   in this matter before coming to the opinions in your
   report?
A  Well, there is differences in perhaps expenses, and
   that's talked to in the report, and that is
   reasonably reflected in the formulas.  So we
   certainly looked to -- we -- I certainly looked to
   whatever differences existed, and in my opinion I
   have considered and analyzed each of those
   differences and I'm opining positively to counsel
   relative to the question asked of me, that this
   mechanical methodology that I have developed applies
   appropriately and reasonably and fairly to all Pre-MN
   annuitants.
Q  You have mentioned that there were different types of
   policies, meaning flexible premium annuity, a single
   premium retirement annuity, and retirement annuity;
   and you took that into account you say.  You took
   into account the different interest rates on
   borrowing.  You took into account whether a policy
   had direct recognition or not.  You said you also
   took into account you said expenses.  Are there any
   other differences you took into account?
A  Again, I -- what I did was review as much as is

   possible regarding the Pre-MN annuitant group, what
   kinds of policies, what differences there were, and
   certainly considered any such difference in
   developing the methodology that I have laid forth
   here, and in reviewing whether I would be able to
   opine positively to counsel relative to the question
   asked of me.
Q  Sir, I'm just asking what other differences can you
   think of between the policies or policyholders that
   you took into account before coming to your ultimate
   opinions in this report?
A  Literally every difference that I could surface with,
   that I was told about, that I saw via extensive
   review of documents in this case, so I believe I have
   considered every such difference.
Q  Can you list any other differences other than the
   ones that you have actually testified about?
   Specific differences.
A  Off the top of my head, no.  My work in this regard,
   as to what exactly the difference between policies in
   the Pre-MN group go back several years, is when I
   started looking at those policies and reviewing them.
   So I believe I'm aware of the differences that do
   exist to the extent there are any, but it was not
   done within the one month period prior to issuing

1   this report, so I can't cite other specifics off the
2   top of my head, no.
3   Q   Now, we talked about prospective relief for in-force
4       policyholders. For those policyholders that are
5       putative class members but have surrendered or
6       otherwise terminated their policies as of today's
7       date, what would you call the relief you're
8       calculating for them?
9   A   That relates to the third question or third bullet of
10      Paragraph 6 that counsel asked if that same
11      methodology could quantify a difference for those
12      policyholders which were in the initial class but are
13      no longer in force, and my answer to that third
14      request of Plaintiffs' counsel was positive, that the
15      same methodology would apply, it will calculate a
16      difference at the time of termination between the
17      amounts accrued for each individual or group of
18      policyholders compared to what I believe would be
19      fair and equitable treatment but for, and that's the
20      term that we have defined, but for the 1985 change.
21  Q   In your mind with regard to those putative class
22      members that have terminated or surrendered their
23      policies, would the relief be damages?
24  A   The difference is the term I'm using. And, again,
25      we're talking this distinction between a legal and a

1       dictionary definition.
2   Q   That's why I asked in your mind.
3   A   Certainly in my mind, using the dictionary definition
4       of damages, that would be a part of damages.
5   Q   What other part of damages would there be for the
6       individuals who have surrendered or terminated their
7       policy?
8   A   Well, I could use as an example, if an individual
9       policyholder terminated in 2005, what I have
10      quantified and what this methodology quantifies is
11      how much additional funds they should have received
12      in 2005, but in fact they did not receive any
13      additional funds, so clearly this difference is
14      applicable to 2005. The Court may decide, someone
15      else may decide, that since it was not paid in 2005,
16      if it is paid in 2013, there is an interest
17      differential, that's beyond the scope of my report.
18  Q   You did nothing to determine on a class-wide basis
19      what the interest differential would be for
20      individuals in the putative class who have
21      surrendered or terminated their policies?
22          MR. KERSTEN: Objection, ambiguous as to
23      form.
24          THE WITNESS: I believe that's correct,
25      sir.

1   BY MR. GRIMSLEY:
2   Q   Are there any other parts of damages that you can
3       think of besides the accumulated difference indicated
4       in the third bullet point in Paragraph 6 for
5       individuals who have terminated or otherwise
6       surrendered their policies?
7   A   Again, you're throwing out that term, and I keep
8       saying I'm not sure how you're using it, in my
9       definition of the dictionary term "damages" or a
10      legalese perspective, and I'm not --
11  Q   And that's fair enough.
12  A   I'm trying to answer as best I can, but you keep
13      asking the same thing and I keep saying there is two
14      levels.
15  Q   That's fair enough. In your definition. And earlier
16      in response to one of my questions on this issue,
17      using your definition, you said the accumulated
18      difference would be part of damages. So given your
19      understanding of damages, not the legal definition,
20      you then testified that interest might be another
21      component?
22  A   Might be, that's correct, sir.
23  Q   Is there some other component of damages that you can
24      think of given your definition of damages that would
25      not be included in the accumulated difference for

1       individuals who terminated or surrendered their
2       policies?
3   A   I'm not an attorney, but I have been involved in
4       litigation situations certainly, and there may or may
5       not be punitive damages or costs. There is -- you
6       know, it gets to be a determination made by the
7       courts, not by my analysis.
8   Q   So you just mentioned also there are punitive damages
9       and potentially costs. Is there any other part of
10      damages given your definition of damages that you can
11      think of that would not be included in the
12      accumulated difference?
13  A   Offhand, from my definition, I'm not aware. I
14      realize that this I believe is a basis -- a
15      difference which is certainly part of damage.
16  Q   But other than the accumulated difference, you did
17      not actually in your report take into account any of
18      those other parts of damage?
19  A   That is correct, sir.
20  Q   Look at Paragraph 8, please.
21  A   (Witness complies.)
22  Q   And the fourth line at the end says, "The data needed
23      to perform the formulaic calculations is readily
24      available to NML and requires no additional data from
25      Pre-MN annuity policyholders." What is the data

