```
     throw out any facts, I used them as they did.
BY MR. GRIMSLEY:
 Q   Is it possible, sir, that without segmentation of the
     Pre-MN annuities into a separate account, that
     Northwestern Mutual after 1985 would have calculated
     a different DIR applicable to the portfolio?
 A   Well, they don't calculate a DIR applicable to the
     portfolio.  The portfolio each year generates the
     DIR, and so they're not calculating that.  That's the
     result of the portfolio.  Now, would they have
     changed their portfolio?  Certainly they could change
     their portfolio every year.  They did.  They made
     investments, and some investments terminated and they
     made new investments.  So they impacted that.  And
     certainly what they did do, the facts of the matter
     were what we used and what are used to develop this
     formulation.
 Q   Do you know what the portfolio rate DIR would have
     been in a world in which Northwestern Mutual had not
     made the 1985 change?
             MR. KERSTEN:  Objection as repetitious.  Go
     ahead and answer.
             THE WITNESS:  Again, that's a speculative
     scenario because that scenario never existed, so I
     didn't think about what would happen in a world that
```

```
     didn't exist.  I utilized the real world and the real
     values that did exist, and that's -- that's the basis
     for this methodology and it's the basis for the
     quantification.
BY MR. GRIMSLEY:
 Q   To be fair, sir, the "but-for" world that you
     calculated and prepared a model to reflect didn't
     exist either, did it?
             MR. KERSTEN:  Objection as argumentative.
             THE WITNESS:  Oh, I have said several times
     today that the "but-for" world is a concept that I
     have used, it never existed, individuals were never
     in it, they made no decisions based on being in it
     because they weren't in it, and it is only used as a
     theoretical to determine a difference on a current
     basis.  "Current" being described as today for those
     policies remaining in force and the date of
     termination for those Pre-MN annuitants who
     terminated their policy at some time prior to today.
             THE VIDEOGRAPHER:  About 5 minutes on the
     tape.
             MR. GRIMSLEY:  Why don't we take a break
     then.
             THE VIDEOGRAPHER:  This will conclude Disk
     1.  We're going off the record, the time 11:10 a.m.
```

```
             (Off the record.)
             THE VIDEOGRAPHER:  We're back on the
     record.  This is the beginning of Disk No. 2 of the
     deposition of Robert Hoyer.  Today's date, May 17th,
     2013.  The time, 11:24 a.m.
BY MR. GRIMSLEY:
 Q   Turn to Paragraph 48 on Page 16 of your report, sir.
 A   (Witness complies.)
 Q   It reads, "This report illustrates how Differences
     can be calculated in a mechanical way for each
     individual annuitant with basic annual information
     and a limited number of variables.  Assumptions of
     end of year deposits tend to underestimate
     differences."  Do you see that?
 A   Yes, sir.
 Q   What did you mean by "tend to underestimate"?
 A   Well, clearly the difference is conservatively
     stated, and hence the word "tend" is used, that it
     need not be every exact situation but certainly in
     most.
 Q   Are there situations in which the assumption of
     end-of-year deposits could overestimate the
     difference?
 A   It is possible, but de minimis.
 Q   In what circumstances would it be possible to
```

```
     overestimate the difference using the assumption of
     end-of-year deposits?
 A   I would say that it's never a scenario where you
     would overestimate the difference in any way other
     than in a de minimis way, but a de minimis
     differential theoretically could exist if I were to
     adjust the timing of deposits and withdrawals and
     mathematically play with those numbers to get a de
     minimis negative difference.
 Q   With regard to the extent to which the assumption
     underestimates the difference, that would not
     necessarily be de minimis, would it?
 A   I would use a different term.  Rather than de
     minimis, I would say immaterial.
 Q   If a class member had, in fact, made all of their
     deposits at the first of the year rather than at the
     end of the year, the assumption the deposits were
     made at the end of the year would materially
     underestimate differences?
 A   No, sir, it would not.
 Q   Why do you say that?
 A   Because those amounts are in fact offset because the
     same assumption is used for any withdrawals, partial
     withdrawals or policy loans, they are also assumed to
     be at the end of the year.  So any such transactions
```

```
 1      would tend to mitigate and it would not be a material
 2      difference in any regard.  There would be an
 3      immaterial but conservative difference.
 4   Q  Imagine a putative class member who did not withdraw
 5      anything at any point in time and did not borrow
 6      against his or her account.  Imagine also that that
 7      individual always deposited their premiums at the
 8      beginning of the year rather than at the end.  Your
 9      assumption of end-of-year deposits would materially
10      impact that particular class member?
11   A  No, I would not agree with that.
12   Q  What would the impact be to the calculation if you
13      assumed beginning-of-year deposits as opposed to
14      end-of-year deposits?
15   A  Again, the formula would be readily applicable.  It
16      would apply to all as a group or individual
17      annuitants; and it would tend to be a reasonable and
18      reliable estimate, but it would tend to overstate the
19      difference if I made such an assumption.
20   Q  Have you made any effort to determine the extent to
21      which the assumption of year-end deposits
22      underestimates differences on a class-wide basis?
23   A  Yes, I have, and that's exactly why I'm telling you
24      that such difference is immaterial to the
25      quantification of difference.  It is a conservative
```

```
 1      estimate that I have made, but it is immaterial to
 2      the aggregate differential.
 3   Q  Where in your report is it set forth a calculation of
 4      what the amount of underestimated difference is as a
 5      result of your assumption of year-end deposits?
 6             MR. KERSTEN:  Could you just re-read that?
 7             (Question read aloud by the reporter.)
 8             THE WITNESS:  That's not in my report
 9      because I did not do a quantification, I did an
10      analysis and concluded that such differential would
11      be immaterial to the aggregate quantification of
12      difference, and the aggregate quantification would be
13      aggregate for the entire policy group or aggregate
14      for an individual.
15   BY MR. GRIMSLEY:
16   Q  Have you attempted any quantification of how much
17      your assumption of end-of-year deposits
18      underestimates the difference for any particular
19      putative class member?
20   A  Only to the extent as to the propriety of this
21      mechanical process I did do such analysis and made
22      the conclusion that this methodology is an accurate
23      and reasonable representation of the difference.
24   Q  I am asking only whether you actually calculated how
25      much the assumption of end-of-year deposits would
```

```
 1      underestimate any particular class member's
 2      accumulated difference.
 3   A  Didn't I answer that?
 4             MR. KERSTEN:  I think you did, but go ahead
 5      and --
 6             THE WITNESS:  I will answer it again.  I
 7      did not do a quantification of such difference, I did
 8      an analysis of such difference.
 9   BY MR. GRIMSLEY:
10   Q  Did you --
11   A  So where is that quantification -- I did not do a
12      quantification, I did an analysis and concluded that
13      the formula that I'm presenting is a fair and
14      accurate representation of the difference and that
15      any such differential is immaterial.
16   Q  Did you do an analysis, putting aside quantification,
17      of the amount of underestimation of the accumulated
18      difference for any particular policyholder?
19   A  I did an analysis of how the formula would apply and
20      what the implications would be to that result.  I did
21      not numerically calculate such.
22   Q  For which class members did you actually do that
23      specifically?
24   A  I did it by looking at my formula and looking at the
25      values that are -- that we have in this regard and
```

```
 1      how that may either overstate or understate the
 2      calculation in this regard, and I concluded that it
 3      was immaterial.
 4   Q  You don't know sitting here today how much your
 5      assumption understates accumulated difference for any
 6      particular class member, do you?
 7   A  I know that such differential is immaterial.
 8   Q  You have done it for every single class member on an
 9      individualized basis?
10   A  I have looked at the formula and determined that the
11      formula is applicable and is a realistic and
12      reasonable representation of the difference and that
13      that assumption, while tending -- tending to be
14      conservative is immaterial.
15   Q  Have you, in fact, tested your formula against any
16      individual class members other than Ms. LaPlant?
17   A  Have I quantified using that formula on any
18      individual annuitant, and that answer is no.
19   Q  Have you attempted to quantify the amount of
20      underestimation that results from your assumption of
21      end-of-year deposits for any particular--meaning the
22      person has a name--annuity policyholder?
23             MR. KERSTEN:  Objection as repetitious.
24             THE WITNESS:  I just said I have not done
25      that in this instance.  I would like to add to that.
```



```
 1      Can I?  Can I --
 2              MR. KERSTEN:  Sure, go ahead.
 3              THE WITNESS:  Well, as stated in my report,
 4      this is an assumption which tends to produce a
 5      conservative estimate of the difference.  I have also
 6      stated in my report that to the extent more detailed
 7      information were made available by the company, that
 8      this same mechanical formulaic approach would
 9      incorporate that information and, again, produce a
10      reasonable, reliable estimate of the difference.
11 BY MR. GRIMSLEY:
12  Q   To your knowledge, do the individual policyholders
13      have that more detailed information that you just
14      referred to?
15  A   I would believe that they were provided it and both
16      the company and the individuals had it at some time.
17      I would think it more likely that the company would
18      be -- would have more of such information currently.
19  Q   You have not actually interviewed any class members
20      to determine whether, in fact, at least some of them
21      have more information than Northwestern Mutual does
22      on that score, have you?
23  A   The only information that a policyholder can
24      conceivably have on that score, as you say it, is
25      that information which was given to them by
```

```
 1      Northwestern Mutual, therefore the basis for my
 2      conclusion that Northwestern Mutual would be the
 3      appropriate source to provide such information.
 4  Q   Well, a policyholder would have information
 5      potentially as to when and how much a deposit was
 6      made into their annuity account; correct?
 7              MR. KERSTEN:  Are you representing they
 8      would have that, counsel?
 9              THE WITNESS:  I would dare say they would
10      not have that to the extent that Northwestern had
11      that.
12 BY MR. GRIMSLEY:
13  Q   Have you actually investigated that to determine
14      whether in fact that is true?
15  A   I have worked in this industry for 40 years, and I
16      will tell you factually, not opinion wise, but
17      factually that many, many policyholders do not retain
18      information as to when a transaction took place in
19      1992.
20  Q   Is it possible that some did?
21  A   It's possible that some did, but it is definitive
22      that the company has.
23  Q   In fact, it's definitive, though, that at least some
24      policyholders would have kept that information, don't
25      you think?
```

```
 1  A   Oh, I'm sure that in the 35,000 class members in this
 2      instance or thereabouts, that I'm sure someone has
