# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                               Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

## APPENDIX TO NORTHWESTERN MUTUAL'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE REPORT AND OPINIONS OF PLAINTIFFS' PROPOSED EXPERT ROBERT HOYER

### Volume II of II

### Items 10 - 24

### Pages 212 - 325

---

# Index to Northwestern Mutual's Appendix

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 1 | Noonan v. Northwestern Mutual Life Ins. Co., Case No. 01-CV-12349, 1/18/05 Plaintiffs' Br. in Support of Motion for Class Certification, | Jan. 18, 2005 | 1 | I |
| 2 | Noonan v. Northwestern Mutual Life Ins. Co., Case No. 01-CV-12349, 4/30/07 Plaintiffs' Br. in Support of Motion for Class Certification | Apr. 30, 2007 | 3 | I |
| 3 | Noonan, Decision on Motions to Certify for Class Action | Jan. 25, 2008 | 10 | I |
| 4 | LaPlant, Decision and Order on Motion of Plaintiff for Class Certification | Oct. 26, 2009 | 21 | I |
| 5 | Motion Hearing Transcript | Oct. 12, 2009 | 39 | I |
| 6 | Decision on Motion of Defendant to Dismiss | Jun. 15, 2009 | 45 | I |
| 7 | Robert L. Hoyer Expert Report | Mar. 4, 2013 | 47 | I |
| 8 | Robert L. Hoyer Deposition Transcript | May 17, 2013 | 73 | I |
| 9 | Michael J. Moore Expert Report | June 28, 2013 | 133 | I |
| 10 | Plaintiffs Proposed Findings of Fact, Conclusions of Law and Order for Judgment | Dec. 20, 2010 | 212 | II |
| 11 | Robert L. Hoyer Expert Report | June 30, 2013 | 241 | II |
| 12 | Ravi Dhar Expert Report | July 01, 2013 | 245 | II |
| 13 | Report to the Court Regarding Class Notice | Mar. 31, 2010 | 278 | II |
| 14 | Letter | June 07, 1990 | 281 | II |
| 15 | Email | Apr. 07, 1998 | 282 | II |
| 16 | Letter | Sep. 14, 1999 | 283 | II |
| 17 | Trial Transcript, a.m. | Nov. 08, 2010 | 285 | II |
| 18 | Marleen LaPlant Deposition Transcript | Sept. 09, 2009 | 291 | II |
| 19 | Trial Ex 528: Dividend Interest Rates vs. Current Rate Annuity Credit Rates | | 296 | II |
| 20 | Affidavit of Jason T. Klawonn | June 27, 2013 | 297 | II |
| 21 | Noonan v. Northwestern Mutual Life Ins. Co., 726 N.W.2d 356 (Wis. Ct. App. 2006) | Nov. 16, 2006 | 301 | II |
| 22 | Noonan v. Northwestern Mutual Life Ins. Co., 2005 WL 6216361 (Wis.Cir. July 6, 2005) | July 6, 2005 | 309 | II |
| 23 | Thao v. Midland Nat. Life Ins. Co., 2012 WL 1900114 (E.D. Wis. May 24, 2012) | May 24, 2012 | 313 | II |
| 24 | Reed v. City of Chicago, 01 C 7865, 2006 WL 1543928 (N.D. Ill. June 1, 2006) | June 1, 2006 | 321 | II |

**STATE OF WISCONSIN**　　　**CIRCUIT COURT**　　　**MILWAUKEE COUNTY**

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

　　　　　　　　　　Plaintiffs,

　　　　vs.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

　　　　　　　　Defendant.

Case No.　08-CV-11988

Code:　　30701
Declaratory Judgment

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT**

---

The plaintiff and class propose that the Court make and enter the

attached findings of fact, conclusions of law and declaratory judgment.

Dated this 20th day of December 2010.

　　　　　　　　　　By:
　　　　　　　　　　　　George P. Kersten, WI Bar #1008099
　　　　　　　　　　　　E. Campion Kersten (1007641)
　　　　　　　　　　　　Kenan J. Kersten (1008505)
　　　　　　　　　　　　Jeffrey A. Bartos
　　　　　　　　　　　　Mark B. Pollack (1010557)
　　　　　　　　　　　　Timothy D. Battin
　　　　　　　　　　　　Christopher Le
　　　　　　　　　　　　Mark J. Schirmer
　　　　　　　　　　　　Soye Kim
　　　　　　　　　　　　Attorneys for the Plaintiff

**Plaintiff's Counsel**:

STRAUS & BOIES, LLP
David Boies III
Timothy D. Battin
Ian Otto
Christopher Le
4041 University Drive, Fifth Floor
Fairfax, VA   22030
Telephone: (703) 764-8700
Fax: (703) 764-8704

GUERRIERI, CLAYMAN, BARTOS &
   PARCELLI, PC
Jeffrey A. Bartos
Soye Kim
1625 Massachusetts Avenue, NW
Washington, DC 20036
Telephone: (202) 624-7400

KERSTEN & MCKINNON, S.C.
George P. Kersten (1008099)
E. Campion Kersten (1007641)
Kenan J. Kersten (1008505)
11518 N. Port Washington Rd.
Suite 104
Mequon, WI   53092
Telephone: (262) 241-0054
Fax:  (262) 241-5935

GALANIS, POLLACK, JACOBS &
   JOHNSON, S.C.
Mark B. Pollack, WI Bar # 1010557
839 N. Jefferson Street, Suite 200
Milwaukee, WI  53202
Telephone: (414) 271-5400

(Prichett; See also Exhibit 344 and Fisher, 11/9 pm at 24-26; Affleck rpt at 22);

(r)   Violated accepted practices in the industry (evidenced in part by the fact that it was the only insurance company ever to segment retroactively as to an existing book of annuities) (Affleck rpt at 4; Hoyer rpt at p.1 and ¶¶34-44; Foudree; Steinig);

(s)   Violated generally-accepted actuarial standards in making the 1985 Change (Hoyer rpt at p. 1 and ¶¶29-33);

(t)   Made the 1985 Change on a gradual or "grading in" basis, knowing that doing so would make it unlikely that Annuitants would learn of the 1985 Change and of its probable effect upon future dividends. (Fisher, 11/9 pm at 54-55, 57-60, 80; Exhibit 32; Hoyer rpt at ¶40).

153.   Northwestern, and its officers and trustees involved in the 1985 Change, and each of them, acted outrageously and in an intentional disregard of the rights of the Pre-MN Annuitants by each and all of the following:

(a)-(t)   They engaged in the course of conduct and committed each and all of the acts set forth in paragraph 152 (a) through (t);

(u)   They engaged in these acts and course of conduct deliberately, willfully, deceptively and with sophistication.

52

# CONCLUSIONS OF LAW

Based on the entire trial record and the above Findings of Fact, the Court concludes as follows:

## I.    BREACH OF CONTRACT.

### A.    <u>Breach of the Express Terms of the Contract and Applicable Statute.</u>

1.    Each year since adopting the 1985 Change, Northwestern has breached the Pre-MN Annuity contracts that were in force and in their deferral period in the respects and for the reasons set forth in the following paragraphs.

2.    The Pre-MN Annuity contracts must be interpreted in accordance with what a reasonable person in the position of the Annuitant would have understood the words to mean, giving the common and ordinary meaning it would have in the mind of a lay person.  *Kremers-Urban Co. v. Am. Employers Ins. Co.*, 119 Wis.2d 722, 735-36, 351 N.W.2d 156, 163 (1984); *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis.2d 16, 32, 673 N.W.2d 65, 73 (2004).

3.    Northwestern breached the Pre-MN Annuity contracts in making the 1985 Change and in its annual dividend determinations thereafter pursuant to the Change by failing to perform its duties under the contracts, by performing them defectively and by violating the dividend-related rights of

53

the Annuitants under the contracts. [Adapted from Wis JI-Civil 3053 Breach of Contract.]

4.     Northwestern was obligated to comply with the following Annuity contract language:

> This policy shall share in the divisible surplus, if any, of the Company. This policy's share shall be determined annually and credited as a dividend.

5.     The substantial equivalent of this language (except for the last clause dealing with the effect of loans on policy dividends) was contained in the Update '83 amendment to which some Annuitants agreed:

> This policy will share in the divisible surplus of the Company. This surplus is determined each year. The policy's share will be credited as a dividend on the policy anniversary. This dividend will reflect the mortality, expense and investment experience of the Company and will be affected by any policy indebtedness during the policy year.

[*E.g.*, Exhibits 262 and 263.]

6.     Northwestern was obligated to comply with the following statutes which the law treats as part of the Pre-MN Annuity contracts:

> (2) PARTICIPATION. Every participating policy shall by its terms give its holder full right to participate annually in the part of the surplus accumulations from the participating business of the insurer that are to be distributed.

> and

54

(4) DIVIDEND PAYMENTS. . . . (b) Payment. Every insurer doing a participating business shall annually ascertain the surplus over required servers and other liabilities. After setting aside such contingency reserves as may be considered necessary and be lawful, such reasonable non-distributable surplus as is needed to permit orderly growth, making provision for the payment of reasonable dividends upon capital stock and such sums as are required by prior contracts to be held on account of deferred dividend policies, the remaining surplus shall be equitably apportioned and returned as a dividend to the participating policyholders or certificate holders entitled to share therein. A dividend may be conditioned on the payment of the succeeding year's premium only on the first and second anniversaries of the policy.

Wisconsin Stat. §632.62(2) and (4); *Noonan v. Northwestern Mut. Life Ins. Co.,* 2004 WI App 154, ¶¶12-17, 276 Wis.2d 33, 41-43, 687 N.W.2d 254 ("*Noonan I*").

7. By virtue of the foregoing contract language and statutory provisions, the Pre-MN Annuity contracts unambiguously required that Northwestern make an annual determination of the Company's "divisible surplus," and provide to the Pre-MN Annuitants their "full right" to participate in that divisible surplus through annual dividends pursuant to an "equitable apportion[ment]" of that divisible surplus.

8. Northwestern breached the Pre-MN Annuity contracts by failing to satisfy these requirements for each of the following reasons:

55

App. 217

(a)   The contract requires that the Pre-MN Annuities "shall share in the divisible surplus . . . of the Company."  When it drafted the Annuities Northwestern did not qualify this language, as it did for the CRAs (and with respect to the impact of loans, in the Update '83 program).  Being unqualified, the Pre-MN language would ordinarily be understood by an owner of the Company to mean a genuine share of the Company's overall divisible surplus, which reflects the Company's overall profitability, rather than merely a share of an atypical, limited  fund or account that  performs independently of the financial performance of the Company as a whole.

(b)   As confirmed by Northwestern's highest officers, participation means policyholders prosper as the Company prospers, and (as the Annuitants were told in their annual reports) dividends are a way in which the participating policyholders share in the results of the Company's operations.

(c)   The word "dividend" commonly and ordinarily means (in the absence of relevant qualification) a share in the overall financial performance of the dividend-issuing company, as distinguished from a share of interest yielded by an atypical, limited account held by the company.  In a broader context, the term "dividend" commonly and ordinarily means "'[a] portion of a company's earnings or profits distributed pro rata to its shareholders, us[ually] in the form of cash or additional shares.'"  *Yates v. Holt-Smith,* 2009

56

**App. 218**

WI App 79 ¶16, 319 Wis.2d 756, 767, 768 N.W.2d 213, quoting Black's Law Dictionary 512 (8th ed. 2004).

(d)   Accepted practices in the insurance industry include the contribution principle.  This principle contemplates departure from a purely pro rata allocation of a company's divisible surplus among participating policyholders by permitting adjustments among different classes of policyholders to reflect their relative contributions to a company's profitability.

(e)   However, in applying the contribution principle here, Northwestern had established the Annuities and life policies in the *same* investment experience factor class, so that under accepted actuarial standards, practices and principles Northwestern was not free to segment the Pre-MN Annuities into a *separate* investment experience factor class without policyholder agreement.  (FOF 140)

(f)   Further, as confirmed by the principal Northwestern actuary involved in the 1985 Change, dividends credited by a mutual company are supposed to be portfolio-based unless special arrangements are made (which did not exist here), and the word "dividend" connotes a general account portfolio-based yield, as contrasted with the word "interest" which would properly be used when referring to the yield on a debt investment account.

57

(g)   Northwestern had consistently applied the contribution principle for many years before the 1985 Change, crediting the Pre-MN Annuities with portfolio-based dividends.  It was told by its own actuarial consultant it could *not* retroactively segment the Pre-MN Annuities, and no insurance company other than Northwestern is known to have done so, all of which confirms the conclusion that Northwestern could not properly do so.  (Durland Dep. at 30-34; FOF 133-140.)

(h)   Accordingly, the term "dividend" without any qualification, together with the phrase "share in the divisible surplus . . . of the Company," again without qualification, would not be understood by a reasonable person in the position of the Annuitant to permit an adjustment that entirely abandons the Company's overall earnings or divisible surplus as the basis for dividends, and instead allows a switch into a limited account that yields interest bearing no relationship to the Company's overall financial performance.  Rather, the unqualified contract language, particularly when taken with the statutory requirement for a "full right to participate," would lead a reasonable person in the position of the Annuitant to understand that the dividends would be substantially based on the overall financial performance and profitability of the Company.

(i)   Further supporting the conclusion that the contribution principle did not permit the 1985 Change is that, apart from all of the considerations

58

stated above, Northwestern's contribution-principle theory rests on the false premise that the 1985 Change was required to cure a supposed "cross subsidy," which in fact did not exist. *(See* FOF 39-40, 118-120.)

(j)    In any event, Northwestern's 1985 Change and dividend determinations made pursuant to it failed to satisfy the requirement that the Company's divisible surplus "shall be equitably apportioned" in several respects:

(i)    Northwestern made the Change from its long-standing, established dividend practices unilaterally, without notice to Annuitants and inequitably in many other respects as set forth in Findings of Fact 106, 116-133, 138-153.

(ii)   Annuities are essentially investments. *Reichel v. Jung,* 2000 WI App 151, ¶18, 237 Wis.2d 853, 863, 616 N.W.2d 118. By the 1985 Change Northwestern, without notice to or agreement of the Pre-MN Annuitants, changed the fundamental investment characteristics of their Annuities, materially and substantially impairing the Annuitants' dividend rights.

(iii)  The 1985 Change unilaterally and without notice switched the annuitants to a substantially different investment philosophy in disregard of their reasonable dividend expectations.

(iv)   The 1985 Change was contrary to accepted insurance industry practices and procedures, as set forth in Findings of Fact 133 through 138 above and confirmed by Northwestern's inability to identify any other insurance company which retroactively segmented as to in-force annuities.

(v)   The 1985 Change violated accepted actuarial principles, as set forth in Findings of Fact 140.  Having designed, priced, marketed, sold and administered the Pre-MN Annuities on the basis of their being in the same investment experience factor class as the life policies (all deriving their dividend interest rate from the yield on the Company's general account portfolio), Northwestern was not free, absent Annuitant agreement, to change the Annuities' investment experience factor class.  This also is confirmed by Northwestern's inability to identify any other insurance company that ever retroactively segmented as to in-force annuities, since the relevant actuarial principles would apply to the actuarial practices of other companies as well as to Northwestern and the financial and competitive circumstances leading to the 1985 Change were essentially common to all.

(vi)   The inequity of Northwestern's 1985 Change is demonstrated, among other things, by an example to which

60

App. 222

Northwestern's own consultant (Durland of TPF&C) testified:

Annuitant funds paid as premiums prior to 1985 were used for

capital investments (such as the acquisition of the Baird

securities firm and MGIC), which typically forego current income

but achieve profit through long-term capital gains. Switching the

Pre-MN Annuities into the segmented account limited to debt

investments deprived the Annuitants of the benefit of those

investments to which they had contributed. The Baird

investment produced a capital gain in Northwestern's general

account portfolio of $30 million. The MGIC investment produced

capital gains of approximately $850 million, of which $350 million

was realized by 1998. None of this benefitted the Pre-MN

Annuities which in the meantime had been switched to the

segmented account. (FOF 129)

    (vii)  The 1985 Change was made in bad faith and unfairly,

in each and all of the respects set forth in the Findings of Fact

152 and 153.

9.  A separate and independent reason Northwestern violated the

Annuity contracts in adopting the 1985 Change and in the annual

determination of the Pre-MN Annuity dividends thereafter is that the Pre-

MN Annuity language and statutory requirements quoted above unambiguously require that every year Northwestern must (1) ascertain the surplus over required reserves and liabilities and (2) subtract necessary contingency reserves, funds for orderly growth, dividends for capital stock and sums required by prior contracts to arrive at its dividend surplus. After the divisible surplus is determined, then and only then must Northwestern decide how to equitably apportion it. *Noonan I,* 276 Wis. 2d at 43-44, ¶17.

10.   Contrary to these contractual and statutory requirements, Northwestern made the allocation to the Annuities before it determined the surplus, in that:

(a)   The financial performance of the segmented account established by Northwestern pursuant to the 1985 Change is determined by the assets that are already held in that account and expenses related thereto; and

(b)   The financial performance of that segmented account determines the annual dividends for the Annuities; and

(c)   As a result, the dividends for the Pre-MN Annuities are predetermined by the financial performance of the segmented account, are established without reference to the Company's surplus and

divisible surplus determinations contemplated in the statute and vary independently of those determinations.

11.    Even if the Pre-MN Annuity contracts were to be regarded as ambiguous[4], a reasonable construction of the contracts as a whole, together with the statutory provisions quoted above, requires the conclusion that Northwestern breached the contract in making the 1985 Change and in the annual dividend determinations made each year thereafter for the Pre-MN Annuities, and the Court does so conclude.

12.    If the words or provisions of the Annuities are capable of more than one reasonable construction, they are ambiguous, and ambiguous provisions must be construed in favor of the Annuitants. *Froedtert Mem'l Lutheran Hosp. v. Nat'l States Ins. Co.*, 2009 WI 33, ¶41, 317 Wis. 2d 54, ¶41; *Danbeck v. Am. Family Mut. Ins. Co.*, 2000 WI App 26, ¶16, 232 Wis. 2d 417, ¶6 (1999), *aff'd* 245 Wis. 2d 186 (2001); *Kozak v. U.S. Fid. & Guar. Co.*, 120 Wis. 2d 462, 467 (Wis. Ct. App. 1984) ("We construe all provisions tending to limit liability most strongly against the insurer."); *Wis. Label v. Northbrook*

---

[4] Plaintiffs submit that their interpretation of the contracts, discussed above, is the only reasonable interpretation as a matter of law and should be adopted and applied by the Court. At a minimum, the plaintiffs' construction of the annuity contracts is a reasonable one, supported by both the plain language of the contracts and the applicable statutory provisions. Assuming arguendo that Northwestern Mutual has also advanced a reasonable construction of the contracts, the term would be ambiguous as a matter of law, *see Solowicz v. Forward Geneva Nat., LLC*, 2010 WI 20, ¶36, 323 Wis. 2d 556, ¶36, 780 N.W.2d 111, ¶36, and the proposed conclusions of law in this section should apply.

*Prop. & Cas. Ins. Co.,* 2000 WI 26, ¶24, 233 Wis. 2d 314, ¶24; *Gen. Cas. Co. of Wis. v. Hills,* 209 Wis. 2d 167, 175, 561 N.W.2d 718, 722 (1997) (ambiguous insurance contract interpreted against drafter, especially when it is a standard form supplied by the drafting party).

13.    Construing the contracts in favor of the Annuitants and against Northwestern leads to the conclusion the Annuitants were entitled under the contracts to the portfolio-based dividends they received prior to 1985 and that in making the 1985 Change and determining the Annuitants' dividends each year thereafter pursuant to that Change Northwestern breached the Annuity contracts.

14.    Another canon of construction leads to the same result: that the Court "ordinarily will place that interpretation upon the terms of the contract which the parties in the course of their dealings have adopted." *George J. Meyer Mfg. Co. v. Howard Brass & Copper Co.*, 246 Wis. 558, 574, 18 N.W. 2d 468 (1945). The acts of the parties, showing the construction that they themselves have put upon a contract are strong evidence of what the arrangement was between the parties. *See* Wis JI-CIVIL 3050 Contracts: Subsequent Construction by Parties.

15.    Northwestern's uniform and consistent conduct in marketing, selling and administering the Annuities prior to the 1985 Change is a strong

64

demonstration of its own understanding of its contractual obligations. It authorized and supported the regular use by its agents of illustrations portraying future dividends as portfolio-based in selling the Annuities. It supplied the same portfolio-based illustrations portraying future dividends to all Annuitants in connection with its Update 83 program. Beginning in 1983 it included portfolio-based illustrations portraying future dividends in the contracts themselves. Throughout that time dividends were a major feature of Northwestern's marketing efforts, and their value was consistently and prominently portrayed by Northwestern as being largely due to the efficacy of its balanced, long-term oriented general account portfolio.

16.   Prior to the 1985 Change, Northwestern's administration of the Annuities - crediting them with portfolio-based dividends - was consistent with these marketing and selling efforts. It was consistent also with its agents' portrayal of the Annuities as an investment in the Company with dividends being based on Northwestern's profitability, and with the dividends being characterized in the annual reports as the way in which the Annuitants share in the improved results of the Company's operations. This long-established and consistent course of conduct demonstrates Northwestern's own construction the Annuity contracts, which further confirms the Annuitants' entitlement to portfolio-based dividends.

17.   If, contrary to the above, Northwestern were correct in contending that the policy language is unambiguously broad, and that the equitable apportionment of its divisible surplus is a matter of business judgment, it would not be protected by the business judgment rule.[5]  The business judgment rule provides that courts will not generally review internal corporate business decisions made in informed good faith and based on the honest belief that the actions are taken in the corporation's best interest. Protection from challenge to corporate decisions under this rule is subject to limits that have clear application here:

(a)   The rule applies only when the business judgment is exercised in good faith.  In this case Northwestern failed to exercise the required good faith in numerous ways as detailed in the above Findings of Fact and in the further Conclusions set forth in paragraphs 19 through 25 below.  *Yates v. Holt-Smith,* 2009 WI App 79 ¶¶ 22-25, 319 Wis.2d 756, 770·72, 768 N.W.2d 213; *Reget v. Paige,* 2001 WI App 73, ¶¶ 17, 18, 242 Wis. 2d 278, 293-294, 626 N.W. 2d 302; *Sprecher v. Weston's Bar, Inc.,*78 Wis. 2d 26, 40-41, 253 N.W. 2d 493 (1977).

---

[5] The plaintiffs do not believe that the "business judgment rule" is applicable in this case.  See *Noonan I*, 276 Wis.2d at 43, ¶16.  However, should the Court consider the "business judgment rule" defense, plaintiffs conditionally propose the following conclusion of law.

66

App. 228

(b)     The business judgment rule does not excuse a breach of contract, including a breach of the implied covenant of good faith and fair dealing.  *Id., E.g., Emily Towers Owners Corporation v. Carleton Emily Towers, LT* 649 NYS 2d 996 (1996).  ("Breach of contract is not a choice that is within the Board's business judgment to make, and the Board may only exercise this judgment where it is authorized to act in the first instance.")

(c)     Under the cases cited in subparagraph (a) of this Conclusion, the business judgment rule does not excuse Northwestern's breach of its fiduciary duties as set forth in the above Findings of Fact and in the further Conclusions set forth in paragraphs 27 through 43 below.

(d)     The business judgment rule does not excuse, and is irrelevant to, Northwestern's improper departure from and violation of the process mandated by Wisconsin Stat. § 632.62 (4)(b) for the determination of dividends.  *Noonan I*, 276 Wis.2d at 43-44, ¶¶ 16-18.

18.    The court concludes that the 1985 Change and the dividend determinations for the Pre-MN Annuities based on it were not made in good faith, were not equitable and breached Northwestern's fiduciary duties as concluded below.  Therefore the business judgment rule does not apply and Northwestern breached its contractual obligation to equitably apportion its

divisible surplus and provide to the Pre-MN Annuitants a dividend based thereon.

## B. <u>Breach of Contractual Duties of Good Faith and Fair Dealing</u>

19.     Northwestern was required to act in good faith towards the Pre-MN Annuitants, and deal fairly with them in  performing its obligations under the Annuity contracts.  This requirement is a part of the Annuity contract just as though the contract stated it. (Adapted from WI JI-Civil–good faith and fair dealing.)[6]

20.     The duties of good faith and fair dealing required Northwestern to refrain from conduct that would impair Annuitants' rights to receive the benefits of the Annuity contracts.  The duties may be breached even if there is no violation of an express term of the contract.  *Id*.

21.     Whether Northwestern met its duties of good faith and fair dealing is determined by examining the purpose of the contract and the benefits the parties expected at the time the agreement was made.  In these

---

[6] The authority supporting the legal principles set forth in paragraphs 19 through 25 (relating to the implied contractual duties of good faith and fair dealing) are contained in the Wisconsin standard instruction and extensive discussion of case authorities included with that standard instruction.  These and other supporting authorities are also cited in the accompanying brief at pp. 15 through 19.

respects Northwestern breached its duties of good faith and fair dealing in at least two material ways.

