# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                     Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

## APPENDIX TO MEMORANDUM IN SUPPORT OF

## NORTHWESTERN MUTUAL'S MOTION TO DECERTIFY WISCONSIN

## ONLY CLASS CERTIFIED UNDER WISCONSIN RULES

**Volume I of II**

**Items 1 - 5**

**Pages 1 - 172**

---

# Index to Northwestern Mutual's Appendix

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 1 | Michael J. Moore Expert Report | June 28, 2013 | 1 | I |
| 2 | Affidavit of Nicholas J. Sales | June 28, 2013 | 80 | I |
| 3 | LaPlant, Complaint and Jury Demand | Aug. 26, 2008 | 82 | I |
| 4 | LaPlant, Decision and Order on Motion of Plaintiff for Class Certification | Oct. 26, 2009 | 105 | I |
| 5 | Paul Benson *et al.*, A Call to Reform Wisconsin's Class-Action Statute, 84 Wisconsin Lawyer 9 | Sept. 2011 | 168 | I |
| 6 | Robert L. Hoyer Deposition | May 17, 2013 | 173 | II |
| 7 | Ravi Dhar Expert Report | July 01, 2013 | 179 | II |
| 8 | Marleen LaPlant Deposition Transcript | Sept. 09, 2009 | 212 | II |
| 9 | LaPlant Policy | May 1, 1975 | 240 | II |
| 10 | LaPlant Surrender ( Annuity Distribution Request) | July 7, 2008 | 253 | II |
| 11 | Merriam Webster Collegiate Dictionary 10th Edition | 1996 | 257 | II |
| 12 | Blacks Law Dict 7th | 1999 | 261 | II |
| 13 | Noonan v. Northwestern Mutual Life Ins. Co., 726 N.W.2d 356 (Wis. Ct. App. 2006) | Nov. 16, 2006 | 264 | II |
| 14 | Noonan v. Northwestern Mutual Life Ins. Co., 2005 WL 6216361 (Wis.Cir. July 6, 2005) | July 6, 2005 | 272 | II |
| 15 | Thao v. Midland Nat. Life Ins. Co., 2012 WL 1900114 (E.D. Wis. May 24, 2012) | May 24, 2012 | 276 | II |
| 16 | Robert L. Hoyer Expert Report | Mar. 4, 2013 | 284 | II |
| 17 | *American Express Co. et al. v. Italian Colors Rest. et al.*, __ S. Ct. __, 2013 WL 3064410, No. 12-133 (June 20, 2013) | June 20, 2013 | 289 | II |
| 18 | *Boelk v. AT & T Teleholdings, Inc.*, 12-CV-40-bbc, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013) | Jan. 10, 2013 | 307 | II |

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **MARLEEN M. LAPLANT, on her own behalf and on behalf of a class similarly situated,** | ) ) ) | Case No. 2:11-CV-00910 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| **THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, a Wisconsin mutual insurance corporation,** | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

# EXPERT REPORT OF MICHAEL J. MOORE, PH.D.

## June 28, 2013

# TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................................................4

A.   Qualifications and Professional Experience ...............................................................4

B.   Allegations and Assignment .........................................................................................5

     1.   Description of putative class ..............................................................................5

     2.   Description of defendant ....................................................................................7

     3.   Allegations .........................................................................................................8

     4.   Assignment .........................................................................................................9

     5.   Materials relied upon .........................................................................................9

C.   Analytical Approach ....................................................................................................10

     1.   Common impact and common proof of impact ................................................11

     2.   Common damages methodology .......................................................................12

     3.   Characterization of the but-for world ..............................................................14

D.   Summary of Opinions ..................................................................................................16

II.  BACKGROUND RELEVANT TO ANALYSIS ...........................................................17

A.   Economics of Annuities and Investing .......................................................................17

     1.   At-issue annuities .............................................................................................17

     2.   Economics of investing ....................................................................................18

B.   NM's 1985 Change .......................................................................................................20

III. ANALYSIS ASSUMING NM IMPLEMENTS AND PROVIDES NOTICE OF THE 1985 CHANGE.....22

A.   Establishing Impact Requires Individualized Inquiry .............................................23

     1.   Some class members might not have behaved differently because they knew about the 1985 change in the actual world ..........................................................................23

     2.   Some class members might not have behaved differently because they would have chosen not to review disclosures ..............................................................................24

     3.   Some class members might not have behaved differently having reviewed a disclosure of the 1985 change ..............................................................................26

B.   For Those Who Would Have Behaved Differently in the But-For World, Estimating Damages Requires Individualized Inquiry ..............................................................................27

2

App. 002

**IV. ANALYSIS ASSUMING NM SEEKS APPROVAL FOR THE 1985 CHANGE** ...................................**27**

**A.**     **Establishing Impact Requires Individualized Inquiry** ............................................................**28**

      *1.*   *Some class members might have approved the change without reviewing it.*..........................*28*

      *2.*   *Some class members might have approved the change because they agreed with it*..............*28*

**B.**     **For Those Who Would Not Have Approved the 1985 Change, Estimating Damages Requires Individualized Inquiry** ............................................................................................................**29**

**V. ANALYSIS ASSUMING NM DOES NOT IMPLEMENT THE 1985 CHANGE** ..........................**29**

**A.**     **Many Members of the Putative Class Were Not Injured in this Scenario** ................................**29**

**B.**     **Establishing Impact Requires Individualized Inquiry** ............................................................**31**

      *1.*   *Investors respond to differentials in the rate of return* ........................................................*32*

      *2.*   *Some annuitants' responses to differential rates of return might have led them to be uninjured*............*33*

      *3.*   *Discerning which annuitants would have behaved differently in the but-for world requires individualized inquiry* ........................................................................................................*34*

**C.**     **For Those Potentially Injured, Estimating Damages Requires Individualized Inquiry** .........................**35**

**VI. ANALYSIS OF HOYER REPORT** ..............................................................................................**36**

**A.**     **Mr. Hoyer's Assignment Does Not Address Common Impact or Damages**................................**36**

**B.**     **The Hoyer Report Does Not Establish Common Economic Impact Among Putative Class Members** ..**38**

**C.**     **A Common Methodology for Estimating Class-wide Damages Cannot Be Derived from the Hoyer Report**........................................................................................................................................**39**

      *1.*   *The Hoyer Report does not account for differences in annuitant behavior between the actual and but-for worlds* ........................................................................................................................*39*

      *2.*   *The Hoyer Report does not take into account all relevant characteristics of the at-issue policies* .........*40*

App. 003

# I. INTRODUCTION

## A. Qualifications and Professional Experience

1. My name is Michael J. Moore. I am a Senior Lecturer at Yale University, with appointments in the Jackson Institute for Global Affairs, the School of Management, and the School of Public Health. I currently teach courses in Competitive Strategy, Regulation and Antitrust, and Microeconomics. Most recently, before joining the faculty at Yale in 2012, I was a Professor of Public Policy at the Batten School of Leadership and Public Policy at the University of Virginia, where I taught courses in Econometrics, Statistics, and Cost-Benefit Analysis. I received my Ph.D. in Economics in 1984 from the University of Michigan. My professional career has been devoted to research, teaching, and consulting in applied microeconomics, including the fields of industrial organization, law and economics, risk and insurance, regulatory and antitrust policy, health economics, econometrics, and statistics. I have also served on the faculties of the University of Virginia (Darden, Law School, Economics, and Medical School), Duke University (Fuqua School of Business, Sanford Institute of Public Policy, and the Center for Aging, Duke Medical Center), the University of Chicago (Graduate School of Business), INSEAD, UC-Santa Barbara (Donald Bren School of the Environment), and the University of Georgia (Terry College of Business). In 1998-99, I was the John M. Olin Fellow in Law and Economics at the George Stigler Center at the University of Chicago.

2. I have published approximately 50 articles in scholarly journals, monographs, and proceedings, and have acted as referee for hundreds of articles submitted to the leading scholarly journals in economics. My research has been funded by the National Science Foundation, the National Institutes for Health, and the U.S. Veteran's Administration. My published research consists almost entirely of economic analyses of real world problems. I have won three awards for this research: the Kenneth Arrow Award for Best Paper in Health Economics (1993), the Kulp-Wright Award for Best Book in Risk and Insurance (1992), and the Best Article Award (1988) from the economics journal Economic Inquiry.

3. My expertise in this matter lies in my general knowledge of economics, particularly law and economics, competition policy, the economics of risk, uncertainty, insurance, and asset pricing, and of the econometric and statistical methods often used to compute economic

4

damages. I have acted as an economic expert in a testifying or consulting capacity in a number of cases. I am being compensated for my work at the rate of $750 per hour. I have directed employees of Analysis Group, Inc., an economics research and consulting firm, to assist me in this assignment. I also receive compensation based on the professional fees of Analysis Group. My curriculum vitae and record of recent testimony are presented in Appendices A and B.

4. I reserve the right to augment or alter any of the opinions expressed herein upon receipt of further evidence or information.

### B. Allegations and Assignment

#### 1. Description of putative class

5. Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief ("Plaintiff's Brief") was filed on March 4, 2013 on behalf of Marleen M. LaPlant and a putative class of purchasers of Northwestern Mutual annuity products.[1] The putative class is defined in Plaintiff's Brief to be:

> All persons who (a) purchased a Northwestern Mutual Life Insurance Company Flexible Premium Annuity or Retirement Annuity (or other deferred, fixed annuity) in force and in its deferral period as of March 31, 1985, and (b) did not sign the 1983 Amendment Agreement while residing in a state other than Wisconsin, and their successors in interest. Excluded from the Class are any of Northwestern's officers, trustees and their family members or affiliates.[2, 3]

---

[1] Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, March 4, 2013 ("Plaintiff's Brief").

[2] Plaintiff's Brief, p. 13.

[3] As used by Northwestern Mutual, "Flexible Premium Annuity" ("FPA") refers to an annuity for which the annuitant may make a range of different premium payments, "Retirement Annuity" ("RA") refers to an annuity with a fixed premium due at regular time intervals, and "Single Premium Retirement Annuity" ("SPRA") refers to an annuity with a single up-front premium payment. The data I have received to date from Northwestern Mutual include only RAs prior to 1971. The data include new RAs, FPAs and SRAs for 1971. After 1971, all new Northwestern Mutual annuities in the data were either FPAs or SPRAs.

5

6.     Marleen LaPlant entered into an annuity contract with Northwestern Mutual on May 1, 1975. Mrs. LaPlant surrendered her annuity on July 3, 2008 and retired on July 31, 2008.[4]  She was a resident of Wisconsin when she entered into her annuity contract, as well as when she surrendered it.[5]  Plaintiffs seek to add Bruce Williams as an additional representative of the class.  Mr. Williams holds two Northwestern Mutual annuities still in the accumulation phase: his Flexible Premium Annuity was purchased on July 27, 1984 and his Single Premium Retirement Annuity was purchased on May 3, 1984.[6]  Mr. Williams was a resident of Wisconsin when he purchased the two annuities and remains so today.[7]

7.     Using data provided by Northwestern Mutual as part of this litigation, I estimate that 19,735 policies are potentially at issue in this litigation.  These policies were purchased by 18,553 individual annuitants (some annuitants purchased more than one policy).  Exhibit 1 describes my determination of the putative class, starting with potential class annuities identified by Northwestern Mutual and accounting for exclusions as identified in the definition of the class in Plaintiff's Brief.[8]  Annuitants who signed Update '83 outside of Wisconsin are not

---

[4]    Deposition of Marleen LaPlant, September 9, 2009, p. 77:2-6 ("Q …When did you actually retire? A. July 31st of '08"); Exhibit 1 to deposition of Marleen LaPlant, September 9, 2009, pp. 121-124.

[5]    Complaint and Jury Demand, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, August 26, 2008 ("Complaint and Jury Demand, *LaPlant v. NM*"), ¶8 ("The plaintiff Marleen M. LaPlant resides at W7868 Riedel Lane, in the City of Fort Atkinson, Jefferson County, Wisconsin 53538. She entered into the annuity contract with Northwestern attached hereto as Exhibit A on May 1,1975) and  ¶13 ("she and all Class members were residents of the State of Wisconsin at the time that they purchased the Annuity contracts."); also see Exhibit 1 to deposition of Marleen LaPlant, September 9, 2009, pp. 121-126.

[6]    Plaintiff's Brief, pp. 16-17 ("In addition, plaintiff seeks to add Bruce Williams as an additional representative for the expanded Class."); Trial Exhibit 155, NM Policy of Bruce L. Williams, July 27, 1984 and Trial Exhibit 157, NM Policy of Bruce L. Williams, May 3, 1984.

[7]    Deposition of Bruce Williams, May 18, 2010,  p. 4:10-15 ("Q. Could you please give your address for the record as well? A. 10230 West Grange Avenue, Hales Corners, Wisconsin, 53130. Q. And how long have you lived at that address? A. Since '85, about 35 years I guess."). Also see Trial Exhibit 155, NM Policy of Bruce L. Williams, July 27, 1984.

[8]    Plaintiff's Brief, p. 13.

included in the class.[9]  Exhibit 2 shows the state of residence of class members with pre-MN annuities in-force as of end-of-year 2012.

8.   Using data provided by Northwestern Mutual as part of this litigation, I estimate that of the 18,553 putative class members, 4,860 owned a Northwestern Mutual life insurance policy as of 2012.  Of these, 1,374 either terminated or surrendered their annuity policies before the beginning of 1994.  I also estimate that 9,931 concurrently owned a Pre-MN annuity and Northwestern Mutual life insurance policy for some time during the class period.[10]

9.   Using data provided by Northwestern Mutual as part of this litigation, I estimate that of the 18,553 putative class members, 1,665 of them purchased a Current Rate Annuity ("CRA") from Northwestern Mutual at some point during the class period.[11]

### 2.   Description of defendant

10.   Northwestern Mutual Life Insurance Company ("NM") was founded in 1857.  According to its website, NM is the largest direct provider of individual life insurance in the United States. NM sells its policies through independent contractor agents and has more than 350 offices in the United States.[12]

11.   As of 2013, annuities accounted for 9% of NM's $202 billion in assets under management. The company currently manages $18.3 billion in annuity assets, covering 325,500 client

---

[9]   Plaintiff's Brief, p. 1 ("After removal, the Seventh Circuit held that annuitants who signed an amendment with a choice of law clause outside of Wisconsin may not have Wisconsin-law claims. Accordingly, we seek in the present motion to certify a class combining all Annuitants who have Wisconsin law claims: those who did *not* sign the amendment and those who amended in Wisconsin."). Update '83 was a policy amendment, also referred to as the 1983 Amendment Agreement, offered by Northwestern Mutual in 1983. The purpose of the amendment was to directly link a policy's annual dividends to the loans taken against that policy.

[10]   See Exhibit 3.

[11]   See Exhibit 4.  Northwestern Mutual introduced the Current Rate Annuities or "CRA" policies in 1985 as a replacement for its existing FPA and SPRA products. The CRAs were designed to track "new money" rates by paying an interest rate on deposits that was declared monthly by the company (see Minutes of Insurance Product & Marketing Committee, September 26, 1984, ML2_NM_4832 to ML2_NM_4836, for additional description; also see Planning Committee Minutes, July 19, 1984, ML2_NM_4877 to ML2_NM_4882).

[12]   Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013.

7

contracts.[13]  In addition to annuities, NM provides life, disability, and long-term care insurance policies as well as other investment products and services.[14]  In 1985, the company managed a total of $18 billion in assets (approximately $39.3 billion in 2013 dollars).[15, 16]

### 3. Allegations

12.  Plaintiffs allege that NM has violated the terms of at-issue (pre-MN) annuity contracts starting in 1985 by unilaterally changing the basis on which it credits Annuitants' accounts (the "1985 change").[17]  Before the change, plaintiffs allege these credits were based on a dividend interest rate derived from NM's divisible surplus.[18]  After the change, plaintiffs allege credits were based on the interest earned on a segmented account of short to medium term investments.[19]  Plaintiffs further allege that NM did not notify Annuitants of the 1985 change, nor did it seek their approval of such a change.[20]  Plaintiffs' brief in support of class certification contains a section titled, "*Damages Can be Calculated on a Class-Wide Basis,*" in which plaintiffs purport to advance a common, formulaic method to calculate class-wide

---

[13]  Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013.

[14]  Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013.

[15]  Northwestern Mutual Life, Trial Exhibit 285, "1985 Annual Report".

[16]  In January 2013, the Consumer Price Index (CPI) was approximately 2.18 times greater than the CPI in January 1985. See U.S. Department of Labor Bureau of Labor Statistics, "Consumer Price Index," last updated June 18, 2013, available at <ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt>, accessed on June 24, 2013.

[17]  Complaint and Jury Demand, *LaPlant v. NM,* ¶2 ("To initiate this scheme, Northwestern unilaterally and deceptively altered the basis on which it credited the accounts of Annuitants.").

[18]  See "Retirement Annuities," ML_NML3_0446.

[19]  Complaint and Jury Demand, *LaPlant v. NM,* ¶2 ("Ignoring the Annuity contract's plain requirement to credit the Annuitants' accounts with a genuine share of the Company's divisible surplus as dividends, Northwestern instead has credited Annuitants with what it continues to call 'dividends' but in fact is merely the interest earned on an account limited to some short-term bonds exclusively and secretly chosen by Northwestern.").

[20]  Complaint and Jury Demand, *LaPlant v. NM,* ¶33 ("Northwestern never solicited or obtained the Annuitants' agreement to this 1985 change, nor did it even disclose the change to them in its Annual Reports to policyholders of otherwise."); Complaint and Jury Demand, *LaPlant v. NM,* ¶35 ("Because Northwestern did not follow its own policy and practice of informing the Annuitants of the change and seeking their written consent to alter the terms of the Annuities, the Annuitants were left unaware and without a reasonable means for learning that Northwestern was no longer crediting genuine dividends to their accounts.").

8

App. 008

damages.[21]  Plaintiffs seek to certify a nationwide class of Pre-MN annuity holders, asserting 1) that all such Annuitants suffered a common injury as the result of NM's alleged acts, and 2) that damages can be computed on a common, formulaic basis for the entire class.[22]

### 4. Assignment

13.    I have been asked by Counsel for Defendant NM to assess whether the economic facts and evidence support a finding that all putative members of the class suffered "impact" (i.e., whether impact is "common"), whether proof of impact is common, and whether damages can be computed for all putative members of the class using a common methodology.  I have further been asked to evaluate whether Mr. Robert Hoyer's Expert Report, submitted on behalf of Plaintiffs on March 4, 2013, offers a method of proof of impact that is common to all class members, whether he proves that impact is common, and whether he provides a viable common, formulaic methodology for computing damages to individual class members.[23]

### 5. Materials relied upon

14.    In preparing my report, I was assisted by a staff of economists at Analysis Group, Inc.  All opinions are my own, and all decisions concerning analyses to be conducted and included are also my own.

15.    I reviewed documents and materials produced by Plaintiffs and Defendants in this matter. See Appendix C for a list of documents reviewed.  In some cases where there was a

---

[21]    Plaintiff's Brief, pp. 25-26 ("Plaintiff is prepared to prove injunctive and damages relief on a class-wide basis…Here the effect of the 1985 Change on policyholders can be calculated mechanically using common evidence, without resort to individualized trials. …The difference between the 'dividend' rate used pursuant to the 1985 Change and the portfolio-based rate that should have been used can readily be determined from Northwestern's records.").

[22]    Complaint and Jury Demand, *LaPlant v. NM*, ¶41 ("Northwestern's actions have injured and will continue to injure Annuitants by under-crediting their accounts by millions of dollars per year."); Plaintiff's Brief, p. 2 ("Plaintiff demonstrates in the accompanying expert report of Robert Hoyer (App. 727-52) how damages can be calculated on a formulaic basis for each class member.").

[23]    See Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013 ("Hoyer Report").

9

voluminous record, I identified areas in which I was interested, and instructed my research team to examine documents for relevant evidence. In all of those cases, I conducted my own independent reviews of the evidence to confirm that my instructions had been carried out effectively. My inquiry into this matter is ongoing, and I reserve the right to consider any new evidence of which I might become aware and, if necessary based on this new evidence, to alter my opinions.

### C.  Analytical Approach

16.  I understand as an economist that there are three thresholds under consideration in my assignment - whether impact is common, whether determination of impact is amenable to common proof, and whether there is available a viable common damages methodology. In particular, is the injury resulting from the alleged harm provable using evidence common to the class, and is there a methodology that allows the measurement of damages on a class-wide basis using a common method or formula?[24]

17.  The foundation of my analysis is the determination of impact and the measurement of damages at the individual level. If it can be shown that all, or almost all, individuals have suffered injury using "common" evidence, then impact is "common," and the evidence used constitutes "common proof." If all, or almost all, individual damage calculations can be made using the same evidence and method, then a common damages method is available.

18.  To determine individual impact and damages I compare a plaintiff's economic position in the actual world, where the alleged misconduct occurred, with his or her economic position in the relevant counterfactual or "but-for" world, i.e., the world as it would have been had the alleged misconduct not occurred. As summarized by Allen, Hall and Lazear (2011), "The first step in a damages study is the translation of the legal theory of the harmful event into an

---

[24]  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426,1430 (2013) ("The District Court held, and it is uncontested here, that to meet the predominance requirement respondents had to show (1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of proof at trial through evidence that [was] common to the class rather than individual to its members'; and (2) that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.'").

10

analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position….Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved."[25]

### 1. Common impact and common proof of impact

19. I consider *individual* impact (injury) to be a binary outcome: either a plaintiff is injured or not. An *injured* plaintiff is one who is worse off in the actual world than in the applicable but-for world, absent the alleged misconduct. In my understanding as an economist, if all or almost all plaintiffs suffer the same type of impact as a result of Defendant's actions at issue, then the *common impact* threshold for class certification is satisfied. I interpret *amenability to common proof* to mean that proof that one plaintiff was injured constitutes proof that all, or almost all, plaintiffs were injured.

20. In my opinion as an economist, common proof of class-wide impact requires demonstrating that 1) a given plaintiff, such as Mrs. LaPlant, would have had a better economic outcome in the applicable but-for world than in the actual world, and that 2) the same type of evidence used to show Mrs. LaPlant's injury also shows that all, or almost all, of the other class members would also have had a better outcome in the applicable but-for world than in the actual world.

---

[25] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Losses in Damages Awards," in *Reference Manual on Scientific Evidence*, The National Academies Press, 2011 ("Allen, Hall, and Lazear"), p. 432.

See also ABA Section of Antitrust Law, *Proving Antitrust Damages, Legal and Economic Issues*, 2nd Edition, American Bar Association, 2010, p. 53 ("The essential starting point for any damages quantification is the but-for premise that the defendant's violation did not occur. That premise is the foundation for constructing a hypothetical 'but-for world,' which, when compared to the plaintiff's actual experience, should isolate the effect of the violation on the plaintiff from the effects of all other events. A quantification of the difference between the plaintiff's experience in the but-for and actual worlds determines the amount of damages.").

11

App. 011

## 2. Common damages methodology

21. While I consider impact to be binary, I consider damages to be a "continuous" outcome, like temperature or weight. Calculating individual damages requires quantifying the difference in economic outcomes between the actual and the but-for worlds. In my opinion, the difference between rates of return in the actual and but-for worlds constitute the most meaningful measure of an individual's changed economic position due to the alleged misconduct in this case. This difference, if found to be important, would then be used to compute damages based on facts such as the cash value of the policy, borrowed amounts, and date of termination. Using this measure, putative class members will have been injured if the return on their annuity investment in the actual world was less than the return on whatever investment program they might have implemented in the but-for world. Damages is the measure of the extent of that injury.

22. Calculating damages for any individual in this case requires two things: First, identification of the appropriate but-for world, reflecting the actions NM would have taken absent the alleged misconduct, and second, determination of the counterfactual returns to individual class members, based on their most likely course of action in this but-for world. For example, some NM annuitants in the but-for world might have contributed less to their NM annuities than they did in the actual world, or perhaps borrowed more from their policies in order to take advantage of higher returns elsewhere. For each individual annuitant, such alternative investment strategies would have to be identified and the returns on the alternatives quantified and compared to actual returns for each member of the class.

23. More generally, any damages calculation will require a combination of factual and behavioral evidence from both the actual and but-for worlds. Evidence about the actual world can often be gathered from existing records that include many important "actual world facts." However, evidence about the but-for world is not so readily available. While some facts will be the same in both worlds, such as age and gender, others, particularly those related to individual investment decisions and the associated returns, will not. Evidence of much of the relevant behavior in the but-for world, particularly evidence regarding individual

investment decisions, is necessarily based on inferences made using economic theory and empirical evidence, and not amenable to determination via formula.[26]

24. For damages to be determined for all class members on a class-wide basis, they must be quantifiable through a common, formulaic approach. For the formulaic approach to be common, it must "work" for every, or almost every, class member. For it to work for almost every class member, it must rely on the same factual and behavioral evidence from both the actual and the but-for worlds for each class member, and the gathering of this evidence must not require individualized inquiry.

25. To take a concrete example, consider named plaintiff Mrs. LaPlant. In order to compute how much more she would have earned in the but-for world than she did in the actual world, I would have to make predictions about her behavior in the but-for world. For example, I might, based on evidence from the record or from additional interviews, predict that Mrs. LaPlant would have terminated her policy sooner in the but-for world than she did in the actual world. This might be the case, for example, because she might have earned a lower return in the but-for world and terminated her policy earlier in order to earn a higher return elsewhere. To calculate her but-for returns, I would need to predict when she would have terminated her policy and where she would have invested her money in the but-for world. Using these predictions, I would calculate her but-for returns. I would then subtract her actual returns from her but-for returns in each year to arrive at an estimate of her annual lost returns.

26. If my predictions about the behavior of each annuitant in the but-for world are identical to my predictions about Mrs. LaPlant's behavior, then proof that Mrs. LaPlant was injured would constitute proof that all class members were injured. If the predictions are not identical for other class members because, for example, some class members might have terminated, borrowed from, or reduced their contributions to their annuities in order to invest elsewhere in the but-for world in a manner different from Mrs. LaPlant, then the nature of the

---

[26] Statistical models that might be used to predict counterfactual behavior are, in the absence of a controlled experiment, fraught with econometric problems. See Angrist, Joshua D., and Alan B. Krueger, "Empirical strategies in labor economics," in *Handbook of Labor Economics*, Vol. 3, 1999, pp. 1277-1366.

13

inquiry and the formula utilized do not work either as a common method of proof of impact or as a common method to compute damages.

27. A common damages formula can allow for differences in certain individual facts, observable in the actual world and invariant in moving to the but-for world, that act as inputs into the formula (e.g. individual class members have policies with different cash values). The dollar amount of damages can therefore differ by class member. However, the damages formula cannot depend on idiosyncratic, hypothetical evidence. If individualized inquiry is required to establish these hypothetical conditions (e.g., "what would you have done with your annuity policy?"), a common, formulaic approach to damages does not exist.

### 3. Characterization of the but-for world

28. A clear statement about the but-for world is an important step in a damages analysis. As described by Allen, Hall, and Lazear (2011), this includes "a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario."[27]

29. In the present case, one central question for determining individual impact concerns which "proper actions" NM would have taken as alternatives to the action at issue that it did take in the actual world. This is a "common question," applicable to all plaintiffs. It needs to be answered in order to set the context for evaluating how individual plaintiffs would have responded. There are at least three possible scenarios regarding the characterization of NM's behavior in the but-for world:

- Notice Scenario: This but-for world is one in which the defendant, NM, directly informed the individual plaintiffs of its decision to invest in, and pay, policy dividends based on the segmented account. This but-for world is consistent with a finding that NM was entitled to change the policy but should have disclosed the change in a specific manner.

- Consent Scenario: This but-for world is one in which NM requested approval from policyholders for the 1985 change. Using the '83 change as a benchmark example,

---

[27] Allen, Hall, and Lazear, p. 432.

14

NM could have implemented the 1985 change only for those policyholders who approved it, which could in turn affect the dividends of all policyholders. This but-for world is consistent with a finding that NM needed approval from policyholders to modify how their annuity dividends were calculated.

- No Change Scenario: This but-for world is one in which NM made no change in how it determined dividends for the pre-MN annuity policies.[28]

30. The central question for determining individual impact concerns what action(s) each annuitant would have taken in response to NM's behavior in the but-for world. Possible annuitant responses include at least the following, each of which requires a different approach to computing the difference in returns and therefore impact:

- Retain the pre-MN NM annuity with no change to contribution or borrowing levels over time relative to what they did in the actual world.[29]

- Retain the pre-MN NM annuity while changing either the level of contributions or the borrowing level relative to what they did in the actual world. In order to examine impact and calculate damages in this circumstance, I would need to know the timing and the magnitude of the change for each annuitant, as well as the alternative use to which the annuitant would have put the extra cash at his or her disposal. For example, annuitants could increase their borrowing (in varying amounts across annuitants) in order to invest in an alternative vehicle with a higher return.

- Terminate the pre-MN annuity and transfer its cash value to a different investment vehicle. In order to examine impact and calculate damages in this circumstance, I would need to know the termination date and the returns on the new, alternative investment for each annuitant who took this action.

31. I conduct my analysis below for each of the three baseline scenarios regarding NM's behavior in the but-for world outlined above. I then consider what actions annuitants might have taken in response to each scenario, using available deposition testimony and documentary evidence concerning annuitant behavior in the actual world.

---

[28] This is the but-for world regarding NM's behavior advanced by Plaintiffs' expert. See Hoyer Report, ¶54 ("This report quantifies the DIRs which would have been credited to Pre-MN annuity policyholders But-For the 1985 Change.").

[29] This appears to be the sole plaintiff response considered by Mr. Hoyer. See Section VI.C.1. below and Hoyer Report, ¶7 ("Prospective relief involves NML crediting to Pre-MN annuity policyholders' accounts the additional amount that would have accumulated 'But-For' the 1985 Change….").

15

### D. Summary of Opinions

32. I have three principal conclusions. First, regardless of the appropriate baseline scenario regarding NM's behavior in the but-for world, I find that the economic facts and evidence are inconsistent with a finding that all putative class members suffered injury, much less a common injury. For example:

   - Had NM disclosed the 1985 change, the evidence indicates that some putative class members would have behaved the same way they did in the actual world. These individuals would have the same outcome in the but-for world as they had in the actual world and therefore are uninjured.

   - Had NM sought approval for the 1985 change, the evidence suggests that some putative class members would have approved the change and behaved the same way they did in the actual world. These individuals would have the same outcome in the but-for world as they had in the actual world and therefore are uninjured.

   - Had NM not made the 1985 change, the evidence suggests that, absent any difference in behavior, approximately 30 percent of the class were not financially injured by the 1985 change.

33. Second, I find that damages cannot be computed for all putative class members using a common methodology. In each of the three baseline scenarios, the evidence suggests that some policyholders' behavior would have been different in the but-for world because of disclosure or because they would have faced but-for dividend interest rates that would have been different than the actual world dividend interest rates. Those policyholders whose behavior would have been different might have suffered damages, but the extent of their financial harm depends on their behavior in the but-for world. For example, some might have terminated their policies earlier, while others might have altered their premium payments. Without individualized inquiry, it is not possible to determine the financial injury suffered by each policyholder. Furthermore, the determination that one policyholder would have been injured in this scenario tells us nothing about whether any others would also have been injured.

34. Finally, I note that Mr. Hoyer's Expert Report does not address the issue of class-wide proof of common impact, and I conclude that it does not provide a common method for calculating damages. In fact, Mr. Hoyer's calculations and his deposition testimony *confirm* my affirmative opinion that impact was not common. His results indicate that up to 30 percent of pre-MN policyholders might have suffered no financial injury as a result of the 1985

16

App. 016

change. Mr. Hoyer's analysis is incomplete because he considers only one of several possible but-for worlds regarding NM's behavior. He does not take into account that policyholder behavior might have been different in the but-for world than in the actual world. In addition, Mr. Hoyer makes several errors in his calculation of differences in returns.

## II. BACKGROUND RELEVANT TO ANALYSIS

### A. Economics of Annuities and Investing

#### 1. At-issue annuities

35. An annuity is a contract with a life insurance company that guarantees payments at regular intervals for a particular period of time. It provides the annuitant with a minimum income guarantee, with the minimum level depending on the level of contributions to the annuity.[30]

36. The annuities at issue in this case are "deferred" annuities. The annuitant contributes to the policy during an accumulation period and receives payments from the policy during the distribution period. The annuities at issue have several characteristics that make them potentially attractive investment vehicles: annuities offer a guaranteed minimum investment return; annuitants can terminate their policy and withdraw the cash value of accumulated funds; contributions to some annuities are tax-deferred; and annuitants can borrow a portion of the cash value of the policy at a contractually determined interest rate.[31]

37. The annuities at issue were also customizable; policyholders had a wide variety of choices in purchasing and managing their policies. Exhibit 5 presents selected characteristics of the at-issue annuities that can vary across policies. For example, annuitants could choose whether to purchase an FPA or an SPRA. Annuitants could choose a dividend payout option and a maturity option.

---

[30] For general background information on annuities, see U.S. Securities and Exchange Commission, "Annuities," April 6, 2011, available at <http://www.sec.gov/answers/annuity.htm>, accessed on June 17, 2013. Also, see Sullivan, Paul, "Annuities: What You Need to Know," *The New York Times*, January 27, 2009, available at <http://www.nytimes.com/2009/01/28/your-money/annuities/primerannuities.html?ref=annuities>, accessed on June 17, 2013.

[31] See Trial Exhibit 121, LaPlant Contract; Trial Exhibit 189, Dividend Interest Rate Tables.

38.     In addition to the loan rate, NM annuity policies specified fees related to administrative and transaction costs that the company charged to its policyholders. For example, named Plaintiff Marleen LaPlant's annuity contract specified a front-end load fee of 10% per premium payment, a $0.50 "collection charge" per premium payment, and a $10 per year "policy fee."[32]

### 2.      Economics of investing

39.     Financial economists define investment to be the purchase of an asset with the goal of accruing pecuniary returns from this asset in the future.[33]  Two principal characteristics of any financial asset are risk and return.[34]  Return is the growth rate (percent change) in the value of the asset per unit of time.  Risk measures are based on variability in the return.

40.     Investor preferences are classified as either risk-averse, risk-neutral, or risk-loving. Risk aversion is defined as a preference for less variability at any given level of return.[35]  The typical assumption in the finance literature is that investors are risk-averse.  Risk aversion is empirically consistent with observed behavior in most contexts.[36]  Risk preferences, including the degree of risk-aversion, vary widely across investors.[37]

---

[32]   See Trial Exhibit 121, LaPlant Contract.

[33]   See, for example, Downes, John and Jordan E. Goodman, *Dictionary of Finance and Investment Terms*, Barron's Educational Series, 2010, pp. 366-367.

[34]   Depending on the context, returns can either be expected returns (i.e., those that will likely accrue in the future) or "historical" returns (i.e., those actually earned in the past).  I will use "return" for each, unless the use of the modifying adjective is called for.

[35]   See, for example, Holt, Charles A. and Susan K. Laury, "Risk Aversion and Incentive Effects," *The American Economic Review*, Vol. 92, No. 5, Dec., 2002 ("Holt and Laury"), pp. 1644-1655.

[36]   See, for example, Holt and Laury, pp. 1649-1654.

[37]   Vitt, Lois A., "Risk Tolerance," in *Encyclopedia of Retirement and Finance*, Vol. 1, Greenwood Publishing Group, Inc. 2003, p. 688 ("Subjective risk tolerance varies by age, gender, education, and other factors. However, financial advisors should not assume that any unique individual shares the average characteristics of his or her group. Within each group—for instance, among older Americans—there is a wide variation of subjective and objective risk tolerance.").

