# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

MARLEEN M. LAPLANT, on her own behalf

and on behalf of a class similarly situated,


Plaintiffs,


v.                                                    Case No. 2:11-CV-00910


THE NORTHWESTERN MUTUAL

LIFE INSURANCE COMPANY, a

Wisconsin mutual insurance corporation,


Defendant.

---

## APPENDIX TO MEMORANDUM IN SUPPORT OF

## NORTHWESTERN MUTUAL'S MOTION TO DECERTIFY WISCONSIN

## ONLY CLASS CERTIFIED UNDER WISCONSIN RULES

### Volume II of II

### Items 6 - 18

### Pages 173 - 319

---

## Index to Northwestern Mutual's Appendix

| Item # | Document | Date | Page | Vol. |
|---|---|---|---|---|
| 1 | Michael J. Moore Expert Report | June 28, 2013 | 1 | I |
| 2 | Affidavit of Nicholas J. Sales | June 28, 2013 | 80 | I |
| 3 | LaPlant, Complaint and Jury Demand | Aug. 26, 2008 | 82 | I |
| 4 | LaPlant, Decision and Order on Motion of Plaintiff for Class Certification | Oct. 26, 2009 | 105 | I |
| 5 | Paul Benson *et al.*, A Call to Reform Wisconsin's Class-Action Statute, 84 Wisconsin Lawyer 9 | Sept. 2011 | 168 | I |
| 6 | Robert L. Hoyer Deposition | May 17, 2013 | 173 | II |
| 7 | Ravi Dhar Expert Report | July 01, 2013 | 179 | II |
| 8 | Marleen LaPlant Deposition Transcript | Sept. 09, 2009 | 212 | II |
| 9 | LaPlant Policy | May 1, 1975 | 240 | II |
| 10 | LaPlant Surrender ( Annuity Distribution Request) | July 7, 2008 | 253 | II |
| 11 | Merriam Webster Collegiate Dictionary 10th Edition | 1996 | 257 | II |
| 12 | Blacks Law Dict 7th | 1999 | 261 | II |
| 13 | Noonan v. Northwestern Mutual Life Ins. Co., 726 N.W.2d 356 (Wis. Ct. App. 2006) | Nov. 16, 2006 | 264 | II |
| 14 | Noonan v. Northwestern Mutual Life Ins. Co., 2005 WL 6216361 (Wis.Cir. July 6, 2005) | July 6, 2005 | 272 | II |
| 15 | Thao v. Midland Nat. Life Ins. Co., 2012 WL 1900114 (E.D. Wis. May 24, 2012) | May 24, 2012 | 276 | II |
| 16 | Robert L. Hoyer Expert Report | Mar. 4, 2013 | 284 | II |
| 17 | *American Express Co. et al. v. Italian Colors Rest. et al.*, __ S. Ct. __, 2013 WL 3064410, No. 12-133 (June 20, 2013) | June 20, 2013 | 289 | II |
| 18 | *Boelk v. AT & T Teleholdings, Inc.*, 12-CV-40-bbc, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013) | Jan. 10, 2013 | 307 | II |

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF WISCONSIN

 3      ------------------------------------------------------------

 4      MARLEEN M. LAPLANT, on her own behalf
        and on behalf of a class similarly situated,
 5
                       Plaintiffs,
 6
               vs.                          Case No. 2:11-CV-00910
 7
        THE NORTHWESTERN MUTUAL
 8      LIFE INSURANCE COMPANY, a
        Wisconsin Mutual Insurance Corporation,
 9
                       Defendant.
10
        ------------------------------------------------------------
11

12

13          VIDEOTAPED DEPOSITION OF ROBERT L. HOYER

14                   Friday, May 17th, 2013

15                        9:00 a.m.

16                           at

17                   QUARLES & BRADY, LLP
                    411 East Wisconsin Avenue
18                     Milwaukee, Wisconsin

19
             Reported by Carla J. Miller, RPR, CRR
20

21

22

23

24

25
```

1                    Videotaped Deposition of ROBERT L. HOYER, a

2          witness in the above-entitled action, taken at the

3          instance of the Defendants, pursuant to the rules of

4          Federal Civil Procedure, pursuant to Notice of

5          Deposition, before Carla J. Miller, Registered

6          Professional Reporter and Certified Realtime

7          Reporter, in and for the State of Wisconsin, at

8          QUARLES & BRADY, LLP, 411 East Wisconsin Avenue,

9          Milwaukee, Wisconsin, on the 17th day of May, 2013,

10         commencing at 9:00 a.m. and concluding at 3:58 p.m.

11

12    A P P E A R A N C E S:

13              KERSTEN & McKINNON, S.C., by
                    MR. GEORGE P. KERSTEN and
14                  E. CAMPION KERSTEN
                    11518 North Port Washington Road, Suite 104
15                  Mequon, Wisconsin, 53092
                    Appeared on behalf of the Plaintiffs
16
                BARTLIT BECK HERMAN PALENCHAR & SCOTT, by
17                  MR. SEAN C. GRIMSLEY and MR. ADAM HOEFLICH
                    1899 Wynkoop Street
18                  Denver, Colorado, 80202
                    Appeared on behalf of the Defendants
19
                NORTHWESTERN MUTUAL, by
20                  MR. RODD SCHNEIDER
                    720 East Wisconsin Avenue
21                  Milwaukee, Wisconsin, 53202

22
      ALSO PRESENT:  Mr. Mark Lyle, Ryker & Lyle Legal
23                  Video Service

24

25

1                        I N D E X

2    EXAMINATION                                    PAGE

3    BY MR. GRIMSLEY                                   5
        MR. KERSTEN                                  212
4        MR. GRIMSLEY                                 212

5


6                    E X H I B I T S

7                        (NONE)

8
     EXHIBIT NO.                          PAGE IDENTIFIED
9
     No. 1 - Hoyer Actuarial Litigation invoice        8
10
     No. 2 - Nathan Associates invoice                10
11
     No. 3 - Hoyer Actuarial Litigation report
12            dated 3/4/13                            14

13   No. 4 - Plaintiffs' Motion for an Order
               Redefining the Class and for          48
14            Related Relief

15   No. 5 - Dividend Interest Rates chart            99

16   No. 6 - Hoyer Actuarial Litigation report
               dated 6/30/10                         122
17
     No. 7 - Trial Exhibit 127 chart                 158
18
     No. 8 - Affidavit of Robert Hoyer               172
19
     No. 9 - Affidavit of Christ Trost               193
20
21               (Exhibits filed with original
22               transcript, copies to counsel.)

23

24

25

```
 1        methodology, is that 2 percent difference immaterial?
 2   A    Yes, that 2 percent, and we have just quantified
 3        exactly which one it is.
 4   Q    Yes.
 5   A    And the reason it's immaterial is because that one
 6        individual, given that situation, we have quantified
 7        no financial difference for those individuals, so the
 8        "but-for" world and this analysis would say that in
 9        that particular deposit for that one individual,
10        there is no financial implication, vis-á-vis,
11        difference.
12   Q    And I just want to be clear:  In the group of
13        putative class members, were there some who
14        surrendered their policies at a particular time such
15        that those individuals were not financially harmed by
16        the 1985 change?
17   A    That is correct.
18   Q    How many people were there that would fit into that
19        category?
20   A    A very small amount.
21             (Deposition Exhibit No. 7 was marked for
22        identification.)
23   BY MR. GRIMSLEY:
24   Q    I'm showing you what is being marked as Deposition
25        Exhibit 7, and this was a trial exhibit from the
```

1  Q   We can also -- And people who surrendered in 1992, if

2      they hadn't put in any additional premiums after

3      1985, would have been 2 percent better off in the

4      actual world than in the "but-for" world; correct?

5  A   That's quite a mouthful.  To the extent that they

6      never made another deposit and to the extent that

7      they terminated at that point, the financial

8      implication would be 2 percent.  I have talked about

9      harm to those individuals which exists irrespective

10     of the 2 percent, but 2 percent in my opinion does

11     not nearly make up for the harm done to them.

12  Q   But from -- Well, have you quantified the harm that

13     was done to them that was other than financial, sir?

14  A   No, that's not a quantifiable value for an actuary to

15     do.

16  Q   Was that something that you were asked to perform as

17     part of your analysis in coming to your opinions in

18     the March 4th, 2013 report?

19  A   I was neither asked to do that nor did I do it.

20  Q   And that would not be something that you would feel

21     you had expertise to quantify; correct?

22  A   I would not attempt to quantify that number, no.

23  Q   But let's go back to this chart then.  Assuming that

24     the people who surrendered in 1992, which were 1,255

25     of them, had not made any premium payments after

1
STATE OF WISCONSIN )
2                    ) SS:
MILWAUKEE COUNTY    )
3

4

5              I, Carla J Miller, Registered

6    Professional Reporter and Notary Public in and for

7    the state of Wisconsin, do hereby certify that I have

8    carefully compared the foregoing pages with my

9    stenographic notes, and that the same is a true and

10   correct transcript.

11             I further certify that I am not a

12   relative or employee or attorney or counsel of any of

13   the parties, or a relative or employee of such

14   attorney or counsel, or financially interested

15   directly or indirectly in said action.

16             Dated at Milwaukee, Wisconsin, on this

17   _____ day of _____, 2013.

18

19             _____
                    Carla J. Miller
20             Registered Professional Reporter
                    Notary Public
21

22

          My commission expires May 15, 2016
23

24

25

MARLEEN M. LAPLANT, on her own
behalf and on behalf of a class similarly
situated,

        Plaintiffs,

  v.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
mutual insurance corporation,

        Defendant.

Case No. 2:11-CV-00910

# EXPERT REPORT OF RAVI DHAR

## July 1, 2013

**Table of Contents**

I.      Qualifications ................................................................................................................ 1

II.     Background ..................................................................................................................... 3

III.    Purpose of the Report ..................................................................................................... 4

IV.     Summary of Opinions ..................................................................................................... 5

V.      Consumer Information Processing and Decision-Making ................................................ 7

VI.     Individualized Analysis is Required to Determine Which Putative Class Members
        Would Have Paid Attention to NM's Communications Regarding the 1985 Change ...... 8

VII.    Individualized Analysis is Required to Determine How Different Putative Class
        Members Would Have Understood the 1985 Change ....................................................... 9

VIII.   Individualized Analysis is Required to Determine What Role, if Any, the 1985 Change
        Would Have Played in Putative Class Members' Evaluation and Their Decision to
        Hold Their Annuities ..................................................................................................... 11

        A.      Consumers Differ in the Factors They Consider When Making Decisions
                Related to Buying and Holding Their Annuities ................................................ 11

        B.      A Change in the Method of Calculating Future Dividends Would Not Have
                Been a Factor for Many Putative Class Members in Their Decision to Hold
                Their Annuities ................................................................................................. 13

IX.     Individualized Analysis is Required to Determine Which Putative Class Members
        Would Have Preferred Dividends Based on the General Portfolio over Dividends
        Based on the Segmented Account .................................................................................. 15

        A.      Putative Class Members Would Have Differed in Their Expectations of Future
                Dividends .......................................................................................................... 16

        B.      Putative Class Members Differed in the Maturity Dates of Their Annuities ....... 17

        C.      Putative Class Members Would Have Differed in Their Discounting of the
                Future ................................................................................................................ 18

        D.      Putative Class Members Would Have Differed in Their Risk Perceptions and
                Risk Preferences ................................................................................................ 19

X.      Conclusions .................................................................................................................. 20

Appendices

A – Curriculum Vitae

B – List of Prior Testimony

C – Materials Relied Upon

D – Data and Methodology

## I. Qualifications

1. My name is Ravi Dhar. I am the George Rogers Clark Professor of Management and Marketing at the Yale School of Management and the Director of the Yale Center for Customer Insights at the School of Management at Yale University in New Haven, Connecticut. I also have an affiliated appointment as a Professor of Psychology at the Department of Psychology, Yale University and serve on the editorial board of leading consumer research journals such as *Journal of Consumer Psychology*, *Journal of Consumer Research*, *Journal of Marketing*, and *Marketing Letters*. I am the current Associate Editor of *Journal of Marketing Research*, the past Area Editor of *Marketing Science*, and the past Associate Editor of *Journal of Consumer Research*.

2. I hold a Ph.D. and M.S. in Business Administration from the University of California at Berkeley. My doctoral dissertation ("Consumer Preference for a No-Choice Option") was in the area of consumer decision making. I have published more than fifty papers in journals, proceedings, and as book chapters, including in the leading marketing, psychology, and management journals, such as the *Harvard Business Review, Journal of Behavioral Decision Making, Journal of Business, Journal of Consumer Psychology, Journal of Consumer Research, Journal of Marketing Research, Journal of Personality and Social Psychology, Management Science, Marketing Science, Organizational Behavior and Human Decision Processes, Sloan Management Review,* and other journals.

3. Several of my publications were also considered for research awards such as the Paul E. Green Award ("The Effect of Forced Choice on Choice," Finalist in 2004) and the William O'Dell Award ("Consumer Choice Between Hedonic and Utilitarian Goods," Winner in 2005; "Making Complementary Choices in Consumption Episodes: Highlighting Versus Balancing," Finalist in 2004; "The Effect of Forced Choice on Choice," Finalist in 2008; "Preference Fluency in Choice," Finalist in 2012). The William O'Dell Award is presented to the best *Journal of Marketing Research* article that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice. The Paul E. Green Award is presented to the *Journal of*

*Marketing Research* article that shows or demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing. I have been awarded the 2012 Distinguished Scientific Accomplishment Award from the Society of Consumer Psychologists, which is given annually to honor a scholar who has made significant and lasting contributions in the field of consumer psychology. A detailed listing of my educational background and publications is set forth in my curriculum vitae, which is attached to the end of this report as Appendix A.

4. My fields of expertise are consumer and customer behavior, consumer psychology, branding, marketing management, and marketing strategy. In my work as a marketing professor and as a consultant to major corporations, I have conducted, supervised, and/or evaluated more than a hundred surveys as well as analyzed questions relating to different aspects of consumer behavior. Most of my research focuses on consumers' decision making—the manner in which consumers acquire and process information when forming product perception and preferences, the effect of product attributes and information presentation on consumer purchase and consumption decisions, and the effect of different marketing mix activities (such as promotions and advertising) on consumer buying decisions.

5. My teaching responsibilities at Yale University's School of Management include two doctoral courses that examine advanced research topics in the area of consumer behavior, judgment, and decision making. I also teach or have taught several different courses for graduate students who are enrolled in the MBA program or the Executive MBA program at Yale: Consumer Behavior, E-Business and Marketing, Marketing Strategy, Marketing Management, Marketing of Financial Services, and Strategic Marketing Leadership. I have also taught and given seminars to mid-level and senior-level executives in more than a dozen countries in North and South America, Asia, and Europe. I have also worked as a consultant or adviser to companies on marketing related issues in different types of industries (e.g., consumer products, high technology, health, and financial services).

6.    I have served as an expert witness on marketing research issues in a variety of litigation matters.  A list of cases in which I have testified as an expert, at trial or by deposition in the preceding four years or more is attached as Appendix B.

## II.    Background

7.    This class action relates to a change in the method of calculating annual dividend payments (the "1985 Change") made by Northwestern Mutual ("NM") on certain annuities.  The annuities at issue (the "pre-MN annuities") are deferred fixed annuities sold on or prior to March 31, 1985, wherein consumers are guaranteed a fixed rate of return in the future for premium payments made until a pre-specified maturity date.  In addition to the fixed guaranteed rate of return, these annuities also provide for the possibility of annual dividends to their owners.  The exact amount of these dividends depends on the performance of an underlying pool of assets and is therefore, variable and not guaranteed.

8.    The 1985 Change refers to a change in the investment basis on which the dividends on pre-MN annuities were calculated.[1]  Before the 1985 Change, the dividends were based on an investment account that was oriented towards long-term investments (the "general portfolio").[2]  After the 1985 Change, plaintiffs allege that dividends were calculated based on a different account that consisted of short-term investments (the "segmented account").[3]

9.    Plaintiffs seek to certify a class (the "putative Class") consisting of "[a]ll persons who (a) purchased a Northwestern Mutual Life Insurance Company Flexible Premium Annuity or Retirement Annuity (or other deferred, fixed annuity) in force and in its deferral period as of March 31, 1985, and (b) did not sign the 1983 Amendment Agreement while residing in a state other than Wisconsin, and their successors in

---

[1] Complaint and Jury Demand, filed August 26, 2008, ¶2.
[2] Complaint and Jury Demand, filed August 26, 2008, ¶2.
[3] Complaint and Jury Demand, filed August 26, 2008, ¶2.

interest. Excluded from the Class are any of NM's officers, trustees and their family members or affiliates."[4]

10. Plaintiffs allege that: (a) NM failed "to disclose the change to owners of the Annuities" through a notice; (b) NM failed "to seek written consent for the change in the basis for determining dividends;" and (c) NM did not have the "right to make the change unilaterally."[5]

### III. Purpose of the Report

11. It follows from plaintiffs' class action claims and allegations, that if NM had sent a notice to or asked for consent from putative Class members for the 1985 Change, all putative Class members would have had a preference to receive dividends on their pre-MN annuities based on the general portfolio over dividends based on the segmented account, and that this preference would have driven their decision to hold their annuities.

12. I have been asked by NM's counsel to analyze, from a consumer behavior perspective, if this is indeed the case, *i.e.,* whether the putative Class members would have responded in a common manner if NM had sent a notice or asked for consent prior to implementing the 1985 Change (hereafter referred to as "the communication from NM"). I have not been asked to determine what exact form a notice from NM would have taken or how NM would have asked for consent from the putative Class members.

13. In forming my opinions, I have reviewed various legal filings and documents in this matter, internal NM documents produced in this litigation, deposition and trial testimony, NM data on annuity and life insurance products, and general industry and academic literature. A complete list of the materials I have relied upon is presented in Appendix C.

---

[4] Plaintiff's Brief In Support of Motion for An Order Redefining the Class and For Related Relief ("plaintiff's brief"), filed March 4, 2013, p. 13.
[5] *See* Complaint and Jury Demand, filed August 26, 2008, ¶15.

14.     I am being compensated by NM for this task at $700 per hour.  I also receive periodic compensation from Cornerstone Research, the firm that provided research assistance to me on this matter and with which I have a longstanding relationship.  It is my understanding that those payments are based generally on my services for and work with that firm, including the level of fees generated on matters in which they provide support to me.  I understand that those payments are in no way based on the content of my opinions or the outcome of any matter.

15.     I reserve the right to supplement my testimony and this report in response to any further information provided by the parties, and/or in light of additional documents or testimony brought forth through the ongoing discovery in this case, at trial, or otherwise, which may be brought to my attention after the date of my signature below.

## IV.     Summary of Opinions

16.     Based upon my review of the data and documents (including deposition and trial transcripts) produced in this case, and my education, background, and professional experience, it is my opinion that the putative Class members would not have responded in a common manner if NM had sent them a notice or asked for their consent regarding the 1985 Change.

17.     First, consumers differ in the levels of attention they pay to communications from financial services companies.  Some putative Class members would not have paid attention to a notice from NM regarding the 1985 Change and, consequently, would have continued to hold their pre-MN annuities and received dividends based on the segmented account.  Without individualized analysis, it is impossible to determine which putative Class members would have paid attention to a notice from NM regarding the 1985 Change.

18.     Second, even if some putative Class members had paid attention to the communication from NM regarding the 1985 Change, they would have differed in their ability to understand and assess what it meant.  As a consequence, some putative Class members would have continued to hold their pre-MN policies and received dividends based on

the segmented account. Identifying who among the putative Class members would have fully understood the 1985 Change requires individualized analysis.

19. Third, even if some putative Class members had paid attention to and fully understood the 1985 Change, the 1985 Change would not necessarily have been a factor in their decision to hold their annuities. Consumers buy and hold annuities for a wide variety of reasons, and the method of calculating dividends may not be a factor in their decision making. Further, the 1985 Change would have required putative Class members to evaluate two methods of calculating future dividends in order to form a judgment as to which of the methods was superior. Because future dividends are variable and not guaranteed, a change in the method of calculating dividends would not have been a factor in many putative Class members' decisions to hold their annuities. Identifying these putative Class members requires individualized analysis.

20. Finally, even if the 1985 Change had been a factor in some putative Class members' evaluation, it is incorrect to assume that all such putative Class members would have had a uniform preference for future dividends based on the general portfolio over dividends based on the segmented account. The future is by definition uncertain, and the putative Class members would have varied in their expectations of future dividends as well as in their risk preferences and time horizons of decision making. Individualized analysis is required to determine which putative Class members would have preferred future dividends based on the general portfolio over dividends based on the segmented account.

21. Thus, putative Class members would have varied in their levels of attention paid to the communication from NM and their understanding of the 1985 Change. They would have also varied in the factors relevant in their decision to hold the pre-MN annuities and their preferences for dividends based on the segmented account. For all these reasons, putative Class members would not have responded in a common manner to the communication from NM regarding the 1985 Change.

**V. Consumer Information Processing and Decision-Making**

22.  In order to understand how putative Class members would have responded to the communication from NM regarding the 1985 Change, it is instructive to first understand how consumers process information and how they make decisions based on that information. According to consumer behavior research, to understand how information might impact consumer behavior, one must consider a sequence of processes. Specifically, for any information to have impact, consumers need to first pay attention to the information, understand that information, decide based on that understanding how it might impact their evaluation, and finally, make a decision given their preferences among various alternative actions.[6]

23.  To illustrate with an example, consider a putative Class member who did not pay attention to NM's notice regarding the 1985 Change. The actions of this putative Class member would not have been affected by the content of the notice. Alternatively, consider a putative Class member who, after receiving and having the ability to understand the notice, evaluates it and decides that he prefers dividends based on the segmented account. This putative Class member would ultimately have received dividends based on the segmented account even if the 1985 Change had been communicated by NM.

24.  In the following sections, I discuss variations in how putative Class members might go through the sequence of processing information in NM's communication regarding the 1985 Change and also the variation in their evaluative response to this communication.

---

[6] For a general discussion of how consumers process information and make decisions, *see*, for example, Assael, H. (2004), "Consumer Behavior: A Strategic Approach," Houghton Mifflin, Chapter 17; Kotler, P. and K. Keller (2012), "Marketing Management: 14E," Prentice Hall, Chapters 6, 17; Pride, W. and O. Ferrell (2012), "Marketing," Cengage Learning, Chapter 7.

**VI. Individualized Analysis is Required to Determine Which Putative Class Members Would Have Paid Attention to NM's Communications Regarding the 1985 Change**

25. Plaintiffs contend that NM should have communicated the 1985 Change to putative Class members prior to implementing it.[7]  It is my opinion that even if the 1985 Change had been communicated, putative Class members would have varied in the amount of attention paid to the communication from NM.

26. Surveys of consumers conducted by industry researchers show that many consumers do not read or pay attention to communications from financial services companies. For example, a 2001 survey by the American Bankers Association showed that 41% of the consumers interviewed did not recall receiving or had not received their bank privacy disclosure, and 22% said they had received but had not read their notices.[8] Similarly, in a 2011 survey conducted by Insured Retirement Institute (IRI), 70% of respondents reported that they never or rarely read the prospectuses of their variable annuities.[9]  An earlier study released in 1979 by the Federal Trade Commission regarding the effectiveness of life insurance cost disclosures also found that "the majority of people did not look at the disclosure materials that were provided."[10]

27. It is also clear from the deposition testimony that putative Class members differ in the levels of attention they paid to various materials they received from NM.  For example, Caroline Meckes, when asked if she reviewed her annual statements said, "I'm sure I read them but I did not pay much attention to them."[11]  Bruce Williams said that he "probably" received annual statements, but he did not recall "looking at

---

[7] *See* Complaint and Jury Demand, filed August 26, 2008, ¶¶4, 33, 35.
[8] "ABA Survey Shows Nearly One out of Three Consumers Read Their Banks' Privacy Notices," American Bankers Association, June 2001.
[9] "Variable Annuity Summary Prospectus High in Demand by Consumers," Insured Retirement Institute, June 2011, p. 5.
[10] "Life Insurance Cost Disclosure:  Staff Report to the Federal Trade Commission," Bureau of Consumer Protection and Bureau of Economics, July 1979, p. 160.
[11] Deposition of Caroline Meckes, June 10, 2010, pp. 31:8–31:14.

them."[12]  By contrast, Marleen LaPlant, recalled receiving the annual reports and "skimming" through them for "five to ten minutes."[13]

28.     In summary, it is my opinion that putative Class members would have differed in the levels of attention they would have paid to a notice from NM regarding the 1985 Change.  As a result, some putative Class members would have continued to hold their pre-MN annuities and received dividends based on the segmented account, even if NM sent them a notice regarding the 1985 Change.  Determining which of the putative Class members would have paid attention to the notice with regard to the 1985 Change requires individualized analysis.

**VII.    Individualized Analysis is Required to Determine How Different Putative Class Members Would Have Understood the 1985 Change**

29.     Even if some putative Class members had paid attention to the communication from NM regarding the 1985 Change, the extent to which they would have been able to understand this information and assess its meaning would have varied.  Therefore, they would have responded differently to the 1985 Change.

30.     Annuities are complex financial products.[14]  Many consumers do not fully understand how they work.  One of the factors contributing to consumers' lack of understanding of annuities is low financial literacy, and surveys conducted by a variety of organizations at different points in time show that by and large, consumers have varying levels of financial literacy.[15]  For example, a study conducted by FINRA in 2009 that surveyed a nationally representative sample of Americans showed that people got, on average, less than 3 out of 5 questions correct regarding basic financial matters.  Performance varied by several characteristics, including income, educational

---

[12] Deposition of Bruce Williams, May 18, 2010, pp. 28:7–28:14.
[13] Deposition of Marleen LaPlant, September 9, 2009, pp. 27:3–28:25.
[14] Brown, J., A. Kapteyn, E. Luttmer, and O. Mitchell (2013), "Complexity as a Barrier to Annuitization: Do Consumers Know How To Value Annuities?" Pension Research Council Working Paper, The Wharton School, University of Pennsylvania.
[15] "Financial Literacy Among Retail Investors in the United States," Federal Research Division, Library of Congress, December 2011, p. 1.

level, age, gender, and ethnic background.[16] To the extent that some putative Class members had low levels of financial literacy and found annuities to be complex, their ability to understand and assess the meaning of the 1985 Change would have varied significantly.

31.     It is clear from the deposition and trial testimony that putative Class members differed in their understanding of the annuities and how the dividends on their policies were calculated. For example, while Bruce Williams generally understood that the dividends would be "based on the profits of the company," he did not know how the dividends were calculated, and was not sure of the "difference from [*sic*] a dividend and an interest rate."[17] While Caroline Meckes testified that she knew the dividends would be based on NM's "earnings," she was not aware that her contract had a guaranteed interest rate, or that the dividends themselves were not guaranteed. Gerald Kreitzman, when asked if he read the policy he received from NM said, "I'm not sure I understood it all, okay. I'm not even sure I understand it all now, okay."[18]

32.     In summary, even if putative Class members had paid attention to the communication from NM regarding the 1985 Change, they would have differed in the extent to which they understood the 1985 Change. Because of these differences, some putative Class members would have continued to hold their pre-MN annuities and received dividends based on the segmented account. Individualized analysis is needed to determine how each putative Class member would have responded to the communication from NM regarding the 1985 Change.

---

[16] "Financial Literacy Among Retail Investors in the United States," Federal Research Division, Library of Congress, December 2011, pp. 7–21.
[17] Trial Transcript of Bruce Williams, November 8, 2010, pp. 18:22–18:25; pp. 21:22–22:5.
[18] Deposition of Caroline Meckes, June 10, 2010, pp. 7:13–8:3; Deposition of Gerald Kreitzman, June 10, 2010, pp. 30:15–30:18.

**VIII.   Individualized Analysis is Required to Determine What Role, if Any, the 1985 Change Would Have Played in Putative Class Members' Evaluation and Their Decision to Hold Their Annuities**

33.    Even if putative Class members had paid attention to the communication from NM and had a common understanding of the 1985 Change, they would have been commonly affected by it only if the method of calculating dividends had been a factor in their decision to hold their annuities.  As discussed next, consumers consider several different factors in their decision to buy or hold annuities and many consumers may not base their decisions on the method of calculating dividends.  Individualized analysis is required to identify putative Class members for whom the method of calculating dividends would have been a factor in their decision to hold their annuities and therefore, would potentially be affected by the communication from NM regarding the 1985 Change.

**A.      Consumers Differ in the Factors They Consider When Making Decisions Related to Buying and Holding Their Annuities**

34.    Consumers consider a variety of factors when purchasing annuity products and they differ in the factors that they consider important.  For example, according to a LIMRA survey in 2012, the financial strength of the insurer, tax-deferred benefits, rate of return, and the ability to receive guaranteed lifetime income were reported to be among the various factors that many consumers consider when buying a variable annuity (*see* Exhibit 1).[19]  However, while 54% of the consumers reported tax-deferred benefits to be "very important," 8% reported tax-deferred benefits to be "not very important" in their annuity buying decision.  Similarly, a Gallup survey conducted in 1992 showed that while 77% of non-qualified annuity owners reported that tax-deferred nature of earnings was a "very important" factor in their annuity

---

[19] NM also considered a wide variety of factors in annuity design.  These included the "savings account" nature of annuities, tax advantages, disability and other benefits, low administrative costs as well as flexibility of investment vehicles. *See* ML2_NM_4518–529.

App. 191

purchase, 46% reported that they valued the easy ability to save through an annuity as a "very important" factor in their purchase (*see* Exhibit 2).

35.   Since financial products are complex and difficult to understand, a factor that affects consumers' decisions to buy or hold a financial product is the firm's reputation.[20]  For example, in the case of pre-MN annuities, plaintiff Janet Reichart thought that NM was a "very solid" company, and that was one of the reasons she purchased her policy.[21]  Similarly, plaintiff Caroline Meckes felt that NM "was a good company to go with" and that she "trusted the company."[22]  Plaintiff Daniel Noonan also thought that NM was a "good company."[23]  Plaintiff John Komives said he was "so comfortable with [NM] that I never felt the need to behave in an adversarial [*sic*] – I accepted the way it was presented."[24]  These plaintiffs' perceptions are consistent with NM's industry rankings.  NM was ranked as "the most admired company" in life and health insurance industry every year from 1983 to 2006 in *Fortune* Corporate Reputations Survey, and it was the only company that ranked first in its industry every year during that period (*see* Exhibit 3).[25]  NM also ranked among the top three life insurance companies according to another influential source, A. M. Best, as seen in the annual publication *Best's Review* (*see* Exhibit 4).[26]

36.   Because consumers differ in the factors they consider important when buying and holding annuity products, firms offer annuity products with different features.  For example, the pre-MN annuities held by putative Class members are comprised of three different product types—Single Premium Retirement Annuity (SPRA), Flexible Premium Annuity (FPA), and Retirement Annuity (RA).[27]  *See* Exhibit 5.  An SPRA

---

[20] Nagy, R. and R. Obenberger (1994), "Factors Influencing Individual Investors' Behavior," *Financial Analysts Journal,* Vol. 50, No. 4, pp. 63–68.
[21] Deposition of Janet Reichart, June 16, 2010, pp. 7:8–7:16.
[22] Deposition of Caroline Meckes, June 10, 2010, pp. 7:1–7:8.
[23] Trial transcript of Daniel Noonan, November 8, 2010, pp. 58:23–59:17.
[24] Deposition of John Komives, May 18, 2010, pp. 36:9–36:20.
[25] ML_NML2_0039.
[26] A. M. Best is cited as an unbiased independent organization that publishes financial ratings in several consumer guides for annuity purchase. *See*, for example, "A Consumer's Guide to Annuities," North Carolina Department of Insurance, p. 8 and "Understanding Annuities," Office of the Commissioner of Insurance: State of Wisconsin, June 2012, p. 14.
[27] *See* Appendix D for details.

could be used to roll over savings from an existing retirement account or to invest an inheritance, while contribution limits on the FPA and RA products would make them less suitable for such purposes.[28]  Similarly, the pre-MN annuities differ in their tax status.  In 1985, at least 80% of annuities held by putative Class members were tax qualified, *i.e.*, funded by pre-tax dollars (*see* Exhibit 6).[29]  Tax qualified annuities face early withdrawal penalties by the IRS unlike non-tax qualified annuities, which face no withdrawal fees on the principal invested in the annuity.

37.     In summary, consumers differ in the factors that drive their decision to buy and hold annuity products.  Therefore, putative Class members also likely differed in the factors they considered in their decision to buy and hold their pre-MN annuities.

   **B.     A Change in the Method of Calculating Future Dividends Would Not Have Been a Factor for Many Putative Class Members in Their Decision to Hold Their Annuities**

38.     Even if putative Class members had paid attention to the communication from NM, had a common understanding of the 1985 Change, and generally considered the DIR in their decision to hold their annuities, a change in the method of calculating dividends likely would not have been a factor for many of them in their decision to hold their annuities.

39.     Plaintiffs assert, looking retrospectively, that the "return on the short-term bond account has lagged far behind the…return on its long-term oriented general account portfolio of investments."[30]  However, it is important to note that, looking into the future, the DIR based on the segmented account was not guaranteed to be lower than the DIR based on the general portfolio.  Future dividends based on either the

---

[28] *See*, for example, Trial Exhibit 155 and Trial Exhibit 310, which show the limits on the Flexible Premium Annuity for plaintiffs Bruce Williams and Daniel Noonan, respectively. Trial Exhibit 157, an SPRA contract for Bruce Williams, shows no such limits.  This could allow consumers to use SPRAs for rolling over income from an existing retirement fund, investing accumulated funds from other investments, or investing an inheritance, all of which would either be unlikely or impossible to do in an FPA or RA.  *See* http://www.statefarm.com/insurance/life_annuity/annuity/deferredplus.asp, accessed on 4/29/13.

[29] Self-employed trusts can be either tax qualified or non-tax qualified, and are therefore excluded from this calculation.

[30] Complaint and Jury Demand, filed August 26, 2008, ¶2.

segmented account or the general portfolio depend on the performance of the underlying investments and were, by definition, variable and not guaranteed. Thus, the impact of the 1985 Change would have been uncertain for putative Class members, and for this reason, a change in the method of calculating dividends would not have been a factor in their decision to hold their annuities.

40. Some putative Class members (who may not have been able to assess the impact of the 1985 Change on their own) may have discussed it with their agents. NM had informed all agents of the 1985 Change.[31] Some putative Class members regularly met their agents and even sought their advice on matters relating to their annuities. When Janet Reichart, a putative Class member, was asked how she would have responded to the 1985 Change, she said, "I would have had to have called [my agent] and talked it over with him to find out exactly what that change meant."[32] John Komives generally met with his agent once a year, at times, more often.[33] Because the impact of any change in the method of calculating future dividends is uncertain, different agents may have evaluated the impact of the 1985 Change differently. Depending on what putative Class members would have discussed with their agents, a change in the method of calculating dividends may not have uniformly affected their decisions.

41. The notion that a change in the method of calculating dividends would not have been a factor in the putative Class members' decisions to hold their annuities is supported by the testimony of the plaintiffs. Some plaintiffs testified that they continued to hold their pre-MN annuities even after learning about the 1985 Change. For example, plaintiffs Bruce Williams and Caroline Meckes both testified that they continued to hold on to their annuities even until the day of their depositions. [34] Further, plaintiff Bruce Williams had "no specific plans" to sell his annuity as of 2010. [35] Named

---

[31] NML2 0539–541; ML_NML2_0489.
[32] Deposition of Janet Reichart, June 16, 2010, pp. 29:1–29:6.
[33] Deposition of John L. Komives, May 18, 2010, pp. 18:2–18:11; 24:22–25:4.
[34] Deposition of Bruce Williams, May 18, 2010, pp. 34:10–34:16; Deposition of Caroline Meckes, June 10, 2010, pp. 29:21–29:24.
[35] Deposition of Bruce Williams, May 18, 2010, pp. 34:10–34:16.

plaintiff Marleen LaPlant surrendered her annuity six years after learning about the 1985 Change.[36]

42.     Similarly, many putative Class members also held a life insurance policy with NM and, therefore, had access to information about the DIR based on the general portfolio. As of 1985, over 9,000 putative Class members also held an active life insurance policy with NM, and approximately 3,000 of those people continued to hold at least one active pre-MN and one active life insurance policy even as late as the year 2000 (*see* Exhibit 7).  Some of these putative Class members may have compared the DIR on their life insurance policies with the DIR on their pre-MN annuities and realized that the two DIRs were based on different methods.  Yet, they continued to hold their annuities based on the segmented account, suggesting that a change in the method of calculating dividends was not a factor in their decision to hold their annuities.

43.     In summary, even if putative Class members had paid attention to the communication from NM and had a common understanding of the 1985 Change, many of them would not have been able to make a judgment that one method of calculating dividends was superior to another because future dividends were variable and not guaranteed. Therefore, a change in the method of calculating dividends would not have been a factor in their decision to hold their annuities.  Individualized analysis is required to determine which putative Class members' decisions would have been affected by the 1985 Change.


**IX.     Individualized Analysis is Required to Determine Which Putative Class Members Would Have Preferred Dividends Based on the General Portfolio over Dividends Based on the Segmented Account**

44.     Even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, it is my opinion that they would not have

---

[36] Deposition of Marleen LaPlant, September 9, 2009, pp. 35:3–35:5; 76:11–76:23; 84:2–84:20.

uniformly preferred dividends based on the general portfolio to dividends based on the segmented account.

45.     The early 1980s was a period of high short-term interest rates, and the market for annuities was highly competitive at that time, with several annuity products based on short-term portfolios available to consumers.[37]  Pre-MN annuities were also experiencing high surrender rates because of competition from short-term products.[38] Putative Class members demonstrated an interest in these products as well.  In fact, 606 individuals in the putative Class purchased NM's current rate annuity ("CRA") product in 1985.[39]  In subsequent years, an additional 1,059 individuals purchased this product.[40]  This implies that if NM had communicated the 1985 Change, many putative Class members likely would have preferred to receive dividends based on the segmented account.

46.     As I discuss next, putative Class members likely differed in their expectations of future dividends, their risk preferences, and the time horizon over which they made decisions, all of which would have affected their preference for the general portfolio relative to the segmented account as a basis for receiving dividends.

    **A.     Putative Class Members Would Have Differed in Their Expectations of Future Dividends**

47.     Consumers vary in their expectations of future dividends, which are ultimately uncertain.  According to a survey conducted in 1985, when asked about interest rate expectations over the next year, roughly one-third of a representative sample of U.S. consumers expected interest rates to increase, one-third expected them to stay constant, and roughly one-third expected them to decrease (*see* Exhibit 8).[41]  Because

---

[37] ML2_NM_4475–4500.
[38] ML2_NM_4545.
[39] ML_NML2_0542–574. This product was based off of a significantly shorter-term investment portfolio and was explicitly marketed as such by NM.
[40] This is the number of unique class members who purchased their first CRA product in 1986 or later.
[41] This is consistent with academic research, which documents several reasons why this could occur, including anchoring biases, momentum beliefs, and contrarian beliefs. *See* Yagan, D. (2012), "Why Do Individual Investors Chase Stock Market Returns?" Working Paper, p. 11; Amromin, G. and S. Sharpe (2008), "Expectations of Risk

of different expectations of interest rates, consumers would likely differ in their preference for short-term versus long-term investments.

48. Many putative Class members knew that the DIRs were variable and not guaranteed. For example, when asked during his deposition if the dividend rate would be the same over time, plaintiff John Komives replied "No."[42]  Plaintiffs Janet Reichart and Bruce Williams also knew that future dividends were not guaranteed.[43]

49. Thus, even if a change in the method of calculating dividends had been a factor in the decision of some putative Class members, they would have had different expectations of future dividends.  Some of these putative Class members would have preferred to receive dividends based on the segmented account, even if they received the communication from NM regarding the 1985 Change.  Individualized analysis is required to determine which of the putative Class members would not have preferred to receive dividends based on the segmented account.

###    B.    Putative Class Members Differed in the Maturity Dates of Their Annuities

50. In addition to having different expectations about future dividends, putative Class members would have also differed in the weight they assigned to the more immediate dividends they expected to get.  Different pre-MN annuities were purchased in different years and had different maturity dates.  As of 1985, the scheduled maturity dates for the annuities held by putative Class members ranged from a few months to up to 69 years in the future (*see* Exhibit 9).

51. Different maturity dates would have resulted in different responses to the 1985 Change.  Putative Class members whose policies were maturing shortly after the 1985

---

and Return Among Household Investors: Are Their Sharpe Ratios Countercyclical?" Finance and Economics Discussion Series, Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, p. 28; Greenwood, R. and A. Shleifer (2013), "Expectations of Returns and Expected Returns," NBER Working Paper No. 18686; Vissing-Jorgensen, A. (2004), "Perspectives on Behavioral Finance: Does 'Irrationality' Disappear with Wealth? Evidence from Expectations and Actions," NBER Macroeconomics Annual 2003, Vol. 18, pp. 139–208.
[42] Deposition of John Komives, May 18, 2010, pp. 34:14–34:17.
[43] Deposition of Bruce Williams, May 18, 2010, pp. 46:6–46:11; Deposition of Janet Reichart, June 16, 2010, pp. 8:9–8:13.

Change had a different horizon of decision making as compared to those whose policies were maturing many years into the future. Some of them may have expected dividends based on the segmented account to be higher than those based on the general portfolio (especially given that short-term rates were high in the early 1980s). Therefore, they would have preferred to receive dividends based on the segmented account. Individualized analysis is required to identify such putative Class members.

### C. Putative Class Members Would Have Differed in Their Discounting of the Future

52. In addition to different expectations of future dividends and horizons of investments due to varying maturity dates, putative Class members also likely would have differed in how they made trade-offs between current and future dividends. This is especially relevant given the high interest rate environment for short-term rates in the early 1980s. Some consumers are present-focused. They act in a manner that suggests they are more concerned about immediate gains and discount the future heavily.[44] Putative Class members may have preferred dividends based on the segmented account in 1985 because they expected dividends from the segmented account to offer higher short-term gains, even if they thought that the general account would provide higher dividends over a longer time horizon.

53. Thus, even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, they could have discounted the future differently, and therefore, would not have responded uniformly to the communication regarding the 1985 Change. Many of them with present-focused preferences would have preferred to receive dividends based on the segmented account, and therefore, would have agreed to the 1985 Change. Individualized analysis is required to identify such putative Class members.

---

[44] Frederick, S., G. Loewenstein, and T. O' Donahue (2002), "Time Discounting and Time Preference: A Critical Review," *Journal of Economic Literature,* Vol. 40, No. 2, pp. 351–401, at p. 393.

**D. Putative Class Members Would Have Differed in Their Risk Perceptions and Risk Preferences**

54. In addition to different expectations of interest rates and horizons of investments, consumers also vary in their risk perceptions and risk preferences. Different consumers may perceive the same financial product to be more or less risky, implying different risk perceptions. Similarly, different consumers may be willing to take different levels of risk in situations of uncertainty, implying different risk preferences.[45] For example, surveys conducted by the Federal Reserve in 1983, between 4–10% of consumers said they would be willing to take "substantial" financial risks and between 30–65% said that they would not be willing to take "any" financial risks.[46] Studies have also shown that younger and less experienced investors hold riskier portfolios.[47]

55. Dividends on the annuities held by putative Class members were not guaranteed, and inherently carried some risk. Deposition testimony suggests that putative Class members differed in their risk preferences, and that these preferences varied over time. For example, John Komives had a preference for riskier investments because he invested in equities and also had been an angel investor in startup companies.[48] By contrast, Janet Reichart invested in stocks before her retirement but "started moving more towards safer investments for [her] retirement."[49] The varied distribution of age across putative Class members, as of 1985, also suggests that they had different risk preferences (*see* Exhibit 10).

---

[45] Weber, E. and R. Milliman (1997), "Perceived Risk Attitudes: Relating Risk Perception to Risky Choice," *Management Science*, Vol. 43, No. 2, pp. 123-144; Barsky, R., T. Juster, M. Kimball, and M. Shapiro (1997), "Preference Parameters and Behavioral Heterogeneity: An Experimental Approach in the Health and Retirement Study," *Quarterly Journal of Economics,* Vol. 112, No. 2, pp. 537–579; Kimball, M., C. Sahm, and M. Shapiro (2009), "Risk Preferences in the PSID: Individual Imputations and Family Covariation," *American Economic Review*, Vol. 99, No. 2, pp. 363–368; Hallahan, T., R. Faff, and M. McKenzie (2004), "An Empirical Investigation of Personal Financial Risk Tolerance," *Financial Services Review,* Vol. 13, pp. 57–78.
[46] 1983 Survey of Consumer Finance as cited in Stango, V. and J. Zinman (2009), "Exponential Growth Bias and Household Finance," *The Journal of Finance,* Vol. 64, No. 6, pp. 2807–2849 at p. 2828.
[47] Korniotis, G. and A. Kumar (2011), "Do Older Investors Make Better Decisions?" *The Review of Economics and Statistics,* Vol. 93, No. 1, pp. 244–265 at p. 264; Agnew, J., P. Balduzzi and A. Sunden (2003), "Portfolio Choice and Trading in a Large 401(k) Plan," *The American Economic Review*, Vol. 93, No. 1, pp.193–215.
[48] Deposition of John Komives, May 18, 2010, pp. 21:13–22:23, pp. 26:24–27:19.
[49] Deposition of Janet Reichart, June 16, 2010, pp. 11:12–11:24.

56.     In summary, even if a change in the method of calculating dividends had been a factor in the decisions of some putative Class members, they would have responded differently to the communication from NM regarding the 1985 Change because of different risk perceptions and risk preferences.  Some would have preferred to receive dividends based on the segmented account.  Individualized analysis is required to identify such putative Class members.

## X.    Conclusions

57.     Plaintiffs' class action claims and allegations imply that if NM had sent a notice to or asked for consent from putative Class members regarding the 1985 Change, they would have all responded in a common manner.  Plaintiffs' claims and allegations regarding common impact are invalid from a consumer behavior perspective.

58.     Thus, putative Class members would have varied in their levels of attention paid to the communication from NM and their understanding of the 1985 Change.  They would have also varied in the factors relevant in their decision to hold the pre-MN annuities and their preferences for dividends based on the segmented account.  For all these reasons, putative Class members would not have responded in a common manner to the communication from NM regarding the 1985 Change.  Some putative Class members would have received dividends based on the segmented account *even if* the 1985 Change had been communicated by NM.  Individualized analysis is required to identify these putative Class members.

App. 200

I declare under penalty of perjury that the foregoing is true and correct.

_____          July 1, 2013

           Ravi Dhar                                        Date

**EXHIBIT 1**

# Factors Valued in Purchasing Variable Annuities
## 2012

| Factors | Very Important | Somewhat Important | Not Very Important | Not at All Important |
|---|---|---|---|---|
| Financial Strength of Company | 71% | 27% | 1% | 1% |
| Interest Rate or Projected Return | 56% | 36% | 6% | 2% |
| Tax-Deferred Benefits | 54% | 33% | 8% | 5% |
| Recommendation of Financial Professional | 47% | 38% | 11% | 4% |
| Ability to Receive Guaranteed Lifetime Income | 47% | 36% | 13% | 4% |

Source: "Why People Buy Annuities: Exclusive LIMRA Research Examines the Motivations That Make the Sale," *Insurancenewsnet,* July 2012

**EXHIBIT 2**

# Factors Valued in Purchasing Non-Qualified Annuities
## 1992

| Factors | Very Important | Somewhat Important |
|---|---|---|
| Earnings would not be taxed until the funds were used | 77% | 18% |
| Was a safe purchase | 68% | 27% |
| Have a good rate of return | 60% | 31% |
| Wanted a long term savings plan | 59% | 26% |
| Could get an income guaranteed for as long as you live | 46% | 25% |
| Easy way to save | 46% | 32% |
| Wanted a source of funds that could be used to pay for emergencies, such as catastrophic illness during retirement | 46% | 25% |
| Have a choice of methods of getting the money | 39% | 30% |

Source:  "Committee of Annuity Insurers:  Survey of Owners of Non-Qualified Annuity Contracts," *The Gallup Organization,* January 1993

**EXHIBIT 3**

# Northwestern Mutual Rankings
## *Fortune* Corporate Reputations Survey
## 1983 to 2011

| Year | Life and Health Insurance Industry Ranking [2] |
|:---:|:---:|
| 1983 | 1 |
| 1984 | 1 |
| 1985 | 1 |
| 1986 | 1 |
| 1987 | 1 |
| 1988 | 1 |
| 1989 | 1 |
| 1990 | 1 |
| 1991 | 1 |
| 1992 | 1 |
| 1993 | 1 |
| 1994 | 1 |
| 1995 | 1 |
| 1996 | 1 |
| 1997 | 1 |
| 1998 | 1 |
| 1999 | 1 |
| 2000 | 1 |
| 2001 | 1 |
| 2002 | 1 |
| 2003 | 1 |
| 2004 | 1 |
| 2005 | 1 |
| 2006 | 1 |
| 2007 | 2 [3] |
| 2008 | 2 [4] |
| 2009 | [5] |
| 2010 | 1 |
| 2011 | 4 |

Source: *Fortune Magazine*

Note:

[1] The Corporate Reputations Survey includes companies that appear in the previous year's annual Fortune 500 and Fortune Service 500 directories. A broad sample of senior executives, outside directors, and financial analysts are asked to rate the ten largest companies (occasionally fewer) in their own industry on eight attributes of reputation, using a scale of zero (poor) to ten (excellent). The eight attributes are: quality of management; quality of product and services; innovativeness; long-term investment value; financial soundness; ability to attract, develop, and keep talented people; community and environmental responsibility; use of corporate assets.

[2] Industry categories are based on definitions by the U.S. Office of Management and Budget.

[3] Prudential Financial was ranked industry No. 1 in 2007.

[4] Aflac was ranked industry No. 1 in 2008.

[5] Data for 2009 is not available.

**EXHIBIT 4**

# Northwestern Mutual Rankings
## A.M. Best 20-Year Dividend Comparison for Whole Life Policies
## 1983 to 1993

| Year | Rank [1] | | | |
| | Average Yearly Payment [2] [3] | Interest-Adjusted Payment Index [4] [5] | Average Yearly Difference [2] [6] | Interest-Adjusted Surrender Cost Index [4] [7] |
|---|---|---|---|---|
| 1983 | 2 | 2 | 1 | 1 |
| 1984 | 1 | 2 | 1 | 1 |
| 1985 | 1 | 2 | 1 | 1 |
| 1986 | 1 | 1 | 1 | 1 |
| 1987 | 1 | 1 | 1 | 1 |
| 1988 | - | 1 | - | 1 |
| 1989 | - | 2 | - | 2 |
| 1990 | - | 2 | - | 1 |
| 1991 | - | 3 | - | 2 |
| 1992 | - | 3 | - | 2 |
| 1993 | - | 3 | - | 3 |

Source: Trial Exhibit 211

Note:

[1] Rankings in each year evaluate ordinary whole life policies originated 20 years prior. At least 50 life insurance companies were examined in each year for this study.

[2] A.M. Best's rankings after 1987 did not include Average Yearly Payment or Average Yearly Difference rankings.

[3] Average Yearly Payment is the average cost over the period if dividends are taken out in cash but the policy is continued.

[4] In 1991, 1992, and 1993, the indices are called Actual Payment Index and Actual Surrender Cost Index but are calculated using a 5% interest adjustment.

[5] Interest-Adjusted Payment Index is the Average Yearly Payment adjusted for the time value of money, assuming a 5% interest rate.

[6] Average Yearly Difference is the average cost over the period if the policy was surrendered for its cash value on the 20th policy anniversary.

[7] Interest-Adjusted Surrender Cost Index is the Average Yearly Difference adjusted for the time value of money, assuming a 5% interest rate.

**EXHIBIT 5**



**In-Force Annuities Held by Putative Class Members**
Annuity Type from 1944 to 2013

Source: Internal Data
Note: Annuities are defined as in-force in a given year if they are active at any point in that year.

App. 206

**EXHIBIT 6**



Number of Annuities

## Pre-MN Annuities Held by Putative Class Members
### Tax Status as of 1985

| Category | Number |
|----------|--------|
| IRA | 9,430 |
| TDA | 4,153 |
| Personal | 2,611 |
| Corporate Trusts/Plans | 2,354 |
| Self-Employed Trusts | 1,180 |
| IRC-B457 | 6 |
| IRC-401, Qualified Policy Exchange | 1 |

Source: Internal Data
Note: Tax status represents the latest available tax status as of 1985. IRAs or Individual Retirement Accounts are tax qualified retirement accounts available to individuals. TDAs or Tax Deferred Annuities are tax qualified annuities available to employees of public schools or 501(c)(3) tax-exempt organizations. Annuities sold through Corporate Plans are tax qualified annuities purchased for employees by a plan sponsor or plan trustee. Corporate Trusts hold the assets of the Corporate Plan. Annuities sold through Self-Employed Trusts are annuities available to self-employed individuals or their trusts. Some are tax qualified. IRC-B457 and IRC-401 are tax qualified annuities available to employees or individuals associated with certain government organizations.

**EXHIBIT 7**



# Putative Class Members with Pre-MN Annuities and Life Insurance Policies
## In-Force from 1985 to 2013

Source: Internal Data
Note: Annuities and policies are defined as in-force in a given year if they are active at any point in that year. Data indicates the number of unique annuitants with at least one in-force pre-MN annuity and in-force Northwestern Mutual life insurance policy in a given year.

**EXHIBIT 8**

# Consumer Expectations of Future Interest Rates [1]
## 1985

| Month | Go Up | Stay the Same | Go Down | Don't Know |
|-------|-------|---------------|---------|------------|
| Jan 85 | 36% | 33% | 28% | 3% |
| Feb 85 | 35% | 37% | 26% | 2% |
| Mar 85 | 45% | 32% | 19% | 4% |
| Apr 85 | 47% | 31% | 19% | 3% |
| May 85 | 44% | 34% | 19% | 3% |
| Jun 85 | 36% | 36% | 26% | 2% |
| Jul 85 | 35% | 38% | 25% | 2% |
| Aug 85 | 41% | 35% | 22% | 2% |
| Sep 85 | 43% | 34% | 20% | 3% |
| Oct 85 | 44% | 33% | 21% | 2% |
| Nov 85 | 36% | 37% | 23% | 4% |
| Dec 85 | 36% | 37% | 25% | 2% |

Source:  Thomson Reuters/University of Michigan Survey of Consumers
Note:
[1] Consumers were asked, "No one can say for sure, but what do you think will happen to interest rates for borrowing money during the next 12 months — will they go up, stay the same, or go down?"

**EXHIBIT 9**



**Pre-MN Annuities Held by Putative Class Members**
Year of Maturity as of 1985

Number of Annuities

Source: Internal Data
Note: Year of maturity represents the latest available maturity date as of 1985. This excludes nine annuities whose maturity date was missing as of 1985 or whose listed maturity date was on or before March 31, 1985.

**EXHIBIT 10**



**Pre-MN Annuities Held by Putative Class Members**
Age of Policyholder as of 1985

Number of
Annuities

Source:  Internal Data
Note:  Age is calculated using birthdate.  When missing, latest available policy date and age at issue as of 1985 are used.

1  STATE OF WISCONSIN   CIRCUIT COURT   MILWAUKEE COUNTY
   --------------------------------------------------------
2
   MARLEEN M. LAPLANT,              CASE NO. 08CV011988
3  W7868 Riedel Lane                CODE:  30701
   Fort Atkinson, WI  53538,
4  on her own behalf and on
   behalf of a class similarly
5  situated,
                                    DEPOSITION OF
6          Plaintiffs,              MARLEEN M. LAPLANT

7
        -vs-
8
                                    9th of September, 2009
9  THE NORTHWESTERN MUTUAL
   LIFE INSURANCE COMPANY,
10 a Wisconsin mutual insurance
   corporation,
11 720 East Wisconsin Avenue
   Milwaukee, WI  53202,
12
            Defendant.
13 --------------------------------------------------------
            DEPOSITION OF MARLEEN M. LAPLANT, before JANET
14 LARSEN, a Registered Professional Reporter and Notary
   Public, in and for the State of Wisconsin, under and
15 pursuant to Section 804 of the Wisconsin Statutes and
   the acts amended, at the offices of Quarles & Brady
16 LLP, 411 East Wisconsin Avenue, Suite 2040, Milwaukee,
   Wisconsin, on the 9th day of September, 2009,
17 commencing at 9:29 a.m. and concluding at 12:03 p.m.

18                A P P E A R A N C E S

19            KERSTEN & MCKINNON, S.C., by
              GEORGE P. KERSTEN, ATTORNEY AT LAW
20            E. CAMPION KERSTEN, ATTORNEY AT LAW
              11518 North Port Washington Road,
21            Suite 104
              Mequon, Wisconsin  53092
22            appeared on behalf of the Plaintiff.

23            GALANIS, POLLACK, JACOBS &
              JOHNSON, S.C., by
24            MARK B. POLLACK, ATTORNEY AT LAW
              839 North Jefferson Street, Suite 200
25            Milwaukee, Wisconsin  53202
              appeared on behalf of the Plaintiff.

```
 1              STRAUS & BOIES, LLP, by
                MARK J. SCHIRMER, ATTORNEY AT LAW
 2              4041 University Drive, Fifth Floor
                Fairfax, Virginia  22030
 3              appeared by telephone on behalf of the
                Plaintiff.
 4
                QUARLES & BRADY LLP, by
 5              ERIC J. VAN VUGT, ATTORNEY AT LAW
                ELIZABETH CHAMBERLIN, ATTORNEY AT LAW
 6              411 East Wisconsin Avenue, Suite 2040
                Milwaukee, Wisconsin  53202
 7              appeared on behalf of the Defendant.

 8              NORTHWESTERN MUTUAL, by
                DAVID W. PEREZ, ASSISTANT GENERAL COUNSEL
 9              720 East Wisconsin Avenue
                Milwaukee, Wisconsin  53202
10              appeared on behalf of the Defendant.
```

11                         I N D E X

12    EXAMINATION BY:                              PAGE

13    Mr. Van Vugt                                   3

14    EXHIBITS:                               MARKED

15    1 - Cover letter and documents produced in     35
          response to request, LaP1 through LaP 130
16        (Withdrawn)
      2 - 12-5-86 document from meeting with Mark     67
17        Mittag with handwriting, LaP 39

18    MATERIAL REQUESTED:                         PAGE

19    None

20    QUESTIONS FOLLOWED BY INSTRUCTIONS NOT TO ANSWER:

21    Page 40, line 6
      Page 41, line 5
22    (Original transcript supplied to Attorney Van Vugt)
      (Exhibit 1 page 1 has been copied and attached to the
23    original transcript and to each attorney's transcript
      with the original of Exhibit 1 returned to Mr. Van
24    Vugt.  Exhibit 2 was retained by Attorney George
      Kersten with a photocopy attached to the original
25    transcript and copies attached to each attorney's
      transcript.)

```
 1        understanding is it would pay out just $5,000?
 2   A.   I'm not sure.
 3   Q.   Do you know whether that policy pays -- Do you
 4        know what dividends are, policy dividends?
 5   A.   Yes.
 6   Q.   What is your understanding of dividends?
 7   A.   That as a policyholder, you have a share in the
 8        profits of the company.
 9   Q.   All right.  And where did you get that
10        understanding?
11   A.   The lawyers told me that.
12   Q.   The lawyers in this case?
13   A.   Yes.
14   Q.   Would that have been something you knew before you
15        hired these lawyers?
16   A.   Had an idea before that it came from that but
17        never really checked into it that thoroughly.
18   Q.   All right.  And at this point can you separate
19        what you knew before and what you know now about
20        dividends?
21   A.   Yes.
22   Q.   And what understanding did you have of dividends
23        before talking to your lawyers?
24   A.   I think I felt that it was probably a, more of a,
25        a fixed rate rather than varying up and down,
```

```
1   A.   M-hm.

2   Q.   -- just let me know.  Otherwise we'll forge ahead.

3        Okay?

4   A.   Okay.

5   Q.   The policy in question now was purchased in May of

6        1975.  Do you recall that?

7   A.   Yes.

8   Q.   What were the circumstances that led you to do

9        that at that time?

10  A.   Mark Mittag was a good friend of ours, still is,

11       and he had talked to us about it, and there was

12       not a retirement policy where I worked, and we

13       wanted, I wanted to get something started, and so

14       he talked to us about it, and I felt it was a good

15       place to invest my money.

16  Q.   All right.  You say Mark Mittag was and still is a

17       friend of the family's?

18  A.   Yes.

19  Q.   Under what circumstances have you known him?

20  A.   Went to high school with him.

21  Q.   Any other involvement?

22  A.   He became a good friend of my husband's when my

23       husband moved to the area, stood up in our

24       wedding.  So we've known each other for a long

25       time.
```

1   Q.   How often on an annual basis or some other period

2        do you see him?

3   A.   Oh, we haven't seen him for a few years now,

4        probably seven, eight.

5   Q.   All right.  And has your husband worked with him

6        professionally, gotten any advice from him?

7   A.   No.

8   Q.   Or purchased any products from him?

9   A.   No.

10  Q.   And had he been, you know, trying to sell you

11       products over a period of time, or was this your

12       first contact with him professionally?

13  A.   That was our first contact with him

14       professionally.

15  Q.   And did you seek him out, or did he seek you out?

16  A.   We kind of seeked each other out.

17  Q.   All right.  And what was -- What was it that you

18       thought you were buying at the time?

19  A.   A policy that I could invest in and have it grow

20       for retirement and was a long term, and that I

21       would be paid dividends each year.

22  Q.   Did you look at other kinds of investment

23       products?

24  A.   I don't recall.

25  Q.   To your recollection, did he present other

1       alternatives that you could put money in?

2    A.   I don't recollect that at all.

3    Q.   How many -- I mean, again, setting aside social

4         interaction with him, did you have an actual

5         meeting with him for the purpose of getting this

6         policy?

7    A.   Oh, yes.

8    Q.   Where did it happen; do you know?

9    A.   I think in his office.

10   Q.   And who else was there, if anyone?

11   A.   My husband.

12   Q.   How long did it last?

13   A.   It was a long time ago.

14   Q.   Right.

15   A.   I don't know how long it lasted.

16   Q.   All right.  Do you recall the discussions you had

17        with him?

18   A.   I remember him, you know, explaining what the, the

19        policy was.

20   Q.   And do you have a pretty clear recollection of

21        what he told you at the time?

22   A.   No.

23   Q.   What do you recall him telling you?

24   A.   That it was, that NML was a good company, and it,

25        its rate of, more or less rate of return was very

1          good on the policy.

2     Q.   Did he put a number on that or anything else?

3     A.   No.

4     Q.   What else can you recall him telling you?

5     A.   I, I don't recall anything else.

6     Q.   At any time after you purchased the policy, did

7          you have other discussions or meetings with

8          Mr. Mittag?

9     A.   Yes.

10    Q.   Which ones do you recall?

11    A.   He would call us, and we would go down to his

12         office, and he would show a computer printout and

13         just tell me what the dividends were and what it

14         was going to be the next year.

15    Q.   And how often did you have those kinds of meetings

16         with him?

17    A.   I only remember about two or three of them.

18    Q.   And was this early in the period or more recently?

19    A.   It was earlier.

20    Q.   In the '70s or the '80s or '90s?

21    A.   '70s, maybe early '80s.

22    Q.   And you recall two such meetings?

23    A.   Two or three.

24    Q.   Was your husband always with you at the time?

25    A.   Yes.

1      yesterday.

2           My question again, to your knowledge, are

3      there any other documents that you have relating

4      to this policy that are for one reason or another

5      not in these documents here today?

6  A.   No.

7  Q.   To your knowledge, other than the annual reports,

8      are there any documents that you received in the

9      course of, any documents you ever received that

10     were not for one reason or another kept in this

11     file?

12 A.   No.

13 Q.   But you understand that there -- Strike that.

14           When did you first learn about this

15     lawsuit or the prior lawsuit by the Noonans?

16 A.   Read it in the Milwaukee paper about the

17     Noonans.

18 Q.   And in the original of this file that you've

19     produced, there is -- on the top there is a

20     newspaper article, and that newspaper article

21     appears as, I think page -- well --

22           MR. GEORGE KERSTEN:  Toward the end,

23     Eric.

24 Q.   It's LaP 89 and 90.

25           When did you first see this article in

```
1        the paper; do you recall?
2   A.   My husband saw it and then showed it to me.
3   Q.   And was this at or about the time it was first
4        published?
5   A.   Yes.
6   Q.   Was he a regular reader of the Milwaukee Journal
7        Sentinel?
8   A.   He'd read it periodically.  Maybe at the library,
9        we'd go through it.
10  Q.   And do you recall anything more about this
11       newspaper article, other than what's in it?
12  A.   No.
13  Q.   There's some handwriting on the original of this,
14       it's also on the copy.  Whose handwriting is that?
15  A.   My husband's.
16  Q.   And it also refers to the case number of the
17       Noonan case, and it has the Kersten & McKinnon
18       name and phone number on there?
19  A.   Yes.
20  Q.   Do you know where he got that information?
21  A.   He got the Kersten name from the article.  I'm not
22       sure where he got the other from.  Phone number
23       would be easy to get.
24  Q.   Sure.
25            Did you and your husband discuss this?
```

1    A.    Yeah.  We talked about it.

2    Q.    What did you --

3    A.    And he had said that it was just like the policy

4          that I had.

5    Q.    And how did he know that?

6    A.    From the description in the article, that it was a

7          retirement annuity.

8    Q.    Do you recall discussing anything else with your

9          husband about this article?

10   A.    No.  Other than we wanted to check into it

11         further, and then he called George.

12   Q.    When was that?

13   A.    Shortly after this article came out.

14   Q.    Did you --

15   A.    After --

16   Q.    Go ahead.

17   A.    After it came out in the paper, I was going to

18         say.

19   Q.    Did you or your husband talk about this article or

20         this lawsuit, the Noonan lawsuit, with anybody

21         else other than Mr. Kersten?

22   A.    No.

23   Q.    And how many times did you talk with Mr. Kersten?

24               MR. GEORGE KERSTEN:  Objection as

25         invading the attorney-client privilege.

1   Q.   Did there come a point where you and your husband
2        hired Mr. Kersten?
3   A.   Yes.
4   Q.   When was that?
5   A.   About a year ago.
6   Q.   All right.  Prior to that, as far as you were
7        concerned, he was not your lawyer?
8             MR. GEORGE KERSTEN:  Objection as
9        invading the attorney-client privilege, calling
10       for a legal conclusion.
11            MR. VAN VUGT:  Are you instructing her
12       not to answer?
13            MR. GEORGE KERSTEN:  Yes.
14  Q.   Up until the point where you hired Mr. Kersten,
15       how many conversations did you have with him?
16  A.   Oh, three or four.
17  Q.   And when did those occur?
18  A.   Within the last two years.
19  Q.   After this initial contact with her --
20            MR. GEORGE KERSTEN:  Excuse me.  I'm
21       sorry.  I'm sorry.  Eric, I was interrupted.
22       Could you just start the last question over again?
23  Q.   Other than this initial -- this initial
24       conversation that you had with him shortly after
25       the article was published, how long did that

1        conversation last?

2   A.   I don't know.  My husband made the call.

3   Q.   Did you communicate at all?

4   A.   No.  Not then.

5   Q.   What did your husband tell you about the call?

6            MR. GEORGE KERSTEN:  Objection as

7        invading the attorney-client privilege.  Instruct

8        the witness not to answer.

9            MR. VAN VUGT:  Counsel, she's indicated

10       that she didn't form an attorney-client

11       relationship or hire you until about a year ago.

12           MR. GEORGE KERSTEN:  Counsel, let me just

13       suggest to you two things.  First of all, she was

14       a member of the proposed class at that point.

15           MR. VAN VUGT:  Is that your

16       representation?

17           MR. GEORGE KERSTEN:  And that alone we

18       believe creates an attorney-client privilege in

19       this context.

20           Secondly, any conversations in

21       anticipation of retaining a lawyer are covered by

22       the privilege as well.  And on each of those

23       grounds, we believe this is privileged.  If

24       there's some specific data that you want, I'm

25       happy to talk about it, but we don't want the

1     attorney-client privilege to be invaded here, and

2     we think on both of those grounds, there is a

3     privilege here.

4              MR. VAN VUGT:  Right.  But you're taking

5     the position now that she was at that time a

6     member of the class that you represented?

7              MR. GEORGE KERSTEN:  She was a member of

8     the proposed Noonan class, correct.

9              MR. VAN VUGT:  On that basis, you had an

10    attorney-client relationship with her?

11             MR. GEORGE KERSTEN:  We believe there was

12    a sufficient attorney-client relationship there to

13    invoke the privilege.  In other words, a member of

14    a proposed class calling in to a class, the

15    attorney for the proposed class or proposed

16    attorney, that that is privileged.  And,

17    additionally, by virtue of the ultimate retainer,

18    it would be fairly construed as being in

19    anticipation of retention.

20             MR. VAN VUGT:  My point really, though,

21    is with respect to the motion recently argued and

22    further motions to come, is it your position that

23    she was a member of the class and represented by

24    you and other counsel as early as 2002?

25             MR. GEORGE KERSTEN:  No.  She was a

1        member of the proposed class, and I believe that

2        if a member of a proposed class calls in to the

3        attorney, that that is probably a privileged

4        communication.

5               MR. VAN VUGT:  Okay.  But you're, again,

6        claiming that you had an attorney-client

7        relationship with, with her going back to --

8               MR. GEORGE KERSTEN:  No.  I think the

9        formal relationship, attorney-client, occurred at

10       or shortly before the actual retention of us as an

11       individual.  But as a member of a proposed class,

12       when a member of a proposed class calls in to the

13       class attorney, or that is to say the attorney who

14       anticipates representing a class based on

15       pleadings that would lead to a motion for class

16       certification, that there is a sufficient

17       understanding of confidentiality there that even

18       though there is not an attorney-client privilege

19       in the formal sense, that deserves the --

20              MR. CAMPION KERSTEN:  Attorney-client

21       relationship.

22              MR. GEORGE KERSTEN:  -- attorney-client

23       relationship, that that deserves that kind of

24       communication between a proposed -- a person who

25       would be within the description of the proposed

1      class, that that kind of communication deserves

2      the confidentiality that is accorded to a person

3      after that person becomes a formal client.

4           Now, she was not, she had not retained us

5      yet at that point.  But I believe that in terms of

6      confidentiality, if someone calls into the class

7      attorney --

8           MR. VAN VUGT:  George, I think we've got

9      it.

10           MR. GEORGE KERSTEN:  Yeah, okay.

11 Q.  Have you discussed this lawsuit or the Noonan

12      lawsuit with anyone other than Mr. Kersten?

13 A.  No.

14 Q.  Has your husband, to your knowledge, discussed

15      this lawsuit --

16 A.  No.

17 Q.  -- or the Noonan lawsuit with anyone other than

18      Mr. Kersten?

19 A.  No.

20 Q.  Have you read anything about the Noonan lawsuit,

21      other than the newspaper article that's part of

22      your file?

23 A.  No.  It was just the newspaper article.

24 Q.  Did you monitor or keep track of developments in

25      the Noonan lawsuit?

1    A.    My husband did, yes.

2    Q.    And how did he do that?

3    A.    Internet.

4    Q.    Do you know what website or what site --

5    A.    No.

6    Q.    -- he was using to track that?

7    A.    No.

8    Q.    One of the notes on the newspaper article is a

9          02-C-0128.  Do you know that that's a case number?

10   A.    I don't know it as the case number, but he

11         probably does, if it is.

12   Q.    Was it your understanding that he was monitoring

13         developments in the Noonan case on some website?

14   A.    Yes, he was watching it.

15   Q.    And how often, to your recollection, did he watch

16         it?

17   A.    Oh, maybe once a week, once every two weeks.

18   Q.    For what period of time was this?

19   A.    Oh, after the article came out, he would look

20         every once in awhile to see if there had been any

21         changes or what was happening.

22   Q.    Did he tell you what he saw on the Internet?

23   A.    Some.

24   Q.    What do you recall him telling you?

25   A.    I don't recall exactly what he said, other than

1      maybe, you know, something was postponed or a

2      different date was set up, and before maybe a

3      decision was made or whatever.

4  Q.  Did you ever look on the, look at whatever --

5  A.  No.

6  Q.  -- he was looking at?

7  A.  No.

8  Q.  Did you come to learn at some point that the case

9      was dismissed and then up on appeal and then back

10     again, that sort of thing?

11 A.  Yes.

12 Q.  Did you understand that at some point -- Strike

13     that.

14          Again, I'm only interested in what you've

15     learned from your husband and from his review of

16     the website, but did you, did you know what a

17     class action was?

18 A.  Yes.

19 Q.  And what was your understanding of that?

20 A.  That it entailed, would be all the shareholders or

21     policyholders of that similar type of policy,

22     would be members of the class.

23 Q.  Did you understand at some point that an attempt

24     to have a class recognized was denied?

25 A.  Yes.

1    Q.   And was that something that your husband noted on

2        the Internet?

3    A.   I believe so.

4    Q.   What did that mean to you?

5    A.   That it wouldn't go any further, that it was being

6        not disallowed but was turned down.

7    Q.   And what was your reaction to that?

8    A.   I'm not sure.  I don't know.

9    Q.   Did you have any other discussions with your

10       husband about this lawsuit or his monitoring of

11       the Noonan lawsuit?

12    A.   No.

13    Q.   And just to be clear, you've never discussed the

14       lawsuit or the subject of this lawsuit with any

15       other person other than --

16    A.   No.

17    Q.   -- your husband and your attorney?  Is that true?

18    A.   True.

19    Q.   What about Mr. Mittag, did you ever call him up

20       or --

21    A.   No.

22    Q.   -- raise the subject with him?

23    A.   No.

24    Q.   Has your husband ever talked to him about this?

25    A.   To Mark Mittag?

1    Q.   Yes.

2    A.   No.

3    Q.   With respect to the newspaper article that we've

4         been talking about -- Strike that.

5              I want to make sure I understand your

6         earlier testimony, which is you really didn't read

7         the annuity contract itself since 1975 when it was

8         first issued; is that right?

9    A.   Yes.

10   Q.   Even when this lawsuit went out, you didn't go

11        back and look at the contract itself?

12   A.   My husband might have.  I didn't.

13   Q.   So whatever it says or doesn't say, you really

14        haven't read it since you first got it back in

15        '75?

16   A.   Yes.

17   Q.   Let's go through Exhibit 1 a little bit, just

18        to -- The first several pages, LaP 1 through 10,

19        are the original text of the contract.  Again,

20        this right now is the first time you've looked at

21        this since 1975; is that right?

22   A.   I looked at this more recently.

23   Q.   When did you look at it?

24   A.   You know, within the last few months.

25   Q.   And why were you looking at it?

1   A.   Because we had gotten a copy of this and -- after,

2        when we pulled the copies out.

3   Q.   Okay.  Why were you looking at it?

4   A.   I didn't read it word-for-word.

5   Q.   Why did you read it at all?

6   A.   I just skimmed at it, looking at it when we were

7        going to take copies of it.

8   Q.   But did you develop any understanding or become

9        aware of something from that review that you

10       didn't know from having reviewed it back in 1975?

11  A.   Probably of the dividends.

12  Q.   What did you notice when you skimmed it recently?

13  A.   That we would be, I'd be paid dividends for each

14       year annually.

15  Q.   All right.  And then you have been paid dividends

16       each year annually; haven't you?

17  A.   Yes.

18  Q.   Did you notice anything in the contract that said

19       how much the dividend was going to be?

20  A.   That it was, it would be from the profits of the

21       company.

22  Q.   And where in the contract did you see that?

23  A.   LaP 4.

24  Q.   Okay.

25  A.   Section 4, Dividends.

1    Q.    Where does it refer to profits of the company?

2    A.    The policy shall share in the divisible surplus,

3          if any, of the company.

4    Q.    Okay.

5    A.    And the policy's share shall be determined

6          annually and credited as a dividend.

7    Q.    Does it say how the policy's share will be

8          determined?

9    A.    Shall be determined from the profits of the

10         company.

11   Q.    Right.  But does it, you know, this policy, which

12         is the phrase that's there, means the annuity

13         contract that you had purchased; correct?

14   A.    Correct.

15   Q.    Does it say how this policy's share of the

16         dividend, share -- Strike that.

17               Does it say how this policy's share of

18         the divisible surplus will be determined?

19               MR. GEORGE KERSTEN:  Objection as asked

20         and answered; therefore, repetitious.

21               You can answer again.

22   A.    Oh, that it was divisible of the surplus, which

23         are the profits of the company.

24   Q.    Well, how do you know the surplus is the profits

25         of the company?

1    A.    We would have gotten together with him.

2    Q.    This is 1990, though.  Do you recall that?

3    A.    No.  It's too long ago.

4    Q.    Well, you recall meeting with him in the '80s.

5          You recall meeting with him in the '70s.

6    A.    Well, as far as talking with him, whenever any of

7          these, we got right from Mr. Mittag.

8    Q.    So would it always be in person?

9    A.    Yes.

10   Q.    So if we see one of these documents like LaP 46,

11         it would be fair to conclude that you met with him

12         at or about the date of the document?

13   A.    Yes.

14   Q.    But you don't have any specific recollection of

15         what you talked about or didn't talk about with

16         him on this date?

17   A.    Correct.

18   Q.    All right.  You know, here we have, for example, a

19         policy cash value $14,000; correct?

20   A.    Yes.

21   Q.    And additions of $8,448; correct?

22   A.    Correct.

23   Q.    Do you recall any reaction to getting that

24         information?  Would you have understood what it

25         meant?

1   A.   I don't know if I understood what the additions

2        were, other than accumulation of dividends over

3        the years.

4   Q.   All right.  And the policy cash value of $14,094,

5        would you have understood what that meant?

6   A.   I think -- I'm not sure.

7   Q.   All right.  You wouldn't even know, for example,

8        whether that represented the total of your premium

9        payments or some other number; true?

10  A.   Correct.

11  Q.   And do you recall -- Just to be thorough, if not

12       repetitious, do you recall any discussion at all,

13       any subject matter that Mr. Mittag talked to you

14       about in this or any other meeting that we haven't

15       talked about?

16  A.   No.

17  Q.   You referred earlier to LaP 57, and this is a form

18       that, at least the information is as of May 1,

19       2001.  Do you see that?

20  A.   M-hm.  Yes.

21  Q.   All right.  And this one actually shows your 2001

22       dividend; do you recall?

23  A.   Yes.

24  Q.   Do you recall getting statements in this form?

25  A.   Yes.  I got a few of them.

1   Q.   What did you do?  I mean what did you do with

2       these forms, other than put them in the folder?

3   A.   I looked at them and then put them in the

4       folder.

5   Q.   Any reaction that you recall to the numbers that

6       are on this page?

7   A.   No.

8   Q.   This one indicates for the first -- at least of

9       the documents we've identified specifically,

10      indicates total paid to date, $20,790.  Do you see

11      that?

12   A.   Yes.

13   Q.   Would you have kept track of those payments

14      yourself in some other form?

15   A.   None other than check stubs.

16   Q.   This indicates at this point that the policy has a

17      paid up -- or, excuse me, a total cash value of

18      $66,000, correct, three times as much?

19   A.   Yes.

20   Q.   Do you recall any reaction to that?

21   A.   No.

22   Q.   Do you recall even noticing that comparison

23      between what you paid in and what it was now

24      worth?

25   A.   I probably noticed it, but --

1   Q.   Did you --
2   A.   -- you know, when I looked at it at that time.
3   Q.   Did you know at this point what your options were
4        in terms of cashing this thing in or doing
5        something else with your money?
6   A.   No, because at that time I wasn't interested in
7        cashing it in.
8   Q.   Were you interested in getting, as most people
9        are, getting the best return on your investments
10       that you can?
11  A.   Yes.
12  Q.   And did you consider whether you could make this
13       much or more money in some other vehicle?
14  A.   No.  I trusted Northwestern was doing a good
15       job.
16  Q.   All right.  But, for example, you see also here
17       the 2001 dividend; don't you?
18  A.   Yes.
19  Q.   Did you have any idea as to how that number was
20       calculated when you got this statement?
21  A.   No.
22  Q.   The next page is a similar statement for the next
23       year, and if you look, it shows the, you know, the
24       total cash value is now $70,000, correct, $70,282?
25  A.   Yes.

1   A.   No.

2   Q.   -- discuss this with you?

3              Did you feel you understood the contract,

4        what you were signing?

5   A.   Yes.

6   Q.   And this was necessary to do in order to get the

7        distribution of the value of the contract?

8   A.   Correct.

9   Q.   Is there a reason why it happened on this

10       particular date or the month of July?

11  A.   No.  I wanted to have it done before I retired.

12  Q.   Okay.  But you had now set up an account at

13       Vanguard into which these funds could be rolled;

14       correct?

15  A.   Yes.

16  Q.   The option that you selected was Option A, which

17       was surrender entire contract, do you see that,

18       the first page, LaP 121?

19  A.   Yes.

20  Q.   And it says, this will cancel the contract.  True?

21  A.   Correct.

22  Q.   And you understood that's what you were doing?

23  A.   Yes.

24  Q.   All right.  And above the signature line, the

25       owner of the contract makes the following

1   authorization, election and certification.  Number

2   one, I am surrendering all or a portion of said

3   contract and all claims thereunder to Northwestern

4   Mutual.

5           Do you see that?

6   A.  What page are you on?

7   Q.  Page LaP 124.

8   A.  Yes.

9   Q.  And do you recall reading that before you signed

10      it?

11  A.  Yes.

12  Q.  Did you feel you understood it?

13  A.  Yes.

14  Q.  What did you think you were doing when you signed

15      this form surrendering all or a portion of said

16      contract and all claims thereunder?

17  A.  That it was going to be rolled over to Vanguard in

18      an IRA.

19  Q.  At that point did you feel you had any claims

20      against or claims under the contract?

21          MR. GEORGE KERSTEN:  Oh, I object on

22      that, on the vagueness and ambiguity of that,

23      calling for a legal conclusion.

24          MR. VAN VUGT:  Just say objection to

25      form.

1    STATE OF WISCONSIN)

2    MILWAUKEE COUNTY  )

3               I, JANET LARSEN, a Notary Public in and

4    for the State of Wisconsin, do hereby certify that the

5    deposition of MARLEEN LAPLANT was taken before me,

6    under and pursuant to Section 804 of the Wisconsin

7    Statutes and the acts amended, on the 9th day of

8    September, 2009.

9               That before said witness testified,

10   she was first duly sworn by me to testify the truth.

11              That I am not a relative or employee or

12   attorney or counsel of any of the parties, or a

13   relative or employee of such attorney or counsel, or

14   financially interested directly or indirectly in this

15   action, and I have not entered into a contract for

16   court reporting services unless the contract is limited

17   to a particular action or incident as stated in

18   Wisconsin Act 227.

19              That the foregoing pages is a true and

20   correct transcription of my original shorthand notes

21   taken at said time and place.

22              Dated this 15th day of September, 2009
                at Milwaukee, Wisconsin.

23

         _____

24       JANET DONALDSON LARSEN
         REGISTERED PROFESSIONAL REPORTER

25       NOTARY PUBLIC, STATE OF WISCONSIN
         MY COMMISSION EXPIRES 3-28-10



The Northwestern Mutual Life Insurance Company agrees
to pay the benefits provided in this policy, subject to its terms and
conditions. Executed at Milwaukee, Wisconsin
on the Date of Issue.

Secretary

*[signature]*

President

*[signature]*

**Flexible Premium Annuity**

**Participating**

Retirement Income payable at maturity.
Death Benefit payable before maturity.
Flexible Premium — Section 3.1(b).

**Right To Examine Policy**—Please examine this policy carefully. The
Owner may return the policy for any reason within ten days after
receiving it. If returned, the policy will be considered void from the
beginning and any premium paid will be refunded.



THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY·MILWAUKEE

EXHIBIT
A

# AMENDMENT OF CONTRACT TO QUALIFY AS INDIVIDUAL RETIREMENT ANNUITY

**As of the Date of Issue, the OWNERSHIP provisions of the contract are amended to add, or amend, Section 2.4 TRANSFERABILITY RESTRICTIONS to read:**

## 2.4 TRANSFERABILITY RESTRICTIONS

Notwithstanding any other provisions of this contract, the Owner may not transfer ownership of the contract except to a former spouse of the Owner under a divorce decree or under a written instrument incident to such divorce.

**In addition, as of the Date of Issue, specific provisions in this contract to the contrary notwithstanding, the contract is amended to limit and restrict the exercise of the rights of the Owner, Annuitant or Insured and any beneficiary and the amount of premiums as follows:**

1. Except for a single premium qualifying as a rollover contribution under applicable provisions of the Internal Revenue Code of 1954, as amended, the annual premiums shall not exceed $1,500. As a further limitation, (a) no additional payments may be made on a contract purchased with a single premium qualifying as such rollover contribution and (b) no premium may be paid unless the contract is an individual retirement annuity which meets the requirements of Section 408 of the Code for the taxable year of the Owner during which the payment is made and the payment (except for a single premium described in (a) above) meets the requirements for deduction under Section 219 of the Code.

2. Any dividend shall not be paid in cash but shall be applied to the payment of a premium, or to purchase paid-up additions, in accordance with the provisions of the contract.

3. Any portion of the surrender or maturity benefits paid to the Owner in one sum shall be paid no later than the close of the taxable year of the Owner in which the Owner attains age 70½.

4. Any portion of the surrender or maturity benefits not paid in one sum shall be paid, beginning no later than the close of the taxable year of the Owner in which the Owner attains age 70½, over (a) the life of the Owner or the lives of the Owner and the Owner's spouse, or (b) a period not extending beyond the life expectancy of such Owner or the life expectancy of such Owner and the Owner's spouse.

5. If the Owner dies before the contract benefits have been paid to him, or if payment to his surviving spouse has commenced under a payment plan and such surviving spouse dies with installments remaining payable under such plan, the entire contract benefits (or the withdrawal value under the payment plan if such plan is in effect) shall, within five years after his death (or the death of his surviving spouse), be paid to the beneficiary or beneficiaries designated by such Owner (or by his surviving spouse) or applied to the purchase of an immediate annuity for such beneficiary or beneficiaries which will be payable for the life of such beneficiary or beneficiaries (or for a term certain not extending beyond the life expectancy of such beneficiary or beneficiaries) which annuity shall be immediately distributed to such beneficiary or beneficiaries. The preceding sentence shall have no application if benefit payments under a term certain payment plan commenced before the death of the Owner and the term certain of such plan is for a period permitted under paragraph 4 above.

# SECTION 1. THE CONTRACT

## 1.1 BENEFITS

(a) **Retirement.** The Northwestern Mutual Life Insurance Company agrees, subject to the terms and conditions of this policy, to pay a Monthly Retirement Life Income to the Annuitant if living on the Maturity Date. The Monthly Retirement Life Income is payable for life commencing on the Maturity Date with installments certain for ten years under the Life Income Plan (Option C) described in Section 9.3(b). In lieu of the Monthly Retirement Life Income, the cash value at maturity will be paid to the Owner on the Maturity Date if requested prior to such date. The Monthly Retirement Life Income and Maturity Value shown on page 3 assume that the specified premium is paid on each due date.

(b) **Death.** The Northwestern Mutual Life Insurance Company agrees, subject to the terms and conditions of this policy, to pay a death benefit to the beneficiary upon receipt at its Home Office of proof of death of the Annuitant before the Maturity Date. The death benefit shall be the amount of the Flexible Premium Annuity premiums paid plus the reserve on any paid-up additions, or the cash value if greater.

## 1.2 INCONTESTABILITY

This policy shall be incontestable after it has been in force during the lifetime of the Annuitant for two years from the Date of Issue.

## 1.3 DATES

The contestable period commences with the Date of Issue. Policy months, years and anniversaries are computed from the Policy Date. Both dates are shown on page 3 of this policy.

## 1.4 MISSTATEMENT OF AGE OR SEX

If the age or sex of the Annuitant has been misstated, the amount payable shall be limited to the amount which the premiums paid would have purchased at the correct age or sex.

## 1.5 GENERAL

This policy and the application, a copy of which is attached when the policy is issued, constitute the entire contract. All statements in the application are representations and not warranties. No statement shall void this policy or be used in defense of a claim under it unless contained in the application.

Only an officer of the Company is authorized to alter this policy or to waive any of the Company's rights or requirements.

All payments by the Company under this policy are payable at its Home Office.

## 1.6 OPTIONAL MATURITY DATE

The Owner may elect to continue the policy in force, without any of the additional benefits, to an Optional Maturity Date by filing a written request with the Company at least 31 days before the Maturity Date. The Optional Maturity Date shall be the policy anniversary nearest the Annuitant's 75th birthday, or five years after the Maturity Date, whichever is later. All policy rights of the Owner shall continue in effect to the Optional Maturity Date. The cash value of the policy shall be increased at the rate of 3% compounded annually. Premium payments may be continued to the Optional Maturity Date.

# SECTION 2. OWNERSHIP

## 2.1 THE OWNER

The Owner is as shown on page 3, or his successor or transferee. All policy rights and privileges may be exercised by the Owner without the consent of any beneficiary. Such rights and privileges may be exercised only during the lifetime of the Annuitant and thereafter to the extent permitted by Sections 8 and 9.

## 2.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this policy, subject to the transferability restrictions in Section 2.4. Written evidence of transfer satisfactory to the Company must be filed at the Home Office and, unless waived by the Company, the policy must be submitted for endorsement to show the transfer.

## 2.3 COLLATERAL ASSIGNMENT

The Owner may assign this policy as collateral security, subject to the transferability restrictions in Section 2.4. The Company assumes no responsibility for the validity or effect of any collateral assignment of this policy. The Company shall not be charged with notice of any assignment unless the assignment is in

writing and filed at its Home Office before payment is made.

The interest of any beneficiary shall be subordinate to any collateral assignment made either before or after the beneficiary designation.

A collateral assignee is not an Owner and a collateral assignment is not a transfer of ownership, which can be accomplished only by complying with Section 2.2.

## 2.4 TRANSFERABILITY RESTRICTIONS

Notwithstanding any other provisions of this policy, the Owner may not change the ownership of this policy nor may this policy be sold, assigned or pledged as collateral for a loan or as security for the performance of an obligation or for any other purpose to any person other than the Company, unless the Owner is the trustee of an employee trust qualified under the Internal Revenue Code or the custodian of a custodial account treated as such. However, the foregoing restrictions shall not preclude the employer under a non-trusteed plan from transferring ownership of this policy to the Annuitant or to the employer or trustee under another plan or trust when required by the plan.

Case 2:11-cv-00916-JPS Filed 07/01/13 Page 72 of 149 Document 42

## 3.1 PREMIUMS

**(a) Payment.** All premiums after ...e first are payable at the Home Office or to an authorized agent. A receipt signed by an officer of the Company will be provided upon request.

**(b) Flexible Premium.** The amount of the first premium is shown on page 3. Subsequent premiums may vary in amount at the option of the Owner only, but no premium payment may be less than $25. Without the consent of the Company, premiums paid in any policy year may not exceed the greater of i) 200% of the amount of premiums due in the first policy year or ii) the amount of premiums due in the first year, plus $2,500.

**(c) Frequency.** Premiums may be paid annually, semiannually, or quarterly at the published rates for this policy. A change to any such frequency shall be effective upon acceptance by the Company of the premium for the changed frequency. Premiums may be paid on any other frequency approved by the Company.

If premiums are being paid by a public school employer or by an employer described in Section 501(c)(3) of the Internal Revenue code of 1954, the availability of premium frequencies other than those enumerated above will be limited to the period during which premiums are being paid by such employer.

**(d) Default.** If a premium is not paid on or before its due date, this policy shall terminate on the due date except as pr ded in Sections 3.1(e) and 5.3.

**(e) Grace Period.** A grace period of 31 days shall be allowed for payment of a premium not paid on its due date. The policy shall continue in full force during this period.

**(f) Date of Crediting.** If premiums are being paid annually, semiannually, or quarterly, a premium received no later than 31 days after the due date shall be credited as of the due date; a premium received later than 31 days after the due date shall be credited on the date received.

If premiums are being paid on a monthly or more frequent basis, the premium will be credited on the date received.

## 3.2 REINSTATEMENT

If the policy has not been surrendered for its cash value, it may be reinstated during the lifetime of the Annuitant and before the Maturity Date by the resumption of premium payments.

If this policy contains the Waiver of Premium Benefit and if this benefit has terminated pursuant to (c) in paragraph 6 of the Waiver of Premium Benefit, evidence of insurability satisfactory to the Company will be required for reinstatement of this benefit with the policy.

# SECTION 4. DIVIDENDS

## 4.1 ANNUAL DIVIDENDS

This policy shall share in the divisible surplus, if any, of the Company. This policy's share shall be determined annually and credited as a dividend. Payment of the first dividend is contingent upon payment of the premium or premiums for the second policy year and shall be credited proportionately as each premium is paid. Thereafter, each dividend shall be payable on the policy anniversary.

## 4.2 USE OF DIVIDENDS

As directed by the Owner, dividends may be paid in cash or applied under one of the following:

**(a) Paid-Up Additions.** Dividends may be applied to purchase paid-up retirement annuity additions. Paid-up additions will also share in the divisible surplus.

**(b) Premium Payment.** Dividends may be applied toward payment of any premium due within one year,

if the balance of the premium is paid. If the balance is not paid, or if this policy is in force as a paid-up annuity, the dividend will be applied to purchase paid-up additions.

If no direction is given by the Owner, dividends will be applied to purchase paid-up additions.

## 4.3 USE OF ADDITIONS

Paid-up additions increase the policy's cash value and loan value and are payable as part of the policy's proceeds. Additions may be surrendered unless required under the Loan or Paid-up Annuity provisions.

## 4.4 DIVIDEND AT DEATH

A dividend for the period from the beginning of the policy year to the end of the policy month in which the Annuitant dies shall be paid as part of the policy proceeds.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 73 of 149   Document 45   App. 243

# SECTION 5. CASH VALUE AND PAID-UP RETIREMENT ANNUITY

## 5.1 CASH VALUE

The cash value for each premium received shall be the net premium as defined below accumulated at a rate of 3% compounded annually from the date the premium is credited at the Home Office. The cash value of this policy shall be the aggregate of the cash values for all premiums received plus the reserve on any paid-up additions. The net premium is the basic premium multiplied by a net premium factor of .90. The basic premium is the total premium paid, exclusive of the premium for any additional benefits, less a collection charge of $.50 per payment, and less a policy fee. The policy fee is $10 per year and is charged in its entirety against the first premium paid in each contract year.

The table below shows cash values per $1,000 of basic premium for whole years elapsed from the date the premium is credited at the Home Office. Values for years not shown are calculated on the same basis as this table and will be furnished on request. Allowance shall be made for any fractional part of a year elapsed. The values shown are exclusive of any paid-up additions or indebtedness. All values are equal to or greater than those required by the State in which this policy is delivered.

## 5.2 CASH SURRENDER

The Owner may surrender this policy for its cash value less any indebtedness. The policy shall terminate upon receipt at the Home Office of this policy and a written surrender of all claims. Receipt of the policy may be waived by the Company.

The Company may defer paying the cash value for a period not exceeding six months from the date of surrender. If payment is deferred 30 days or more, interest shall be paid on the cash value less any indebtedness at the rate of 3% compounded annually from the date of surrender to the date of payment.

## 5.3 PAID-UP ANNUITY

If any premium remains unpaid at the end of the grace period, this policy shall continue in force as a participating paid-up retirement annuity with the death benefit as provided in Section 1.1(b). The Maturity Value will be for the amount the cash value will purchase as a net single premium at the attained age of the Annuitant. Any indebtedness shall remain outstanding.

## 5.4 RESERVES AND NET PREMIUMS

The Maturity Value for this policy is established using the 1955 American Annuity Mortality Table with interest at 3%. Reserves and net premiums used to fund the Maturity Value are determined with interest at 3%. The reserve is exclusive of any additional benefits.

### TABLE OF CASH VALUES

| Whole Years From Date Premium is Credited | Cash Value Per $1,000 of Basic Premium | Whole Years From Date Premium is Credited | Cash Value Per $1,000 of Basic Premium |
|---|---|---|---|
| 1 | $ 927 | 16 | $1,444 |
| 2 | 954 | 17 | 1,487 |
| 3 | 983 | 18 | 1,532 |
| 4 | 1,012 | 19 | 1,578 |
| 5 | 1,043 | 20 | 1,625 |
| 6 | 1,074 | 21 | 1,674 |
| 7 | 1,106 | 22 | 1,724 |
| 8 | 1,140 | 23 | 1,776 |
| 9 | 1,174 | 24 | 1,829 |
| 10 | 1,209 | 25 | 1,884 |
| 11 | 1,245 | 26 | 1,940 |
| 12 | 1,283 | 27 | 1,999 |
| 13 | 1,321 | 28 | 2,059 |
| 14 | 1,361 | 29 | 2,120 |
| 15 | 1,402 | 30 | 2,184 |

App. 244

### 6.1 POLICY LOAN

The Owner may obtain a policy loan by assignment of this policy to the Company. The amount of the loan, plus any existing indebtedness, shall not exceed the loan value. The Company may defer making a loan for six months unless the loan is to be used to pay premiums on policies issued by the Company.

### 6.2 LOAN VALUE

The loan value is the largest amount which, with accrued interest, does not exceed the cash value either on the next premium due date or at the end of one year from the date of the loan.

### 6.3 LOAN INTEREST

Interest is payable at the rate of 6% compounded annually, or at any lower rate established by the Company for any period during which the loan is outstanding. Interest on policy loans accrues on a daily basis from the date of the loan. Unpaid interest is added to and becomes part of the loan principal and bears interest on the same terms.

### 6.4 INDEBTEDNESS

Indebtedness is unpaid policy loans including accrued interest. Indebtedness may be repaid at any time. Any unpaid indebtedness will be deducted from the policy proceeds.

If indebtedness equals or exceeds the cash value, this policy shall terminate. Termination shall occur 31 days after a notice has been mailed to the address of record of the Owner and of any assignee recorded at the Home Office.

# SECTION 7. CHANGE OF POLICY

### 7.1 CHANGE OF PLAN

The Owner may change this policy to any permanent life or endowment plan offered by the Company on the Date of Issue of this policy. The change may be made upon payment of any cost and subject to the conditions determined by the Company. For a change made after the first year to a plan having a higher reserve, the cost shall not exceed the difference in cash reserve, the cost shall not exceed the difference in cash values or the difference in reserves, whichever is greater, plus 3½% of such difference.

The Owner may increase the retirement benefit at the Maturity Date to an amount not greater than three times the Monthly Retirement Life Income available on the Maturity Date upon payment of 103½% of the additional cash value required.

KK 12

8

# SECTION 8. BENEFICIARIE

## 8.1 DESIGNATION AND CHANGE OF BENEFICIARIES

(a) **By Owner.** The Owner may designate and change direct and contingent beneficiaries and further payees of death proceeds:

(1) during the lifetime of the Annuitant.

(2) during the 60 days following the date of death of the Annuitant, if the Annuitant immediately before his death was not the Owner. Any such designation of direct beneficiary may not be changed. If the Owner is the direct beneficiary and elects a payment plan, any such designation of contingent beneficiaries and further payees may be changed.

(b) **By Direct Beneficiary.** The direct beneficiary may designate and change contingent beneficiaries and further payees if:

(1) the direct beneficiary is the Owner.

(2) at any time after the death of the Annuitant, no contingent beneficiary or further payee is living, and no designation is made by the Owner under Section 8.1(a) (2).

(3) the direct beneficiary elects a payment plan after the death of the Annuitant, in which case the interest in the share of such direct beneficiary or any other payee designated by the Owner shall terminate.

(c) **By Spouse (Marital Deduction Provision).** Notwithstanding any provision of Section 8 or 9 of this policy to the contrary, if the Annuitant immediately before his death was the Owner and if the direct beneficiary is the spouse of the Annuitant and survives the Annuitant, such direct beneficiary shall have the power to appoint all amounts payable under the policy either to the executors or administrators of the direct beneficiary's estate or to such other contingent beneficiaries and further payees as he may designate. The exercise of such power shall revoke any then existing designation of contingent beneficiaries and further payees and any election of a payment plan applying to them.

(d) **Effective Date.** Any designation or change of beneficiary shall be made by the filing and recording at the Home Office of a written request satisfactory to the Company. Unless waived by the Company, the request must be endorsed on the policy. Upon the recording, the request will take effect as of the date it was signed. The Company will not be held responsible for any payment or other action taken by it before the recording of the request.

## 8.2 SUCCESSION IN INTEREST OF BENEFICIARIES

(a) **Direct Beneficiaries.** The proceeds of this policy shall be payable in equal shares to the direct beneficiaries who survive to receive payment. The unpaid share of any direct beneficiary who dies while receiving payment shall be payable in equal shares to the direct beneficiaries who survive to receive payment.

(b) **Contingent Beneficiaries.** At the death of the last surviving direct beneficiary, payments due or to become due shall be payable in equal shares to the contingent beneficiaries who survive to receive payment. The unpaid share of any contingent beneficiary who dies while receiving payment shall be payable in equal shares to the contingent beneficiaries who survive to receive payment.

(c) **Further Payees.** At the death of the last to survive of the direct and contingent beneficiaries, the proceeds, or the withdrawal value of any payments due or to become due if a payment plan is in effect, shall be paid in one sum:

(1) in equal shares to the further payees who survive to receive payment; or

(2) if no further payees survive to receive payment, to the executors or administrators of the last to survive of the direct and contingent beneficiaries.

(d) **Estate of Owner.** If no direct or contingent beneficiaries or further payees survive the Annuitant, the proceeds shall be paid to the Owner or the executors or administrators of the Owner.

## 8.3 GENERAL

(a) **Transfer of Ownership.** A transfer of ownership, will not change the interest of any beneficiary.

(b) **Claims of Creditors.** So far as permitted by law, no amount payable under this policy shall be subject to the claims of creditors of the payee.

(c) **Succession under Payment Plans.** A direct or contingent beneficiary succeeding to an interest in a payment plan shall continue under such plan subject to its terms, with the rights of transfer between plans and of withdrawal under plans as provided in this policy.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 76 of 149   Document 45   App. 246

# SECTION 9. PAYMENT OF POLICY BENEFITS

## 9.1 PAYMENT

Payment of policy benefits upon surrender or maturity will be made in cash or under one or more of the payment plans described in Section 9.2, if elected.

If policy benefits become payable by reason of the Annuitant's death, payment will be made under any payment plan then in effect. If no election of a payment plan is in effect, the proceeds will be held under the Interest Income Plan (Option A) with interest accumulating from the date of death until an election or cash withdrawal is made.

## 9.2 PAYMENT PLANS

**(a) Interest Income Plan (Option A).** The proceeds will earn interest which may be received in monthly payments or accumulated. The first interest payment is due one month after the plan becomes effective. Withdrawal of accumulated interest as well as full or partial proceeds may be made at any time.

**(b) Installment Income Plans.** Monthly installment income payments will be made as provided by the plan elected. The first payment is due on the date the plan becomes effective.

**(1) Specified Period (Option B).** Monthly installment income payments will be made providing for payment of the proceeds with interest over a specified period of one to 30 years. Withdrawal of the present value of any unpaid installments may be made at any time.

**(2) Specified Amount (Option D).** Monthly installment income payments will be made for a specified amount of not less than $5 per $1,000 of proceeds. Payments will continue until the entire proceeds with interest are paid, with the final payment not exceeding the unpaid balance. Withdrawal of the unpaid balance may be made at any time.

**(c) Life Income Plans.** Monthly life income payments will be made as provided by the plan elected. The first payment is due on the date the plan becomes effective. Proof of date of birth satisfactory to the Company must be furnished for any individual upon whose life income payments depend.

**(1) Single Life Income (Option C).** Monthly payments will be made for the selected certain period, if any, and thereafter during the remaining lifetime of the individual upon whose life income payments depend. The selections available are:

(i) no certain period,

(ii) a certain period of 10 or 20 years, or

(iii) a refund certain period such that the sum of the income payments during the certain period will be equal to the proceeds applied under the plan, with the final payment not exceeding the unpaid balance.

**(2) Joint and Survivor Life Income (Option E).** Monthly payments will be made for a 10 year certain period and thereafter during the joint lifetime of the two individuals upon whose lives income payments depend and continuing during the remaining lifetime of the survivor.

**(3) Withdrawal.** Withdrawal of the present value of any unpaid income payments which were to be made during a certain period may be made at any time after the death of all individuals upon whose lives income payments depend.

**(d) Payment Frequency.** In lieu of monthly payments, a quarterly, semiannual or annual frequency may be selected.

## 9.3 PAYMENT PLAN RATES

**(a) Interest Income and Installment Income Plans.** Proceeds under the Interest Income and Installment Income plans will earn interest at rates declared annually by the Company, but not less than a rate of 3% compounded annually. Interest in excess of 3% will increase payments, except that for the Installment Income Specified Amount plan (Option D), excess interest will be applied to lengthen the period during which payments are made.

The present value for withdrawal purposes will be based on the rate of 3% compounded annually.

The Company may from time to time also make available higher guaranteed interest rates under the Interest Income and Installment Income plans, with certain conditions on withdrawal as then published by the Company for those plans.

**(b) Life Income Plans.** Life Income Plan payments will be based on rates declared by the Company. These rates will provide at least 104% of the income provided by the Company's Immediate Annuities being offered on the date the plan becomes effective. The rates are based on the sex and age nearest birthday of any individual upon whose life income payments depend, and adjusted for any certain period and the immediate payment of the first income payment. In no event will payments under these rates be less than the minimums described in Section 9.3(c).

**(c) Minimum Income Payments.** Minimum monthly income payments for the Installment Income Plans (Options B and D) and the Life Income Plans (Options C and E) are shown in the Minimum Income Table. The minimum Life Income payments are determined as of the date the payment plan becomes effective and depend on the age nearest birthday adjusted for policy duration.

The adjusted age is equal to the age nearest birthday decreased by one year if more than 25 years have elapsed since the Policy Date, two years if more than 35 years have elapsed, three years if more than 40 years have elapsed, four years if more than 45 years have elapsed or five years if more than 50 years have elapsed.

## 9.4 ELECTION OF PAYMENT PLANS

**(a) Effective Date.** Election o. payment plans for death proceeds made by the Owner and filed at the Home Office during the Annuitant's lifetime will be effective on the date of death of the Annuitant. All other elections of payment plans will be effective when filed at the Home Office, or later if specified.

**(b) Death Proceeds.** Payment plans for death proceeds may be elected:

(1) by the Owner during the lifetime of the Annuitant.

(2) by the Owner during the 60 days following the date of death of the Annuitant, if the Annuitant immediately before his death was not the Owner. Any such election may not be changed by the Owner.

(3) by a direct or contingent beneficiary to whom such proceeds become payable, if no election is then in effect and no election is made by the Owner under Section 9.4(b) (2).

**(c) Surrender or Maturity Proceeds.** Payment plans for surrender or maturity proceeds may be elected by the Owner for himself as direct beneficiary.

**(d) Transfers Between Payment Plans.** A direct or contingent beneficiary receiving payment under a payment plan with the right to withdraw may elect to transfer the withdrawal value to any other payment plan then availab'.

**(e) Life Income Plan Limitations.** An individual beneficiary may receive payments under a Life Income Plan only if the payments depend upon his life. A corporation may receive payments under a Life Income Plan only if the payments depend upon the life of the Annuitant, or a surviving spouse or dependent of the Annuitant.

**(f) Minimum Amounts.** Proceeds of less than $5,000 may not be applied without the Company's approval under any payment plan except the Interest Income Plan (Option A) with interest accumulated. The Company retains the right to change the payment frequency or pay the withdrawal value if payments under a payment plan are or become less than $25.

## 9.5 INCREASE OF MONTHLY INCOME

Upon the death of the Annuitant, the direct beneficiary who is to receive the death proceeds of this policy under a payment plan may increase the total monthly income by payment of an annuity premium to the Company. The premium, after deduction of charges not exceeding 2% and any applicable premium tax, shall be applied under the payment plan at the same rates as the policy proceeds. The net amount so applied may not exceed twice the proceeds payable under this policy.

## MINIMUM INCOME TABLE
### Minimum Monthly Income Payments Per $1,000 Proceeds

#### INSTALLMENT INCOME PLANS (Options B and D)

| PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT | PERIOD (YEARS) | MONTHLY PAYMENT |
|---|---|---|---|---|---|
| 1 | $84.50 | 11 | $8.86 | 21 | $5.32 |
| 2 | 42.87 | 12 | 8.24 | 22 | 5.15 |
| 3 | 29.00 | 13 | 7.71 | 23 | 4.99 |
| 4 | 22.07 | 14 | 7.26 | 24 | 4.84 |
| 5 | 17.91 | 15 | 6.67 | 25 | 4.71 |
| 6 | 15.14 | 16 | 6.53 | 26 | 4.59 |
| 7 | 13.17 | 17 | 6.23 | 27 | 4.48 |
| 8 | 11.69 | 18 | 5.96 | 28 | 4.37 |
| 9 | 10.54 | 19 | 5.73 | 29 | 4.27 |
| 10 | 9.62 | 20 | 5.51 | 30 | 4.18 |

KK 12

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 78 of 149   Document 45

App. 248

# MINIMUM INCOME TABLE
## Minimum Monthly Income Payments Per $1,000 Proceeds

### LIFE INCOME PLANS

| SINGLE LIFE MONTHLY PAYMENTS (Option C) | | | | | |
|---|---|---|---|---|---|
| ADJUSTED AGE | | CERTAIN PERIOD | | | |
| MALE | FEMALE | NONE | 10 YEARS | 20 YEARS | REFUND |
| 50 | 55 | $4.62 | $4.56 | $4.34 | $4.36 |
| 51 | 56 | 4.72 | 4.65 | 4.40 | 4.44 |
| 52 | 57 | 4.83 | 4.75 | 4.46 | 4.52 |
| 53 | 58 | 4.94 | 4.85 | 4.53 | 4.61 |
| 54 | 59 | 5.07 | 4.96 | 4.59 | 4.69 |
| 55 | 60 | 5.20 | 5.07 | 4.66 | 4.79 |
| 56 | 61 | 5.33 | 5.19 | 4.72 | 4.88 |
| 57 | 62 | 5.48 | 5.31 | 4.78 | 4.99 |
| 58 | 63 | 5.64 | 5.43 | 4.84 | 5.09 |
| 59 | 64 | 5.80 | 5.57 | 4.90 | 5.20 |
| 60 | 65 | 5.98 | 5.70 | 4.96 | 5.32 |
| 61 | 66 | 6.16 | 5.85 | 5.02 | 5.44 |
| 62 | 67 | 6.36 | 5.99 | 5.07 | 5.57 |
| 63 | 68 | 6.57 | 6.14 | 5.13 | 5.71 |
| 64 | 69 | 6.79 | 6.30 | 5.17 | 5.85 |
| 65 | 70 | 7.03 | 6.45 | 5.22 | 6.00 |
| 66 | 71 | 7.28 | 6.62 | 5.26 | 6.15 |
| 67 | 72 | 7.54 | 6.78 | 5.30 | 6.31 |
| 68 | 73 | 7.83 | 6.95 | 5.33 | 6.48 |
| 69 | 74 | 8.13 | 7.11 | 5.36 | 6.66 |
| 70 | 75 | 8.45 | 7.28 | 5.39 | 6.85 |
| 71 | 76 | 8.79 | 7.45 | 5.41 | 7.05 |
| 72 | 77 | 9.16 | 7.62 | 5.43 | 7.26 |
| 73 | 78 | 9.55 | 7.79 | 5.45 | 7.48 |
| 74 | 79 | 9.96 | 7.95 | 5.46 | 7.71 |
| 75 | 80 | 10.41 | 8.11 | 5.48 | 7.95 |

### JOINT AND SURVIVOR MONTHLY PAYMENTS (Option E)

| ADJUSTED AGE | | JOINT PAYEE ADJUSTED AGE | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MALE | | 45 | 50 | 55 | 60 | 65 | 70 | 75 |
| | FEMALE | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 45 | 50 | $3.68 | $3.80 | $3.90 | $3.97 | $4.02 | $4.06 | $4.10 |
| 50 | 55 | 3.80 | 3.97 | 4.13 | 4.25 | 4.34 | 4.41 | 4.46 |
| 55 | 60 | 3.90 | 4.13 | 4.35 | 4.56 | 4.72 | 4.84 | 4.92 |
| 60 | 65 | 3.97 | 4.25 | 4.56 | 4.86 | 5.13 | 5.33 | 5.48 |
| 65 | 70 | 4.02 | 4.34 | 4.72 | 5.13 | 5.51 | 5.85 | 6.10 |
| 70 | 75 | 4.06 | 4.41 | 4.84 | 5.33 | 5.85 | 6.33 | 6.73 |
| 75 | 80 | 4.10 | 4.46 | 4.92 | 5.48 | 6.10 | 6.73 | 7.28 |

EMPLOYEE PLANS.
90-1533

APPLICATION TO

G 451666  THE NORTHWESTERN  TUAL LIFE INSURANCE COMPANY
MILWAUKEE, WISCONSIN

Trust No. _____
Payer No. _____ 'o7DA or IRA

TDA or IRA Only

1A. INSURED (Please Print)  First  Middle Initial  Last  Sex: ☐ Male  ☐ Female
OR ANNUITANT

1B. Owner
Identify in full.

1C. Category  ☐ TDA  ☐ IRC Sec. 151 (e) (4) – Public elementary or secondary school, college or university
of  ☐ TDA  ☐ IRC Sec. 501 (c) (3) – Give activity in which organization is engaged:
Policy:  ☐ TDA  ☐ IRC Sec. 408 (a) or (b) – Individual Retirement Account/Annuity
☐ IRA  ☐ IRC Sec. 408 (d) – IRA Rollover

2. RESIDENCE OF INSURED: Print:
Street & No. or R.F.D.
City _____ County _____ Zip Code 7 3 7 7
State

3. POLICY HEREBY APPLIED FOR: ("X" and complete one):
☐ A. Employee Life  ☐ RI at age _____
☐ (i) $ _____ Amount.
☐ (ii) Such amount as a _____ Premium of $ _____
will provide.  mode
☐ B. Flexible Premium Annuity at age _____ providing a monthly
Retirement Life Income of $ _____
☐ C. Flexible Premium Annuity at age _____ providing a monthly
Retirement Life Income of such amount as a _____
Premium of $ _____ will provide.  mode
☐ D. Retirement Annuity at age _____ providing a monthly
Retirement Life Income of such amount as a single premium of
$ _____ will provide.
☐ E. Other (EOL, Whole Life, 65 Life, etc.):
$ _____ Amount.  other, specify

4. PREMIUMS: ☐ Anl  ☐ Semi-Anl  ☐ Qtly  ☐ Mo.  ☐ Bi-Wkly
☐ Single  TDA _____  Months to be Om'tted

5. DATE POLICY: _____

6. ADDITIONAL BENEFITS:
☐ Waiver of Premium
☐ Other, _____
specify
If any Additional Benefits cannot be approved, should the policy be
issued without them?  ☐ Yes  ☐ No

7. Shall the Premium Loan provision, if available, become operative
according to its terms?  ☐ Yes  ☐ No

8. ANNUAL DIVIDENDS, until otherwise directed, shall be:
☐ A. Applied toward reduction of current premium.
☐ B. Applied to purchase paid-up additions.
☐ C. Left to accumulate at interest. (Not available if Annuity is
requested.) Owner's Taxpayer Ident. No.
☐ D. Cash.

9A. DIRECT BENEFICIARY of Retirement Life Income or Maturity Value.
(Applicable only to RI and FPA)
☐ INSURED  ☐ OWNER, but only in one sum.

B. DIRECT BENEFICIARY of Death Benefit:
☐ OWNER, but only in one sum.
☐ OTHER, Print Full Name _____
Relationship to Insured

C. CONTINGENT BENEFICIARY of Death Benefit:
Full Name (Print) _____
Relationship to Insured _____
(One of the following may be selected by marking with "X"):
☐ (1) and any (other) children of the Insured.
☐ (2) and any (other) children of the Insured, except that any amount
(or the withdrawal value thereof if a payment plan is in effect) a
deceased child of the insured would have received, if living, shall be
payable when due in one sum in equal shares to his or her then living
children.
Under (1) and (2) "children" includes child and any legally adopted
child, and decisions made by the Company upon evidence satisfac-
tory to it shall be conclusive and fully protect it.

8. If the premium for the policy applied for has been paid and the proposed Insured was actively at work and was on an acceptable risk but at a
premium higher than the premium paid for the plan or for any Additional Benefit applied for, the policy shall be issued at such higher premium
unless one of the following is selected:
☐ A. A Flexible Premium Annuity policy maturing at age _____
with a monthly Retirement Life Income of $ _____ or,
if no amount is here inserted, a monthly Retirement Life Income
the same as the policy applied for would have provided.
☐ B. A policy on the plan applied for but for such reduced amount
as the Company's rules and standards permit.
☐ C. No policy.

10. Has the premium for the policy applied for been paid to the agent in
exchange for the policy and the Conditional Life Insurance Agreement with the same
number as the application and if so, do you accept and agree to the
terms and conditions thereof?  ☐ Yes  ☐ No

11. Has application or informal inquiry ever been made to the Northwestern
Mutual for annuity, life, or disability insurance on the life of the
Insured?
☐ Yes  ☐ No  If yes, last Policy No. or Application Date is
QUESTIONS 12 THRU 16 APPLY TO AND MUST BE ANSWERED BY THE INSURED.

12A. DATE OF BIRTH: Mo. _____ Day _____ Yr. _____
B. Place of Birth: _____
City  State or Country

13. Are you a citizen of the United States? (If "No" give details and present
status in "REMARKS.")  ☐ Yes  ☐ No.

14A. PRESENT OCCUPATION:
If more than one, state all.
Job title and duties _____
Industry _____
B. Number of years with present employer _____

15. Will the insurance or annuity applied for replace insurance or annuities
on Insured's (or Annuitant's) life in this Company or elsewhere?
☐ Yes  ☐ No  If "Yes," explain and submit required papers.
ANSWERS TO QUESTION 16 NOT REQUIRED IF FLEXIBLE PREMIUM ANNUIT IS
APPLIED FOR WITHOUT WAIVER PREMIUM BENEFIT OR IF SIMPLIFIED ISSU IS
AVAILABLE.

16A. Are you a member of or do you contemplate joining, any branch of the
Armed Forces, the R.O.T.C., the National Guard or any other com-
ponent of the Armed Forces Reserve either on an active or inactive
status? (If "Yes" complete Military Section 90-5)  ☐ Yes  ☐ No

B. Have you flown within the past 5 years or do you contemplate flyin
except as a passenger on a regularly scheduled airline? (If "Yes" c m
plete Aviation Section, 90-5)  ☐ Yes  ☐ No

C. Have you within the past two years participated in or do you contem-
plate participating in racing (automobile, motorcycle, boat, go-kart, or
snowmobile), scuba, or skin diving, sky diving, mountain climbing or
rodeos? (If "Yes" complete Avocation Section, 90-6)  ☐ Yes  ☐ No.

D. In the past two years have you been in a motor vehicle acci ent,
charged with a moving violation of any motor vehicle law or had your
license restricted or revoked? (If "Yes" complete Driving Section, 90-6).
☐ Yes  ☐ No

E. Do you contemplate leaving the United States of America for travel or
residence? (If "Yes" explain in "REMARKS")  ☐ Yes  ☐ No

F. Have you ever had life, disability or hospital insurance declined, rated,
modified, cancelled or not renewed? (If "Yes" explain in "REMARKS")
☐ Yes  ☐ No.

ANSWER QUESTION 17 ONLY IF SIMPLIFIED ISSUE IS AVAILABLE.

17A. Are you a full-time employee? (If "No," explain in "REMARKS.")
☐ Yes  ☐ No

B. Are you now actively at work? (If "No" explain in "REMARKS.") (Actively
at work means that the Insured was actively at work on a full-time
basis on the date of this application or on one of the 3 days before
such date and that he has been so working for the 3 weeks preceding
the date of application without absence of more than 3 days because
of sickness or injury).  ☐ Yes  ☐ No

REMARKS:

he Insured or Annuitant consents to this application, acknowledges
:ceipt of the Federal Fair Credit Reporting Act and Medical Information
ureau notices and declares that the foregoing answers and statements are
orrectly recorded, complete and true to the best of his knowledge and belief.
: is agreed that: (1) If 3B, 3C or 3D is selected, the word "Annuitant" shall
: substituted for the word "Insured" wherever it appears.
2) If the premium is not paid when the application is signed, no policy
hall be in effect. If, however, a policy is delivered and the premium paid
luring the Insured's lifetime, the coverage shall be in effect if at the time
f such delivery and payment the answers and statements in the application
are then true and the Insured is then actively at work.
3) Acceptance of a policy in an extra premium classification shall amend
he policy so that if any premium is unpaid at the end of the grace period
he policy shall be automatically continued in force under the paid-up
insurance provision. If the policy contains the extended term insurance
provision, it may be continued as term insurance only with consent of the

Company or if the loan value is insufficient to grant a Premium Loan.
(4) If the premium is paid when the application is taken, no insurance
shall have been in effect. (If Paragraph 1 of the Receipt given for the
premium is applicable.)
(5) The owner of any policy issued on this application named in 1B may
elect a payment plan payable to the Insured as direct beneficiary at the
maturity of the policy or upon its surrender for cash.
(6) If the Owner is a Trustee or successor in trust, Custodian of qualified
custodial account or the employer under a qualified non-trusteed plan, the
Company shall be fully discharged of liability for all amounts paid to such
Owner and shall have no obligation as to the application of such amounts.
In all dealings with such Owner, including but not limited to any consent,
release or waiver of interest, the Company shall be fully protected against
the claims or demands of every other person.
(7) No agent is authorized to make or alter contracts or to waive any of
the Company's rights or requirements.

igned at ST _____ City  County  State  on _____ Month  Day  19__

_____ Signature of INSURED

_____ Signature of APPLICANT

_____ Signature of LICENSED AGENT

0-1533-0175)

AUTHORIZATION TO OBTAIN MEDICAL INFORMATION

authorize any physician, hospital, or other medically related facility, insurance company, the Medical Information Bureau, or other organization,
nstitution or person, that has any records, or knowledge of me, or my health or medical history, to give to the Northwestern Mutual Life Insurance Company or its reinsurers
Northwestern Mutual Life Insurance Company _____ 19__ _____
Witness  Signature of Insured

2:11-cv-00910-LA  Filed 07/01/13  Page 80 of 149  Document 45  App. 250

# — SPECIFICATIONS —

| PLAN AND ADDITIONAL BENEFITS | | AMOUNT | | PREMIUM | YEARS PAYABLE |
|---|---|---|---|---|---|
| FLEXIBLE PREMIUM ANNUITY AT AGE 65 | | | $ | 100.00 | 33 |
| MONTHLY RETIREMENT LIFE INCOME | $ | 332.09* | | | |
| MATURITY VALUE | | 59,621* | | | |

MATURITY DATE   MAY  1, 2008

A PREMIUM IS PAYABLE ON THE POLICY DATE AND EVERY POLICY MONTH THEREAFTER.
THE FIRST PREMIUM IS        $100.00.

   *THE MONTHLY RETIREMENT LIFE INCOME AND MATURITY VALUE SHOWN ABOVE
    ASSUME THAT THE SPECIFIED PREMIUM IS PAID ON EACH DUE DATE.

DIRECT BENEFICIARY   JOHN R  LA PLANT, HUSBAND OF THE ANNUITANT

OWNER              MARLEEN M  LA PLANT, THE ANNUITANT

ANNUITANT        MARLEEN M  LA PLANT

POLICY DATE      MAY  1, 1975

AGE AND SEX      34  FEMALE

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 81 of 149   Document 45-1   p. 251

# THE NORTHWESTERN MUTUAL LIFE
# INSURANCE COMPANY·MILWAUKEE 

### It is recommended that you...

CLAIRE A. THOMAS
GENERAL AGENT
MADISON, WISCONSIN

read your policy.

notify your NML agent or the Company at 720 E. Wisconsin Avenue, Milwaukee, Wis. 53202, of any address change.

call upon your NML agent for any information — particularly upon any suggestion to terminate or exchange this policy for any other policy or plan.

MARK E. MITTAG, Agent
81 North Main St.
Fort Atkinson, WI 53538
Office:  563-8168
Res:     563-2824

NML

NORTHWESTERN MUTUAL LIFE · MILWAUKEE

## Election of Trustees

The members of The Northwestern Mutual Life Insurance Company are its policyholders of insurance policies and deferred annuity contracts. The members exercise control through a Board of Trustees. Elections to the Board are held each year at the annual meeting of members. Members are entitled to vote in person or by proxy.

## Flexible Premium Annuity

## Participating

Retirement Income payable at maturity.
Death Benefit payable before maturity.
Flexible Premium — Section 3.1(b).

KK 12



**Northwestern Mutual™**

Investment Client Services Dept.
P.O. Box 2099
Milwaukee, WI 53201-2099
1 888 455 2232 ph
1 414 665 2632 fax

**ANNUITY DISTRIBUTION REQUEST**
Traditional, SEP, SIMPLE, Roth IRA

## 1. CONTRACT INFORMATION (Please Print)

| CONTRACT NUMBER | ANNUITANT NAME | E-MAIL ADDRESS |
|---|---|---|
| 6986523 | Marleen M La Plant | |

| OWNER TAXPAYER ID | OWNER NAME (IF DIFFERENT THAN ANNUITANT) | OWNER DAYTIME PHONE |
|---|---|---|
| ▉ | | ( 920 ) 563 – 3920 |

For SIMPLE IRA Contract Owners only: Have you been a participant in a SIMPLE IRA plan over 2 years? ☐ Yes ☐ No

## 2. DISTRIBUTION TYPE & AMOUNT

Select A, B or C:

**☒ A. Surrender Entire Contract**

*This will cancel the contract.*
*Go to Section 3, "Federal & State Income Tax Withholding"*

**☐ B. Partial Withdrawal**

*Select **One** option below:*
**Amount:**

☐ Gross: $_____ Amount withdrawn **before** applicable withdrawal charges, market value adjustment, Federal/State Income Tax Withholding and/or Express Mail Delivery Fee.

☐ Net: $_____ Amount received **after** applicable withdrawal charges, market value adjustment, Federal/State Income Tax Withholding or Express Mail Delivery Fee.

☐ Available Corridor
☐ Maximum Withdrawal Charge Free Amount

Withdraw all available withdrawal charge free corridor.*
Withdraw all below, if applicable:
- Available withdrawal charge free corridor*
- 0% withdrawal charge category
- Class A units *(Only available on RR Series Variable Annuity Contracts issued after 3/00)*

*Withdrawal charge free amount not available from amounts withdrawn from GIF 8 during first four years of the guaranteed period.

**☐ C. Systematic Withdrawal**

*Withdraw money automatically in equal amounts as indicated below ($100 minimum):*
**Amount:**

☐ Set Up
☐ Change
☐ Terminate Existing Election Immediately

☐ Gross: $_____ Amount withdrawn **before** applicable withdrawal charges, market value adjustment, and/or Federal/State Income Tax Withholding

☐ Net: $_____ Amount received **after** applicable withdrawal charges, market value adjustment, and/or Federal/State Income Tax Withholding.

☐ Available Corridor

Withdraw all available withdrawal charge free corridor.
**(Only available on RS SPRA contracts)**

*Available for:*
- *Flexible Premium Annuities issued after 3/85*
- *Variable Annuities*
- *Single Premium Retirement Annuities*

LaP 0121

**Frequency:**

Withdrawals will be MONTHLY unless a different frequency is selected.
Withdrawals will process on the same day of each month. Requests received on days 29, 30 or 31 will begin on the first of the next month.
☐ Quarterly        ☐ Semi-Annually        ☐ Annually

**Duration:**

The withdrawals will end...
- Automatically when the amount in any of the selected funds is depleted via transfer or withdrawal -OR-
- Automatically when the final amount is distributed and there is no value left in the contract. Please note, the contract will then terminate -OR-
- After the specified period of time:    YEARS _____    MONTHS _____

# Northwestern Mutual™

Investment Client Services Dept.
P.O. Box 2099
Milwaukee, WI 53201-2099
1 888 455-2232 ph
1 414 665 2532 fax

# ANNUITY DISTRIBUTION REQUEST
## Traditional, SEP, SIMPLE, Roth IRA

## 3 FEDERAL & STATE INCOME TAX WITHHOLDING SELECTION (Variable Annuities Only) (Not applicable for Roth IRAs)

I DO NOT want Federal or State Income Tax withheld unless specified below:

☐ Withhold _____ % -OR- $ _____ Federal Income Tax; withhold State Income Tax if applicable.

## 4 INVESTMENT OPTION SELECTION (Variable Annuities Only)

Distributions will be **DEDUCTED PROPORTIONATELY**[†] from each invested fund (excluding GIF 8) **unless the Dollar or Percent to withdraw is specified below:**

- If entire fund, indicate "ALL"
- Indicate either a dollar amount or percentage
- Enter whole number only

| Investment Option | Dollar (Not available for Systematic Withdrawals) | OR | Percent |
|---|---|---|---|
| Large Company Value (MSA/American Century) ...A04 | $ | | % |
| Domestic Equity (MSA/Capital Guardian) ...A23 | $ | | % |
| Equity Income (MSA/T Rowe Price) ...A22 | $ | | % |
| Large Cap Blend (MSA/Capital Guardian) ...A29 | $ | | % |
| Index 500 Stock (MSA) ...A38 | $ | | % |
| Large Cap Core Stock (MSA) ...A25 | $ | | % |
| Neuberger Berman Socially Responsive ...A21 | $ | | % |
| Russell Multi-Style Equity ...A08 | $ | | % |
| Fidelity VIP Contrafund ...A13 | $ | | % |
| Focused Appreciation (MSA/Janus)* ...A05 | $ | | % |
| Growth Stock (MSA) ...A09 | $ | | % |
| Mid Cap Value (MSA/Alliance Bernstein) ...A15 | $ | | % |
| Fidelity VIP Mid Cap ...A30 | $ | | % |
| Index 400 Stock (MSA) ...A37 | $ | | % |
| Mid Cap Growth Stock (MSA) ...A18 | $ | | % |
| Small Cap Value (MSA/T Rowe Price) ...A31 | $ | | % |
| Index 600 Stock (MSA) ...A20 | $ | | % |
| Russell Aggressive Equity ...A32 | $ | | % |
| Small Cap Growth Stock (MSA) ...A17 | $ | | % |
| Research International Core (MSA/MFS) ...A03 | $ | | % |
| International Equity (MSA/Franklin Templeton) ...A26 | $ | | % |

| Investment Option | Dollar (Not available for Systematic Withdrawals) | OR | Percent |
|---|---|---|---|
| International Growth Stock (MSA) ...A06 | $ | | % |
| Emerging Markets Equity (MSA/MFS) ...A28 | $ | | % |
| Russell Non-US ...A36 | $ | | % |
| Short Term Bond (MSA) ...A02 | $ | | % |
| Select Bond (MSA) ...A39 | $ | | % |
| Russell Core Bond ...A24 | $ | | % |
| Inflation Protection (MSA/American Century) ...A14 | $ | | % |
| Long Term U.S. Government Bond (MSA/PIMCO) ...A12 | $ | | % |
| Multi Sector Bond (MSA/PIMCO) ...A35 | $ | | % |
| High Yield Bond (MSA) ...A33 | $ | | % |
| Asset Allocation (MSA) ...A16 | $ | | % |
| Balanced (MSA) ...A34 | $ | | % |
| Russell Real Estate Securities ...A07 | $ | | % |
| Russell LifePoints Variable Moderate ...A11 | $ | | % |
| Russell LifePoints Variable Balanced ...A01 | $ | | % |
| Russell LifePoints Variable Growth ...A19 | $ | | % |
| Russell LifePoints Equity Growth ...A27 | $ | | % |
| Money Market (MSA) ...A10 | $ | | % |
| Guaranteed Interest Fund 1 ...A44 | $ | | % |
| Guaranteed Interest Fund 8** ...A53 | $ | | % |
| **TOTAL** | $ | | 100 % |

* Effective April 30, 2008, the investment option name of Janus Capital Appreciation was changed to Focused Appreciation. This reflects a change in name only.
** Guaranteed Interest Fund 8: Market Value Adjustment (MVA) will apply only prior to the end of the guaranteed period.
† Proportionate deduction will not include GIF 8 except to the extent that amounts in the other funds are insufficient to cover the requested withdrawal.

**Note:** Fund code numbers in italics are for Home Office use only.
The parenthetical next to certain divisions listed above reflects the adviser (Mason Street Advisors, LLC) and the sub-adviser, if any, for the underlying investment option that corresponds to the division. Assets of a division are invested exclusively in the shares of the corresponding underlying investment options.

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202 • 414 271-1444 www.northwesternmutual.com

31-0502 (04/08)

LaP 0122

(Page 2 of 4) FE



**Investment Client Services Dept.**
P.O. Box 2099
Milwaukee, WI 53201-2099
1 888 455 2232 ph
1 414 665 2632 fax

**ANNUITY DISTRIBUTION REQUEST**
Traditional, SEP, SIMPLE, Roth IRA

## 5 PAYEE INSTRUCTIONS

*Select A, B or C:*

☐ **A. Mail Check Payable to Owner**

☐ **Express Mail Service –** $15.00 fee deducted from distribution proceeds. Please allow 3-5 business days for processing of distribution and an additional 1-2 days for express delivery.
    ☐ Signature required – additional $2 fee
    ☐ Signature not required

*Check will be mailed to address on record unless specified below:*
*(Street address required for Express Mail Service)*

ADDRESS

ADDRESS

| CITY | STATE | ZIP |
|------|-------|-----|
| | | |

☐ **This is a new address.** Update address on record to this new address.

☒ **B. Mail Check Payable to Financial Institution as a Direct Transfer/Rollover**

☐ **Express Mail Service –** $15.00 fee deducted from distribution proceeds. Please allow 3-5 business days for processing of distribution and an additional 1-2 days for express delivery.
    ☐ Signature required – additional $2 fee
    ☐ Signature not required

FINANCIAL INSTITUTION NAME
*Vanguard*

FOR THE BENEFIT OF          ACCOUNT NUMBER
*Marleen M. LaPlant*

ADDRESS
~~W7868 Riedel Lane~~ *P.O. Box 1110*

ADDRESS

| CITY | STATE | ZIP |
|------|-------|-----|
| ~~East~~ *Valley Forge* | *PA* | *19482-1110* |

### DIRECT TRANSFER or DIRECT ROLLOVER   Select one

☒ **From a Traditional/SEP IRA to:**
    ☒ Traditional/SEP IRA    ☐ 403(b) Tax Deferred Annuity
    ☐ Pension/401(k) Plan    ☐ 457(b) Governmental Plan
    ☐ Former Pension Annuity

☐ **From a SIMPLE IRA to a SIMPLE IRA**

☐ **From a SIMPLE IRA to:** (only available if owner has been in a SIMPLE plan for over 2 years)
    ☐ Traditional /SEP IRA    ☐ 403(b) Tax Deferred Annuity
    ☐ Pension/401(k) Plan    ☐ 457(b) Governmental Plan
    ☐ Former Pension Annuity

☐ **From a Roth IRA to a Roth IRA**

*LaP 0123*

### CONVERSION / RECHARACTERIZATION   Select one

| From: | To: |
|-------|-----|
| ☐ Traditional/SEP IRA | Roth IRA |
| ☐ Roth IRA | Traditional/SEP IRA |
| ☐ SIMPLE IRA | Roth IRA |

**OPTION C: Payee Instructions continued on page 4.**

*(ONLY AVAILABLE IF OWNER HAS BEEN IN A SIMPLE PLAN FOR OVER 2 YEARS.)*

31-0952 (0408)    The Northwestern Mutual Life Insurance Company * 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202 * 414 271-1444 -www.northwesternmutual.com    (Page 3 of 4) FE



Northwestern Mutual

Investment Client Services Dept.
P.O. Box 2099
Milwaukee, WI 53201-2099
1 888 455 2232 ph
1 414 665 2632 fax

**ANNUITY DISTRIBUTION REQUEST**
Traditional, SEP, SIMPLE, Roth IRA

## 5. OPTION C: PAYEE INSTRUCTIONS *(continued from page 3)*

☐ **C. Direct Deposit to Owner's Bank Account**

*Available for:*

- *Flexible Premium Annuities issued prior to 3/85 <u>with</u> surrenderable additions or full surrender*
- *Flexible Premium Annuities issued after 3/85*
- *Variable Annuities*
- *Single Premium Retirement Annuities*

*Complete bank information below:*

**Deposit Timing – Please allow 3-5 business days for distribution processing and an additional 3-5 banking days for the deposit to reach your bank account.**

You authorize Northwestern Mutual to electronically transfer the withdrawal/surrender amount from your deferred annuity contract directly to your bank and deposit the proceeds into your account.

BANK NAME

<u>ACCOUNT TYPE</u>

☐ Checking-
attach voided check

BANK TRANSIT NUMBER          ACCOUNT NUMBER

☐ Savings

## 6. EFFECTIVE DATE

This request *(completed, signed and in good order)* will be effective on:

- The date your request is received in the Northwestern Mutual Home Office, if received prior to the close of trading of the New York Stock Exchange, **-OR-**
- If your request is received after the close of trading of the New York Stock Exchange, the next available New York Stock Exchange date, **-OR-**
- The date of your current systematic withdrawal, **-OR-**
- For cash settlements at maturity the effective date will be the contract maturity date, **-OR-**
- A future effective date as indicated:          FUTURE EFFECTIVE DATE (MM/DD/YYYY)

## AUTHORIZATION AND CERTIFICATION

**The owner of the contract referenced in Section 1, "Contract Information" makes the following authorization, election and certification:**

1. I am surrendering all or a portion of said contract and all claims thereunder to Northwestern Mutual.
2. I elect to have NO Federal or, if applicable, State income tax withheld from the payment requested above UNLESS indicated in Section 3 of this form.
3. I certify that the owner's tax identification number in Section 1 of this form is correct.
4. I certify that the plan to which I have directed my distribution in an eligible rollover will accept the distribution under the plan's terms and, to the extent applicable, will separately account for any after-tax contributions.

X *Marlean M. LaClant*
SIGNATURE OF OWNER

*07-03-08*
DATE SIGNED (MM/DD/YYYY)

LaP 0124

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 86 of 149   Document 45     App. 256



# Merriam-Webster's Collegiate® Dictionary

## TENTH EDITION

Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.

Case 2:11-cv-00910-LA   Filed 07/01/13   Page 87 of 149   Document 45
App. 257



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1996 by Merriam-Webster, Incorporated

Philippines Copyright 1996 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.

  p.  cm.

  Includes index.
  ISBN 0-87779-708-0 (unindexed : alk. paper). — ISBN 0-87779-709-9 (indexed :
alk. paper). — ISBN 0-87779-710-2 (deluxe : alk. paper). — ISBN 0-87779-707-2
(laminated cover).
  1. English language—Dictionaries. I. Merriam-Webster, Inc.
PE1628.M36  1996
423—dc20        95-36076
              CIP

Merriam-Webster's Collegiate® Dictionary, Tenth Edition principal copyright 1993

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

  1516RMcN96

**¹surface** *n* (ca. 1604) **1 :** the exterior or upper boundary of an object or body **2 :** a plane or curved two-dimensional locus of points (as the boundary of a three-dimensional region) ⟨plane ∼⟩ ⟨∼ of a sphere⟩ **3 a :** the external or superficial aspect of something **b :** an external part or layer — **on the surface :** to all outward appearances

**²surface** *adj* (1664) **1 a :** of, located on, or designed for use at the surface of something **b :** situated, transported, or employed on the surface of the earth ⟨∼ mail⟩ ⟨∼ vehicles⟩ **2 :** appearing to be such on the surface only : SUPERFICIAL ⟨∼ friendships⟩

**³surface** *vb* **surfaced; surfacing** *vt* (1778) **1 :** to give a surface to: as **a :** to plane or make smooth **b :** to apply the surface layer to ⟨∼ a highway⟩ **2 :** to bring to the surface ∼ *vi* **1 :** to work on or at the surface **2 :** to come to the surface **3 :** to come into public view : SHOW UP — **sur-fac-er** *n*

**surface-active** *adj* (1920) **:** altering the properties and esp. lowering the tension at the surface of contact between phases ⟨soaps and wetting agents are typical ∼ substances⟩

**surface of revolution** (1840) **:** a surface formed by the revolution of a plane curve about a line in its plane

**sur-face–rip-ened** \'sər-fəs-͵rī-pənd, -͵rī-p⁼md\ *adj* (1945) **of cheese :** ripened by the action of microorganisms (as molds) on the surface

**surface structure** *n* (1964) **1 :** formal representation of the phonetic form of a sentence; *also* **:** the structure which such a representation describes

**surface tension** *n* (1876) **:** the attractive force exerted upon the surface molecules of a liquid by the molecules beneath that tends to draw the surface molecules into the bulk of the liquid and makes the liquid assume the shape having the least surface area

**surface–to–air** *adj* (1949) **:** launched from the ground against a target in the air

**surfacing** *n* (1882) **:** material forming or used to form a surface

**sur-fac-tant** \(͵)sər-'fak-tənt, 'sər-͵\ *n* [surface-active + -ant] (1950) **:** a surface-active substance (as a detergent) — **surfactant** *adj*

**surf and turf** *n* (1973) **:** seafood and steak served as a single course

**surf-bird** \'sərf-͵bərd\ *n* (1839) **:** a shorebird (*Aphriza virgata*) of the Pacific coasts of America that has a black-tipped white tail

**surf-board** \-͵bōrd, -͵bȯrd\ *n* (ca. 1826) **:** a long narrow buoyant board (as of lightweight wood or fiberglass-covered foam) used in the sport of surfing — **surfboard** *vi* — **surf-board-er** *n*

**surf-boat** \-͵bōt\, *n* (1847?) **:** a boat for use in heavy surf

**surf casting** *n* (1928) **:** a method of fishing in which artificial or natural bait is cast into the open ocean or in a bay where waves break on a beach — **surf caster** *n*

**surf clam** *n* (1884) **:** any of various typically rather large hard-shelled edible clams (family Mactridae); *esp* **:** a common clam (*Spisula solidissima*) of the Atlantic coast chiefly from Nova Scotia to So. Carolina

**sur-feit** \'sər-fət\ *n* [ME *surfait*, fr. MF, fr. OF *surfaire* to overdo, fr. *sur-* + *faire* to do, fr. L *facere* — more at DO] (14c) **1 :** an overabundant supply : EXCESS **2 :** an intemperate or immoderate indulgence in something (as food or drink) **3 :** disgust caused by excess

**²surfeit** *vt* (14c) **:** to feed, supply, or give to surfeit ∼ *vi, archaic* **:** to indulge to satiety in a gratification (as indulgence of the appetite or senses) *syn* see SATIATE — **sur-feit-er** *n*

**surf fish** *n* (1882) **:** SURFPERCH

**sur-fi-cial** \͵sər-'fi-shəl\ *adj* [surface + -icial (as in superficial)] (1892) **:** of or relating to a surface ⟨∼ geologic processes⟩

**surf-ing** \'sər-fiŋ\ *n* (1926) **:** the sport of riding the surf esp. on a surfboard

**surf-perch** \'sərf-͵pərch\ *n* (1885) **:** any of a family (Embiotocidae) of small or medium-sized viviparous bony fishes chiefly of shallow water along the Pacific coast of No. America that resemble the perches

**¹surge** \'sərj\ *vb* **surged; surg-ing** [MF *sourge-*, stem of *sourdre* to rise, surge, fr. L *surgere* to go straight up, rise, fr. *sub-* up + *regere* to lead straight — more at SUB-, RIGHT] *vi* (1511) **1 :** to rise and fall actively : TOSS ⟨a ship *surging* in heavy seas⟩ **2 :** to rise and move in waves or billows : SWELL **3 :** to slip around a windlass, capstan, or bitts — used esp. of a rope **4 :** to rise suddenly to an excessive or abnormal value ⟨the stock market ∼*ed* to a record high⟩ **5 :** to move with a surge or in surges ⟨felt the blood surging into his face —Harry Hervey⟩ ∼ *vt* **1 :** to let go or slacken gradually (as a rope)

**²surge** *n* (1520) **1 :** a swelling, rolling, or sweeping forward like that of a wave or series of waves ⟨a ∼ of interest⟩ **2 a :** a large wave or billow : SWELL **b** (1) **:** a series of such swells or billows (2) **:** the resulting elevation of water level **3 :** the tapered part of a windlass barrel or a capstan **4 a :** a movement (as a slipping or slackening) of a rope or cable **b :** a sudden jerk or strain caused by such a movement **5 a :** a transient sudden rise of current or voltage in an electrical circuit

**sur-geon** \'sər-jən\ *n* [ME *surgien*, fr. AF, fr. OF *cirurgien*, fr. *cirurgie* surgery] (14c) **:** a medical specialist who practices surgery

**sur-geon-fish** \-͵fish\ *n* (1871) **:** any of a family (Acanthuridae) of tropical bony fishes that have toxic flesh and typically a movable spine on each side of the body near the base of the tail capable of inflicting a painful wound

**surgeon general** *n, pl* **surgeons general** (1706) **:** the chief medical officer of a branch of the armed services or of a public health service

**surgeon's knot** *n* (1733) **:** any of several knots used in tying ligatures or surgical stitches; *esp* **:** a reef knot in which the first knot has two turns — see KNOT illustration

**sur-gery** \'sər-jə-rē, 'sər-jə-\ *n, pl* **-ger-ies** [ME *surgerie*, fr. MF *cirurgie*, fr. L *chirurgia*, fr. Gk *cheirourgos*, fr. *cheirourgos* surgeon, fr. *cheirourgos* doing by hand, fr. *cheir* hand + *ergon* work — more at CHIR-, WORK] (14c) **1 :** a branch of medicine concerned with diseases and conditions requiring or amenable to operative or manual procedures **2 :** alterations made as if by surgery ⟨literary ∼⟩ **3 a** *Brit* **:** a physician's or dentist's office **b :** a room or area where surgery is performed **4 :** an operation done by a surgeon **5 :** OPERATION

**sur-gi-cal** \'sər-ji-kəl\ *adj* [surgeon + -ical] (1770) **1 a :** of or relating to surgeons or surgery ⟨∼ skills⟩ **b :** used in or in connection with surgery **c :** characteristic of or resembling surgery or a surgeon esp. in control or incisiveness ⟨∼ precision⟩ **2 :** following or resulting from surgery ⟨∼ fevers⟩ — **sur-gi-cal-ly** \-k(ə-)lē\ *adv*

**su-ri-mi** \su̇-'rē-mē\ *n* [Jp, chopped meat or fish] (1976) **:** a fish product made from inexpensive whitefish and often processed to resemble more expensive seafood (as crabmeat)

**sur-jec-tion** \(͵)sər-'jek-shən\ *n* [prob. fr. *sur-* + *-jection* (as in *projection*)] (1964) **:** a mathematical function that is an onto mapping — compare BIJECTION, INJECTION 3

**sur-jec-tive** \-'jek-tiv\ *adj* (1964) **:** ONTO ⟨a set of ∼ functions⟩

**sur-li-ly** \'sər-lə-lē\ *adv* **sur-li-er; -est** [alter. of ME *sirly* lordly, imperious, fr. *sir*] (ca. 1572) **1** *obs* **:** ARROGANT, IMPERIOUS **2 :** irritably sullen and churlish in mood or manner : CRABBED **3 :** menacing or threatening in appearance ⟨∼ weather⟩ *syn* see SULLEN — **sur-li-ly** \-lə-lē\ *adv*

**sur-li-ness** \-lē-nəs\, *n* — **surly** *adv*

**¹sur-mise** \sər-'mīz\ *vt* **sur-mised; sur-mis-ing** (1569) **:** a thought or idea based on scanty evidence : CONJECTURE

**²surmise** \sər-'mīz\ *vt* **sur-mised; sur-mis-ing** [ME, to accuse, fr. MF *surmis*, pp. of *surmettre*, fr. L *supermittere* to throw on, fr. *super-* + *mittere* to send] (1700) **:** to imagine or infer on slight grounds

**sur-mount** \sər-'maunt\ *vt* [ME, fr. MF *surmonter*, fr. *sur-* + *monter* to mount] (14c) **1** *obs* **:** to surpass in quality or attainment : EXCEL **2 :** to prevail over : OVERCOME ⟨∼ an obstacle⟩ **3 :** to get to the top of : CLIMB **4 :** to stand or lie at the top of — **sur-mount-able** \-'maun-tə-bəl\ *adj*

**¹sur-name** \'sər-͵nām\ *n* (14c) **1 :** an added name derived from occupation or other circumstance : NICKNAME 1 **2 :** the name borne in common by members of a family

**²surname** *vt* (15c) **:** to give a surname to

**sur-pass** \sər-'pas\ *vt* [MF *surpasser*, fr. *sur-* + *passer* to pass] (1555) **1 :** to become better, greater, or stronger than : EXCEED **2 :** to go beyond : OVERSTEP **3 :** to transcend the reach, capacity, or powers of *syn* see EXCEED — **sur-pass-able** \-'pa-sə-bəl\ *adj*

**sur-pass-ing** *adj* (ca. 1580) **:** greatly exceeding others **:** of a very high degree — **sur-pass-ing-ly** \-'pa-siŋ-lē\ *adv*

**¹sur-plice** \'sər-pləs\ *n* [ME *surplis*, fr. OF *surpliz*, fr. ML *superpellicium*, fr. *super-* + *pellicium* coat of skins, fr. L *pellicius*, neut. of *pellicius* made of skins, fr. *pellis* skin — more at FELL] (13c) **:** a loose white outer ecclesiastical vestment usu. of knee length with large open sleeves

**²surplice** *adj* (1845) **:** having a diagonally overlapping neckline or closing ⟨a ∼ bodice⟩

**sur-plus** \'sər-(͵)pləs\ *n* [ME, fr. AF, fr. ML *superplus*, fr. L *super-* + *plus* more — more at PLUS] (14c) **1 a :** the amount that remains when use or need is satisfied **b :** an excess of receipts over disbursements **2 :** the excess of a corporation's net worth over the par or stated value of its capital stock — **surplus** *adj*

**sur-plus-age** \-͵(͵)plə-sij\ *n* (13c) **1 :** SURPLUS 1a **2 a :** excessive or nonessential matter **b :** matter introduced in legal pleading which is not necessary or relevant to the case

**surplus value** *n* (1887) **:** the difference between the value of work done or of commodities produced by labor and the usu. subsistence wages paid by the employer

**sur-print** \'sər-͵print\ *vt or n* (1917) **:** OVERPRINT

**sur-pris-al** \sə(r)-'prī-zəl\ *n* (1591) **:** the action of surprising **:** the state of being surprised

**¹sur-prise** *also* **sur-prize** \sə(r)-'prīz\ *n* [ME, fr. MF, fr. fem. of *surpris*, pp. of *surprendre* to take over, surprise, fr. *sur-* + *prendre* to take — more at PRIZE] (15c) **1 a :** an attack made without warning **b :** a taking unawares **2 :** something that surprises **3 :** the state of being surprised : ASTONISHMENT

**²surprise** *also* **surprize** *vb* **sur-prised; sur-pris-ing** *vt* (15c) **1 :** to attack unexpectedly; *also* **:** to capture by an unexpected attack **2 a :** to take unawares **b :** to detect or elicit by a taking unawares **3 :** to strike with wonder or amazement esp. because unexpected ∼ *vi* **:** to cause astonishment or surprise ⟨her success didn't ∼⟩ — **sur-pris-er** *n*

*syn* SURPRISE, ASTONISH, ASTOUND, AMAZE, FLABBERGAST mean to impress forcibly through unexpectedness. SURPRISE stresses causing an effect through being unexpected at a particular time or place rather than by being essentially unusual or novel ⟨*surprised* to find them at home⟩. ASTONISH implies surprising so greatly as to seem incredible ⟨a discovery that *astonished* the world⟩. ASTOUND stresses the shock of astonishment ⟨too *astounded* to respond⟩. AMAZE suggests an effect of bewilderment ⟨*amazed* by the immense size of the place⟩. FLABBERGAST may suggest thorough astonishment and bewilderment or dismay ⟨*flabbergasted* by his angry refusal⟩.

**sur-pris-ing** *adj* (1645) **:** of a nature that excites surprise

**sur-pris-ing-ly** \sə(r)-'prī-ziŋ-lē\ *adv* (1661) **1 :** in a surprising manner **:** to a surprising degree ⟨a ∼ fast runner⟩ **2 :** it is surprising that ⟨∼, voter turnout was high⟩

**sur-ra** \'su̇r-ə\ *n* [Marathi *sūra* wheezing sound] (1883) **:** a severe Old World febrile and hemorrhagic disease of domestic animals that is caused by a flagellate protozoan (*Trypanosoma evansi*) and is transmitted by biting insects

**sur-re-al** \sə-'rē(-ə)l, -'ri-əl *also* -'rā-əl\ *adj* [back-formation fr. *surrealism*] (1937) **1 :** having the intense irrational reality of a dream **2 :** SURREALISTIC — **sur-re-al-ly** *adv*

**sur-re-al-ism** \sə-'rē-ə-͵li-zəm, -'ri- *also* -'rā-\ *n* [F *surréalisme*, fr. *sur- + réalisme* realism] (1925) **:** the principles, ideals, or practice of producing fantastic or incongruous imagery or effects in art, literature, film, or theater by means of unnatural juxtapositions and combinations — **sur-re-al-ist** \-ist\ *n or adj*

**sur-re-al-is-tic** \-͵rē-ə-'lis-tik, -͵ri- *also* -͵rā-\ *adj* (1925) **1 :** of or relating to surrealism **2 :** having a strange dreamlike atmosphere or quality like that of a surrealist painting — **sur-re-al-is-ti-cal-ly** \-ti-k(ə-)lē\ *adv*

**sur-re-but-ter** \͵sər-(r)i-'bə-tər\ *n* (ca. 1601) **:** the reply in common law pleading of a plaintiff to a defendant's rebutter

**sur-re-join-der** \-(r)i-'jȯin-dər\ *n* (ca. 1543) **:** the reply in common law pleading of a plaintiff to a defendant's rejoinder

**sur-ren-der** \sə-'ren-dər\ *vb* **-dered; -der-ing** \-d(ə-)riŋ\ [ME, fr. MF *surrendre*, fr. *sur-* + *rendre* to give back, yield — more at RENDER] *vt* (15c) **1 a :** to yield to the power, control, or possession of another upon compulsion or demand ⟨∼*ed* the fort⟩ **b :** to give up completely or agree to forgo esp. in favor of another **2 a :** to give (oneself) up into the power of another esp. as a prisoner **b :** to give (oneself) over to something (as an influence) ∼ *vi* **:** to give oneself up into the power of another : YIELD *syn* see RELINQUISH

**²surrender** *n* (15c) **1 a :** the action of yielding one's person or giving up the possession of something esp. into the power of another **b :** the relinquishment by a patentee of rights or claims under a patent **c :** the

delivery of a principal into lawful custody by bail — called also *surrender by bail* **3** : the voluntary cancellation of the legal liability of an insurance company by the insured and beneficiary for a consideration **e** : the delivery of a fugitive from justice by one government to another **2** : an instance of surrendering

**sur·rep·ti·tious** \ˌsər-əp-ˈti-shəs, ˌsa-rəp-, ˌsə-rep-\ *adj* [ME, fr. L *surrepticius*, fr. *surreptus*, pp. of *surripere* to snatch secretly, fr. *sub-* + *rapere* to seize — more at RAPID] (15c) **1** : done, made, or acquired by stealth : CLANDESTINE **2** : acting or doing something clandestinely : STEALTHY **syn** see SECRET — **sur·rep·ti·tious·ly** *adv*

**surrey** \ˈsər-ē, ˈsə-rē\ *n, pl* **surreys** (*Surrey,* England) (ca. 1891) : a four-wheel two-seated horse-drawn pleasure carriage


surrey

**sur·ro·ga·cy** \ˈsər-ə-gə-sē\ *n* (1984) : the practice of serving as a surrogate mother

**¹sur·ro·gate** \ˈsər-ə-ˌgāt, ˈsə-rə-\ *vt* **-gat·ed; -gat·ing** [L *surrogatus,* pp. of *surrogare* to choose in place of another, substitute, fr. *sub-* + *rogare* to ask — more at RIGHT] (1533) : to put in the place of another: **a** : to appoint as successor, deputy, or substitute for oneself **b** : SUBSTITUTE

**²sur·ro·gate** \-gət, -ˌgāt\ *n, often attrib* (1603) **1 a** : one appointed to act in place of another : DEPUTY **b** : a local judicial officer in some states (as New York) who has jurisdiction over the probate of wills, the settlement of estates, and the appointment and supervision of guardians **2** : one that serves as a substitute **3** : SURROGATE MOTHER

**surrogate mother** *n* (1978) : a woman who becomes pregnant usu. by artificial insemination or surgical implantation of a fertilized egg for the purpose of carrying the fetus to term for another woman — **surrogate motherhood** *n*

**¹sur·round** \sə-ˈraund\ *vt* [ME, to overflow, fr. MF *suronder,* fr. LL *superundare,* fr. L *super-* + *unda* wave; influenced in meaning by *²round* — more at WATER] (ca. 1616) **1 a** (1) : to enclose on all sides : ENVELOP ⟨the crowd ∼*ed* her⟩ (2) : to enclose so as to cut off communication or retreat : INVEST **b** : to form or be a member of the entourage of ⟨flatterers who ∼ the king⟩ **c** : to constitute part of the environment of ⟨∼*ed* by poverty⟩ **2** : to extend around the margin or edge of : ENCIRCLE ⟨a wall ∼*s* the old city⟩ **b** : to cause to be surrounded by something ⟨∼*ed* himself with friends⟩

**²surround** *n* (1825) : something (as a border or ambient environment) that surrounds ⟨from urban centre to rural ∼ —Emrys Jones⟩

**surround·ings** \sə-ˈraun-diŋz\ *n pl* (1861) : the circumstances, conditions, or objects by which one is surrounded : ENVIRONMENT

**sur·roy·al** \sər-ˌroi(-ə)l, n [ME *surriȝal,* fr. *sur-* + *ryall* royal antler] (15c) : one of the terminal tines above the royal antler of a large deer (as a stag) usu. grown by four years of age

**sur·sum cor·da** \ˌsur-səm-ˈkor-də, -ˌdä\ *n* [LL, (lift up your) hearts; fr. the opening words] (1537) **1** *often cap S&C* : a versicle that in traditional eucharistic liturgies exhorts the faithful to enthusiastic worship **2** : something inspiriting

**sur·tax** \ˈsər-ˌtaks\ *n* (1881) **1** : an extra tax or charge **2** : a graduated income tax in addition to the normal income tax imposed on the amount by which one's net income exceeds a specified sum

**sur·tout** \(ˌ)sər-ˈtü, ˈsər-ˌ\ *n* [F, fr. *sur* over (fr. L *super*) + *tout* all, fr. L *totus* whole — more at OVER] (1686) : a man's long close-fitting overcoat

**sur·veil** \sər-ˈvā(ə)l\ *vt* **sur·veilled; sur·veil·ling** [back-formation fr. *surveillance*] (1949) : to subject to surveillance

**sur·veil·lance** \sər-ˈvā-lən(t)s *also* -ˈvā-yən(t)s\ *n* [F, fr. *surveiller* to watch over, fr. *sur-* + *veiller* to watch, fr. L *vigilare,* fr. *vigil* watchful — more at VIGIL] (1802) : close watch kept over someone or something (as by a detective); *also* : SUPERVISION

**sur·veil·lant** \-ˈvā-lənt *also* -ˈvāl-yənt *or* -ˈvā-ənt\ *n* (1819) : one that exercises surveillance

**¹sur·vey** \sər-ˈvā, ˈsər-ˌvā, *n* vb **sur·veyed; sur·vey·ing** [ME, fr. MF *surveeir* to look over, fr. *sur-* + *veeir* to see — more at VIEW] *vt* (15c) **1 a** : to examine as to condition, situation, or value : APPRAISE **b** : to query (someone) in order to collect data for the analysis of some aspect of a group or area **2** : to determine and delineate the form, extent, and position of (as a tract of land) by taking linear and angular measurements and by applying the principles of geometry and trigonometry **3** : to view or consider comprehensively **4** : INSPECT, SCRUTINIZE ⟨he ∼*ed* us in a lordly way —Alan Harrington⟩ ∼ *vi* : to make a survey

**²sur·vey** \ˈsər-ˌvā, sər-ˈvā, *n, pl* **surveys** (1548) **1** : the act or an instance of surveying: as **a** : a broad treatment of a subject **b** : POLL **5a 2** : something that is surveyed

**survey course** \ˈsər-ˌvā-\ *n* (1916) : a course treating briefly the chief topics of a broad field of knowledge

**sur·vey·ing** \sər-ˈvā-iŋ\ *n* (1682) : a branch of applied mathematics that teaches the art of determining the area of any portion of the earth's surface, the lengths and directions of the bounding lines, and the contour of the surface and of accurately delineating the whole on paper

**sur·vey·or** \sər-ˈvā-ər\ *n* (15c) : one that surveys; *esp* : one whose occupation is surveying land

**surviv·able** \sər-ˈvī-və-bəl\ *adj* (1955) : resulting in or permitting survival — **sur·viv·abil·i·ty** \-ˌvī-və-ˈbi-lə-tē\ *n*

**sur·viv·al** \sər-ˈvī-vəl\ *n, often attrib* (1598) **1 a** : a living or continuing longer than another person or thing **b** : the continuation of life or existence ⟨problems of ∼ in arctic conditions⟩ **2** : one that survives

**sur·viv·al·ist** \sə-ˈvī-və-list\ *n* (1970) : one who views survival as a primary objective; *esp* : one who has prepared to survive in the anarchy of an anticipated breakdown of society — **survivalist** *adj*

**survival of the fittest** *n* (ca. 1623) : NATURAL SELECTION

**sur·vi·vance** \sər-ˈvī-vən(t)s\ *n* (ca. 1623) : SURVIVAL

**¹sur·vive** \sər-ˈvīv\ *vb* **sur·vived; sur·viv·ing** [ME, fr. MF *survivre* to outlive, fr. L *supervivere,* fr. *super-* + *vivere* to live — more at QUICK] *vi* (15c) **1** : to remain alive or in existence : live on **2** : to continue to function or prosper *vt* **1** : to remain alive after the death of ⟨*survived* by his wife⟩ **2** : to continue to exist or live after ⟨*survived* the

earthquake⟩ **3** : to continue to function or prosper despite : WITHSTAND — **sur·vi·vor** \-ˈvī-vər\ *n*

**sur·vi·ver** \-ˈvī-vər\ *n* (1602) *archaic* : one that survives : SURVIVOR

**sur·vi·vor·ship** \-ˌship\ *n* (ca. 1597) **1** : the legal right of the survivor of persons having joint interests in property to take the interest of the person who has died **2** : the probability of surviving to a particular age; *also* : the number or proportion of survivors (as of an age group)

**Su·san B. An·tho·ny Day** \ˌsü-z'n-ˌbē-ˈan(t)-thə-nē-\ *n* (ca. 1951) : February 15 observed to commemorate the birth of Susan B. Anthony

**sus·cep·ti·bil·i·ty** \sə-ˌsep-tə-ˈbi-lə-tē\ *n, pl* **-ties** (1644) **1** : the quality or state of being susceptible; *esp* : lack of ability to resist some extraneous agent (as a pathogen or drug) : SENSITIVITY **2 a** : a susceptible temperament or constitution **b** *pl* : FEELINGS, SENSIBILITIES **3 a** : the ratio of the magnetization in a substance to the corresponding magnetizing force **b** : the ratio of the electric polarization to the electric intensity in a polarized dielectric

**sus·cep·ti·ble** \sə-ˈsep-tə-bəl\ *adj* [LL *susceptibilis,* fr. L *susceptus,* pp. of *suscipere* to take up, admit, fr. *sub-* + *capere* to take — more at SUB-, HEAVE] (1605) **1** : capable of submitting to an action, process, or operation ⟨a theory ∼ to proof⟩ **2** : open, subject, or unresistant to some stimulus, influence, or agency **3** : IMPRESSIONABLE, RESPONSIVE **syn** see LIABLE — **sus·cep·ti·bly** \-blē\ *adv*

**sus·cep·tive** \-ˈsep-tiv\ *adj* (15c) **1** : RECEPTIVE **2** : SUSCEPTIBLE — **sus·cep·tive·ness** *n* — **sus·cep·tiv·i·ty** \sə-ˌsep-ˈti-və-tē\ *n*

**su·shi** \ˈsü-shē *also* ˈsü-shē\ *n* [Jp] (1893) : cold rice dressed with vinegar, formed into any of various shapes, and garnished esp. with bits of raw fish or shellfish

**su·slik** \ˈsü-slik\ *n* [Russ] (1774) **1** : any of several rather large short-tailed ground squirrels (genus *Citellus*) of eastern Europe or northern Asia **2** : the mottled grayish black fur of a suslik

**¹sus·pect** \ˈsəs-ˌpekt, sə-ˈspekt\ *adj* [ME, fr. MF, fr. L *suspectus,* fr. pp. of *suspicere*] (14c) **1** : regarded or deserving to be regarded with suspicion : SUSPECTED ⟨investigates ∼ employees⟩ **2** : DOUBTFUL, QUESTIONABLE ⟨whose skills are ∼ —Peter Vecsey⟩

**²sus·pect** \ˈsəs-ˌpekt\ *n* (1591) : one who is suspected; *esp* : one suspected of a crime

**³sus·pect** \sə-ˈspekt\ *vb* [ME, fr. L *suspectare,* freq. of *suspicere* to look up at, regard with awe, suspect, fr. *sub-, sus-* up, secretly + *specere* to look at — more at SUB-, SPY] *vt* (15c) **1** : to imagine (one) to be guilty or culpable on slight evidence or without proof ⟨∼ him of giving false information⟩ **2** : to have doubts of : DISTRUST **3** : to imagine to exist or be true, likely, or probable ∼ *vi* : to imagine something to be true or likely

**sus·pend** \sə-ˈspend\ *vb* [ME, fr. OF *suspendre* to hang up, interrupt, fr. L *suspendere,* fr. *sub-, sus-* up + *pendere* to cause to hang, weigh] *vt* (14c) **1** : to debar temporarily from a privilege, office, or function ⟨∼ a student from school⟩ **2 a** : to cause to stop temporarily ⟨∼ bus service⟩ **b** : to set aside or make temporarily inoperative ⟨∼ the rules⟩ **3** : to defer to a later time on specified conditions ⟨∼ sentence⟩ **4** : to hold in an undetermined or undecided state awaiting further information ⟨∼ judgment⟩ ⟨∼ disbelief⟩ **5 a** : HANG; *esp* : to hang so as to be free on all sides except at the point of support ⟨∼ a ball by a thread⟩ **b** : to keep from falling or sinking by some invisible support (as buoyancy) ⟨dust ∼*ed* in the air⟩ **6 a** : to keep fixed or lost (as in wonder or contemplation) **b** : to keep waiting in suspense or indecision **7** : to hold (a musical note) into the following chord ∼ *vi* **1** : to cease operation temporarily **2** : to stop payment or fail to meet obligations **3** : HANG **syn** see DEFER

**suspended animation** *n* (1795) : temporary suspension of the vital functions (as in persons nearly drowned)

**sus·pend·er** \sə-ˈspen-dər\ *n* (1522) **1** : one that suspends **2** : a device by which something may be suspended: as : one of two supporting bands worn across the shoulders to support trousers, skirt, or belt — usu. used in pl. and often with *pair* **b** Brit : a fastener attached to a garment or garter to hold up a stocking or sock; *also* : a device consisting of garter and fastener — **sus·pend·ered** \-dərd\ *adj*

**sus·pense** \sə-ˈspen(t)s\ *n* [ME, fr. MF, fr. *suspendre*] (15c) **1** : the state of being suspended : SUSPENSION **2 a** : mental uncertainty : ANXIETY **b** : pleasant excitement as to a decision or outcome ⟨a novel of ∼⟩ **3** : the state or character of being undecided or doubtful : INDECISIVENESS — **sus·pense·ful** \-fəl\ *adj* — **sus·pense·ful·ly** \-fə-lē\ *adv* — **sus·pense·ful·ness** \-fəl-nəs\ *n* — **sus·pense·less** \-ləs\ *adj*

**suspense account** *n* (1869) : an account for the temporary entry of charges or credits or esp. of doubtful accounts receivable pending determination of their ultimate disposition

**sus·pens·er** \sə-ˈspen(t)-sər\ *n* (ca. 1960) : a suspenseful film

**sus·pen·sion** \sə-ˈspen(t)-shən\ *n* [ME *suspensyon,* fr. MF *suspension,* fr. LL *suspension-, suspensio,* fr. L *suspensus*] (15c) **1** : the act of suspending : the state or period of being suspended: as **a** : temporary removal from office or privileges **b** : temporary withholding (as of belief or decision) **c** : temporary abrogation of a law or rule **d** (1) : the holding over of one or more musical tones of a chord into the following chord producing a momentary discord and suspending the concord which the ear expects; *specif* : such a dissonance which resolves downward — compare ANTICIPATION, RETARDATION (2) : the tone thus held over **e** : stoppage of payment of business obligations : FAILURE — used esp. of a business or a bank **f** : a rhetorical device whereby the principal idea is deferred to the end of a sentence or longer unit **2 a** : the act of hanging : the state of being hung **b** (1) : the state of a substance when its particles are mixed with but undissolved in a fluid or solid (2) : a substance in this state (3) : a system consisting of a solid dispersed in a solid, liquid, or gas usu. in particles of larger than colloidal size — compare EMULSION **3** : something suspended **4 a** : a device by which something (as a magnetic needle) is suspended **b** : the system of devices (as springs) supporting the upper

\ə\ abut \ᵊ\ kitten, F table \ər\ further \a\ ash \ā\ ace \ä\ mop, mar \au̇\ out \ch\ chin \e\ bet \ē\ easy \g\ go \i\ hit \ī\ ice \j\ job \ŋ\ sing \ō\ go \o̊\ law \o̊i\ boy \th\ thin \t̲h\ the \ü\ loot \u̇\ foot \y\ yet \zh\ vision \ä, ᵏ, ᵉ, ῡ, œ, ⁀, ᵫ\ see Guide to Pronunciation

# Black's Law Dictionary®

## Seventh Edition

**Bryan A. Garner**
Editor in Chief



**WEST**
**GROUP**

ST. PAUL, MINN., 1999

App. 261

"BLACK'S LAW DICTIONARY" is a registered trademark of West
Group. Registered in U.S. Patent and Trademark Office.

COPYRIGHT © 1891, 1910, 1933, 1951, 1957, 1968, 1979, 1990 WEST PUBLISHING CO.

COPYRIGHT © 1999 By WEST GROUP
                    610 Opperman Drive
                    P.O. Box 64526
                    St. Paul, MN 55164–0526
                    1–800–328–9352,

All rights reserved
Printed in the United States of America

ISBN 0–314–22864–0
ISBN 0–314–24130–2—deluxe

 TEXT IS PRINTED ON 10% POST
CONSUMER RECYCLED PAPER



**surrejoinder** (sər-ri-**join**-dər). *Common-law pleading.* The plaintiff's answer to the defendant's rejoinder. See REPLICATION.

> "Where the common-law system of pleading is in force, the pleadings do not terminate with the plaintiff's replication. The defendant may interpose a rejoinder to the replication, and the plaintiff a surrejoinder to the defendant's rejoinder. Then follows the rebutter, which in turn may be met by a surrebutter." 61A Am. Jur. 2d *Pleading* § 193, at 192 (1981).

**surrender,** *n.* **1.** The act of yielding to another's power or control. **2.** The giving up of a right or claim; RELEASE (1). **3.** The return of an estate to the person who has a reversion or remainder, so as to merge the estate into a larger estate. **4.** *Commercial law.* The delivery of an instrument so that the delivery releases the deliverer from all liability. **5.** A tenant's relinquishment of possession before the lease has expired, allowing the landlord to take possession and treat the lease as terminated. — **surrender,** *vb.*

**surrender by bail.** A surety's delivery of a prisoner, who had been released on bail, into custody.

**surrender by operation of law.** An act that is an equivalent to an agreement by a tenant to abandon property and the landlord to resume possession, as when the parties perform an act so inconsistent with the landlord-tenant relationship that surrender is presumed, or when a tenant performs some act that would not be valid if the estate continued to exist.

**surrenderee.** One to whom a surrender is made. See SURRENDER.

**surrenderer.** See SURRENDEROR.

**surrender of a criminal.** An officer's delivery of a prisoner to the authorities in the appropriate jurisdiction. See EXTRADITION; RENDITION.

**surrender of a preference.** *Bankruptcy.* The yielding of a voidable conveyance, transfer, assignment, or encumbrance by a creditor to the trustee as a condition of allowing the creditor's claim.

**surrender of charter.** *Corporations.* The dissolution of a corporation by a formal yielding of its charter to the state under which it was created and the subsequent acceptance of that charter by the state.

> "The surrender of a charter can be made only by some formal, solemn act of the corporation, and will be of no avail until accepted by the government. There must be

the same agreement of the parties to dissolve that there was to form the compact. It is the acceptance which gives efficacy to the surrender. Consent of the state is sometimes given by general statute." 19 Am. Jur. 2d *Corporations* § 2738, at 546 (1986).

**surrender of copyhold.** *Hist.* The transfer by a tenant of a copyhold estate by yielding it to the lord in trust for the transferee according to the terms in the surrender. ● In normal practice, the tenant went to the steward of the manor and delivered a rod, a glove, or other customary symbol, thereby conveying to the lord (through the steward) all interest and title to the estate, in trust, to be then granted by the lord to the transferee. See COPYHOLD.

**surrenderor.** One who surrenders; esp., one who yields up a copyhold estate for conveyance. — Also spelled *surrenderer.* See COPY-HOLD.

**surrender to uses of will.** *Hist.* A required yielding of a copyhold interest passed by will to the will's uses. ● The requirement was abolished by St. 55 Geo. 3, ch. 192.

**surrender value.** See *cash surrender value* under VALUE.

**surreptitious** (sər-əp-**tish**-əs), *adj.* (Of conduct) unauthorized and clandestine; stealthily and usu. fraudulently done <surreptitious interception of electronic communications is prohibited under wiretapping laws>.

**surreptitious-entry warrant.** See WARRANT (1).

**surrogate** (**sər**-ə-git), *n.* **1.** A substitute; esp., a person appointed to act in the place of another <in his absence, Sam's wife acted as a surrogate>. **2.** PROBATE JUDGE <the surrogate held that the will was valid>. — **surrogacy** (**sər**-ə-gə-see), **surrogateship,** *n.*

**surrogate court.** See *probate court* under COURT.

**surrogate mother. 1.** A woman who carries a child to term on behalf of another woman and then assigns her parental rights to that woman and the father. **2.** A person who carries out the role of a mother.

**surrogate parent.** A person who carries out the role of a parent by court appointment or the voluntary assumption of parental responsibilities.

Unpublished Disposition

298 Wis.2d 247

See Rules of Appellate Procedure, Rule 809.23(3),
regarding citation of unpublished opinions.
Unpublished opinions issued before July 1, 2009, are
of no precedential value and may not be cited except
in limited instances. Unpublished opinions issued on
or after July 1, 2009 may be cited for persuasive value.
NOTE: THIS OPINION WILL NOT APPEAR
IN A PRINTED VOLUME. THE DISPOSITION
WILL APPEAR IN A REPORTER TABLE.
Court of Appeals of Wisconsin.

Catherine D. NOONAN and Daniel
A. Noonan, Plaintiffs–Appellants,

v.

The NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, Doe A; Doe
B; Doe C; Insurer X; Insurer Y and
Insurer D, Defendants–Respondents.

No. 2005AP1683.   |   Nov. 16, 2006.

Appeal from an order of the circuit court for Milwaukee
County: Earl Schmidt, Judge. Affirmed.

Before DYKMAN, DEININGER and HIGGINBOTHAM,
JJ.

**Opinion**

¶ 1 DYKMAN, J.

  **\*1** Catherine and Daniel Noonan (Noonans) appeal from
an order denying their motion for class certification in their
action for breach of contract and breach of fiduciary duty
against The Northwestern Mutual Life Insurance Company
(NML). Noonans contend that the circuit court erroneously
denied class certification because, on the facts in the record,
all three criteria for class certification are met and no facts
indicate a class action would be unmanageable. We conclude
that the circuit court's decision to deny class certification,
because a class action would be unmanageable, is supported
by the record, and is not an erroneous exercise of discretion.
Accordingly, we affirm.

*Background*

¶ 2 The following facts are taken from the circuit court's
decision to deny class certification. [1] NML sells financial
instruments, such as annuities and life insurance policies,
through independent agents throughout the United States. In
1976, Noonans purchased NML annuity contracts through
one of NML's agents, Daniel Madigan. The contracts
provided Noonans with a share of the divisible surplus of
NML, called "dividends."

¶ 3 When Noonans purchased their annuity contracts, most
of NML's financial instruments were invested in long-term
securities. However, in the early 1980s, high interest rates
caused some NML annuity owners to redeem their annuities
because short-term bonds were more lucrative. Because their
portfolio was uncompetitive in that market, in the mid–
1980s NML altered the basis for paying dividends for their
annuities, creating a "segmented account" that paid dividends
using a higher interest rate.

¶ 4 Noonans allege they first realized a change had been made
in the distribution of dividends for their NML annuities in
2000. They sued NML for breach of contract and breach of
fiduciary duty, seeking actual and punitive damages. After
we reversed the circuit court's judgment and order granting
NML's motion to dismiss, *see Noonan v. Northwestern Mut.
Life Ins. Co.,* 2004 WI App 154, ¶ 2, 276 Wis.2d 33, 687
N.W.2d 254, Noonans moved for class certification. The
parties briefed and argued the issue of class certification to
the circuit court, which denied the motion. Noonans appeal
from the denial of class certification. [2]

*Standard of Review*

¶ 5 We review a circuit court's denial of class certification
for an erroneous exercise of discretion. [3] *Sisters of St.
Mary v. AAER Sprayed Insulation,* 151 Wis.2d 708, 713,
445 N.W.2d 723 (Ct.App.1989) (citation omitted). "A trial
court properly exercises its discretion if it examines the
relevant facts, applies a proper legal standard and, using a
demonstrated rational process, reaches a conclusion that a
reasonable judge could reach." *Id.* (citation omitted). A proper
exercise of discretion relies on facts in the record or inferences
reasonably derived from the record. *Goberville v. Goberville,*
2005 WI App 58, ¶ 7, 280 Wis.2d 405, 694 N.W.2d 503

(citation omitted). Further, while a circuit court is required to articulate its reasoning, we may look to the record to find support for the circuit court's decision if that reasoning is not clear. *Id.* (citing *Vier v. Vier,* 62 Wis.2d 636, 639–40, 215 N.W.2d 432 (1974)).

¶ 6 We are not persuaded by Noonans's recitation of federal cases demonstrating that some federal circuits give less deference to denials of class certification than other discretionary decisions. *See, e.g., Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993) (concluding that "abuse of discretion can be found more readily on appeals from the denial of class status than in other areas, for the courts have built a body of case law with respect to class action status") (citation omitted). We rely on Wisconsin case law, which compels us to grant a circuit court's findings as to the manageability of a class action "a wide range of discretion." *Sisters of St. Mary,* 151 Wis.2d at 714, 445 N.W.2d 723 (citation omitted).

**\*2** ¶ 7 We uphold a circuit court's discretionary decision unless discretion was erroneously exercised, even if the trial court did not make its reasoning clear and even if we would have reached a different decision ourselves. *See, e.g., Vier,* 62 Wis.2d at 641, 215 N.W.2d 432 (affirming circuit court even though it did not explain the reason for its decision and even though supreme court may have reached a different decision in its place, because circuit court's decision was not unreasonable).

### Discussion

¶ 8 Under WIS. STAT. § 803.08, a party seeking class certification must establish three elements: commonality, numerosity, and adequate representation. *See Sisters of St. Mary,* 151 Wis.2d at 713–14, 445 N.W.2d 723. In deciding whether to certify a class, the circuit court also addresses the basic question of manageability, determining "whether the advantages of disposing of the entire controversy in one proceeding are outweighed by the difficulties of combining divergent issues and persons." *Id.* at 714, 445 N.W.2d 723 (citations omitted). If all three elements of class certification are met, it is in the public interest to certify the class. *Id.* (citing *Mercury Records v. Econ. Consultants,* 91 Wis.2d 482, 490, 283 N.W.2d 613 (Ct.App.1979)). However, even if all three elements of class certification are met, a circuit court may deny certification if it reasonably determines that the case would be unmanageable as a class action. *Id.* at 715, 445

N.W.2d 723. Here, the parties do not dispute that the elements of numerosity and adequacy are met. They argue over whether commonality is met and whether the circuit court properly determined that the case would be unmanageable as a class action. We conclude that the court's decision that a class action would be unmanageable in this case is supported by the facts in the record, and that it therefore properly exercised its discretion when it denied class certification. [4]

¶ 9 The determination of manageability is "primarily a factual one with which a [trial] court generally has a greater familiarity and expertise than does a court of appeals." *Id.* at 714, 445 N.W.2d 723. A circuit court, in determining class certification, must resolve "whether, considering the effect of all of the burdens [of class certification] together, which includes any synergistic effect those burdens may have, the burdens of a class action outweigh the benefits." *Id.* at 716, 445 N.W.2d 723. The court may consider difficulties it anticipates during discovery, trial, and jury verdict in reaching its decision on manageability. *See iid.* at 716–19.

¶ 10 Here, the circuit court identified choice of law and damages issues for plaintiffs from all fifty states who obtained their annuities under disparate scenarios as contributing to the unmanageability of a class action. Noonans argue that the circuit court erroneously relied on those factors and failed to weigh the potential benefits of a class action in determining that a class action would be unmanageable. We disagree.

**\*3** ¶ 11 Noonans first contest the circuit court's reliance on its finding that multiple states' laws may apply to various aspects of this case in determining that a class action would be unmanageable. [5] They argue that the circuit court's reliance on choice of law issues as a factor against class certification was an error of law because Wisconsin case law mandates that Wisconsin law apply to each issue in this case, relying on *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 270 Wis.2d 356, 677 N.W.2d 298. We disagree.

¶ 12 In *Beloit,* the supreme court concluded that, under WIS. STAT. § 180.1704 (1999–2000) and Wisconsin case law, Wisconsin law applied to an action for breach of fiduciary duty by a liquidating trust against a corporation incorporated in Delaware but domiciled in Wisconsin. *Beloit,* 270 Wis.2d 356, ¶¶ 1–3, 677 N.W.2d 298. In reaching that conclusion, the *Beloit* court first held that § 180.1704 put the Delaware corporation on notice that it would be subject to Wisconsin law if it transacted business in Wisconsin. *Id.,* ¶ 23. Then, the court explained that Wisconsin case law sets out two

tests for determining choice of law. First, courts look to "whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling." *Id.,* ¶ 24 (citation omitted). Then, courts analyze the five factors set forth in *Heath v. Zellmer,* 35 Wis.2d 578, 595, 151 N.W.2d 664 (Ct.App.1967): "(1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." *Id.,* ¶ 25, 151 N.W.2d 664. The *Beloit* court concluded that both tests supported applying Wisconsin law. *Id.,* ¶¶ 24–32.

¶ 13 We are not convinced that *Beloit* mandates Wisconsin law apply uniformly in this case. First, neither test is as clearly met here as in *Beloit.* In *Beloit,* the first test was met because the corporation's contacts with Delaware were limited to incorporation and filing bankruptcy there while every other significant event occurred in Wisconsin, so that "application of Delaware law ... would constitute officious intermeddling with the laws of Wisconsin." *Id.,* ¶ 24. Here, in contrast, the putative class contains members who purchased annuities in all fifty states, from independent agents. Thus, the contacts of foreign states are not so minimal here as to exclude their laws as "officious intermeddling." The court also relied on the corporation's minimal contact with Delaware and its extensive contact with Wisconsin in concluding all five *Heath* factors were met. *Id.,* ¶¶ 26–31, 151 N.W.2d 664. Because the putative class members in this case are domiciled and purchased their annuities from agents in all fifty states, the *Heath* factors do not weigh as heavily toward the application of Wisconsin law as they did in *Beloit.* [6]

¶ 14 Noonans also rely on *Schlosser v. Allis–Chalmers Corp.,* 86 Wis.2d 226, 239, 271 N.W.2d 879 (1978) (*Schlosser II* ), in which the supreme court stated that Wisconsin "follows the 'grouping of contacts' approach to determine which state law applies to resolve questions of contract. By this method the law of the state with which the contract has its most significant relationship applies." [7] Noonans contend that because NML is a Wisconsin company, has its home office here, and manages annuities here, Wisconsin has the most significant relationship to the contracts in this case and thus Wisconsin law controls. However, as the circuit court noted, this case is distinguishable from *Schlosser II.* Here, each putative class member individually purchased their annuities, while in *Schlosser II,* the life insurance policy was issued as a term of employment. *See Id.* While the plaintiff class members in *Schlosser II* lived and worked in various states, they were all

subject to the same master insurance plan purchased by Allis–Chalmers for their benefit. *Id.* at 235, 239–41, 271 N.W.2d 879. They all received the same letter notifying them of the change in their benefits. *Id.* at 235, 271 N.W.2d 879. Further, the *Schlosser II* court relied on the following comment in the Second Restatement of Conflict of Laws:

**\*4** *h. Group life insurance.* In the case of group life insurance, rights against the insurer are usually governed by the law which governs the master policy. This is because it is desirable that each individual insured should enjoy the same privileges and protection. So where an employer arranges for group life insurance for its employees, the rights of a particular employee against the insurer will usually be determined, in the absence of an effective choice-of-law clause and at least as to most issues, not by the local law of the state where the employee was domiciled and received his certificate but rather by the law governing the master policy with respect to that issue. This will usually be the state where the employer has his principal place of business.

*Id.* at 239–40 n. 2, 271 N.W.2d 879 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 192 cmt. h (1971)). Here, there are more significant contacts with the various states involved than in *Schlosser II,* and thus a "grouping of contacts" inquiry requires a more arduous judicial task and its result is less certain.

¶ 15 In addition, the *Schlosser II* court identified the following five factors from § 188 of the Second Restatement following its explanation of the "grouping of contacts" rule: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188). Because the contracts at issue here were negotiated and purchased in various states and the putative class members continue to reside there, these factors do not clearly establish that Wisconsin law applies.

¶ 16 Noonans also contend that Wisconsin's statute of limitations necessarily applies to all class members, and therefore any concern the circuit court had over the application of various statutes of limitation was erroneous. [8] Noonans rely on *Abraham v. General Cas. Co. of Wisconsin,* 217 Wis.2d 294, 576 N.W.2d 46 (1998), which explains the "final significant event" test for determining which state's statute of limitations will apply for an action sounding in

contract.[9] The *Abraham* court concluded that "a claim sounding in contract is a 'foreign cause of action' when the final significant event giving rise to a suable claim occurs outside the state of Wisconsin." *Id.* at 311, 576 N.W.2d 46. There, Abraham was a Wisconsin resident with an insurance policy issued by General Casualty, a Wisconsin corporation. *Id.* at 306, 576 N.W.2d 46. The insurance contract was negotiated and issued in Wisconsin. *Id.* The only event that occurred outside of Wisconsin was the injury for which Abraham sought insurance coverage. *Id.* at 299–300, 576 N.W.2d 46. The *Abraham* court concluded that the Wisconsin statute of limitation applied because Abraham had a "suable claim" for breach of contract when General Casualty denied his claim for underinsured motorist benefits in Wisconsin, rather than when he was injured in Florida. *Id.* at 312–13, 576 N.W.2d 46.

**\*5** ¶ 17 *Abraham,* however, is distinguishable on its facts. Abraham had a cause of action when his benefits were denied. That occurred entirely in Wisconsin. General Casualty denied the benefits and Abraham was notified of that denial in Wisconsin. There was no complexity in determining that the "final significant event" giving rise to his suable claim thus occurred in Wisconsin. Here, the facts are more varied. The putative class members reside in all fifty states. Their suable claims arose when NML breached their contracts, if it did. But where, and when, did this "final significant event" occur? We, and the circuit court, are left with the ambiguity discussed in the concurring opinion in *Abraham:*

> Does [the final significant event] occur in the state where the party in breach is located? Does it occur in the state wherein the injured party resides? Does it occur in the state where the ... contract was negotiated or purchased? Does it occur in the state from which the breach is communicated?

*Id.* at 315, 576 N.W.2d 46 (Bradley, J., concurring). The circuit court reasonably identified the resolution of such questions as to each putative class member, and the application of potentially differing statutes of limitations, as an obstacle to class certification.[10] The varied factual scenarios under which the plaintiffs entered into their contracts and then learned of NML's breach provide support for the court's conclusion that the potential application of various statutes of limitation contributed to the unmanageability of a class action.

¶ 18 Thus, Wisconsin law would not clearly apply to each aspect of a class action in this case, as the Noonans contend. On the motion for class certification, the parties briefed and argued the issue of which state's laws would apply, and the circuit court reasonably found that the varied factual scenarios for each putative class member rendered the determination and application of choice of law for all putative class members unmanageable. For example, as NML argues, whether NML owed each plaintiff a fiduciary duty would vary depending on the applicability of individual state laws.[11] As we held in our previous decision in this case, Noonans's allegations state a claim for breach of fiduciary duty under Wisconsin law. *Noonan,* 276 Wis.2d 33, ¶¶ 19–26, 687 N.W.2d 254. Whether the other putative class members state a claim for breach of fiduciary duty under their respective state laws has not yet been decided. *See id.* (relying on Wisconsin law in determining that NML owes Noonans a fiduciary duty). If other states' laws control the breach of fiduciary duty claim in this case, the application of those potentially differing laws would certainly render this case unmanageable. *See, e.g., Sisters of St. Mary,* 151 Wis.2d at 718, 445 N.W.2d 723.

**\*6** ¶ 19 Also, the circuit court recognized that the application of different states' laws to the putative class members' breach of contract claims would prove unmanageable.[12] As NML correctly asserts, the states have widely differing rules for the interpretation of contracts, most significantly concerning parol evidence.[13] Thus, the determination of which state's laws apply for the interpretation of the contracts at issue, and the resulting application of those rules to the contracts of each putative class member, was a reasonable factor for the circuit court to consider.[14]

¶ 20 Because it is not clear from the record that Wisconsin law definitively controls, the circuit court was justified in identifying the forgoing choice of law concerns as rendering a class action unmanageable.[15] We therefore conclude that it did not erroneously exercise its discretion in relying on this factor.

¶ 21 Noonans also contend that the circuit court erred by considering individual agent/plaintiff relationships as relevant to a determination of individual damages. They contend that the cases on which the circuit court relied were limited to claims for fraudulent misrepresentation, thus necessitating an analysis of individual sales, while here the conduct of the home office, not the individual agents, is

relevant. We conclude that the trial court correctly identified individual interactions between agents and purchasers as relevant to a determination of damages for Noonans's claims for breach of contract and breach of fiduciary duty. [16]

¶ 22 Contrary to Noonans's assertion, the federal cases on which the circuit court relied were not limited to actions for fraudulent misrepresentation. In *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 275–77 (W.D.Mo.2000), for example, the court found that the plaintiff's claims were too individualized and fact specific to support class certification for claims including fraudulent inducement, breach of fiduciary duty, and breach of contract in connection with the defendant's sale of life insurance policies. The court explained that individual agent/purchaser interactions would be relevant to proving reliance in the fraudulent inducement claim, and would also be necessary for proving the existence of a fiduciary duty and interpreting the ambiguous insurance contract. *Id.* at 277–82.

¶ 23 In *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 219 (W.D.Mich.1998), the court denied class certification for plaintiffs' claims, including their claims for fraud, breach of fiduciary duty, and breach of contract for the defendant's sale of misleading insurance policies. The court found that class certification was inappropriate under FED.R.CIV.P. 23(b)(3) because plaintiffs had "failed to show that the disparate legal and factual issues posed by this case are manageable in trial." *Id.* at 223. In reaching this conclusion, the court explained that the class action would require introduction of agent/purchaser interactions, because "the information ... was generally communicated to consumers, if at all, through varying oral representations," so that "adjudication of the claims will ... unavoidably require individualized treatment." [17] *Id.* at 224.

*7 ¶ 24 Here, the court found that a class action would entail the introduction of an unmanageable amount of evidence of agent/purchaser interactions to determine damages and affirmative defenses. [18] The circuit court had sufficient material from which to conclude that individual agent/purchaser interactions would need to be introduced during trial to determine damages, based on the varied factual scenarios under which individual plaintiffs obtained annuities and learned of the alleged breach. [19] Because the circuit court explained the factors it considered in determining the issue of individual damages would render a class action unmanageable, and reached a decision a reasonable judge

could reach, we conclude it did not erroneously exercise its discretion in relying on this factor.

¶ 25 Further, Noonans assert that the circuit court erroneously disregarded the "common fund" method typically used in class actions in finding that the jury would have to determine damages as to each individual plaintiff. In support, Noonans argue that *Schlosser v. Allis–Chalmers Corp.,* 65 Wis.2d 153, 168–72, 222 N.W.2d 156 (1974) (*Schlosser I*), compels class certification in this case. *Schlosser I,* however, is inapposite. In *Schlosser I,* the supreme court upheld the circuit court's determination that a class action could be maintained. *Id.* The *Schlosser I* court concluded that the circuit court reasonably certified the class because it could easily resolve the issue of separately triable damages, and accordingly affirmed. Here, Noonans urge us to reverse the circuit court's denial of class certification, arguing that its finding that the potentially disparate damage awards contributed to the unmanageability of a class action was unreasonable. As in *Schlosser I,* we conclude that the circuit court's decision was reasonable and we therefore will not disturb it.

¶ 26 The circuit court found that a jury verdict would "inquire as to damages and not as to a formula" and that "[i]ndividual damage awards will have to be fleshed out for the jury." We are not convinced that the court's failure to specifically address a "common fund" method for determining damages for the class means that it erroneously exercised its discretion. Noonans thoroughly argued in their brief to the circuit court on their motion for class certification how they believed damage awards could be easily handled by the circuit court in a class action. [20] However, the circuit court concluded the issue of damages nonetheless contributed to the unmanageability of a class action. [21] A reasonable judge could conclude that despite the availability of case management techniques in determining damages, the complicated factual scenarios in this case under which those damages arose rendered a class action unmanageable. [22] As we explained in *Sisters of St. Mary:*

*8 "Where the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation, the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials

of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created 'make the damage aspect of [the] case predominate,' and render the case unmanageable as a class action."

The trial court's conclusion that the present case falls into the latter category rather than the former is not unreasonable.

*Sisters of St. Mary's,* 151 Wis.2d at 720–21, 445 N.W.2d 723 (citations omitted).

¶ 27 Noonans also assert any reliance by the circuit court on affirmative defenses or mitigating factors for determining damages—if NML can establish that any putative class members learned of the 1985 change to dividend distribution and accepted it—was erroneous because there was no record to support that finding. We disagree.

¶ 28 In its brief in opposition to class certification, NML argued that some of the putative class members either waived or are estopped from asserting claims because they knew of the 1985 change and accepted it. The record reflects that NML's independent agents had been informed of the change, and that it was the agents' job to communicate information to annuity owners. Thus, it was logical for the circuit court to infer that some agents had communicated the 1985 change in dividend distribution to their clients. If those putative class

members knew of the change and accepted it, this would raise the issue of whether they waived their right to enforce the previous provisions, depending on which state's laws would apply. *See* 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 39:25 (4th ed.2000) (discussing differing states' views on waiver of contract provisions).

¶ 29 Finally, Noonans argue that the circuit court was required to balance the benefits and burdens of class action certification, and here ignored all the benefits in reaching its decision. However, on our review of the record, we conclude that Noonans adequately presented all those benefits to the circuit court for its consideration.[23] On our own review of those benefits and the burdens already explained, we conclude that a reasonable judge could find that class certification was nonetheless unmanageable in this case. Accordingly, we affirm.

**\*9** Order affirmed.

Not recommended for publication in the official reports.

**Parallel Citations**

726 N.W.2d 356 (Table), 2006 WL 3314622 (Wis.App.), 2007 WI App 1

Footnotes

1    For a more detailed factual background, *see Noonan v. Northwestern Mut. Life Ins. Co.,* 2004 WI App 154, ¶¶ 3–9, 276 Wis.2d 33, 687 N.W.2d 254.

2    We granted Noonan's petition for leave to appeal the denial of class certification pursuant to WIS. STAT. § 808.03(2) (2003–04). All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

3    Noonans concede that the standard of review for a denial of class certification is for an erroneous exercise of discretion, but assert that discretionary determinations based on erroneous views of the law are not given any deference. *See Consumer's Co–Op of Walworth County v. Olsen,* 142 Wis.2d 465, 473, 419 N.W.2d 211 (1988). This correctly states the erroneous exercise of discretion standard of review, but does not convince us to change that standard to a less deferential one. Because we conclude that the legal criteria for class certification were properly identified and applied to the facts in this case, we do not further question the circuit court's exercise of its discretion.

4    The circuit court said, in denying class certification: "Because the jury trial to determine the issues of breach of contract, breach of fiduciary duty, punitiveness and concomitant damages will not be manageable as a class action, the Court denies the motion." The court's ruling on commonality is not clear. However, because a court may deny certification because of unmanageability even if all the criteria for certification are met, the circuit court's denial of certification on a reasonable finding of unmanageability is dispositive. *See Sisters of St. Mary,* 151 Wis.2d at 715, 445 N.W.2d 723; *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 277 n. 5 (W.D.Mo.2000); *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 220 (W.D.Mich.1998); *Keyes v. Guardian Life Ins. Co. of Am.,* 194 F.R.D. 253, 256 (S.D.Miss.2000); *Parkhill v. Minnesota Mut. Life Ins. Co.,* 188 F.R.D. 332, 340 (D.Minn.1999). Thus, we need not determine whether commonality was met.

5    The parties do not contest that the policies at issue do not have a choice of law provision, and thus choice of law must be determined by case law.

6    We need not extensively analyze each factor under *Heath v. Zellmer,* 35 Wis.2d 578, 595, 151 N.W.2d 664 (Ct.App.1967), nor conclude which state's laws will apply to which issues in this case. For the purposes of concluding that the circuit court reasonably identified choice of law issues as contributing to the unmanageability of a class action, it suffices for us to distinguish this case from *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 270 Wis.2d 356, 677 N.W.2d 298, because this case is much less clearly governed solely by Wisconsin law.

7    As highlighted during oral arguments to this court, which test to follow when deciding choice of law in Wisconsin is less than clear. In *Schlosser v. Allis–Chalmers Corp.,* 86 Wis.2d 226, 239–40, 271 N.W.2d 879 (1970) (*Schlosser II* ), for example, the court stated it followed the "grouping of contacts" test but also relied on the five *Heath* factors. However, we need not resolve the state of choice of law in Wisconsin today. We conclude that under the various tests for choice of law identified and argued by the parties, the circuit court did not erroneously exercise its discretion in relying on choice of law concerns in deciding a class action would be unmanageable.

8    The court said: "NML has concerns about the applicability of the other state laws. Noonans argue that the laws of the forty-nine other states where the contracts were actually sold are not relevant. Statutes of limitation, for example, may very well be relevant."

9    *Abraham v. General Cas. Co. of Wisconsin,* 217 Wis.2d 294, 296 n. 1, 576 N.W.2d 46 (1998) interpreted Wisconsin's borrowing statute, which states:

> **Application of foreign statutes of limitation. (1)** If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies has expired, no action may be maintained in this state.
>
> **(2)** If an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies to that action has not expired, but the applicable Wisconsin period of limitation has expired, no action may be maintained in this state.
>
> *Id.*(quoting WIS. STAT. § 893.07 (1993–1994), which is identical to the current version).

10    *See, e.g.,* COLO.REV.STAT. ANN. § 13–80–101 (West 2006) (three-year statute of limitations for breach of contract in Colorado); CAL. CIV. PRO.CODE § 337 (West 2006) (four-year statue of limitation for breach of contract in California).

11    We note that the circuit court did not explain this reasoning for its decision. However, it did specifically find that a jury trial to determine breach of fiduciary duty would be unmanageable and later qualified its concern with choice of law for statutes of limitations with the phrase "for example," indicating other choice of law concerns were present. We conclude that such concerns were reasonable, and applied to the issue of fiduciary duties.

12    The court concluded that a jury trial to determine breach of contract would be unmanageable, and later said: "The Noonans also made shortshrift of other concerns NML has over commonality regarding equitable remedies the law has developed to take the harshness out of unambiguous contracts, e.g. waiver, estoppel, etc. These remedies may be applicable to any number of the proposed class depending on their individual facts." After stating its concern over choice of law issues, the court said: "The Court is not aware what the adversarial strategies of the parties will be, but it is more likely than not that many fact situations between clients and independent agents will be material and probative." While the court's reasoning is not clear from its opinion, we conclude on our own review of the record that the court was reasonable in concluding that the potential application of differing state laws to the interpretation of the contracts at issue contributed to the unmanageability of a class action.

13    We have decided that, under Wisconsin law, the Noonans's contracts are unambiguous in stating "that annuity policyholders 'will share in the divisible surplus of the Company' and the 'share shall be determined annually and credited as a dividend,' " and thus Noonans state a claim for breach of contract in their complaint. *Noonan,* 276 Wis.2d 33, ¶ 17, 687 N.W.2d 254. However, the states have developed different tests for determining whether a contract is ambiguous, and thus the absence of ambiguity under Wisconsin law does not necessarily translate into the absence of ambiguity if other states' laws apply. *See, e.g., Dieter v. Chrysler Corp.,* 2000 WI 45, ¶ 15, 234 Wis.2d 670, 610 N.W. 2. 832 ("Contractual language is ambiguous only when it is reasonably and fairly susceptible to more than one construction.") (citation omitted); *Bunkers v. Jacobson,* 653 N.W.2d 732, 738 (S.D.2002) ("Ambiguity exists when [the contract] is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.") (citation omitted); *Petovello v. Murray,* 139 Mich.App. 639, 362 N.W.2d 857, 858 (Mich.Ct.App.1984) ("It is a fundamental principal of law that, if the language of a written contract is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous, and a factual development is necessary to determine the intent of the parties."). Furthermore, the states have developed differing laws on the use of extrinsic evidence to help interpret contracts. *See, e.g., Jake C. Byers, Inc. v. J.B.C. Invs.,* 834 S.W.2d 806, 811 (Mo.Ct.App.1992) ("In the absence of fraud, accident, mistake, or duress, the parol evidence rule prohibits evidence of prior or contemporaneous oral agreements which vary or contradict the terms of an unambiguous, final and complete writing.") (citations omitted); *Mercury Inv. Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 529 (Okla.1985) ("While parol testimony cannot vary, modify or contradict the terms of the instrument, it is admissible to explain the meaning of words when there is a latent ambiguity in the written text of the agreement.") (citations omitted); *Hibbett Sporting Goods, Inc., v. Biernbaum,* 375 So.2d 431, 434 (Ala.1979) ("Where there exists doubt that the written agreement was ever intended to reflect the full agreement of the parties, the courts of this State have not hesitated to admit contradictory parol evidence of their true agreement.") (citations omitted).

14    We are not convinced by Noonans's assertion that the court was required to disregard the individual purchases of contracts and focus solely on the similarity of contract language among all putative class members. The circumstances under which each putative class member purchased annuities and where each "final significant event" occurred is relevant under Wisconsin law for determining which state's law to apply to a breach of contract claim. *See Abraham,* 217 Wis.2d at 315, 576 N.W.2d 46 (Bradley, J., concurring); *Schlosser II,* 86 Wis.2d at 239 n. 2, 271 N.W.2d 879.

15    The parties disagree over whether punitive damages are also a potential choice of law issue. Noonans contend that punitive damages are necessarily controlled by Wisconsin law while NML contends that they are not, claiming that such damages would be available under some states' laws and not others. We need not resolve this issue. The circuit court's order denying class certification does not appear to consider punitive damages as a potential choice of law concern. Rather, the court specifies its concern over punitive damages as the issue of individual determinations, citing recent Wisconsin cases.

16    Manageability under WIS. STAT. § 803.08 mirrors the question of manageability under FED.R.CIV.P. 23(b)(3). *Sisters of St. Mary,* 151 Wis.2d at 713–14, 445 N.W.2d 723. The circuit court thus correctly relied for guidance on federal cases discussing class certification under FED.R.CIV.P. 23(b)(3).

17    *See also Parkhill,* 188 F.R.D. at 335, 342–45 (denying class certification for plaintiff's claims for breach of contract and breach of Minnesota's consumer protection statutes because both claims would require evidence of individual contract purchases).

18    The court was "especially concerned with the punitive damages question and award," noting that recent Wisconsin cases may indicate higher evidentiary standards for the defense of punitive damages. *See, e.g., Strenke v. Hogner,* 2005 WI 25, ¶¶ 38–41, 279 Wis.2d 52, 694 N.W.2d 296 (concluding that punitive damages in Wisconsin require that the defendant's actions were "deliberate," "actually disregard[ed] the rights of the plaintiff," and were "sufficiently aggravated to warrant punishment by punitive damages," thus requiring evidence establishing punitive damages are warranted by clear and convincing evidence). (Citations omitted.) Noonans contend that this is a non-issue because punitive damages are only available in Wisconsin on the breach of fiduciary duty claim, not on the claim for breach of contract, and focus exclusively on the actions of the top management. We again note that this argument fails because this case is not clearly governed solely by Wisconsin law. Further, we do not analyze this concern of the trial court in isolation, but together with the other burdens to class certification. In their entirety, those burdens support the circuit court's decision to deny class certification.

19    Both parties submitted documents detailing the method by which dividends were originally distributed under the Noonans's annuities and how the 1985 change affected dividend distribution. As already noted, the parties also agreed that the putative class contained members from all fifty states and that each purchased their annuities from independent agents.

20    Noonans argued:

      If the class makes a recovery by settlement or judgement, administration of the recovered fund occurs, in which the formula and procedure for distribution of the recovery among the class members are determined and implemented. 5 Newberg, ch. 10, 11. The administration and distribution process is usually handled by a court-appointed administrator.

      ....

      Any dollar differential between amounts due annuities, including both those still in the "deferral" period and those which have terminated or reached maturity since March 1, 1985, would in the normal course be recognized in the distribution formula applied in the administration of any Class recovery.

21    While the circuit court did not explain its analysis of those available methods for managing damages among the putative class, we conclude that is not fatal to its decision. We may look beyond the actual decision for support for a circuit court's exercise of its discretion. *See Vier v. Vier,* 62 Wis.2d 636, 639–40, 215 N.W.2d 432 (1974).

22    We also note that a circuit court may reasonably deny class certification despite the availability of case management techniques. *See Sisters of St. Mary,* 151 Wis.2d at 718, 445 N.W.2d 723.

23    Noonans argued:

      The actions of NML complained of here were directed against the Class, not individually against the named plaintiffs or any other individual member of the Class. The dividend rights of the entire Class were adversely impacted in the same, class-wide way. There are far too many injured annuity owners to even consider separate actions. The rights of the Class are in good hands. It would be unjust and against the public interest to deny class certification in these circumstances.

---

**End of Document**                                                          © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 6216361 (Wis.Cir.) (Trial Order)
Circuit Court of Wisconsin.
Milwaukee County

Catherine D. NOONAN and Daniel A Noonan, Plaintiffs,

v.

THE NORTHWEST MUTUAL LIFE INSURANCE COMPANY, Doe
A; Doe B; Doe C; Insurer X; Insurer Y and Insurer D, Defendants.

No. 01-CV-012349.
July 6, 2005.

**Decision on Motion to Certify for Class Action**

Kersten & McKinnon, S.C., by E. Campion Kersten and George Kersten, for Plaintiffs.

Quarles & Brady, LLP, by Eric J. Van Vugt, for Defendants.

Earl W. Schmidt, Reserve Judge.

*DECISION*

The plaintiffs, Noonans, bring this motion to certify for a class action. The Court has received the parties' briefs and heard argument on March 15, 2005. Because the jury trial to determine the issues of breach of contract, breach of fiduciary duty, punitiveness and concomitant damages will not be manageable as a class action, the Court denies the motion.

*LAW*

Wisconsin does not have many cases dealing with the class action statute, § 803. Wis. Stats. The lead case, *Schlosser v. Allis Chalmers Corp.,* 86 Wis.2d 226,271 N.W. 2d 879 (1978), states that the proposed class must have commonality, numerosity and adequate representation.

In addition, a fourth factor, manageability, is cited in *Cruz v. All Saints Healthcare Systems, Inc.,* 2001 WI App 67, 242 Wis.2d 432, 625 N.W.2d 344 (Ct. App. 2001).

*FACTS*

The defendant, NML, is a mutual financial institution that offers financial instruments, e.g. annuities, life insurance policies, etc. These instruments are pedaled and sold by independent agents throughout the United States. There are thousands of them. The agents do not exclusively sell NML policies. Noonans purchased NML annuity contracts in 1976 through an agent, Daniel Madigan. The terms of the annuity permitted Noonans to share in the financial performance of the company. Most of NML's instruments were in long-term securities, real estate and business endeavors. In the early 1980's, when interest rates cycled up, perhaps even spiked, some NML annuity holders cashed in their long-term annuities because bank certificates of deposits and other short-term bonds were more remunerative. An officer of NML indicated NML's annuity portfolio was uncompetitive causing clients to surrender contracts and created marketing problems for agents, (deposition of Richard E. Fisher, Plaintiff's exhibit 8, pages 28-30).

In response NML in 1985 or 1986 changed, allegedly unilaterally according to the complaint, the basis for payment of the annual dividends for the annuities by creating a "segmented account" that paid dividends on short-term high interest bonds.

That resulted in a higher return for the annuities for several years, but when interest rates cycled down, the longer-term equities paid more. Noonans allege they first noticed in 2000 that their annuities were worth materially less than they would be had the change not been made.

Noonans contacted their agent, Madigan, who on March 8, 2000 requested of NML an explanation, (Defendant's exhibit M). Prior to receiving a response from NML, Daniel A. Noonan prepared a handwritten log in which he expressed a concern about being "screwed" on this and that Madigan agreed with him stating NML had a right to do it, (Plaintiff's exhibit N).

Consequently, Noonans brought this lawsuit for breach of contract, breach of fiduciary duty and punitive damages. The motion before the Court is to permit them to act on behalf of others, similarly situated, i.e. certification for a class action. [1]

## REASONING

There is no dispute in this case with regard to the competence of Noonans to represent all members of the proposed class. There is no dispute with the numerosity criterion except if the testimony and evidence possessed by many or all of the proposed class is material and probative, and not redundant, then the judicial efficiency purpose of the one class action is defeated. There is a dispute over commonality and manageability.

Noonans appear to argue that the whole question of class action certification begins and ends with NML's alleged unilateral change of the pre 1984-85 annuity contracts. They argue that any distinctions as to individual damages, if any, can be determined by a formula after the trial is over. The Court believes that a proper verdict will inquire as to damages and not as to a formula. Individual damage awards will have to be fleshed out for the jury.

The Court is especially concerned with the punitive damages question and award. The use of the word "screw" is well understood in mechanics as one of the simple machines where an inclined plane moves in a circle. However, when applied to interpersonal human conduct, it becomes the "s" word connoting intentional wrongdoing. This is the domain of punitive damges. [2] The Court granting the question and the jury making the award would want to hear plumbed under oath the factual content of Daniel A. Noonan's conversation with Madigan. And at that point, the Court does not know of any evidentiary rule precluding NML from putting as many independent agent-client conversations before the Court and jury to dispel, if it can, the notion that NML engages in using the circular inclined plane maneuver on those who end up owning its financial instruments. The trier of fact should not be left to speculate how NML is still in business if that is the word on the street and in the mouths of the agents. Noonans argued at the March 15, 2005 hearing that damage concerns at this point are a "red herring." At the jury trial, that will not be a sustainable objection.

The Noonans also made shortshrift of other concerns NML has over commonality regarding equitable remedies the law has developed to take the harshness out of unambiguous contracts, e.g. waiver, estoppel, etc. These remedies may be applicable to any number of the proposed class depending on their individual facts.

NML has concerns about the applicability of the other state laws. Noonans argue that the laws of the forty-nine other states where the contracts were actually sold are not relevant. Statutes of limitation, for example, may very well be relevant.

The Court is not aware what the adversarial strategies of the parties will be, but it is more likely than not that many fact situations between clients and independent agents will be material and probative. The purchasing of an annuity is not like receiving insurance ancillary to employment as in *Schlosser* or the cost of medical records ancillary to medical treatment as in *Cruz*. The majority of other cases cited by plaintiffs in which a class action certification was granted are similar such fact situations. On the other hand, the purchase of an annuity involves big plan, big money and big monitor ever after. And if the testimony can be discovered from twenty years ago and brought to the trial over the inconvenient out state miles, the Court envisions interminable objections and offers of proof, interminable jury in and jury out. The Court thinks as a class action little time will be saved

Further, a one class action suit here will be difficult, if not unworkable, for the jury with a multiple-page verdict on the damage question. In addition to waiver and estoppel concerns, if notice of the 1985-86 change can be shown with regard to certain members of the proposed class, it may raise the issue of mitigation of damages for those individuals. (Defendant's exhibit 6)

Given these concerns, the Court looks for guidance from case law. Noonans have cited 43 cases and NML 45 cases. The parties have argued over their applicability given their respective interests in this case. The Court finds no Wisconsin case on point with regard to the fact situation here present None of the Wisconsin cases, including *Schlosser,* have the independent agent whose skills are almost totally determinative of the sale of financial instruments. The cases that have that factor are federal cases and one Pennsylvania state case. Noonans argue that these cases are not on point because they deal with misrepresentation causes of action. In the Court's view, the underlying cause of action is not the relevant point, but the independent agent factor that gets the financial instruments out there and keeps them there is. And it is the give and take between the client and agent that will generate material and probative testimony in this case, particularly as to whether there was notice of the 1985-86 change. In all the cases cited that had the agent factor, none were certified for class action. And each of these cases expressed one or more of the concerns the Court mentioned above, *Adams v. Kansas City Life Insurance Co.,* 192 F.RD. 274 (W.D. Mo 2000), *Cunningham v. PFL Life Insurance Co.,* 1999 WL 3656879 (N.D. Iowa), *Jackson National Life Insurance Co. Premium Litigation,* 183 F.R.D. 217 (W.D. Mich. 1998), *Keyes v. Guardian Life Insurance Co.,* 194 F.R.D. 253 (S.D. Miss. 2000), *Parkhill v. Minnesota Life,* 188 F.R.D. 332 (D. Minn. 1999), *Zarella v. Minnesota Life Ins. Co.,* 1999 WL 22623 (RI. Super. Apr. 4, 1999) *Janick v. Prudential Ins. Co. of America,* 305 Pa. Super., 120, 451 A.2d 451 (1982), Note: In *Janick* class action was denied, but granted for residents of Pennsylvania.

For the reasons stated and the cases cited, Noonans motion to certify a class action is denied. Counsel for NML may prepare an order and forward it to Joan Smith, Deputy Clerk to Chief Judge, Milwaukee County Courthouse, 901 North 9th Street, Room 609, Milwaukee, Wisconsin 53233, for my signature pursuant to Milwaukee County's "five-day rule."

Dated at Bimamwood, Wisconsin, this 10 day of 2005.

<<signature>>

Earl W. Schmidt

Reserve Judge

## ORDER

The plaintiffs' Motion for Class Certification having come on for hearing-before the Honorable Earl W. Schmidt on March 15, 2005, and the Court having received written briefs, having heard oral arguments and having issued a Decision dated June 10, 2005,

IT IS HEREBY ORDERED that plaintiffs' Motion for Class Certification is denied, and this case shall proceed forward on the individual claims of the plaintiffs, Catherine D. Noonan and Daniel A. Noonan.

Dated at Bimamwood, Wisconsin this 6th day of July, 2005.

<<signature>>

Earl W. Schmidt

Reserve Judge

Footnotes



1    Other background information can be garnered from the complaint, the briefs and the appellate court decision *Noonan v. Narthwestern Mutual Life Insurance Co.,* 276 Wis.2d (Ct App. 2004).

2    Recent Wisconsin Supreme Court decision may very well require greater evidentiary efforts by parties to defend punitive damage claims. *Strenke v. Hogner, et al,* 2005 WI 25 (pending publication), *Wischer v. Mitsubishi Heavy Industry Am. Inc.,2005* WI 26 (pending publication).

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1900114
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

MAI NHIA THAO, individually and on behalf
of a class of others similarly situated, Plaintiff,

v.

MIDLAND NATIONAL LIFE
INSURANCE COMPANY, Defendant.

No. 09–C–1158.  |  May 24, 2012.

**Attorneys and Law Firms**

Jacques C. Condon, K. Scott Wagner, Hale & Wagner SC, Milwaukee, WI, John J. Schirger, Matthew W. Lytle, Stephen R. Miller, Miller Schirger LLC, Lee R. Anderson, Patrick J. Stueve, Richard M. Paul, III, Kansas City, MO, for Plaintiff.

Henry Pietrkowski, Chicago, IL, Linda B. Oliver, Robert D. Phillips, Jr., William H. Higgins, San Francisco, CA, Paul F. Heaton, Heaton Trial Law SC, Milwaukee, WI, for Defendant.

**Opinion**

### *DECISION AND ORDER*

LYNN ADELMAN, District Judge.

**\*1** Mai Nhia Thao seeks to represent a class comprising owners of certain life insurance policies issued by Midland National Life Insurance Company ("Midland"). Before me now is Thao's motion to certify this case as a class action pursuant to Federal Rule of Civil Procedure 23.[1]

Thao asks that I certify the following class and designate her as the class representative:

> All persons who reside in the states of AZ, AR, CA, CO, CT, FL, GA, IL, IN, IA, KS, KY, LA, MD, MA, MI, MN, MS, MO, NE, NV, NC, ND, OH, OK, PA, SC, SD, TX, UT, VA, WA or WI and purchased or owned during the applicable statute of limitations a life insurance policy issued by Defendant based on any of

the following base policy forms: L128, L129, L130, L131, L133, L134, L136, and L138.

The base policy forms identified in the class definition are components of universal life insurance policies. Universal life insurance can be contrasted with term life insurance and whole life insurance. With term life insurance, the insured pays a premium in exchange for a death benefit that the insurer pays to the beneficiary only if the insured dies during the term of the policy. *See* 1 Jeffrey E. Thomas & Francis J. Mootz III, *New Appleman on Insurance Law Library Edition* § 1.08[2][b][ii] (2011). With whole life insurance, the insured pays a premium in exchange for both a death benefit (the insurance component) and a savings plan (the savings component). The savings component can be described as an investment that gets bigger over the term of the policy. Should the insured choose to do so, she can "surrender" the policy in exchange for whatever cash value has accumulated in the savings component at the time of the surrender. *Id.*

Universal life insurance, like whole life insurance, has both an insurance component and a savings component. Universal life is different than whole life in essentially two ways—flexibility and transparency. Universal life is said to be more flexible than whole life because it allows the insured to make various decisions over the life of the policy. With whole life, the insured pays a fixed premium over the life of the policy, and the death benefit is fixed at the policy's face value. With universal life, the insured can pay premiums in almost any amount at almost any time and may increase or decrease the amount of the death benefit at any time (subject to certain limits). *See* Richard G. Schectman, *New Concepts in Life Insurance Planning: Universal Life,* 13 Cumb. L.Rev. 219, 222 (1982). Relatedly, the insured can use the savings component to pay for the death benefit. That is, instead of making premium payments, the insured can allow the cost of the insurance component to be deducted from the savings component. So long as the policy's cash value is sufficient to pay the cost of the death benefit, skipping a premium does not result in the policy's lapsing. *Id.* at 224. Universal life is said to be more transparent than whole life because the policyholder receives periodic statements detailing how her premiums are being used. The statements itemize the various costs, fees and expenses that the insurer deducts from her premiums. With whole life, the policyholder typically does not know how her premiums are being used. *Id.* at 224–25; Douglas I. Friedman, *Universal Life: Product Development and Tax Aspects,* 13 Cumb. L.Rev. 499, 503–04 (1982).

**\*2** The mechanics of the Midland universal life policies at issue in this lawsuit are as follows: When a policy is purchased, the policyholder pays an initial premium and specifies the amount of the death benefit. Midland deducts a "premium load" from this initial payment and then applies the rest to the "policy fund," which is the savings component. If the policyholder makes additional premium payments, Midland adds that payment to the policy fund. Each month, Midland calculates the policy fund by taking the existing amount in the fund, adding any premium payments (and any interest earned on the savings component), and subtracting various charges. If after the relevant additions and subtractions are made there is still money left in the policy fund, then the policy will continue in force. If there is no money left in the policy fund, then (subject to certain exceptions), the policy will terminate.

The focus of this lawsuit is on the cost-of-insurance charge, which is one of the charges that Midland deducts from a policyholder's policy fund each month. In general, "cost of insurance" refers to the amount that an insurance company charges to cover its risk—i.e., the cost of paying the death benefit upon the death of the insured. Midland's policies specify that Midland will calculate cost-of-insurance charges by multiplying a "cost-of-insurance rate" by the difference between the amount of the death benefit and the amount of the policy fund.[2] The cost-of-insurance rate is taken from a set of tables produced by Midland's actuaries. Each policy type—that is, each Midland "product"—will have its own set of tables. The rates on the tables are organized by certain characteristics: the insured's age when the policy was issued ("issue age"), the number of years the policy has been in force ("policy years"), the insured's sex, the amount of the death benefit (the "specified amount"), and the insured's "premium class" (which is determined by certain characteristics that affect the insured's mortality risk, such as whether the insured uses tobacco or participates in hazardous activities). These characteristics determine which rate Midland will apply to a given policyholder at a given time. For example, suppose that the insured is a female nonsmoker (as Thao is) who purchased a Century Universal Life–G policy with a $100,000 death benefit (as Thao did). To calculate her cost-of-insurance rate for a particular month, Midland will first find the set of tables designed for the Century Universal Life–G product. It will then find the table in that set that contains rates for female non-smokers who selected a death benefit of between $100,000 and $1 million.[3] The table will have cost-of-insurance rates organized by issue age and policy years-the rows are issue ages and the columns are policy years. Thus,

assuming that the insured was twenty-six when the policy was issued and the policy has been in force for ten years, Midland will select the rate in the cell of the table located at the row corresponding to age twenty-six and the column corresponding to ten years' duration. Midland will then plug that rate into the cost-of-insurance formula to determine the cost-of-insurance charge.

**\*3** Thao's contention in this lawsuit is that Midland has been setting its cost-of-insurance rates in a way that is inconsistent with the following provision in her policy: "Cost of Insurance rates are based on the Issue Age, completed Policy Years, Sex, Specified Amount, and Premium Class of the Insured." Thao Policy § 7.7, ECF No. 57–1. Now, Midland's cost-of-insurance rates are in some sense "based on" issue age, policy years, sex, specified amount, and premium class in that, as explained above, Midland's cost-of-insurance rate tables are organized by these five factors. However, Thao contends that the policy language requires more than using tables organized by the five factors. According to her, the policy language imposes a constraint on how Midland sets the rates that appear in the cells of the tables. She contends that the policy language required Midland to consider nothing other than the five factors listed in the policy—which are all factors related to mortality expectations—when setting those rates. Thao contends that, contrary to this language, Midland considered factors unrelated to mortality expectations when setting its rates.

Thao contends that this case is appropriate for class treatment. She points out that all of the proposed class members' policies incorporate one of nine base policy forms and that each of the nine forms contains the same or virtually the same operative language as her policy. She also points out that there are no significant differences in state contract law or individualized issues concerning extrinsic evidence that might result in the policies' having different meanings for different class members. Thus, argues Thao, whether the policies allowed Midland to consider factors unrelated to mortality expectations when setting cost-of-insurance rates is a common question of law or fact. *See* Fed.R.Civ.P. 23(a)(2).

It is true that whether Midland acted contrary to language that appears in all of the proposed class members' policies is a common question of law or fact. The operative language in all of the base policy forms is the same or virtually the same, and differences in state law and extrinsic evidence will likely not result in different meanings for different class members. Thus, there is likely a single answer for all

policyholders: either the policies allowed Midland to consider factors unrelated to mortality expectations when setting its cost-of-insurance rates, or they did not. However, it does not follow that this case is appropriate for class treatment. This is so because, as we will see, the class members may not agree on what the answer to the common question should be. Some class members might prefer rates that are not based exclusively on mortality expectations, while other class members might, like Thao, prefer rates that are based exclusively on mortality expectations. Put differently, there may not be a common claim that Thao can litigate on behalf of a class of policyholders. Thus, in the remainder of this opinion, I examine whether Thao's individual claim is representative of claims that other Midland policyholders might have.

**\*4** Thao's individual claim is that Midland is overcharging her. More specifically, she claims that Midland is deducting too much from her policy fund each month because the cost-of-insurance charge is based on rates that are higher than they would be if Midland had set its cost-of-insurance rates using only the five factors listed in the policy. Essentially, Thao claims that if Midland had set its rates using a methodology based exclusively on the five factors, all of the numerical values in the table containing her cost-of-insurance rates would be either lower than they are now or unchanged.[4] According to Thao, all of the other proposed class members have the same claim against Midland. She contends that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. Thus, argues Thao, all members of the proposed class have a claim against Midland that arises out of Midland's use of improper cost-of-insurance rates. She believes that each proposed class member would want (1) declaratory and injunctive relief requiring Midland to adjust its rates so that they are based exclusively on the five factors and (2) a refund of the excess cost-of-insurance charges paid in the past on account of Midland's using rates that were based on other factors.

The key premise in Thao's argument for class certification is that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. If this premise is false—if, for example, a set of rates based exclusively on the five factors would result in *higher* rates for certain policyholders—then the members of the proposed class would not have a common

claim against Midland.[5] Only those members who would pay lower rates would have a claim, because only those members would have been injured by Midland's conduct. *See Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011) (holding that to show commonality plaintiff must show that the class members have suffered the same injury); *Bieneman v. City of Chicago,* 864 F.2d 463, 465–66 (7th Cir.1988) (individual opposed to noise created by O'Hare airport could not represent a class of property owners in area around airport because some property owners benefitted from proximity to airport). Thus, before the class proposed by Thao may be certified, Thao must prove—not merely assert—that if Midland had set its cost-of-insurance rates using only the five factors listed in the policy, then all of the numerical values in all of Midland's tables would be either lower than they are now or unchanged. *See Wal–Mart,* 131 S.Ct. at 2551–52 (satisfaction of all Rule 23 requirements must be proved, not merely asserted, even if proving those requirements requires resolving an issue relevant to the merits of the underlying claim); *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675–76 (7th Cir.2001) (same).

**\*5** In an attempt to prove that under her interpretation of the policies all policyholders would pay lower cost-of-insurance rates, Thao points to a collection of spreadsheets known as the "COI Solver" workbooks. *See* Pl.'s Br. in Supp. at 7–8, ECF No. 57. In the next few pages of this opinion, I will explain what these workbooks are and why they are important to plaintiff's argument for class certification.

The COI Solver workbooks are a set of Excel spreadsheets that Midland's actuaries developed and used in the course of designing the policies at issue in this case. *See* Bill Decl. ¶¶ 24–27, 37, 39, ECF No. 64. As Midland seems to be using the term, "designing" refers to the overall process of setting the rates that will determine the various credits to and deductions from a policy that Midland will make over the life of that policy. *Id.* ¶ 24. The cost-of-insurance rates are set during this process, but other rates, such as interest-crediting rates, are also set during this process. In designing a policy, Midland's actuaries attempt to set rates that will both further the policyholder's objectives in purchasing the policy and earn Midland a reasonable profit. *Id.* ¶¶ 24, 28. Although Midland's objective—making money—is the same in every policy, the policyholder's objectives may be different. For example, some policyholders might want a policy that is designed to have a high cash surrender value at a certain point in time, while other policyholders might want a policy that is

designed to have a high death benefit and lower cash value. *Id.* ¶ 24.

Part of Midland's design process is known as "pricing." *Id.* ¶¶ 31–38. During pricing, Midland's actuaries feed a proposed set of rates into a computer program to examine various financial metrics relating to Midland's profitability (such as cash flow and distributable earnings). The actuaries assign probabilities to uncertain future events and feed those probabilities into the program along with the proposed rates. After running the program, the actuaries use the results to get a sense of what is likely to happen in the future if Midland adopts the proposed rates. The goal of this process is to determine whether the rates are viable—not so low that Midland loses money, but not so high that Midland loses business to its competitors. If after testing the proposed rates Midland's actuaries determine that the rates are problematic, they will make adjustments. The actuaries might revise a

single rate scale or multiple rate scales, and the cost-of-insurance rate scale is one of the scales that might be adjusted.

The purpose of the COI Solver workbooks is to expedite the process of developing scales of cost-of-insurance rates for testing in the pricing program. *Id.* ¶¶ 37 & 39. As noted, the workbooks are Excel spreadsheets. Numerical values are entered into the cells of the spreadsheets in a manner that allows arithmetical operations to be performed in accordance with specified formulas. A workbook for a particular policy will contain many spreadsheets-one for every permutation of policyholder characteristics (issue age, sex, premium class, etc.). Here is an excerpt from a COI Solver spreadsheet for a particular Midland product (labeled "UL–CV") and permutation of policyholder characteristics (male nonsmoker "MN", issue age 35, and band 2):

| UL-CV | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class: | MN | | | | | | | | | | |
| Age: | 35 | | | | | | | | | | |
| Band: | 2 | | | | | | | | | | |
| | | | | | | | | | | | |
| | | Pricing Mortality | Select | | | Mult of | Tot | Product | 2001 CSO Composite | Minimum | XLCV2 |
| Age | Pol Yr | (Att. Age) | Factor | Product | Add-On | Add-On | Add-on | + Add-on | Guar COI | Column I-J | Mo COI |
| 40 | 6 | 0.06 | 0.99 | 0.06 | 0.050 | 1.00 | 0.05 | 0.11 | 0.14 | 0.11 | 0.11 |
| 51 | 17 | 0.19 | 0.88 | 0.16 | 0.030 | 1.00 | 0.03 | 0.19 | 0.36 | 0.19 | 0.19 |
| 52 | 18 | 0.21 | 0.87 | 0.18 | 0.020 | 1.00 | 0.02 | 0.20 | 0.39 | 0.20 | 0.20 |
| 53 | 19 | 0.23 | 0.86 | 0.20 | 0.010 | 1.00 | 0.01 | 0.21 | 0.44 | 0.21 | 0.21 |
| 54 | 20 | 0.26 | 0.85 | 0.22 | 0.000 | 1.00 | 0.00 | 0.22 | 0.49 | 0.22 | 0.22 |

**\*6** When Midland's actuaries create a spreadsheet for a given permutation of policyholder characteristics, they start by entering a base scale of numbers into one of the columns. Each row of the spreadsheet represents a policy year. Any set of numbers having some reasonable pattern could be used as a base scale. *Id.* ¶ 40. However, Midland's actuaries have chosen to use numbers that resemble (but do not match) Midland's "pricing mortality" rates.[6] *Id.* The reason for this is that mortality rates generally increase with age, and in most policies the design objectives will call for cost-of-insurance rates that increase with age. Thus, using an approximation of Midland's pricing-mortality rates as a base scale gives the actuaries a convenient starting point. *Id.* However, there is nothing special or significant about the actuaries' decision to use an approximation of Midland's pricing-mortality rates as a base scale. The actuaries could just as easily have used any one of a number of different mortality tables published for use in actuarial science. *Id.* ¶¶ 40–41. Or the actuaries could have used something other than a mortality table. For example, in

one Midland policy (which plaintiff has excluded from the class definition), the actuaries used reinsurance premium rates as the base scale. *Id.* ¶ 41.

The column of the COI Solver spreadsheet containing the base scale for a particular permutation of policyholder characteristics is labeled "Pricing Mortality."[7] To turn this base scale into usable cost-of-insurance rates, the COI Solver spreadsheet relates the numerical values in the Pricing Mortality column to values in other columns in accordance with a specified formula. One of the other columns is the "Select Factor" column. The first step in turning the base scale into cost-of-insurance rates is to multiply the values in the Pricing Mortality column by the values in the Select Factor column. The numerical values that result from this operation appear in the column labeled "Product."[8] The value in the Select Factor column is usually one or below for non-tobacco users and one or above for tobacco users, and thus the Select Factor usually decreases the numbers in the base scale for

non-tobacco users and increases them for tobacco users. *Id.* ¶ 45. However, the value of the Select Factor generally decreases as the number of policy years increases-that is, the value gets smaller as it moves down the Select Factor column and into the lower rows, which represent later policy years. Thus, use of the Select Factor has the effect of producing lower rates in later policy years. *Id* . ¶ 49.

Three columns in the COI Solver spreadsheet involve something known as the "Add–On." As we will see, the Add–On is the centerpiece of Thao's theory for class certification. The three columns are labeled "Add–On," "Mult of Add–On," and "Tot Add–On ." The values in the Add–On column are taken from a separate spreadsheet in the workbook labeled "Expense Add–On." *Id.* ¶ 48. This spreadsheet is organized by issue age and policy year. *Id.* ¶ 47. According to Midland, the values that appear in the cells of the Expense Add–On spreadsheet do not represent any particular cost, expense, or mortality characteristic. Instead, those numbers are nothing more than a scale that Midland adjusts as needed to meet design objectives—i.e., producing cost-of-insurance rates that meet policyholder objectives and Midland's objective of earning a reasonable profit. *Id.*

 **\*7** Once the values in the Expense Add–On spreadsheet are imported into the COI Solver spreadsheet, the values in the Add–On column are multiplied by the values in the Multiple of Add–On column (which are determined by the sex, premium class and specified amount of the policyholder), and the result of this operation appears in the Total Add–On column. *Id.* The values in the Total Add–On column are then added to the values in the Product column. The result of this operation appears in the "Product

👉 Add–On" column.

The Add–On is generally structured so that its value declines towards zero over some initial number of policy years. *Id.* ¶ 49. That is, the greatest numerical values in the Add–On and Total Add–On columns generally appear at the top of the columns (i.e., in the rows representing early policy years), and then the values gradually decline towards zero, and eventually become zero, as they move down the columns. Thus, the purpose of the Add–On is to adjust the base rate upwards during the initial years in which the policy is in force. This is contrary to what Midland would do if the Add–On were related to mortality characteristics, since the risk of dying generally increases with age rather than decreases. However, for various reasons, including producing favorable tax consequences, some policyholders prefer to pay higher

rates in earlier policy years in exchange for lower rates in later policy years. *Id.* ¶ 50. Using the Add–On, which generally produces higher rates in earlier years, in conjunction with the Select Factor, which generally produces lower rates in later years, helps Midland's actuaries produce a rate scale that achieves this particular policyholder objective. *Id.* ¶¶ 49–50.

The final step in the COI Solver process is to determine the final rate for testing. This is done by comparing the value in the Product

👉 Add–On column for a particular policy year to the value in the column labeled "Composite Guar COI," which is the maximum cost-of-insurance rate allowed under the policy. [9] *Id.* ¶ 42. If the value in the Product

👉 Add–On column is less than the value in the Composite Guarantee column, then the value in the Product

👉 Add–On column becomes the cost-of-insurance rate for that policy year. Otherwise, the value in the Composite Guarantee column becomes the cost-of-insurance rate for that policy year. The cost-of-insurance rate scale thus appears in the column labeled "Mo COI." This is the rate scale that Midland's actuaries will feed into their pricing program to determine whether that scale—together with all other rate scales for the policy under consideration—will produce the desired results. If after testing the actuaries determine that adjustments to the cost-of-insurance rate scale are needed, the actuaries will adjust the values in the Add–On and Select Factor columns (and possibly other columns that I have not discussed) as needed to produce a revised cost-of-insurance rate scale for testing. *Id.* ¶¶ 44 & 50. This process will continue through as many iterations as needed to produce a rate scale that satisfies all of the objectives for the policy under consideration. *Id.* ¶ 37. Once Midland's actuaries find that rate scale, Midland will use it to construct the cost-of-insurance rate tables for that policy.

 **\*8** Having explained the function of the COI Solver workbooks, I can explain why they are important to Thao's theory for class certification. Recall that a class may be certified only if Thao can show that all class members would pay lower cost-of-insurance rates than they do now if Midland's rates were based exclusively on the five factors listed in the policies. In an attempt to make this showing, Thao focuses on the Add–On. The Add–On has the effect of producing higher cost-of-insurance rates during early policy years because the value of the Add–On, which is positive in early policy years, is added to the Product (i.e., the base scale multiplied by the Select Factor). Thus, as a matter of arithmetic, if the Add–On were removed from Midland's

cost-of-insurance rates—that is, if the values in the Add–On columns were all set to zero—all class members would pay lower cost-of-insurance rates than they do now in early policy years, but their rates in later years (in which the Add–On is already zero) would not change. Thao contends that all class members thus have a claim against Midland for removal of the Add–On.

The problem for Thao is that her theory for class certification does not match her theory for the merits of this case. In order to obtain class certification, Thao argues that Midland must recalculate all of its cost-of-insurance rates after removing the Add–On from the COI Solver workbooks. However, that remedy is not consistent with Thao's interpretation of the policy language. Under Thao's interpretation of the policy language, cost-of-insurance rates must be based exclusively on Midland's mortality expectations— i.e., Midland's estimates of future death rates for groups of policyholders as determined by age, sex, tobacco use, etc. However, no column in the COI Solver workbooks contains Midland's mortality expectations. Although the base scale is loosely related to mortality expectations in that its values are larger in later policy years than in earlier policy years, the base scale does not itself constitute Midland's mortality expectations for any set of policyholder characteristics. *See* Bill Decl. ¶¶ 40–41, 63. Likewise, although the value of the Select Factor is generally larger for tobacco users than for non-tobacco users, the Select Factor does not reflect Midland's expectations regarding the effect of tobacco use on mortality. *Id.* ¶ 47 (stating that the Select Factor has no independent meaning). Removing the Add–On would leave the base scale multiplied by the Select Factor, but since neither the base scale nor the Select Factor (nor the product of the two) is based on Midland's mortality expectations, removing the Add–On from the rates produced by the COI Solver workbooks would not transform a rate scale that is not based exclusively on mortality expectations into one that is. Thus, even if Thao is correct on the merits and the policy language requires Midland to base its cost-of-insurance rates exclusively on mortality expectations, it would not follow that removing the Add–On would bring Midland's existing rates into line with that language.

*9 In an attempt to show that removal of the Add–On is consistent with her interpretation of the policy language, Thao contends that the Add–On represents a surcharge for Midland's "expenses." However, even if the Add–On were a surcharge for expenses, which it is not, [10] that would not change the fact that removing the Add–On from Midland's existing rates would not leave rates that are based exclusively on mortality expectations. No matter what the Add–On is or what it represents, it simply is not the case that removing the Add–On from Midland's current rates would produce rates based exclusively on mortality expectations. Again, since no part of the COI Solver workbooks is based on mortality expectations in the first place, removing the Add–On from those workbooks would not result in the creation of rates based exclusively on mortality expectations.

Thus, Thao's removal-of-the-Add–On remedy is not consistent with her interpretation of the policy language. And when we set that remedy aside, we can see that the class does not have a common claim against Midland. This is best illustrated by showing what would happen if Thao's interpretation of the policy language were adopted, as I do below.

Recall that under Thao's interpretation of the policy language, Midland's cost-of-insurance rates must be based exclusively on mortality expectations. There is one rate scale that Midland uses that is based exclusively on mortality expectations, and that is Midland's pricing-mortality rates. *See* Bill Decl. ¶ 53 (explaining that pricing-mortality rates are estimates of uncertain future death rates). [11] However, many class members would prefer Midland's current cost-of-insurance rates to rates based on Midland's pricing-mortality rates. In many (if not all) policies, Midland's current rates are higher than pricing-mortality rates during early policy years and lower than pricing-mortality rates in later policy years. *Id.* ¶ 50. That is because the design objectives for those policies called for charging a cost-of-insurance rate that is higher than expected mortality in early policy years in exchange for charging a rate that is lower than expected mortality in later policy years, as illustrated in the following graph:



This graph is for a particular policy design (UL–CV) and a particular permutation of policyholder characteristics (male, non-tobacco premium class, issue age forty-five, and specified amount falling within band two). What it shows is that until about the fifteenth policy year, Midland's current cost-of-insurance rates are higher than they would be if Midland had used its pricing-mortality rates as its cost-of-insurance rates. However, in later policy years, Midland's cost-of-insurance rates are lower than they would be if Midland had used its pricing-mortality rates. Many policyholders will prefer to pay higher rates in early policy years in exchange for lower rates later in life—that is, they will prefer the shape of the cost-of-insurance curve to the shape of the pricing-mortality curve. One reason why they may prefer the shape of the cost-of-insurance curve is that it has certain tax advantages. *Id.* In any event, whatever their motives may be, the fact is that some policyholders will prefer Midland's current cost-of-insurance rates to rates based on pricing mortality. Thus, many class members would prefer Midland's interpretation of the policy language to Thao's.

 **\*10** In an effort to avoid this problem, Thao devised her removal-of-the-Add-On remedy, which basically results in bringing the cost-of-insurance rates down to pricing-mortality rates in early policy years but leaving the lower-than-pricing-mortality rates in place in later policy years. However, as already discussed, removing the Add–On from Midland's current rates is not a remedy that follows from Thao's interpretation of the policy language.

The problems identified above show that the class that Thao seeks to represent does not comprise policyholders with

a common grievance against Midland. Instead, the class contains many policyholders who would prefer Midland's interpretation of the policy to Thao's. Thus, Thao's motion for class certification will be denied. To the extent that any individual policyholders feel that they are being injured by Midland's current cost-of-insurance rates, they must bring their own individual suits.

The remaining issue is Midland's motion to strike, which I can deal with quickly. Midland moves to strike the expert reports that Thao attached to her reply brief along with all arguments in the reply brief that are based on such reports on the ground that those materials should have appeared in Thao's opening brief rather than in her reply brief. However, I conclude that the reports and the arguments employing them were properly included in Thao's reply brief, as they are directly responsive to arguments made in Midland's brief in opposition and supporting materials.

Accordingly, **IT IS ORDERED** that Thao's motion for class certification is **DENIED.**

**IT IS FURTHER ORDERED** that Midland's motion to strike is **DENIED.**

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **June 7, 2012 at 11:00 a m.** for the purpose of determining whether further proceedings are necessary. The parties should confer in advance of the call and be prepared to propose a plan for proceeding. Counsel must call the court at 414/297–1285 to advise of their participation.

Footnotes

1  Also before me is Midland's motion to strike the reports of Thao's expert witnesses and portions of her reply brief. I briefly address that motion at the end of this opinion.

2  Cost of Insurance = Cost-of-insurance rate x (Amount of death benefit-Amount of policy fund).

3  Midland generally uses three different "bands" for purposes of factoring the specified amount into its rates: (1) less than $100,000, (2) $100,000 to $1 million, and (3) over $1 million. *See* Bill Decl. ¶ 13, ECF No. 64. Thus, the table that Midland would use for Thao would be the table for female nonsmokers, band two.

4  As we will see, under Thao's theory, cost-of-insurance rates would be lower in early policy years than they are under Midland's current rates but the same as Midland's current rates in later policy years.

5  Even if this premise is true, this case might not be appropriate for class treatment. *See* Midland's Br. in Opp. at 14–16, ECF No. 61. However, since it turns out that this premise is false, I will not consider whether a class could be certified if the premise were true.

6  Pricing-mortality rates are estimates of uncertain future death rates. *See* Bill Decl. ¶ 53. Midland's actuaries develop such estimates and feed them into the pricing program during the pricing process. *Id.*

7  This label is misleading. As discussed, the base scale only approximates Midland's pricing-mortality rates. Thus, the numbers in the "Pricing Mortality" column are not the numbers that Midland would use if it were using its actual pricing-mortality rates as the base scale.

8  Note that the product of the value in the Pricing Mortality column and the value in the Select Factor column is rounded to two decimal places. Thus, in the UL–CV excerpt, in the first row the Pricing Mortality value is 0.06, the Select Factor value is 0.99, and the Product value is 0.06—i.e., 0.0594 rounded to two decimal places.

9  When Midland issues a policy, it attaches a table of guaranteed maximum cost-of-insurance rates. *See* Thao Policy, ECF No. 57–1 at 13–14. Midland guarantees that the policyholder's cost-of-insurance rate will never be higher than the specified maximum rates. The Composite Guarantee column in a COI Solver spreadsheet is intended to make sure that the spreadsheet does not produce a rate scale that includes rates that exceed the specified maximum.

10  Thao just asserts that the Add–On is a surcharge for expenses, and she has no evidence that supports her assertion. The only evidence in the record on whether the Add–On is a surcharge for expenses is in the declaration of the Midland actuary who invented the Add–On, and according to him the Add–On has nothing to do with expenses. *See* Bill Decl. ¶¶ 47–48, ECF No. 64.

11  Remember that Midland's pricing-mortality rates are not the rates that appear in the Pricing Mortality columns of the COI Solver workbooks.

---

End of Document

© 2013 Thomson Reuters. No claim to original U.S. Government Works.



EXPERT WITNESS REPORT:
ROBERT L. HOYER, FSA, MAAA
M. LaPLANT

VS.

NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY

MARCH 4, 2013



**Step 4**: Multiply the Step 2 Difference in Rates by the corresponding net deposits in Step 3.

**Step 5**: Add the values calculated in Step 4.

**48.** This report illustrates how Differences can be calculated in a mechanical way for each individual annuitant with basic annual information and a limited number of variables. Assumptions of end of year deposits tend to underestimate Differences. The ultimate calculations can take into account exactly when in the year deposits were contributed, withdrawals were taken, funds were borrowed, loans were repaid and dividends were credited (that is, policy anniversary date). Factoring in these dates will not make the calculations any less formulaic.

### F.     LaPlant Example

49. I reviewed a limited set of account statements from Ms. LaPlant. This included her "Policy Anniversary Report," issued each year on her policy anniversary date of May 1, from 1986 to 2000. These reports include her total cash value and her total "paid-in to date" (her total deposits throughout the life of the annuity). Looking at the 1986 statement, her account value as of May 1, 1986 can be determined. Looking at the change in the "paid-in to date," her total contributions each year can be determined. Other documents indicate that she did not make deposits after 2000. This information, summarized in the table below, provides sufficient information to calculate Differences in her cash value:

**Table 10. LaPlant Beginning Balance and Deposits**

| Policy Year[a] | Gross Deposit | | Net Deposit [b] | |
|---|---|---|---|---|
| 1986 | $ 11,624 | [c] | $ 11,624 | [c] |
| 1987 | 2,000 | | 1,870 | |
| 1988 | 2,000 | | 1,870 | |
| 1989 | - | | - | |
| 1990 | 4,000 | | 3,750 | |
| 1991 | - | | - | |
| 1992 | 2,000 | | 1,870 | |
| 1993 | - | | - | |
| 1994 | - | | - | |
| 1995 | - | | - | |
| 1996 | - | | - | |
| 1997 | - | | - | |
| 1998 | 3,890 | | 3,646 | |

Sources: Policy Anniversary Reports of Marleen
LaPlant and ML2_NM_0001-0111

[a] Policy year is the year from May 2 of the previous
year until May 1 of the year stated.

[b] Calculated as Gross Contributions minus 6% load,
and $10 per year and $0.50 per payment charge.
LaPlant made two payments in 1990 and 1998.

[c] Represents Total Cash Value on May 1, 1986.

50. In order to determine the appropriate adjustments to LaPlant's cash values, I follow the five step process outlined above:

> **Step 1**: As LaPlant had Direct Recognition, use the Difference in Rates table applicable to Pre-MN annuitants with Direct Recognition.

> **Step 2**: Because LaPlant's account matured in 2008, use the row labeled 2008 for the Difference in Rates.

> **Step 3**: The net deposit amounts by year were identified in the previous table.

> **Step 4:** Multiply the net deposits by year by the corresponding Difference in Rates.

> **Step 5**: Add the values calculated in Step 4.

17

51. This process is demonstrated in the table below:

**Table 11. Difference in
LaPlant's Cash Value due to
1985 Change**

| Year | Net Contributions | Difference in Rates | Difference |
|------|-------------------|---------------------|------------|
| 1986 | $ 11,624 | 1.76 | $ 20,458 |
| 1987 | 1,870 | 1.58 | 2,955 |
| 1988 | 1,870 | 1.45 | 2,712 |
| 1990 | 3,750 | 1.22 | 4,575 |
| 1992 | 1,870 | 1.02 | 1,907 |
| 1998 | 3,646 | 0.48 | 1,750 |
| Total | | | $ 34,357 |

52. The Difference to Ms. LaPlant's cash value, shown above, is conservatively stated because net deposits were assumed to be invested as of the end of each policy year. If NML provided actual dates for each net deposit, the calculations would be based on a proration of the Difference in Rates table values for the two surrounding calendar years and a larger adjustment would result.

## VII.  Conclusions

53. NML credits dividends on a formulaic basis to all of its policyholders. The methodology presented in this report to calculate the But-For DIRs and related Differences to cash values is consistent with that process and also uses a formulaic approach. The information necessary to perform this analysis for Pre-MN annuitants should be readily available from NML and should require no additional information from policyholders.

54. If the 1985 Change had not been effected, Pre-MN annuity policyholders would have received a higher DIR beginning at least as early as 1993 and continuing each year through the present. This report quantifies the DIRs which would have been credited to Pre-MN annuity policyholders But-For the 1985 Change. The DIRs for Pre-MN annuity policyholders with Direct Recognition and no loan balance would have been the same as the DIRs for corresponding life insurance policies. This But-For DIR is used to mechanically calculate the But-For DIR for those without Direct Recognition.

18

Case 2:11-cv-00910-LA   Filed 03/04/13   Page 357 of 362   Document 45-2   App. 287   745

55. My methodology can be applied to remaining in-force Pre-MN annuitants to adjust their accounts to reflect the appropriate cash values upon which future dividends (reflecting the portfolio rate) should be applied. The same methodology can be used to calculate the additional accumulations that would have occurred for Pre-MN annuity policyholders that are no longer in-force.

Respectfully submitted,

Robert L. Hoyer, FSA, MAAA
Hoyer Actuarial Litigation, LLC
7708 Classics Drive
Naples, Florida 34113
(239) 776-7622
March 4, 2013

19



--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

H

Only the Westlaw citation is currently available.

Supreme Court of the United States
**AMERICAN EXPRESS** CO., et al., Petitioners
v.
**ITALIAN COLORS** RESTAURANT et al.

No. 12–133.
Argued Feb. 27, 2013.
Decided June 20, 2013.

**Background:** Merchants filed class action antitrust suit against charge-card issuer. The United States District Court for the Southern District of New York, George B. Daniels, J., 2006 WL 662341, granted issuer's motion to compel arbitration and dismissed the underlying claims. Merchants appealed. The United States Court of Appeals for the Second Circuit, Pooler, Circuit Judge, 554 F.3d 300, reversed, finding that class-action waiver provision contained in mandatory arbitration clause in card acceptance agreement was unenforceable. Issuer petitioned for writ of certiorari. The Supreme Court granted writ, —— U.S. ——, 130 S.Ct. 2401, 176 L.Ed.2d 920, and vacated and remanded for reconsideration in light of its decision in *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.* The Court of Appeals, Pooler, Circuit Judge, 634 F.3d 1, again reversed the district court, but placed a hold on mandate in order for issuer to petition for writ of certiorari. While mandate was on hold, Supreme Court issued its decision in *AT&T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742, addressing the issue of class-action waivers. The Court of Appeals, Pooler, Circuit Judge, 667 F.3d 204, again reversed the district court and remanded with instructions, and reconsideration en banc was denied, 681 F.3d 139. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held that:

(1) no contrary congressional command overrode the overarching principle, reflected in the text of the Federal Arbitration Act (FAA), that arbitration was a matter of contract, as would require a court to reject merchants' contractual waiver of class arbitration, and

(2) judge-made exception to FAA's enforcement of arbitration agreements did not apply to merchants' contractual waiver of class arbitration.

Court of Appeals reversed.

Justice Thomas filed a concurring opinion.

Justice Kagan filed a dissenting opinion, in which Justices Ginsburg and Breyer joined.

Justice Sotomayor took no part in the consideration or decision of the case.

West Headnotes

**[1] Alternative Dispute Resolution 25T** ⚷114

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
        25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases

The text of the Federal Arbitration Act (FAA) reflects the overarching principle that arbitration is a matter of contract, and consistent with that text, courts must rigorously enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes, and the rules under which that arbitration will be conducted. 9 U.S.C.A. § 2.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

**[2] Alternative Dispute Resolution 25T** 🔑**112**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk112 k. Contractual or Consensual Basis. Most Cited Cases

The overarching principle, reflected in the text of the Federal Arbitration Act (FAA), that arbitration is a matter of contract holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been overridden by a contrary congressional command. 9 U.S.C.A. § 2.

**[3] Alternative Dispute Resolution 25T** 🔑**134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
          25Tk131 Requisites and Validity
           25Tk134 Validity
              25Tk134(1) k. In General. Most Cited Cases

No contrary congressional command overrode the overarching principle, reflected in the text of the Federal Arbitration Act (FAA), that arbitration was a matter of contract, as would require the court to reject merchants' waiver of class arbitration in their contract with charge-card issuer, which waiver the issuer sought to enforce with respect to merchants' federal antitrust claims against issuer; even if costs for merchants to individually arbitrating their antitrust claims exceeded potential recovery for each merchant, federal antitrust laws did not guarantee an affordable procedural path to the vindication of every claim or evince an intention to preclude a waiver of class-action procedure, and congressional approval of the federal rule of civil procedure allowing class proceedings did not establish an entitlement to class

proceedings for the vindication of statutory rights. 9 U.S.C.A. § 2; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Statutes 361** 🔑**1075**

361 Statutes
    361III Construction
        361III(A) In General
          361k1074 Purpose
           361k1075 k. In General. Most Cited Cases

No legislation pursues its purposes at all costs.

**[5] Federal Civil Procedure 170A** 🔑**181.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
          170AII(D)3 Particular Classes Represented
           170Ak181.5 k. Antitrust Plaintiffs. Most Cited Cases

The federal antitrust laws do not evince an intention to preclude a waiver of class-action procedure. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[6] Alternative Dispute Resolution 25T** 🔑**251**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(F) Arbitration Proceedings
          25Tk251 k. Mode and Course of Proceedings in General. Most Cited Cases

Congressional approval of the federal rule of civil procedure allowing class proceedings did not establish an entitlement to class proceedings, in arbitration, for the vindication of statutory rights. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 290

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

**[7] Alternative Dispute Resolution 25T ⬦251**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(F) Arbitration Proceedings
         25Tk251 k. Mode and Course of Proceedings in General. Most Cited Cases

Federal law does not secure a nonwaivable opportunity to vindicate federal policies in arbitration by satisfying the procedural strictures for class certification or by invoking some other informal class mechanism in arbitration. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[8] Alternative Dispute Resolution 25T ⬦134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(1) k. In General. Most Cited Cases

Judge-made exception to overarching principle reflected in text of Federal Arbitration Act (FAA) that arbitration is a matter of contract, which exception allows courts to invalidate arbitration agreements that prevent effective vindication of a federal statutory right, finds its origin in the desire to prevent prospective waiver of a party's right to pursue statutory remedies, and the exception certainly covers a provision in an arbitration agreement forbidding the assertion of certain statutory rights, and perhaps covers filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable, but the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy. 9 U.S.C.A. § 2.

**[9] Alternative Dispute Resolution 25T ⬦134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(1) k. In General. Most Cited Cases

Judge-made exception to overarching principle reflected in text of Federal Arbitration Act (FAA) that arbitration is a matter of contract, which exception allowed courts to invalidate arbitration agreements that prevented effective vindication of a federal statutory right, did not apply to merchants' waiver of class arbitration in their contract with charge-card issuer, which waiver the issuer sought to enforce with respect to merchants' federal antitrust claims against issuer; exception originated in desire to prevent prospective waiver of a party's right to pursue statutory remedies, but merchants' allegation that it was not worth the expense involved in individually proving their federal statutory remedies did not eliminate the right to pursue those remedies, and class-action waiver merely limited arbitration to the two contracting parties. 9 U.S.C.A. § 2.

**[10] Alternative Dispute Resolution 25T ⬦134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(1) k. In General. Most Cited Cases

The Federal Arbitration Act's (FAA) command to enforce arbitration agreements trumps any interest in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

ensuring the prosecution of low-value claims, since that interest is unrelated to the FAA. 9 U.S.C.A. § 2.

**[11] Alternative Dispute Resolution 25T ⬤⇌114**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
          25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases

The Federal Arbitration Act (FAA) favors the absence of litigation when that is the consequence of a contractual class-action waiver, since the FAA's principal purpose is the enforcement of arbitration agreements according to their terms. 9 U.S.C.A. § 2.

*Syllabus* FN*

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1** An agreement between petitioners, American Express and a subsidiary, and respondents, merchants who accept American Express cards, requires all of their disputes to be resolved by arbitration and provides that there "shall be no right or authority for any Claims to be arbitrated on a class action basis." Respondents nonetheless filed a class action, claiming that petitioners violated § 1 of the Sherman Act and seeking treble damages for the class under § 4 of the Clayton Act. Petitioners moved to compel individual arbitration under the Federal Arbitration Act (FAA), but respondents countered that the cost of expert analysis necessary to prove the antitrust claims would greatly exceed the maximum recovery for an individual plaintiff. The District Court granted the motion and dismissed the lawsuits. The Second Circuit re-

versed and remanded, holding that because of the prohibitive costs respondents would face if they had to arbitrate, the class-action waiver was unenforceable and arbitration could not proceed. The Circuit stood by its reversal when this Court remanded in light of *Stolt–Nielsen S.A. v. AnimalFeeds International Corp.,* 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605, which held that a party may not be compelled to submit to class arbitration absent an agreement to do so.

*Held* : The FAA does not permit courts to invalidate a contractual waiver of class arbitration on the ground that the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery. Pp. —— – ——.

(a) The FAA reflects the overarching principle that arbitration is a matter of contract. See *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, ——, 130 S.Ct. 2772, 177 L.Ed.2d 403. Courts must "rigorously enforce" arbitration agreements according to their terms, *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158, even for claims alleging a violation of a federal statute, unless the FAA's mandate has been " 'overridden by a contrary congressional command,' " *CompuCredit Corp. v. Greenwood,* 565 U.S. ——, ——, 132 S.Ct. 665, 181 L.Ed.2d 586. Pp. —— – ——.

(b) No contrary congressional command requires rejection of the class-arbitration waiver here. The antitrust laws do not guarantee an affordable procedural path to the vindication of every claim, see *Rodriguez v. United States,* 480 U.S. 522, 525–526, 107 S.Ct. 1391, 94 L.Ed.2d 533, or "evince an intention to preclude a waiver" of class-action procedure, *Mitsubishi Motors Corp. v. Soler–Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444. Nor does congressional approval of Federal Rule of Civil Procedure 23 establish an entitlement to class proceedings for the vindication of statutory rights. The Rule imposes stringent

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

requirements for certification that exclude most claims, and this Court has rejected the assertion that the class-notice requirement must be dispensed with because the "prohibitively high cost" of compliance would "frustrate [plaintiff's] attempt to vindicate the policies underlying the antitrust" laws, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 167–168, 175–176, 94 S.Ct. 2140, 40 L.Ed.2d 732. Pp. —— – ——.

(c) The "effective vindication" exception that originated as dictum in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444, also does not invalidate the instant arbitration agreement. The exception comes from a desire to prevent "prospective waiver of a party's right to pursue statutory remedies," *id., at* 637, n. 19, 105 S.Ct. 3346; but the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy. Cf. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 32, 111 S.Ct. 1647, 114 L.Ed.2d 26; *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 530, 534, 115 S.Ct. 2322, 132 L.Ed.2d 462. *AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742, all but resolves this case. There, in finding that a law that conditioned enforcement of arbitration on the availability of class procedure interfered with fundamental arbitration attributes, *id., at* ——, 131 S.Ct. 1740, the Court specifically rejected the argument that class arbitration was necessary to prosecute claims "that might otherwise slip through the legal system," *id., at* ——, 131 S.Ct. 1740. Pp. —— – ——.

**\*2** 667 F.3d 204, reversed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion. KAGAN, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined. SOTOMAYOR, J., took no part in the consideration

or decision of the case.
Michael Kellogg, Washington, DC, for Petitioners.

Paul D. Clement, Washington, DC, for Respondents.

Malcolm L. Stewart, for the United States as amicus curiae, by special leave of the Court, supporting the Respondents.

Louise M. Parent, Mark G. Califano, Bernadette Miragliotta, American Express Travel Related Services, Inc., New York, NY, Julia B. Strickland, Stroock & Stroock & Lavan LLP, Los Angeles, CA, Michael K. Kellogg, Counsel of Record, Derek T. Ho, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, for Petitioners.

Deepak Gupta, Brian Wolfman, Gregory A. Beck, Jonathan E. Taylor, Gupta Beck PLLC, Washington, DC, Paul D. Clement, Counsel of Record, Michael H. McGinley, Bancroft PLLC, Washington, DC, for Respondents.

For U.S. Supreme Court Briefs, See:2012 WL 6755152 (Pet.Brief)2013 WL 267025 (Resp.Brief)

Justice SCALIA delivered the opinion of the Court.
We consider whether a contractual waiver of class arbitration is enforceable under the Federal Arbitration Act when the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery.

## I

Respondents are merchants who accept American Express cards. Their agreement with petitioners—American Express and a wholly owned subsidiary—contains a clause that requires all disputes between the parties to be resolved by arbitration. The agreement also provides that "[t]here shall be no right or authority for any Claims to be arbitrated on a class action basis." *In re American Express Merchants'*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

_Litigation,_ 667 F.3d 204, 209 (C.A.2 2012).

Respondents brought a class action against petitioners for violations of the federal antitrust laws. According to respondents, American Express used its monopoly power in the market for charge cards to force merchants to accept credit cards at rates approximately 30% higher than the fees for competing credit cards.[FN1] This tying arrangement, respondents said, violated § 1 of the Sherman Act. They sought treble damages for the class under § 4 of the Clayton Act.

FN1. A charge card requires its holder to pay the full outstanding balance at the end of a billing cycle; a credit card requires payment of only a portion, with the balance subject to interest.

**\*3** Petitioners moved to compel individual arbitration under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 _et seq._ In resisting the motion, respondents submitted a declaration from an economist who estimated that the cost of an expert analysis necessary to prove the antitrust claims would be "at least several hundred thousand dollars, and might exceed $1 million," while the maximum recovery for an individual plaintiff would be $12,850, or $38,549 when trebled. App. 93. The District Court granted the motion and dismissed the lawsuits. The Court of Appeals reversed and remanded for further proceedings. It held that because respondents had established that "they would incur prohibitive costs if compelled to arbitrate under the class action waiver," the waiver was unenforceable and the arbitration could not proceed. _In re American Express Merchants' Litigation,_ 554 F.3d 300, 315–316 (C.A.2 2009).

We granted certiorari, vacated the judgment, and remanded for further consideration in light of _Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,_ 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010),

which held that a party may not be compelled to submit to class arbitration absent an agreement to do so. _American Express Co. v. Italian Colors Restaurant,_ 559 U.S. 1103, 130 S.Ct. 2401, 176 L.Ed.2d 920 (2010). The Court of Appeals stood by its reversal, stating that its earlier ruling did not compel class arbitration. _In re American Express Merchants' Litigation,_ 634 F.3d 187, 200 (C.A.2 2011). It then _sua sponte_ reconsidered its ruling in light of _AT&T Mobility LLC v. Concepcion,_ 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), which held that the FAA pre-empted a state law barring enforcement of a class-arbitration waiver. Finding _AT&T Mobility_ inapplicable because it addressed pre-emption, the Court of Appeals reversed for the third time. 667 F.3d, at 213. It then denied rehearing en banc with five judges dissenting. _In re American Express Merchants' Litigation,_ 681 F.3d 139 (C.A.2 2012). We granted certiorari, 568 U.S. ——, 133 S.Ct. 594, 184 L.Ed.2d 390 (2012), to consider the question "[w]hether the Federal Arbitration Act permits courts ... to invalidate arbitration agreements on the ground that they do not permit class arbitration of a federal-law claim," Pet. for Cert. i.

II

**\*4** [1][2] Congress enacted the FAA in response to widespread judicial hostility to arbitration. See _AT&T Mobility, supra,_ at ——, 131 S.Ct., at 1745. As relevant here, the Act provides:

"A written provision in any maritime transaction or contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

This text reflects the overarching principle that arbitration is a matter of contract. See _Rent–A–Center, West, Inc. v. Jackson,_ 561 U.S. ——, ——, 130 S.Ct.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

2772, 2776, 177 L.Ed.2d 403 (2010). And consistent with that text, courts must "rigorously enforce" arbitration agreements according to their terms, *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), including terms that "specify *with whom* [the parties] choose to arbitrate their disputes," *Stolt–Nielsen, supra,* at 683, 130 S.Ct. 1758, and "the rules under which that arbitration will be conducted," *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). That holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been " 'overridden by a contrary congressional command.' " *CompuCredit Corp. v. Greenwood,* 565 U.S. ——, ——, 132 S.Ct. 665, 668–669, 181 L.Ed.2d 586 (2012) (quoting *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)).

### III

[3][4] No contrary congressional command requires us to reject the waiver of class arbitration here. Respondents argue that requiring them to litigate their claims individually—as they contracted to do—would contravene the policies of the antitrust laws. But the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim. Congress has taken some measures to facilitate the litigation of antitrust claims—for example, it enacted a multiplied-damages remedy. See 15 U.S.C. § 15 (treble damages). In enacting such measures, Congress has told us that it is willing to go, in certain respects, beyond the normal limits of law in advancing its goals of deterring and remedying unlawful trade practice. But to say that Congress must have intended whatever departures from those normal limits advance antitrust goals is simply irrational. "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States,* 480 U.S. 522, 525–526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (*per curiam* ).

[5] The antitrust laws do not "evinc[e] an inten-

tion to preclude a waiver" of class-action procedure. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The Sherman and Clayton Acts make no mention of class actions. In fact, they were enacted decades before the advent of Federal Rule of Civil Procedure 23, which was "designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The parties here agreed to arbitrate pursuant to that "usual rule," and it would be remarkable for a court to erase that expectation.

[6][7] Nor does congressional approval of Rule 23 establish an entitlement to class proceedings for the vindication of statutory rights. To begin with, it is likely that such an entitlement, invalidating private arbitration agreements denying class adjudication, would be an "abridg[ment]" or "modif[ication]" of a "substantive right" forbidden to the Rules, see 28 U.S.C. § 2072(b). But there is no evidence of such an entitlement in any event. The Rule imposes stringent requirements for certification that in practice exclude most claims. And we have specifically rejected the assertion that one of those requirements (the class-notice requirement) must be dispensed with because the "prohibitively high cost" of compliance would "frustrate [plaintiff's] attempt to vindicate the policies underlying the antitrust" laws. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 166–168, 175–176, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). One might respond, perhaps, that federal law secures a nonwaivable *opportunity* to vindicate federal policies by satisfying the procedural strictures of Rule 23 or invoking some other informal class mechanism in arbitration. But we have already rejected that proposition in *AT&T Mobility,* 563 U.S., at ——, 131 S.Ct., at 1748.

### IV

**\*5** Our finding of no "contrary congressional

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

command" does not end the case. Respondents invoke a judge-made exception to the FAA which, they say, serves to harmonize competing federal policies by allowing courts to invalidate agreements that prevent the "effective vindication" of a federal statutory right. Enforcing the waiver of class arbitration bars effective vindication, respondents contend, because they have no economic incentive to pursue their antitrust claims individually in arbitration.

The "effective vindication" exception to which respondents allude originated as dictum in *Mitsubishi Motors,* where we expressed a willingness to invalidate, on "public policy" grounds, arbitration agreements that "operat [e] ... as a prospective waiver of a party's *right to pursue* statutory remedies." 473 U.S., at 637, n. 19, 105 S.Ct. 3346 (emphasis added). Dismissing concerns that the arbitral forum was inadequate, we said that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id.,* at 637, 105 S.Ct. 3346. Subsequent cases have similarly asserted the existence of an "effective vindication" exception, see, *e.g.,* 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 273–274, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), but have similarly declined to apply it to invalidate the arbitration agreement at issue.[FN2]

> **FN2.** Contrary to the dissent's claim, *post,* at —— – ——, and n. 3 (opinion of KAGAN, J.), the Court in *Mitsubishi Motors* did not hold that federal statutory claims are subject to arbitration so long as the claimant may effectively vindicate his rights in the arbitral forum. The Court expressly stated that, "at this stage in the proceedings," it had "no occasion to speculate" on whether the arbitration agreement's potential deprivation of a claimant's right to pursue federal remedies may render that agreement unenforceable.

473 U.S., at 637, n. 19, 105 S.Ct. 3346. Even the Court of Appeals in this case recognized the relevant language in *Mitsubishi Motors* as dicta. *In re American Express Merchants' Litigation,* 667 F.3d 204, 214 (C.A.2 2012).

[8][9] And we do so again here. As we have described, the exception finds its origin in the desire to prevent "prospective waiver of a party's *right to pursue* statutory remedies," Mitsubishi Motors, supra, at 637, n. 19, 105 S.Ct. 3346 (emphasis added). That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights. And it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable. See *Green Tree Financial Corp.–Ala. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) ("It may well be that the existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights"). But the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy. See 681 F.3d, at 147 (Jacobs, C.J., dissenting from denial of rehearing en banc).[FN3] The class-action waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for relief in 1938, see Fed. Rule Civ. Proc. 23, 28 U.S.C., p. 864 (1938 ed., Supp V); 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1752, p. 18 (3d ed. 2005). Or, to put it differently, the individual suit that was considered adequate to assure "effective vindication" of a federal right before adoption of class-action procedures did not suddenly become "ineffective vindication" upon their adoption.[FN4]

> **FN3.** The dissent contends that a class-action waiver may deny a party's right to pursue statutory remedies in the same way as a clause that bars a party from presenting

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

economic testimony. See *post,* at ——, ——. That is a false comparison for several reasons: To begin with, it is not a given that such a clause would constitute an impermissible waiver; we have never considered the point. But more importantly, such a clause, assuming it makes vindication of the claim impossible, makes it impossible not just as a class action but even as an individual claim.

FN4. Who can disagree with the dissent's assertion that "the effective-vindication rule asks about the world today, not the world as it might have looked when Congress passed a given statute"? *Post,* at ——. But time does not change the meaning of effectiveness, making ineffective vindication today what was effective vindication in the past. The dissent also says that the agreement bars other forms of cost sharing—existing before the Sherman Act—that could provide effective vindication. See *post,* at —— – ——, and n. 5. Petitioners denied that, and that is not what the Court of Appeals decision under review here held. It held that, because other forms of cost sharing were not economically feasible ("the *only economically feasible* means for ... enforcing [respondents'] statutory rights is *via a class action* "), the class-action waiver was unenforceable. 667 F.3d, at 218 (emphasis added). (The dissent's assertion to the contrary cites not the opinion on appeal here, but an earlier opinion that was vacated. See *In re American Express Merchants' Litigation,* 554 F.3d 300 (C.A.2 2009), vacated and remanded, 559 U.S. 1103, 130 S.Ct. 2401, 176 L.Ed.2d 920 (2010).) That is the conclusion we reject.

**\*6** A pair of our cases brings home the point. In *Gilmer, supra,* we had no qualms in enforcing a class waiver in an arbitration agreement even though the federal statute at issue, the Age Discrimination in Employment Act, expressly permitted collective actions. We said that statutory permission did " 'not mean that individual attempts at conciliation were intended to be barred.' " *Id., at 32, 111 S.Ct. 1647.* And in *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995), we held that requiring arbitration in a foreign country was compatible with the federal Carriage of Goods by Sea Act. That legislation prohibited any agreement " 'relieving' " or " 'lessening' " the liability of a carrier for damaged goods, *id., at 530, 534, 115 S.Ct. 2322* (quoting 46 U.S.C.App. § 1303(8) (1988 ed.))—which is close to codification of an "effective vindication" exception. The Court rejected the argument that the "inconvenience and costs of proceeding" abroad "lessen[ed]" the defendants' liability, stating that "[i]t would be unwieldy and unsupported by the terms or policy of the statute to require courts to proceed case by case to tally the costs and burdens to particular plaintiffs in light of their means, the size of their claims, and the relative burden on the carrier." 515 U.S., at 532, 536, 115 S.Ct. 2322. Such a "tally[ing] [of] the costs and burdens" is precisely what the dissent would impose upon federal courts here.

[10][11] Truth to tell, our decision in *AT&T Mobility* all but resolves this case. There we invalidated a law conditioning enforcement of arbitration on the availability of class procedure because that law "interfere[d] with fundamental attributes of arbitration." 563 U.S., at ——, 131 S.Ct., at 1748. "[T]he switch from bilateral to class arbitration," we said, "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.,* at ——, 131 S.Ct., at 1751. We specifically rejected the argument that class arbitration was necessary to prosecute claims "that might otherwise slip through the legal system." *Id.,* at ——, 131 S.Ct., at 1753.FN5

FN5. In dismissing *AT&T Mobility* as a case involving pre-emption and not the effec-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

tive-vindication exception, the dissent ignores what that case established—that the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims. The latter interest, we said, is "unrelated" to the FAA. 563 U.S., at ——, 131 S.Ct., at 1752–1753. Accordingly, the FAA does, contrary to the dissent's assertion, see *post*, at ——, favor the absence of litigation when that is the consequence of a class-action waiver, since its " 'principal purpose' " is the enforcement of arbitration agreements according to their terms. 563 U.S., at ——, 131 S.Ct., at 1748 (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 487, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).

3

**\*7** The regime established by the Court of Appeals' decision would require—before a plaintiff can be held to contractually agreed bilateral arbitration—that a federal court determine (and the parties litigate) the legal requirements for success on the merits claim-by-claim and theory-by-theory, the evidence necessary to meet those requirements, the cost of developing that evidence, and the damages that would be recovered in the event of success. Such a preliminary litigating hurdle would undoubtedly destroy the prospect of speedy resolution that arbitration in general and bilateral arbitration in particular was meant to secure. The FAA does not sanction such a judicially created superstructure.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

Justice SOTOMAYOR took no part in the consideration or decision of this case.

Justice THOMAS, concurring.

I join the Court's opinion in full. I write separately to note that the result here is also required by the plain meaning of the Federal Arbitration Act. In *AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), I explained that "the FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress." *Id.,* at ——, 131 S.Ct. at 1753 (concurring opinion). In this case, Italian Colors makes two arguments to support its conclusion that the arbitration agreement should not be enforced. First, it contends that enforcing the arbitration agreement "would contravene the policies of the antitrust laws." *Ante,* at ——. Second, it contends that a court may "invalidate agreements that prevent the 'effective vindication' of a federal statutory right." *Ante,* at ——. Neither argument "concern[s] whether the contract was properly made," *Concepcion, supra,* at ——, 131 S.Ct., at 1756 (THOMAS, J., concurring). Because Italian Colors has not furnished "grounds ... for the revocation of any contract," 9 U.S.C. § 2, the arbitration agreement must be enforced. Italian Colors voluntarily entered into a contract containing a bilateral arbitration provision. It cannot now escape its obligations merely because the claim it wishes to bring might be economically infeasible.

Justice KAGAN, with whom Justice GINSBURG and Justice BREYER join, dissenting.

**\*8** Here is the nutshell version of this case, unfortunately obscured in the Court's decision. The owner of a small restaurant (Italian Colors) thinks that American Express (Amex) has used its monopoly power to force merchants to accept a form contract violating the antitrust laws. The restaurateur wants to challenge the allegedly unlawful provision (imposing a tying arrangement), but the same contract's arbitration clause prevents him from doing so. That term imposes a variety of procedural bars that would make

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

pursuit of the antitrust claim a fool's errand. So if the arbitration clause is enforceable, Amex has insulated itself from antitrust liability—even if it has in fact violated the law. The monopolist gets to use its monopoly power to insist on a contract effectively depriving its victims of all legal recourse.

And here is the nutshell version of today's opinion, admirably flaunted rather than camouflaged: Too darn bad.

That answer is a betrayal of our precedents, and of federal statutes like the antitrust laws. Our decisions have developed a mechanism—called the effective-vindication rule—to prevent arbitration clauses from choking off a plaintiff's ability to enforce congressionally created rights. That doctrine bars applying such a clause when (but only when) it operates to confer immunity from potentially meritorious federal claims. In so doing, the rule reconciles the Federal Arbitration Act (FAA) with all the rest of federal law—and indeed, promotes the most fundamental purposes of the FAA itself. As applied here, the rule would ensure that Amex's arbitration clause does not foreclose Italian Colors from vindicating its right to redress antitrust harm.

The majority barely tries to explain why it reaches a contrary result. It notes that we have not decided this exact case before—neglecting that the principle we have established fits this case hand in glove. And it concocts a special exemption for class-arbitration waivers—ignoring that this case concerns much more than that. Throughout, the majority disregards our decisions' central tenet: An arbitration clause may not thwart federal law, irrespective of exactly how it does so. Because the Court today prevents the effective vindication of federal statutory rights, I respectfully dissent.

I
Start with an uncontroversial proposition: We

would refuse to enforce an exculpatory clause insulating a company from antitrust liability—say, "Merchants may bring no Sherman Act claims"—even if that clause were contained in an arbitration agreement. See *ante,* at ——. Congress created the Sherman Act's private cause of action not solely to compensate individuals, but to promote "the public interest in vigilant enforcement of the antitrust laws." *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). Accordingly, courts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or any other contract. See *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, and n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The same rule applies to other important federal statutory rights. See *14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 273, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009) (Age Discrimination in Employment Act); *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (Fair Labor Standards Act). But its necessity is nowhere more evident than in the antitrust context. Without the rule, a company could use its monopoly power to protect its monopoly power, by coercing agreement to contractual terms eliminating its antitrust liability.

If the rule were limited to baldly exculpatory provisions, however, a monopolist could devise numerous ways around it. Consider several alternatives that a party drafting an arbitration agreement could adopt to avoid antitrust liability, each of which would have the identical effect. On the front end: The agreement might set outlandish filing fees or establish an absurd (*e.g.*, one-day) statute of limitations, thus preventing a claimant from gaining access to the arbitral forum. On the back end: The agreement might remove the arbitrator's authority to grant meaningful relief, so that a judgment gets the claimant nothing worthwhile. And in the middle: The agreement might block the claimant from presenting the kind of proof that is necessary to establish the defendant's liabil-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

ity—say, by prohibiting any economic testimony (good luck proving an antitrust claim without that!). Or else the agreement might appoint as an arbitrator an obviously biased person—say, the CEO of Amex. The possibilities are endless—all less direct than an express exculpatory clause, but no less fatal. So the rule against prospective waivers of federal rights can work only if it applies not just to a contract clause explicitly barring a claim, but to others that operate to do so.

**\*9** And sure enough, our cases establish this proposition: An arbitration clause will not be enforced if it prevents the effective vindication of federal statutory rights, however it achieves that result. The rule originated in *Mitsubishi,* where we held that claims brought under the Sherman Act and other federal laws are generally subject to arbitration. *473 U.S., at 628, 105 S.Ct. 3346.* By agreeing to arbitrate such a claim, we explained, "a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Ibid.* But crucial to our decision was a limiting principle, designed to safeguard federal rights: An arbitration clause will be enforced only "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." *Id., at 637, 105 S.Ct. 3346.* If an arbitration provision "operated ... as a prospective waiver of a party's right to pursue statutory remedies," we emphasized, we would "condemn[ ]" it. *Id., at 637, n. 19, 105 S.Ct. 3346.* Similarly, we stated that such a clause should be "set [ ] aside" if "proceedings in the contractual forum will be so gravely difficult" that the claimant "will for all practical purposes be deprived of his day in court." *Id., at 632, 105 S.Ct. 3346* (internal quotation marks omitted). And in the decades since *Mitsubishi,* we have repeated its admonition time and again, instructing courts not to enforce an arbitration agreement that effectively (even if not explicitly) forecloses a plaintiff from remedying the violation of a federal statutory right. See *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Vimar Seguros y Reaseguros, S.A. v. M/V*

*Sky Reefer,* 515 U.S. 528, 540, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995); *14 Penn Plaza,* 556 U.S., at 266, 273–274, 129 S.Ct. 1456.

Our decision in *Green Tree Financial Corp.–Ala. v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), confirmed that this principle applies when an agreement thwarts federal law by making arbitration prohibitively expensive. The plaintiff there (seeking relief under the Truth in Lending Act) argued that an arbitration agreement was unenforceable because it "create[d] a risk" that she would have to "bear prohibitive arbitration costs" in the form of high filing and administrative fees. *Id., at 90, 121 S.Ct. 513* (internal quotation marks omitted). We rejected that contention, but not because we doubted that such fees could prevent the effective vindication of statutory rights. To the contrary, we invoked our rule from *Mitsubishi,* making clear that it applied to the case before us. See *531 U.S., at 90, 121 S.Ct. 513.* Indeed, we added a burden of proof: "[W]here, as here," we held, a party asserting a federal right "seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id., at 92, 121 S.Ct. 513.* Randolph, we found, had failed to meet that burden: The evidence she offered was "too speculative." *Id., at 91, 121 S.Ct. 513.* But even as we dismissed Randolph's suit, we reminded courts to protect against arbitration agreements that make federal claims too costly to bring.

**\*10** Applied as our precedents direct, the effective-vindication rule furthers the purposes not just of laws like the Sherman Act, but of the FAA itself. That statute reflects a federal policy favoring actual arbitration—that is, arbitration as a streamlined "method of resolving disputes," not as a foolproof way of killing off valid claims. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Put otherwise: What the FAA prefers to litigation is arbitration, not

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

*de facto* immunity. The effective-vindication rule furthers the statute's goals by ensuring that arbitration remains a real, not faux, method of dispute resolution. With the rule, companies have good reason to adopt arbitral procedures that facilitate efficient and accurate handling of complaints. Without it, companies have every incentive to draft their agreements to extract backdoor waivers of statutory rights, making arbitration unavailable or pointless. So down one road: More arbitration, better enforcement of federal statutes. And down the other: Less arbitration, poorer enforcement of federal statutes. Which would you prefer? Or still more aptly: Which do you think Congress would?

The answer becomes all the more obvious given the limits we have placed on the rule, which ensure that it does not diminish arbitration's benefits. The rule comes into play only when an agreement "operate[s] ... as a prospective waiver"—that is, forecloses (not diminishes) a plaintiff's opportunity to gain relief for a statutory violation. *Mitsubishi,* 473 U.S., at 637, n. 19, 105 S.Ct. 3346. So, for example, *Randolph* assessed whether fees in arbitration would be "prohibitive" (not high, excessive, or extravagant). 531 U.S., at 90, 121 S.Ct. 513. Moreover, the plaintiff must make that showing through concrete proof: "[S]peculative" risks, "unfounded assumptions," and "unsupported statements" will not suffice. *Id.,* at 90–91, and n. 6, 121 S.Ct. 513. With the inquiry that confined and the evidentiary requirements that high, courts have had no trouble assessing the matters the rule makes relevant. And for almost three decades, courts have followed our edict that arbitration clauses must usually prevail, declining to enforce them in only rare cases. See Brief for United States as *Amicus Curiae* 26–27. The effective-vindication rule has thus operated year in and year out without undermining, much less "destroy [ing]," the prospect of speedy dispute resolution that arbitration secures. *Ante,* at ——.

And this is just the kind of case the rule was meant to address. Italian Colors, as I have noted, alleges that Amex used its market power to impose a tying arrangement in violation of the Sherman Act. The antitrust laws, all parties agree, provide the restaurant with a cause of action and give it the chance to recover treble damages. Here, that would mean Italian Colors could take home up to $38,549. But a problem looms. As this case comes to us, the evidence shows that Italian Colors cannot prevail in arbitration without an economic analysis defining the relevant markets, establishing Amex's monopoly power, showing anticompetitive effects, and measuring damages. And that expert report would cost between several hundred thousand and one million dollars. [FN1] So the expense involved in proving the claim in arbitration is ten times what Italian Colors could hope to gain, even in a best-case scenario. That counts as a "prohibitive" cost, in *Randolph 's* terminology, if anything does. No rational actor would bring a claim worth tens of thousands of dollars if doing so meant incurring costs in the hundreds of thousands.

FN1. The evidence relating to these costs comes from an affidavit submitted by an economist experienced in proving similar antitrust claims. The Second Circuit found that Amex "ha[d] brought no serious challenge" to that factual showing. See, *e.g.,* 667 F.3d 204, 210 (2012). And in this Court, Amex conceded that Italian Colors would need an expert economic report to prevail in arbitration. See Tr. of Oral Arg. 15. Perhaps that is not really true. A hallmark of arbitration is its use of procedures tailored to the type of dispute and amount in controversy; so arbitrators might properly decline to demand such a rigorous evidentiary showing in small antitrust cases. But that possibility cannot disturb the factual premise on which this case comes to us, and which the majority accepts: that Italian Colors's tying claim is an ordinary kind of antitrust claim; and that it is worth about a tenth the cost of arbitration.

**\*11** An arbitration agreement could manage such

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

a mismatch in many ways, but Amex's disdains them all. As the Court makes clear, the contract expressly prohibits class arbitration. But that is only part of the problem.[FN2] The agreement also disallows any kind of joinder or consolidation of claims or parties. And more: Its confidentiality provision prevents Italian Colors from informally arranging with other merchants to produce a common expert report. And still more: The agreement precludes any shifting of costs to Amex, even if Italian Colors prevails. And beyond all that: Amex refused to enter into any stipulations that would obviate or mitigate the need for the economic analysis. In short, the agreement as applied in this case cuts off not just class arbitration, but any avenue for sharing, shifting, or shrinking necessary costs. Amex has put Italian Colors to this choice: Spend way, way, way more money than your claim is worth, or relinquish your Sherman Act rights.

> FN2. The majority contends that the class-action waiver is the only part we should consider. See *ante,* at —— – ——, n. 4. I explain below why that assertion is wrong. See *infra,* at —— – ——.

So contra the majority, the court below got this case right. Italian Colors proved what the plaintiff in *Randolph* could not—that a standard-form agreement, taken as a whole, renders arbitration of a claim "prohibitively expensive." 531 U.S., at 92, 121 S.Ct. 513. The restaurant thus established that the contract "operate[s] ... as a prospective waiver," and prevents the "effective[ ] ... vindicat[ion]" of Sherman Act rights. *Mitsubishi,* 473 U.S., at 637, and n. 19, 105 S.Ct. 3346. I would follow our precedents and decline to compel arbitration.

## II

The majority is quite sure that the effective-vindication rule does not apply here, but has precious little to say about why. It starts by disparaging the rule as having "originated as dictum." *Ante,* at ——. But it does not rest on that swipe, and for good

reason. As I have explained, see *supra,* at —— – ——, the rule began as a core part of *Mitsubishi* : We held there that federal statutory claims are subject to arbitration "*so long as* " the claimant "effectively may vindicate its [rights] in the arbitral forum." 473 U.S., at 637, 105 S.Ct. 3346 (emphasis added). The rule thus served as an essential condition of the decision's holding.[FN3] And in *Randolph,* we provided a standard for applying the rule when a claimant alleges "prohibitive costs" ("Where, as here," etc., see *supra,* at ——), and we then applied that standard to the parties before us. So whatever else the majority might think of the effective-vindication rule, it is not dictum.

> FN3. The majority is dead wrong when it says that *Mitsubishi* reserved judgment on "whether the arbitration agreement's potential deprivation of a claimant's right to pursue federal remedies may render that agreement unenforceable." *Ante,* at ——, n. 2. What the *Mitsubishi* Court had "no occasion to speculate on" was whether a particular agreement *in fact* eliminated the claimant's federal rights. 473 U.S., at 673, n. 19, 105 S.Ct. 3375. But we stated expressly that if the agreement did so (as Amex's does), we would invalidate it. *Ibid.;* see *supra,* at ——.

The next paragraph of the Court's decision (the third of Part IV) is the key: It contains almost the whole of the majority's effort to explain why the effective-vindication rule does not stop Amex from compelling arbitration. The majority's first move is to describe *Mitsubishi* and *Randolph* as covering only discrete situations: The rule, the majority asserts, applies to arbitration agreements that eliminate the "right to pursue statutory remedies" by "forbidding the assertion" of the right (as addressed in *Mitsubishi* ) or imposing filing and administrative fees "so high as to make access to the forum impracticable" (as addressed in *Randolph* ). *Ante,* at —— (emphasis deleted; internal quotation marks omitted). Those cases are not this case, the majority says: Here, the agree-

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

ment's provisions went to the possibility of "*proving* a statutory remedy." *Ante,* at ——.

  **\*12** But the distinction the majority proffers, which excludes problems of proof, is one *Mitsubishi* and *Randolph* (and our decisions reaffirming them) foreclose. Those decisions establish what in some quarters is known as a principle: When an arbitration agreement prevents the effective vindication of federal rights, a party may go to court. That principle, by its nature, operates in diverse circumstances—not just the ones that happened to come before the Court. See *supra,* at —— – ——. It doubtless covers the baldly exculpatory clause and prohibitive fees that the majority acknowledges would preclude an arbitration agreement's enforcement. But so too it covers the world of other provisions a clever drafter might devise to scuttle even the most meritorious federal claims. Those provisions might deny entry to the forum in the first instance. Or they might deprive the claimant of any remedy. Or they might prevent the claimant from offering the necessary proof to prevail, as in my "no economic testimony" hypothetical—and in the actual circumstances of this case. See *supra,* at ——. The variations matter not at all. Whatever the precise mechanism, each "operate[s] ... as a prospective waiver of a party's [federal] right[s]"—and so confers immunity on a wrongdoer. *Mitsubishi,* 473 U.S., at 637, n. 19, 105 S.Ct. 3346. And that is what counts under our decisions.[FN4]

      FN4. *Gilmer* and *Vimar Seguros,* which the majority relies on, see *ante,* at ——, fail to advance its argument. The plaintiffs there did not claim, as Italian Colors does, that an arbitration clause altogether precluded them from vindicating their federal rights. They averred only that arbitration would be less convenient or effective than a proceeding in court. See *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31–32, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S.

528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). As I have explained, that kind of showing does not meet the effective-vindication rule's high bar. See *supra,* at ——.

  Nor can the majority escape the principle we have established by observing, as it does at one point, that Amex's agreement merely made arbitration "not worth the expense." *Ante,* at ——. That suggestion, after all, runs smack into *Randolph,* which likewise involved an allegation that arbitration, as specified in a contract, "would be prohibitively expensive." 531 U.S., at 92, 121 S.Ct. 513. Our decision there made clear that a provision raising a plaintiff's costs could foreclose consideration of federal claims, and so run afoul of the effective-vindication rule. The expense at issue in *Randolph* came from a filing fee combined with a per-diem payment for the arbitrator. But nothing about those particular costs is distinctive; and indeed, a rule confined to them would be weirdly idiosyncratic. Not surprisingly, then, *Randolph* gave no hint of distinguishing among the different ways an arbitration agreement can make a claim too costly to bring. Its rationale applies whenever an agreement makes the vindication of federal claims impossibly expensive—whether by imposing fees or proscribing cost-sharing or adopting some other device.

  That leaves the three last sentences in the majority's core paragraph. Here, the majority conjures a special reason to exclude "class-action waiver[s]" from the effective-vindication rule's compass. *Ante,* at —— – ——, and n. 4. Rule 23, the majority notes, became law only in 1938—decades after the Sherman Act. The majority's conclusion: If federal law in the interim decades did not eliminate a plaintiff's rights under that Act, then neither does this agreement.

  **\*13** But that notion, first of all, rests on a false premise: that this case is only about a class-action waiver. See *ante,* at ——, n. 4 (confining the case to that issue). It is not, and indeed could not sensibly be.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**App. 303**

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

The effective-vindication rule asks whether an arbitration agreement *as a whole* precludes a claimant from enforcing federal statutory rights. No single provision is properly viewed in isolation, because an agreement can close off one avenue to pursue a claim while leaving others open. In this case, for example, the agreement could have prohibited class arbitration without providing the effective-vindication rule *if* it had provided an alternative mechanism to share, shift, or reduce the necessary costs. The agreement's problem is that it bars not just class actions, but also all mechanisms—many existing long before the Sherman Act, if that matters—for joinder or consolidation of claims, informal coordination among individual claimants, or amelioration of arbitral expenses. See *supra,* at ——. And contrary to the majority's assertion, the Second Circuit well understood that point: It considered, for example, whether Italian Colors could shift expert expenses to Amex if its claim prevailed (no) or could join with merchants bringing similar claims to produce a common expert report (no again). See 554 F.3d 300, 318 (2009). It is only in this Court that the case has become strangely narrow, as the majority stares at a single provision rather than considering, in the way the effective-vindication rule demands, how the entire contract operates.[FN5]

> **FN5.** In defense of this focus, the majority quotes the Second Circuit as concluding that "the *only economically feasible* means" for Italian Colors to enforce its statutory rights "is via a class action." *Ante,* at —— – ——, n. 4 (quoting 667 F.3d, at 218; internal quotation marks omitted; emphasis added by the Court). But the Court of Appeals reached that conclusion only after finding that the agreement prohibited all *other* forms of cost-sharing and cost-shifting. See 554 F.3d 300, 318 (2009). (That opinion was vacated on other grounds, but its analysis continued to inform—indeed, was essential to—the Second Circuit's final decision in the case. See 667 F.3d, at 218.) The Second Circuit

therefore did exactly what the majority refuses to do—look to the agreement as a whole to determine whether it permits the vindication of federal rights.

In any event, the age of the relevant procedural mechanisms (whether class actions or any other) does not matter, because the effective-vindication rule asks about the world today, not the world as it might have looked when Congress passed a given statute. Whether a particular procedural device preceded or post-dated a particular statute, the question remains the same: Does the arbitration agreement foreclose a party—right now—from effectively vindicating the substantive rights the statute provides? This case exhibits a whole raft of changes since Congress passed the Sherman Act, affecting both parties to the dispute—not just new procedural rules (like Rule 23), but also new evidentiary requirements (like the demand here for an expert report) and new contract provisions affecting arbitration (like this agreement's confidentiality clause). But what has stayed the same is this: Congress's intent that antitrust plaintiffs should be able to enforce their rights free of any prior waiver. See *supra,* at —— – ——; *Mitsubishi,* 473 U.S., at 637, n. 19, 105 S.Ct. 3346. The effective-vindication rule carries out that purpose by ensuring that any arbitration agreement operating as such a waiver is unenforceable. And that requires courts to determine in the here and now—rather than in ye olde glory days—whether an agreement's provisions foreclose even meritorious antitrust claims.

Still, the majority takes one last stab: "Truth to tell," it claims, *AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), "all but resolves this case." *Ante,* at ——. In that decision, the majority recounts, this Court held that the FAA preempted a state "law conditioning enforcement of arbitration on the availability of class procedure." *Ibid.*; see 563 U.S., at ——, 131 S.Ct., at 1748. According to the majority, that decision controls here because "[w]e specifically rejected the argument

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 304

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

that class arbitration was necessary." *Ante,* at ——.

*\*14* Where to begin? Well, maybe where I just left off: Italian Colors is not claiming that a class action is necessary—only that it have *some* means of vindicating a meritorious claim. And as I have shown, non-class options abound. See *supra,* at ——. The idea that *AT&T Mobility* controls here depends entirely on the majority's view that this case is "class action or bust." Were the majority to drop that pretense, it could make no claim for *AT&T Mobility 's* relevance.

And just as this case is not about class actions, *AT&T Mobility* was not—and could not have been—about the effective-vindication rule. Here is a tip-off: *AT&T Mobility* nowhere cited our effective-vindication precedents. That was so for two reasons. To begin with, the state law in question made class-action waivers unenforceable even when a party *could* feasibly vindicate her claim in an individual arbitration. The state rule was designed to preserve the broad-scale "deterrent effects of class actions," not merely to protect a particular plaintiff's right to assert her own claim. *563 U.S., at ——, 131 S.Ct., at 1745.* Indeed, the Court emphasized that the complaint in that case was "most unlikely to go unresolved" because AT & T's agreement contained a host of features ensuring that "aggrieved customers who filed claims would be essentially guaranteed to be made whole." *Id., at ——, 131 S.Ct., at 1753* (internal quotation marks and brackets omitted). So the Court professed that *AT&T Mobility* did not implicate the only thing (a party's ability to vindicate a meritorious claim) this case involves.

And if that is not enough, *AT&T Mobility* involved a *state* law, and therefore could not possibly implicate the effective-vindication rule. When a state rule allegedly conflicts with the FAA, we apply standard preemption principles, asking whether the state law frustrates the FAA's purposes and objectives. If the state rule does so—as the Court found in *AT&T*

*Mobility*—the Supremacy Clause requires its invalidation. We have no earthly interest (quite the contrary) in vindicating that law. Our effective-vindication rule comes into play only when the FAA is alleged to conflict with another *federal* law, like the Sherman Act here. In that all-federal context, one law does not automatically bow to the other, and the effective-vindication rule serves as a way to reconcile any tension between them. Again, then, *AT&T Mobility* had no occasion to address the issue in this case. The relevant decisions are instead *Mitsubishi* and *Randolph.*

3

*\*15* The Court today mistakes what this case is about. To a hammer, everything looks like a nail. And to a Court bent on diminishing the usefulness of Rule 23, everything looks like a class action, ready to be dismantled. So the Court does not consider that Amex's agreement bars not just class actions, but "other forms of cost-sharing ... that could provide effective vindication." *Ante,* at ——, n. 4. In short, the Court does not consider—and does not decide—Italian Colors's (and similarly situated litigants') actual argument about why the effective-vindication rule precludes this agreement's enforcement.

As a result, Amex's contract will succeed in depriving Italian Colors of any effective opportunity to challenge monopolistic conduct allegedly in violation of the Sherman Act. The FAA, the majority says, so requires. Do not be fooled. Only the Court so requires; the FAA was never meant to produce this outcome. The FAA conceived of arbitration as a "method of *resolving* disputes"—a way of using tailored and streamlined procedures to facilitate redress of injuries. *Rodriguez de Quijas,* 490 U.S., at 481, 109 S.Ct. 1917 (emphasis added). In the hands of today's majority, arbitration threatens to become more nearly the opposite—a mechanism easily made to block the vindication of meritorious federal claims and insulate

© 2013 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332
**(Cite as: 2013 WL 3064410 (U.S.))**

wrongdoers from liability. The Court thus undermines the FAA no less than it does the Sherman Act and other federal statutes providing rights of action. I respectfully dissent.

U.S.,2013.
American Exp. Co. v. Italian Colors Restaurant
--- S.Ct. ----, 2013 WL 3064410 (U.S.), 13 Cal. Daily Op. Serv. 6332

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**App. 306**



Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Wisconsin.
Rob BOELK, Jerry Seger, Dave Jacak, Greg
Congdon, David Moffitt and Jeff Sopel, on behalf of
themselves and all others similarly situated, Plaintiffs,
v.
AT & T TELEHOLDINGS, INC., Wisconsin Bell,
Inc., Ameritech Services, Inc. And AT & T Services,
Inc., Defendants.

No. 12–cv–40–bbc.
Jan. 10, 2013.

Michael R. Bauer, Peggy A. Lautenschlager, Bauer &
Bach, LLC, Sarah E. Siskind, Miner, Barnhill &
Galland, P.C., Madison, WI, Nancy L. Maldonado,
Miner, Barnhill & Galland, P.C., Chicago, IL, for
Plaintiffs.

Kendall W. Harrison, Bryan J. Cahill, Godfrey &
Kahn, S.C., Madison, WI, for Defendants.

OPINION AND ORDER
BARBARA B. CRABB, District Judge.
**\*1** This is a proposed collective action under the
Fair Labor Standards Act (FLSA), 29 U.S.C. §§
201–219, and a proposed class action under
Fed.R.Civ.P. 23. Plaintiffs Rob Boelk, Jerry Seger,
Dave Jacak, Greg Congdon, David Moffitt and Jeff
Sopel contend that defendants AT & T Teleholdings,
Inc., Wisconsin Bell, Inc., Ameritech Services, Inc.
and AT & T Services, Inc. violated the FLSA and
Wisconsin law (Wisconsin Wage Payment Act, Wis.
Stat. §§ 104.02, 109.03, Wis. Admin. Code § DWD
272.04, 274.02, 272.12(2)(c)) by failing to pay wages

for meal breaks. According to plaintiffs, defendants
imposed such severe restrictions on what plaintiffs
could do during the breaks that the breaks should have
been compensated. Additionally, plaintiffs contend
that defendants' performance and efficiency rating
system compels plaintiffs to work through their meal
breaks without reporting the work. Plaintiffs contend
that defendants knew or should have known that
plaintiffs were working through their meal breaks.

Plaintiffs brought this lawsuit on behalf of a class
composed of defendants' current and former field
technician working in Wisconsin. They have now
moved for conditional certification of an opt-in col-
lective action under 29 U.S.C. § 216(b), class certifi-
cation of Rule 23 class and authorization to notify
potential class members of their right to join this case.
Dkt. # 28. Defendants oppose the motion, contending
that plaintiffs' claims depend on the resolution of too
many individualized issues. Defendants also filed a
motion for leave to file a sur-reply, dkt. # 102, to
which plaintiffs responded by filing a motion to strike,
or in the alternative, to file a response to defendants'
sur-reply. Dkt. # 107. Additionally, defendants filed a
motion requesting oral argument. Dkt. # 111.

After reviewing the facts in the record, I conclude
that this case cannot proceed as a class or collective
action. With respect to Rule 23, plaintiffs have failed
to identify a common issue of law or fact central to
their claims that could be resolved on a classwide
basis. Moreover, even if plaintiffs had identified a
common issue, individual issues would predominate
in this case, making the case unmanageable. For the
same reasons, plaintiffs have failed to show that their
situation is sufficiently similar to potential opt-in
plaintiffs that it would be appropriate to conditionally
certify this action under § 216(b) of the FLSA.
Therefore, I am denying plaintiffs' motion for class
and collective certification in full. I am granting the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

parties' requests to file sur-replies, though neither sides' filing had any effect on the ultimate decision. Finally, I am denying defendants' request for oral argument as unnecessary.

In determining whether the class should be certified, I considered the allegations in the complaint and the affidavits and depositions that have been submitted. *Sharpe v. APAC Customer Services, Inc.,* 2010 WL 135168, *1 (W.D.Wis. Jan. 11, 2010); *Sjoblom v. Charter Communications, LLC,* 571 F.Supp.2d 961, 964 (W.D.Wis.2008).

FACTS

A. *Defendants' Business*

**\*2** Defendants AT & T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc. and AT & T Services, Inc are telecommunications companies operating a network of longdistance telephone, internet and television service for business and residential customers throughout the country. (The parties do not distinguish among defendants, so I will refer to them collectively as "defendants" throughout this opinion.) Within the Wisconsin network, there are three departments: Installation and Repair, Construction and Engineering and U–Verse. Defendants operate 37 garages in Wisconsin from which technicians work.

B. *Defendants' Policies*

1. *All work hours must be reported and paid*

Defendants have a policy that technicians must report and be paid for all hours worked. The training materials for managers remind managers to insure that "non-exempt employees begin their meal periods on time, take the entire time allotted, and perform no work during the period." The materials also remind managers to insure that their employees are not working off the clock and that they are recording all of the time they work.

2. *Productivity, quality and efficiency*

Defendants also have policies encouraging effi-

cient and quality work. Before 2010, the slogan for defendant's performance expectation was "4 good jobs in 8," meaning that technicians were expected to complete four quality jobs in every eight-hour day, without overtime. Since 2010, defendant has used a performance system called Management System and Operating Control. As part of the system, studies were conducted to determine the average amount of time for completing each of approximately 2,000 jobs. The extent to which technicians complete jobs within these targets is used to determine their efficiency. The system records precise dispatch and driving times for each assigned job and measures each technician's efficiency by dividing expected times established for each job by the time the technician actually takes to do them. Defendants post the technicians' scores at garages at least monthly, in rank order. A ranking in the bottom twenty percent (or below the goal) can put a technician into Performance Improvement Plan status and on track to possible discipline or termination.

Defendants track the technicians' activities and whereabouts throughout the day using a GPS Vehicle Tracking System. GPS devices in the technicians' vehicles report where each vehicle goes, how fast it goes, every time it stops for a minute or more, where and how long it stops and whether it is idling or the ignition is turned off. Managers use "near real-time inquiries and analysis" from the GPS data "to identify patterns of inefficient travel, inefficient work methods, and other productivity inhibitors."

In addition to the productivity and efficiency measures, technicians are evaluated under other performance standards, including the frequency with which a job needs to be reserviced, customer experience, quality of work, observing company policy, attendance and punctuality, dependability and safety.

2. *Meal break*

**\*3** Defendants' policies provide for an unpaid meal break to be taken at some point during or between the third and sixth hours of the shift. The length

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

App. 308

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

of the daily meal break depends on the department in which the technician works. Technicians in Construction and Engineering and U–Verse have one 30–minute meal break each shift. In January 2010, the meal break for Installation and Repair technicians was extended from 30 to 45 minutes. Technicians do not clock in and out for meals and are not required to report to payroll the times they actually start and end their meal breaks. Defendants do not track technicians' meal breaks with the GPS system.

Technicians are subject to certain restrictions on how they are allowed to use meal break time. The meal break restrictions applicable to Installation and Repair and Construction and Engineering technicians are set forth primarily in defendants' "2008 Non–Management Employee Expectations." Under the Expectations, technicians are expected not to drive "off route" between one job to the next; not to use company vehicles for personal business; and not to read, nap or operate electronic equipment in the vehicles. They may not idle company vehicles for personal comfort, such as to heat or cool the vehicle, but may idle vehicles for safety or health reasons. Technicians may be subject to corrective action for violating these policies. (A different set of guidelines, the U–Verse Field Operations Premises Technician Guidelines, applies to U–Verse technicians. Dkt. # 36–8. It contains similar restrictions.)

C. *Testimony of Named Plaintiffs and Other Technicians*

Plaintiffs are current and former field technicians employed by defendants in Wisconsin. They began their shifts at garages throughout the state and were then dispatched to job sites in company vehicles where they installed, maintained and repaired elements of the company's telecommunications network. They worked shifts of 8.5 or 8.75 hours, which included one unpaid meal break of 30 or 45 minutes.

All named plaintiffs submitted declarations stating that they were aware of the meal break restrictions

imposed by defendants. Several declared that because of the meal break restrictions, they were unable to fill the 30 or 45 minute meal break and typically ate lunch while driving from job to job, spending between five and 20 minutes eating. Some read about their next jobs during their meal breaks and others talked to their supervisors on the phone. Some were interrupted by customers in public places. Some technicians believed they could increase their productivity ratings by using all or part of their meal break for work. All plaintiffs declared that either the meal break restrictions or the pressure from the performance rating system caused them to work during all or part of their meal breaks without reporting the work to their supervisors or on their time sheets.

Plaintiffs and other technicians testified during their depositions that whether the meal break restrictions affected their meal breaks depended on the day, their route location and their supervisor's interpretation of the restrictions. For example,

**\*4 •** Plaintiff Seger testified that whether something was "out of route" depended on the supervisor's definition, and whether he wanted or needed to go out of route for lunch depended on where he was assigned on a particular day. Seger Dep., dkt. # 71, at 141–42, 148. If he was assigned to an urban location, it was easy to find a place "on route" to eat. *Id.* at 148. He also testified that the out of route restriction would not prevent him from stopping for lunch at a fast food restaurant or his house if it was on route. *Id.* at 142.

• Plaintiff Congdon testified that his proximity to restaurants depended on his route. Congdon Dep., dkt. # 72, at 138. Congdon testified that he sometimes studied his college materials or napped in his vehicle, sometimes did personal errands, depending on his supervisor, and frequently got hair cuts on his lunch break, at a salon that was on route. *Id.* at 81–82, 106–08. Congdon also testified that he idled his truck for warmth during his meal breaks in the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

winter. *Id.* at 108.

• Plaintiff Moffitt testified that he met other technicians and supervisors for lunch and that technicians sometimes drove out of route to meet each other for lunch, depending on the day. Moffitt Dep., dkt. # 73, at 135–36. He testified that the out of route restrictions did not affect him because "most places that we're at, going from one place to another, you would have the ability to get something to eat, either leaving or getting into the next town." *Id.* at 185. He also testified that he runs his truck when necessary to use the heater and understands and complies with the expectation that he idle his truck as needed if there is a safety concern. *Id.* at 161, 164, 247.

• Plaintiff Sopel testified that he has never had trouble keeping warm in his truck, Sopel Dep., dkt. # 74, at 79–80, and that restrictions prohibiting him from driving out of route had no affect on him because he "never ha[d] a reason to go out of route." *Id* . at 167. He stated that he had "no issues" with the restrictions on his meal breaks. *Id.* at 176.

• Plaintiff Jacak testified that he usually went out to eat for lunch, depending on where he was, Jacak Dep., dkt. # 75, at 59, 174, and that "so many things [ ] change from week to week." *Id* . at 33–35. He also testified that the "out of route" rules "change by whoever you talk to," and that he and "[e]verybody" else have gone "out of route" to go to a restaurant. *Id.* at 172, 174. He stated that the idling rule was "just like any rule that's out there, you know, some of them get looked over and some of them get hammered on and it depends on who the boss is and what rule it is, I guess." *Id.* at 182–83. He testified that he idled his truck to get warm or cool. *Id.* at 184, 188.

• Plaintiff Boelk testified that his supervisors allowed him to read newspapers in his truck during meal breaks, Boelk Dep., dkt. # 76, at 68, that he

could request permission from a supervisor to have lunch at home, *id.* at 62, and that whether technicians can congregate for lunch depended on the location. *Id.* at 173.

**\*5** • Potential opt-in plaintiff Bolwerk testified that if he had asked his supervisor permission to got out of route to do a personal errand on his meal break, he is "sure" he would have been permitted to do so. Bolwerk Dep., dkt. # 77, at 81.

• Potential opt-in plaintiff Gustavus testified that during his meal breaks, he was able to go to restaurants, shop or stop at home, and that it was generally easy to visit restaurants on route. Gustavus Dep., dkt. # 78, at 53–54, 57–58.

Plaintiffs and other technicians testified that whether they took a full meal break or reported all the time they worked depended on the day, the volume of work and their supervisor. For example,

• Plaintiff Congdon testified that whether he took a lunch, how long the lunch was and whether he reported it depended on the day. Congdon Dep., dkt. # 72, at 51, 79. Some days he took a full 45 minute lunch; some days he worked through his lunch, reported the work and was paid overtime for it; some days he worked through lunch and left early; and on other days, he did not take a 45 minute lunch but reported taking one. *Id.* He stated that "[e]very day [was] unpredictable." *Id.* at 31–32.

• Plaintiff Seger testified that he sometimes reported the time he worked during lunch as overtime. Seger Dec., dkt. # 33, ¶ 31. He also testified that he did not really understand how the productivity rating system worked, Seger Dep., dkt. # 71, at 184, but that he occasionally looked at his efficiency numbers that were posted. *Id.* at 186. He testified that he had low efficiency ratings because he was assigned more difficult jobs. *Id.* at 56. He stated that if he had

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

been given easier jobs, like other technicians, he would have had less pressure. *Id.*

• Plaintiff Moffitt testified that he if he took a shortened lunch, he did not report it, unless he worked through lunch completely. Moffitt Dec., dkt. # 32, at 20. He also testified that he did not like taking his full meal breaks because he does not like "spend[ing] time sitting idle," and would rather start his next job. Moffitt Dep., dkt. # 73, at 144. Additionally, he testified that how busy he was on a particular day depended on whether he was working the day or night shift and how large a territory he covered. *Id.* at 57–58, 69–71. When he had a small territory, he did not have enough jobs to fill the day. *Id.* at 56–57. He also testified that some departments require technicians to work harder than others and that some managers are more aggressive than others. *Id.* at 51.

• Plaintiff Jacak testified that when he did not take a lunch break, he asked permission from his supervisor to leave work early and be paid for eight hours, or to be approved for overtime. Jacak Dep., dkt. # 75, at 57, 66. He testified that he generally takes a 45 minute lunch, *id.* at 59, but that other technicians do not, depending on the day and whether they are trying to increase their efficiency numbers. *Id.* at 48–49, 56, 58–59.

**\*6** • Plaintiff Sopel testified that he worked more than eight hours almost every day because of "forced overtime." Sopel Dep., dkt. # 74, at 28, 207–08. He was paid overtime premium for any hours worked above eight. *Id.* at 31. Whether he took a meal break depended on how much work was available, *id.* at 32, and whether he could achieve good productivity ratings depended on the difficulty of jobs he was assigned. *Id.* at 134–35. He also testified that U–Verse managers were particularly harsh and threatening and affected his motivation. *Id.* at 145.

• Potential opt-in plaintiff Bolwerk testified that his lunch practices "had a lot to do with what [he] was doing that day." Ordinarily, he would take a full lunch if he worked air pressure jobs but other times he would take a "quick, quick lunch" depending on the amount of jobs in the load." Bolwerk Dep., dkt. # 77, at 69. He also testified that he would take no lunch at all when he had long drives between jobs, but that it was not very often that he was not near a gas station or fast food place to eat. *Id.* at 34. Bolwerk testified that he was never pressured about his performance rankings and that he always had good rankings. *Id* . at 81.

D. *Defendants' Knowledge of Underreporting*
   Some plaintiffs testified that their supervisors knew of their short lunch breaks or encouraged them to shorten or skip meal breaks. In particular, plaintiff Sopel stated that he was encouraged by supervisors to improve his productivity by eating lunch while driving to the next job. Plaintiff Boelk told a garage manager in Beaver Dam that technicians were already working through meal breaks and could do no more to meet the company's productivity goals. Other plaintiffs testified that their supervisors would have no way of knowing whether they or other technicians were working during their meal breaks.

   The parties dispute whether any corporate officer knew that technicians underreported the time they worked during meal breaks. Plaintiff Boelk says he told Peggy Texeira, defendants' labor relations manager, that he and other technicians believed that the restrictions on the meal breaks combined with the efficiency ranking system were pushing technicians to work through meal breaks. Boelk also says that Texeira told him that she knew technicians were working through their meal breaks without reporting. Texeira denies knowing that any technician worked through his meal break to boost his efficiency scores or for any other reason without being paid for the time.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

OPINION

A. *Class Certification under* Fed.R.Civ.P. 23

Plaintiffs seek Rule 23 certification of their claims under the Wisconsin Wage Payment Act on behalf of all current and former field technicians employed by defendants in Wisconsin since January 18, 2009. Plaintiffs are asserting two claims under the Wisconsin Wage Payment Act and its accompanying regulations: (1) companywide restrictions on where technicians can take their lunch breaks and what they cannot do during the breaks so restricted the technicians' use of the breaks as to render the breaks not bona fide and therefore, compensable work; and (2) combined with defendants' productivity and efficiency ranking system, the restrictions caused technicians to work during their meal breaks without pay.

**\*7** Before the court may certify a class, the plaintiffs seeking certification must satisfy the requirements of both subsection (a) and (b) of Rule 23. *Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir.1992). First, plaintiffs must show that they can sue as representative parties on behalf of others by meeting the four prerequisites laid out in Rule 23(a): (1) numerosity, that "the class is so numerous that joinder of all members is impracticable"; (2) commonality, that "there are questions of law or fact common to the class"; (3) typicality, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) adequacy, that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Next, plaintiffs must show that the proposed class action "may be maintained" as one of the four types of class actions permitted under Rule 23(b).

Defendants do not challenge plaintiffs' ability to satisfy the numerosity requirement of Rule 23(a), and, because plaintiff has adduced evidence that there are approximately 1,300 people falling within the proposed class definition, I conclude that numerosity is satisfied. However, defendants contend that plaintiffs

cannot satisfy any of the remaining Rule 23(a) requirements. Additionally, defendants contend that plaintiffs' proposed class does not satisfy the predominance and superiority requirements of Rule 23(b)(3) and cannot be maintained under any other subsection of Rule 23(b)(3).

1. *Commonality*

A plaintiff can meet the commonality requirement if "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The Supreme Court has instructed district courts that they are to perform a "rigorous analysis" to determine that the commonality requirement is satisfied, "because actual, not presumed, conformance with Rule 23(a) remains indispensable." *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551–52 (2011) (citation omitted). As the Supreme Court explained in *Dukes,* plaintiffs cannot satisfy the commonality requirement simply by crafting a common question:

> Reciting [general common] questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members have 'suffered the same injury.' This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
(Cite as: 2013 WL 261265 (W.D.Wis.))

the validity of each one of the claims in one stroke.

**\*8** *Id.* In other words, the common question must be one that will resolve an essential fact or issue of the plaintiffs' claim. *Ross v. RBS Citizens, N.A.,* 667 F.3d 900, 908 (7th Cir.2012) (what matters for class certification is whether claim rests on factual and legal questions that are common to class and whether resolution of one or more of these questions is "apt to drive the resolution of the litigation").

With this is mind, I turn to plaintiffs' two claims.

a. Plaintiffs' claim that their meal breaks should have been compensated because they were overly restrictive

Plaintiffs' first claim is that defendants violated Wisconsin law by failing to pay plaintiffs for the mandatory 30 or 45 minute meal breaks. Under Wisconsin law, employers must pay their employees for all hours worked, which means "all time spent in 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business.' " Wis. Admin. Code § DWD 272.12(1). Employers do not have to pay employees for rest and meal periods if the meal period is a "[b]ona fide meal period of 30 minutes or more." *Id.* § DWD 272.12(2)(c). A lunch break does not qualify as bona fide, unless the employee taking it is "completely relieved of duty" and not "required to perform any duties, whether active or inactive, while eating." *Id.*

Plaintiffs' theory is that their mandatory meal breaks were "rendered not bona fide" by the restrictions defendants placed on what field technicians could do during the breaks. Plts.' Br., dkt. # 37, at 12; Plts.' Reply Br., dkt. # 98, at 1 (claim is that "array of restrictions so limits what they can do during lunch as to preclude meaningful use of the break for personal pursuits"). According to plaintiffs, they typically ate a sack lunch or grabbed a quick lunch at a fast food

establishment or convenience store. This took only a few minutes, leaving technicians with several minutes of their 30 or 45 minute break for other activities. However, plaintiffs contend that because they were prohibited from driving off-route, idling for comfort, using company vehicles for personal business or for reading, napping or using electronic equipment, they could not actually use the remaining time for personal pursuits. There were simply too many restrictions on what they were permitted to do. Plaintiffs contend that, by themselves, these restrictions render their meal breaks compensable work time. Plaintiffs contend that the proposed class satisfies the commonality requirement with respect to this claim because the primary question that must be resolved is common to all class members, namely, whether the restrictions limited technicians' breaks so much that the breaks should have been compensated.

As an initial matter, plaintiffs have not framed their common question in terms of the actual elements of a claim under Wisconsin or federal law. (Both parties agree that federal law is used to interpret Wisconsin wage laws in this area. Dfts.' Br., dkt. # 51, at 28; Plts.' Reply Br., dkt. # 98, at 11.) This is important because, as the Supreme Court made clear in Dukes, commonality is not simply a matter of common questions, "even in droves," but rather, whether the class proceeding can generate "common *answers* apt to drive the resolution of the litigation." *Id.* at 2551 (emphasis in the original). That requires a close scrutiny into the class allegations and in some circumstances, even a consideration of merits questions to determine whether the lawsuit can generate common answers that are central to the validity of the plaintiffs' claim. *Id.* at 2551–52. *See also Messner v. Northshore University Health System,* 669 F.3d 802, 815 (7th Cir.2012) (consideration of class certification begins with elements of plaintiffs' claim).

**\*9** Plaintiffs have cited nothing in Wisconsin or federal law supporting the proposition that employers must pay employees for meal breaks simply because

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

the employee is restricted in what he can do during the break, regardless whether the employees are performing work for the employer. Under plaintiffs' theory, they should be paid, even if they are just sitting in their trucks, because defendants' restrictions prohibit them from doing the things they would like to be doing with their meal breaks. Plts.' Reply Br., dkt. # 98, at 9. However, the law requires only that employees be compensated for performing "work." Wis. Admin. Code § DWD 272.12(2)(c). *See also Musch v. Domtar Industries,* Inc., 587 F.3d 857, 859 (7th Cir.2009) (employees must be paid for time spent engaged in "physical or mental exertion ... controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."); Wis. Admin. Code § DWD 272.12(1)(a) (applying same standard).

As the court of appeals has explained in cases involving similar meal break claims, the relevant question is whether meal break restrictions resulted in the employee's devoting his time and attention "predominantly for the benefit of the employer," in other words, whether the officers were unable "comfortably and adequately to pass the mealtime because the officer's time or attention [was] devoted primarily to official responsibilities." *Alexander v. City of Chicago,* 994 F.2d 333, 337 (7th Cir.1993). *See also id.* at 341 (Crabb, J. concurring) ("The regulations do not affirmatively require the performance of active duties or so restrict the officer's choice of location and activities as to make his lunch break the equivalent of work time. It is the allegation of frequent interruptions that raises the possibility that the officers could show that their 'attention is devoted primarily to official responsibilities' during meal periods."). In *Leahy v. City of Chicago,* 96 F.3d 228, 232 (7th Cir.1996), the court confirmed that the relevant question is whether restrictions on meal breaks constituted "work." In that case, police officers contended that the extent of restrictions on their meal breaks required that they be compensated under the FLSA. In affirming dismissal of the collective action, the court of appeals explained

that

[t]he situation here—a police department of some 12,000 officers in different districts with different shift schedules and different exigencies arising each day that might affect officers' meal periods—is not conducive to a one-shot solution. The officers want just such a solution: because some officers on some days miss all or part of their meal periods, the plaintiffs want all meal periods to be compensable work time. That would brook a result we cannot sanction, where officers might be paid for doing nothing more than eating during their meal periods.

*Id.* at 232. *See also Jonites v. Exelon Corp,* 522 F.3d 721, 725–26 (7th Cir.2008) (rejecting as "preposterous" argument that because some employees may sometimes do some work at lunch, all employees are entitled to pay during their lunch breaks).

**\*10** Thus, the relevant question for plaintiffs' claim is whether the meal break restrictions resulted in field technicians' engaging in activities that predominantly benefited defendants during their meal breaks. *White v. Baptist Memorial Health Care Corp.,* 699 F.3d 869, 873 (6th Cir.2012) ("As long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation" for the break); *Haviland v. Catholic Health Initiatives–Iowa Corp.,* 729 F.Supp.2d 1038, 1063 (S.D.Iowa 2010) ("[I]n determining whether the restrictions on the [plaintiffs'] meal break time make [ ] the time spent predominantly for Plaintiffs' benefit or for [defendant]'s benefit, the Court must look not just at what Plaintiffs *could not do* during their lunch breaks; it must also look at what Plaintiffs *could,* and *in fact did,* do during their lunch breaks.") (emphasis in original).

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

When the common question is framed in these terms, whether the meal break restrictions resulted in the technicians performing activities for the benefit of defendants, instead of themselves, it becomes clear that the question cannot be resolved on a classwide basis. Plaintiffs submitted little evidence to support a finding that field technicians who took meal breaks commonly ended up engaging in activities for the benefit of defendants during those breaks. Even setting aside that issue (which is arguably a merits issue), the facts in the record show that whether any meal break restriction foreclosed a technician's use of his break for his own purposes depended on the circumstances. Whether the restriction on driving "out of route" for lunch on a particular day would result in not being able to stop at a restaurant or fast food establishment for 30 or 45 minutes depended on the location, job assignment and particular supervisor. Similarly, whether a technician could conduct personal errands depended on his route location and the discretion of his supervisor. Whether the restriction on reading personal materials in a truck had any effect on a technicians' use of his meal break depended on whether the technician wanted to read, whether he could read at a fast food establishment, a park or somewhere else and whether his supervisor enforced the prohibition against reading in company vehicles. The rules regarding idling affected technicians differently depending on the weather and the proximity to indoor establishments where the technician could spend a meal break. These differences between the technicians' experiences and supervisor discretion make it impossible to generate common answers on a classwide basis. *Bolden v. Walsh Construction Co.,* 688 F.3d 893, 896 (7th Cir.2012) ("[W]here multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question."); *Vang v. Kohler Co.,* Case No. 12–8029, 2012 WL 3689501, *1 (7th Cir. Aug. 28, 2012) (unpublished) (vacating and remanding wage and hour class certification decision "to determine whether this suit concerns one firm-wide policy or congeries of supervisor-level practices").

**\*11** It is true, as plaintiffs' argue, that courts frequently conclude that class treatment is appropriate in cases in which plaintiffs are challenging company-wide official or unofficial policies that result in violations of the law. In the two cases on which plaintiffs rely most heavily, *Ross,* 667 F.3d 900, and *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 672 F.3d 482, 484 (7th Cir.2012), the court of appeals concluded that commonality was satisfied and rejected the defendants' arguments that it was defeated by individualized differences in the class members' circumstances and supervisors. In both cases, the plaintiffs were challenging corporate policies or practices of classwide application. *Ross,* 667 F.3d at 902–03 (Charter One's alleged enforcement of an unofficial policy denying lawfully due overtime); *McReynolds,* 672 F.3d at 483 (company-wide policy allowing brokers to form "teams" and another basing account distributions on competing brokers' past success, resulting allegedly in racial discrimination).

However, in those cases, the court of appeals was satisfied that the plaintiffs had presented proof that any violations of the law were caused by policies enforced at the corporate level, rather than by individual supervisors. *McReynolds,* 672 F.3d at 489 (distinguishing *Dukes* on grounds that plaintiffs in *Dukes* were challenging actions of local management, rather than corporate policy); *Ross,* 667 F.3d at 909 (distinguishing *Dukes,* in part, because plaintiffs had submitted significant evidence in *Ross* of company-wide policy and limited supervisor discretion). In this case, by contrast, plaintiffs have failed to submit proof showing that the companywide meal break restrictions deprived plaintiffs and other technicians of bona fide meal breaks. Additionally, the evidence they submitted suggests that local supervisors had significant discretion in the enforcement of the meal break restrictions. Thus, plaintiffs have failed to show that there are common questions that could be resolved on a classwide basis using common proof. *Gonzalez v. Millard Mall Services, Inc.,* 281 F.R.D. 455, 463

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

(S.D.Cal.2012) (district courts "den[y] class certification where a plaintiff has failed to show common proof that its employer prevented the putative class from taking required breaks"); *Brown v. Federal Express Corp.,* 249 F.R.D. 580, 587 (C.D.Cal.2008) (plaintiffs showed no method of common proof to establish that defendant's policies prevented putative class from taking required breaks). *See also Espenscheid v. DirectSat USA,* Case No. 09–cv–625–bbc, 2011 WL 2009967, *5 (W.D.Wis. May 23, 2011) (decertifying Rue 23 class action and FLSA collective action because "proof of plaintiffs' claims depends on how individual technicians responded to the numerous policies and practices at issue in this case" and "the evidence shows that opt-in plaintiffs and class members have different work experiences and were affected by defendants' policies in different ways"); *Ruiz v. Serco, Inc.,* Case No. 10–cv–394–bbc, 2011 WL 7138732, at *6 (W.D.Wis. Aug. 5, 2011) ("[T]he answer to th[e common] question must be susceptible to proof that can be extrapolated to the class plaintiffs seek to represent.").

b. Plaintiffs' claim that they are owed compensation for unpaid meal breaks during which plaintiffs actually worked

**\*12** Plaintiffs' second claim is that the combination of the meal break restrictions and defendants' efficiency and performance system caused them to work during their unpaid meal breaks without reporting their time. In light of defendants' policy mandating that employees report and be paid for all hours worked, the crucial question with respect to this claim is *why* plaintiffs and other technicians worked through all or part of their meal breaks without reporting their doing so. Plaintiffs have failed to show that this question could be resolved on a classwide basis. Although plaintiffs and other technicians submitted declarations stating that they often worked through meal breaks because of the meal break restrictions, the productivity rating system or a combination of both, it is clear from the deposition testimony of plaintiffs and other technicians that the rea-

son for doing so depended on the circumstances, which varied on a day-to-day basis. As discussed above, whether technicians decided to work through meal breaks because of the meal break restrictions depended on the day, the volume of work, the route, the supervisor and the technician's individual needs and desires.

Similarly, whether a technician felt rushed in completing jobs or pressure from the performance scoring and ranking system depended on the size of the territory to which the technician was assigned, the number of technicians available to cover the territory, the type of job assigned, the technicians' experience and supervisors' varying expectations. In light of these variables, the common questions central to plaintiffs' claim could not be resolved on a classwide basis. *York v. Starbucks Corp.,* Case No. 08–07919, 2011 WL 8199987, *26 (C.D.Cal. Nov. 23, 2011) (concluding that meal break claims failed to meet Rule 23 commonality requirement because plaintiff conceded that "whether an employee took a proper meal break depended on who was running the shift ... which indicates that violations resulted from individual action and not a corporate-wide policy or practice.... [A]n evaluation of a meal break claim as to any individual would involve a variety of particularized factors that would not necessarily impact any other company employee.").

2. *Predominance under* Rule 23(b)(3)

Because I conclude that plaintiffs cannot satisfy the commonality requirement of Rule 23(a), I need not address the remaining factors of Rule 23(a) or whether plaintiffs may maintain a class under Rule 23(b). However, I will address subsection (b)(3) briefly because it is clear that even if plaintiffs had been able to satisfy the commonality requirement, they would be unable to satisfy the predominance requirement of Rule 23(b)(3).

As an initial matter, plaintiffs argue briefly that this action could be maintained under Rule 23(b)(2) or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

(b)(3). However, it would not be appropriate to certify this action under Rule 23(b)(2). Rule 23(b)(2) permits classes for actions in which "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "[C]ertification under Rule 23(b)(2) 'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.' " *Kartman v. State Farm Mutual Automobile Insurance Co.,* 634 F.3d 883, 888 (7th Cir.2011) (citation omitted). Additionally, courts should not certify classes under Rule 23(b)(2) solely to lay the groundwork for subsequent individualized monetary damage awards. *Dukes,* 131 S.Ct. at 2557. *See also Jamie S. v. Milwaukee Public School,* 668 F.3d 481, 499 (7th Cir.2012) ("[A] claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final."); *Randall v. Rolls–Royce Corp.,* 637 F.3d 818, 826 (7th Cir.2011) ("[C]alculating the amount of back pay to which the members of the class would be entitled if the plaintiffs prevailed would require 500 separate hearings ... An injunction thus 'would not provide' relief as required by Rule 23(b)(2)."); *Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 978 (5th Cir.2000) (class certification not permitted where class members "have nothing to gain from an injunction, and the declaratory relief they seek serves only to facilitate the award of damages").

**\*13** In this case, it is clear that plaintiffs' primary claim is for monetary damages: they want to recover back pay for their unpaid meal breaks. Plaintiffs requested only broad declaratory relief and did not specify any particular injunctive relief that would remedy their injuries. Some of the named plaintiffs are no longer employees of defendants and would receive final relief only from monetary damages. Thus, a declaration regarding the illegality of defendants' policies would not be a "final remedy" for purposes of

Rule 23(b)(2); it would "merely lay an evidentiary foundation for subsequent determinations of liability." *Randall,* 637 F.3d at 826.

This leaves Rule 23(b)(3), which requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615–16 (1997). Although similar to the commonality requirement under 23(a)(2), the predominance requirement is more demanding and is meant to test "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. To determine whether the liability issues would require individual fact-intensive determinations or whether they are subject to class-wide proof, the court examines such factors as the substantive elements of plaintiffs' claims, the proof necessary for those elements and the manageability of trial on those issues. *Farmer v.. DirectSat USA, LLC,* 08 C 3962, 2010 WL 3927640, \*22 (N.D.Ill. Oct. 4, 2010)

For the same reasons described above in discussing commonality, plaintiffs cannot show that common questions of law and fact predominate. Determining whether a given employee suffered a meal break violation will depend largely on numerous highly fact-specific inquiries as to the reason why a technician worked during all or part of his meal break on a particular day, including the volume of jobs, the territory and route on that day, the number of other technicians available for work, the technician's personal preferences and the particular supervisor involved. Thus, it would be exceedingly difficult to determine in one proceeding whether particular restrictions or productivity ranking concerns had any effect on a technician's meal break or reporting practices on a particular day. Under the circumstances, the case would be unmanageable as a class action.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

Therefore, plaintiffs cannot maintain this action under
*Rule 23(b), Kenny v. Supercuts, Inc.,* 252 F.R.D. 641,
646 (N.D.Cal.2008) (denying class certification be-
cause individual issues would predominate as court
would need to determine why each class member did
not clock out for meal break on any particular day);
*Salazar v. Avis Budget Group, Inc.,* 251 F.R.D. 529,
534 (S.D.Cal.2008) (denying class certification be-
cause individual issues would predominate in deter-
mining whether defendants forced plaintiffs to forgo
missed meal periods).

3. *Rule 23(c)(4)*
   **\*14** Plaintiffs contend that if the court concludes
that their claims cannot be certified under Rule 23(b),
the court should certify the "common issues" under
Rule 23(c)(4). That rule states that "[w]hen appropri-
ate, an action may be brought or maintained as a class
action with respect to particular issues." Fed.R.Civ.P.
23(c)(4). However, plaintiffs do not identify any
common issues that could be resolved on a classwide
basis. The only issues identified are those discussed
above. Because plaintiffs failed to show that any
common issue central to their claims could be resolved
on a classwide basis, I will not certify any issue under
Rule 23(c)(4). Therefore, I am denying plaintiffs'
motion for class certification under Rule 23 in full.

B. *Conditional Certification of FLSA Collective Class
Action*
   Plaintiffs have also moved for conditional certi-
fication of a collective action for alleged violations of
the FLSA's overtime compensation provision. Under
that provision, "no employer shall employ any of his
employees ... for a workweek longer than forty hours
unless such employee receives compensation for his
employment in excess of the hours above specified at
a rate not less than one and one-half times the regular
rate at which he is employed." 29 U.S.C. § 207(a)(1).
Plaintiffs contend that defendants' failure to pay
plaintiffs for their meal breaks resulted in plaintiffs
working more than 40 hours each week without re-
ceiving overtime compensation. Under § 216(b),

plaintiffs may bring a collective action under the
overtime provision "for and [o]n behalf of himself or
themselves and other employees similarly situated."

   This court has adopted a two-step process for
class certification under the FLSA. *Espenscheid v.
DirectSat USA, LLC,* 2010 WL 2330309, \*6
(W.D.Wis. June, 7, 2010); *Kelly v. Bluegreen Corp.,*
256 F.R.D. 626, 628–89 (W.D.Wis.2009). At the first
step, plaintiffs must make "a modest factual showing"
that they are similarly situated to potential class
members and that they and potential class members
were "victims of a common policy or plan that vio-
lated the law." *Kelly,* 256 F.R.D. at 629–30. If this
showing is made, the court conditionally certifies a
class and authorizes notice to potential class members
and the parties conduct discovery. *Austin v. CUNA
Mutual Insurance Society,* 232 F.R.D. 601, 605
(W.D.Wis.2006). The second step occurs at the close
of discovery upon a motion for decertification from
the defendant. At that point the court determines
whether the plaintiffs are in fact similarly situated to
those who have opted in. *Id.*

   Plaintiffs contend that because this case is at the
first stage of the process, they are required to make
only a modest factual showing that they are similarly
situated to the potential class members. However, the
primary purpose of the two-stage process is to allow
the parties to conduct discovery on the issue whether
plaintiffs are similarly situated to class members. In
this case, the parties have conducted significant dis-
covery. The record contains several declarations from
field technicians, depositions of all six named plain-
tiffs, depositions of two individuals who consented to
opt in should a class be certified, and a Fed.R.Civ.P.
30(b)(6) deposition by plaintiffs. Under the circum-
stances, it is appropriate to apply more scrutiny to
plaintiffs' claim than would normally be applied at the
conditional certification stage. *Hawkins v. Alorica,
Inc.,* Case No. 2:11–CV–00283–JMS, 2012 WL
4391095 (S.D.Ind. Sept. 25, 2012) (applying "inter-
mediate level of scrutiny" to conditional certification

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 261265 (W.D.Wis.)
**(Cite as: 2013 WL 261265 (W.D.Wis.))**

where substantial discovery had been conducted but was not yet complete); *Scott v. NOW Courier, Inc.,* Case No. 1:10–CV–971–SEB–TAB, 2012 WL 1072751 (S.D.Ind. Mar. 29, 2012) (same); *Purdham v. Fairfax County Public Schools,* 629 F.Supp.2d 544, 547 (E.D.Va.2009) (if court can determine at condition certification stage that notice is not appropriate, court can "collapse the two stages of the analysis and deny certification outright").

**\*15** The facts in the record fail to establish that plaintiffs and potential class members were victims of a common policy or plan that resulted in common injuries. As explained above with respect to plaintiffs' Rule 23 motion, plaintiffs' experiences with the meal break restrictions were not common and varied depending on their individual practices and particular supervisor. Additionally, plaintiffs' own deposition testimony proves how variable their experiences were with respect to the way performance standards affected their day-today work activities and with respect to how other factors affected their work. Accordingly, for the reasons already explained, I find that plaintiffs have not shown that they are similarly situated to potential class members. Therefore, I will deny their motion for conditional certification under § 216(b).

ORDER

IT IS ORDERED that

1. The motion to file sur-reply filed by defendants AT & T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc. and AT & T Services, Inc., dkt. # 102, is GRANTED.

2. The motion to respond to defendants' sur-reply filed by plaintiffs Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon, David Moffitt and Jeff Sopel, dkt. # 107, is GRANTED, and the motion to strike is DENIED.

3. Plaintiffs' motion for class certification under Fed.R.Civ.P. 23 and conditional certification under § 216(b) of the Fair Labor Standards Act, dkt. # 28, is DENIED.

4. Defendants' motion for oral argument, dkt. # 111, is DENIED.

5. The case will proceed with the claims of the named plaintiffs.

W.D.Wis.,2013.
Boelk v. AT & T Teleholdings, Inc.
Slip Copy, 2013 WL 261265 (W.D.Wis.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.