1   needed to perform the formulaic calculations
2   specifically?
3 A Well, again, I'm indicating in the sentence directly
4   above your question that it can be applied to
5   individual Pre-MN annuitants or specified groups.  So
6   the answer to your question, to be specific, which of
7   those two do you -- are you questioning or are
8   interested in?
9 Q On a class-wide basis, what particular data would be
10  needed to apply your formula so as to fairly
11  compensate in your mind the Pre-MN annuitants?
12          MR. KERSTEN:  Objection as to the
13  ambiguity, and if you want I can describe what I mean
14  by that.
15          MR. GRIMSLEY:  No.
16          MR. KERSTEN:  You don't want to know?
17          MR. GRIMSLEY:  No, I don't.
18          MR. KERSTEN:  I object to the ambiguity of
19  the form of the question.
20          THE WITNESS:  Well, as stated, the formula
21  recognizes whether each Pre-MN annuitant would be in
22  either a direct recognition or a non-direct
23  recognition category; would have any loan rate or
24  policy loan rate, either 5, 6 or 8 percent, because
25  the formula differentiates among those things; and

1   also to apply the formula, cash values and cash
2   transactions would need to be known.
3           So cash values certainly should be
4   readily available, cash transactions certainly should
5   be readily available, and they would include
6   deposits, withdrawals, policy loans, repayment of
7   policy loans.  Whatever cash transacts between the
8   company and these Pre-MN annuitants.
9 Q One of the pieces of data that you would want is when
10  certain premiums were actually paid; correct?
11 A Yes, that's part of the cash transactions.  So if a
12  policyholder deposited an amount of money, how much
13  and when would be a necessary value to apply the
14  formula properly.
15 Q And you would not only want to know what year the
16  premium was paid, you would want to know when in that
17  year the premium was paid in order to apply the
18  formula properly?
19 A No, that's not correct.  As shown in the report, for
20  purposes of simplicity and for purposes of
21  understandability, we took all transactions as of the
22  end of the policy year and applied the formula, and
23  the formula works perfectly well under that basis,
24  which is cash transactions defined by year.  It also
25  states within the report that if more refined

1   information were available, such as cash transactions
2   at specific dates, the same formula would apply
3   equally well to that additional information and
4   provide a reasonable and reliable value for
5   difference under that scenario as well.  So the
6   formula is the same, the value is equally reliable
7   under each and could be applied under either
8   scenario.
9 Q Is it true, however, that the accumulated difference
10  in an account would be greater if you assume the
11  premium was deposited at the beginning of the year
12  rather than at the end of the year as your model
13  assumes?
14 A Yes, sir, that is accurate.
15 Q So your model, if anything, comes up with a damages
16  number that is lower than in your mind the real
17  damages number would be?
18 A It comes up with a reasonable, reliable value for
19  difference, not damage, for difference which in my
20  opinion is conservatively stated, yes, sir.
21 Q In your -- Does that mean that your model is really
22  an estimate of the accumulated difference rather than
23  the actual accumulated difference in the "but-for"
24  world?
25 A Yeah, there is -- it certainly is a reliable