 3      kept that information, but I -- I don't see why that
 4      has any bearing on my formula or whatever.
 5  Q   Is it possible in your mind that some people --
 6      policyholders would have deposited less money after
 7      1985 than they did in the actual world, in a world in
 8      which Northwestern Mutual never made the 1985 change?
 9  A   Absolutely.
10  Q   Is it possible that policyholders would have borrowed
11      more against their policies in a world in which
12      Northwestern Mutual never made the 1985 change?
13  A   It's possible that policyholders would do anything;
14      and in a different scenario, policyholders might do
15      different things.  Certainly that is a consideration,
16      but I haven't spent much time analyzing it.
17  Q   And is it possible that policyholders would have
18      withdrawn more money in a world in which Northwestern
19      Mutual had not made the 1985 change than they did in
20      the actual world?
21  A   Well, that is one where I can say that a prudent
22      individual and a reasonable estimate of what somebody
23      theoretically may have done would say that fewer
24      people would have withdrawn their policies if the
25      "but-for" world or if the 1985 change, you know, did
```

```
 1      not exist.
 2  Q   But is it possible that there are some people who
 3      would have withdrawn more in a world in which the
 4      1985 change had never been made?
 5  A   Again, I have no opinion as to what an individual may
 6      or may not do in a scenario that didn't exist, so I
 7      can only talk about what a reasonable and prudent
 8      group would tend to do over time, not what any given
 9      individual would do.
10              MR. KERSTEN:  You know, I object to this
11      whole line of questioning on which we have now spent
12      the better part of at least two hours as wholly
13      immaterial and a waste of time.
14 BY MR. GRIMSLEY:
15  Q   You also assumed for purposes of your report in the
16      "but-for" world that individuals who surrendered
17      their policies did so at the end of the year; is that
18      correct?
19  A   That is correct.
20  Q   If, however, people surrendered their policies before
21      the end of the year, would your assumption of
22      end-of-year surrenders tend to overstate the
23      accumulated difference?
24  A   It would tend to overstate.  It is a mitigating
25      assumption relative to the contra-assumption that
```

```
 1      deposits are made at the end of the year.
 2   Q  Have you done anything to quantify the amount that
 3      the assumption of end-of-year surrenders overstates
 4      the accumulated difference?
 5   A  In an attempt to quantify the extent of surrenders in
 6      a vacuum, no.  To identify the implications or the
 7      magnitude of the aggregate assumption, which was used
 8      for both deposits and terminations, yes.
 9   Q  Where in your report is the calculation of the
10      aggregate assumptions that shows that your
11      assumptions on the whole tend to understate the
12      accumulated difference?
13   A  I did not do a quantification of that, I did an
14      analysis of that.  And where is it stated?  I don't
15      know offhand, but if we walk through page by page it
16      would say that by assuming the end of the year, it is
17      a conservative estimate, but an immaterial
18      differential.
19   Q  But you did not do anything to quantify the
20      offsetting assumptions of surrenders at the end of
21      the year versus deposits at the end of the year?
22   A  I did analysis of that, not quantification, but
23      analysis of that to enable me to opine that such
24      differential is immaterial.
25   Q  What analysis did you do specifically, sir?
```

```
 1   A  I looked at values and looked at the methodology and
 2      mathematically analyzed the extent to which I would
 3      either be high or low given a given cash transaction;
 4      concluded that since I'm making the same assumption
 5      on both deposits and withdrawals, that there is
 6      certainly a mitigation one to the other.  However,
 7      for most policies, deposits are greater than
 8      withdrawals, for especially in-force policies, and
 9      hence the tendency would be a conservative
10      estimation, but not a material one.
11   Q  But you have done no effort to actually quantify
12      what --
13          MR. KERSTEN:  Objection as repetitious.
14          MR. GRIMSLEY:  Hey, buddy, let me finish my
15      question and then you can object.
16          MR. KERSTEN:  Okay, finish.
17   BY MR. GRIMSLEY:
18   Q  You have made no effort to actually quantify what the
19      amount of overestimation based on the assumption of
20      end-of-year surrenders would be versus the
21      underestimation for the assumption of end of year
22      deposits?
23   A  That's not correct.  I have done analysis to enable
24      me to conclude that such differential is immaterial,
25      so I did enough analysis to reach that opinion.  A
```

```
 1      quantification, which is a numerical determination,
 2      is not what I did.  I did an analysis to enable the
 3      conclusion.
 4   Q  Can you describe your analysis that you performed to
 5      come to that conclusion in sufficient detail for a
 6      court to understand it?  Because that's ultimately
 7      the person who is going to be looking at this.
 8          MR. KERSTEN:  Objection, that's already
 9      been done repeatedly over the last two hours.
10          THE WITNESS:  Yes.
11   BY MR. GRIMSLEY:
12   Q  The description you have provided is the full
13      description you believe would be necessary to explain
14      to a court what the analysis was that you performed?
15   A  Yes, sir.
16   Q  In a world in which Northwestern Mutual had not made
17      the 1985 change, is it possible that some
18      policyholders would have surrendered their policies
19      sooner than they did in the actual world?
20   A  I have answered this question fifteen times, which
21      is, I have no opinion as to the actions of some
22      policyholders or individual policyholders.  I -- My
23      professional background, my experience says that
24      rendering opinion on what individuals may or may not
25      do is beyond the scope of my capability, so I have no
```

```
 1      opinion.
 2   Q  Would the best people to ask that be the individual
 3      policyholders themselves as to what they would have
 4      done?
 5          MR. KERSTEN:  Objection on the assumption
 6      that would be legally competent evidence.
 7          THE WITNESS:  No, I think that would be
 8      kind of a ridiculous request or statement.
 9   BY MR. GRIMSLEY:
10   Q  You think it would be ridiculous to ask individual
11      policyholders what they would have done in the
12      "but-for" world?
13          MR. KERSTEN:  Same objection as before.
14          THE WITNESS:  That's correct, they don't
15      know what a "but-for" world is, it's something I
16      invented.  So if you go to individual policyholders
17      and say what would you have done in 2002 if you lived
18      in Bob Hoyer's "but-for" world, I would dare say you
19      would not get an answer which would be reasonable and
20      appropriate.
21   BY MR. GRIMSLEY:
22   Q  So there is nobody to ask really about what somebody
23      might do in Bob Hoyer's "but-for" world?
24   A  It never existed, it doesn't exist now, so I think
25      individuals would have a hard time concluding what
```

```
 1        they would do in a scenario -- especially what they
 2        would do -- what they would have done years ago in a
 3        scenario that didn't exist, then or now.  I would say
 4        that's a very difficult question to go ask an
 5        individual.
 6   Q    Have you done any market research to determine what
 7        people have done in similar situations where changes
 8        were not made?
 9              MR. KERSTEN:  Objection on the assumption
10        there is a similar situation where the undisputed
11        record is Northwestern is unique in the insurance
12        industry for having done this.
13              MR. GRIMSLEY:  "Objection to form" is the
14        only appropriate objection.
15              MR. KERSTEN:  That's my objection, to form.
16        It states an assumption that's contrary to the
17        record.
18              MR. GRIMSLEY:  The word "form" is the
19        appropriate objection, not the explanation of why
20        it's an objection.
21   BY MR. GRIMSLEY:
22   Q    Can you answer it, please?
23   A    It's been quite a while since the question was asked,
24        but I believe the question was have you done market
25        research.  I don't do market research.
```

```
 1   Q    You're not an expert in market research or consumer
 2        behavior?
 3              MR. KERSTEN:  Objection as double in form.
 4              THE WITNESS:  Yeah, I don't know how to
 5        answer that question.  I have developed insurance
 6        products, which are certainly based on how the
 7        marketplace will react to such policies.  I'm not a
 8        marketing expert, but an awareness of that area is
 9        something that certainly fits in the activities that
10        I have performed.
11   BY MR. GRIMSLEY:
12   Q    And all you can say in this case is that in the
13        "but-for" world different people would have acted
14        differently?
15   A    I have no opinion as to how individuals will act in
16        any scenario.
17   Q    We talked a little bit about this earlier, but I want
18        to go into a little more detail.  You assume that the
19        but-for DIR for annuity policies who have direct
20        recognition and no loan balance would be equal to the
21        corresponding DIR for life insurance policyholders?
22   A    That's correct.  I assume that that value is the
23        appropriate benchmark applicable to those
24        individuals.
25   Q    You are aware, however, that in the years prior to
```

```
 1        the 1985 change the DIR for Pre-MN annuity
 2        policyholders was different than the DIR for life
 3        insurance policyholders?
 4   A    No, not in all years.  In certain instances it was,
 5        as stated in my report.
 6   Q    But you acknowledge that there were certain years
 7        prior to the 1985 change in which the annuity rate
 8        DIR was different from the life insurance DIR?
 9   A    I state in Paragraph 25, there is a historical
10        comparability, not equality.
11              (Deposition Exhibit No. 5 was marked for
12        identification.)
13   BY MR. GRIMSLEY:
14   Q    I'm showing you what is being marked as Deposition
15        Exhibit 5, and this was a trial exhibit at the trial
16        that I believe you testified at.  Do you recognize
17        this chart?
18   A    I have seen many charts along these lines, so I do
19        not know if I recognize this particular one.
20   Q    Looking at these numbers, do you have any reason
21        sitting here to dispute the accuracy of them?
22   A    I have neither a basis to dispute the accuracy nor to
23        conclude that these are accurate.  As I say, I'm not
24        sure if I have seen this particular exhibit.
25   Q    You see that there is -- there are three columns here
```



```
 1        showing DIRs for life rate, Pre-MN rate, and the CRA
 2        rate?
 3   A    Yes, sir.
 4   Q    I want to focus on the life rate and the Pre-MN rate;
 5        okay?  Okay.
 6   A    You can do that.  I have no objection.
 7   Q    I notice, sir, that you're looking over comparing
 8        Exhibit 5, which is trial Exhibit 528, to a chart
 9        that is in your own report.
10   A    Yes, sir, I am.
11   Q    Your report contains a chart that is somewhat similar
12        to this on Page 6, which starts with 1986 rather than
13        1982 and does not have the CRA rates on it; correct?
14   A    I wouldn't categorize it as somewhat similar in that
15        they appear to be the same other than the fact that
16        "CRA" is on one exhibit, so they appear to be equal
17        at first glance otherwise.
18   Q    If you look at the year 1982, what was the
19        differential between the life DIR and the Pre-MN DIR
20        in Exhibit 5?
21   A    Well, Exhibit 5, which goes for years beyond what was
22        in table one that I was just comparing, the
23        differential is 40 basis points.
24   Q    And which DIR is lower in Exhibit 5?
25   A    In Exhibit 5, the Pre-MN annuitants.
```