22.     First, the fundamental purpose of the Annuity is to serve as a vehicle for retirement investment. The 1985 Change unquestionably constituted a material change in the investment characteristics of the Pre-MN Annuities. Northwestern knew at the time it made the 1985 Change there was a genuine risk that the result would be a reduction in the dividends to be credited to the Annuities based on that Change. That result in fact did occur. Moreover, as the evidence showed and the court has found, Northwestern knew at the time it made the Change that a reduction in future dividends was likely. The court concludes that, even apart from the question of whether Annuitant agreement was required for the 1985 Change, it was bad faith and unfair dealing for Northwestern to make the Change and then to make dividend determinations annually thereafter based on that Change without having given full and fair notice and disclosure of the Change to the Annuitants. It was manifestly bad faith and unfair dealing for Northwestern to make the conscious decision against giving direct notice, adopt a smooth landing process to reduce the potential (and make it unlikely) for Annuitants to become aware of the Change and misrepresent the Change to its agents at the time it was made.

23.     Second, Northwestern's understanding of its obligations as demonstrated in how it marketed, sold and administered the Annuities as portfolio-based investments is itself a demonstration of the parties' reasonable expectations embodied in the contract at the time the agreement was made, and the court so concludes.  The 1985 Change and dividend determinations made annually pursuant to the Change are in breach of the duties of good faith and fair dealing for this reason as well.

24.     In determining whether Northwestern and its officers, trustees and employees acted in good faith, the court considers the motives and intent of those involved in making the 1985 Change.  *Id.*  As the court has found based on contemporaneous documents, Northwestern made the 1985 Change out of self-interest to facilitate its introduction of the CRA and at the expense of the Pre-MN Annuitants.  In doing so it violated accepted practices of the insurance industry and accepted principles of actuarial practice, and compounded the inequity of its conduct by the decisions to withhold direct notice to the Annuitants of the Change and to take the additional steps to make it unlikely the Annuitants would ever know the Change had been made.

25.     Accordingly, the court concludes that Northwestern breached its duties of good faith and fair dealing in making the 1985 Change, in failing to

notify the Annuitants of the Change, in taking steps to conceal the Change

from the Annuitants and in basing its dividend determinations each year

after 1985 on the Change.


**C.** **Material Impact of the 1985 Change.**

26.    The impact of Northwestern's breach of the Pre-MN Annuity

contracts is properly, fairly and reasonably measured by the differential

shown in the chart set forth in Finding of Fact 102, since the chart fairly and

reasonably measures the difference between what the Pre-MN Annuitants

would have received as dividends absent the 1985 Change compared with

what they did receive because of the Change.  *Thorp Sales Corp. v. Gyuro*

*Grading Co.,* 111 Wis. 2d 431, 438,  331 N.W. 2d 342 (1983).


**II.    BREACH OF FIDUCIARY DUTY.**[7]

27.    Northwestern was and is a fiduciary to the Pre-MN Annuitants in

respect to the dividend issues that are the subject of this case.   *Noonan I*, 276

Wis.2d at 47, ¶ 24 .

---

[7] The controlling law defining fiduciary duties relevant to this case includes *Zastrow v. Journal Comm., Inc.,* 2006 WI 72, ¶¶ 28-9, 291 Wis.2d 426, 703 N.W.2d 673; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis. 2d 127, 136 (1985); *Jorgenson v. Water Works, Inc.*, 218 Wis.2d 761, 783 (1995); *Groshek v. Trewin*, 2010 WI 51, ¶¶ 15-6, 325 Wis. 2d 250, 261-3; *Van Der Puy v. Van Der Puy*, 2009 WI App 27 ¶ 8; 316 Wis. 2d 412; 763 N.W.2d 559 (Ct. App. 2009)(unpublished); *Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶ 56, 284 Wis.2d 307, 337-8, 700 N.W.2d 180, 195.

71

28.     This fiduciary relationship arose from Northwestern's agreement in the Annuities to act for the benefit of the Annuitants and the special circumstances regarding the relative positions of Northwestern and the Annuitants, as to which there was an inequality between them, a dependence of the Annuitants on Northwestern's good faith, fair and equitable performance of its duties relating to dividends, Northwestern's superior knowledge of facts involved, the trust and confidence Annuitants placed in Northwestern in entrusting their investments and savings on a continuing basis to Northwestern's power and control, and Northwestern's possession and exercise of that power and control over the Annuitants' investments and savings during that continuing period . *Noonan I,* 276 Wis. 2d at 47, ¶24; *Miranovitz v. Gee,* 163 Wis. 2d 246, 252-53, 157 N.W. 790 (1916); *Winslow v. Winslow,* 257 Wis. 393, 396-97, 43 N.W.2d 496 (1950) and *Estate of Lecic*, 104 Wis. 2d 592, 608, 614-15, 312 N.W.2d 773 (1981).  *See* FOF 111-115.

29.     The Northwestern officers and trustees who made and acted pursuant to the 1985 Change were also fiduciaries to the Annuitants in respect to the dividend issues that are the subject of this case (with respect to the 1985 Change and actions taken pursuant to it).  *Noonan I,* 276 Wis. 2d at 47, 48, ¶¶ 25, 27; *Grognet v. Fox Valley Trucking Services,* 45 Wis. 2d 235, 241-42, 172 N.W.2d 812 (1969).

72

30.  All actions at issue were performed by Northwestern's officers, employees and trustees acting within the scope and in the course of their respective offices and trusteeships with the full knowledge, participation, authority and approval of Northwestern's highest management and Board of Trustees.  Accordingly, Northwestern is vicariously liable for all of their actions, which actions were a cause of the 1985 Change and the adverse dividend determinations made pursuant to that Change.

31.  As fiduciaries, Northwestern and its officers and trustees each had and continue to have the duty to act with utmost loyalty, diligence, good faith, fairness and honesty toward the Annuitants with respect to the dividend issues that are the subject of this case.  They were and are prohibited from acting in a way that would deprive Annuitants of the right to enjoy the fruits and profits of their Annuity investments, and from acting in a way that would otherwise injure or prejudice that right.

32.  As fiduciaries, Northwestern, and each of its officers and trustees involved in making and acting pursuant to the 1985 Change were and are also bound to make a fair, timely and full disclosure to Annuitants of the 1985 Change, since it materially and substantially affected their interests, rights, investment and savings and was reasonably likely to affect their judgments and actions in respect to their annuities and dividends.

73

33.   Northwestern, and each of its officers and trustees involved in the 1985 Change, intentionally violated their fiduciary duties of disclosure to the Annuitants in the following ways:

(a)   Failing to provide Annuitants directly with a full and fair disclosure of the 1985 Change and its potential effects upon their Annuity dividends.

(b)   Taking steps to make it unlikely that Annuitants would become aware of the 1985 Change and its potential effects on their Annuities and dividends.

(c)   Misrepresenting the 1985 Change to its agents, rather than providing to them a full and fair disclosure of the 1985 Change and its potential effects on the Annuity dividends.

(d)   Failing to instruct the agents to inform Annuitants of the 1985 Change and of its potential effects upon their Annuities and dividends.

(e)   Making dishonest and misleading representations in and after 1985 with respect to Northwestern's continuing strategy of long-term investments, when in fact it had switched the basis for Pre-MN Annuity dividends to a short-term oriented portfolio of debt instruments.

74

34.   As a fiduciary Northwestern was also prohibited from acting in its own interest at the expense of the Annuitants, and was required to prefer the interests of those Annuitants over its own interests.

35.   Northwestern, and its officers and trustees involved in the 1985 Change, intentionally violated their fiduciary duties of loyalty, and instead acted in Northwestern's interests and contrary to and at the expense of the interests of the Pre-MN Annuities, by making the 1985 Change in order to facilitate the marketing and sale of the CRA Northwestern brought to the market in 1985.

36.   Northwestern, and its officers and trustees involved in the 1985 Change, intentionally breached their fiduciary duty of good faith to Annuitants in failing to equitably apportion the Company's divisible surplus in the following respects:

(a)   In engaging in an inequitable and unfair course of conduct rendering the apportionment process inequitable, as found by the court in the Findings of Fact; and

(b)   In determining the Pre-MN Annuitants' dividends each year since 1985 on the inequitable and unfair basis established in the 1985 Change.

37.   Northwestern intentionally violated its fiduciary duties to Annuitants by adopting the 1985 Change and acting annually thereafter pursuant to that Change, thereby depriving the Pre-MN Annuitants of their rights to enjoy the fruits and profits of their annuity investments, and in injuring and prejudicing those rights.

38.   Northwestern's breaches of fiduciary duty were directed against and committed as to the "closed block" of Pre-MN Annuities as a whole, thereby proximately causing financial injuries to the Pre-MN Annuitants in that block.

39.   The breaches of fiduciary duties by its officers and trustees for which Northwestern is vicariously liable, and each of them, were directed and committed as to the "closed block of Pre-MN Annuities as a whole, thereby causing financial injuries to the Pre-MN Annuitants in that block.

40.   The financial injury to the Pre-MN Annuitants from these breaches and each of them is fairly and reasonably measured by the differential between the "life" (portfolio-based) and Pre-MN Dividend Interest Rates shown in the chart appearing in Finding of Fact 102 for the reasons stated above.

41.    Each of Northwestern's breaches of fiduciary duties was done in an intentional disregard of the rights of the Pre-MN Annuitants within the meaning of Wisconsin Statutes §895.85 (3).

42.    The Northwestern officers and trustees involved in the 1985 Change and in the dividend determinations made pursuant to the 1985 Change intentionally violated their fiduciary duties to Annuitants in participating in, consenting to and authorizing each of the acts and misconduct described in these Findings and Conclusions, for which breaches of fiduciary duties Northwestern is vicariously liable.

43.    Each of the breaches of fiduciary duty of the Northwestern officers and employees referred to in paragraph 42 above was and is done in an intentional disregard for the rights of Annuitants within the meaning of Wisconsin Statutes §895.85 (3).

## III.    ADDITIONAL CONCLUSIONS.

44.    Neither the Wisconsin Department of Insurance nor the New York Insurance Department adjudicated, concluded or ruled that the 1985 Change was consistent with Northwestern's contractual or fiduciary obligations toward the Plaintiffs.  The existence *vel non* of the regulatory approval claimed by Northwestern does not bear on the claims involved in this case.  *Noonan I*, 276 Wis. 2d at 48-49, ¶¶29, 30.

45. The Wisconsin Department of Insurance never granted approval to the 1985 Change.

46. The New York Insurance Department's approval of Northwestern's plan of segmentation did not constitute approval of the 1985 Change with respect to Plaintiffs, because such approval was specifically based on Northwestern's giving of notice to the plaintiffs, and such notice was never provided. (FOF 72.)

47. The interest of justice are best served by this court's retaining jurisdiction of this case following entry of the Declaratory Judgment set forth below.

## ORDER FOR JUDGMENT

Therefore, IT IS ORDERED that a Declaratory Judgment shall be entered in accordance with and based upon the above Findings and Conclusions.

Signed this          day of                    , 2011.

BY THE COURT:


The Honorable Dennis J. Flynn
Reserve Circuit Judge

78

App. 240



# EXPERT WITNESS REPORT :

# ROBERT L. HOYER , FSA, MAAA

## M. LaPLANT
## VS.
## NORTHWESTERN MUTUAL
## LIFE INSURANCE COMPANY

# JUNE 30, 2010

necessarily means for the new CRA annuities only. Therefore, TPF&C recommended that no adjustment be made for the Pre-MN annuities. NML initially embraced this recommendation, as evidenced by a 1984 letter from Mr. Fisher to the NY-DOI, which stated that "the proposal was for NML to make a prospective segregation... there would be no retroactive change." (Exhibit 51) Ultimately, however NML did make a retroactive change by establishing a segregated portfolio for the Pre-MN annuitants.

88.   TPF&C also recommended that "a conversion, or exchange program be embarked on to exchange the old annuities (the Pre-MN annuities)... into one of the new products (the CRA annuities) that would be developed." (Deposition of Mr. Fisher) Within the life insurance industry, a conversion or exchange program means that a company obtain agreement from a group of existing policyholders to terminate or surrender their policies and purchase a newer, but comparable product offered by the company. Companies typically provide a measure of financial incentive to policyholders to obtain their approval to make such a change. NML did not implement the exchange program recommended by TPF&C.

89.   The decisions made by NML not to act according to the two recommendations provided by TPF&C with respect to the Pre-MN annuity group reflect their perspective as noted earlier in this report:

- "We (NML) can't have the old FPA (the Pre-MN annuities) and the new CRA  running side by side" as stated by Mr. Zore (Exhibit 27);

- "You (NML) can't just let people (the Pre-MN annuitants) flip-flop back and forth (elect to exercise the options of their policies)" as stated by Mr. Fisher in deposition testimony, and
- "If you (NML) have the old product (the Pre-MN annuities) and you (NML) have the new product (the CRA annuities), you (NML) have to reconcile them" as stated by Mr. Zore in deposition testimony.

90. Based on my analysis and extensive life insurance industry experience, in my opinion, the two recommendations set forth by TPF&C regarding the Pre-MN annuities were consistent with generally accepted practices and procedures of the life insurance industry and consistent with generally accepted practices and procedures of the actuarial profession, and would have represented a viable course of action for NML. Further, in my opinion, each of the three statements by NML listed above are false and not consistent with generally accepted practices and procedures within the life insurance industry. NML could have and should have had the two products running side by side, NML could have and should have allowed Pre-MN policyholders to elect the options available to them under their contracts, and NML could have and should have allowed the two products to co-exist without reconciliation.

## X. Additional Opinions

91.  The analyses and opinions provided in this report reflect the work on this dispute that I have performed to-date. It is possible that I may be asked to review additional information or provide additional analyses at a later date, and if so, I may have additional conclusions and opinions at that time.

Respectfully submitted,

Robert L. Hoyer, FSA, MAAA
Hoyer Actuarial Litigation, LLC
81 Claire Pass
Saratoga Springs, New York 12866
(860) 716-6757

June 30, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARLEEN M. LAPLANT, on her own
behalf and on behalf of a class similarly
situated,

            Plaintiffs,

  v.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

            Defendant.

Case No. 2:11-CV-00910

**EXPERT REPORT OF RAVI DHAR**

**July 1, 2013**

# Table of Contents

| | | |
|---|---|---|
| **I.** | Qualifications ........................................................................................................... | 1 |
| **II.** | Background ............................................................................................................... | 3 |
| **III.** | Purpose of the Report............................................................................................... | 4 |
| **IV.** | Summary of Opinions .............................................................................................. | 5 |
| **V.** | Consumer Information Processing and Decision-Making ................................... | 7 |

**VI.** Individualized Analysis is Required to Determine Which Putative Class Members Would Have Paid Attention to NM's Communications Regarding the 1985 Change ....... 8

**VII.** Individualized Analysis is Required to Determine How Different Putative Class Members Would Have Understood the 1985 Change ........................................ 9

**VIII.** Individualized Analysis is Required to Determine What Role, if Any, the 1985 Change Would Have Played in Putative Class Members' Evaluation and Their Decision to Hold Their Annuities ................................................................................................ 11

    **A.** Consumers Differ in the Factors They Consider When Making Decisions Related to Buying and Holding Their Annuities ................................................ 11

    **B.** A Change in the Method of Calculating Future Dividends Would Not Have Been a Factor for Many Putative Class Members in Their Decision to Hold Their Annuities ................................................................................................ 13

**IX.** Individualized Analysis is Required to Determine Which Putative Class Members Would Have Preferred Dividends Based on the General Portfolio over Dividends Based on the Segmented Account .................................................................................... 15

    **A.** Putative Class Members Would Have Differed in Their Expectations of Future Dividends ............................................................................................................ 16

    **B.** Putative Class Members Differed in the Maturity Dates of Their Annuities ....... 17

    **C.** Putative Class Members Would Have Differed in Their Discounting of the Future ................................................................................................................... 18

    **D.** Putative Class Members Would Have Differed in Their Risk Perceptions and Risk Preferences .................................................................................................. 19

**X.** Conclusions ............................................................................................................. 20

Appendices

A – Curriculum Vitae

B – List of Prior Testimony

C – Materials Relied Upon

D – Data and Methodology

## I.      Qualifications

1.      My name is Ravi Dhar.  I am the George Rogers Clark Professor of Management and Marketing at the Yale School of Management and the Director of the Yale Center for Customer Insights at the School of Management at Yale University in New Haven, Connecticut.  I also have an affiliated appointment as a Professor of Psychology at the Department of Psychology, Yale University and serve on the editorial board of leading consumer research journals such as *Journal of Consumer Psychology*, *Journal of Consumer Research*, *Journal of Marketing*, and *Marketing Letters*.  I am the current Associate Editor of *Journal of Marketing Research*, the past Area Editor of *Marketing Science*, and the past Associate Editor of *Journal of Consumer Research*.

2.      I hold a Ph.D. and M.S. in Business Administration from the University of California at Berkeley.  My doctoral dissertation ("Consumer Preference for a No-Choice Option") was in the area of consumer decision making.  I have published more than fifty papers in journals, proceedings, and as book chapters, including in the leading marketing, psychology, and management journals, such as the *Harvard Business Review, Journal of Behavioral Decision Making, Journal of Business, Journal of Consumer Psychology, Journal of Consumer Research, Journal of Marketing Research, Journal of Personality and Social Psychology, Management Science, Marketing Science, Organizational Behavior and Human Decision Processes, Sloan Management Review,* and other journals.

3.      Several of my publications were also considered for research awards such as the Paul E. Green Award ("The Effect of Forced Choice on Choice," Finalist in 2004) and the William O'Dell Award ("Consumer Choice Between Hedonic and Utilitarian Goods," Winner in 2005; "Making Complementary Choices in Consumption Episodes: Highlighting Versus Balancing," Finalist in 2004; "The Effect of Forced Choice on Choice," Finalist in 2008; "Preference Fluency in Choice," Finalist in 2012).  The William O'Dell Award is presented to the best *Journal of Marketing Research* article that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice.  The Paul E. Green Award is presented to the *Journal of*

*Marketing Research* article that shows or demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing. I have been awarded the 2012 Distinguished Scientific Accomplishment Award from the Society of Consumer Psychologists, which is given annually to honor a scholar who has made significant and lasting contributions in the field of consumer psychology. A detailed listing of my educational background and publications is set forth in my curriculum vitae, which is attached to the end of this report as Appendix A.

4.      My fields of expertise are consumer and customer behavior, consumer psychology, branding, marketing management, and marketing strategy. In my work as a marketing professor and as a consultant to major corporations, I have conducted, supervised, and/or evaluated more than a hundred surveys as well as analyzed questions relating to different aspects of consumer behavior. Most of my research focuses on consumers' decision making—the manner in which consumers acquire and process information when forming product perception and preferences, the effect of product attributes and information presentation on consumer purchase and consumption decisions, and the effect of different marketing mix activities (such as promotions and advertising) on consumer buying decisions.

5.      My teaching responsibilities at Yale University's School of Management include two doctoral courses that examine advanced research topics in the area of consumer behavior, judgment, and decision making. I also teach or have taught several different courses for graduate students who are enrolled in the MBA program or the Executive MBA program at Yale: Consumer Behavior, E-Business and Marketing, Marketing Strategy, Marketing Management, Marketing of Financial Services, and Strategic Marketing Leadership. I have also taught and given seminars to mid-level and senior-level executives in more than a dozen countries in North and South America, Asia, and Europe. I have also worked as a consultant or adviser to companies on marketing related issues in different types of industries (e.g., consumer products, high technology, health, and financial services).

6. I have served as an expert witness on marketing research issues in a variety of litigation matters. A list of cases in which I have testified as an expert, at trial or by deposition in the preceding four years or more is attached as Appendix B.

## II. Background

7. This class action relates to a change in the method of calculating annual dividend payments (the "1985 Change") made by Northwestern Mutual ("NM") on certain annuities. The annuities at issue (the "pre-MN annuities") are deferred fixed annuities sold on or prior to March 31, 1985, wherein consumers are guaranteed a fixed rate of return in the future for premium payments made until a pre-specified maturity date. In addition to the fixed guaranteed rate of return, these annuities also provide for the possibility of annual dividends to their owners. The exact amount of these dividends depends on the performance of an underlying pool of assets and is therefore, variable and not guaranteed.

8. The 1985 Change refers to a change in the investment basis on which the dividends on pre-MN annuities were calculated.[1] Before the 1985 Change, the dividends were based on an investment account that was oriented towards long-term investments (the "general portfolio").[2] After the 1985 Change, plaintiffs allege that dividends were calculated based on a different account that consisted of short-term investments (the "segmented account").[3]

9. Plaintiffs seek to certify a class (the "putative Class") consisting of "[a]ll persons who (a) purchased a Northwestern Mutual Life Insurance Company Flexible Premium Annuity or Retirement Annuity (or other deferred, fixed annuity) in force and in its deferral period as of March 31, 1985, and (b) did not sign the 1983 Amendment Agreement while residing in a state other than Wisconsin, and their successors in

---

[1] Complaint and Jury Demand, filed August 26, 2008, ¶2.
[2] Complaint and Jury Demand, filed August 26, 2008, ¶2.
[3] Complaint and Jury Demand, filed August 26, 2008, ¶2.

interest.  Excluded from the Class are any of NM's officers, trustees and their family members or affiliates."[4]

10.    Plaintiffs allege that: (a) NM failed "to disclose the change to owners of the Annuities" through a notice; (b) NM failed "to seek written consent for the change in the basis for determining dividends;" and (c) NM did not have the "right to make the change unilaterally."[5]

## III.    Purpose of the Report

11.    It follows from plaintiffs' class action claims and allegations, that if NM had sent a notice to or asked for consent from putative Class members for the 1985 Change, all putative Class members would have had a preference to receive dividends on their pre-MN annuities based on the general portfolio over dividends based on the segmented account, and that this preference would have driven their decision to hold their annuities.

12.    I have been asked by NM's counsel to analyze, from a consumer behavior perspective, if this is indeed the case, *i.e.,* whether the putative Class members would have responded in a common manner if NM had sent a notice or asked for consent prior to implementing the 1985 Change (hereafter referred to as "the communication from NM").  I have not been asked to determine what exact form a notice from NM would have taken or how NM would have asked for consent from the putative Class members.

13.    In forming my opinions, I have reviewed various legal filings and documents in this matter, internal NM documents produced in this litigation, deposition and trial testimony, NM data on annuity and life insurance products, and general industry and academic literature.  A complete list of the materials I have relied upon is presented in Appendix C.

---

[4] Plaintiff's Brief In Support of Motion for An Order Redefining the Class and For Related Relief ("plaintiff's brief"), filed March 4, 2013, p. 13.
[5] *See* Complaint and Jury Demand, filed August 26, 2008, ¶15.

14. I am being compensated by NM for this task at $700 per hour. I also receive periodic compensation from Cornerstone Research, the firm that provided research assistance to me on this matter and with which I have a longstanding relationship. It is my understanding that those payments are based generally on my services for and work with that firm, including the level of fees generated on matters in which they provide support to me. I understand that those payments are in no way based on the content of my opinions or the outcome of any matter.

15. I reserve the right to supplement my testimony and this report in response to any further information provided by the parties, and/or in light of additional documents or testimony brought forth through the ongoing discovery in this case, at trial, or otherwise, which may be brought to my attention after the date of my signature below.

## IV.  Summary of Opinions

16. Based upon my review of the data and documents (including deposition and trial transcripts) produced in this case, and my education, background, and professional experience, it is my opinion that the putative Class members would not have responded in a common manner if NM had sent them a notice or asked for their consent regarding the 1985 Change.

17. First, consumers differ in the levels of attention they pay to communications from financial services companies. Some putative Class members would not have paid attention to a notice from NM regarding the 1985 Change and, consequently, would have continued to hold their pre-MN annuities and received dividends based on the segmented account. Without individualized analysis, it is impossible to determine which putative Class members would have paid attention to a notice from NM regarding the 1985 Change.

18. Second, even if some putative Class members had paid attention to the communication from NM regarding the 1985 Change, they would have differed in their ability to understand and assess what it meant. As a consequence, some putative Class members would have continued to hold their pre-MN policies and received dividends based on

the segmented account. Identifying who among the putative Class members would have fully understood the 1985 Change requires individualized analysis.

19. Third, even if some putative Class members had paid attention to and fully understood the 1985 Change, the 1985 Change would not necessarily have been a factor in their decision to hold their annuities. Consumers buy and hold annuities for a wide variety of reasons, and the method of calculating dividends may not be a factor in their decision making. Further, the 1985 Change would have required putative Class members to evaluate two methods of calculating future dividends in order to form a judgment as to which of the methods was superior. Because future dividends are variable and not guaranteed, a change in the method of calculating dividends would not have been a factor in many putative Class members' decisions to hold their annuities. Identifying these putative Class members requires individualized analysis.