18

41.    Portfolio theory shows how it is possible to construct a set of asset portfolios that maximize expected return at every given level of risk.[38]  Higher expected return portfolios will entail higher risks.  The particular portfolio chosen from this set by an individual investor will depend on that individual's attitudes towards risk and expected return, with more risk-averse investors tending to choose safer, less risky portfolios.[39]

42.    Another characteristic that determines demand for a particular asset is its liquidity, or how easy it is to get cash out of the investment. Because more liquidity is preferred to less, less liquid assets will pay a premium over more liquid assets in equilibrium.  Important determinants of the demand for liquidity include the investor's time horizon and expectations about the future rate of inflation, which vary across individuals. Therefore, the demand for liquidity will vary across individual investors.[40]

43.    In sum, investors will construct portfolios consistent with their preferences for expected return, risk, and liquidity, given that assets with higher expected returns are associated with higher risks and may be associated with lower liquidity.  One investor might put all his or her money into low risk-low expected return Treasury bonds, and another might put all his or her money into high risk-high expected return stocks.  Yet another might construct a portfolio that combines the two.

44.    Many investors include annuities as part of a larger investment portfolio, which would be constructed in its entirety to generate expected returns with a risk/return profile consistent with the preferences of the investor.  The academic literature in finance provides evidence that individual investors will seek to rebalance their investment portfolios in response to changes in relative rates of return or risks on different assets within and outside their

---

[38]  For a detailed explanation of risk, return and diversification, see Brealey, Richard A. and Stewart C. Myers, Principles of Corporate Finance, McGraw-Hill, Inc., 1991, 4th Edition ("Brealey and Myers"), Chapter 7.

[39]  For additional background on investment, risk and return, see Brealey and Myers.

[40]  Marquard, Steven, *The Distortion Theory of Macro-Economic Forecasting*: *A Guide for Economists and Investors*, Greenwood Publishing Group, Inc. 1994, p. 41 ("[T]he liquidity preference ratio, the ratio between an individual's cash balance and the market value of his physical good.... varies from individual to individual just as any other valuation of different options does. Variations reflect different shapes of individuals' revenue lines and different personal time preferences. Each of these trace to personal natures and circumstances.").

19

portfolio.[41]   Economic analysis also shows, in particular, that investors will decrease their contributions to pensions when the expected rate of return on other forms of savings increases relative to the expected rate of return on pension deposits.[42]

### B.    NM's 1985 Change

45.   NM's decision to change the basis for calculation of returns to pre-MN annuities in March of 1985 was implemented in response to a change in the economic environment.  In the early 1980s, shorter term investments were earning more than longer term investments.[43]   NM's investment portfolio was concentrated in longer term investments, and the Dividend Interest Rate ("DIR"), which formed the basis of its calculation of returns to both insurance and annuities up to that point, reflected the lower long term returns.[44]

46.   According to NM, some NM annuitants responded to changing relative interest rates by reducing premium payments and increasing policy surrenders.[45]   In other words, they apparently took their funds out of NM accounts in order to earn a higher return elsewhere.[46]

---

[41]   See, for example, Rosen, Kenneth T. and Larry Katz, "Money Market Mutual Funds: An Experiment in Ad Hoc Deregulation: A Note," *The Journal of Finance*, Vol. 38, No. 3, Jun., 1983, pp. 1011-1017; Gibson, William E. and James L. Pierce, "Deposit Demand, 'Hot Money,' and the Viability of Thrift Institutions," *Brookings Papers on Economic Activity*, Vol. 1974, No. 3, 1974, pp. 593-636.

[42]   Bernheim, B. Douglas and John B. Shoven, Pension Funding and Saving, in *Pensions in the U.S. Economy*, Zvi Bodie, John B. Shoven and David A. Wise (Eds.)*,* University of Chicago Press, 1988, pp. 85-114.

[43]   See, for example, Downes, John and Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms*, Barron's Educational Series, 2010, p. 366. ("Normally, lenders receive a higher yield when committing their money for a longer period of time; this situation is called a POSITIVE YIELD CURVE.  An inverted YIELD CURVE occurs when a surge in demand for short-term credit drives up short-term rates on instruments like Treasury bills and money-market funds, while long-term rates move up more slowly, since borrowers are not willing to commit themselves to paying high interest rates for many years.  This situation happened in the early 1980s, when short-term interest rates were around 20%, while long-term rates went up to only 16% or 17%. The existence of an inverted yield curve can be a sign of an unhealthy economy, marked by high inflation and low levels of confidence.").

[44]   Plaintiff's Brief, Appendix Exhibit 39, "Explanation of 1986 Dividend Scale for MM and Prior Series Deferred Annuities," p. 2 ("The company experienced very heavy surrenders on annuities during 1981 and 1982 when the long-term portfolio interest rate got so far out of line with prevailing interest rates in the marketplace.").

[45]   Employee Plans Product Development Committee, "July 29th Meeting Minutes," ML2_NM_4552 to ML2_NM_4569 at ML2_NM_4553.

[46]   "MN Series Annuities – Product Information Release," ML_NML2_0513 to ML_NML2_0519 at ML_NML2_517 ("We believe that, over the long term, an annuity owner may be more satisfied with an

20

This led to concerns on the part of NM regarding withdrawals in excess of reserves. Insurance companies, in structuring their investment portfolios, will invest a portion of policyholder premiums, leaving the remainder available for withdrawals, policy loans, and terminations.[47] With terminations accelerating, NM (and other insurance companies) faced an increased risk that it would have to liquidate long term investments in order to meet short term demands for funds.[48] Early liquidation of long term investments can often lead to losses, which would reduce the surplus available to all policyholders. In order to address this "disintermediation" problem, NM created a segmented fund of short to medium term assets that would provide the basis for the returns to Pre-MN annuities.[49] The fact of disintermediation, in addition to regulatory requirements,[50] thus elicited the 1985 change.

---

investment that more closely tracks the interest rates with which he is most familiar – 'new money' CDs, U.S. Treasury bills, etc. – than an investment based on a longer term portfolio which can vary substantially from those 'familiar' rates….Increasingly over the past 20 years, Northwestern Mutual's annuity products have failed to meet annuity policyowners' expectations for an interest rate that moves up with 'current rates.' For 13 out of the last 19 years, NML's annuity dividend interest rate has been below the 'current rate' as measured by the one year U.S. Treasury bill yield….As the difference between the portfolio rate and the policyowner's expectations for 'current rates' got larger and larger, and as policyowners became increasingly aware of 'current rate' alternatives, surrenders increased and new sales decreased to the point that surrenders exceeded premium for new annuity sales by a margin of 19 to 1 in 1981.").

[47] Bardrinath, SG, Jayant R. Kale and Harley E. Ryan, Jr., "Characteristics of Common Stock Holdings of Insurance Companies," *The Journal of Risk and Insurance*, Vol. 63, No. 1, Mar., 1996, p. 49 ("At the most fundamental level, an insurance company buys risk from an individual or an institution for which it is paid a premium. These premiums are received from a large number of clients, and claims are paid to a significantly smaller number. In other words, the insurer receives a steady stream of relatively small periodic premiums, and its relatively larger liabilities occur randomly. These contingent liabilities to be paid will come partly from its equity base but primarily from the accumulated premiums. For the company to be in a sound financial position, therefore, these premiums must be invested in a manner such that it is easily able to honor these claims.").

[48] Bardrinath, SG, Jayant R. Kale and Harley E. Ryan, Jr., "Characteristics of Common Stock Holdings of Insurance Companies," *The Journal of Risk and Insurance*, Vol. 63, No. 1, Mar., 1996, p. 68 footnote 21 ("On several different occasions in the last 20 years, inflation and high interest rates have forced life insurance companies to accommodate extraordinary cash outflows. As interest rates reached record levels in the 1980s, policyholders took advantage of the option to borrow some or all of the cash value in their policies at below-market loan rates as permissible in the policy contract. This, coupled with the surrender of policies for cash value, may have heightened the preoccupation of insurance company portfolio managers with steady cash flow sources, even though they are, in theory, long-term investors.").

[49] See Trial Exhibit 356, a letter from Mr. William E. Ebel, a Northwestern Mutual Life General Agent, to an annuity holder ("The experience of the recent past led us to establish a separate segmented portfolio for annuities and move to a current rate basis for new issues. We have been concerned for some time about the severe disintermediation, or investment anti-selection, that we were experiencing on the part of our annuity

47.     Relevant but-for worlds can keep the 1985 change intact but alter the manner in which information about the change was conveyed. Alternative but-for worlds, such as one in which NM made no change and let the disintermediation continue, can also be evaluated. In each instance, the analysis must ask 1) whether all annuitants were injured, and 2) whether damages can be computed using a common formula or methodology, given the assumed counterfactual. For purposes of my report, I am assuming *arguendo* that plaintiffs' allegations about NM's conduct in the actual world are correct.

## III.   ANALYSIS ASSUMING NM IMPLEMENTS AND PROVIDES NOTICE OF THE 1985 CHANGE

48.     One possible but-for world is one in which NM makes the change in annuity dividend calculations and informs its policyholders of the change directly.[51]

49.     In this but-for world, determining impact for any given policyholder would depend on whether being notified of the 1985 change affects the behavior of that policyholder. A plaintiff who would have done the same thing if directly notified of the 1985 change (the but-for world) as he did in the actual world cannot have been injured, since the but-for and actual returns for this investor would be identical. Furthermore, a plaintiff who would have changed his behavior if notified would only have been injured if his alternative strategy in the but-for world would have made him better off than in the actual world. Since but-for

---

policyholders and annuity purchasers. During times when new-money rates were particularly high, compared to our portfolio rate, we saw significant increases in the surrender of annuity values. Similarly, at times when new-money rates were lower than our portfolio basis, we saw a significant increase in new premium. These kinds of actions coupled with a portfolio-based approach which reflects the longer-term, less volatile investment pattern for life insurance produces negative results for the annuity policyowners, and also for our life policyowners. The net impact is to reduce the overall portfolio rate as a result of having fewer funds available to invest at high interest rates and more funds to invest when rates are lower….As noted, we have been concerned and seeking a solution for this problem for some time. We decided that the best way to deal with it was to develop a current-rate-based annuity for new sales. But this only satisfies half the problem. We also needed to move our portfolio-based inforce annuities to a similar interest basis in order to avoid the other half of the investment anti-selection.").

[50]   Plaintiff's Brief, Appendix 39, "Explanation of 1986 Dividend Scale for MM and Prior Series Deferred Annuities," p. 2. ("The New York Insurance Department passed a law this last summer requiring penalty reserves for companies that are mismatched by more than three years. Segmented accounts are necessary to comply with these requirements.").

[51]   As described below, there is evidence that some annuitants were, in fact, informed of the change.

returns can only be determined through the analysis of individual responses to notification of the change, proof of impact here is individualized rather than common.

### A. Establishing Impact Requires Individualized Inquiry

50.  NM communicates with its policyholders both directly through mailed statements and disclosures and indirectly through independent contractor agents.[52]  The evidence presented below suggests that even had NM notified all plaintiffs via direct communication of its decision to invest in and pay policy dividends out of the segmented account, some class members would not have altered their behavior and therefore are not injured.

#### 1. Some class members might not have behaved differently because they knew about the 1985 change in the actual world

51.  Some putative class members knew about the change in the actual world even without a formal disclosure and did not change their behavior.  Thus their behavior in the actual and but-for worlds would be the same.  These individuals suffered no financial impact.

52.  Some annuitants were informed about the 1985 change by their NM insurance agent, or through direct communication with the company.  For example, agent Michael Holden testified that he received information in 1985 regarding the 1985 change, and that he was certain that he discussed the new MN series annuities with his clients.[53]  While some annuitants might have learned of the 1985 change from their agents, others received direct

---

[52] For instance, policyholders were informed of "Update '83" via a letter and an accompanying informational brochure (see Trial Exhibit 312, Documentation associated with Update '83, September 28, 1983).Policyholders also received annual reports from Northwestern Mutual and had periodic contact with their agents (see Deposition of William J. Timmers, July 23, 2010, p. 14:19-23, "Q. Do you know whether you receive an annual report from Northwestern Mutual that's not your account statement but a general report on the company? A. You know, I used to, but lately I don't know if I have or not, but I used to…" Deposition of Janet Reichart, June 16, 2010, p. 14:12-14 "Q. Did you receive annual reports from Northwestern Mutual? A. An annual report, yes." Deposition of John Komives, May 18, 2010, p. 18:4-11 "Q. How often do you meet with Mr. Gardner? A. Once a year. Q. And that's an in-person meeting? A. No, in the last seven or eight years it's -- he sends me an update on my policies and asks if there's any reason for us to get together. He's open to -- he's invited me to chat with him, but I haven't felt the need.").

[53] Deposition of Michael J. Holden, May 25, 2010, p. 31:15-22 ("Q …Do you remember receiving information in 1985 regarding the new MN series annuity? A. I'm sure -- I'm sure I did, yes. Q. Okay. Do you remember having any discussions with any of your clients regarding the new MN series annuities? A. I'm sure I did, but I have -- I can't remember who or what was said.").

23

App. 023

communication regarding the change from NM in the form of letters or email.[54]  If annuitants did not change their behavior after learning of the change in the actual world, this suggests that they might not have changed their behavior when notified (possibly at an earlier point in time) in the but-for world either and therefore are uninjured.

53. Some annuitants noticed the 1985 change because they owned other NM policies that were yielding returns different from those on their pre-MN policies.  For example, Daniel Noonan noted the difference between the annuity dividend rate and the dividend rate on his NM insurance policy "sometime in early 2000."[55]  Exhibit 3 shows the number of class members with life and annuity policies in-force in the same year during the class period, as well as the total number of class members who own a life insurance policy as of 2012.  Approximately 53.5 percent of the putative class simultaneously owned a pre-MN annuity and a life insurance policy at some point during the class period.  Whether and when each of these investors noticed the change in dividend rates through a comparison of dividend rates across policies, and whether each would have behaved differently if notified by NM at some time prior to the fact of noticing the difference, is an individualized question.

### 2.     Some class members might not have behaved differently because they would have chosen not to review disclosures

54. Empirical evidence indicates that some consumers do not conduct a thorough review of contracts that they sign and disclosures and financial statements that they receive.  For

---

[54]  See, for example, a June 7, 1990 letter from NM to annuitant, an April 7, 1998 email from NM to annuitant and a September 14, 1999 letter from NM to annuitant as cited in Northwestern Mutual's Memorandum in Opposition to Plaintiff's Motion for Class Certification, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-cv-00128-SPM, April 15, 2011, pp. 116-119.  At least one of these annuitants continued to hold the annuity through at least 2012 without withdrawals or any change in borrowing.

[55]  Testimony of Daniel Noonan, November 8, 2010, p. 66:24-25 and p. 67:4-15 ("Well, as I communicated with Dan - Madigan, that is - I had noticed a disparity between the rate of return or the amount of dividends which I hadn't picked up on earlier, but I had noticed that there was a disparity because the premise upon which we had been proceeding for many years is that these annuities would always pay. The beauty of these he would say and the company would say well, the beauty of these annuities, they pay the same portfolio rate, same dividend interest rate as the cash surrender value rate that's paid on whole life policies. That was the beauty. That's how they were sold. So I noticed a difference. I said well, Dan, what's – what's the problem here?").

24

example, a survey in the UK showed that only 23 percent of consumers "had a good read" of contracts before entering them. The remainder picked out key points, gave it a quick "skim" read, did not read it at all or didn't remember.[56] In other words, some NM policyholders were likely to read carefully through all communications from NM while others were not. Even among those who would have read a disclosure, the changes in their behavior would have varied. Those who would not have read a disclosure would behave similarly in both the actual and but-for worlds, and therefore could not have been injured. Without individualized inquiry, it is impossible to determine whether an individual class member would have read or acted upon a notification of the 1985 change in the but-for world.

55.   Depositions of members of the putative class confirm that some read statements and reports from NM, while others did not. Janet Reichart testified that she read her annuity policy and looked at both her annual annuity statements and annual reports received from NM.[57] Caroline Meckes testified that she did not remember reading her policy.[58] William Timmers testified that he did not read his annuity policy or annual reports received from NM.[59]

---

[56]   Office of Fair Trading, "Consumer Contracts," Crown Publishing, February 2011, p. 27.

[57]   Deposition of Janet Reichart, June 16, 2010, p. 13:9-14 ("Q. … did you receive on an annual basis a statement from Northwestern Mutual setting forth your annual dividend for your annuities? A. Yes, I'm sure I did. Q. Do you know whether you reviewed those or not? A. I looked at them, yes."); p. 14:12-16 ("Q. Did you receive annual reports from Northwestern Mutual? A. An annual report, yes. Q. Did you ever review the annual report? A. I looked at it, yes."); p. 20:9-12 ("Q. Okay. Did you ever read the policy that you received from Northwestern Mutual when you purchased your annuities? A. I'm sure I did.").

[58]   Deposition of Caroline Meckes, June 10, 2010, p. 8:8-19 ("Q. Do you remember reading that provision at the time you purchased the policy? A. I don't remember reading the policy at all, you know. Perhaps I did, but we're talking quite a few years ago. Q. So your understanding that you're conveying now regarding the dividends is your current understanding of dividends? A. I guess I never expected that there would be a problem with Northwestern. I trusted them and thought the dividends would be there. I trusted Dean Lawrence and I trusted the company.").

[59]   Deposition of William J. Timmers, July 23, 2010, p. 9:14-18 ("Q. Do you remember whether you read the policy for your annuity when you received it? A. No, I didn't. Q. No, you did not review it? A. No, I did not review it, no. I trusted the agent."; p. 14:19-25 ("Q. Do you know whether you receive an annual report from Northwestern Mutual that's not your account statement but a general report on the company? A. You know, I used to, but lately I don't know if I have or not, but I used to. Q. When you received those, did you read them? A. No.").

25

Jacqueline Baumgart testified that she did not read her annuity policy.[60]  John Komives testified that he didn't feel "compelled" to read his policies.[61]

56.    Class-wide evidence cannot identify which individual plaintiffs would have read a disclosure statement from NM.  A determination that one plaintiff would have read the disclosure does not determine whether another plaintiff would have done likewise.

### 3.    Some class members might not have behaved differently having reviewed a disclosure of the 1985 change

57.    Some class members would have read a disclosure of the 1985 change, had NM sent one directly to each annuitant.  Of these, some might have decided to retain their annuity policies with the restructured investment pools, and thus their behavior in the actual and but-for worlds is the same.  These individuals suffered no injury.

58.    Informed annuity holders might have retained their policies for several reasons, including 1) an understanding of, and agreement with, NM's analysis; 2) a deference to NM's approach; and 3) a concern for returns on other investments.  Consider an individual who is contemplating terminating his or her policy in order to invest in higher-yielding short term securities.  Upon hearing that NM is going to do just that with his or her asset portfolio, the investor decides to do nothing, leaving the policy intact.  Alternatively, the individual might delegate the investment allocation decisions to NM based on NM's reputation and experience.  In another example, consider an investor who held both a whole life policy and an annuity who might have been concerned about the risks that disintermediation presented

---

[60]    Deposition of Jacqueline Baumgart, June 16, 2010, pp. 10:25-11:9 ("Q. Back in 1983 when this annuity was purchased did you read the policy when it was finally purchased? A. No. Q. To your recollection have you ever read the policy, your annuity policy? A. No. Q. Did you ever speak with anyone at Northwestern Mutual after the annuity was purchased, so after 1983, regarding that annuity policy? A. No.").

[61]    Deposition of John Komives, May 18, 2010, pp. 36:13-37:2 ("Q. …Do you recall reading any of your policies at the time you received them, the original policies from Mr. Moser or anyone else from Northwestern Mutual? A. I don't recall, but I'm sure that I glanced through it. I always felt so comfortable with NML that I never felt the need to behave in an adversarial -- I accepted the way it was presented.  Q. I'm sorry, I didn't understand the last part of your answer, sir.  A. I always felt so comfortable with NML I never felt compelled to read something in an adversarial fashion, what the hell is this kind of routine. I accepted when he handed me the piece of paper, I was comfortable with it.").

26

App. 026

for the divisible surplus as it applied to both policies and thus agreed with NM's solution to the problem.

59. Common evidence cannot reveal which plaintiffs would have reacted to a notification about the 1985 change by changing their investment behavior, and which would have retained their policies either because of or despite the 1985 change. Neither can common evidence tell us where those plaintiffs who would have changed their behavior would have invested their funds. Determination that plaintiff A would have cashed out of the altered annuity in the but-for world says nothing about whether plaintiff B would have done likewise.

### B. For Those Who Would Have Behaved Differently in the But-For World, Estimating Damages Requires Individualized Inquiry

60. Annuitants who were not aware of the 1985 change and would have changed their behavior had they received notice of the change are potentially injured. Estimating damages for such annuitants requires knowing how their behavior would have changed individually had they received such notice. Determining what an individual annuitant would have done is complicated by the fact that different responses are possible and economically plausible. Some annuitants might have terminated their policies and reinvested the withdrawn funds in another investment product. But others might have kept their NM policies and responded by, for example, reducing their premium payments or increasing borrowing against the cash value of their policy. For all types of responses, estimating damages requires assessing what alternative investments would have been selected so that the but-for return could be calculated.

### IV. ANALYSIS ASSUMING NM SEEKS APPROVAL FOR THE 1985 CHANGE

61. Another possible but-for world is one in which NM seeks approval for the 1985 change in annuity dividend calculations. Using Update '83 as a reference, NM could have implemented the change only for those policyholders who approved it. Any policyholder who would have approved the change was not injured.

62. Some class members might have agreed to the at-issue change and made the same choices had NM sought approval. These class members would not be injured by the change. Individualized inquiry is needed to determine which policyholders these are.

27

63. For those policyholders who would not have agreed to the change and may have been injured, damages depend on how their behavior would have been different given the alternatives NM provided for them. Since policyholders would have behaved in myriad ways that cannot be identified using class-wide evidence, estimating damages requires individualized inquiry.

### A. Establishing Impact Requires Individualized Inquiry

64. Even if NM sought approval from policyholders for the change in the pre-MN annuity policy, some plaintiffs might have approved the change and therefore not been injured.

### 1. Some class members might have approved the change without reviewing it

65. As described above, not all annuitants carefully review the documents and disclosures sent to them by NM. Some prefer not to take the time. Such annuitants tend to go along with suggested changes in policy.

66. Class-wide evidence cannot reveal which annuitants would approve the 1985 change, nor which would review the change and reject it.

### 2. Some class members might have approved the change because they agreed with it

67. Those policyholders who were aware that short term interest rates were higher than long term interest rates during the time period before the 1985 change might have approved the change given the opportunity. It is this same group of annuitants that NM was worried would switch to the newly created CRA policies. Exhibit 4 shows the number of class members who purchased CRAs once they became available.

68. The fact that some policyholders learned of the change during the class period but did not liquidate their policies in order to earn a higher rate of return elsewhere, indicates that the 1985 change might have been accepted by a number of putative class members.

28

69.   Class-wide evidence cannot reveal which policyholders would have agreed to the 1985 change because investment preferences are idiosyncratic and variable.  Determination of impact is thus individualized.

**B.      For Those Who Would Not Have Approved the 1985 Change, Estimating Damages Requires Individualized Inquiry**

70.   Estimating damages for putative class members who might have been injured requires determining how they would have changed their premium payments, borrowing and timing of termination and identifying what alternative investments are likely to have been undertaken.  For the same reasons articulated in Section III.B, above, without knowledge of the risk tolerance and investment goals of the putative class members, it is not possible to identify how potentially injured class members would have behaved with regard to contributions, borrowing or termination of annuity contracts in the but-for world.

**V.      ANALYSIS ASSUMING NM DOES NOT IMPLEMENT THE 1985 CHANGE**

71.   The third but-for world is one in which pre-MN annuities continue to earn dividends based on the returns of the non-segmented, general account of the company.  In other words, NM makes no policy change to address the disintermediation that was occurring in its existing portfolio of annuities.

**A.      Many Members of the Putative Class Were Not Injured in this Scenario**

72.   Even assuming that in the but-for world NM would have continued paying annuitants based on a non-segmented general account, many annuitants were not injured and some were economically better off in the actual world than they would have been in the but-for world.

73.   Plaintiff's expert, Mr. Hoyer, claims that but-for the 1985 change pre-MN annuity holders would have received the same DIR as life insurance policyholders.[62]  However, in the actual world, cumulative returns to the pre-MN annuities from 1985 until 1993 were higher, on

---

[62]   Hoyer Report, ¶24 ("The But-For DIR, in my opinion, for Pre-MN annuitants who have Direct Recognition and have no loan balance is equal to the corresponding DIR for life insurance policyholders.").

average, than cumulative returns to NM life insurance policies.  Many pre-MN annuitants whose policies matured or were terminated prior to the beginning of 1994 thus might have earned a higher rate of return in the actual world than they would have absent the 1985 change.  They are therefore better off in the actual world than in the but-for world, and so were not injured by NM's alleged misconduct.

74.  Exhibit 6 compares pre-MN annuity and life DIRs, for policies with direct recognition and no policy borrowing, in the time period from 1985 to 1993.  Exhibit 7 shows the percentage point spread in DIRs.  For most of this time period, the annuity DIR is the same as or higher than the life DIR.  Even using Mr. Hoyer's benchmark for the but-for DIR, there are a number of years during which annuitants would earn more in the actual world than they would have in the but-for world.  This is apparent from the tables created by Mr. Hoyer to display his "differences" calculations.  Exhibit 8 shows one of these tables for the years 1985 to 1994, a portion of the table that Mr. Hoyer does not include in his Expert Report.  (The complete tables for the four scenarios presented by Mr. Hoyer are shown in Appendix Exhibit 1.)

75.  Exhibit 8 demonstrates that, using Mr. Hoyer's benchmark, annuitants who terminated their policies in 1985 or any year from 1988 to year-end 1993 are likely to have earned a higher or equal return on their annuity policies in the actual than in the but-for world without the 1985 change.  As shown in Exhibit 9, nearly 30 percent of the at-issue annuities were terminated in these years.

76.  This analysis might understate the number of putative class members who were uninjured because it is possible that the returns to pre-MN annuity policies would have been lower than the returns to life insurance policies had the 1985 change not occurred.  First, as a simple factual matter, the pre-MN annuity DIR was lower than the life insurance policy DIR in five of the nine years for which data are available prior to the 1985 change, as shown in Exhibit 10.  Second, the DIR for any particular type of policy is a function of the expenses that NM

allocates that policy type.[63]  I understand that had the 1985 change not taken place, NM contends it would have increased the expenses allocated to pre-MN annuities, further lowering returns to the pre-MN annuities relative to life insurance policies.[64]

### B.    Establishing Impact Requires Individualized Inquiry

77.    Investors generally seek to maximize returns for a given level of risk, and will therefore compare the current rate of return on their asset holdings with those available on similar alternative assets.[65]  The greater the return differential, the higher the likelihood that a given investor will sell the existing asset, and reallocate funds to the alternative.  This decision depends on idiosyncratic factors.

78.    If higher rates of return are available on comparable alternative investments, NM annuitants might choose to cash in their policies and invest their money elsewhere.  NM observed this behavior during the time period leading up to 1985, motivating the 1985 change.  Between 1985 and 1993, as can be seen in Exhibits 6 and 7, even using Mr. Hoyer's benchmark there were several years during which putative class members' returns on the NM annuity would have been lower in the but for than in the actual world.  In these time periods, it is therefore also the case that the differential between annuity returns in the but-for world and returns on alternative investments would have been greater.  As a result, some annuitants during this time period would have been more likely to terminate their policies, decrease their premium

---

[63]    See, for example, Plaintiff's Brief, Appendix Exhibit 39, "Explanation of 1986 Dividend Scale for MM and Prior Series Deferred Annuities," p. 1 ("First of all, the life insurance dividend interest rate is based on a gross interest rate of 11.75% less 0.50% for federal income taxes. The gross interest rate for annuities is 11.70%, only five basis points less, less a deduction of 0.20% for federal income taxes and 0.50% for home office expenses. This home office expense factor is a consequence of the competitive marketplace for annuities which limits loads deducted from premium payments so that insurance companies must recover some expenses out of interest margins. This is not the case for life insurance.").

[64]    Affidavit of Chris G. Trost, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011, ¶4 ("...if Northwestern Mutual had decided not to use segmentation, or if Northwestern Mutual were prohibited by the court from using segmentation, the Company would have assessed expense, disintermediation and dilution charges on the annuity dividend interest rates, which would have led to different final rates than the rates paid on life insurance products.").

[65]    For additional background on investment, risk and return, see Brealey and Myers.

payments, or borrow more from their policies in the but-for world in order to invest elsewhere. It is thus incorrect as a matter of economics to assume that all class members would have continued as before, earning the returns observed on NM's portfolios in the but-for world. Some would have terminated their NM annuity policies and earned more elsewhere.[66]

### 1. Investors respond to differentials in the rate of return

79. NM documents produced in this matter are consistent with a relationship between annuitant behavior and the level of returns on alternative investments relative to the returns on pre-MN annuities.[67] The minutes of an NM Employee Plans Product Development Committee meeting, dated July 1982, state as follows: "This is an interest rate driven market…In the last four years, our sales have declined sharply as the average 90-day Treasury Bill rate has become 3 to 6 percentage points higher than our FPA dividend rate." The minutes further document "increasing surrenders and declining in-force FPA and RA business as the difference between our dividend interest rate and the 90-day U.S. Treasury Bill rate rose."[68]

80. The academic literature summarized above in Section II.A provides supporting evidence that individual investors allocate their financial assets according to relative rates of return.[69] Rational investors will move money from low-return to high-return assets, holding risk and other asset characteristics constant. Economic analysis also shows that investors decrease

---

[66] For the years in which the but-for rate of return was higher than the actual rate of return, individuals might also have behaved differently in the but-for world than in the actual world. For example, some individuals might have surrendered their policies in the actual world but not in the but-for world.

[67] Simple correlations, such as those produced in this litigation, do not prove there is a relationship. Such a causal interpretation is difficult to establish here with the available data. An enormous empirical literature in finance has, however, established the causal connection.

[68] Employee Plans Product Development Committee, "July 29th Meeting Minutes," ML2_NM_4552 to ML2_NM_4569 at ML2_NM_4553.

[69] See, for example, Rosen, Kenneth T. and Larry Katz, "Money Market Mutual Funds: An Experiment in Ad Hoc Deregulation: A Note," *The Journal of Finance*, Vol. 38, No. 3, Jun., 1983, pp. 1011-1017; Gibson, William E. and James L. Pierce, "Deposit Demand, 'Hot Money,' and the Viability of Thrift Institutions," *Brookings Papers on Economic Activity*, Vol. 1974, No. 3, 1974, pp. 593-636.

32

their contributions to pensions when the interest rate on other forms of savings increases relative to the rate of return on pension deposits.[70]

### 2. Some annuitants' responses to differential rates of return might have led them to be uninjured

81. During the class period, the relationships between both but-for and actual returns on NM investment products, and between NM returns and those on alternative short term investments such as T-bills, were changing. Given the evidence presented above that investors respond to changes in interest rate differentials by reallocating investment towards the relatively higher returns, it is likely that at least some NM policyholders would have behaved differently in the but-for world than in the actual world. Relevant alternative investments include short to medium term Treasury bills, mutual funds, and other low risk, liquid instruments. Those annuitants who would have cashed out of their pre-MN annuities in the but-for world and earned higher short term returns on alternative investments that mimic those produced under the 1985 change would not have been injured by the 1985 change.

82. Exhibit 9 shows annual terminations of pre-MN annuities included in the putative class. There is a significant difference in the year to year termination rate. For example, in 1998, 9.9% of existing policies were terminated, whereas, in 2003, only 5.4% of existing policies were terminated. Exhibit 11 shows the relationship between the percentage of all pre-MN policies (including those not in the class) surrendered between 1976 and the first five months of 1982, and the spread between the annuity DIR and the 90-day Treasury bill rate. In years where the spread is greater, surrenders increase.

83. As an alternative to surrendering their policies, annuitants might have responded to return differentials by decreasing premium payments or increasing borrowing on their policies to take advantage of higher returns elsewhere. Any such change in annuitant behavior in the

---

[70] Bernheim, B. Douglas and John B. Shoven, Pension Funding and Saving, in *Pensions in the U.S. Economy*, Zvi Bodie, John B. Shoven and David A. Wise (Eds.), University of Chicago Press, 1988, pp. 85-114.

but-for world would affect the returns they earned and therefore affect the extent to which they were injured, if at all.

### 3. Discerning which annuitants would have behaved differently in the but-for world requires individualized inquiry

84. The degree of interest rate sensitivity of particular investors is determined in substantial part by individual characteristics. Some investors are more proactive and informed and therefore more likely to be aware of interest rate differentials than otherwise identical but uninformed investors. Some investors have professional financial advisors that are proactive in managing their portfolios, of which annuities form a part, while others may invest in an annuity as a retirement vehicle and not pay any attention to short-term variation in annuity returns relative to other investment opportunities. Additional idiosyncratic factors that affect responsiveness to return differentials include age, income, and wealth.

85. Risk-aversion varies across individuals as well. An individual more averse to risk might gladly hold a portfolio of short term assets, given the option, even at the cost of lower long-run returns. This is the essence of the risk-return tradeoff that forms the basis of much of the modern theory of finance. Risk-aversion can also be situational for a given plaintiff. An individual might be more willing to take risks, investing in longer-term assets, when he has a longer time horizon, greater wealth or health, or perhaps holds investments elsewhere in less-risky securities.

86. Deposition testimony indicates that putative class members have different risk preferences and different investment strategies. For example, policyholder Gerald Kreitzman held a portfolio of stocks, but did not know what "kind of investments" they were or what companies they were in because his brother managed his account.[71] Policyholder Marleen

---

[71] Deposition of Gerald Kreitzman, June 10, 2010, pp. 34:20-35:13 ("Q. Is the annuity the only -- whether an investment or a policy that you have that has a dividend payment attached to it? A. Well, my brother and I own some stocks, okay, but that's through Fidelity. And it's not like it's my stock, it's our stock together. We are, what, tenants in common or something like that, okay. And if I die, he gets all the stock. And if he dies, I get all the stock. And that's the only other kind of connection I have to the stock market. …Q. Do you know what kind of investments they are? A. No. Q. Do you know what companies they're in? A. No. I know they haven't done too well.").

App. 034

LaPlant had never, during her married life, purchased stocks outside of an IRA and showed a preference for safer fixed income investments recalling that she bought "CD's and that sort of thing."[72]  Policyholder John Komives had a preference for riskier investments. Mr. Komives conveyed that not only did he invest in equities, but he also had been an angel investor—and lost money—in startup companies.[73]  Policyholder Janet Reichart expressed a preference for "safer investments, nothing volatile," after she retired and sold her stocks.[74]  Each of these individuals is likely to have an idiosyncratic response to changes in returns to particular investments in their portfolios.

87.   Because determining how any given individual would react to a change in interest rate differentials is essential to determining whether that individual has been injured, impact cannot be determined on a class-wide basis for holders of pre-MN annuities.  In other words, proof that one individual would not have changed his behavior in this but-for world and was injured says nothing about what another plaintiff would have done and therefore cannot prove that this other plaintiff was injured.

### C.   For Those Potentially Injured, Estimating Damages Requires Individualized Inquiry

88.   Annuitants who would have responded to higher interest rate differentials in the but-for world might have been injured depending on their alternative investment strategy.  Without

---

72   Deposition of Marleen LaPlant, September 9, 2009, p. 8:6-14 ("Q. …. At any time during your married life have you or he purchased shares of stock, other than in an investment, in an IRA? A. No. Q. Have you made any investments of any kind, other than the retirement IRA's that you talked about before, and we'll talk about the Northwestern Mutual contract. A. We've bought like CD's and that sort of thing.").