1   representation and it is a reasonable and accurate
2   estimation of that difference.
3 Q But if you applied your model to the class, there are
4   members of the class who would actually receive less
5   money than they would if you took into account the
6   actual dates of premium deposits rather than assuming
7   that all of them occurred at the end of the year?
8 A We have shown it in the example within the report on
9   an end of year basis and state that that is a
10  conservative estimate.  If -- And we indicate in the
11  report, I indicate, that if more detailed information
12  were available, such as precise dates of cash
13  transactions, that the reasonable and reliable and
14  accurate estimation would in fact likely increase
15  somewhat.
16 Q Do you know whether anyone on behalf of Plaintiffs'
17  counsel has informed the class members that the
18  damages model you have adopted is conservative in
19  nature, meaning that it doesn't account for the
20  actual date of the premium deposit?
21 A I have no idea what counsel has discussed with class
22  members.
23 Q Have you discussed it?
24 A But my methodology, I will underscore, is a
25  reasonable, reliable, and accurate representation of

```
 1        the difference for policyholders.
 2   Q    Have you --
 3   A    And is conservative relative to that one estimate or
 4        one aspect of cash transaction.
 5   Q    Have you personally asked any of the putative class
 6        members whether they agree with your model?
 7   A    No, I have not.
 8   Q    Have you personally asked any of the class members
 9        whether they agree with using a conservative approach
10        that might actually understate the amount of
11        accumulated difference for a particular class member?
12   A    I have not; and I do not believe that a reasonable,
13        reliable, and conservative estimate understates as
14        that--that is not -- I think the process has shown
15        that we're using year-end values--gives a reliable
16        and accurate representation of the difference.
17   Q    You said that your model could take account of actual
18        dates of premium deposits if that information were
19        available; correct?
20   A    Of cash transactions of which premium deposits or --
21        whether you call them premium deposits, whatever, and
22        other cash transactions were to be identified on a
23        daily basis.
24   Q    Let's assume that Northwestern Mutual does not have
25        the actual date of premium deposit for all premium
```

```
 1        deposits for the entire class period. At that point,
 2        in order to obtain that information, wouldn't you
 3        need to ask the annuity holder him or herself?
 4   A    Absolutely not. You would certainly not need to ask
 5        the individual policyholder. And I want to go to the
 6        first part of your question, because it -- it applies
 7        on a general basis as well. Northwestern does not
 8        know. No insurance company knows the exact date of
 9        transaction because, in fact, they do various
10        proximations or value adjustments themselves, such as
11        cash transacted in a week is reflected on a Friday.
12        Every company does that to some extent.
13             So the same thing applies within a
14        company. So if more detail comes about and if
15        Northwestern had such detail, this formula would
16        reflect it properly. And if they are limited to
17        providing information on an annual basis, this
18        formula reflects that properly. In either case, you
19        get a reliable accurate representation of the
20        difference.
21   Q    Assume with me that Northwestern Mutual for the
22        entire class period does not, in fact, have even the
23        weekly deposit information for all of the annuity
24        policyholders. At that point, there is the
25        possibility that you could get better information on
```

```
 1        the timing of deposits by going to each individual
 2        class member. It's at least possible, isn't it, sir?
 3   A    For a particular individual, you could perhaps get
 4        more accurate information. But as I state in my
 5        report, it's really irrelevant to getting a
 6        reasonable and accurate representation of the
 7        difference.
 8   Q    Do you think it's possible that there are individual
 9        policyholders out there that would want a court to
10        take into account more accurate information about the
11        date of premium deposits if that individual has that
12        information in his or her possession?
13   A    I'm not sure how to answer that question. In any
14        class action I have ever seen, again, speaking as a
15        non-attorney, just from my own awareness, class
16        members are always allowed to go outside any
17        arrangement and calculate or proceed on an individual
18        basis, but I do not see why in this instance that
19        would be of any value to any individual policyholder.
20   Q    You have not actually talked, however, to any
21        individual policyholder about that issue?
22             MR. KERSTEN: Objection, repetitious and
23        irrelevant.
24             THE WITNESS: No, I have not.
25             (Exhibit No. 4 was marked for
```

```
 1        identification.)
 2   BY MR. GRIMSLEY:
 3   Q    I'm showing you what is being marked as Deposition
 4        Exhibit No. 4. This is the Plaintiffs' motion in
 5        support of it's -- Well, this is Plaintiffs' motion
 6        for an order redefining the class that was filed with
 7        the federal court in this case. Do you recognize
 8        this?
 9   A    Yeah, I do not believe I have seen this before.
10   Q    I just want to ask you about the class definition.
11        And you will see on the first page, there is a
12        definition of the proposed class. Do you see that?
13   A    Yes, sir.
14   Q    Have you been provided or have you seen previously
15        the proposed definition of the class?
16   A    I have not seen, I have been told.
17   Q    Please read this definition and let me know if it is
18        consistent with the proposed definition that you have
19        been provided.
20   A    I believe this is what I have been told.
21   Q    As defined there, would the class include individuals
22        who had Pre-MN annuity policies in force as of
23        March 31st, 1985 but who terminated or otherwise
24        surrendered their policies prior to 1993?
25   A    There is a Section B which excludes certain people.
```

```
 1        And to the extent they do not fall in Section B, it
 2    would include those people that terminated prior to
 3    1993.
 4              MR. GRIMSLEY: We have been going for about
 5    an hour, a little over, if you want to take a break.
 6    It's up to you.
 7              MR. KERSTEN: Sure. Could you give us a
 8    guesstimate or speculative guesstimate of how long
 9    we're going to go today?
10              MR. GRIMSLEY: You know what, it's going to
11    depend on the answers that are given. My questions
12    are relatively short --
13              MR. KERSTEN: Well, I realize that.
14              MR. GRIMSLEY: Well, when the answers are
15    three paragraphs long it definitely changes the --
16              MR. KERSTEN: Well, assume that, just give
17    me a reasonable --
18              MR. GRIMSLEY: I would say it would be six
19    to seven hours if the answers remain this long. If
20    they don't, it will be much shorter.
21              MR. KERSTEN: So you're talking 3:00, 3:30,
22    something like that? We want to know because we want
23    to confirm travel plans.
24              MR. GRIMSLEY: I don't think so, unless you
25    want to have him each lunch while he's giving the
```

```
 1    deposition. I think it will be more like 4:30, 5:00.
 2              MR. KERSTEN: Let's do the best we can to
 3    keep it 3:00 to 3:30 if you can; okay?
 4              MR. GRIMSLEY: Talk to him. It will go
 5    much more quickly.
 6              MR. KERSTEN: He's pretty damn responsive,
 7    and maybe as things go on you will realize that I'm
 8    actually trying to expedite things by suggesting
 9    things are ambiguous because I think some of the
10    questions that you asked might encompass a couple
11    different situations. That's always been my concern.
12              MR. GRIMSLEY: All right. Take a break.
13              THE VIDEOGRAPHER: Going off the record at
14    10:12 a.m.
15              (Off the record.)
16              THE VIDEOGRAPHER: We're back on the record
17    at 10:22 a.m.
18    BY MR. GRIMSLEY:
19  Q  Do you recall in the State Court part of this case
20    that you provided an opinion during trial that
21    Northwestern Mutual should have given notice to its
22    policyholders of the 1985 change?
23              MR. KERSTEN: Objection as irrelevant and
24    the question goes to something that's already been
25    adjudicated and beyond the scope of this deposition.
```

```
 1    Go ahead and answer.
 2              THE WITNESS: That has nothing to do with
 3    my current report, but I do -- I do remember that
 4    that was a topic of issue.
 5  BY MR. GRIMSLEY:
 6  Q  You say it had nothing to do with your current
 7    report. Did you do anything at all with regard to
 8    your current report to determine what actions
 9    policyholders would have taken in the "but-for" world
10    had Northwestern Mutual provided notice of the 1985
11    change?
12  A  Policyholders did not exist in the "but-for" world.
13    The "but-for" world is a theoretical concept used to
14    define a current difference. So it's -- I have no
15    idea, and it's irrelevant to my conclusions, any
16    actions they might have taken in such world. They
17    did not live in that world.
18  Q  But you have not done any analysis for purposes of
19    this report of what policyholders would have done in
20    a world in which they had received notice of the 1985
21    change?
22  A  I have done no analysis in that regard.
23  Q  You have also done no analysis in your report of what
24    policyholders would have done if Northwestern Mutual
25    had provided notice and sought their consent to the
```

```
 1    1985 change?
 2  A  I have not done such analysis.
 3  Q  Were you asked by counsel to do such an analysis of
 4    whether -- of what the "but-for" world would look
 5    like if Northwestern Mutual had given notice of the
 6    1985 change?
 7              MR. KERSTEN: Do you mean other than this
 8    financial difference that he's analyzed?