1  Q   Look at 1983. What is the differential between the
2      life DIR and the Pre-MN DIR?
3  A   15 basis points.
4  Q   And which DIR is lower as between the two?
5  A   Pre-MN annuitants.
6  Q   Look at 1984. What is the difference in the DIR
7      between life and Pre-MN policies?
8  A   15 basis points.
9  Q   Of the two policies, which is lower?
10 A   The Pre-MN annuitants in this instance.
11 Q   And in 1985 the rates are the same; is that correct?
12 A   Yes, sir, they are.
13 Q   Of the years 1982 through 1985 shown on this exhibit,
14     in any of those years is the Pre-MN annuity DIR
15     higher than the life DIR?
16 A   As shown in this exhibit, there are none. As shown
17     in other exhibits, there are some.
18 Q   Which ones? Which exhibits?
19 A   Oh, I would have to -- I would have to go get them.
20 Q   In what years were the Pre-MN DIRs higher than the
21     life DIRs?
22 A   Sometime during this period for certain
23     categorizations.
24 Q   When you say "certain categorizations," what do you
25     mean?

1  A   Different policy loan rates, et cetera.
2  Q   You're familiar with the fact that there are tax
3      qualified and non-tax qualified annuities?
4  A   Yes, sir.
5  Q   And those are different types of annuities that are
6      owned by different class members in the putative
7      class?
8          MR. KERSTEN: Counsel, I object to the form
9      as ambiguous as to time.
10         THE WITNESS: Yeah, I'm not sure -- I'm not
11     sure how to answer that.
12 BY MR. GRIMSLEY:
13 Q   There are putative class members in the class as we
14     saw defined earlier, some that have tax qualified
15     annuity policies and some that have non-tax qualified
16     annuity policies.
17         MR. KERSTEN: Same objection as before.
18     Ambiguous as to time.
19         THE WITNESS: I'm not sure.
20 BY MR. GRIMSLEY:
21 Q   You understand that the putative class includes
22     people that had in-force annuity policies as of 1985?
23 A   Yes, sir.
24 Q   Are there any individuals who had in-force policies
25     as of 1985 who had tax-qualified annuity policies?

1  A   I'm not sure.
2  Q   Are there any individuals in the -- who had in-force
3      policies as of 1985 who had non-tax-qualified annuity
4      policies?
5  A   No.
6          MR. KERSTEN: Counsel, I object as a
7      continuing objection so I don't have to keep making
8      it. It's all ambiguous as to time.
9          THE WITNESS: Yeah, I'm not sure.
10 BY MR. GRIMSLEY:
11 Q   You don't know whether any of the in-force policies
12     as of 1985 were tax qualified or not?
13 A   I don't recall, I reviewed that at some time years
14     ago.
15 Q   You do know that there are different DIR rates
16     applicable to tax qualified versus non-tax qualified?
17 A   There are different DIR rates applied to different
18     categorizations, yes.
19 Q   You have not, in fact, taken into account the
20     different DIR rates that apply to tax qualified
21     versus non-tax qualified annuity policies in your
22     model, in your March 4th, 2013 report, have you?
23         MR. KERSTEN: Same objection, ambiguous in
24     form as to time.
25         THE WITNESS: Yeah, I believe I have

1      incorporated that fairly and equitably.
2  BY MR. GRIMSLEY:
3  Q   Is there anyplace in your report that you can point
4      me to where you talk about the distinction in DIRs
5      with regard to tax qualified versus non-tax qualified
6      policies that were in-force as of 1985?
7  A   It's not stated in the report.
8  Q   And your model does not specifically differentiate
9      between the DIRs applicable to tax-qualified versus
10     non-tax-qualified policies?
11 A   I think it incorporates the two to the extent they
12     exist and does so properly and equitably.
13 Q   But does it actually delineate what the DIRs would be
14     for each of those types of policies in the "but-for"
15     world?
16 A   No, I do not believe in the "but-for" world that
17     that's appropriate.
18 Q   How does your model account for the fact that in the
19     "but-for" world some policies would have been tax
20     qualified and some would have been non-tax qualified?
21         MR. KERSTEN: Objection as ambiguous in
22     form because of the timing.
23         THE WITNESS: Yeah, it looks to be the
24     aggregate -- aggregate compilation of both of those
25     and I believe it accurately reflects the existence of

that to the extent that they were there.
BY MR. GRIMSLEY:
Q   Have you done any -- made any effort to quantify what the differential in DIRs would be in the "but-for" world for Pre-MN annuitants with tax qualified versus non-tax qualified policies at any time during the class period?
A   Only to the extent whether that would materially misstate the differences that we quantified and concluded they would not.
Q   What did you do to actually determine there would be no material misstatement as a result of tax qualified versus non-tax qualified?
A   Again, the "but-for" world is theoretical and it's representative and there is nothing that came to our -- my awareness that there would be a necessity to subset the methodology such as we did for various interest rates -- policy loan rates, rather. That differential was immaterial.
Q   But you made no quantification of that differential?
A   Again, only to the extent that our formula was a reasonable representation of what would be applicable.
Q   Where is the quantification in the report of the differential between tax qualified and non-tax

qualified DIRs in the "but-for" world?
        MR. KERSTEN: Objection as repetitious.
        THE WITNESS: I just said that was done as an analysis, not as a quantification.
BY MR. GRIMSLEY:
Q   Where is the analysis?
A   The analysis was done prior to me stating this formulation and this numerical approach and formulaic approach as being representative for all Pre-MN annuitant class members.
Q   What specific analysis did you do to take into account the difference in tax qualified versus non-tax qualified DIRs?
A   I just looked at those policies, looked at the historical disparity, and concluded that this was a reasonable representation for those policies.
Q   Did you do any mathematical analysis to back that up?
A   The analysis results in a mathematical result, which is that to the extent there would be materiality such as was found for various policy loan rates, that would require the formula to reflect that difference. My analysis in regard to what you are now stating is that they -- the "but-for" world is a reasonable representation of that differential and accurately reflects the difference for those policies.

Q   Well, I would like to be able to assess for myself whether it's a reasonable representation, and so to that extent I would like to know specifically what analysis you performed that you consider reasonable to determine that the differential between tax qualified and non-tax qualified DIRs is immaterial.
        MR. KERSTEN: Objection as repetitious. What you yourself would like to do is also totally immaterial to the case.
        THE WITNESS: Yeah.
        MR. KERSTEN: Counsel, are you representing on this record that there is a difference between these from and after 1985 in the respect to which you have been questioning this witness?
        MR. GRIMSLEY: I'm asking if this witness has taken that into account.
        THE WITNESS: Yes.
        MR. KERSTEN: Taking what into account?
        MR. GRIMSLEY: George, seriously.
        MR. KERSTEN: I'm very serious. Are you representing that there is a difference between these Pre-MN policies from and after 1985? Are you stating that as a foundation?
        MR. GRIMSLEY: I will state to you as a foundation that prior to the 1985 change there was a