20. Finally, even if the 1985 Change had been a factor in some putative Class members' evaluation, it is incorrect to assume that all such putative Class members would have had a uniform preference for future dividends based on the general portfolio over dividends based on the segmented account. The future is by definition uncertain, and the putative Class members would have varied in their expectations of future dividends as well as in their risk preferences and time horizons of decision making. Individualized analysis is required to determine which putative Class members would have preferred future dividends based on the general portfolio over dividends based on the segmented account.

21. Thus, putative Class members would have varied in their levels of attention paid to the communication from NM and their understanding of the 1985 Change. They would have also varied in the factors relevant in their decision to hold the pre-MN annuities and their preferences for dividends based on the segmented account. For all these reasons, putative Class members would not have responded in a common manner to the communication from NM regarding the 1985 Change.

## V.     Consumer Information Processing and Decision-Making

22.    In order to understand how putative Class members would have responded to the communication from NM regarding the 1985 Change, it is instructive to first understand how consumers process information and how they make decisions based on that information.  According to consumer behavior research, to understand how information might impact consumer behavior, one must consider a sequence of processes. Specifically, for any information to have impact, consumers need to first pay attention to the information, understand that information, decide based on that understanding how it might impact their evaluation, and finally, make a decision given their preferences among various alternative actions.[6]

23.    To illustrate with an example, consider a putative Class member who did not pay attention to NM's notice regarding the 1985 Change.  The actions of this putative Class member would not have been affected by the content of the notice. Alternatively, consider a putative Class member who, after receiving and having the ability to understand the notice, evaluates it and decides that he prefers dividends based on the segmented account. This putative Class member would ultimately have received dividends based on the segmented account even if the 1985 Change had been communicated by NM.

24.    In the following sections, I discuss variations in how putative Class members might go through the sequence of processing information in NM's communication regarding the 1985 Change and also the variation in their evaluative response to this communication.

---

[6] For a general discussion of how consumers process information and make decisions, *see*, for example, Assael, H. (2004), "Consumer Behavior:  A Strategic Approach," Houghton Mifflin, Chapter 17; Kotler, P. and K. Keller (2012), "Marketing Management: 14E," Prentice Hall, Chapters 6, 17; Pride, W. and O. Ferrell (2012), "Marketing," Cengage Learning, Chapter 7.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 44 of 116   Document 42-5

## VI.  Individualized Analysis is Required to Determine Which Putative Class Members Would Have Paid Attention to NM's Communications Regarding the 1985 Change

25.  Plaintiffs contend that NM should have communicated the 1985 Change to putative Class members prior to implementing it.[7]  It is my opinion that even if the 1985 Change had been communicated, putative Class members would have varied in the amount of attention paid to the communication from NM.

26.  Surveys of consumers conducted by industry researchers show that many consumers do not read or pay attention to communications from financial services companies. For example, a 2001 survey by the American Bankers Association showed that 41% of the consumers interviewed did not recall receiving or had not received their bank privacy disclosure, and 22% said they had received but had not read their notices.[8] Similarly, in a 2011 survey conducted by Insured Retirement Institute (IRI), 70% of respondents reported that they never or rarely read the prospectuses of their variable annuities.[9]  An earlier study released in 1979 by the Federal Trade Commission regarding the effectiveness of life insurance cost disclosures also found that "the majority of people did not look at the disclosure materials that were provided."[10]

27.  It is also clear from the deposition testimony that putative Class members differ in the levels of attention they paid to various materials they received from NM.  For example, Caroline Meckes, when asked if she reviewed her annual statements said, "I'm sure I read them but I did not pay much attention to them."[11]  Bruce Williams said that he "probably" received annual statements, but he did not recall "looking at

---

[7] *See* Complaint and Jury Demand, filed August 26, 2008, ¶¶4, 33, 35.
[8] "ABA Survey Shows Nearly One out of Three Consumers Read Their Banks' Privacy Notices," American Bankers Association, June 2001.
[9] "Variable Annuity Summary Prospectus High in Demand by Consumers," Insured Retirement Institute, June 2011, p. 5.
[10] "Life Insurance Cost Disclosure:  Staff Report to the Federal Trade Commission," Bureau of Consumer Protection and Bureau of Economics, July 1979, p. 160.
[11] Deposition of Caroline Meckes, June 10, 2010, pp. 31:8–31:14.

them."[12]  By contrast, Marleen LaPlant, recalled receiving the annual reports and "skimming" through them for "five to ten minutes."[13]

28.     In summary, it is my opinion that putative Class members would have differed in the levels of attention they would have paid to a notice from NM regarding the 1985 Change.  As a result, some putative Class members would have continued to hold their pre-MN annuities and received dividends based on the segmented account, even if NM sent them a notice regarding the 1985 Change.  Determining which of the putative Class members would have paid attention to the notice with regard to the 1985 Change requires individualized analysis.

## VII.    Individualized Analysis is Required to Determine How Different Putative Class Members Would Have Understood the 1985 Change

29.     Even if some putative Class members had paid attention to the communication from NM regarding the 1985 Change, the extent to which they would have been able to understand this information and assess its meaning would have varied.  Therefore, they would have responded differently to the 1985 Change.

30.     Annuities are complex financial products.[14]  Many consumers do not fully understand how they work.  One of the factors contributing to consumers' lack of understanding of annuities is low financial literacy, and surveys conducted by a variety of organizations at different points in time show that by and large, consumers have varying levels of financial literacy.[15]  For example, a study conducted by FINRA in 2009 that surveyed a nationally representative sample of Americans showed that people got, on average, less than 3 out of 5 questions correct regarding basic financial matters.  Performance varied by several characteristics, including income, educational

---

[12] Deposition of Bruce Williams, May 18, 2010, pp. 28:7–28:14.
[13] Deposition of Marleen LaPlant, September 9, 2009, pp. 27:3–28:25.
[14] Brown, J., A. Kapteyn, E. Luttmer, and O. Mitchell (2013), "Complexity as a Barrier to Annuitization: Do Consumers Know How To Value Annuities?" Pension Research Council Working Paper, The Wharton School, University of Pennsylvania.
[15] "Financial Literacy Among Retail Investors in the United States," Federal Research Division, Library of Congress, December 2011, p. 1.

level, age, gender, and ethnic background.[16]  To the extent that some putative Class members had low levels of financial literacy and found annuities to be complex, their ability to understand and assess the meaning of the 1985 Change would have varied significantly.

31.     It is clear from the deposition and trial testimony that putative Class members differed in their understanding of the annuities and how the dividends on their policies were calculated.  For example, while Bruce Williams generally understood that the dividends would be "based on the profits of the company," he did not know how the dividends were calculated, and was not sure of the "difference from [*sic*] a dividend and an interest rate."[17]  While Caroline Meckes testified that she knew the dividends would be based on NM's "earnings," she was not aware that her contract had a guaranteed interest rate, or that the dividends themselves were not guaranteed.  Gerald Kreitzman, when asked if he read the policy he received from NM said, "I'm not sure I understood it all, okay.  I'm not even sure I understand it all now, okay."[18]

32.     In summary, even if putative Class members had paid attention to the communication from NM regarding the 1985 Change, they would have differed in the extent to which they understood the 1985 Change.  Because of these differences, some putative Class members would have continued to hold their pre-MN annuities and received dividends based on the segmented account.  Individualized analysis is needed to determine how each putative Class member would have responded to the communication from NM regarding the 1985 Change.

---

[16] "Financial Literacy Among Retail Investors in the United States," Federal Research Division, Library of Congress, December 2011, pp. 7–21.
[17] Trial Transcript of Bruce Williams, November 8, 2010, pp. 18:22–18:25; pp. 21:22–22:5.
[18] Deposition of Caroline Meckes, June 10, 2010, pp. 7:13–8:3; Deposition of Gerald Kreitzman, June 10, 2010, pp. 30:15–30:18.

**VIII. Individualized Analysis is Required to Determine What Role, if Any, the 1985 Change Would Have Played in Putative Class Members' Evaluation and Their Decision to Hold Their Annuities**

33. Even if putative Class members had paid attention to the communication from NM and had a common understanding of the 1985 Change, they would have been commonly affected by it only if the method of calculating dividends had been a factor in their decision to hold their annuities. As discussed next, consumers consider several different factors in their decision to buy or hold annuities and many consumers may not base their decisions on the method of calculating dividends. Individualized analysis is required to identify putative Class members for whom the method of calculating dividends would have been a factor in their decision to hold their annuities and therefore, would potentially be affected by the communication from NM regarding the 1985 Change.

**A. Consumers Differ in the Factors They Consider When Making Decisions Related to Buying and Holding Their Annuities**

34. Consumers consider a variety of factors when purchasing annuity products and they differ in the factors that they consider important. For example, according to a LIMRA survey in 2012, the financial strength of the insurer, tax-deferred benefits, rate of return, and the ability to receive guaranteed lifetime income were reported to be among the various factors that many consumers consider when buying a variable annuity (*see* Exhibit 1).[19] However, while 54% of the consumers reported tax-deferred benefits to be "very important," 8% reported tax-deferred benefits to be "not very important" in their annuity buying decision. Similarly, a Gallup survey conducted in 1992 showed that while 77% of non-qualified annuity owners reported that tax-deferred nature of earnings was a "very important" factor in their annuity

---

[19] NM also considered a wide variety of factors in annuity design. These included the "savings account" nature of annuities, tax advantages, disability and other benefits, low administrative costs as well as flexibility of investment vehicles. *See* ML2_NM_4518–529.

**App. 257**

purchase, 46% reported that they valued the easy ability to save through an annuity as a "very important" factor in their purchase (*see* Exhibit 2).

35. Since financial products are complex and difficult to understand, a factor that affects consumers' decisions to buy or hold a financial product is the firm's reputation.[20] For example, in the case of pre-MN annuities, plaintiff Janet Reichart thought that NM was a "very solid" company, and that was one of the reasons she purchased her policy.[21] Similarly, plaintiff Caroline Meckes felt that NM "was a good company to go with" and that she "trusted the company."[22] Plaintiff Daniel Noonan also thought that NM was a "good company."[23] Plaintiff John Komives said he was "so comfortable with [NM] that I never felt the need to behave in an adversarial [*sic*] – I accepted the way it was presented."[24] These plaintiffs' perceptions are consistent with NM's industry rankings. NM was ranked as "the most admired company" in life and health insurance industry every year from 1983 to 2006 in *Fortune* Corporate Reputations Survey, and it was the only company that ranked first in its industry every year during that period (*see* Exhibit 3).[25] NM also ranked among the top three life insurance companies according to another influential source, A. M. Best, as seen in the annual publication *Best's Review* (*see* Exhibit 4).[26]

36. Because consumers differ in the factors they consider important when buying and holding annuity products, firms offer annuity products with different features. For example, the pre-MN annuities held by putative Class members are comprised of three different product types—Single Premium Retirement Annuity (SPRA), Flexible Premium Annuity (FPA), and Retirement Annuity (RA).[27] *See* Exhibit 5. An SPRA

---

[20] Nagy, R. and R. Obenberger (1994), "Factors Influencing Individual Investors' Behavior," *Financial Analysts Journal,* Vol. 50, No. 4, pp. 63–68.
[21] Deposition of Janet Reichart, June 16, 2010, pp. 7:8–7:16.
[22] Deposition of Caroline Meckes, June 10, 2010, pp. 7:1–7:8.
[23] Trial transcript of Daniel Noonan, November 8, 2010, pp. 58:23–59:17.
[24] Deposition of John Komives, May 18, 2010, pp. 36:9–36:20.
[25] ML_NML2_0039.
[26] A. M. Best is cited as an unbiased independent organization that publishes financial ratings in several consumer guides for annuity purchase. *See*, for example, "A Consumer's Guide to Annuities," North Carolina Department of Insurance, p. 8 and "Understanding Annuities," Office of the Commissioner of Insurance: State of Wisconsin, June 2012, p. 14.
[27] *See* Appendix D for details.

could be used to roll over savings from an existing retirement account or to invest an inheritance, while contribution limits on the FPA and RA products would make them less suitable for such purposes.[28]  Similarly, the pre-MN annuities differ in their tax status.  In 1985, at least 80% of annuities held by putative Class members were tax qualified, *i.e.*, funded by pre-tax dollars (*see* Exhibit 6).[29]  Tax qualified annuities face early withdrawal penalties by the IRS unlike non-tax qualified annuities, which face no withdrawal fees on the principal invested in the annuity.

37.     In summary, consumers differ in the factors that drive their decision to buy and hold annuity products.  Therefore, putative Class members also likely differed in the factors they considered in their decision to buy and hold their pre-MN annuities.

      **B.**     **A Change in the Method of Calculating Future Dividends Would Not Have Been a Factor for Many Putative Class Members in Their Decision to Hold Their Annuities**

38.     Even if putative Class members had paid attention to the communication from NM, had a common understanding of the 1985 Change, and generally considered the DIR in their decision to hold their annuities, a change in the method of calculating dividends likely would not have been a factor for many of them in their decision to hold their annuities.

39.     Plaintiffs assert, looking retrospectively, that the "return on the short-term bond account has lagged far behind the…return on its long-term oriented general account portfolio of investments."[30]  However, it is important to note that, looking into the future, the DIR based on the segmented account was not guaranteed to be lower than the DIR based on the general portfolio.  Future dividends based on either the

---

[28] *See*, for example, Trial Exhibit 155 and Trial Exhibit 310, which show the limits on the Flexible Premium Annuity for plaintiffs Bruce Williams and Daniel Noonan, respectively. Trial Exhibit 157, an SPRA contract for Bruce Williams, shows no such limits.  This could allow consumers to use SPRAs for rolling over income from an existing retirement fund, investing accumulated funds from other investments, or investing an inheritance, all of which would either be unlikely or impossible to do in an FPA or RA.  *See* http://www.statefarm.com/insurance/life_annuity/annuity/deferredplus.asp, accessed on 4/29/13.
[29] Self-employed trusts can be either tax qualified or non-tax qualified, and are therefore excluded from this calculation.
[30] Complaint and Jury Demand, filed August 26, 2008, ¶2.

Page 13

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 50 of 116   Document 42-5

App. 259

segmented account or the general portfolio depend on the performance of the underlying investments and were, by definition, variable and not guaranteed. Thus, the impact of the 1985 Change would have been uncertain for putative Class members, and for this reason, a change in the method of calculating dividends would not have been a factor in their decision to hold their annuities.

40. Some putative Class members (who may not have been able to assess the impact of the 1985 Change on their own) may have discussed it with their agents. NM had informed all agents of the 1985 Change.[31] Some putative Class members regularly met their agents and even sought their advice on matters relating to their annuities. When Janet Reichart, a putative Class member, was asked how she would have responded to the 1985 Change, she said, "I would have had to have called [my agent] and talked it over with him to find out exactly what that change meant."[32] John Komives generally met with his agent once a year, at times, more often.[33] Because the impact of any change in the method of calculating future dividends is uncertain, different agents may have evaluated the impact of the 1985 Change differently. Depending on what putative Class members would have discussed with their agents, a change in the method of calculating dividends may not have uniformly affected their decisions.

41. The notion that a change in the method of calculating dividends would not have been a factor in the putative Class members' decisions to hold their annuities is supported by the testimony of the plaintiffs. Some plaintiffs testified that they continued to hold their pre-MN annuities even after learning about the 1985 Change. For example, plaintiffs Bruce Williams and Caroline Meckes both testified that they continued to hold on to their annuities even until the day of their depositions. [34] Further, plaintiff Bruce Williams had "no specific plans" to sell his annuity as of 2010. [35] Named

---

[31] NML2 0539–541; ML_NML2_0489.
[32] Deposition of Janet Reichart, June 16, 2010, pp. 29:1–29:6.
[33] Deposition of John L. Komives, May 18, 2010, pp. 18:2–18:11; 24:22–25:4.
[34] Deposition of Bruce Williams, May 18, 2010, pp. 34:10–34:16; Deposition of Caroline Meckes, June 10, 2010, pp. 29:21–29:24.
[35] Deposition of Bruce Williams, May 18, 2010, pp. 34:10–34:16.

plaintiff Marleen LaPlant surrendered her annuity six years after learning about the 1985 Change.[36]

42. Similarly, many putative Class members also held a life insurance policy with NM and, therefore, had access to information about the DIR based on the general portfolio. As of 1985, over 9,000 putative Class members also held an active life insurance policy with NM, and approximately 3,000 of those people continued to hold at least one active pre-MN and one active life insurance policy even as late as the year 2000 (*see* Exhibit 7). Some of these putative Class members may have compared the DIR on their life insurance policies with the DIR on their pre-MN annuities and realized that the two DIRs were based on different methods. Yet, they continued to hold their annuities based on the segmented account, suggesting that a change in the method of calculating dividends was not a factor in their decision to hold their annuities.

43. In summary, even if putative Class members had paid attention to the communication from NM and had a common understanding of the 1985 Change, many of them would not have been able to make a judgment that one method of calculating dividends was superior to another because future dividends were variable and not guaranteed. Therefore, a change in the method of calculating dividends would not have been a factor in their decision to hold their annuities. Individualized analysis is required to determine which putative Class members' decisions would have been affected by the 1985 Change.

## IX. Individualized Analysis is Required to Determine Which Putative Class Members Would Have Preferred Dividends Based on the General Portfolio over Dividends Based on the Segmented Account

44. Even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, it is my opinion that they would not have

---

[36] Deposition of Marleen LaPlant, September 9, 2009, pp. 35:3–35:5; 76:11–76:23; 84:2–84:20.

uniformly preferred dividends based on the general portfolio to dividends based on the segmented account.

45. The early 1980s was a period of high short-term interest rates, and the market for annuities was highly competitive at that time, with several annuity products based on short-term portfolios available to consumers.[37] Pre-MN annuities were also experiencing high surrender rates because of competition from short-term products.[38] Putative Class members demonstrated an interest in these products as well. In fact, 606 individuals in the putative Class purchased NM's current rate annuity ("CRA") product in 1985.[39] In subsequent years, an additional 1,059 individuals purchased this product.[40] This implies that if NM had communicated the 1985 Change, many putative Class members likely would have preferred to receive dividends based on the segmented account.

46. As I discuss next, putative Class members likely differed in their expectations of future dividends, their risk preferences, and the time horizon over which they made decisions, all of which would have affected their preference for the general portfolio relative to the segmented account as a basis for receiving dividends.

### A. Putative Class Members Would Have Differed in Their Expectations of Future Dividends

47. Consumers vary in their expectations of future dividends, which are ultimately uncertain. According to a survey conducted in 1985, when asked about interest rate expectations over the next year, roughly one-third of a representative sample of U.S. consumers expected interest rates to increase, one-third expected them to stay constant, and roughly one-third expected them to decrease (*see* Exhibit 8).[41] Because

---

[37] ML2_NM_4475–4500.
[38] ML2_NM_4545.
[39] ML_NML2_0542–574. This product was based off of a significantly shorter-term investment portfolio and was explicitly marketed as such by NM.
[40] This is the number of unique class members who purchased their first CRA product in 1986 or later.
[41] This is consistent with academic research, which documents several reasons why this could occur, including anchoring biases, momentum beliefs, and contrarian beliefs. *See* Yagan, D. (2012), "Why Do Individual Investors Chase Stock Market Returns?" Working Paper, p. 11; Amromin, G. and S. Sharpe (2008), "Expectations of Risk

of different expectations of interest rates, consumers would likely differ in their preference for short-term versus long-term investments.

48. Many putative Class members knew that the DIRs were variable and not guaranteed. For example, when asked during his deposition if the dividend rate would be the same over time, plaintiff John Komives replied "No."[42]  Plaintiffs Janet Reichart and Bruce Williams also knew that future dividends were not guaranteed.[43]

49. Thus, even if a change in the method of calculating dividends had been a factor in the decision of some putative Class members, they would have had different expectations of future dividends.  Some of these putative Class members would have preferred to receive dividends based on the segmented account, even if they received the communication from NM regarding the 1985 Change.  Individualized analysis is required to determine which of the putative Class members would not have preferred to receive dividends based on the segmented account.

### B. Putative Class Members Differed in the Maturity Dates of Their Annuities

50. In addition to having different expectations about future dividends, putative Class members would have also differed in the weight they assigned to the more immediate dividends they expected to get.  Different pre-MN annuities were purchased in different years and had different maturity dates.  As of 1985, the scheduled maturity dates for the annuities held by putative Class members ranged from a few months to up to 69 years in the future (*see* Exhibit 9).

51. Different maturity dates would have resulted in different responses to the 1985 Change.  Putative Class members whose policies were maturing shortly after the 1985

---

and Return Among Household Investors: Are Their Sharpe Ratios Countercyclical?" Finance and Economics Discussion Series, Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, p. 28; Greenwood, R. and A. Shleifer (2013), "Expectations of Returns and Expected Returns," NBER Working Paper No. 18686; Vissing-Jorgensen, A. (2004), "Perspectives on Behavioral Finance: Does 'Irrationality' Disappear with Wealth? Evidence from Expectations and Actions," NBER Macroeconomics Annual 2003, Vol. 18, pp. 139–208.
[42] Deposition of John Komives, May 18, 2010, pp. 34:14–34:17.
[43] Deposition of Bruce Williams, May 18, 2010, pp. 46:6–46:11; Deposition of Janet Reichart, June 16, 2010, pp. 8:9–8:13.

Change had a different horizon of decision making as compared to those whose policies were maturing many years into the future. Some of them may have expected dividends based on the segmented account to be higher than those based on the general portfolio (especially given that short-term rates were high in the early 1980s). Therefore, they would have preferred to receive dividends based on the segmented account. Individualized analysis is required to identify such putative Class members.

### C. Putative Class Members Would Have Differed in Their Discounting of the Future

52. In addition to different expectations of future dividends and horizons of investments due to varying maturity dates, putative Class members also likely would have differed in how they made trade-offs between current and future dividends. This is especially relevant given the high interest rate environment for short-term rates in the early 1980s. Some consumers are present-focused. They act in a manner that suggests they are more concerned about immediate gains and discount the future heavily.[44] Putative Class members may have preferred dividends based on the segmented account in 1985 because they expected dividends from the segmented account to offer higher short-term gains, even if they thought that the general account would provide higher dividends over a longer time horizon.

53. Thus, even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, they could have discounted the future differently, and therefore, would not have responded uniformly to the communication regarding the 1985 Change. Many of them with present-focused preferences would have preferred to receive dividends based on the segmented account, and therefore, would have agreed to the 1985 Change. Individualized analysis is required to identify such putative Class members.

---

[44] Frederick, S., G. Loewenstein, and T. O' Donahue (2002), "Time Discounting and Time Preference: A Critical Review," *Journal of Economic Literature,* Vol. 40, No. 2, pp. 351–401, at p. 393.

### D. Putative Class Members Would Have Differed in Their Risk Perceptions and Risk Preferences

54. In addition to different expectations of interest rates and horizons of investments, consumers also vary in their risk perceptions and risk preferences. Different consumers may perceive the same financial product to be more or less risky, implying different risk perceptions. Similarly, different consumers may be willing to take different levels of risk in situations of uncertainty, implying different risk preferences.[45] For example, surveys conducted by the Federal Reserve in 1983, between 4–10% of consumers said they would be willing to take "substantial" financial risks and between 30–65% said that they would not be willing to take "any" financial risks.[46] Studies have also shown that younger and less experienced investors hold riskier portfolios.[47]

55. Dividends on the annuities held by putative Class members were not guaranteed, and inherently carried some risk. Deposition testimony suggests that putative Class members differed in their risk preferences, and that these preferences varied over time. For example, John Komives had a preference for riskier investments because he invested in equities and also had been an angel investor in startup companies.[48] By contrast, Janet Reichart invested in stocks before her retirement but "started moving more towards safer investments for [her] retirement."[49] The varied distribution of age across putative Class members, as of 1985, also suggests that they had different risk preferences (*see* Exhibit 10).

---

[45] Weber, E. and R. Milliman (1997), "Perceived Risk Attitudes: Relating Risk Perception to Risky Choice," *Management Science*, Vol. 43, No. 2, pp. 123-144; Barsky, R., T. Juster, M. Kimball, and M. Shapiro (1997), "Preference Parameters and Behavioral Heterogeneity: An Experimental Approach in the Health and Retirement Study," *Quarterly Journal of Economics*, Vol. 112, No. 2, pp. 537–579; Kimball, M., C. Sahm, and M. Shapiro (2009), "Risk Preferences in the PSID: Individual Imputations and Family Covariation," *American Economic Review*, Vol. 99, No. 2, pp. 363–368; Hallahan, T., R. Faff, and M. McKenzie (2004), "An Empirical Investigation of Personal Financial Risk Tolerance," *Financial Services Review,* Vol. 13, pp. 57–78.