73   Deposition of John Komives, May 18, 2010, p. 22:11-23 ("Q…Other than the investments that were from your wife, do you have any other investments that were in your name primarily? A. Well, I own some stock in a couple of these little private companies which, if they ever get sold, I might make a few dollars on them. Q. Have you been active as an angel investor with any startup company? A. Yes. Q. And have you lost money sometimes on those angel investments? A. Yes.").

74   Deposition of Janet Reichart, June 16, 2010, p. 11:12-24 ("Q. You mention that you have some stock investments, …[d]o you know in 1995 what kinds of stocks you got into when you went to your new financial advisor? A. I don't remember, because I'm not in stocks anymore. Q. Do you know when you got out of stocks? A. Around the time I retired we started moving more towards safer investments for my retirement. Q. Was there any kind of investment return that you were targeting for your retirement investments? A. Not specifically. Just safer investments, nothing volatile.").

35

knowledge of the risk tolerance and investment goals of the putative class members, it is not possible to identify which potentially injured class members would have behaved differently with regard to contributions, borrowing or termination of annuity contracts in the but-for world, or how their behavior might have been different. Individualized inquiry is required to determine annuitant behavior and but-for returns.

89. Some annuitants might have behaved differently in the but-for than in the actual world because the timing of their retirement or their willingness to borrow from their annuity policy depends on their level of accumulated savings. To the extent that the accumulated savings differ between the actual and but-for worlds, behavior might also differ. Investment goals might differ across individuals. Some might be targeting a particular level of savings that will allow them to retire, while others might retire at a given age regardless of accumulated savings.

90. Estimating damages for those putative class members whose behavior would have been different in the but-for than in the actual world requires determining how they would have changed their premium payments, borrowing and timing of termination and identifying what alternative investments were likely to have been undertaken. These individuals would have received different investment returns than they did in the actual world.

## VI.    ANALYSIS OF HOYER REPORT

### A.    Mr. Hoyer's Assignment Does Not Address Common Impact or Damages

91. Plaintiffs' expert Robert Hoyer was asked by attorneys for the Plaintiffs:

> To describe a reasonable methodology that would provide the basis for prospective relief for current Pre-MN annuity policyholders; To indicate whether the methodology could be applied to all Pre-MN annuity policyholders on a common basis using a mechanical calculation; and To determine if the same methodology can be applied to determine the 'Difference' as defined (see below) to annuitants with policies no longer in-force resulting from the 1985 Change.[75]

92. Mr. Hoyer defines "prospective relief" as including two steps. The first step "involves [NM] crediting to Pre-MN annuity policyholders' accounts the additional amount that would have

---

[75] Hoyer Report, ¶ 6.

accumulated 'But-For' the 1985 Change (the 'Difference')."[76]  The second step requires NM to "credit dividends thereafter on the revised cash values using a dividend interest rate ('DIR') that reflects the company's aggregate investment income dividend factor rather than the investment income factor associated with the segmented account of current rate investments."[77]

93.  Given this assignment, the Hoyer Report does not directly address the issue of class-wide common impact.  In fact, as I explain below, Mr. Hoyer's deposition testimony *supports* my opinion that not all members of the putative class were injured, i.e., that impact is not common.  Nor does the Hoyer Report provide a methodology for proving impact or calculating damages on a class-wide basis.  Instead, Mr. Hoyer produces a set of tables showing the difference in the rate of accumulation of net deposits by year of deposit and withdrawal, assuming that but for the 1985 change NM would have set the DIR on pre-MN annuities equal to the DIR on life policies and that all putative members either did or did not have direct recognition during the entire class period.  As I explain below, the calculation of this "difference" falls far short of a complete damages methodology. It also ignores relevant annuity characteristics, rendering Mr. Hoyer's analysis inadequate as a basis for computing damages.

94.  Mr. Hoyer proposes to calculate the "DIR but-for the 1985 change."[78]  In doing so, he does not consider that there were many different ways in which NM could have behaved absent the 1985 change.  In addition, Mr. Hoyer does not attempt to calculate the but-for return to annuitants, taking into account economically plausible differences in annuitant behavior that would have affected that return in the but-for world.  Instead, he implicitly asserts that each individual annuitant would have done the same thing (i.e., nothing) had they been made aware of the change.

---

[76]  Hoyer Report, ¶7.

[77]  Hoyer Report, ¶7.

[78]  Hoyer Report, p. 5.

37

## B. The Hoyer Report Does Not Establish Common Economic Impact Among Putative Class Members

95.     In his deposition in this matter, Mr. Hoyer at one point stated his belief that "every member in this class was harmed the moment the change in '85 was made."[79] He does not offer any, much less a plausible, definition of what he means by "harm" here. He *asserts* that plaintiffs were injured, rather than provide evidence of economic injury and argument as to the commonality of such evidence across the entire class.[80]

96.     At another point in his deposition, however, Mr. Hoyer confirmed that some class members were not *financially* harmed by the 1985 change:

> Q   And I just want to be clear: In the group of [putative] class members, were there some who surrendered their policies at a particular time such that those individuals were not financially harmed by the 1985 change?
> A   That is correct.[81]

97.     Mr. Hoyer's own "difference" calculation indicates that almost a third of the putative class might not have been financially injured. As shown in Exhibit 9, and described in Section V. A above, nearly 30 percent of the at-issue annuities were terminated in 1985 or any year from 1988 to 1993 and are likely to have earned a higher or equal return on their annuity policies in the actual world than in Mr. Hoyer's but-for world.

98.     Moreover, Mr. Hoyer's assumption that absent the 1985 change the pre-MN annuities would have earned a rate of return equal to typical NM life insurance policies might not be correct. If, as was the case in some years prior to the 1985 change, annuities had a lower DIR than life insurance policies, then the number of uninjured putative class members would be even

---

[79]   Deposition of Robert L. Hoyer, May 17, 2013, p. 146: 8-10.

[80]   Mr. Hoyer admits in deposition that he did not attempt to quantify nonfinancial harm to plaintiffs nor was he qualified to do so. See Deposition of Robert L. Hoyer, May 17, 2013, p. 161:12-22 ("Q. …Well, have you quantified the harm that was done to them that was other than financial, sir? A. No, that's not a quantifiable value for an actuary to do. Q. Was that something that you were asked to perform as part of your analysis in coming to your opinions in the March 4th, 2013 report? A. I was neither asked to do that nor did I do it. Q. And that would not be something that you would feel you had expertise to quantify; correct? A. I would not attempt to quantify that number, no.").

[81]   Deposition of Robert L. Hoyer, May 17, 2013, p. 158:12-20.

larger.  In addition, had the 1985 change not taken place, NM might have increased the expenses allocated to pre-MN annuities, further lowering the pre-MN DIR relative to life insurance DIRs.[82]

### C.    A Common Methodology for Estimating Class-wide Damages Cannot Be Derived from the Hoyer Report

99.    Regardless of what return pre-MN annuities would have earned in the absence of the 1985 change, the calculations presented in the Hoyer Report do not provide the basis for a common methodology for estimating class-wide damages.

#### 1.    The Hoyer Report does not account for differences in annuitant behavior between the actual and but-for worlds

100.    As I describe above, some annuitants will respond to changing economic and personal circumstances by modifying their borrowing behavior, their deposit behavior, and/or their withdrawal (or termination of contract) behavior.  They will do so in ways that vary depending on personal preferences and circumstances.  Mr. Hoyer acknowledged these facts in his deposition, stating that "if the change had not been made, policyholders would have behaved in a different manner"[83] and, had NM never made the 1985 change "[i]t's possible that policyholders would do anything; and in a different scenario policyholders might do different things.  Certainly that is a consideration, but I haven't spent much time analyzing it."[84]

101.    The "difference" calculation presented in the Hoyer Report assumes that annuitant behavior would have been the same in all relevant respects but for implementation of the 1985 change.

---

[82]    Affidavit of Chris G. Trost, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011, ¶4 ("...if Northwestern Mutual had decided not to use segmentation, or if Northwestern Mutual were prohibited by the court from using segmentation, the Company would have assessed expense, disintermediation and dilution charges on the annuity dividend interest rates, which would have led to different final rates than the rates paid on life insurance products.").

[83]    Deposition of Robert L. Hoyer, May 17, 2013, p. 64:5-7.

[84]    Deposition of Robert L. Hoyer, May 17, 2013, p. 91:13-16.

This "difference" calculation therefore cannot form the basis for a damages quantification because it does not "isolate the effect of the violation on the plaintiff from the effect of all other events."[85]  Hoyer rejects the need to construct a but-for world that takes into account that annuitants might have behaved differently in the actual than in the but-for world.  He states his rationale in his deposition:

> Policyholders did not exist in the 'but-for' world.  The 'but-for' world is a theoretical concept used to define a current difference.  So it's – I have no idea, and it's irrelevant to my conclusions, any action they might have taken in such world.  They did not live in that world.[86]

102.    Careful construction of a but-for world is an essential part of damages calculations.  It requires making economically plausible assumptions about a state of the world that did not occur.  Calculation of damages in the present matter must consider differences in the behavior of putative class members with regard to their policies absent the 1985 change.

**2.      The Hoyer Report does not take into account all relevant characteristics of the at-issue policies**

103.    Even assuming damages should be calculated holding annuitant behavior constant, the analysis in the Hoyer Report does not provide a viable method for estimating damages because it fails to take into account all relevant characteristics of the at-issue policies.

104.    In his deposition, Mr. Hoyer testified that his calculation of the "difference to date" is "a part of what [he] would consider damages."[87]  He further confirmed that the analysis in his report

---

[85]    ABA Section of Antitrust Law, *Proving Antitrust Damages, Legal and Economic Issues*, 2nd Edition, American Bar Association, 2010, p. 53.

[86]    Deposition of Robert Hoyer, May 17, 2013, p. 51:12-17.

[87]    Deposition of Robert L. Hoyer, May 17, 2013, p. 19:13-18 ("Prospective relief as I have analyzed it and as I discussed with counsel, in my opinion, takes two forms: A difference to date for those individuals that are remaining in force and fair and equitable treatment of those individuals prospectively from point of that adjustment.") and pp. 20:18-21:3 (Q. It would be based on things that happened in the past and there would be money provided by Northwestern Mutual to an account based on things that happened in the past? A. It would be current adjustment based on historical activity, yes, sir. Q. Is that damages? A. In my dictionary term, it's certainly a part of what I would consider damages. You have brought up that term as a legal term. I have no opinion as to how that fits your legal definition.").

did not take into account any of those other parts of damages.[88]  For individuals that terminated their at-issue annuities prior to the present, Mr. Hoyer appeared to suggest in his deposition that economic damages could be calculated by applying interest to the "difference" calculated using the method laid out in his report.[89]  He stated that the methodology in his report quantifies how much in additional funds an annuitant should have received in the year the policy was terminated and an "interest differential" could be applied to account for the damages being paid in the present.[90]

105.  This suggested approach fails to correctly calculate damages because the methodology outlined in the Hoyer Report does not quantify how much in additional funds an annuitant would have received but for the 1985 change (for a given series of annual but-for pre-MN annuity DIRs).  There are several reasons why this is so.

106.  First, the cash value of the account at termination depends on how the annuitant elected to receive his dividend payments.  For example, if an annuitant received dividend payments as cash, then the cash value of the annuity is unaffected by the DIR.  Estimating damages for such an annuitant requires a determination of how to compensate him for annual differences in his cash dividend payments, taking into account that in some years his dividend payments might have been higher in the but-for than the actual world and in some years they might have been lower.  Mr. Hoyer's methodology, using only the cash value of the annuity at termination, would not calculate damages correctly for this annuitant.  More generally, Mr.

---

[88]  Deposition of Robert L. Hoyer, May 17, 2013, p. 40:16-19 ("Q. But other than the accumulated difference, you did not actually in your report take into account any of those other parts of damage? A. That is correct, sir.").

[89]  Mr. Hoyer indicates that damages might also include punitive damages. See Deposition of Robert L. Hoyer, May 17, 2013, p. 40:3-7 ("A. I'm not an attorney, but I have been involved in litigation situations certainly, and there may or may not be punitive damages or costs. There is – you know, it gets to be a determination made by the courts, not by my analysis.").

[90]  Deposition of Robert L. Hoyer, May 17, 2013, p. 38:5-17 ("Q. What other part of damages would there be for the individuals who have surrendered or terminated their policy? A. Well, I could use as an example, if an individual policyholder terminated in 2005, what I have quantified and what this methodology quantifies is how much additional funds they should have received in 2005, but in fact they did not receive any additional funds, so clearly this difference is applicable to 2005. The Court may decide, someone else may decide, that since it was not paid in 2005, if it is paid in 2013, there is an interest differential, that's beyond the scope of my report.").

41

Hoyer's methodology works only for those policies whose dividends were applied entirely to increase cash value.

107. Second, not all annuitants choose to receive a single cash payment when their policy is terminated. If the policy is terminated because of maturity, the annuitant has many payout options. For example, as shown in Exhibit 5, the annuitant may select a single life income plan. Under such a plan, payments are made until the death of the annuitant. The size of the periodic payments made to an annuitant that selects a single life income plan depends on the cash value of his policy at maturity. But the total payments he receives from his policy depend on how long he lives. The damage, if any, incurred by such an annuitant is therefore not simply the difference in the cash value of his policy at maturity. Rather, a damages calculation must take into account how many payments the annuitant received and whether he is still receiving payments.

108. Third, Mr. Hoyer assumes that all putative class members who accepted Update '83 did so before the class period.[91] This assumption is incorrect, yet Mr. Hoyer implies that because the effect on overall damages is small the effect of this assumption is "immaterial."[92] Mr. Hoyer does not offer a calculation of the impact of this assumption. Instead, his method assumes the result. In addition, his approach could result in the improper calculation of the damages of those class members who accepted Update '83 during the class period. Specifically, because an annuitant's status regarding Update '83 factors into the determination of his DIR, policies that accepted Update '83 during the class period cannot be categorized into one of the four tables Mr. Hoyer uses to display his "differences"

---

[91] In deposition, Mr. Hoyer contradicts himself in his description of how he accounts for Update '83. He states that he does not have a separate formula for individuals who accepted Update '83 during the class period, implying that all putative class members who accepted the amendment were considered to have had Direct Recognition throughout the class period (see Deposition of Robert L. Hoyer, May 17, 2013, pp. 133:15 - 134:15).

[92] Deposition of Robert L. Hoyer, May 17, 2013, p. 134:6-15 ("The opinion of treatment of those who have accepted Update '83 or direct recognition and those who did not, I think within this formula, without trying to nitpick the formula for a few individuals for a couple of years, it's immaterial and hence the opinions that I made or the assumptions, however you want to categorize them, I think accurately and fairly reflect all individuals, not -- you know, including a couple who may have changed it during a certain period of time.").

calculations.  Using Mr. Hoyer's approach, these policies would each have unique tables for calculating the "difference" based on when Update '83 was accepted.  As shown in Exhibit 12, there are over a hundred at-issue annuities for which Update '83 was accepted during or after 1985.

App. 043

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 28, 2013, in Charlottesville, Virginia.

Michael J. Moore

**APPENDIX A**

**CURRICULUM VITAE**

**MICHAEL J. MOORE**

<u>Work</u>                                                                                          <u>Home</u>

<u>Regular postal services</u>                                                        51 Lincoln Street
Jackson Institute for Global Affairs                                   New Haven CT 06511
Yale University
P.O. Box 208206
New Haven, CT 06520

<u>Express delivery</u>
Jackson Institute for Global Affairs
Yale University
34 Hillhouse Avenue
New Haven, CT 06511

Telephone: (312) 925-3315 (M)

Email: michael.j.moore@yale.edu

**EMPLOYMENT & AFFILIATIONS**

**ACADEMIC**

Yale University:

      Jackson Institute of Global Affairs: Senior Lecturer
      School of Public Health: Senior Lecturer
      School of Management: Senior Lecturer

University of Virginia:

      Batten School of Leadership and Public Policy: Professor of Public Policy, 2011-2012;
      Visiting Professor, 2008-2011

      Department of Economics, 2006-2008

      Darden Graduate School of Business: Visiting Professor, 2011-present; Batten Fellow, 2009-
      present; Bank of America Research Professor, 2003-2005; Professor, 2001-2002; Visiting
      Associate Professor, 2000-2001

      Medical Center: Professor of Health Evaluation Sciences, 2001-2003

1

Law School 2005

National Bureau of Economic Research:

   Health Economics Program, Health Policy Program: Research Associate, 1996-2008

University of Chicago:

   Graduate School of Business: Adjunct Professor of Economics, 2007
   Stigler Center for the Study of Economy and the State: Olin Fellow, 1999-2000

University of Georgia:

   Terry College of Business: Visiting Professor, 2007-present

UC-Santa Barbara:

   Bren School of the Environment: Visiting Professor, 1999-2006

Duke University:

   Fuqua School of Business: Associate Professor (with tenure), 1992-2001; Associate Professor
   (without tenure), 1990-1992; Assistant Professor, 1986-1989; Visiting Assistant Professor,
   1984-1985

   Terry Sanford Institute of Public Policy, various years; Center for Aging, 1994-2001

INSEAD:

   Visiting Professor, 1995-1996

University of Michigan:

   Graduate School of Business: Instructor of Economics, 1981-1984

**NON-ACADEMIC**

Chicago Partners (Navigant Consulting): Academic Affiliate, 2011-2012; Principal, 2006-2011

Huron Consulting Group: Managing Director, 2003-2006

**EDUCATION**

Ph.D.          University of Michigan, Department of Economics, 1984, M.A., 1982

M.B.A.        Babson College, 1978

B.S.            Boston College, 1975

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 48 of 174   Document 45   App. 046

**AWARDS AND HONORS**

Kenneth Arrow Award for best paper in Health Economics, Medical Care Section, American Public Health Association, for "Drinking and Schooling," 1993

Kulp-Wright Prize for Outstanding Book in Risk and Insurance, American Society of Risk and Insurance, *Compensation Mechanisms for Job Risks*, 1990

Best Published Article published in *Economic Inquiry*, "The Quantity Adjusted Value of Life," 1988

**RESEARCH GRANTS AND OTHER CONTRACTS**

Center for the Study of Aging and Human Development, Duke University Medical Center, Senior Fellow 1994-2001
University Research Council, Duke University, 1986, 1987
National Science Foundation: Program in Decision, Risk, and Management Science, co-principal investigator, Product Liability Project 1989-1991
National Science Foundation: Program in Decision Risk and Management Science, co-principal investigator, Consumer Product Safety Project, 1990-1991
National Institute on Alcohol Abuse and Alcoholism: Youthful Drinking Project, 1992-1994
National Institute for Child Health and Development: Shannon Award, 1994-1995
National Institute for Child Health and Development: Pregnancy Outcomes Project, 1996-1998
U.S. Veteran's Administration: "Informal Caregivers of Veterans with Dementia: Costs, Quality of Life, and Service Use." 1997-2003
National Institute for Child Health and Development: Long Term Consequences of Abortion Funding Cutoffs, 1999-2001

**PROFESSIONAL ACTIVITIES**

Editorial Advisory Board, Journal of Risk and Uncertainty

American Economic Association, Econometric Society, Industrial Relations Research Association

Duke University: Faculty Compensation Committee, 1994-1996; Alcohol Policy Task Force, 1995; Sport Agents Committee, 1991-2001. Fuqua School of Business: Economics Area Coordinator, 1994-1998; Curriculum Committee, Admissions Director Search Committee, Health Care Management Committee; LEAD Program in Business, Curriculum Director 1993-1996

Ad Hoc Reviewer, *Journal of Political Economy*, *American Economic Review*, *Quarterly Journal of Economics*, *RAND Journal of Economics*, *Review of Economic Studies*, *Journal of Law and Economics*, *Review of Economics and Statistics*, *Journal of Risk and Uncertainty*, *Journal of Health Economics*, *Journal of Environmental Economics and Management*, *Journal of Human Resources*, *Journal of Public Economics*, *Economic Journal*, *Journal of Labor Economics*, *Industrial and Labor Relations Review*, *Economic Inquiry*

3

App. 047

Dissertation Committees: Lindsey Boiney (Fuqua School of Business), Jens Ludwig (Duke Economics), David Anderson (Duke Economics), Rosalie Pacula (Duke Economics), Natalie Webb (Duke Economics), Geoff Gee (Duke Economics), Ruskin Morgan (Fuqua School of Business), Robert Scharff (Duke Economics), Wei Zhu (Duke Economics)

**RESEARCH PUBLICATIONS/JOURNAL ARTICLES**

"Workers' Compensation: Wage Effects, Benefit Inadequacies, and the Value of Health Losses," with W. Kip Viscusi, *The Review of Economics and Statistics*, Vol. 69, No. 2 (1987), pp. 249-261.

"The Quantity Adjusted Value of Life," with W. Kip Viscusi, *Economics Inquiry*, Vol. 26, No. 3 (1988), pp. 369-388. Awarded best paper prize for 1988 volume of *Economic Inquiry*.

"Doubling the Estimated Value of Life: Results Using New Occupational Fatality Data," with W. Kip Viscusi, *Journal of Policy Analysis and Management*, Vol. 7, No. 3 (1988), pp. 476-490.

"Adaptive Learning. Adaptive Utility, and Rational Behavior in a Repeated Prisoner's Dilemma," with Marian C. Moore (1989), *The Journal of Risk and Uncertainty*, Vol. 2, No. 4 (1989), pp. 499-515.

"Rates of Time Preference and Valuations of the Duration of Life," with W. Kip Viscusi, *Journal of Public Economics,* no. 38 (1989), pp. 297-317.

"Promoting Safety Through Workers' Compensation: The Efficacy and Net Wages Costs of Injury Insurance," with W. Kip Viscusi, *The RAND Journal of Economics*, Vol. 20, No. 4 (1989), pp. 499-515.

"Discounting Environmental Health Risks: New Evidence and Policy Implications," with W. Kip Viscusi, *Journal of Environmental Economics and Management*, No. 18 (1989), pp. S51-S62.

"Models for Estimating Discount Rates for Long-term Health Risks Using Labor Market Data," with W. Kip Viscusi, *Journal of Risk and Uncertainty*, Vol. 3 (1990), pp. 381-401.

"Pioneering and Market Share: Is Entry Time Endogenous and Does It Matter?" with William Boulding and Ronald Goodstein, *Journal of Marketing Research*, Vol. 28 (1991), pp. 97-104.

"Worker Learning and Compensating Differentials," with W. Kip Viscusi, *Industrial and Labor Relations Review*, Vol. 45, no. 1 (1991), pp. 80-96.

"Product Liability, Research and Development, and Innovation," with W. Kip Viscusi, *Journal of Political Economy*, Vol. 101, no. 1 (1993), pp. 161-184.

"Drinking and Schooling," with Philip Cook, *Journal of Health Economics*, Vol. 12 (1994), pp. 411-429. Awarded Kenneth Arrow Award, best paper in health economics (1994).

"This Tax is for You: The Case for a Higher Beer Tax," with Philip Cook, *National Tax Journal*, 47 (3), (1994), pp. 559-573.

4

App. 048

"A Statistical Profile of Product Liability in the Pharmaceutical Industry," with W. Kip Viscusi and James Albright, *Seton Hall Law Review*, 24 (3), (1994), pp. 1418-1436.

"Habit Formation, Interdependent Preferences, and Individual Consumption: Evidence from Panel Data," with Narayan Naik, *Review of Economics and Statistics*, vol. 88 (1996), pp. 321-328.

"Unions, Employment Risks, and Market Provision of Employment Risk Differentials," *Journal of Risk and Uncertainty*, 10 (1), 1995, pp. 57-70.

"The Learning Curve for Laparoscopic Cholycystectomy," with W. Meyers and C. Bennett, *American Journal of Surgery*, 1995.

"Consumer Product Safety Regulation in the U.S. and U.K.: The Case of Bicycles," with Wes Magat, *RAND Journal of Economics*, Spring, 1996, pp. 148-164.

"The content and properties of the Caregiver Activities Time Survey (CATS): An outcome measure for use in clinical trial research on Alzheimer's disease," with Elizabeth C. Clipp and Linda K. George, *American Journal of Alzheimer's Disease and Other Dementias*, vol. 1 no. 6, 1996, pp. 3-9.

"The Impact of Velnacrine Maleate on Time Use among Caregivers of Patients with Alzheimer's Disease," with Elizabeth Clipp, *Clinical Pharmacology*, 1996.

"Death and Tobacco Taxes," *RAND Journal of Economics*, Summer 1996, pp. 415-428.

"An Outcome Measure for Use in Clinical Trials Research on Alzheimer's Disease," with Elizabeth Clipp and Linda George, *American Journal of Alzheimer's Disease*, 1996.

"Labeling and Performance Standards for Product Safety: The Case of CPSC's Lawn Mover Standards," with Wes Magat, *Managerial and Decision Economics*, 1997.

"The Injury Risk Consequences of the All-Terrain Vehicles Consent Decrees," with Wes Magat, *International Review of Law and Economics*, 1997, pp. 241-257.

"The Anatomy of Jumps and Falls in Wages," with W. Kip Viscusi and Richard J. Zeckhauser, *Research in Labor Economics*, Vol. 17, 1998.

"Changes in Abortion Funding and Pregnancy Outcomes," with Alan Parnell, Phil Cook, and Deanna Pagnini, *Journal of Health Economics*, 18 (1999), pp. 241-257.

"Only the Illusion of Possible Collusion? Cheap Talk and Similar Goals: Some Experimental Evidence," with Marian C. Moore and Ruskin Morgan, *Journal of Public Policy and Marketing*, *Competition Policy and Antitrust Law*, (2001) 20(1), pp. 27-37.

"Passive Smoking: Health Perceptions Myth vs. Health Care Reality," with Carolyn Zhu, *Journal of Risk and Uncertainty* 2000, 21 (2), pp. 283-310.

"Informal Costs of Dementia Care: Estimates from the National Longitudinal Caregiver Study," with Elizabeth Clipp and Carolyn Zhu, *Journal of Gerontology: Social Sciences*, 56B, S219-S228, 2001.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 51 of 174   Document 45

**App. 049**

"Dementia Problem Behaviors and the Production of Informal Caregiving Services," with Elizabeth Clipp and Carolyn Zhu, *Review of Economics of the Household*, vol. 1, no. 1.

**BOOKS**

*Compensation Mechanisms for Job Risks: Wages, Worker' Compensation, and Product Liability*, with W. Kip Viscusi, (Princeton University Press, 1990). Awarded Kulp-Wright Prize for Outstanding Book in Risk and Insurance, 1990.

*Safety Rules: 25 Years of Consumer Product Safety Regulation in the U.S. and the U.K.*, with W. Magat (Kluwer Academic Publishers, unpublished manuscript).

*The Profit Impact of Marketing Strategy Project: Retrospect and Prospects*, Farris, Paul W., and Michael J. Moore, eds. Cambridge, Cambridge University Press, 2004.

**BOOK CHAPTERS, CONFERENCES PROCEEDINGS, AND BOOK REVIEWS**

"Michigan State Expenditures and the Provision of Public Services," John Cross with Cathy Jensen, Michael Moore and Janet Wolfe, in Brazer, Harvey E., (ed.), *Michigan's Fiscal and Economic Structure*, University of Michigan Press, Ann Arbor, Michigan, (1981).

"Social Insurance in Markets Contexts: Implications of the Structure of Workers' Compensation for Job Safety and Wages," with W. Kip Viscusi, in *Contributions to Insurance Economics,* G. Dionne, ed (Norwell, MA: Kluwer Academic Publishers, 1989), pp. 399-424.

"Have Increases in Workers' Compensation Benefits Paid for Themselves?" with W. Kip Viscusi, in *Benefits, Costs, and Cycles in Workers' Compensation Insurance*, P. Borba and D. Appel, eds., (Norwell, Ma: Kluwer Academic Publishers, 1990), pp. 1-22.

"Cooperation, Hierarchy, and Structure," with Marian Chapman Moore, in *Research on Negotiation in Organizations*, Vol. 2, Roy J. Lewicki, et al., ed., (JAI Press, 1990), pp. 207-217.

"Rationalizing the Relationship between Product Liability and Innovation," with W. Kip Viscusi, *Tort Law and the Public Interest*, P. Schuck, ed., (W.W. Norton Publishers, 1991), pp. 105-127.

"An Industrial Profile of the Links between Product Liability and Innovation," with W. Kip Viscusi, in Litan, R. and P. Huber, *The Liability Maze*, (Washington, D.C.: Brookings Institution, 1991), pp. 81-119.

"Accident Records as a Screening Device: An Appraisal," in *The Human Resources Professional*, Vol. 3, no. 3 (1991), pp. 13-15.

"Violence Reduction Through Restrictions on Alcohol Availability," with Phil Cook, in *Alcohol, Health, and Research World*, Vol. 17, no. 2 (1993), pp. 151-156.

"Taxation of Alcoholic Beverages," with Phil Cook, in Hilton, Michael, and Greg Bloss, E*conomics and the Prevention of Alcohol-Related Problems*, U.S. Department of Health and Human Services, (1993), pp. 33-58.

6

**App. 050**

"Economic Perspectives on Alcohol Related Violence," with Phil Cook, in S. Martin, ed., *Alcohol and Interpersonal Violence*, Research Monograph No. 24, National Institute of Alcohol Abuse and Alcoholism, (1994), pp. 193-212.

"Nonprice Competition, Cost Shocks, and Profits in the Airline Industry," with Messod D. Beneish in B. Starr McMullen, ed., *Research in Transportation Economics*, Vol. 3 (1994), pp. 67-94.

Review of *A Measure of Malpractice: Medical Injury, Malpractice Litigation, and Patient Compensation*, Weiler, Paul C., et. al., Journal of Economic Literature.

Review of *Simulating Workplace Safety*, Kneisner, T. And J. Leeth, Kluwer Academic Press, forthcoming in *Journal of Economic Literature.*

"Insurance for Workplace Injuries," in *New Palgrave Dictionary of Law and Economics*, P. Newman, ed.

"Discontinuous Wage Changes and Job Events," with Kip Viscusi and Richard Zeckhauser, in *Research in Labor Markets*, S. Polachek, ed., vol. 17, (1998).

"Alcohol," with Philip Cook in Newhouse, J., and A. Cuyler, eds., *Handbook of Health Economics*, Amsterdam: North-Holland, 2000.

"Environment and Persistence in the Youthful Demand for Alcohol," with Philip Cook, in Gruber, J., ed., *Risky Behavior Among Youths*, University of Chicago Press/NBER, 2001.

"The Health Care Consequences of Smoking and its Regulation," with James Hughes, in Garber, A., ed., *Frontiers of Health Policy*, vol. 4. NBER.

"The Economics of Alcohol Abuse and Alcohol Control Policies," with Philip Cook, *Health Affairs*, (2002).

"Informal Costs of Dementia," with E. C. Clipp and Carolyn Zhu, In *Research and Practice in Alzheimer's Disease and Other Dementias (special Issue on Caregiving)*, B. Vellas, Editor-in-Chief, European Alzheimer's Disease Consortium (EADC), 2002.

"Product Liability Entering the 21st Century," with W. Kip Viscusi (AEI-Brookings Joint Center for Regulatory Studies, 2001).

"Cargo Cult Econometrics: Specification Testing in Simultaneous Equation Marketing Models," with Russ Morgan and Judith Roberts, in Farris, Paul, and Michael Moore, eds., *The Profit Impact of Marketing Strategy Project: Retrospect and Prospects*, Cambridge, Cambridge University Press, 2004.

**OTHER PUBLICATIONS**

"Effect of Mentane (velnacrine maleate) on Alzheimer Caregiver Time Allocation: A

Multicenter, Double-blind Comparison with Placebo," with Elizabeth C. Clipp. On file Hoechst-Roussel Pharmaceuticals Neurosciences Strategic Marketing, (1993).

"Consumer Product Safety Regulation: Lessons from International Data," with Wesley Magat. Final Report to National Science Foundation, Decision, Risk and Management Science program, Project No. 8922249, (1994).

"Alzheimer's Disease and Caregiver Time," with Elizabeth C. Clipp. Letter to the Editor, *The Lancet,* (1994).

"Impact of Therapy on Caregiving Time and Costs in Alzheimer's Disease," with Elizabeth C. Clipp. *Progress in Alzheimer's Disease*, 1994, in press.

"Block the threats to Workers' Compensation," op-ed article, *Wall Street Journal.*

## WORKING PAPERS

"Applied Econometrics: a STATA Companion," with Greg Talbert and Jim Albright, Working Paper.

"Addiction and Schooling," draft.

"Drinking by Young Adults, Part I: Demographics," with Philip Cook and Rosalie Pacula. Center for the Study of Business, Regulation, and Economic Policy Working Paper, No. 93-15.

"The Efficacy of Voluntary Safety Standards: Lessons from the Chain Saw Industry," with Wesley Magat.

"Habit and Heterogeneity in the Youthful Demand for Alcohol," with Philip Cook. Center for the Study of Business, Regulation, and Economic Policy Working Paper, No. 94-3.

"The Political Economy of Workplace Smoking," Working Paper.

"Napsterizing Pharmaceuticals: Access, Innovation, and Welfare," with Edward Snyder and James Hughes. (Previous version: NBER Working Paper No. 7769).

"The Sealy Litigation and Its Aftermath," with Edward Snyder. Draft.