 9              THE WITNESS: You know, I developed the
10    "but-for" world as the basis for my methodology, so
11    counsel did not ask me to do anything in that world.
12    It's simply a world used to develop a difference.
13  BY MR. GRIMSLEY:
14  Q  Did counsel ask you to develop a model for a
15    "but-for" world in which Northwestern Mutual had
16    given notice to policyholders and asked for consent
17    to the 1985 change?
18  A  Again, the "but-for" world is my definition, so
19    counsel did not ask me anything about such an
20    environment.
21  Q  Counsel did not ask you to perform any analysis of
22    what policyholders would have done had they been
23    notified of the 1985 change?
24  A  Not for purpose of this report.
25  Q  And counsel for purposes of this report did not ask
```

```
 1      you to do any sort of analysis of what policyholders
 2      would have done had they been notified of the change
 3      and asked for their consent?
 4   A  Not for purposes of this report.
 5   Q  You have, though, testified before that Northwestern
 6      Mutual in your opinion should have given notice of
 7      the 1985 change?
 8          MR. KERSTEN: Well, repetitious; but,
 9      again, irrelevant here and --
10          THE WITNESS: That was not my opinion.
11      This is -- You're relating to not this report, but
12      work done a couple of years ago on this case, and I
13      would not agree with your characterization that I in
14      any way opined that they should have notified them of
15      the change. I don't agree with that.
16   BY MR. GRIMSLEY:
17   Q  Is it your opinion that Northwestern Mutual was not
18      under an obligation to notify its policyholders of
19      the 1985 change?
20   A  That's correct, because the notification should have
21      been done before the 1985 change, so they should not
22      have notified policyholders that we made a change.
23      That was improper and I would never agree with that.
24      So notification was important, but I was talking
25      years ago in an earlier part of this case about
```

```
 1      notification before a change, not of the change.
 2   Q  Okay. Have you done anything with regard to this
 3      report to determine what policyholders would have
 4      done had they been notified that Northwestern Mutual
 5      was going to make the 1985 change?
 6   A  That has no bearing on this report.
 7   Q  Did counsel ask you to in any way analyze what
 8      policyholders would have done had Northwestern Mutual
 9      provided them with notice that Northwestern Mutual
10      was going to implement the 1985 change?
11   A  Paragraph 6 specifies what counsel asked me, and
12      that's not in Paragraph 6, so they did not ask me
13      that. They did not ask me anything other than what's
14      in Paragraph 6.
15   Q  So you have not developed a model for determining on
16      a class-wide basis with common proof what
17      policyholders would have done had Northwestern Mutual
18      notified those policyholders of the 1985 change
19      before Northwestern Mutual implemented that change?
20   A  There is a lot in that question. You used a legal
21      term in the middle of it. I'm not sure how to
22      respond to that question.
23   Q  Well, you said, sir, that you have developed a model
24      for determining the accumulated difference on a
25      class-wide basis; correct?
```

```
 1   A  On a class wide and an individual basis, that is
 2      correct, sir.
 3   Q  Have you done anything to determine on a class-wide
 4      basis what Northwestern Mutual annuity policyholders
 5      would have done if Northwestern Mutual had given them
 6      notice of the 1985 change before Northwestern Mutual
 7      implemented that change?
 8   A  Yes, I --
 9          MR. KERSTEN: Objection as repetitious. Go
10      ahead and answer.
11          THE WITNESS: I have done analysis of that,
12      and that was done not for purposes of this report but
13      as part of my involvement at least two years ago.
14   BY MR. GRIMSLEY:
15   Q  But there is nothing in this report on that question?
16   A  That's correct, that didn't happen and does not
17      impact this report.
18   Q  So you said you did something before on this issue.
19      Did you previously, before this report, analyze and
20      provide a model for determining on a class-wide basis
21      what Northwestern Mutual annuity policyholders would
22      have done had they been notified of the 1985 change
23      before it was implemented?
24   A  Analyze, yes, more than two years ago. Provide a
25      model, no.
```

```
 1   Q  You did not provide an opinion as to what every
 2      single putative class member would have done had they
 3      received notice of the 1985 change before it was
 4      implemented?
 5   A  No one can provide an opinion as to what, quote,
 6      every single policyholder would do in any situation.
 7   Q  You did not provide an opinion as to what the
 8      majority of policyholders would do if Northwestern
 9      Mutual had notified them of the 1985 change for
10      implementing that change?
11   A  That cuts closer to what I did do prior to testimony
12      more than two years ago, or two years ago, and so I
13      did do some analysis in that regard.
14   Q  What analysis, sir?
15          MR. KERSTEN: Objection --
16          THE WITNESS: Precisely what I did two
17      years ago, I don't recall.
18          MR. KERSTEN: Objection as irrelevant and
19      beyond the scope of this -- beyond the proper scope
20      of this deposition.
21   BY MR. GRIMSLEY:
22   Q  Did you at any point provide an opinion that one
23      could determine on a class-wide basis what
24      individuals who own Northwestern Mutual policies
25      would have done had Northwestern Mutual notified them
```




```
 1    of the 1985 change before implementing that change?
 2              MR. KERSTEN: Same objection as before.
 3              THE WITNESS: I have the same answer as
 4    before, which is no one can opine as to what every
 5    policyholder would do in any situation, let alone
 6    notification of the '85 change, so I certainly did
 7    not do that regarding every individual.
 8  BY MR. GRIMSLEY:
 9  Q   But did you attempt to do it on a class-wide basis?
10              MR. KERSTEN: Objection as to the ambiguity
11    of the word "it" and absorbing the earlier question,
12    which is equally ambiguous and also irrelevant; but
13    go ahead, Bob, do the best you can.
14              THE WITNESS: What I did do, again, two
15    years ago, was opine as to the proprietary of making
16    such an announcement to class members. That I did
17    do.
18  BY MR. GRIMSLEY:
19  Q   But you have not opined as to what class members
20    would, in fact, have done if Northwestern Mutual had
21    given notification prior to implementing the 1985
22    change?
23  A   I was not asked to do that and I did not do that.
24  Q   Do you think given your experience that different
25    policyholders would have done different things if
```

```
 1    they had been given notice of the 1985 change prior
 2    to its implementation?
 3  A   Different policyholders do different things in any
 4    situation, it has nothing to do with the 1985 change,
 5    and I have no opinion as to what an individual
 6    policyholder would do in any situation.
 7  Q   Now I want to ask you about your opinion from the
 8    earlier case that not only should Northwestern Mutual
 9    have notified policyholders before the change, but it
10    should have sought consent. Do you recall giving
11    that opinion?
12  A   I provided opinions which were specified exactly,
13    precisely, and reflected my analysis two years ago in
14    my report, and I testified on that basis. I remember
15    those topics being discussed, but I do not recall
16    precisely and exactly what my opinion was, how I
17    specified it in my report, and how I described it in
18    court. However, I can tell you that the way I
19    expressed it in my report and the way I expressed it
20    in court is exactly the result of my analysis, so I
21    have no new perspective to provide.
22  Q   Have you at any point done anything to determine what
23    class members would have done had Northwestern Mutual
24    notified them of the 1985 change and sought their
25    consent prior to implementing that change?
```

```
 1  A   I was never asked that question and I provided no
 2    opinions thereon.
 3  Q   Sitting here today, can you say with any confidence
 4    what each class member would have done had
 5    Northwestern Mutual notified them of the 1985 change
 6    and sought consent before implementing that change?
 7              MR. KERSTEN: Objection as double in form
 8    and irrelevant. Beyond the scope -- proper scope of
 9    this deposition.
10              THE WITNESS: I would not opine as to what
11    any particular class member would do in any
12    situation, whether it be the 1985 change or any other
13    situation.
14  BY MR. GRIMSLEY:
15  Q   And why would you not opine as to that?
16  A   Because it would be speculative and I could not opine
17    as to what an individual would do, that's not within
18    the scope of actuarial work.
19  Q   Do you know or have an opinion on what types of
20    different things various individuals would have done
21    had Northwestern Mutual notified them of the 1985
22    change and sought consent before implementing that
23    change?
24  A   I have never analyzed that. I have no opinion
25    thereon.
```

```
 1  Q   Do you think that different people might have done
 2    different things in response to notification and
 3    request for consent?
 4  A   I will say again, different people can do different
 5    things on any issue irrespective of the 1985 change,
 6    it has nothing to do with that. I have no opinion as
 7    to what an individual would do in a given situation.
 8  Q   Do you have any opinion as to what the class of
 9    people would have done?
10  A   I was not asked that question, I did not analyze it,
11    and I have no such opinion.
12  Q   You're familiar with the 1983 update?
13  A   Yes, sir.
14  Q   You're familiar that Northwestern Mutual in that
15    situation provided notice of the update and sought
16    consent for the update?
17  A   Yes, sir.
18  Q   Did everybody who was notified and asked for consent
19    agree to the 1985 update?
20  A   No, sir.
21  Q   Roughly how many people did not agree?
22  A   I saw that information more than two years ago. I
23    don't recall.
24  Q   Was it a substantial percentage that did not agree,
25    in your recollection?
```