difference in DIRs for tax-qualified and non-tax-qualified policies, and his "but-for" world is a world in which there was no 1985 change so I can't represent what the facts would have been in that circumstance, as he has acknowledged numerous times. So I am asking him whether he took into account what the impact would have been of calculations of DIRs for non-tax-qualified versus tax-qualified policies as they existed prior to 1985 in coming up with his DIRs in the "but-for" world. That is my question.
        MR. KERSTEN: Just hold on, Sean. My question is -- My point and my objections go to a different point. Are you stating there is a difference between what you characterize as tax qualified and non-tax qualified in the years beginning with January 1, 1986? Yes or no.
        MR. GRIMSLEY: I believe so.
        MR. KERSTEN: That's your understanding. That's the record I wanted to make.
BY MR. GRIMSLEY:
Q   You didn't take that into account?
A   Is that a question?
Q   Yes.
A   I don't know how to answer it, "you didn't take that



```
 1      into account."  What's your question?  That's not a
 2      question.
 3  Q   Let's look back --
 4  A   That's not a question.  What is your question?
 5  Q   I will withdraw it.  Let's look back at Exhibit 5.
 6  A   Okay, good.
 7  Q   Okay?  Do you know how in the real world Northwestern
 8      Mutual came up with the differential between the
 9      Pre-MN DIR rate and the life DIR rate?
10  A   No, I do not.
11  Q   Did you make any effort to determine how?
12  A   For Exhibit 5?
13  Q   Yes.
14  A   I will state again, that I have seen several
15      comparable exhibits, some of which had Pre-MN
16      annuitants receiving a higher DIR than life in
17      certain years, some of which they had the same, so
18      this is not the only exhibit which compares life and
19      Pre-MN annuitants.  And I could tomorrow send you
20      another document in this case which shows that Pre-MN
21      annuitants received a higher DIR than life rates in
22      certain years.
23  Q   Will you send me that document tomorrow?
24  A   Certainly.
25          MR. KERSTEN:  Well, we will take that into
```

```
 1      consideration.  We will send you something.
 2  BY MR. GRIMSLEY:
 3  Q   But you do acknowledge that there were different
 4      rates for Pre-MN annuities and life insurance
 5      policies prior to 1985?
 6  A   Yes, as stated in my report.  My assumption is based
 7      on historical comparability, not equality.
 8  Q   Did you do anything to determine how Northwestern
 9      Mutual in the years prior to the 1985 change
10      calculated the differential between the Pre-MN
11      annuity DIR and the life DIR?
12  A   Yes.
13  Q   What did you do?
14  A   I looked at their dividend formulas and I looked at
15      policies and compared and contrasted.
16  Q   Okay.  And did you apply any of that in the "but-for"
17      world in which you assumed that the annuity policy
18      rate and the life policy rate would be the same each
19      year?
20  A   Yes.
21  Q   Did you attempt to yourself calculate on a yearly
22      basis what the differential in the life rate DIR and
23      the Pre-MN DIR would have been had there not been the
24      1985 change?
25  A   Yes.
```

```
 1  Q   And what was your conclusion?
 2  A   That there is an immaterial difference between the
 3      two as stated in my report; and that the life rate,
 4      which is a benchmark rate, which is a readily
 5      available rate, which is well defined and understood,
 6      was not only reasonable, but the -- the most accurate
 7      representation of what the annuity rate should be.
 8  Q   Are there any calculations anywhere in your report to
 9      reflect the analysis that you have just described?
10  A   No, there are not.
11  Q   Where could I find those calculations?
12  A   I don't think they exist.
13  Q   So you did not do any calculations to determine the
14      reasonableness of your assumption that the life and
15      Pre-MN DIRs would be identical to one another in the
16      "but-for" world even though they were not in the
17      actual world prior to the 1985 change?
18  A   I did not do such calculations because I conclude
19      that such calculations are irrelevant and
20      unnecessary.  I do analysis and I make conclusions.
21      Sometimes I adjunct my analysis with quantification,
22      but that's hardly a basis for an opinion in all
23      instances.
24          MR. KERSTEN:  I didn't have a chance, but I
25      object on the great amount of repetition on what is
```

```
 1      essentially testified to in excess of 15 times, if
 2      not more, and is essentially irrelevant, so I object
 3      to this waste of time.
 4  BY MR. GRIMSLEY:
 5  Q   Do you consider a .4 basis point differential to be
 6      material?
 7          MR. KERSTEN:  Object as to form as to
 8      insufficient information.
 9          THE WITNESS:  Yeah, it would depend on the
10      instance, and I don't know what .4 you're talking
11      about and where that comes to play.
12  BY MR. GRIMSLEY:
13  Q   Looking at 1985, where there is a .4 basis point
14      differential or a 40 basis point differential between
15      the life and Pre-MN rates, in your view is that a
16      material difference?
17  A   A material difference for what?
18  Q   For somebody owning a Pre-MN annuity versus somebody
19      owning a life insurance policy?
20  A   For purposes of the assumption that I made, it is
21      possible only looking at this one piece of paper to
22      say that there is a clear and apparent trend that the
23      Pre-MN rate is getting larger relative to the life
24      rate every year up until '85, so it's not
25      unreasonable to make the conclusion that if that
```

```
 1    obvious trend per this exhibit were to continue, that
 2    an appropriate assumption would be the Pre-MN
 3    annuitant rate would be much higher than the life
 4    rate.
 5                I have seen other exhibits in addition
 6    to this Exhibit 5 which show different differentials,
 7    and I conclude that the appropriate and the
 8    reasonable representation for what the annuity rate
 9    will be or would be in a "but-for" world after '85 is
10    precisely and exactly equal to the life rate.
11            MR. KERSTEN:  Counsel, you have gotten the
12    same answer twenty times, but it's now ten after
13    12:00.
14            MR. GRIMSLEY:  Lunch is fine.
15            MR. KERSTEN:  And we can go off the record.
16            MR. GRIMSLEY:  We will do one question
17    first.
18            MR. KERSTEN:  Okay.
19  BY MR. GRIMSLEY:
20   Q  Did you identify in your report all of the exhibits
21      and documents that you did, in fact, rely upon in
22      coming to the opinions that you just provided?
23   A  That I just provided in the last question?
24   Q  In regards to your determination that the assumption
25      of identicality in the "but-for" world of the Pre-MN
```

```
 1      annuity and life DIRs is reasonable.
 2   A  I've never made that assumption, an assumption of
 3      identicality.  What I have assumed is that the,
 4      again, readily apparent, well-known life rate is the
 5      best, most reasonable, most accurate representation
 6      of what the Pre-MN annuity rate would be thereafter.
 7      But as I state in Paragraph 25, there is not an
 8      identicality issue here, there is comparability.
 9   Q  Well, in fact in your model, though, sir, you have
10      assumed that the DIR rate would be identical?
11   A  I have assumed that the best estimate for the Pre-MN
12      annuitant DIR would be to use the benchmark life
13      rate, which is well known, readily available, readily
14      apparent, and as stated several bullets here in
15      Paragraph 25 as to why that is the case, that that
16      makes the best representation that can be done.
17   Q  But in your mind, it is nevertheless an estimate?
18   A  Absolutely.
19   Q  And did you identify all documents you relied on in
20      determining the reasonableness of that estimate?
21   A  There is an attachment to my report which shows items
22      that I am -- that I have been provided.  But as I
23      indicated earlier, I have been involved in some
24      aspect of this or related cases in this regard for
25      numerous years and some of the basis is a cumulative
```

```
 1      knowledge, and so exactly what was handed me in the
 2      last month is not the full basis for my ability to
 3      opine.
 4   Q  But did you consider in coming to your opinion that
 5      these were reasonable estimates for but-for DIRs, the
 6      fact that the annuity and life rate DIRs prior to
 7      1985 were different in some years?
 8   A  That's a fact, they were different in some years.
 9   Q  And --
10   A  As I state here, it's the historical comparability in
11      addition to several other rational bullets points
12      that I have expressed in my report on Paragraph 25
13      that enabled me to conclude that that is the -- not
14      only a reasonable estimate, but it's the best
15      estimate.  It's the most reliable estimate, it's
16      readily apparent, it's readily available.  It -- It
17      fairly reflects what is appropriate for a "but-for"
18      world.
19   Q  To the extent there were documents that you saw that
20      showed the annuity rate being higher than the life
21      rate in the years prior to the 1985 change, would
22      those have been documents that you would have
23      considered and relied upon in coming to your
24      assessment of the reasonableness of your estimate?
25   A  I state it's the historical comparability between,
```

```
 1      that is one of the reasons for enabling me to
 2      conclude as such, and so looking at those historical
 3      disparities was certainly part of that basis, yes,
 4      sir.
 5   Q  Would you have then cited in your report as a
 6      document upon which you relied documents that showed
 7      that the annuity rate was higher than the life rate
 8      in some years prior to 1985?
 9          MR. KERSTEN:  Are you asking whether
10      documents showing that are on the list?
11  BY MR. GRIMSLEY:
12   Q  Yes.
13   A  Yeah, I have seen so many of these over the years,
14      and I was well aware of that prior to receiving any
15      information on this.  All of those documents, to the
16      extent that I saw them, were identified in previous
17      reports perhaps, or this one.  There is certainly
18      nothing that I have ever seen that hasn't been
19      identified as a -- as information that was provided
20      to me, so it's very hard to answer your question
21      because of that duration of involvement.  I have seen
22      several reports along the lines of this Exhibit 5
23      which show values which are somewhat different than
24      Exhibit 5.
25          MR. GRIMSLEY:  Break for lunch?
```

                    THE WITNESS:  (Witness nods.)
                    THE VIDEOGRAPHER:  Going off the record.
      The time, 12:17 p.m.
                    (Off the record.)
                    THE VIDEOGRAPHER:  We're back on the record
      at 1:02 p.m.
BY MR. GRIMSLEY:
Q    Mr. Hoyer, we were talking before lunch about an
     analysis you had done to determine that it was
     reasonable to assume that the Pre-MN annuity rate and
     life rate would have been the same in the "but-for"
     world.  Do you recall those questions and answers?
A    Yes, sir.
Q    How would I go about recreating the analysis that you
     did to come to your conclusion regarding the
     reasonableness of that assumption?
A    Well, I think you would start by taking actuarial
     exams.
Q    What else would I do to actually recreate the
     analysis that you did?
A    If you get through that, after that many years, I
     will tell you the rest.  But that's obviously the
     basis for any analysis I do is the experience and
     training that I have.  So it's very difficult for me
     to answer the question because it certainly is a

     function of everything I have ever done in the
     industry.
Q    Imagine a world in which we have an expert ourselves
     who has actuarial expertise.  Can you explain to that
     individual how he or she would recreate the analysis
     that you undertook to come up with your opinion that
     assuming the life rate and Pre-MN rate would be the
     same in the "but-for" world was reasonable?
A    Yeah, I did an analysis, and the result of that
     analysis was an opinion -- my opinion that those two
     rates, that the life rate is not only a reasonable
     representation of the annuity rate, but the most
     fair, equitable, and appropriate rate that can be --
     that can be assumed.
            So that's my opinion based on my
     analysis.  What did I do to analyze that?  Well, I
     have in my report on Paragraph 25 several factors
     which were incorporated in my review and support that
     opinion and conclusion.
Q    Do the four factors that are -- five factors, I'm
     sorry, that are set forth in Paragraph 25 of your
     March 4th, 2013 report accurately and completely
     represent the analysis that you performed to
     determine that your assumption regarding the
     comparability of life rates and annuity rates in the



     "but-for" world was reasonable?
A    That summarizes the material rationale for that
     opinion.
Q    How would an expert who wanted to test your analysis
     recreate the analysis that you conducted in order to
     determine whether that analysis was valid?
A    Well, I would suggest that they would ask themselves
     the questions specified in those bullet points and
     reach a conclusion regarding each of those items; and
     if that were done, I think their opinion, if they
     were a reasonable practitioner, would be very
     consistent with my opinion.
Q    Let's look at Paragraph 25, the second bullet point.
     How would an expert recreate the analysis that you
     performed to determine the historical comparability
     between DIRs for life insurance and annuity
     policyholders prior to the 1985 change?
A    It's just a review of numerical values, some of which
     are represented on the trial exhibit that you
     provided earlier today and some of which are
     represented on other exhibits that I have reviewed.
Q    Can you point out which exhibits an expert attempting
     to test the validity of your analysis would need to
     look at?
A    Every exhibit available which provides historical

     Pre-MN annuity and life insurance DIRs that were made
     available should be reviewed, analyzed, and an
     opinion formed based on that review.  I have looked
     at that.  I have seen differences such as you have
     cited.  I have seen comparability in other years.  I
     have seen trends.  And putting those items together
     and saying what would a reasonable practitioner
     expect to happen after 1985, in my opinion, based on
     my analysis, that using the life rate as the Pre-MN
     annuitant rate is reasonable, prudent, fair, and an
     accurate reflection of what would happen.
Q    You mentioned that there are a number of exhibits
     that have historical information regarding life
     insurance and annuity DIRs; correct?
A    Yes, sir.
Q    And did you take all of those that you have seen into
     account in your analysis?
A    Absolutely.
Q    So you relied upon those documents in your analysis?
A    Absolutely.  That is a part of my analysis, was to
     review those documents.
Q    Please take a look at Appendix B to your report,
     which is the last page, I believe, of your March 4th,
     2013 report.  Are you there?
A    Yes, sir.