[46] 1983 Survey of Consumer Finance as cited in Stango, V. and J. Zinman (2009), "Exponential Growth Bias and Household Finance," *The Journal of Finance,* Vol. 64, No. 6, pp. 2807–2849 at p. 2828.

[47] Korniotis, G. and A. Kumar (2011), "Do Older Investors Make Better Decisions?" *The Review of Economics and Statistics,* Vol. 93, No. 1, pp. 244–265 at p. 264; Agnew, J., P. Balduzzi and A. Sunden (2003), "Portfolio Choice and Trading in a Large 401(k) Plan," *The American Economic Review*, Vol. 93, No. 1, pp.193–215.

[48] Deposition of John Komives, May 18, 2010, pp. 21:13–22:23, pp. 26:24–27:19.

[49] Deposition of Janet Reichart, June 16, 2010, pp. 11:12–11:24.

56. In summary, even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, they would have responded differently to the communication from NM regarding the 1985 Change because of different risk perceptions and risk preferences. Some would have preferred to receive dividends based on the segmented account. Individualized analysis is required to identify such putative Class members.

## X.    Conclusions

57. Plaintiffs' class action claims and allegations imply that if NM had sent a notice to or asked for consent from putative Class members regarding the 1985 Change, they would have all responded in a common manner. Plaintiffs' claims and allegations regarding common impact are invalid from a consumer behavior perspective.

58. Thus, putative Class members would have varied in their levels of attention paid to the communication from NM and their understanding of the 1985 Change. They would have also varied in the factors relevant in their decision to hold the pre-MN annuities and their preferences for dividends based on the segmented account. For all these reasons, putative Class members would not have responded in a common manner to the communication from NM regarding the 1985 Change. Some putative Class members would have received dividends based on the segmented account *even if* the 1985 Change had been communicated by NM. Individualized analysis is required to identify these putative Class members.

I declare under penalty of perjury that the foregoing is true and correct.


_____                    <u>July 1, 2013</u>
            Ravi Dhar                                              Date

**EXHIBIT 1**

# Factors Valued in Purchasing Variable Annuities
## 2012

| Factors | Very Important | Somewhat Important | Not Very Important | Not at All Important |
|---|---|---|---|---|
| Financial Strength of Company | 71% | 27% | 1% | 1% |
| Interest Rate or Projected Return | 56% | 36% | 6% | 2% |
| Tax-Deferred Benefits | 54% | 33% | 8% | 5% |
| Recommendation of Financial Professional | 47% | 38% | 11% | 4% |
| Ability to Receive Guaranteed Lifetime Income | 47% | 36% | 13% | 4% |

Source:  "Why People Buy Annuities:  Exclusive LIMRA Research Examines the Motivations That Make the Sale," *Insurancenewsnet,* July 2012

**EXHIBIT 2**

## Factors Valued in Purchasing Non-Qualified Annuities
1992

| Factors | Very Important | Somewhat Important |
|---|---|---|
| Earnings would not be taxed until the funds were used | 77% | 18% |
| Was a safe purchase | 68% | 27% |
| Have a good rate of return | 60% | 31% |
| Wanted a long term savings plan | 59% | 26% |
| Could get an income guaranteed for as long as you live | 46% | 25% |
| Easy way to save | 46% | 32% |
| Wanted a source of funds that could be used to pay for emergencies, such as catastrophic illness during retirement | 46% | 25% |
| Have a choice of methods of getting the money | 39% | 30% |

Source: "Committee of Annuity Insurers: Survey of Owners of Non-Qualified Annuity Contracts," *The Gallup Organization,* January 1993

**EXHIBIT 3**

# Northwestern Mutual Rankings
## *Fortune* Corporate Reputations Survey
## 1983 to 2011

| Year | Life and Health Insurance Industry Ranking [2] |
|:---:|:---:|
| 1983 | 1 |
| 1984 | 1 |
| 1985 | 1 |
| 1986 | 1 |
| 1987 | 1 |
| 1988 | 1 |
| 1989 | 1 |
| 1990 | 1 |
| 1991 | 1 |
| 1992 | 1 |
| 1993 | 1 |
| 1994 | 1 |
| 1995 | 1 |
| 1996 | 1 |
| 1997 | 1 |
| 1998 | 1 |
| 1999 | 1 |
| 2000 | 1 |
| 2001 | 1 |
| 2002 | 1 |
| 2003 | 1 |
| 2004 | 1 |
| 2005 | 1 |
| 2006 | 1 |
| 2007 | 2 [3] |
| 2008 | 2 [4] |
| 2009 | [5] |
| 2010 | 1 |
| 2011 | 4 |

Source: *Fortune Magazine*

Note:

[1] The Corporate Reputations Survey includes companies that appear in the previous year's annual Fortune 500 and Fortune Service 500 directories. A broad sample of senior executives, outside directors, and financial analysts are asked to rate the ten largest companies (occasionally fewer) in their own industry on eight attributes of reputation, using a scale of zero (poor) to ten (excellent). The eight attributes are: quality of management; quality of product and services; innovativeness; long-term investment value; financial soundness; ability to attract, develop, and keep talented people; community and environmental responsibility; use of corporate assets.

[2] Industry categories are based on definitions by the U.S. Office of Management and Budget.

[3] Prudential Financial was ranked industry No. 1 in 2007.

[4] Aflac was ranked industry No. 1 in 2008.

[5] Data for 2009 is not available.

**EXHIBIT 4**

# Northwestern Mutual Rankings
## A.M. Best 20-Year Dividend Comparison for Whole Life Policies
## 1983 to 1993

| | Rank [1] | | | |
|---|---|---|---|---|
| Year | Average Yearly Payment [2] [3] | Interest-Adjusted Payment Index [4] [5] | Average Yearly Difference [2] [6] | Interest-Adjusted Surrender Cost Index [4] [7] |
| 1983 | 2 | 2 | 1 | 1 |
| 1984 | 1 | 2 | 1 | 1 |
| 1985 | 1 | 2 | 1 | 1 |
| 1986 | 1 | 1 | 1 | 1 |
| 1987 | 1 | 1 | 1 | 1 |
| 1988 | - | 1 | - | 1 |
| 1989 | - | 2 | - | 2 |
| 1990 | - | 2 | - | 1 |
| 1991 | - | 3 | - | 2 |
| 1992 | - | 3 | - | 2 |
| 1993 | - | 3 | - | 3 |

Source: Trial Exhibit 211

Note:

[1] Rankings in each year evaluate ordinary whole life policies originated 20 years prior. At least 50 life insurance companies were examined in each year for this study.

[2] A.M. Best's rankings after 1987 did not include Average Yearly Payment or Average Yearly Difference rankings.

[3] Average Yearly Payment is the average cost over the period if dividends are taken out in cash but the policy is continued.

[4] In 1991, 1992, and 1993, the indices are called Actual Payment Index and Actual Surrender Cost Index but are calculated using a 5% interest adjustment.

[5] Interest-Adjusted Payment Index is the Average Yearly Payment adjusted for the time value of money, assuming a 5% interest rate.

[6] Average Yearly Difference is the average cost over the period if the policy was surrendered for its cash value on the 20th policy anniversary.

[7] Interest-Adjusted Surrender Cost Index is the Average Yearly Difference adjusted for the time value of money, assuming a 5% interest rate.

**EXHIBIT 5**



**In-Force Annuities Held by Putative Class Members**
Annuity Type from 1944 to 2013

Number of Annuities

■ Flexible Premium Annuities
■ Single Premium Retirement Annuities
■ Retirement Annuities

Source: Internal Data
Note: Annuities are defined as in-force in a given year if they are active at any point in that year.

App. 272

**EXHIBIT 6**



Number of Annuities

## Pre-MN Annuities Held by Putative Class Members
### Tax Status as of 1985

| Category | Number |
|---|---|
| IRA | 9,430 |
| TDA | 4,153 |
| Personal | 2,611 |
| Corporate Trusts/Plans | 2,354 |
| Self-Employed Trusts | 1,180 |
| IRC-B457 | 6 |
| IRC-401, Qualified Policy Exchange | 1 |

Source: Internal Data
Note: Tax status represents the latest available tax status as of 1985. IRAs or Individual Retirement Accounts are tax qualified retirement accounts available to individuals. TDAs or Tax Deferred Annuities are tax qualified annuities available to employees of public schools or 501(c)(3) tax-exempt organizations. Annuities sold through Corporate Plans are tax qualified annuities purchased for employees by a plan sponsor or plan trustee. Corporate Trusts hold the assets of the Corporate Plan. Annuities sold through Self-Employed Trusts are annuities available to self-employed individuals or their trusts. Some are tax qualified. IRC-B457 and IRC-401 are tax qualified annuities available to employees or individuals associated with certain government organizations.

App. 273

**EXHIBIT 7**



**Putative Class Members with Pre-MN Annuities and Life Insurance Policies**
In-Force from 1985 to 2013

Number of Annuitants

Source: Internal Data
Note: Annuities and policies are defined as in-force in a given year if they are active at any point in that year. Data indicates the number of unique annuitants with at least one in-force pre-MN annuity and in-force Northwestern Mutual life insurance policy in a given year.

App. 274

**EXHIBIT 8**

# Consumer Expectations of Future Interest Rates [1]
## 1985

| Month | Go Up | Stay the Same | Go Down | Don't Know |
|-------|-------|---------------|---------|------------|
| Jan 85 | 36% | 33% | 28% | 3% |
| Feb 85 | 35% | 37% | 26% | 2% |
| Mar 85 | 45% | 32% | 19% | 4% |
| Apr 85 | 47% | 31% | 19% | 3% |
| May 85 | 44% | 34% | 19% | 3% |
| Jun 85 | 36% | 36% | 26% | 2% |
| Jul 85 | 35% | 38% | 25% | 2% |
| Aug 85 | 41% | 35% | 22% | 2% |
| Sep 85 | 43% | 34% | 20% | 3% |
| Oct 85 | 44% | 33% | 21% | 2% |
| Nov 85 | 36% | 37% | 23% | 4% |
| Dec 85 | 36% | 37% | 25% | 2% |

Source:  Thomson Reuters/University of Michigan Survey of Consumers
Note:
[1] Consumers were asked, "No one can say for sure, but what do you think will happen to interest rates for borrowing money during the next 12 months — will they go up, stay the same, or go down?"

**EXHIBIT 9**



Number of
Annuities

## Pre-MN Annuities Held by Putative Class Members
### Year of Maturity as of 1985

Source: Internal Data
Note: Year of maturity represents the latest available maturity date as of 1985. This excludes nine annuities whose maturity date was missing as of 1985 or whose listed maturity date was on or before March 31, 1985.

**EXHIBIT 10**



# Pre-MN Annuities Held by Putative Class Members
## Age of Policyholder as of 1985

Source: Internal Data
Note: Age is calculated using birthdate. When missing, latest available policy date and age at issue as of 1985 are used.

STATE OF WISCONSIN  CIRCUIT COURT  MILWAUKEE COUNTY

---

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

        Plaintiffs,

    vs.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

        Defendant.

Case No.  08-CV-11988

Code:  30701
Declaratory Judgment

---

## REPORT TO THE COURT REGARDING CLASS NOTICE

---

Pursuant to this Court's December 14, 2009 Order For Dissemination of Class Notice, counsel for the Class file herewith the attached Exhibit A containing copies of the opt-out forms of all persons who have elected to opt out of the Class.

The Court's Order required counsel to send, by first-class U.S. mail, a copy of the approved Notice with attached opt-out form to each Class member at his or her last-known address, between 15 and 30 days from December 14, 2009. On January 11, 2010, using an address list of Class members provided by

Northwestern Mutual, the Notice was sent by first-class U.S. mail to the 3,358 persons on that list.[1]

The Notice required persons desiring to opt out of the Class to sign the attached opt-out form and mail it to Class counsel no later than February 25, 2010. As of March 30, 2010, a total of 115 individuals have elected to opt out of the Class, as expressed in Exhibit A hereto.[2]

Dated March 31, 2010.

Respectfully submitted,

KERSTEN & McKINNON, SC
STRAUS & BOIES, LLP
GUERRIERI, EDMOND, CLAYMAN & BARTOS, PC
GALANIS, POLLACK, JACOBS & JOHNSON, SC
Attorneys for the Class

By: _____
George P. Kersten
State Bar No. 1008099

---

[1] Of the 3,358 Notices mailed, 579 were returned by the Post Office. Notice was not sent to an additional 33 Class members for whom a valid mailing address could not be determined. These 612 Class members not receiving the Notice are listed on Exhibit B.

[2] Two annuitants, Janet Kozerski (a Northwestern Mutual employee) and Edward Gmach (parent of a Northwestern Mutual employee), received the Notice but were later determined to be excluded from the Class due to their affiliation with Northwestern Mutual.

2

## CERTIFICATE OF SERVICE

I certify that on this 31st day of March 2010 I served a copy the this Report to the Court Regarding Class Notice, with attached exhibits, upon defense counsel at their address of record by first class U.S. mail.

_____
George P. Kersten

June 7, 1990



Re:

We received your letter inquiring about the differences between dividends on annuities and life insurance policies.

Annuities and life insurance policies are treated differently with respect to dividends. This is due to the fact that assets for each of the portfolios are invested differently. Each portfolio has different strategies and investment goals. Dividend interest rates for individual policies are based on portfolio investment results.

The dividend interest rate for annuities for 1990 is 10.00%. This is a decrease from the 1989 rate of 10.75%. Life policies dividend interest rate remained the same at 10.00% from 1989 to 1990. However, life pol-icies had an increase in expense costs that is used in calculating the dividend interest rate. The increase in expenses is primarily due to an increase in the cost of maintaining policies.

Your policy has a loan interest rate of 6.00%. The policy has direct recognition which provides a higher interest rate for unborrowed cash value. Because your policy has direct recognition and no loans, you receive a 10.00% dividend interest rate on non-borrowed cash value. The dividend interest rate on any borrowed portion would be 5.15%.

A life policy with direct recognition and a 6.00% loan rate would receive a 10.00% dividend interest rate on the non-borrowed cash value and 5.30% on the borrowed portion.

I hope this information is helpful to you.


Stephanie Della
Service Correspondent
Executive Benefits Division
Policyowner Services Department

djw
cc: 005

56842

CONFIDENTIAL   ML2_PM_56684

**laberge, shelly**

| | |
|---|---|
| **From:** | LABERGE, SHELLY |
| **Sent:** | Tuesday, April 07, 1998 3:02 PM |
| **Subject:** | Dividend interest rate |

SAMPLE

██████ let me assure you we are not discriminating against you by paying your annuity a lower dividend rate than what is quoted in our Annual Report.  The rates earned between life insurance and annuities have been different since 1986.  Prior to this, the two product lines shared the same dividend interest rate.  A change was made to reflect differences in how NML invests the assets underlying these two products.  The main reason and need for this is because the cash flow of money into and out of our annuities does not give the same commitment to future premium flows as we see with life insurance. In addition, annuity contracts have a greater likelihood of being withdrawn than we see with life insurance.   This volatility of cash flow dictates that NML invest in shorter term investments.  Additionally, we do not have any riskier, higher yielding assets such as common stock or real estate underlying our annuity business.  This impact means the annuity dividend rate will be more responsive to changes in market interest rates. If interest rates were to reverse their downward trend, annuity rates could again exceed life insurance rates, similar to what we saw in the late 80's.  For now, however, they remain lower. As you can see, it is not you or your annuity that causes the lower rate but rather the underlying investments associated with annuities that are different than those used for life insurance.

CONFIDENTIAL

KELLY ROSE...S
Senior Customer Service Representative
Annuity Administration
Annuity & Accumulation Products Dept.



September 14, 1999



**RE:**

In your recent letter to ▮▮▮▮▮▮▮ you questioned why your annuity had a decreasing investment return while the annual report stated record returns.

Let me begin by assuring you the values in your annuity are correct; however, let me explain the differences you raised. Much of the explanation involves the differences in investment portfolios between life insurance and annuities. Our fixed annuities are invested in short term investments, such as bonds and mortgages with maturity periods of less than five years. The 8.80% you have referred to is the company's overall portfolio rate for our *Life Insurance* products, which invest in larger term bonds, stock, and real estate investments.

The following is a calculation summarizing the method used to obtain your current cash value:

| | |
|---|---|
| *Total Cash Value as of 8/1/1998* | $57,663.85 |
| *Total Cash Value as of 8/1/1999* | $61,823.03 |
| | |
| Your basic Annual Annuity Premium | $ 416.60 |
| Annual Policy Fee (416.60-6.00) | $ 6.00 |
| | $ 410.60 |
| | |
| Current Load 6.00% (410.60 x .06) | $ 24.64 |
| Net Premium (410.60 – 24.64) | $ 385.96 |
| | |
| Beginning Year Cash Value (8/1/1998) | $57,049.81 |
| Interest (58,049.81 x .065) | $ 3,773.24 |
| End of Year Cash Value (8/1/1999) | $61,823.05 |
| | |
| **Declared Total Cash Value** | **$61,823.05** |

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202 • 414 271-1444

CONFIDENTIAL

September 14, 1999
Page 2

You asked if there was an advantage to continuing payments to this annuity. The current declared interest rate for this annuity is greater than rates offered for our Varible Annuity Guaranteed Interest Fund. In addition, your current policy cash value provides a death benefit and payment plan options only offered through an Insurance Company. Like all investments vehicles, an annual review of your investment objectives and time horizon along with investment options available should be compared routinely to achieve your maximum financial goals. Your Northwestern Mutual Life Agent would be happy to assist you with your investment goals.

Thank you for entrusting us with you business these past 34 years and allowing us to serve you. If I can be of further assistance please feel free to contact me at 1-888-455-2232.

Sincerely,

Kelly Krueger

cc: Lars Holmberg • 702-369-0405
    Sta 100 • 3773 Howard Hughes Pkwy • Las Vegas NV  89109                          127/65160

CONFIDENTIAL

```
 1   STATE OF WISCONSIN       CIRCUIT COURT      MILWAUKEE COUNTY
 2                             Branch 36
 3   _____
 4   MARLEEN M. LA PLANT,
 5                     Plaintiff,
 6           -vs-                         Case No. 08CV011988
 7
 8   NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,
 9                     Defendant.
10   _____
11                             COURT TRIAL
12   _____
13   November 8, 2010 (a.m.)             Dennis J. Flynn
14                                       Reserve Judge Presiding
15
16   APPEARANCES:
17           Kersten & McKinnon by George P. Kersten, E. Campion
18       Kersten and Kenan J. Kersten, Attorneys at law, appeared on
19       behalf of the Plaintiff.
20           Quarles & Brady by Eric M. VanVugt and Cristina D.
21       Hernandez, Attorneys at law, appeared on behalf of the
22       Defendant.
23
24
25   Leposava Munns, Official Court Reporter
```


COPY

```
 1
 2            WITNESS CALLED BY PLAINTIFF:
 3            Daniel A. Noonan          Direct      55
 4                                      Cross       83
 5
 6
 7
 8
 9
10
11
12
13            P R O C E E D I N G S:
14            THE CLERK:  Case 08CV011988, Marleen LaPlant
15      versus Northwestern Mutual Life Insurance Company.
16      Appearances, please.
17            MR. KERSTEN:  Your Honor, for the plaintiff and
18      Class, Attorneys George Kersten, Campion Kersten, Kenan
19      Kersten and Attorney Jeffrey Bartos, Attorney Christopher
20      Lee, Attorney Mark Pollack, Attorney Maria Lazar, Attorney
21      Timothy Battin; and Your Honor, Mrs. LaPlant and her
22      husband, John, are in the courtroom as well.
23            MR. VAN VUGT:  For the defendant Eric VanVugt,
24      Cristina Hernandez, Joshua Maggard from Quarles & Brady.
25      In-house attorneys at Northwestern Mutual Ray Manista, Rod
```

2

| | | |
|---|---|---|
| 1 | Q | Now, would you identify what is Exhibit 313?  That should be |
| 2 | | the next one in the stack. |
| 3 | A | It's entitled amendment to dividend provision. |
| 4 | Q | Is this the amendment to which you agreed in the so-called |
| 5 | | update '83? |
| 6 | A | I believe it is. |
| 7 | Q | Did there come a time --did there come a time when you |
| 8 | | became concerned about the level of dividends being credited |
| 9 | | to your annuity, Exhibit 310 and your wife's annuity, |
| 10 | | Exhibit 311? |
| 11 | A | Yes. |
| 12 | Q | Can you give us a time frame as to when that you developed |
| 13 | | that concern? |
| 14 | A | Well, it arose out of sort of an annual review type of |
| 15 | | process that I would engage in sometimes with Dan, sometimes |
| 16 | | without Dan Madigan I'm speaking of, and it --I would just |
| 17 | | kind of do a net worth type of statement so he would give me |
| 18 | | what is known as like a policy data review which would be a |
| 19 | | summary of all of my policies and my wife's policies. |
| 20 | | They were quite numerous so, you know, we just add |
| 21 | | up the cash values and you kind of take a look at what your |
| 22 | | net worth looks like, see where you stand type of thing.  I |
| 23 | | would do that annually and I'm sure I did one concerning |
| 24 | | this matter that gave rise to all of this.  It looks like it |
| 25 | | occurred some time in early 2000. |

66

| 1 | Q | And what was the concern that you had just in general terms? |
| 2 | | What --what disturbed you? What concern did you have at |
| 3 | | that point? |
| 4 | A | Well, as I communicated with Dan --Madigan, that is --I had |
| 5 | | noticed a disparity between the rate of return or the amount |
| 6 | | of dividends which I hadn't picked up on earlier, but I had |
| 7 | | noticed that there was a disparity because the premise upon |
| 8 | | which we had been proceeding for many years is that these |
| 9 | | annuities would always pay. The beauty of these he would |
| 10 | | say and the company would say well, the beauty of these |
| 11 | | annuities, they pay the same portfolio rate, same dividend |
| 12 | | interest rate as the cash surrender value rate that's paid |
| 13 | | on whole life policies. That was the beauty. That's how |
| 14 | | they were sold. So I noticed a difference. I said well, |
| 15 | | Dan, what's --what's the problem here? |
| 16 | Q | What did he say? |
| 17 | A | He didn't know. |
| 18 | Q | What did you do with it? |
| 19 | A | I think I had run some calculations and I said look, I'll go |
| 20 | | back into the, you know, take a sample into the '90s, take a |
| 21 | | look at whether there was something going on here that I had |
| 22 | | earlier missed. |
| 23 | | Apparently there was but it became a little more |
| 24 | | dramatic as the disparity or the spread increased meaning |
| 25 | | the annuity was producing a lower rate of return --I had |

```
1    calculated like 6.8 percent --and then the announced rate
2    that Northwestern Mutual always annually announces its rate
3    tells, you know, the customers, the policy owners and
4    everybody what their annual rates are, it was 8.8 percent at
5    that point.  I was a little off.  It turns out subsequently
6    it was really 6.5, not 6.8, so I was off in my calculation.
7  Q  Having that concern in mind, having in mind that Dan Madigan
8    said he didn't know why this difference existed, what did
9    you then do?
10 A  I asked him if he'd be good enough to look into it and he
11   did.
12 Q  And what was the product of that request of him?  What
13   occurred next?
14 A  I think he corresponded with the company and whoever was
15   responsible for answering questions like that.  He did that
16   on my wife Kathy's behalf and my behalf.
17 Q  And what is Exhibit 314?
18 A  The two 314 that I have, Counsel, are different than the
19   ones --actually, no, this is correct.  314, is that what
20   you're asking?
21 Q  314.
22 A  Okay, I'm sorry.
23 Q  Which I believe is the two-page letter.
24 A  I've got that now.  Thank you.
25 Q  Okay.  Just identify first of all who authored that letter,
```

68

App. 289

```
1   STATE OF WISCONSIN )
2                      )SS:
3   MILWAUKEE COUNTY   )
4              I, Leposava Munns, an official court reporter in
5       and for the Circuit Court of Milwaukee County, do hereby
6       certify that the foregoing is a true and correct transcript
7       of all the proceedings had and testimony taken in the above-
8       entitled matter as the same are contained in my original
9       machine shorthand notes on the said trial or proceeding.
10             Dated at Milwaukee, Wisconsin, this 7th
11             day of January, 2011.
12
13             Leposava Munns
14             Leposava Munns, RPR
15             Official Reporter
16
17
18
```

```
 1  STATE OF WISCONSIN   CIRCUIT COURT   MILWAUKEE COUNTY
    -------------------------------------------------------
 2
    MARLEEN M. LAPLANT,            CASE NO. 08CV011988
 3  W7868 Riedel Lane              CODE:  30701
    Fort Atkinson, WI  53538,
 4  on her own behalf and on
    behalf of a class similarly
 5  situated,
                                   DEPOSITION OF
 6         Plaintiffs,         MARLEEN M. LAPLANT

 7
        -vs-
 8
                                   9th of September, 2009
 9  THE NORTHWESTERN MUTUAL
    LIFE INSURANCE COMPANY,
10  a Wisconsin mutual insurance
    corporation,
11  720 East Wisconsin Avenue
    Milwaukee, WI  53202,
12
               Defendant.
13  -------------------------------------------------------
             DEPOSITION OF MARLEEN M. LAPLANT, before JANET
14  LARSEN, a Registered Professional Reporter and Notary
    Public, in and for the State of Wisconsin, under and
15  pursuant to Section 804 of the Wisconsin Statutes and
    the acts amended, at the offices of Quarles & Brady
16  LLP, 411 East Wisconsin Avenue, Suite 2040, Milwaukee,
    Wisconsin, on the 9th day of September, 2009,
17  commencing at 9:29 a.m. and concluding at 12:03 p.m.

18                  A P P E A R A N C E S

19             KERSTEN & MCKINNON, S.C., by
               GEORGE P. KERSTEN, ATTORNEY AT LAW
20             E. CAMPION KERSTEN, ATTORNEY AT LAW
               11518 North Port Washington Road,
21             Suite 104
               Mequon, Wisconsin  53092
22             appeared on behalf of the Plaintiff.

23             GALANIS, POLLACK, JACOBS &
               JOHNSON, S.C., by
24             MARK B. POLLACK, ATTORNEY AT LAW
               839 North Jefferson Street, Suite 200
25             Milwaukee, Wisconsin  53202
               appeared on behalf of the Plaintiff.
```

```
 1              STRAUS & BOIES, LLP, by
                MARK J. SCHIRMER, ATTORNEY AT LAW
 2              4041 University Drive, Fifth Floor
                Fairfax, Virginia  22030
 3              appeared by telephone on behalf of the
                Plaintiff.
 4
                QUARLES & BRADY LLP, by
 5              ERIC J. VAN VUGT, ATTORNEY AT LAW
                ELIZABETH CHAMBERLIN, ATTORNEY AT LAW
 6              411 East Wisconsin Avenue, Suite 2040
                Milwaukee, Wisconsin  53202
 7              appeared on behalf of the Defendant.

 8              NORTHWESTERN MUTUAL, by
                DAVID W. PEREZ, ASSISTANT GENERAL COUNSEL
 9              720 East Wisconsin Avenue
                Milwaukee, Wisconsin  53202
10              appeared on behalf of the Defendant.

11                    I N D E X

12   EXAMINATION BY:                        PAGE

13   Mr. Van Vugt                             3

14   EXHIBITS:                              MARKED

15   1 - Cover letter and documents produced in    35
         response to request, LaP1 through LaP 130
16       (Withdrawn)
     2 - 12-5-86 document from meeting with Mark    67
17       Mittag with handwriting, LaP 39

18   MATERIAL REQUESTED:                    PAGE

19   None

20   QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:

21   Page 40, line 6
     Page 41, line 5
22   (Original transcript supplied to Attorney Van Vugt)
     (Exhibit 1 page 1 has been copied and attached to the
23   original transcript and to each attorney's transcript
     with the original of Exhibit 1 returned to Mr. Van
24   Vugt.  Exhibit 2 was retained by Attorney George
     Kersten with a photocopy attached to the original
25   transcript and copies attached to each attorney's
     transcript.)
```

1    yesterday.