## WORK IN PROGRESS

U.S. v. Sealy and its Aftermath (with Edward Snyder)

Pharmaceutical Regulation and Antitrust

Antitrust Law and Econometrics

8

App. 052

**APPENDIX B**

**LAST 5 YEARS OF EXPERT TESTIMONY FOR MICHAEL J. MOORE**

**TESTIFYING EXPERT**

1. **In re TFT-LCD (Flat Panel) Price Fixing Litigation. United States District Court, Northern District of California, San Francisco Division. Master File No. 07-m-1827 SI.**

> Target Corp., et al., v. AU Optronics Corp., et al. Case No. 10-cv-4945 SI
>
> Motorola Mobility, Inc., v. AU Optronics Corp., et al. Case No. 09-cv-5840 SI
>
> AT&T Mobility, LLC, v. AU Optronics Corp., et al. Case No. 09-cv-4997 SI
>
> Electrograph Systems Inc.; Electrograph Technologies Corp., v. Epson Imaging Devices Corp., et al. Case No. 10-cv-00117 SI
>
> Antitrust Price Fixing, Liability. Declaration and deposition
> Contact: Nick Verwolf, Davis Wright & Tremaine, Seattle WA

2. **Ehret v. USA. United States District Court, Northern District of Indiana.**

> Takings Damages. Declaration and Trial Testimony
> Contact: Mark Christensen, Christensen & Ehret, Chicago IL

3. **William Roberts v. The Scott Fetzer Company. Civil action No. 4:07-CV-00080-CDL. United States District Court, Middle District of Georgia, Columbus Division.**

> Consumer Fraud, Class Certification. Declaration and deposition
> Contact: Lee Garrett, Jones Day, Atlanta GA

4. **Emerson Electric Co., et al., v. Le Carbone Lorraine, S.A., et al., United States District Court for the District of New Jersey, No. 05-cv-06042.**

> Antitrust Price Fixing Damages (settled)
> Contact: Jonathan Feld, Katten Muchen, Chicago, IL

1

App. 053

5. **Chivers, et al., v. State Farm, et al.**

        Insurance Fraud, Class Certification, Declaration
        Contact: Tom Rodgers, Stacy Allen. Jackson Walker, Austin TX

6. **Burgess v. Farmers Insurance Company, Inc., and Farmers Insurance Exchange. U.S. District Court of Comanche County, State of Oklahoma, CJ-2001-292.**

        Insurance Fraud, Damages, Deposition
        Contact: Tom Rodgers, Willliam Cobb. Jackson Walker, Austin TX

7. **Grays Harbor Adventist Christian School, Greg G. Bogdanoavich, and Mary LaForest v. Carrier Corporation, U.S. District Court, Western District of Washington No. CV05-5437-RBL.**

        Class Action Damages – Consumer Fraud
        Affidavit and deposition
        Contact: Brian Swanson - Bartlit-Beck, Chicago IL

8. **Jeff Dougherty, Frank Zinn, and Harvey Opaleski v. Carrier Corporation, U.S. District Court, Eastern District of Michigan, No. 2:06-cv-15659.**

        Consumer Fraud, Class Certification
        Declaration and deposition
        Contact: Brian Swanson – Bartlit-Beck, Chicago IL

9. **Mark Neuser, Arlan and Marcia Hinkelman, vs. Carrier Corporation, U.S. District Court, Western District of Wisconsin, No. 06-C-645-S.**

        Class Certification – Consumer Fraud
        Declaration and deposition
        Contact: Brian Swanson - Bartlit-Beck, Chicago IL

10. **Costco v. Hoen, et al. U.S. District Court, Western District of Washington at Seattle, No. CV04-0360.**

        Challenges to state restrictions on alcohol distribution (21st Amendment)
        Affidavit, deposition, and trial testimony
        Contact: Michael Sandler - Sandler Ahern & McConaughy, Seattle WA
        David Burman - Perkins Coie, Seattle WA

2

App. 054

11. **In Re Ocean Tankers Price Fixing Litigation.**

> Antitrust price fixing damages
> Class action Opt-outs
> Retained, case settled
> Contact: Andrew Klevorn - Eimer, Stahl, Klevorn, and Solberg,
> Chicago, IL

## CONSULTING EXPERT

12. **In re eBay Sellers Antitrust Litigation. U.S. District Court, N.D. Cal., San Jose Division, Case No. C 07-01882 JF (RS).**

> Monopolization, Class Certification
> Contact: Tom Brown, O'Melveny and Myers, San Francisco CA

13. **Sun Microsystems, In., et al., v. Hynix Semiconductor, Inc., et al., U.S. District Court, N.D. Cal., No. C-06-01665 PJH (Consolidated).**

> Antitrust Price Fixing
> Injury and Damages
> Contact: Ian Simmons, Tom Brown – O'Melveny and Myers,
> Washington DC

14. **Anderson Contracting, Inc., v. Bayer AG, et al., (EPDM Antitrust Litigation), Iowa District Court, Polk County IA, Case No. CL 95959.**

> Antitrust Price Fixing
> Indirect purchaser class certification
> Contact: Ian Simmons - O'Melveny & Myers, Washington DC

15. **Brock v. Honeywell International, U.S. District Court, N.D. Cal., No. C-04-5328 WHA.**

> Attempt to monopolize
> Indirect purchaser class certification
> Contact: Ian Simmons - O'Melveny & Myers, Washington DC

16. **MacKinnon v. Honeywell International, Maine.**

> Attempt to monopolize
> Indirect purchaser class certification
> Supporting testifying expert
> Contact: Ian Simmons - O'Melveny & Myers, Washington DC

3

App. 055

17. **Wright, et al., v. Honeywell, State of Vermont, Orange County Superior Court, Docket No. 301-11-04.**

> Attempt to monopolize
> Indirect purchaser class certification
> Supporting testifying expert
> Contact: Ian Simmons - O'Melveny & Myers, Washington DC

18. **In Re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation, No. 3:03-MD1542 (PCD).**

> Antitrust Price Fixing
> Direct Purchaser Class Certification
> Contact: Ian Simmons - O'Melveny and Myers, Washington DC

4

App. 056

# APPENDIX C

## DOCUMENTS CONSIDERED

**Legal Filings**

### *Marleen M. LaPlant v. The Northwestern Mutual Life Insurance Company*

Complaint and Jury Demand, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, August 26, 2008

Decision and Order on Motion of Plaintiff for Class Certification, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, October 26, 2009

Notice of Class Action, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, December 14, 2009

Decision in Matter Tried to the Court, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, March 7, 2011

Plaintiff's Amended Notice and Motion to Redefine the Class to Include All Pre-MN Annuitants and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, Code: 30701, September 12, 2011

Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, March 4, 2013

Appendix Exhibit 39 to Plaintiff's Brief in Support of Motion for an Order Redefining the Class and for Related Relief, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, March 4, 2013

1

App. 057

Expert Report of Theodore E. Affleck, Submitted for *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988, June 30, 2010

Expert Report of S. Travis Pritchett, Submitted for *M. LaPlant v. Northwestern Mutual Life Company*, July 2, 2010

Expert Report of Bruce W. Foudree, Submitted for *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company, a Wisconsin mutual insurance corporation,* State of Wisconsin Circuit Court, Milwaukee County, Case No. 08-CV-11988*, August 6, 2010

Expert Report of Stephen N. Steinig, Submitted for M. *LaPlant v. Northwestern Mutual Life Company*, August 6, 2010

Affidavit of Nicholas J. Sales, *Marleen M. LaPlant, on her own behalf and on behalf of a class similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Eastern District of Wisconsin, Case No. 2:11-CV-00910, November 17, 2011

Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for *M. LaPlant v. Northwestern Mutual Life Company*, Hoyer Actuarial Litigation, LLC, March 4, 2013

### *Beverly E. Krueger v. The Northwestern Mutual Life Insurance Company*

Northwestern Mutual's Memorandum in Opposition to Plaintiff's Motion for Class Certification, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011

Affidavit of Chris G. Trost, *Beverly E. Krueger and Richard A. Race, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, June 30, 2010

Affidavit of Nicholas J. Sales, *Beverly E. Krueger, on behalf of herself and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, August 13, 2010

Affidavit of Chris G. Trost, *Beverly E. Krueger, on behalf of themselves and all others similarly situated v. The Northwestern Mutual Life Insurance Company*, United States District Court, Northern District of Florida, Gainesville Division, Case No. 1:10-CV-00128-SPM, April 15, 2011

2

App. 058

*Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company et al.*

Decision on Motion to Certify for Class Action, *Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company et al.*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 01-CV-12349, July 6, 2005

Decision on Motions to Certify for Class Action and Summary Judgment, *Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company et al.*, State of Wisconsin Circuit Court, Milwaukee County, Case No. 01-CV-12349, January 25, 2008

Affidavit of Robert L. Hoyer, *Catherine D. Noonan and Daniel A. Noonan v. The Northwestern Mutual Life Insurance Company, et al.,* State of Wisconsin Circuit Court, Milwaukee County, Case No. 01-CV-012349, March 8, 2005

### *Other*

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)

## Articles and Book Chapters

ABA Section of Antitrust Law, *Proving Antitrust Damages, Legal and Economic Issues,* 2nd ed., American Bar Association, (2010)

Allen, Mark A., et al., "Reference Guide on Estimation of Economic Losses in Damages Awards," in *Reference Manual on Scientific Evidence*, The National Academies Press, (2011): 425-502

Angrist, Joshua D., and Alan B. Krueger, "Chapter 23 Empirical strategies in labor economics," in *Handbook of Labor Economics*, Vol. 3, (1999): 1277-1366

Bardrinath, SG, Jayant R. Kale and Harley E. Ryan, Jr., "Characteristics of Common Stock Holdings of Insurance Companies," *The Journal of Risk and Insurance*, Vol. 63, No. 1 (Mar., 1996): 49-76

Bernheim, B. Douglas, and John B. Shoven, "Pension Funding and Saving," in *Pensions in the US Economy*, University of Chicago Press, (1988): 85-114

Brealey, Richard A. and Stewart C. Myers, *Principles of Corporate Finance*, McGraw-Hill, Inc., 4th ed., (1991)

Downes, John and Jordan E. Goodman, *Dictionary of Finance and Investment Terms*, Barron's Educational Series, (2010)

Gibson, William E. and James L. Pierce, "Deposit Demand, 'Hot Money,' and the Viability of Thrift Institutions," *Brookings Papers on Economic Activity*, 1974, No. 3 (1974): 593-636

3

App. 059

Holt, Charles A. and Susan K. Laury, "Risk Aversion and Incentive Effects," *The American Economic Review*, Vol. 92, No. 5, (Dec., 2002): 1644-1655

Marquard, Steven, *The Distortion Theory of Macroeconomic Forecasting: A Guide for Economists and Investors*, Greenwood Publishing Group, Inc. (1994)

Office of Fair Trading, *Consumer Contracts*, Crown Publishing, (2011): 1-116

Rosen, Kenneth T. and Larry Katz, "Money Market Mutual Funds: An Experiment in Ad Hoc Deregulation: A Note," *The Journal of Finance*, Vol. 38, No. 3, (1983): 1011-1017

Vitt, Lois A., "Risk Tolerance," in *Encyclopedia of Retirement and Finance*, Volume 1, Greenwood Publishing Group, Inc., (2003)

**Depositions and Trial Testimony**

Deposition of Jacqueline Baumgart, June 16, 2010

Deposition of Thomas Colbert, July 23, 2010

Deposition of Thomas Dyer, May 13, 2010

Deposition of Michael J. Holden, May 25, 2010

Deposition of Robert L. Hoyer, May 17, 2013

Deposition of Russell R. Jensen, June 15, 2010

Deposition of John Komives, May 18, 2010

Deposition of Gerald Kreitzman, June 10, 2010

Deposition of Marleen LaPlant, September 9, 2009

Deposition of Caroline Meckes, June 10, 2010

Deposition of Janet Reichart, June 16, 2010

Deposition of William J. Timmers, July 23, 2010

Deposition of Bruce Williams, May 18, 2010

Testimony of Daniel Noonan, November 8, 2010

**Non-Bates Numbered Deposition Exhibits**

Exhibits 1 - 9 to deposition of Robert L. Hoyer, May 17, 2013

Exhibit 167 to deposition of Gerald Kreitzman, June 10, 2010

Exhibit 1 to deposition of Marleen LaPlant, September 9, 2009

***Marleen M. LaPlant v. Northwestern Mutual* Trial Exhibits**

Trial Exhibit 15

Trial Exhibit 16

Trial Exhibit 67

Trial Exhibit 73

Trial Exhibit 74

Trial Exhibit 102

Trial Exhibit 121

Trial Exhibit 154

Trial Exhibit 155

Trial Exhibit 157

Trial Exhibit 180

Trial Exhibit 189

Trial Exhibit 261

Trial Exhibits 269 - 286

Trial Exhibit 312

Trial Exhibit 314

Trial Exhibit 316

Trial Exhibits 319 to 335

5

App. 061

Trial Exhibit 340

Trial Exhibit 342

Trial Exhibit 356

Trial Exhibit 385

Trial Exhibit 424

Trial Exhibit 528

**Other Bates Numbered Documents**

| | |
|---|---|
| ML_NML0446 to ML_NML0459 | ML2_NM_4818 to ML2_NM_4819 |
| ML_NML2_0503 | ML2_NM_4820 to ML2_NM_4829 |
| ML_NML2_0504 | ML2_NM_4830 to ML2_NM_4831 |
| ML_NML2_0505 | ML2_NM_4832 to ML2_NM_4836 |
| ML_NML2_0506 | ML2_NM_4837 to ML2_NM_4838 |
| ML_NML2_0513 to ML_NML2_0519 | ML2_NM_4877 to ML2_NM_4882 |
| ML_NML2_0528 | ML2_NM_5553 to ML2_NM_5555 |
| ML_NML2_0533 | ML2_NM_5556 to ML2_NM_5563 |
| ML_NML2_0537 to ML_NML2_0538 | ML2_NM_5564 to ML2_NM_5572 |
| ML_NML2_0575 to ML_NML2_0576 | ML2_NM_5573 to ML2_NM_5575 |
| ML_NML3_0209 to ML_NML3_0217 | ML2_NM_5576 to ML2_NM_5579 |
| ML_NML3_0218 to ML_NML3_0234 | ML2_NM_5580 to ML2_NM_5587 |
| ML_NML3_0235 to ML_NML3_0249 | ML2_NM_5588 to ML2_NM_5595 |
| ML_NML3_0380 to ML_NML3_0503 | ML2_NM_5596 to ML2_NM_5600 |
| ML_NML3_0446 | ML2_NM_5601 to ML2_NM_5609 |
| ML_NML3_3604 to ML_NML3_3605 | ML2_NM_6738 to ML2_NM_6739 |
| ML_NML3_3606 to ML_NML3_3608 | ML2_NM_6740 to ML2_NM_6747 |
| ML_NML3_3609 to ML_NML3_3626 | ML2_NM_6748 |
| ML_NML3_3627 to ML_NML3_3629 | ML2_NM_6749 to ML2_NM_6754 |
| ML_NML3_3630 to ML_NML3_3631 | ML2_NM_6755 to ML2_NM_6758 |
| ML_NML3_3632 to ML_NML3_3637 | ML2_NM_6759 to ML2_NM_6780 |
| ML_NML3_3638 to ML_NML3_3640 | ML2_NM_6781 |
| ML_NML3_3641 to ML_NML3_3661 | ML2_NM_6782 to ML2_NM_6815 |
| ML2_NM_4518 to ML2_NM_4529 | ML2_NM_6816 |
| ML2_NM_4552 to ML2_NM_4569 | ML2_NM_6817 to ML2_NM_6818 |
| ML2_NM_4805 to ML2_NM_4806 | ML2_NM_6819 to ML2_NM_6822 |
| ML2_NM_4807 to ML2_NM_4817 | ML2_NM_6827 |

6

App. 062

**Other Publicly Available Documents**

Northwestern Mutual, "Northwestern Mutual Facts for 2013," May 2013, available at <http://www.northwesternmutual.com/about-northwestern-mutual/our-company/Documents/fact_sheet.pdf>, accessed on June 17, 2013

Sullivan, Paul, "Annuities: What You Need to Know," *The New York Times*, January 27, 2009, available at <http://www.nytimes.com/2009/01/28/your-money/annuities/primerannuities.html?ref=annuities>, accessed on June 17, 2013

U.S. Department of Labor Bureau of Labor Statistics, "Consumer Price Index," last updated June 18, 2013, available at <ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt>, accessed on June 24, 2013

U.S. Securities and Exchange Commission, "Annuities," April 6, 2001, available at <http://www.sec.gov/answers/annuity.htm>, accessed on June 17, 2013

**Data Files**

1983_12 PreMNAnn Plans_R2.txt

1985_12 Assoc CRA Plans_R2.txt

Annuity Termination Data.xlsx

Data+Field+Definitions+May3+File.xlsx

LaPlant Life policies 1983_2012 File1.txt

LaPlant Life policies 1983_2012 File2.txt

List of 36,935 Annuities Updated.xlsx

7

# Exhibit 1
## Determination of Putative Class

|  | Annuities |
|---|---|
| **Potential Class Annuities Identified by Northwestern Mutual** | 36,935 |

**Policies Excluded from Potential Class**

| | Annuities | |
|---|---|---|
| Policies Terminated Prior to March 31, 1985 | 28 | |
| Policies Dated After March 31, 1985 | 66 | |
| HE Series Policies | 1,549 | |
| KL Series Policies | 89 | |
| Non-Participating Policy | 1 | |
| Subtotal | 1,733 | |

| **Potential Class Annuities: Total Less Exclusions** | 35,202 |
|---|---|

**Update '83 Status of Potential Class Annuities**

| | |
|---|---|
| Not Eligible | 11,306 |
| Not Signed | 6,131 |
| Signed in Wisconsin | 2,229 |
| Signed Outside Wisconsin | 15,467 |
| Unknown | 69 |

**Putative Class:**

| **Annuities** (Potential Class Annuities Less Signed Outside Wisconsin) | **19,735** |
|---|---|
| **Annuitants** | **18,553** |

**Notes:**

[1] The 1,549 "HE Series Policies" are employee plans which are not included in the class according to Trial Ex. 404.

[2] The 89 "KL Series Policies" are employee plans which are not included in the class according to Trial Ex. 404.

[3] The one "Non-Participating Policy" is a non-participating policy with no annual change in cash value.

[4] The 11,306 "Not Eligible" annuities are those that were issued after the implementation of Update '83.

[5] The 6,131 "Not Signed" annuities are those that were eligible for Update '83 but never amended.

[6] The 69 "Unknown" annuities are those with values of "Unknown" or "???" for the "Update '83 Details" field in the data.

**Sources:**

[1] List of 36,935 Annuities Updated xlsx.

[2] Annuity Termination Data xlsx.

[3] 1983_12 PreMNAnn Plans_R2.txt.

**Exhibit 2**

**Current Residence of Putative Class Members with In-Force Annuities**

| State/Country | Number of Putative Class Members | State/Country | Number of Putative Class Members |
|---|---|---|---|
| AK | 5 | NC | 45 |
| AL | 21 | ND | 29 |
| AR | 10 | NE | 24 |
| AZ | 29 | NH | 16 |
| CA | 116 | NJ | 40 |
| CO | 41 | NM | 20 |
| CT | 44 | NV | 14 |
| DC | 4 | NY | 136 |
| DE | 2 | OH | 124 |
| FL | 121 | OK | 31 |
| GA | 35 | OR | 24 |
| HI | 20 | PA | 145 |
| IA | 97 | RI | 26 |
| ID | 14 | SC | 18 |
| IL | 206 | SD | 31 |
| IN | 97 | TN | 15 |
| KS | 32 | TX | 74 |
| KY | 29 | UT | 24 |
| LA | 11 | VA | 53 |
| MA | 48 | VT | 9 |
| MD | 42 | WA | 35 |
| ME | 14 | WI | 391 |
| MI | 114 | WV | 26 |
| MN | 74 | WY | 2 |
| MO | 53 | | |
| MS | 11 | Canada | 1 |
| MT | 14 | Other Country | 7 |
| | | Total | 2,664 |

**Note:**

[1] The total of 2,664 corresponds to the number of putative class members with at least one Pre-MN annuity in-force as of year end 2012.

**Sources:**

[1] List of 36,935 Annuities Updated.xlsx.

[2] Annuity Termination Data.xlsx.

[3] 1983_12 PreMNAnn Plans_R2.txt.

[4] Data+Field+Definitions+May3+File.xlsx.

**Exhibit 3**
**Putative Class Members with Simultaneous Life and Annuity Policies In-Force**
**1985 - 2012**

| Year | Total Class Annuities | Total Class Policyholders | Policyholders with Simultaneous Policies | Percent of Class with Simultaneous Policies |
|------|------|------|------|------|
| 1985 | 19,735 | 18,553 | 9,043 | 48.7% |
| 1986 | 18,579 | 17,482 | 8,613 | 49.3% |
| 1987 | 16,970 | 16,000 | 7,968 | 49.8% |
| 1988 | 15,438 | 14,591 | 7,236 | 49.6% |
| 1989 | 14,490 | 13,703 | 6,831 | 49.9% |
| 1990 | 13,531 | 12,815 | 6,386 | 49.8% |
| 1991 | 12,695 | 12,046 | 6,020 | 50.0% |
| 1992 | 11,972 | 11,370 | 5,717 | 50.3% |
| 1993 | 11,304 | 10,738 | 5,402 | 50.3% |
| 1994 | 10,692 | 10,162 | 5,125 | 50.4% |
| 1995 | 10,011 | 9,526 | 4,792 | 50.3% |
| 1996 | 9,347 | 8,900 | 4,474 | 50.3% |
| 1997 | 8,556 | 8,149 | 4,077 | 50.0% |
| 1998 | 7,744 | 7,386 | 3,681 | 49.8% |
| 1999 | 6,978 | 6,676 | 3,301 | 49.4% |
| 2000 | 6,409 | 6,144 | 3,029 | 49.3% |
| 2001 | 5,831 | 5,596 | 2,732 | 48.8% |
| 2002 | 5,450 | 5,235 | 2,552 | 48.7% |
| 2003 | 5,132 | 4,935 | 2,412 | 48.9% |
| 2004 | 4,856 | 4,681 | 2,298 | 49.1% |
| 2005 | 4,570 | 4,408 | 2,172 | 49.3% |
| 2006 | 4,316 | 4,161 | 2,058 | 49.5% |
| 2007 | 4,041 | 3,895 | 1,929 | 49.5% |
| 2008 | 3,724 | 3,596 | 1,803 | 50.1% |
| 2009 | 3,467 | 3,350 | 1,699 | 50.7% |
| 2010 | 3,268 | 3,160 | 1,611 | 51.0% |
| 2011 | 3,093 | 2,990 | 1,532 | 51.2% |
| 2012 | 2,905 | 2,807 | 1,438 | 51.2% |
| 1985 - 2012 | 19,735 | 18,553 | 9,931 | 53.5% |

**Notes:**

[1] "Total Class Annuities" corresponds to the annual total number of putative class annuities that are in-force or that have been terminated in each respective year.

[2] "Total Class Policyholders" corresponds to the annual total number of putative class policyholders with annuity policies in-force or policies that have been terminated in each respective year.

[3] As of 2012, 4,860 putative class members had life policies in-force. Of these, 1,374 either terminated or surrendered their annuity policies before 1994.

**Sources:**

[1] List of 36,935 Annuities Updated.xlsx.
[2] Annuity Termination Data.xlsx.
[3] 1983_12 PreMNAnn Plans_R2.txt.
[4] LaPlant Life policies 1983_2012 File1.txt.
[5] LaPlant Life policies 1983_2012 File2.txt.

**Exhibit 4**
**Putative Class Members' CRA Purchases**
**1985 - 2012**

| Year | Total Class Annuities | Total Class Policyholders | Class Members who Purchased CRAs |
|------|------|------|------|
| 1985 | 19,735 | 18,553 | 606 |
| 1986 | 18,579 | 17,482 | 157 |
| 1987 | 16,970 | 16,000 | 169 |
| 1988 | 15,438 | 14,591 | 178 |
| 1989 | 14,490 | 13,703 | 229 |
| 1990 | 13,531 | 12,815 | 169 |
| 1991 | 12,695 | 12,046 | 155 |
| 1992 | 11,972 | 11,370 | 79 |
| 1993 | 11,304 | 10,738 | 30 |
| 1994 | 10,692 | 10,162 | 55 |
| 1995 | 10,011 | 9,526 | 60 |
| 1996 | 9,347 | 8,900 | 26 |
| 1997 | 8,556 | 8,149 | 15 |
| 1998 | 7,744 | 7,386 | 7 |
| 1999 | 6,978 | 6,676 | 4 |
| 2000 | 6,409 | 6,144 | 5 |
| 2001 | 5,831 | 5,596 | 15 |
| 2002 | 5,450 | 5,235 | 14 |
| 2003 | 5,132 | 4,935 | 13 |
| 2004 | 4,856 | 4,681 | 5 |
| 2005 | 4,570 | 4,408 | 5 |
| 2006 | 4,316 | 4,161 | 5 |
| 2007 | 4,041 | 3,895 | 4 |
| 2008 | 3,724 | 3,596 | 10 |
| 2009 | 3,467 | 3,350 | 25 |
| 2010 | 3,268 | 3,160 | 8 |
| 2011 | 3,093 | 2,990 | 9 |
| 2012 | 2,905 | 2,807 | 0 |
| 1985 - 2012 | 19,735 | 18,553 | 1,665 |

**Notes:**

[1] "Total Class Annuities" corresponds to the annual total number of putative class annuities that are in-force or that have been terminated in each respective year.

[2] "Total Class Policyholders" corresponds to the annual total number of putative class policyholders with annuity policies in-force or policies that have been terminated in each respective year.

[3] The count of annual putative class members who purchased CRAs does not sum to the 1,665 total shown for 1985 - 2012 because some putative class members purchased more than one CRA during the period shown.

**Sources:**

[1] List of 36,935 Annuities Updated xlsx.
[2] Annuity Termination Data xlsx.
[3] 1983_12 PreMNAnn Plans_R2.txt.
[4] 1985_12 Assoc CRA Plans_R2.txt.

## Exhibit 5
## Selected Characteristics of At-Issue Annuities

| Premium Modes | Policy Loan Rates |
|---|---|
| Flexible premiums ("FPA") | 5% compounded annually |
| Fixed premiums ("RA") | 6% compounded annually |
| Single premium ("SPRA") | 8% compounded annually |

| Maturity Options | Dividend Payout Options |
|---|---|
| Cash payout | Cash payout |
| Interest Income Plan | Premium payment |
| Installment Income Plans | Purchase policy additions |
|     Specified Period | |
|     Specified Amount | |
| Life Income Plans | |
|     Single Life Income | |
|     Joint and Survivor Life Income | |

**Note:**
[1] "Dividend Payout Options" and "Maturity Options" are based on Marleen M. LaPlant's Fixed Premium Annuity contract.

**Sources:**
[1] Trial Exhibit 121, LaPlant Contract.
[2] Trial Exhibits 319 to 335, Sample Contracts.

App. 068



**Exhibit 6**

**Pre-MN Annuity and Life Policy DIRs**

**For Policies with Direct Recognition and No Policy Borrowing**

**1985 - 1993**

Dividend Interest Rate (%)

Calendar Year

Life DIR

Annuity DIR

Notes:
[1] DIR values are as reported for tax qualified policies.
[2] "Life" and "Annuity" values are for "Employee Life Insurance" and "Retirement Annuity" policies, respectively.

Source:
[1] Trial Exhibit 189, Dividend Interest Rate Tables.



Exhibit 7

Percentage Point Spread between Pre-MN Annuity and Life Policy DIRs
For Policies with Direct Recognition and No Policy Borrowing
1985 - 1993

**Notes:**
[1] DIR values are as reported for tax qualified policies.
[2] "Life" and "Annuity" values are for "Employee Life Insurance" and "Retirement Annuity" policies, respectively.
[3] Spread calculated as the difference between Annuity and Life policy DIRs for non-borrowed policies with direct recognition.

**Source:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.

**Exhibit 8**

**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants with Direct Recognition and No Policy Borrowing**

Deposited in Column Year and Withdrawn in Row Year

Based on Hoyer Report Table 9

All Zero and Negative Values Highlighted

**1985 - 1994**

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1985 | 0.00 | - | X | X | X | X | X | X | X | X | X |
| 1986 | 0.28 | 0.25 | - | X | X | X | X | X | X | X | X |
| 1987 | 0.62 | 0.56 | 0.25 | - | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | -0.28 | -0.50 | - | X | X | X | X | X | X |
| 1989 | -1.14 | -1.02 | -1.23 | -1.38 | -0.75 | - | X | X | X | X | X |
| 1990 | -1.25 | -1.13 | -1.35 | -1.52 | -0.82 | 0.00 | - | X | X | X | X |
| 1991 | -1.38 | -1.24 | -1.48 | -1.67 | -0.91 | 0.00 | 0.00 | - | X | X | X |
| 1992 | -2.01 | -1.81 | -2.03 | -2.20 | -1.33 | -0.30 | -0.28 | -0.25 | - | X | X |
| 1993 | -0.53 | -0.48 | -0.87 | -1.18 | -0.35 | 0.66 | 0.60 | 0.55 | 0.75 | - | X |
| 1994 | 1.83 | 1.65 | 1.01 | 0.48 | 1.21 | 2.16 | 1.96 | 1.78 | 1.90 | 1.00 | - |

**Note:**

[1] Values expressed as percentages.

**Sources:**

[1] Trial Exhibit 189, Dividend Interest Rate Tables.

[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

| Year | Number Terminated | | | | | Percent of Remaining Policies Terminated | Percent of Putative Class Policies Terminated |
|------|-------|----------|-----------|-------|--------|------|------|
| | Death | Maturity | Surrender | Other | Total | | |
| 1985 | 44 | 120 | 990 | 2 | 1,156 | 5 9% | 5 9% |
| 1986 | 67 | 190 | 1,349 | 3 | 1,609 | 8 7% | 8 2% |
| 1987 | 76 | 197 | 1,258 | 1 | 1,532 | 9 0% | 7 8% |
| 1988 | 53 | 189 | 704 | 2 | 948 | 6 1% | 4 8% |
| 1989 | 67 | 219 | 673 | 0 | 959 | 6 6% | 4 9% |
| 1990 | 67 | 194 | 575 | 0 | 836 | 6 2% | 4 2% |
| 1991 | 50 | 175 | 498 | 0 | 723 | 5 7% | 3 7% |
| 1992 | 55 | 124 | 489 | 0 | 668 | 5 6% | 3 4% |
| 1993 | 51 | 143 | 418 | 0 | 612 | 5 4% | 3 1% |
| 1994 | 42 | 167 | 472 | 0 | 681 | 6 4% | 3 5% |
| 1995 | 63 | 164 | 437 | 0 | 664 | 6 6% | 3 4% |
| 1996 | 51 | 139 | 601 | 0 | 791 | 8 5% | 4 0% |
| 1997 | 34 | 152 | 626 | 0 | 812 | 9 5% | 4 1% |
| 1998 | 37 | 135 | 594 | 0 | 766 | 9 9% | 3 9% |
| 1999 | 36 | 113 | 420 | 0 | 569 | 8 2% | 2 9% |
| 2000 | 38 | 85 | 455 | 0 | 578 | 9 0% | 2 9% |
| 2001 | 20 | 69 | 292 | 0 | 381 | 6 5% | 1 9% |
| 2002 | 30 | 77 | 211 | 0 | 318 | 5 8% | 1 6% |
| 2003 | 42 | 69 | 165 | 0 | 276 | 5 4% | 1 4% |
| 2004 | 40 | 83 | 163 | 0 | 286 | 5 9% | 1 4% |
| 2005 | 28 | 57 | 169 | 0 | 254 | 5 6% | 1 3% |
| 2006 | 30 | 55 | 190 | 0 | 275 | 6 4% | 1 4% |
| 2007 | 24 | 47 | 246 | 0 | 317 | 7 8% | 1 6% |
| 2008 | 26 | 57 | 174 | 0 | 257 | 6 9% | 1 3% |
| 2009 | 37 | 59 | 103 | 0 | 199 | 5 7% | 1 0% |
| 2010 | 37 | 36 | 102 | 0 | 175 | 5 4% | 0 9% |
| 2011 | 40 | 42 | 106 | 0 | 188 | 6 1% | 1 0% |
| 2012 | 32 | 47 | 79 | 0 | 158 | 5 4% | 0 8% |
| Total Terminated | 1,217 | 3,204 | 12,559 | 8 | 16,988 | | 86 1% |
| 1985, 1988-1993 | 387 | 1,164 | 4,347 | 4 | 5,902 | | 29 9% |

**Notes:**
[1] "Percent of Remaining Policies Terminated" corresponds to the number of policies terminated annually expressed as a percentage of the number of policies in-force as of the beginning of each respective year
[2] "Percent of Putative Class Policies Terminated" is expressed as a percentage of the 19,735 annuities that are part of the class as specified in Exhibit 1
[3] As of year end 2012, 2,747 putative class policies remain in force

**Sources:**
[1] List of 36,935 Annuities Updated xlsx
[2] Annuity Termination Data xlsx
[3] 1983_12 PreMNAnn Plans_R2 txt

# Exhibit 10
## DIRs for Life and Annuity Policies
### 1976 - 1984

| Year | Annuity | Life | Difference |
|------|---------|------|------------|
|  | [A] | [B] | [A] - [B] |
| 1976 | 6.15% | 6.15% | 0.00% |
| 1977 | 6.50% | 6.50% | 0.00% |
| 1978 | 7.25% | 7.25% | 0.00% |
| 1979 | 7.50% | 7.50% | 0.00% |
| 1980 | 8.50% | 8.65% | (0.15%) |
| 1981 | 9.00% | 9.15%/8.65% | (0.15%)/0.35% |
| 1982 | 9.75% | 10.15% | (0.40%) |
| 1983 | 10.85% | 11.00% | (0.15%) |
| 1984 | 11.00% | 11.15% | (0.15%) |

**Notes:**

[1] From 1976 to 1981, the DIRs are for tax qualified policies without direct recognition. From 1982 to 1984, the dividend interest rates are for tax qualified policies with direct recognition and no borrowing.

[2] In 1981, the DIRs for life insurance policies with a loan rate of 8% was 9.15%. For life policies with a loan rate of 6% or 5%, the DIR was 8.65%.

[3] "Life" and "Annuity" values are for "Employee Life Insurance" and "Retirement Annuity" policies, respectively.

**Source:**

[1] Trial Exhibit 189, Dividend Interest Rate Tables.

## Exhibit 11
## Pre-MN Annuity Surrenders
## 1976 - 1982

| Year | Tax-Qualified DIR | Average 90-Day Treasury Bill | FPA and RA Surrenders | FPAs and RAs In-Force | Spread between DIR and 90-Day Treasury Bill | Percent Surrendered |
|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [A] - [B] | [C] / [D] |
| 1976 | 6.2% | 5.1% | 3,155 | 37,502 | 1.1% | 8.4% |
| 1977 | 6.5% | 5.4% | 2,828 | 37,706 | 1.1% | 7.5% |
| 1978 | 7.3% | 7.6% | 2,858 | 38,819 | -0.4% | 7.4% |
| 1979 | 7.5% | 10.7% | 3,117 | 39,343 | -3.2% | 7.9% |
| 1980 | 8.5% | 12.5% | 3,822 | 38,559 | -4.0% | 9.9% |
| 1981 | 9.0% | 15.4% | 5,196 | 35,419 | -6.4% | 14.7% |
| First 5 months of 1982 | 9.8% | 13.1% | 3,188 | 33,366 | -3.4% | |

**Notes:**
[1] "Percent Surrendered" was not calculated for 1982 because values reported are for the first five months of the year only.
[2] Source document includes FPAs and RAs but does not mention SPRAS. As a result, SPRAs are not included here.

**Source:**
[1] Employee Plans Product Development Committee, titled "July 29th Meeting Minutes" (ML2_NM_4552 to ML2_NM_4569).

**Exhibit 12**
**Timing of Update '83 for Annuities Included in Putative Class**
**1982 - 2012**

| Year | Number Updated | Percent of Eligible Policies Updated |
|------|----------------|--------------------------------------|
| 1982 | 291 | 3.5% |
| 1983 | 1,767 | 21.0% |
| 1984 | 57 | 0.7% |
| 1985 | 32 | 0.4% |
| 1986 | 23 | 0.3% |
| 1987 | 23 | 0.3% |
| 1988 | 6 | 0.1% |
| 1989 | 8 | 0.1% |
| 1990 | 9 | 0.1% |
| 1991 | 6 | 0.1% |
| 1992 | 5 | 0.1% |
| 1993 | 1 | 0.0% |
| 1994 - 2012 | 0 | 0.0% |
| **1985 - 1993** | **113** | **1.3%** |

**Notes:**

[1] "Percent of Eligible Policies Updated" corresponds to the annual number of policy amendments expressed as a percentage of the 8,429 annuities included in the class that were eligible for the Update '83 policy amendment. This total was calculated by counting all of the annuities in this dataset with values of "never did," "Unknown," "WI," or "???" for the "Update '83 Details" field.

[2] There are 7 policies that accepted the amendement that were missing data to determine the timing of acceptance. These policies are excluded from the exhibit.

**Sources:**

[1] List of 36,935 Annuities Updated xlsx.

[2] Annuity Termination Data xlsx.

[3] 1983_12 PreMNAnn Plans_R2.txt.