1  A   I do not think that's accurate, but I'm not sure what
2      the percentage is.
3  Q   There were also individuals who consented to the 1983
4      change; correct?
5  A   Yes, sir.
6  Q   How many individuals consented to the 1983 change?
7  A   I certainly do not know how many.
8  Q   Do you have a rough sense of what percentage of the
9      individuals consented to the 1983 change?
10 A   I did more than two years ago when I reviewed that,
11     but I do not recall at this time.
12 Q   Well, you did as part of your report look at
13     individuals who had direct recognition versus
14     individuals who did not; right?
15 A   That is correct.
16 Q   Individuals with direct recognition are the ones that
17     actually agreed to the 1983 update; correct?
18         MR. KERSTEN: Objection as ambiguous as to
19     form.
20         THE WITNESS: I believe so.
21 BY MR. GRIMSLEY:
22 Q   So what percentage of individuals, given that you
23     have been looking at that issue for this report, have
24     direct recognition?
25 A   For purposes of this report, it's irrelevant what

1      percentage. This report says that the formulaic
2      mechanical approach needs to reflect the difference;
3      and whatever percentage it is, the formula and the
4      methodology here will reflect it and it's irrelevant
5      what percentage it is.
6  Q   You said that different policyholders in your
7      experience may do different things. Do you recall
8      that?
9  A   That's not my experience, that's fact.
10 Q   Does your model take into account the fact that
11     different policyholders may have done different
12     things in the "but-for" world?
13         MR. KERSTEN: Objection as irrelevant. Go
14     ahead.
15         THE WITNESS: Yes, it does, because there
16     was no "but-for" world and hence policyholders could
17     make no decisions in it because they were not in it.
18     It is simply a theoretical process used to determine
19     a current difference or a difference at time of
20     termination, but it did not exist. So I do have an
21     opinion, and the opinion is that since policyholders
22     were never in that world, they could make no
23     decisions within that world.
24 BY MR. GRIMSLEY:
25 Q   Did you do anything to determine what policyholders