1  Q  And you will see that this is a list of documents
2     upon which you -- or which you reviewed in addition
3     to those that are cited in your June 30th, 2010
4     report and July 20th, 2010 deposition and then the
5     trial.
6           MR. KERSTEN: Excuse me, counsel, I think
7     you have misstated that. You may want to rephrase
8     your question.
9  BY MR. GRIMSLEY:
10 Q  Okay. This sets forth additional documents that you
11    reviewed in preparation of your March 4th, 2013
12    report; correct?
13          MR. KERSTEN: Answer the question as best
14    you can.
15          THE WITNESS: This represents any new
16    documents that I received after that time period and
17    certain of the older documents that I had reviewed,
18    which are cited in this report. I'm spiking them out
19    for reciting, so it's a combination.
20 BY MR. GRIMSLEY:
21 Q  So you have the additional documents reviewed, and
22    the first sentence of this page says, "In addition to
23    the documents reviewed for my June 30th, 2010 report,
24    July 20th, 2010 deposition, and November 16th and
25    17th, 2010 trial, I have reviewed the following." Do

1     you know whether that universe of documents in
2     addition to the additional documents listed in
3     Appendix B contains all of the documents you relied
4     upon for your analysis?
5  A  Again, let me make this clear to you. I'm saying in
6     addition to documents I reviewed certain new
7     documents of which I spike out, but I'm also spiking
8     out some of the old documents. For example, trial
9     Exhibit 189, just because it's cited in the report.
10    That is not a new document, I have seen that prior to
11    this last month. That was incorporated in the
12    earlier items.
13          Now, since I did reports, I believe,
14    prior to 2010, the 2010 report could say that in
15    addition to what I had seen for a previous report I
16    have looked at certain other new items, so this is
17    kind of -- it's hard for me to answer your question
18    with precision because that report could have also
19    cited it.
20          (Deposition Exhibit No. 6 was marked for
21    identification.)
22 BY MR. GRIMSLEY:
23 Q  I'm showing you what has been marked as Deposition
24    Exhibit No. 6. Would you take a look at that?
25 A  (Witness complies.)

1  Q  Can you go to -- What is Deposition Exhibit 6?
2  A  It is a report that I issued on June 30th, 2010.
3  Q  Is that the other report that you were just referring
4     to, sir?
5  A  No.
6  Q  Are there other reports besides the one issued on
7     June 30th, 2010 and the one issued on March 4th, 2013
8     that you have issued in this case?
9  A  I said just a minute ago that I have issued reports
10    prior to 2010 in cases related to this issue.
11 Q  Okay. But I'm just trying to figure out whether
12    these two reports do, in fact, contain all of the
13    documents that you relied upon to come to your
14    opinions in the March 4th, 2013 report; okay?
15          Looking now at Exhibit B to your
16    June 30th, 2010 report and Appendix B to your
17    March 4th, 2013 report, can you tell me whether all
18    of the documents that you have relied upon in
19    conducting your analyses and rendering your opinions
20    in this report of March 4th, 2013 are contained in
21    these two appendices?
22 A  These are the only documents on which I have relied
23    in formulating opinion.
24 Q  So if there is a document out there that shows that
25    the annuity rate was higher than the life rate at any

1     point in time prior to 1985, it would be referred to
2     in one of these two appendices?
3  A  I believe so.
4  Q  But you don't know which document that would be or
5     documents looking at the appendices here today?
6  A  I'm not sure looking at the appendices here today.
7  Q  We also discussed before the break some analysis that
8     you had done to determine that your assumptions
9     regarding end-of-year surrender, end-of-year
10    deposits, and end-of-year withdrawal were reasonable.
11    Do you recall that?
12 A  Yes, sir.
13 Q  Explain to me how an actuarial expert would go about
14    recreating the analysis you performed to come to the
15    conclusion that your assumptions were reasonable.
16 A  Since the information that was provided to me for my
17    analysis indicated cash items on an annual basis, I
18    had to make some conclusion as to how to treat them.
19    I could treat them as mid year, I could treat them
20    end of year, beginning of year. There is various
21    treatments that could be made. What I chose to do
22    after analysis was to make an assumption regarding
23    the treatment of those items in such a manner that if
24    anything my analysis would be considered relatively
25    conservative while still accurate.

1  Q  How could an actuarial expert on our side of the
2     fence recreate the analysis that you performed in
3     order to test the validity of your assertion that
4     your assumptions are, in fact, conservative?
5  A  I'm not sure how your individual or group would do
6     that, but I certainly could do that and they could as
7     well.
8  Q  How would they do that?
9  A  They would simply look at the implications of those
10    values and estimate what, if any, disparity would
11    result from using that assumption and proceed
12    accordingly.  I have done so, I have analyzed the
13    implications and concluded that it's immaterial.
14 Q  You did not, however, do any actual quantification or
15    calculations in performing that analysis?
16 A  Only because having done thousands of comparable
17    analyses it was my opinion that a quantification was
18    unnecessary to formulate that opinion -- a numerical
19    calculation.  I did an analytical calculation.
20 Q  Did you reduce to writing anywhere that particular
21    analysis?
22 A  Yes.
23 Q  Where?
24 A  In the report it specifies that I assumed end of year
25    for financial transactions, and I indicate in the

1     report that the implication of that estimate is to
2     render the difference somewhat conservatively stated,
3     but also in the report I indicate that the difference
4     is a fair and reasonable representation and an
5     accurate representation of such difference, so I
6     conclude that it is immaterial.
7  Q  But where in the report do you include the actual
8     analysis itself that led you to conclude that the
9     assumptions you were making were conservative?
10        MR. KERSTEN:  Objection as repetitious.  Go
11    ahead and answer the question.
12        THE WITNESS:  I made many, many analyses,
13    starting with can I respond to counsel's questions of
14    me.  There is nothing in my report that writes out in
15    detail step by step what each of those analyses were.
16    As that example, I concluded and responded to
17    client -- to counsel that I can respond to their
18    question positively and a formulaic mechanical
19    process can be developed and proceeded accordingly.
20    I did not put in my report precisely how I reached
21    that conclusion nor do I think it's appropriate.
22    That's not what they asked.  They asked can I do it,
23    I analyzed, concluded I could.  It's not in the
24    report.
25 BY MR. GRIMSLEY:

1  Q  Was your analysis part of the bases for the opinions
2     that you provided in your report?
3  A  Every aspect of my consideration and analysis was
4     utilized and evolved into the report that's been
5     provided to you.
6  Q  I'm just asking whether the analyses that you
7     performed provided at least some of the basis for the
8     opinions that you rendered in your report.
9         MR. KERSTEN:  Object as to the ambiguity in
10    the question.
11        THE WITNESS:  Yeah, I'm not sure which -- I
12    said I have done numerous, numerous analyses in
13    developing and formulating this report, starting
14    with, I'm using as an example, client -- counsel
15    asked me a question, can I respond to it.  I do an
16    analysis.  I concluded yes, I can.  That's just one
17    example of an analysis and a conclusion.  I don't
18    have step by step how I reached that conclusion to
19    get back to them.  I don't think it's appropriate to
20    put in the report.  There is many analyses that I
21    did.  They're not step by step shown here.
22 BY MR. GRIMSLEY:
23 Q  Let's --
24 A  What is shown here is the basis for the approach that
25    I developed and why I think it's an accurate and

1     reasonable reflection of the difference.
2  Q  Let's take your analysis that you just used as your
3     example of whether you could answer the first
4     question that was posed in Paragraph 6, bullet point
5     one; okay?
6  A  Yes, sir.
7  Q  And you said you performed that analysis, but you did
8     not put it in your report?
9         MR. KERSTEN:  Wait a minute.  I object to
10    that as not a fair characterization of this
11    testimony, and I also object on the ground that in
12    addition to that error as to form, I object to the
13    total waste of time of all of this.
14        THE WITNESS:  I'm sorry, I'm going to have
15    to hear your question one more time, please.
16 BY MR. GRIMSLEY:
17 Q  Yeah.  You had given the example of an analysis that
18    you performed that resulted in the opinion that you
19    could, in fact, perform calculation of accumulated
20    difference on a class-wide basis.  Do you recall
21    that?
22 A  Specific to the question that's asked, which is on a
23    class-wide basis and an individual basis, for those
24    still in force, for those who terminated, there was a
25    few questions that are shown there.  But before I

entered into doing the analysis, I had to -- before I developed the methodology I had to do an analysis to see if it's appropriate to go down that path and whether it was likely that I can surface with an appropriate answer to the question.

And I did that analysis, I called counsel back, and indicated that based on the information I have seen and my knowledge of the situation, I think we have sufficient information and that the -- any other information would be readily available to enable those questions to be answered positively.

Q  Did that analysis that you performed prior to answering counsel's question form the basis for some of the opinions that are set forth in your report?

MR. KERSTEN: Objection as to ambiguous as to form.

THE WITNESS: No, that's not a basis for the opinions. That indicated that I should proceed to make a development of that methodology, and the methodology itself provides the basis for the opinions.

BY MR. GRIMSLEY:

Q  Well, let's turn to the analysis that you performed to -- that led you to conclude that your assumptions

were generally conservative. Did that analysis form the basis of any of your opinions in this report?

A  The analysis that -- and we talked about one, the -- whether the cash transactions, how they should be treated. Since I only had them on an annual basis, by definition I had to do -- make some sort of assumption as to when they transacted. I also indicate that what I have developed here is in no way, shape, or form dependent on that assumption. But for purposes of presentation in this report, I purposely assumed the most conservative approach.

Q  But you did perform an analysis of some sort to determine that your approach was conservative; correct?

A  Absolutely.

MR. KERSTEN: Objection as repeatedly repetitious.

THE WITNESS: Yes, sir.

BY MR. GRIMSLEY:

Q  And I just wanted to know, it's really simple, whether that analysis that you performed can be found anywhere in the report itself.

MR. KERSTEN: Same objection.

THE WITNESS: In the report you can see that I considered how to treat cash items. I

indicate in the report that I treated them as year end. I indicated in the report that if anything that is a conservative approach, and then I also indicate in the report that to the extent additional information were made available that this methodology would incorporate it and then you wouldn't have that assumption.