2            My question again, to your knowledge, are

3    there any other documents that you have relating

4    to this policy that are for one reason or another

5    not in these documents here today?

6  A.  No.

7  Q.  To your knowledge, other than the annual reports,

8    are there any documents that you received in the

9    course of, any documents you ever received that

10    were not for one reason or another kept in this

11    file?

12  A.  No.

13  Q.  But you understand that there -- Strike that.

14            When did you first learn about this

15    lawsuit or the prior lawsuit by the Noonans?

16  A.  Read it in the Milwaukee paper about the

17    Noonans.

18  Q.  And in the original of this file that you've

19    produced, there is -- on the top there is a

20    newspaper article, and that newspaper article

21    appears as, I think page -- well --

22            MR. GEORGE KERSTEN:  Toward the end,

23    Eric.

24  Q.  It's LaP 89 and 90.

25            When did you first see this article in

1    the paper; do you recall?

2 A. My husband saw it and then showed it to me.

3 Q. And was this at or about the time it was first

4    published?

5 A. Yes.

6 Q. Was he a regular reader of the Milwaukee Journal

7    Sentinel?

8 A. He'd read it periodically.  Maybe at the library,

9    we'd go through it.

10 Q. And do you recall anything more about this

11    newspaper article, other than what's in it?

12 A. No.

13 Q. There's some handwriting on the original of this,

14    it's also on the copy.  Whose handwriting is that?

15 A. My husband's.

16 Q. And it also refers to the case number of the

17    Noonan case, and it has the Kersten & McKinnon

18    name and phone number on there?

19 A. Yes.

20 Q. Do you know where he got that information?

21 A. He got the Kersten name from the article.  I'm not

22    sure where he got the other from.  Phone number

23    would be easy to get.

24 Q. Sure.

25      Did you and your husband discuss this?

1    STATE OF WISCONSIN)

2    MILWAUKEE COUNTY  )

3                    I, JANET LARSEN, a Notary Public in and

4    for the State of Wisconsin, do hereby certify that the

5    deposition of MARLEEN LAPLANT was taken before me,

6    under and pursuant to Section 804 of the Wisconsin

7    Statutes and the acts amended, on the 9th day of

8    September, 2009.

9                    That before said witness testified,

10   she was first duly sworn by me to testify the truth.

11                   That I am not a relative or employee or

12   attorney or counsel of any of the parties, or a

13   relative or employee of such attorney or counsel, or

14   financially interested directly or indirectly in this

15   action, and I have not entered into a contract for

16   court reporting services unless the contract is limited

17   to a particular action or incident as stated in

18   Wisconsin Act 227.

19                   That the foregoing pages is a true and

20   correct transcription of my original shorthand notes

21   taken at said time and place.

22                   Dated this 15th day of September, 2009
                     at Milwaukee, Wisconsin.
23
                     _____
24                   JANET DONALDSON LARSEN
                     REGISTERED PROFESSIONAL REPORTER
25                   NOTARY PUBLIC, STATE OF WISCONSIN
                     MY COMMISSION EXPIRES 3-28-10

# Dividend Interest Rates vs. Current Rate Annuity Credit Rates

| Year | Life | Pre-MN | CRA* |
|------|------|--------|------|
| 1982 | 10.15% | 9.75% | -- |
| 1983 | 11.00% | 10.85% | -- |
| 1984 | 11.15% | 11.00% | -- |
| 1985 | 11.15% | 11.15% | -- |
| 1986 | 11.25% | 11.00% | 8.25% |
| 1987 | 11.00% | 10.75% | 6.25% |
| 1988 | 10.25% | 10.75% | 7.50% |
| 1989 | 10.00% | 10.75% | 8.50% |
| 1990 | 10.00% | 10.00% | 7.75% |
| 1991 | 10.00% | 10.00% | 7.40% |
| 1992 | 9.25% | 9.50% | 5.50% |
| 1993 | 9.25% | 8.50% | 5.40% |
| 1994 | 8.50% | 7.50% | 4.50% |
| 1995 | 8.50% | 7.00% | 7.30% |
| 1996 | 8.50% | 7.00% | 4.65% |
| 1997 | 8.50% | 6.50% | 5.35% |
| 1998 | 8.80% | 6.50% | 5.20% |
| 1999 | 8.80% | 6.50% | 4.50% |
| 2000 | 8.80% | 6.50% | 6.25% |
| 2001 | 8.80% | 6.50% | 5.45% |
| 2002 | 8.60% | 6.25% | 4.20% |
| 2003 | 8.20% | 5.75% | 3.00% |
| 2004 | 7.70% | 5.00% | 2.15% |
| 2005 | 7.50% | 4.65% | 2.60% |
| 2006 | 7.50% | 4.35% | 3.65% |
| 2007 | 7.50% | 4.35% | 4.00% |
| 2008 | 7.50% | 4.35% | 3.50% |
| 2009 | 6.50% | 4.35% | 3.25% |
| 2010 | 6.15% | 4.45% | 1.85% |
| 2011 | 6.00% | 4.60% | 1.25% |

\* For January new issues ($50,000 size contract).

TRIAL
EXHIBIT
528

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

        Plaintiffs,

    v.                                 Case No. 2:11-CV-00910

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, a
Wisconsin mutual insurance corporation,

        Defendant.

## AFFIDAVIT OF JASON T. KLAWONN

STATE OF WISCONSIN )
                       ) ss
MILWAUKEE COUNTY )

    I, Jason T. Klawonn, being first duly sworn under oath, depose and state:

1.    I am an adult resident of Kenosha, Wisconsin, and I am employed by defendant, Northwestern Mutual.

2.    I was appointed vice president of Northwestern Mutual on June 1, 2012. In my position as vice president – actuary, I have responsibility for actuarial life insurance functions, reinsurance programs, and dividend scale process oversight. Prior to my current role, I had responsibility for the methods, tools and assumptions used to price life insurance products, life and annuity experience studies, dividend scale process coordination and illustration testing. I started with Northwestern Mutual in 1996 and have held various positions during my career

with Northwestern Mutual.  Before joining Northwestern Mutual, I worked at the Principal Financial Group from 1990 to 1996.  I graduated from Drake University with a bachelor's degree in Business Administration and a major in actuarial science.  I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries.

3.    I am familiar with the manner in which Northwestern Mutual (the Company) calculates dividends for its policyholders.

4.    Northwestern Mutual has only one divisible surplus, which is determined each year.  All dividends paid to the Company's policyholders, including those paid to all holders of Northwestern Mutual's pre-MN series annuities, have been paid from the divisible surplus of the Company.

5.    Broadly speaking, "surplus" represents that portion of the Company's assets that are in excess of its liabilities.  "Divisible surplus" refers to that portion of the Company's surplus that the Company determines should be distributed to policyholders, rather than being retained by the Company to maintain its financial strength and stability.

6.    Determining the appropriate amount of surplus to be retained by the Company is a time-consuming, detailed and complicated process that requires the expertise and judgment of the Actuarial Department, management and the Board of Trustees.

7.    Northwestern Mutual determines the amount that it will retain as surplus annually by first determining the appropriate level of reserves.  Reserves are for liabilities of the Company and represent the present value of the contractual benefit obligations of the Company, less the present value of future premiums.

8.    Next, the Company determines its additional liabilities.  Once total liabilities are assessed, the Company balances those liabilities against its assets.

9.      The Company then engages in analysis to determine the appropriate level of surplus needed to protect against various contingencies and to provide for the future growth of the Company. Based upon the ongoing work of the Actuarial Department, the Controller's department, various investment departments, and the recommendations of the Management Committee, the Board of Trustees annually determines what amount of surplus should be retained by the Company, what amount is available to be distributed to policyholders, and how those distributions should be allocated among the Company's participating policyholders as dividends.

10.     One component of dividends issued to policyholders is the dividend interest rate (DIR). The DIR can vary based on, among other things, the type of policy. For example, the DIR for pre-MN annuities and whole life insurance policies have differed, even prior to the change in the method for calculating dividends for pre-MN annuities at issue in this litigation (the 1985 Change).

11.     Prior to the 1985 Change, in years where the DIR for pre-MN annuities differed from the DIR for life insurance policies the DIR for pre-MN annuities was typically lower than the life insurance DIR.

12.     The reason the DIR differed for pre-MN annuities and life insurance policies prior to the 1985 change was because the Company applied different charges to annuity and life policies prior to the 1985 Change, a practice that, to my understanding, plaintiffs do not contend was improper.

13.     Altering the Company's dividend determinations, either retrospectively or prospectively, upsets decisions of the Board of Trustees that are fundamental to how the Company operates. For example, if a policyholder claims that his policy and the policy group to which it belongs should have received greater dividends, there are only two sources from which additional dividends can come: (1) from retained surplus, in which case the

Company pays out more than was set as prudent by the Board; or (2) from already existing divisible surplus, in which case it must be reallocated away from some other group by an allocation different from the Board's determination.

14. The process of allocating divisible surplus is a zero sum game. If pre-MN annuity policyholders are to receive a greater share of divisible surplus, then other series and types of policies will either receive less, or the Company will retain less surplus than the Board determined was prudent. The economic interests of different groups conflict over these types of changes.

15. A judgment in this case requiring the Company to pay damages based upon a higher past and future dividend rate for pre-MN annuitants as well as possibly punitive damages could be contrary to the economic interests of the Company's other policyholders such as life insurance policyholders. For example, a judgment of $200,000,000 or more would impact the amount of available divisible surplus and would lower future life insurance policy dividends, including lowering the dividends for most if not all the approximately 4,600 putative class members who currently own Northwestern Mutual life insurance policies.

Dated at Milwaukee, Wisconsin this 27 day of June, 2013.

_Jason T. Klawonn_
Jason T. Klawonn

Subscribed and sworn to before me
this 27 day of June, 2013.

_Rodel Schmidt_
Notary Public, State of Wisconsin
My commission: is Permanent

4847-4794-2420, v. 1

App. 300

Unpublished Disposition

298 Wis.2d 247
See Rules of Appellate Procedure, Rule 809.23(3),
regarding citation of unpublished opinions.
Unpublished opinions issued before July 1, 2009, are
of no precedential value and may not be cited except
in limited instances. Unpublished opinions issued on
or after July 1, 2009 may be cited for persuasive value.
NOTE: THIS OPINION WILL NOT APPEAR
IN A PRINTED VOLUME. THE DISPOSITION
WILL APPEAR IN A REPORTER TABLE.
Court of Appeals of Wisconsin.

Catherine D. NOONAN and Daniel
A. Noonan, Plaintiffs–Appellants,

v.

The NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, Doe A; Doe
B; Doe C; Insurer X; Insurer Y and
Insurer D, Defendants–Respondents.

No. 2005AP1683.    |    Nov. 16, 2006.

Appeal from an order of the circuit court for Milwaukee
County: Earl Schmidt, Judge. Affirmed.

Before DYKMAN, DEININGER and HIGGINBOTHAM,
JJ.

**Opinion**

¶ 1 DYKMAN, J.

 **\*1** Catherine and Daniel Noonan (Noonans) appeal from
an order denying their motion for class certification in their
action for breach of contract and breach of fiduciary duty
against The Northwestern Mutual Life Insurance Company
(NML). Noonans contend that the circuit court erroneously
denied class certification because, on the facts in the record,
all three criteria for class certification are met and no facts
indicate a class action would be unmanageable. We conclude
that the circuit court's decision to deny class certification,
because a class action would be unmanageable, is supported
by the record, and is not an erroneous exercise of discretion.
Accordingly, we affirm.

*Background*

¶ 2 The following facts are taken from the circuit court's
decision to deny class certification.[1] NML sells financial
instruments, such as annuities and life insurance policies,
through independent agents throughout the United States. In
1976, Noonans purchased NML annuity contracts through
one of NML's agents, Daniel Madigan. The contracts
provided Noonans with a share of the divisible surplus of
NML, called "dividends."

¶ 3 When Noonans purchased their annuity contracts, most
of NML's financial instruments were invested in long-term
securities. However, in the early 1980s, high interest rates
caused some NML annuity owners to redeem their annuities
because short-term bonds were more lucrative. Because their
portfolio was uncompetitive in that market, in the mid–
1980s NML altered the basis for paying dividends for their
annuities, creating a "segmented account" that paid dividends
using a higher interest rate.

¶ 4 Noonans allege they first realized a change had been made
in the distribution of dividends for their NML annuities in
2000. They sued NML for breach of contract and breach of
fiduciary duty, seeking actual and punitive damages. After
we reversed the circuit court's judgment and order granting
NML's motion to dismiss, *see Noonan v. Northwestern Mut.
Life Ins. Co.,* 2004 WI App 154, ¶ 2, 276 Wis.2d 33, 687
N.W.2d 254, Noonans moved for class certification. The
parties briefed and argued the issue of class certification to
the circuit court, which denied the motion. Noonans appeal
from the denial of class certification.[2]

*Standard of Review*

¶ 5 We review a circuit court's denial of class certification
for an erroneous exercise of discretion.[3] *Sisters of St.
Mary v. AAER Sprayed Insulation,* 151 Wis.2d 708, 713,
445 N.W.2d 723 (Ct.App.1989) (citation omitted). "A trial
court properly exercises its discretion if it examines the
relevant facts, applies a proper legal standard and, using a
demonstrated rational process, reaches a conclusion that a
reasonable judge could reach." *Id.* (citation omitted). A proper
exercise of discretion relies on facts in the record or inferences
reasonably derived from the record. *Goberville v. Goberville,*
2005 WI App 58, ¶ 7, 280 Wis.2d 405, 694 N.W.2d 503

(citation omitted). Further, while a circuit court is required to articulate its reasoning, we may look to the record to find support for the circuit court's decision if that reasoning is not clear. *Id.* (citing *Vier v. Vier,* 62 Wis.2d 636, 639–40, 215 N.W.2d 432 (1974)).

¶ 6 We are not persuaded by Noonans's recitation of federal cases demonstrating that some federal circuits give less deference to denials of class certification than other discretionary decisions. *See, e.g., Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993) (concluding that "abuse of discretion can be found more readily on appeals from the denial of class status than in other areas, for the courts have built a body of case law with respect to class action status") (citation omitted). We rely on Wisconsin case law, which compels us to grant a circuit court's findings as to the manageability of a class action "a wide range of discretion." *Sisters of St. Mary,* 151 Wis.2d at 714, 445 N.W.2d 723 (citation omitted).

**\*2** ¶ 7 We uphold a circuit court's discretionary decision unless discretion was erroneously exercised, even if the trial court did not make its reasoning clear and even if we would have reached a different decision ourselves. *See, e.g., Vier,* 62 Wis.2d at 641, 215 N.W.2d 432 (affirming circuit court even though it did not explain the reason for its decision and even though supreme court may have reached a different decision in its place, because circuit court's decision was not unreasonable).

### Discussion

¶ 8 Under WIS. STAT. § 803.08, a party seeking class certification must establish three elements: commonality, numerosity, and adequate representation. *See Sisters of St. Mary,* 151 Wis.2d at 713–14, 445 N.W.2d 723. In deciding whether to certify a class, the circuit court also addresses the basic question of manageability, determining "whether the advantages of disposing of the entire controversy in one proceeding are outweighed by the difficulties of combining divergent issues and persons." *Id.* at 714, 445 N.W.2d 723 (citations omitted). If all three elements of class certification are met, it is in the public interest to certify the class. *Id.* (citing *Mercury Records v. Econ. Consultants,* 91 Wis.2d 482, 490, 283 N.W.2d 613 (Ct.App.1979)). However, even if all three elements of class certification are met, a circuit court may deny certification if it reasonably determines that the case would be unmanageable as a class action. *Id.* at 715, 445

N.W.2d 723. Here, the parties do not dispute that the elements of numerosity and adequacy are met. They argue over whether commonality is met and whether the circuit court properly determined that the case would be unmanageable as a class action. We conclude that the court's decision that a class action would be unmanageable in this case is supported by the facts in the record, and that it therefore properly exercised its discretion when it denied class certification. [4]

¶ 9 The determination of manageability is "primarily a factual one with which a [trial] court generally has a greater familiarity and expertise than does a court of appeals." *Id.* at 714, 445 N.W.2d 723. A circuit court, in determining class certification, must resolve "whether, considering the effect of all of the burdens [of class certification] together, which includes any synergistic effect those burdens may have, the burdens of a class action outweigh the benefits." *Id.* at 716, 445 N.W.2d 723. The court may consider difficulties it anticipates during discovery, trial, and jury verdict in reaching its decision on manageability. *See iid.* at 716–19.

¶ 10 Here, the circuit court identified choice of law and damages issues for plaintiffs from all fifty states who obtained their annuities under disparate scenarios as contributing to the unmanageability of a class action. Noonans argue that the circuit court erroneously relied on those factors and failed to weigh the potential benefits of a class action in determining that a class action would be unmanageable. We disagree.

**\*3** ¶ 11 Noonans first contest the circuit court's reliance on its finding that multiple states' laws may apply to various aspects of this case in determining that a class action would be unmanageable. [5] They argue that the circuit court's reliance on choice of law issues as a factor against class certification was an error of law because Wisconsin case law mandates that Wisconsin law apply to each issue in this case, relying on *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 270 Wis.2d 356, 677 N.W.2d 298. We disagree.

¶ 12 In *Beloit,* the supreme court concluded that, under WIS. STAT. § 180.1704 (1999–2000) and Wisconsin case law, Wisconsin law applied to an action for breach of fiduciary duty by a liquidating trust against a corporation incorporated in Delaware but domiciled in Wisconsin. *Beloit,* 270 Wis.2d 356, ¶¶ 1–3, 677 N.W.2d 298. In reaching that conclusion, the *Beloit* court first held that § 180.1704 put the Delaware corporation on notice that it would be subject to Wisconsin law if it transacted business in Wisconsin. *Id.,* ¶ 23. Then, the court explained that Wisconsin case law sets out two

tests for determining choice of law. First, courts look to "whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling." *Id.,* ¶ 24 (citation omitted). Then, courts analyze the five factors set forth in *Heath v. Zellmer,* 35 Wis.2d 578, 595, 151 N.W.2d 664 (Ct.App.1967): "(1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." *Id.,* ¶ 25, 151 N.W.2d 664. The *Beloit* court concluded that both tests supported applying Wisconsin law. *Id.,* ¶¶ 24–32.

¶ 13 We are not convinced that *Beloit* mandates Wisconsin law apply uniformly in this case. First, neither test is as clearly met here as in *Beloit.* In *Beloit,* the first test was met because the corporation's contacts with Delaware were limited to incorporation and filing bankruptcy there while every other significant event occurred in Wisconsin, so that "application of Delaware law ... would constitute officious intermeddling with the laws of Wisconsin." *Id.,* ¶ 24. Here, in contrast, the putative class contains members who purchased annuities in all fifty states, from independent agents. Thus, the contacts of foreign states are not so minimal here as to exclude their laws as "officious intermeddling." The court also relied on the corporation's minimal contact with Delaware and its extensive contact with Wisconsin in concluding all five *Heath* factors were met. *Id.,* ¶¶ 26–31, 151 N.W.2d 664. Because the putative class members in this case are domiciled and purchased their annuities from agents in all fifty states, the *Heath* factors do not weigh as heavily toward the application of Wisconsin law as they did in *Beloit.* [6]

¶ 14 Noonans also rely on *Schlosser v. Allis–Chalmers Corp.,* 86 Wis.2d 226, 239, 271 N.W.2d 879 (1978) (*Schlosser II* ), in which the supreme court stated that Wisconsin "follows the 'grouping of contacts' approach to determine which state law applies to resolve questions of contract. By this method the law of the state with which the contract has its most significant relationship applies." [7] Noonans contend that because NML is a Wisconsin company, has its home office here, and manages annuities here, Wisconsin has the most significant relationship to the contracts in this case and thus Wisconsin law controls. However, as the circuit court noted, this case is distinguishable from *Schlosser II.* Here, each putative class member individually purchased their annuities, while in *Schlosser II,* the life insurance policy was issued as a term of employment. *See Id.* While the plaintiff class members in *Schlosser II* lived and worked in various states, they were all

subject to the same master insurance plan purchased by Allis–Chalmers for their benefit. *Id.* at 235, 239–41, 271 N.W.2d 879. They all received the same letter notifying them of the change in their benefits. *Id.* at 235, 271 N.W.2d 879. Further, the *Schlosser II* court relied on the following comment in the Second Restatement of Conflict of Laws:

**\*4** *h. Group life insurance.* In the case of group life insurance, rights against the insurer are usually governed by the law which governs the master policy. This is because it is desirable that each individual insured should enjoy the same privileges and protection. So where an employer arranges for group life insurance for its employees, the rights of a particular employee against the insurer will usually be determined, in the absence of an effective choice-of-law clause and at least as to most issues, not by the local law of the state where the employee was domiciled and received his certificate but rather by the law governing the master policy with respect to that issue. This will usually be the state where the employer has his principal place of business.

*Id.* at 239–40 n. 2, 271 N.W.2d 879 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 192 cmt. h (1971)). Here, there are more significant contacts with the various states involved than in *Schlosser II,* and thus a "grouping of contacts" inquiry requires a more arduous judicial task and its result is less certain.

¶ 15 In addition, the *Schlosser II* court identified the following five factors from § 188 of the Second Restatement following its explanation of the "grouping of contacts" rule: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188). Because the contracts at issue here were negotiated and purchased in various states and the putative class members continue to reside there, these factors do not clearly establish that Wisconsin law applies.