**Appendix Exhibit I-A**
**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants with Direct Recognition and No Policy Borrowing**
Deposited in Column Year and Withdrawn in Row Year
Based on Hoyer Report Table 9
All Zero and Negative Values Highlighted
1985 - 2010

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1986 | 0.28 | 0.25 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1987 | 0.62 | 0.56 | 0.25 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | -0.28 | -0.50 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1989 | -1.14 | -1.02 | -1.23 | -1.38 | -0.75 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1990 | -1.25 | -1.13 | -1.35 | -1.52 | -0.82 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1991 | -1.38 | -1.24 | -1.48 | -1.67 | -0.91 | 0.00 | -0.25 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1992 | -2.01 | -1.81 | -2.03 | -2.20 | -1.33 | -0.30 | -0.28 | 0.75 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1993 | -0.53 | -0.48 | -0.87 | -1.18 | -0.35 | 0.66 | 0.60 | 0.55 | 1.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 1.83 | 1.65 | 1.01 | 0.48 | 1.21 | 2.16 | 1.96 | 1.78 | 1.90 | 1.50 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 5.87 | 5.28 | 4.24 | 3.37 | 3.88 | 4.66 | 4.24 | 3.85 | 3.81 | 2.70 | 1.50 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 10.53 | 9.47 | 7.97 | 6.70 | 6.96 | 7.53 | 6.85 | 6.23 | 6.01 | 4.65 | 3.23 | 2.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 17.35 | 15.61 | 13.46 | 11.60 | 11.47 | 11.71 | 10.65 | 9.68 | 9.19 | 7.51 | 5.80 | 3.77 | 2.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 26.14 | 23.52 | 20.53 | 17.94 | 17.28 | 17.08 | 15.53 | 14.11 | 13.27 | 11.18 | 9.11 | 6.72 | 4.63 | 2.30 | - | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 36.18 | 32.55 | 28.61 | 25.18 | 23.91 | 23.20 | 21.09 | 19.17 | 17.92 | 15.38 | 12.90 | 10.10 | 7.64 | 4.95 | 2.30 | - | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 47.60 | 42.83 | 37.80 | 33.43 | 31.46 | 30.15 | 27.41 | 24.92 | 23.20 | 20.15 | 17.22 | 13.96 | 11.09 | 8.00 | 4.95 | 2.30 | - | X | X | X | X | X | X | X | X | X | X |
| 2001 | 60.57 | 54.49 | 48.24 | 42.79 | 40.03 | 38.04 | 34.58 | 31.44 | 29.20 | 25.57 | 22.12 | 18.36 | 15.03 | 11.48 | 8.00 | 4.95 | 2.30 | - | X | X | X | X | X | X | X | X | X |
| 2002 | 75.32 | 67.77 | 60.13 | 53.46 | 49.78 | 47.01 | 42.74 | 38.85 | 36.01 | 31.73 | 27.71 | 23.38 | 19.54 | 15.49 | 11.52 | 8.04 | 5.00 | 2.35 | - | X | X | X | X | X | X | X | X |
| 2003 | 92.07 | 82.84 | 73.63 | 65.58 | 60.85 | 57.18 | 51.98 | 47.25 | 43.72 | 38.72 | 34.06 | 29.12 | 24.71 | 20.11 | 15.61 | 11.66 | 8.18 | 5.15 | 2.45 | - | X | X | X | X | X | X | X |
| 2004 | 111.49 | 100.31 | 89.29 | 79.65 | 73.68 | 68.93 | 62.67 | 56.97 | 52.64 | 46.82 | 41.44 | 35.81 | 30.77 | 25.56 | 20.48 | 15.99 | 12.04 | 8.58 | 5.49 | 2.70 | - | X | X | X | X | X | X |
| 2005 | 133.51 | 120.12 | 107.06 | 95.62 | 88.23 | 82.25 | 74.78 | 67.98 | 62.74 | 56.00 | 49.83 | 43.42 | 37.68 | 31.80 | 26.08 | 21.01 | 16.53 | 12.58 | 9.07 | 5.90 | 2.85 | - | X | X | X | X | X |
| 2006 | 159.33 | 143.34 | 127.89 | 114.36 | 105.29 | 97.85 | 88.96 | 80.87 | 74.56 | 66.76 | 59.66 | 52.38 | 45.84 | 39.19 | 32.73 | 26.99 | 21.91 | 17.41 | 13.41 | 9.80 | 6.36 | 3.15 | - | X | X | X | X |
| 2007 | 187.76 | 168.93 | 150.85 | 135.00 | 124.09 | 115.03 | 104.57 | 95.06 | 87.58 | 78.61 | 70.50 | 62.26 | 54.83 | 47.35 | 40.09 | 33.62 | 27.87 | 22.78 | 18.24 | 14.15 | 10.28 | 6.67 | 3.15 | - | X | X | X |
| 2008 | 219.05 | 197.08 | 176.11 | 157.72 | 144.76 | 133.92 | 121.75 | 110.68 | 101.89 | 91.64 | 82.44 | 73.13 | 64.75 | 56.35 | 48.21 | 40.95 | 34.48 | 28.72 | 23.59 | 18.98 | 14.64 | 10.60 | 6.67 | 3.15 | - | X | X |
| 2009 | 245.54 | 220.91 | 197.49 | 176.94 | 162.27 | 149.94 | 136.31 | 123.91 | 114.04 | 102.69 | 92.53 | 82.31 | 73.09 | 63.89 | 54.99 | 47.03 | 39.93 | 33.60 | 27.96 | 22.89 | 18.15 | 13.74 | 9.45 | 5.60 | 2.15 | - | X |
| 2010 | 270.75 | 243.59 | 217.83 | 195.22 | 178.93 | 165.19 | 150.17 | 136.52 | 125.60 | 113.20 | 102.12 | 91.02 | 80.99 | 71.02 | 61.37 | 52.74 | 45.03 | 38.16 | 32.02 | 26.52 | 21.37 | 16.60 | 11.96 | 7.79 | 4.06 | 1.70 | - |

**Note:**
[1] Values expressed as percentages.

**Sources:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.
[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

# Appendix Exhibit 1-B

## Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants without Direct Recognition and a 8% Policy Loan Rate

Deposited in Column Year and Withdrawn in Row Year
Based on Hoyer Report Table 9
All Zero and Negative Values Highlighted
1985 - 2010

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1986 | 0.24 | 0.22 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1987 | 0.54 | 0.49 | 0.22 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | -0.24 | -0.44 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1989 | -0.98 | -0.88 | -1.06 | -1.20 | -0.66 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1990 | -1.07 | -0.97 | -1.17 | -1.32 | -0.72 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1991 | -1.17 | -1.06 | -1.28 | -1.45 | -0.79 | 0.00 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1992 | -1.71 | -1.55 | -1.75 | -1.90 | -1.15 | -0.26 | -0.24 | -0.22 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1993 | -0.45 | -0.41 | -0.75 | -1.02 | -0.30 | 0.58 | 0.53 | 0.48 | 0.66 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 1.85 | 1.67 | 1.10 | 0.63 | 1.24 | 2.05 | 1.87 | 1.70 | 1.80 | 1.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 5.13 | 4.64 | 3.75 | 3.00 | 3.45 | 4.13 | 3.77 | 3.43 | 3.40 | 2.43 | 1.25 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 8.92 | 8.07 | 6.81 | 5.74 | 6.00 | 6.52 | 5.94 | 5.42 | 5.24 | 4.07 | 2.69 | 1.25 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 15.06 | 13.62 | 11.80 | 10.22 | 10.13 | 10.35 | 9.44 | 8.61 | 8.19 | 6.72 | 5.07 | 3.36 | 1.87 | - | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 22.97 | 20.78 | 18.23 | 16.01 | 15.45 | 15.28 | 13.94 | 12.71 | 11.96 | 10.13 | 8.14 | 6.11 | 4.34 | 2.16 | - | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 32.01 | 28.95 | 25.57 | 22.63 | 21.53 | 20.90 | 19.06 | 17.38 | 16.27 | 14.03 | 11.66 | 9.27 | 7.16 | 4.64 | 2.16 | - | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 42.29 | 38.25 | 33.93 | 30.16 | 28.44 | 27.29 | 24.89 | 22.70 | 21.17 | 18.47 | 15.66 | 12.87 | 10.39 | 7.49 | 4.64 | 2.16 | - | X | X | X | X | X | X | X | X | X | X |
| 2001 | 53.96 | 48.81 | 43.42 | 38.71 | 36.29 | 34.54 | 31.50 | 28.73 | 26.73 | 23.50 | 20.21 | 16.96 | 14.08 | 10.75 | 7.49 | 4.64 | 2.16 | - | X | X | X | X | X | X | X | X | X |
| 2002 | 67.40 | 60.97 | 54.35 | 48.56 | 45.33 | 42.87 | 39.10 | 35.66 | 33.11 | 29.29 | 25.46 | 21.70 | 18.35 | 14.56 | 10.84 | 7.58 | 4.73 | 2.24 | - | X | X | X | X | X | X | X | X |
| 2003 | 82.50 | 74.63 | 66.65 | 59.65 | 55.49 | 52.23 | 47.63 | 43.44 | 40.27 | 35.80 | 31.36 | 27.05 | 23.19 | 18.88 | 14.67 | 10.96 | 7.71 | 4.86 | 2.29 | - | X | X | X | X | X | X | X |
| 2004 | 100.31 | 90.74 | 81.15 | 72.74 | 67.46 | 63.73 | 57.67 | 52.59 | 48.69 | 43.46 | 38.34 | 33.40 | 29.08 | 24.08 | 19.31 | 15.10 | 11.39 | 8.14 | 5.20 | 2.58 | - | X | X | X | X | X | X |
| 2005 | 120.37 | 108.88 | 97.50 | 87.50 | 80.96 | 75.62 | 68.97 | 62.90 | 58.17 | 52.10 | 46.22 | 40.57 | 35.50 | 30.09 | 24.61 | 19.84 | 15.63 | 11.92 | 8.58 | 5.60 | 2.69 | - | X | X | X | X | X |
| 2006 | 144.04 | 130.30 | 116.79 | 104.93 | 96.88 | 90.22 | 82.28 | 75.04 | 69.33 | 62.28 | 55.53 | 49.07 | 43.26 | 37.01 | 30.94 | 25.54 | 20.76 | 16.53 | 12.72 | 9.32 | 6.03 | 3.00 | - | X | X | X | X |
| 2007 | 170.15 | 153.91 | 138.08 | 124.15 | 114.44 | 106.32 | 96.96 | 88.43 | 81.64 | 73.51 | 65.79 | 58.45 | 51.83 | 44.78 | 37.95 | 31.86 | 26.45 | 21.65 | 17.32 | 13.47 | 9.76 | 6.35 | 3.00 | - | X | X | X |
| 2008 | 198.90 | 179.92 | 161.52 | 145.32 | 133.77 | 124.04 | 113.13 | 103.17 | 95.19 | 85.88 | 77.10 | 68.79 | 61.28 | 53.37 | 45.70 | 38.85 | 32.75 | 27.32 | 22.43 | 18.08 | 13.92 | 10.10 | 6.35 | 3.00 | - | X | X |
| 2009 | 223.33 | 202.02 | 181.42 | 163.30 | 150.20 | 139.12 | 126.88 | 115.71 | 106.72 | 96.39 | 86.70 | 77.55 | 69.26 | 60.58 | 52.19 | 44.68 | 37.98 | 32.00 | 26.62 | 21.83 | 17.28 | 13.09 | 9.00 | 5.33 | 2.04 | - | X |
| 2010 | 246.75 | 223.20 | 200.50 | 180.52 | 165.95 | 153.58 | 140.06 | 127.74 | 117.78 | 106.47 | 95.89 | 85.92 | 76.89 | 67.47 | 58.36 | 50.20 | 42.92 | 36.41 | 30.55 | 25.34 | 20.40 | 15.86 | 11.43 | 7.45 | 3.89 | 1.64 | - |

**Note:**
[1] Values expressed as percentages.

**Sources:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.
[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

## Appendix Exhibit 1-C
## Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants without Direct Recognition and a 6% Policy Loan Rate
Deposited in Column Year and Withdrawn in Row Year
Based on Hoyer Report Table 9
All Zero and Negative Values Highlighted
1985 - 2010

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1986 | 0.22 | 0.20 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1987 | 0.49 | 0.44 | 0.20 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | 0.00 | -0.40 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1989 | -0.88 | -0.80 | -0.97 | -1.10 | -0.60 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1990 | -0.96 | -0.87 | -1.05 | -1.20 | -0.66 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1991 | -1.05 | -0.95 | -1.15 | -1.31 | -0.72 | 0.00 | -0.20 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1992 | -1.52 | -1.37 | -1.56 | -1.70 | -1.04 | -0.24 | -0.22 | -0.20 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1993 | -0.41 | -0.37 | -0.67 | -0.92 | -0.28 | 0.51 | 0.47 | 0.43 | 0.60 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 1.37 | 1.25 | 0.77 | 0.38 | 0.95 | 1.69 | 1.55 | 1.42 | 1.53 | 0.82 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 4.32 | 3.92 | 3.18 | 2.54 | 2.97 | 3.60 | 3.30 | 3.03 | 3.02 | 2.16 | 1.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 7.68 | 6.97 | 5.92 | 5.02 | 5.28 | 5.78 | 5.30 | 4.86 | 4.73 | 3.69 | 2.55 | 1.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 12.81 | 11.62 | 10.12 | 8.82 | 8.80 | 9.06 | 8.32 | 7.63 | 7.29 | 6.01 | 4.65 | 3.06 | 1.67 | - | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 19.38 | 17.57 | 15.51 | 13.70 | 13.31 | 13.26 | 12.17 | 11.16 | 10.57 | 8.99 | 7.35 | 5.49 | 3.84 | 1.92 | - | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 26.83 | 24.34 | 21.62 | 19.24 | 18.43 | 18.03 | 16.54 | 15.17 | 14.28 | 12.36 | 10.42 | 8.25 | 6.32 | 4.11 | 1.92 | - | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 35.27 | 31.99 | 28.55 | 25.51 | 24.23 | 23.41 | 21.48 | 19.71 | 18.48 | 16.19 | 13.90 | 11.38 | 9.14 | 6.62 | 4.11 | 1.92 | - | X | X | X | X | X | X | X | X | X | X |
| 2001 | 44.80 | 40.63 | 36.37 | 32.60 | 30.77 | 29.49 | 27.05 | 24.82 | 23.22 | 20.50 | 17.82 | 14.93 | 12.34 | 9.46 | 6.62 | 4.11 | 1.92 | - | X | X | X | X | X | X | X | X | X |
| 2002 | 55.69 | 50.51 | 45.31 | 40.71 | 38.25 | 36.42 | 33.42 | 30.66 | 28.62 | 25.42 | 22.32 | 19.00 | 16.03 | 12.75 | 9.53 | 6.68 | 4.18 | 1.98 | - | X | X | X | X | X | X | X | X |
| 2003 | 68.57 | 62.19 | 55.89 | 50.31 | 47.09 | 44.61 | 40.93 | 37.55 | 35.00 | 31.25 | 27.64 | 23.84 | 20.42 | 16.71 | 13.05 | 9.82 | 6.96 | 4.45 | 2.18 | - | X | X | X | X | X | X | X |
| 2004 | 82.85 | 75.14 | 67.63 | 60.97 | 56.90 | 53.68 | 49.25 | 45.18 | 42.05 | 37.70 | 33.56 | 29.23 | 25.34 | 21.15 | 17.04 | 13.38 | 10.15 | 7.29 | 4.72 | 2.25 | - | X | X | X | X | X | X |
| 2005 | 99.22 | 90.00 | 81.09 | 73.20 | 68.15 | 64.06 | 58.77 | 53.92 | 50.13 | 45.10 | 40.34 | 35.44 | 31.01 | 26.29 | 21.67 | 17.55 | 13.90 | 10.66 | 7.73 | 4.94 | 2.41 | - | X | X | X | X | X |
| 2006 | 118.61 | 107.58 | 97.04 | 87.69 | 81.46 | 76.34 | 70.04 | 64.26 | 59.68 | 53.85 | 48.39 | 42.81 | 37.77 | 32.44 | 27.23 | 22.58 | 18.44 | 14.76 | 11.43 | 8.27 | 5.41 | 2.70 | - | X | X | X | X |
| 2007 | 139.95 | 126.94 | 114.60 | 103.64 | 96.12 | 89.86 | 82.44 | 75.63 | 70.18 | 63.49 | 57.25 | 50.94 | 45.21 | 39.22 | 33.37 | 28.14 | 23.47 | 19.30 | 15.53 | 11.97 | 8.76 | 5.72 | 2.70 | - | X | X | X |
| 2008 | 163.40 | 148.20 | 133.89 | 121.17 | 112.22 | 104.70 | 96.06 | 88.12 | 81.73 | 74.08 | 66.99 | 59.87 | 53.41 | 46.69 | 40.15 | 34.28 | 29.03 | 24.33 | 20.08 | 16.08 | 12.48 | 9.08 | 5.72 | 2.70 | - | X | X |
| 2009 | 183.30 | 166.26 | 150.26 | 136.04 | 125.89 | 117.32 | 107.63 | 98.74 | 91.54 | 83.07 | 75.25 | 67.42 | 60.32 | 52.96 | 45.81 | 39.39 | 33.63 | 28.47 | 23.80 | 19.41 | 15.47 | 11.75 | 8.09 | 4.80 | 1.84 | - | X |
| 2010 | 202.72 | 183.87 | 166.23 | 150.54 | 139.23 | 129.63 | 118.93 | 109.11 | 101.12 | 91.84 | 83.30 | 74.78 | 67.04 | 59.06 | 51.30 | 44.33 | 38.06 | 32.45 | 27.37 | 22.60 | 18.32 | 14.29 | 10.33 | 6.76 | 3.55 | 1.53 | - |

**Note:**
[1] Values expressed as percentages.

**Sources:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.
[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

Appendix Exhibit 1-D
**Difference in Rates of Accumulation of Net Deposits Made by Pre-MN Annuitants without Direct Recognition and a 5% Policy Loan Rate**
Deposited in Column Year and Withdrawn in Row Year
Based on Hoyer Report Table 9
All Zero and Negative Values Highlighted
1985 - 2010

| Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1985 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1986 | 0.21 | 0.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1987 | 0.45 | 0.41 | 0.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1988 | 0.00 | 0.00 | -0.21 | -0.37 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1989 | -0.81 | -0.73 | -0.89 | -1.02 | -0.56 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1990 | -0.88 | -0.80 | -0.97 | -1.11 | -0.61 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1991 | -0.95 | -0.86 | -1.05 | -1.20 | -0.66 | 0.00 | 0.00 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1992 | -1.37 | -1.24 | -1.42 | -1.56 | -1.20 | -0.22 | -0.20 | -0.19 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1993 | -0.36 | -0.33 | -0.60 | -0.83 | -0.25 | 0.48 | 0.44 | 0.41 | 0.56 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1994 | 1.22 | 1.11 | 0.68 | 0.33 | 0.85 | 1.54 | 1.42 | 1.31 | 1.41 | 0.75 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1995 | 3.91 | 3.55 | 2.90 | 2.33 | 2.73 | 3.32 | 3.06 | 2.82 | 2.82 | 2.02 | 1.14 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1996 | 6.97 | 6.33 | 5.41 | 4.61 | 4.87 | 5.34 | 4.92 | 4.53 | 4.42 | 3.47 | 2.44 | 1.14 | - | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1997 | 11.61 | 10.54 | 9.24 | 8.10 | 8.11 | 8.38 | 7.72 | 7.11 | 6.82 | 5.65 | 4.42 | 2.92 | 1.59 | - | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 1998 | 17.53 | 15.92 | 14.13 | 12.55 | 12.24 | 12.24 | 11.28 | 10.39 | 9.88 | 8.44 | 6.96 | 5.21 | 3.66 | 1.83 | - | X | X | X | X | X | X | X | X | X | X | X | X |
| 1999 | 24.23 | 22.01 | 19.66 | 17.59 | 16.92 | 16.61 | 15.30 | 14.09 | 13.32 | 11.58 | 9.84 | 7.81 | 6.00 | 3.91 | 1.83 | - | X | X | X | X | X | X | X | X | X | X | X |
| 2000 | 31.77 | 28.86 | 25.89 | 23.26 | 22.18 | 21.52 | 19.83 | 18.26 | 17.20 | 15.13 | 13.08 | 10.75 | 8.66 | 6.28 | 3.91 | 1.83 | - | X | X | X | X | X | X | X | X | X | X |
| 2001 | 40.25 | 36.56 | 32.90 | 29.65 | 28.10 | 27.04 | 24.91 | 22.95 | 21.56 | 19.12 | 16.73 | 14.05 | 11.65 | 8.96 | 6.28 | 3.91 | 1.83 | - | X | X | X | X | X | X | X | X | X |
| 2002 | 49.83 | 45.26 | 40.81 | 36.86 | 34.79 | 33.27 | 30.65 | 28.23 | 26.47 | 23.61 | 20.86 | 17.80 | 15.06 | 12.01 | 8.99 | 6.32 | 3.95 | 1.87 | - | X | X | X | X | X | X | X | X |
| 2003 | 60.64 | 55.07 | 49.75 | 45.02 | 42.34 | 40.29 | 37.11 | 34.19 | 32.01 | 28.69 | 25.52 | 22.05 | 18.93 | 15.50 | 12.11 | 9.10 | 6.43 | 4.06 | 1.94 | - | X | X | X | X | X | X | X |
| 2004 | 73.07 | 66.36 | 60.03 | 54.40 | 51.01 | 48.34 | 44.54 | 41.03 | 38.36 | 34.52 | 30.89 | 26.97 | 23.43 | 19.58 | 15.78 | 12.39 | 9.38 | 6.71 | 4.32 | 2.12 | - | X | X | X | X | X | X |
| 2005 | 86.13 | 78.23 | 70.85 | 64.27 | 60.13 | 56.81 | 52.33 | 48.21 | 45.03 | 40.65 | 36.54 | 32.14 | 28.17 | 23.88 | 19.66 | 15.89 | 12.53 | 9.54 | 6.85 | 4.40 | 2.04 | - | X | X | X | X | X |
| 2006 | 105.94 | 96.22 | 87.25 | 79.26 | 73.96 | 69.61 | 64.13 | 59.08 | 55.11 | 49.94 | 45.13 | 40.05 | 35.45 | 30.54 | 25.73 | 21.42 | 17.56 | 14.11 | 11.01 | 8.18 | 5.48 | 3.15 | - | X | X | X | X |
| 2007 | 127.82 | 116.09 | 105.37 | 95.82 | 89.24 | 83.75 | 77.15 | 71.08 | 66.23 | 60.20 | 54.61 | 48.79 | 43.50 | 37.92 | 32.46 | 27.55 | 23.14 | 19.19 | 15.63 | 12.39 | 9.33 | 6.67 | 3.15 | - | X | X | X |
| 2008 | 151.94 | 138.00 | 125.36 | 114.08 | 106.08 | 99.33 | 91.51 | 84.30 | 78.50 | 71.51 | 65.08 | 58.44 | 52.39 | 46.08 | 39.90 | 34.33 | 29.32 | 24.82 | 20.77 | 17.08 | 13.62 | 10.60 | 6.67 | 3.15 | - | X | X |
| 2009 | 172.17 | 156.38 | 142.11 | 129.38 | 120.20 | 112.42 | 103.56 | 95.40 | 88.80 | 80.99 | 73.84 | 66.50 | 59.81 | 52.85 | 46.06 | 39.93 | 34.40 | 29.43 | 24.94 | 20.87 | 17.05 | 13.74 | 9.45 | 5.60 | 2.15 | - | X |
| 2010 | 191.30 | 173.76 | 157.95 | 143.84 | 133.56 | 124.80 | 114.97 | 105.91 | 98.56 | 89.97 | 82.12 | 74.11 | 66.80 | 59.22 | 51.83 | 45.15 | 39.13 | 33.70 | 28.81 | 24.37 | 20.21 | 16.60 | 11.96 | 7.79 | 4.06 | 1.70 | - |

**Note:**
[1] Values expressed as percentages.

**Sources:**
[1] Trial Exhibit 189, Dividend Interest Rate Tables.
[2] Expert Witness Report of Robert L. Hoyer, FSA, MAAA, Submitted for M. LaPlant v. Northwestern Mutual Life Company, Hoyer Actuarial Litigation, LLC, March 4, 2013.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARLEEN M. LAPLANT, on her own behalf
and on behalf of a class similarly situated,

        Plaintiffs,

v.                                 Case No. 2:11-CV-00910

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, a
Wisconsin mutual insurance corporation,

        Defendant.

## AFFIDAVIT OF NICHOLAS J. SALES

STATE OF WISCONSIN )
                     ) ss
MILWAUKEE COUNTY )

1.     1. I am an adult resident of Grafton, Wisconsin, and I am employed by defendant, Northwestern Mutual.

2.     I am a Senior Actuary for Northwestern Mutual, a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries.

3.     The information presented in this affidavit is based upon records maintained by Northwestern Mutual in the ordinary course of its business.

4.     I have reviewed the class certified by the state court (State Court Class).

5.     The State Court Class has over 3,300 members.

6.   Approximately 100 members of the State Court Class signed the 1983 Amendment outside of Wisconsin (in 28 different states and foreign countries).

7.   The Pre-MN annuity policies of approximately 450 members of the State Court Class remain in force today.

8.   Approximately 1,400 members of the State Court Class surrendered or otherwise terminated their policies before 1993, and approximately 680 members of the State Court class surrendered or otherwise terminated their policies between 1989 and 1993.

Dated at Milwaukee, Wisconsin this 28 day of June, 2013.


_____
Nicholas J. Sales


Subscribed and sworn to before me
this 28 day of June, 2013.

_____
Notary Public, State of Wisconsin
My commission: 1) permanent

4843-1505-1284, v. 1

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY 03CV011988

MARLEEN M. LaPLANT
W7868 Riedel Lane
Fort Atkinson, Wisconsin 53538, on her
own behalf and on behalf of a class
similarly situated,

                         Case No.

          Plaintiffs,

                         Code:    30701
         vs.                    Declaratory Judgment

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,
720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

          Defendant.

---

**COMPLAINT AND JURY DEMAND**



---

The plaintiff Marleen M. LaPlant by Straus & Boies, LLP, Guerrieri,

Edmond, Clayman & Bartos, PC, Kersten & McKinnon, S.C. and Galanis,

Pollack, Jacobs & Johnson, S.C., her attorneys, complains on her own behalf

and on behalf of the Class identified below against the defendant,

Northwestern Mutual Life Insurance Company ("Northwestern" or the

"Company"), as follows:

App. 082

# I.   INTRODUCTION

1.     This case arises from a long-running, sophisticated, and ongoing scheme by Northwestern to quietly, deliberately and repeatedly cheat owners of certain Northwestern annuities out of millions of dollars in dividends to which they were and are clearly entitled under the explicit, unambiguous provisions of both the annuity contract language and controlling Wisconsin state law.  These annuities are participating annuity contracts (the "Annuity" or "Annuities"), each requiring Northwestern to pay owners of the Annuities (the "Annuitants") dividends based on their share of Northwestern's annual profits or "divisible surplus" (the "Dividends").  Despite the clarity of its obligations under the Annuity contracts and state statutes, Northwestern has, to this day, wrongfully refused to credit the Dividends to Annuitants, thereby substantially shortchanging Annuitants and significantly decreasing both the value of the Annuities and the amounts ultimately payable to Annuitants thereunder.

2.     To initiate this scheme, Northwestern unilaterally and deceptively altered the basis on which it credited the accounts of Annuitants. Ignoring the Annuity contract's plain requirement to credit the Annuitants' accounts with a genuine share of the Company's divisible surplus as dividends, Northwestern instead has credited Annuitants with what it

2

continues to call "dividends" but in fact is merely the interest earned on an

account limited to some short-term bonds exclusively and secretly chosen by

Northwestern. Thus, instead of receiving the contracted-for investment in

the growth and profitability of Northwestern, Annuitants have been

unilaterally relegated to a much less valuable and more limited investment in

some short-term bonds, all without the Annuitants' consent or even notice. In

fact, as was fully anticipated by Northwestern, the return on the short-term

bond account has lagged far behind the overall growth and profitability of

Northwestern, which is largely determined by the return on its long-term

oriented general account portfolio of investments in a broad variety of

securities, real estate, business enterprises, and other financial vehicles, and

reflects both current yield and capital gains on those investments.

    3.    A key component of Northwestern's scheme was its undisclosed

conversion of the Annuities into "no-dividend" annuities, substantially

destroying the Annuitants' rights to share in Northwestern's financial

performance and divisible surplus as owners of the Company, a relationship

expressly acknowledged by Northwestern in its Annual Reports to

policyholders. Annuitants never consented to this forfeiture of their rights as

Company owners / policyholders and were never provided notice that

Northwestern had ceased to treat them as owners of the Company entitled to

3

their shares of its divisible surplus as dividends. Indeed, Northwestern actively and purposefully concealed this extinguishing of Annuitants' rights by, for example, disguising the change by phasing it in over several years, continuing to characterize as "dividends" what really is only interest on the short-term bond account, and obfuscating the source of payments and credits on account statements.

4. Compounding this illegal conduct, Northwestern wilfully violated its own internal policies and procedures by not notifying Annuitants or obtaining their written consent regarding a material change in the Annuity contract with potentially enormous financial consequences. Indeed, two years prior to making the unilateral change alleged in this case, Northwestern did notify these very Annuitants and solicited their written consent regarding a different, less important change in the Annuity contract that had a smaller financial impact on Annuitants.

5. Northwestern's manipulation of its dividend determination and payment procedures constitutes an intentional disregard of the rights of the Annuitants under the contract and state law to share in the divisible surplus of the Company. This manipulation is all the more outrageous because it eviscerates the earnings on a savings vehicle specifically designed for retirement and long-term investors.

4

6.      Northwestern has always known it owes a fiduciary duty to Annuitants, whose savings and retirement expectations are entrusted to its management and control. Northwestern knows as well that it is responsible for the actions of its officers and directors (expressly called "trustees" in Northwestern's corporate documents) who have participated in the misconduct alleged herein and are fiduciaries to the Annuitants in respect to dividend rights. Northwestern also knows that it was, and is, acting in its own interests, not in the interests of Annuitants when making the undisclosed, illegal and unfair dividend determinations alleged herein.

7.      Pursuant to the Wisconsin Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, plaintiff seeks a ruling from this Court determining the parties' rights and status with respect to the Annuity contracts at issue in this case.

## II.    THE PARTIES

8.      The plaintiff Marleen M. LaPlant resides at W7868 Riedel Lane, in the City of Fort Atkinson, Jefferson County, Wisconsin 53538. She entered into the annuity contract with Northwestern attached hereto as Exhibit A on May 1, 1975.

9.      The defendant, Northwestern Mutual Life Insurance Company ("Northwestern" or the "Company"), is a mutual insurance company

5

organized under the laws of Wisconsin. Northwestern's principal offices are located at 720 East Wisconsin Avenue, in the City and County of Milwaukee, Wisconsin 53202. Its registered agent for service at that address is Raymond J. Manista.

10.    Northwestern's officers, employees, and trustees (who function as company directors) who caused or participated in causing Northwestern to credit the Class Members' accounts improperly were at all relevant times acting within the scope and in the course of their respective offices, employment and trusteeships and were acting with the full knowledge, authority and approval of Northwestern's highest management and board of trustees.

## III.    CLASS ACTION ALLEGATIONS

11.    Marleen LaPlant brings this action on her own behalf and, under Wis. Stats. § 803.08, on behalf of all persons who are members of the Class, defined as follows:

> All persons who (a) purchased an Annuity prior to March 1985, (b) were residents of the State of Wisconsin at the time of purchase, and (c) did not expressly consent, in writing, to limit or surrender their right to fully participate in Northwestern's divisible surplus during the time that they owned the Annuities. Excluded from the Class are any of Northwestern's officers, trustees, employees, family members, or affiliates.

6

12.     Upon information and belief, the number of Class members exceeds one thousand. The exact number of Class members is known only by Northwestern.

13.     The claims of Marleen LaPlant are typical of the claims of all Class members because, among other reasons, (a) she and all Class members entered into Annuity contracts with Northwestern that are the same in all relevant respects; (b) she and all Class members were residents of the State of Wisconsin at the time that they purchased the Annuity contracts; (c) she and all Class members did not consent to limit or surrender their right to fully participate in Northwestern's divisible surplus during the time that they owned the Annuities, and (d) Northwestern's conduct in connection with the matters set forth herein was directed against and applicable to all Class members as a whole (i.e., the "block" of Annuities described herein).

14.     Marleen LaPlant will fairly and adequately represent the interests of all Class members because her claims are similar and not antagonistic to the claims of all Class members and she has retained competent counsel experienced in the prosecution of complex and class action litigation.

15.     There are numerous questions of law and fact that are common to the claims of all Class members including: (a) whether Class members

7

became policy holders and owners of Northwestern by entering into the Annuity contracts; (b) whether Northwestern failed to follow its own internal policies and procedures by failing to seek written consent for the change in the basis for determining dividends; (c) whether Northwestern had the unilateral right to convert the Annuities into no-dividend annuities; (d) how and why Northwestern made this unilateral change; (e) what steps were taken to make the change; (f) why Northwestern failed to disclose the change to owners of the Annuities; (g) why Northwestern failed to seek the Annuity Owners' agreement to the change; (h) on what authority Northwestern claims to have the right to make the change unilaterally; (i) whether the account statements and other class wide notices provided to Annuitants adequately disclosed the change in the basis for determining dividends; (j) whether declaratory relief requested herein is appropriate; (k) whether the terms of the annuity contract are unambiguous; (l) whether Northwestern and its officers and trustees owed Class members a fiduciary duty as a result of entering into the Annuity contracts or by virtue of the duties imposed upon Northwestern by Wisconsin state law; (m) whether the Wisconsin State Statutes that govern the conduct at issue in this case are unambiguous; and (n) whether Northwestern is vicariously liable for the conduct of its officers and trustees in the performance of their duties to the Class as alleged herein.

8

App. 089

16.    The common questions among Class members predominate over issues of law or fact, if any, that affect only individual Class members. Indeed, all issues in this case are common Class issues because Marleen LaPlant has confined her requested relief to only a Class-wide claim arising from the identical contract language and applicable statute, the identical acts of Northwestern under that contract language and statute which were directed against the Class as a whole, and the identical effect of these identical acts upon the Class. A class action is the superior, if not the only practicable, method to resolve the claims asserted herein.

## IV.    GENERAL ALLEGATIONS

17.    Northwestern is in the business of selling and managing insurance products and annuities, including the Annuities that are the subject of this litigation.

18.    Northwestern is a "mutual" insurance company. As a mutual company, it is owned by and managed for the benefit of its participating policyowners. Its Annual Report published to policyowners in January 1985 stated that Northwestern "is owned by more than 1.7 million policyowners," which includes (among others) all members of the Class.

19.    Northwestern manages its business for the purpose of ensuring the ability to pay the claims of its policyowners and to reduce the obligations

9

of its participating policyowners and increase the cash value of their policies by crediting their policy accounts with their respective shares of the Company's profits (its "divisible surplus") in the form of dividends.

20.    For many years prior to 1985, Northwestern marketed and sold the Annuities. These are deferred annuities expressly denominated as "participating". The Annuities provide for participation in the Company's profits and growth through the payment or crediting of annual dividends. When an Annuity matures, Northwestern makes retirement payments to the Annuitant based on the enhanced value to which the Annuity has grown through the dividends. The contract also gives the Annuitant options to borrow against the Annuity or cash it in prior to or at maturity. *See* Exhibit A.