1      likely would have done had they been in a world in
2      which Northwestern Mutual never made the 1985 change?
3         MR. KERSTEN: Objection as repetitious.
4         THE WITNESS: They weren't in the world so
5      I didn't even consider what they may have done in a
6      place that they were never in.
7  BY MR. GRIMSLEY:
8  Q   Your model that determines the accumulated difference
9      does not take into account the different things that
10     annuity policyholders would have done in a "but-for"
11     world in which Northwestern Mutual never made the
12     1985 change?
13         MR. KERSTEN: Objection as without
14     foundation, repetitious, and multiple in form.
15         THE WITNESS: Yes, it does reflect what
16     they would have done. And since I know they did not
17     exist in that world, they could have made no decision
18     other than what they did do because they were never
19     in the position to make such decision.
20 BY MR. GRIMSLEY:
21 Q   Just to be clear, though, is it your opinion that if
22     Northwestern Mutual had never implemented the 1985
23     change, every single class member would have made the
24     same premium investments at the same time and
25     borrowed the same amount at the same time and

1      surrendered their policies at the same time as they
2      did in the actual world?
3         MR. KERSTEN: Objection as without
4      foundation and multiple as to form.
5         THE WITNESS: If the change had not been
6      made, policyholders would have behaved in a different
7      manner.
8  BY MR. GRIMSLEY:
9  Q   Your model does not account for the fact that
10     policyholders would have behaved in a different
11     manner if the 1985 change had never been made?
12 A   Yes, it does account for that by quantifying a
13     difference which is the result of the action of
14     Northwestern Mutual in implementing the 1985 change.
15 Q   Go to Paragraph 20 of your report, sir.
16 A   (Witness complies.)
17 Q   It says, "The cash value of a Pre-MN annuitant's
18     account at any point in time is based on the history
19     of cash deposits, expense charges, policy loans,
20     withdrawals, and the history of DIRs used to
21     determine policyholder dividends credited to the
22     account." Do you see that?
23 A   Yes, sir.
24 Q   And do you stand by that statement today?
25 A   Absolutely.

**Q** You assume in your model that in the "but-for" world the cash deposits made by the various class members would have been made at the same time and for the same amounts as they were made in the actual world; correct?

**A** I'm assuming that because it's a fact. So cash transactions were factual, so the facts of the matter are the facts of the matter and that's what I used.

**Q** If, however, Northwestern Mutual had never implemented the 1985 change, would you have any reason to believe that the cash deposits would have been of the same amount and at the same time as they were in the actual world?

**A** They would certainly not have been.

**Q** The second item you mention is expense charges. What do you mean there by expense charges?

**A** I mean charges for expenses.

**Q** That's an actuarial term?

**A** That's a definition out of the dictionary.

**Q** What is your definition of it?

**A** Charges made by the company for expenses, to cover expenses.

**Q** And those charges can change over time?

**A** It's possible, but many of them are defined within the policy.

**Q** What type of expense charges can change over time?

**A** Well, I specified in the report charges applicable to deposits for the class representative did change over time, so that would be an example of how they can change.

**Q** You are aware that there is something called the expense experience factor class?

**A** That's a term -- I would have to see it. That's not a defined term. It could be defined by Northwestern. I don't recall it as specific to that.

**Q** Do you recall having testified that prior to the 1985 change Northwestern Mutual placed Pre-MN annuities and life insurance policies in a different expense experience factor class?

**A** That's correct.

**Q** What types of expenses can, in your opinion, a mutual insurance company take into account in determining the appropriate value to assign to an expense experience factor class?

**A** They can put into expense factors whatever they feel like, literally, and write that into their policy and a policyholder can either agree to that or not. But what goes into an expense charge can reflect many areas, such as administrative expense, profit, contingencies, risks. It can vary, but it's

developed and analyzed by the company, and the policyholder either can agree to that by buying a policy or not.

**Q** Is it your testimony that every consideration that goes into assigning a value to an expense experience factor class has to be set forth in the policy agreement itself?

MR. KERSTEN: Objection as beyond the proper scope of this deposition. Answer as best you can, if you understand the question.

THE WITNESS: A policy can state whatever a policy states. It's just a legal agreement. One policy to another can provide for expenses in many different ways. It can be a fixed rate, it can be a rate that can change by year based on experience, but it's specified in the policy. So there is a wide, wide range of possibilities to how a company can charge expenses to policyholders.

BY MR. GRIMSLEY:

**Q** What I'm asking, though, is whether in your opinion every single consideration that a mutual insurance company takes into account in assigning a value to an expense experience factor class has to be set forth explicitly in the policy itself?

**A** There is two parts to your question. You said in

assigning a value. If the policy indicates that the assigning of a value will be determined based on experience each year, then the assigning of value is not determined at the time the policy is written. If, in fact, on the other hand within the policy there is a specified value which will be applicable, then it is determined at the time. So it can or cannot be and it's a function of the individual policy.

**Q** With regard to the Pre-MN annuity policies that are at issue in this case, do those Pre-MN annuity policies specify expressly what type of expenses will be taken into account in assigning a value to the experience factor class?

**A** There is about four parts to that question; and if we can take them piecemeal, there is different answers to different things. You said is it expressly -- I don't even -- Could you read the question back and we will do it piecemeal, because there is a lot in there.

MR. KERSTEN: Before this is done, I do object to the question as multiple in form, and I think it's also beyond the proper scope of this deposition.