BY MR. GRIMSLEY:

Q  In your report you distinguish between policyholders that have direct recognition and those that do not?

A  Yes, sir.

Q  And whether a policyholder has direct recognition or not depends on whether that policyholder agreed to Update '83?

MR. KERSTEN: Objection. Counsel, are you -- I object to the ambiguity of that question as do you mean the agreement upon purchasing a contract? Does that include that?

BY MR. GRIMSLEY:

Q  Whether a policyholder in the putative class has direct recognition or not would depend on whether that policyholder had agreed to Update '83; right?

MR. KERSTEN: That's not correct the way you have asked it.

THE WITNESS: I can answer it.

MR. GRIMSLEY: Yeah, he can answer the question.

MR. KERSTEN: I think you're wrong on that, Sean.

MR. GRIMSLEY: That's fine. He can answer the question. He's the expert, he can tell me if I'm wrong.

THE WITNESS: In part, and not in total.

BY MR. GRIMSLEY:

Q  What do you mean by that?

A  I mean that you're partially correct and not all correct.

Q  In what way am I not correct?

A  The Update '83 was something that happened prior to the class -- the defining of the class group. And for policies that were issued after Update '83, I think they were all on direct recognition, if I'm not mistaken. So some people opted into that, other people bought into that.

MR. KERSTEN: Sean, that is what I was trying to alert you too.

MR. GRIMSLEY: That's fine, that's why I'm asking questions.

BY MR. GRIMSLEY:

Q  So there are some policyholders after 1983 who had





App. 105

```
 1    direct recognition who had not opted for Update '83.
 2    But with regard to policyholders who purchased their
 3    policy prior to 1983, in order for those to have
 4    direct recognition, they would have had to opt for
 5    Update '83?
 6  A I agree with your statement other than you're using
 7    "83" as a definitive, and in fact the exact timing or
 8    implementation of that was not necessarily '83 per
 9    se, but that's your -- what you said was correct.
10  Q I'm just using "Update '83" to refer to the update,
11    because I think lots of people have referred to it
12    that way. Have you seen it referred to that way?
13  A Referred to that way, but the implementation of
14    which, you know, wasn't strictly '83 per se.
15  Q How would your model account for the possibility of a
16    Pre-MN annuity policyholder who purchased their
17    annuity prior to 1983 having chosen to agree to
18    Update '83 during the class period, meaning after
19    1985?
20  A I'm not sure how many there were. It's a fairly
21    small group, first of all; but it would treat them as
22    direct recognition Pre-MN annuitants after the time
23    which they accepted direct recognition or Update '83.
24  Q But each of those individuals, if they had accepted
25    Update '83 after the 1985 change, would have its own
```

```
 1    individual set of grids based on when that individual
 2    actually accepted Update '83; correct?
 3         MR. KERSTEN: Objection as multiple in
 4    form.
 5         THE WITNESS: No, you would not need
 6    multiple grids. The opinion of treatment of those
 7    who have accepted Update '83 or direct recognition
 8    and those who did not, I think within this formula,
 9    without trying to nitpick the formula for a few
10    individuals for a couple of years, it's immaterial
11    and hence the opinions that I made or the
12    assumptions, however you want to categorize them, I
13    think accurately and fairly reflect all individuals,
14    not -- you know, including a couple who may have
15    changed it during a certain period of time.
16  BY MR. GRIMSLEY:
17  Q Do you know how many of the putative class members
18    actually accepted and agreed to Update '83 after the
19    1985 change had been implemented?
20  A I'm not sure precisely.
21  Q Have you looked into that in preparing your opinions
22    that are set forth in the March 4th, 2013 report?
23  A I'm sorry, say that question again.
24  Q Did you look into that question in preparing the
25    opinions that are set forth in your March 4th, 2013
```

```
 1    report?
 2  A Yes.
 3  Q And what analysis did you perform to determine that
 4    it was immaterial to your model that certain
 5    individuals agreed to Update '83 only after
 6    implementation of the 1985 change?
 7  A Well, I have been made aware, I have seen evidential
 8    matter which shows how many individuals there are in
 9    the group, how that number has changed over time,
10    percentages of those who are in direct recognition or
11    accepted Update '83 versus those that did not, and
12    I'm comfortable that having seen as much information
13    in that regard as I could have, that the formulaic
14    mechanical approach that I have provided fairly and
15    accurately reflects every one of those Pre-MN
16    annuitants' situations and that the difference that I
17    quantify is a fair and reasonable representation of
18    that difference.
19  Q How would somebody with actuarial expertise go about
20    recreating the analysis that you performed to
21    determine that it was immaterial to your model that
22    certain individuals accepted Update '83 after the
23    1985 change had been implemented?
24  A They would have to review numerous documents that had
25    the kinds of numbers that I was just alluding to.
```

```
 1    How many are in the group, how many opted for Update
 2    '83, when they did so, and that would be I think
 3    sufficient basis for a reasonable person with
 4    knowledge in this area to make an informed opinion as
 5    I did.
 6  Q But just to be clear, you don't know today how many
 7    people actually agreed to Update '83 after the '85
 8    change was made?
 9  A I don't have a number, no.
10  Q Do you know how much in terms of the amount invested
11    in annuities was accounted for by individuals who
12    accepted the 1983 change after -- or the 1983 update
13    after the 1985 change had been put in place?
14  A I saw that in the totality of evidential matter that
15    I reviewed over the years of this case, and I know it
16    in sufficient detail to conclude that my opinion in
17    this regard is reasonable and accurate, and I'm
18    satisfied that any outlier would be immaterial to
19    such quantification.
20  Q Is there anywhere in your report where you discuss
21    the question of the potential impact on your analysis
22    of the fact that some number of putative class
23    members accepted the 1983 update after implementation
24    of the 1985 change?
25  A Yes.
```

1  Q  Where?
2  A  Where I conclude that this formula and its
3     application represents a fair and reasonable and
4     accurate representation of that difference.  I could
5     not reach that conclusion without having considered
6     the implications of various outliers, subtleties,
7     nuances, trends, and differences that existed which
8     are a part of reaching that conclusion.
9  Q  I understand that you have the conclusion in here, so
10    I don't want to be confusing, but did you include in
11    the report itself the underlying analysis that led
12    you to conclude that it was immaterial to your model
13    that certain individuals had accepted Update '83
14    after the 1985 change?
15           MR. KERSTEN:  Objection as repetitious.
16           THE WITNESS:  No, it's not spelled out in
17    detail in this report.
18 BY MR. GRIMSLEY:
19 Q  Let's assume your model that's in your report and a
20    hypothetical class member who accepted the 1983
21    change after -- or I'm sorry.
22           Let's assume your model that is set
23    forth in your report and assume also that there is a
24    class member who agreed to Update '83 after the 1985
25    change.  Say, for instance, sometime in 1986.  Okay?

1  A  Fine.
2  Q  In order to calculate the accumulated difference for
3     that particular individual, would you need to know
4     when specifically that individual agreed to Update
5     '83?
6  A  Absolutely unequivocally, no.
7  Q  Wouldn't the amount in the account at the time the
8     policyholder agreed to Update '83 be influenced by
9     the fact that prior to that time the policyholder did
10    not have direct recognition?
11 A  For three months?  The answer is it's immaterial.
12 Q  How about if we move it to 1988?
13 A  Well, as stated in the report, the quantification of
14    difference begins in 1993 for presentation purposes.
15    We can apply the same formula to any individual in
16    the class.  But for purposes of presentation, we have
17    started in 1993, so the formula would handle that
18    person absolutely accurately, properly, and he would
19    be starting in the direct recognition class for when
20    he made the change to direct recognition.  The
21    formula accepts that with no problem.
22 Q  But each individual who accepted direct recognition
23    after the 1985 change may have a different date upon
24    which they did it?
25 A  It's irrelevant and immaterial.

1  Q  But the date on which the individual accepted direct
2     recognition would impact how you apply the model,
3     would it not?
4  A  It would not.
5  Q  If somebody accepted direct recognition in 1987,
6     their accumulated difference would be different 10
7     years later than somebody who accepted it in 1988,
8     would it not?
9  A  Individually there may be a difference which is
10    immaterial, and that's why the formula works.  That's
11    why it is the best representation of difference,
12    that's why it's a fair and accurate presentation of
13    difference, and that's why it is in fact not only
14    fair, it's the best estimate of the difference.  It's
15    immaterial that a person took direct recognition on
16    March 30th, 1986 or May 5th, 1986.  The
17    quantification of difference either to date for those
18    remaining in force or until the date of their
19    termination can be quantified accurately, reasonably,
20    and fairly using this process, and there is no
21    material difference.  It's irrelevant.
22 Q  Would there be a material difference if the person
23    had switched from direct recognition in 1986 versus
24    1990?
25 A  Only for those -- only for those individuals who