¶ 16 Noonans also contend that Wisconsin's statute of limitations necessarily applies to all class members, and therefore any concern the circuit court had over the application of various statutes of limitation was erroneous. [8] Noonans rely on *Abraham v. General Cas. Co. of Wisconsin,* 217 Wis.2d 294, 576 N.W.2d 46 (1998), which explains the "final significant event" test for determining which state's statute of limitations will apply for an action sounding in

contract. [9] The *Abraham* court concluded that "a claim sounding in contract is a 'foreign cause of action' when the final significant event giving rise to a suable claim occurs outside the state of Wisconsin." *Id.* at 311, 576 N.W.2d 46. There, Abraham was a Wisconsin resident with an insurance policy issued by General Casualty, a Wisconsin corporation. *Id.* at 306, 576 N.W.2d 46. The insurance contract was negotiated and issued in Wisconsin. *Id.* The only event that occurred outside of Wisconsin was the injury for which Abraham sought insurance coverage. *Id.* at 299–300, 576 N.W.2d 46. The *Abraham* court concluded that the Wisconsin statute of limitation applied because Abraham had a "suable claim" for breach of contract when General Casualty denied his claim for underinsured motorist benefits in Wisconsin, rather than when he was injured in Florida. *Id.* at 312–13, 576 N.W.2d 46.

**\*5** ¶ 17 *Abraham,* however, is distinguishable on its facts. Abraham had a cause of action when his benefits were denied. That occurred entirely in Wisconsin. General Casualty denied the benefits and Abraham was notified of that denial in Wisconsin. There was no complexity in determining that the "final significant event" giving rise to his suable claim thus occurred in Wisconsin. Here, the facts are more varied. The putative class members reside in all fifty states. Their suable claims arose when NML breached their contracts, if it did. But where, and when, did this "final significant event" occur? We, and the circuit court, are left with the ambiguity discussed in the concurring opinion in *Abraham:*

> Does [the final significant event] occur in the state where the party in breach is located? Does it occur in the state wherein the injured party resides? Does it occur in the state where the ... contract was negotiated or purchased? Does it occur in the state from which the breach is communicated?

*Id.* at 315, 576 N.W.2d 46 (Bradley, J., concurring). The circuit court reasonably identified the resolution of such questions as to each putative class member, and the application of potentially differing statutes of limitations, as an obstacle to class certification. [10] The varied factual scenarios under which the plaintiffs entered into their contracts and then learned of NML's breach provide support for the court's conclusion that the potential application of various statutes of limitation contributed to the unmanageability of a class action.

¶ 18 Thus, Wisconsin law would not clearly apply to each aspect of a class action in this case, as the Noonans contend. On the motion for class certification, the parties briefed and argued the issue of which state's laws would apply, and the circuit court reasonably found that the varied factual scenarios for each putative class member rendered the determination and application of choice of law for all putative class members unmanageable. For example, as NML argues, whether NML owed each plaintiff a fiduciary duty would vary depending on the applicability of individual state laws. [11] As we held in our previous decision in this case, Noonans's allegations state a claim for breach of fiduciary duty under Wisconsin law. *Noonan,* 276 Wis.2d 33, ¶¶ 19–26, 687 N.W.2d 254. Whether the other putative class members state a claim for breach of fiduciary duty under their respective state laws has not yet been decided. *See id.* (relying on Wisconsin law in determining that NML owes Noonans a fiduciary duty). If other states' laws control the breach of fiduciary duty claim in this case, the application of those potentially differing laws would certainly render this case unmanageable. *See, e.g., Sisters of St. Mary,* 151 Wis.2d at 718, 445 N.W.2d 723.

**\*6** ¶ 19 Also, the circuit court recognized that the application of different states' laws to the putative class members' breach of contract claims would prove unmanageable. [12] As NML correctly asserts, the states have widely differing rules for the interpretation of contracts, most significantly concerning parol evidence. [13] Thus, the determination of which state's laws apply for the interpretation of the contracts at issue, and the resulting application of those rules to the contracts of each putative class member, was a reasonable factor for the circuit court to consider. [14]

¶ 20 Because it is not clear from the record that Wisconsin law definitively controls, the circuit court was justified in identifying the forgoing choice of law concerns as rendering a class action unmanageable. [15] We therefore conclude that it did not erroneously exercise its discretion in relying on this factor.

¶ 21 Noonans also contend that the circuit court erred by considering individual agent/plaintiff relationships as relevant to a determination of individual damages. They contend that the cases on which the circuit court relied were limited to claims for fraudulent misrepresentation, thus necessitating an analysis of individual sales, while here the conduct of the home office, not the individual agents, is

relevant. We conclude that the trial court correctly identified individual interactions between agents and purchasers as relevant to a determination of damages for Noonans's claims for breach of contract and breach of fiduciary duty. [16]

¶ 22 Contrary to Noonans's assertion, the federal cases on which the circuit court relied were not limited to actions for fraudulent misrepresentation. In *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 275–77 (W.D.Mo.2000), for example, the court found that the plaintiff's claims were too individualized and fact specific to support class certification for claims including fraudulent inducement, breach of fiduciary duty, and breach of contract in connection with the defendant's sale of life insurance policies. The court explained that individual agent/purchaser interactions would be relevant to proving reliance in the fraudulent inducement claim, and would also be necessary for proving the existence of a fiduciary duty and interpreting the ambiguous insurance contract. *Id.* at 277–82.

¶ 23 In *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 219 (W.D.Mich.1998), the court denied class certification for plaintiffs' claims, including their claims for fraud, breach of fiduciary duty, and breach of contract for the defendant's sale of misleading insurance policies. The court found that class certification was inappropriate under FED.R.CIV.P. 23(b)(3) because plaintiffs had "failed to show that the disparate legal and factual issues posed by this case are manageable in trial." *Id.* at 223. In reaching this conclusion, the court explained that the class action would require introduction of agent/purchaser interactions, because "the information ... was generally communicated to consumers, if at all, through varying oral representations," so that "adjudication of the claims will ... unavoidably require individualized treatment." [17] *Id.* at 224.

 *7 ¶ 24 Here, the court found that a class action would entail the introduction of an unmanageable amount of evidence of agent/purchaser interactions to determine damages and affirmative defenses. [18] The circuit court had sufficient material from which to conclude that individual agent/purchaser interactions would need to be introduced during trial to determine damages, based on the varied factual scenarios under which individual plaintiffs obtained annuities and learned of the alleged breach. [19] Because the circuit court explained the factors it considered in determining the issue of individual damages would render a class action unmanageable, and reached a decision a reasonable judge

could reach, we conclude it did not erroneously exercise its discretion in relying on this factor.

¶ 25 Further, Noonans assert that the circuit court erroneously disregarded the "common fund" method typically used in class actions in finding that the jury would have to determine damages as to each individual plaintiff. In support, Noonans argue that *Schlosser v. Allis–Chalmers Corp.,* 65 Wis.2d 153, 168–72, 222 N.W.2d 156 (1974) (*Schlosser I*), compels class certification in this case. *Schlosser I,* however, is inapposite. In *Schlosser I,* the supreme court upheld the circuit court's determination that a class action could be maintained. *Id.* The *Schlosser I* court concluded that the circuit court reasonably certified the class because it could easily resolve the issue of separately triable damages, and accordingly affirmed. Here, Noonans urge us to reverse the circuit court's denial of class certification, arguing that its finding that the potentially disparate damage awards contributed to the unmanageability of a class action was unreasonable. As in *Schlosser I,* we conclude that the circuit court's decision was reasonable and we therefore will not disturb it.

¶ 26 The circuit court found that a jury verdict would "inquire as to damages and not as to a formula" and that "[i]ndividual damage awards will have to be fleshed out for the jury." We are not convinced that the court's failure to specifically address a "common fund" method for determining damages for the class means that it erroneously exercised its discretion. Noonans thoroughly argued in their brief to the circuit court on their motion for class certification how they believed damage awards could be easily handled by the circuit court in a class action. [20] However, the circuit court concluded the issue of damages nonetheless contributed to the unmanageability of a class action. [21] A reasonable judge could conclude that despite the availability of case management techniques in determining damages, the complicated factual scenarios in this case under which those damages arose rendered a class action unmanageable. [22] As we explained in *Sisters of St. Mary:*

 *8 "Where the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation, the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials

of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created 'make the damage aspect of [the] case predominate,' and render the case unmanageable as a class action."

The trial court's conclusion that the present case falls into the latter category rather than the former is not unreasonable.

*Sisters of St. Mary's,* 151 Wis.2d at 720–21, 445 N.W.2d 723 (citations omitted).

¶ 27 Noonans also assert any reliance by the circuit court on affirmative defenses or mitigating factors for determining damages—if NML can establish that any putative class members learned of the 1985 change to dividend distribution and accepted it—was erroneous because there was no record to support that finding. We disagree.

¶ 28 In its brief in opposition to class certification, NML argued that some of the putative class members either waived or are estopped from asserting claims because they knew of the 1985 change and accepted it. The record reflects that NML's independent agents had been informed of the change, and that it was the agents' job to communicate information to annuity owners. Thus, it was logical for the circuit court to infer that some agents had communicated the 1985 change in dividend distribution to their clients. If those putative class

members knew of the change and accepted it, this would raise the issue of whether they waived their right to enforce the previous provisions, depending on which state's laws would apply. *See* 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 39:25 (4th ed.2000) (discussing differing states' views on waiver of contract provisions).

¶ 29 Finally, Noonans argue that the circuit court was required to balance the benefits and burdens of class action certification, and here ignored all the benefits in reaching its decision. However, on our review of the record, we conclude that Noonans adequately presented all those benefits to the circuit court for its consideration.[23] On our own review of those benefits and the burdens already explained, we conclude that a reasonable judge could find that class certification was nonetheless unmanageable in this case. Accordingly, we affirm.

  **\*9** Order affirmed.

Not recommended for publication in the official reports.

**Parallel Citations**

726 N.W.2d 356 (Table), 2006 WL 3314622 (Wis.App.), 2007 WI App 1

Footnotes

1    For a more detailed factual background, *see Noonan v. Northwestern Mut. Life Ins. Co.,* 2004 WI App 154, ¶¶ 3–9, 276 Wis.2d 33, 687 N.W.2d 254.

2    We granted Noonan's petition for leave to appeal the denial of class certification pursuant to WIS. STAT. § 808.03(2) (2003–04). All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

3    Noonans concede that the standard of review for a denial of class certification is for an erroneous exercise of discretion, but assert that discretionary determinations based on erroneous views of the law are not given any deference. *See Consumer's Co–Op of Walworth County v. Olsen,* 142 Wis.2d 465, 473, 419 N.W.2d 211 (1988). This correctly states the erroneous exercise of discretion standard of review, but does not convince us to change that standard to a less deferential one. Because we conclude that the legal criteria for class certification were properly identified and applied to the facts in this case, we do not further question the circuit court's exercise of its discretion.

4    The circuit court said, in denying class certification: "Because the jury trial to determine the issues of breach of contract, breach of fiduciary duty, punitiveness and concomitant damages will not be manageable as a class action, the Court denies the motion." The court's ruling on commonality is not clear. However, because a court may deny certification because of unmanageability even if all the criteria for certification are met, the circuit court's denial of certification on a reasonable finding of unmanageability is dispositive. *See Sisters of St. Mary,* 151 Wis.2d at 715, 445 N.W.2d 723; *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 277 n. 5 (W.D.Mo.2000); *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 220 (W.D.Mich.1998); *Keyes v. Guardian Life Ins. Co. of Am.,* 194 F.R.D. 253, 256 (S.D.Miss.2000); *Parkhill v. Minnesota Mut. Life Ins. Co.,* 188 F.R.D. 332, 340 (D.Minn.1999). Thus, we need not determine whether commonality was met.

5    The parties do not contest that the policies at issue do not have a choice of law provision, and thus choice of law must be determined by case law.

6    We need not extensively analyze each factor under *Heath v. Zellmer*, 35 Wis.2d 578, 595, 151 N.W.2d 664 (Ct.App.1967), nor conclude which state's laws will apply to which issues in this case. For the purposes of concluding that the circuit court reasonably identified choice of law issues as contributing to the unmanageability of a class action, it suffices for us to distinguish this case from *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 270 Wis.2d 356, 677 N.W.2d 298, because this case is much less clearly governed solely by Wisconsin law.

7    As highlighted during oral arguments to this court, which test to follow when deciding choice of law in Wisconsin is less than clear. In *Schlosser v. Allis–Chalmers Corp.,* 86 Wis.2d 226, 239–40, 271 N.W.2d 879 (1970) (*Schlosser II* ), for example, the court stated it followed the "grouping of contacts" test but also relied on the five *Heath* factors. However, we need not resolve the state of choice of law in Wisconsin today. We conclude that under the various tests for choice of law identified and argued by the parties, the circuit court did not erroneously exercise its discretion in relying on choice of law concerns in deciding a class action would be unmanageable.

8    The court said: "NML has concerns about the applicability of the other state laws. Noonans argue that the laws of the forty-nine other states where the contracts were actually sold are not relevant. Statutes of limitation, for example, may very well be relevant."

9    *Abraham v. General Cas. Co. of Wisconsin,* 217 Wis.2d 294, 296 n. 1, 576 N.W.2d 46 (1998) interpreted Wisconsin's borrowing statute, which states:

> **Application of foreign statutes of limitation. (1)** If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies has expired, no action may be maintained in this state.
>
> **(2)** If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies to that action has not expired, but the applicable Wisconsin period of limitation has expired, no action may be maintained in this state.
>
> *Id.*(quoting WIS. STAT. § 893.07 (1993–1994), which is identical to the current version).

10   *See, e.g.,* COLO.REV.STAT. ANN. § 13–80–101 (West 2006) (three-year statute of limitations for breach of contract in Colorado); CAL. CIV. PRO.CODE § 337 (West 2006) (four-year statue of limitation for breach of contract in California).

11   We note that the circuit court did not explain this reasoning for its decision. However, it did specifically find that a jury trial to determine breach of fiduciary duty would be unmanageable and later qualified its concern with choice of law for statutes of limitations with the phrase "for example," indicating other choice of law concerns were present. We conclude that such concerns were reasonable, and applied to the issue of fiduciary duties.

12   The court concluded that a jury trial to determine breach of contract would be unmanageable, and later said: "The Noonans also made shortshrift of other concerns NML has over commonality regarding equitable remedies the law has developed to take the harshness out of unambiguous contracts, e.g. waiver, estoppel, etc. These remedies may be applicable to any number of the proposed class depending on their individual facts." After stating its concern over choice of law issues, the court said: "The Court is not aware what the adversarial strategies of the parties will be, but it is more likely than not that many fact situations between clients and independent agents will be material and probative." While the court's reasoning is not clear from its opinion, we conclude on our own review of the record that the court was reasonable in concluding that the potential application of differing state laws to the interpretation of the contracts at issue contributed to the unmanageability of a class action.

13   We have decided that, under Wisconsin law, the Noonans's contracts are unambiguous in stating "that annuity policyholders 'will share in the divisible surplus of the Company' and the 'share shall be determined annually and credited as a dividend,' " and thus Noonans state a claim for breach of contract in their complaint. *Noonan,* 276 Wis.2d 33, ¶ 17, 687 N.W.2d 254. However, the states have developed different tests for determining whether a contract is ambiguous, and thus the absence of ambiguity under Wisconsin law does not necessarily translate into the absence of ambiguity if other states' laws apply. *See, e.g., Dieter v. Chrysler Corp.,* 2000 WI 45, ¶ 15, 234 Wis.2d 670, 610 N.W. 2. 832 ("Contractual language is ambiguous only when it is reasonably and fairly susceptible to more than one construction.") (citation omitted); *Bunkers v. Jacobson,* 653 N.W.2d 732, 738 (S.D.2002) ("Ambiguity exists when [the contract] is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.") (citation omitted); *Petovello v. Murray,* 139 Mich.App. 639, 362 N.W.2d 857, 858 (Mich.Ct.App.1984) ("It is a fundamental principal of law that, if the language of a written contract is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous, and a factual development is necessary to determine the intent of the parties."). Furthermore, the states have developed differing laws on the use of extrinsic evidence to help interpret contracts. *See, e.g., Jake C. Byers, Inc. v. J.B.C. Invs.,* 834 S.W.2d 806, 811 (Mo.Ct.App.1992) ("In the absence of fraud, accident, mistake, or duress, the parol evidence rule prohibits evidence of prior or contemporaneous oral agreements which vary or contradict the terms of an unambiguous, final and complete writing.") (citations omitted); *Mercury Inv. Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 529 (Okla.1985) ("While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of the agreement.") (citations omitted); *Hibbett Sporting Goods, Inc., v. Biernbaum,* 375 So.2d 431, 434 (Ala.1979) ("Where there exists doubt that the written agreement was ever intended to reflect the full agreement of the parties, the courts of this State have not hesitated to admit contradictory parol evidence of their true agreement.") (citations omitted).

14    We are not convinced by Noonans's assertion that the court was required to disregard the individual purchases of contracts and focus solely on the similarity of contract language among all putative class members. The circumstances under which each putative class member purchased annuities and where each "final significant event" occurred is relevant under Wisconsin law for determining which state's law to apply to a breach of contract claim. *See Abraham,* 217 Wis.2d at 315, 576 N.W.2d 46 (Bradley, J., concurring); *Schlosser II,* 86 Wis.2d at 239 n. 2, 271 N.W.2d 879.

15    The parties disagree over whether punitive damages are also a potential choice of law issue. Noonans contend that punitive damages are necessarily controlled by Wisconsin law while NML contends that they are not, claiming that such damages would be available under some states' laws and not others. We need not resolve this issue. The circuit court's order denying class certification does not appear to consider punitive damages as a potential choice of law concern. Rather, the court specifies its concern over punitive damages as the issue of individual determinations, citing recent Wisconsin cases.

16    Manageability under WIS. STAT. § 803.08 mirrors the question of manageability under FED.R.CIV.P. 23(b)(3). *Sisters of St. Mary,* 151 Wis.2d at 713–14, 445 N.W.2d 723. The circuit court thus correctly relied for guidance on federal cases discussing class certification under FED.R.CIV.P. 23(b)(3).

17    *See also Parkhill,* 188 F.R.D. at 335, 342–45 (denying class certification for plaintiff's claims for breach of contract and breach of Minnesota's consumer protection statutes because both claims would require evidence of individual contract purchases).

18    The court was "especially concerned with the punitive damages question and award," noting that recent Wisconsin cases may indicate higher evidentiary standards for the defense of punitive damages. *See, e.g., Strenke v. Hogner,* 2005 WI 25, ¶¶ 38–41, 279 Wis.2d 52, 694 N.W.2d 296 (concluding that punitive damages in Wisconsin require that the defendant's actions were "deliberate," "actually disregard[ed] the rights of the plaintiff," and were "sufficiently aggravated to warrant punishment by punitive damages," thus requiring evidence establishing punitive damages are warranted by clear and convincing evidence). (Citations omitted.) Noonans contend that this is a non-issue because punitive damages are only available in Wisconsin on the breach of fiduciary duty claim, not on the claim for breach of contract, and focus exclusively on the actions of the top management. We again note that this argument fails because this case is not clearly governed solely by Wisconsin law. Further, we do not analyze this concern of the trial court in isolation, but together with the other burdens to class certification. In their entirety, those burdens support the circuit court's decision to deny class certification.

19    Both parties submitted documents detailing the method by which dividends were originally distributed under the Noonans's annuities and how the 1985 change affected dividend distribution. As already noted, the parties also agreed that the putative class contained members from all fifty states and that each purchased their annuities from independent agents.

20    Noonans argued:

> If the class makes a recovery by settlement or judgement, administration of the recovered fund occurs, in which the formula and procedure for distribution of the recovery among the class members are determined and implemented. 5 Newberg, ch. 10, 11. The administration and distribution process is usually handled by a court-appointed administrator.
>
> ....
>
> Any dollar differential between amounts due annuities, including both those still in the "deferral" period and those which have terminated or reached maturity since March 1, 1985, would in the normal course be recognized in the distribution formula applied in the administration of any Class recovery.

21    While the circuit court did not explain its analysis of those available methods for managing damages among the putative class, we conclude that is not fatal to its decision. We may look beyond the actual decision for support for a circuit court's exercise of its discretion. *See Vier v. Vier,* 62 Wis.2d 636, 639–40, 215 N.W.2d 432 (1974).

22    We also note that a circuit court may reasonably deny class certification despite the availability of case management techniques. *See Sisters of St. Mary,* 151 Wis.2d at 718, 445 N.W.2d 723.

23    Noonans argued:

> The actions of NML complained of here were directed against the Class, not individually against the named plaintiffs or any other individual member of the Class. The dividend rights of the entire Class were adversely impacted in the same, class-wide way. There are far too many injured annuity owners to even consider separate actions. The rights of the Class are in good hands. It would be unjust and against the public interest to deny class certification in these circumstances.

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 6216361 (Wis.Cir.) (Trial Order)
Circuit Court of Wisconsin.
Milwaukee County

Catherine D. NOONAN and Daniel A Noonan, Plaintiffs,

v.

THE NORTHWEST MUTUAL LIFE INSURANCE COMPANY, Doe
A; Doe B; Doe C; Insurer X; Insurer Y and Insurer D, Defendants.

No. 01-CV-012349.
July 6, 2005.

**Decision on Motion to Certify for Class Action**

Kersten & McKinnon, S.C., by E. Campion Kersten and George Kersten, for Plaintiffs.

Quarles & Brady, LLP, by Eric J. Van Vugt, for Defendants.

Earl W. Schmidt, Reserve Judge.

*DECISION*

The plaintiffs, Noonans, bring this motion to certify for a class action. The Court has received the parties' briefs and heard argument on March 15, 2005. Because the jury trial to determine the issues of breach of contract, breach of fiduciary duty, punitiveness and concomitant damages will not be manageable as a class action, the Court denies the motion.

*LAW*

Wisconsin does not have many cases dealing with the class action statute, § 803. Wis. Stats. The lead case, *Schlosser v. Allis Chalmers Corp.,* 86 Wis.2d 226,271 N.W. 2d 879 (1978), states that the proposed class must have commonality, numerosity and adequate representation.

In addition, a fourth factor, manageability, is cited in *Cruz v. All Saints Healthcare Systems, Inc.,* 2001 WI App 67, 242 Wis.2d 432, 625 N.W. 2d 344 (Ct. App. 2001).

*FACTS*

The defendant, NML, is a mutual financial institution that offers financial instruments, e.g. annuities, life insurance policies, etc. These instruments are pedaled and sold by independent agents throughout the United States. There are thousands of them. The agents do not exclusively sell NML policies. Noonans purchased NML annuity contracts in 1976 through an agent, Daniel Madigan. The terms of the annuity permitted Noonans to share in the financial performance of the company. Most of NML's instruments were in long-term securities, real estate and business endeavors. In the early 1980's, when interest rates cycled up, perhaps even spiked, some NML annuity holders cashed in their long-term annuities because bank certificates of deposits and other short-term bonds were more remunerative. An officer of NML indicated NML's annuity portfolio was uncompetitive causing clients to surrender contracts and created marketing problems for agents, (deposition of Richard E. Fisher, Plaintiff's exhibit 8, pages 28-30).

In response NML in 1985 or 1986 changed, allegedly unilaterally according to the complaint, the basis for payment of the annual dividends for the annuities by creating a "segmented account" that paid dividends on short-term high interest bonds.

That resulted in a higher return for the annuities for several years, but when interest rates cycled down, the longer-term equities paid more. Noonans allege they first noticed in 2000 that their annuities were worth materially less than they would be had the change not been made.

Noonans contacted their agent, Madigan, who on March 8, 2000 requested of NML an explanation, (Defendant's exhibit M). Prior to receiving a response from NML, Daniel A. Noonan prepared a handwritten log in which he expressed a concern about being "screwed" on this and that Madigan agreed with him stating NML had a right to do it, (Plaintiff's exhibit N).

Consequently, Noonans brought this lawsuit for breach of contract, breach of fiduciary duty and punitive damages. The motion before the Court is to permit them to act on behalf of others, similarly situated, i.e. certification for a class action. [1]

### REASONING

There is no dispute in this case with regard to the competence of Noonans to represent all members of the proposed class. There is no dispute with the numerosity criterion except if the testimony and evidence possessed by many or all of the proposed class is material and probative, and not redundant, then the judicial efficiency purpose of the one class action is defeated. There is a dispute over commonality and manageability.

Noonans appear to argue that the whole question of class action certification begins and ends with NML's alleged unilateral change of the pre 1984-85 annuity contracts. They argue that any distinctions as to individual damages, if any, can be determined by a formula after the trial is over. The Court believes that a proper verdict will inquire as to damages and not as to a formula. Individual damage awards will have to be fleshed out for the jury.

The Court is especially concerned with the punitive damages question and award. The use of the word "screw" is well understood in mechanics as one of the simple machines where an inclined plane moves in a circle. However, when applied to interpersonal human conduct, it becomes the "s" word connoting intentional wrongdoing. This is the domain of punitive damages. [2] The Court granting the question and the jury making the award would want to hear plumbed under oath the factual content of Daniel A. Noonan's conversation with Madigan. And at that point, the Court does not know of any evidentiary rule precluding NML from putting as many independent agent-client conversations before the Court and jury to dispel, if it can, the notion that NML engages in using the circular inclined plane maneuver on those who end up owning its financial instruments. The trier of fact should not be left to speculate how NML is still in business if that is the word on the street and in the mouths of the agents. Noonans argued at the March 15, 2005 hearing that damage concerns at this point are a "red herring." At the jury trial, that will not be a sustainable objection.