21.    The terms of the Annuities require Northwestern to credit the accounts of Annuitants with annual dividends equal to their respective shares of Northwestern's divisible surplus. Thus, the language of Exhibit A (§ 4.1, emphasis added), as well as equivalent language in the Annuities of all Class members, states:

> *This policy shall share in the divisible surplus, if any, of the Company. This policy's share shall be determined annually and credited as a dividend.* Payment of the first dividend is contingent upon payment of the premium or premiums for the second policy year and shall be credited proportionately

10

as each premium is paid.  Thereafter, each dividend shall
be payable on the policy anniversary.

22.   The foregoing and other provisions of the Annuities provide that
the annual growth in the value of the Annuities is based on a combination of
the premiums paid by Annuitants and the Dividends paid by Northwestern
reflecting the Annuitants' share of the divisible surplus.  Thus, the terms of
the Annuities entitle Annuitants to an equity share in Northwestern and to
share in its growth.  As Donald J. Schuenke, then president and CEO of
Northwestern, wrote in a January 31, 1984 letter to policyowners, "Dividends
are a way in which you [the policyowner]  share the improved results of your
company's operations."

23.   The obligations of Northwestern arising from the contract
provisions alleged above are provided also by Wisconsin's insurance laws,
which control Northwestern as a mutual insurance company organized under
Wisconsin law and domiciled here.  Wis. Stats. § 632.62(2) provides:

> **632.62(2)  Participation.**  Every participating policy
> shall by its terms give its holder full right to participate
> annually in the part of the surplus accumulations from the
> participating business of the insurer that are to be
> distributed.

The surplus accumulation to be distributed by Wisconsin mutuals is
determined according to Wis. Stats. § 632.62(4)(b), which provides:

11

632.62(4)(b)  *Payment.*  Every insurer doing a participating business shall annually ascertain the surplus over required reserves and other liabilities.  After setting aside such contingency reserves as may be considered necessary and be lawful, such reasonable nondistributable surplus as is needed to permit orderly growth, making provision for the payment of reasonable dividends upon capital stock and such sums as are required by prior contracts to be held on account of deferred dividend policies, the remaining surplus shall be equitably apportioned and returned as a dividend to the participating policyholders or certificate holders entitled to share therein.  A dividend may be conditioned on the payment of the succeeding year's premium only on the first and second anniversaries of the policy.

24.   Until 1985, Northwestern credited dividends to the Annuity accounts in accordance with the contract language and statutory provisions quoted above.  Those dividends were a genuine participation in the financial performance of the Company as a whole, which, as noted above, is largely determined by the return on Northwestern's general account portfolio of investments in a broad variety of securities, real estate, business enterprises and other financial vehicles, and reflects both current yield and capital gains on those investments. Thus, holders of the Annuities had an important economic interest in Northwestern and could expect significant returns in their Annuity accounts based upon Northwestern's profitability and growth through the years.

12

App. 093

25.   The Annuity contracts contained no provision relieving Northwestern of its duties or allowing unilateral changes in its obligations thereunder. For example, the Annuity contracts (drafted solely by Northwestern) state:  "This policy and the application, a copy of which is attached when the policy is issued, constitute the entire contract." Further, the application forms for the Annuities (likewise drafted by Northwestern) state: "No agent is authorized to make or alter contracts or to waive any of the Company's rights or requirements." And Northwestern's contracts with the agents through which it sold the Annuities (likewise drafted by Northwestern) provide: "Agent shall have no power, personally or on behalf of the Company or First Party, to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract."

26.   The terms of the Annuity contracts thus clearly establish the rights and obligations of Northwestern and the Annuitants and any alterations in those rights and obligations can properly be effectuated only in the usual way that binding written contracts are modified -- by notifying Annuitants of the proposed change and obtaining their consent.

27.   By 1985, however, Northwestern had become dissatisfied with the Annuity contracts. By the early 1980's economic problems experienced by the country had produced an inverted yield curve on investments, in which short-

13

term rates exceeded long-term rates. Accordingly, spiking short-term rates available through bank CDs and other investments exceeded what Northwestern was willing to pay as dividends on the Annuities. As a result, Northwestern's Annuity sales declined sharply and many Annuitants borrowed on their Annuities or cashed them in to invest elsewhere. In Northwestern's view (as voiced by its chief actuary), Annuitants "simply had too much control over their money." Northwestern's response to this "problem" was twofold.

28.     First, to compete with alternative investments reflecting the temporary spike in short-term interest rates, Northwestern crafted a new form of annuity expressly designed to *not participate* in the Company's financial performance through dividends. Under its contract language it would instead be credited annually with the interest earned on a short-term bond account established by Northwestern. Northwestern denominated this "no-dividend" form of annuity as its "MN series." These were ready to be marketed by 1985.

29.     Second, Northwestern simultaneously decided to unilaterally change the nature of the annuities already in force (which it internally called the "Pre-MN" annuities) by secretly treating them like the no-dividend annuities. In an internal memo, a senior Northwestern officer explained the

14

reason for this: "The real problem is with the [old, in-force or 'Pre-MN' annuities]." According to him, "We can't have the old [Pre-MN annuity] and the new [MN series] running side-by-side, *so the old [Pre-MN annuity] has to be made to look like the new [MN series] even though the contract language might be different.*" The "Pre-MN" annuities thus referred to are the Annuities owned by the Class. Northwestern's unilateral conversion of these Annuities into the functional equivalent of the MN no-dividend annuities is the underlying basis for this lawsuit.

30. To convert the Class's "Pre-MN" Annuities into no-dividend annuities, Northwestern internally set up an account consisting of short-term bonds, the interest on which (less expenses and taxes) became what Northwestern continued to call "dividends" for the Annuities. In a memorandum to top management at Northwestern, the actuary overseeing this 1985 change in the Class's dividend rights describes the predetermined "separate portfolio of assets for the in-force annuities" and the "gross interest rate" it earns, and gives the formula for determining the Class members' "dividend interest rate," *i.e.,* their dividends: "It is determined by taking the 'gross interest rate' (net of investment expenses) and deducting a tax charge and sometimes an expense charge."

31.    Northwestern implemented this change gradually, so that the Class members were unlikely to realize what was happening.  It did this by combining the short-term interest income with a partial participation, gradually diminishing over several years, in the divisible surplus generated by Northwestern's general account portfolio.

32.    No Pre-MN annuities were sold after March 1985, and thus they became a "closed block."  As planned, over the ensuing several years Northwestern quietly transformed the Class' block of Annuities into the equivalent of the new no-dividend annuities.  All of this misconduct was done by Northwestern against the Class as a whole -- *i.e.*, to that "block" of annuities -- long after the Annuities had been sold to the Class.

33.    Northwestern never solicited or obtained the Annuitants' agreement to this 1985 change, nor did it even disclose the change to them in its Annual Reports to policyowners or otherwise.  Instead, at the very time the change was being made, Northwestern's Annual Report sent to the Annuitants in early 1985 told them that Northwestern had "continued to emphasize a long-term approach to investments and dividends that optimizes returns for its policyowners and avoids short-term swings."

34.    Each year since the phase-in of the 1985 change was complete, Northwestern ascertains the net interest earned by the predetermined short-

16

term bond account, and that establishes the so-called "dividends" for the Class' Annuities (the "closed block" of "Pre-MN" annuities). After Northwestern takes that annual, illegal action against the block, its computers ratably credit the Annuitants' individual accounts with amounts equal to their respective shares of the interest earned on the short-term bond account.

35.    Because Northwestern did not follow its own policy and practice of informing the Annuitants of the change and seeking their written consent to alter the terms of the Annuities, the Annuitants were left unaware and without a reasonable means for learning that Northwestern was no longer crediting genuine dividends to their accounts.

## V.    DECLARATORY JUDGMENT ALLEGATIONS

36.    Marleen LaPlant repeats and realleges, as if fully set forth herein, each of the allegations contained in the preceding paragraphs of this Complaint.

37.    The relative rights and status of the parties under the terms of the Annuity contracts and Wis. Stats. § 632.62 are a matter of actual and material dispute among the parties.

17

App. 098

38.    A determination by this Court of the rights and status of the parties will materially advance the resolution of the dispute between the parties.

39.    The terms of the Annuities and Wisconsin law require that each year Northwestern determine the Annuitants' share of, and issue dividends from, the divisible surplus to credit the accounts of Marleen LaPlant and other Annuitants accordingly.

40.    Each year since 1985, Northwestern has failed to credit Class members' accounts with their share of Northwestern's divisible surplus. Northwestern's use of a short-term bond account to determine the "dividends" to be credited to Annuitants instead of a genuine "share" of "the divisible surplus of the Company" is contrary to the express terms of the Annuity contracts and Wisconsin law.

41.    Northwestern's actions have injured and will continue to injure Annuitants by under-crediting their accounts by millions of dollars per year.

42.    The declaratory relief requested herein should lead to a timely and final resolution of the dispute between Northwestern and the Class without unduly burdening the courts.  Faced with a clear judicial determination of the rights and status of the parties, Northwestern should be expected to do the right thing by rectifying its wrongful treatment of

18

Annuitants through a reasonable and equitable resolution. In all events, the declaratory relief requested here will substantially narrow the issues separating the parties and materially advance any further litigation should that be necessary.

43.    Under Wisconsin's version of the Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, Plaintiff and the members of the Class are entitled to a declaration of their rights and status under the Annuities and applicable state law as requested herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests an order from this Court certifying the Class as proposed herein and an order under Wis. Stats. § 806.04 declaring that:

A.    Wisconsin law governs the interpretation and enforcement of Class members' Annuity contracts with Northwestern;

B.    Wis. Stats. § 632.62 is unambiguous with respect to Northwestern's obligation to determine, allocate, and pay the annual divisible surplus to Northwestern policy holders;

C.    The Annuitants became policy holders and owners of Northwestern by entering into the Annuity contracts with Northwestern;

19

D. The Annuity contracts between Northwestern and Class members are unambiguous with respect to Northwestern's obligation to determine and credit Class members with a genuine share of the Company's annual divisible surplus;

E. The Annuity contracts between Class members and Northwestern, by their unambiguous terms, entitle Class members to receive dividends genuinely based on the Company's annual divisible surplus during the period in which they own or owned the Annuities;

F. Northwestern owes members of the Class a fiduciary duty pursuant to the terms of the Annuity contracts and under Wisconsin law;

G. Northwestern's conduct as alleged herein demonstrates an intent to act in its own self interest, not in the interests of Annuitants;

H. Northwestern is liable for the conduct of its officers and trustees as alleged herein;

I. By basing the Class' so-called "dividends" on the interest earned on a short-term bond account, Northwestern failed to determine, allocate, and credit to Class members their

20

proper and equitable share of the Company's divisible

surplus in accordance with the unambiguous provisions of

the Annuity contracts and Wisconsin state law;

J.  Northwestern's conduct as alleged in the complaint was

intended to deceive Class members concerning the true

method by which Defendants determined dividends and to

conceal the adverse economic effects to Class members

resulting from Northwestern's failure to pay Class

members their share of the divisible surplus.

K.  By its conduct alleged herein, Northwestern acted in an

intentional disregard of the rights of the Class.

Respectfully submitted this _26th_ day of August, 2008.


KERSTEN & McKINNON, S.C.               STRAUS & BOIES, LLP,
Attorneys for the Plaintiffs,          Attorneys for the Plaintiffs,

by: _____          by: _____
    George P. Kersten (1008099)            David Boies III
    E. Campion Kersten (1007641)           Timothy D. Battin
    Kenan J. Kersten (1008505)             Mark J. Schirmer
    KERSTEN & McKINNON, S.C.               STRAUS & BOIES, LLP
    11518 N. Port Washington Rd.           4041 University Drive
    Suite 104                              Fifth Floor
    Mequon, WI  53092                      Fairfax, VA  22030
    Telephone: (262) 241-0054              Telephone: (703) 764-8700
    Fax:  (262) 241-5935                   Fax: (703) 764-8704

21

Of Counsel:

GALANIS, POLLACK, JACOBS &
 JOHNSON, S.C.
Mark B. Pollack, WI Bar # 1010557
Maria S. Lazar, WI Bar # 1017150
330 East Kilbourn Avenue
Two Plaza East, Suite 560
Milwaukee, WI 53202

GUERRIERI, EDMOND, CLAYMAN &
 BARTOS, PC
Jeffrey A. Bartos
1625 Massachusetts Avenue, NW
Washington, DC 20036
(202) 624-7400

## DEMAND FOR A JURY

Mrs. LaPlant and the Plaintiff Class hereby demand trial by a jury of twelve persons of all issues of fact herein.

George P. Kersten, one of the
attorneys for the Plaintiffs

App. 104

State of Wisconsin        Circuit Court        Milwaukee County

---

Marleen M. LaPlant, on her own behalf*
and on behalf of a class similarly
situated,
        Plaintiff,        *

Versus
        *

The Northwestern Mutual Life
Insurance Company, a Wisconsin   *
mutual insurance corporation,
        Defendant.
        *

**DECISION and ORDER on**

**MOTION of PLAINTIFF for**

**CLASS CERTIFICATION**

Case No. 08-CV-11988

Code:   30701
        Declaratory Judgment

FILED

OCT 2 6 2009

JOHN BARRETT
Clerk of Circuit Court

### **Introduction**

      The underlying action in this matter was filed on 26 August 2008. An

Answer and Affirmative Defenses were filed on 10 July 2009. The case was

assigned to this judge on 16 March 2009, as the fourth judge to preside over

the matter. An earlier Motion to Dismiss was resolved with a written decision

on 15 June 2009. A Hearing was held in Court on 10 July 2009, and dates

were set at that Hearing for the parties to file and respond to a Motion for

Class Certification since that was in dispute. A Hearing on this motion took

place in Court on 12 October 2009. The actual Motion for Class Certification

was filed by Plaintiff on 18 August 2009. It was thereafter amended on 19

August 2009. Plaintiff's brief (with exhibits) was filed with her motion.

Defendant (hereafter Northwestern) filed its responding brief (with exhibits)

on 15 September 2009. Plaintiff's reply brief (with exhibits) was filed on 1

October 2009. A Scheduling Conference has also been set by the Clerk for 3

November 2009 at 10:00 A.M. at the Milwaukee County Courthouse.

## Facts

For this court and the reviewing appellate court it is important to have

an understanding of the facts asserted and arguments made by the parties on

this motion.

Plaintiff LaPlant seeks to be designated as "class representative" of a

class she defines as follows:

> *"All persons who (a) purchased a Northwestern Mutual Life*
> *Insurance Company Pre-MN Annuity prior to March 1985, (b)*
> *were residents of the State of Wisconsin at the time of purchase,*
> *and ( c)  did not expressly consent, in writing, to limit or*
> *surrender their right to fully participate in Northwestern's*
> *divisible surplus during the time that they owned the Annuities.*
> *Excluded from the Class are any of Northwestern's officers,*
> *trustees, employees, family members, or affiliates."*

Plaintiff further asks that five attorneys and their firms be designated as co-

lead counsel. They include David Boies III, George P. Kersten, E. Campion

Kersten, Kenan J. Kersten and Jeffery A. Bartos. Finally, Plaintiff asks that

Attorneys Mark B. Pollack and Maria S. Lazar be denominated as "of

counsel". Defendant opposes the motion on a number of grounds and notes

that it is the <u>third</u> such "class certification" motion it has responded to. The

prior two motions, it asserts, were rejected in **Noonan v. Northwestern**

**Mutual,** case No. 02-C–128.

Plaintiff's Complaint alleges a body of core facts upon which the

motion is to be considered. These facts have been augmented by the parties

via exhibits attached to their memorandum submissions. The full Complaint

and the exhibits presented by the parties through memorandums contain all of

the operative facts. Some of the allegations emphasized by Plaintiff which

she asserts are relevant to the issues before us are as follows:

1.  The claims of LaPlant and the other affected Wisconsin-resident annuity purchasers (numbering about 3618) are similar in that the contract language is the same in all relevant respects. In addition, none of the proposed class members consented to limiting or surrendering their right to fully participate in Northwestern's divisible surplus. Northwestern's actions are alleged to be directed against all class members as a whole.

2.  Plaintiff asserts that she will fairly and adequately represent the interests of all class members. Her interests are not antagonistic to the claims of other class members and she has retained competent and experienced counsel to prosecute this complex litigation.

3.  Common questions of law and fact are claimed to exist. They may include:

    A.  Whether class members became policy holders by

*3*

entering into annuity contracts.

B.    Whether Northwestern failed to follow its own
      internal policies by failing to seek written consent
      for the change in the Pre-MN annuities.

C.    Whether Northwestern had the unilateral right to
      convert the Pre-MN annuities into no-dividend
      annuities.  Northwestern is a "mutual" life
      insurance company organized under Wisconsin law.
      Its 1.7 million policy holders own the company and
      have the right to share in its profits (if any).  In the
      accumulation phase of each pre-MN annuity policy,
      the policy holder is to be credited with annual
      dividends which consist of their share of
      Northwestern's divisible surplus.

D.    How and why Northwestern made the claimed
      unilateral change in the annuities.

E.    How the annuity change was made.

F.    Why Northwestern failed to disclose the annuity
      change to the owners.  In this regard Plaintiff notes
      an Affidavit in the **Noonan** action by Northwestern
      agent Michael J. Holden.  In that affidavit Mr.
      Holden says it would not be the job of a
      Northwestern agent to notify annuity policy holders
      of policy changes.  Rather, he says that would be
      the obligation of Northwestern's home office.  It is
      also stated that Northwestern would have the ability
      to present evidence of actual agents giving annuity
      policy holders notice of the 1985 change if that had
      occurred and it has not done so.  The inference
      sought is that no such notice was given by an agent
      of Northwestern.

G.    Why Northwestern failed to seek the annuity
      owners' agreement to the change.

4

H.      What was the authority that was used by Northwestern as the basis for the unilateral change in the annuities.

I.      Whether the account statements and/or other notices provided adequate subsequent disclosure of the change made by Northwestern in determining dividends.

J.      Whether declaratory relief is appropriate.

K.      Whether the terms of the annuity contract are ambiguous.

L.      Whether Northwestern and its officers and trustees owed class member a fiduciary duty.

M.      Whether the Wisconsin Statutes which govern the conduct at issue are ambiguous.

N.      Whether Northwestern is liable for the conduct of its officers and trustees in the performance of their duties to the alleged class.

4.      Northwestern, as a mutual insurance company, is in the business of selling and managing insurance products and all of the annuities that are the subject of this dispute. As part of its business, Northwestern manages its affairs so as to pay claims made by policy holders and to reduce the obligations of its participating policyholders and to increase the cash value of policies by crediting the policy accounts with their respective shares of the Company's profits (its divisible surplus) in the form of dividends.

5.      Prior to 1985, Northwestern marketed and sold annuities that were purchased by class members. These annuities were denominated as "participating". Owners of these pre-MN annuities participated in the Company's profits

5

and growth through the receipt of annual dividends. In addition policy owners were able to borrow against the Annuity or cash it in at or prior to maturity.

6.  The annuity language in all of the proposed class member contracts that required Northwestern to credit the owners' accounts with the dividends states:

> *"This policy shall share in the divisible surplus, if any, of the Company. This policy's share shall be determined annually and credited as a dividend. Payment of the first dividend is contingent upon payment of the premium or premiums for the second year and shall be credited proportionately as each premium is paid. Thereafter, each dividend shall be payable on the policy anniversary."*

It is claimed that Northwestern's conduct affected the "block" of pre-MN annuitants as a whole (i.e. as a class).

7.  The annuity contract language entitled all the pre-MN annuitants to an equity share in Northwestern and to a share in its growth. In addition, Wisconsin insurance law obligates Northwestern as a domiciled mutual insurance company to pay the dividends at issue. Wisconsin Statutes, section 632.62(2) provides:

> *"**Participation**. Every participating policy shall by its terms give its holder full right to participate annually in the part of the surplus accumulations from the participating business of the insurer that are to be distributed."*

The surplus accumulation to be distributed is claimed to be determined by Wisconsin Statutes, section 632.62(4)(b), which states:

> *"**Payment**. Every insurer doing a participating business*

*shall annually ascertain the surplus over required reserves and other liabilities. After setting aside such contingency reserves as may be considered necessary and be lawful, such reasonable nondistributable surplus as is needed to permit orderly growth, making provision for the payment of reasonable dividends upon capital stock and such sums as are required by prior contracts to be held on account of deferred dividend policies, the remaining surplus shall be equitably apportioned and returned as a dividend to the participating policyholders or certificate holders entitled to share therein. A dividend may be conditioned on the payment of the succeeding year's premium only on the first and second anniversaries of the policy."*

Plaintiff alleges that this contract language is essentially the same for all proposed class members. The same "block" approach was utilized when Northwestern sought regulatory approval per Plaintiff.

8.    Plaintiff asserts that Northwestern credited all dividends for the pre-MN annuities in accord with the contract language in the period before 1985. The contract language for the pre-MN annuities did not allow either Northwestern or its agents or the annuitants to change contract terms unilaterally.

9.    By 1985, it is asserted that Northwestern became dissatisfied with the pre-MN annuity contracts due to economic problems (inverted yield curve on investments, short term rates exceeding long term rates, sharp decline in sales of the annuity product and borrowing by annuity owners which exceeded Company expectations) being experienced in the U.S.. As a result, it is asserted that Northwestern intentionally and unilaterally took action as follows:

A.    A new, non-participating annuity product was created. It was called an "MN" series annuity. The

dividend for this product would come from a bond account established by Northwestern.

B.  The pre-MN annuities owned by the proposed class in this case were unilaterally changed so as to secretly treat them like the newly create no-dividend annuity product.   It is claimed that Northwestern set up a separate, short term bond fund in 1985 and this fund was used, after a gradual phase-in period,  to pay interest to the pre-MN annuitants.  All of the conduct by Northwestern was taken as to the pre-MN annuitant class as a whole.  It is claimed that Northwestern never solicited or obtained agreement by the pre-MN annuitants for this change in calculating the policy dividend.  Instead, it is claimed that Northwestern acted to misrepresent to the pre-MN annuitants what it had done.  The pre-MN annuitants were left unaware of the 1985 change and without a reasonable means for learning that Northwestern was no longer crediting genuine, contractually required dividends to their accounts.

10.   After the phase-in of the 1985 change was complete, Northwestern has utilized a formula for calculating the annuity dividend that was different from that contained in the actual pre-MN annuity contracts.  The result of that difference has been to produce dividends for the pre-MN annuities that were lower than the dividends would have been if the contract language had been followed.  This was the result intended by Northwestern and it inured to the Company's economic benefit.   Plaintiff asserts that this is an illegal conversion of funds belonging to the pre-MN annuitants.  The dividend differential from 1986 through the present is shown at Exhibit 5, page 35 of Plaintiff's Appendix.  There was a limited period when the new dividends exceeded the divisible surplus payment that would have been paid to the pre-MN annuitants.

11. The controlling law is the same for all class members. The same duty is owed to all the class members. Northwestern's actions were directed to all of the pre-MN annuitants. Northwestern's actions since 1985 in crediting pre-MN annuitants with interest from a bond fund has been made to the "block" of pre-MN annuitants as a whole.

12. The evidence in this matter comes largely from Northwestern's conduct and will be essentially the same for all of the annuitants.

Plaintiff contends that Northwestern acted knowingly to illegally and secretly convert dividend funds from pre-MN annuitants to itself. Plaintiff contends that the data in support of that position, which is contained in the Appendix, includes:

A. Northwestern Annual Reports for 1983, 1984 and 1985

B. July 1982 Memo to Northwestern Planning Committee.

C. 16 July 1984 Memo from NML VP to Messrs. Jensen, Erickson, Wright and Carlson.

D. February 1985 "information Release" on MN Series annuities.

E. 18 December 1985 letter from Chief Actuary and VP to General Agent Ebel.

F. Fisher letter of 7 January 1986 explaining Pre-MB annuity dividends.

G. NWM training manual on new MN annuities.

H. 4 September 1991 Memo from NWM Chief Actuary to Messrs Schuenke and Ericson and NWM Management Committee.

9

I. Excerpts from NWM Board of Trustees filings or Management Committee minutes regarding dividends for the years 1987 through 2005.

J. 9 May 2000 letter from Mr. Fisher, NWM Senior Actuary regarding history of pre-MN annuities. Blame is placed on "pressure from field force".

K. Affidavit of Robert L. Hoyer on damages and impact on Northwestern.

L. Affidavit of Mr. Holden on ability to modify NWM policies and regarding duty of NWM agents to notify policy owners of 1985 change regarding dividends.

It is noted that Plaintiff's Appendix includes resumes of the proposed class counsel. This is to be considered regarding the legal standard as to the competency and experience of proposed class counsel.

Facts emphasized by Defendant, from the record created herein, include the following:

A. Plaintiff purchased a "participating flexible premium deferred annuity policy" from Northwestern in 1975. The policy had a guaranteed rate of return of 3%. The initial amount put into this retirement investment vehicle by Plaintiff was approximately $20,000.

B. The same language noted by Plaintiff above at page 5, number 6, regarding the controlling contract wording in the annuity policy is cited by Defendant.

C. As of 14 January 1986, Northwestern implemented an amendment to the annuity policy of Plaintiff by action of its corporate Secretary. In its fact background statement of its legal

brief Defendant alleges that Plaintiff and others in the proposed class "agreed" to this amendment to the dividend provision of the annuity policy. The language of this amendment is as follows:

> *"This policy will share in the divisible surplus of the Company. This surplus is determined each year. The policy's share will be credited as a dividend on the policy anniversary. This dividend will reflect the mortality, expense and investment experience of the Company and will be affected by any policy indebtedness during the policy year."*

D.     The annuity policies at issue were sold, not by Northwestern's central office, but by its independent contractor agents. All purchase discussions were between Plaintiff (and her husband) and the Northwestern agent.

E.     After the policy was purchased Plaintiff and her spouse met with the Northwestern agent a few times to find out how the annuity was performing.

F.     In discovery it was learned that Plaintiff's expectation during the time she owned the annuity was to receive some unstated amount of dividends. While she did receive dividends each year she did not inquire as to the basis for the award of those dividends. She did realize that the dividends did increase the cash value of her annuity beyond what she initially paid for it.

G.     LaPlant learned about the **Noonan** case in 2002 from her husband and a newspaper article. Thereafter she and her husband contacted counsel for the Noonans. She consulted with that/those counsel regarding the class action and this occurred on more than one occasion. One or more of those **Noonan** case counsel are present counsel for Plaintiff.

H.     During the period of Plaintiff's discussion with counsel in the **Noonan** case, LaPlant considered herself to be represented by those counsel as a putative class member. The discovery

interchange on this point was as follows:

> *"MR. VAN VUGT: Right. But you're taking the position now that she was at that time a member of the class that you represented?*
>
> *MR. GEORGE KERSTEN: She was a member of the proposed Noonan class, correct.*
>
> *MR. VAN VUGT: On that basis you had attorney-client relationship with her?*
>
> *MR. GEORGE KERSTEN: We believe there was a sufficient attorney-client relationship there to invoke the privilege. In other words, a member of a proposed class calling into a class, the attorney for the proposed class or proposed attorney, that that is privileged..."*

I.   LaPlant knew at all material times that class certification had been denied in the **Noonan** case.

J.   LaPlant in surrendering her annuity policy on 3 July 2006, signed a document which included the following language regarding her status:

> *7. Authorization and Certification*
> *The owner of the contract referenced in Section 1, "Contract Information" makes the following authorization election and certification:*
> *1.   I am surrendering all or a portion of said contract and all claims hereunder to Northwestern Mutual."   (Underlining added.)*

The surrender position is also noted in the policy contract as follows:

> *"5.2 CASH SURRENDER.*
> *The owner may surrender this policy for its cash value less any indebtedness. The policy shall*

12

> *terminate upon receipt at the Home Office of this policy and a written surrender of all claims. Receipt of the policy may be waived by the Company."*

K. The total value of LaPlant's annuity plan at surrender was approximately $93,000 and her contribution was approximately $20,000. This data was obtained from LaPlant's deposition transcript.

L. LaPlant thoroughly read her Complaint in this matter. She seeks more dividends in addition to a declaratory ruling. In her deposition these statements were made:

> *" Q. Ms. LaPlant, could you tell me in your own words, what it is that you're suing Northwestern Mutual for in this lawsuit?*
>
> *A. For my share of the profits of the company in the form of dividends.*
>
> *Q. So what you expect to get out of this lawsuit is money?*
>
> *A. Yes."*

M. Northwestern's Board's decision in 1985 was made in good faith, it was made with the knowledge and consent of both the Wisconsin and New York Departments of Insurance and it was consistent with both the law and industry best practices. This is the use of the business judgment rule by the Board.

N. Northwestern uses the contribution method for apportioning dividends that are paid to its policyholders. Factors it considers under this method include:

1. Investment returns

2. The relative contribution of a particular group of

*13*

policyholders to Northwestern Mutual's surplus position

Under this system not every policyholder is entitled to a pro rata share of the divisible surplus.

O. On an annual basis the Board determines the amount of the surplus (if any). This surplus is the difference between the company's assets and liabilities, minus certain other amounts set aside under Wisconsin Statutes, section 632.62(4)(b).

P. The Board used, at all times material, the "contribution" principle to allocate the divisible surplus to policyholders. Factors it considered are:

    1.   Investment returns (again)

    2.   Mortality

    3.   Expenses (again)

    4.   The risk presented by various policies

    5.   Other matters

Q. Northwestern did, at all times, allocate dividends to LaPlant and all of its annuitants from its divisible surplus. Northwestern complied with the requirements of law in determining the divisible surplus and in exercising discretion in "equitably apportioning" that surplus.

R. In the late 1970's and early 1980's there was concern among insurance regulators regarding annuity holders surrendering their policies or borrowing from them in order to obtain higher market returns. In response to those concerns Northwestern determined that a new allocation "methodology" should be developed that would better match the liabilities of the flexible premium deferred annuities with the assets that supported them. In 1982 Northwestern revised the investment strategy for its pre-MN series annuities. The goal was to select assets that would more

14

closely match the actual or potential usage of annuity funds. The assets themselves were held in the general account of Northwestern.

S.   Under the methodology in "R" above it became possible for Northwestern's Board to evaluate the investment returns from the specific assets which backed pre-MN annuities. The divisible surplus allocated annually by Northwestern's Board for the pre-MN annuities became the investment return earned each year from this "segmented" category of assets. These returns could be greater or lesser than the return earned on the remainder of the investment portfolio of Northwestern.

T.   The revised dividend allocation methodology of Northwestern was presented to both the New York and the Wisconsin Departments of Insurance. The New York Department approved the new methodology in 1984 and the Wisconsin Department did not object after it received notification.

U.   As a result of Northwestern's 1985 decision, LaPlant and other pre-MN annuity policy holders received dividends every year of each policy's existence. For a number of years the dividend was larger for the annuity policies than for the life policies issued by Northwestern.

V.   Northwestern believed the 1985 decision was a good thing for its annuitants and it also acted to communicate the change to its field sales force "so that it could be communicated to policyholders."

W.   The 1985 decision was a legitimate exercise of "discretion" by Northwestern's Board. It did not harm the involved annuitants, nor did it unjustly enrich Northwestern.

X.   Many of the annuity policies were amended (by signed documents) after purchase to include the following 1983 (approximately) language:

        *"This Amendment is governed by the law of the state in*

15

*which the Owner resides at the time that the Amendment is accepted by the Owner. If a provision in the policy is not consistent with the terms of this Amendment, it is modified to conform to this Amendment."*

The exhibits presented by Northwestern in support of it factual

presentation opposing class certification include:

1. The Decision of 10 June 2005 in **Noonan et al v. The Northwestern Mutual Life Insurance Company et al**, Case number 01-CV-012349 (hereafter **Noonan I** case). It relates to class certification.

2. The Decision of 25 January 2008 in **Noonan** (hereafter **Noonan II.** It relates to class certification.

3. LaPlant deposition transcript (rough draft) of 9 September 2009.

4. LaPlant annuity.

5. The written Amendment to Dividend Provision.

6. News article on Noonan case.

7. LaPlant annuity distribution request.

8. Northwestern Board minutes regarding dividends in 1996

9. Portions of Northwestern's responses to discovery requests of Plaintiff regarding dividend allocation methodology.

10. Northwestern's discovery responses including data from 1984 regarding communication with the New York State Insurance Department on the methodology change.

11. Letter of 27 December 1984 from New York Insurance Department approving Northwestern's request. It states, in part, as follows:

*16*

> *"Relying on the commitments made in your letter of October 26th we are approving your submission with respect to your identification of assets, for segmentation purposes only, as appropriate for Flexible and Single Premium Deferred Annuities as separate from all remaining assets."*

12. Northwestern's letter of 26 October 1984, to the New York State Insurance Department regarding certain assurances.

13. Letter of 11 September 1984, from Northwestern to the Wisconsin Insurance Department regarding Northwestern's new plan.

14. Letter of 12 October 1984, from Northwestern to Wisconsin Insurance Department on new plan.

15. Chart showing dividend interest rates paid from 1986 through 2000.

16. Information Release to all Agents document from Northwestern under date of February 1985.

17. Information Release from Northwestern to Agents under date of 1 November 1985.

18. Value screen for LaPlant as of 5 February 1986.

In Plaintiff's Reply brief she presented an affidavit dated 29 September 2009, in response to some of the facts asserted by Defendant at letters "G, H, I and J" on pages 10, 11 and 12. There, in part, she states as follows:

1. *"At no time prior to the year 2002 did I have notice or knowledge of what is referred to in paragraphs 30 through 34 of the Complaint as the "1985 change" in the nature of and basis for determining the "dividends" to be credited annually by*

*17*

*Northwestern to my Annuity account."*

2.     *"I never agreed to that "1985 change"..."*

3.     *"It was my understanding that the sole purpose in my signing and delivering that form was to accomplish the rollover. At no time did I intend to waive, release or discharge any of my rights, claims or causes of action for declaratory relief, breach of contract, breach of fiduciary duty or any other causes of action which I may have against Northwestern."*

4.     *"Thereafter, I retained the law firm of Kersten & McKinnon, S.C. and authorized it to commence the above-entitled action on my behalf."*

Plaintiff, in the underlying cause of action, seeks a declaratory ruling regarding the rights and duties and status of the pre-MN annuitants and Northwestern under the language of the contract and the actions of the parties. In the instant motion, Plaintiff asks that the case be certified as a class action. Defendant objects as noted above.

## Law

The statute controlling class actions in our jurisdiction is Wisconsin Statutes, section 803.08.

*"**Class actions**. When the question before the court is one of common or general interest of many persons or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole."*

A motion regarding class action is addressed to the trial court's

*18*

exercise of discretion. **Sisters of St. Mary v. AAER Sprayed Insulation, 151 Wis. 2d 708, 713 (Ct. App. 1989)**. Our appellate courts have often dealt with this concept. In **State ex rel Cynthia v. Michael**, 181 Wis. 2d 618, 624 (1994), the Supreme Court said:

> *"The term discretion contemplates a process of reasoning which depends on facts that are in the record or are derived by inference from the record and yields a conclusion based on logic and founded on proper legal standards."*

Factors to be considered when addressing a motion to certify a class were noted over 35 years ago by the Supreme Court in **Schlosser v. Allis-Chalmers Corp.**, 65 Wis. 2d 153, 169 (1974):

> *"The statute should be construed to present only one set of criteria. These criteria were spelled out in **Lozoff v. Kaisershot**, as follows: (1) The named parties "must have a right or interest in common with the persons represented;" (2) the named parties "must fairly represent the interest or right involved so that the issue may be fairly and honestly tried;" and (3) it must be "impracticable to bring all interested persons before the court."*

Often these concepts are referred to as commonality, adequate representation and numerosity. The burden is on the party bringing the motion to establish each of the prerequisites. **Mercury Records v. Economic Consultants**, 91 Wis. 2d 482, 490 (1979).