(The following question read aloud by

 1   reporter: With regard to the Pre-MN annuity policies
 2   that are at issue in this case, do those Pre-MN
 3   annuity policies specify expressly what type of
 4   expenses will be ...)
 5            THE WITNESS: Okay. The answer to that,
 6   no.
 7            (The following question read aloud by
 8   reporter: "Taken into account in assigning a value
 9   to the experience factor class?")
10            THE WITNESS: Assigning a value, yes.
11   BY MR. GRIMSLEY:
12   Q   How, with regard to assigning a value, is it
13       expressly set forth in the policies that are at issue
14       in this case?
15   A   In the policies in this instance it specifies in the
16       policy what those charges will be. Now, I have
17       already provided you an example for Ms. LaPlant of
18       how those values did change over time, but they were
19       expressly quantified, not specified as to what it
20       covered, but specifically quantified in her initial
21       policy.
22   Q   Given that the expense-related considerations were
23       spelled out in Ms. LaPlant's policy, how could the
24       expenses change from year to year?
25   A   Well, as indicated in the report, Ms. LaPlant's

 1   policy called for a 10 percent expense charge on
 2   deposits. After some duration, Northwestern began
 3   charging 6 percent on such deposits. They did so, to
 4   my knowledge, without any notice, but I'm not aware
 5   of whether there was one or not; but it was strictly
 6   in the benefit of Ms. LaPlant and any other
 7   comparable policyholders, so clearly no policyholder
 8   would take exception to that change from the value
 9   that was specified in her policy to what was actually
10   charged.
11   Q   Would the expense charges have been the same as they
12       were in the actual world for Pre-MN annuity
13       policyholders if Northwestern Mutual had never
14       implemented the 1985 change?
15   A   I'm sorry, could you read the question?
16            (Question read aloud by the reporter.)
17            THE WITNESS: Yes.
18   BY MR. GRIMSLEY:
19   Q   And why do you say that?
20   A   Because they were specified in the policy.
21   Q   You mentioned, however, that there were changes made
22       to the policies that were different, although better
23       than what was specified in the policy?
24   A   I cited an example of one such incidence.
25   Q   Can you say with certainty that there would not have

 1   been other changes like that in a world in which
 2   Northwestern Mutual had not implemented the 1985
 3   change?
 4   A   I have no opinion in that regard.
 5   Q   The next item you identify in Paragraph 20 is policy
 6       loans?
 7   A   Yes, sir.
 8   Q   Did you assume that in your "but-for" world the dates
 9       and amounts of policy loans would have been the same
10       for each class member as they were in the actual
11       world?
12   A   Yes, I did, because those are the facts of the
13       transactions.
14   Q   Did you do anything to determine what the dates and
15       amounts of policy loans would have been in a world in
16       which Northwestern Mutual had not made the 1985
17       change?
18   A   No, I did not.
19   Q   Do you have any reason to believe that the dates and
20       amounts of policy loans in a world where Northwestern
21       Mutual made the 1985 change -- Strike that.
22            Do you have any reason to believe that
23       the dates and amounts of policy loans in a world in
24       which Northwestern Mutual had not made the 1985
25       change would have been the same as in the actual

 1   world where it did?
 2   A   I did not analyze that and I have no such opinion. I
 3       have no opinion one way or the other.
 4   Q   Do you think it's likely that at least some of the
 5       policy loan dates and amounts would be different in a
 6       world in which Northwestern Mutual had not made the
 7       1985 change?
 8   A   Absolutely.
 9   Q   The next item that you identify -- And did you take
10       into account in your model the fact that policy loan
11       dates and amounts would have been different in a
12       world in which Northwestern Mutual did not make the
13       1985 change in coming up with your opinions in this
14       report?
15   A   I did not because that did not exist.
16   Q   The next item is withdrawals. Did you assume for
17       purposes of your model that the withdrawals in the
18       "but-for" world would have been for the same amount
19       and at the same date as withdrawals in the actual
20       world?
21   A   I did because those are the facts of those
22       transactions.
23   Q   Do you have any reason to believe that the
24       withdrawals would have been on the same date and for
25       the same amount in a world in which Northwestern

Mutual had not implemented the 1983 change as in the -- 1985 change as in the actual -- Let me start that over.
        Do you have any reason to believe that withdrawals would have been for the same amount and on the same date in a world in which Northwestern Mutual had not made the 1985 change as the actual world in which it did implement that change?
A  I can assure you they would be different.
Q  Did you take into account the fact that they would be different in coming up with your model that is set forth in your report?
A  Yes, I did, in saying that the "but-for" world is a nonexistent world. Transactions are facts, and the methodology appropriately reflects those facts.
Q  But you do acknowledge that if --
        MR. KERSTEN: Objection as argumentative in form by the use of the word "but."
BY MR. GRIMSLEY:
Q  Are you an economist, sir?
A  No, I'm not.
Q  Have you ever been asked to calculate damages in a particular case?
A  Yes, sir.
Q  In what circumstance?

A  Many.
Q  Any other than the actuarial situation or insurance situation?
A  That I am an actuary and I deal in insurance and healthcare, so other than the field in which I -- which I act, I have not provided any testimony.
Q  Have you ever provided an opinion on damages in a case involving financial products?
A  Yes, sir.
Q  What types of financial products?
A  I have provided opinions, court documents, and testified on the basis of the term damages--and, again, I define that in a dictionary sense of the word--on numerous occasions.
Q  Do you consider yourself an expert on damages as that term is legally defined?
A  I don't define anything legally, and I have no opinion as to the legalese of a situation. I respond to requests of me and perform analysis and -- and render opinions.
Q  In fact, sir, you're not comfortable testifying about what the legal definition is of damages, are you?
A  That's absolutely correct.
Q  Have you ever before this matter held yourself out as an expert on calculating damages on a class-wide