1     terminated in that duration, and obviously they
2     couldn't have opted for direct recognition in 1990
3     and terminated in 1988, but that's the only case
4     where that information would be pertinent.  And since
5     it applies only to those who terminated during the
6     period in which you are asking your question, that
7     no, I do not care, and the reason I do not care is
8     because it does not impact the answer.  There is an
9     immaterial difference.
10 Q  Let's take out of the hypothetical you were just
11    talking about somebody surrendering before they
12    accepted direct recognition.  Let's assume they
13    surrendered in 2000.  Would there be a difference --
14    an accumulated difference for that person if they had
15    adopted direct recognition in 1986 versus adopting it
16    in 1990?
17 A  The answer is no to any material extent.
18 Q  Have you done any actual calculation to make that
19    determination?
20 A  Yes.  Any analysis, yes.  "Calculation," you keep
21    referring to that.  Calculation is done to augment
22    analysis as appropriate.  Analysis incorporates
23    numerical assessment.  I did numerical assessment,
24    not calculation.
25 Q  What numerical assessment did you perform to conclude

```
 1       that the difference in taking direct recognition in
 2       1986 and 1990 would have been immaterial for somebody
 3       who surrendered their policy later?
 4   A   By looking at the values that we have developed and
 5       by saying what if a different treatment had been
 6       utilized and in applying that in a numerical sense, I
 7       conclude that there is no material difference.
 8   Q   How would an actuarial expert recreate that analysis
 9       that you just described?
10   A   By doing just what I just described.  By looking at
11       the values that are shown in this report and
12       hypothetically applying them to those two scenarios.
13       And when you do so, you will get no material
14       distinction.
15   Q   Did you in any way memorialize in writing the process
16       of the analysis that you performed that you just
17       described?
18   A   No, because it's irrelevant to the conclusions that I
19       reached.  Irrelevant in the sense that I have
20       considered alternatives and I am -- and I concluded
21       that in my opinion that this formula meets the
22       objectives and it attains the goals that I have said
23       in the report and that there is no outliers or
24       fluctuations or considerations or anything else of a
25       material nature that I have not considered.
```

```
 1   Q   So let's assume, again, somebody who opted for direct
 2       recognition in 1990.
 3            MR. KERSTEN:  Is there such a person,
 4       counsel?
 5            THE WITNESS:  Yeah, I said it's de minimis.
 6   BY MR. GRIMSLEY:
 7   Q   Let's just assume hypothetically.
 8            MR. KERSTEN:  Wait a minute now.  Is there
 9       any foundation for that assumption, counsel?
10   BY MR. GRIMSLEY:
11   Q   Let's assume hypothetically that there is somebody
12       who in 1992 adopted direct recognition.
13            MR. KERSTEN:  Same objection.  There is no
14       foundation at all for these that I'm aware of.  If
15       counsel is aware of any conceivable foundation, I ask
16       that he so state.
17   BY MR. GRIMSLEY:
18   Q   I'm assuming a hypothetical.
19   A   And the question is?
20   Q   Assume that somebody adopted direct recognition in
21       1990.
22   A   Right.
23   Q   Which grid would you apply to that individual in your
24       model, the direct recognition grid or the non-direct
25       recognition grid?
```

```
 1   A   For that hypothetical, the model would assume the
 2       direct recognition grid.
 3   Q   Why?
 4   A   Because that accurately reflects the difference,
 5       which is what we're trying to quantify.  And the
 6       difference is either a current difference, and the
 7       direct recognition grid will do precisely that; or
 8       they terminated it sometime prior to the current, and
 9       the direct recognition grid will calculate a fair and
10       accurate number for that individual.  And that, I
11       said, is a de minimis group in any case.
12   Q   How many people would constitute a de minimis group?
13   A   It would depend on the nature of the question being
14       asked and the situation.
15   Q   Assuming a putative class of 19,000 people, what
16       would be a de minimis number in your mind of people
17       that accepted Update '83 after the 1985 change?
18   A   Since the numerical calculation is immaterial in any
19       case, that -- how much would be de minimis?  Perhaps
20       a lot, because the numerical calculation does not
21       give a numerical answer which is of any material
22       difference.
23   Q   Now, you said for presentational purposes the report
24       presents accumulated differences beginning in the
25       year 1993?
```

```
 1   A   Yes, sir.
 2   Q   You did not, at least in the report itself, present
 3       accumulated differences for the years 1985 through
 4       1992; is that right?
 5   A   I did not show such differences for three of the four
 6       categories which I define in the report.  I'm only
 7       showing one as a representation of how it can be done
 8       and should be done.  So to show that table from '93
 9       on, those are the material years and that's why I
10       changed it at that time.  So it's strictly for
11       presentation, but the formula exists and can apply to
12       all years, all policyholders, equitably and fairly.
13   Q   What do you mean "strictly by presentation"?
14   A   That for purposes of understanding, it is those --
15       I'm showing those years for which there are some
16       material difference.
17   Q   Turn to Page 15 of your -- Do you mean to say there
18       is no material difference before 1993?
19   A   What I mean to say is that these are the years for
20       which material difference is evident and that the
21       difference for earlier years is certainly less.  Now,
22       an individual might have terminated their policy
23       prior to 1993, and for them the only quantification
24       would be prior to this date, and the formula handles
25       that.  But just for presentation, we're showing it
```

```
 1       from '93.
 2  Q    Applying your formula, it's true that there are
 3       people who would have surrendered prior to 1993 whose
 4       accumulated difference would have been zero or
 5       negative; correct?
 6  A    Whose difference would have been zero or negative,
 7       that is a possibility.
 8  Q    Did you do anything to determine how many putative
 9       class members surrendered at a point in time where
10       their accumulated difference would have been zero or
11       negative?
12  A    As I indicated earlier, I did see the values in terms
13       of number of policyholders and policyholder account
14       values by year over the period from '85 through
15       current, so I have an idea of what that would be,
16       yes.
17  Q    Roughly what percentage of the putative class members
18       surrendered their policies prior to 1993?
19  A    I don't recall offhand.
20  Q    Do you have any sense of the magnitude?
21  A    No.
22  Q    But did you go through and apply your formula to
23       determine how many of those individuals would have an
24       accumulated difference of zero or a negative value?
25  A    No, I didn't.
```



```
 1  Q    Those individuals, if they have an accumulated
 2       difference of zero or a negative value, would not
 3       have suffered any damages?
 4  A    That's false.
 5  Q    And why is that false?
 6  A    Again, you know, I have testified in court, that
 7       question was asked precisely and directly.  I will
 8       try to reiterate what I already said.  Every member
 9       in this class was harmed the moment the change in '85
10       was made.  The moment.  None them had been
11       financially impacted at that time.  They were all
12       damaged, they were all harmed at the moment the
13       change was made.  The insurance company violated
14       their contractual obligations, they violated
15       generally accepted insurance practices and
16       procedures, they violated every agreement of fair and
17       equitable treatment of policyholders at that time, so
18       everyone was harmed at the second the change was
19       made.
20            Now, the numerical quantification is a
21       fundamentally different element, and that's done via
22       this formulation here.  And as far as materiality is
23       concerned, it begins around 1993.
24  Q    For somebody who was a Pre-MN annuity policyholder
25       who surrendered their policy prior to 1993, what is
```



```
 1       the quantification of the damages to that person?
 2  A    Quantification of damages is a decision for the court
 3       to decide upon.  The financial implications are
 4       relatively small -- relatively small for the group as
 5       a whole, and that's why my presentation is as shown.
 6       But the court would decide how to quantify their
 7       damages.  I have just spelled out a difference.
 8  Q    There are people, though, who surrendered their
 9       policies prior to 1993 in the actual world who did
10       better from a financial perspective than they would
11       have in your "but-for" world?
12  A    To a de minimis extent, to an immaterial extent, yes,
13       I would agree.  Strictly from a financial standpoint.
14  Q    Have you gone through and calculated what the actual
15       difference would be between the accumulated
16       difference in your "but-for" world and the actual
17       difference in the actual world for people who
18       actually were financially better off because they
19       surrendered before 1993?
20  A    Certainly I have considered that, and it's
21       immaterial.
22  Q    What's the amount?
23  A    I don't know offhand, but I am well aware of its
24       relative magnitude and in my opinion it's immaterial.
25  Q    Do you have a rough sense as to order of magnitude of
```

```
 1       the amount?
 2  A    Yes.
 3  Q    What is the order of magnitude of the amount?
 4  A    Immaterial.
 5  Q    Is it thousands, tens of thousands of dollars,
 6       hundreds of thousands?
 7  A    It certainly approaches the first of those three.  It
 8       is immaterial.
 9  Q    But you don't know sitting here today what it is?
10  A    I do not have a numerical value for that.
11  Q    If a person were intending to terminate their policy,
12       say in 1992, how would they have been harmed by the
13       implementation of the 1985 change?
14  A    I just answered that.  You want me to say the same
15       answer?
16  Q    How would they have been financially harmed by the
17       implementation of the 1985 change?
18  A    That's a different question.  I will answer that one
19       now.  Certain of those policies, you just indicated
20       that it's conceivable that someone may have by the
21       subsidies paid by Northwestern received any material,
22       but greater dollar amount.  There is at least that
23       many people who also received not significant in
24       total, but to them it's their only value, and they
25       received less, so those people were harmed
```



```
         financially by the change made in 1985.
 2   Q   Are you talking about people who actually surrendered
 3       their policies prior to 1993?
 4   A   Yes.
 5   Q   And are those people who surrendered their policies
 6       in the '86, '87 time period?
 7   A   I believe those people were financially harmed, yes.
 8   Q   And you believe that because those individuals
 9       received an annuity rate that was somewhat less than
10       the life rate in the years 1986 and 1987?
11   A   I believe that is the case.
12   Q   But the presentation that you provide in your report
13       does not account for the accumulated difference of
14       those individuals, does it?
15   A   Absolutely not.  When I'm saying absolutely not, I'm
16       saying absolutely not it does not reflect.  It
17       certainly reflects -- the methodology as laid out
18       here can apply to every individual in the group and
19       it would apply to those as well.  So the methodology
20       is specified here.  If someone surrendered their
21       policy in 1986, this methodology will apply to that
22       individual and quantify a difference, which is a
23       positive difference, meaning that they were
24       financially harmed to that extent, so it is within
25       this methodology.
```

```
 1   Q   But just looking at Paragraph 15 of your report --
 2       I'm sorry, not paragraph, Page 15.  That chart that
 3       is shown there regarding the accumulated differences
 4       by year, that does not include 1986 through 1992?
 5   A   The presentation is not shown here.
 6   Q   And I see it's very small.  There is some negative
 7       numbers in 1993?
 8   A   Yes, there are.
 9   Q   Does that mean that the accumulated difference for
10       individuals within that grid would actually be
11       negative?
12   A   When you say "within that grid," what do you mean
13       "within that grid"?  Because I don't think there is
14       any definition of what you are saying when you say
15       "within that grid."
16   Q   The accumulated difference for somebody who invested
17       something in 1986, as of 1993, would be negative with
18       relation to the investment in 1986?
19   A   For that particular transaction for that individual.
20       Now, that individual could also have contributed in
21       1989 three times as much and be financially harmed.
22       So when you say persons within the grid, I don't know
23       what you're saying because this just shows a year by
24       year accumulation, it doesn't indicate at all that
25       anyone who invested in 1986 would have a negative
```

```
 1       damage or a negative difference.
 2   Q   But for somebody who terminated in 1987 -- or 1993,
 3       I'm sorry.
 4   A   Uh-huh.
 5   Q   That person would have a negative accumulated
 6       difference?
 7   A   That is incorrect.
 8   Q   Okay.  Why is it incorrect?
 9   A   Because I just explained to you, that if they had
10       $1,000 in at the time of the beginning of this class
11       and they contributed $10,000 in 1989 and terminated
12       in '93, they would have an absolute positive
13       differential that would show damage or difference or
14       however you want to define that.  These are year by
15       year.  If you walk through the numerical calculation
16       that I have shown as an example for Ms. LaPlant, you
17       will see that.
18           MR. GRIMSLEY:  Why don't we take a break.
19           THE VIDEOGRAPHER:  This will conclude Disk
20       2.  We're off the record at 2:01 p.m.
21           (Off the record.)
22           THE VIDEOGRAPHER:  We're back on the
23       record, beginning of Disk No. 3 of the deposition of
24       Robert Hoyer.  Today's date, May 17th, 2013.  The
25       time, 2:12 p.m.
```

```
 1   BY MR. GRIMSLEY:
 2   Q   Look at Table 9 in your report, Mr. Hoyer.  On the Y
 3       axis, for the years beginning at 1993, is that the
 4       year of deposit?
 5           MR. KERSTEN:  Counsel, for the record, can
 6       we understand "Y" is the vertical?
 7           THE WITNESS:  Yes.
 8           MR. GRIMSLEY:  Yes.
 9           MR. KERSTEN:  Okay.
10           MR. GRIMSLEY:  I didn't say it was a
11       horizontal, did I?  You just wanted to make clear for
12       the record?
13           MR. KERSTEN:  Yes.
14   BY MR. GRIMSLEY:
15   Q   I will start over.  Mr. Hoyer, are the dates on the
16       vertical Y axis the dates of deposit or withdrawal in
17       Table 9?
18   A   Neither.
19   Q   What is signified by the dates on the vertical Y
20       axis?
21   A   The year in a time basis.
22   Q   That reflects what?
23   A   The year it is.
24   Q   So what --
25   A   So 2005 reflects eight years ago, 2005.
```