The Noonans also made shortshrift of other concerns NML has over commonality regarding equitable remedies the law has developed to take the harshness out of unambiguous contracts, e.g. waiver, estoppel, etc. These remedies may be applicable to any number of the proposed class depending on their individual facts.

NML has concerns about the applicability of the other state laws. Noonans argue that the laws of the forty-nine other states where the contracts were actually sold are not relevant. Statutes of limitation, for example, may very well be relevant.

The Court is not aware what the adversarial strategies of the parties will be, but it is more likely than not that many fact situations between clients and independent agents will be material and probative. The purchasing of an annuity is not like receiving insurance ancillary to employment as in *Schlosser* or the cost of medical records ancillary to medical treatment as in *Cruz*. The majority of other cases cited by plaintiffs in which a class action certification was granted are similar such fact situations. On the other hand, the purchase of an annuity involves big plan, big money and big monitor ever after. And if the testimony can be discovered from twenty years ago and brought to the trial over the inconvenient out state miles, the Court envisions interminable objections and offers of proof, interminable jury in and jury out. The Court thinks as a class action little time will be saved

Further, a one class action suit here will be difficult, if not unworkable, for the jury with a multiple-page verdict on the damage question. In addition to waiver and estoppel concerns, if notice of the 1985-86 change can be shown with regard to certain members of the proposed class, it may raise the issue of mitigation of damages for those individuals. (Defendant's exhibit 6)

Given these concerns, the Court looks for guidance from case law. Noonans have cited 43 cases and NML 45 cases. The parties have argued over their applicability given their respective interests in this case. The Court finds no Wisconsin case on point with regard to the fact situation here present None of the Wisconsin cases, including *Schlosser,* have the independent agent whose skills are almost totally determinative of the sale of financial instruments. The cases that have that factor are federal cases and one Pennsylvania state case. Noonans argue that these cases are not on point because they deal with misrepresentation causes of action. In the Court's view, the underlying cause of action is not the relevant point, but the independent agent factor that gets the financial instruments out there and keeps them there is. And it is the give and take between the client and agent that will generate material and probative testimony in this case, particularly as to whether there was notice of the 1985-86 change. In all the cases cited that had the agent factor, none were certified for class action. And each of these cases expressed one or more of the concerns the Court mentioned above, *Adams v. Kansas City Life Insurance Co.,* 192 F.RD. 274 (W.D. Mo 2000), *Cunningham v. PFL Life Insurance Co.,* 1999 WL 3656879 (N.D. Iowa), *Jackson National Life Insurance Co. Premium Litigation,* 183 F.R.D. 217 (W.D. Mich. 1998), *Keyes v. Guardian Life Insurance Co.,* 194 F.R.D. 253 (S.D. Miss. 2000), *Parkhill v. Minnesota Life,* 188 F.R.D. 332 (D. Minn. 1999), *Zarella v. Minnesota Life Ins. Co.,* 1999 WL 22623 (RI. Super. Apr. 4, 1999) *Janick v. Prudential Ins. Co. of America,* 305 Pa. Super., 120, 451 A.2d 451 (1982), Note: In *Janick* class action was denied, but granted for residents of Pennsylvania.

For the reasons stated and the cases cited, Noonans motion to certify a class action is denied. Counsel for NML may prepare an order and forward it to Joan Smith, Deputy Clerk to Chief Judge, Milwaukee County Courthouse, 901 North 9th Street, Room 609, Milwaukee, Wisconsin 53233, for my signature pursuant to Milwaukee County's "five-day rule."

Dated at Bimamwood, Wisconsin, this 10 day of 2005.

<<signature>>

Earl W. Schmidt

Reserve Judge

### ORDER

The plaintiffs' Motion for Class Certification having come on for hearing-before the Honorable Earl W. Schmidt on March 15, 2005, and the Court having received written briefs, having heard oral arguments and having issued a Decision dated June 10, 2005,

IT IS HEREBY ORDERED that plaintiffs' Motion for Class Certification is denied, and this case shall proceed forward on the individual claims of the plaintiffs, Catherine D. Noonan and Daniel A. Noonan.

Dated at Bimamwood, Wisconsin this 6th day of July, 2005.

<<signature>>

Earl W. Schmidt

Reserve Judge

Footnotes



1    Other background information can be garnered from the complaint, the briefs and the appellate court decision *Noonan v. Narthwestern Mutual Life Insurance Co.,* 276 Wis.2d (Ct App. 2004).

2    Recent Wisconsin Supreme Court decision may very well require greater evidentiary efforts by parties to defend punitive damage claims. *Strenke v. Hogner, et al,* 2005 WI 25 (pending publication), *Wischer v. Mitsubishi Heavy Industry Am. Inc.,2005* WI 26 (pending publication).

---

End of Document                                            © 2011 Thomson Reuters. No claim to original U.S. Government Works.

**App. 312**

2012 WL 1900114
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

MAI NHIA THAO, individually and on behalf
of a class of others similarly situated, Plaintiff,

v.

MIDLAND NATIONAL LIFE
INSURANCE COMPANY, Defendant.

No. 09–C–1158. | May 24, 2012.

**Attorneys and Law Firms**

Jacques C. Condon, K. Scott Wagner, Hale & Wagner SC, Milwaukee, WI, John J. Schirger, Matthew W. Lytle, Stephen R. Miller, Miller Schirger LLC, Lee R. Anderson, Patrick J. Stueve, Richard M. Paul, III, Kansas City, MO, for Plaintiff.

Henry Pietrkowski, Chicago, IL, Linda B. Oliver, Robert D. Phillips, Jr., William H. Higgins, San Francisco, CA, Paul F. Heaton, Heaton Trial Law SC, Milwaukee, WI, for Defendant.

**Opinion**

### *DECISION AND ORDER*

LYNN ADELMAN, District Judge.

**\*1** Mai Nhia Thao seeks to represent a class comprising owners of certain life insurance policies issued by Midland National Life Insurance Company ("Midland"). Before me now is Thao's motion to certify this case as a class action pursuant to Federal Rule of Civil Procedure 23.[1]

Thao asks that I certify the following class and designate her as the class representative:

> All persons who reside in the states of AZ, AR, CA, CO, CT, FL, GA, IL, IN, IA, KS, KY, LA, MD, MA, MI, MN, MS, MO, NE, NV, NC, ND, OH, OK, PA, SC, SD, TX, UT, VA, WA or WI and purchased or owned during the applicable statute of limitations a life insurance policy issued by Defendant based on any of

the following base policy forms: L128, L129, L130, L131, L133, L134, L136, and L138.

The base policy forms identified in the class definition are components of universal life insurance policies. Universal life insurance can be contrasted with term life insurance and whole life insurance. With term life insurance, the insured pays a premium in exchange for a death benefit that the insurer pays to the beneficiary only if the insured dies during the term of the policy. *See* 1 Jeffrey E. Thomas & Francis J. Mootz III, *New Appleman on Insurance Law Library Edition* § 1.08[2][b][ii] (2011). With whole life insurance, the insured pays a premium in exchange for both a death benefit (the insurance component) and a savings plan (the savings component). The savings component can be described as an investment that gets bigger over the term of the policy. Should the insured choose to do so, she can "surrender" the policy in exchange for whatever cash value has accumulated in the savings component at the time of the surrender. *Id.*

Universal life insurance, like whole life insurance, has both an insurance component and a savings component. Universal life is different than whole life in essentially two ways—flexibility and transparency. Universal life is said to be more flexible than whole life because it allows the insured to make various decisions over the life of the policy. With whole life, the insured pays a fixed premium over the life of the policy, and the death benefit is fixed at the policy's face value. With universal life, the insured can pay premiums in almost any amount at almost any time and may increase or decrease the amount of the death benefit at any time (subject to certain limits). *See* Richard G. Schectman, *New Concepts in Life Insurance Planning: Universal Life,* 13 Cumb. L.Rev. 219, 222 (1982). Relatedly, the insured can use the savings component to pay for the death benefit. That is, instead of making premium payments, the insured can allow the cost of the insurance component to be deducted from the savings component. So long as the policy's cash value is sufficient to pay the cost of the death benefit, skipping a premium does not result in the policy's lapsing. *Id.* at 224. Universal life is said to be more transparent than whole life because the policyholder receives periodic statements detailing how her premiums are being used. The statements itemize the various costs, fees and expenses that the insurer deducts from her premiums. With whole life, the policyholder typically does not know how her premiums are being used. *Id.* at 224–25; Douglas I. Friedman, *Universal Life: Product Development and Tax Aspects,* 13 Cumb. L.Rev. 499, 503–04 (1982).

**\*2** The mechanics of the Midland universal life policies at issue in this lawsuit are as follows: When a policy is purchased, the policyholder pays an initial premium and specifies the amount of the death benefit. Midland deducts a "premium load" from this initial payment and then applies the rest to the "policy fund," which is the savings component. If the policyholder makes additional premium payments, Midland adds that payment to the policy fund. Each month, Midland calculates the policy fund by taking the existing amount in the fund, adding any premium payments (and any interest earned on the savings component), and subtracting various charges. If after the relevant additions and subtractions are made there is still money left in the policy fund, then the policy will continue in force. If there is no money left in the policy fund, then (subject to certain exceptions), the policy will terminate.

The focus of this lawsuit is on the cost-of-insurance charge, which is one of the charges that Midland deducts from a policyholder's policy fund each month. In general, "cost of insurance" refers to the amount that an insurance company charges to cover its risk—i.e., the cost of paying the death benefit upon the death of the insured. Midland's policies specify that Midland will calculate cost-of-insurance charges by multiplying a "cost-of-insurance rate" by the difference between the amount of the death benefit and the amount of the policy fund.[2] The cost-of-insurance rate is taken from a set of tables produced by Midland's actuaries. Each policy type—that is, each Midland "product"—will have its own set of tables. The rates on the tables are organized by certain characteristics: the insured's age when the policy was issued ("issue age"), the number of years the policy has been in force ("policy years"), the insured's sex, the amount of the death benefit (the "specified amount"), and the insured's "premium class" (which is determined by certain characteristics that affect the insured's mortality risk, such as whether the insured uses tobacco or participates in hazardous activities). These characteristics determine which rate Midland will apply to a given policyholder at a given time. For example, suppose that the insured is a female nonsmoker (as Thao is) who purchased a Century Universal Life–G policy with a $100,000 death benefit (as Thao did). To calculate her cost-of-insurance rate for a particular month, Midland will first find the set of tables designed for the Century Universal Life–G product. It will then find the table in that set that contains rates for female non-smokers who selected a death benefit of between $100,000 and $1 million.[3] The table will have cost-of-insurance rates organized by issue age and policy years-the rows are issue ages and the columns are policy years. Thus,

assuming that the insured was twenty-six when the policy was issued and the policy has been in force for ten years, Midland will select the rate in the cell of the table located at the row corresponding to age twenty-six and the column corresponding to ten years' duration. Midland will then plug that rate into the cost-of-insurance formula to determine the cost-of-insurance charge.

**\*3** Thao's contention in this lawsuit is that Midland has been setting its cost-of-insurance rates in a way that is inconsistent with the following provision in her policy: "Cost of Insurance rates are based on the Issue Age, completed Policy Years, Sex, Specified Amount, and Premium Class of the Insured." Thao Policy § 7.7, ECF No. 57–1. Now, Midland's cost-of-insurance rates are in some sense "based on" issue age, policy years, sex, specified amount, and premium class in that, as explained above, Midland's cost-of-insurance rate tables are organized by these five factors. However, Thao contends that the policy language requires more than using tables organized by the five factors. According to her, the policy language imposes a constraint on how Midland sets the rates that appear in the cells of the tables. She contends that the policy language required Midland to consider nothing other than the five factors listed in the policy—which are all factors related to mortality expectations—when setting those rates. Thao contends that, contrary to this language, Midland considered factors unrelated to mortality expectations when setting its rates.

Thao contends that this case is appropriate for class treatment. She points out that all of the proposed class members' policies incorporate one of nine base policy forms and that each of the nine forms contains the same or virtually the same operative language as her policy. She also points out that there are no significant differences in state contract law or individualized issues concerning extrinsic evidence that might result in the policies' having different meanings for different class members. Thus, argues Thao, whether the policies allowed Midland to consider factors unrelated to mortality expectations when setting cost-of-insurance rates is a common question of law or fact. *See* Fed.R.Civ.P. 23(a)(2).

It is true that whether Midland acted contrary to language that appears in all of the proposed class members' policies is a common question of law or fact. The operative language in all of the base policy forms is the same or virtually the same, and differences in state law and extrinsic evidence will likely not result in different meanings for different class members. Thus, there is likely a single answer for all

policyholders: either the policies allowed Midland to consider factors unrelated to mortality expectations when setting its cost-of-insurance rates, or they did not. However, it does not follow that this case is appropriate for class treatment. This is so because, as we will see, the class members may not agree on what the answer to the common question should be. Some class members might prefer rates that are not based exclusively on mortality expectations, while other class members might, like Thao, prefer rates that are based exclusively on mortality expectations. Put differently, there may not be a common claim that Thao can litigate on behalf of a class of policyholders. Thus, in the remainder of this opinion, I examine whether Thao's individual claim is representative of claims that other Midland policyholders might have.

*4 Thao's individual claim is that Midland is overcharging her. More specifically, she claims that Midland is deducting too much from her policy fund each month because the cost-of-insurance charge is based on rates that are higher than they would be if Midland had set its cost-of-insurance rates using only the five factors listed in the policy. Essentially, Thao claims that if Midland had set its rates using a methodology based exclusively on the five factors, all of the numerical values in the table containing her cost-of-insurance rates would be either lower than they are now or unchanged.[4] According to Thao, all of the other proposed class members have the same claim against Midland. She contends that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. Thus, argues Thao, all members of the proposed class have a claim against Midland that arises out of Midland's use of improper cost-of-insurance rates. She believes that each proposed class member would want (1) declaratory and injunctive relief requiring Midland to adjust its rates so that they are based exclusively on the five factors and (2) a refund of the excess cost-of-insurance charges paid in the past on account of Midland's using rates that were based on other factors.

The key premise in Thao's argument for class certification is that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. If this premise is false—if, for example, a set of rates based exclusively on the five factors would result in *higher* rates for certain policyholders—then the members of the proposed class would not have a common

claim against Midland.[5] Only those members who would pay lower rates would have a claim, because only those members would have been injured by Midland's conduct. *See Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011) (holding that to show commonality plaintiff must show that the class members have suffered the same injury); *Bieneman v. City of Chicago,* 864 F.2d 463, 465–66 (7th Cir.1988) (individual opposed to noise created by O'Hare airport could not represent a class of property owners in area around airport because some property owners benefitted from proximity to airport). Thus, before the class proposed by Thao may be certified, Thao must prove—not merely assert—that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. *See Wal–Mart,* 131 S.Ct. at 2551–52 (satisfaction of all Rule 23 requirements must be proved, not merely asserted, even if proving those requirements requires resolving an issue relevant to the merits of the underlying claim); *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675–76 (7th Cir.2001) (same).

*5 In an attempt to prove that under her interpretation of the policies all policyholders would pay lower cost-of-insurance rates, Thao points to a collection of spreadsheets known as the "COI Solver" workbooks. *See* Pl.'s Br. in Supp. at 7–8, ECF No. 57. In the next few pages of this opinion, I will explain what these workbooks are and why they are important to plaintiff's argument for class certification.

The COI Solver workbooks are a set of Excel spreadsheets that Midland's actuaries developed and used in the course of designing the policies at issue in this case. *See* Bill Decl. ¶¶ 24–27, 37, 39, ECF No. 64. As Midland seems to be using the term, "designing" refers to the overall process of setting the rates that will determine the various credits to and deductions from a policy that Midland will make over the life of that policy. *Id.* ¶ 24. The cost-of-insurance rates are set during this process, but other rates, such as interest-crediting rates, are also set during this process. In designing a policy, Midland's actuaries attempt to set rates that will both further the policyholder's objectives in purchasing the policy and earn Midland a reasonable profit. *Id.* ¶¶ 24, 28. Although Midland's objective—making money—is the same in every policy, the policyholder's objectives may be different. For example, some policyholders might want a policy that is designed to have a high cash surrender value at a certain point in time, while other policyholders might want a policy that is

designed to have a high death benefit and lower cash value. *Id.* ¶ 24.

Part of Midland's design process is known as "pricing." *Id.* ¶¶ 31–38. During pricing, Midland's actuaries feed a proposed set of rates into a computer program to examine various financial metrics relating to Midland's profitability (such as cash flow and distributable earnings). The actuaries assign probabilities to uncertain future events and feed those probabilities into the program along with the proposed rates. After running the program, the actuaries use the results to get a sense of what is likely to happen in the future if Midland adopts the proposed rates. The goal of this process is to determine whether the rates are viable—not so low that Midland loses money, but not so high that Midland loses business to its competitors. If after testing the proposed rates Midland's actuaries determine that the rates are problematic, they will make adjustments. The actuaries might revise a

single rate scale or multiple rate scales, and the cost-of-insurance rate scale is one of the scales that might be adjusted.

The purpose of the COI Solver workbooks is to expedite the process of developing scales of cost-of-insurance rates for testing in the pricing program. *Id.* ¶¶ 37 & 39. As noted, the workbooks are Excel spreadsheets. Numerical values are entered into the cells of the spreadsheets in a manner that allows arithmetical operations to be performed in accordance with specified formulas. A workbook for a particular policy will contain many spreadsheets-one for every permutation of policyholder characteristics (issue age, sex, premium class, etc.). Here is an excerpt from a COI Solver spreadsheet for a particular Midland product (labeled "UL–CV") and permutation of policyholder characteristics (male nonsmoker "MN", issue age 35, and band 2):

| UL-CV | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class: | MN | | | | | | | | | | |
| Age: | 35 | | | | | | | | | | |
| Band: | 2 | | | | | | | | | | |
| | | | | | | | | | 2001 CSO | | |
| | | Pricing Mortality | Select | | | Mult of | Tot | Product | Composite | Minimum | XLCV2 |
| Age | Pol Yr | (Att. Age) | Factor | Product | Add-On | Add-On | Add-On | + Add-on | Guar COI | Column I-J | Mo COI |
| 40 | 6 | 0.06 | 0.99 | 0.06 | 0.050 | 1.00 | 0.05 | 0.11 | 0.14 | 0.11 | 0.11 |
| 51 | 17 | 0.19 | 0.88 | 0.16 | 0.030 | 1.00 | 0.03 | 0.19 | 0.36 | 0.19 | 0.19 |
| 52 | 18 | 0.21 | 0.87 | 0.18 | 0.020 | 1.00 | 0.02 | 0.20 | 0.39 | 0.20 | 0.20 |
| 53 | 19 | 0.23 | 0.86 | 0.20 | 0.010 | 1.00 | 0.01 | 0.21 | 0.44 | 0.21 | 0.21 |
| 54 | 20 | 0.26 | 0.85 | 0.22 | 0.000 | 1.00 | 0.00 | 0.22 | 0.49 | 0.22 | 0.22 |

**\*6** When Midland's actuaries create a spreadsheet for a given permutation of policyholder characteristics, they start by entering a base scale of numbers into one of the columns. Each row of the spreadsheet represents a policy year. Any set of numbers having some reasonable pattern could be used as a base scale. *Id.* ¶ 40. However, Midland's actuaries have chosen to use numbers that resemble (but do not match) Midland's "pricing mortality" rates.[6] *Id.* The reason for this is that mortality rates generally increase with age, and in most policies the design objectives will call for cost-of-insurance rates that increase with age. Thus, using an approximation of Midland's pricing-mortality rates as a base scale gives the actuaries a convenient starting point. *Id.* However, there is nothing special or significant about the actuaries' decision to use an approximation of Midland's pricing-mortality rates as a base scale. The actuaries could just as easily have used any one of a number of different mortality tables published for use in actuarial science. *Id.* ¶¶ 40–41. Or the actuaries could have used something other than a mortality table. For example, in

one Midland policy (which plaintiff has excluded from the class definition), the actuaries used reinsurance premium rates as the base scale. *Id.* ¶ 41.

The column of the COI Solver spreadsheet containing the base scale for a particular permutation of policyholder characteristics is labeled "Pricing Mortality."[7] To turn this base scale into usable cost-of-insurance rates, the COI Solver spreadsheet relates the numerical values in the Pricing Mortality column to values in other columns in accordance with a specified formula. One of the other columns is the "Select Factor" column. The first step in turning the base scale into cost-of-insurance rates is to multiply the values in the Pricing Mortality column by the values in the Select Factor column. The numerical values that result from this operation appear in the column labeled "Product."[8] The value in the Select Factor column is usually one or below for non-tobacco users and one or above for tobacco users, and thus the Select Factor usually decreases the numbers in the base scale for

non-tobacco users and increases them for tobacco users. *Id.* ¶ 45. However, the value of the Select Factor generally decreases as the number of policy years increases-that is, the value gets smaller as it moves down the Select Factor column and into the lower rows, which represent later policy years. Thus, use of the Select Factor has the effect of producing lower rates in later policy years. *Id* . ¶ 49.

Three columns in the COI Solver spreadsheet involve something known as the "Add–On." As we will see, the Add–On is the centerpiece of Thao's theory for class certification. The three columns are labeled "Add–On," "Mult of Add–On," and "Tot Add–On ." The values in the Add–On column are taken from a separate spreadsheet in the workbook labeled "Expense Add–On." *Id.* ¶ 48. This spreadsheet is organized by issue age and policy year. *Id.* ¶ 47. According to Midland, the values that appear in the cells of the Expense Add–On spreadsheet do not represent any particular cost, expense, or mortality characteristic. Instead, those numbers are nothing more than a scale that Midland adjusts as needed to meet design objectives—i.e., producing cost-of-insurance rates that meet policyholder objectives and Midland's objective of earning a reasonable profit. *Id.*

 **\*7** Once the values in the Expense Add–On spreadsheet are imported into the COI Solver spreadsheet, the values in the Add–On column are multiplied by the values in the Multiple of Add–On column (which are determined by the sex, premium class and specified amount of the policyholder), and the result of this operation appears in the Total Add–On column. *Id.* The values in the Total Add–On column are then added to the values in the Product column. The result of this operation appears in the "Product
👉 Add–On" column.

The Add–On is generally structured so that its value declines towards zero over some initial number of policy years. *Id.* ¶ 49. That is, the greatest numerical values in the Add–On and Total Add–On columns generally appear at the top of the columns (i.e., in the rows representing early policy years), and then the values gradually decline towards zero, and eventually become zero, as they move down the columns. Thus, the purpose of the Add–On is to adjust the base rate upwards during the initial years in which the policy is in force. This is contrary to what Midland would do if the Add–On were related to mortality characteristics, since the risk of dying generally increases with age rather than decreases. However, for various reasons, including producing favorable tax consequences, some policyholders prefer to pay higher

rates in earlier policy years in exchange for lower rates in later policy years. *Id.* ¶ 50. Using the Add–On, which generally produces higher rates in earlier years, in conjunction with the Select Factor, which generally produces lower rates in later years, helps Midland's actuaries produce a rate scale that achieves this particular policyholder objective. *Id.* ¶¶ 49–50.

The final step in the COI Solver process is to determine the final rate for testing. This is done by comparing the value in the Product
👉 Add–On column for a particular policy year to the value in the column labeled "Composite Guar COI," which is the maximum cost-of-insurance rate allowed under the policy. [9] *Id.* ¶ 42. If the value in the Product
👉 Add–On column is less than the value in the Composite Guarantee column, then the value in the Product
👉 Add–On column becomes the cost-of-insurance rate for that policy year. Otherwise, the value in the Composite Guarantee column becomes the cost-of-insurance rate for that policy year. The cost-of-insurance rate scale thus appears in the column labeled "Mo COI." This is the rate scale that Midland's actuaries will feed into their pricing program to determine whether that scale—together with all other rate scales for the policy under consideration—will produce the desired results. If after testing the actuaries determine that adjustments to the cost-of-insurance rate scale are needed, the actuaries will adjust the values in the Add–On and Select Factor columns (and possibly other columns that I have not discussed) as needed to produce a revised cost-of-insurance rate scale for testing. *Id.* ¶¶ 44 & 50. This process will continue through as many iterations as needed to produce a rate scale that satisfies all of the objectives for the policy under consideration. *Id.* ¶ 37. Once Midland's actuaries find that rate scale, Midland will use it to construct the cost-of-insurance rate tables for that policy.