Defendant points out under "commonality" that Plaintiff's interests

/9

must be consistent with those of the other policy holders. An argument is made that in giving a greater amount of the divisible surplus to annuity policy holders at the expense of other (life or disability) policy holders, it creates an inherent and unavoidable conflict. Cited in support of denial of certification is **State Farm Mutual Auto Ins. Co. v. Lopez**, 156 S.W. 3d 550, 556 (Tex. 2004). In that case the appellate court found an abuse of discretion where the trial court did not address a trial plan or notification under Texas Rule 42. At issue were choice of law matters and the alleged antagonistic position of the class members. See also **Mercury Records**, supra at page 7 of Brief Exhibit 22.

> *"The test for common interest is whether all members of the purported class desire the same outcome of the suit that the alleged representative of the class desires."*

Just 8 years ago the Wisconsin appellate court emphasized the 3 **Schlosser** criteria and gave additional guidance to the trial courts in **Cruz v. All Saints Healthcare System, Inc.**, 2001 WI App 67, 242 Wis. 2d 432, 442 (Ct. App. 2001).

> *"In addition to satisfying these three criteria, however, we must also engage in an analysis of the benefits and burdens of a class action. Our courts have consistently held the view that the trial court must weigh "the advantages of disposing of the entire controversy in one proceeding" against " the difficulties of combining divergent issues and persons." (Citation.) Simply put, we need to assess the manageability of the proposed*

20

*class."*

The Court in **Sisters of St. Mary's, supra. at 714**, noted, in referring to the

Federal Rules of Civil Procedure, section 23(b)(3), that the determination of

manageability is a factual and practical one and, in making any decision in

this area, *"the trial court must of necessity be granted a wide range of*

*discretion."* Regarding manageability Defendant cites **Sisters of St. Mary,**

supra at 714:

> *"The determination [of] whether a case should proceed as a*
> *class action turns on the question whether the benefits to be*
> *derived from such procedure outweighs the inherent difficulties.*
> *In other words, a court must determine whether the issues*
> *common to the named plaintiff and the class are outweighed by*
> *the issues particular to the individual class members. The*
> *determination rests in the sound determination of the court."*

The person who seeks to be representative of the class must fairly act

in that capacity. Our Court in addressing that issue noted the following in

**Cruz, supra.,** 445 (page 5 of Defendant's Exhibit 6):

> *"In determining adequacy of representation, the primary*
> *criteria are: (1) whether the plaintiffs or counsel have interests*
> *antagonistic to those of absent class members; and (2) whether*
> *class counsel are qualified, experienced and generally able to*
> *conduct the proposed litigation. (Citation) So long as the*
> *individual has a general understanding of the nature of the*
> *class claims alleged, the individual can serve as*
> *representative."*

Any antagonisms between the class member must be real and

substantial to defeat class certification.  **Littlewolf v. Hodel, 681 F. Supp. 929, 936-937 (D.D.C. 1988)**.  Data, if damages were at issue, regarding the impact of determining annuity dividends under Plaintiff's approach could be relevantly compared to Northwestern's  total annual payment of dividends on its life policies.

Where the noted factors are established, there is a public interest presumption favoring certification of the class.  **Mussallem v. Diners' Club, Inc., 69 Wis. 2d 437, 445 (1975)**.

> *"In Schlosser, we concluded that it was in the public interest as declared by the legislature to permit class actions in those cases which meet the criteria established by sec. 260.12, Stats."*

Also, under the heading of public policy it is noted that the language of Wisconsin's Uniform Declaratory Judgment Act (UDJA) expresses a preference in favor of  joining all parties who have a claim or interest that would be affected by the declaration.  Wisconsin Statute, section 806,.04(11) states:

> *"Parties.  When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration may prejudice the right of persons not parties to the proceeding ... "*

When the legislature uses the word "shall" it connotes something which is mandatory and not subject to other options by a court in interpreting that law.

**Swatek v. County of Dane, 192 Wis. 2d 47, 58 (1995).**

> *"The general rule is that the word "shall" is presumed to be mandatory when it appears in a statute... Thus, the use of the word "may" implies a discretionary element ..."*

That said, the legal standard for class certification is not modified by Wisconsin's UDJA. Rather, UDJA's intent statement is a factor for consideration in exercising discretion.

The Wisconsin Appellate Courts have given direction to trial courts to be aware of the economic realities of each given case in considering the factors of commonality, numerosity, adequate representation and manageability. **Cruz, supra. at 440.**

> *"We believe that given the economic realities of this case, class action may be the only effective means to implement the legislature's intent to provide redress for unreasonable charges in Wis. STAT., section 146.84. The individual amounts at issue are small and not likely to justify individual suits.. These economic factors make this case ideally suited to class action. Here, the aggregation of small claims, when joined as a class, becomes worthwhile to litigate. This economy of scale rationale underlying class actions has long been recognized by courts. (Citation.)"*

Complexity is a matter to consider in addressing manageability. See both **Noonan I** and **Noonan II** and **Parkhill v. Minnesota Life, 188 F.R.D. 332, 342-43 (D. Minn. 1999).**

Defendant asserts that a choice of law analysis will need to be done in

23

this case because Wisconsin's law as to the fiduciary duty owed its citizens may not apply to putative class members who have come to live outside of Wisconsin after purchasing their annuity policy. The existence of that duty in Wisconsin was addressed in **Noonan I**, (276 Wis. 2d 33, 41 and 42, 2004 WI App 154).

> *"Here, the Noonans invested in annuities through Northwestern, and Northwestern has an obligation to act for the Noonans' and other policy holders' benefit. The policyholders are dependent upon Northwestern's investment decisions and are thus in an inferior position to Northwestern. Consequently, Northwestern owes the policyholders a fiduciary duty."*

The existence of the fiduciary duty for Wisconsin residents has already been addressed by the appellate court. At issue is whether moving out of Wisconsin after purchasing the annuity does or does not create the possibility of that other state's law regarding fiduciary duty being applied. Plaintiff looks to residency at the time of the annuity purchase and Defendant looks to any non-Wisconsin residency subsequent to the annuity purchase. The non-Wisconsin residency could be at the time of the annuitant's death or current residency if the annuitant is alive or even an interim residency hiatus outside of Wisconsin. In **Noonan II** (298 Wis. 2d 247 at paragraph 18-unpublished) the Court noted that *"If other states' laws control the breach of fiduciary duty claim in this case, the application of those potentially differing laws*

24

*would certainly render this case unmanageable."* However, for Wisconsin

residents at the time of signing the annuity, a subsequent change in residency

(if that were to be factually established beyond just speculation) would not

automatically impact the choice of law analysis. In **Brooks v. General**

**Casualty Company of Wisconsin, 2007 WL 4305577 at \*3 (E.D. Wis.**

**2007),** it was stated:

> *"In Wisconsin, courts use two tests to determine which state's laws should apply. The first requires the court to "judge" whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling.*
>
> ...
>
> *Applying the first test , I conclude that the application of the Michigan Act would constitute officious intermeddling. Wisconsin courts have held that a plaintiff's residency is an insufficient contact to support the application of the law of the plaintiff's home state."*

Reasons in support of applying Wisconsin law in cases where the most

significant policy relationship is in this state include protection of Wisconsin

citizens and the ensuring of consistent and predictable interpretation of

contract rights and duties. The court articulated that position in **State Farm**

**Mutual Auto Ins. V. Gillette, 2002 WI 31, paragraph 27**, when it stated the

following:

> *"The insurance policy in the present case was issued in Wisconsin between State Farm, an insurance company doing business in Wisconsin, and Ostlund, a Wisconsin resident. The*

25

> *policy covers cars registered in Wisconsin. Wisconsin is the state with which the policy has its most significant relationship. Wisconsin law, therefore, governs the interpretation of the insurance policy in the present case."*

This rule is particularly the case when the applicable contract terms are unchanged as to the annuitant sharing in the divisible surplus of the issuing insurance company .

Factors that make the case unmanageable under the noted legal standard, according to Defendant under its Answer and Affirmative Defenses, include matters such as damages, determining the date of knowledge of the "change" and the related statute of limitations, the dates and amounts of policy loans and their repayment, the amount of annuity consideration paid, the total amounts invested, dividends earned and different purchase dates, estoppel, waiver, laches, statute of limitations and accord and satisfaction.

It is Defendant's position that these multiple matters would confuse jurors and create the illusion of a strong class claim when that is not the case. In support of this position reference is made to **Methyl Tertiary Butyl Ether Prods. Liab. Litig., 209 F.R.D. 323 (S.D.N.Y. 2002)**, wherein the Court refused a motion to certify a class. It is argued by Defendant that class certification should not occur as "… thousands of individual suits will still be necessary to determine liability and damages". Plaintiff distinguishes this

26

case as being one where class certification was unreasonably sought regarding liability where such a universal finding was not situationally or factually possible. In **Jefferson v. Ingersoll Intern. Inc.**, **195 F.3d 894, 898 (7ᵗʰ Cir. 1999)**, the court stated, regarding when to allow class certification, as follows:

> *"As the Advisory Committee put it: "The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.""*

This was a case involving alleged racial discrimination in employment applications. The District Court limited the class to persons who actually applied for employment. Plaintiff wanted to have the class enlarged to include persons who were discouraged from applying for employment as well as persons who were allegedly improperly denied promotion. The decision focuses on when a class action could be maintained if there is a request, under federal Rule 23(b), for both equitable and monetary damages. Certification would occur if the monetary damages sought are more than incidental to the equitable relief demanded. The case before us involves contract matters and various affirmative defenses. In the formal pleadings, it does not seek damages.

Partial resolution of disputes under a declaratory judgment action should not be, Defendant asserts, certified for a class action. In support the

27

case of **Sarafin v. Sears, Roebuck & Co., Inc.,** 446 F. Supp. 611, 615

**(N.D. Ill. 1978)** is cited. That case does note the declaratory judgment/class

action standard to be applied in complex actions when the entire case is not

resolved.

> *"Therefore, relief is proper either '1) where the judgment will serve a useful purpose in clarifying and settling the legal relations issue; or 2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.*
>
> ...
>
> *Courts have declined to entertain actions for a declaratory judgment where the declaration would result in piecemeal litigation or would try particular issues without settling the entire controversy.*
>
> ...
>
> *It is not necessary to put the entire dispute to rest, but the issues must be separable so that an important and autonomous part of the controversy can be finalized.   6A Moore's Federal Practice, P 57.08(4) (2d ed. 1974)."*

The court must address, under the just noted law, the concepts of separability

of issue(s), importance of the issue, autonomous nature of the issue(s) and

whether that or those issues can be finalized. Further, the existence of

hypothetical and/or minor non-resolvable issues does not automatically act to

deny class certification. In **Miner v. The Gillette Co.,** 428 N.E. 2d 478, 485

**(Ill. 1981),** the court affirmed the certification of a class action for only

residents of Illinois even though all issues would not be resolved.

> *"This court in **Harrison Sheet Steel Co. v. Lyons** (citation)*

*28*

stated:

> *But the hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issue is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action."*

A claim is made that the proposed class is defective in that it would include members who have no claims under the "surrender" contract language or the statute of limitations. On this issue reference (and inclusion by that reference) is made to the court's decision on the Motion to Dismiss regarding the Statute of Limitations as to breach of contract (Wisconsin Statute, section 893.43) and breach of fiduciary duty (Wisconsin Statute, section 893.57). Exceptions to the use of strict time limits exist regarding breach of contract due to the concept of "continuing" breach actions. The Wisconsin discovery rule is the exception to a fixed, statute of repose 2 year rule under breach of fiduciary duty.

An argument by Defendant is made that Plaintiff should be precluded from re-litigating class certification because of her alleged involvement as a member of the **NOONAN** putative class. This was dealt with in the decision on the Motion to Dismiss. However, it is claimed that discovery has produced new information of "actual knowledge" by LaPlant of **NOONAN** rulings and, thus, preclusion law does apply. The law in that Motion to

29

Dismiss decision is incorporated by reference and to save time and length here. The court reaffirms here that the referred-to decisions (two in the Court of Appeals and one in the Circuit Court) in the **Noonan** cases dealt with either no motion for class certification or a putative class that included all 50 states or involved a non-binding circuit court decision as to a Wisconsin-only class.

Consideration is a contract element which impacts a "new" contractual release matter in a situation where the parties to the new contract "already" have existing rights and duties under the annuity contract. One of those rights and duties relates to terminating or canceling the annuity contract. In **Bartley v. Thompson, 198 Wis. 2d 323, 333 and 334 (Ct. App. 1995)**, the court stated:

> " *Bartley does not dispute the general rule that a promise to do something the promisor is already legally obligated to do, or the performance of an existing legal obligation, does not constitute sufficient consideration for a contract.*
> ...
> *The trial court could properly conclude on these facts that his attempt to assert a breach-of-contract claim against the governor failed for lack of consideration.* "

Reasonable consideration is the test for the new contract matter relating to "release". **Brown v. Hammerill Paper Co., 88 Wis. 2d 224, 234 (1979)**.

> *"The issue of the intended scope of a release is not determined by the form of the instrument alone or by the mere use of the term "release" in the documents in question. It has been said*

*30*

> *that the ultimate test of the intended scope of such documents is whether the obligee has received "full satisfaction, or that which the law must consider as such"."*

Good faith is presumed and implied in all Wisconsin contracts.

**Wisconsin Natural Gas v. Gabe's Construction, 220 Wis. 2d 14, 21 (Ct. App. 1998).**

> *"Every contract implies good faith and fair dealing between the parties to it."*

Contract terms must be certain and unambiguous. As to ambiguity the court in **Younger v. Skiing Enterprises Inc., 196 Wis. 2d 485, 499 (Ct. App. 1995), said:**

> *Whether a contract is ambiguous is a question of law. We test whether the term is reasonable or fairly susceptible of more than one construction."*

If ambiguity does exist it is resolved against the drafting party (here Northwestern). The existence of a fiduciary responsibility is a factor that increases the fairness and noticability obligation of the drafter. The scope of a release is resolved by considering the intent of the parties. **Muchow v. Goding, 198 Wis. 2d 609, 629 (Ct. App. 1995).**

> *"The effect of a release of a claim against a particular person is a question of law. Before addressing that question, however, a court must determine the intended scope of the release and instruments related to it."*

An unconscionable contract is one where choice does not exist. In

*31*

**Kohler v. Wixen**, 204 Wis. 2d 327, 339 (Ct. App. 1996), the court said:

> "*In Wisconsin "unconscionability has been defined as "the absence of a meaningful choice on the part of one party, together with contract terms that are unreasonably favorable to the other party.*"

Other courts have noted that it is defined as a contract that no man in his senses and not under delusion would make, on the one hand, and as one which no fair and honest man would accept, on the other. See **Discount Fabric House v. Wisconsin Telephone**, 113 Wis. 2d 258, 261 (Ct. App. 1983). Unconscionability is also impacted by looking to how the language in the contract is or isn't highlighted so as to alert all and draw it to the attention of those who would sign the release document. **Yauger, supra. at paragraphs 18 and 19.**

## Discussion

In this matter the court must exercise discretion in reviewing the factors that impact upon the class certification motion. Each factor will be dealt with separately. In addition, certain matters are referred to in the legal briefs which do not fall strictly under the legal elements to be addressed. These will also be discussed.

## I. Commonality

In order for the class to be certified the class members must have a

3ż

right or interest in common with the Plaintiff. Here it is possible to reasonably conclude that Plaintiff and all members of the proposed class seek the same outcome--a determination of the rights and duties of the pre-MN annuitants and Northwestern under the original annuity contract language. Defendant argues that if the divisible surplus were to be divided as Plaintiff proposes that the position of some class members would be antagonistic. The record discloses that Northwestern paid approximately $5,000,000,000 in dividends just to its life policy holders in 2008. The approximate amount of the differential owing to all of the Wisconsin pre-MN annuitants for 2008 would have been about $1,000,000 according to the affidavit of Mr. Hoyer. It is possible to conclude that the impact on the life policy dividends under the theory postulated by Defendant with regard to the pre-MN annuitants would be almost nonexistent (0.02% annually). Any reduction in the overall Northwestern surplus due to reallocation of it among differing policyholder groups would not even minimally impact policyholders. It would not, under the facts presented, result in any meaningful diminution of the available divisible surplus. This claimed conflict does not rise to the level of creating a legal antagonism in the proposed class. In any event, the case before us does not seek damages under declaratory judgment. In argument on 12 October 2009, Defendant acknowledged that common issues do exist for members of

33

the proposed class. The real dispute, from Defendant's point of view, has to do with its belief that any decision in the class action would have to be relitigated in subsequent damage actions (which are not before us). Defense counsel went so far as to say that only 10% of the issues in dispute would be resolved, in its judgment, in a class action.

Plaintiff's interest in clarifying rights and duties under the pre-MN annuity contracts is consistent with all of the other policy holders. The threshold standard for commonality noted in **Cruz, supra.** ("…general understanding of the nature of the class claim alleged …") is not particularly high. Plaintiff here has met her burden of establishing commonality for class certification. Class antagonism has not been established as to Plaintiff or in juxtaposition to the class as a whole. The claims of class members are factually similar (same annuity language, no consent to 1985 change in how the divisible surplus would be determined and actions of Northwestern appear to be taken with respect to the pre-MN annuitants as a block). The controlling law in the declaratory judgment matter would be essentially the same for all class members. All class member share a common goal of obtaining a declaration of the rights and duties of the pre-MN annuitants and Northwestern as to the legality of the 1985 change in determining the divisible surplus and thereafter allocating policy dividends.

34

## II.   **Numerosity**

The record presented discloses that there are approximately 3,618 pre-MN annuities purchased by Wisconsin residents. Of that number only 659 continue to hold those pre-MN annuities. The diminishment of the original number is due to death, maturity of annuity such that distribution is occurring and/or surrender. The chart contained in Plaintiff's App. 35 demonstrates how the pre-MN annuitants were impacted by the 1985 change regarding divisible surplus. This exhibit was prepared by Northwestern's Senior Actuary. It is argued by Northwestern that many of those who are no longer owners of pre-MN annuities are ineligible to make any claim against Northwestern due to the passing of time periods under Wisconsin's statutes of limitation for breach of contract and breach of fiduciary duty. While not resolving those claims, it is clear that under Defendant's approach there are, at a minimum, perhaps a thousand or more persons who viably make up the proposed class. Under Plaintiff's reasoning there are over 3,600 in the proposed class. Under either approach, the number of proposed claimants is significant in its impact. It would be impracticable to bring all (whether 1,000 or 3,600) of the interested persons before the court.

Plaintiff has met her burden in establishing numerosity with respect to class certification.

35

## III.    Adequacy

A number of issues are contested under this criteria.  Defendant contends that this motion has been addressed three times previously over an eight year period.  In a generic sense that rings true.  However, LaPlant was not a party to any of those prior motions.  In addition, the second Court of Appeals Decision in **Noonan** focused not on a Wisconsin-only class, but rather on a nation-wide class.  It is not a decision which constitutes controlling precedent.  The decisions of other circuit courts (including this court) on a Wisconsin-only class are/will also not be controlling precedent.  There will be precedence at such time as our appellate court(s) render there wise and thorough ruling regarding the certification of a Wisconsin-only class in this dispute..  Defendant's contention that it has already obtained binding prior rulings on the class certification motion now before us is not accurate.

Next, it is claimed that Plaintiff cannot represent fairly the interests of the proposed class because she:

1.    Surrendered her annuity in 2008

2.    Signed a contract "releasing any claim" against Defendant

3.    Has no possibility of future loss regarding divisible surplus payments.

The facts above do support the claim that Plaintiff did surrender her

36

annuity on 3 July 2008. The issue, however, is what effect did that surrender have on Plaintiff's standing under the "adequacy" criteria for class certification. The contract document (Exhibit G to Defendant's legal brief) she signed in accomplishing that surrender was prepared by Northwestern alone. The document was titled ANNUITY DISTRIBUTION REQUEST. Plaintiff's Affidavit of 29 September 2009, and her rollover language in the surrender request document indicates that LaPlant wanted, as a part of her retirement planning, to have her annuity funds transferred to her Vanguard account. On page 4 of the ANNUITY DISTRIBUTION REQUEST, under the heading of AUTHORIZATION AND CERTIFICATION, it is stated at item 1 as follows:

> "*I am surrendering all or a portion of said contract and all claims thereunder to Northwestern Mutual.*" (Emphasis)

In the actual annuity contract from 1975, Plaintiff had the right to surrender her annuity policy for its cash value ( See Exhibit D to Defendants legal brief). Under the facts presented the court is able to determine that no additional consideration was paid for the Plaintiff's release of future claims against Northwestern when she surrendered her annuity policy. The law (**Bartley v Thompson**, **198 Wis. 2d 323, 333 (Ct. App. 1995)** is an exemplar) requires additional consideration for the new contractual release of

*37*

future claims against Northwestern. In addition, Northwestern served as a fiduciary (conclusion reached in first Court of Appeals decision in **Noonan** and **Thorn Wire Hedge Co. v. Washburn & Moen Mfg. Co.**, **159 U.S. 423, 433 (1895)**. Nothing in the ANNUITY DISTRIBUTION REQUEST, given that fiduciary position, highlights (by underlining or the use of bolding or shading) the release that is said to occur in item 1 on page 4 of the distribution contract. Fundamental fairness did not occur. The new release of future claims language was simply put into the ANNUITY DISTRIBUTION REQUEST without reasonably alerting LaPlant as to its presence or its content and impact.

In addition to the foregoing, the ANNUITY DISTRIBUTION REQUEST contract as prepared by Defendant alone constitutes an unconscionable contract under Wisconsin law ( **Younger, supra.**). This is so for the following reasons which are arrived at from the record presented:

1. Plaintiff is not given any meaningful choice with respect to the "release" since it is not emphasized or highlighted for purposes of notice. Further, there is no space provided for the annuitant to strike the provision or modify it if she wished. There is no reason for the annuitant to believe that the language of the contract does anything other than rollover her annuity funds into her Vanguard account. The document appears to be intentionally misleading.

2. The release terms favor only Northwestern. This is unreasonable on its face and even more so in the absence

*38*

of any consideration and Northwestern's fiduciary status to the pre-MN annuitants.

3.    No fair and honest person possessed of his or her senses and not under delusion would accept such a one-sided release contract.

The extent of Plaintiff's individual claimed harm is limited by virtue of her annuity policy surrender in 2008. That fact does not mean that her position as the class representative is undermined. She shares in common with all members of the proposed class a desire to have the rights and duties if the pre-MN annuitants and Northwestern determined under the annuity contract at issue. Defendant has noted that it is possible that other class members may be deceased or may have also surrendered their policies or may now be receiving annuity payments. It would be arbitrary, a mistake of law, a denial of equal protection and an abuse of discretion for the court to allow only a person within the group of the existing 659 annuity policyholders to act as a class representative. No basis has been given in the record created which would allow the court to show favoritism and standing only to that subgroup of the pre-MN annuitants for purposes of adequacy.

Plaintiff's status as an adequate representative of the proposed class is not affected by the surrender of her annuity in 2008, by the signing of a release document prepared solely by Northwestern in the rollover of her

39

annuity into her Vanguard account or by her potential "past injury only" status regarding the divisible surplus being limited to the period before her annuity was surrendered.

Plaintiff has established that she is an adequate class representative. Her interests are not antagonistic to those of the absent/proposed class members. Just the opposite is the case under the record create here. Plaintiff has presented data regarding the qualifications, experience and overall competence of the proposed class counsel. That has not been challenged in any meaningful way by Defendant. The court has also had an opportunity to observe proposed class counsel on the "field of battle" in this matter. It is possible to say that counsel for <u>both</u> parties possess the abilities needed to effectively and competently represent their respective client(s). The court has reviewed Plaintiff's Exhibit 44 (pages 355 to 380) regarding the resumes/vitaes of proposed class counsel. A finding is made based upon the record presented that proposed class counsel are qualified, experienced and generally able to conduct the subject litigation for the proposed class.

## IV.  <u>Manageability</u>

Under this heading the court must determine whether the issues common to LaPlant and the other class members are outweighed by the issues particular to the individual class members. Defendant raises five separate

40

matters under this heading.

A.      Individual defenses will necessarily need to be addressed.

The matters raised as affirmative defenses relate to laches, estoppel, waiver, statute of limitations and accord and satisfaction. It has not been established in the record that these are actual issues in the case. Defendant has used in its brief, regarding these matters, the following language:

1.      "... agents <u>may</u> have discussed..." Defendant's brief at p. 15.

2.      "... <u>may</u> be barred from bringing a claim on statute of limitation grounds ..." Defendant's brief at p. 16.

3.      "... <u>may</u> be deemed to have knowingly accepted the change and/or waived any claim." Defendant's brief at p. 16.

4.      "Northwestern Mutual has not affirmatively reached out to the thousands of policyholders and their agents to determine whether they knew of the change precisely because of the onerous nature of the task." Defendant's brief at pages 16 and 17.

The matters raised as affirmative defenses are assumed to be accurate or potentially accurate by Defendant. Whether that proves to be the case is unknown. Actual evidence as to these claimed defensive matters is largely missing in the record. There is an affidavit referred to in the Facts that rebuts the idea that agents ever gave notice to the involved annuitants or were even required to do so. However, those asserted defenses relate to damages and

that is not a matter before us in this case. What is at issue is an annuity contract and a request that the rights and duties if the parties be determined under that contract.

There is not a legal requirement that an entire dispute be fully resolved in order to address either declaratory judgment or certification of a class action. See prior decision on Motion to Dismiss and **Serafin, supra.**. However, the court must look to a number of factors in making its decision and exercising discretion. These include:

1. Are the issues separable? Here a determination of the rights and duties of the parties to an annuity contract are clearly distinguishable from the affirmative defense issues raised (if in fact those matters come to be real and not just imaginary).

2. What is the importance of the issues? The use of a class action to address for all class members and Northwestern their rights and duties is significant. The issues raised by Defendant may or may not ever be supported by credible evidence. Even if the affirmative defense matters are supported by credible evidence, there would still be a real and important benefit to be derived from concluding a determination of rights and duties under the annuity contract.

3. Are the issues autonomous? It is clear that the defensive matters are separable from the contract determination issues. The words used have meanings. Very specific rules of law apply to contract interpretation in Wisconsin.

4. Can the autonomous part of the controversy be finalized? In this case it is possible to resolve the matter of the rights

and duties of the parties under the written pre-MN annuity contract. The determination of what the annuity contract said and meant and whether the Northwestern Board had a right, under management discretion, to modify the contract terms would be determined. Other issues could thereafter be addressed if the parties sought that end. However, the contract interpretation matter would have been finalized for the benefit of all the parties.

It is not accurate under manageability to claim that affirmative defense issues must be considered in a class action under a declaratory judgment when dealing with the issue of interpreting the annuity contract under the heading of manageability. They (affirmative defense issues) are separate matters and irrelevant under the issues raised in the pleadings in this case and they can be dealt with after declaratory rulings as to the pre-MN annuity contract are made. Further, hypothetical issues are not enough to prevent certification of a class. **Miner v. The Gillette Co., 428 N.E. 2d 478, 485 (Ill. 1981)** and **In re Farmers Ins. Co., FCRA Litigation, 2006 WL 1042450, *8 (W.D. Okla. 2006)**.

B.    A choice of law analysis must occur

Defendant claims that "Wisconsin law concerning fiduciary duty <u>may not apply</u> to putative class members that lived outside of Wisconsin after purchasing their policy" (underlining added). The fiduciary duty matter for these annuities was addressed by the Court of Appeals in its first **Noonan**

43

decision in 2004 due to a special circumstance. Defendant asserts it is "likely" that a number of policyholders who bought their policy in Wisconsin have thereafter moved out of state. No evidence was presented in support of that assertion, but the argument was made that this will result in the law of other states being applied to any breach of fiduciary duty claim. This fact (that the law of another state would be applied) would, standing alone, be enough to produce the result of unmanageability. The clear law of this state is that Wisconsin law alone would apply to situations where the contract was entered into in this state and the company issuing the annuity is Wisconsin based and the owners were residents of Wisconsin at the time the contract came into existance. **Beloit Liquidating Trust v. Grade, 2004 WI 39, paragraph 24-31**. This dispute would be an intra-corporate matter between Northwestern and certain of its policyholders. In **Brooks v. General Casualty Company of Wisconsin, 2007 WL 4305577 at \*3 (E.D. Wis. 2007**, the court dealt with residency alone as the lynchpin for choice of law determinations. The court found that miniscule contacts (just residency) with another state was not enough to invoke its laws for resolution of the dispute. This would, under federalism, constitute officious intermeddling by the other state. See quote in Law section at pages 25 and 26.

Choice of law issues are, based upon the record presented, not a proper

44

App. 148

basis for finding that class certification should be denied under the concept of

unmanageability. The contacts hypothecated are imaginary and/or

insufficient to invoke the law of another state without being officious

intermeddling.

C. <u>Many of the putative class have had their annuities amended so
so as to be covered under the laws of another state.</u>

In 1983 a number (total unknown) of annuitants who would be in the

proposed class signed an amendment that had language saying that the

amendment should be governed by the laws of the state where the annuitant

then resided.. Those amendments were before the action of the Northwestern

Board in 1985 that is at issue in this case. Nothing in the language of the

amendment changed the contract language that is here being addressed in this

case as to the allocation of the divisible surplus of Defendant. The language

of the 1983 amendment did not affect the rights and duties at issue here. That

language is unchanged. There is no compelling reason to apply the law of

another state where the sole contact there was residency by the annuitant at

the time of an amendment that did not impact the annuity contract language

that is at issue in this case. Such an interpretation would undermine

commerce in Wisconsin and the other states, create confusion regarding

contract interpretation in all states and make it substantially more difficult for

45

a court to discharge its function of articulating and maximizing the rights of citizens in their respective states. Similarly, foreign state's would also be protected by maximizing the contract rights of their citizens.

Defendant has not established unmanageability of the class action as a result of choice of law issues resulting from the 1983 annuity amendment. Wisconsin law would govern annuity disputes and this is not changed as a result of the 1983 amendment.

D.     Plaintiff's real goal is to secure damages.

Defendant contends that Plaintiff's real goal is damages from Defendant.     In the deposition of Plaintiff, she acknowledged her objective of obtaining dividends she claims are due her. That there may be legal actions after a declaratory ruling and/or after a class certification does not act to make a case unmanageable.   See **Serafin, supra.** and prior decision on Motion to Dismiss. While Defendant asserts that there is a strong likelihood of jury confusion, that need not be the case. Appropriate instructions can be crafted and utilized if necessary to eliminate any possibility of that result impacting jury fairness. If a finding of general liability comes about there is no reason to believe that it would somehow overshadow strong defenses that might exist. This is partisan conjecture built upon unfounded fears and possibilities with a goal of creating an end result of denying class

46

certification. This type of argument cannot be the basis for granting or denying relief to our citizens and corporations.

Defendant has not established that Plaintiff's goal of securing damages at some future point makes the prosecution of the instant case, which does not include a demand for damages, unmanageable.

E.   The class as proposed is overly broad,

Defendant contends that certain sub groupings within the proposed class have no claim against Northwestern. These include:

1.   Owners who have surrendered their policies. The persons here would be those who, like LaPlant, surrendered their policies. As earlier noted those who signed "release" statements similar to LaPlant would not be excluded since the contract did not include consideration and they were unconscionable "release contracts" under Wisconsin law.

2.   Persons who surrendered their policies years ago. See "1" above. Also there would not be an automatic result of no claim since tolling of the statute of limitations can occur if no knowledge of the breach existed or if a continuing violation existed. See decision on Motion to Dismiss. Facts would have to be presented to address each case. Those facts are not now in the record.

The record created by Defendant does not establish that the proposed class is overly broad or that sub groupings within the proposed class make it unmanageable.

F.   Preclusion principals prevent LaPlant from seeking class certification

47

In the court's decision on the Motion to Dismiss it was found that LaPlant did not have constructive notice of the **Noonan** class action. In addition the Court of Appeals second decision dealt with a class that included the entire U.S.. In other words the class was different from a Wisconsin-only class. The Circuit Court did deal with a Wisconsin-only class, but that decision is not binding precedent on other courts. In order not to add unnecessary length to this decision, reference is made to the facts and law and discussion regarding this matter contained in the decision regarding the Motion to Dismiss. The discovery information produced data that LaPlant did make contact with counsel for the Noonans in 2002. She also was alerted to some articles regarding the Noonans in the local print media. Counsel at the deposition instructed LaPlant not to answer certain questions from Defendant's counsel under privilege law. Counsel for LaPlant as well as LaPlant in her affidavit say representation began with the instant case and not the Noonan case. Counsel for LaPlant says the privilege extends to those calling counsel in anticipation of retention and/or becoming a class member in another case.

None of this discovery data would constitute constructive participation in the **Noonan** case or constructive knowledge of a final ruling on class

48

certification. Above all that, however, is the fact that no final ruling was ever made on a Wisconsin-only class certification. Preclusion does not act to prevent LaPlant from proceeding in the instant matter. Defendant has not established that preclusion principals impact Plaintiff's ability to prosecute this matter. Unmanageability has not been established by Defendant under preclusion. Conversely, Plaintiff has established that class certification in this matter would not make prosecution of the case unmanageable.

In addition to the foregoing, two other issues need be addressed. One relates to the economic realities in this proposed class certification and the other is raised as a defense to the 1985 action taken by Northwestern's Board in the underlying declaratory judgment action. These are noted as follows:

A.     <u>Did the actions of the regulators provide support for Northwestern's Board when it instituted the dividend change for pre-MN annuities?</u>

It is Defendants position that the New York and Wisconsin regulatory bodies approved the Northwestern Board's action in exercising discretion to modify the method for determining how dividends would be determined for the pre-MN annuities. As a result, it is claimed that Northwestern *"allocated dividends to all of its annuitants from the divisible surplus, and as such complied with Wisconsin Statutes, sections 644.02 an 632.62"*. It is asserted that Northwestern engaged in a complex and difficult process during the

period 1982 through 1986 to better allocate its liabilities for its annuity products and the assets which supported them. The idea of Northwestern was to "segment" the assets that support the annuity products by means of a safe and separate bond fund. In turn, the bond fund would support the annuity dividends.

The objective was to have the investment returns from the bond fund be used to provide dividends for annuity policies. This would be a change from the use of Northwestern's total divisible surplus as the supporting vehicle for annuity dividends. This made good sense to Northwestern's Board and its management. Such market adaptations are a part of a corporations on-going product review. Corporations routinely scrutinize and fine tune their business models in light of changes and developments in the marketplace. The right of the corporation to engage in studies of its businesses and to change its approach regarding how it wants to do business is not really at issue in this case. The core conflict relates to the corporations ability to modify unilaterally and retroactively its existing contracts (given the language of those contracts) with some or all of its pre-MN annuity customers at the time it instituted the new annuity business model. Defendant asserts a right to engage in this conduct under 2 separate theories. These are claimed under Northwestern's argument at page 6 et al of its brief that contends that

50

Plaintiff mischaracterizes the Board's 1985 Decision.

     A.    Business discretion is vested in its Board independent of the existing pre-MN annuity contracts and this discretion includes the right to modify existing annuity contracts as it develops and implements a new annuity business model.

     B.    Approval of the 1985 modifications of annuity policies by 2 regulatory bodies is noted in support of the Board's proper exercise of discretion.