basis?
        MR. KERSTEN: I object to the use of the word "class-wide" in that context because there is an ambiguity in the form, but not by counsel. Do the best you can to answer.
        THE WITNESS: Okay. I have provided court testimony using the term "damages" in insurance and healthcare situations on more than fifteen occasions.
BY MR. GRIMSLEY:
Q  Have you ever developed a model for calculating damages on a class-wide basis prior to this opinion?
        MR. KERSTEN: Same objections as before. Do your best.
        THE WITNESS: Numerous times.
BY MR. GRIMSLEY:
Q  What were those times?
A  I can't recall specifically all them, but I certainly remember some of them.
Q  Was that always on the plaintiff's side?
A  No.
Q  Have you ever testified that a party could not calculate damages on a class-wide basis in a particular case?
A  The fact that I was testifying as to damages would be only those instances where damages could be

quantified, so I don't recall those other situations.
Q  Have you ever in the context of a motion for class certification provided a damages model for calculating damages on a class-wide basis?
A  Yes, sir.
Q  And what was that situation?
A  Many such situations.
Q  Can you give me one?
A  I could give you one that was -- you know, cases are I guess public information after they go to court, but I certainly quantified damages using one such example regarding Prudential and the vanishing premium type policies.
Q  Was that in the context of a motion for class certification?
A  Yes.
Q  Any other examples besides that one?
A  More than 25.
Q  And have those all been on the side of the plaintiff?
A  No.
Q  So have you ever in any circumstance testified that a party could not, in fact, calculate damages on a class-wide basis?
A  I'm sorry, read the question.
        (Question read aloud by the reporter.)

```
 1              THE WITNESS:  I have not so testified.  I
 2      have come to that conclusion and discussed those
 3      situations with counsel.  Such as this instance they
 4      asked me a question, I analyzed it, responded to
 5      counsel that in this instance I could do that.  In
 6      some instances I would be asked by counsel can you do
 7      a certain thing.  I would review that certain thing
 8      and conclude that no mechanical process could be used
 9      and that would be the end of my involvement, so it's
10      not a testifying situation.
11 BY MR. GRIMSLEY:
12  Q   But you said you had testified for defendants in the
13      context of class certification motions?
14  A   Yes.
15  Q   In the context of class certification motions, have
16      you ever provided an opinion on the defense side that
17      damages could not be quantified on a class-wide
18      basis?
19  A   I do not recall testifying to that extent.
20  Q   Have you ever prepared a report in which you
21      expressed such an opinion?
22  A   Very possibly.  I don't recall offhand.
23  Q   Back to Paragraph 20, if you would, sir.  The last
24      item that you identify as relevant to determining the
25      cash value of an annuitant's account at any point in
```

```
 1      time is the history of DIRs.  Do you see that?
 2  A   Yes, sir.
 3  Q   You assumed that in the "but-for" world the DIR for
 4      the Pre-MN annuitants would be the same as the life
 5      rate DIR?
 6  A   For those Pre-MN annuitants who opted for direct
 7      recognition and did not have a policy loan or for
 8      that portion of their business that did not take a
 9      policy loan.
10  Q   For the other putative class members, what did you
11      assume with regard to the but-for DIR?
12  A   When you say for the other class members, I'm
13      translating that into being those class members who
14      did not take direct recognition and take several
15      pages to describe or to quantify or show what the
16      appropriate and reasonable DIR is for those
17      individuals, but that's spelled out in my report.
18  Q   But for purposes of those calculations for those
19      other individuals, did you start with the life rate
20      DIR and then make adjustments accordingly?
21  A   I started with the opinion that the life rate DIR for
22      individuals that opted for direct recognition is a
23      reasonable benchmark and an appropriate value to use
24      for those individuals and the numerical
25      quantification applicable to those policyholders that
```

```
 1      did not opt for direct recognition is a function of
 2      that value, yes, sir.
 3  Q   Do you have any reason to believe that the history of
 4      DIRs would have been the same in a world in which
 5      Northwestern Mutual had never implemented the 1985
 6      change?
 7  A   Can you read the question, please?
 8              (Question read aloud by the reporter.)
 9              THE WITNESS:  Well, the history of DIRs
10      prior to 1985 was precisely what NML used, so that --
11      what they used prior to the change is what they used
12      and hence that part of your answer -- the question is
13      yes.  After '85, then I would have to take a look at
14      that, and I made no assumption as to what would be
15      different.
16 BY MR. GRIMSLEY:
17  Q   You have made no effort to quantify what the DIRs
18      would have been after 1985 in a world in which
19      Northwestern Mutual had not made the 1985 change?
20  A   Well, that's precisely what I did do.  The "but-for"
21      world is saying that the DIRs would likely have been
22      the but-for DIRs as represented in this report if the
23      1985 change had not taken place.  That's precisely
24      what I did answer.
25  Q   That is an assumption you're making about the DIRs in
```

```
 1      the "but-for" world?
 2  A   No, that's the result of my analysis and the
 3      application of this formula.
 4  Q   Did you make any efforts to actually calculate what
 5      Northwestern Mutual would have done with regard to
 6      the portfolio rate DIR in a world in which
 7      Northwestern Mutual had not implemented the 1985
 8      change?
 9              MR. KERSTEN:  Objection as repetitious.
10              THE WITNESS:  For the Pre-MN annuitants,
11      that's precisely what I'm quantifying in this report.
12 BY MR. GRIMSLEY:
13  Q   Did you make any effort to determine whether
14      Northwestern Mutual would have altered the general
15      portfolio rate DIR --
16              MR. KERSTEN:  Same objection.
17 BY MR. GRIMSLEY:
18  Q   -- if Northwestern Mutual had not made the 1985
19      change?
20              MR. KERSTEN:  Same objection.
21              THE WITNESS:  The portfolio rate DIR is the
22      portfolio rate DIR.  Certainly their actions every
23      year are going to impact that result, but they did
24      what they did and I used what they did.  So those
25      are, again, facts of the matter, so I didn't alter or
```