1  Q  So in the vertical Y axis under the column 1984, what
2     is signified by .05 next to the year 1995 -- or .06,
3     I'm sorry.
4  A  I believe it's .06. That is the difference as
5     defined within the report for deposits -- net
6     deposits made in the year 1984 as of year end 1995.
7  Q  So the years on -- in the Y vertical axis correspond
8     to a hypothetical year of withdrawal?
9  A  No.
10 Q  Look up at the title of the table. It says,
11    "Differences in rates of accumulation of net deposits
12    made by Pre-MN annuitants with direct recognition
13    deposited in column year and withdrawn in row year."
14 A  Okay.
15 Q  Does that make sense to you, looking at these numbers
16    at this point?
17 A  Yes. If you -- if you happened to withdraw in 2005
18    and deposited in 1984, the difference would be 1.34
19    per dollar. If you didn't withdraw in 2005 and
20    maintained that deposit to the current, you would
21    look at the column or the row, rather, 2012. So it
22    would mean for withdrawal, if you withdrew, but the
23    majority don't withdraw in any particular year, the
24    majority keep in force.
25 Q  So the deposit is in the year that's horizontal

1     across the top?
2  A  That is correct.
3  Q  And the hypothetical withdrawal is in the year in the
4     column on the left in the vertical Y axis?
5  A  If a withdrawal was made in that year, that would be
6     the net difference, yes, sir.
7  Q  Can you perform a -- Pull out Exhibit 5, if you
8     would, which is the exhibit with the various life
9     interest rates and annuity interest rates after 1982.
10    Do you have that?
11 A  Yes, sir.
12 Q  Can you by chance tell me what the accumulated
13    difference would be for a deposit made in 1984 with a
14    hypothetical withdrawal date of 1991?
15 A  Not by looking at this table; but by looking at the
16    previous tables, yes.
17 Q  And what would the accumulated difference be in that
18    situation where there was a deposit in 1984 and a
19    withdrawal in 1991?
20 A  It looks to be -- And these numbers are relatively
21    small in the copy of a copy that you provided for me,
22    it looks like it would be minus-2 cents.
23 Q  Which page are you on -- looking at right now, sir?
24 A  Pages 13 and 14. I would like to adjunct my last
25    answer by saying as specified and as indicated in the

1     report, what we are looking at is strictly for those
2     Pre-MN annuitants who opted for direct recognition
3     and have made no policy loans.
4  Q  What would the accumulated difference be in the
5     "but-for" world for a deposit in 1984 that was
6     surrendered or withdrawn in 1990?
7  A  1990, it would be a penny.
8  Q  That would be a penny for every dollar invested?
9  A  Yes, sir.
10 Q  And in 1991, the difference would be two pennies for
11    every dollar invested?
12 A  I'm sorry, it would be one penny per dollar, that's
13    correct.
14 Q  So that would be 1 percent difference?
15 A  That's correct.
16 Q  And in 1991 there would be a 2 percent difference for
17    a deposit in 1984?
18 A  That is correct.
19 Q  And that 1 percent difference for 1990 and 2 percent
20    difference for 1991 would be differences where the
21    Pre-MN annuity would be worth more in the actual
22    world than in the "but-for" world?
23 A  The difference would be negative, yes, sir.
24 Q  Just to be clear, what do you mean by "negative
25    difference"?

1  A  The negative difference signifies for that one
2     deposit that the but-for determination is somewhat
3     less than the actual world determination.
4  Q  Does that mean that if somebody had actually
5     surrendered in 1990 or 1991, they would have been
6     financially better off in the actual world than they
7     were in the "but-for" world?
8  A  No.
9  Q  Why not?
10 A  Because we have done that for one deposit. Most
11    individuals, not all, have several years of deposits,
12    so we have done it for one deposit. And so those
13    individuals might have other deposits in other years
14    which swing the other way and hence would -- you
15    know, you have done a piece of one calculation.
16 Q  What's the date that you actually assume the 1985
17    change took place specifically?
18 A  I don't know -- recall offhand specifically what my
19    assumption was. We're looking here at year end '84,
20    so it's starting into '85 and it -- when I say "year
21    end '84," I'm talking about fiscal year '84, which
22    is, you know -- so inter-fiscal year 1985.
23 Q  So assuming that the 1985 change took place at the
24    beginning of 1985, would the deposit amount for
25    purposes of your model existing in 1984 be the



```
 1        accumulated amount in the account up to that point in
 2        time?
 3   A    Yes, it would.
 4   Q    And that would include all of the money that the
 5        policyholder had invested up to that date and any
 6        dividends it had received as well?
 7   A    That's correct, for purposes of this exhibit which
 8        has no policy loans within it.
 9   Q    So for purposes of the amount -- Put aside policy
10        loans.  For purposes of the amount that the annuity
11        was worth as of the time of the 1985 change, looking
12        just at that amount, people who surrendered in 1991
13        and 1992 would have been financially better off in
14        the actual world than in the "but-for" world?
15   A    If they made no further deposits, that is correct, to
16        an immaterial amount.
17   Q    Have you -- in your view, is 2 percent an immaterial
18        amount?
19   A    2 percent is not immaterial to an individual.  2
20        percent is 2 percent.  Each individual can make their
21        own determination.  For purposes of this analysis,
22        this methodology gives you a reasonable and accurate
23        and fair and reasonable presentation of any
24        difference.
25   Q    But in your opinion, for purposes of your
```

```
 1        methodology, is that 2 percent difference immaterial?
 2   A    Yes, that 2 percent, and we have just quantified
 3        exactly which one it is.
 4   Q    Yes.
 5   A    And the reason it's immaterial is because that one
 6        individual, given that situation, we have quantified
 7        no financial difference for those individuals, so the
 8        "but-for" world and this analysis would say that in
 9        that particular deposit for that one individual,
10        there is no financial implication, vis-á-vis,
11        difference.
12   Q    And I just want to be clear:  In the group of
13        putative class members, were there some who
14        surrendered their policies at a particular time such
15        that those individuals were not financially harmed by
16        the 1985 change?
17   A    That is correct.
18   Q    How many people were there that would fit into that
19        category?
20   A    A very small amount.
21             (Deposition  was marked for
22        identification.)
23   BY MR. GRIMSLEY:
24   Q    I'm showing you what is being marked as Deposition
25        , and this was a trial exhibit from the
```

```
 1        state court trial, labeled trial exhibit No. 127.  Do
 2        you recognize this chart?
 3   A    I have seen charts along these lines, yes, sir.
 4   Q    And do you see that in this chart there is in the
 5        left-hand column a year beginning with 1985 and in
 6        the right-hand column the number of Pre-MN policies
 7        in force at the end of each respective year?
 8   A    Yes, sir.
 9   Q    So between 19 -- the end of 1992 and the beginning of
10        1985, you can from this chart calculate the number of
11        policyholders that surrendered their policies or
12        otherwise terminated; correct?
13   A    That's correct.
14   Q    Okay.  So how many in-force policyholders terminated
15        or otherwise surrendered their policies before 1993?
16        Would that be 35,261 minus 21,420?
17   A    That is correct.
18   Q    Okay.  So that would be 13,841?
19   A    That is correct.
20   Q    You would not characterize 13,841 people as de
21        minimis or immaterial, would you?
22   A    Immaterial to the difference, absolutely.
23   Q    The difference in --
24   A    In what we have -- in what this formula will quantify
25        as the difference for all individuals who terminated
```

```
 1        in every year up to the current or remain in-force.
 2        That quantification of difference, this 14,000
 3        approximately or 13,000 individuals account for very
 4        little of that difference.  They're immaterial to the
 5        difference.
 6   Q    But you would not say that 13,841 people is an
 7        immaterial percentage of the overall number of Pre-MN
 8        policyholders?
 9   A    That's a different question, I would never say that.
10   Q    Okay.  You can tell, actually, from this chart how
11        many Pre-MN annuity policyholders with policies in
12        force as of 1985 surrendered their policies in 1990,
13        1991, and 1992?
14   A    Yes, sir.
15   Q    In 1992 you can determine the number of people who
16        surrendered their policies in that year by taking
17        22,675 minus 21,420; is that correct?
18   A    That's correct.
19   Q    And that would yield a total of 1,255 people?
20   A    Yes, sir.
21   Q    You are not saying that that number of people is
22        immaterial, vis-á-vis, the total number of people in
23        the group of Pre-MN annuity policyholders who had
24        in-force policies as of 1985, are you?
25   A    No, I'm not.
```