 **\*8** Having explained the function of the COI Solver workbooks, I can explain why they are important to Thao's theory for class certification. Recall that a class may be certified only if Thao can show that all class members would pay lower cost-of-insurance rates than they do now if Midland's rates were based exclusively on the five factors listed in the policies. In an attempt to make this showing, Thao focuses on the Add–On. The Add–On has the effect of producing higher cost-of-insurance rates during early policy years because the value of the Add–On, which is positive in early policy years, is added to the Product (i.e., the base scale multiplied by the Select Factor). Thus, as a matter of arithmetic, if the Add–On were removed from Midland's

cost-of-insurance rates—that is, if the values in the Add–On columns were all set to zero—all class members would pay lower cost-of-insurance rates than they do now in early policy years, but their rates in later years (in which the Add–On is already zero) would not change. Thao contends that all class members thus have a claim against Midland for removal of the Add–On.

The problem for Thao is that her theory for class certification does not match her theory for the merits of this case. In order to obtain class certification, Thao argues that Midland must recalculate all of its cost-of-insurance rates after removing the Add–On from the COI Solver workbooks. However, that remedy is not consistent with Thao's interpretation of the policy language. Under Thao's interpretation of the policy language, cost-of-insurance rates must be based exclusively on Midland's mortality expectations— i.e., Midland's estimates of future death rates for groups of policyholders as determined by age, sex, tobacco use, etc. However, no column in the COI Solver workbooks contains Midland's mortality expectations. Although the base scale is loosely related to mortality expectations in that its values are larger in later policy years than in earlier policy years, the base scale does not itself constitute Midland's mortality expectations for any set of policyholder characteristics. *See* Bill Decl. ¶¶ 40–41, 63. Likewise, although the value of the Select Factor is generally larger for tobacco users than for non-tobacco users, the Select Factor does not reflect Midland's expectations regarding the effect of tobacco use on mortality. *Id.* ¶ 47 (stating that the Select Factor has no independent meaning). Removing the Add–On would leave the base scale multiplied by the Select Factor, but since neither the base scale nor the Select Factor (nor the product of the two) is based on Midland's mortality expectations, removing the Add–On from the rates produced by the COI Solver workbooks would not transform a rate scale that is not based exclusively on mortality expectations into one that is. Thus, even if Thao is correct on the merits and the policy language requires Midland to base its cost-of-insurance rates exclusively on mortality expectations, it would not follow that removing the Add–On would bring Midland's existing rates into line with that language.

**\*9** In an attempt to show that removal of the Add–On is consistent with her interpretation of the policy language, Thao contends that the Add–On represents a surcharge for Midland's "expenses." However, even if the Add–On were a surcharge for expenses, which it is not, [10] that would not change the fact that removing the Add–On from Midland's existing rates would not leave rates that are based exclusively on mortality expectations. No matter what the Add–On is or what it represents, it simply is not the case that removing the Add–On from Midland's current rates would produce rates based exclusively on mortality expectations. Again, since no part of the COI Solver workbooks is based on mortality expectations in the first place, removing the Add–On from those workbooks would not result in the creation of rates based exclusively on mortality expectations.

Thus, Thao's removal-of-the-Add–On remedy is not consistent with her interpretation of the policy language. And when we set that remedy aside, we can see that the class does not have a common claim against Midland. This is best illustrated by showing what would happen if Thao's interpretation of the policy language were adopted, as I do below.

Recall that under Thao's interpretation of the policy language, Midland's cost-of-insurance rates must be based exclusively on mortality expectations. There is one rate scale that Midland uses that is based exclusively on mortality expectations, and that is Midland's pricing-mortality rates. *See* Bill Decl. ¶ 53 (explaining that pricing-mortality rates are estimates of uncertain future death rates). [11] However, many class members would prefer Midland's current cost-of-insurance rates to rates based on Midland's pricing-mortality rates. In many (if not all) policies, Midland's current rates are higher than pricing-mortality rates during early policy years and lower than pricing-mortality rates in later policy years. *Id.* ¶ 50. That is because the design objectives for those policies called for charging a cost-of-insurance rate that is higher than expected mortality in early policy years in exchange for charging a rate that is lower than expected mortality in later policy years, as illustrated in the following graph:



This graph is for a particular policy design (UL–CV) and a particular permutation of policyholder characteristics (male, non-tobacco premium class, issue age forty-five, and specified amount falling within band two). What it shows is that until about the fifteenth policy year, Midland's current cost-of-insurance rates are higher than they would be if Midland had used its pricing-mortality rates as its cost-of-insurance rates. However, in later policy years, Midland's cost-of-insurance rates are lower than they would be if Midland had used its pricing-mortality rates. Many policyholders will prefer to pay higher rates in early policy years in exchange for lower rates later in life—that is, they will prefer the shape of the cost-of-insurance curve to the shape of the pricing-mortality curve. One reason why they may prefer the shape of the cost-of-insurance curve is that it has certain tax advantages. *Id.* In any event, whatever their motives may be, the fact is that some policyholders will prefer Midland's current cost-of-insurance rates to rates based on pricing mortality. Thus, many class members would prefer Midland's interpretation of the policy language to Thao's.

**\*10** In an effort to avoid this problem, Thao devised her removal-of-the-Add-On remedy, which basically results in bringing the cost-of-insurance rates down to pricing-mortality rates in early policy years but leaving the lower-than-pricing-mortality rates in place in later policy years. However, as already discussed, removing the Add–On from Midland's current rates is not a remedy that follows from Thao's interpretation of the policy language.

The problems identified above show that the class that Thao seeks to represent does not comprise policyholders with a common grievance against Midland. Instead, the class contains many policyholders who would prefer Midland's interpretation of the policy to Thao's. Thus, Thao's motion for class certification will be denied. To the extent that any individual policyholders feel that they are being injured by Midland's current cost-of-insurance rates, they must bring their own individual suits.

The remaining issue is Midland's motion to strike, which I can deal with quickly. Midland moves to strike the expert reports that Thao attached to her reply brief along with all arguments in the reply brief that are based on such reports on the ground that those materials should have appeared in Thao's opening brief rather than in her reply brief. However, I conclude that the reports and the arguments employing them were properly included in Thao's reply brief, as they are directly responsive to arguments made in Midland's brief in opposition and supporting materials.

Accordingly, **IT IS ORDERED** that Thao's motion for class certification is **DENIED.**

**IT IS FURTHER ORDERED** that Midland's motion to strike is **DENIED.**

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **June 7, 2012 at 11:00 a m.** for the purpose of determining whether further proceedings are necessary. The parties should confer in advance of the call and be prepared to propose a plan for proceeding. Counsel must call the court at 414/297–1285 to advise of their participation.

Footnotes

1    Also before me is Midland's motion to strike the reports of Thao's expert witnesses and portions of her reply brief. I briefly address that motion at the end of this opinion.

2    Cost of Insurance = Cost-of-insurance rate x (Amount of death benefit-Amount of policy fund).

3    Midland generally uses three different "bands" for purposes of factoring the specified amount into its rates: (1) less than $100,000, (2) $100,000 to $1 million, and (3) over $1 million. *See* Bill Decl. ¶ 13, ECF No. 64. Thus, the table that Midland would use for Thao would be the same as Midland's current rates in later policy years.

4    As we will see, under Thao's theory, cost-of-insurance rates would be lower in early policy years than they are under Midland's current rates but the same as Midland's current rates in later policy years.

5    Even if this premise is true, this case might not be appropriate for class treatment. *See* Midland's Br. in Opp. at 14–16, ECF No. 61. However, since it turns out that this premise is false, I will not consider whether a class could be certified if the premise were true.

6    Pricing-mortality rates are estimates of uncertain future death rates. *See* Bill Decl. ¶ 53. Midland's actuaries develop such estimates and feed them into the pricing program during the pricing process. *Id.*

7    This label is misleading. As discussed, the base scale only approximates Midland's pricing-mortality rates. Thus, the numbers in the "Pricing Mortality" column are not the numbers that Midland would use if it were using its actual pricing-mortality rates as the base scale.

8    Note that the product of the value in the Pricing Mortality column and the value in the Select Factor column is rounded to two decimal places. Thus, in the UL–CV excerpt, in the first row the Pricing Mortality value is 0.06, the Select Factor value is 0.99, and the Product value is 0.06—i.e., 0.0594 rounded to two decimal places.

9    When Midland issues a policy, it attaches a table of guaranteed maximum cost-of-insurance rates. *See* Thao Policy, ECF No. 57–1 at 13–14. Midland guarantees that the policyholder's cost-of-insurance rate will never be higher than the specified maximum rates. The Composite Guarantee column in a COI Solver spreadsheet is intended to make sure that the spreadsheet does not produce a rate scale that includes rates that exceed the specified maximum.

10    Thao just asserts that the Add–On is a surcharge for expenses, and she has no evidence that supports her assertion. The only evidence in the record on whether the Add–On is a surcharge for expenses is in the declaration of the Midland actuary who invented the Add–On, and according to him the Add–On has nothing to do with expenses. *See* Bill Decl. ¶¶ 47–48, ECF No. 64.

11    Remember that Midland's pricing-mortality rates are not the rates that appear in the Pricing Mortality columns of the COI Solver workbooks.

**End of Document**        © 2013 Thomson Reuters. No claim to original U.S. Government Works.


Not Reported in F.Supp.2d, 2006 WL 1543928 (N.D.Ill.)
**(Cite as: 2006 WL 1543928 (N.D.Ill.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Ruby REED, Special Administrator of the Estate of
J.C. Reed, Deceased, Plaintiff,
v.
CITY OF CHICAGO, et al., Defendants.

No. 01 C 7865.
June 1, 2006.

Michael J. Cronin, Peter A. Cantwell, Stephen Falk
Boulton, Cantwell & Cantwell, Chicago, IL, for
Plaintiff.

Penelope Moutoussamy George, Arnold Hyunguk
Park, City of Chicago, Department of Law, Mara
Stacy Georges, Corporation Counsel, Dennis C. Cu-
sack, Stefanie R. Glover, Johnson & Bell, Ltd., Joseph
M. Polick, City Of Chicago, Department of Law,
Brian H. Eldridge, Jeffrey Singer, Zora K. Shaw,
Segal, Mccambridge, Singer & Mahoney, Ltd., Chi-
cago, IL, Denis K. Sheehan, Norton, Mancini, Weiler
& Deano, Wheaton, IL, Karen Masters Wilson, Smith,
Rickert & Smith, Downers Grove, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*
MORAN, Senior J.

**\*1** Plaintiff Ruby Reed, as Special Administrator
of the Estate of J.C. Reed, deceased, brought this
action against the City of Chicago, Timothy Gould,
Bruce Young, Brian Pemberton, Susan Madison,
Edwards Medical Supply, Inc., Cypress Medical
Products, Ltd., Cypress Medical Products, Inc., Med-
line Industries, Inc., Thai Hospital Products Company,
Ltd., and Midpack Corporation, for damages associ-
ated with the death of J.C. Reed. Plaintiff's complaint

alleges civil rights violations, negligence, and willful
and wanton conduct against defendants City of Chi-
cago, Gould, Young, Pemberton and Madison, and
allegations of strict products liability, negligence and
breach of warranty against defendants Edwards, Cy-
press, Ltd., Cypress, Inc., Medline, Thai Hospital
Products and Midpack. After failing to convince this
court in an initial motion for summary judgment,
Medline brought a second motion for summary
judgment on February 3, 2005. Plaintiff's opposition
to that motion, filed on February 13, 2006, included 23
exhibits, the last of which was a report by expert
Steven Frumkin in support of plaintiff's opposition to
summary judgment. Defendant Medline then filed this
motion to strike Frumkin's report as unqualified under
FED.R.EVID. 702. For the reasons stated below, we
grant defendant's motion to strike Frumkin's report.

BACKGROUND

On November 12, 2000, J.C. Reed committed
suicide in a City of Chicago police lockup by hanging
himself with an isolation gown provided to him by the
police department. J.C. Reed's mother, plaintiff Ruby
Reed, brought this action against the City, the officers
on duty at the lockup, and the alleged manufacturers
of the gown. As to the manufacturers, plaintiff alleges
that the isolation gown was designed and marketed to
break or tear away in the event a person attempted to
use it to hang himself, and the gown failed to tear
away, leading to Reed's death. Plaintiff further alleges
that the failure of the gown to tear away was a breach
of implied and express warranties, and defendant
manufacturers should be held liable in strict liability
and negligence. Plaintiff's claims against the manu-
facturers primarily turn on the foreseeability of the
isolation gown's use as a suicide-prevention device
and the existence of any express or implied warranties.

DISCUSSION

The admission of expert evidence is regulated by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1543928 (N.D.Ill.)
**(Cite as: 2006 WL 1543928 (N.D.Ill.))**

Rule 702 and the Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[FN1] Rule 702 states:

> FN1. Rule 702 was amended in 2000 to include three specific requirements for expert testimony admissibility, in response to *Daubert* and its progeny. Although Rule 702 has technically superceded *Daubert,* the Seventh Circuit has consistently referred to *Daubert* for guidance. *See Naeem v. McKesson Drug Co.,* 444 F.3d 593, 2006 WL 932354 (7th Cir.2006); *Fuesting v. Zimmer, Inc.,* 421 F.3d 528 (7th Cir.2005); *Durkin v. Equifax Check Services, Inc.,* 406 F.3d 410 (7th Cir.2005).

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**\*2** In *Daubert,* the Supreme Court explained, "the Rules of Evidence-especially Rule 702-do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." 509 U.S. at 597. *See also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (applying *Daubert'* s "gate-keeping" obligation to testimony based not only on scientific knowledge, but also on "technical" and "other specialized" knowledge). In this case, Medline argues that Frumkin's report is inadmissible under

*Daubert* and Rule 702 because it "does not establish any applicable expertise, does not cite any legitimate authorities, is based on insufficient and erroneous 'facts,' and does not contain any basis for establishing its reliability" (def's mem. at 1). Plaintiff vehemently disagrees and contends that "Professor Frumkin's opinions are competent and admissible as evidence" (plf's response at 2).

The Seventh Circuit has interpreted *Daubert* to require a two-step inquiry to determine expert fitness under Rule 702. First, we must determine whether the expert's testimony pertains to scientific knowledge. *O'Connor v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.1994). Such a determination requires us to "consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation." ' *Id.* (citing *Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607, 613 (7th Cir.1993)). Second, we must " 'determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying." ' *Id.* (citing *Porter,* 9 F.3d at 616). Thus, it is our responsibility to make sure that, prior to admission into the record, an expert's testimony is both reliable and relevant. *Masters v. Hesston Corp.,* 291 F.3d 985, 991 (7th Cir.2002); *Dewick v. Maytag Corp.,* 324 F.Supp.2d 894, 897 (N.D.Ill.2004). Defendant challenges Professor Frumkin's qualifications on both grounds. We will address each argument in turn.

An expert's opinion is reliable if the "expert is qualified in the relevant field and [ ] the methodology underlying the expert's conclusions is reliable." *Masters,* 291 F.3d at 991 (citing *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000)). In determining an expert's qualifications we consider his " 'full range of practical experience as well as academic or technical training." ' *U.S. v. Parra,* 402 F.3d 752, 758 (7th Cir.2005) (citing *Smith,* 215 F.3d at 718). Ultimately, however, boasting years of education and experience

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 322

Not Reported in F.Supp.2d, 2006 WL 1543928 (N.D.Ill.)
**(Cite as: 2006 WL 1543928 (N.D.Ill.))**

is insufficient; we must "assess the reliability of the *methodology* the expert has employed in arriving at his opinion." *Fuesting,* 421 F.3d at 535 (emphasis in original). Thus, "experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff-deploying neither data nor analysis-is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir.2000). Defendant contends that Frumkin's report is unsupported and conclusory (def's mem. at 6). Plaintiff strongly disagrees, claiming that "Professor Frumkin's methodology and principles are sound and reliable as applied to the facts in this case" (plf's response at 8). Specifically, plaintiff notes that Frumkin's opinions rely on his "vast experience and knowledge in the apparel and textile industry," along with "the history in the industry, the published industry history, including his own scholarly publications, case histories, custom and practice in the industry, and his role as a teacher and lecturer, among other resources." (*Id.*)

**\*3** In the cover letter to his report, Frumkin states that he conducted extensive investigation and review, including "extensive reading of provided legal documents (filings and depositions, etc.), a governmental regulatory search with regard to proper warnings and labeling required, and a review of channels of distribution and product liability," along with "[c]ommon business practiced [sic]-industry practice," including "an investigation of similar and related business practices of Medline Industries" (Frumkin report, at 1). In coming to his conclusions, however, Frumkin does not cite to any authority or describe how he formulated his opinions. He concludes: "Based on the convergence of the above personal experience and conducted research I can execute my opinion: that the City of Chicago and ultimately Mr. Reed was ill served, ill advised, and not properly warned about potentially life threatening dangers. Therefore, Medline was deficient in their failure to warn, instruct or otherwise participate in their responsibilities to their customer or end user. Medline clearly produced an

unreasonably dangerous garment for the purpose for which it was used, and breached its warranty as a merchantable product for its foreseeable use" (*id.,* at 8). Other than an allusion to his background and personal experience, Frumkin cites to few and somewhat irrelevant sources, including online dictionary definitions for paper and legal cases from New York State and other unidentified jurisdictions. Although Frumkin states that it is "usual and customary" to have a compliance officer (*id.,* at 5), it is "standard practice and procedure in the industry to warn and advise the next person in the chain of distribution" (*id.*), and that the "knowledge in the industry of incidents of suicide and the types of environments at risk is well known and understood" (*id.,* at 6), Frumkin does not define the industry, point to any collaborating authority, or even describe how he came to such conclusions. Finally, although Frumkin states that Medline could have provided warning labels or information sheets to provide for further safety, he does not point to any studies showing the use or success of such warnings.

Plaintiff suggests that we should not strike Frumkin's report simply because it is not persuasive, arguing that an effective adversary system, including cross-examination and competing expert witnesses, is sufficient to maintain the integrity of the judicial system (plf's response at 2). In *Daubert* and its progeny, however, the Supreme Court suggests that we must act as a gatekeeper at this stage to ensure the reliability of expert witnesses. And while it is true that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence" ( *Daubert,* 509 U.S. at 596), such safeguards are not a basis for admitting otherwise inadmissible evidence. *Loeffel Steel Products, Inc. v. Delta Brands, Inc.,* 387 F.Supp.2d 794, 800 (N.D.Ill.2005). Because bare conclusions and naked opinions fail the first prong of the expert opinion admissibility test (*see* *Fuesting,* 421 F.3d at 536; *McMahon v. Bunn-O-Matic,* 150 F.3d 651, 658 (7th Cir.1998)), we find that Frumkin's report is inadmis-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1543928 (N.D.Ill.)
**(Cite as: 2006 WL 1543928 (N.D.Ill.))**

sible under Rule 702. *See Naeem v. McKesson Drug Co., 444 F.3d 593, 2006 WL 932354 at *11* (admission of expert testimony was in error where expert did not tie his conclusions to specific citations to the policy manual, and appeared to be giving "general observations regarding what is normal or usual business practice"); *Durkin v. Equifax Check Services, Inc., 406 F.3d 410* (7th Cir.2005) (affirming exclusion of expert linguist's proposed testimony because expert endorsed plaintiff's claims without explaining how he came to such conclusions); *Dewick, 324 F.Supp.2d at 900* ("without his having tested the efficacy of Maytag's original warning or having drafted alternate warnings or having offered any other comparably reliable methodology, Hyde's opinions on that subject cannot be characterized as anything more than speculation or personal observation"); *Stasior v. National R.R. Passenger Corp., 19 F.Supp.2d 835 (N.D.Ill.1998)* (expert opinion as to foreseeability that plaintiff would develop carpal tunnel syndrome was not reliable under *Daubert* because expert could not cite any studies during the relevant years showing that the work conducted by plaintiff was scientifically connected to carpal tunnel syndrome).

**\*4** Even if we were to find that Frumkin's report was reliable, it would still be inadmissible because Frumkin's expertise lacks relevance to the case. Defendant argues that "there is absolutely no basis upon which to conclude that Mr. Frumkin is qualified to testify concerning the provision of isolation gowns to a jail and, more specifically, whether the use of an isolation gown as a hanging device should be reasonably expected by a medial [sic] supply distributor." We agree that the bulk of Frumkin's report and experience is irrelevant to the issues in contention in this motion for summary judgment, and thus fails the second prong of the *Daubert* test.

FED.R.EVID. 402 states that "Evidence which is not relevant is not admissible," and FED.R.EVID. 401 defines "relevant evidence" to be "evidence having any tendency to make the existence of any fact that is

of consequence to the determination of the action more probable or less probable than it would be without the evidence." Because Professor Frumkin's report was attached in opposition to defendant's motion for summary judgment, we consider whether his findings and opinions are relevant to the issues in contention in that motion.

A close reading of the motion for summary judgment and plaintiff's response in opposition shows that the motion raises four contentious issues. First, whether defendant should have reasonably foreseen that its isolation gowns would be used for suicide prevention. Second, whether the subject gown was defective with respect to its purpose and function. Third, whether defendant made express or implied warranties with respect to the use of its gown. And finally, whether defendant was legally required to inquire as to the end use of the subject gowns and/or provide instructions or warnings as to the use of the gowns. Frumkin's report is relevant if it both addresses any or all of these issues and his background and expertise are such that he can reliably opine on such issues.

Frumkin's report includes a short abstract, definition of the claim, short discussion of Medline Industries and its corporate governance, short discussion of supply-chains and their relationships to the end user, and four pages labeled "conclusions." The report also sets forth Medline's background and operations, an "industry background" discussion of consumer protection legislation and products liability definitions, and snippets of case law and agency reviews. Finally, the report attaches Frumkin's *curriculum vitae,* definitions of "paper," and catalogue copies of an unidentified isolation gown and Ferguson Safety Products paper gowns. Frumkin's conclusions focus on (1) the manufacturer's ability and duty to ensure proper use of its products and warn against dangerous misuse; (2) Medline's responsibility to be aware of the uses of its products; (3) allegation of breach of warranty; and (4) the foreseeability of the end use of Medline's iso-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1543928 (N.D.Ill.)
**(Cite as: 2006 WL 1543928 (N.D.Ill.))**

lation gown. Such conclusions do speak to at least some of the issues in contention in the summary judgment motion.

**\*5** The relevance of the report fails, however, because Frumkin's background and expertise are not such that he can speak as an expert to any of these issues. Plaintiff spends almost five pages cataloguing Frumkin's qualifications and reciting his *curriculum vitae.* We have also examined Frumkin's background and experience, and recognize that he is well versed in many areas of textiles and manufacturing. Even defendant does not disagree with this assessment (def's mem. at 4). A witness is only qualified as an expert, however, if the "area in which the witness has superior knowledge, skill, experience, or education," matches the "subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990).

Considering Frumkin's "full range of practical experience as well as academic or technical training" ( *Smith,* 215 F.3d at 718), we find it insufficient to provide expert status as to his testimony. His testimony focuses on consumer protection, manufacturer responsibility and foreseeability. His background focuses on general and textile manufacturing, retail strategy, textile applications, product development, and international textile markets. Frumkin's lectures focus on fashion design and global marketing. None of those experiences suggests that Frumkin would be a reliable expert regarding consumer protection or foreseeable uses of isolation gowns. Plaintiff argues that Frumkin's article "Tagless to the Rescue" is of "particular relevance to the labeling issues in this case" (plf's response at 4). A closer look reveals, however, that the focus of the article is on the comfort and financial advantages of ink process transfer directly onto garments for tagless identification. The article does not address consumer protection or warnings, as plaintiff would have us believe. Nor do his other publications, appearances or professional experiences have any greater bearing on this case. *Cf.*

*Baumholder v. Amax Coal Co.,* 630 F.2d 550 (7th Cir.1980) (affirming trial court's decision to allow geologist to testify as to the damage done by a coal mine explosion, even where geologist did not have specific experience in the effects of blasting, finding that the issues on which expert testified were "subject matter within the scope of a geologist's expertise"). Even the narrative attached to Frumkin's *curriculum vitae* belies his expertise in consumer protection, warnings, warranties, and/or suicide-prevention clothing. It states, "Professor Frumkin has been responsible for fabric styling, new product development and fiber innovations; sales management, marketing and merchandising; domestic and international financing, sourcing and U.S. Customs regulations' retail product sourcing, placement and design" (plf's response, ex. 1, p. 10). Frumkin's background shows no signs of expertise in consumer protection or product liability, nor does it establish an expertise in manufacturer's responsibilities to the end users of their products. Therefore, we find his background and expertise fail the relevance prong of the *Daubert* test.

*CONCLUSION*

**\*6** For the reasons stated above, we grant defendant Medline's motion to strike the report of plaintiff's expert, Peter Frumkin. Plaintiff is granted leave to file a supplemental verified report.

N.D.Ill.,2006.
Reed v. City of Chicago
Not Reported in F.Supp.2d, 2006 WL 1543928 (N.D.Ill.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.