There is not a dispute regarding how Northwestern may chose to engage in its life insurance and annuity business. What is in dispute is whether Northwestern may unilaterally and retroactively modify existing pre-MN annuity contracts because of a decision by its Board and management that the new annuity business model is superior to the old annuity business model. The language of the pre-MN annuity contracts appears not to allow either party to modify the agreement unilaterally. In addition, agents of either party are not allowed to modify the pre-MN annuity contracts.

The law submitted by Defendant does not go to the matter of Northwestern's right to unilaterally and retroactively change existing contracts because it has developed a better "mousetrap model" for annuity contracts. The language and reasonable inferences in the pre-MN annuity contracts appears clear and unambiguous regarding unilateral and retroactive modification. As a result, the intent of the parties on that issue can be

discerned under a meeting of the minds analysis. Nothing Defendant has presented would validate its claim that its Board, acting on the recommendation of management and having thereafter received regulatory approval, has a legal right to unilaterally and retroactively modify existing pre-MN annuity contracts (as opposed to new annuity contracts) such that class certification should be denied. It is noted that Northwestern makes this argument in the context of responding to a motion for class certification. That the Northwestern Board has a right to analyze, discuss, review and ultimately develop a new business model for its annuity products does not in any way impact on the legal contractual right of Defendant to unilaterally utilize that new annuity business model on annuity policies that were in existence before the new business model came into being.

Northwestern has presented a number of exhibits dealing with its annuity change under segmenting that relate to its communications with regulators, agents and the media in the 1984- 1985 period. These are:

1. Exhibit "J". In this letter Associate Actuary Fisher writes to the New York State Insurance Department. He discusses the new segmenting business model and, as to the pre-MN annuities states:

> *"We hope to obtain your <u>temporary approval</u> of our approach as soon as possible." (Underlining added.)*

…

5 2

> *"Our plans for communicating this change for the in-force business are as follows. The November 1, 1984 dividend information release to agents and press release picked up by newspapers would mention the interest factor for the 1985 scale and would mention the restructuring of the investment account for annuities to make 1986 and subsequent scales more current. The 1984 annual report published in spring 1985 would again mention the change. Finally, a stuffer enclosed with dividend notices on 1985 anniversaries for annuity policyholders would explain the dividend interest rate for the policy year just completed and mention that the rate for the upcoming year will be a more current rate which will reflect shorter-term investments."*

2.  Exhibit "K". This is a letter dated 27 December 1984 from the State of New York Insurance Department to Northwestern (Mr. Fisher) regarding approval of the request for use of the new business model.

> *"Relying on the comments made in your letter of October 26[th] we are approving your submission with respect to your identification of assets, for segmentation purposes only, as appropriate for Flexible and Single Premium Deferred Annuities as separate from all remaining assets."*

3.  Exhibit "L". This is a letter of 26 October 1984 from Northwestern (Mr. Fisher) to the New York State Insurance Department. It discusses the proposed new business model Northwestern wishes to implement and the actions Northwestern will take to provide certain assurances as to safety.

4.  Exhibit "M". This is a letter of 11 September 1984 from Northwestern (Mr. Fisher) to the State of Wisconsin Insurance Department. It seeks a "reaction" to the proposed new annuity business model. As to the pre-MN annuities the letter states:

*53*

> *"The second part of our plan has to do with in-force
> business. As I stated before, this business is front-end
> loaded dividend-paying business. We would like to put
> the dividend interest rate on a consistent basis with the
> new contracts to avoid any internal replacement now or
> in the future. To accomplish that, we would like to
> identify a portfolio of assets for this block and invest it
> consistently, I.e., one to three years. As of June 30, 1984
> the amount would be about $358 million. We would like
> to accomplish this portion of the project as soon as
> possible, perhaps by November 1, 1984. These assets
> would also serve as the "seed money" for sales under the
> new contracts."*

5.      Exhibit "N". This is a letter from Northwestern (Mr. Fisher) to
        the State of Wisconsin Insurance Department which is dated 12
        October 1984. It is a follow-up to a meeting involving
        Northwestern and the State of Wisconsin Insurance Department
        on 19 September 1984. In this letter Mr. Fisher gives the State
        of Wisconsin Insurance Department certain assurances regarding
        the safety of the new annuity business plan. The assurances are
        similar to those given the New York State Insurance Department.

6.      Exhibit "P". This is an Information Release regarding MN
        series annuities made to all Northwestern agents in February
        1985. As to "In Force FPA's and SPRA's the release states:

> *"In-force FPA's and SPRA's will be unaffected except for
> the dividend interest rate in future years. The 1985
> Dividend Scale interest rate for annuities is 11.15%.
> Over the next 5 years, the investment basis will grade
> into the basis for the new product, which will be a newly
> established annuity investment portfolio emphasizing
> current yield. Thus, in-force policies will be consistent
> with new policies in the future but will actually carry an
> advantage temporarily due to the higher portfolio rate.
> For that reason, it is not possible to replace accumulated
> values in an in-force annuity with a new policy."*

54

No directive is given in this release for agents to discuss these changes with the policyholders.

7.      Exhibit "Q".  This is an information release dated 1 November 1985.  In this release Northwestern notes that the 1986 dividend scale interest rate for MM and prior series Flexible Premium Annuities, Single Premium Retirement Annuities and Retirement Annuities will be 11%.  It also states that:

> *"The dividend interest rate for non-borrowed cash values has been reduced by 0.15% for MM and prior series deferred annuities, reflecting a shift to investments with shorter maturities.  This investment strategy is consistent with that underlying the new current rate MN FPA and SPRA contracts.  The dividend interest rate for deferred annuities will reflect the investment experience of a portfolio designed to be appropriate for interest sensitive products.  This shift in strategy will be made gradually over the next 5 years."*

A review of these exhibits raises doubt in the court's mind regarding the entire subject of the regulatory approvals.

1.      No permanent approval was ever sought by Northwestern regarding the implementation of its new business model.  Words mean what they say.  Northwestern sought only a <u>temporary approval</u> from the New York State Insurance Department with respect to its use of a new business model for its annuity products.  The alleged approval of the State of New York Insurance Department is, at most, a temporary approval.  That in turn leads to the question of how long a period is at issue.  Is it for 25 years or is it for only a day or a week or a month.  The State of New York Insurance Department is limited in its consideration of Northwestern's request by the language used in the request.  Any ambiguity is held against the drafter of the requesting documents.  Also, under what authority does a Supervising Actuary in the Life Insurance and Companies Bureau bind the State of New York Insurance Department?  The

55

letter from Mr. Leonard H. McVity of 27 December 1984, notes that Mr. James P. Corcoran is the Superintendent of Insurance for the State of New York Insurance Department. The issue of authority to approve is further complicated by Northwestern's use of an "Associate" Actuary to seek and negotiate approval for a matter involving hundreds of millions of dollars in annuity policies and impacting billions of dollars for life policyholders. Why wasn't a formal agreement used that was presented and vetted by the regulator and Northwestern's counsel? Or did that in fact occur? Who is Mr. McVity that he can grant approval on a matter involving hundreds of millions of dollars. When his letter of 27 December 1984, says "... *we are approving your submission...*", who is the <u>we</u> that is being referred to? Is it Mr. McVity's Bureau or is it the New York State Insurance Department? Ambiguity exists regarding the claimed New York regulatory approval and the submission made by Northwestern. How did the temporary approval request get changed to a permanent approval? How does an Assistant Chief Actuary from the New York State Insurance Department get to approve either a temporary or a permanent change in Northwestern's annuity products?

2.  Northwestern made an effort to have regulators approve its new business model for its annuity products. This included merging its pre-MN annuities into the new product base so as to ultimately accomplish segmenting. This effort did not include presenting a proposal in a single document. The contents of its "proposal" to regulators, under the evidence presented, was both oral ( 2 meetings in June 1984 and another on 25 September 1984) and written (in the Northwestern letters of 13 August 1984 and 26 October 1984).

3.  The New York State Insurance Department approved the Northwestern proposal only with respect to the identification of assets for segmentation purposes so as to allow annuity products/business to be separated from all remaining assets of Northwestern. This was done in an ambiguous, unclear, imprecise and brief 4-line, one-sentence statement. What submission (oral, written or both) is being referred to? There are

*56*

letters touching on disparate matters and a number of oral statement that are not memorialized in this record. What were those oral statements? It is not clear what was being approved. The matters at issue involved hundreds on millions of dollars. No single cohesive document is presented for action by the regulator. Why were matters so imprecisely dealt with? Does the regulator's statement concern both the new annuities and the pre-MN annuities? Northwestern had the ability in 1984 and thereafter to obtain clarification, but it did not. Why? Now it seeks to use this one sentence statement to buttress its claim of regulatory approval for the claimed proper actions of its Board under business discretion. This so-called approval may not be viewed reasonably as a blanket approval for the larger Northwestern request for both segmentation and the request to merge its pre-MN annuity product into the new annuity business model. It reasonably could be viewed as approval for Northwestern to identify new annuity assets for segmentation purposes. No statement is made that Northwestern has the imprimatur of the New York State Insurance Department to modify already existing annuity contracts. To make this as an inference strains the record presented herein. The unclear oral and written proposal by Northwestern and the ambiguous statement of the New York State Insurance Department cannot reasonably stand as the basis for the wholesale modification of existing pre-MN annuity contracts under action by Northwestern's Board. This is so under the existing record herein.

4. The State of Wisconsin Insurance Department gave no regulator written approval in a matter that Northwestern claims involved $358,000,000 of insurance reserves. Oral approval, if it occurred, would not be sufficient under contract law in Wisconsin. Also, what authority did the Director of the Property and Casualty "Rates and Forms" Bureau (underlining and quotes added) have to consider and approve (even orally) the utilization by Northwestern of a new business model involving $358 million dollars at a minimum and perhaps billions of dollars when the impact of the segmenting change is viewed in light of Northwestern's life policies? Why wasn't the actual head of the

*57*

State of Wisconsin Insurance Department the one who would be considering any claim for approval in this matter of substantial consequence? Great weight is accorded actual decisions by Wisconsin agencies due to their recognized expertise. Only final administrative decisions are reviewable. **Pasch v. Wis. Dept. of Revenue, 58 Wis. 2d 346 (1973).** Any enabling statute is strictly construed to preclude the exercise of power not expressly granted. **State Public Intervenor v. DNR, 177 Wis. 2d 666, 671 (Ct. App. 1993).** The record here is devoid of any power possessed by either the State of Wisconsin Insurance Department or the New York State Insurance Department that would include the unilateral and retroactive modification of annuity insurance contracts at the request of only the insurance company. The court is perplexed as to how the head of a rates and forms bureau could make the approval that Northwestern claims and produce the major consequences that followed. Also, why would a property and casualty bureau be involved in considering and approving a new business model for insurance that related to annuities and life insurance? That makes no sense. The record is not clear regarding the authority of this rates and forms bureau in an area that relates to property and casualty insurance, but is supposedly considering life and annuity lines of insurance.

5. Exhibits "P" and "Q" are efforts to notify Northwestern agents and the media of the annuity business model change. No request is made in these exhibits that agents are to notify pre-MN annuity policyholders of the business model change.

6. The record does not disclose as an exhibit any "stuffer" that was enclosed with dividend notices on the 1985 anniversary dates for annuity policyholders that explained the referred to business model change. If there was an agreement with regulators for conditions subsequent to the approval and these conditions (one or more) were not met or complied with, what is the effect on the alleged regulator approval?

7. Why was the representative of Northwestern in this major matter just an associate actuary?

*58*

No law was presented regarding the ability of a regulatory body to authorize the modification of existing annuity contracts at the request of the insurance company as it rolled out a new annuity product model and without any input from the policyholders. This should be distinguished from the regulator's ability to authorize prospective business changes to annuity products under proposals made to it by an insurance company. The record needs to be made clear as to the authority of the property and casualty rates and forms bureau chief in Wisconsin and the assistant chief actuary in New York to grant the approvals that Northwestern claims they made. Northwestern's proposal as to a new annuity business model and the New York State Insurance Department's approval of that proposal appear ambiguous. Reasonable persons could differ as to the meaning of each. In addition, the court has concerns regarding the underlying authority of a supervising actuary to bind the New York State Insurance Department. A similar concern exists regarding a person who addresses property and casualty matters and who is in a rates and forms bureau to bind the State of Wisconsin Insurance Department. Finally, why was Northwestern's representative for this proposal just an associate actuary? These last cautionary comments are made in a motion regarding class certification.

59

App. 163

Perhaps clarification will occur as the case progresses.

B.    Do the economic realities of the case augur for or against a
      class action?

**Cruz, supra.,** addresses the concept of "economic realities" as a factor

to be considered in deciding upon whether or not to certify a class action.  In

addressing this point the court considers the following data in the record:

1.    There are potentially somewhere between a low of 600 to
      1,000 (Defendant's numbers) and 3600 (Plaintiff's
      number) individual pre-MN annuity claims.

2.    Individual trials will take from 1 to 2 days (Defendant's
      numbers) to 1 to 2 weeks (Plaintiff's numbers).

3.    From statements made by counsel at the Hearing in Court
      on 10 October 2009, information was provided on the
      economic realities of this case.  Trial preparation by
      counsel will involve motions, depositions, document and
      other discovery, as well as the retention of expert
      witnesses.  Pro se litigation for the claimants is not
      reasonable.  Defendant does not have a cost estimate, but
      Plaintiff suggest that each claimant's counsel will have to
      spend hundreds of hours with a likely cost in the six
      figures.

4.    The costs for each claimant will be onerous and
      significant in order to have his or her matter resolved
      Individually.

5.    The court time and resources involved in adjudicating
      each Wisconsin claim will be significant.

It would be tremendously burdensome in an economic sense for from 600 to

3600 pre-MN annuity disputes to be resolved totally by separate lawsuits.  In

_60_

App. 164

this case judicial economy favors certification of the proposed class. The burdens noted above would likely lead to many plaintiff citizens not being able to utilize their courts for the fair and just resolution of the dispute. It is the public policy of this state going back to 1848 to allow our citizens to have full access to their courts in the resolution of disputes. After the declaratory judgment rulings are made, the resolution of any remaining matters (entire case may be resolved if Defendant prevails at trial) will be less time and cost intensive. This factor of the economic realities of the case favors class certification. The benefits of a class action to both sides outweigh the difficulties and costs presented. This would occur by the expedient of bundling hundreds or thousands of pre-MN annuity contract cases into one case for a declaratory judgment regarding the pre-MN annuity contract. In the event that other independent and autonomous issues would still have to be addressed, that task will be materially eased for the parties by having the contact issues already resolved.

## Decision

Plaintiff has met her burden in establishing that class certification should occur. LaPlant has carefully, persuasively and credibly demonstrated that numerosity, commonality, adequacy and manageability exist for the class (including herself) in this case as the lawful predicates to certification.

Plaintiff also has established the competency and experience of the counsel she seeks to represent the proposed class. Conversely, Defendant has not credibly established any of its claimed objections to certification of the class or, as to Plaintiff's standing, hasn't demonstrated any legal impediment to her ability to adequately represent that class. There are also in the record serious and multiple doubts with respect to the claimed approval of the new business model made by two regulatory bodies. When all of the predicate criteria are met, as is the case here, it is in the public interest in Wisconsin to allow certification of the proposed class.

## ORDER

For the reasons stated herein, it is ORDERED that Plaintiff's Motion for Class Certification is granted. In addition, Plaintiff's request for approval of counsel and "of counsel" to represent the class is granted.

Dated this _26_ day of October 2009

Dennis J. Flynn, Reserve Circuit Judge

62

Distribution

Original to:   Court File to Milwaukee County Clerk of Courts
Attn: Ms. Carol Boettger in Chief Judge's Office
1-414-278-4998

Copies to:   Attorney George P. Kersten (for Plaintiff)
Kersten & McKinnon, S.C.
11518 North Port Washington Road
Suite 104
Mequon, WI   53092

Attorney Eric J. Van Vugt (for Defendant)
Quarles & Brady, LLP
411 East Wisconsin Avenue
Milwaukee, WI   53202-4497

63





SEARCH THE SITE                    Log in here

**About Us**      *for* **Members**      **Marketplace**      **News & Publications**      *for* **Public**



WISBAR   >   News & Publications   >   Wisconsin Lawyer   >   Article

*Wisconsin Lawyer*™

THE OFFICIAL PUBLICATION OF THE STATE
BAR OF WISCONSIN

| SEPTEMBER | VOLUME | NUMBER |
| 2011 | 84 | 9 |

ARCHIVE

2013
2012
2011
2010 & Beyond

# Viewpoint: A Call to Reform Wisconsin's Class-Action Statute

Wisconsin's class-action statute is vague and provides insufficient guidance for the state's courts and attorneys. Wisconsin should repeal section 803.08 and adopt some or all of the language of the federal class-action statute, thereby following the lead of the 43 other states that have done so.

**PAUL BENSON, JOE OLSON & BEN KAPLAN**

The language of Wisconsin's 49-word class-action statute, Wis. Stat. section 803.08, has been untouched since it was adopted by supreme court order in 1975. The 1975 language is nearly identical to Wisconsin's first class-action statute from 1898[1] — which was itself a remnant of the 1849 Field Code.[2] Thirty-seven years ago, the Wisconsin Supreme Court found section 803 08 had "intentionally been left in vague language unamended."[3]

In 1973, the State Bar of Wisconsin's Civil Rules Revision Committee advised against updating section 803 08 to conform to the federal statute, Federal Rule of Civil Procedure 23 (hereinafter Rule 23).[4] The committee reasoned that although Rule 23 had been amended and improved seven years earlier, "Wisconsin would be wise not to adopt either version of Rule 23 until more experience is gained in other jurisdictions."[5]

In the 38 years since that suggestion was made, federal law has developed, Rule 23 has undergone several refinements, and no fewer than 43 states have drafted or amended their class-action statutes to align with Rule 23.[6] It is time for Wisconsin to become number 44.

**Section 803.08's Plain Language**

Section 803.08 reads, in its entirety, as follows: "When the question before the court is one of a common or general interest of many persons or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole." Two potential requirements for class certification are explicitly mentioned: commonality and numerosity. Those requirements are stated in the disjunctive ("or") rather than the conjunctive ("and"). This suggests that a Wisconsin circuit court judge could properly certify a class based on either commonality or numerosity alone. Most Wisconsin courts, however, ignore the plain language of the statute and interpret it conjunctively to require both commonality and numerosity for a class to be certified.[7]



The plain language of section 803 08 does not include some of Rule 23's requirements. These include the concepts of adequacy of the class representative and superiority, meaning that handling the cases as a class action must be superior to handling the cases individually. It also is silent on

HIGHLIGHTS

Unique Issues in Healthcare,
Labor and Employment

Regulating Off-Duty Conduct:
Social Media, Use of Lawful
Products, and Employee Rights
*Away From* the Workplace

Public Records, Open Meetings
Update

Eighth Annual Door County
Intellectual Property Academy

Prepare your clients for court or
depositions with Law Office
Videos.

NEWS & PUBS SEARCH

SEARCH

**App. 168**

outweigh the individual issues involved.[8]

A staple of statutory interpretation is that courts begin with the statute's text. If the language is plain and unambiguous, the inquiry ends.[9] Because of the sparse language of section 803.08, however, opinions in which the courts attempted to interpret it as written are few and far between, and those that have done so often are unhelpful. In *Mercury Records Productions Inc. v. Economic Consultants Inc.*, the court of appeals complained, "there is no case or statutory law in Wisconsin governing the procedural aspects of class action suits.    There has been no real guidance given by our Supreme Court in the area of state procedural requirements for class actions."[10] Unfortunately, this statement remains true today.

### Supreme Court Efforts to Interpret Section 803.08

The Wisconsin Supreme Court has not published an opinion truly analyzing section 803.08 since 1978.[11] These early decisions, while helpful, only go so far. Among other things, they show the court struggling to add to the statute elements – found nowhere in its text – to make it more robust. The reasoning supporting these early cases was quite varied, as the court attempted to apply the scanty statutory language.

*Schlosser v. Allis-Chalmers Corp. (Schlosser I).* In 1974, the Wisconsin Supreme Court evaluated whether former Allis-Chalmers employees could bring suit as a class against their former employer, the defendant corporation. After determining that plaintiffs need not satisfy joinder requirements to bring a class-action suit, the court analyzed the plaintiffs' class-certification claim.[12] Recognizing that Wisconsin's governing statute was intentionally left vague, the *Schlosser I* court found three prerequisites to certification: a community of interests, adequate representation, and numerousness.[13] Also, although not explicitly separating it from the three recognized class-action criteria, the court gave credence to the concept of manageability: "[T]he court must determine whether the advantages of disposing of the entire controversy in one proceeding are outweighed by the difficulties of combining divergent issues and persons."[14] Ultimately, the plaintiffs were permitted to join as a class.

*Browne v. Milwaukee Board of School Directors.* A year after *Schlosser I*, the Wisconsin Supreme Court heard an appeal to class certification of employees of the Milwaukee Board of School Directors, who brought the action to challenge a portion of the Municipal Employment Relations Act.[15] In rejecting the defendants' appeal, the *Browne* court held the community-of-interest requirement demands that all members of the purported class desire the same outcome of the suit as do their alleged representatives.[16] This evaluation merged *Schlosser I*'s separate requirements of a community of interests and adequate representation. The court also relied on a 1960 Wisconsin Supreme Court case, *Pipkorn v. Brown Deer*, which referenced the typicality and adequate-representation elements by relying on the general discussion of class actions found in the treatise, *American Jurisprudence*.[17]

*Nolte v. Michels Pipeline Construction Inc.* The three *Schlosser I* criteria were reaffirmed by the Wisconsin Supreme Court in 1978 in *Nolte*.[18] *Nolte* is significant because the court clearly accepted *Schlosser I*'s manageability criterion. The concept of manageability requires the court to decide whether the benefits of the plaintiffs proceeding as a class outweigh the "inherent difficulties, so as to justify maintaining" a class-action suit. The court saw this determination as a weighing of convenience and efficiency on one hand versus accuracy and fairness on the other. The court asked whether the class-action suit will settle all the issues involved or whether the parties will need to maintain individual actions afterwards. This determination was left to the sole discretion of the circuit court.[19]

Although this is an effective and common-sense element of a class-certification evaluation, it is nowhere to be found in the statute. The court clearly was struggling with the minimal statutory language. The *Nolte* court cited two 1960 supreme court cases, *Lozoff*[20] and *Pipkorn*,[21] along with *Schlosser I*.[22] The two 1960 cases, however, discuss the circuit court's discretion in determining *numerosity*, not *manageability*. And as mentioned above, although *Schlosser I* does evaluate manageability as a prerequisite to certification, the opinion does not cite binding Wisconsin authority but does cite Zechariah Chafee's 1950 book, *Some Problems of Equity*.[23] The court made significant progress, albeit with shaky support.

The *Nolte* court ultimately concluded certification was inappropriate in situations in which the members of the purported class suffer both different amounts and different types of injury.[24]



**Paul Benson**, *Minnesota 1990, is chair of the product and tort liability litigation focus group, leader of the agribusiness, food and beverage industry team, and a*

*member of the class action/multi-district litigation*

*team of Michael Best &*

*Goebel v. First Federal Savings & Loan Association.* Only one day after releasing its opinion in *Nolte*, the supreme court heard oral arguments in an appeal to the class certification of a group of mortgagors.[25] In evaluating whether the class was improperly certified, the *Goebel* court focused on the commonality and adequate-representation requirements. The court

found commonality requires only "a community of interest among [the class members] in the questions

of law and fact involved in the general controversy or in

*Friedrich. He has litigated matters involving products liability and personal injury, general commercial law, toxic torts, and insurance.*



*Joe Olson, U.W. 2003, is a trial attorney, a partner in the firm's litigation practice group, and a member of the firm's class action/multi-district litigation team. He practices primarily in the areas of constitutional law, class-action defense, products-liability defense, employee benefits, and complex commercial-litigation matters.*



*Ben Kaplan, Minnesota 2010, is an associate and a member of the firm's litigation practice group. He maintains an active commercial-litigation practice, including commercial torts, products liability, and contract disputes.*

the kind and form of relief demanded and obtained by or against each individual member of the numerous body."[26] This appears to be inconsistent with the language of the Rule 23 commonality provision, which requires that class actions have "questions of law or fact common to the class." There is no mention of commonality of relief sought being a possible substitute for commonality of issues at play or alleged injuries suffered.[27]

The *Goebel* court concluded by determining that the balancing process favored certification of the class, and that there was no question that "all the members of the purported class desire the same outcome of the suit that their alleged representatives desire."[28]

***Schlosser v. Allis-Chalmers Corp. (Schlosser II).*** After hearing *Schlosser I* and permitting the plaintiffs to proceed as a class, the supreme court again heard an appeal in this case, this time from an interlocutory summary judgment finding the defendant liable to the plaintiffs.[29] The *Schlosser II* court reiterated the class-certification criteria from *Schlosser I* – commonality, numerosity, and adequate representation – and held that the decision "whether the action may proceed as a class suit is addressed to the trial court's discretion. It involves a weighing of the benefits to be gained from disposing of the entire controversy in one proceeding against the difficulties inherent in a single action."[30] Later in its analysis, the *Schlosser II* court discussed the propriety of a class constructed on an "opt-out" basis as opposed to an "opt-in" basis. The court upheld the "opt-out" scheme, as "expressly prescribed by [Rule 23]."[31]

**Subsequent Efforts to Interpret Section 803.08**

An ever-increasing class-action docket has required the Wisconsin Court of Appeals to further develop the section 803.08 analysis over the past three-and-a-half decades. Perhaps not coincidentally, the court has reached toward federal law and begun to follow the more developed and nuanced Rule 23 jurisprudence.[32]

In 1989, the court of appeals stated in *Sisters of St. Mary v. AAER Sprayed Insulation*[33] that class certification required the three then-regularly applied section 803.08 elements and also required manageability, with near-full discretion given to the circuit court.[34] In *Sisters*, however, the court supported its manageability holding by citing not to Wisconsin precedent but to a Fourth Circuit case interpreting Rule 23.[35] Although the concept of manageability had been a part of Wisconsin case law for at least a decade at that point, the *Sisters* court asked, "Is the proposed class action manageable? This is the same question federal courts are faced with" under Rule 23.[36] Further, the court of appeals supported its holding that manageability determinations fall within the circuit court's broad discretion, a well-developed component of section 803.08, by citing not to a Wisconsin case but to a Third Circuit opinion.[37]

Similarly, in *Cruz v. All Saints Healthcare System Inc.*, the court of appeals analyzed the adequacy-of-representation requirement for certification.[38] Although the court was evaluating an element discussed in *Nolte* and *Browne*, it found more persuasive an 11th Circuit opinion using a two-factor test: 1) whether plaintiffs or counsel have interests antagonistic to absent class members, and 2) whether class counsel are generally able and qualified to conduct the proposed litigation.[39] In this way, *Sisters* and *Cruz* demonstrate the modern judicial mindset of seeking direction from federal authority, not only when the issue is not addressed in Wisconsin precedent but also when the federal law is more clearly developed.

That is not to say appellate courts have completely abandoned or ignored state standards. In 2006, the court of appeals stated in *Noonan* that it "rel[ied] on Wisconsin case law" regarding deference to the circuit court on manageability determinations,[40] but that is the same area in which *Sisters* relied on federal law. Later in that opinion, the *Noonan* court stated that because manageability is primarily a factual determination that mirrors Rule 23 evaluation, the circuit court "correctly relied for guidance on federal cases discussing class certification."[41]

Arguably, these court of appeals decisions relying on federal statutes and case law are of uncertain precedential value. As an error-correcting body, the Wisconsin court of appeals "does not have [a] law-developing or law-declaring function."[42] Inserting federal standards into section 803.08 could be termed by some as "law-developing," thereby placing these decisions outside the purview of an error-correcting court. Thus, Wisconsin's class-action jurisprudence is muddled indeed.

**Proposal  Formally Adopt Rule 23 as Wisconsin's Class Action Statute**

The current judicial trend appears to be a piece-by-piece incorporation of Rule 23 standards into

section 803 08. That being the case, Wisconsin should simply overhaul section 803 08 to follow its federal counterpart.

The advantages of importing the federal rule into the Wisconsin statutes is readily apparent: circuit courts would have a much wider, more refined body of precedent as guidance; certification considerations would become more uniform; questions of what jurisprudence was controlling would be clarified; and parties could predict with greater accuracy the merits of their litigation, potentially lowering the costs involved in the litigation for both the parties involved and the judiciary.

Rule 23 should be imported in full. However, if in the process of political compromise there is a desire to maintain aspects of Wisconsin's class-action jurisprudence, that can easily be accomplished. This should not be an impediment to the overhaul but simply a point of negotiation. In fact, of the 43 state statutes based on Rule 23, only a few adopted every provision of the federal rule. If, for example, the Wisconsin legislature wants circuit courts to have greater deference in determining manageability, it may decide to include that in the language of the new statute. There is no requirement that Rule 23 be adopted in its entirety, and the desire to avoid such absolute adherence should not prevent implementation of the majority of Rule 23.

Some may ask, given that Rule 23 is so often looked to for guidance, why should Wisconsin bother updating its statute? Will this change have much impact? The answer is that an obvious and foreseeable problem remains. Circuit court judges apply different standards in their interpretation and application of the statute and are forced to continually look beyond Wisconsin case law and the plain language of the statute for guidance. Compounding this problem is Wisconsin's grant of "sole discretion" to circuit courts for manageability evaluations, a threshold determination in class certification. Forum shopping and inconsistent intrastate results could very well be the result.

### Conclusion

Class actions are a different animal today than in 1975 and vastly different from when the statutory language of section 803.08 originated. Judges face a dearth of guidance, attorneys face substantial uncertainty, and courts produce inter- and intra-district discrepancies that are justifiable under the current law. It is time to act, by adopting Rule 23 as the class-action law of Wisconsin.

### Endnotes

[1] Wis. Stat. § 2604 (1898).

[2] Adolf Homburger, *State Class Actions and the Federal Rule*, 71 Colum. L. Rev. 609, 612 (1971).

[3] *Schlosser v. Allis-Chalmers Corp.*, 65 Wis. 2d 153, 168, 222 N.W 2d 156 (1974) (*Schlosser I*).

[4] State Bar Civil Rules Revision Committee, Wisconsin Judicial Council, Minutes from May 4, 1973.

[5] *Id.*

[6] American Bar Ass'n, Survey of State Class Action Law, A Report of the State Laws Subcommittee of the Class Actions and Derivative Suits Committee (2010).

[7] *See, e.g., Mercury Records Prods. Inc. v. Economic Consultants Inc.*, 91 Wis. 2d 482, 283 N.W.2d 613 (Ct. App. 1979).

[8] Fed. R. Civ. P. 23(b)(3).

[9] *State v. Doss*, 2008 WI 93, ¶ 30, 312 Wis. 2d 570, 754 N.W.2d 150 (internal citations omitted).

[10] *Mercury Records*, 91 Wis. 2d at 490-91.

[11] This is not intended to in any way be a criticism of the Wisconsin Supreme Court. In 1978, the court heard *Goebel, Nolte*, and *Schlosser II*. Since then, it has heard many cases relating to class-action lawsuits, but none focusing on the statute's interpretation and application for class certification. It may very well be that the Wisconsin Supreme Court simply has not been presented with the right opportunity to add to its prior teachings on this subject.

[12] *Schlosser I*, 65 Wis. 2d at 168.

[13] *Id.* at 168-69.

[14] *Id.* at 172 (citing Chafee, *Some Problems of Equity*, 193).

[15] *Browne v. Milwaukee Bd. of Sch. Directors*, 69 Wis. 2d 169, 171, 230 N.W 2d 704 (1975).

[16] *Id.* at 181 (citing *Pipkorn v. Brown Deer*, 9 Wis. 2d 571, 577, 101 N.W.2d 623 (1960)).

[17] *Pipkorn*, 9 Wis. 2d at 577 (citing 39 Am. Jur., Parties 919, 921, 922, §§ 45, 47, 48).

[18] *Nolte v. Michels Pipeline Constr. Inc.*, 83 Wis. 2d 171, 176, 265 N.W 2d 482 (1978): "(1)The named parties must have a right or interest in common with the persons represented; (2) the named parties must fairly represent the interest or right involved so that the issue may be fairly and honestly tried; and (3) it must be impracticable to bring all interested persons before the court" (citing *Schlosser I*, 65 Wis. 2d at 169) (other citations omitted).

*Id.* at 177.

20 *Lozoff v. Kaisershot*, 11 Wis. 2d 485, 488-89, 105 N.W.2d 783 (1960).

21 *Pipkorn*, 9 Wis. 2d at 578-79.

22 *Nolte*, 83 Wis. 2d at 177 (citing *Schlosser I*).

23 *Schlosser I*, 65 Wis. 2d at 172.

24 *Nolte*, 83 Wis. 2d at 178-79.

25 *Goebel v. First Fed. Savings & Loan Ass'n*, 83 Wis. 2d 668, 670, 266 N.W.2d 352 (1978).

26 *Id.* at 684 (citing *Nolte*) (internal citations omitted).

27 *See Hassine v. Jeffes*, 846 F 2d 169, 176-77 (3d Cir. 1988).

28 *Goebel*, 83 Wis. 2d at 684.

29 *Schlosser v. Allis-Chalmers Corp.*, 86 Wis. 2d 226, 230, 271 N.W.2d 879 (1978) (*Schlosser II*).

30 *Id.* at 233-34 (citing *Schlosser I* and *Nolte*).

31 *Id.* at 243.

32 In the last decade, Wisconsin courts have also heard *Hermanson v. Wal-Mart Stores Inc.*, 2006 WI App 36, 290 Wis. 2d 225, 711 N.W 2d 694, and *Tietsworth v. Harley-Davidson Inc.*, 2003 WI App 75, 261 Wis. 2d 755, 661 N.W 2d 450 (and accompanying line of cases). These cases, although significant in their own right, do not significantly add to the class-action analysis conversation and therefore are not discussed in this article.

33 *Sisters of St. Mary v. AAER Sprayed Insulation*, 151 Wis. 2d 708, 445 N.W.2d 723 (Ct. App. 1989).

34 *Id.* at 713-14.

35 *Id.* at 721 (citing *Windham v. American Brands Inc.*, 565 F 2d 59, 68 (4th Cir. 1977)). The *Windham* court stated that a key manageability determination is whether the differences between individuals trying to bring a class action can be determined "mechanical[l]y" or if they will require numerous "mini-trials."

36 *Id.* at 714.

37 *Id.* at 714-17 (citing *Link v. Mercedes-Benz of N. Am. Inc.*, 550 F.2d 860, 864 (3d Cir. 1977)).

38 *Cruz v. All Saints Healthcare Sys. Inc.* 2001 WI App 67, 242 Wis. 2d 432, 625 N.W.2d 344.

39 *Id.* ¶ 18 (citing *Griffin v. Carlin*, 755 F 2d 1516, 1533 (11th Cir. 1985)). *Cruz* then held the second prong of that test required a representative to simply have a general understanding of the nature of the class claims alleged, citing Andrew P. Campbell, *Class Actions: A Primer*, 20 Am. J. Trial Advoc. 305, 310 (1997).

40 *Noonan v. Northwestern Mut. Life Ins. Co.*, No. 2005AP1683, 2006 WL 3314622, ¶ 6 (Wis. Ct. App. Nov. 16, 2006) (unpublished decision) (discussing the standard of review to examine a circuit court's manageability determination).

41 *Id.* ¶ 21 n.16.

42 *State v. Schumacher*, 144 Wis. 2d 388, 407, 424 N.W.2d 672 (WI 1988) (internal citations omitted).

Advertise With Us | Legal | Copyright © 2013



S T A T E  B A R  OF  W I S C O N S I N

View Full Site Map